**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 22-_____ (___) |
| FTX TRADING, LTD., *et al.*,[2] | |
| Defendants. | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

The Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee" or "Plaintiff"), comprising international customers that hold accounts on the FTX.com platform, by and through undersigned counsel, respectfully brings this Complaint for a declaratory judgment against the above-captioned debtors in possession (collectively, the "Debtors" or the "Defendants") in these chapter 11 cases (the "Chapter 11 Cases") and alleges and states as follows:

**SUMMARY OF ACTION**

1.      This action seeks a declaration that assets customers deposited, held, received, or acquired on the FTX.com platform are customer property and not property of the Debtors' estates

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]  Each of the Debtors in these Chapter 11 Cases is named as a Defendant in this Complaint.  A list of the Debtor-Defendants subject to this Complaint is attached hereto as **Exhibit A**.

under section 541 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

2.    Under the clear and unambiguous language of the FTX.com Terms of Service (the "Terms of Service"), title to digital assets on the FTX.com platform remained at all times with the customer and did not transfer to FTX Trading Ltd. ("FTX Trading" or "FTX.com"), which owned and controlled the FTX.com platform.  Digital assets held in customer accounts expressly were ***not*** the property of and could ***not*** be loaned to FTX Trading or any of its affiliated Debtors.

3.    FTX Trading represented to customers in the Terms of Service that it could issue them electronic money, or E-money, from the fiat currency that they loaded into their accounts, and they could use the E-money to purchase digital assets.  The Terms of Service provide that the customers could redeem all or part of any E-money held in their accounts at any time.

4.    Despite the clear and unambiguous language of the Terms of Service, and as has now been widely reported, the FTX.com customers were the victims of mass misappropriation of their funds.  FTX Trading, through its sister company, Alameda Research LLC ("Alameda") surreptitiously siphoned off customer funds for its own use, in violation of these express provisions, leading to over $8 billion in customer deposits going missing.  Amended Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties under the Commodity Exchange Act and Commission Regulations at ¶ 3, *Commodity Futures Trading Comm'n v. Bankman-Fried*, 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022) (D.I. 13) (the "CFTC Compl.") ¶ 3; Complaint at ¶¶ 2, 4, *Sec. and Exch. Comm'n v. Bankman-Fried*, 1:22-cv-10794-PKC (S.D.N.Y. Dec. 21, 2022) (D.I. 1) (the "SEC Compl.").  *See also* Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner (the "Examiner Motion"), D.I. 176, ¶¶ 16, 36, 37.

5.      Sam Bankman-Fried, the co-founder and majority owner of both FTX Trading and Alameda, has been criminally charged for his role in defrauding FTX.com customers by misappropriating their deposits.    Indictment, *United States v. Samuel Bankman-Fried a/k/a "SBF,"*, 22-cr-673-LAK (S.D.N.Y. Dec. 9, 2022) (D.I. 1) (the "SDNY Indictment") (Counts One, Two, and Five).    Two of Bankman-Fried's top lieutenants, Zixiao "Gary" Wang and Caroline Ellison, pleaded guilty to criminal charges for their roles in the scheme and are cooperating with law enforcement.    Dec. 19, 2022 Minute Entry, *United States v. Zixiao "Gary" Wang*, 22-cr-673-LAK-2 (S.D.N.Y. Dec. 19, 2022) (D.I. 6) (the "Wang Plea"); and Dec. 19, 2022 Minute Entry, *United States v. Caroline Ellison*, 22-cr-673-LAK-3 (S.D.N.Y. Dec. 19, 2022) (D.I. 8) (the "Ellison Plea").    Wang and Ellison also do not contest their liability on the CFTC's claims, and they have consented to settlements of the SEC's charges.  *See* CFTC Press Release No. 8644-22 (Dec. 21, 2022); SEC Press Release No. 2022-234 (Dec. 21, 2022).

