**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 22-50514 (JTD) |
| FTX TRADING, LTD., *et al.*, | **RE: A.D.I. 10** |
| Defendants. | |

**OPENING BRIEF IN SUPPORT OF THE AD HOC COMMITTEE OF NON-US
CUSTOMERS OF FTX.COM'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
eschwartz@morrisnichols.com
mharvey@morrisnichols.com
ptopper@morrisnichols.com

**EVERSHEDS SUTHERLAND (US) LLP**
Erin E. Broderick
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the debtors' claims and noticing agent's website at https://cases.ra.kroll.com/FTX.

**EVERSHEDS SUTHERLAND (US) LLP**
David A. Wender
Nathaniel T. DeLoatch
999 Peachtree St NE
Atlanta, GA 30309
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
davidwender@eversheds-sutherland.com
nathanieldeloatch@eversheds-sutherland.com

**EVERSHEDS SUTHERLAND (US) LLP**
Peter A. Ivanick
Sarah E. Paul
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
peterivanick@eversheds-sutherland.com
sarahpaul@eversheds-sutherland.com

*Counsel for Ad Hoc Committee of Non-US Customers of FTX.com*

Dated: March 24, 2023
        Wilmington, Delaware

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 1

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ...................................... 2

STATEMENT OF FACTS ...................................................................................................... 6

    I.    Alameda and the FTX.com Exchange ............................................................... 6

    II.    The FTX.com Terms of Service and Treatment of Customer Assets................................ 6

    III.    Misappropriation of Customer Assets ............................................................. 11

LEGAL STANDARDS ........................................................................................................ 13

    I.    Summary Judgment Standard ......................................................................... 13

    II.    Declaratory Judgment Standard...................................................................... 14

    III.    Standard to Determine Property of the Estates ................................................ 16

LEGAL ARGUMENT.......................................................................................................... 18

    I.    The Debtors Have No Beneficial Interest in Customer Assets Under the Terms of Service and English Law (First Claim of Relief)...................................................................... 18

        A.    English Law Governs Interpretation of the Terms of Service ................................... 18

        B.    FTX.com Customers Own Their Digital Assets ....................................................... 19

        C.    FTX.com Customers Own Their Fiat and E-Money ................................................. 20

    II.    The Customer Assets are Held in a Custodial Trust for FTX.com Customers Under English Law (Second Claim for Relief)....................................................................... 21

    III.    The Customer Assets Are Held in Trust for FTX.com Customers Under Delaware Law, To the Extent Applicable (Third Claim for Relief) ........................................................ 23

        A.    Application of Delaware Law ................................................................................ 23

        B.    The Customer Assets Are Held in an Express Trust Under Delaware Law ............... 24

C.  The Customer Assets Are Held in a Resulting Trust Under Delaware Law .............. 26

D.  The Customer Assets are Held in a Constructive Trust Under Delaware Law .......... 27

CONCLUSION ........................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ABC Learning Ctrs. Ltd.*,
   728 F.3d 301 (3d Cir. 2013).............................................................................16

*Alameda Research Ltd. v. Voyager Digital, LLC*,
   No. 22-11068, Adv. Proc. No. 23-50084 (Bankr. D. Del. Jan. 30, 2023) .............................29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................................14

*Arnold v Britton*
   [2015] UKSC 36, [2015] AC 1619 ...............................................................20

*Begier v. IRS*,
   496 U.S. 53 (1990)...........................................................................3, 16

*In re BlockFi Inc.*,
   No. 22-19361-MBK (Bankr. D.N.J. Dec. 19, 2022)...................................................4

*In re Catholic Diocese of Wilmington, Inc.*,
   432 B.R. 135 (Bankr. D. Del. 2010) ..........................................................26, 27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................13, 14

*In re Celsius Network LLC (In re Celsius)*,
   No. 22-10964-MG (Bankr. S.D.N.Y. Sept. 1, 2022) ]........................................4, 7

*Certain Underwriters at Lloyds v. Chemtura Corp.*,
   160 A.3d 457 (Del. 2017) ...................................................................18, 23

*Chartbrook Ltd v Persimmon Homes Ltd*
   [2009] UKHL 38, [2009] 1 AC 1101..............................................................20

*City of Farrell v. Sharon Steel Corp.*,
   41 F.3d 92 (3d Cir. 1994)......................................................................2, 17

*Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*,
   298 F.3d 201 (3d Cir. 2002).......................................................................15

*In re Columbia Gas Sys., Inc.*,
   997 F.2d 1039 (3d Cir. 1993)....................................................................16, 17

*Commodity Futures Trading Comm'n v. Bankman-Fried,*
    No. 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022) ................................................. 9

*Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.,*
    838 F.2d 612 (1st Cir. 1988) ................................................................................... 17

*Dhingra v Dhingra*
    [1990] EWCA Civ 1899 ........................................................................................... 22

*E. Lake Methodist Episcopal Church, Inc. v. Trs. of the Peninsula - Delaware*
    *Ann. Conf. of the United Methodist Church, Inc.,*
    731 A.2d 798 (Del. 1999) ........................................................................................ 26

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,*
    702 A.2d 1228 (Del. 1997) ................................................................................ 14, 25

*F.D.I.C. v. Bathgate,*
    27 F.3d 850 (3d Cir. 1994) ...................................................................................... 14

*Franco v. Connecticut Gen. Life Ins. Co.,*
    818 F. Supp. 2d 792 (D.N.J. 2011), *aff'd in part, vacated and rev'd in part on*
    *unrelated grounds* 647 F. App'x 76 (3rd Cir. 2015) ............................................... 25

*Goldberg v. New Jersey Lawyers' Fund,*
    932 F.2d 273 ........................................................................................................... 17

*Greenly v. Greenly,*
    49 A.2d 126 (Del. Ch. 1946) ................................................................................... 26

*Halperin v. Moreno (In re Green Field Energy Servs.),*
    594 B.R. 239 (Bankr. D. Del. 2018) ................................................................. 27, 28

*Hogg v. Walker,*
    622 A.2d 648 (Del. 1993) ........................................................................................ 28

*Hudak v. Procek,*
    806 A.2d 140 (Del. 2002) ........................................................................................ 26

*Investors Compensation Scheme Ltd v West Bromwich Building Society*
    [1998] 1 WLR 896 ................................................................................................... 20

*J.S. Alberici Constr. Co. v. Mid-West Conveyor Co.,*
    750 A.2d 518 (Del. 2000) ........................................................................................ 18

*Levin v. Smith,*
    513 A.2d 1292 (Del. 1986) ...................................................................................... 24

iv

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................14

*Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*,
    155 F.3d 718 (4th Cir. 1998) ................................................................17

*Otto v. Gore*,
    45 A.3d 120 (Del. 2012) .......................................................................24

*Pearson v Lehman Brothers*
    [2010] EWHC 2914 *aff'd* [2011] EWCA Civ 1544 .............................23

*Pennbarr Corp. v. Ins. Co. of N. Am.*,
    976 F.2d 145 (3d Cir. 1992)..................................................................14

*Rainy Sky SA v Kookmin Bank*
    [2011] UKSC 50, [2011] 1 WLR 2900..................................................20

*SEC v. Bankman-Fried*,
    No. 1:22-cv-10794-PKC (S.D.N.Y. Dec. 21, 2022) ..............................11

*In re SemCrude, L.P.*,
    418 B.R. 98 (Bankr. D. Del. 2009) .......................................................27

*In re Suniva Inc.*,
    No. 17-10837-KG, 2018 Bankr. LEXIS 761 (Bankr. D. Del. 2018) .......4

*Turley v. Mahan & Rowsey, Inc. (In re Mahan & Rowsey, Inc.)*,
    817 F.2d 682 (10th Cir. 1987) ..............................................................17

