## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 22-50514 (JTD) |
| FTX TRADING, LTD., *et al.*, | **Re: D.I. 10, 11** |
| Defendants. | |

## PROPRIETARY CLAIMS BY FTX.COM CUSTOMERS DECLARATION, SUBMITTED BY DAVID QUEST KC

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the debtors' claims and noticing agent's website at https://cases.ra.kroll.com/FTX.

**FTX Trading Ltd**

**Proprietary claims by FTX.com customers**

**Declaration**

1      I, David Quest KC, declare as follows.

**Instructions**

2      FTX Trading Ltd (FTX Trading) provides services for customers, amongst other things, to hold and trade digital assets. Customers contracted with FTX Trading on its standard Terms of Service, which provide that they are governed by and construed in accordance with English law.

3      FTX Trading is now insolvent. I have been instructed by Eversheds Sutherland to provide my opinion as to what proprietary rights customers may have as a matter of English law to assets deposited, held, received and/or acquired on the FTX.com platform.

4      Capitalised terms in this declaration are used as defined in the FTX.com Terms of Service and section numbers refer to sections of the FTX.com Terms of Service.

**Qualifications**

5      I was called to the Bar of England and Wales in 1993 and have practised continuously since then in the field of commercial law and commercial disputes, with a focus on banking, financial services, and civil fraud. I was appointed Queen's Counsel in 2013 (and I am now King's Counsel). I am joint Head of Chambers at 3 Verulam Buildings, Gray's Inn, a leading commercial set of chambers. I was recently appointed a deputy High Court Judge in the King's Bench Division (a part time role).

6      I have a particular interest in digital assets. I am co-author of the UK Jurisdiction Taskforce (UKJT) Legal Statement on Cryptoassets and Smart Contracts (the Legal Statement), which sets out English law on the proprietary status of cryptoassets and the enforceability of smart contracts. The UKJT is an industry-led initiative tasked with

promoting the use of English law and UK jurisdiction for technology; it is chaired by Sir Geoffrey Vos, the Master of the Rolls and President of the Civil Division of the Court of Appeal of England and Wales. I am also co-author of the UKJT Digital Dispute Resolution Rules, a set of arbitration rules aimed at digital transactions, and of the recently issued UKJT Legal Statement on Digital Securities. I am regularly instructed in cases concerning digital assets in England and other common law jurisdictions. I am ranked as a band 1 leading silk in cryptocurrency in Chambers & Partners 2022 and 2023 (one of three at the English Bar).

7       Further biographical information is available at www.3vb.com.

**Property in digital assets**

8       The UKJT commissioned the Legal Statement in 2019 with the aim of answering certain important questions of law that might arise in connection with the use of distributed ledger technology, including the proprietary status of digital assets. The authors[1] concluded that, although the answer would always depend on the nature of the asset, the rules of the system in which it exists, and the purpose for which the question is asked, digital assets should be treated in principle as property. They have all the legal indicia of property, and the novel and distinctive features possessed by some cryptoassets (in particular intangibility, cryptographic authentication, use of a distributed transaction ledger, decentralisation and rule by consensus) did not disqualify them from being property. Nor were they disqualified by any difficulty in classifying them as things in action or things in possession; nor by the fact that they were represented by information.

9       Although the Legal Statement did not at the time have any formal status as a legal precedent, its analysis and conclusions were subsequently adopted in England by Bryan J in *AA v Persons Unknown*,[2] and it has also been cited with approval in other common law jurisdictions, including in New Zealand in *New Ruscoe v Cryptopia Ltd,*[3] and in the British Virgin Islands in *Smith v Torque Group Holdings Ltd*.[4]

---

[1] Lawrence Akka QC, Matthew Lavy, Sam Goodman and myself.
[2] [2019] EWHC 3556 (Comm). See also *Danisz v Persons Unknown* [2022] EWHC 280 (QB) at [13], *DPP v Briedis* [2021] EWHC 3155 (Admin) at [10] (holding that bitcoin can be the subject of a property freezing order pursuant to section 245A of the Proceeds of Crime Act 2002); *Litecoin Foundation Ltd v Inshallah Ltd* [2021] EWHC 1998 (Ch) at [2].
[3] [2020] NZHC 728.
[4] Unreported, 2 July 2021.