6.      There is no dispute that FTX.com customers were the victims of massive fraud and misappropriation of billions of dollars of their assets in violation of the clear and unambiguous Terms of Service.  Indeed, the Debtors' new CEO, John J. Ray, III, testified under oath to Congress that: "This is really old fashioned embezzlement. This is just taking money from customers and using it for your own purposes . . . . This is just plain old embezzlement."[3]

7.      English law governs the Terms of Service.  Under English law, FTX.com customers – and not FTX Trading or any other Debtor – are the owners of the assets they deposited, held, received, or acquired on the FTX.com platform.  If those assets can be identified, either because they remain on the platform or because they can be identified in another location, the customers are entitled to recover the assets, free of any claims of other customers or creditors.

---

[3] *FTX's New CEO: "This is Really Old-Fashioned Embezzlement*," Yahoo! (Dec. 13, 2022) (summarizing portions of John J. Ray, III's testimony before the U.S. House Financial Services Committee) (the "Ray Testimony").

8.      Moreover, under English law, the customers also have a trust interest in, or otherwise own beneficial or equitable proprietary interests in, customer assets that have been commingled or unallocated, up to the amount of the balance on their accounts.

9.      Because these assets are customer property, and not the Debtors' property, the assets are not part of the Debtors' estates under section 541 of the Bankruptcy Code.  So FTX.com customers are not mere unsecured creditors of the Debtors, but rather the owners of interests in property.

10.     To date, however, the Debtors have classified FTX.com customers as unsecured creditors and have frozen FTX.com customer withdrawals, actions inconsistent with the customers' ownership rights.  Thus, a controversy exists, and the Ad Hoc Committee files this Complaint seeking a declaratory judgment that the FTX.com customer assets are not property of the estate, but instead, are customer property.

## JURISDICTION AND VENUE

11.     This adversary proceeding arises in and relates to the Chapter 11 Cases pending before the U.S. Bankruptcy Court for the District of Delaware (the "Court") under the Bankruptcy Code.

12.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G) and (O).

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory predicates for the relief requested herein are sections 105(a) and 541 of the Bankruptcy Code, as supplemented by Rules 7001(1) and 7001(9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PARTIES

15.     The Plaintiff is the Ad Hoc Committee of Non-US Customers of FTX.com.  The Ad Hoc Committee comprises international customers with accounts on the FTX.com platform. The Ad Hoc Committee is represented by Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP.[4]  As of the filling of this Complaint, the Ad Hoc Committee comprises 15 members representing approximately $1.9 billion in aggregate claims. The Ad Hoc Committee has been growing every week since its formation on December 2, 2022.

16.     The Defendants are the Debtors in the above-captioned Chapter 11 Cases.  The Debtors' names and addresses are set forth in their voluntary petitions filed with this Court, and are incorporated herein by reference as part of the allegations of this Complaint.  A list of the Debtor entities is attached hereto as **Exhibit A**.  The corporate organization of the Debtors, as well as their jurisdictions of formation, are set forth in Exhibit B to the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings*, filed on November 17, 2022 [D.I. 24] (the "First Day Declaration"), and are incorporated herein by reference as part of the allegations of this Complaint.

## BACKGROUND AND FACTS

### I.     Overview of FTX Trading and Alameda

17.     In or around October 2017, Bankman-Fried and Wang co-founded Alameda, a quantitative trading firm specializing in crypto assets.  SEC Compl. ¶ 18.

---

[4] The aggregate claim amounts represented by each of the members of the Ad Hoc Committee will be set forth in a statement ("Rule 2019 Statement") filed by the Ad Hoc Committee's counsel in short order.  For the reasons set forth in the Debtors' motion to redact or withhold certain confidential information of customers and personal information of individuals (D.I. 45), and in the Ad Hoc Committee's joinder in support of that motion (D.I. 327), the names, addresses, and email addresses of the members of the Ad Hoc Committee will be redacted in the Rule 2019 Statement.

18.    Alameda was a "'crypto hedge fund' with a diversified business trading and speculating in digital assets and related loans and securities for the account of its owners, Messrs. Bankman-Fried (90%) and Wang (10%)."  First Day Decl. ¶ 22.