*In re United Milk Prods. Co.*,
    261 F. Supp. 766 (N.D. Ill. 1966) ........................................................16

*United States v. Caroline Ellison*,
    No. 22-cr-673 (S.D.N.Y. 2022) .......................................................11–12

*United States v. Nishad Singh*,
    No. 22-cr-673 (S.D.N.Y. 2022) .............................................................12

*United States v. Samuel Bankman-Fried*,
    No. 22-cr-673 (S.D.N.Y. 2022) .............................................................25

*United States v. Zixiao Wang*,
    No. 22-cr-673 (S.D.N.Y. 2022), ...........................................................12

*Universal Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.*,
    960 F.2d 366 (3d Cir. 1992)..................................................................17

*In re Visiting Nurse Ass'n v. Bow*en,
   143 B.R. 633 (W.D. Pa. 1992), *aff'd*, 986 F.2d 1410 (3d Cir. 1993) ....................................17

*In re Voyager Digital Holdings, Inc.*,
   No. 22-10943-MEW (Bankr. S.D.N.Y. July 14, 2022) .............................................................4

*Wang v Darby*
   [2021] EWHC 3054 (Comm)...................................................................................................22

*Wood v Capita Insurance Services Ltd*
   [2017] UKSC 24, [2017] 2 WLR 1095....................................................................................20

**Statutes**

28 U.S.C. § 2201(a) ........................................................................................................................15

United States Code title 11 section 541, 11 U.S.C. §§ 101, et seq. ................................1, 2, 15, 16

**Other Authorities**

Fed. R. Bankr. P. 7001 ......................................................................................................................1

Fed. R. Bankr. P. 7056 ......................................................................................................................1

Fed. R. Civ. P. 56 ..............................................................................................................................1

Fed. R. Civ. P. 56(a) .......................................................................................................................13

Restatement (Second) of Conflict of Laws, § 6 .............................................................................23

## NATURE AND STAGE OF PROCEEDINGS

1. On December 28, 2022, the Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee"), currently comprised of 27 members holding over $2.0 billion in aggregate claims against the above-captioned debtors and debtors in possession (collectively, the "Debtors"),[2] filed its *Complaint for Declaratory Judgment* (the "Complaint") No. 22-50514-JTD (Bankr. D. Del. Dec. 28, 2022) [D.I. 1] (A000001–000007).

2. The Ad Hoc Committee now files a *Motion for Partial Summary Judgment* ("Motion") on its Complaint under Rule 56 of the Federal Rules of Civil Procedure and Rules 7001 and 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking the entry of an order, in substantially the form attached as Exhibit A to the Motion (the "Proposed Order"): (a) granting the Motion as set forth therein; (b) entering a declaratory judgment that the Debtors have no equitable interest in the assets that FTX.com customers deposited, held, received, or acquired on the FTX.com platform (collectively, the "Customer Assets") for purposes of determining estate property under section 541 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and (c) granting related relief.

3. In support of the Motion, the Ad Hoc Committee submits this (i) *Opening Brief in Support of the Ad Hoc Committee of Non-US Customers of FTX.com's Motion for Partial Summary Judgment*; (ii) the *Proprietary Claims by FTX.com Customers Declaration*, submitted by David Quest KC (the "Quest Declaration"), and (iii) the *Appendix to the Opening Brief in Support of the Ad Hoc Committee of Non-US Customers of FTX.com's Motion for Partial*

---

[2] *See Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP pursuant to Bankruptcy Rule 2019* ("2019 Statement") [D.I. 1136].  A redacted version of the 2019 Statement is forthcoming.

*Summary Judgment and the Proprietary Claims by FTX.com Customers Declaration, submitted by David Quest KC (the "Appendix").*[3]

## **PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

4.     The Ad Hoc Committee's Complaint seeks a determination, through declaratory judgments, of ***the*** fundamental issue in these cases: what constitutes property of an FTX.com customer—and not of the Debtors' estates?

5.     In determining whether the Customer Assets belong to the Debtors' estates under section 541 of the Bankruptcy Code, the ***first, threshold question*** is whether the Debtors hold an equitable interest in the Customer Assets under applicable non-bankruptcy law. The ***second question*** is whether, to the extent that the Customers Assets have been commingled, the FTX.com customers can identify and trace their Customer Assets to prove their ownership.[4]

6.     By its Motion, the Ad Hoc Committee seeks to resolve the first, threshold question with a finding that the Debtors have ***no equitable interest*** in the Customer Assets. This finding cannot be disputed as a matter of law. The Terms of Service are clear and unambiguous that ***title to all Digital Assets on the FTX.com platform remained at all times with the FTX.com customer*** and did not transfer to FTX Trading Ltd. ("FTX Trading") or any other Debtor in these cases. Terms of Service § 8.2.6(A); (A000097). They are also clear and unambiguous that ***none of the Digital Assets in the customer's Account are the property of, or shall or may be loaned to, FTX Trading***. *Id.* § 8.2.6(B); (A000097).

---

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the FTX.com Terms of Service, dated May 13, 2022 (the "Terms of Service") (A000088–149), included in the Appendix filed substantially contemporaneously herewith.  All unreported cases and other materials not readily available on Lexis or Westlaw cited herein and in the Quest Declaration are included in the Appendix.  References to the Appendix shall be as follows: "A[ ]–[ ]."

[4]     *See generally City of Farrell v. Sharon Steel Corp*., 41 F.3d 92, 95 (3d Cir. 1994) (In general, "to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled.")

7.      While the Terms of Service do not contain the same express provisions regarding title and ownership of fiat and E-Money, basic rules of contract construction dictate the same treatment for all Customer Assets.[5] It would be improper to find that an FTX.com customer retains title to their Digital Assets, but loses title to their fiat deposited in their FTX.com Account for the sole purpose of purchasing Digital Assets, or worse yet, to lose title to the proceeds of liquidating their own Digital Assets.

8.      To be sure, FTX.com customers' ownership rights in *all* of their Customer Assets, as reflected in their FTX.com Account ledgers or otherwise identified in the Debtors' books or records, are consistently documented in the Debtors' internal policies as well as the Debtors' repeated assurances that FTX Trading held the Customer Assets in custody, segregated from its own assets, for the benefit of FTX.com customers.[6] As explained below, these undisputed facts establish the existence of a custodial trust over *all* Customer Assets under English law. To the extent that the Court finds Delaware law applies, the same facts require a finding of the existence of an express, resulting or constructive trust over *all* the Customer Assets. The result is the same: ***the Debtors do not have an equitable interest in the Customer Assets*** as a matter of law.[7]

9.      In other recent crypto-company bankruptcies, the debtors sought determinations on customer property rights early in the cases while acknowledging that further factual analysis and investigations would be required before they could return customer property. In each case, where the language of the operative customer agreements was clear and unambiguous that title to

---

[5]      *See infra* ¶¶ 48-50.

[6]      *Id*. ¶¶ 22-26.