10    A particular consequence of a digital asset being property is that it can be subject to a trust, as was held in *New Ruscoe*.[5]

11    The general position is that the person who controls a network address (through access to the private key) is treated as the legal owner of the assets associated with it, and so a transfer on the blockchain generally equates to a transfer of ownership. However, the blockchain is not a definitive record of ownership,[6] and, in the present case, it was in principle open to FTX Trading and its customers to contract as to the proprietary effects of Digital Asset transactions on the FTX platform.

**General principles on the interpretation of contracts**

12    The leading cases in English law on interpretation of contracts include *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619 and *Wood v Capita Insurance Services Ltd* [2017] UKSC 24, [2017] 2 WLR 1095. The key principles are as follows:

a    The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The starting point is that words are to be given their ordinary and natural meaning; and, except perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. The parties' subjective understanding of the language is irrelevant.

b    As well as looking at the text, the court can take into account the context: i.e. the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract. The court is entitled to prefer a construction which is more consistent with business common sense.

c    Textualism and contextualism are both tools to be used to ascertain the objective meaning of the words used; the relative importance of these tools will vary according to the circumstances, including the quality and expertise of the drafting.

---

[5] See also *Wang v Darby* [2021] EWHC 3054 (Comm), where it was accepted by the parties that cryptocurrency could be the subject of a trust.

[6] Law Commission Digital Assets Consultation Paper (LawCom 256) at para 13.8; UKJT Legal Statement at para 43.

**The FTX.com platform and Terms of Service**

13    Based on the information available to me, the FTX.com platform appears to operate as follows. Each customer of FTX Trading has an Account recording the customer's holdings of Digital Assets, and also any fiat currency or E-money held by the customer on the platform. A customer can acquire Digital Assets in the customer's Account by four principal methods: (i) by sending Digital Assets that the customer already owns to a network address generated by the platform (s8.2.1); (ii) by purchasing Digital Assets using fiat currency and E-Money (s8.2.2 and s8.3.5); (iii) by exchanging a Digital Asset in the customer's Account for a different type of Digital Asset (s8.2.3); or (iv) by receiving Digital Assets from a third party, either within or outside the FTX platform (s8.2.3).

14    In relation to proprietary rights, the FTX.com Terms of Service expressly provide that all Digital Assets are held in a customer's Account on the following basis (s8.2.6):

a    "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account."

b    "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

c    "You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."

15    Those provisions refer to Digital Assets "in" an Account. However, an Account is not a receptacle of assets, but a record kept by FTX Trading of customer transactions, holdings and balances. That record should be distinguished from the Digital Assets themselves, which exist independently as data objects on blockchains, are linked to network addresses in accordance with the blockchain protocol, and are controllable only by the use of the associated private keys. In this case, my understanding is that the relevant

4

private keys are held by FTX Trading.[7] Thus, any withdrawal of a Digital Asset from an Account has to be implemented by FTX Trading on the customer's instruction.

16    It may be possible in some cases to link a credit on an Account to a specific Digital Asset. For example, if a customer deposits a Digital Asset held by the customer outside the FTX.com platform by sending it to a platform-generated network address, that asset is identifiable on the blockchain before and after the point of the deposit (it can be seen at the sending and receiving addresses). Under s8.2.6, the customer retains title to the Asset, and title does not transfer to FTX Trading, even though the Digital Asset has been transferred onto the FTX.com platform to a network address for which the customer does not have the private key.

17    The position would be the same if a customer received a Digital Asset from a third party outside the FTX.com platform. The effect of s8.2.6 is that title passes from the third party to the customer, and not to FTX Trading.