19.    In May 2019, Bankman-Fried, Wang, and Nishad Singh launched FTX.com, the trade name for the business conducted by FTX Trading, a centralized digital asset exchange organized in Antigua.  *Id.* at ¶ 33.

20.    FTX Trading offered trading in a large variety of digital assets, including digital asset commodities such as bitcoin, ether, tether and others.  CFTC Compl. ¶ 36.  The FTX.com platform was not available to U.S. users.  First Day Decl. ¶ 33.

21.    Bankman-Fried, along with Wang, Ellison, and/or others, operated FTX Trading and Alameda as part of a common enterprise.  CFTC Compl. ¶ 4.

22.    The FTX.com platform "grew quickly since its launch to become one of the largest cryptocurrency exchanges in the world."  First Day Decl. ¶ 35.  At its height, it claimed to have millions of registered users and approximately $15 billion in assets.  *Id.*

23.    On November 10, 2022, FTX Trading halted all trading and withdrawals, and Bankman-Fried announced that Alameda was being wound down.  CFTC Compl. ¶ 110.  That same day, Bankman-Fried resigned as CEO of FTX Trading and as majority owner of FTX Trading and Alameda, authorizing the appointment of an independent CEO and the filing of Chapter 11 bankruptcy proceedings.  *Id.* ¶ 111.

24.    On November 11, 2022, the Debtors, facing a severe liquidity crisis, filed these Chapter 11 Cases.  First Day Decl. ¶ 40.

25.    On November 28, 2022, the Debtors filed a redacted list of the top 50 creditors of the "Dotcom Silo", which includes FTX Trading, listing customers as the top 50 holders of

unsecured claims against the Debtors in the Dotcom Silo.  *See* D.I. 164-4.  Upon information and

belief, the unidentified customers on such list are customers of FTX Trading, who, for the reasons

set forth herein, are not mere unsecured creditors of FTX Trading.

26.    As discussed in further detail below, in the days and weeks since the Debtor's' filed

for chapter 11 protection, it has been revealed that FTX Trading, including through its sister

company Alameda, engaged in mass fraud and misappropriation of FTX customer assets.  CFTC

Compl. ¶ 3; SEC Compl. ¶ 2; Examiner Motion ¶¶ 16, 36, 37; SDNY Indictment (Counts One,

Two, and Five); Wang Plea; Ellison Plea.  *See also* Ray Testimony ("This is really old fashioned

embezzlement.  This is just taking money from customers and using it for your own purposes. . . .

This is just plain old embezzlement.").

## II.    <u>The FTX.com Platform and Terms of Service</u>

27.    Customers, or users, who wished to use the FTX.com platform did so in reliance

on the representations made to them in the FTX.com Terms of Service (the "<u>Terms of Service</u>"),

a true and correct copy of which is attached as **<u>Exhibit B</u>**.

28.    The Terms of Service constitute the agreement between the customers and FTX

Trading and apply to the customers' use of the platform to transact in Digital Assets.  Terms of

Service, at 1.

29.    The Terms of Service are governed by and construed in accordance with English

law.  *Id.* § 38.11.

30.    "Digital Assets," as defined in Schedule 1 to the Terms of Service, means "BTC,

ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token,

stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other

tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform." *Id.* at Schedule 1, § 1.1.

31.     "Assets," as defined in section 2.4.1 of the Terms of Service, includes Digital Assets, fiat currency, and E-Money. *Id.* § 2.4.1. E-Money is electronic money that FTX Trading would issue to a customer representing an equivalent amount of fiat currency deposited by the customer. *Id.* § 8.3.2.