[7]      *See, e.g., Begier v. IRS*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'").

the assets in question remained with customers, they asked the courts to find—and the courts readily agreed—that the assets were property of the customers and not of the debtors' estates.[8]

10.    While the Ad Hoc Committee is not seeking a determination with respect to the identification and tracing of specific Customer Assets at this time, it is confident that a substantial portion of the "estate" assets identified by the Debtors as well as the billions of dollars' worth of transfers the Debtors made before the Petition Date can—and will—be traced back to their rightful owners, the FTX.com customers. In fact, the Debtors have already performed "on-chain asset tracing to originating exchange addresses for all identified assets and unauthorized transfers" to locate an estimated $2.155 billion in fiat, stablecoin, and other digital assets associated with FTX.com customer Accounts.[9] It is also undisputed that the Debtors misappropriated billions of dollars' worth of Customer Assets for their own improper purposes, including by allowing Alameda to use Customer Assets to make investments in its own portfolio and to pay off billions of its own liabilities before the Petition Date.  According to the testimony of the Debtors' new CEO, John J. Ray, III, there is "voluminous" documentation regarding the Debtors' transfer of assets that should allow the Debtors to identify the origins of the misappropriated assets back to FTX.com customer Accounts:

---

[8]    *See In re Celsius Network LLC (In re Celsius)*, No. 22-10964-MG (Bankr. S.D.N.Y. Sept. 1, 2022) [D.I. 1767] (A000150–156) (approving debtors' request made seven weeks into the case to permit customer withdrawals where the terms of service provided that "title and ownership of Custody Assets remain with customers at all times"); *In re BlockFi Inc.,* No. 22-19361-MBK (Bankr. D.N.J. Dec. 19, 2022) [D.I. 121] (A000157–199) (debtors filed motion three weeks into the case to permit customer withdrawals where the terms of service provided that title to the assets in question remained with the customer); *In re Voyager Digital Holdings, Inc.*, No. 22-10943-MEW (Bankr. S.D.N.Y. July 14, 2022) [D.I. 247] (A000200–205) (approving debtors' request made nine days into the case to honor customer withdrawals from for-the-benefit of (FBO) accounts.); *see also In re Suniva Inc.*, No. 17-10837-KG, 2018 Bankr. LEXIS 761 (Bankr. D. Del. 2018), at *8 (holding that funds were subject to a constructive trust and allowing for subsequent discovery and determination on tracing questions).

[9]    *See Notice of Presentation to the Official Committee of Unsecured Creditors: Preliminary Analysis of Shortfalls at FTX Exchanges* [D.I. 792] (A000206–232) (the "Shortfall Presentation") at pp. 4, 10. The Debtors also previously identified $1.953 billion in digital assets held by Alameda, but have either not conducted tracing of these funds to FTX.com customer Accounts, or have not disclosed their findings. *See Notice of Presentation to the Official Committee of Unsecured Creditors: Preliminary Analysis of Shortfalls at FTX Exchanges* [D.I. 507] at p. 9. The Ad Hoc Committee believes at least some of the digital assets held by Alameda belong to FTX.com customers.

> *"[W]e should be able to trace the movement of crypto assets": "one way or another, we'll get the banking records, and we'll be able to trace the sources of, of cash, how that cash was utilized to buy assets. Once we can identify the assets, we can then trace the asset from either transferred other currencies or ultimate payment outside the company...we'll have the records ultimately, to do that."*

Ray Testimony, 2:06 (A000233).

11.    Indeed, the Debtors have highlighted their extensive efforts to identify and trace what they refer to as "customer entitlements" over the last four months and the substantial fees incurred in connection with those efforts have been publicly disclosed. Nonetheless, the Ad Hoc Committee recognizes that the Debtors still have significant work left to do before questions regarding identification and tracing of the Customer Assets can be fully answered. It would thus be wasteful to commence discovery on those issues now and premature to ask the Court for a final determination that the Customer Assets are not property of the estates.

12.    However, the Debtors should not be identifying and tracing Customer Assets in a black box, without input from or information given to those who actually own such assets—the FTX.com customers—and in the absence of the threshold legal determination from this Court that the Debtors ***do not hold an equitable interest in the Customer Assets***. Without this ruling, the Debtors will continue their identification and tracing of "customer entitlements" with undisclosed standards of their own choosing to reach determinations potentially at odds with the FTX.com customers' legal rights. Similarly, the Debtors will continue to use and dispose of potential Customer Assets to fund the administration of proceedings in which the FTX.com customers have not been given a seat at the table to advocate for their legal rights and interests. The Debtors should not be allowed to remain on this path towards *fait accompli* treatment of FTX.com customers as nothing more than general unsecured creditors, unfettered by guiding

determinations of law and stakeholder input. That is at best extremely wasteful of estate (or more likely customer) property and, at worst, irreparably damaging to FTX.com customers.

## STATEMENT OF FACTS

### I.    Alameda and the FTX.com Exchange

13.    In or around November 2017, Sam Bankman-Fried ("Bankman-Fried") and Zixiao "Gary" Wang ("Wang") co-founded Alameda, a quantitative trading firm specializing in crypto assets. *Transcript of First Day Hearing*, held on Nov. 22, 2022 [D.I. 142] (A000255) (the "First Day Hr'g Tr.") at 22; *see also Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings*, filed on November 17, 2022 [D.I. 24] (A000321) (the "First Day Decl.") ¶ 22. Alameda was a "'crypto hedge fund' with a diversified business trading and speculating in digital assets and related loans and securities for the account of its owners, Messrs. Bankman-Fried (90%) and Wang (10%)." *Id.*

14.    In May 2019, Bankman-Fried, Wang, and Nishad Singh ("Singh") launched FTX.com, the trade name for the business conducted by FTX Trading, a centralized digital asset exchange organized in Antigua. First Day Decl. ¶ 33 (A000266). FTX Trading offered trading in a large variety of Digital Assets, including bitcoin, ether, tether and others. Terms of Service, Schedule 1, § 1.1 (A000115) (listing types of Digital Assets that were "supported by and made available from time to time to transact in using the Platform"). The FTX.com platform was not available to customers in the United States. First Day Decl. ¶ 33 (A000266).

### II.    The FTX.com Terms of Service and Treatment of Customer Assets

15.    To utilize the FTX.com platform, customers were required to enter into the Terms of Service. As an initial matter, the Terms of Service apply to all FTX.com customers who used the FTX.com platform from May 13, 2022 forward, including customers who opened their

Accounts prior to that date, but used the platform's services after that date. This application is confirmed by express language in the prior versions of the FTX.com terms of service. *See Declaration of Edgar W. Mosley* [D.I. 337] at 97, <u>Exhibit H</u> ¶ 28 (A000447) ("We may amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised agreement …."); *Id.* at 118, <u>Exhibit I</u> ¶ 28 (A000468) (same). Other courts have held that updated terms of service replace and supersede prior versions, as they do here. *See, e.g., In re Celsius*, No. 22-10964-MG (Bankr. S.D.N.Y. Jan. 4, 2023) [D.I. 1822] at p. 38 (A000566) (finding that "updates to the Terms of Use constituted valid modifications of the contract that an Account Holder entered when they created an account with Celsius").

16.     The Terms of Service are governed by and construed in accordance with English law. Terms of Service § 38.11 (A000114).

17.     Under the Terms of Service, each FTX.com customer had an Account that recorded and reflected the Customer Assets held on the platform. *Id.* at 1 (A000088) (describing "Account"); § 8 (A000096–99) (describing customer funding of its Account with Digital Assets and/or fiat currency, and issuance of E-Money to a customer convertible to fiat). The Account, in other words, was a record kept by FTX Trading of an FTX.com customer's transactions, holdings, and balances at any given time. *See id.*

18.     "Assets," as defined in section 2.4.1 of the Terms of Service and referred to herein as Customer Assets, includes Digital Assets, fiat currency, and E-Money. *Id.* at § 2.4.1 (A000090). "Digital Assets," as defined in Schedule 1 to the Terms of Service, means "BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token,

stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform." *Id.* at Schedule 1, § 1.1 (A000115).