18    It follows that if a customer can identify a deposited (or received) Digital Asset within the assets now held by FTX Trading (for example if it remains at the network address where it was first deposited) or in the hands of another party, then the customer is entitled to make a claim to title[8] and so to recover the asset, free of any claims of other customers or creditors.

19    It may well be, however, that the customer will not be able to identify the original Digital Asset deposited or received. Exchanges typically remove Digital Assets from the initial deposit addresses and combine them in central pool addresses, where they are treated as fungible and available to meet ongoing obligations of the exchange, including withdrawal requests by customers.[9] It seems likely that that was FTX Trading's practice too because one of its published "key investor protection principles" was "maintaining adequate liquid resources to ensure the platform can return the customer's assets on request", which suggests that it met withdrawal requests from a general pool of assets. In that case, identifying and recovering the original Digital Asset may become difficult or impossible.

---

[7] That is the typical model for exchanges, and seems to be consistent with the description on FTX's website of the operation of "blockchain deposits and withdrawals".

[8] The precise nature of the title and the claim may depend on the discussion (see Legal Statement, paras 45–48 and LawCom 256 para 13.18–13.19) about whether the transfer of a digital asset creates a new, original title or whether the existing title passes to the transferee.

[9] See LawCom 256 paras 16.24-16.26.

20    A further issue arises if the customer acquires a Digital Asset from within the FTX platform, for example by purchasing it from FTX or from another customer on the platform. A transaction of that kind may not involve any underlying transfer of an asset on the blockchain: it may be settled simply by credit and debit entries on the relevant Accounts. In that case, it may not be possible to identify a particular Digital Asset as referable to the transaction or as allocated to the customer's Account.

**Trust of Digital Assets**

21    In the light of those issues, I have considered whether s8.2.6 might be analysed as establishing a trust arrangement, whereby each customer holds a beneficial or equitable proprietary interest in Digital Assets held by FTX Trading, with the extent of the interest being referable to the relevant credit balance on the customer's Account. A custodial structure of that kind is described in the Law Commission Digital Assets Consultation Paper (LawCom 256) paras 16.52 to 16.55. It is a well-established method of holding conventional assets such as shares and bonds.

22    Establishing such a trust requires proof of three things: (i) intention by FTX Trading to hold Digital Assets on trust; (ii) sufficient identification of the beneficiary of the trust; and (iii) sufficient identification of the Digital Assets that are the subject matter of the trust (see LawCom 256 para 16.56).

23    Conditions (i) and (ii) present no real difficulty. It is express in section 8.2.6 that the customer is the owner of the Digital Assets in the customer's Account and that FTX Trading is not permitted to use them for its own purposes. Since FTX Trading had no beneficial interest, as is clear from section 8.2.6, then FTX Trading's acquisition of those Digital Assets must be treated as held on trust for the customer.

24    In previous cases, courts have had to embark on a detailed investigation of the terms and operation of the relationship between the parties in order to ascertain whether the customer's rights against the custodial counterparty were intended to be proprietary in nature or only contractual; see, for example, *Ruscoe*, supra, and *Quoine v B2C2* [2020] SGCA(I) 02, where the courts reached opposite results. However, I do not see that it is necessary to do that in the present case because, unlike *Ruscoe* and *Quoine*, the contract clearly and expressly provides for the allocation of ownership between the parties.

25    Moreover, I do not think that the analysis is affected by the fact that FTX Trading has the contractual right, in various circumstances, to deduct or remove Digital Assets from an Account or to freeze an Account. *See* for example ss7.10, 8.1.3, 8.3.6, 10.2, 10.3.1, 16.2.

I see no inconsistency between the customer's fundamental right to beneficial ownership of the Digital Assets in the customer's Account and those provisions, which are simply qualifications of that right under specified circumstances.

26    S2.1.3 provides that FTX Trading has no fiduciary relationship or obligation to customers in connection with any trades or other decisions or activities, but that appears to be aimed at avoiding fiduciary duties in relation to trading activities, such as a duty to act in a customer's best interests or to avoid conflict. Again, I see no inconsistency with the customer having a right to beneficial ownership of Digital Assets, as is expressly provided for in s8.2.6.