32.     Each customer had an "Account" recording the Assets held by the customer on the platform. *Id.* at 1 (describing "Account"); § 8 (describing customer funding of Account with Digital Assets and/or fiat currency, and issuance of E-Money to customer). The Account, in other words, was a record kept by FTX Trading of a customer's transactions, holdings and Asset balances. *See id.*

33.     A customer could acquire Digital Assets in the customer's Account by four principal methods: (i) by sending Digital Assets that the customer already owned to a network address generated by the platform (*id.* § 8.2.1); (ii) by purchasing Digital Assets using fiat currency (*id.* § 8.2.2); (iii) by exchanging a Digital Asset in the customer's Account for a different type of Digital Asset (*id.* § 8.2.3); or (iv) by receiving Digital Assets from a third party, either within or outside the platform (*id.*).

34.     The Terms of Service expressly state that all Digital Assets are held in a customer's Account on the following basis:

> (A)     **Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading**.  As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

    (B)    **None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading**.

    (C)    **You control the Digital Assets held in your Account.** At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

*Id.* § 8.2.6 (emphasis added).

35.    The Terms of Service, accordingly, clearly and unambiguously provide that: (i) title to a customer's Digital Assets remain with the customer at all times; (ii) none of the customer's Digital Assets are or were the property of, or could be loaned to, FTX Trading; and (iii) the customer controlled the Digital Assets held in in a customer's Account. *Id.* § 8.2.6. Put simply, customers – and not FTX Trading or any other Debtor – owned and controlled their Digital Assets.

36.    Moreover, the Terms of Service state that a customer may purchase Digital Assets by using E-Money credited to the customer's Account. *Id.* § 8.3.5. E-Money would be issued to the customer by FTX Trading based on the equivalent amount of fiat currency the customer loaded into the customer's Account. *Id.* §§ 8.3.2, 8.3.5.

37.    The Terms of Service clearly and unambiguously provide that a customer can redeem all or part of any E-Money held in the customer's Account at any time. *Id.* § 8.3.7.

## III.    <u>The Misappropriation of the FTX Customers' Assets.</u>

38.    Unbeknownst to FTX.com's customers, FTX.com was defrauding its customers from launch in May 2019 to at least November 11, 2022, including through its affiliate Alameda, by secretly using FTX.com customer Assets without authorization and in clear violation of the Terms of Service. *Id.* §§ 8.2.6, 8.3.2, 8.3.7; CFTC Compl. ¶ 5.

39.     During this time period, Alameda used FTX.com customer Assets to trade on other digital asset exchanges and to fund a variety of high-risk digital asset industry investments. CFTC Compl. ¶ 7; SEC Compl. ¶ 2.

40.     These misuses of customer Assets by Alameda were not disclosed to or authorized by FTX.com customers. CFTC Compl. ¶ 52. To the contrary, the Terms of Service expressly prohibited these uses of customer Assets. *Id.* (quoting section 8.2.6 of the Terms of Service); *see also* SEC Compl. ¶ 52 (quoting sections 8.2.6, 8.3.2, and 8.3.7 of the Terms of Service).

41.     At the time of FTX.com's launch, customers seeking to deposit fiat currency into their FTX.com accounts were directed unwittingly to wire their funds to bank accounts owned and controlled by Alameda. CFTC Compl. ¶ 46. When FTX.com customer Assets were deposited into Alameda bank accounts, Alameda personnel manually credited FTX.com customer accounts with the corresponding amount of fiat currency on FTX Trading's internal ledger system to maintain the ruse that FTX.com customer Assets were being handled in the manner required by the Terms of Service. *Id.* ¶ 47. Customers accessing their FTX.com accounts would be able to observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX.com accounts, even though the fiat deposits actually and fraudulently were being held in Alameda-controlled bank accounts. *Id.*

42.     For a small subset of customer deposits, Alameda exchanged customer deposits for fiat-backed stablecoins and then transferred an equivalent amount of such stablecoins to FTX's digital asset wallets. *Id.* ¶ 48. While this happened occasionally, customer Assets typically remained solely in bank accounts in the name of Alameda, where they continued to be commingled with Alameda's own assets. *Id.* By approximately August 2020, FTX had opened its own "for the benefit of" (FBO) fiat bank accounts. *Id.* ¶ 50. However, FTX.com customer Assets that had

previously been wired to Alameda were not transferred to FTX's bank accounts. *Id.* Furthermore, even after August 2020, at least some FTX.com customers continued to send fiat deposits to Alameda-owned accounts. *Id.*

43.     Between May 2019 and November 11, 2022, an account designated as "fiat@ftx" on FTX Trading's internal ledger systems reflecting the Alameda-owned bank accounts described above held a balance of as much as $8 billion in customer Assets. *Id.* ¶ 49.