19.     The Terms of Service expressly provide that all Digital Assets are held in a customer's Account on the following basis:

> "(A)   ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading***.  As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> (B)    ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading***.
>
> (C)    ***You control the Digital Assets held in your Account***.  At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

*Id.* § 8.2.6 (A000097) (emphases added).[10]

20.     The Terms of Service do not expressly address property rights with respect to fiat currency or E-Money. However, there is nothing in the Terms of Service that would suggest the Debtors had an ownership interest in these Customer Assets. To the contrary, the Terms of Service state that E-Money issued to a customer is not a deposit or investment account, and simply "represents the fiat currency that you have loaded" into your Account." *Id.* §§ 8.3.2, 8.3.3

---

[10]     The Terms of Service separately provide that a customer may engage in activities on the platform such as staking and margin trading, and that FTX Trading has certain rights in connection with these activities upon the occurrence of certain events. *See* Terms of Service §§ 15, 16 (A000103–104). FTX Trading, for instance, may seize and/or liquidate Digital Assets where an Account has engaged in margin trading and falls below the margin maintenance requirement or appears to be in danger of defaulting on a loan. *Id.* § 16.2 (A000104). These provisions, however, only grant a set off right to FTX Trading in particular Account Assets, to the extent that certain events are proven to have occurred. They do not alter the customers' ownership rights in their Digital Assets, which—under the Terms of Service—remain with the customers at all times. See id. § 8.2.6.

(A000098–99). The Terms of Service also make clear that customers will not earn any interest on the E-Money they hold in their Accounts. *Id.* § 8.3.4 (A000098). Further, the Terms of Service provide that a customer may "redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions." *Id*. § 8.3.7 (A000099)

21.    The intended ownership rights with respect to all Customer Assets is further supported by numerous internal company documents that consistently recognize that all Customer Assets belong to the FTX.com customers at all times. For example, an internal FTX policy document (the "Internal Policy Document"), promised that FTX Digital Markets Ltd. ("FDM"), an FTX Trading affiliate, would ensure that:

- "All third-party service providers are aware that ***customer funds do not represent property of FDM and are therefore protected from third-party creditors;***"

- "All third-party providers are aware that ***customer assets are held in trust;***"

- "Customer monies will be appropriately ring-fenced to protect from:
    - The unlikely event FDM becomes insolvent;
    - The use of customer monies being used to benefit others; and
    - FDM using customer monies to finance its own operations.
      Written notice will be provided to the relevant regulated credit, e-money or payment institution to clarify that ***the assets are held by us on trust for our customers*** …"

*Commodity Futures Trading Comm'n v. Bankman-Fried*, No. 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022) [D.I. 1], Compl. at pp. 14-15 ¶ 50 (A000587) (emphases added) (quoting Internal Policy Document).

22.    The FTX.com website also publicly stated, consistent with the Terms of Service and generally understood practices for derivatives exchanges, that "as a general principle FTX ***segregates customer assets from its own assets across our platforms***." FTX Policy: FTX's Key

Principles for Ensuring Investor Protections on Digital-Asset Platforms (Mar. 10, 2022) ¶ 3 (A000619–620), https://www.ftxpolicy.com/posts/investor-protections ("FTX's Key Principles for Ensuring Investor Protections") (emphasis added). The website represented that FTX Trading maintained liquid assets for customer withdrawals to "ensure a customer without losses can redeem *its assets* from the platform on demand." *Id.* ¶ 1 (A000616–617) (emphasis added).

23.    Bankman-Fried made similar claims to the public about the segregation of customer assets. For example, during his February 9, 2022 testimony before the U.S. Senate Committee on Agriculture, Nutrition and Forestry, Bankman-Fried stated that, "[b]y logging in to the customer's account at FTX, the customer can immediately view the types of assets they own held *in custody by FTX*. The assets are ledgered and *easily identifiable to the user* (but held in an omnibus wallet in the case of the customer's tokens in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX. Additionally, as a general principle *FTX segregates customer assets from its own assets across our platforms*." *Testimony of Sam Bankman-Fried Co-Founder and CEO of FTX*, U.S. Senate Committee on Agriculture, Nutrition and Forestry (Feb. 9, 2022), at 34 (A000660) (the "Bankman-Fried Senate Committee Testimony of Feb. 9, 2022") (emphases added).

24.    Bankman-Fried also made public statements providing assurances that FTX.com customers could always access their Customer Assets. For example, on June 27, 2022, Bankman-Fried tweeted: "Backstopping customer assets should always be primary. Everything else is secondary." Bankman-Fried (@SBF_FTX), Twitter (June 27, 2022), 1:29 P.M. (A000666).

25.    On November 7, 2022—just four days before these chapter 11 cases were filed—Bankman-Fried tweeted: "FTX is fine. Assets are fine ... FTX has enough to *cover all client*

*holdings*. We ***don't invest client assets*** (even in treasuries). We have been processing all withdrawals…"[11] Bankman-Fried (@SBF_FTX), Twitter (Nov. 7, 2022) (A000699) (emphases added). Notwithstanding this tweet, on November 8, 2022, FTX paused all customer withdrawals. First Day Hr'g Tr. at 30 (A000264); *see also* First Day Decl. ¶ 40 (A000274).

### III.    Misappropriation of Customer Assets

26.    The Debtors' own professionals have also acknowledged that FTX Trading, including through its affiliate Alameda, misappropriated Customer Assets without authorization. Second Day Hr'g Tr. pp. 8-9 (A000712–713) (Debtors' counsel Andrew Dietderich describing "Alameda backdoor, was a secret way for Alameda to borrow from customers on the exchange without permission," which Wang created through computer code, and which resulted in a $65 billion line of credit from customers to Alameda "to which customers did not consent"); *see also Adversary Proceeding Complaint filed by Debtors against FTX Digital Markets Ltd. et al.*, filed on March 19, 2023, [D.I. 1119] (A000883–884) (the "Debtors' Adversary Proceeding") ¶ 22 ("From at least 2019 and through November 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and Ms. Ellison (the "Co-Conspirators") variously used Alameda Research, FTX Trading, and FTX DM to engage in a colossal criminal conspiracy."); Ray Testimony, 2:23 (A000233) (acknowledging that the transfer of FTX.com customer funds from FTX.com to Alameda conflicted with the Terms of Service). Alameda's misappropriation of Customer Assets included both fiat deposits that were sent to Alameda-owned bank accounts and Digital Assets that Alameda accessed via the unbounded withdrawal capabilities of its FTX account. *See United*

---

[11]    This tweet has since been deleted, but has been quoted in numerous places and its occurrence is not disputed. *See, e.g.*, *SEC v. Bankman-Fried*, No. 1:22-cv-10794-PKC (S.D.N.Y. Dec. 21, 2022) (D.I. 1) (the "SEC Compl.") ¶ 107.

*States v. Caroline Ellison*, No. 22-cr-673 (S.D.N.Y. 2022), *Transcript of Caroline Ellison Guilty Plea*, held on Dec. 19, 2022 (the "Ellison Plea Tr.") at 27-28 (A000929–930).

27.     Three of the Co-Conspirators have admitted their guilt in misappropriating Customer Assets. *See id.* (Ellison admits to participating in illegal scheme whereby Alameda "was borrowing funds that FTX's customers had deposited onto the exchange"); *United States v. Zixiao Wang*, No. 22-cr-673 (S.D.N.Y. 2022), *Transcript of Gary Wang Guilty Plea*, held on Dec. 19, 2022 (the "Wang Plea Tr.") (A000961) at 24 (Wang admits to participating in illegal scheme to make changes to the platform's code that resulted in special privileges to Alameda); *United States v. Nishad Singh*, No. 22-cr-673 (S.D.N.Y. 2022), *Transcript of Nishad Singh Guilty Plea*, held on Feb. 28, 2023 (the "Singh Plea Tr.") (A000999) at 28 (Singh admits to participating in illegal scheme whereby Alameda borrowed several billion dollars in funds that belonged to FTX.com customers, and did so without the customers' knowledge or consent).