27    I turn next to condition (iii). It is sometimes said that there is in English law an "allocation principle": a rule that proprietary rights cannot be acquired in fungibles forming an unidentified part of a bulk until they have been separated by some suitable act of appropriation.[10] Identification issues in the present case are discussed above. In relation to Digital Assets deposited or received from outside the platform, it may be difficult to identify them once transferred into a pooled address; and in relation to Digital Assets acquired within the FTX platform, it may be impossible to identify them if there is no process of allocating particular assets to particular transactions. If FTX Trading mixed its own proprietary assets, or other non-customer assets, in pooled addresses, then that would add a further layer of complexity to the process.

28    The allocation principle, its application to digital assets, and the exceptions to it, are discussed in detail at LawCom 256 at paras 16.69–. I do not repeat the analysis, which I respectfully agree with, except to emphasise (as the Law Commission does) that the possibility of there being a valid trust over a commingled fund was recognised by Briggs J in *Pearson v Lehman Brothers* [2010] EWHC 2914[11], who said at [232]: "such a trust works by creating a beneficial co-ownership share in the identified fund, rather than in the conceptually much more difficult notion of seeking to identify a particular part of that fund which the beneficiary owns outright". The Law Commission's provisional conclusion on custodial trust structures (paras 16.75–16.76) was that, notwithstanding the allocation principle:

a    "under the law of England and Wales, crypto-token custody arrangements could be characterised and structured as trusts, even where the underlying entitlements are (i) held on a consolidated unallocated basis for the benefit of multiple users,

---

[10] LawCom 16.66.
[11] Upheld on appeal on this point [2011] EWCA Civ 1544.

and (ii) potentially even commingled with unallocated entitlements held for the benefit of the custodian itself"; and

b    "the best way of understanding the interests of beneficiaries under such trusts are as rights of co-ownership in an equitable tenancy in common".

29    LawCom 256 is a consultation paper: it sets out the Law Commission's views of the current state of the law with a view to obtaining the views of consultees on legal reform. A final report is due to be published during 2023. It is neither definitive nor binding. It can nevertheless properly be treated as a detailed and up to date statement of the law in this area, and one that would certainly carry great weight in any English court or tribunal.

30    On that basis of that material and analysis, customers of FTX Trading may make the claim that they have acquired beneficial or equitable proprietary interests in Digital Assets held by FTX Trading in the form of a right of co-ownership in the asset pool.

31    I recognise this leaves open questions as to precisely how the assets remaining at FTX Trading should be pooled or consolidated for the purpose of that analysis, and which customers are entitled to participate in which pools. For example, one might expect each type of Digital Asset (e.g. bitcoin, ether, USDC) to be treated as a separate pool held for the benefit of customers with an interest in that asset type (see LawCom 256 para 16.69). The pooling analysis may also be affected by the way in which FTX Trading accounted internally for its assets—for example if it accounted for its own assets separately from customers—or how they were pooled within network addresses on the blockchain. Those questions were not addressed by the Law Commission and as far as I am aware have not yet been the subject of any judicial or academic consideration.

32    However, I do not think questions of that kind need to be resolved before an English court could or would give effect to s8.2.6 by finding, in principle, a trust on appropriate terms. As Briggs J said in *Pearson* at [245, 247]:

"The law does not lightly allow contracting parties' purposes and intentions to be defeated by supposed uncertainty, and there is in my judgment no reason why the law should do so any more readily than normal merely because the issue is as to the validity of an intended trust. On the contrary, the law commonly recognises the creation of a trust as a necessary consequence of an intention that parties should share property beneficially, in circumstances where the parties themselves have given no thought at all to the terms of the consequential trust, if indeed they even recognised its existence. In

all such cases the law fills the consequential gaps by implication, and by importation of generally applicable principles…

"…the fact that [the operations of Lehman Brothers entities] may throw up difficulties of analysis as to their proportionate shares in the securities which remain after the collapse is not a basis for concluding that the trust which the law necessarily recognises so as to give effect to their intended proprietary interests should fail for want of certainty, whether as to terms, or as to the amount of those beneficial interests."