44.     Consistently from FTX.com's launch, Alameda illegally and impermissibly accessed and used FTX.com customer Assets for Alameda's own operations and activities, including to fund its trading, investment and borrowing/lending activities. *Id.* ¶ 51. Alameda's use of FTX.com customer Assets included both customer fiat currency deposits that were sent to Alameda-owned bank accounts and customer Digital Asset deposits and holdings that Alameda accessed via the unbounded withdrawal capabilities of its FTX account. *Id.*

45.     The participants engaged in this scheme despite being aware of the need to segregate and protect customer Assets. *Id.* ¶ 53. Internal FTX policy documents, for instance, promised that FTX Digital Markets Ltd. ("FDM"), an FTX Trading affiliate, would ensure that:

- "All third-party service providers are aware that **customer funds do not represent property of FDM and are therefore protected from third-party creditors**";

- "All third-party providers are aware that **customer assets are held in trust**";

- "Customer monies will be appropriately ring-fenced to protect from:

    o   The unlikely event FDM becomes insolvent;

    o   The use of customer monies being used to benefit others; and

    o   FDM using customer monies to finance its own operations.

    Written notice will be provided to the relevant regulated credit, e-money or payment institution to clarify that **the assets are held by us on trust for our customers** …"

*Id.* (emphasis added).

46.     Bankman-Fried and other FTX representatives also claimed that customer Assets were properly segregated and custodied by FTX at all times, in conformation with both the Terms of Service and generally understood best practices for derivatives exchanges.  *Id.* ¶ 54. For example, during February 9, 2022 testimony before the U.S. Senate Committee on Agriculture, Nutrition and Forestry, Bankman-Fried stated that, "By logging in to the customer's account at FTX, the customer can immediately view the types of assets they own held in custody by FTX. The assets are ledgered and easily identifiable to the user (but held in an omnibus wallet in the case of the customer's tokens in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX.  Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms." *Id.* ¶ 56.

47.     Contrary to these representations, and without disclosure to FTX.com customers, Alameda and FTX comingled funds and freely used FTX.com customer Assets as if they were their own, including as capital to deploy in their own trading and investment activities. *Id.* ¶ 57.

48.     Upon information and belief, and in reliance on the Debtors' own statements and the uncontested allegations of the SEC and CFTC, Plaintiff understands and believes that FTX Trading and/or Alameda comingled, and/or transferred FTX.com customer funds to, with, or among some or potentially all other Debtor entities as well.  For example, the Debtors' new CEO testified that "the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments."[5]  Based on

---

[5] Testimony of Mr. John J. Ray III before the House Committee on Financial Services, Dec. 13, 2022, available at https://financialservices.house.gov/events/eventsingle.aspx?EventID=410002.

Mr. Ray's statement, and upon information and belief, the funds used acquire those business and investments were in whole or in part FTX.com customer funds, and those business and investments are believed to be held, directly or indirectly, by various Debtor entities in addition to or other than FTX Trading and Alameda.