28.     As John J. Ray, III, succinctly stated during his Congressional testimony: "This is just ***taking money from customers and using it for your own purposes . . . . This is just plain old embezzlement***." Ray Testimony, 1:33 (A000233) (emphasis added). According to Mr. Ray, there is "no question about it"—"assets of customers in the dotcom silo [i.e., FTX.com customers] were transferred to Alameda," and "customer assets at FTX.com were commingled with assets from the Alameda trading platform." *Id.*, 1:13, 0:14 (A000233). Mr. Ray has further acknowledged that customers seeking to deposit fiat currency into their FTX.com Accounts were directed unwittingly to wire their funds directly to bank accounts owned and controlled by Alameda. Ray Testimony, 0:44 (A000233) (". . . we can ***confirm that funds were deposited directly into Alameda as opposed to FTX bank accounts*** . . .") (emphasis added).

29.     As the Debtors' counsel, Andrew Dietderich has acknowledged, FTX.com Customer Assets were even used to "buy planes and houses, throw parties, make political donations, pay for sponsorships, and make personal loans to its founders." Second Day Hr'g Tr. at 9 (A000713). Alameda also used Customer Assets to trade on other digital asset exchanges and to fund a variety of high-risk digital asset industry investments. *Id.* (Alameda used Customer Assets to "gamble[] on cryptocurrency investments, often unsuccessfully," and to make "debt and equity investments in diverse businesses, many at prices that greatly exceeded market value at the time of the investment"); *see also* Ray Testimony, 0:14 (A000233) ("Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.").

30.     Around June 2022, Alameda became subject to a number of margin calls and loan recalls. Ellison Plea Tr. at 27-28 (A000929–930). Lacking its own assets to satisfy the liabilities, Alameda "borrowed" Customer Assets worth billions of dollars with the full knowledge that such Customer Assets were being directly misappropriated from FTX.com customers. *See id.*

## LEGAL STANDARDS

### I.     Summary Judgment Standard

31.     Under the Federal Rules of Civil Procedure 56(a), made applicable to this adversary proceeding by Bankruptcy Rule 7056, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (holding that summary judgment is "an integral part of the Federal Rules as a whole . . . designed to secure the just, speedy and inexpensive determination of every action.") (internal quotes and citation omitted). In considering whether summary judgment is appropriate,

courts may consider pleadings, admissions and any affidavits or declarations on file. *See, e.g., F.D.I.C. v. Bathgate*, 27 F.3d 850, 860 (3d Cir. 1994).

32.     To defeat a motion for summary judgment, an opposing party must "go beyond the pleadings" and "designate 'specific facts showing . . . a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (internal quotations and citation omitted). The mere existence of some alleged factual dispute will not defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Rather, "the requirement is that there be no **genuine** issue of material fact." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-moving party must "do more than simply show . . . there is some metaphysical doubt as to the material facts.").

33.     Here, the Ad Hoc Committee's Motion can be decided on the bases of the clear and unambiguous Terms of Service, irrefutable extrinsic evidence, and as a matter of law. *Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145, 149 (3d Cir. 1992) (finding summary judgment should have been granted on appeal where court "must conclude that the contract is so clear it can only be read one way."); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232-33 (Del. 1997) ("when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms. This task may be accomplished by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so as to create issues of material fact.").

## II.     Declaratory Judgment Standard

34.     The Declaratory Judgment Act provides, in relevant part, that "[i]n a case of actual controversy within its jurisdiction, [. . .] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Under Third Circuit law, "[t]he standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief." *See Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*, 298 F.3d 201, 210, n.12 (3d Cir. 2002) (internal citations omitted).

35.     An actual controversy exists here, as the Debtors have consistently classified all FTX.com customers as nothing more than general unsecured creditors and have failed to acknowledge even once that FTX.com customers have ownership claims to the assets the Debtors are administering and using to pay significant professional fees in these cases. For example, in the Debtors' recently filed adversary proceeding complaint against FTX DM, the Debtors describe the Customer Assets held on the FTX.com exchange as "the Debtors' cryptocurrency" and "the Debtors fiat currency." *See* Debtors' Adversary Proceeding, Counts I-II and Prayer for Relief (A000876–902). While seemingly recognizing that FTX Trading was simply functioning as a "custodian" of the Customer Assets, *id.* ¶ 39 (A000889), the Debtors nevertheless refer to the Customer Assets as "the Debtors' property" and ask this Court to find that FTX DM has no ownership interest in "the Debtors' property." *Id.* ¶ 3 (A000878). Resolution of the legal ownership rights of FTX.com customers to the Customer Assets is plainly needed to protect those rights while the Debtors investigate tracing of the Customer Assets.

36.     The Motion also seeks a declaration of the "rights and other legal relations" of FTX.com customers. Specifically, the Motion seeks a declaration that the Debtors' have no equitable interest in the Customer Assets. This determination can be made based on undisputed evidence and without assessing the ability of the Ad Hoc Committee to identify or trace specific Customer Assets. Thus, the relief sought in the Motion is appropriate for summary judgment.

### III.    Standard to Determine Property of the Estates

37.    Section 541(a) of the Bankruptcy Code defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Bankruptcy Code does not, by itself, create new legal or equitable interests in property; instead, property interests are created and defined by otherwise applicable non-bankruptcy law. *In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 313 (3d Cir. 2013) ("property rights the debtor does not have do not become part of the bankruptcy estate.").

38.    Under the Bankruptcy Code, property held in trust by the debtor for a third party is not property of the debtor's bankruptcy estate. *See* 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest …becomes property of the estate … only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); *Begier*, 496 U.S at 59 ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'").

39.    The Third Circuit has also explicitly recognized that "Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust." *In re Columbia Gas Sys.*, *Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) ("[A] trustee has no equitable interest in funds its holds in trust."). As such, property held in trust is subject only to the claims of the trust beneficiaries—here FTX.com customers—and is not subject to claims of the debtor's other creditors. *See In re United Milk Prods. Co.,* 261 F. Supp. 766, 768 (N.D. Ill. 1966) (stating that "the remaining unsecured creditors should not be permitted to share in monies in which the debtor has no direct financial interest and which it would not have been permitted to retain for its own use").

16

40.     If trust property is segregated or otherwise identifiable, it is clearly not property of the estate. However, trust property does not lose its trust character simply because the debtor misappropriated it or commingled it with the debtor's own property. *E.g.*, *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 102 n.10 (3d Cir. 1994) ("a party should not be able to defeat a trust 'simply by commingling the withholding funds with its other assets.'"); *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723–24 (4th Cir. 1998) ("courts have consistently rejected the notion that commingling of trust property, without more, is sufficient to defeat tracing"); *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988) ("mere comingling of the trust property with other property of the [debtor] … does not defeat [trust beneficiary's] claim"); *Turley v. Mahan & Rowsey, Inc. (In re Mahan & Rowsey, Inc.)*, 817 F.2d 682, 684 (10th Cir. 1987) (the "trust pursuit will even allow tracing of trust funds into a commingled mass"). If, however, trust property is comingled, a trust beneficiary must be able to identify and trace that property to determine whether it belongs to the beneficiary. *See In re Columbia Gas Sys. Inc.*, 997 F.2d at 1063 ("beneficiaries of trust funds bear the burden of identifying and tracing their trust property"), *cert. denied*, 510 U.S. 1110 (1994).

41.     While applicable non-bankruptcy law determines whether a debtor has an equitable interest in the property in question, federal law determines the requirements for tracing and identification of such property. *City of Farrell*, 41 F.3d at 95 (citing *Goldberg v. New Jersey Lawyers' Fund*, 932 F.2d 273, 280); *see also Universal Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc*., 960 F.2d 366, 369 (3d Cir. 1992); *In re Visiting Nurse Ass'n v. Bow*en, 143 B.R. 633, 641 (W.D. Pa. 1992) ("Once a bankruptcy court makes a determination concerning whether a debtor has any legal or equitable interest in property based upon applicable state law, whether

the property will come into the estate is a federal question.") (internal quotations and citations omitted), *aff'd*, 986 F.2d 1410 (3d Cir. 1993).