**Fiat money and E-money**

33   I have also considered what rights a customer may have in fiat currency and E-money in an Account.

34   S8.3.1 provides that the Platform supports various fiat currencies "for deposit, withdrawal, and/or trading". S8.3.2 provides that once fiat currency has been "loaded" into an Account, FTX Trading may "issue you with an equivalent amount of electronic money ('E-Money'), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded." S.8.3.3 states that "E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT," and S.8.3.4 states that "E-Money held in your Account will not earn any interest." S.3.8.7, moreover, provides that a customer may "redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions."

35   By contrast with Digital Assets, the FTX.com Terms of Service do not expressly provide that customers retain title in fiat currency loaded into their Accounts. On the other hand, they also do not expressly provide that customers are merely creditors for an equivalent amount, as in the case of a conventional bank deposit.

36   As regards the status of customer fiat currency, I understand (from para 45 of the Complaint) that FTX Digital Markets Ltd, an affiliate of FTX Trading, issued an internal policy document in the following terms:

a      "All third-party service providers are aware that customer funds do not represent property of FDM and are therefore protected from third-party creditors."

b      "All third-party providers are aware that customer assets are held in trust."

    c      "Customer monies will be appropriately ring-fenced to protect from: the unlikely event FDM becomes insolvent; the use of customer monies being used to benefit others; and FDM using customer monies to finance its own operations."

    d      "Written notice will be provided to the relevant regulated credit, e-money or payment institution to clarify that the assets are held by us on trust for our customers."

I also understand (from para 46 of the Complaint) that a senior representative of FTX Trading gave evidence to a US Senate Committee that "as a general principle FTX segregates customer assets from its own assets across [its] platforms".

37     The reference to the giving of notice to credit, e-money and payment institutions suggests (as one would expect) that fiat currency was received from customers into bank accounts in the name of FTX Trading or some affiliated entity. As a matter of English law,[12] it is possible for a bank account holder to create a trust over the credit balances by a simple declaration and without any other formality, provided that the conditions set out in para [21] above are met. See *Dhingra v Dhingra* [1999] EWCA Civ 1899 (citing *Snell's Equity*): "first, as far as concerns personalty… a declaration of trust may be by word of mouth or even inferred from conduct; secondly, no particular form of words in necessary…; thirdly, where the property in relation to which the trust is declared is already in the name of the declarer of the trust, the trust is, as it is put, 'Completely constituted the moment that the trust is declared',…; fourthly, once the trust is completely constituted it can be enforced by a beneficiary even if he or she is a mere volunteer."

38     If the statements set out in para 36 above reflect the position of the FTX entities holding fiat currency deposited by customers, then they are prima facie evidence of a sufficient intention to create a trust of that currency (thereby satisfying condition (i) discussed in para 22 above).[13] If customer fiat deposits were held in a commingled fund, then a trust could be established on the same basis as that described above in relation to Digital Assets.

---

[12] Assuming that English law applies.

[13] I note that, under s38.1, customers agreed that they had not relied on any statement, commitment etc., not expressly set out in the terms of service. I do not think that affects the position because reliance by the beneficiary on the declaration is not a requirement for a valid trust.

**Conclusion**

39    I therefore conclude, based on the information available to me, that customers of FTX Trading should be treated as having beneficial or equitable proprietary interests in Digital Assets deposited, received or acquired by them on the FTX platform, and should not be classified as merely unsecured creditors of FTX Trading for the balances on their Accounts. Moreover, if the FTX entities that hold deposited fiat currency evinced an intention to hold it on trust for customers, as the statements in para 36 appear to show, the customers should similarly be treated as having beneficial or equitable proprietary interests in those assets too.

**DAVID QUEST KC**

3 Verulam Buildings,
Gray's Inn, London
N6 4SL

23 March 2023