49.     Furthermore, the CTFC similarly alleges that the FTX and Alameda "through a web of subsidiaries, affiliates and other related entities constituting the FTX Enterprise, misappropriated customer assets for their own use and benefit." CFTC Compl. ¶ 9. The "FTX Enterprise" as defined in the CFTC Complaint means FTX Trading, Alameda Research, and "other entities under Bankman-Fried's majority ownership and control, as a common enterprise." *Id.* ¶ 4. FTX Trading and Alameda "together with other entities under the majority ownership and control of Bankman-Friend operated as a single, integrated common enterprise under the sole ultimate authority of Bankman-Fried as their mutual owner, and identified [ ] as the FTX Enterprise. Bankman-Fried regularly exercised control over each of the component entities of the FTX Enterprise throughout the Relevant Period, including regularly serving as signatory on core corporate agreements, as well as corporate bank accounts and trading accounts, many of which were held in the United States. The FTX Enterprise failed to observe corporate formalities, including failure to segregate assets, operations, resources and personnel, or to properly document intercompany transfers of assets and other resources. The entities regularly shared office space, systems, accounts and communications channels. On information and belief, assets flowed freely between the FTX Enterprise entities, often without documentation or effective tracking." *Id.* ¶ 21. Accordingly, Plaintiff reasonably believes that some or all of the Debtor-Defendants hold property or assets belonging to or traceable to the Assets of FTX.com customers.

50.     In approximately May to June 2022, Alameda was subject to a large number of margin calls and loan recalls. *Id.* ¶ 75. It did not have sufficient liquid assets to service its loans. *Id.* Instead, Alameda greatly increased its usage of FTX.com customer Assets to meet its external debt obligations. *Id.* Alameda was able to rely on its undisclosed ordinary-course access to FTX.com credit and customer Assets to facilitate these large withdrawals, which were several billion dollars in notional value. *Id.*; *see also* SEC Compl. ¶ 5 ("Bankman-Fried, with [Wang's and Ellison's] knowledge, directed FTX to divert billions more in customer assets to Alameda [at this time] to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. Ellison then used FTX's customer assets to pay Alameda's debts.").

51.     In early November 2022, following a liquidity crisis at Alameda, Ellison acknowledged to Alameda staff members that she and others had decided to use FTX.com customer Assets to pay Alameda's debts. CFTC Compl. ¶ 107. Specifically, on November, 9, 2022, during an "all hands" meeting with Alameda staff, Ellison admitted that to meet its loan recalls, Alameda had borrowed "a bunch of funds" from FTX, which in turn "led to FTX having a shortfall in user funds." *Id.*

52.     On November 10, 2022, FTX Trading and FTX US (a separate group of operating entities operating a digital asset exchange specifically for U.S. persons) halted all trading and withdrawals, and Bankman-Fried announced that Alameda was being wound down. *Id.* ¶ 110. Bankman-Fried also posted a lengthy Twitter thread purporting to explain how he "f[***]ed up." *Id.*

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That Assets in Customer Accounts or Otherwise Identifiable as Customer Assets Are Not Property of the Estate)**

53.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

54.     Based on the clear and unambiguous Terms of Service, if a customer can identify the customer's Digital Assets now held by FTX Trading (for example, if the Digital Assets remain at the network address where they were first deposited) or in the hands of another party, then the customer clearly owns such Digital Assets free of any claims held by FTX Trading or other customers or creditors of FTX Trading or its affiliates.

55.     The same is true for a customer's identifiable fiat currency and E-Money.  Based on the Terms of Service, as well as on FTX's internal policies and representations to the outside world, each FTX.com customer owns the fiat currency and E-Money described in the Terms of Service, to the extent those Assets can be identified.

56.     Accordingly, all identifiable FTX.com customer Assets described in the FTX.com Terms of Service are property of the respective FTX.com customers, and not property of the Debtors' estates under section 541 of the Bankruptcy Code and governing English law.

57.     Each FTX.com customer's Assets are property of that customer under the Terms of Service, English law, and the undisputed facts of this case, regardless of whether such Assets remain segregated in such customer's Account or have been transferred and are held by one or more of the Debtors or a third party.  The ownership rights extend both to Assets that are currently frozen and Assets that were unlawfully misappropriated.

58.     Based upon the foregoing, Plaintiff is entitled to an order of this Court declaring that the FTX customers are the owners of the customer Assets held in customer Accounts or otherwise identifiable as customer Assets.