## LEGAL ARGUMENT

I.   **The Debtors Have No Beneficial Interest in Customer Assets Under the Terms of Service and English Law (First Claim of Relief)**

A.   **English Law Governs Interpretation of the Terms of Service**

42.     The Terms of Service are governed by, and construed in accordance, with English law. Terms of Service § 38.11. When considering choice of law in a contractual dispute, Delaware courts apply the *Restatement (Second) of Choice of Law*'s "most significant relationship" analysis. The threshold question is "determining if the parties made an effective choice of law through their contract." *Certain Underwriters at Lloyds v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017). Delaware courts "will generally honor a contractually-designed choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction," and the jurisdiction's laws are not "repugnant to the public policy of Delaware." *J.S. Alberici Constr. Co. v. Mid-West Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).

43.     Here, the FTX.com customers are non-US customers from various jurisdictions who contracted with FTX Trading and agreed that English law would govern disputes. Terms of Service § 38.11 (A000114). English law's treatment of this dispute is not "repugnant" to Delaware public policy—on the contrary, and as further explained below, Delaware state law mandates the same conclusion. As a result, the Terms of Service's choice of law provision should be honored, and the Court should apply English law to their interpretation.

44.     The Quest Declaration, filed substantially contemporaneously herewith, provides a detailed analysis regarding FTX.com customers' proprietary rights with respect to the

Customer Assets under the Terms of Service and English law.[12] As discussed below, based on English law's treatment of Customer Assets as described in the Quest Declaration, FTX.com customers are the owners of ***all*** Customer Assets that can be identified on the FTX.com customer Account ledgers, or otherwise in the Debtors' books and records whether those Customer Assets are "now held by FTX Trading" or are "in the hands of another party." Quest Decl. ¶ 18.

### B.  FTX.com Customers Own Their Digital Assets

45.     The Terms of Service are clear and unambiguous—FTX.com customers retain ownership to their Digital Assets at all times. *Id.* ¶ 14 (citing Terms of Service § 8.2.6 (A000097) (*see, e.g.*, "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading…None of the Digital Assets in your Account are the property of…FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading…You control the Digital Assets held in your Account…")). Because the FTX.com customers retained ownership over their Digital Assets at all times, FTX Trading was not permitted to take action on their Digital Assets absent customer direction. Quest Decl. ¶¶ 15, 16.

46.     As the Quest Declaration explains, while the Terms of Service reference Digital Assets "in" an Account, "an Account is not a receptacle of assets, but a record kept by FTX Trading of customer transactions, holdings and balances." Quest Decl. ¶ 15. If a Digital Asset can be identified as associated with a customer Account, because it remains on the blockchain or at the network address where it was first deposited, the customer retains title to such Digital Asset, wherever held. *Id.* ¶ 18. The fact that an FTX.com customer does not possess a private key to transfer Digital Assets does not impact the customer's ownership rights. *Id.* at ¶ 16.

---

[12]  As further set forth in the Quest Declaration, Mr. Quest has extensive experience in legal principles surrounding digital assets, including co-authoring the UK Jurisdiction Taskforce Legal Statement on Cryptoassets and Smart Contracts, which has been adopted by courts in England and other common law jurisdictions.

## C. FTX.com Customers Own Their Fiat and E-Money

47.     The Terms of Service do not contain express ownership provisions regarding fiat and fiat represented by E-Money. However, that should not be surprising given that the FTX.com exchange was a "centralized digital asset exchange" to trade Digital Assets, not to deposit fiat or fiat convertible into E-Money. First Day Decl. ¶ 33. Moreover, there is nothing in the Terms of Service that would suggest the Debtors had an ownership interest in any customer fiat or fiat represented by E-Money. To the contrary, the Terms of Service state that E-Money issued to a customer is not a deposit or investment account, and simply "represents the fiat currency that you have loaded" into your Account." Terms of Service §§ 8.3.2 & 8.3.3 (A000098). The Terms of Service also make clear that customers will not earn any interest on the E-Money they hold in their Accounts. *Id*. § 8.3.4 (A000098). Further, the Terms of Service provide that a customer may "redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions." *Id*. § 8.3.7 (A000099).

48.     Under English law, the starting point in the interpretation of a contract is to give words their ordinary and natural meaning. Quest Decl. ¶ 12(a) (citing *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 (A002142–2158); *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101 (A002159–2199); *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900 (A002200); *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619 (A002221–2269); and *Wood v Capita Insurance Services Ltd* [2017] UKSC 24, [2017] 2 WLR 1095 (A002270–2284). As well as looking at the text, the court can take into account the context, *i.e.*, the background knowledge that would reasonably have been

available to the parties at the time of the contract. *Id.* ¶ 12(b). Courts are entitled to prefer a construction of the contract that "is more consistent with business common sense." *Id.*

49.     Here, it would defy logic and commercial expectations that FTX.com customers would have title to the Digital Assets in their Account, for which the FTX.com exchange provided a means to trade, but not the fiat and E-Money that was solely used to purchase such Digital Assets or simply represented the proceeds from liquidation of such Digital Assets. Therefore, as a matter of contractual interpretation under English law, *see id.* ¶ 12, the Terms of Service should be read as treating *all* Customer Assets as owned by the FTX.com customers.

50.     FTX.com customers' ownership rights to *all* Customer Assets are made abundantly clear by multiple statements and representations by FTX Trading and its affiliates and representatives. These statements repeatedly communicated that customers retain ownership of *all* Customer Assets, even though FTX Trading holds the Customers Assets on behalf of the customers. *See, e.g.*, Internal Policy Document (A000587); FTX Policy: FTX's Key Principles for Ensuring Investor Protections (A000614–626); Bankman-Fried Senate Committee Testimony Feb. 9, 2022 (A000627–665); Bankman-Fried (@SBF_FTX), Twitter (Nov. 7, 2022) (A000699).

51.     Under the plain and unambiguous Terms of Service, governed by and interpreted under English law, the Debtors do not have an equitable interest in any of the Customer Assets.

**II.     The Customer Assets are Held in a Custodial Trust for FTX.com Customers Under English Law (Second Claim for Relief)**

52.     Even if the Court were to find that the Terms of Service did not establish ownership rights with respect to *all* Customer Assets, under English law, a custodial trust exists with respect to *all* Customer Assets, even if they are unallocated or commingled.  As forth in the Quest Declaration, establishing a custodial trust under English law requires proof of three elements: "(i) intention by [the trustee] to hold [] [a]ssets on trust; (ii) sufficient identification of

21

the beneficiary of the trust; and (iii) sufficient identification of the assets that are the subject matter of the trust." Quest Decl. ¶ 22 (citing *Law Commission Digital Assets Consultation Paper* ¶ 16.56 (LawCom 256)) (A002285).[13]

53.     Under English law, the intention to hold assets in trust can be established by express contractual terms, as it is here under the Terms of Service with respect to the Digital Assets, or "by word of mouth or even inferred from conduct" as such intention is established with respect to ***all*** Customer Assets, including fiat and e-money. Quest Decl. ¶¶ 23, 37 (citing *Dhingra v Dhingra* [1990] EWCA Civ 1899 (A003076–3084)). Accordingly, having reviewed the Terms of Service, Mr. Quest concluded that with respect to Digital Assets, satisfying "conditions (i) and (ii) present no real difficulty" because:

> *It is express in section 8.2.6 that the customer is the owner of the Digital Assets in the customer's Account and that FTX Trading is not permitted to use them for its own purposes. Since FTX Trading had no beneficial interest, as is clear from section 8.2.6, then FTX Trading's acquisition of those Digital Assets must be treated as held on trust for the customer.*

*Id.* ¶ 23.