## SECOND CLAIM FOR RELIEF

**(Declaratory Judgment That Unallocated or Commingled Assets Are Held in Trust for the Collective Benefit of FTX.com Customers and Are Not Property of the Estate)**

59.      Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

60.     Under English law, the FTX.com customers also hold a beneficial or equitable proprietary interest in their Assets, with the extent of the interest being referable to the relevant credit balance on the customer's account.

61.     Establishing a custodial trust of this nature requires proof of three elements under English law: (i) intention by FTX Trading to hold the assets on trust; (ii) sufficient identification of the beneficiary of the trust; and (iii) sufficient identification of the assets that are the subject matter of the trust.

62.     Conditions (i) and (ii) are satisfied by the indisputable facts at issue here, as summarized above.

63.     Condition (iii) is satisfied by guiding principles of English law, which provide that crypto-token custody arrangements can be structured as trusts, even where the underlying entitlements are held on a consolidated unallocated basis for the benefit of multiple users, and potentially even commingled with unallocated entitlements held for the benefit of the custodian itself.  Under English law principles, the best way of understanding the interests of beneficiaries under such trusts are as rights of co-ownership in an equitable tenancy in common.

64.     Accordingly, commingled or unallocated Assets of FTX.com customers are property held in trust for the collective benefit of FTX.com customers under English law and are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

65.     Based upon the foregoing, Plaintiff is entitled to an order of this Court declaring that the FTX.com customers are the collective owners of their commingled or unallocated Assets, up to the amount of the balance on their accounts.

## THIRD CLAIM FOR RELIEF

**(Declaratory Judgment That Customer Assets, including Unallocated or Commingled Assets Are Held in a Constructive or Resulting Trust for the Benefit of Customers and Are Not Property of the Estate)**

66.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

67.     To the extent not deemed to be beneficial property of FTX.com customers under English law, all identifiable FTX.com customer Assets, including Digital Assets, described in the FTX.com Terms of Service are held in a constructive or resulting trust or trusts for the benefit of the respective FTX.com customers, and are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

68.     To the extent not deemed to be beneficial property of FTX.com customers under English law, commingled or unallocated Assets of FTX.com customers are property held in a constructive or resulting trust or trusts for the benefit of FTX.com customers and are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

69.     Further, property or assets acquired in whole or in part by FTX Trading or its affiliates using Assets of FTX.com customers are property held in a constructive or resulting trust for the collective benefit of FTX.com customers and are not property of the Debtors' estates.

70.    Based upon the foregoing, Plaintiff is entitled to an order of this Court declaring that all Assets, whether separately identifiable or unallocated or commingled, and property or assets acquired with such Assets, are held in a constructive or resulting trust or trusts for the benefit of FTX.com customers.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests as follows:

(i)    the grant of relief as set forth in the final paragraph in each the foregoing Claims for Relief;

(ii)    the grant of such other and further relief as this Court deems just and proper under the circumstances.

*[Remainder of page intentionally left blank.]*

Date: December 28, 2022
Wilmington, Delaware

*/s/ Eric D. Schwartz*
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Paige N. Topper (No. 6470)
Brian Loughnane (No. 6853)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
eschwartz@morrisnichols.com
mharvey@morrisnichols.com
ptopper@morrisnichols.com
bloughnane@morrisnichols.com

-AND-

**EVERSHEDS SUTHERLAND (US) LLP**
Peter A. Ivanick
Sarah E. Paul
Philip H. Ehrlich
Lynn W. Holbert
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
peterivanick@eversheds-sutherland.com
sarahpaul@eversheds-sutherland.com
philipehrlich@eversheds-sutherland.com
lynnholbert@eversheds-sutherland.com

-and-

Erin E. Broderick
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com

-and-

Mark D. Sherrill
1001 Fannin Street, Suite 3700

Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
marksherrill@eversheds-sutherland.com

-and-

Andrea L. Gordon
700 Sixth Street NW, Suite 700
Washington, District of Columbia 20001
Telephone: (202) 383-0100
Facsimile: (202) 637-3593
andreagordon@eversheds-sutherland.com

*Counsel to the Ad Hoc Committee of Non-US
Customers of FTX.com*