54.     With respect to other Customer Assets, such as fiat and fiat represented by E-Money, Mr. Quest similarly concluded that the Internal Policy Documents and numerous statements made to the public regarding the Debtors' intention to hold the Customer Assets in trust for FTX.com customers "are *prima facie* evidence of a sufficient intention to create a trust of that currency (thereby satisfying condition (i) discussed [] above)." *Id.* ¶ 38. The second element of sufficient identification of the beneficiaries of the intended trust—FTX.com customers—is easily satisfied by the same evidence. *Id.* ¶¶ 38-39.

---

[13]     As an initial matter, under English law, digital assets are treated as property, and therefore crypto-token custody arrangements can be structured as trusts. Quest Decl. ¶¶ 10, 28 (citing *Wang v Darby* [2021] EWHC 3054 (Comm) (A002116)). Trusts can also be created over credit balances of fiat or e-money. *Id.* ¶ 37 (citing *Dhingra v Dhingra* [1999] EWCA Civ 1899 (A003076–3084)).

55.    Under English law, the third condition of sufficient identification of assets subject to the trust is satisfied even when assets are commingled or otherwise not able to be allocated to a specific beneficiary. Quest Decl. ¶¶ 27-30 (citing *Pearson v Lehman Brothers* [2010] EWHC 2914 (A002943–3039), *aff'd* [2011] EWCA Civ 1544 (A003040–3075); LawCom256 ¶¶ 16.66, 16.69 & 16.75–16.76 (A002649–2653). As Mr. Quest explains, under an English law custodial trust, "each customer holds a beneficial or equitable proprietary interest in [] Assets held by FTX Trading, with the extent of the interest being referable to the relevant credit balance on the customer's Account." *Id.* ¶ 21. (LawCom256 ¶¶ 16.52-16.55 (A002644–2645)). Said differently, a custodial trust exists over the Customer Assets as reflected on the FTX.com customer Account ledgers or otherwise reflected in the Debtors' books and records, regardless of whether the assets were in segregated customer wallets, held at FTX Trading, or elsewhere. *Id.* ¶ 28. Thus, given the existence of a custodial trust over the Customer Assets as a matter of English law, the Debtors have no equitable interest in the Customer Assets.

### III.    The Customer Assets Are Held in Trust for FTX.com Customers Under Delaware Law, To the Extent Applicable (Third Claim for Relief)

#### A.    Application of Delaware Law

56.    Even if the Court finds that English law does not apply to the interpretation of the Terms of Service, the ownership of identifiable assets, and/or the creation of a trust, Delaware state law nonetheless leads to the same result.

57.    In the absence of an effective contractual choice of law provision, Delaware courts consider which state has the "most significant relationship to the contract and parties to the contract", including "the relevant policies of the forum" and the "ease in the determination and application of the law to be applied." *Certain Underwriters at Lloyds*, 160 A.3d at 465, n.52; *Restatement (Second) of Conflict of Laws*, § 6. Accordingly, in the event that the Court does not

apply the contractual choice of law provision of the Terms of Service, these factors weigh in favor of applying Delaware law because these chapter 11 cases and the underlying facts generally have a significant relationship with Delaware. Moreover, FTX.com transferred billions of dollars of FTX.com property to Alameda, which is organized in the state of Delaware. Lastly, the Debtors opted to file these chapter 11 cases in Delaware.

### B.  The Customer Assets Are Held in an Express Trust Under Delaware Law

58.     Pursuant to Delaware law, a party seeking to establish an express trust must prove the intention to create a trust relationship. *Otto v. Gore*, 45 A.3d 120, 130 (Del. 2012). The Supreme Court of Delaware has explained that the intent to create a trust can be demonstrated either "by definite, explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty." *Id*. at 130 (*quoting Levin v. Smith*, 513 A.2d 1292, 1297 (Del. 1986).

59.     As explained above, whether interpreted under English or Delaware law, the clear and unambiguous Terms of Service make clear that FTX.com customers own their Digital Assets and therefore the Debtors have no equitable interest in such Digital Assets. Terms of Service § 8.2.6.  Moreover, general rules of contract interpretation, under either English or Delaware law, confirm FTX.com customers' ownership of *all* Customer Assets, including fiat and E-Money convertible into fiat. *Supra* ¶¶ 48-50. Nonetheless, courts may also look to extrinsic evidence "[w]hen determining whether a settlor has formed the requisite intent to create a final, enforceable trust." *Otto*, 45 A.3d at 130. In the trust context, extrinsic evidence may include the circumstances surrounding the creation of the trust or the conduct of the parties involved. *Id*. at 130-31. Here, there is irrefutable extrinsic evidence of the Debtors' representations regarding the ownership of *all* Customer Assets, including fiat and E-Money. *See supra* ¶¶ 22-26.

24

60.     Indeed, the Department of Justice (the "DOJ"), the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission ("CFTC"), the Office of the United States Trustee (the "US Trustee"), and even the Debtors' current CEO have all recognized, without exception, that FTX Trading agreed and represented to FTX.com customers that they remained owners of their Customer Assets and that FTX Trading was prohibited from using Customer Assets for its own purposes under the Terms of Service.[14] Indeed, you cannot have a case of "*plain old embezzlement*" if in fact FTX Trading was permitted to "loan" Customer Assets to Alameda.[15] Where extrinsic evidence cannot be rebutted so as to create issues of material fact, summary judgment is appropriate. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d at 1232-33 (holding a court may interpret a contract through extrinsic evidence through summary judgment procedure where the factual record is not *prima facie* rebutted so as to create issues of material fact.).

---

[14]     *See, e.g.*, *United States v. Samuel Bankman-Fried* a/k/a "SBF", No. 22-cr-673 (S.D.N.Y. Dec. 9, 2022), [D.I. 80] ¶¶ 2-3 (A001012) ("[I]n public statements, including in testimony before the United States Senate, BANKMAN-FRIED represented that 'as a general principle FTX segregates customer assets from its own assets across our platforms . . . ."); SEC Compl. ¶¶ 52-53 (A000683) ("FTX's Terms of Service, which were publicly available on FTX's website and accessible to investors, assured FTX customers that their assets were secure . . . . Similarly, FTX posted on its website a document entitled, 'FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms,' in which FTX represented that it "segregates customer assets from its own assets across our platforms.'"); CFTC Compl. ¶¶ 54, 57 (A000588) ("Bankman-Fried and other representatives of FTX consistently and repeatedly reiterated, in a variety of contexts, that customer assets were properly segregated and custodied by FTX at all times . . . ."); Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner, [D.I. 176] ¶ 37 (A001068) ("FTX Trading has a claim against Alameda Research in the billions of dollars on behalf of its customers in connection with one or more loans of allegedly converted customer funds that FTX Trading had no right to make in the first instance."); Ray Testimony, 2:23 (A000233) (acknowledging that the transfer of FTX.com customer funds from FTX.com to Alameda conflicted with the Terms of Service).

[15]     Webster's dictionary defines "embezzlement" as appropriation of "something, such as property entrusted to one's case) fraudulently to one's own use." https://www.merriam-webster.com/dictionary/embezzlement. *See also Franco v. Connecticut Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 828 (D.N.J. 2011), ("The crime of embezzlement entails the conversion or misappropriation of funds belonging to another.") *aff'd in part, vacated and rev'd in part on unrelated grounds* 647 F. App'x 76 (3rd Cir. 2015).

61.     Thus, to the extent the Court finds that English law does not apply, the Ad Hoc Committee is entitled to a partial summary judgment finding that the Debtors do not have an equitable interest in the Customer Assets because an express trust was established over the Customer Assets under Delaware law.

### C.   The Customer Assets Are Held in a Resulting Trust Under Delaware Law

62.     A resulting trust is one implied by law from the intentions of the parties and the nature of the particular transaction. *Greenly v. Greenly*, 49 A.2d 126, 129 (Del. Ch. 1946). Specifically, a resulting trust "arises where a person conveys property under circumstances that raise an inference that the person does not intend the person taking or holding the property to have the beneficial interest in the property." *In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. 135, 148, n.23 (Bankr. D. Del. 2010) (*citing E. Lake Methodist Episcopal Church, Inc. v. Trs. of the Peninsula - Delaware Ann. Conf. of the United Methodist Church, Inc*., 731 A.2d 798, 809 (Del. 1999). This principle rests upon the "natural presumption that, in the absence of evidence to the contrary, the person who supplies the purchase price intends that the property shall inure to her own benefit, and that a conveyance in the name of another is for some mere incidental reason." *Greenly*, 49 A.2d at 129; *see Hudak v. Procek*, 806 A.2d 140, 146 (Del. 2002) ("As a general rule, equity will presume, absent contrary evidence, that a person supplying the purchase money for property intends to retain a beneficial interest in the property and that title is placed in the name of another for some incidental reason."). "The inference arises from the character of the transaction rather than from a declaration of intention." *In re Catholic Diocese,* 432 B.R. at 148.

63.     Here, the plain language of the Terms of Service and the record are clear that Digital Assets held in an FTX.com Account were conveyed to FTX Trading with the full expectation that FTX.com customers would retain their ownership interest in the Digital Assets.

Terms of Service § 8.2.6 (A000097).  As explained above, the same inference of ownership applies to all Customer Assets, including fiat or E-Money. *See supra* ¶¶ 22-26.

64.    The establishment of a resulting trust does not require the Customer Assets to be held in a segregated account for each FTX.com customer or separate from the Debtors' own property. Indeed, courts have found resulting trusts to exist where the debtor acts as a mere conduit to collect and pass funds on to the beneficiary. *See, e.g., In re SemCrude, L.P.*, 418 B.R. 98, 100-101 (Bankr. D. Del. 2009) (finding oil well proceeds placed in the debtors' operating account were subject to a resulting trust, and thus not property of the estate, because the debtors orally agreed to pay such funds to royalty owners and working interest owners on behalf of its customer); *see also In re Catholic Diocese*, 432 B.R. at 148 (finding that the "overwhelming" weight of facts established the existence of a resulting trust over assets that investors contributed to the debtor's pooled investment program for the benefit of the investors as a whole, even though the funds were deposited directly into the debtors' operating account).

65.    Here, as in the preceding cases, clear evidence demonstrates that the parties' intent was that ***all*** Customer Assets would remain property of the FTX.com customers, and therefore Customer Assets held by the Debtors are held in a resulting trust for the customers.

### D.    <u>The Customer Assets are Held in a Constructive Trust Under Delaware Law</u>

66.    Even if there were no express or resulting trust established over the Customer Assets, the Court can impose a constructive trust as an "equitable remedy of great flexibility and generality" when the "defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty." *Halperin v. Moreno (In re Green Field Energy Servs.)*, 594 B.R. 239, 305 (Bankr. D. Del. 2018); *see also Hogg v.*

*Walker*, 622 A.2d 648, 652 (Del. 1993) (a constructive trust is "the formula through which the conscience of equity finds expression.").

67.    Under Delaware law, a constructive trust exists if: (a) there was an enrichment; (b) an impoverishment; (c) a relation between the enrichment and impoverishment; (d) absence of justification; and (e) the absence of a remedy provided by law. *Halperin*, 594 B.R. at 305-06.

68.    For all the reasons stated above, the present situation undeniably satisfies the criteria to find that the Debtors hold the Customer Assets in a constructive trust. It is undisputed that FTX Trading and Alameda were enriched by using FTX.com customers' misappropriated Customer Assets for unauthorized purposes. Indeed, the Debtors have identified over $10 billion in "borrowing" by Alameda from the FTX.com exchange and have further conceded that the funds "borrowed" were substantially, if not entirely, Customer Assets. Ray Testimony, 1:13, 0:14, 0:44 (A000233); s*ee also* Ellison Plea Tr. at 27-28 (A000929–930); Singh Plea Tr. at 28 (A000999). It does not matter that Alameda was the direct recipient of the stolen Customer Assets and FTX Trading may have simply facilitated the misappropriation because, as Mr. Ray, has conceded "FTX Trading, Alameda, and other debtor entities "really operated as one" enterprise. Ray Testimony at 0:17 (A000233). Indeed, according to Mr. Ray, there was "no distinction whatsoever" in governance between FTX Trading and Alameda, and "the owners of the company could really run free reign across all four silos." Ray Testimony at 0:25 (A000233).

69.    There is also no dispute that the Debtors' actions impoverished the FTX.com customers. The Debtors themselves estimate an approximate $9 billion shortfall in Customer Assets held on the FTX.com exchange—Customer Assets that would have been available for return to their rightful owners—the FTX.com customers—absent the Debtors' misappropriation. Shortfall Presentation at p. 10. There is absolutely no justification for the Debtors' actions—as

28

explained by Mr. Ray, this was "***just plain old embezzlement***" that involved "***taking money from customers and using it for your own purposes***." Ray Testimony, 1:33 (A000233).

70.    Finally, absent the requested declaration that the Debtors have no equitable interest in the Customer Assets, there is no adequate remedy at law—the FTX.com customers could be lumped together with all general unsecured creditors. It is important to remember that while FTX.com customers currently constitute the vast majority of creditors of the estates, the recipients of the billions of dollars' of preferential or fraudulent transfers the Debtors made of Customers Assets before the Petition Date will receive a dollar-for-dollar unsecured claim against the Debtors if those transfers are avoided and recovered by the estates. As a result, there is an inevitable and significant stakeholder group with conflicting interests to FTX.com customers.  FTX.com customers should have priority rights to recovery of their stolen Customer Assets over avoidance action defendants turned unsecured creditors, some of which likely ***benefitted from and may have even encouraged*** the misappropriation of Customer Assets.[16]

### CONCLUSION

Given the plain and unambiguous Terms of Service, the Debtors' own representations and admissions, the undisputed misappropriation of Customer Assets, and well-established principles of law, the relief requested in the Motion is warranted.

WHEREFORE, the Ad Hoc Committee respectfully requests that the Court enter the Proposed Order declaring, as a legal matter, that the Debtors have no equitable interest in the Customer Assets under the plain and unambiguous Terms of Service and because the Customer Assets are held in a custodial trust under English law, or, to the extent Delaware law applies, the

---

[16]    *See Alameda Research Ltd. v. Voyager Digital, LLC*, No. 22-11068, Adv. Proc. No. 23-50084 (Bankr. D. Del. Jan. 30, 2023) [D.I. 596], Compl. ¶ 2 ("Largely lost in the (justified) attention paid to the alleged misconduct of Alameda and its now-indicted former leadership has been the role played by Voyager and other cryptocurrency 'lenders' who funded Alameda and fueled that alleged misconduct, either knowingly or recklessly.'").

that the Debtors have no equitable interest in the Customer Assets because the Customer Assets

are held in an express, resulting, or constructive trust under Delaware law.

Dated:  March 24, 2023

/s/ Eric D. Schwartz
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
eschwartz@morrisnichols.com
mharvey@morrisnichols.com
ptopper@morrisnichols.com

-AND-

**EVERSHEDS SUTHERLAND (US) LLP**
Erin E. Broderick
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com

-and-

David A. Wender
Nathaniel T. DeLoatch
999 Peachtree St NE
Atlanta, GA 30309
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
davidwender@eversheds-sutherland.com
nathanieldeloatch@eversheds-sutherland.com

-and-

Peter A. Ivanick
Sarah E. Paul
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
peterivanick@eversheds-sutherland.com
sarahpaul@eversheds-sutherland.com

*Counsel for Ad Hoc Committee of Non-US Customers of FTX.com*