**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 22-_____ (___) |
| FTX TRADING, LTD., *et al.*,[2] | |
| Defendants. | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

The Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee" or "Plaintiff"), comprising international customers that hold accounts on the FTX.com platform, by and through undersigned counsel, respectfully brings this Complaint for a declaratory judgment against the above-captioned debtors in possession (collectively, the "Debtors" or the "Defendants") in these chapter 11 cases (the "Chapter 11 Cases") and alleges and states as follows:

**SUMMARY OF ACTION**

1.     This action seeks a declaration that assets customers deposited, held, received, or acquired on the FTX.com platform are customer property and not property of the Debtors' estates

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]  Each of the Debtors in these Chapter 11 Cases is named as a Defendant in this Complaint.  A list of the Debtor-Defendants subject to this Complaint is attached hereto as **Exhibit A**.

A000001

under section 541 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

2.     Under the clear and unambiguous language of the FTX.com Terms of Service (the "Terms of Service"), title to digital assets on the FTX.com platform remained at all times with the customer and did not transfer to FTX Trading Ltd. ("FTX Trading" or "FTX.com"), which owned and controlled the FTX.com platform.  Digital assets held in customer accounts expressly were ***not*** the property of and could ***not*** be loaned to FTX Trading or any of its affiliated Debtors.

3.     FTX Trading represented to customers in the Terms of Service that it could issue them electronic money, or E-money, from the fiat currency that they loaded into their accounts, and they could use the E-money to purchase digital assets.  The Terms of Service provide that the customers could redeem all or part of any E-money held in their accounts at any time.

4.     Despite the clear and unambiguous language of the Terms of Service, and as has now been widely reported, the FTX.com customers were the victims of mass misappropriation of their funds.  FTX Trading, through its sister company, Alameda Research LLC ("Alameda") surreptitiously siphoned off customer funds for its own use, in violation of these express provisions, leading to over $8 billion in customer deposits going missing.  Amended Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties under the Commodity Exchange Act and Commission Regulations at ¶ 3, *Commodity Futures Trading Comm'n v. Bankman-Fried*, 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022) (D.I. 13) (the "CFTC Compl.") ¶ 3; Complaint at ¶¶ 2, 4, *Sec. and Exch. Comm'n v. Bankman-Fried*, 1:22-cv-10794-PKC (S.D.N.Y. Dec. 21, 2022) (D.I. 1) (the "SEC Compl.").  *See also* Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner (the "Examiner Motion"), D.I. 176, ¶¶ 16, 36, 37.

A000002

5.      Sam Bankman-Fried, the co-founder and majority owner of both FTX Trading and Alameda, has been criminally charged for his role in defrauding FTX.com customers by misappropriating their deposits.    Indictment, *United States v. Samuel Bankman-Fried a/k/a "SBF,"*, 22-cr-673-LAK (S.D.N.Y. Dec. 9, 2022) (D.I. 1) (the "SDNY Indictment") (Counts One, Two, and Five).   Two of Bankman-Fried's top lieutenants, Zixiao "Gary" Wang and Caroline Ellison, pleaded guilty to criminal charges for their roles in the scheme and are cooperating with law enforcement.   Dec. 19, 2022 Minute Entry, *United States v. Zixiao "Gary" Wang*, 22-cr-673-LAK-2 (S.D.N.Y. Dec. 19, 2022) (D.I. 6) (the "Wang Plea"); and Dec. 19, 2022 Minute Entry, *United States v. Caroline Ellison*, 22-cr-673-LAK-3 (S.D.N.Y. Dec. 19, 2022) (D.I. 8) (the "Ellison Plea").   Wang and Ellison also do not contest their liability on the CFTC's claims, and they have consented to settlements of the SEC's charges.   *See* CFTC Press Release No. 8644-22 (Dec. 21, 2022); SEC Press Release No. 2022-234 (Dec. 21, 2022).

6.      There is no dispute that FTX.com customers were the victims of massive fraud and misappropriation of billions of dollars of their assets in violation of the clear and unambiguous Terms of Service.   Indeed, the Debtors' new CEO, John J. Ray, III, testified under oath to Congress that: "This is really old fashioned embezzlement. This is just taking money from customers and using it for your own purposes . . . . This is just plain old embezzlement."[3]

7.      English law governs the Terms of Service.   Under English law, FTX.com customers – and not FTX Trading or any other Debtor – are the owners of the assets they deposited, held, received, or acquired on the FTX.com platform.   If those assets can be identified, either because they remain on the platform or because they can be identified in another location, the customers are entitled to recover the assets, free of any claims of other customers or creditors.

---

[3] *FTX's New CEO: "This is Really Old-Fashioned Embezzlement*," Yahoo! (Dec. 13, 2022) (summarizing portions of John J. Ray, III's testimony before the U.S. House Financial Services Committee) (the "Ray Testimony").

8.      Moreover, under English law, the customers also have a trust interest in, or otherwise own beneficial or equitable proprietary interests in, customer assets that have been commingled or unallocated, up to the amount of the balance on their accounts.

9.      Because these assets are customer property, and not the Debtors' property, the assets are not part of the Debtors' estates under section 541 of the Bankruptcy Code.  So FTX.com customers are not mere unsecured creditors of the Debtors, but rather the owners of interests in property.

10.     To date, however, the Debtors have classified FTX.com customers as unsecured creditors and have frozen FTX.com customer withdrawals, actions inconsistent with the customers' ownership rights.  Thus, a controversy exists, and the Ad Hoc Committee files this Complaint seeking a declaratory judgment that the FTX.com customer assets are not property of the estate, but instead, are customer property.

## JURISDICTION AND VENUE

11.     This adversary proceeding arises in and relates to the Chapter 11 Cases pending before the U.S. Bankruptcy Court for the District of Delaware (the "Court") under the Bankruptcy Code.

12.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G) and (O).

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory predicates for the relief requested herein are sections 105(a) and 541 of the Bankruptcy Code, as supplemented by Rules 7001(1) and 7001(9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

A000004

## PARTIES

15.     The Plaintiff is the Ad Hoc Committee of Non-US Customers of FTX.com.  The Ad Hoc Committee comprises international customers with accounts on the FTX.com platform. The Ad Hoc Committee is represented by Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP.[4]  As of the filling of this Complaint, the Ad Hoc Committee comprises 15 members representing approximately $1.9 billion in aggregate claims. The Ad Hoc Committee has been growing every week since its formation on December 2, 2022.

16.     The Defendants are the Debtors in the above-captioned Chapter 11 Cases.  The Debtors' names and addresses are set forth in their voluntary petitions filed with this Court, and are incorporated herein by reference as part of the allegations of this Complaint.  A list of the Debtor entities is attached hereto as **Exhibit A**.  The corporate organization of the Debtors, as well as their jurisdictions of formation, are set forth in Exhibit B to the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings*, filed on November 17, 2022 [D.I. 24] (the "First Day Declaration"), and are incorporated herein by reference as part of the allegations of this Complaint.

## BACKGROUND AND FACTS

### I.     Overview of FTX Trading and Alameda

17.     In or around October 2017, Bankman-Fried and Wang co-founded Alameda, a quantitative trading firm specializing in crypto assets.  SEC Compl. ¶ 18.

---

[4] The aggregate claim amounts represented by each of the members of the Ad Hoc Committee will be set forth in a statement ("Rule 2019 Statement") filed by the Ad Hoc Committee's counsel in short order.  For the reasons set forth in the Debtors' motion to redact or withhold certain confidential information of customers and personal information of individuals (D.I. 45), and in the Ad Hoc Committee's joinder in support of that motion (D.I. 327), the names, addresses, and email addresses of the members of the Ad Hoc Committee will be redacted in the Rule 2019 Statement.

A000005

18.    Alameda was a "'crypto hedge fund' with a diversified business trading and speculating in digital assets and related loans and securities for the account of its owners, Messrs. Bankman-Fried (90%) and Wang (10%)." First Day Decl. ¶ 22.

19.    In May 2019, Bankman-Fried, Wang, and Nishad Singh launched FTX.com, the trade name for the business conducted by FTX Trading, a centralized digital asset exchange organized in Antigua. *Id.* at ¶ 33.

20.    FTX Trading offered trading in a large variety of digital assets, including digital asset commodities such as bitcoin, ether, tether and others. CFTC Compl. ¶ 36. The FTX.com platform was not available to U.S. users. First Day Decl. ¶ 33.

21.    Bankman-Fried, along with Wang, Ellison, and/or others, operated FTX Trading and Alameda as part of a common enterprise. CFTC Compl. ¶ 4.

22.    The FTX.com platform "grew quickly since its launch to become one of the largest cryptocurrency exchanges in the world." First Day Decl. ¶ 35. At its height, it claimed to have millions of registered users and approximately $15 billion in assets. *Id.*

23.    On November 10, 2022, FTX Trading halted all trading and withdrawals, and Bankman-Fried announced that Alameda was being wound down. CFTC Compl. ¶ 110. That same day, Bankman-Fried resigned as CEO of FTX Trading and as majority owner of FTX Trading and Alameda, authorizing the appointment of an independent CEO and the filing of Chapter 11 bankruptcy proceedings. *Id.* ¶ 111.

24.    On November 11, 2022, the Debtors, facing a severe liquidity crisis, filed these Chapter 11 Cases. First Day Decl. ¶ 40.

25.    On November 28, 2022, the Debtors filed a redacted list of the top 50 creditors of the "Dotcom Silo", which includes FTX Trading, listing customers as the top 50 holders of

A000006

unsecured claims against the Debtors in the Dotcom Silo.  *See* D.I. 164-4.  Upon information and belief, the unidentified customers on such list are customers of FTX Trading, who, for the reasons set forth herein, are not mere unsecured creditors of FTX Trading.

26.     As discussed in further detail below, in the days and weeks since the Debtor's' filed for chapter 11 protection, it has been revealed that FTX Trading, including through its sister company Alameda, engaged in mass fraud and misappropriation of FTX customer assets.  CFTC Compl. ¶ 3; SEC Compl. ¶ 2; Examiner Motion ¶¶ 16, 36, 37; SDNY Indictment (Counts One, Two, and Five); Wang Plea; Ellison Plea.  *See also* Ray Testimony ("This is really old fashioned embezzlement.  This is just taking money from customers and using it for your own purposes. . . . This is just plain old embezzlement.").

## II.     The FTX.com Platform and Terms of Service

27.     Customers, or users, who wished to use the FTX.com platform did so in reliance on the representations made to them in the FTX.com Terms of Service (the "Terms of Service"), a true and correct copy of which is attached as **Exhibit B**.

28.     The Terms of Service constitute the agreement between the customers and FTX Trading and apply to the customers' use of the platform to transact in Digital Assets.  Terms of Service, at 1.

29.     The Terms of Service are governed by and construed in accordance with English law.  *Id.* § 38.11.

30.     "Digital Assets," as defined in Schedule 1 to the Terms of Service, means "BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other

tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform." *Id.* at Schedule 1, § 1.1.

31.     "Assets," as defined in section 2.4.1 of the Terms of Service, includes Digital Assets, fiat currency, and E-Money. *Id.* § 2.4.1. E-Money is electronic money that FTX Trading would issue to a customer representing an equivalent amount of fiat currency deposited by the customer. *Id.* § 8.3.2.

32.     Each customer had an "Account" recording the Assets held by the customer on the platform. *Id.* at 1 (describing "Account"); § 8 (describing customer funding of Account with Digital Assets and/or fiat currency, and issuance of E-Money to customer). The Account, in other words, was a record kept by FTX Trading of a customer's transactions, holdings and Asset balances. *See id.*

33.     A customer could acquire Digital Assets in the customer's Account by four principal methods: (i) by sending Digital Assets that the customer already owned to a network address generated by the platform (*id.* § 8.2.1); (ii) by purchasing Digital Assets using fiat currency (*id.* § 8.2.2); (iii) by exchanging a Digital Asset in the customer's Account for a different type of Digital Asset (*id.* § 8.2.3); or (iv) by receiving Digital Assets from a third party, either within or outside the platform (*id.*).

34.     The Terms of Service expressly state that all Digital Assets are held in a customer's Account on the following basis:

> (A)     **Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading**. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

A000008

(B)    **None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading**.

(C)    **You control the Digital Assets held in your Account.**  At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

*Id.* § 8.2.6 (emphasis added).

35.    The Terms of Service, accordingly, clearly and unambiguously provide that: (i) title to a customer's Digital Assets remain with the customer at all times; (ii) none of the customer's Digital Assets are or were the property of, or could be loaned to, FTX Trading; and (iii) the customer controlled the Digital Assets held in in a customer's Account.  *Id.* § 8.2.6.  Put simply, customers – and not FTX Trading or any other Debtor – owned and controlled their Digital Assets.

36.    Moreover, the Terms of Service state that a customer may purchase Digital Assets by using E-Money credited to the customer's Account.  *Id.* § 8.3.5.  E-Money would be issued to the customer by FTX Trading based on the equivalent amount of fiat currency the customer loaded into the customer's Account.  *Id.* §§ 8.3.2, 8.3.5.

37.    The Terms of Service clearly and unambiguously provide that a customer can redeem all or part of any E-Money held in the customer's Account at any time.  *Id.* § 8.3.7.

## III.    The Misappropriation of the FTX Customers' Assets.

38.    Unbeknownst to FTX.com's customers, FTX.com was defrauding its customers from launch in May 2019 to at least November 11, 2022, including through its affiliate Alameda, by secretly using FTX.com customer Assets without authorization and in clear violation of the Terms of Service.  *Id.* §§ 8.2.6, 8.3.2, 8.3.7; CFTC Compl. ¶ 5.

A000009

39.     During this time period, Alameda used FTX.com customer Assets to trade on other digital asset exchanges and to fund a variety of high-risk digital asset industry investments. CFTC Compl. ¶ 7; SEC Compl. ¶ 2.

40.     These misuses of customer Assets by Alameda were not disclosed to or authorized by FTX.com customers. CFTC Compl. ¶ 52. To the contrary, the Terms of Service expressly prohibited these uses of customer Assets. *Id.* (quoting section 8.2.6 of the Terms of Service); *see also* SEC Compl. ¶ 52 (quoting sections 8.2.6, 8.3.2, and 8.3.7 of the Terms of Service).

41.     At the time of FTX.com's launch, customers seeking to deposit fiat currency into their FTX.com accounts were directed unwittingly to wire their funds to bank accounts owned and controlled by Alameda. CFTC Compl. ¶ 46. When FTX.com customer Assets were deposited into Alameda bank accounts, Alameda personnel manually credited FTX.com customer accounts with the corresponding amount of fiat currency on FTX Trading's internal ledger system to maintain the ruse that FTX.com customer Assets were being handled in the manner required by the Terms of Service. *Id.* ¶ 47. Customers accessing their FTX.com accounts would be able to observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX.com accounts, even though the fiat deposits actually and fraudulently were being held in Alameda-controlled bank accounts. *Id.*

42.     For a small subset of customer deposits, Alameda exchanged customer deposits for fiat-backed stablecoins and then transferred an equivalent amount of such stablecoins to FTX's digital asset wallets. *Id.* ¶ 48. While this happened occasionally, customer Assets typically remained solely in bank accounts in the name of Alameda, where they continued to be commingled with Alameda's own assets. *Id.* By approximately August 2020, FTX had opened its own "for the benefit of" (FBO) fiat bank accounts. *Id.* ¶ 50. However, FTX.com customer Assets that had

A000010

previously been wired to Alameda were not transferred to FTX's bank accounts. *Id.* Furthermore, even after August 2020, at least some FTX.com customers continued to send fiat deposits to Alameda-owned accounts. *Id.*

43.     Between May 2019 and November 11, 2022, an account designated as "fiat@ftx" on FTX Trading's internal ledger systems reflecting the Alameda-owned bank accounts described above held a balance of as much as $8 billion in customer Assets. *Id.* ¶ 49.

44.     Consistently from FTX.com's launch, Alameda illegally and impermissibly accessed and used FTX.com customer Assets for Alameda's own operations and activities, including to fund its trading, investment and borrowing/lending activities. *Id.* ¶ 51. Alameda's use of FTX.com customer Assets included both customer fiat currency deposits that were sent to Alameda-owned bank accounts and customer Digital Asset deposits and holdings that Alameda accessed via the unbounded withdrawal capabilities of its FTX account. *Id.*

45.     The participants engaged in this scheme despite being aware of the need to segregate and protect customer Assets. *Id.* ¶ 53.  Internal FTX policy documents, for instance, promised that FTX Digital Markets Ltd. ("FDM"), an FTX Trading affiliate, would ensure that:

- "All third-party service providers are aware that **customer funds do not represent property of FDM and are therefore protected from third-party creditors**";

- "All third-party providers are aware that **customer assets are held in trust**";

- "Customer monies will be appropriately ring-fenced to protect from:

    o   The unlikely event FDM becomes insolvent;

    o   The use of customer monies being used to benefit others; and

    o   FDM using customer monies to finance its own operations.

    Written notice will be provided to the relevant regulated credit, e-money or payment institution to clarify that **the assets are held by us on trust for our customers** …"

A000011

*Id.* (emphasis added).

46.     Bankman-Fried and other FTX representatives also claimed that customer Assets were properly segregated and custodied by FTX at all times, in conformation with both the Terms of Service and generally understood best practices for derivatives exchanges. *Id.* ¶ 54. For example, during February 9, 2022 testimony before the U.S. Senate Committee on Agriculture, Nutrition and Forestry, Bankman-Fried stated that, "By logging in to the customer's account at FTX, the customer can immediately view the types of assets they own held in custody by FTX. The assets are ledgered and easily identifiable to the user (but held in an omnibus wallet in the case of the customer's tokens in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX.  Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms." *Id.* ¶ 56.

47.     Contrary to these representations, and without disclosure to FTX.com customers, Alameda and FTX comingled funds and freely used FTX.com customer Assets as if they were their own, including as capital to deploy in their own trading and investment activities. *Id.* ¶ 57.

48.     Upon information and belief, and in reliance on the Debtors' own statements and the uncontested allegations of the SEC and CFTC, Plaintiff understands and believes that FTX Trading and/or Alameda comingled, and/or transferred FTX.com customer funds to, with, or among some or potentially all other Debtor entities as well.  For example, the Debtors' new CEO testified that "the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments."[5]  Based on

---

[5] Testimony of Mr. John J. Ray III before the House Committee on Financial Services, Dec. 13, 2022, available at https://financialservices.house.gov/events/eventsingle.aspx?EventID=410002.

A000012

Mr. Ray's statement, and upon information and belief, the funds used acquire those business and investments were in whole or in part FTX.com customer funds, and those business and investments are believed to be held, directly or indirectly, by various Debtor entities in addition to or other than FTX Trading and Alameda.

49.     Furthermore, the CTFC similarly alleges that the FTX and Alameda "through a web of subsidiaries, affiliates and other related entities constituting the FTX Enterprise, misappropriated customer assets for their own use and benefit." CFTC Compl. ¶ 9. The "FTX Enterprise" as defined in the CFTC Complaint means FTX Trading, Alameda Research, and "other entities under Bankman-Fried's majority ownership and control, as a common enterprise." *Id.* ¶ 4. FTX Trading and Alameda "together with other entities under the majority ownership and control of Bankman-Friend operated as a single, integrated common enterprise under the sole ultimate authority of Bankman-Fried as their mutual owner, and identified [ ] as the FTX Enterprise. Bankman-Fried regularly exercised control over each of the component entities of the FTX Enterprise throughout the Relevant Period, including regularly serving as signatory on core corporate agreements, as well as corporate bank accounts and trading accounts, many of which were held in the United States. The FTX Enterprise failed to observe corporate formalities, including failure to segregate assets, operations, resources and personnel, or to properly document intercompany transfers of assets and other resources. The entities regularly shared office space, systems, accounts and communications channels. On information and belief, assets flowed freely between the FTX Enterprise entities, often without documentation or effective tracking." *Id.* ¶ 21. Accordingly, Plaintiff reasonably believes that some or all of the Debtor-Defendants hold property or assets belonging to or traceable to the Assets of FTX.com customers.

A000013

50.     In approximately May to June 2022, Alameda was subject to a large number of margin calls and loan recalls. *Id.* ¶ 75.  It did not have sufficient liquid assets to service its loans. *Id.*  Instead, Alameda greatly increased its usage of FTX.com customer Assets to meet its external debt obligations.  *Id.*  Alameda was able to rely on its undisclosed ordinary-course access to FTX.com credit and customer Assets to facilitate these large withdrawals, which were several billion dollars in notional value.  *Id.*; *see also* SEC Compl. ¶ 5 ("Bankman-Fried, with [Wang's and Ellison's] knowledge, directed FTX to divert billions more in customer assets to Alameda [at this time] to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors.  Ellison then used FTX's customer assets to pay Alameda's debts.").

51.     In early November 2022, following a liquidity crisis at Alameda, Ellison acknowledged to Alameda staff members that she and others had decided to use FTX.com customer Assets to pay Alameda's debts. CFTC Compl. ¶ 107.  Specifically, on November, 9, 2022, during an "all hands" meeting with Alameda staff, Ellison admitted that to meet its loan recalls, Alameda had borrowed "a bunch of funds" from FTX, which in turn "led to FTX having a shortfall in user funds." *Id.*

52.     On November 10, 2022, FTX Trading and FTX US (a separate group of operating entities operating a digital asset exchange specifically for U.S. persons) halted all trading and withdrawals, and Bankman-Fried announced that Alameda was being wound down. *Id.* ¶ 110. Bankman-Fried also posted a lengthy Twitter thread purporting to explain how he "f[***]ed up." *Id.*

A000014

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That Assets in Customer Accounts or Otherwise Identifiable as Customer Assets Are Not Property of the Estate)**

53.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

54.     Based on the clear and unambiguous Terms of Service, if a customer can identify the customer's Digital Assets now held by FTX Trading (for example, if the Digital Assets remain at the network address where they were first deposited) or in the hands of another party, then the customer clearly owns such Digital Assets free of any claims held by FTX Trading or other customers or creditors of FTX Trading or its affiliates.

55.     The same is true for a customer's identifiable fiat currency and E-Money.  Based on the Terms of Service, as well as on FTX's internal policies and representations to the outside world, each FTX.com customer owns the fiat currency and E-Money described in the Terms of Service, to the extent those Assets can be identified.

56.     Accordingly, all identifiable FTX.com customer Assets described in the FTX.com Terms of Service are property of the respective FTX.com customers, and not property of the Debtors' estates under section 541 of the Bankruptcy Code and governing English law.

57.     Each FTX.com customer's Assets are property of that customer under the Terms of Service, English law, and the undisputed facts of this case, regardless of whether such Assets remain segregated in such customer's Account or have been transferred and are held by one or more of the Debtors or a third party.  The ownership rights extend both to Assets that are currently frozen and Assets that were unlawfully misappropriated.

A000015

58.     Based upon the foregoing, Plaintiff is entitled to an order of this Court declaring that the FTX customers are the owners of the customer Assets held in customer Accounts or otherwise identifiable as customer Assets.

## SECOND CLAIM FOR RELIEF

**(Declaratory Judgment That Unallocated or Commingled Assets Are Held in Trust for the Collective Benefit of FTX.com Customers and Are Not Property of the Estate)**

59.      Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

60.     Under English law, the FTX.com customers also hold a beneficial or equitable proprietary interest in their Assets, with the extent of the interest being referable to the relevant credit balance on the customer's account.

61.     Establishing a custodial trust of this nature requires proof of three elements under English law: (i) intention by FTX Trading to hold the assets on trust; (ii) sufficient identification of the beneficiary of the trust; and (iii) sufficient identification of the assets that are the subject matter of the trust.

62.     Conditions (i) and (ii) are satisfied by the indisputable facts at issue here, as summarized above.

63.     Condition (iii) is satisfied by guiding principles of English law, which provide that crypto-token custody arrangements can be structured as trusts, even where the underlying entitlements are held on a consolidated unallocated basis for the benefit of multiple users, and potentially even commingled with unallocated entitlements held for the benefit of the custodian itself.  Under English law principles, the best way of understanding the interests of beneficiaries under such trusts are as rights of co-ownership in an equitable tenancy in common.

A000016

64.     Accordingly, commingled or unallocated Assets of FTX.com customers are property held in trust for the collective benefit of FTX.com customers under English law and are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

65.     Based upon the foregoing, Plaintiff is entitled to an order of this Court declaring that the FTX.com customers are the collective owners of their commingled or unallocated Assets, up to the amount of the balance on their accounts.

## THIRD CLAIM FOR RELIEF

**(Declaratory Judgment That Customer Assets, including Unallocated or Commingled Assets Are Held in a Constructive or Resulting Trust for the Benefit of Customers and Are Not Property of the Estate)**

66.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

67.     To the extent not deemed to be beneficial property of FTX.com customers under English law, all identifiable FTX.com customer Assets, including Digital Assets, described in the FTX.com Terms of Service are held in a constructive or resulting trust or trusts for the benefit of the respective FTX.com customers, and are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

68.     To the extent not deemed to be beneficial property of FTX.com customers under English law, commingled or unallocated Assets of FTX.com customers are property held in a constructive or resulting trust or trusts for the benefit of FTX.com customers and are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

69.     Further, property or assets acquired in whole or in part by FTX Trading or its affiliates using Assets of FTX.com customers are property held in a constructive or resulting trust for the collective benefit of FTX.com customers and are not property of the Debtors' estates.

A000017

70.     Based upon the foregoing, Plaintiff is entitled to an order of this Court declaring that all Assets, whether separately identifiable or unallocated or commingled, and property or assets acquired with such Assets, are held in a constructive or resulting trust or trusts for the benefit of FTX.com customers.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests as follows:

(i)     the grant of relief as set forth in the final paragraph in each the foregoing Claims for Relief;

(ii)    the grant of such other and further relief as this Court deems just and proper under the circumstances.

*[Remainder of page intentionally left blank.]*

A000018

Date: December 28, 2022
Wilmington, Delaware

/s/ Eric D. Schwartz
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Paige N. Topper (No. 6470)
Brian Loughnane (No. 6853)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
eschwartz@morrisnichols.com
mharvey@morrisnichols.com
ptopper@morrisnichols.com
bloughnane@morrisnichols.com

-AND-

**EVERSHEDS SUTHERLAND (US) LLP**
Peter A. Ivanick
Sarah E. Paul
Philip H. Ehrlich
Lynn W. Holbert
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
peterivanick@eversheds-sutherland.com
sarahpaul@eversheds-sutherland.com
philipehrlich@eversheds-sutherland.com
lynnholbert@eversheds-sutherland.com

-and-

Erin E. Broderick
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com

-and-

Mark D. Sherrill
1001 Fannin Street, Suite 3700

A000019

Houston, Texas 77002
Telephone: (713) 470-6100
Facsimile: (713) 654-1301
marksherrill@eversheds-sutherland.com

-and-

Andrea L. Gordon
700 Sixth Street NW, Suite 700
Washington, District of Columbia 20001
Telephone: (202) 383-0100
Facsimile: (202) 637-3593
andreagordon@eversheds-sutherland.com

*Counsel to the Ad Hoc Committee of Non-US
Customers of FTX.com*

A000020

**Exhibit A**

A000021

**Single listing of the Debtors' names:**

FTX Trading Ltd.
Alameda Research LLC
Alameda Research Ltd
Alameda Research Holdings Inc.
Clifton Bay Investments LLC
West Realm Shires Services Inc.
West Realm Shires Financial Services Inc.
Ledger Holdings Inc.
FTX Japan Holdings K.K.
FTX Europe AG
FTX Property Holdings Ltd
LT Baskets Ltd
Alameda TR Ltd
Allston Way Ltd
Analisya Pte Ltd
Atlantis Technology Ltd.
Bancroft Way Ltd
Blue Ridge Ltd
Cardinal Ventures Ltd
Cedar Bay Ltd
Liquid Securities Singapore Pte Ltd
Maclaurin Investments Ltd.
Mangrove Cay Ltd
Paper Bird Inc
Pioneer Street Inc.
Quoine India Pte Ltd
Quoine Vietnam Co. Ltd
SNG INVESTMENTS YATIRIM VE DANISMANLIK ANONIM SIRKETI
Strategy Ark Collective Ltd.
Technology Services Bahamas Limited
Verdant Canyon Capital LLC
West Innovative Barista Ltd.
Western Concord Enterprises Ltd.
FTX Equity Record Holdings Ltd
FTX Exchange FZE
FTX Hong Kong Ltd
FTX Japan K.K.
FTX Japan Services KK
Alameda Aus Pty Ltd
Alameda Research (Bahamas) Ltd
Alameda Research KK
Alameda Research Pte Ltd
Alameda Research Yankari Ltd
Alameda TR Systems S. de R. L.

A000022

Blockfolio, Inc.
Clifton Bay Investments Ltd
Cottonwood Grove Ltd
Crypto Bahamas LLC
Deep Creek Ltd
Digital Custody Inc.
FTX (Gibraltar) Ltd
FTX Canada Inc
FTX Digital Holdings (Singapore) Pte Ltd
FTX Products (Singapore) Pte Ltd
FTX Services Solutions Ltd.
FTX Structured Products AG
FTX Trading GmbH
FTX Zuma Ltd
Global Compass Dynamics Ltd.
Goodman Investments Ltd.
Hawaii Digital Assets Inc.
Innovatia Ltd
Island Bay Ventures Inc
Killarney Lake Investments Ltd
Zubr Exchange Ltd
Alameda Global Services Ltd.
Cottonwood Technologies Ltd
Deck Technologies Holdings LLC
Deck Technologies Inc.
Euclid Way Ltd
FTX Digital Assets LLC
FTX EMEA Ltd.
FTX US Trading, Inc.
Hive Empire Trading Pty Ltd
Liquid Financial USA Inc.
LiquidEX LLC
North Dimension Inc
North Wireless Dimension Inc.
LedgerPrime Bitcoin Yield Enhancement Master Fund, LLC
LedgerPrime Digital Asset Opportunities Fund, LLC
LedgerPrime Digital Asset Opportunities Master Fund LP
LedgerPrime LLC
LedgerPrime Ventures, LP
North Dimension Ltd
Quoine Pte Ltd
Cedar Grove Technology Services, Ltd.
DAAG Trading, DMCC
FTX Certificates GmbH
FTX Crypto Services Ltd.
FTX EU Ltd.

A000023

FTX Lend Inc.
FTX Marketplace, Inc.
FTX Switzerland GmbH
FTX TURKEY TEKNOLOJI VE TICARET ANONIM SIRKET
FTX US Services, Inc.
FTX Ventures Ltd.
GG Trading Terminal Ltd
Good Luck Games, LLC
Hannam Group Inc
Hilltop Technology Services LLC
LedgerPrime Bitcoin Yield Enhancement Fund, LLC
West Realm Shires Inc.

A000024

Exhibit B

A000025

**FTX TERMS OF SERVICE**

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)      the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)      the FTX Application Programming Interface (**"API"**); and

(C)      any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

     (together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)      FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)      Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.      **STRUCTURE OF TERMS**

1.1      The Terms comprise:

         1.1.1      the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2 the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our <u>Privacy Policy</u>, <u>Security Policy</u> and <u>Fee Schedule</u> (**"FTX Policies"**); and

1.1.3 the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2 To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, <u>Fee Schedule</u>, <u>Privacy Policy</u>, <u>Security Policy</u> and other FTX Policies.

1.3 **<u>IMPORTANT:</u>** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

2. **RISK DISCLOSURES**

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1 **No advice and no reliance**

2.1.1 FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2 You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3 FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2 **Digital Asset transfers and volatility**

2.2.1 Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

A000027

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

2.3    **Supply and value of Digital Assets**

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

2.4    **Margin trading**

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

2.5    **Complex products**

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3　USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4　FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

## 2.6　Blacklisted addresses and forfeited Assets

2.6.1　FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2　In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

## 2.7　Software protocols and operational challenges

2.7.1　The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2　You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3　You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4　Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

A000029

2.7.5 Digital Assets depend on the availability and reliability of power, connectivity, and hardware. Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

## 2.8 Compliance

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 2.9 Legislative and regulatory changes

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

## 2.10 No deposit protection

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

## 2.11 Digital Asset Distributions not supported

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

## 2.12 Reliance on third parties

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

## 3. APPLICABLE LAWS AND REGULATIONS

## 3.1 Compliance with Applicable Laws

3.1.1 You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2 Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

A000030

3.2 **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3 **Export controls**

3.3.1 The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A) you are in a prohibited jurisdiction as set forth at Location Restrictions (**"Restricted Territories"**);

(B) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C) you intend to transact with any Restricted Territories or Restricted Persons;

(D) you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E) the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2 We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4. **ELIGIBILITY**

4.1 In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1 If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2 If you are registering to use the Services on behalf of a legal entity, then:

(A) you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B) the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C) the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

A000031

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3    You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4    You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5    You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6    You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2    If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

## 5.    REGISTRATION PROCESS; IDENTITY VERIFICATION

5.1    When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2    In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3    You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4    Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5    If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6    We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

A000032

6. **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1 You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2 You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3 You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4 FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5 In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7. **ORDER BOOK AND CONVERT**

7.1 FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2 The Convert function on the Platform also allows you to submit instructions ("**Convert Instructions**") to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

8

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3 The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4 We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5 You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6 You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7 Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8 Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9 Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10 You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

8. **ACCOUNT FUNDING**

8.1 **Funding - General**

8.1.1 In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2 You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3 Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

A000034

## 8.2 Digital Assets

8.2.1 The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2 You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3 The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4 You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5 FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6 All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7 FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8 It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

A000035

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9    You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10   When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11   You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12   It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

## 8.3    Fiat currency

8.3.1    Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2    Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3    E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4    E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5    You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

11

A000036

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

## 9.    UNCLAIMED OR ABANDONED PROPERTY

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

A000037

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

## 10. DEBIT ACCOUNT BALANCE

10.1 If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2 If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3 If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

10.3.1 you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

10.3.2 you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

10.3.3 you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

## 11. THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

## 12. ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION

12.1 FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

12.1.1 refuse to let you open an Account, suspend your Account, or terminate your Account;

12.1.2 decline to process any instruction or Order submitted by you; and/or

12.1.3 limit, suspend or terminate your use of one or more, or part of, the Services.

12.2 Such actions will not relieve you from your obligations pursuant to the Terms.

12.3 Such actions may be taken as a result of a number of factors, including without limitation:

13

A000038

12.3.1      as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2      as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3      where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4     If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5     Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6     Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7     You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8     We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1      your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2      to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3      you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9     Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10    Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

## 13.    RESTRICTED ACTIVITIES

In connection with your use of the Services, you agree that you will not:

13.1.1      violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2      provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3      infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4      engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

13.1.5 distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6 use a web crawler or similar technique to access our Services or to extract data;

13.1.7 reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8 perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9 take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10 transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11 otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12 transfer any rights granted to you under the Terms;

13.1.13 engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14 engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15 assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14. ELECTRONIC TRADING TERMS

14.1 FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2 A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3 In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4 We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5 FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6 Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7 The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

## 15. STAKING

15.1 When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2 The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

## 16. MARGIN TRADING

16.1 This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2 Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

A000041

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3 When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4 Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5 The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

## 17. FORKS AND DISTRIBUTIONS

17.1 As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2 FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3 If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4 The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

A000042

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5 In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18. ATTACKS ON BLOCKCHAIN NETWORKS

18.1 FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2 Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19. SITE; THIRD PARTY CONTENT

19.1 FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2 The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3 We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20. AVAILABILITY

20.1 We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

18

A000043

20.2 You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3 FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

21. **RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES**

21.1 We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2 If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

22. **UPDATES TO THE TERMS**

22.1 We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2 If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

23. **FEES**

23.1 In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2 On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3 You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

A000044

24.   **TAXES**

24.1   You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2   FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25.   **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1   **License**

25.1.1   FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2   Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3   "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2   **API use**

25.2.1   Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2   FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3   FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3   **Third Party Applications**

25.3.1   We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

A000045

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2    If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3    You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4    In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

## 26.    PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 27.    CONFIDENTIALITY

27.1    You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2    You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3    The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1    in the public domain through no breach of the Terms;

27.3.2    known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3    required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4    If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5    Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6    Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

A000046

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7 The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8 The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9 The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

28. **COOKIES**

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

29. **INDEMNIFICATION; RELEASE**

29.1 You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2 You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3 You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

30. **LIMITATION OF LIABILITY; NO WARRANTY**

30.1 NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

A000047

30.1.1 FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2 FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3 TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2 SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1 INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2 INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3 YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4 YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1 THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2 THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3 THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

A000048

30.5    SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.    **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions will apply to your use of the Services as set forth in the Schedules attached hereto.

32.    **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

33.    **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide to us or one of our social media accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, in and to such Feedback, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

34.    **QUESTIONS AND CONTACT INFORMATION**

34.1    We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2    To contact us, please visit one of the links or channels above. For support with your Account, you may submit a support ticket at https://ftx.com/support. For legal and media inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide all relevant information, including your Account username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will endeavour to get back to you as soon as possible.

35.    **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to the Platform.

24

A000049

36. **FORCE MAJEURE AND RELIEF EVENTS**

36.1 FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1 any Force Majeure Event; or

36.1.2 any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37. **ASSIGNMENT AND SUBCONTRACTING**

37.1 You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2 FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38. **GENERAL**

38.1 **Entire agreement**

38.1.1 You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2 You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3 You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2 **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3 **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4 **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

A000050

assigns.

### 38.5 Variation and waiver

38.5.1 Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2 No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

### 38.6 No partnership or agency

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

### 38.7 Set off

38.7.1 Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2 FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

### 38.8 Equitable remedies

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

### 38.9 Third party rights

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1 the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2 no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

### 38.10 Electronic signature

The Terms may be entered into by electronic means.

A000051

38.11 **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12 **Arbitration**

38.12.1 Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2 This arbitration agreement shall be governed by English law.

38.12.3 The seat of the arbitration shall be Singapore.

38.12.4 The language of the arbitration shall be English.

38.12.5 The number of arbitrators shall be one.

38.12.6 Each party agrees that:

(A) any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B) combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7 This agreement to arbitrate shall:

(A) be binding upon the parties, their successors and assigns;

(B) survive the termination of these Terms.

38.12.8 Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13 **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

A000052

## SCHEDULE 1

### DEFINITIONS AND INTERPRETATION

1. **DEFINITIONS**

1.1 As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)     acts of God, flood, drought, earthquake or other natural disaster;

(ii)    epidemic or pandemic;

(iii)   terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)    nuclear, chemical or biological contamination or sonic boom;

(v)     any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)    collapse of buildings, fire, explosion or accident; and

(vii)   any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2. **INTERPRETATION**

2.1 **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1 a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2 a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3 the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4 a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5 a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2 **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

A000054

2.3 **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1      a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2      a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3      a reference to an individual includes that individual's estate and personal representatives.

2.4 **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5 **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6 **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1      the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2      general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7 **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8 **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

A000055

**SCHEDULE 2**

**SERVICE SCHEDULE**

| **Specified Service** | **Spot Market** |
|---|---|
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |

A000056

**SCHEDULE 3**

**SERVICE SCHEDULE**

| Specified Service | Spot Margin Trading |
|---|---|
| **Specified Service description** | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | **IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement.<br><br>The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk.<br><br>The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins.<br><br>The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000057

| Risk disclosures | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms. |
| --- | --- |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

A000058

**SCHEDULE 4**
**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | **OTC / Off-exchange Portal (OEP Portal)** |
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000059

## SCHEDULE 5
## SERVICE SCHEDULE

| Specified Service | Futures Market |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after.<br><br>Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24.<br><br>You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin.<br><br>Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins.<br><br>**IMPORTANT:** Section 16 of the General Terms applies to this service.<br><br>Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors.<br><br>In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

A000060

| | |
|---|---|
| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset.<br><br>YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES.<br><br>By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A000061

**SCHEDULE 6**
**SERVICE SCHEDULE**

| Specified Service | Volatility Market (Options Contacts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date.<br><br>If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies.<br><br>You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin.<br><br>Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins.<br><br>**IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date.<br><br>The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money".<br><br>The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration.<br><br>Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value.<br><br>If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

A000062

| | |
|---|---|
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A000063

## SCHEDULE 7
## SERVICE SCHEDULE

| Specified Service | Volatility Market (MOVE Volatility Contracts) |
|---|---|
| Specified Service description | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. 1. Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. 2. Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. 3. Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. **IMPORTANT**: Section 16 of the General Terms applies to this service. MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

A000064

| | |
|---|---|
| | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A000065

**SCHEDULE 8**

**SERVICE SCHEDULE**

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

| | |
|---|---|
| | ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.<br><br>By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.<br><br>If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specific Service. |
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors.<br><br>• **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying.<br><br>• **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.<br><br>• **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets. |

A000067

## SCHEDULE 9
## SERVICE SCHEDULE

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.

In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of:

- Tomorrow's MOVE Volatility contract
- Next weeks' MOVE contract, and the two weeks after that
- Next Quarter's MOVE contract, and the quarter after that

and

- -1x BTC-PERP (Short)

IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long).

BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk.

YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

A000068

REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors.

By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specified Service.

| | |
|---|---|
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.<br><br>• **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.<br><br>• **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

A000069

|  | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |

A000070

**SCHEDULE 10**

**SERVICE SCHEDULE**

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider.<br><br>Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index.<br><br>Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.<br><br>You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins.<br><br>You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform.<br><br>You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins.<br><br>Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable).<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000071

## SCHEDULE 11
## SERVICE SCHEDULE

| Specified Service | NFT Market |
|---|---|
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion. |
| | Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens. |
| | NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all. |
| | NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it. |
| | While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion. |
| | You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so. |
| | There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value. |
| | NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

A000072

PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING.

A000073

## SCHEDULE 12

## SERVICE SCHEDULE

| Specified Service | NFT Listing |
| --- | --- |
| **Specified Service description** | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. <br><br> If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail. <br><br> Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise. <br><br> **Intellectual property** <br><br> You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content. <br><br> By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates. <br><br> You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork. <br><br> **Prohibited activities** <br><br> You will not: |

A000074

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

A000075

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

A000076

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

A000077

**SCHEDULE 13**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**
**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

1. **FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES**

   If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

   a) your deposit of fiat currency to Digital Assets; and

   b) your withdrawal of Digital Assets to fiat currency,

   will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

   You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

   If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

   You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

2. **FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA**

   Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

   Neither FTX Trading or the DCE provider will, or may, provide you with financial services or financial products.

A000078

3.    **STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions (**"FTX Australia Terms"**) to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

4.    **YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the _Corporations Act 2001_ (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

5.    **DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the _Privacy Act 1988_ (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

A000079

## SCHEDULE 14
## SERVICE SCHEDULE
## TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

A000080

## SCHEDULE 15
## SERVICE SCHEDULE
## TERMS APPLICABLE TO JAPAN USERS ONLY
### (Updated September 19, 2022)

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

---

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

A000081

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are ***non-recourse*** with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

57

A000082

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

---

A000083

別紙 15

サービスに関する別紙

日本のユーザーにのみ適用される規約

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

FTX トレーディングは、P2P 貸借暗号資産の貸出人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸出人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸出人となることはありません。

当社のユーザーのみが、借受人又は貸出人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

A000084

## 貸出し

お客様が P2P 貸借暗号資産取引の貸人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

## 借受け

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

A000085

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**責任財産は**本借受人の口座において本借受人が保有する資産**に限定されます**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出を含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

A000086

**SCHEDULE 16**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO UK USERS ONLY**
**(Updated September 29, 2022)**

---

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

---

A000087

## FTX TERMS OF SERVICE

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)     the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)     the FTX Application Programming Interface (**"API"**); and

(C)     any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

(together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)     FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)     Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.     **STRUCTURE OF TERMS**

1.1     The Terms comprise:

1.1.1     the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2  the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our Privacy Policy, Security Policy and Fee Schedule (**"FTX Policies"**); and

1.1.3  the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2  To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, Fee Schedule, Privacy Policy, Security Policy and other FTX Policies.

1.3  **IMPORTANT:** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

2.  **RISK DISCLOSURES**

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1  **No advice and no reliance**

2.1.1  FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2  You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3  FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2  **Digital Asset transfers and volatility**

2.2.1  Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

2.3    **Supply and value of Digital Assets**

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

2.4    **Margin trading**

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

2.5    **Complex products**

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3    USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4    FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

**2.6    Blacklisted addresses and forfeited Assets**

2.6.1    FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2    In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

**2.7    Software protocols and operational challenges**

2.7.1    The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2    You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3    You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4    Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

A000091

2.7.5     Digital Assets depend on the availability and reliability of power, connectivity, and hardware.  Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

## 2.8     Compliance

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 2.9     Legislative and regulatory changes

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

## 2.10     No deposit protection

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

## 2.11     Digital Asset Distributions not supported

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

## 2.12     Reliance on third parties

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

## 3.     APPLICABLE LAWS AND REGULATIONS

## 3.1     Compliance with Applicable Laws

3.1.1     You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2     Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

A000092

3.2  **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3  **Export controls**

3.3.1  The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A)  you are in a prohibited jurisdiction as set forth at Location Restrictions (**"Restricted Territories"**);

(B)  you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C)  you intend to transact with any Restricted Territories or Restricted Persons;

(D)  you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E)  the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2  We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4.  **ELIGIBILITY**

4.1  In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1  If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2  If you are registering to use the Services on behalf of a legal entity, then:

(A)  you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B)  the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C)  the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

A000093

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3    You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4    You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5    You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6    You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2    If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

## 5.    REGISTRATION PROCESS; IDENTITY VERIFICATION

5.1    When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2    In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3    You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4    Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5    If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6    We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

A000094

6.      **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1     You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2     You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3     You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4     FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5     In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.      **ORDER BOOK AND CONVERT**

7.1     FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2     The Convert function on the Platform also allows you to submit instructions ("**Convert Instructions**") to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3    The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4    We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5    You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6    You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7    Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8    Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9    Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10    You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

8.    **ACCOUNT FUNDING**

8.1    **Funding - General**

8.1.1    In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2    You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

A000096

8.2 **Digital Assets**

8.2.1 The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2 You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3 The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4 You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5 FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6 All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7 FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8 It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

A000097

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9    You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10   When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11   You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12   It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

## 8.3    Fiat currency

8.3.1    Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2    Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3    E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4    E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5    You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

11

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

## 9.    UNCLAIMED OR ABANDONED PROPERTY

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

A000099

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

## 10.    DEBIT ACCOUNT BALANCE

10.1    If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2    If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3    If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

10.3.1    you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

10.3.2    you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

10.3.3    you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

## 11.    THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

## 12.    ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION

12.1    FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

12.1.1    refuse to let you open an Account, suspend your Account, or terminate your Account;

12.1.2    decline to process any instruction or Order submitted by you; and/or

12.1.3    limit, suspend or terminate your use of one or more, or part of, the Services.

12.2    Such actions will not relieve you from your obligations pursuant to the Terms.

12.3    Such actions may be taken as a result of a number of factors, including without limitation:

12.3.1   as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2   as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3   where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4   If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5   Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6   Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7   You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8   We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1   your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2   to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3   you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9   Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10   Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

13.   **RESTRICTED ACTIVITIES**

In connection with your use of the Services, you agree that you will not:

13.1.1   violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2   provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3   infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4   engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

A000101

13.1.5   distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6   use a web crawler or similar technique to access our Services or to extract data;

13.1.7   reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8   perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9   take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10   transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11   otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12   transfer any rights granted to you under the Terms;

13.1.13   engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14   engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15   assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14.   ELECTRONIC TRADING TERMS

14.1   FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2   A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3   In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4   We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

A000102

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5    FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6    Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7    The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

15.    **STAKING**

15.1    When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2    The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

16.    **MARGIN TRADING**

16.1    This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3    When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4    Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5    The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

## 17.    FORKS AND DISTRIBUTIONS

17.1    As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2    FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3    If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4    The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5   In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18.   ATTACKS ON BLOCKCHAIN NETWORKS

18.1   FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2   Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19.   SITE; THIRD PARTY CONTENT

19.1   FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2   The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3   We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20.   AVAILABILITY

20.1   We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

A000105

20.2 You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3 FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

## 21.    RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES

21.1 We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2 If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

## 22.    UPDATES TO THE TERMS

22.1 We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2 If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

## 23.    FEES

23.1 In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2 On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3 You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

A000106

24.    **TAXES**

24.1    You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2    FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25.    **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1    **License**

25.1.1    FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2    Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3    "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2    **API use**

25.2.1    Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2    FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3    FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3    **Third Party Applications**

25.3.1    We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

20

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2    If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3    You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4    In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

## 26.    PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 27.    CONFIDENTIALITY

27.1    You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2    You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3    The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1    in the public domain through no breach of the Terms;

27.3.2    known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3    required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4    If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5    Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6    Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

A000108

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7    The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8    The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9    The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

28.    **COOKIES**

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

29.    **INDEMNIFICATION; RELEASE**

29.1    You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2    You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3    You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

30.    **LIMITATION OF LIABILITY; NO WARRANTY**

30.1    NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

30.1.1   FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2   FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3   TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2   SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1   INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2   INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3   YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4   YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1   THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2   THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3   THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

30.5    SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.    **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions will apply to your use of the Services as set forth in the Schedules attached hereto.

32.    **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

33.    **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide to us or one of our social media accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, in and to such Feedback, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

34.    **QUESTIONS AND CONTACT INFORMATION**

34.1    We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2    To contact us, please visit one of the links or channels above. For support with your Account, you may submit a support ticket at https://ftx.com/support. For legal and media inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide all relevant information, including your Account username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will endeavour to get back to you as soon as possible.

35.    **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to the Platform.

A000111

36. **FORCE MAJEURE AND RELIEF EVENTS**

36.1    FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1    any Force Majeure Event; or

36.1.2    any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37. **ASSIGNMENT AND SUBCONTRACTING**

37.1    You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2    FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38. **GENERAL**

38.1    **Entire agreement**

38.1.1    You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2    You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3    You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2    **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3    **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4    **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

A000112

assigns.

**38.5** **Variation and waiver**

38.5.1   Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2   No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

**38.6** **No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

**38.7** **Set off**

38.7.1   Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2   FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

**38.8** **Equitable remedies**

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

**38.9** **Third party rights**

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1   the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2   no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

**38.10** **Electronic signature**

The Terms may be entered into by electronic means.

A000113

38.11   **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12   **Arbitration**

38.12.1   Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2   This arbitration agreement shall be governed by English law.

38.12.3   The seat of the arbitration shall be Singapore.

38.12.4   The language of the arbitration shall be English.

38.12.5   The number of arbitrators shall be one.

38.12.6   Each party agrees that:

(A)   any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B)   combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7   This agreement to arbitrate shall:

(A)   be binding upon the parties, their successors and assigns;

(B)   survive the termination of these Terms.

38.12.8   Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13   **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

A000114

**SCHEDULE 1**

**DEFINITIONS AND INTERPRETATION**

1.    **DEFINITIONS**

1.1    As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)    acts of God, flood, drought, earthquake or other natural disaster;

(ii)    epidemic or pandemic;

(iii)    terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)    nuclear, chemical or biological contamination or sonic boom;

(v)    any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)    collapse of buildings, fire, explosion or accident; and

(vii)    any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2.    **INTERPRETATION**

2.1    **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1    a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2    a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3    the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4    a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5    a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2    **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

A000116

2.3     **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1     a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2     a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3     a reference to an individual includes that individual's estate and personal representatives.

2.4     **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5     **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6     **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1     the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2     general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7     **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8     **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

**SCHEDULE 2**

**SERVICE SCHEDULE**

| **Specified Service** | **Spot Market** |
|---|---|
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000118

**SCHEDULE 3**
**SERVICE SCHEDULE**

| Specified Service | Spot Margin Trading |
|---|---|
| **Specified Service description** | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform. <br><br> You may also lend your Digital Assets to other Users who need them to spot trade. <br><br> Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | **IMPORTANT**: Section 16 of the General Terms applies to this service. <br><br> You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement. <br><br> The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk. <br><br> The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins. <br><br> The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion. <br><br> Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations. <br><br> The Service Provider reserves the right to final interpretation of this Specified Service. |

A000119

| | |
|---|---|
| **Risk disclosures** | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

**SCHEDULE 4**

**SERVICE SCHEDULE**

| Specified Service | OTC / Off-exchange Portal (OEP Portal) |
|---|---|
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000121

**SCHEDULE 5**

**SERVICE SCHEDULE**

| **Specified Service** | **Futures Market** |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after. |
| | Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24. |
| | You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins. |
| | **IMPORTANT:** Section 16 of the General Terms applies to this service. |
| | Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors. |
| | In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

A000122

| | |
|---|---|
| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A000123

**SCHEDULE 6**

**SERVICE SCHEDULE**

| **Specified Service** | **Volatility Market (Options Contacts)** |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date. |
| | If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies. |
| | You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date. |
| | The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money". |
| | The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration. |
| | Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |
| | If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

A000124

| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING. |
|---|---|
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

## SCHEDULE 7
## SERVICE SCHEDULE

| **Specified Service** | **Volatility Market (MOVE Volatility Contracts)** |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. <br><br> MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. <br><br> 1.  Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. <br><br> 2.  Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. <br><br> 3.  Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. <br><br> You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. <br><br> **IMPORTANT**: Section 16 of the General Terms applies to this service. <br><br> MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

A000126

|  | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
|---|---|
|  | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
|  | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A000127

## SCHEDULE 8
## SERVICE SCHEDULE

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

| | |
|---|---|
| | ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.<br><br>By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.<br><br>If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specific Service. |
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors.<br><br>• **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying.<br><br>• **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.<br><br>• **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets. |

A000129

SCHEDULE 9

SERVICE SCHEDULE

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
| --- | --- |
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.

In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of:

- Tomorrow's MOVE Volatility contract
- Next weeks' MOVE contract, and the two weeks after that
- Next Quarter's MOVE contract, and the quarter after that

and

- -1x BTC-PERP (Short)

IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long).

BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk.

YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

A000130

| | REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM. |
|---|---|
| | BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors. |
| | By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account. |
| | If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.<br><br>• **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.<br><br>• **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

| | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |

A000132

## SCHEDULE 10
## SERVICE SCHEDULE

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider.<br><br>Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index.<br><br>Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.<br><br>You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins.<br><br>You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform.<br><br>You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins.<br><br>Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable).<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000133

SCHEDULE 11

SERVICE SCHEDULE

| Specified Service | NFT Market |
|---|---|
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion. |
| | Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens. |
| | NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all. |
| | NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it. |
| | While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion. |
| | You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so. |
| | There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value. |
| | NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

A000134

| | PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING. |

A000135

**SCHEDULE 12**

**SERVICE SCHEDULE**

| Specified Service | NFT Listing |
|---|---|
| **Specified Service description** | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. |
| | If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail. |
| | Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise. |
| | **Intellectual property** |
| | You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content. |
| | By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates. |
| | You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork. |
| | **Prohibited activities** |
| | You will not: |

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

A000137

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

A000139

**SCHEDULE 13**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**
**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

## 1.   FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a)   your deposit of fiat currency to Digital Assets; and

b)   your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

## 2.   FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or  financial products.

**3.**   **STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

**4.**   **YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the *Corporations Act 2001* (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

**5.**   **DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the *Privacy Act 1988* (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

**SCHEDULE 14**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY**

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

A000142

**SCHEDULE 15**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO JAPAN USERS ONLY**
**(Updated September 19, 2022)**

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

A000143

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are ***non-recourse*** with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

A000144

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

A000145

**別紙 15**

**サービスに関する別紙**

**日本のユーザーにのみ適用される規約**

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

FTX トレーディングは、P2P 貸借暗号資産の貸出人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸出人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸出人となることはありません。

当社のユーザーのみが、借受人又は貸出人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

## 貸出し

お客様が P2P 貸借暗号資産取引の貸出人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

## 借受け

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**_責任財産は_**本借受人の口座において本借受人が保有する資産**_に限定されます_**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらに係る補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出を含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

_FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。_

**SCHEDULE 16**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO UK USERS ONLY**
**(Updated September 29, 2022)**

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

A000149

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## ORDER (I) AUTHORIZING THE
## DEBTORS TO REOPEN WITHDRAWALS
## FOR CERTAIN CUSTOMERS WITH RESPECT
## TO CERTAIN ASSETS HELD IN THE CUSTODY PROGRAM
## AND WITHHOLD ACCOUNTS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order") authorizing the Debtors to reopen

withdrawals for certain customers with respect to certain assets held in the Custody Program and

in Withhold Accounts, and granting related relief, all as more fully set forth in the Motion; and

upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States

District Court for the Southern District of New York, entered February 1, 2012; and this Court

having the power to enter a final order consistent with Article III of the United States Constitution;

and this Court having found that venue of these cases in this district is proper pursuant to

28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 USA LLC (9450); and GK8 UK Limited (0893).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the *Debtors' Memorandum of Law Regarding Phase I Custody and Withhold Issues* [Docket No. 1291], as applicable.

is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and the Order and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing")[3]; and this Court having (a) found that digital assets in the Custody Wallets and Ineligible Withhold Assets (as defined below) are not property of the Debtors' estates under section 541 of the Bankruptcy Code and (b) reserved decision with respect to whether digital assets transferred into the Custody Program, but not held in the Custody Wallets are property of the Debtors' estates under section 541 of the Bankruptcy Code; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1.      The Motion is granted in part as set forth herein.

2.      The Debtors are authorized, subject to the terms of this Order and in consultation with advisors for the official committee of unsecured creditors (the "Committee"), to permit customers to withdraw digital assets held by the Debtors on behalf of customers—other than any current or former employees or insiders[4] or, with respect to any of the foregoing, any affiliate[5] thereof—in the Custody Program and/or associated with Withhold Account obligations that were (A) (1) only ever in the Custody Program (the "Pure Custody Assets") or (2) transferred in the 90 days before the Petition Date from the Earn Program or the Borrow Program to the Custody

---

[4]      As such term is defined in section 101(31) of the Bankruptcy Code.

[5]      As such term is defined in section 101(2) of the Bankruptcy Code; *provided* that any entity that would fall within the definition of affiliate if such entity was a debtor in a case under the Bankruptcy Code shall also be an "affiliate" for purposes of this Order.

A000151

Program and, at the time of such transfer(s), the aggregate value of such transfer(s) was less than $7,575 (valued as of the time of each such transfer) (the "Transferred Custody Assets"), in each case *pro rata* on a coin-by-coin basis based on the proportion of each type of digital asset currently in the Custody Wallets as set forth on the Distribution Schedule (as defined below) or (B) transferred by users to Celsius' platform but were not supported on the platform and remain in the Debtors' possession (the "Ineligible Withhold Assets" and, together with the Pure Custody Assets and Transferred Custody Assets, the "Distributable Assets"); *provided*, that the Distributable Assets shall not include any digital assets held by, and at this time the Debtors are not authorized to transfer any digital assets to (1) any current or former employee or insider or (2) any affiliate of any current or former employee or insider; *provided, further* that the Debtors, the Withhold Ad Hoc Group, and the Committee shall meet and confer to determine which digital assets on the Debtors' platform qualify as Ineligible Withhold Assets. Notwithstanding the foregoing, to the extent the Court issues an opinion or order finding that digital assets transferred into the Custody Program are not property of the Debtors' estates under section 541 of the Bankruptcy Code whether or not such digital assets are held in the Custody Wallets, the Debtors shall be authorized to permit customers to withdraw the full amount of such customer's Pure Custody Assets and Transferred Custody Assets.

3.    As soon as reasonably practicable, the Debtors shall provide to the Committee and the Ad Hoc Groups a detailed schedule (the "Distribution Schedule") specifying (i) each affected user entitled to withdraw Distributable Assets pursuant to this Order, (ii) each user's Distributable Assets by category, and (iii) the prorated amount of the Distributable Assets to be released with respect to customers with digital assets in the Custody Program on a coin-by-coin basis based on the proportion of each type of digital assets in the Debtors' Custody Wallets and the Debtors'

3

A000152

obligations associated with the Custody Program on the Petition Date, as set forth in Exhibit B to the *Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of Celsius Network Limited, with Respect to Custody and Withhold Assets* [Docket No. 1532]; *provided*, that if the Court issues an opinion or order finding that digital assets transferred into the Custody Program are not property of the Debtors' estates under section 541 of the Bankruptcy Code whether or not they are held in the Custody Wallets prior to the provision of the Distribution Schedule, then this Paragraph 3(iii) shall only require the Distribution Schedule to provide for the Distributable Assets to be released with respect to customers with digital assets in the Custody Program. No digital assets shall be permitted to be withdrawn unless and until the Distribution Schedule is (a) agreed with the Committee or (b) approved by a further order of the Court following notice and a hearing.

4.     Digital assets shall be permitted to be withdrawn by customers in accordance with the Distribution Schedule(s), net of any gas fees or transaction costs (or a fee approximating such costs) necessary to effectuate the withdrawal or transfer of digital assets to customers; *provided, further*, that no digital assets shall be permitted to be withdrawn unless the account balance of the withdrawing customer is sufficient to satisfy any gas fees or transaction costs (or a fee approximating such costs) necessary to effectuate the withdrawal or transfer of digital assets to customers.

5.     Withdrawal of digital assets authorized hereunder is subject to, and may be delayed or prohibited as a result of, the Debtors' ordinary course legal, compliance, anti-money laundering, and security verifications.

6.     Prior to the Debtors' reopening of withdrawals in accordance with this Order, the Debtors shall file a notice on the docket and serve a notice on each affected account holder (which

A000153

service shall be by email and posting on the Celsius application) attaching the Distribution Schedule and details on how affected account holders may withdraw assets and the time period for doing so (if applicable).

7.      The Debtors shall not permit customers to transfer assets between programs of the Debtors in connection with this Order.

8.      In advance of any account reopening or digital asset withdrawal authorized by this Order, the Debtors shall be permitted, in their reasonable business judgment, to effectuate any necessary or appropriate technical tries and tests on Celsius' platform or otherwise to ensure a successful reopening of the platform and withdrawal process authorized hereunder.  For the avoidance of doubt, the Debtors shall be permitted to transfer digital assets in and out of Celsius' wallets, for the limited purpose of testing such reopening and withdrawal process, and shall be permitted to incur and pay any gas fees or transaction costs associated therewith, *provided*, that no such tries, tests, or transfers shall have any effect on any party's claim or other substantive rights.

9.      Notwithstanding anything in this Order to the contrary, this Order does not authorize the Debtors to permit withdrawals of any digital assets (a) other than digital assets held in the Custody Program and/or associated with Withhold Accounts that is a Distributable Asset, (b) by (1) any current or former employee or insider or (2) any affiliate of any current or former employee or insider, or (c) to any customer with an outstanding loan owed to the Debtors through the Debtors' Borrow Program.

10.     For the avoidance of any doubt, customer withdrawals permitted pursuant to this Order will be in cryptocurrency, not in fiat currency.

11.     For the reasons set forth on the record at the hearing held December 7, 2022, absent further order of the Court, the Debtors shall not distribute any digital assets to any account holder

A000154

against which the Debtors or the Committee have identified preference, loan or other claims and obligations, and the absence of a pending action by the Debtors or the Committee for preference or other claims against such account holders will not constitute a basis to permit the withdrawal of assets in the Custody Wallets other than as permitted under this Order.

12.     The hearing currently set for December 20, 2022, at 10:00 a.m. (prevailing Eastern Time) shall include a status update on the matters relevant to the implementation of this Order.

13.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

14.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the rights of any Debtor or the Creditors' Committee to dispute any particular claim on any grounds, including with respect to what constitutes property of the estate, any avoidance actions, and any right to setoff; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the rights of any Debtor or the Creditors' Committee under the Bankruptcy Code or any other applicable law including with respect to any avoidance actions and any right to setoff; (g) a concession by the Debtors or the Creditors' Committee that any liens (contractual, common

A000155

law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens; or (h) a waiver of, or concession or admission relating to, any cause of action or right of the Debtors. Without limiting the generality of the foregoing, any payment made pursuant to this Order is not intended and should not be construed as an admission regarding the validity of any particular claim or a waiver or prejudice of the Debtors' rights (or the rights of any successor to the Debtors or of any entity that has or acquires standing to assert rights on behalf of the Debtors or their estates) to subsequently dispute such claim or pursue such rights.

15.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

16.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

17.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

18.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Dated:  December 20, 2022
        New York, New York


_____**/s/ Martin Glenn**_____
MARTIN GLENN
Chief United States Bankruptcy Judge

A000156

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al*., | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |
| | **HEARING DATE AND TIME:**<br>**January 9, 2023, at 10:00 a.m. (EST)** |
| | **ORAL ARGUMENT WAIVED UNLESS**<br>**OBJECTIONS TIMELY FILED** |

**NOTICE OF HEARING OF DEBTORS' MOTION FOR ENTRY OF**
**AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS**
**FROM WALLET ACCOUNTS, (B) UPDATE THE USER INTERFACE TO PROPERLY**
**REFLECT TRANSACTIONS AND ASSETS AS OF THE PLATFORM PAUSE, AND (C) CONDUCT**
**ORDINARY COURSE RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

A000157

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* (the "Wallet Withdrawal Motion") will be held on **January 9, 2023 at 10:00 am (prevailing Eastern Time)** or as soon thereafter as counsel may be heard (the "Hearing") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE** that the Wallet Withdrawal Motion sets forth the relevant factual bases upon which the relief requested should be granted. A proposed Order granting the relief requested in the Wallet Withdrawal Motion is also submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that Objections, if any, to the relief requested in the Wallet Withdrawal Motion shall: (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received on or before **January 2, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

A000158

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served, the Wallet Withdrawal Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d) and the relief requested may be granted without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Kroll Restructuring Administration, LLC at https://restructuring.ra.kroll.com/blockfi.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

A000159

Dated: December 19, 2022                    /s/ Michael D. Sirota
                                            _____
                                            **COLE SCHOTZ P.C.**
                                            Michael D. Sirota, Esq. (NJ Bar No. 014321986)
                                            Warren A. Usatine, Esq. (NJ Bar No. 025881995)
                                            Court Plaza North, 25 Main Street
                                            Hackensack, New Jersey 07601
                                            (201) 489-3000
                                            msirota@coleschotz.com
                                            wusatine@coleschotz.com

                                            **KIRKLAND & ELLIS LLP**
                                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                            Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
                                            Christine A. Okike, P.C. (admitted *pro hac vice*)
                                            601 Lexington Avenue
                                            New York, New York 10022
                                            (212) 446-4800
                                            jsussberg@kirkland.com
                                            christine.okike@kirkland.com

                                            **HAYNES AND BOONE, LLP**
                                            Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
                                            Kenric D. Kattner, Esq. (admitted *pro hac vice*)
                                            30 Rockefeller Plaza, 26th Floor
                                            New York, New York 10112
                                            (212) 659-7300
                                            richard.kanowitz@haynesboone.com
                                            kenric.kattner@haynesboone.com

                                            *Proposed Attorneys for Debtors and*
                                            *Debtors in Possession*

A000160

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

<div align="center">

**DEBTORS' MOTION FOR ENTRY OF**
**AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR**
**WITHDRAWALS FROM WALLET ACCOUNTS, (B) UPDATE THE USER**
**INTERFACE TO PROPERLY REFLECT TRANSACTIONS AND ASSETS**
**AS OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE**
**RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF**

</div>

TO:    THE    HONORABLE    CHIEF    JUDGE    MICHAEL    B.    KAPLAN

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (the "Motion"):[2]

### Preliminary Statement

1.      The Debtors have always prioritized doing right by their clients.  At its core, this means respecting the terms of service governing the relationship between the Debtors and their clients.  Through this motion, the Debtors seek to do just that, by permitting clients to access digital assets that are owned by them and were held in their Wallet Accounts on BlockFi's platform as of the Platform Pause (each as defined below).  The BlockFi Wallet Terms of Service are clear.  They provide that "*title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi*."[3]  The Debtors have no legal or equitable interest in cryptocurrency that was present in the Wallet Accounts as of Platform Pause, and clients should be able to withdraw such assets from the platform if they choose.

2.      The Debtors also seek to reconcile and adjust the User Interface (as defined below) to reflect the proper accounting of digital assets in the Wallet Accounts in connection with certain attempted transactions that took place following the Debtors' decision to pause all platform activity so that all clients are treated fairly.  As described more fully in the First Day Declaration, the Debtors were subject to substantial exposure to FTX through the FTX Loan Agreement and FTX Option Agreement, as well as loans that the Debtors made to Alameda Research Ltd.  Upon news of FTX's bankruptcy filing, the Debtors recognized that they could not operate their business as usual, and took swift, decisive action to protect their clients' interests and ensure equality of

---

[2]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 17] (the "First Day Declaration").

[3]     BlockFi Wallet Terms of Service, https://blockfi.com/wallet-terms (emphasis added).

A000162

treatment among similarly situated clients.  Chief among these measures was the pause of account

withdrawals as permitted under the Debtors' Terms of Service (the "Platform Pause"), which was

publicly announced via the Debtors' Twitter account and implemented on the evening of

November 10, 2022 at 8:15 p.m. (prevailing Eastern Time) (the "Platform Pause Time Stamp").

On November 11, 2022, FTX began filing for chapter 11 bankruptcy in the District of Delaware[4]

and the Debtors published an update on their website and emailed all clients alerting them to the

fact that the Debtors were limiting platform activity.[5]

3.      The Platform Pause took effect the moment of the Platform Pause Time Stamp.

Thereafter, a client's ability to effectuate a withdrawal, transfer, or trade on the platform was

terminated in an effort to maintain the status quo for all clients' digital assets held on the platform

as of the Platform Pause Time Stamp.  In accordance with the Platform Pause, the Debtors

immediately (a) ceased to record transactions in the U.S. Wallet Ledger and International Wallet

Ledger and (b) discontinued the ongoing daily true-ups of the WLLC FBO Wallets, the

International Vault Wallets, the U.S. Wallet Ledger, and the International Wallet Ledger (each as

defined below), and ceased making digital asset transfers in connection therewith.  Simply put, the

Debtors' clients were unable to, and did not, effectuate any transactions on the BlockFi platform

beginning the moment of the Platform Pause Time Stamp.

4.      As part of the Debtors' ordinary course of business, clients are able to view their

account balances (e.g., the balance in their Wallet Account) and use various product offerings

through the Debtors' client-facing web-based user interface system (the "User Interface").

Although the Platform Pause was effective as of the Platform Pause Time Stamp, it took the

---

[4]     @SBF_FTX, Twitter (Nov 11, 2022).

[5]     November 11, 2022 BlockFi Update (Nov. 11, 2022), https://blockfi.com/november-11-2022-blockfi-update.

3

Debtors a period of time to disable the client-facing transactional functionality of the User Interface (*i.e.*, a client's ability to enter transaction requests). Specifically, with respect to the requested client withdrawals and trades, it took the Debtors approximately five hours to fully disable such functionality on the User Interface between the Platform Pause Time Stamp and 1:15 a.m. (prevailing Eastern Time), on November 11, 2022 (the "Initial Pause Period"). With respect to transfers from BlockFi interest bearing accounts ("BIA") to the Wallet Accounts and transfers from the Wallet Accounts to BIAs, it took the Debtors up to eight days to fully disable transfer functionality on their web-based platform, iOS mobile application, and Android mobile application (the "Secondary Pause Period" and, together with the Initial Pause Period, the "Platform Pause Period").

5.      During the Platform Pause Period, a number of clients continued to attempt to enter transactions on the User Interface with respect to the digital assets in their Wallet Accounts. While the Debtors had immediately frozen all platform activity at the Platform Pause Time Stamp, the User Interface continued to improperly reflect the completion of the Attempted Platform Pause Transactions (as defined below) that were attempted during the Platform Pause Period. Accordingly, following the Platform Pause the User Interface does not properly reflect the actual digital assets that are in the Wallet Accounts and recorded on the U.S. Wallet Ledger and International Wallet Ledger as of the Platform Pause Time Stamp.

6.      As more fully described herein, the attempted transactions that occurred during the Platform Pause Period included the below (collectively, the "Attempted Platform Pause Transactions"):

(a)      ***Pending Withdrawals***. Clients requested the withdrawal of digital assets from their Wallet Accounts;

(b)      ***Attempted BIA to Wallet Transfers***. Clients attempted to transfer digital assets from their BIA into their Wallet Accounts;

4

A000164

(c)     ***Attempted Wallet to BIA Transfers***.  Clients attempted to transfer digital assets from their Wallet Accounts into their BIAs;

(d)     ***Pending Trades***.  Clients requested the purchase, sale, or trade of digital assets using their Wallet Account assets; and

(e)     ***Attempted Posting of Loan Collateral***.  Clients attempted to post loan collateral using their Wallet Account assets.

7.      But none of the Attempted Platform Pause Transactions actually took place. Accordingly, in connection with the Debtors' reconciliation efforts, the Debtors request authority to update the User Interface to properly reflect each Client's balance in their Wallet Accounts as of the Platform Pause Time Stamp.  This would be accomplished by deleting each Attempted Platform Pause Transaction from the User Interface.

8.      For the avoidance of doubt, the Debtors do not seek to reverse any client deposits from outside the platform into Wallet Accounts which were received following the Platform Pause Time Stamp.  Substantially contemporaneously with the Platform Pause, the Debtors caused a notice of the Platform Pause to be delivered to their clients, which advised them to discontinue depositing funds into their Wallet Accounts.  Notwithstanding this notice, certain clients *deposited* additional and new funds into their Wallet Accounts.

9.      If the relief requested herein is approved, clients who chose to deposit new funds from outside the platform into their Wallet Accounts following the Platform Pause Time Stamp will also have the ability to withdraw such funds in the ordinary course.

### Relief Requested

10.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"):  (a) authorizing the Debtors to (i) honor client withdrawals solely from the Wallet Accounts as of the Platform Pause Time Stamp,[6] (ii) update the User Interface to

---

[6]     With respect to withdrawal requests of the clients of BlockFi International, the Debtors request the authority to

A000165

properly reflect transactions and assets held in clients' accounts as of the Platform Pause Time Stamp, and (iii) conduct ordinary course reconciliation of client accounts, and (b) granting related relief.

### Jurisdiction and Venue

11.  The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.  The bases for the relief requested herein are sections 541, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(a) of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

### Background

14.  On November 28, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 42].  The Debtors are operating their business and

---

honor withdrawal requests from the International Vault Wallet (as defined herein) subject to entry of an order authorizing such withdrawals in the parallel joint provisional liquidation proceedings (the "Bermuda JPL Proceedings") currently pending in the Supreme Court of Bermuda, together with related relief of the same or substantially similar nature as sought in this Motion.

managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### The Wallet Accounts

15.    The Debtors provide Wallet Accounts for domestic and international clients. BlockFi U.S. clients have the ability to store digital assets by opening accounts provided by Debtor BlockFi Trading LLC ("BlockFi Trading"), which are maintained by Debtor BlockFi Wallet LLC ("BlockFi Wallet"), on behalf of BlockFi Trading, "for the benefit of" the clients of BlockFi Trading (each, a "WLLC FBO Wallet").  Similarly, BlockFi international clients have the ability to store digital assets by opening accounts provided by Debtor BlockFi International Ltd. ("BlockFi International"), which are maintained by BlockFi International "for the benefit of" the clients of BlockFi International (each, an "International Vault Wallet,"[7] and together with the WLLC FBO Wallets, the "Wallet Accounts," and each individually, a "Wallet Account").

16.    A Wallet Account can be funded either:  (a) by transferring supported digital assets from an external personal wallet to a wallet address provided by BlockFi Trading or BlockFi International, as applicable, which will then immediately record the digital assets to the Wallet Account; or (b) by transferring U.S. dollar fiat currency via wire or ACH to BlockFi Trading's account at Silvergate Bank,[8] which is used to purchase supported digital assets immediately recorded in the Wallet Account.[9]

---

[7]    Until recently, BlockFi Wallet maintained wallet accounts on behalf of BlockFi International "for the benefit of" the clients of BlockFi International (the "International FBO Wallet") per the BlockFi Wallet Terms of Service. In connection with offering international clients the ability to store Trade-Only Assets (as defined below) in their Wallet Accounts, prior to the Petition Date, the digital assets in the International FBO Wallet were transferred from the International FBO Wallet to a separate, non-interest bearing, segregated vault account labeled the "No Sweep BFI (NIA)," which is maintained by BlockFi International for the benefit of the clients of BlockFi International.

[8]    Once a client transfers funds to BlockFi Trading's account at Silvergate Bank, BlockFi Trading then allocates

A000167

17.     Wallet Accounts are non-interest bearing, and the cryptocurrency held in a Wallet Account is *not* rehypothecated for the Debtors' lending activities.  Instead, all cryptocurrency recorded in the Wallet Accounts is held by BlockFi Wallet "for the benefit of" the clients of BlockFi Trading for U.S. clients, or by BlockFi International "for the benefit of" the clients of BlockFi International for international clients.  The digital assets in the Wallet Accounts are held through internal custodial solutions, such as those provided by Fireblocks or BitGo, or third party custodians.  The WLLC FBO Wallets and International Vault Wallets do not belong to and are not assets of BlockFi.  Instead, the WLLC FBO Wallets and International Vault Wallets are pooled custodial accounts that allow BlockFi Trading or BlockFi International, as applicable, to store digital assets on behalf of, or "for the benefit of," their clients without BlockFi Trading or BlockFi International ever assuming legal ownership of such accounts.  Only cryptocurrency recorded in Wallet Accounts is held in WLLC FBO Wallets or International Vault Wallets—there is no commingling of this cryptocurrency with assets used in the other BlockFi programs.

18.     A Wallet Account can be used by retail clients in connection with BlockFi's other products and services.  For example, after opening a Wallet Account, clients had the ability to, among other things, (a) direct the transfer of cryptocurrency recorded in their Wallet Account to an interest earning account (for non-U.S. clients), (b) buy and sell cryptocurrency on BlockFi's platform, (c) direct transfers of cryptocurrency or fiat cash to the client's external personal account, and (d) receive digital asset rewards through a BlockFi Rewards Visa® Signature Card.[10]

---

such funds to the appropriate U.S. Wallet Accounts and International Wallet Accounts.

[9]     The exception to this is residents of New York who have a crypto-backed loan but who do not have a BlockFi Wallet account because Wallet Accounts are not available in the state of New York.

[10]    BlockFi Rewards Visa® Signature Card is available for U.S. clients only.

A000168

19.     All transactions involving Wallet Accounts are reflected in the ledger for U.S. clients (the "U.S. Wallet Ledger") or in the ledger for international clients (the "International Wallet Ledger").  Each business day, the WLLC FBO Wallets, the International Vault Wallets, the U.S. Wallet Ledger, and the International Wallet Ledger are trued-up and any necessary transfers of cryptocurrency to or from the WLLC FBO Wallet or International Vault Wallet are made to bring the WLLC FBO Wallet or the International Vault Wallet and the U.S. Wallet Ledger and the International Wallet Ledger into balance to reflect all Wallet Account transactions.  BlockFi Wallet, on behalf of the clients of BlockFi Trading, and BlockFi International, on behalf of the clients of BlockFi International, each maintain these strict controls to ensure compliance with the BlockFi Wallet Terms of Service, attached hereto as **Exhibit B**, which provide that:

> ***The title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi.***  You hereby represent and warrant to us at all times during which you maintain a balance in your BlockFi Wallet that: (i) any cryptocurrency that you transferred into your BlockFi Wallet is owned by you at the time of transfer; and (ii) you are validly authorized to instruct us to carry out transactions relating to your BlockFi Wallet balance and that all transactions initiated with your BlockFi Wallet are for your own account (or, in the case of business accounts, for your business's account) and not on behalf of any other person or entity.  Except as required by a valid court order or applicable law, **BlockFi shall not sell, transfer, loan, hypothecate or otherwise alienate cryptocurrency held in your BlockFi Wallet unless specifically instructed by you.**[11]

The BlockFi Wallet Terms of Service further provide that:

> You may make a request for a complete or partial withdrawal of cryptocurrency from your BlockFi Wallet at any time with appropriate time notice as stated above . . . **BlockFi initiates the withdrawal process instantly when possible,**

---

[11]   BlockFi Wallet Terms of Service, https://blockfi.com/wallet-terms (emphasis added).

A000169

**and we may require up to seven (7) days after you submit your withdrawal request to process the withdrawal.**[12]

20.    While title to cryptocurrency held in Wallet Accounts does not pass to the Debtors, the Terms of Service do grant the Debtors a security interest in the cryptocurrency held in Wallet Accounts to secure any obligations a client may have in connection with other BlockFi services and products.

### Wallet Account Withdrawals, Reconciliation, and Attempted Platform Pause Transactions

21.    By the motion, the Debtors seek authority to: (a) honor client withdrawals solely from the Wallet Accounts as of the Platform Pause Time Stamp, (b) update the User Interface to properly reflect transactions and assets held in clients' accounts as of the Platform Pause Time Stamp, and (c) conduct ordinary course reconciliation in respect of the Wallet Accounts.

22.    ***Withdrawals***.  In the ordinary course of business, the Debtors' clients can request the transfer of digital assets reflected in their Wallet Account to an external private wallet.  Clients can also request to transfer the notional value of stablecoin reflected in their Wallet Account, which can be traded for U.S. Dollar for purposes of withdrawal, subject to the ordinary withdrawal fees under the BlockFi Wallet Terms of Service.  When a client requests the transfer of digital assets to a private wallet, the pending transfer is immediately reflected in their Wallet Account and in the U.S. Wallet Ledger or International Wallet Ledger.

23.    Certain clients may have "trade-only" digital assets in their Wallet Accounts, meaning that such assets are only available for buying, selling and holding within the Debtors' platform (the "Trade-Only Assets").  Withdrawals of the Trade-Only Assets are not available on the Debtors' platform.  Accordingly, to ensure the equal treatment among the Debtors' clients and

---

[12]    BlockFi Wallet Terms of Service, https://blockfi.com/wallet-terms (emphasis added).

A000170

enable the Debtors to honor client withdrawals of the Trade-Only Assets from the Wallet Accounts, the Debtors request authority to dollarize the Trade-Only Assets that are requested to be withdrawn as soon as reasonably practicable following such a withdrawal request so that clients will receive the cash equivalent of their Trade-Only Assets, subject to the ordinary withdrawal fees under the BlockFi Wallet Terms of Service.

24.     ***The Attempted Platform Pause Transactions.***  The Debtors further seek authority to update the User Interface so that it properly reflects platform activity as of the Platform Pause Time Stamp.  This would be accomplished by deleting each Attempted Platform Pause Transaction from the User Interface.

25.     As described above, the Attempted Platform Pause Transactions occurred during the Platform Pause Period.  There are five categories of Attempted Platform Pause Transactions, as follows:

26.     <u>Pending Withdrawals</u>.  During the Platform Pause Period, certain clients attempted to withdraw assets from their Wallet Accounts.  As of the date hereof, there are approximately $291,673,009 of pending client withdrawals from Wallet Accounts (the "<u>Pending Withdrawals</u>").  Because such withdrawals were requested after the Platform Pause Time Stamp, the Debtors request authority to delete the Pending Withdrawals so that the User Interface properly reflects the digital assets contained in the Wallet Accounts as of the Platform Pause Time Stamp.  Permitting the Debtors to delete the Pending Withdrawals will allow the Debtors' clients to resubmit their withdrawals requests and update their external wallet addresses as may be necessary, thereby (a) preventing the Debtors' inadvertent transmission of digital assets to incorrect client wallets (where exchanges may no longer exist) and (b) limiting potential fraud resulting from the over-one-month lapse between withdrawals requests and the execution of such withdrawals.

A000171

27.    <u>Attempted BIA to Wallet Transfers</u>.  During the Platform Pause Period, certain clients attempted to transfer assets from BIAs to their Wallet Accounts (the "<u>Attempted BIA to Wallet Transfers</u>").  As of the date hereof, there are approximately $375,004,761 worth of digital assets that were requested to be transferred from clients' BIAs to their Wallet Accounts.  The Debtors request authority to delete the Attempted BIA to Wallet Transfers so that the User Interface properly reflects the digital assets contained in the Wallet Accounts as of the Platform Pause Time Stamp.  This will maintain the status quo as of the Platform Pause Time Stamp and ensure that all clients are treated equally.

28.    <u>Attempted Wallet to BIA Transfers</u>.  During the Platform Pause Period, certain clients attempted to transfer digital assets from their Wallet Accounts to their BIAs (the "<u>Attempted Wallet to BIA Transfers</u>").  As of the date hereof, there are approximately $7,423,926 worth of digital assets that were requested to be transferred from clients' Wallet Accounts to their BIAs.  The Debtors request authority to delete the Attempted Wallet to BIA Transfers so that the User Interface properly reflects the digital assets contained in the Wallet Accounts as of the Platform Pause Time Stamp.  This will maintain the status quo as of the Platform Pause Time Stamp and ensure that all clients are treated equally.

29.    <u>Pending Trades</u>.  During the Platform Pause Period, numerous clients attempted to engage in trading activity by either (a) selling the digital assets reflected in their Wallet Account for cash and/or stablecoin, or (b) purchasing digital assets using the cash and/or stablecoin balance in their Wallet Account (the "<u>Pending Trades</u>").  As of the date hereof, there is approximately $3,011,275 of Pending Trades that were initiated, but never effectuated, during the Platform Pause Period.  The Debtors request authority to delete the Pending Trades so that the User Interface properly reflects the digital assets contained therein as of the Platform Pause Time Stamp.

12

A000172

30.     <u>Attempted Posting of Loan Collateral</u>.   During the Platform Pause Period, numerous clients attempted to post some or all of the assets in their Wallet Accounts as collateral for certain loans that they have with the Debtors.  As of the date hereof, clients attempted to post approximately $868,843 in digital assets as loan collateral during the Platform Pause Period.  The Debtors request authority to delete the Attempted Posting of Loan Collateral so that the User Interface properly reflects the digital assets posted as collateral as of the Platform Pause Time Stamp.

31.     ***Ordinary Course Reconciliation.***   To ensure that clients are able to accurately access the digital assets contained in their Wallet Accounts, the Debtors also seek authority to continue to engage in various ordinary course reconciliatory practices related to client accounts, including, but not limited to, (i) reconciling digital asset and ACH deposits and withdrawals that currently hold an incomplete status, (ii) reconciling withdrawals of digital assets that were submitted prior to the Platform Pause Time Stamp, (iii) reconciling and fulfilling partially filled orders to buy or sell digital assets and otherwise canceling all open orders that were not filled or partially filled prior to the Platform Pause Time Stamp, (iv) reconciling closed accounts that no longer have a balance to disable user access to the Debtors' platform, (v) recovering client withdrawn or deposited funds that were sent to incorrect blockchains, and (vi) closing unfunded accounts that the Debtors deem fraudulent.

32.     The foregoing reconciliatory practices are primarily accounting related in nature and are commonplace in technology-focused platforms similar to the Debtors' platform.  The reconciliatory practices are also necessary to correctly reconcile client balances to ensure that client balances properly reflect all trading and transfer activity that took place prepetition.  Without the ability to reconcile the Wallet Accounts, one client could artificially benefit to the detriment of

A000173

others.  Accordingly, the Debtors seek authority to continue their ordinary course reconciliation efforts related to client accounts to promote the necessary functions that ensure the Debtors are able to provide their clients with access to the digital assets held in Wallet Accounts as of the Platform Pause Time Stamp.

<div align="center">**Basis for Relief**</div>

**I.      Digital Assets Held in the Wallet Accounts Are Not Property of the Debtors' Estates and Should Be Returned to Clients.**

33.      Section 541 of the Bankruptcy Code generally provides that all property in which a debtor has a legal or equitable interest, including any interest in property that a debtor acquires postpetition, becomes property of the estate upon the commencement of a chapter 11 case. 11 U.S.C. § 541(a)(1), (a)(7).  Importantly, section 541 of the Bankruptcy Code does not by itself create new legal or equitable interests in property; instead, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54–55 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").  Indeed, Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367–68 (1977); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less").  Thus, if a debtor holds no legal or equitable interest in property as of the commencement of the case, such property does not become property of the debtor's estate under section 541 and the debtor is prohibited from distributing such property to its creditors.  *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ("The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's

<div align="center">14</div>

property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.").

34.     Further, courts have interpreted section 541(d) to provide "expressly" that "property in which a debtor holds only bare legal title is not property of the estate." *Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006); *see also In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010) (holding that property held in trust, escrow, or as part of bailment is not property of the estate). When a debtor holds legal title to but does not have equitable interest in certain property, the debtor must turn such property over to the holders with such equitable interest in the property. *See MCZ, Inc. v. Andrus Res., Inc. (In re MCZ, Inc.)*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("[w]here Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner." (citations omitted)). A debtor who holds proceeds attributable to property owned by another holds only bare legal title to such property, and thus must turnover such proceeds to the interest holder of such property. *See, e.g., In re Columbia Pac. Mortg., Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (awarding holder of participation ownership interest proceeds of a property sale because holder was beneficial owner, and debtor only held legal title to the proceeds).

35.     By the BlockFi Wallet Terms of Service, the Debtors do not have legal or equitable title to the digital assets held for the benefit of the Debtors' clients in the Wallet Accounts. As described above, the BlockFi Wallet Terms of Service explicitly provide that, "[t]he title to the cryptocurrency held in [a Client's] BlockFi Wallet shall at all times remain with [the Client] and shall not transfer to BlockFi." The Supreme Court has held that property held by debtors for a third party (such as funds held on account of a resulting trust) is not property of the estate.

A000175

*Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate). Further, courts have held that property over which the debtor is merely exercising some "power ... solely for the benefit of an entity other than the debtor" is not property of the estate. *In re S.W. Bach & Co.*, 435 B.R. at 878. Thus, any property held by the Debtors on account of the Wallet Accounts is not property of the Debtors' estates.

36.       Because the Debtors do not have a legal or equitable interest in the digital assets held in the Wallet Accounts as of the Platform Pause Time Stamp, the Debtors should be permitted to honor withdrawal requests under the parameters described in this Motion. The authority to satisfy withdrawals from Wallet Accounts verifies the Debtors' position that client assets held in Wallet Accounts as of the Platform Pause Time Stamp are properly client property. These funds held in the Wallet Accounts as of the Platform Pause Time Stamp are owned by clients, not the Debtors, and therefore none of the Debtors' creditors will be prejudiced by the relief requested herein. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to satisfy their obligations to clients on account of withdrawals from those assets held in the Wallet Accounts as of the Platform Pause Time Stamp.

## II.     Updating the User Interface and Conducting Ordinary Course Reconciliation of Accounts are Authorized under Sections 1107(a) and 1108 of the Bankruptcy Code.

37.       The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of

A000176

chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.

38.     Properly reflecting the fact that the Attempted Platform Pause Transactions did not actually occur is a matter of administrative cleanup necessary for the User Interface to properly reflect transactions on the Debtors' platform as of the Platform Pause Time Stamp. Such reconciliation efforts ensure the Debtors' platform runs smoothly, efficiently, and that transactions and assets are accurately accounted for. These practices are also necessary to ensure that all client balances properly reflect the trading and transfer activity that took place prior to the Platform Pause so that clients are not artificially advantaged or disadvantaged by improper reconciliation of their accounts. If the Debtors are not able to reconcile the Attempted Platform Pause Transactions, the Debtors will not be able to satisfy client withdrawals from Wallet Accounts, as the amounts presently displayed on the User Interface for the Wallet Accounts do not properly reflect activity as of the Platform Pause Time Stamp. Therefore, the Debtors submit that the relief requested is necessary to ensure the Debtors can carry out their duties under sections 1107(a) and 1108 of the Bankruptcy Code.

## **Waiver of Memorandum of Law**

39.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## **Reservation of Rights**

40.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to

17

dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

41.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable:  (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (c) the United States Attorney's Office for the District of New Jersey; (d) the Internal Revenue Service; (e)  the United States Securities and Exchange Commission; (f) the attorneys general in the states where the Debtors conduct their business operations; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.


*[Remainder of page intentionally left blank.]*


18

A000178

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: December 19, 2022

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

A000180

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date and Time:** |

## ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS FROM WALLET ACCOUNTS, (B) UPDATE THE USER INTERFACE TO PROPERLY REFLECT TRANSACTIONS AND ASSETS AS OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

The relief set forth on the following pages, numbered three (3) through six (6), is

**ORDERED**.

A000182

Upon the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* (the "<u>Motion</u>"),[1] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), for entry of an order (this "<u>Order</u>") (a) authorizing the Debtors to (i) honor client withdrawals solely from the Wallet Accounts as of the Platform Pause Time Stamp, (ii) update the User Interface to properly reflect transactions and assets held in clients' accounts as of the Platform Pause Time Stamp, and (iii) conduct ordinary course reconciliation of client accounts, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the declaration filed in support of the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

A000183

(Page | 4)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al*. |
| Case No.: | 22-19361 (MBK) |
| Caption: | Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief |

the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY**

**ORDERED THAT**:

1.　　The Motion is **GRANTED** on a basis as set forth herein.

2.　　The Debtors are authorized to honor client withdrawal requests solely from the Wallet Accounts as of the Platform Pause Time Stamp in accordance with the BlockFi Wallet Terms of Service; *provided, however,* that the withdrawal requests of the BlockFi International clients from the International Vault Wallets shall be honored subject to entry of an order authorizing such withdrawals in the parallel Bermuda JPL Proceedings currently pending in the Supreme Court of Bermuda. For the avoidance of doubt, all complete or partial withdrawals from the Wallet Accounts, including Trade-Only Assets, shall be subject to the ordinary withdrawal fees provided for under the BlockFi Wallet Terms of Service and the cost of facilitating the withdrawals shall be mitigated insofar as reasonably practicable by the Debtors.

3.　　The Debtors are authorized to dollarize the Trade-Only Assets as soon as reasonably practicable after a client makes a withdrawal request of such Trade Only Assets. Withdrawal of the Trade-Only Assets of BlockFi International shall be conducted subject to entry of an order authorizing such withdrawals in the parallel Bermuda JPL Proceedings currently pending in the Supreme Court of Bermuda.

4.　　The Debtors are authorized to take any actions reasonably necessary to accurately reflect that the Attempted Platform Pause Transactions did not actually occur, so that the User Interface properly reflects the digital assets in the Wallet Accounts as of the Platform Pause Time Stamp. With respect to Attempted Platform Pause Transactions for BlockFi International, this

A000184

(Page | 5)
Debtors:        BLOCKFI INC., *et al*.
Case No.:       22-19361 (MBK)
Caption:        Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet
                Accounts, (B) Update the User Interface to Properly Reflect Transactions and
                Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation
                of Accounts, and (II) Granting Related Relief

shall be carried out subject to entry of an order authorizing such relief in the parallel Bermuda JPL

Proceedings currently pending in the Supreme Court of Bermuda.

5.      The Debtors are authorized to conduct reconciliatory practices in the ordinary

course consistent with prepetition practices.  Reconciliatory practices for BlockFi International

shall be carried out subject to entry of an order authorizing such relief in the parallel Bermuda JPL

Proceedings currently pending in the Supreme Court of Bermuda.

6.      Notwithstanding the actual or threatened suspension or termination of any

transmission licenses by any U.S. state or governmental entity, any transfers or disbursements

made pursuant to this Order shall not be deemed an implication, admission, or determination that

the Debtors are operating with a suspended or terminated license, nor shall the Debtors or their

insurance providers be liable for any associated fines or penalties, including, but not limited to,

penalties related to the Arch Insurance Company money transmitter bonds or otherwise.

7.      Notwithstanding the relief granted in this Order and any actions taken pursuant to

such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any

particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular

claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication

or admission that any particular claim is of a type specified or defined in this Order or the Motion;

(e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365

of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy

Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual,

common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors

A000185

(Page | 6)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al*. |
| Case No.: | 22-19361 (MBK) |
| Caption: | Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief |

expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

8. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

9. The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

10. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

A000186

**Exhibit B**

**BlockFi Wallet Terms of Service**

A000187

On November 28, 2022, BlockFi filed voluntary cases under Chapter 11 of the U.S. Bankruptcy Code. Additional information about our filing can be found on our blog here.





 **Wallet Terms**

WALLET TERMS

# Wallet Terms

**BlockFi Wallet Terms (New)**

**INTRODUCTION**

Welcome to BlockFi. Our BlockFi Wallet is a non-interest-bearing crypto account that allows you to hold, transfer and manage your cryptocurrency held in your account. Please read and keep these BlockFi Wallet Terms ("Wallet Terms"). If you need a physical copy of these Wallet Terms or if you have any questions, you can submit a support ticket here or visit blockfi.com. These Wallet Terms are incorporated by reference into the BlockFi Terms of Service found here: https://blockfi.com/terms/

**OUR RELATIONSHIP**

In these Wallet Terms, holders of a BlockFi Wallet, including owners, employees, agents and affiliates of any business, corporation, partnership or other entity that is, or is considering becoming, an account holder are sometimes referred to in the Wallet Terms as "you" or "your." The provider of the BlockFi Wallet, which for U.S clients is BlockFi Trading LLC and for non-U.S clients is BlockFi International Ltd., a Bermuda exempted company which holds a Class F (full) license from the Bermuda Monetary Authority to conduct digital assets business, is referred to as "BlockFi," "we," "us" or "our" in these Wallet Terms. Together, you and we may be collectively referred to as "Parties."

**ACCEPTANCE OF TERMS**

By opening a BlockFi Wallet, you agree that the terms and conditions contained in these Wallet Terms, as modified from time to time, will govern your BlockFi Wallet. We reserve the right to

update these Wallet Terms at any time and may notify you of such changes via the Website or by email at the address specified on your account application, but we have no obligation to notify you of every update.

## A. Opening a BlockFi Wallet

1. Anyone residing in a jurisdiction where we offer a BlockFi Wallet and who is at least eighteen (18) years old can apply to open a BlockFi Wallet.  BlockFi Wallet can be opened at blockfi.com, the BlockFi app or by contacting us here. All crypto received will initially be transferred to an account at one of BlockFi's or its affiliates' institutional custodians. If you are a U.S client, your BlockFi Wallet will be opened and maintained by BlockFi Wallet LLC acting for and on behalf of BlockFi Trading LLC and if you are a non-U.S client, your BlockFi Wallet will be opened and maintained by BlockFi Wallet LLC acting for and on behalf of BlockFi International Ltd.

2. In order to open your account, we will first verify your identity and require you to provide acceptable forms of identification. To help the government fight the funding of terrorism and money laundering activities, United States federal law and Bermuda requires us to obtain, verify, and record information that identifies each person or entity that opens an account. We may also ask for your driver's license or other identifying documents. For business accounts, we may require identification information related to a controlling manager and/or equity owners of your business. You represent and warrant that all information provided to us pursuant to these Wallet Terms or otherwise is true, accurate and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible. Note that we may use credit reports or other information from third parties to help us determine if we should open or maintain your account.

3. BlockFi Wallet is not available in Cuba, Iran, North Korea, Sudan, Syria, or any other country to which the United States or Bermuda embargoes goods or imposes similar sanctions. BlockFi Wallet is not available in the State of New York, or any other jurisdiction which we determine we would not be able to offer or chose not to offer a BlockFi Wallet. Due to the dynamic nature of regulatory requirements and interpretations in the cryptocurrency market, we reserve the right to update the list of prohibited jurisdictions and reject applications to open accounts that we determine we would be unable to accept for regulatory or policy reasons in our sole and absolute discretion.

4. Your account is not deemed to be opened, and we have no responsibility to you unless and until you have received written (which may be electronic) confirmation from us that your account has been opened. We are not obligated to accept an application from any applicant, and we reserve the right not to open an account for any applicant in our sole and absolute discretion.

## B. How Accounts Can Be Owned

BlockFi Wallet can be held in the types of ownership described below. Each individual or business entity shall only be permitted to maintain a single BlockFi Wallet at any given time.

1. Individual Account. This account is owned by only one person or entity who can transfer or withdraw cryptocurrency held in the account. There is a 1 (one) individual BlockFi Wallet maximum per individual.

A000189

2. **Business Account.** This account is owned by a corporation, unincorporated association, limited liability company, limited liability partnership, fiduciary, partnership, sole proprietorship or other entity holding an account in any capacity other than an individual capacity. Each person or entity completing any account opening requirements represents and agrees that he or she (i) is fully authorized to execute all documents or otherwise complete our requirements in his or her stated capacity, (ii) has furnished all documents or other information necessary to demonstrate that authority, and (iii) will furnish other documents and complete other requirements as we may request from time to time. We may refuse to recognize any resolution affecting your business account that appears to us to be incomplete or improperly executed.

## C. Funding your BlockFi Wallet

1. You can open your account by transferring eligible cryptocurrency to the wallet address provided in your BlockFi account. Your cryptocurrency will be accepted by BlockFi, and then will be transferred to BlockFi Wallet LLC, which will open and maintain your BlockFi Wallet, acting for and on behalf of BlockFi Trading LLC if you are U.S client.If you are non-U.S client your BlockFi Wallet will be opened and maintained by BlockFi Wallet LLC on behalf of BlockFi International Ltd.

2. The transfer of such eligible cryptocurrency to your BlockFi Wallet may not be deemed settled and completed until the transaction has met the specific protocol for a relevant cryptocurrency that BlockFi has defined.

3. In addition, you can open your account or add additional assets to your BlockFi Wallet by sending a wire transfer or ACH from a bank account to BlockFi to purchase certain cryptocurrencies as published on our website from time to time. Trading activity is governed by BlockFi Trading LLC's Trading Terms. If you have a BlockFi Wallet, all assets purchased through BlockFi, shall be immediately debited and credited to your BlockFi Wallet maintained by BlockFi Wallet LLC, acting for and behalf of BlockFi.

4. As of the date of these Wallet Terms, there is no minimum amount required to open a BlockFi Wallet. We may, in our sole discretion, institute a minimum balance in the future, and such minimum balance will apply to your BlockFi Wallet. Once your account has been opened and funded, BlockFi requires seven calendar days' notice prior to your complete or partial withdrawal of the eligible crypto in your BlockFi Wallet.

## D. Withdrawals

1. You may make a request for a complete or partial withdrawal of cryptocurrency from your BlockFi Wallet at any time with appropriate time notice as stated above. Additionally, before a withdrawal is processed, you may be required to provide certain personally identifiable information so BlockFi can verify your identity. BlockFi initiates the withdrawal process instantly when possible, and we may require up to seven (7) days after you submit your withdrawal request to process the withdrawal.

2. Withdrawal limits based on frequency and amount may apply from time-to-time and will be described in your BlockFi Wallet interface and on our Website at https://blockfi.com/fees

3. In the case of any withdrawal, you will be required to provide the details for the account to

A000190

which you wish to transfer your cryptocurrency. Upon a withdrawal request, your cryptocurrency will first be transferred to BlockFi Trading LLC, and then will be transferred to your designated account. Assets subject to a withdrawal request cannot be traded.

4. If the details you provide are inaccurate or incomplete, your cryptocurrency may be permanently lost. When you withdraw all or any of your cryptocurrency, we will not be liable for any loss that results from inaccurate, incomplete or misleading details that you may provide for such transfer. If the account you specify is one to which we are unable to process transfers, we will have no liability for any failure or delay in processing your requested withdrawal.

5. BlockFi and our third-party partners may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of transfers and withdrawals of cryptocurrency either temporarily or permanently. BlockFi is not and will not be responsible or liable for any loss or damage of any sort incurred by you as a result of such cyber-attacks, operational or technical difficulties or suspensions of transfers or withdrawals.

6. For withdrawals of  cryptocurrency in any calendar month, the transaction fees described at https://blockfi.com/fees will be deducted from the amount of cryptocurrency you withdraw from your BlockFi Wallet. For example, if you withdraw one Ethereum from your account, and the Ethereum network charges a transaction fee equal to .01 Ethereum, you will receive .99 Ethereum. BlockFi may also charge a fee for withdrawals. We will publish any such withdrawal fees on our Website before they take effect, and thereafter the applicable withdrawal fee will be deducted from the amount of cryptocurrency you withdraw from your BlockFi Wallet.

7. Additionally, from time to time there may be withdrawal minimums at BlockFi's third party custodians which may limit your ability to withdraw un-tradable fractions or other small amounts of cryptocurrency without first increasing the amount of cryptocurrency in your BlockFi Wallet.

**E. Taxes**

1. You will be able to see a record of the transactions related to your BlockFi Wallet which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to the payments you make or receive, and to collect, report, and remit the correct tax to the appropriate tax authority.

2. We will make any tax withholdings or filings that we are required by law to make, but we are not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction. You are responsible for complying with all applicable law, whether federal, state, local, or non-U.S. You agree that BlockFi is not responsible for determining whether or which laws may apply to your transactions, including tax law. You are solely responsible for reporting and paying any taxes arising from your BlockFi Wallet.

**F. Ownership of Cryptocurrency**

The title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi. You hereby represent and warrant to us at all times during which you maintain a balance in your BlockFi Wallet that: (i) any cryptocurrency that you transferred

A000191

into your BlockFi Wallet is owned by you at the time of transfer, and (ii) you are validly authorized to instruct us to carry out transactions relating to your BlockFi Wallet balance and that all transactions initiated with your BlockFi Wallet are for your own account (or, in the case of business accounts, for your business's account) and not on behalf of any other person or entity. Except as required by a valid court order or applicable law, BlockFi shall not sell, transfer, loan, hypothecate or otherwise alienate cryptocurrency held in your BlockFi Wallet unless specifically instructed by you.

**G. General Rules Governing BlockFi Wallet**

1. If you are U.S client, all our actions relating to your account, including these Wallet Terms, will be governed by the laws and regulations of the United States and, to the extent not preempted, the laws and regulations of the State of New Jersey. Any lawsuit regarding your account must be brought in a proper court in the State of New Jersey, City of Jersey City. If you are a non-U.S client, all our actions relating to your account, including these Wallet Terms, will be governed by the laws of Bermuda and any lawsuit regarding your account must be brought in the Bermuda courts. If any part of these Wallet Terms is determined to be invalid or unenforceable, such determination will not affect the remainder of these Wallet Terms.

2. We reserve the right at all times to monitor, review, retain and/or disclose any information as necessary to satisfy any applicable law, regulation, legal process or governmental request.

3. All transfers to your BlockFi Wallet must consist of eligible cryptocurrency and must be transferred to the wallet address provided in your BlockFi account application, unless we notify you otherwise. We have the right to reject any transfer and the right to return cryptocurrency already transferred into your BlockFi Wallet. Any contribution meeting the confirmation guidelines in Section C.2 on any day at or before 11:59 p.m. UTC-4 will be treated by us as being received on such day. If you attempt to transfer assets to an unsupported wallet or using an unsupported network, or if you attempt to transfer assets other than eligible cryptocurrency (including any unsupported digital assets) to your BlockFi Wallet, such assets may be permanently lost, and we will have no liability for any such loss.

4. These Wallet Terms and the relationship created hereby do not create a fiduciary relationship between us.

5. We may follow instructions regarding your BlockFi Wallet if we reasonably believe that you have authorized the instructions.

6. We will make statements for your BlockFi Wallet available to you by email and/or online at blockfi.com. All your accounts and (in our discretion) those of any of your affiliates may be combined into one statement.

7. We will make available to you a periodic statement showing the activity on your account and containing information sufficient to allow you to reasonably identify transactions. You must examine the statement and notify us of any unauthorized use or any error or irregularity on the statement within 30 calendar days after the statement is sent or made available to you. If notice is not received within the 30-calendar day period, then we will have no liability to you and any losses will be entirely yours.

A000192

8.  Your BlockFi Wallet is not transferable or assignable to another person in whole or in part.

9. BlockFi is required by law to turn over the assets in abandoned or unclaimed customer accounts to the state of your last known residence. You must promptly notify us of any change in your residential mailing or email address. Failure to notify us may result in delay or non-receipt of BlockFi correspondence.

10. We may record and monitor our telephone conversations with you and your electronic communications with us (chat, e-mail and other forms of electronic exchange). Unless the law requires otherwise, you consent in advance to such recording and monitoring, and we do not need to remind you of these activities.

11. For purposes of these Wallet Terms, our business days are Monday through Friday. Saturdays, Sundays and all federal and New York State holidays are not included.

12. We reserve the right to limit access to your accounts, which can include temporarily or permanently removing your online access, restricting your account and/or closing your accounts without prior notice to you unless prior notice is required by law. We do not bear liability for such actions. In addition, BlockFi reserves the right to withhold or delay the withdrawal of funds or assets belonging to you if you fail to comply with these Wallet Terms.

**H. Indemnification and Limitation of Liability; Attorney's Fees and Costs for Lawsuits**

1. You will indemnify and hold us and our affiliates harmless from any losses, damages, suits and expenses, of whatever kind, including reasonable attorneys' fees, which we may incur in connection with or arising out of your use of your BlockFi Wallet or our activities in connection with such account, your violation of any law, regulation, order or other legal mandate, or the rights of a third party, or any act or omission by your agent, representative or third-party service provider while using your BlockFi Wallet, regardless of whether the specific use was expressly authorized by you.

2. We are not liable to you for claims, costs, losses or damages caused by an event that is beyond our reasonable control (e.g., the acts or omissions of third parties, natural disaster, emergency conditions, disease epidemics/pandemics such as Covid-19, government action, equipment or communications malfunction).

3. We are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind.

4. Except for any setoff permitted by applicable law, any amounts owed, or liabilities incurred by us ("Obligations") may be satisfied solely from the assets of BlockFi and BlockFi Wallet LLC. Without limiting the generality of the foregoing, in no event shall you have any recourse, whether by setoff or otherwise, with respect to any amounts owed or liabilities incurred, to or against any assets of any person or entity other than BlockFi and BlockFi Wallet LLC for Obligations, including, without limitation, any member, affiliate, investor, employee, officer, agent or advisor of BlockFi and BlockFi Wallet LLC. For the avoidance of doubt, the foregoing shall not limit any setoff permitted by applicable law.

A000193

5. Our liability to you for a claim is limited to the face value of the item or transaction, or the actual value of any assets not properly credited or debited.

**I. Risk Disclosure**

1. Your BlockFi Wallet is not a checking or savings account, and it is not covered by insurance against losses. In certain jurisdictions, cryptocurrency is not legal tender, and is not backed by the government. Accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of cryptocurrency.

2. Transactions in cryptocurrency may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.  If you attempt to transfer assets to an unsupported wallet or using an unsupported network, or if you attempt to transfer assets other than eligible cryptocurrency (including any unsupported digital assets) to your BlockFi Wallet, such assets may be permanently lost. We assume no liability, obligation or responsibility whatsoever with respect to any unsupported digital asset or any asset that is transferred using an unsupported network or to an unsupported wallet. Some cryptocurrency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the customer initiates the transaction. The value of cryptocurrency may be derived from the continued willingness of market participants to exchange government-issued currency for cryptocurrency, which may result in the potential for permanent and total loss of value of a particular cryptocurrency should the market for that cryptocurrency disappear.

3. There is no assurance that a person who accepts a cryptocurrency as payment today will continue to do so in the future. The volatility and unpredictability of the price of cryptocurrency relative to government-issued currency may result in significant loss over a short period of time. The nature of cryptocurrency may lead to an increased risk of fraud or cyber-attack, including rollback attacks or blockchain reorganizations. The nature of cryptocurrency means that any technological difficulties experienced by BlockFi may prevent the access or use of a customer's cryptocurrency. Any bond or trust account maintained by BlockFi for the benefit of its customers may not be sufficient to cover all losses incurred by customers. Considering these risks, you should carefully consider whether holding cryptocurrency in a BlockFi account is suitable.

**J. Conflict/Disputes Involving Your Account**

1. We are not liable to you for errors that do not result in financial loss to you. We may take any action authorized or permitted by these Wallet Terms without being liable to you, even if such action causes you to incur fees, expenses or damages.

2. If third parties make claims on your account, or if we receive conflicting instructions from authorized signers, or if we become involved in or concerned about a dispute between you and an authorized signer, we have discretion to act in ways we believe to be appropriate, including by closing your BlockFi Wallet and returning the cryptocurrency in such account. You are liable for all expenses and fees we incur for such conflicts or disputes, including internal costs and attorneys' fees, and we may charge them to your BlockFi Wallet.

A000194

3. Fraudulent activity, including any attempt to withdraw assets that you do not own, did not transfer into your BlockFi Wallet, or did not purchase, is strictly prohibited and may result in the closure of your BlockFi Wallet. Fraudulent activity includes any attempt to take advantage of errors on the BlockFi Website, systems, applications, or technology platforms. Any errors identified should be flagged to investigations@blockfi.com for appropriate compensation, where applicable.

**K. Legal Process Affecting Accounts**

1. If legal action such as an attachment, garnishment, seizure, liquidation, levy or other state or federal legal process ("legal process") is brought against your BlockFi Wallet, we may refuse to permit (or may limit) withdrawals or transfers from your account until the legal process is satisfied or dismissed. We may also be required to transfer the assets in your BlockFi Wallet at the behest of governmental authorities pursuant to legal and regulatory actions. Regardless of the terms of such attachment, garnishment, levy or other state or federal process, we have first claim to all assets in your account.

2. We will not contest on your behalf any such legal process and may take action to comply with such legal process as we determine to be appropriate in the circumstances without liability to you. If we incur any expenses, including without limitation, reasonable attorney fees, in connection with any such legal process, we may charge any expenses and fees to your account or any other account you may have with us without prior notice to you, or we may bill you directly for such expenses and fees. Any garnishment, seizure, liquidation, or other levy against your account is subject to our right of setoff.

**M. Setoff and Security Interest Rights**

1. You grant us a security interest in any and all of your BlockFi account(s) with us for obligations owing to us or any of our affiliates by any owner of any of your accounts. These obligations include both secured and unsecured debts and debts you owe individually or together with someone else, including debts and obligations under other transactions or agreements between you and us or any of our affiliates.

2. We may take or set off assets in your  BlockFi Wallet, or transfer  assets between any or all of your BlockFi Wallet, with us or any of our affiliates for direct, indirect and acquired obligations that you owe us or our affiliates, including any balances as a result of not having sufficient assets available or as a result of an erroneous transfer of  assets to an address under your control, or a return or other negative balance, regardless of the source of assets in an account.

3. These rights are in addition to other rights we have to take, transfer or charge assets in your account for obligations you owe us or our affiliates. We may consider these Wallet Terms as your consent to BlockFi's asserting its security interest or exercising its right of setoff should any laws governing your account require your consent.

4. If the law restricts our ability to take, transfer or setoff against assets in your account, or if some contributions are protected from attachment, levy or legal process to the extent that you may do so by contract, you waive those conditions and limits and authorize us to apply assets in any or all of your accounts with us to obligations you owe us. Exercising these rights may result in early withdrawal penalties.

A000195

5. We hereby agree that, to the extent permitted by applicable law, you may take or set off assets in your account, or any amounts we owe you with respect thereto, against the Obligations. If the law restricts your ability to take, transfer or setoff assets in your account, or if some contributions are protected from attachment, levy or legal process to the extent that we may do so by contract, we waive those conditions and limits and authorize you to apply assets in any or all of your accounts with us to the Obligations.

## M. Waiver

We may delay or waive any rights we have under these Wallet Terms. If we delay or waive our rights, you are still obligated to pay us fees and other amounts you may owe us under these Wallet Terms. Any delay or waiver of our rights applies only to the specific instance in which we decide to delay or waive the provision and does not affect our future rights in any way.

## N. Digital Images, e-Signatures, & Facsimile Signatures

1. We accept digital images, e-signatures, and facsimile signatures for documents that need to be signed. However, we will not be liable if use of a device was unauthorized or if the size, color or quality of the signature is different from that of any signature previously presented to us.

2. If a facsimile signature is used for a withdrawal from your account, you are responsible for any withdrawal from your account when the facsimile signature resembles or purports to be the signature of a person authorized to make withdrawals from your account. You agree to reimburse us (and we may charge your account) for all claims, costs, losses and damages, including reasonable attorneys' fees, that result from our payment of a withdrawal accompanied by a facsimile signature or by a facsimile or digital image that we otherwise believe you authorized.

## O. Closing an Account

We have the right to close your BlockFi Wallet at any time for any reason without advance notice. In addition, your account will be closed automatically if we do not receive your initial transfer of assets to your BlockFi Wallet within sixty (60) days of the date on which your account is opened. If your account has a balance when we close it, and you provide a valid wallet address to us, we will return the remaining crypto assets to that address, unless prohibited by applicable law. We will cooperate with any regulatory or governmental entity's instructions or requests regarding your BlockFi Wallet, including freezing it and seizing its assets if mandated.

## P. Liability for Failure to Make Transfers

If we do not complete a transfer to or from your BlockFi Wallet or in the correct amount as clearly instructed to us according to these Wallet Terms, we will be liable for your actual losses or damages, subject to certain exceptions. We will not be liable, for instance: (i) if, through no fault of ours, you do not have enough  assets in your account to make the transfer; (ii) if circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken; (iii) in the case of preauthorized credits, if the data from the third party is not received, is incomplete or erroneous; (iv) if your BlockFi Wallet is not in an active status; (v) due to legal requirements of regulatory restrictions; (vi) other exceptions stated in these Wallet Terms or in another agreement with you.

**Q. Disclosure of Account Information**

We will disclose information to third parties about your account or the transfers you make: (i) where it is necessary for completing transfers; (ii) in order to verify the existence and condition of your BlockFi Wallet for a third party, such as a credit bureau or merchant; (iii) in accordance with the BlockFi Terms of Service; (iv) if you give us your written permission; (v) if we close your BlockFi Wallet due to a deficient balance, excessive instances when you do not have sufficient assets in your account or to protect or enforce our legal rights; and (vi) in order to comply with government agency or court orders.

**R. Account Errors or Questions**

1. Our platform allows you to review your BlockFi Wallet and conduct certain other transactions online. You must maintain adequate security and control of all IDs, passwords, hints, or any other codes that you use to access your BlockFi Wallet through our online platform. Any loss or compromise of the foregoing information or your personal information may result in unauthorized access to your BlockFi Wallet. We assume no responsibility for any loss that you may sustain due to compromise of your sensitive information. You accept all risks of unauthorized access and use of your BlockFi Wallet.

2. Tell us promptly if you believe that an electronic transfer has been made without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the assets in your BlockFi Wallet (plus any other BlockFi account you own). If your statement shows transfers that you did not make, tell us immediately by contacting us here.

3. Please submit a support ticket here, as soon as you can, if you think your statement is wrong or if you need more information about an item listed on the statement. We must hear from you no later than thirty (30) days after we send you or make available to you the first statement on which the problem or error appeared.

4. If you tell us orally or via electronic means, we may require that you send us your complaint or question in writing, and we may request additional information within ten (10) business days. We will endeavor to determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. For errors involving new accounts, we may take up to ninety (90) days to investigate your complaint or question. If we decide to do this, we will credit your account within ten (10) business days for the amount of the error, so that you will have the use of the assets during the time it takes us to complete our investigation. For new accounts, we may take up to twenty (20) business days to credit your account for the amount you think is in error.

5. If we ask you to put your complaint or question in writing, or request additional information, and do not receive it within ten (10) business days, we may not credit your account. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

Terms Last Modified: 7/1/2022

A000197

Products ⌄

Institutions ⌄

Resources ⌄

Company ⌄

Follow Us ⌄





Everything you need on-the go

**Download the BlockFi app**



Log in

BlockFi Lending LLC NMLS ID#1737520 | NMLS Consumer Access
BlockFi Trading LLC NMLS ID#1873137 | NMLS Consumer Access

Privacy Policy | Legal | Licenses | Disclosures and Complaints | NMLS Consumer Access

A000198

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with BlockFi are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by BlockFi. Rates for BlockFi products are subject to change.

BlockFi Rewards Credit Card: For more information, please see BlockFi's Terms of Service. BlockFi is not a Bank. Cards are issued by Evolve Bank & Trust, Member FDIC, pursuant to a license from Visa® USA Inc. Rewards are not offered by Evolve Bank & Trust and are instead offered and managed by BlockFi.

BlockFi International Ltd. holds a Class F digital assets business license under the Digital Assets Business Act, 2018 (as amended) and is licensed by the Bermuda Monetary Authority to conduct the following digital assets business activities: (i) issuing, selling or redeeming virtual coins, tokens or any other form of digital assets (ii) operating as a digital asset exchange (iii) providing custodial wallet services (iv) operating as a digital asset derivative exchange provider and (v) operating as a digital assets services vendor.

See blockfi.com/terms for more information.

2022 © All Rights Reserved.

A000199

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS FROM THE MC FBO ACCOUNTS, (B) LIQUIDATE CRYPTOCURRENCY FROM CUSTOMER ACCOUNTS WITH A NEGATIVE BALANCE, (C) SWEEP CASH HELD IN THIRD-PARTY EXCHANGES, (D) CONDUCT ORDINARY COURSE RECONCILIATION OF CUSTOMER ACCOUNTS, AND (E) CONTINUE STAKING CRYPTOCURRENCY, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing the Debtors to: (i) honor customer withdrawals from the MC FBO Accounts, (ii) liquidate cryptocurrency from customer accounts with a negative balance, (iii) sweep cash held in third-party exchanges, (iv) conduct ordinary course reconciliation of customer accounts, and (v) continue to stake cryptocurrency; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED**:

1.    The Motion is granted on a final basis to the extent set forth herein.

2.    The record of the Hearing demonstrated that funds held in two FBO Accounts at MC Bank and administered by the Debtors are funds held for the benefit of customers and that those funds belong to customers and are not property of the estate.  MC Bank and the Debtors are authorized to honor any requests for withdrawals by customers of cash held on the customers' behalf in the applicable MC FBO Accounts as of the Petition Date.  In the case of each customer, nothing in this paragraph shall be interpreted as authorizing any withdrawal of any amount other than the cash actually held in two designated MC FBO Accounts for the benefit of that customer as of the Petition Date, and nothing in this paragraph shall authorize the withdrawals of cryptocurrency or any efforts to rescind, recharacterize, fulfill or reverse any cryptocurrency trades made by or on behalf of such customer.  Any issues as to the amounts of cash held by individual customers in the MC FBO Accounts shall be resolved pursuant to the normal operating procedures

A000201

of MC Bank and the Debtors, or if such issues cannot be resolved they may be presented to the Court for resolution.

3.      The Debtors are authorized to reinstate their ordinary course practices with respect to: (a) liquidating cryptocurrency for customer accounts with a negative USD balance, (b) sweeping cash held in third party exchanges, (c) reconciling customer records to reflect the status of accounts as of the commencement of these cases (including, but not limited to, reconciliations to reflect transactions that were fulfilled or partially fulfilled prior to the commencement of these cases), (d) closing accounts that are unfunded and/or deemed to be fraudulent; (e) disabling user access to closed accounts; and (f) recovering funds that were sent to incorrect blockchains.

4.      To the extent that customers placed orders that were not filled or that were only partially filled prior to the commencement of these cases, the Debtors are authorized to cancel the portions of such orders that were not filled.

5.      The Debtors may "stake" cryptocurrency pursuant to their ordinary course practices as they deem appropriate in the ordinary course of business; *provided, however*, that the Debtors shall give seven (7) business days' written notice (the "Staking Notice") to the Committee prior to staking or unstaking cryptocurrency. The Staking Notice shall include information sufficient to allow the Committee to evaluate the proposed staking and unstaking, including, without limitation, the staking protocol, the smart contract address, anticipated yield, the cryptocurrency to be staked, the cryptocurrency or fiat the Debtors propose to convert to stake, staking mechanics, lock-up period, transaction fees, actions required to unstake, and the involvement of any third-party and their respective fees. If the Committee objects to the proposed staking or unstaking within seven (7) business days of receiving the Staking Notice, the Debtors shall not stake or unstake until such

A000202

objection is adjudicated by this Court. For the avoidance of doubt, nothing in this Order shall authorize the Debtors to conduct any lending activity.

6. The Committee shall have thirty (30) days after entry of this Order to evaluate the Debtors' staking positions that existed as of the Petition Date. The Debtors shall comply with all reasonable requests for information from the Committee to allow the Committee to conduct its evaluation of such staking positions. Nothing in this Order shall affect the Committee's rights to object to the Debtors' staking positions that existed as of the Petition Date.

7. Nothing provided in this Order shall be deemed to modify, alter, or supersede the relief granted in paragraph 8 of the Cash Management Order regarding the assignment, to the Debtors, of MC Bank's authority to challenge cash withdrawal requests from customers and to challenge efforts by customers to reverse prior ACH transfers.

8. Nothing provided in this Order shall affect any claims or causes of action arising under chapter 5 of the Bankruptcy Code.

9. The Debtors are authorized to reinstate their ordinary course practices and otherwise honor their obligation to cover any amounts debited from the applicable FBO Account by reason of returned entries or ACH Chargebacks pursuant to paragraph 3.6 and Schedule C of the FBO Agreement and sections 9, 11(a), and 12 of the ACH Agreement.

10. Notwithstanding any language to the contrary in the Motion or this Order, no provision of the Motion or Order shall constitute a finding as to whether the Cryptocurrency Transactions are securities or comply with federal or state securities laws, and the right of the United States Securities and Exchange Commission to challenge such transactions on any basis are expressly reserved.

A000203

11.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

12.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

13.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

14.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

A000204

15.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

16.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.


Dated: New York, New York
      August 5, 2022

            /s/ **Michael E. Wiles**
            THE HONORABLE MICHAEL E. WILES
            UNITED STATES BANKRUPTCY JUDGE

A000205

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**NOTICE OF PRESENTATION TO THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

**PLEASE TAKE NOTICE** that, on November 11, 2022 and November 14, 2022, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on December 15, 2022, the Office of the United States Trustee (the "U.S. Trustee") filed the *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 231], and on December 20, 2022, the U.S. Trustee filed the *Amended Notice of Appointment of Committee of Unsecured Creditors* [D.I. 261], forming the Official Committee of Unsecured Creditors (the "Committee").

**PLEASE TAKE FURTHER NOTICE** that, on March 2, 2023, the Debtors provided a presentation (the "Presentation") to the Committee, a copy of which is attached hereto as **Exhibit A**.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

{1368.002-W0070145.}

**PLEASE TAKE FURTHER NOTICE** that copies of the Presentation and other pleadings filed in the above-captioned Chapter 11 Cases may be obtained free of charge from the website maintained by the Debtors' noticing and claims agent at https://cases.ra.kroll.com/FTX. You may also obtain copies from the Court's website at www.deb.uscourts.gov for a fee.

Dated: March 2, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

A000207

# EXHIBIT A

A000208

# Preliminary Analysis of Shortfalls at FTX.COM and FTX.US

March 2, 2023

**Preliminary / Subject to Material Change**

## Materials for Official Committee and Other Stakeholders

A000209

SUBJECT TO MATERIAL CHANGE

# General Disclaimer

The limiting conditions, qualifications, assumptions and disclaimers set forth herein are an integral part of this Presentation, must be reviewed in conjunction herewith, and may not be modified or distributed separately.

**Limitations of Presentation**

This presentation and the information contained herein (the "Presentation") has been prepared at the direction of FTX Trading Ltd. (d.b.a. FTX.com) and approximately 100 additional affiliated companies (together, the "Company") for its own business purposes with the assistance of Alvarez & Marsal North America, LLC ("A&M"). The information herein reflects and/or is based upon financial and other information provided to A&M by the Company, including management, staff, contract staff and other advisors of the Company, as well as other sources. A&M has relied upon, and assumed, without independent verification, the accuracy and completeness of such information, and make no representation or warranty as to the accuracy or completeness of, and otherwise assumes no liability with respect to, the Presentation or the information upon which the Presentation is based.

In the event this Presentation contains or involves prospective financial or forward-looking information, this information was prepared by the Company's management and does not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the American Institute of Certified Public Accountants, and A&M expresses no assurance of any kind on such information. Further, the work to prepare the Presentation did not include a detailed review of any transactions, and cannot be expected to identify errors, irregularities or illegal acts, including fraud or defalcations that may exist. In addition, any references to estimated value or recoveries included in this Presentation are preliminary in nature, provided for informational purposes only, subject to material change and not valuations of any kind. It is expected that there will be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and these differences may be material. Accordingly, A&M cannot and does not express an opinion or any other form of assurance on, and assumed no responsibility for, the accuracy or correctness of the historical information, the accuracy of any valuation or estimate, or the completeness and achievability of any of the projected financial data, information and assessments upon which the Presentation is based on.

The subject matter of this Presentation will be subject to further work, revisions and other factors which means that this version may be substantially different from any final report or advice issued.

The Presentation does not constitute a recommendation as to what action, if any, any person should take with respect to any claims and/or securities, nor does the Presentation constitute a recommendation regarding the accounting, tax, financial, legal or regulatory aspects of any proposed or possible outcome of the Company's restructuring.

**No Third Party Reliance**

This Presentation and any related informational updates are provided only in connection with the purpose of a public case update in respect of which the services are being provided. In no event, regardless of whether consent has been provided, shall A&M or any other advisor to or representative of the Company assume any responsibility, liability or duty of care to any claimholder, person or entity other than the Company ("Third Party") to which any of this preliminary information is disclosed or otherwise made available. This Presentation does not necessarily take account of those matters or issues which might be of relevance to any Third Parties and any Third Party is responsible for conducting its own investigation with respect to the Presentation and any related transactions or activities. A&M makes no representation or warranty, express or implied, to any Third Party on which any such party may rely with respect to the Information, including without limitation, as to accuracy or completeness, the inclusion or omission of any facts or information, or as to its suitability, sufficiency or appropriateness for the purposes of any such party.

A000210

SUBJECT TO MATERIAL CHANGE

# Nature and Limitations of Presentation

1. On January 17, 2023, the FTX Debtors presented preliminary information to the Official Committee of Creditors on the FTX Debtors' consolidated assets, recovery efforts and other matters. The presentation was made public on the same day and is available at https://restructuring.ra.kroll.com/FTX/

2. This second presentation of preliminary information, part of what the FTX Debtors anticipate will be a series, shows digital assets and fiat associated with the exchanges at commencement (the "Petition Time") of the chapter 11 case for FTX Trading Ltd., the owner and operator of FTX.COM ("FTX Trading"), and West Realm Shires Financial Services, Inc., the owner and operator of FTX.US ("WRSFS"), excluding digital assets and/or fiat associated with the Japan, Cyprus and Singapore exchanges, and with Alameda or other FTX Debtors.

3. The FTX Debtors' analysis is ongoing, and complicated by the incomplete nature of the books and records maintained by pre-petition management. As a result, the information in this presentation is <u>preliminary</u> and <u>subject to material change</u> as new, additional or conflicting information is identified, and it should not be relied upon <u>for any purpose</u>. The FTX Debtors are disclosing this presentation at this time because they determined that the need for transparency, and to ensure that all stakeholders have roughly contemporaneous access to the preliminary information as it develops, outweighs the interest in delaying disclosure until the relevant information is no longer reasonably subject to change.

4. **In particular, it is not possible to calculate or predict customer recoveries based on the preliminary information in this presentation. Among other reasons:**

   – **The presentation does not attempt to adjust for commingling of assets or insider access to assets, which may be the subject of future, material adjustments.**

   – **Actual recoveries will depend on many facts and factors, including (a) the extent of other assets and liabilities of FTX Trading and WRSFS, (b) the nature of intercompany payables and receivables, (c) claims and causes of action, (d) the resolution of numerous legal issues, (e) recoveries from the liquidation, sale or reorganization of over a hundred companies comprising the FTX group globally, and (f) fluctuations in the value of assets.**

A000211

SUBJECT TO MATERIAL CHANGE

# Timeline of Work to Determine Exchange Shortfalls



**Chapter 11 Filing**
November 11, 2022

**Cyber Attack**

**Rapidly Secured FTX Computing Environment**

**Rapidly Secured Assets to Cold Storage**

**Customer Balance Review Started**
December 6, 2022

**Initial Analysis Completed**
*Significant Balance Issues Identified*
December 29, 2022

**Developed Script & Reconciled Exchange Data**
FTX data team, engineers and advisors utilized script & exchange data reconciliation to produce preliminary customer balances

**Performed Preliminary Asset Tracing**
Performed on-chain asset tracing to originating exchange addresses for all identified assets and unauthorized transfers

✳ TRM

**Preliminary Customer Balances Published**
Today

**Data Complexity:**

| 120 Billion Rows of User Transaction Data | Incomplete Leveraged Tokens & Derivatives Data | Compromised FTX Computer Environment |
|---|---|---|
| 14 Million Wallet Addresses | Challenges in Identifying Related Party Balances | Abnormal Internal User Accounts |

A000212

4

SUBJECT TO MATERIAL CHANGE

# Hurdles in Determining Preliminary Balances

**Access to key data was limited while the FTX Debtors' computing environment was secured in the aftermath of the cyber attack, and remains subject to certain restrictions necessary for security purposes.**



**Preliminary Customer Balances Published**
Today

**1** Calculate balances as of the precise **Petition Time**

**2** Validate pricing and treatment of **futures and derivatives** contracts

**3** Recalculate **leverage token** pricing & valuation

**4** Determine appropriateness of **source of pricing**

**5** Lack of recordkeeping & documentation resulting in challenges in **locating crypto assets**

**6** Review of **certain accounts and tokens** to understand activity and determine inclusion / exclusion in balance

**7** On-chain crypto **tracing across dozens of blockchains** conducted to validate source wallets by exchange

A000213

5

SUBJECT TO MATERIAL CHANGE

# Assumptions and Notes on Analysis

1. Tokens have been broken down into two categories:
   a) "Category A Assets" are tokens with (i) a market capitalization of at least $15M and (ii) an average daily trading volume of at least $1M during the past 30 days, in each case measured at February 2, 2023.
   b) "Category B Assets" are tokens that do not satisfy the test for Category A Assets or which are largely held and/or controlled by the estate.

2. Digital assets and/or fiat associated with the Japan, Cyprus and Singapore exchanges, and with Alameda or other FTX Debtors, are excluded.

3. All pricing is as of the Petition Time based on preliminary information from CoinMarketCap ("Petition Time Pricing"). Petition Time Pricing may not reflect the actual market value of positions, especially for Category B Assets, or the valuation to be used by the FTX Debtors for other purposes.

4. Certain tokens carried at fixed values are excluded entirely because they do not have an active trading market (FTX Equity, West Realm Equity, etc.).

5. To simplify the presentation, certain internal accounts are excluded from the analysis and related party and third party accounts have been netted where considered appropriate based on current information.

6. As previously noted, the information set forth in this presentation is preliminary and subject to material change as new, additional or conflicting information is identified. As a result, the information should not be relied upon for any purpose including, but not limited to, estimating recoveries in the FTX Debtors' Chapter 11 cases.

A000214

SUBJECT TO MATERIAL CHANGE

# Preliminary Takeaways

**1** The FTX Debtors have identified and inventoried substantially all wallets associated with the FTX.COM and FTX.US exchanges. Both exchanges generally held digital assets in sweep wallets which were not segregated for individual customers.

**2** FTX's pre-petition management used the FTX.COM and FTX.US sweep wallets to store, borrow and lend digital assets for the proprietary account of the FTX Debtors and a large number of related parties, including employees, suppliers, vendors and business partners, as well as exchange customers.

**3** There is a massive shortfall at the FTX.COM exchange at the Petition Time, defined as the difference between digital asset claims on the ledger of FTX.COM and digital assets available to satisfy those claims. The shortfall is especially pronounced for Category A Assets. Only a small amount of cash, stablecoin, BTC, ETH and other Category A Assets remain in wallets preliminarily sourced to the FTX.COM exchange.

**4** The shortfall is smaller at FTX.US, but still significant. In addition to FTX.US customers, other FTX Debtors and related parties maintained a $128 million (net) receivable position from FTX.US at the Petition Time. Accordingly, creditors of other FTX Debtors, including FTX.COM customers, may have an indirect interest in assets at the FTX.US exchange.

**5** Prior to the FTX Debtors obtaining custody of digital assets from pre-petition management, unauthorized transfers removed an additional $293 million from wallets preliminarily sourced to the FTX.COM exchange and $139 million from wallets preliminarily sourced to the FTX.US exchange.

A000215



A000216

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances



**USD Millions at Petition Time Pricing**
*Excludes Japan, Singapore and Cyprus Local Exchanges*

**Related party payables and receivables include $9.3B of net borrowing by Alameda from FTX.com**



**$16,080**

Related Party Payables[1]
**$4,847**

**See page 11 for detail**

Customer Payables[2]
**$11,233**

**$16,080**

Related Party Receivables[1]
**$13,246**

Unauthorized Transfers
**$293**

Customer Receivables[2]
**$385**

Located Assets[3]
**$2,155**

**Liabilities[4,5]**

**Assets[4]**

**Notes:**
1. Related Parties include founder accounts (Sam Bankman-Fried, Gary Wang, and Nishad Singh), Alameda Research accounts, FTX.com affiliate and FTX US affiliate accounts. Employee accounts are included in customer liabilities. Creditors in other silos may have an indirect interest in Related Party Payables.
2. Customer balances may include unidentified founder, related party or disqualified accounts.
3. Includes [restricted] cash of $19M and $93M in FDM accounts as of 12/16/2022. *Excludes* FTT and SRM in custody of the Securities Commission of The Bahamas.
4. Balances combine and net subaccount payables and are subject to continuing review.
5. Several fiat withdrawals were initiated but in a pending status in the AWS system due to exchange shutdown procedures; fiat withdrawal tracing on-going to review successful withdrawals (est. impact up to $200M liability decrease).

A000217

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances by Token



**USD Millions at Petition Time Pricing**

## Comparison of customer liabilities and assets for top located tokens, cash, and stablecoins by category

| Token | Customer Payables | Located Assets | Customer Receivables | Total Assets | (Deficit) / Surplus[1] |
|---|---|---|---|---|---|
| **Category A** | | | | | |
| Cash / Stablecoin | $ 6,991 | $ 270 | $ 310 | $ 580 | $ (6,411) |
| BTC | 1,591 | 1 | 5 | 6 | (1,585) |
| ETH | 922 | 9 | 42 | 52 | (870) |
| SOL | 118 | 2 | 7 | 9 | (109) |
| XRP | 93 | 12 | 3 | 14 | (79) |
| BNB | 68 | 5 | 2 | 7 | (61) |
| MATIC | 65 | 45 | 1 | 46 | (19) |
| TRX | 62 | 18 | 2 | 20 | (43) |
| All Other | 635 | 334 | 11 | 345 | (290) |
| **Total Category A** | **10,544** | **694** | **383** | **1,078** | **(9,466)** |
| **Category B** | | | | | |
| FTT | 441 | 130 | 0 | 130 | (312) |
| MAPS | 96 | 1,004 | - | 1,004 | 909 |
| SRM | 56 | 157 | 1 | 158 | 102 |
| FIDA | 4 | 59 | 0 | 59 | 55 |
| MEDIA | 0 | 38 | - | 38 | 38 |
| All Other | 93 | 72 | 1 | 73 | (19) |
| **Total Category B** | **690** | **1,461** | **2** | **1,462** | **773** |
| **Total** | **$ 11,233** | **$ 2,155** | **$ 385** | **$ 2,540** | **$ (8,693)** |

Notes:
1. (Deficit) / Surplus excludes $293M of unauthorized transfers preliminarily sourced to the FTX.COM exchange.

A000218

SUBJECT TO MATERIAL CHANGE

# Related Party Detail



**USD Millions at Petition Time Pricing**

## Related Party Balances[1]

| Payables | | |
|---|---|---|
| # | Related Party | Total |
| 1 | Alameda Research LLC | $   3,535 |
| 2 | Cottonwood Grove LTD | 483 |
| 3 | Maclaurin Investments LTD (fka Alameda Ventures LTD) | 309 |
| 4 | FTX Europe AG | 100 |
| 5 | SNG Investments | 83 |
| 6 | Founder Accounts | 16 |
| 7 | FTX Turkey | 12 |
| 8 | Paper Bird Inc. | 0 |
| | All Other[2] | 310 |
| | **Total Related Party Payables** | **$   4,847** |

| Receivables | | |
|---|---|---|
| # | Related Party | Total |
| 1 | Alameda Research LLC | $   12,842 |
| 2 | Maclaurin Investments LTD (fka Alameda Ventures LTD) | 149 |
| 3 | Founder Accounts | 53 |
| 4 | Cottonwood Grove LTD | 52 |
| 5 | Paper Bird Inc. | 21 |
| | All Other[2] | 130 |
| | **Total Related Party Receivables** | **$   13,246** |

Notes:
1.  Balances include netting of sub account payables and receivables into the main account; largest impact is to info@alameda-research.com which has both a payable and receivable balance on different sub accounts of 573B of FTT.
2.  "All Other" may include payables and receivables that have yet to be reclassified to legal entities listed above.

A000219

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances – Category A Only



**USD Millions at Petition Time Pricing**
*Excludes Japan, Singapore and Cyprus Local Exchanges*

**Related party payables and receivables include $9.2B of net borrowing by Alameda from FTX.com**



**Notes:**
1. Related Parties include founder accounts (Sam Bankman-Fried, Gary Wang, and Nishad Singh), Alameda Research accounts, FTX.com affiliate and FTX US affiliate accounts. Employee accounts are included in customer liabilities. Creditors in other silos may have an indirect interest in Related Party Payables.
2. Customer balances may include unidentified founder, related party or disqualified accounts.
3. Includes [restricted] cash of $19M and $93M in FDM accounts as of 12/16/2022. *Excludes* FTT and SRM in custody of the Securities Commission of The Bahamas.
4. Balances combine and net subaccount payables and are subject to continuing review.
5. Several fiat withdrawals were initiated but in a pending status in the AWS system due to exchange shutdown procedures; fiat withdrawal tracing on-going to review successful withdrawals (est. impact up to $200M liability decrease).

A000220



A000221

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances

 **FTX** US

**USD Millions at Petition Time Pricing**

> **Related party payables and receivables include $127M of net payables to Alameda / Paper Bird**



**Notes:**
1. Related Parties include founder accounts (Sam Bankman-Fried, Gary Wang, and Nishad Singh), Alameda Research accounts, FTX.com affiliate and FTX US affiliate accounts. Employee accounts are included in customer liabilities. Creditors in other silos may have an indirect interest in Related Party Payables.
2. A portion of the deficit may be related to the de-pegging of Sollet tokens from their underlying digital assets.
3. Customer balances may include unidentified founder, related party or disqualified accounts.
4. Located Assets includes [restricted] cash of $24M where property interests are still being reviewed.
5. Balances combine and net subaccount payables and are subject to continuing review.

A000222

14

SUBJECT TO MATERIAL CHANGE

# Petition Time Balances by Token



**USD Millions at Petition Time Pricing**

## Comparison of customer liabilities and assets for top located tokens, cash, and stablecoins by category

| Token | Customer Payables | Located Assets | Customer Receivables | Total Assets | (Deficit) / Surplus[1] |
|---|---|---|---|---|---|
| **Category A** | | | | | |
| Cash / Stablecoin | $ 181 | $ 88 | $ 28 | $ 116 | $ (65) |
| BTC | 66 | 64 | 0 | 64 | (2) |
| ETH | 38 | 7 | 0 | 7 | (31) |
| SOL | 19 | - | 0 | 0 | (19) |
| DOGE | 9 | 15 | 0 | 15 | 6 |
| MATIC | 4 | 0 | 0 | 0 | (4) |
| LINK | 4 | 0 | 0 | 0 | (4) |
| SHIB | 3 | 0 | 0 | 0 | (3) |
| TRX | 2 | 6 | - | 6 | 4 |
| UNI | 1 | 0 | 0 | 0 | (1) |
| ALGO | 1 | 2 | 0 | 2 | 2 |
| PAXG | 1 | - | 0 | 0 | (1) |
| ETHW | 1 | 2 | 0 | 2 | 1 |
| WBTC | 0 | 0 | 0 | 0 | (0) |
| WETH | - | 1 | - | 1 | 1 |
| All Other | 6 | 5 | 0 | 5 | (0) |
| **Total Category A** | **335** | **190** | **28** | **219** | **(116)** |
| **Category B** | | | | | |
| All Other | 0 | 0 | - | 0 | (0) |
| **Total Category B** | **0** | **0** | **-** | **0** | **(0)** |
| **Total** | **$ 335** | **$ 191** | **$ 28** | **$ 219** | **$ (116)** |

A000223

**Notes:**
1. (Deficit) / Surplus excludes $139M of unauthorized transfers preliminarily sourced to the FTX.US exchange .

SUBJECT TO MATERIAL CHANGE

# Related Party Detail



**USD Millions at Petition Time Pricing**

| Related Party Balances[1] | | | | | |
|---|---|---|---|---|---|

| **Payables** | | | **Receivables** | | |
|---|---|---|---|---|---|
| # | Related Party | Total | # | Related Party | Total |
| 1 | Alameda Research LLC | $ 262 | 1 | Alameda Research LLC | $ 155 |
| 2 | Paper Bird Inc. | 19 | | All Other[2] | 0 |
| 3 | Maclaurin Investments LTD (fka Alameda Ventures LTD) | 0 | | **Total Related Party Receivables** | **$ 155** |
| 4 | Founder Accounts | 0 | | | |
| 5 | FTX Digital Markets LTD | 0 | | | |
| 6 | Blockfolio, Inc. | 0 | | | |
| | All Other[2] | 1 | | | |
| | **Total Related Party Payables** | **$ 283** | | | |

**Notes:**
1. Balances include netting of sub account payables and receivables into the main account.
2. "All Other" may include payables and receivables that have yet to be reclassified to legal entities listed above.

# Appendix
## Daily Deposits and Withdrawals Activity
## 90 Days Prior to Petition Date



A000225

SUBJECT TO MATERIAL CHANGE

# Daily Deposits & Withdrawals
## 90 Day Activity:  August 14, 2022 to November 11, 2022



**USD Millions at Petition Time Pricing**



**Notes:**
1.   The sharp rise in deposits in the days immediately prior to the petition date include in large part deposits from Alameda

A000226

18

SUBJECT TO MATERIAL CHANGE

# Daily Deposits & Withdrawals Activity
## November 1, 2022 Through Petition Date

**FTX.com**

**USD Millions at Petition Time Pricing**

### Consolidated

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|---|---|---|---|---|
| 11/1/2022 | $1,959 | ($2,419) | ($461) | ($461) |
| 11/2/2022 | 1,341 | (1,507) | (166) | (627) |
| 11/3/2022 | 1,157 | (1,547) | (390) | (1,017) |
| 11/4/2022 | 1,632 | (1,444) | 189 | (828) |
| 11/5/2022 | 525 | (739) | (213) | (1,042) |
| 11/6/2022 | 1,752 | (3,306) | (1,554) | (2,596) |
| 11/7/2022 | 3,507 | (4,659) | (1,152) | (3,748) |
| 11/8/2022 | 1,004 | (983) | 21 | (3,728) |
| 11/9/2022 | 25 | (3) | 21 | (3,706) |
| 11/10/2022 | 16 | (38) | (22) | (3,728) |
| 11/11/2022 | 20 | (64) | (44) | (3,773) |
| **Total** | **$12,937** | **($16,710)** | **($3,773)** | **N/A** |

### Customers

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|---|---|---|---|---|
| 11/1/2022 | $1,091 | ($1,489) | ($398) | ($398) |
| 11/2/2022 | 923 | (1,090) | (167) | (566) |
| 11/3/2022 | 939 | (1,459) | (519) | (1,085) |
| 11/4/2022 | 1,068 | (1,204) | (136) | (1,221) |
| 11/5/2022 | 446 | (626) | (181) | (1,402) |
| 11/6/2022 | 425 | (2,273) | (1,848) | (3,250) |
| 11/7/2022 | 929 | (4,235) | (3,306) | (6,556) |
| 11/8/2022 | 414 | (824) | (410) | (6,965) |
| 11/9/2022 | 20 | (3) | 17 | (6,948) |
| 11/10/2022 | 14 | (35) | (21) | (6,969) |
| 11/11/2022 | 20 | (64) | (44) | (7,014) |
| **Subtotal** | **$6,289** | **($13,303)** | **($7,014)** | **N/A** |

### Alameda & Other Related Parties

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|---|---|---|---|---|
| 11/1/2022 | $868 | ($930) | ($62) | ($62) |
| 11/2/2022 | 417 | (417) | 1 | (62) |
| 11/3/2022 | 218 | (88) | 129 | 68 |
| 11/4/2022 | 565 | (240) | 325 | 393 |
| 11/5/2022 | 80 | (112) | (33) | 360 |
| 11/6/2022 | 1,327 | (1,033) | 294 | 654 |
| 11/7/2022 | 2,578 | (424) | 2,154 | 2,808 |
| 11/8/2022 | 589 | (159) | 430 | 3,238 |
| 11/9/2022 | 4 | (0) | 4 | 3,242 |
| 11/10/2022 | 2 | (3) | (1) | 3,241 |
| 11/11/2022 | 0 | (0) | 0 | 3,241 |
| **Subtotal** | **$6,648** | **($3,407)** | **$3,241** | **N/A** |



**Notes:**
1. The sharp rise in deposits in the days immediately prior to the petition date include in large part deposits from Alameda

Deposits — Withdrawals - - -

A000227

19

# Appendix

**Daily Deposits and Withdrawals Activity
90 Days Prior to Petition Date**



A000228

# Daily Deposits & Withdrawals
## 90 Day Activity: August 14, 2022 to November 11, 2022



**USD Millions at Petition Time Pricing**





A000229

SUBJECT TO MATERIAL CHANGE

# Daily Deposits & Withdrawals Activity
## November 1, 2022 Through Petition Date



**USD Millions at Petition Time Pricing**

## Consolidated

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|---|---|---|---|---|
| 11/1/2022 | $159 | ($197) | ($38) | ($38) |
| 11/2/2022 | 133 | (152) | (20) | (58) |
| 11/3/2022 | 96 | (97) | (1) | (58) |
| 11/4/2022 | 204 | (190) | 14 | (44) |
| 11/5/2022 | 86 | (78) | 8 | (37) |
| 11/6/2022 | 181 | (471) | (290) | (326) |
| 11/7/2022 | 309 | (573) | (264) | (590) |
| 11/8/2022 | 354 | (752) | (398) | (988) |
| 11/9/2022 | 253 | (583) | (330) | (1,319) |
| 11/10/2022 | 114 | (264) | (150) | (1,468) |
| 11/11/2022 | 19 | (78) | (59) | (1,528) |
| **Total** | **$1,908** | **($3,436)** | **($1,528)** | **N/A** |

## Customers

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|---|---|---|---|---|
| 11/1/2022 | $84 | ($100) | ($16) | ($16) |
| 11/2/2022 | 105 | (111) | (6) | (22) |
| 11/3/2022 | 72 | (81) | (10) | (32) |
| 11/4/2022 | 116 | (122) | (6) | (38) |
| 11/5/2022 | 86 | (78) | 8 | (30) |
| 11/6/2022 | 38 | (159) | (121) | (151) |
| 11/7/2022 | 144 | (336) | (192) | (343) |
| 11/8/2022 | 86 | (622) | (536) | (879) |
| 11/9/2022 | 60 | (417) | (357) | (1,236) |
| 11/10/2022 | 78 | (197) | (119) | (1,355) |
| 11/11/2022 | 19 | (78) | (59) | (1,415) |
| **Subtotal** | **$887** | **($2,301)** | **($1,415)** | **N/A** |

## Alameda & Other Related Parties

| Date | Deposits | Withdrawals | Net | Cumulative Net |
|---|---|---|---|---|
| 11/1/2022 | $75 | ($97) | ($22) | ($22) |
| 11/2/2022 | 28 | (41) | (14) | (35) |
| 11/3/2022 | 25 | (16) | 9 | (26) |
| 11/4/2022 | 88 | (69) | 20 | (7) |
| 11/5/2022 | 0 | (0) | 0 | (7) |
| 11/6/2022 | 143 | (311) | (168) | (175) |
| 11/7/2022 | 166 | (238) | (72) | (247) |
| 11/8/2022 | 269 | (131) | 138 | (109) |
| 11/9/2022 | 192 | (166) | 27 | (82) |
| 11/10/2022 | 36 | (67) | (31) | (113) |
| 11/11/2022 | 0 | (0) | (0) | (113) |
| **Subtotal** | **$1,021** | **($1,134)** | **($113)** | **N/A** |





Deposits — — — Withdrawals

A000230

# Appendix

**Assets Bridge from Previous Press Release**
***"January 17, 2023 – Maximizing FTX Recoveries:***
***Management & Committee Meeting Presentation"***

A000231

SUBJECT TO MATERIAL CHANGE

# Assets Bridge from Previous Press Release (1/17/23)

**USD Millions at Petition Time Pricing**

| | Crypto | Cash | Securities | Total |
|---|---|---|---|---|
| **Liquid Assets as of Jan 17th (Category A and FTT)** | **$3,472** | **$1,729** | **$268** | **$5,469** |
| (A) Newly Located Crypto | 384 | – | – | 384 |
| (B) Pricing Source Adj. | 214 | – | – | 214 |
| All Other Adj. | 9 | 32 | – | 41 |
| **Liquid Assets as of March 1st (Category A and FTT)** | **$4,078** | **$1,762** | **$268** | **$6,107** |

| **Bridge:  Liquid Assets to Located Assets (FTX.COM/US)** [1] | |
|---|---|
| **Liquid Assets as of March 1st (Category A and FTT)** | **$4,078** |
| (C) Excl. Alameda Crypto | (2,442) |
| Excl. Japan and Singapore | (220) |
| Inclusion of Category B Tokens (excl. FTT / SRM in Bahamas) | 793 |
| (D) Restricted and FDM FBO Cash | 136 |
| **Located Assets - FTX.US and FTX.COM (Exchange Shortfall Presentation)** | **$2,346** |
| *Located Assets - FTX.US* | *$191* |
| *Located Assets - FTX.COM* | *$2,155* |

## Select Commentary

**(A) Newly located crypto consists of:**
- $202M of crypto held at Alameda
- $125M of stablecoins
- $57M of crypto held at subsidiaries

**(B) Change in pricing source from AWS environment (reflective of FTX order book) to CoinMarketCap**

**(C) Exchange shortfall excludes Alameda assets; Alameda crypto primarily consists of:**
- $956M of Solana and Aptos
- $820M at 3rd party exchanges
- $185M of stablecoins in cold storage
- $169M of BTC in cold storage

**(D) Located assets in the Exchange Shortfall Presentation include Restricted and FDM FBO cash only**

**Notes:**
1. "Liquid assets" as defined for purposes of the prior January 17 presentation included Category A Assets and FTT, and this Asset Bridge Slide includes information to reconcile the January 17 information with the new method of categorization that excludes FTT from Category A Assets.

A000232

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## NOTICE OF PRESENTATION TO THE OFFICIAL
## COMMITTEE OF UNSECURED CREDITORS

**PLEASE TAKE NOTICE** that, on November 11, 2022 and November 14, 2022, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on December 15, 2022, the Office of the United States Trustee (the "U.S. Trustee") filed the *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 231], and on December 20, 2022, the U.S. Trustee filed the *Amended Notice of Appointment of Committee of Unsecured Creditors* [D.I. 261], forming the Official Committee of Unsecured Creditors (the "Committee").

**PLEASE TAKE FURTHER NOTICE** that, on January 17, 2022, the Debtors provided a presentation (the "Presentation") to the Committee, a copy of which is attached hereto as **Exhibit A**.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**PLEASE TAKE FURTHER NOTICE** that copies of the Presentation and other pleadings filed in the above-captioned Chapter 11 Cases may be obtained free of charge from the website maintained by the Debtors' noticing and claims agent at https://cases.ra.kroll.com/FTX. You may also obtain copies from the Court's website at www.deb.uscourts.gov for a fee.

Dated: January 17, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

A000233-1

# **EXHIBIT A**

A000234-1

# Maximizing FTX Recoveries

January 17, 2023

Preliminary / Subject to Material Change

## Management & Committee Meeting

ALVAREZ & MARSAL | SULLIVAN & CROMWELL LLP | P/W/P PERELLA WEINBERG PARTNERS

A000235-1

# Disclaimer

**Limitations of Report**

This report and the information contained herein (the "Report") has been prepared solely for use by FTX Trading Ltd. (d.b.a. FTX.com), and approximately 101 additional affiliated companies (together, the "Company") based on instructions given by the Company to Sullivan & Cromwell ("S&C"), Alvarez & Marsal North America, LLC ("A&M") and Perella Weinberg Partners ("PWP" and together with S&C and A&M, the "Debtors' Advisors").

The limiting conditions, assumptions and disclaimers set forth herein are an integral part of this Report, must be reviewed in conjunction herewith, and may not be modified or distributed separately.

The preliminary Information included herein reflects and/or is based upon financial and other information provided to the Debtors' Advisors by the Company, including management, staff, contract staff and other advisors of the Company, as well as other sources. The Debtors' Advisors have relied upon, and assumed, without independent verification, the accuracy and completeness of such information, and make no representation or warranty as to the accuracy or completeness of, and otherwise assumes no liability with respect to, the Report or upon which the Report is based. The Debtors' Advisors are not responsible to any party, in any way, for any analysis contained in this Report or for the future financial or operational performance of any recipient or any affiliated company.

In the event this Report contains or involves prospective financial or forward-looking information, this information was prepared by the Company's management and our work did not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the American Institute of Certified Public Accountants, and the Debtors' Advisors express no assurance of any kind on such information. Further, the work involved did not include a detailed review of any transactions, and cannot be expected to identify errors, irregularities or illegal acts, including fraud or defalcations that may exist. Accordingly, the Debtors' Advisors cannot and do not express an opinion or any other form of assurance on, and assumed no responsibility for, the accuracy or correctness of the historical information or the completeness and achievability of the projected financial data, information and assessments upon which the Report is presented.

Further, any references to estimated ranges of collateral values or cash flow recoveries included in this Report are preliminary in nature, subject to material change and not valuations of any kind. Rather, estimates have been necessary to include herein, and are based upon the limited financial information as provided or made available by the Company, available market information and various assumptions and are provided for informational purposes only. References to values of any cryptocurrencies or other digital assets are approximate and subject to material change. It is expected that there will be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. Accordingly, no representation or warranty is made as to, and the Debtors' Advisors take no responsibility for, the achievability of any estimated recovery results described in this Report. Accordingly, the Debtors' Advisors are not responsible to any party, in any way, for the future financial or operational performance of any recipient of the Report or any affiliated company.

Further, this Report will be subject to further work, revisions and other factors which means that this version may be substantially different from any final report or advice issued.

The Report does not constitute a recommendation as to what action, if any, any person should take with respect to any claims and/or securities, nor does the Report constitute a recommendation regarding the accounting, tax, financial, legal or regulatory aspects of any proposed or possible outcome of the Company's restructuring.

A000236-1

# Disclaimer (cont'd)

**No Third Party Reliance**

This preliminary Report and any related informational updates are provided only in connection with the purpose of a public case update in respect of which the services are being provided. In no event, regardless of whether consent has been provided, shall the Debtors' Advisors assume any responsibility, liability or duty of care to any claimholder, person or entity other than the Company ("Third Party") to which any this preliminary information is disclosed or otherwise made available. This Report does not necessarily take account of those matters or issues which might be of relevance to any Third Parties and any Third Party is responsible for conducting its own investigation with respect to the Report and any related transactions or activities. The Debtors' Advisors make no representations or warranties, express or implied, to any Third Party on which any such party may rely with respect to the Information, including without limitation, as to accuracy or completeness, the inclusion or omission of any facts or information, or as to its suitability, sufficiency or appropriateness for the purposes of any such party.

A000237-1

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Executive Summary

**FTX Debtors have made important progress in efforts to maximize recoveries for customers and other stakeholders**

**FTX Debtors have identified approximately $5.5 billion of liquid assets to date comprising:**

- $1.7 billion of cash
- $3.5 billion of liquid cryptocurrency and FTT tokens
- $0.3 billion of liquid securities

**Investigation has confirmed shortfalls at both International and U.S. Exchanges**

- FTX Debtors have identified only $1.6 billion of digital assets associated with FTX.com as of the Petition Time
- FTX Debtors have identified only $181 million of digital assets associated with FTX US as of the Petition Time
- FTX Debtors have uncovered the mechanics behind how Alameda Research had the ability to borrow without collateral effectively unlimited amounts from customers and how a small group of individuals had the ability remove digital assets from the exchange without being recorded on the exchange ledger

**FTX Debtors are continuing the effort to maximize recovery through:**

- Exploring potential sale of four regulated or licensed subsidiaries
- Exploring potential monetization of over 300 prepetition investments with book value of approximately $4.6 billion
- Exploring potential reorganization opportunities for FTX exchanges
- Marketing real estate in the Bahamas in a joint process with the Joint Provisional Liquidators
- Investigating all historical transactions conducted by prepetition management

A000238-1

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Potential Sources of Recovery



**RECOVERY TO CREDITORS**

A000239-1

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Liquid Assets



**Approximately $5.5 billion of liquid assets identified to date**



A000240-1

6

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Confirmed Cash

           

**$1.7 billion of Debtor & non-Debtor cash confirmed to date**

| USD in Millions | WRS Silo | Alameda Silo | Ventures Silo | Dotcom Silo | Total |
|---|---|---|---|---|---|
| Unrestricted Cash | $234.6 | $825.2 | $8.8 | $138.0 | $1,206.6 |
| Custodial Cash | 29.4 | 28.7 | - | 131.3 | 189.4 |
| Other Restricted Cash | 1.3 | 1.2 | - | 4.0 | 6.4 |
| **Total Debtor Cash** | **265.3** | **855.1** | **8.8** | **273.2** | **1,402.4** |
| Non-Debtor Cash | 162.8 | - | - | 164.1 | 326.8 |
| **Total Cash** | **$428.1** | **$855.1** | **$8.8** | **$437.3** | **$1,729.2** |



**Includes $128.4 million of primarily restricted cash at LedgerX**



**Includes $153.2 million of primarily custodial or other restricted cash at FTX Digital Markets**

A000241-1

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Located Crypto Assets

           

| Cash | Crypto Assets | Securities | Venture Investments | Equity Investments | Debt Investments | Subsidiary Businesses | Primary Exchanges | Real Estate | Exchange Avoidance Actions | Other Avoidance Actions | Causes of Action |

## $3.5 billion[1] of Debtor cryptocurrency assets located at Petition Date pricing[2]

**USD in Millions**

 **Hot Wallet** — $1,761

 **BitGo Cold Storage** — $1,144

 **Held in Bahamas** — $426

 **FTX JP** — $140[3]

 **Hacked Crypto** — $415

Notes:
1. $3.5 billion of identified crypto assets excludes $415mm of hacked crypto.
2. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book at that time.
3. ~$140mm of crypto held at FTX Japan is segregated in cold wallets 1:1 for Japan customers, some of which may be available to the Debtors.

A000242-1

8

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Located Crypto Asset Tracing by Silo



**Crypto tracing achieved by analyzing database of 14mm addresses & 3rd party exchanges[1,2,3]**

USD in Millions



**Notes:**
1. Crypto tracing by silo is based on preliminary on-chain tracing back to dedicated FTX.COM/US deposit and sweep addresses, and Alameda addresses. Crypto held on 3rd party exchanges, staked Solana, and other Alameda crypto are classified as Alameda. In instances where tracing has not been completed, a preliminary allocation was used. Furthermore, Chainalysis and TRM Labs are also involved in tracing exercises to assist with refining these amounts.
2. Excludes ~$140mm of crypto held at FTX Japan is segregated in cold wallets 1:1 for Japan customers, some of which may be available to the Debtors.
3. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book at that time.

A000243-1

9

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Top Located Tokens, incl. Alameda

            

## $3.3 billion[1] located at FTX US, FTX.com, and Alameda Research[2]

USD in Millions

  

**Includes crypto held at 3rd party exchanges**

The Debtors currently have limited visibility into the token composition of crypto balances at certain 3rd party exchanges. Once obtained, information provided by these exchanges is likely to increase the balances of certain tokens listed here.



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $685 | $529 | $268 | $90 | $67 | $42 | $39 | $35 | $31 | $29 | $245 | $1,271 |
| SOL | FTT | BTC | ETH | APT | DOGE | MATIC | BIT | TON | XRP | Stablecoins | Mixed |

          

**Notes:**
1. Excludes ~$140mm of crypto held at FTX Japan is segregated in cold wallets 1:1 for Japan customers, some of which may be available to the Debtors.
2. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book at that time.

A000244-1

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Illiquid Crypto Assets

           

Cash | Crypto Assets | Securities | Venture Investments | Equity Investments | Debt Investments | Subsidiary Businesses | Primary Exchanges | Real Estate | Exchange Avoidance Actions | Other Avoidance Actions | Causes of Action

## Illiquid tokens[1,2] are not included in located crypto value estimates as of Petition Date

**USD in Millions**

| No. | Logo | Token | Quantity | Petition Date Spot Price | USD Equivalent at Spot Price | No. | Logo | Token | Quantity | Petition Date Spot Price | USD Equivalent at Spot Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | SRM | 9,919,593,204 | $0.200 | $1,987 | 11 | | TRUMPLOSE | 13,999,994 | $0.974 | $14 |
| 2 | | SOLETH | 479,331 | $1,169.800 | $561 | 12 | | GT | 3,165,320 | $3.734 | $12 |
| 3 | | MAPS | 9,870,251,766 | $0.053 | $521 | 13 | | LUNA (Wormhole) | 6,951,539 | $1.690 | $12 |
| 4 | | SOLBTC | 14,077 | $16,857.672 | $237 | 14 | | LIKE | 18,180,467 | $0.500 | $9 |
| 5 | | OXY | 9,969,097,181 | $0.019 | $188 | 15 | | HXRO | 104,378,582 | $0.082 | $9 |
| 6 | | MEDIA | 8,354,518 | $6.000 | $50 | 16 | | MSOL | 333,019 | $21.375 | $7 |
| 7 | | BEAR | 190,134,415,155 | $0.000 | $46 | 17 | | JSOL | 364,860 | $16.800 | $6 |
| 8 | | FIDA | 277,871,751 | $0.111 | $31 | 18 | | XSUSHI | 3,399,998 | $1.660 | $6 |
| 9 | | BRZ | 138,942,485 | $0.171 | $24 | 19 | | ALEPH | 57,657,313 | $0.092 | $5 |
| 10 | | ALM | 2,433,093,847 | $0.006 | $15 | 20 | | JET | 62,283,609 | $0.075 | $5 |

The **listed top 20 tokens compose 98%** of the illiquid value while the remaining ~200 tokens make up the rest

**Notes:**
1. Illiquid tokens reflect certain tokens whereby the market cap and volume is low, or where FTX holds a significant portion of the coins in circulation, whereby attempts to liquidate would materially affect their market value.
2. Crypto assets are priced as of the Petition Date based on preliminary pricing information from the AWS environment, reflective of the FTX order book around that time.

A000245-1

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Brokerage Assets



**$268 million[1] in securities held in Alameda brokerage account**



### GRAYSCALE
**$45 Million**
Grayscale Ethereum Trust ETF
*2.0% of Total Shares*

### Bitwise
**$21 Million**
Bitwise 10 Crypto Index Fund
*14.4% of Total Shares*

17%   8%   2%

### GRAYSCALE
**$4 Million Across**
Ethereum Classic ETF
Litecoin Trust ETF
Digital Large Cap ETF

### GRAYSCALE
**$197 Million**
Grayscale Bitcoin Trust ETF
*3.2% of Total Shares*

74%

### BlackRock
**<$0.1 Million**
BlackRock Equity

**All values as of the Petition Date**

A000246-1

**Note:**
1. Totals may not reconcile due to rounding.

PRELIMINARY / SUBJECT TO MATERIAL CHANGE
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Venture Investments



**~$4.6 billion book value investments across 300+ prepetition transactions**

**Select assets including:**

 Equity / Debt Investments

   
    
     
    

Fund Investments

    
  

 Token

    
   

**Recoverable value likely to be materially lower than acquisition value**

A000247-1

13

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Exploring Potential Sale of Four Licensed Subsidiaries

           

**Four wholly owned subsidiaries covered by Bid Procedures Order entered January 12, 2023**

|  |  LedgerX | Embed |  FTX EU |  FTX JP |
|---|---|---|---|---|
| **Description** | Operational US Crypto Derivatives Exchange | US-Based Clearing Broker | Diversified Derivatives & Crypto Operations | Japan & Singapore Exchange |
| **Primary Licensing** | CFTC Regulated | SEC registered Broker-Dealer & member of FINRA | Licensed in Cyprus (currently suspended) | Registered in Japan; operated under temporary exemption in Singapore (license pending) |

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary
report and should be read in conjunction therewith*

# Exploring Exchange Reorganization

           

**Joint task force assessing reorganization opportunities for FTX exchanges**

    

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Real Estate in The Bahamas with a Cost Basis of $253M

 Cash
 Crypto Assets
 Securities
 Venture Investments
 Equity Investments
 Debt Investments
 Subsidiary Businesses
 Primary Exchanges
 Real Estate
 Exchange Avoidance Actions
 Other Avoidance Actions
 Causes of Action

## 36 Bahamas properties to be marketed in a joint process with the JPLs

### A — $166.1 Million
15 Properties



Orchid Penthouse & Units

Honeycomb – Condo Units

Tetris – Condo Units

Charles – Condo Unit

Cube – Condo Unit

Gemini – Condo Unit



Coral – Condo Unit

**Albany Marina Residences**

### B — $12.9 Million
1 Property



The Conch Shack

### C — $28.8 Million
3 Properties



Veridian Corporate Centre

### D — $5.9 Million
5 properties



ONE Cable Beach

### + $39.4 million across 12 additional properties

Nassau



The Bahamas

A000250-1

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Sample Historical Transactions Under Review



**The Debtors are reviewing all historical transactions conducted by prepetition management**

Select examples of historical transactions under review:



**Hundreds of M&A and other transactions under review**

A000251-1

PRELIMINARY / SUBJECT TO MATERIAL CHANGE
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# The $65 Billion Backdoor



**Alameda Research had the ability to borrow without collateral up to $65B from customers**



**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# Margin Requirements & Auto Liquidation[1] – FTX.com



## Alameda Research and small group of individuals had ability to remove assets from exchange

| | Account Setting Code | Implications | Number of Accounts |
|---|---|---|---|
| **Customers** | `'borrow' = 0` | User **cannot** have a negative balance on the exchange. Once an account balance is negative up to an amount equal to posted collateral, net of fees, all positions are auto-liquidated. | **7 Million** |

**Market Makers** | `'borrow' > 0` | User **can** have a negative balance up to a specified credit limit. Primarily used for market makers to receive lending from FTX.

Credit Limit:
| Greater than $0 | 4,000 |
| $1 Million to $150 Million | 41 |
| $65 Billion | 1 |

**God Mode**

**"On Ledger"** where entries are recorded in AWS
`'can_withdraw_below_borrow' = true`
User can **withdraw** assets (cash or crypto) from the exchange while having a net negative balance.[2]


| $65 Billion | 1 |

**"Off AWS Ledger"** by moving funds through a direct on-chain transaction

User can **move** assets (crypto) by accessing the private keys to initiate a direct on-chain transaction.[3]

**Small group of individuals**
| All Crypto | 1 |

Notes:
1. The exchange code assessment above was based on a review of the FTX codebase and conversations with post-petition FTX employees. For the FTX US platform, preliminary analysis shows that 3 accounts had "borrow > zero", notably Alameda for $150mm. The FTX US platform had the same "off ledger" issue, and preliminary analysis shows that it had a similar "on ledger" issue that is under review.
2. The FTX codebase reflects that an "allow_negative" function may also enable this ability, however it only applies to 10 internal FTX/Alameda trading accounts.
3. Certain users had permissions in the AWS environment to access private keys. Investigation is underway to determine whether any off-ledger misuse of such access occurred.

A000253-1

19

**PRELIMINARY / SUBJECT TO MATERIAL CHANGE**
*The limiting conditions are integral to this preliminary report and should be read in conjunction therewith*

# AWS Environment



### Certain individuals could withdraw assets without record on the exchange ledger[1]



**Typical Flow of Funds Scenario**

1. Customers Deposit Funds into Specific Addresses
2. FTX Aggregated Customer Deposits by Moving Funds to Sweep Addresses
3. Customer Withdrawals Initiated Movement of Funds from Sweep Addresses to Recipient

A000254-1

**Note:**
1. Investigation is underway to determine whether any off-ledger misuse of this ability to withdraw assets occurred.

20

**John J. Ray, III's Testimony before the US House Financial Services Committee, Dec. 13, 2022**

The complete testimony is only available by video. The full video recording is publicly available at https://www.c-span.org/video/?524743-1/ftx-ceo-testifies-cryptocurrency-companys-collapse.

```
 1              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,   .
                                 .
 5                               .  Courtroom No. 5
                                 .  824 Market Street
 6           Debtors.            .  Wilmington, Delaware 19801
                                 .
 7                               .  Tuesday, November 22, 2022
     . . . . . . . . . . . . . . .  11:00 a.m.
 8
                  TRANSCRIPT OF FIRST DAY HEARING
 9           BEFORE THE HONORABLE JOHN T. DORSEY
             CHIEF UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:          Adam Landis, Esquire
12                            Kimberly Brown, Esquire
                              Matthew Pierce, Esquire
13                            LANDIS RATH & COBB LLP
                              919 Market Street, Suite 1800
14                            Wilmington, Delaware 19801

15                            Andrew G. Dietderich, Esquire
                              James L. Bromley, Esquire
16                            Brian D. Glueckstein, Esquire
                              Alexa J. Kranzley, Esquire
17                            SULLIVAN & CROMWELL LLP
                              125 Broad Street
18                            New York, NY 10004

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1  APPEARANCES (CONTINUED):

 2  For the U.S. Trustee:      Benjamin Hackman, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
 3                             844 King Street, Suite 2207
                               Lockbox 35
 4                             Wilmington, Delaware 19801

 5  For the Ad Hoc Group
    of Account Holders:        Matthew Kelsey, Esquire
 6                             ALSTON & BIRD LLP
                               90 Park Avenue, 15th Floor
 7                             New York, New York 10016

 8  For Certain Customers:     Michael Roeschenthaler, Esquire
                               WHITEFORD TAYLOR & PRESTON LLP
 9                             11 Stanwix Street, Suite 1400
                               Pittsburgh, Pennsylvania 15222
10
    For Joint Provisional
11  Liquidators:              Christopher Shore, Esquire
                               WHITE & CASE LLP
12                             1221 Avenue of the Americas
                               New York, New York 10020
13
    For Evolve Bank:           Scott Cousins, Esquire
14                             COUSINS LAW LLC
                               1521 Concord Pike, Suite 301
15                             Wilmington, Delaware 19803

16  For Philadelphia
    Insurance Indemnity:       Gaston Loomis, Esquire
17                             MCELROY DEUTSCH MULVANEY
                                 & CARPENTER LLP
18                             300 Delaware Avenue, Suite 1014
                               Wilmington, Delaware 19801
19

20

21

22

23

24

25
```

A000235

1                              <u>INDEX</u>

2   <u>MOTIONS:</u>                                                    <u>PAGE</u>

3
    Agenda
4   Item 2:  Motion of Debtors for Entry of an Order (I)        35
             Authorizing Joint Administration of the Debtors'
5            Chapter 11 Cases and (II) Granting Certain
             Related Relief [D.I. 3; Filed on 11/14/22]
6
7            Court's Ruling:                                     36

8   Agenda
    Item 3:  Motion of Debtors for Entry of an Order (I)        36
9            Modifying Certain Creditor List Requirements;
             (II) Authorizing the Debtors to Serve Certain
10           Parties by E-Mail; and (III) Granting Related
             Relief [D.I. 9; Filed on 11/14/22]
11
    Agenda
12  Item 7:  Motion of Debtors for Entry of Interim and Final
             Orders (I) Authorizing the Debtors to Maintain a
13           Consolidated List of Creditors in Lieu of
             Submitting a Separate Matrix for Each Debtor, (II)
14           Authorizing the Debtors to Redact or Withhold
             Certain Confidential Information of Customers and
15           Personal Information of Individuals and (III)
             Granting Certain Related Relief
16           [D.I. 45; Filed 11/19/22]

17           Court's Ruling:                                     52

18
    Agenda
19  Item 4:  Emergency Motion Pursuant to Fed R. Bankr. P.      54
             1014(B) (I) to Transfer Chapter 15 Proceeding
20           Relating to FTX Digital Markets Ltd. and (II) for
             a Stay [D.I. 22; Filed 11/17/22]
21
             Court's Ruling:                                     55
22

23

24

25

INDEX

MOTIONS:                                                          PAGE

Agenda
Item 5:  Motion of Debtors for Entry of an Order                   55
         Enforcing Sections 362, 365I(1),525 and 541 of
         the Bankruptcy Code [D.I. 25; Filed 11/17/22]

         Court's Ruling:                                           60

Agenda
Item 6:  Debtors' Application for Entry of an Order                60
         Authorizing the Employment and Retention of Kroll
         Restructuring Administration LLC as Claims and
         Noticing Agent Effective *Nunc Pro Tunc* to the
         Petition Date [D.I. 28; Filed 11/17/22]

         Court's Ruling:                                           62

Agenda
Item 9:  Motion of Debtors for Entry of Interim and                63
         Final Orders (I) Authorizing the Debtors to (A)
         Operate A Postpetition Cash Management System,
         (B) Maintain Existing Business Forms, and (C)
         Perform Intercompany Transactions, (II) Granting
         a Partial Waiver of the Deposit Guidelines Set
         Forth in Section 345(B), and (III) Granting
         Certain Related Relief [D.I. 47; Filed 11/19/22]

         Court's Ruling:                                           68

Agenda
Item 8:  Motion of Debtors for Entry of Interim and Final          68
         Orders (I) Authorizing the Debtors to Pay Certain
         Prepetition Claims of Critical Vendors, Foreign
         Vendors, 503(B)(9) Claimants and Lien Claimants,
         (II) Granting Administrative Expense Priority to All
         Undisputed Obligations on Account of Outstanding
         Orders, (III) Authorizing All Financial Institutions
         to Honor All Related Payment Requests and (IV)
         Granting Certain Related Relief
         [D.I. 46; Filed 11/19/22]

         Court's Ruling:                                           70

1                                    INDEX

2   MOTIONS:                                                    PAGE

3   Agenda
4   Item 10: Motion of Debtors for Entry of Interim and          70
                 Final Orders (I) Establishing Notice and
5                Objection Procedures for Transfers of Equity
                 Securities and Claims of Worthless Stock
6                Deductions and (II) Granting Certain Related
                 Relief [D.I. 49; Filed 11/19/22]
7
                 Court's Ruling:                                 71
8
    Agenda
9   Item 11: Motion of Debtors for Entry of an Order (I)         71
                 Authorizing the Debtors to (A) Pay Prepetition
10               Compensation and Benefits and (B) Continue
                 Compensation and Benefits and (II) Granting
11               Certain Related Relief [D.I. 50; Filed 11/19/22]

12               Court's Ruling:                                 73

13


14  DECLARATIONS:                                               PAGE

15  John J. Ray III                                              33

16  Edgar W. Mosley II                                           33

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 11:02 a.m.)

2          THE COURT:  Good morning, everyone.  Thank you.

3  Please be seated.

4          All right.  Before we begin, I wanted to make some

5  announcements about conduct and decorum.  I know this case

6  has generated a great deal of public interest and publicity.

7  And understandably, a lot of people are anxious and upset

8  about what happened with this company.  But it's important to

9  remain -- to maintain proper courtroom decorum, both in the

10  court, for those who are here, and for those participating

11  remotely.  At this point, we have 535 people on the Zoom

12  call.

13          So, if you're participating in the courtroom,

14  please keep in mind that the proceeding is being recorded.

15  If you want to speak, you will need to approach the podium or

16  speak from one of the microphones at counsel table, so that

17  we can pick up the recording and make sure we have a good

18  record.  Everyone should have their cell phones on silent.

19  If you haven't done that already, please do so.

20          If you're on the Zoom call, please keep the line

21  muted and your video off, unless you are asking to speak.

22  And if you do want to speak, you need to use the raise-your-

23  hand function on the Zoom call, and I will recognize you and

24  give you an opportunity.  But keep in mind that, you know,

25  everyone has a right to be heard, but today might not be the

1  day for everyone to be heard because we have a lot of people

2  involved in this case.

3          Any interruptions, of course, will not be

4  tolerated.  If you -- you know, if you make noise on the Zoom

5  call, I will have you removed from the call.  You will not be

6  allowed to reenter.  If you turn your video on before

7  recognized, I will have you removed from the call, as well.

8          And for the future, there is, on the court's

9  website, we have set up a YouTube channel for this case, so

10  that parties who are -- want to -- don't need to participate,

11  but what to listen to what's happening -- it's only audio,

12  it's not video -- so you can listen to proceedings on the

13  YouTube channel going forward from here.

14          One other thing is, prior to the hearing, I did

15  conduct a chambers conference with debtors' counsel and

16  counsel for the Government -- and I see I already have people

17  coming on with their videos on -- with government counsel and

18  the U.S. Trustee's Office over the -- regarding the motion to

19  seal and the accompanying motion that was filed yesterday.

20          I heard the discussion and I will be granting the

21  relief, both on the motion to seal and the underlying request

22  for relief that was requested under seal, but it's on an

23  interim basis only, both of those; meaning, the seal motion

24  and the motion for relief is on an interim basis only, and it

25  will probably be lifted relatively quickly and we'll put this

1   on for the final hearing when we come back in a few weeks.

2            Okay.  All right.  With that, I will turn it over

3   to debtors' counsel to run the agenda.

4            MR. LANDIS:  Good morning, Your Honor, and may it

5   please the Court, Adam Landis from Landis, Rath & Cobb,

6   proposed co-counsel to the debtors in the FTX Trading Limited

7   group of debtors that we have filed.

8            Let me thank Your Honor for not only hearing us

9   today with respect to the request for relief filed on the

10   agenda, but also in connection with the Section 105 chambers

11   conference that you conducted this morning.

12            With me this morning is a team from Sullivan &

13   Cromwell, proposed counsel to the debtors.  At counsel table:

14   Andrew Dietderich, James Bromley, Brian Gluckstein, Alexa

15   Kranzley, Julie Petiford.

16            Our declarants are in the courtroom:  Mr. John Ray,

17   Edgar Mosley from A&M.

18            And I would remiss if I didn't also recognize the

19   Office of the United States Trustee, who has been here and

20   been working with us tirelessly, really, over the last

21   several days, hours, into the wee hours of the night.

22   They've gone above and beyond to work through a number of

23   issues with us.  And I'm pleased to report that almost

24   everything that has been raised by the United States Trustee

25   has been consensually resolved in connection with the first-

1 | day motions, almost everything.

2 |        THE COURT:  I was going to say "almost everything."

3 |        MR. LANDIS:  Almost everything.  That word "almost"

4 | is doing a lot of work in that sentence.

5 |        But with that, Your Honor, what I'd seek to do --

6 | and -- is cede the podium to Mr. Bromley, who will present,

7 | and we'll work our way through the agenda in due course.

8 |        THE COURT:  All right.  Thank you.

9 |        Mr. Bromley.

10 |        MR. BROMLEY:  Good morning, Your Honor.  May it

11 | please the Court, James Bromley of Sullivan & Cromwell,

12 | proposed co-counsel to the debtors in these cases.

13 |        I'd like to echo Mr. Landis' comments and thank the

14 | Court for the accommodation of hearing us today and for

15 | hearing us earlier in chambers with respect to the motion

16 | under seal.

17 |        Your Honor, we are here on an unprecedented matter,

18 | and I don't say those words lightly.  We are dealing with a

19 | first-day hearing that is taking place well over a week after

20 | these cases were filed.  That, in and of itself, is uncommon.

21 | But what we have here with respect to the FTX Debtors is a

22 | different sort of animal.

23 |        Before I get into it, Your Honor -- and I have a

24 | presentation to go through -- I do want to go through in some

25 | detail just to talk a little bit about the folks who are in

1  the courtroom and who Mr. Landis has already introduced.

2        First of all, we do have in the courtroom Mr. John

3  Ray, who is the Chief Executive Officer and Chief

4  Restructuring Officer of the FTX Debtors before you.  Mr. Ray

5  has over 40 years of experience in the law and restructuring,

6  including leading the Enron estate, Fruit of the Loom,

7  Nortel, Residential Capital.  Mr. Ray is uniquely qualified

8  to be guiding this very complex and developing exercise.

9        In addition, Mr. Ray has assembled a team of

10  advisors, and we have Mr. Landis and his terrific crew here

11  in Wilmington.

12        We have the Alvarez & Marsal team, led by Ed Mosley

13  and Steve Coverick.  The A&M team are critical to this

14  exercise because I think, as many people have read Mr. Ray's

15  first-day declaration, unfortunately, the FTX Debtors were

16  not particularly well run, and that is an understatement.

17        One of the things that Mr. Ray says in his first-

18  day declaration is we are now writing things down.  And it is

19  with the incredible efforts of the A&M team that we are

20  working to organize and secure all of the assets of these

21  very complex estates.

22        In addition, Your Honor, we have the team from

23  Sullivan & Cromwell, who Mr. Landis has already introduced.

24  But there are three other individuals I'd like to mention.

25  Because of the issues that we're facing here, we have

1   assembled a team of investigators who are at the top of their

2   fields:

3           In the courtroom today is Mr. Steve Peikin, who is

4   a former Director of Enforcement at the SEC and a former U.S.

5   Attorney -- Assistant U.S. Attorney for the Southern District

6   of New York.

7           With him is Jamie McDonald, a former head of

8   enforcement at the CFTC and also a former AUSA and [sic] the

9   Southern District of New York.

10          Not here in the courtroom, but an equally important

11  member of the team is Nicky Friedlander, the former Chief of

12  Complex Frauds and the Cyber Crime Unit in the Southern

13  District of New York.

14          These individuals are working tirelessly to help us

15  identify all of the issues that we need to deal with, in

16  terms of what has happened.  And in particular, they are

17  interfacing, as I will indicate in -- later in the

18  presentation, with the U.S. Government and the various

19  regulators around the world who have taken a very keen

20  interest in this situation.  They will be reporting to Mr.

21  Ray as the CEO and CRO.

22          In addition, we have engaged Nardello & Company,

23  which is a leading investigative firm.  That was one of the

24  first things that Mr. Ray instructed us to do, and we brought

25  Nardello on, and they are working with us both here in the

1   United States and around the world.

2          We have engaged a firm named Chainalysis, which is

3   the leading consultant with respect to blockchain analysis

4   because all of the issues that we're dealing with in the

5   cyberspace relate to blockchain transactions, and Chainalysis

6   has been working around the clock with us to secure the

7   assets and identify them.

8          In addition, we have retained a cyber security

9   firm, the identity of which we have not disclosed because of

10  concerns that those who are undertaking cyber attacks on the

11  company and its assets will use that information to their

12  benefit.

13         We've also engaged Kroll, formerly known as Prime

14  Clerk, to be our noticing and claims agent;

15         Joele Frank to be our communications consultant.

16         And in addition, the law firm of Quinn Emanuel has

17  been retained to provide advice to the board of directors,

18  the independent board that we have appointed, and I will

19  describe them in a few moments.

20         With that, Your Honor, that's the team that's been

21  assembled.  And we have been working literally around the

22  clock to get to this day.

23         As I mentioned earlier, "unprecedented" is the word

24  of the day.  The crypto crisis that we're facing in the

25  United States and around the world is well documented, but

1  the FTX situation is both the latest and the largest failure

2  in this space.

3          Beginning at the -- in the first week of November,

4  there was effectively a run on the bank with respect to FTX,

5  both with respect to the international exchange, which is

6  operated under the brand name FTX.COM, as well as the U.S.

7  exchange, which was under -- operated under the brand name

8  FTX US.

9          At the same time that the run on the bank was

10  occurring, there was a leadership crisis.  As I will describe

11  in a moment, the FTX companies were controlled by a very

12  small group of people led by Mr. Sam Bankman-Fried.  During

13  the run on the bank, Mr. Fried's leadership frayed and that

14  led to resignations throughout the ranks.

15          This is a developing situation, Your Honor.  We

16  recognize that there are millions of customers around the

17  world and in the United States.  We recognize that the

18  debtors have unreliable books and records.  We recognize that

19  the debtors have compromised systems and have been subject to

20  cyber attacks.  We recognize that press and internet

21  attention is at an all-time high with respect to these

22  debtors.

23          It is for that reason, Your Honor, that we have

24  decided that we are going to -- that Mr. Ray has set out five

25  core objectives, and I'm going to go through those

1   objectives.  But I think it's fair to say that those who are

2   involved right now, today, in running FTX understand the

3   concern and the outrage as to what has happened and we are

4   working day and night to bring order to disorder.

5          Your Honor, as Mr. Ray has set forth in his first-

6   day declaration, there are five core objectives that we are

7   pursuing at the moment:

8          The first is the implementation of controls.  As I

9   described, Mr. Ray has been installed as the CEO and CRO of

10  the debtors.  He has assembled an impeccable team of advisors

11  and put in place an independent board.

12         This independent board provides, for the first time

13  in the history of FTX, a traditional and dependable

14  governance structure.  Prior to the commencement of these

15  cases, FTX was in the control of a small group of

16  inexperienced and unsophisticated individuals.  And

17  unfortunately, the evidence seems to indicate that some or

18  all of them were also compromised individuals.

19         Now the types of controls that we're putting in

20  place right now with the assistance, in particular, of

21  Alvarez & Marsal are traditional and market standard

22  accounting, audit, cash management, human resource, risk

23  management, and data management standards.  In doing this,

24  it's important to note that the -- there are -- is a core

25  group of employees who have remained at the FTX companies who

1   have stepped up in the face of incredible uncertainty and

2   have been assisting all of the advisors in making sure that

3   the assets are secured and the records are now being kept in

4   a manner that is appropriate.

5           I'd like to focus for a moment, Your Honor, on

6   board governance.  We have several -- identified several

7   silos of the business.  And this is for organizational

8   purposes.  We'll talk in a moment about the organizational

9   chart.

10          But with respect to these silos, the first is -- we

11  call it the "WRS Silo," which is the U.S. currency exchange

12  silo.  An independent director, Mitchell Sonkin, has been

13  appointed to the board of WRS.  He is a lawyer.  He is the

14  former Chief Executive at MBIA, who led the -- MBIA's

15  exposure in the Puerto Rico situation for almost ten years.

16  He's a member of the board of Residential Capital.  He is

17  also a former partner of King & Spaulding, with over 40 years

18  of experience.

19          The next silo is the Alameda Silo.  Alameda

20  Research is a substantial debtor here and it operated

21  effectively as a hedge fund within the FTX group of families

22  -- group of companies.  Installed as a director at Alameda is

23  Matthew Rosenberg, with an expertise in finance.  He is an

24  investment banker and investor with Lincoln Park Advisors

25  from Chicago.  Before starting at Lincoln Park Advisors, he

1   was a partner at Chilmark Partners and advised on matters,

2   including SuperMedia, Covanta, USG, Nortel, Overseas

3   Shipholding Group, and Conte Group.  He has over 30 years of

4   experience.

5           There's a silo that we have identified as the

6   Venture Silo.  The director at that silo, independent

7   director, is Rishi Jain.  Rishi has a background in finance,

8   he is a Managing Director at the Accordion Group, which

9   specializes in financial and technology consulting.  He also

10  worked for Alvarez & Marsal for over ten years and was

11  instrumental in the Washington Mutual exercise.

12          At the Dotcom Silo, which is the international

13  business, we have two directors, Your Honor, independent

14  director:

15          First is Joseph Farnan, a lawyer from Delaware,

16  former judge and U.S. Attorney, with experience in complex

17  financial disputes and investigations.

18          Joining Mr. Farnan at the dot-com board is Matthew

19  Doheny.  Matthew Doheny is a financial expert.  He is the

20  Chief Executive of North Country Capital.  He has been either

21  on the board of directors or Chief Restructuring Officer of

22  Yellow Corp., the trucking company, Residential Capital,

23  Kodak, and MatlinPatterson.  Prior to that, he worked at HSBC

24  and Deutsche Bank.

25          Our second core objective, Your Honor, is asset

1  protection and recovery.  It's important to note that we're

2  not just talking about crypto assets or cash assets or

3  physical assets; we're also talking about information.  And

4  information, here, is an asset.

5       Unfortunately, as the debtors have -- new advisors

6  have -- and Mr. Ray have been exercising their investigations

7  so far, a substantial amount of assets have either been

8  stolen or are missing.  We are suffering from high cyber

9  attacks, both on the petition date and in the days following.

10  And we have, as I mentioned earlier, engaged sophisticated

11  expertise to protect against the hacks, but they continue.

12       The third objective, Your Honor, is transparency

13  and investigation.  As I noted, there is a team of

14  investigators who are working tirelessly with the debtors to

15  collect and coordinate information.

16       The debtors will conduct the investigation.  We

17  recognize this is not a normal situation and that there are

18  others who will have to review the facts and the history.  We

19  are going to serve as a central repository.  Unlike many

20  debtor cases, where the debtor already knows what information

21  it has, this debtor is accumulating the information in

22  realtime.

23       We are also in constant communication with the U.S.

24  Department of Justice and the Southern District of New York

25  Cyber Crimes Unit, which has opened a criminal investigation

 1  with respect to these debtors.  We are in communication

 2  constantly with the Securities and Exchange Commission, the

 3  Commodities Futures Trading Commission.  We have received

 4  requests, I would say -- some might say "demands" -- from the

 5  U.S. Congress, both from the Senate and the House, to have

 6  Mr. Ray appear during the month of December.  We are

 7  coordinating with regulators in multiple states around the

 8  United States, as well as foreign regulators around the

 9  world.

10        I think, Your Honor, it's fair to say we typically

11  would not quote things that happen on Twitter, but there was

12  a quote that I think summarizes this quite well, which is:

13        "What appears to be taking place is a serious

14  investigation by serious adults."

15        And we would respectfully agree with that

16  characterization.

17        THE COURT:  There might be other things on Twitter

18  you wouldn't agree with, though, about this case.

19        MR. BROMLEY:  Well ...

20     (Laughter)

21        MR. BROMLEY:  That's for sure.

22        Our fourth core objective, Your Honor, is

23  efficiency and coordination.  As you will see, Your Honor,

24  this was an enterprise that operated around the world, not

25  only at the time of the petitions, but also during the brief

1 history that it had leading up to the filing of the

2 petitions.

3       There has been a joint administration proceeding

4 commenced in Australia.  We have already made arrangements to

5 meet with the joint administrators from Australia, who are

6 coming to New York in the next couple of weeks, and it is our

7 hope to be able to approach Your Honor with a consensual

8 protocol with respect to the Australian proceedings.

9       I think Your Honor is also aware that there has

10 been a liquidation proceeding commenced in the Bahamas with

11 respect to a single entity, FTX Digital Markets Limited.  And

12 representatives of the joint provisional liquidators are here

13 in the courtroom today.

14       Your Honor may also be aware that the joint

15 provisional liquidators had filed a petition before the

16 Southern District of New York Bankruptcy Court to recognize

17 the proceedings in the Bahamas under Chapter 15 of the

18 Bankruptcy Code.  We had filed with Your Honor a motion to

19 transfer that case from the Southern District of New York to

20 the District of Delaware, and we are pleased to report that

21 we have reached an agreement with the joint provisional

22 liquidators to do just that, to bring the case from New York

23 here to Delaware.

24       It is our wish to engage in a constructive dialogue

25 with the joint provisional liquidators.  However, as we noted

1   in our pleadings to transfer, we do have evidence that there

2   have been movement of assets out of the debtors' estates to

3   the Bahamas, and there have been somewhat cryptic comments

4   that have been issued by the Government of the Bahamas as to

5   the actions they have taken with respect to certain assets.

6          It's sufficient to say at this point, Your Honor,

7   that the debtors reserve all of their rights with respect

8   both any requests by the joint provisional liquidators to

9   recognize the proceedings here and with respect to any relief

10  they may request.

11         I would say, Your Honor, though, it is essential to

12  keep in mind that, as we are going forward and dealing with

13  any of these foreign entities and with respect to any

14  regulators or liquidators that might be appointed, that we

15  are focusing on a single word, which is "reciprocity."  It is

16  essential that any dealings that we have are characterized by

17  reciprocal relationships, both with respect to asset recovery

18  and information sharing.

19         Finally, Your Honor, maximization of value.  We

20  realize that there are many people that are looking to get

21  their money back immediately, and we sympathize with that and

22  we are working towards being able to do that.  It is

23  essential, though, Your Honor, that we first maximize the

24  value of the assets of the estates.  We have to identify

25  those assets, we have to collect them, and we have to

1  maximize them, whether that means selling assets, selling

2  businesses, or reorganizing businesses.  All of those things

3  are on the table.  And we believe, Your Honor, that we will

4  be before you quite quickly with an attempt to sell certain

5  of the businesses that we understand, at least today, are

6  self-sufficient, robust, and have generated interest from

7  others in the marketplace.

8         So, Your Honor, just I put up on this screen a

9  slide which duplicates the big board that we have here in the

10 courtroom.  And just before I go further, this does capture,

11 from a summary perspective, the four silos that this business

12 operates.

13        The green silo, WRS, is the U.S. domestic currency

14 exchange.  You will see that that was ultimately controlled

15 by Mr. Sam Bankman-Fried, and that the control of the WRS

16 Silo was also then shared with two other of the founders of

17 the business, Gary Wang and Nishad Singh.  There were

18 approximately 23 percent of the business that was also owned

19 by third-party investors, and I will get to that in a moment.

20        The Alameda Silo, again, relates to Alameda

21 Research.  That is, effectively, the hedge fund within the

22 FTX enter -- world.  The Alameda Silo was controlled by Mr.

23 Sam Bankman-Fried and Gary Wang.

24        The Venture Silo is the most recent addition to the

25 FTX world.  That was controlled, effectively, 100 percent by

1   Mr. Sam Bankman-Fried.

2          And the Dotcom Silo is the international exchange.

3   As you can see, Your Honor, that was 75 percent controlled by

4   Mr. Sam Bankman-Fried and 25 percent by third-party

5   investors.

6          Your Honor, I'd like to go through a bit of the

7   history with respect to FTX.

8          This does start with Mr. Sam Bankman-Fried.  Mr.

9   Fried -- Bankman-Fried went to MIT, and it was at MIT that he

10  met Gary Wang.  Mr. Bankman-Fried graduated in 2014, less

11  than ten years ago.  Mr. Wang graduated in 2015.  The third

12  founder, Nishad Singh, graduates in June of 2017 from the

13  University of California at Berkeley.

14         It's in November of 2017 that Mr. Bankman-Fried and

15  Gary Wang found the Alameda Research business, which is

16  effectively a crypto hedge fund that is headquartered in

17  Berkeley, California.

18         Fast-forward two years, a little less than two

19  years, April of 2019, the Dotcom Silo or FTX.COM is founded.

20  It is founded in Hong Kong.  It is founded in Hong Kong

21  because of the regulatory regime that was present in Hong

22  Kong and it was founded with the business FTX Trading

23  Limited, and Antiguan company, which is a U.S. debtor in

24  these cases.

25         In July of 2019, the FTT Token was launched.  The

1  FTT Token is effectively a credit that is able to be used on

2  the FTX exchanges.  And also, because of that credit that's

3  able to be used, it also carries with it or did carry with it

4  a value in the marketplace and traded separately.

5          In July of 2020, the Clifton Bay Investments LLC

6  was formed here in Delaware.

7          In January of 2020, FTX US is founded by Sam

8  Bankman-Fried, by Gary Wang and Nishad Singh.  That is

9  founded, as well, in Berkeley, California.

10          In November of 2020, the Bahamas passes the DARE

11  Act, a digital assets act, which is intended to encourage the

12  relocation of crypto businesses to the Bahamas.

13          In July of 2021, FTX Digital Markets, the Bahamian

14  single debtor, is formed.

15          And in September of 2021, Mr. Bankman-Fried

16  announces that FTX Digital Markets is going to be registered

17  with the Securities Commission of the Bahamas.

18          In May of 2020, the U.S. silo, WRS, moves its

19  headquarters from Berkeley, California to Chicago, Illinois.

20          Then, in September of 2022, the U.S. silo announces

21  that it's in the process of moving its headquarters from

22  Chicago to Miami.

23          There were a series of investments that were made

24  in FTX:

25          November of '19, Binance, a current --

1  cryptocurrency exchange that operates offshore, enters into a

2  strategic partnership and invests in FTX.  Binance will

3  appear later in the script, so to speak.

4          In July of 2021, Binance divests the entirety of

5  its equity stake.  This is a substantial outbound payment

6  that is made by FTX and it also includes a substantial amount

7  of the FTT Token.  An investigation will have to take place

8  with respect to the Binance divestment and the amounts of

9  money and tokens that were paid to Binance.

10          Also, at the same time, in July of 2021, there was

11  an investment of a billion dollars by a series of third-party

12  investors, including Sequoia, Paradigm, and Thoma Bravo.

13          Just a few months later, in October of 2021, there

14  was an additional investment, Series B1, of another 420

15  million.  This included, at the time, the Ontario Teachers

16  Pension Fund, Tiger Global, and Blackrock.  At the time, in

17  October of '21, this is, again, just FTX.COM, the

18  international exchange.  The market valued the company at $25

19  billion.

20          In January of '22, two things happened:

21          First, there was an investment into the U.S. silo,

22  a Series A four-hundred-million-dollar investment by

23  investors, including Multicoin, Paradigm, and Sequoia.  That

24  valued the U.S. silo, the U.S. currency exchange, at $8

25  billion.

1      And at the same time, in January of '22, there was

2  an investment of another $500 million in the international

3  business, the Dotcom silo, with investors including Paradigm,

4  SoftBank, and Temasek, the sovereign wealth fund of

5  Singapore.  That valued the business, at the time, at $32

6  billion.

7      So, when you combine the U.S. silo and the

8  international silo, in January of '22, just 10 months ago,

9  the overall value of those two businesses was $40 billion,

10  from a market cap perspective.

11      Your Honor, I want to talk a little bit about the

12  employee base with respect to the debtors, and this is as of

13  October 31, 2022.  And we picked that date because it was a

14  date that seemed to correspond with sort of the last clear

15  information date that was also a point in time when the

16  business seemed to be stable.

17      So, as of October 31, 2022, the debtors, the U.S.

18  debtors, employed 330 employees around the world.  This pie

19  chart gives you a sense of where they were located.  They

20  were located in many different jurisdictions, but the largest

21  number were located here in the United States.

22      When you take into account the nondebtor employees

23  -- and that would include those who were employed by the

24  Australian business, as well as FTX Digital Markets in the

25  Bahamas, the number increases by 190 to 520 employees.  And

1   when you look at the worldwide number of employees as of

2   October 31, 2022, including nondebtors, again, the United

3   States has the largest number of employees, the Bahamas

4   second, and -- well, other is second -- and these are people

5   who are working remotely -- and the Bahamas is third.

6         This chart, Your Honor, focuses on the distribution

7   of customers on a global basis, between both the U.S. WRS and

8   the Dotcom international silos.  This is as of the petition

9   date, based on the best information that we have.  You will

10   see, Your Honor, that the largest jurisdictions are the

11   Cayman Islands and the Virgin Islands, with China, Great

12   Britain, and Singapore following.

13         With respect to the Dotcom Silo -- and this is the

14   international silo, 94 percent of the customers were

15   customers of FTX Trading Limited, that is a U.S. debtor, and

16   approximately 6 percent were customers of FTX Digital Markets

17   Limited, the Bahamian entity that is under the jurisdiction

18   of the joint provisional liquidators.

19         The reason for this disparity is that, in May of

20   2022, when FTX Trading Limited was considering transferring

21   its customers over to Digital Markets, it did not do so.  So

22   none of the customers that preexisting FTX Trading customers

23   as of the middle of May of 2022 transitioned over to being

24   official customers of FTX Digital Markets.  They remained

25   customers of FTX Trading Limited, a U.S. debtor, which,

1   again, Your Honor, brings us back to the recovery silos.

2         The exercise here, Your Honor, is to identify the

3   assets in each of these silos.  And you can see that each of

4   these silos has different types of assets, right?  In the --

5   if you look at the Dotcom Silo and the WRS Silo, the assets

6   are relatively similar:  Cash and cash equivalents,

7   cryptocurrency, subsidiaries, and that's about it, cash, cash

8   equivalents, cryptocurrency.  They were operating as crypto

9   exchanges.

10         The Alameda Silo, Your Honor, is somewhat

11  different, right?  That is the hedge fund.  Substantial funds

12  appear to have been transferred from other silos to Alameda,

13  and it appears that assets were used for a number of

14  purposes.  Substantial investments were made in ventures that

15  were primarily focused on the crypto and technology sphere.

16  But there were also substantial amounts of money that were

17  spent on things that were not related to the business.

18         For instance, one of the U.S. debtors is an entity

19  that is operate -- that purchased almost $300 million worth

20  of real estate in the Bahamas.  Based on preliminary

21  investigations, most of those -- most of those real estate

22  purchases related to homes and vacation properties that were

23  used by senior executives of the company.

24         Substantial funds were also spent in the Venture

25  Silo to make venture investments in a number of different

1  businesses.  One of the things that the debtors are doing

2  right now is to identify whether or not any of these venture

3  investments are able to be sold and how much they're able to

4  be sold for.

5          So, Your Honor, what we have is a worldwide

6  organization, but an organization that was run, effectively,

7  as a personal fiefdom of Sam Bankman-Fried.

8          The business only had a short life.  It was founded

9  in 2017 at Alameda.  The currency exchanges were founded in

10 2019 and 2020.  And here we are, less than two years later,

11 in bankruptcy, having collapsed.

12         In effect, the company, during that period of time,

13 wandered the world.  It started in Berkeley, it went to Hong

14 Kong, it went to Chicago, it went to Miami, it went to the

15 Bahamas.  But at all times, it was, effectively, under the

16 control of Mr. Bankman-Fried.  And effectively, what we had

17 was a lack of corporate controls at a level that none of us

18 in the profession that have looked at it so far have ever

19 seen.

20         Your Honor, this is a slide that gives you a sense

21 of the different investments that exist in the silos.  So no

22 need to focus too much on it, but what we have is a number of

23 different investments that were made in the Venture Silo, a

24 number that were made in the Alameda Silo, a number that were

25 made at the WRS silo -- including LedgerX, which is a

1   licensed derivatives brokerage business and still operating

2   as nondebtor -- and others at the Dotcom Silo.

3           I'd like now, Your Honor, to take you through the

4   collapse.  It happened very quickly, it was quite shocking,

5   but I think it's worthwhile to walk through the past couple

6   of weeks.

7           On November 2nd, documents leaked online showing

8   that the FTT Token position in the Alameda balance sheet was

9   substantially larger than most anticipated.  So what does

10  that mean?  It means the FTT Token is a token that is created

11  by FTX.  It's an asset that it creates and it had a

12  substantially larger amount on its balance sheet than anyone

13  had anticipated.

14          A few days later, on November 6th, Caroline

15  Ellison, who was then the CEO of Alameda Research and is no

16  longer the CEO and no longer employed, tweets out information

17  with respect to the balance sheet of Alameda.  In this tweet,

18  she indicates that there are approximately -- there are less

19  than ten -- that there are greater than $10 billion of assets

20  that are not reflected on the balance sheet.

21          That same day, Your Honor, is when Changpeng Zhao -

22  - known in the business as "CZ" -- who is the Chief Executive

23  Officer of Binance -- and remember, Binance had been an

24  initial investor in FTX and also had been taken out entirely

25  from its equity investment.  He tweets that, as part of

1  Binance's exist from FTX Equity last year, Binance received

2  roughly $2.1 billion equivalent in cash and FTT, but:

3          "Due to recent revelations that have come to light,

4  we have decided to liquidate any remaining FTT on our books."

5          This, in effect, tells the market that CZ believes

6  that FTT is worth substantially less than prior -- than

7  previously anticipated and the value of FTT plummets in the

8  marketplace.

9          Two days later, on November 8th, in the face of a

10  run on the bank, FTX pauses all customer withdrawals and the

11  FTT price continues to fall by approximately 80 percent just

12  over a period of two days.

13          On the afternoon of November 8th, CZ tweeted that

14  FTX and Mr. Bankman-Fried had asked for help, that there was

15  a significant liquidity crunch at FTX generally, and to

16  protect users, that a non-binding LOI had been signed,

17  intending to fully acquire FTX.COM, and help cover the

18  liquidity crunch.  He concludes by saying:

19          "We will be conducting a full DD" -- meaning due

20  diligence -- "in the coming days."

21          Just one day later, Binance tweets:

22          "As a result of corporate due diligence as well as

23  the latest news reports regarding mishandled customer funds

24  and alleged U.S. agency investigations, we have decided we

25  will not pursue the potential acquisition of FTX.COM."

1           Mr. Bankman-Fried is an active tweeter throughout

2    this period and indicates online that he is requesting

3    emergency funding to cover -- from investors to cover up a

4    shortfall of up to $8 billion.

5           The next day, on the 10th, the Bahamas Securities

6    Commission freezes assets of FTX Digital Markets and appoints

7    a provisional liquidator.

8           Also on November 10th, Alameda Research announces

9    via tweet that it is winding down trading.

10          During the course of the day of November 10th and

11   into the early morning hours of November 11th, near constant

12   communication is going on with Mr. Bankman-Fried.  He is

13   being interviewed by regulators in the Bahamas, he has hired

14   lawyers in the United States at the Paul Weiss law firm.  He

15   has also engaged a professor at Stanford Law School, Mr.

16   David Mills, and is consulting with his father, who is also a

17   professor at Stanford Law School.

18          Throughout the day, consideration is being given by

19   Mr. Bankman-Fried as to whether or not he should relinquish

20   control over the entities.  It is during that time that

21   Sullivan & Cromwell and Alvarez & Marsal have been engaged on

22   an emergency basis to consult on contingency planning.  The

23   first reach-out to Mr. Ray and other potential candidates to

24   come in as CRO were made.

25          And at 4:30 a.m. on November 11th, Mr. Bankman-

1  Fried resigned and he signed documentation authorizing Mr.

2  Ray to take control of the businesses and having full power

3  of any officer at any of the entities, including, among other

4  things, to commence these Chapter 11 cases.

5         And then, starting on the morning of the -- the

6  traditional morning, rather than the 4:30 a.m. morning, of

7  November 11th, these Chapter 11 cases began to be filed,

8  after Mr. Ray had authorized them.

9         This graph, Your Honor, gives you a sense of what

10 the market was doing with respect to the FTT Token.  This

11 gives you a sense of market cap over time and it shows the

12 complete collapse of the value of the FTT Token at the time

13 of the bankruptcy filing.  At the peak, the market cap was

14 $9.6 billion.  Right now, the market cap is approximately 422

15 million.

16        So, Your Honor, that's where we are.  We have

17 witnessed probably one of the most abrupt and difficult

18 collapses in the history of corporate America, the history of

19 corporate entities around the world.

20        When Mr. Bankman-Fried signed over control of these

21 businesses, he signed over control in a way that allowed

22 everyone, for the first time, to really see under the covers

23 and to recognize that the emperor had no clothes.  These

24 businesses were not operated in a manner that was consistent

25 with any sort of traditional best practices.  And since that

 1  time, mister -- under Mr. Ray's direction, the advisors and

 2  the remaining loyal employees at FTX have worked day and

 3  night to identify the assets, to secure those assets wherever

 4  they are located, to start applying the controls that are

 5  necessary, and substantial progress has been made.

 6         But we stand here today, Your Honor, with an

 7  absence of information.  We do not have the traditional

 8  amount of information that a debtor would traditionally have,

 9  but every day, we generate more and more.

10         So we do have, finally, before Your Honor a series

11  of traditional first-day motions.  We are ready to request

12  that relief.  And I will now hand over the dias to my

13  colleagues.

14         I would ask, Your Honor, though, before doing that,

15  if we could move the declarations that have been submitted in

16  support of the relief into evidence.  There are two

17  declarations by Mr. Ray and two declarations by Mr. Mosley of

18  Alvarez & Marsal.

19         THE COURT:  Okay.  Is there any objection?

20     (No verbal response)

21         THE COURT:  They're admitted without objection.

22     (Ray Declarations received in evidence)

23     (Mosley Declarations received in evidence)

24         MR. BROMLEY:  Thank you very much, Your Honor.

25         THE COURT:  Before you sit down --

1            MR. BROMLEY:  Yes.

2            THE COURT:  -- Mr. Bromley.  How many employees

3  remain at the company?  Do you know?

4            MR. BROMLEY:  That's a good question.  I can check,

5  Your Honor.

6            THE COURT:  Okay.

7            MR. RAY:  Your Honor, John Ray.  Roughly 260.

8            MR. BROMLEY:  Roughly 260, Your Honor.

9            THE COURT:  Okay.  Thank you.  That's all.  Thank

10 you.

11           MR. BROMLEY:  Okay.  Thank you very much, Your

12 Honor.

13           THE COURT:  We can begin --

14           MR. BROMLEY:  I'll hand over to --

15           THE COURT:  -- the first-days.

16           MR. BROMLEY:  -- my partner Brian Gluckstein.

17 Thank you very much.

18           THE COURT:  Okay.

19           MR. GLUCKSTEIN:  Good morning, Your Honor.  Brian

20 Gluckstein --

21           UNIDENTIFIED:  Good morning.

22           MR. GLUCKSTEIN:  -- off Sullivan & Cromwell on

23 behalf of the debtors.

24           Your Honor, with the Court's indulgence, we will

25 largely take today's agenda as it appears -- today's matters

1  as they appear on the agenda, with a couple of exceptions.

2           But starting at the top, Your Honor, the first

3  motion that we have is Agenda Item 2, which was filed at

4  Docket Number 3, and it is our motion for joint

5  administration.

6           By this motion, the debtors request -- it's 102

7  debtors that have been filed, the cases be jointly

8  administered under the caption of FTX Trading Limited, to

9  allow for efficient administration, pursuant to Rule 1015(b).

10          The debtors are affiliates here.  The 102 entities

11 fall into the 4 silos that Mr. Bromley just walked through,

12 all of which have common ownership and, prior to the filing

13 of these cases, were under the common control of Mr. Bankman-

14 Fried.  The debtors believe joint administration of these

15 cases, of course, will permit the efficient and convenient

16 administration of these matters.  Most, if not all, of the

17 notices, applications, hearings in these cases will affect

18 each and every one of the debtors.  Absent joint

19 administration, it would result in numerous duplicative

20 filings.

21          The motion, Your Honor, of course only requests

22 administrative and non-substantive consolidation of the

23 debtors' estates; thus, joint administration will not

24 adversely affect the debtors, creditors, or other

25 stakeholders, and rather, constituents stand only to benefit

1  from joint administration through cost reductions and

2  efficiency gains.

3          Your Honor, the U.S. Trustee did provide --

4  reviewed the motion and provided minor comments that are

5  reflected in the revised form of order that was filed

6  overnight at Docket Number 80 -- 98, at Exhibit A.

7          And unless Your Honor has any questions, we request

8  entry of the joint administration order.

9          THE COURT:  Okay.  I have no questions.

10          Does anyone else wish to be heard?

11       (No verbal response)

12          THE COURT:  No.

13          I'm satisfied the requested relief is appropriate

14  and I'll grant the relief.

15          MR. GLUCKSTEIN:  Thank you, Your Honor.

16          The next item on the agenda, which is Item Number

17  3, is the debtors' motion for entry of an order modifying

18  certain creditor list requirements and authorizing the

19  service of creditors by email.

20          And I would suggest, Your Honor, if it pleases the

21  Court, that we consider Agenda Item 7 in connection with

22  Agenda Item 3.  That is the debtors' motion authorizing

23  consolidated creditor matrix and to redact certain customer

24  information, as that relief is quite related.

25          THE COURT:  That's fine.  Thank you.

1            MR. GLUCKSTEIN:  With respect to Agenda Item 3,

2   Your Honor, in that motion, the debtors are requesting that

3   we be permitted to file a consolidated list of top 50

4   creditors and to serve the debtors' customers by email.

5            With respect to the creditor list, Your Honor,

6   there have been 102 debtors filed in these cases, many of

7   which are expected to have very few creditors and many others

8   expected to have overlapping creditors.

9            In addition, as detailed in Mr. Ray's declaration,

10  the state of the debtors' historical books and records has

11  been substandard; thus, the exercise of compiling separate

12  creditor lists for each debtor would be particularly time

13  consuming and resource intensive at this point, as the

14  debtors' team works to protect assets and maximize value.  We

15  submit the consolidated top 50 creditors list is appropriate

16  under the circumstances.

17            Furthermore, Your Honor, as reflected in the

18  revised form of order that was filed at Docket 98, Exhibit B,

19  the debtors have now agreed, at the request of the United

20  States Trustee, to file a consolidated top 50 creditors list

21  for each of the four main debtors and their subsidiaries --

22  the so-called "silos," for WRS, Alameda, Ventures, and Dotcom

23  -- separately, as applicable.  So, to the extent that each of

24  those silos have individual creditors, we will file a

25  consolidated list, effectively, for each silo.  And that's

1  reflected in the amended order that was filed late last

2  night.

3       THE COURT:  I did see it.  Thank you.

4       MR. GLUCKSTEIN:  As noted in Paragraph 75 of Mr.

5  Ray's declaration, the debtors have struggled to gain access

6  to their customer data due to ongoing security risks in

7  accessing that information.

8       The debtors have now succeeded in finding a way to

9  safely view the necessary customer information to prepare and

10 file the consolidated top 50 list that was filed in redacted

11 form at Docket Number 51, despite the debtors still not

12 having full access to their customer data.  We will now work

13 to promptly file those 4 creditor lists for each of the main

14 debtors, assuming the relief in this motion is granted today.

15 Presenting the information on a consolidated basis will

16 ensure the most relevant and reliable information can be

17 promptly disclosed.

18      With respect to the second part of Agenda 3, Your

19 Honor, the email service request, the motion seeks to modify

20 the service requirements, under Bankruptcy Rule 2002(g), to

21 permit email service to customers, unless they have

22 designated a mailing address or come forward and request hard

23 copy service.

24      The Court has significant discretion to modify the

25 general rule pursuant to Bankruptcy Rule 2002(m) and has

1   permitted email service in similar situations, including the

2   in Cred case involving customers of a cryptocurrency

3   platform.

4          The number of customers and former customers to be

5   noticed in these cases could certainly number in the

6   millions.

7          The debtors operate cryptocurrency platforms and

8   all of the debtors' customers interact online and through

9   email in the ordinary course.  In fact, with respect to the

10  exchange customers, both FTX US and FTX.COM user agreements

11  expressly provide that notice or other communications will be

12  by email or through online applications.

13         Following discussions with the United States

14  Trustee, we have revised a form of order to make clear that

15  email service is permitted for customers unless hard copy

16  service by mail is requested.  As we understand it, there is

17  no continuing concerns with respect to the relief from the

18  United States Trustee with respect to that motion.

19         The other piece of the relief, Your Honor, is set

20  forth in the motion docketed at Agenda Item Number 7.

21  Pursuant to that motion, the debtors are seeking authority to

22  file a single consolidated creditor matrix in lieu of

23  separate lists for each debtor to establish procedures for

24  providing notice of commencement and only on an interim

25  basis, Your Honor, at this time, redact confidential customer

1  and creditor information from public viewing of court

2  filings.

3          Your Honor, FTX's customers were the lifeblood of

4  the company.  The debtors are very cognizant of customers'

5  concerns, particularly with respect to privacy, and intend to

6  try to protect customers and their interests as these cases

7  progress.

8          The revised form of order filed at Docket Number 98

9  at Exhibit E incorporates a number of comments from the

10  United States Trustee.  As we understand it, the only open

11  issue is whether to redact on an interim basis the

12  confidential customer information in the scope that is

13  requested.

14          And Your Honor, the requested redactions include

15  that we would be permitted to redact, again, only on an

16  interim basis at this time, confidential names and addresses

17  of customers from all the court filings, addresses and email

18  addresses of individual non-customer creditors and

19  shareholders, and the names and addresses of all creditors

20  who are Citizens of the United Kingdom or European Union

21  member country, subject to local data privacy protections.

22          It's my understanding that the United States

23  Trustee has agreed, for purposes of this motion today, to the

24  redaction of information for customers residing in the

25  European Union covered by the GDPR is appropriate and is

1 willing to permit the redaction of individual customer

2 addresses, but not names.

3          We submit, Your Honor, that there is no basis at

4 this point in the case to treat some customers worse and to

5 immediately reveal their customer sensitive personal

6 information.  These cases present very unusual circumstances,

7 as Mr. Bromley just walked through this morning; and, thus,

8 the complete redaction relief on an interim basis we submit

9 is appropriate here.

10          The debtors' customer records include the names and

11 email addresses of millions of individuals and entities.

12 There are two independent reasons, Your Honor, why redaction,

13 at least on an interim basis, is in the best interests of the

14 estates and their stakeholders:

15          First, Your Honor, the debtors' customer list,

16 numbering in the millions, is an asset of the estate that is

17 important to any potential reorganization or sale to maximize

18 value for all stakeholders.  These cases are in their

19 infancy.  Mr. Ray states in his declaration, in Paragraph 6,

20 as Mr. Bromley walked through this morning, that one of the

21 core objectives of these cases is asset protection and

22 recovery.  Public release of the debtors' customer list and

23 identifying information would give the debtors' competitors a

24 free opportunity to poach the debtors' customers and would

25 interfere with the ability to sell assets and maximize value

1  as these cases progress.  There is no counter-reason to

2  eliminate a potentially significant source of value on the

3  first hearing before Your Honor, in the very first week of

4  these cases.

5          Mr. Mosley states in his declaration, Paragraph 18,

6  that the debtors' customer list and related data is a

7  valuable asset.  How valuable, Your Honor, is to be

8  determined.  But the debtors and all of their stakeholders

9  have an interest in preserving that asset today.

10         The circumstances are similar to those considered

11 by the Court in Cred, but we would submit, respectfully, on a

12 much larger scale.  We submit that, under the circumstances,

13 Section 107(b)(1) provides a basis consistent with the

14 Court's prior decision in the Cred case to permit the

15 redaction of the customer's personal information on an

16 interim basis.

17         Second, Your Honor, there are significant privacy

18 concerns raised by the disclosure of this customer and

19 protected creditor information.  The debtors' customer base

20 is global.  Those customers who reside in the United Kingdom

21 and the European Union country -- member countries have

22 additional data privacy protections under local law.  But

23 privacy concerns are not limited to the customers in those

24 jurisdictions.

25         Customers in the cryptocurrency space are not the

1   typical creditors.  Many customers invest in cryptocurrency,

2   in part, to not be publicly identified.  This is a highly

3   sensitive issue for the customer community.  And we've heard

4   from numerous customers in that community, both individuals

5   and entities, already in these cases, requesting that their

6   personal information be protected.

7          Many of the debtors' creditors are high net worth

8   individuals and entities with significant positions in

9   digital assets.  As explained in Mr. Ray's declaration, the

10  debtors have been the targets of ongoing hacking and

11  unauthorized access to their systems.  Identifying the

12  personal contact information of the debtors' customers,

13  particularly at this time, while emotions are running high,

14  could put them in the crosshairs of bad actors.

15         In addition, the immediate identification of the

16  debtors' customers with exposure to FTX could have the effect

17  of further destabilizing the broader crypto markets.  Section

18  107(c) of the Bankruptcy Code provides that the Court may,

19  for cause, protect personal information from disclosure,

20  which would create a risk of injury to the individual's

21  property.  And courts in this district have taken a strong

22  stance with respect to the protection of customer and

23  personally identifiable information.

24         In contrast, Your Honor, there is minimal benefit,

25  in our opinion, to requiring the immediate mass disclosure of

1  the customers -- the debtors' customer and individual

2  creditor personal information.  The Court and the U.S.

3  Trustee have been and will continue to be provided the

4  unredacted information, as will any statutory committee

5  appointed in these cases; thus, we submit there is no

6  prejudice to any party-in-interest by granting this relief on

7  an interim basis.  Creditors will be noticed through our

8  claims agent and receive all notices that they're entitled to

9  under the Bankruptcy Code and Rules.

10      Finally, Your Honor, on this issue, the debtors

11  have included language in the proposed order before Your

12  Honor today consistent with the language the Court suggested

13  in the Cred case, reserving rights and providing that, upon

14  request of any party-in-interest, the Court may revisit this

15  issue upon a showing of good cause to release some or all of

16  the redacted information.

17      Under the circumstances, Your Honor, we

18  respectfully request that the entirety of the relief

19  requested in this motion be granted in its entirety.

20      THE COURT:  Okay.  Thank you.

21      Let me hear from the U.S. Trustee.

22      MR. HACKMAN:  Good morning, Your Honor.  May I

23  please the Court, Ben Hackman for the U.S. Trustee.

24      We object to two aspects of the creditor matrix

25  motion:

1          First, in ordered Paragraph 4, we oppose the

2   redaction of the names and addresses of creditors and

3   customers who are not individuals.  We see no basis to redact

4   that information for legal or business entities.  There

5   should be transparency about who those entities are including

6   on the top 50 lists that are to be filed.

7          Second, we object to order Paragraph 7, in

8   particular ordered Paragraph Sub (c), which would authorize

9   the claims and noticing agent to withhold publication of

10  proofs of claim filed by the debtors' customers.  We're not

11  entirely sure what that means.

12         We submit, respectfully, that proofs of claim

13  should not be withheld from being published on the claims

14  register wholesale. If Your Honor authorizes certain types of

15  other information to be redacted in other papers that are

16  filed with the Court such as individual customer addresses we

17  take no position on that same information being redacted in

18  filed proofs of claim, but there should not be redactions

19  beyond that in proofs of claim.

20         The claims register paints a picture and in a case

21  with over 100,000, potentially over a million, creditors that

22  picture may be substantial.  Proofs of claim allow creditors

23  to tell their story.  And we submit that those proofs of

24  claim should not be withheld or sealed wholesale.

25         In the Altera Healthcare decision Judge Walrath

1   wrote that "There is a strong presumption in favor of public

2   access to bankruptcy proceedings and records.  During a

3   Chapter 11 reorganization a debtor's affairs are an open

4   book, and the debtor operates in a fishbowl."

5         The Supreme Court has written that "It is clear

6   that the Courts of this country recognize a general right to

7   inspect and copy public records and documents including

8   judicial records and documents."  That is the Nixon v. Warner

9   Communications case.

10        The Third Circuit has, likewise, recognized that

11  there is a strong presumption -- I apologize, the District of

12  Delaware recognizes "There is a strong presumption in favor

13  of public access to judicial records and papers which has

14  statutory common law and first amendment under-pinnings."

15  That is the Continental Airlines decision, 150 B.R. at 334,

16  Pin Site 341.

17        I believe Mr. Bromley described this case as one

18  of the most abrupt collapses in the history of corporate

19  America.  And in counsel's presentation earlier they

20  indicated that one of Mr. Ray's five core objectives in this

21  case is transparency and investigation.  We submit that over

22  broad redactions do not serve transparency in these cases.

23        We're also concerned that presently the top 50

24  list contains no information identifying who the creditors

25  are.  And if our office appoints a creditors committee we

1  will need to identify who we are appointing to that committee

2  or those committees.  We need to be able to do that with

3  transparency.  Any redaction or sealing relief should not

4  prevent us from filing those notices of appointment.

5          We would also point out, Your Honor, that we do

6  object to the names of individuals being redacted.  We take

7  no position about individual addresses being redacted, but as

8  to their names we respectfully submit they should not

9  redacted unless they are citizens, members of the European

10 Union and are covered by the GDPR.

11         Unless Your Honor has any questions that's all I

12 have.

13         THE COURT:  Thank you, Mr. Hackman.

14         MR. HACKMAN:  Thank you, Your Honor.

15         THE COURT:  Mr. Glueckstein, can you address the

16 issue about the proofs of claim.

17         MR. GLEUCKSTEIN:  I can, Your Honor.  We have

18 requested, in the motion, at this point, that the idea of all

19 of this is to ensure that creditors -- customers are not

20 having their information involuntarily disclosed.  No bar

21 date has been set yet in this case.  It will be at some point

22 and creditors will need to file claims in order to preserve

23 those claims.

24         So with the disclosure issue at this point there

25 are some folks, I think there have been a couple of people

1   who have voluntarily come forward and have started to put

2   claims on the docket; that is their prerogative.  From the --

3   that is self-identification.  But what we are trying to

4   protect, again, Your Honor, just for this interim period, is

5   to ensure that nobody's personal information is being

6   involuntarily disclosed.  And, two, Your Honor, that the

7   debtors' customer list is not being compromised in a

8   significant way before we're able to marshal that asset.

9   Both of those issues are in play.

10          I think the proof of claim issue can be avoided

11  for the interim period because we haven't set a bar date.  So

12  I think at this point we could table that portion of the

13  relief if somebody has voluntarily filed a proof of claim on

14  a docket.  We haven't yet sought to take any action with

15  respect to that claim, its very few.

16          The issue that is raised by counsel with respect

17  to the creditor's committee, I think, is a good example of

18  how we see this playing out, Your Honor.  We don't believe

19  the top 50 list should be unredacted including names, the

20  names of customers, once you have customer names it's not

21  very difficult to solicit those customers, find information

22  about them and know that they are customers of FTX.

23          The United States Trustees Office, of course, is

24  presumably going to form a creditors committee and those

25  members of that committee will have come forward voluntarily

1  to serve on that committee, and presumably are comfortable

2  with the requirements of service that are necessary including

3  the disclosure of their names and their participation in this

4  process.  That will be a handful of customers who agree to

5  serve on a creditors committee.  That is very different and,

6  again, that is voluntary.  That is very different than the

7  millions of customers that are sitting in a data base that

8  need to be noticed in this case and will appear on the

9  debtors' creditor matrix.  That is a very different

10  situation.

11          Again, Your Honor, there is no need, certainly at

12  this time, in the first month of the case, we submit, for the

13  world to have all of those names and addresses,

14  understanding, Your Honor, for most of our customers.  We

15  don't have physical addresses.  These are folks who conducted

16  business with the debtors entirely online through

17  applications.  For many of these customers we have email

18  addresses or other contact information, identifiable

19  information, but not necessarily brick and mortar mailing

20  addresses.

21          So the -- I think many people would view email

22  addresses and the ability to contact people as some of the

23  most valuable customer information.  So I don't think --

24  there is absolutely a balance.  We are very cognizant of the

25  need for transparency in these cases.  The debtors intend to

1  provide that transparency to its stakeholders including the

2  customer base.

3       What is being asked here today, Your Honor, is

4  simply to ensure for now, on an interim basis, that the

5  customer information in its entirety, individuals and

6  entities because entities many times are individuals behind

7  those entities in this space, those are all valuable

8  customers, and the identifiable information of customers,

9  including email addresses, be redacted from all filings.  I

10  think for purposes of the interim order we could remove the

11  proof of claim issue.

12       THE COURT:  All right.  Anyone else wish to be

13  heard?  I got some other folks standing up.  Come forward.

14       MR. PIERCE:  Good afternoon, Your Honor.  This is

15  Matthew Kelsey of Alston & Bird.  We represent an ad hoc

16  group of account holders.

17       The relief requested in the motion, which we

18  support, you know, by implication effects our group in the

19  sense of 2019 requirements, Your Honor.  I think both

20  confidentiality and privacy are implicated here.

21       Our group was formed yesterday and we have not

22  filed a 2019 yet, but we were hoping for some guidance from

23  the Court in connection with your resolution as to the

24  ability to redact names and addresses particularly of

25  individual holders, especially given what we have heard

1  today; the risk of cyber-attack and the lack of controls, at

2  least, that was handed to the current management now.

3          I have no doubt that they are working hard to put

4  those controls into place, but, at least, on an interim basis

5  redacting this sort of information on a 2019 seems

6  appropriate.

7          THE COURT:  Okay.

8          MR. KELSEY:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10         MR. ROESCHENTHALER:  Good afternoon, Your Honor.

11 Mike Roeschenthaler from Whiteford Taylor & Preston. I am

12 here with my colleague, Rich Riley.  We too are here on

13 behalf of a significant number of customers, some of which,

14 based on what's been disclosed so far, will likely be on that

15 consolidated 50 list of unsecured creditors.

16         We certainly join in the debtors' motion.  This is

17 a case filed crypto currency.  So, obviously, confidentiality

18 is, candidly, part of the benefit of the bar date for those

19 that participated in this space.  We think the disclosures

20 being sought by the Office of the United States Trustee could

21 actually disincentivize participation in the case.  And by

22 extension impairs the ability of creditors to recover from

23 this case which, of course, would be contrary to the best

24 interest of the creditors.  So we join in the debtors'

25 motion.

1        Thank you.

2        THE COURT:  Anyone else?

3    (No verbal response)

4        THE COURT:  Well this certainly is a pull and tug

5   here between the right to privacy and the right to, everybody

6   in this case, to have transparency.  As I did in the Cred,

7   Inc., case -- well let's deal first with the modified

8   creditors list of 50.  I think the only issue there from the

9   U.S. Trustee is the disclosure of the names.  Is that right,

10  Mr. Hackman?

11       MR. HACKMAN:  We would submit, Your Honor, that

12  for institutional entities names and addresses should not be

13  redacted for any individuals.  Only their addresses should be

14  redacted.

15       THE COURT:  All right.  Here is what I am going to

16  do on that: I am going to, on an interim basis, enter the

17  order as the debtors have requested, but it does raise a

18  factual issue and there may be a factual basis for why names

19  need to be disclosed.  So we will reserve that for the final

20  hearing and if there is still an objection by the U.S.

21  Trustee at that time, once they have seen the list and know

22  who these parties are, if they think there should be

23  disclosure of those entities we will revisit it at that time.

24  On an interim basis I will enter the order allowing the

25  redaction of the names and address of the top 50 list.

1          The same goes for the consolidated creditor list.

2   It -- again, I need to make sure I am protecting the interest

3   of these individuals.  This is a space where it's all done

4   over the internet and everyone in this room knows the

5   internet is wrought with potential dangers; hacking happens

6   all the time, people's individual accounts get hacked.  I

7   think it's important that we protect those individuals who

8   are seeking -- who want to participate in this case, want to

9   file their proofs of claim, but also want to protect their

10  assets.

11         So, again, on an interim basis I will grant the

12  release requested by the debtor excluding the proof of claim.

13  We will take that out of the form of order.  We will deal

14  with that once we set a bar date because, as debtors' counsel

15  pointed  out, if someone wants to voluntarily disclose who

16  they are that's perfectly okay, they can do that.

17         On the -- certainly, Mr. Hackman, on the -- when

18  you come to the time of appointing a statutory committee they

19  have to be disclosed.  I would assume that anybody who is

20  coming forward who wants to serve on the committee is

21  voluntarily agreeing to disclose their names.  I would not,

22  under any circumstances, allow a committee member to withhold

23  their information.  They have to disclose.

24         Again, on an interim basis we can revisit this on

25  the final.  Again, if there is some evidentiary basis for why

1   you think I should not allow this relief, Mr. Hackman, you

2   can come back and we will deal with it at the final hearing.

3            MR. HACKMAN:  Thank you, Your Honor.

4            THE COURT:  Okay.  So with that, based on my

5   comments, I will approve both the motion regarding the

6   modification of the creditors list and the consolidated

7   creditors list, Items 3 and 7.

8            UNIDENTIFIED SPEAKER:  Thank you very much, Your

9   Honor.

10           Continuing to move through the agenda, the next

11  item on the list -- on the agenda is Agenda Item 4 which was

12  the debtors' emergency motion to transfer the Chapter 15 case

13  of FTX Digital Markets to this Court.  As filed on the docket

14  yesterday and as Mr. Bromley touched on in his opening

15  remarks we have reached an agreed form of order with counsel

16  for the joint provisional liquidators to, in fact, permit and

17  have the Chapter 15 case transferred to this Court with the

18  rights of all parties reserved.  So absent any questions from

19  the Court we would ask that that be entered.

20           THE COURT:  I have no questions.  Do the

21  liquidators wish to be heard on that?

22           MR. SHORE:  Your Honor, Chris Shore from White &

23  Case on behalf of the three JPL's.

24           We have nothing to address.  I will note, because

25  I am going to stand on one motion in a bit, that we're going

1  to need a recognition hearing setting, but we can discuss

2  that we're going to need a recognition hearing setting, but

3  we can discuss that in the context of the setting the second

4  days.

5           THE COURT:  We will get to that.  I will enter

6  that order.  Thank you.

7           Has it been uploaded, the final on that one?

8           UNIDENTIFIED SPEAKER:  Yes, Your Honor, it has.

9           THE COURT:  We can go ahead and enter that one

10 right away.

11          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12          That brings us to the next item on the agenda

13 which is Agenda Item 5.  This is a motion of the debtors for

14 entry of an order filed -- a motion filed at Docket No. 25

15 with respect to the automatic stay.

16          By this motion, Your Honor, the debtors are

17 requesting entry of an order enforcing and restating the

18 worldwide stay.  As a result of the debtors' international

19 business operations, Your Honor, the debtors have many

20 foreign creditors, contract counterparties and other parties

21 in interest in countries who are not and may not be as well-

22 versed in the protections and restrictions of the bankruptcy

23 code.  These creditors and parties in interest may be

24 unfamiliar with the operation of the stay and the other

25 provisions, operative provisions, of the bankruptcy code.

1           Upon commencement of the cases non-US parties may,

2    in fact, try to take action to violate the protections

3    afforded to the debtors under the code and we have started to

4    see some notices in that regard.  We are responding to those,

5    but accordingly the debtors submit that such circumstances

6    warrant an order apprising all parties of such protections as

7    set forth in the code.

8           Importantly, Your Honor, the debtors are not

9    seeking to expand the protections provided by the code,

10   rather only seeking an order to be able to notify parties in

11   a standalone order of this Court who are unfamiliar with the

12   code of the scope and effect of Section 362 and related

13   provisions including 365(e)(1) and 541.

14          Your Honor, the debtors did receive some comments

15   from the United States Trustee and other parties on the

16   proposed form of order that we incorporated in the form filed

17   at Docket No. 98, Exhibit C.  We would ask that under the

18   circumstances Your Honor enter that order unless the Court

19   has any questions.

20          THE COURT:  No, I don't have any questions.

21          Mr. Shore.

22          MR. SHORE:  Thank you, again, Your Honor.  Chris

23   Shore from White & Case on behalf of the three JPL's, Brian

24   Simms, Peter Greaves, and Kevin Cambridge, who have all been

25   appointed as joint provisional liquidators of FTX Digital

1  Markets, a Bohemian Company in a Bohemian wind-down

2  proceeding.

3           I will note that some of what Mr. Bromley said

4  when he put the charts up is not in the evidentiary record.

5           THE COURT:  I understand.

6           MR. SHORE:  Yeah, and we have some disagreements

7  which we will work out over time as to how we fit-in and what

8  portion of customers sat where within the organization.  But

9  for now, as noted, we had started a Chapter 15 in New York.

10  We have consented to having it come down here.  And we will

11  need to get a scheduling date which we can do at the end of

12  the hearing.

13          For now the 15 isn't being called, it's just the

14  11.  We are only appearing, we are not seeking any provision

15  or relief.  We are just participating to make sure that what

16  is happening today isn't impinging upon any relief that the

17  JPL's might need pending recognition.

18          We have been working with the debtors to begin the

19  process of coordinating our efforts on information flow,

20  asset containment, and ultimately judicial coordination.  We

21  worked out everything except for the automatic stay.  We are

22  not objecting to the relief, we're actually asking for a

23  comfort clarification on a comfort order.

24          There is a tension that is going on right now

25  between the automatic stay.  The automatic stay is what the

1  automatic stay is, but also Mr. Ray's guiding principles that

2  went up.  There is a lot that needs to get done in between

3  now and a recognition hearing, and now and second day

4  hearings with respect to information gathering, asset

5  containment, developing information, sharing information,

6  coordinating information.

7         You heard Mr. Bromley say information is property.

8  It can't be that the JPL's seeking to access information of

9  their debtor is a stay violation in a Chapter 11 case.  We

10 are going to try to work this out.  We were able to work out

11 everything else.  We weren't able to put language in the

12 order with respect to the automatic stay.  We are going to

13 continue to work with them.

14        My caveat on provisional relief is we can't get to

15 a place where we can develop and information flow between the

16 .com silo and the JPL's.  We may have to come back and get

17 provisional relief because from the perspective of the JPL's

18 order number one in this case is to make sure that all assets

19 are protected and all information is protected.  We can

20 figure out later what that information means or where those

21 assets get mapped, but we can't have assets being dissipated,

22 nor can we have information sitting there unassessed because

23 we can't get out of our own ways to come up with a protocol

24 to share information.

25        So, again, we don't object to the order being

1   entered, but we're going to have to work out some arrangement

2   between ourselves; otherwise, we may have to come back and

3   address it with Your Honor.

4            THE COURT:  Mr. Glueckstein.

5            MR. GLUECKSTEIN:  Thank you, Your Honor.  I don't

6   think there is -- I don't have any agreement with what Mr.

7   Shore said, but --

8            THE COURT:  You mean disagreement.  You said I

9   don't have any agreement with what --

10           MR. GLUECKSTEIN:  I'm sorry, a disagreement.  We

11  might have disagreements later.  You know, sometimes we have

12  disagreements, but I like working with Mr. Shore.

13           I think that the issue here -- everything he said

14  goes both ways, right.  They are going to be looking for

15  information from us, we are going to be looking for

16  information from them.  We are actually looking forward to

17  the possibility of coming up with a protocol that makes

18  sense.  It is something that we suggested to prior counsel

19  for the joint liquidators.  It didn't get traction last week.

20  We are glad that Mr. Shore and his colleagues are now on the

21  scene and we hope to make some progress in that regard.

22           With respect to this motion Paragraph 7, as

23  revised, with input from other parties makes very clear that

24  this order is simply declarative and intended to simply state

25  what is in the statute and all parties' rights are reserved.

1   So I think with respect to the relief today, Your Honor, I

2   didn't hear any objection from Mr. Shore on this order being

3   entered.  We would ask that this order be entered and we look

4   forward to working with them on the issues as related to the

5   Bahamas and the Chapter 15 v the Chapter 11.

6           THE COURT:  Okay.  Yeah, I didn't hear Mr. Shore

7   saying he actually said he doesn't object to entry of the

8   order and I will enter the order.  It obviously is a comfort

9   order that gives the Debtors an opportunity to send something

10  under the signature of a judge to parties outside the items

11  who might not understand the automatic stay.

12          But the automatic stay is what the automatic stay

13  is, and if someone violates it, they do so at their own risk.

14          MR. GLUECKSTEIN:  Thank you very much, Your Honor.

15          THE COURT:  Okay.

16          MR. GLUECKSTEIN:  The next item on the agenda,

17  Item 6 is the Debtors' application, which was filed at Docket

18  28 to retain Kroll Restructuring Administration LLC.  The

19  Debtors, by this motion, are seeking to employ and retain

20  Kroll as claims and noticing agent, effective *nunc pro tunc*,

21  to the petition date, pursuant to 28 U.S.C. 156(c).

22          Appended to the motion as Exhibit B was the

23  declaration of Benjamin J. Steele, the managing director at

24  Kroll.  The Debtors also filed a supplemental declaration for

25  Mr. Steele at Docket 96, which includes additional

1 disclosures that were requested by the United States Trustee.

2 Mr. Steele is on the Zoom hearing today.

3       The Debtors, Your Honor, anticipate, as we've been

4 discussing this morning, and now this afternoon, that there

5 will be millions of creditors in these Chapter 11 cases.  In

6 light of the number of anticipated claimants and the

7 complexity of the Debtors' businesses, the Debtors submit

8 that appointment of a claims and noticing agent, required by

9 Local Rule 2002(1)(f) and, otherwise, is in the best

10 interests of both, the Debtors' estates and their creditors.

11       By appointing Kroll, the distribution of notices

12 and processing of claims will be expedite and the Office of

13 the Clerk and Bankruptcy Court will be relieved of an

14 administrative burden, of what otherwise could be an

15 overwhelming number of claims and contacts.  In selecting

16 Kroll, Your Honor, the debtors obtained and reviewed

17 proposals from two other court-approved claims and noticing

18 agents, to ensure selection was through a competitive

19 process.  The Debtors believe that Kroll is qualified due to

20 its significant experience in both, legal and administrative

21 aspects of large and complex Chapter 11 cases.

22       The Debtors further submit, Your Honor, that *nunc*

23 *pro tunc* relief is appropriate because Kroll has provided and

24 continues to provide valuable services to the Debtors'

25 estates in this interim period.

1    The Debtors did receive informal comments on

2 Kroll's retention application from the United States Trustee,

3 which the Debtors addressed in the revised order that was

4 filed at Docket 98, Exhibit D, and the supplemental

5 declaration of Mr. Steele.

6    Unless Your Honor has any questions, we would

7 request, respectfully, enter of that order.

8    THE COURT:  Does anyone else wish to be heard?

9    (No verbal response)

10    THE COURT:  Okay.  I'm satisfied the retention is

11 appropriate and I will enter the order.

12    MR. GLUECKSTEIN:  Thank you very much, Your Honor.

13    I think we're going to go, with Your Honor's

14 indulgence, slightly out of order, and would take, next, the

15 cash management, which is at Item 8 on the agenda and I would

16 turn it over to -- to Mr. Dietderich to present that motion.

17    THE COURT:  We've been going about an hour and a

18 half.  Why don't we take a 10-minute recess and allow people

19 a little break and we'll come back and we'll take up that

20 next order.

21    MR. GLUECKSTEIN:  Sounds great.  Thank you, Your

22 Honor.

23    (Recess taken at 12:30 p.m.)

24    (Proceedings resumed at 12:47 p.m.)

25    THE COURT:  I heard we had some entertainment

 1  while we were on break, music playing on the system.

 2          All right.  You may proceed.

 3          MR. DIETDERICH:  May I please the Court?  Andy

 4  Dietderich, Sullivan & Cromwell.

 5          Your Honor, I present the cash management motion

 6  today.  We have, I think, a consensual motion.  We have one

 7  objection on the record.  I think it's been rendered moot by

 8  language that we put into the order last night and maybe when

 9  I through, we can confirm that on the record.

10          Your Honor, the cash management motion takes the

11  Debtors' current accounts -- there are 216 bank accounts, 36

12  institutions, 19 countries -- and creates on top of those, a

13  new set of five pooling account, that are compliant with the

14  U.S. Trustee Guidelines.  I put up on the screen for Your

15  Honor, the snapshot of liquidity that we have in all four

16  silos as of today.  Your Honor, there was a revised

17  declaration of Ed Mosley we filed overnight, which shows the

18  additional cash the Debtors have been able to verify.  This

19  process will continue.  It's likely we find additional cash,

20  additional marketable securities and other liquid assets, so

21  we hope our cash situation does approve or improve.

22          And what you have in front of you are the cash

23  projections we're using for the five-week period that was our

24  initial estimation for an interim period of relief.  And

25  you'll see, Your Honor, that at the end of the period, each

1  of the silos has positive cash.

2          Now, Your Honor, it's very important that this is

3  unencumbered or unrestricted cash.  So, within the Debtors'

4  system, there's restricted cash which consists of cash held

5  in custodial accounts, FOB accounts, cash necessary to keep

6  the regulated entities for regulatory capital purposes; all

7  of that is excluded from these calculations, so this only

8  shows unencumbered cash.

9          Your Honor, we do have a revised form of order

10  that we put in last night.  I think that's been reviewed by

11  all the applicable parties.  And then I have two comments

12  that came in this morning that we resolved.  One is from the

13  SEC, Securities and Exchange Commission, which has some

14  additional reservation-of-rights language and the second is a

15  comment from the U.S. Trustee, who has asked us to reduce the

16  amount we can move from the master pooling account into the

17  silo pooling accounts from the $25 million initially

18  requested in the motion to $5 million.  And, Your Honor, the

19  Debtors are fine with that, given the robust liquidity

20  picture in each of the silos.  So, with that, Your Honor, I'd

21  ask for entry of the order.

22          THE COURT:  Okay.  Does anyone else wish to be

23  heard?

24          MR. COUSINS:  Good afternoon, Your Honor.  Scott

25  Cousins, on behalf of Evolve Bank, but we're close.  We did

1 file an objection this morning.

2         When we first saw the motion, we were concerned

3 about, with respect to Evolve Bank, these FBO accounts, which

4 according to our agreement with WRS, our property, our

5 property of the estate, the Debtors have made some additional

6 language.  We're not quite there.  We saw the final last

7 night.

8         Footnote 3 says the FBO accounts, these are the

9 accounts that are of concern to Evolve Bank, are frozen, but

10 paragraph 11 allows the existing bank accounts to be closed.

11 And Exhibit C of the motion includes the Evolve FBO accounts.

12         So, we've given the Debtors language that would

13 say that the identified FBO accounts, 0066, 0078, and 0082,

14 shall remain frozen and shall not be closed or accessed until

15 we can determine, you know, a final order of the Court,

16 presumably the next cash management order, that determines if

17 it's our property.

18         So, we want to avoid a situation where these

19 accounts, which belong to the bank.  It's in fiat currency.

20 It's used for credit cards of our customer.  So, in other

21 words, when a customer uses a credit card, it's fiat

22 currency.  It's not, in our view, property of the estate.

23         So, we've asked to punt it, but we still need that

24 reservation of rights so that the bank accounts aren't closed

25 since we believe these are not property of the estate.

1          THE COURT:  Okay.  I think we have somebody else

2  who wants to speak, as well.  Why don't we get both the --

3  yeah, you are?

4          MR. LOOMIS:  Thank you, Your Honor.

5          THE COURT:  Yeah, go ahead.  And I'll have you

6  address both.

7          MR. LOOMIS:  Your Honor, Gaston Loomis from

8  McElroy Deutsch, here, on behalf of Philadelphia Indemnity

9  Insurance Company.  I'm joined today by co-counsel to

10 Philadelphia Indemnity, Scott Williams, who is appearing

11 remotely.  He's based in the law firm of Manier & Herod,

12 based in Nashville, Tennessee.

13          My client conveyed a limited objection to the

14 Debtors about the cash management motion, which I'm glad to

15 announce has been resolved, at least for purposes of this

16 interim order.  As background, Philadelphia is a surety that

17 issued 7 million in money transmittal and other surety bonds

18 connected to various state licenses the Debtors possessed

19 that allowed to operate custodial (indiscernible) to flow

20 into other accounts in those states.

21          Philadelphia had concerns about the motion as it

22 related to funds in those accounts, as well as the Debtors'

23 management of those accounts in compliance with trust fund

24 and other state laws.  Philadelphia reached out to the

25 Debtors to address these concerns and, again, I'm pleased to

1 | say the parties have reached an agreement on language to

2 | include in the interim order, that is addressed at Footnote

3 | 3, that counsel just talked about, Your Honor.

4 | Again, I wish to thank the Debtors for working

5 | with my client at this point on this issue, especially given

6 | all the other matters we're having to deal with at this time

7 | in this case.

8 | THE COURT:  All right.  Thank you, Mr. Loomis.

9 | Mr. Dietderich, do you want to address Mr.

10 | Cousins' proposed additional change, I guess.

11 | MR. DIETDERICH:  Yes.  Thank you, Your Honor.

12 | We can confirm on the record we will not close any

13 | accounts at Evolve Bank during the interim period.

14 | THE COURT:  All right.  Thank you.  Does that

15 | satisfy you, Mr. Cousins, or do you need something in the

16 | order?

17 | MR. COUSINS:  I would like something -- I

18 | apologize -- Scott Cousins, on behalf of Evolve Bank.  I

19 | would like something in the order, Your Honor.

20 | MR. DIETDERICH:  Your Honor, we have 36 banks and

21 | 216 bank accounts.  I think by negative implication, that

22 | might just concern others.  I'm just a little bit loathe to

23 | put specific bank names in the order.

24 | We're happy to have Alvarez & Marsal look at the

25 | particular account numbers that he referenced and confirm in

1 writing that those accounts are FBO accounts, as specified in

2 the order.

3         MR. COUSINS:  With that, Your Honor, maybe we'll

4 see you at the final hearing, but I think that representation

5 works.

6         THE COURT:  All right.  Yeah, I think the

7 representation on the record is sufficient to address the

8 issues.

9         MR. COUSINS:  Thank you, Your Honor.

10         MR. DIETDERICH:  Thank you, Your Honor.

11         THE COURT:  So, for the record, I will enter the

12 order, if I didn't say that.  Thank you.

13         MS. KRANZLEY:  Good afternoon, Your Honor.  Alexa

14 Kranzley from Sullivan & Cromwell, proposed counsel for the

15 Debtors.  Your Honor, I'll take the remaining items on the

16 agenda.

17         Going back to Item 8, which is the vendor motion

18 at Docket 46, Your Honor, the Debtors are seeking authority

19 to pay prepetition claims of certain critical domestic

20 vendors, foreign vendors, 503(b)(9) claimants, and potential

21 lien claimants.  Notwithstanding that the Debtors and their

22 advisors do not currently have full books and records, the

23 Debtors and their advisors have identified certain vendors

24 who are critical to their business.

25         Given the nature of the business, most of these

1  vendors relate to data systems, data storage, and security

2  measures.  As such, the Debtors' businesses do not require a

3  material amount of physical goods or shipments and primarily

4  rely on these services.  Additionally, as Mr. Bromley

5  discussed earlier, the debtors' businesses are international

6  and involve foreign vendors all over the world.

7         Your Honor, we had requested in the motion,

8  authorization to pay critical vendors up to an interim cap of

9  9.3 million, to pay foreign vendors with no cap, to pay

10  503(b)(9) claimants with no cap, and to pay potential lien

11  claimants up to a cap of 125,000.

12         Your Honor, further, to discussions with the U.S.

13  Trustee, the Debtors have agreed to make a number of

14  revisions as follows:  first, the Debtors will reduce the

15  critical interim cap from 9.3 million to 8.5 million; second,

16  to include a foreign vendor interim cap of 1 million; third,

17  to include an interim cap of 200,000 for 503(b)(9) claimants;

18  and, fourth, to remain and leave the cap for lien claimants

19  at 125,000.

20         With those changes, Your Honor, we understand the

21  U.S. Trustee's issues with respect to this motion and order

22  are resolved and unless Your Honor has any questions, we

23  request that the relief be entered.

24         THE COURT:  Okay.  I don't have any questions.

25         Mr. Hackman?

 1          MR. HACKMAN:  Yes, Your Honor.  I rise to confirm

 2 that our comments on this motion resolved.

 3          THE COURT:  Okay.  Thank you.

 4          With that, I'm satisfied the requested relief is

 5 appropriate and I will enter the order.

 6          MS. KRANZLEY:  Thank you, Your Honor.  This is one

 7 order where we did not file last evening, so we'll submit a

 8 new order.

 9          THE COURT:  Okay.  Thank you.

10          MS. KRANZLEY:  Item 10 and the agenda and Docket

11 49 is the equity NOL motion.  By this motion, the Debtors are

12 requesting entry of an interim order to establish two things.

13 First, notice an objection procedures related to certain

14 transfers and declarations of worthlessness for federal or

15 state tax purposes, with respect to common or preferred or

16 equity interests in seven Debtors for U.S. taxpayers.  And,

17 second, to direct that any purchased, sale, transfer, or

18 declaration of worthlessness, in violation of the procedures

19 to be null and void.

20          Your Honor, we did serve this motion on all the

21 shareholders of these seven Debtors based on the contact

22 information available to the Debtors.  Similar to the other

23 motions we've discussed with the U.S. Trustee, there were

24 limited comments made to the revised form of order filed last

25 evening at Docket 98, Exhibit (indiscernible).

1          If Your Honor doesn't have any questions, we

2     request entry of this order.

3          THE COURT:  Mr. Hackman, anything from the U.S.

4     Trustee?

5          MR. HACKMAN:  Yeah, this is Ben Hackman for the

6     U.S. Trustee.  Our comments are resolved on this motion, Your

7     Honor.  The change we've requested was increasing the number

8     of days from 14 to 30 that current, substantial shareholders

9     are required to make their initial disclosures.

10         THE COURT:  All right.  Thank you.

11         I don't have any questions.  I'm satisfied the

12     requested relief is appropriate.  I'll enter the order.

13         MS. KRANZLEY:  Thank you, Your Honor.

14         Last item on the agenda is Item 11 and Docket 50,

15     the employee and wages motion.  Your Honor, we're seeking

16     limited relief with respect to the dedicated employees and

17     the newly appointed officers, working under the direction of

18     the newly appointed chief executive officer.  The Debtors are

19     not seeking approval of any severance, retention, incentive,

20     or bonus payments for any employees or insiders.  The Debtors

21     are also not seeking to make any payments to Mr. Sam Bankman-

22     Fried, Mr. Gary Wang, Mr. Nishad Singh, or Ms. Caroline

23     Ellison.

24         The Debtors' limited relief includes payment of

25     prepetition wages, salary, and compensation and benefits, and

1   continuing the compensation and benefit programs in the

2   ordinary course and making any changes, as necessary.

3          Your Honor, we've likewise, worked with the U.S.

4   Trustee and resolved all their objections.  There were a

5   number of changes that were reflected in the revised form of

6   order filed last evening.  First, the Debtors have agreed

7   that the relief in this motion will be sought on an interim

8   basis and then on a final basis at the second day hearing.

9          In paragraph 2 of the proposed form of order, we

10  would clarify that the Debtors are only seeking authority to

11  pay amounts above the 15,000 statutory cap by no more than

12  40,000 in the aggregate.  We've incorporated a new paragraph

13  3 that the new, non-employee director compensation is

14  approved on an interim basis, and, finally, we've agreed with

15  the U.S. Trustee that with respect to the advisory firm

16  obligations to Owl Hill and RLKS Executive Solutions, that we

17  have agreed to remove the request from this motion and will

18  seek approval of these obligations by separate motion.

19          THE COURT:  Okay.  Thank you.

20          MS. KRANZLEY:  Your Honor, with that, we'd ask you

21  to enter the proposed order.

22          THE COURT:  Mr. Hackman, anything?

23          MR. HACKMAN:  I'd confirm that our informal

24  comments are resolved, Your Honor.  Thank you.

25          THE COURT:  Okay.  Thank you.

1           All right.  Again, I'm satisfied the requested

2    relief is appropriate and I will enter the order.

3           MS. KRANZLEY:  Thank you very much, Your Honor.  I

4    believe that that concludes the agenda, so I think the only

5    item is a housekeeping one, scheduling the second day

6    hearing.

7           THE COURT:  Okay.

8           MS. KRANZLEY:  We've been in touch with your

9    chambers and understand that Your Honor is available on

10   January 11th at 10:00 a.m.

11          THE COURT:  Well, if Mr. Cavello says I'm

12   available, I guess I'm available.  So, January 11th, it is.

13          MR. LANDIS:  Your Honor, Adam Landis from Landis

14   Rath & Cobb, I can confirm that you are available.

15          THE COURT:  Okay.  All right.

16          I think we have another housekeeping matter.  We

17   need to schedule the recognition hearing or the U.S. Trustee

18   has an issue?

19          MS. SARKESSIAN:  Your Honor, Juliet Sarkessian, on

20   behalf of the U.S. Trustee.

21          I have some -- I'm sorry, let me take this off --

22   I'll say that again in case it wasn't picked up.  Juliet

23   Sarkessian, on behalf of the U.S. Trustee.

24          Your Honor, I'm worried about waiting until

25   January 11th, was it, to have the second day hearing.  That

1  means that the sealing, all the items that are sealed will

2  continue to be sealed to that -- through that date.  So, Your

3  Honor, I would ask that there be, if possible, a hearing date

4  set, you know, maybe in the week of December the 12th to

5  address, at least, that and, you know, potentially other

6  final orders on some of the other first day -- actually, I

7  don't really see why we shouldn't have the final order and

8  all the rest of the first day relief in December, because the

9  interim order stays in place until we have that final

10 hearing.

11              THE COURT:  Mr. Bromley?

12              MR. BROMLEY:  Your Honor, James Bromley of

13 Sullivan & Cromwell.  Just to be clear, Ms. Sarkessian, are

14 you suggesting only with respect to the sealing we go forward

15 on an earlier date or are you suggesting all the second day?

16              MS. SARKESSIAN:  All of it.

17              MR. BROMLEY:  Because I think we can accommodate

18 with moving -- if we could find a date, perhaps, in the

19 middle of December, just to deal with the sealing and then on

20 the rest of the second day, we could deal with January 11th?

21              MS. SARKESSIAN:  Let me -- if I could have just a

22 minute to speak with my colleague?

23              THE COURT:  All right.  That's fine.

24              And in the meantime, Mr. Shore, you wanted to

25 schedule a recognition hearing?  Have you conferred with the

1  other side about potential dates on that one?

2         MR. SHORE:  No, I thought we were talking about

3  everything in the middle of December, but it just sounded

4  like -- we're fine in the mid-December.  I have a conflict,

5  14th, 15th, 16th in front of Judge Owens and Judge Goldblatt,

6  but other than that, we're kind of available at Your Honor's

7  convenience.

8         THE COURT:  Mr. Bromley, do you have any --

9         MR. BROMLEY:  I apologize to Mr. Shore.  I think

10 we were talking about numbers and not months.  I thought we

11 were talking about January.

12        MR. SHORE:  No, for recognition.

13        MR. BROMLEY:  For recognition.

14        MR. SHORE:  Well, we're going to have to have a

15 discussion.

16        THE COURT:  Yeah, why don't you meet-and-confer on

17 it.  It's going to be an evidentiary hearing, obviously.  I

18 need to make findings of fact and conclusions of law, so make

19 sure that you've left yourself enough time for whatever

20 discovery and you coordinate with other witnesses you're

21 going to need to bring and so forth.

22        MR. SHORE:  Understood, Your Honor.

23        THE COURT:  So, we'll schedule the recognition

24 hearing.  You can contact chambers once you've conferred.

25        MR. SHORE:  Okay.

1          THE COURT:  Ms. Sarkessian, have you --

2      (Pause)

3          MS. SARKESSIAN:  So, Your Honor, I think we can

4  live with having that interim, that hearing in December for

5  just the sealing motion.

6          THE COURT:  Okay.

7          MR. BROMLEY:  Just so that we're clear, we're

8  talking about sealing -- we're talking about the sealing with

9  respect to the motion that we dealt with before the hearing,

10 right?

11         MS. SARKESSIAN:  And the creditor matrix motion

12 and the 30 -- the top-50 and the creditor matrix being

13 sealed.  I don't want that to wait until January to be heard.

14 And then the sealing motion, with respect to the other

15 matter, yes.  (Indiscernible) can also be in December.

16 Anything related to sealing should be in December.

17         MR. BROMLEY:  Well, Your Honor, the issues with

18 respect to the creditor matrix, I believe, are going to

19 require an evidentiary hearing, assuming that we're not going

20 to be able to get over the hump with the U.S. Trustee's

21 Office.  And I do understand that the U.S. Trustee's Office

22 has a policy position on this, so I don't think we're

23 anticipating we're going to get past it.

24         So, I guess the question is, is whether we think

25 that's enough time to have an evidentiary hearing -- to

A000309

1  prepare for and have an evidentiary hearing on those issues.

2         Ms. Sarkessian, I'm sorry, what date did you

3  suggest?

4         MS. SARKESSIAN:  There was some time available the

5  week of December 12th.

6         THE COURT:  That's a month from today, so --

7         MS. SARKESSIAN:  That's a good amount of time.

8         THE COURT:  -- that should be enough time, I would

9  think.

10         MR. BROMLEY:  Do you have -- I'm sorry, Your

11  Honor, during that week, is it -- this is your calendar not

12  the judges.

13         MS. SARKESSIAN:  I can do it any time during the

14  week of the 12th.

15         THE COURT:  I could -- I'm fairly jammed up that

16  week, other than the 16th.

17         MS. SARKESSIAN:  That's good for me.

18         Does that work for you?

19         MR. BROMLEY:  Okay.  I guess we'll take     the

20  16th.

21         MS. SARKESSIAN:  That would be wonderful, Your

22  Honor.  Thank you so much.

23         THE COURT:  Okay.  The 16th and we'll start at

24  10:00 a.m.

25         MS. SARKESSIAN:  Thank you, Your Honor.

1          MR. BROMLEY:  Thank you very much, Your Honor.

2          THE COURT:  All right.  It was going so smoothly

3 until --

4     (Laughter)

5          THE COURT:  Yes?

6          MR. BROWN:  Your Honor, if I may?  Stuart Brown.

7          I was just looking for an objection deadline for

8 the hearing on the 16th in case others wanted to weigh in on

9 the issues.

10          THE COURT:  Let's set the -- let's set it for the

11 9th with replies due on the 14th.

12          MR. BROWN:  Thank you, Your Honor.

13          THE COURT:  Okay.  Anything else, Mr. Bromley?

14          MR. BROMLEY:  That is it for the Debtors, Your

15 Honor.  We want to thank you very much for the time and

16 attention.  We appreciate the effort.

17          THE COURT:  Thank you all for a smooth

18 presentation and a very thorough presentation.  I appreciate

19 it.  You brought me up to speed on the case and I'm glad to

20 hear the parties are cooperating, frankly, with the

21 liquidators and the Debtors here and the Chapter 11,

22 hopefully, that will continue and come to a resolution about

23 how to proceed forward with the sharing of information and

24 recognition and maybe we can avoid the whole hearing in

25 January or whenever it's going to be, because we don't have a

1  date yet for recognition.  Okay.  Well, thank you all very

2  much.  We're adjourned.

3           (Proceedings concluded at 1:08 p.m.)

A000312

1                     CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                November 22, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Mary Zajaczkowski                 November 22, 2022

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Coleen Rand                       November 22, 2022

18   Coleen Rand, CET-341

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF JOHN J. RAY III IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, John J. Ray III, hereby declare under penalty of perjury as follows:

1.      I am the Chief Executive Officer of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), having accepted this position in the early morning hours of November 11, 2022.  I am administering the interests and affairs of the Debtors from my offices in the United States.

2.      My first official act in these roles was to authorize the chapter 11 filings of the Debtors and the commencement of the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3.      Since my appointment, I have worked around the clock with teams of professionals at Alvarez & Marsal, Sullivan & Cromwell, Nardello & Co., Chainalysis, Kroll and a confidential cybersecurity firm, to secure the assets of the Debtors wherever located, to identify reliable books and records, to assemble the information necessary to provide to this Court, and to respond to numerous inquiries from multiple regulators and government authorities including the

---

[1]     The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

4892-0827-0654 v.2

A000314

U.S. Commodity Futures Trading Commission ("<u>CFTC</u>"), the U.S. Attorney's Office for the Southern District of New York, the U.S. Securities and Exchange Commission ("<u>SEC</u>"), and the U.S. Congress, among others.

4.      I have over 40 years of legal and restructuring experience.  I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history.  I have supervised situations involving allegations of criminal activity and malfeasance (Enron).  I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding).  Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.

5.      Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

6.      These Chapter 11 Cases have five core objectives:

(a)      **Implementation of Controls**:  the implementation of accounting, audit, cash management, cybersecurity, human resources, risk management, data protection and other systems that did not exist, or did not exist to an appropriate degree, prior to my appointment;

(b)      **Asset Protection & Recovery**:  the location and security of property of the estate, a substantial portion of which may be missing or stolen;

(c)      **Transparency and Investigation**:  the pending, comprehensive, transparent and deliberate investigation into claims against Mr. Samuel Bankman-Fried, the other co-founders of the Debtors and third parties, in

-2-

A000315

coordination with regulatory stakeholders in the United States and around the world;

(d) **Efficiency and Coordination:** cooperation and coordination with insolvency proceedings of subsidiary companies in other jurisdictions; and

(e) **Maximization of Value:** the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and digital and physical property.

These proceedings in the District of Delaware are the appropriate means to accomplish each of these objectives.

7. Except as otherwise indicated herein, all facts set forth in this declaration (the "Declaration") are based on my personal knowledge, my review of relevant materials in the Debtors' files or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial affairs. I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors.

8. For the reasons explained below, the Debtors expect to provide supplemental declarations as to the subject matter of this Declaration in connection with future motions as more information becomes available to the Debtors, stakeholders and the Court.

## I.     THE PREPETITION DEBTORS

### A.     Corporate Organization and Identification of Four Silos

9. For purposes of managing the Debtors' affairs, I have identified four groups of businesses, which I refer to as "Silos." These Silos include: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries (the "WRS Silo"), which includes the businesses known as "FTX US," "LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among other businesses; (b) a group composed of Debtor Alameda Research LLC and its Debtor subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor

-3-

A000316

Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "<u>Ventures Silo</u>"); and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries (the "<u>Dotcom Silo</u>"), including the exchanges doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions.  These Silos together are referred to by me as the "FTX Group."

10.     Each of the Silos was controlled by Mr. Bankman-Fried.[2]  Minority equity interests in the Silos were held by Zixiao "Gary" Wang and Nishad Singh, the co-founders of the business along with Mr. Bankman-Fried.  The WRS Silo and Dotcom Silo also have third party equity investors, including investment funds, endowments, sovereign wealth funds and families. To my knowledge, no single investor other than the co-founders owns more than 2% of the equity of any Silo.[3]

11.     The diagram attached as <u>Exhibit A</u> provides a visual summary of the Silos and the indicative assets in each Silo.  <u>Exhibit B</u> contains a preliminary corporate structure chart. These materials were prepared at my direction based on information available at this time and are subject to revision as our investigation into the affairs of the FTX Group continues.

## B.      The WRS Silo

12.     The WRS Silo includes FTX US, an exchange for spot trading in digital assets and tokens.  FTX US was founded in January 2020.  FTX US is available to U.S. users

---

[2]     To my knowledge, Mr. Bankman-Fried owns (a) directly, approximately 53% of the equity in Debtor West Realm Shires Inc.; (b) indirectly, approximately 75% of the equity in Debtor FTX Trading Ltd.; (c) directly, approximately 90% of the equity in Debtor Alameda Research LLC; and (d) directly, approximately 67% of the equity in Clifton Bay Investments LLC.

[3]     Based on the information provided to me, the only Debtors that have received third party equity investments are Debtor FTX Trading Ltd. (Dotcom Silo) and Debtor West Realm Shires Inc. (WRS Silo).  To my knowledge, (a) approximately 25% of the equity in Debtor FTX Trading Ltd. is owned by a dispersed group of approximately 600 third party equity investors and (b) approximately 22.25% of the equity in Debtor West Realm Shires Inc. is owned by a dispersed group of approximately 570 third party equity investors.  FTX Trading Ltd also acquired 51% of Blockfolio, Inc. in 2020, with the remaining 49% of Blockfolio, Inc. owned by the original shareholders.

-4-

and, according to statements by Mr. Bankman-Fried, had approximately one million users as of

August 2022.  FTX US's spot exchange is registered with the Department of the Treasury (via

the Financial Crimes Enforcement Network) as a money services business and holds a series of

state money transmission licenses in the United States.

13.     The WRS Silo also owns 100% of the equity interests in the LedgerX

business, which is operated by non-Debtor LedgerX LLC (d/b/a FTX US Derivatives)

("LedgerX").  LedgerX offers futures, options, and swaps contracts on digital assets and other

commodities to both U.S. and non-U.S. persons.  LedgerX operates with licenses from the

CFTC.  Based on the information that I have reviewed at this time, LedgerX is solvent.

14.     The WRS Silo also owns 100% of the equity interests in non-Debtor FTX

Capital Markets LLC, which is an SEC-registered broker-dealer.  Based on the information that I

have reviewed at this time, FTX Capital Markets LLC is solvent.

15.     The WRS Silo also owns 100% of the equity interests in non-Debtor

Embed Financial Technologies Inc., as well as its wholly-owned non-Debtor subsidiary Embed

Clearing LLC, which operates as a securities clearing firm and is an SEC-registered broker-

dealer.  Based on the information that I have reviewed at this time, each of these non-Debtor

entities is solvent.

16.     The WRS Silo also owns 100% of the equity interests in FTX Value Trust

Company, a South Dakota Trust Company, which provides custodial services.  Based on the

information that I have reviewed at this time, this non-Debtor company is solvent.

17.     The WRS Silo also owns 100% of other Debtor and non-Debtor

companies operating miscellaneous businesses, such as video game development and a market

place for trading non-fungible tokens.  Finally, the WRS Silo has made loans and investments,

-5-

A000318

including a loan of FTT tokens to BlockFi Inc. in a principal amount of FTT tokens valued at $250 million as of September 30, 2022.

18.    I have been provided with an unaudited consolidated balance sheet for the WRS Silo as of September 30, 2022, which is the latest balance sheet available.  The balance sheet shows $1.36 billion in total assets as of that date.  However, because this balance sheet was produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it, and the information therein may not be correct as of the date stated.

19.    The chart below summarizes certain information regarding the WRS Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| WRS Silo Consolidated Assets as of September 30, 2022 | |
|---|---|
| *Current Assets* | |
| Cash and Cash Equivalents | $144,207 |
| Restricted Cash | $267,738 |
| U.S. Dollar Denominated Stablecoins | $68,035 |
| Customer Custodial Funds | $102,225 |
| Accounts Receivable | $2,978 |
| Accounts Receivable, Related Party | $71,563 |
| Loans Receivable | $250,000 |
| Prepaid Expenses and Other Current Assets | $21,448 |
| Crypto Assets Held at Fair Value | $1,026 |
| **Total Current Assets** | **$929,220** |
| Property and Equipment, Net | $2,017 |
| Other Non-Current Assets | $429,428 |
| **Total Assets** | **$1,360,665** |

(1)    Amounts shown in thousands of U.S. Dollars.

(2)    In the above table, assets shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)    Restricted cash at the WRS Silo is primarily comprised of approximately $250 million in restricted funds at non-Debtor LedgerX.

(4)    Customer custodial fund assets are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited were not recorded as assets on the balance sheet and are not presented**.

(5)    Loans receivable of $250 million consists of a loan by Debtor West Realm Shires Inc. to BlockFi Inc. of $250 million in FTT tokens.

(6)    Intangible assets (in the amount of $229 million) are not reflected above.  These consist of values attributable to customer relationships and trade names.

-6-

A000319

(7)     Goodwill balance (in the amount of $135 million) is not reflected above.

20.     To my knowledge, the WRS Silo Debtors do not have any long-term or funded debt.  The WRS Silo Debtors are expected to have significant liabilities arising from crypto assets deposited by customers through the FTX US platform.  However, such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried.  The chart below summarizes certain information regarding the WRS Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| WRS Silo Consolidated Liabilities as of September 30, 2022 | |
| --- | --- |
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $6,014 |
| Accounts Payable, Related Party | $124,221 |
| Custodial Funds Due to Customers | $102,225 |
| Purchase Consideration Payable | — |
| Loan Payable | — |
| Lease Liability, Current | $1,672 |
| Crypto Asset Borrowings at Fair Value | $1,737 |
| **Total Current Liabilities** | **$235,869** |
| Lease Liability, Non-Current | $9,399 |
| Deferred Taxes | $20,185 |
| Contract Liability | $887 |
| SAFE Note, Related Party, Non-Current | $50,000 |
| Other Non-Current Liabilities | — |
| **Total Liabilities** | **$316,014** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, liabilities shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)     Customer custodial fund liabilities are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited are not presented.**

21.     All Debtors and non-Debtors in the WRS Silo are organized in the State of Delaware, other than non-Debtor FTX Vault Trust Company, which is a South Dakota Trust Company.

### C.    The Alameda Silo

22.    The parent company and primary operating company in the Alameda Silo is Alameda Research LLC, which is organized in the State of Delaware.  Before the Petition Date (as defined below), the Alameda Silo operated quantitative trading funds specializing in crypto assets.  Strategies included arbitrage, market making, yield farming and trading volatility.  The Alameda Silo also offered over-the-counter trading services, and made and managed other debt and equity investments.  In short, the Alameda Silo was a "crypto hedge fund" with a diversified business trading and speculating in digital assets and related loans and securities for the account of its owners, Messrs. Bankman-Fried (90%) and Wang (10%).

23.    Alameda Research LLC prepared consolidated financial statements on a quarterly basis.  To my knowledge, none of these financial statements have been audited.  The September 30, 2022 balance sheet for the Alameda Silo shows $13.46 billion in total assets as of its date.  However, because this balance sheet was unaudited and produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it and the information therein may not be correct as of the date stated.

24.    The chart below summarizes certain information regarding the Alameda Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| Alameda Silo Consolidated Assets as of September 30, 2022 | |
| --- | --- |
| *Current Assets* | |
| Cash and Cash Equivalents | $547,964 |
| Restricted Cash | - |
| U.S. Dollar Denominated Stablecoins | - |
| Customer Custodial Funds | - |
| Investments | $3,976,632 |
| Accounts Receivable | $10,845 |
| Accounts Receivable, Related Party | $427,323 |
| Loans Receivable | $41,607 |
| Loans Receivable, Related Party | $4,102,365 |
| Prepaid Expenses and Other Current Assets | $1,083 |
| Crypto Assets Held at Fair Value | $4,084,886 |

-8-

A000321

| | |
|---|---|
| **Total Current Assets** | **$13,192,706** |
| Property and Equipment, Net | $26,763 |
| Other Non-Current Assets | $239,696 |
| **Total Assets** | **$13,459,165** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

(3)     Related Party Loans Receivable of $4.1 billion at Alameda Research (consolidated) consisted primarily of a loan by Euclid Way Ltd. to Paper Bird Inc. (a Debtor) of $2.3 billion and three loans by Alameda Research Ltd.: one to Mr. Bankman-Fried, of $1 billion; one to Mr. Singh, of $543 million; and one to Ryan Salame, of $55 million.

25.     The chart below summarizes certain information regarding the Alameda

Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| Alameda Silo<br>Consolidated Liabilities as of September 30, 2022 | |
|---|---|
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $916,305 |
| Accounts Payable, Related Party | $75,900 |
| Custodial Funds Due to Customers | $309,634 |
| Purchase Consideration Payable | - |
| Loans Payable | - |
| Loans Payable, Related Party | $13,762 |
| Lease Liability, Current | - |
| Crypto Asset Borrowings at Fair Value | $3,773,979 |
| **Total Current Liabilities** | **$5,089,579** |
| Lease Liability, Non-Current | - |
| Deferred Taxes | - |
| Contract Liability | - |
| SAFE Note, Related Party, Non-Current | - |
| Other Non-Current Liabilities | - |
| **Total Liabilities** | **$5,089,579** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

26.     As mentioned above, Alameda Research LLC is organized in the State of

Delaware.  The other Debtors in the Alameda Silo are organized in Delaware, Korea, Japan, the

British Virgin Islands, Antigua, Hong Kong, Singapore, the Seychelles, the Cayman Islands, the

Bahamas, Australia, Panama, Turkey and Nigeria.

-9-

A000322

### D.    The Ventures Silo

27.    The Debtors in the Ventures Silo make and manage private investments. The investments are held in Debtors Clifton Bay Investments, LLC, Clifton Bay Investments Ltd., FTX Ventures Ltd., Island Bay Ventures Inc. and, potentially, affiliated companies.

28.    To my knowledge, Debtors Clifton Bay Investments, LLC and FTX Ventures Ltd. prepared financial statements on a quarterly basis.  The September 30, 2022 balance sheet for Debtor Clifton Bay Investments LLC shows assets with a total value of $1.52 billion as of its date, and the September 30, 2022 balance sheet for FTX Ventures Ltd. shows assets with a total value of $493 million as of its date.  To my knowledge, none of these financial statements have been audited.  Because these balance sheets were unaudited and produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in them, and the information therein may not be correct as of the date stated.

29.    I have not been able to locate financial statements for Island Bay Ventures Inc.

30.    The chart below summarizes certain information regarding the Ventures Silo's assets as reflected in the September 30, 2022 balance sheets, excluding any assets held by Island Bay Ventures Inc.

| Ventures Silo Consolidated Assets as of September 30, 2022 | | |
|---|---|---|
| | **Clifton Bay Investments LLC (consolidated)** | **FTX Ventures Ltd** |
| *Current Assets* | | |
| Cash and Cash Equivalents | $245 | $261 |
| Restricted Cash | - | - |
| U.S. Dollar Denominated Stablecoins | - | - |
| Customer Custodial Funds | - | - |
| Investments | $1,492,856 | $397,861 |
| Accounts Receivable | - | - |
| Accounts Receivable, Related Party | $10,200 | - |

-10-

| | | |
|---|---|---|
| Loans Receivable | $16,810 | - |
| Loans Receivable, Related Party | - | - |
| Prepaid Expenses and Other Current Assets | - | - |
| Crypto Assets Held at Fair Value | - | $95,337 |
| **Total Current Assets** | **$1,520,111** | **$493,459** |
| Property and Equipment, Net | - | - |
| Other Non-Current Assets | - | - |
| **Total Assets** | **$1,520,111** | **$493,459** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

31.     The chart below summarizes certain information regarding the Ventures Silo's liabilities as reflected in the September 30, 2022 balance sheets excluding any liabilities of Island Bay Ventures Inc.:

| Ventures Silo Consolidated Liabilities as of September 30, 2022 | | |
|---|---|---|
| | **Clifton Bay Investments LLC (Consolidated)** | **FTX Ventures Ltd** |
| *Current Liabilities* | | |
| Accounts Payable and Accrued Expenses | $44 | - |
| Accounts Payable, Related Party | $1,519,283 | $129,518 |
| Custodial Funds Due to Customers | - | - |
| Purchase Consideration Payable | - | - |
| Loans Payable | - | - |
| Loans Payable, Related Party | - | $362,915 |
| Lease Liability, Current | - | - |
| Crypto Asset Borrowings at Fair Value | - | - |
| **Total Current Liabilities** | **$1,519,326** | **$492,432** |
| Lease Liability, Non-Current | - | - |
| Deferred Taxes | - | - |
| Contract Liability | - | - |
| SAFE Note, Related Party, Non-Current | - | - |
| Other Non-Current Liabilities | - | - |
| **Total Liabilities** | **$1,519,326** | **$492,432** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

(3)     Related Party Accounts Payable at Clifton Bay Investments LLC consists of four related-party balances: one with Debtor Alameda Research Ltd, of $1,400 million; one with Debtor Alameda Research LLC, of $68.6 million; one with Debtor Alameda Ventures Ltd, of $38.5 million; and one with Debtor West Realm Shires Services Inc. of $2.25 million.

-11-

(4)   Customer custodial fund liabilities are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited are not presented**.

32.   All Debtors in the Ventures Silo are organized in the State of Delaware or the British Virgin Islands.

### E.   The Dotcom Silo

33.   The Dotcom Silo includes FTX.com, the trade name for the business conducted by the parent company in the Dotcom Silo, FTX Trading Ltd., which is organized in Antigua.  FTX.com is a digital asset trading platform and exchange.  It was founded by Messrs. Bankman-Fried, Wang and Singh and commenced operations in May 2019.  The Dotcom Silo also holds certain marketplace licenses and registrations in certain non-U.S. jurisdictions, including the European Union and Japan.  The FTX.com platform is not available to U.S. users.

34.   In addition to its core digital asset exchange, the Dotcom Silo offered an off-exchange portal that enabled users to connect and request quotes for spot digital assets and trade directly.  The portal enabled users to lend their digital assets to other users for spot trading and matched users wanting to borrow with those willing to lend.

35.   The FTX.com platform grew quickly since its launch to become one of the largest cryptocurrency exchanges in the world.  Mr. Bankman-Fried claimed that, by the end of 2021, around $15 billion of assets were on the platform, which according to him handled approximately 10% of global volume for crypto trading at the time.  Mr. Bankman-Fried also claimed that FTX.com, as of July 2022, had "millions" of registered users.  These figures have not been verified by my team.

36.   The Dotcom Silo's unaudited consolidated balance sheet as of September 30, 2022 is the latest balance sheet that was provided to me with respect to the Dotcom Silo.  It shows total assets of $2.25 billion as of September 30, 2022.  Because such balance sheet was

-12-

A000325

produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it, and the information therein may not be correct as of the date stated.

37.     The chart below summarizes certain information regarding the Dotcom Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| Dotcom Silo Consolidated Assets as of September 30, 2022 | |
| --- | --- |
| *Current Assets* | |
| Cash and Cash Equivalents | $483,724 |
| Restricted Cash | $10,188 |
| U.S. Dollar Denominated Stablecoins | $1,140,795 |
| Customer Custodial Funds | – |
| Accounts Receivable | $9,459 |
| Accounts Receivable, Related Party | $188,155 |
| Loans Receivable | $103,949 |
| Prepaid Expenses and Other Current Assets | $42,661 |
| Crypto Assets Held at Fair Value | $659 |
| **Total Current Assets** | **$1,979,590** |
| Property and Equipment, Net | $256,996 |
| Other Non-Current Assets | $22,148 |
| **Total Assets** | **$2,258,734** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     The balance sheet for non-Debtor FTX Digital Markets Ltd. is consolidated to Debtor FTX Trading Ltd.'s balance sheet.  The September 30, 2022 Balance Sheet of non-Debtor FTX Digital Markets Ltd. reflects an asset position of $149,336, as follows: Cash and Cash Equivalents ($82,564), Restricted Cash ($10,000), U.S. Dollar Denominated Stablecoins ($63), Related Party Receivables ($45,944), Prepaid Expenses and Other Current Assets ($4,922), Property and Equipment, Net ($5,565) and Other Non-Current Assets ($278) (amounts in thousands of U.S. Dollars).

(3)     Non-debtor FTX Digital Markets Ltd. has a net intercompany accounts payable of $30 million due to entities controlled by Debtor FTX Trading Ltd.

(4)     In the above table, assets shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(5)     Customer custodial fund assets are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited are not presented.**

(6)     Loans Receivable of $250 million at FTX US consists of a loan to BlockFi Inc. of $250 million in FTT tokens.

(7)     Intangible assets (in the amount of $343 million) are not reflected above.  These consist of values attributable to customer relationships and trade names.

(8)     Goodwill balance (in the amount of $359 million) is not reflected above.

38.     To my knowledge, the Dotcom Silo Debtors do not have any long-term or funded debt.  The Dotcom Silo Debtors may have significant liabilities to customers through the

-13-

A000326

FTX.com platform. However, such liabilities are not reflected in the financial statements prepared by these companies while they were under the control of Mr. Bankman-Fried. The chart below summarizes certain information regarding the Dotcom Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| Dotcom Silo Consolidated Liabilities as of September 30, 2022 | |
| --- | --- |
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $38,970 |
| Accounts Payable, Related Party | $125,626 |
| Custodial Funds Due to Customers | – |
| Purchase Consideration Payable | $26,970 |
| Loan Payable | $124,298 |
| Lease Liability, Current | $23 |
| Crypto Asset Borrowings at Fair Value | $149,723 |
| **Total Current Liabilities** | **$465,610** |
| Lease Liability, Non-Current | – |
| Deferred Taxes | – |
| Contract Liability | – |
| SAFE Note, Related Party, Non-Current | – |
| Other Non-Current Liabilities | $46 |
| **Total Liabilities** | **$465,656** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, liabilities shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)     The balance sheet for non-Debtor FTX Digital Markets Ltd. is consolidated to Debtor FTX Trading Ltd.'s balance sheet. The September 30, 2022 Balance Sheet of non-Debtor FTX Digital Markets Ltd. reflects total liabilities in the amount of $1,278, as follows: Accounts Payable and Accrued Expenses ($1,259), Accounts Payable, Related Party ($19) (amounts in thousands of U.S. Dollars).

(4)     Customer custodial fund liabilities are comprised of fiat customer deposit balances. **Balances of customer crypto assets deposited were not recorded as assets on the balance sheet and are not presented.**

39.     The Debtors in the Dotcom Silo are organized in jurisdictions around the world, with the parent company FTX Trading Ltd. organized in Antigua. The Debtors in the Dotcom Silo also own 100% of the equity interests in over a dozen non-Debtor companies.

## II.     EVENTS LEADING TO CHAPTER 11 FILING

40.     The Debtors faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11, 2022, and in the case of Debtor

-14-

A000327

West Realm Shires Inc., on November 14, 2022 (collectively, the "Petition Date"). In the days leading up to the Petition Date, certain of the circumstances described in Part III below became known to a broader set of executives of the FTX Group beyond Mr. Bankman-Fried and members of his inner circle. Questions arose about Mr. Bankman-Fried's leadership and the handling of the Debtors' complex array of assets and businesses.

41.     As the situation became increasingly dire, Sullivan & Cromwell and Alvarez & Marsal were engaged to provide restructuring advice and services to the Debtors.

42.     On November 10, 2022, the Securities Commission of the Bahamas (the "SCB") took action to freeze assets of non-Debtor FTX Digital Markets Ltd., a service provider to FTX Trading Ltd. and the employer of certain current and former executives and staff in the Bahamas. Mr. Brian Simms, K.C. was appointed as provisional liquidator of FTX Digital Markets Ltd. on a sealed record. The provisional liquidator for this Bahamas subsidiary has filed a chapter 15 petition seeking recognition of the provisional liquidation proceeding in the Bankruptcy Court for the Southern District of New York.

43.     In addition, in the first hours of November 11, 2022 EST, the directors of non-Debtors FTX Express Pty Ltd and FTX Australia Pty Ltd., both Australian entities, appointed Messrs. Scott Langdon, John Mouawad and Rahul Goyal of KordaMentha Restructuring as voluntary administrators.

44.     At the same time, negotiations were being held between certain senior individuals of the FTX Group and Mr. Bankman-Fried concerning the resignation of Mr. Bankman-Fried and the commencement of these Chapter 11 Cases. Mr. Bankman-Fried consulted with numerous lawyers, including lawyers at Paul, Weiss, Rifkind, Wharton & Garrison LLP, other legal counsel and his father, Professor Joseph Bankman of Stanford Law

-15-

A000328

School. A document effecting a relinquishment of control was prepared and comments from Mr.

Bankman-Fried's team incorporated. At approximately 4:30 a.m. EST on Friday, November 11,

2022, after further consultation with his legal counsel, Mr. Bankman-Fried ultimately agreed to

resign, resulting in my appointment as the Debtors' CEO. I was delegated all corporate powers

and authority under applicable law, including the power to appoint independent directors and

commence these Chapter 11 Cases on an emergency basis.

45.     Other than the proceedings in the Bahamas and Australia, to my

knowledge, no other Debtor or non-Debtor subsidiary is subject to other insolvency proceedings

at this time.

## III.     ACTION TAKEN SINCE MR. BANKMAN-FRIED'S DEPARTURE

### A.     New Governance Structure

46.     Many of the companies in the FTX Group, especially those organized in

Antigua and the Bahamas, did not have appropriate corporate governance. I understand that

many entities, for example, never had board meetings.

47.     The following new independent directors (the "Directors") have been

appointed as directors of the primary companies in the FTX Group:

(a)     **WRS Silo:  Mitchell I. Sonkin:** Mitchell Sonkin is currently a Senior
Advisor to MBIA Insurance Corporation in connection with the
restructuring of the Firm's insured portfolio exposure of the
Commonwealth of Puerto Rico's $72 billion of outstanding debt. He is
also currently Chairman of the Board of the ResCap Liquidating Trust,
successor to ResCap and GMAC Mortgage Corporations. Before joining
MBIA, Mr. Sonkin was a senior partner at the international law firm, King
& Spalding, where he was co-chair of King & Spalding's Financial
Restructuring Group and a member of the firm's Policy Committee. He
has over 40 years of experience in U.S. and international bond issuances,
corporate reorganizations, bankruptcies and other debt restructurings and
has served as a bankruptcy-court-appointed examiner. In particular, he has
played a significant role in numerous municipal, utility, insurance, airline,
healthcare debt and international debt restructurings including the
Anglo/French Euro Tunnel debt reorganization.

-16-

A000329

(b) **<u>Alameda Silo:  Matthew R. Rosenberg</u>:**  Mr. Rosenberg is a Partner at Lincoln Park Advisors, a financial advisory firm that he founded in 2014. He has more than 25 years of restructuring, corporate finance, principal investing, operating and board experience. Prior to founding Lincoln Park Advisors, he was a partner at the restructuring and investment banking firm Chilmark Partners, a partner in two private equity funds, the Zell/Chilmark Fund and Chilmark Fund II, the Chief Restructuring Officer of The Wellbridge Company and a member of multiple corporate boards. His restructuring advisory experience includes such companies as OSG, Supermedia, Nortel, Trinity Coal, USG Corporation, JHT Holdings, Inc., Covanta Energy, Sirva, Lodgian, Inc., ContiGroup Companies, Inc., Fruit of the Loom, Ltd. and Recycled Paper Greetings.

(c) **<u>Ventures Silo:  Rishi Jain</u>:**  Mr. Jain is a Managing Director and Co-Head of the Western Region of Accordion, a financial and technology consulting firm focused on the private equity industry. He has more than 25 years of experience supporting management teams and leading finance and operations initiatives in both stressed and distressed environments. Prior to joining Accordion, Mr. Jain was part of Alvarez & Marsal's corporate restructuring and turnaround practice for over 10 years and served in a variety of senior financial operating roles. His most notable assignments have included helping lead the restructuring, liquidation and wind down of Washington Mutual and its predecessor entity, WMI Liquidating Trust. He also navigated the restructuring of Global Geophysical Services in its chapter 11 and eventually the liquidation and wind down in its second chapter 11 filing.

(d) **<u>Dotcom Silo:  The Honorable Joseph J. Farnan (Lead Independent Director)</u>:**  Mr. Farnan served as a United States District Judge for the District of Delaware from 1985 to 2010. He served as Chief Judge from 1997-2001. During his tenure, Mr. Farnan presided over numerous bench and jury trials involving complex commercial disputes. Prior to his appointment to the federal bench, Mr. Farnan was appointed to several positions in local, state and the federal government returning to private practice in 2010 with the formation of Farnan LLP, a law firm focused on complex commercial matters, including chapter 11 proceedings, securities litigation, antitrust litigation and patent litigation. Additionally, Mr. Farnan serves as an arbitrator, mediator, independent director and trustee of businesses contemplating or filing chapter 11 bankruptcy.

(e) **<u>Dotcom Silo:  Matthew A. Doheny</u>:**  Mr. Doheny is President of North Country Capital LLC, an advisory and investment firm focused on challenging advisory assignments and investing private investment portfolios in special situation opportunities. He has held this position since January 2011. Mr. Doheny has served on the board of directors or as Chief Restructuring Officer of numerous stressed and distressed companies, including Yellow Corp., MatlinPatterson, GMAC Rescap and Eastman

-17-

A000330

Kodak. He was also Managing Director and Head of Special Situations Investing at HSBC Securities Inc. from 2015 to 2017. Previously, Mr. Doheny served as Portfolio Manager in Special Situations at Fintech Advisory Inc. from 2008 to 2010 and as Managing Director of the Distressed Products Group at Deutsche Bank Securities Inc. from 2000 to 2008.

48.     The appointment of the Directors will provide the FTX Group with appropriate corporate governance for the first time.

49.     The Directors intend to hold joint board meetings of the Debtors on matters of common interest, including (a) the implementation of controls, (b) asset protection and recovery, (c) the investigation into claims against the founders and third parties, (d) cooperation with insolvency proceedings of subsidiary companies in other jurisdictions and (e) the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and property around the world.  The Directors will implement appropriate procedures for the resolution of any conflicts of interest among the Silos and, if necessary, within the Silos as the case progresses, including the potential engagement of independent counsel to represent various Debtors in the resolution of intercompany claims against other Debtors.  I expect there to be a multitude of intercompany claims that will benefit from fair resolution under the rules and conventions of U.S. chapter 11 practice in the District of Delaware for complex, multi-Debtor cases.  For the time being, my belief is that all stakeholders are best served by a coordinated and centralized administration.

## B.     Cash Management

50.     The FTX Group did not maintain centralized control of its cash.  Cash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners

around the world.  Under my direction, the Debtors are establishing a centralized cash management system with proper controls and reporting mechanisms.

51.     During these Chapter 11 Cases, cash that the Debtors are able to locate and transfer to the United States without adverse consequences, including substantially all proceeds of the global reorganization effort, will be deposited into financial institutions in the United States that are approved depository institutions in accordance with the U.S. Trustee Guidelines.  Each Silo will have a centralized cash pool, and the Debtors will implement appropriate arrangements for allocating costs across the various Silos and Debtors.  The Debtors expect to file promptly a Cash Management Motion that will describe the new cash management system in more detail.

52.     Because of historical cash management failures, the Debtors do not yet know the exact amount of cash that the FTX Group held as of the Petition Date.  The Debtors are working with Alvarez & Marsal to verify all cash positions.  To date, it has been possible to approximate the following balances as of the Petition Date based on available books and records:

| Entity | Unrestricted Cash | Custodial Cash | Other Restricted Cash | Total Cash |
|---|---|---|---|---|
| **_Debtor Entities_** | | | | |
| FTX EU Ltd | $1,250,848 | $47,925,646 | $175,832 | $49,352,327 |
| West Realm Shires Services Inc. | $32,233,606 | $14,596,119 | $1,270,700 | $48,100,425 |
| West Realm Shires Inc. | $35,411,619 | - | - | $35,411,619 |
| Paper Bird Inc | $7,906,893 | - | - | $7,906,893 |
| FTX Exchange FZE | $1,812,563 | - | $4,000,000 | $5,812,563 |
| Ledger Holdings Inc. | $4,098,480 | - | - | $4,098,480 |
| FTX TURKEY TEKNOLOJİ VE TİCARET ANONİM ŞİRKET | $36,682 | $3,069,526 | - | $3,106,208 |
| FTX Europe AG | $2,979,584 | - | - | $2,979,584 |
| FTX Trading Ltd | $375,726 | $2,600,324 | - | $2,976,050 |
| Maclaurin Investments Ltd. | $2,529,814 | - | - | $2,529,814 |
| Blockfolio, Inc. | $2,396,067 | - | - | $2,396,067 |
| Ledger Prime LLC | $2,230,765 | - | - | $2,230,765 |
| Crypto Bahamas LLC | $900,000 | - | - | $900,000 |
| FTX Ventures Ltd | $779,542 | - | - | $779,542 |
| West Realm Shires Financial Services Inc. | $576,831 | - | - | $576,831 |
| FTX Lend Inc. | $484,738 | - | - | $484,738 |
| FTX Trading GmbH | $146,059 | - | - | $146,059 |
| FTX Switzerland GmbH | $16,799 | - | - | $16,799 |

-19-

A000332

| Entity | Unrestricted Cash | Custodial Cash | Other Restricted Cash | Total Cash |
|---|---|---|---|---|
| **Total Debtor Entities** | **$96,166,614** | **$68,191,615** | **$5,446,532** | **$169,804,762** |
| *Non-Debtor Entities* | | | | |
| LedgerX LLC | $13,644,269 | $24,103,085 | $265,603,056 | $303,350,409 |
| FTX Digital Markets Ltd | - | - | $49,999,600 | $49,999,600 |
| Embed Clearing LLC. | - | - | $29,978,776 | $29,978,776 |
| FTX Philanthropy Inc | $10,877,387 | - | - | $10,877,387 |
| Embed Financial Technologies Inc | $395,371 | - | - | $395,371 |
| **Total Non-Debtor Entities** | **$24,917,027** | **$24,103,085** | **$345,581,432** | **$394,601,543** |
| **Total** | **$121,083,641** | **$92,294,700** | **$351,027,964** | **$564,406,305** |

53. The Debtors have been in contact with banking institutions that they believe hold or may hold Debtor cash. These banking institutions have been instructed to freeze withdrawals and alerted not to accept instructions from Mr. Bankman-Fried or other signatories. Proper signature authority and reporting systems are expected to be arranged shortly.

54. Effective cash management also requires liquidity forecasting, which I understand was also generally absent from the FTX Group historically. The Debtors are putting in place the systems and processes necessary for Alvarez & Marsal to produce a reliable cash forecast as well as the cash reporting required for Monthly Operating Reports under the Bankruptcy Code.

## C. Financial Reporting

55. The FTX Group received audit opinions on consolidated financial statements for two of the Silos – the WRS Silo and the Dotcom Silo – for the period ended December 31, 2021. The audit firm for the WRS Silo, Armanino LLP, was a firm with which I am professionally familiar. The audit firm for the Dotcom Silo was Prager Metis, a firm with which I am not familiar and whose website indicates that they are the "first-ever CPA firm to officially open its Metaverse headquarters in the metaverse platform Decentraland."[4]

---

[4] https://pragermetis.com/news/prager-metis-opens-first-ever-cpa-firm-metaverse/.

-20-

56.     I have substantial concerns as to the information presented in these audited financial statements, especially with respect to the Dotcom Silo.  As a practical matter, I do not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances of these Silos.

57.     The Debtors have not yet been able to locate any audited financial statements with respect to the Alameda Silo or the Ventures Silo.

58.     The Debtors are locating and securing all available financial records but expect it will be some time before reliable historical financial statements can be prepared for the FTX Group with which I am comfortable as Chief Executive Officer.  The Debtors do not have an accounting department and outsource this function.

### D.     Human Resources

59.     The FTX Group's approach to human resources combined employees of various entities and outside contractors, with unclear records and lines of responsibility.  At this time, the Debtors have been unable to prepare a complete list of *who* worked for the FTX Group as of the Petition Date, or the terms of their employment.  Repeated attempts to locate certain presumed employees to confirm their status have been unsuccessful to date.

60.     Nevertheless, there is a core team of dedicated employees at the FTX Group who have stayed focused on their jobs during this crisis and with whom I have established appropriate lines of authority and working relationships.  The Debtors continue to review personnel issues but I expect, based on my experience and the nature of the Debtors' business, that a large number of employees of the Debtors will need to continue to work for the Debtors for the foreseeable future in order to establish accountability, preserve value and maximize stakeholder recoveries after the departure of Mr. Bankman-Fried.  As Chief Executive Officer, I am thankful for the extraordinary efforts of this group of employees, who despite difficult

-21-

personal circumstances, have risen to the occasion and demonstrated their critical importance to the Debtors.

61.     The Debtors are preparing one or more motions to address issues relating to continuing employees and contractors.  The Debtors also may hire new employees and officers with turnaround or other relevant experience in core functions where I determine that new leadership is required.  I anticipate that the Debtors will be able to file these motions in the coming days.

### E.     Disbursement Controls

62.     The Debtors did not have the type of disbursement controls that I believe are appropriate for a business enterprise.  For example, employees of the FTX Group submitted payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis.

63.     In the Bahamas, I understand that corporate funds of the FTX Group were used to purchase homes and other personal items for employees and advisors.  I understand that there does not appear to be documentation for certain of these transactions as loans, and that certain real estate was recorded in the personal name of these employees and advisors on the records of the Bahamas.

64.     The Debtors now are implementing a centralized disbursement approval process that reports to me as Chief Executive Officer.

### F.     Digital Asset Custody

65.     The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets.  Mr. Bankman-Fried and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries).  Unacceptable

-22-

management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

        66.     The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases.  The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos.  The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined.  These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.

        67.     In response, the Debtors have engaged forensic analysts to identify potential Debtor assets on the blockchain, cybersecurity professionals to identify the parties responsible for the unauthorized transactions on and after the Petition Date and investigators to begin the process of identifying what may be very substantial transfers of Debtor property in the

days, weeks and months prior to the Petition Date.  The Debtors' team includes business, accounting, forensic, technical and legal resources that I believe are among the best in the world at these activities.  It is my expectation that the Debtors will require assistance from the Court with respect to these matters as the investigation and these Chapter 11 Cases continue.

68.     Although the investigation has only begun and must run its course, it is my view based on the information obtained to date, that many of the employees of the FTX Group, including some of its senior executives, were not aware of the shortfalls or potential commingling of digital assets.  Indeed, I believe some of the people most hurt by these events are current and former employees and executives, whose personal investments and reputations have suffered.  These are many of the same people whose work will be necessary to ensure the maximization of value for all stakeholders going forward.

## G.     Custody of Other Assets and Investments

69.     The FTX Group had billions in investments other than cryptocurrency, as suggested above in the descriptions of the four Silos.  However, the main companies in the Alameda Silo and the Ventures Silo did not keep complete books and records of their investments and activities.

70.     The Debtors are creating a balance sheet and other financial statements for the Alameda Silo and the Ventures Silo as of the Petition Date.  The Debtors are doing so from the 'bottom-up' by using the records of cash transactions at the Debtors, and also are reviewing various third-party sources to locate investments.

## H.     Information and Retention of Documents

71.     One of the most pervasive failures of the FTX.com business in particular is the absence of lasting records of decision-making.  Mr. Bankman-Fried often communicated

-24-

A000337

by using applications that were set to auto-delete after a short period of time, and encouraged employees to do the same.

72.     The Debtors are writing things down.  The investigative effort underway is led by myself and a team at Sullivan & Cromwell that reports directly to me, including a former Director of Enforcement at the SEC, a former Director of Enforcement at the CFTC, and a former Chief of the Complex Frauds and Cybercrime Unit of the United States Attorney's Office for the Southern District of New York.  I regard ensuring the comprehensiveness, professionalism and integrity of this investigation as an essential part of my job as Chief Executive Officer.

73.     Transparency with regulators around the world is an important objective for the Debtors.  Since Friday, the Debtors have been in contact with dozens of regulators throughout the United States and around the world, and will continue to be as these cases continue.

## I.      Regulated and Licensed Subsidiaries

74.     The FTX Group included regulated or licensed subsidiaries in many jurisdictions that may or may not have valuable going concern franchises.  The Debtors will soon be taking efforts to preserve these subsidiary businesses to the extent practicable under the circumstances.  The Debtors also are engaging a leading investment bank to assist the Debtors in valuing these businesses and potentially conducting sales efforts.

## J.      Access to Data

75.     The Debtors have cryptocurrency, digital assets and other critically sensitive data in repositories that have been the subject of unauthorized attempts to access.  The Debtors have implemented certain defensive measures.  The Debtors have been advised that attempts to access this property of the estate may create a risk of its loss to unauthorized persons.

-25-

The Debtors expect to seek special relief from the Court to authorize measures to access this information as safely as possible. The Debtors are unable to create a list of their top 50 creditors that includes customers without access to the data repositories at issue, and may seek related relief from the Court as well if the problem cannot be promptly resolved.

### K.  Corporate Communications

76.     Finally, and critically, the Debtors have made clear to employees and the public that Mr. Bankman-Fried is not employed by the Debtors and does not speak for them. Mr. Bankman-Fried, currently in the Bahamas, continues to make erratic and misleading public statements. Mr. Bankman-Fried, whose connections and financial holdings in the Bahamas remain unclear to me, recently stated to a reporter on Twitter: "F*** regulators they make everything worse" and suggested the next step for him was to "win a jurisdictional battle vs. Delaware".

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  November 17, 2022               */s/ John J. Ray III*
                                         Name:  John J. Ray III
                                         Title:  Chief Executive Officer

-26-

A000339

**Exhibit A**

**Summary of the Silos and Indicative Assets**

4892-0827-0654 v.2

A000340

# FOUR SILOS FOR RECOVERY PURPOSES



A000341

**Exhibit B**

**Preliminary Corporate Structure Chart**

A000342

# PRELIMINARY ORGANIZATIONAL CHART

Last updated: Draft of November 17, 2022



* Percentages directly held by each of Sam Bankman-Fried, Gary Wang and Nishad Singh in individual entities varies.

** Indicates non-operational subsidiary entity.

A000343

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:** January 6, 2023 at 9:30 a.m. (ET) |
| In re | Chapter 15 |
| FTX DIGITAL MARKETS LTD.,[2] | Case No. 22-11217 (JTD) |
| Debtor in a Foreign Proceeding. | |

## DECLARATION OF EDGAR W. MOSLEY II IN SUPPORT OF DEBTORS' OBJECTION TO THE EMERGENCY MOTION OF THE JOINT PROVISIONAL LIQUIDATORS OF FTX DIGITAL MARKETS LTD. (I) FOR RELIEF FROM AUTOMATIC STAY AND (II) TO COMPEL TURNOVER OF ELECTRONIC RECORDS UNDER SECTIONS 542, 1519(A)(3), 1521(A)(7) AND 1522 OF THE BANKRUPTCY CODE

I, Edgar W. Mosley II, hereby declare under penalty of perjury as follows:

1.     I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services and financial and operation restructuring.

2.     I have more than 20 years of restructuring and distressed investment experience across various industries, including oil & gas, manufacturing, transportation,

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]     FTX Digital Markets Ltd. (in Provisional Liquidation) was incorporated in the Commonwealth of The Bahamas as an International Business Company, registered number 207269B.

A000344

automotive, retail, industrial construction, telecommunications, healthcare, and consumer products. I have a Bachelor's Degree from Harvard University, and have been recognized as a Certified Insolvency and Restructuring Advisor by the Association of Insolvency and Restructuring Advisors, where I served on the board from 2019 until 2020.

3.    Since joining A&M, I have been involved in numerous Chapter 11 restructurings including Seadrill Limited (2020 and 2017), Valaris plc, Diamond Offshore Drilling, Inc., Imerys Talc America, White Star Petroleum, Southcross Energy, Magnum Hunter Resources, Exide Technologies (where I served as the Chief Restructuring Officer), and Visteon Corporation.

4.    On November 9, 2022, the Debtors retained A&M. Since A&M's retention, I and the team of A&M professionals I oversee have, among other things, worked with the Debtors and their other professionals to identify reliable books and records and to assemble the information necessary to support the Debtors in their chapter 11 cases and the ongoing investigations, and to provide information to parties in interest and the Court, as appropriate.

5.    I submit this declaration (the "Declaration") in support of *Debtors' Objection to the Emergency Motion of the Joint Provisional Liquidators of FTX Digital Markets Ltd. (I) For Relief From Automatic Stay and (II) To Compel Turnover of Electronic Records Under Sections 542, 1519(A)(3), 1521(A)(7) and 1522 of the Bankruptcy Code* ("Objection").

6.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors and their advisors, including the A&M team working under my supervision, my review of relevant documents and information concerning the Debtors' operations and financial affairs, or my opinions based upon my experience

A000345

and knowledge.  If called as a witness, I would testify competently to the statements set forth in this Declaration.

### A.    The FTX Debtors and FTX DM

7.    Alameda Research LLC ("Alameda"), one of the Debtors,[3] was founded on November 20, 2017 by Samuel Bankman-Fried and Zixiao "Gary" Wang.  Attached hereto as Exhibit A is a true and correct copy of Alameda's certificate of formation.

8.    FTX Trading Ltd. (also referred to as FTX.com) was founded on April 2, 2019 by Mr. Bankman-Fried, Mr. Wang, and Nishad Singh.  Attached hereto as Exhibit B is a true and correct copy of FTX Trading Ltd.'s certificate of incorporation.

9.    West Realm Shires Services, Inc. (d/b/a FTX US) was founded on January 29, 2020 by Messrs. Bankman-Fried, Wang, and Singh.  Attached hereto as Exhibit C is a true and correct copy of West Realm Shires Services, Inc.'s certificate of incorporation.

10.    FTX Digital Markets ("FTX DM") was incorporated in The Bahamas on July 22, 2021.  Attached hereto as Exhibit D is a true and correct copy of FTX DM's certificate of incorporation.

11.    Attached hereto as Exhibit E are true and correct copies of documents identified in the Debtors' records during the ongoing investigation into the Debtors' affairs, reflecting FTX DM and FTX Trading income statements.

12.    The Debtors' records reflect that in the time from FTX DM's formation, including the less than six months it operated, FTX DM generated no revenue from customers or other third parties.  The Debtors' records reflect that FTX DM generated only intercompany or

---

[3]    Any undefined terms in this Declaration have the meanings set forth for those terms in the Objection.

A000346

related party revenue, which was paid primarily by FTX Trading as well as other related parties, and FTX DM did not have third party borrowings.

13.     The Debtors' records reflect that FTX DM earned approximately $604,000 net income during calendar year 2021 and approximately $5.17 million net income through the first three quarters of 2022 from intercompany and related party revenue.

14.     The Debtors' records reflect that during calendar year 2021, FTX Trading generated over $1 billion in third party revenue.

15.     The Debtors' records reflect that during the first three quarters of 2022, FTX Trading generated over $700 million in third party revenue.

16.     Attached hereto as <u>Exhibit F</u> is a summary of certain disbursements made by FTX DM during calendar year 2021 and the first three calendar quarters of 2022, which was prepared by the A&M team under my direction.

17.     The Debtors' records reflect that $15.4 million for "Hotels & Accommodation" was paid primarily to three hotels in The Bahamas:  the Albany ($5.8 million), the Grand Hyatt ($3.6 million), and the Rosewood ($807,000).  The $6.9 million for "Meals & Entertainment" was paid primarily to Hyatt Services Caribbean ($1.4 million), Six Stars Catering ($974,000), and to three other catering and delivery services ($2.3 million in total).

18.     The Debtors' records reflect that in the first three quarters of 2022, FTX DM had total operating expenses of approximately $73 million, including over $40 million labeled "other expenses."

19.     The Debtors' records reflect that FTX DM's 2022 income statements show that FTX DM made no disbursements in connection with transaction, engineering or product expenses.

A000347

20.     The Debtors' records reflect that in September 2021, $10 million was deposited into an account in FTX DM's name with Fidelity Bank and Trust (Bahamas) Limited ("Fidelity Bahamas"), which sum represented the estimated cost of an orderly wind down of FTX DM's business over a six month period.

21.     The Debtors' records reflect that the $10 million previously deposited in FTX DM's name with Fidelity Bahamas was provided by FTX Trading.

**B.     User Agreements**

22.     Attached hereto as Exhibit G is a true and correct copy of a document titled "FTX Terms of Service," which was the form user agreement for FTX.com customers, dated May 13, 2022.

23.     Customers who transacted on the FTX.com trading platform before May 13, 2022 were subject to a different form of Terms of Use Agreement.  Attached hereto as Exhibit H and Exhibit I are true and correct copies of documents, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs, titled "FTX Exchange: Terms of Service" from 2019 and 2020, respectively.

**C.     AWS Cloud Environment**

24.     At all times, including after May 13, 2022, the FTX Debtors' U.S. and international exchange and trading platforms, including FTX.com, were hosted by Amazon Web Services ("AWS").  In addition to AWS, Google Cloud Platform ("GCP"), holds a copy select data tables from AWS for analytics purposes.

25.     Debtor Alameda Research LLC ("Alameda Research") contracted for, pays for, and has the right to control access to, the AWS.

A000348

26.     Attached hereto as <u>Exhibit J</u> is a true and correct copy of the AWS user agreement, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs.

27.     Attached hereto as <u>Exhibit R</u> is a true and correct redacted copy of the AWS Private Pricing Addendum, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs.

28.     Attached hereto as <u>Exhibit S</u> is a true and correct copy of an AWS invoice, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs.

**D.     Correspondence**

29.     On November 8, 2022, withdrawals were initially stopped for all customers with accounts on FTX.com.  The halt on withdrawals encompassed both FTX Trading Ltd. and FTX DM.

30.     Attached as <u>Exhibit K</u> is a true and correct copy of an email chain, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs, including an email from Sam Bankman-Fried to Ryan Pinder KC, dated November 9, 2022.

31.     Attached as <u>Exhibit L</u> is a true and correct copy of a letter from Christina Rolle to Jean-Louis Van Der Velde, dated November 12, 2022.

32.     Attached as <u>Exhibit M</u> is a true and correct copy of an email chain, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs, including an email from Gary Wang to Christina Rolle, dated November 13, 2022.

33.     Attached as <u>Exhibit N</u> is a true and correct copy of an email, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs, from Gary Wang to Christina Rolle, dated November 13, 2022.

A000349

34. Attached as <u>Exhibit O</u> is a true and correct copy of an email, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs, from Sam Bankman-Fried to Christina Rolle and Brian C. Simms KC, dated November 13, 2022.

35. Attached as <u>Exhibit P</u> is a true and correct copy of Slack messages, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs, from Sam Bankman-Fried to an internal FTX Slack channel, dated November 10, 2022.

36. Attached as <u>Exhibit Q</u> is a true and correct copy of Slack messages, identified in the Debtors' records during the ongoing investigations into the Debtors' affairs, from Gary Wang to an internal FTX Slack channel, dated November 13, 2022.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Avon, Colorado on December 30, 2022

/s/ *Edgar W. Mosley II*
Edgar W. Mosley II

A000350

# EXHIBIT A

A000351

# CERTIFICATE OF FORMATION

## OF

## ALAMEDA RESEARCH LLC

The undersigned, an authorized natural person, for the purpose of forming a limited liability company under the provisions and subject to the requirements of the Delaware Limited Liability Company Act, hereby certifies that:

1. The name of the limited liability company is Alameda Research LLC.

2. The address of its registered office is 3500 South Dupont Highway, Dover, Delaware 19901, County of Kent. The name of its registered agent at that address is GKL Registered Agents of DE, Inc.

IN WITNESS WHEREOF, the undersigned authorized person has executed this Certificate of Formation this 20th day of November, 2017.

Andrew Albertson, Authorized
Person

A000352

# EXHIBIT B

A000353

**IBC No.: 17180**



ANTIGUA AND BARBUDA
FINANCIAL SERVICES REGULATORY COMMISSION

# CERTIFICATE OF INCORPORATION

## FTX TRADING LTD.

The undersigned **HEREBY CERTIFIES**, pursuant to Section 9 of the International Business Corporations Act, Cap. 222, of the Revised Laws of Antigua and Barbuda, that the above named company was incorporated under the laws of Antigua and Barbuda and has complied with all the requirements of the said Act.

**Chief Executive Officer**
*Financial Services Regulatory Commission*

REGISTERED AT: ST. JOHN'S ANTIGUA, ON APRIL 02, 2019

A000354

# **EXHIBIT C**

A000355



Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "WEST REALM SHIRES SERVICES INC.", FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF JANUARY, A.D. 2020, AT 3:49 O`CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE KENT COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

7824732  8100
SR# 20200650033

Authentication: 202287082
Date: 01-29-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

A000356

State of Delaware
Secretary of State
Division of Corporations
Delivered  03:49 PM 01/29/2020
FILED  03:49 PM 01/29/2020
SR 20200650033 - File Number  7824732

# WEST REALM SHIRES SERVICES INC.

## CERTIFICATE OF INCORPORATION

### ARTICLE I:  NAME

The name of the corporation is West Realm Shires Services Inc.

### ARTICLE II:  AGENT FOR SERVICE OF PROCESS

The address of the registered office of the corporation in the State of Delaware is 3500 South Dupont Highway, City of Dover, County of Kent, Delaware 19901.  The name of the registered agent of the corporation at that address is GKL Registered Agents of DE, Inc.

### ARTICLE III:  PURPOSE

The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

### ARTICLE IV:  AUTHORIZED STOCK

The total number of shares of stock which the corporation has authority to issue is One Hundred (100) shares, all of which shall be Common Stock, $0.01 par value per share.

### ARTICLE V:  AMENDMENT OF BYLAWS

The Board of Directors of the corporation shall have the power to adopt, amend or repeal Bylaws of the corporation.

### ARTICLE VI:  VOTE BY BALLOT

Election of directors need not be by written ballot unless the Bylaws of the corporation shall so provide.

### ARTICLE VII:  DIRECTOR LIABILITY

1.  **Limitation of Liability.**  To the fullest extent permitted by law, no director of the corporation shall be personally liable for monetary damages for breach of fiduciary duty as a director.  Without limiting the effect of the preceding sentence, if the Delaware General Corporation Law is hereafter amended to authorize the further elimination or limitation of the liability of a director, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

2.  **Change in Rights.**  Neither any amendment nor repeal of this Article VII, nor the adoption of any provision of this Certificate of Incorporation inconsistent with this Article VII,

A000357

shall eliminate, reduce or otherwise adversely affect any limitation on the personal liability of a director of the corporation existing at the time of such amendment, repeal or adoption of such an inconsistent provision.

## ARTICLE VIII:  CREDITOR AND STOCKHOLDER COMPROMISES

Whenever a compromise or arrangement is proposed between this corporation and its creditors or any class of them and/or between this corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this corporation under the provisions of §291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this corporation under §279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this corporation.

## ARTICLE IX:  INCORPORATOR

The name and mailing address of the incorporator is Kathleen Murray, c/o Fenwick & West LLP, 1191 Second Avenue, 10th Floor, Seattle, WA 98101.

The undersigned incorporator hereby acknowledges that the foregoing certificate is the act and deed of the undersigned and that the facts stated herein are true.


Dated: January 29, 2020


/s/ Kathleen Murray
Kathleen Murray, Incorporator

A000358

# EXHIBIT D

A000359



# Commonwealth of The Bahamas
# The International Business Companies Act

IBC 01

# Certificate of Incorporation

(SECTION 16)

**No. 207269 B**

## FTX Digital Markets Ltd.

**I, ELLICE SALLYANN LOCKHART-PRATT,** Registrar General of the Commonwealth of The Bahamas,

do hereby certify, pursuant to the International Business Companies Act 2000,

that all the requirements of the said Act in respect of incorporation have been satisfied, and that

## FTX Digital Markets Ltd.

is incorporated in the Commonwealth of The Bahamas as an International Business Company.

this **22nd day of July, 2021**

Authentication Code : aHVWEza6e4ec

**Commonwealth of Bahamas
Registrar General's Office**
I certify the foregoing to be a true copy of
the original deposited in this office.

*[signature]*  **Registrar General**

July 22, 2021
Authentication Code: mSTDUFH6e4ee



Given under my hand and seal of office
at Nassau in the Commonwealth of The
Bahamas

*[signature]*

**Registrar General**

A000360

**EXHIBIT E**

**FTX Digital Markets, Ltd.**
**Consolidated Statements of Operations**
*(In thousands)*
*Unaudited*

| | Q3 2022 YTD | Year Ended 2021 |
|---|---|---|
| Revenue | | |
| Trading fees: | | |
| Future fill fees | $ - | $ - |
| Spot fill fees | - | - |
| Spot margin fees | - | - |
| Blockfolio interest fees | - | - |
| Blockfolio fees | - | - |
| LOC interest fees | - | - |
| Insurance fund revenue | - | - |
| Options fees | - | - |
| Fee voucher rebates | - | - |
| Leveraged token fees | - | - |
| OTC fees | - | - |
| Transaction fees | | |
| Unstake fees | - | - |
| Withdrawal fees | - | - |
| Staking fees | - | - |
| Net revenue | - | - |
| Other fees: | | |
| NFT fees | - | - |
| Other fees | - | - |
| Net revenue, related party | 644 | |
| Intercompany revenue | 78,445 | 9,550 |
| Total net revenue | 79,089 | 9,550 |
| | | |
| Operating expenses | | |
| Transaction expenses: | | |
| Exchange software royalty, related party | - | - |
| User compensation & accommodations | - | - |
| Gas fees | - | - |
| Market maker fees | - | - |
| Rebates | - | - |
| Insurance fund expense | - | - |
| Monitoring & Other transaction expenses | - | - |
| Total transaction expenses | - | - |
| Engineering and product | | |
| Engineering staff & contractor expenses | - | |
| Sales and marketing | | |
| Sales and marketing staff & contractor expenses | - | |
| Endorsement deals | | |
| Performance, promotion, & other | 7,759 | 758 |
| General and administrative | | |
| General staff & contractor expenses | 18,118 | 651 |
| Legal & professional fees | 575 | 1,416 |
| Donations | 2,915 | 2,699 |
| Licensing, filing, & monitoring fees | 1,000 | |
| Other expenses | 40,919 | 2,900 |
| IT expenses | 1,505 | 186 |
| Intercompany expense | 600 | 336 |
| Total operating expenses | 73,391 | 8,946 |
| Operating (loss) income | 5,698 | 604 |
| Other income (expense): | | |
| Interest income, net | (44) | |
| Gain on crypto assets, net | - | |
| Other (expense) income, net | (484) | |
| (Loss) income before provision for income tax | 5,170 | 604 |
| Income tax expense | - | |
| Net (loss) income | $ 5,170 | $ 604 |
| Other comprehensive loss | | |
| Foreign currency translation adjustment | - | - |
| Total comprehensive (loss) income | $ 5,170 | $ 604 |

A000362

**FTX Trading, Ltd.**
**Consolidated Statements of Operations**
*(In thousands)*
*Unaudited*

| | Q3 2022 YTD | Year Ended 2021 |
|---|---:|---:|
| Revenue | | |
| Trading fees: | | |
| Future fill fees | $ 437,696 | $ 674,032 |
| Spot fill fees | 125,845 | 146,032 |
| Spot margin fees | 17,233 | 35,225 |
| Blockfolio interest fees | 9,327 | 1,858 |
| Blockfolio fees | 7,114 | 12,611 |
| LOC interest fees | 60,345 | 10,621 |
| Insurance fund revenue | 17,155 | 10,446 |
| Options fees | 50 | 258 |
| Fee voucher rebates | (391) | (199) |
| Leveraged token fees | 8,990 | 37,587 |
| OTC fees | 1,147 | 2,238 |
| Transaction fees | | |
| Unstake fees | 4,588 | 15,456 |
| Withdrawal fees | 6,046 | 10,656 |
| Staking fees | 27,789 | 58,084 |
| Net revenue | 722,934 | 1,014,905 |
| Other fees: | | |
| NFT fees | 14 | 223 |
| Other fees | - | - |
| Net revenue, related party | - | - |
| Intercompany revenue | | |
| Total net revenue | 722,948 | 1,015,128 |
| | | |
| Operating expenses | | |
| Transaction expenses: | | |
| Exchange software royalty, related party | 174,787 | 250,424 |
| User compensation & accommodations | 71,201 | 42,788 |
| Gas fees | 14,763 | 18,852 |
| Market maker fees | 17,182 | 11,280 |
| Rebates | 54,508 | 84,702 |
| Insurance fund expense | 34,428 | 25,687 |
| Monitoring & Other transaction expenses | 6,478 | 1,177 |
| Total transaction expenses | 373,347 | 434,910 |
| Engineering and product | | |
| Engineering staff & contractor expenses | 720 | 8,960 |
| Sales and marketing | | |
| Sales and marketing staff & contractor expenses | 5,052 | 100,341 |
| Endorsement deals | 163,589 | - |
| Performance, promotion, & other | 9,095 | 1,935 |
| General and administrative | | |
| General staff & contractor expenses | 34,491 | 69,820 |
| Legal & professional fees | 6,838 | 5,570 |
| Donations | 10,065 | 12,857 |
| Licensing, filing, & monitoring fees | 4 | - |
| Other expenses | 17,240 | 18,634 |
| IT expenses | 31,560 | 22,639 |
| Intercompany expense | 80,476 | - |
| Total operating expenses | 732,477 | 675,666 |
| Operating (loss) income | (9,529) | 339,462 |
| Other income (expense): | | |
| Interest income, net | - | - |
| Gain on crypto assets, net | - | 110,586 |
| Other (expense) income, net | 801 | 1,161 |
| (Loss) income before provision for income tax | (8,728) | 451,209 |
| Income tax expense | - | - |
| Net (loss) income | $ (8,728) | $ 451,209 |
| Other comprehensive loss | | |
| Foreign currency translation adjustment | - | - |
| Total comprehensive (loss) income | $ (8,728) | $ 451,209 |

A000363

# EXHIBIT F

A000364

| Account | Sep 2022 YTD |
|---|---:|
| Meals and Entertainment | 6,870,515.21 |
| Flights | 3,951,273.75 |
| Hotels & Accommodation | 15,402,605.65 |
| Other Transportation | 1,674,561.56 |
| Insurance | 217,027.28 |
| Dues & Subscriptions | 299,697.13 |
| Rent & Lease | 691,316.32 |
| Utilities | 919,496.14 |
| Repairs & Maintenance | 1,416,991.10 |
| Office Supplies | 5,152,395.48 |
| Postage & Delivery | 534,715.26 |
| Miscellaneous | - |
| Depreciation | - |
| Depreciation - Office F&E | - |
| Depreciation - Leasehold Improvements | 1,134,410.93 |
| Amortization | - |
| Bank Charges & Fees | 2,654,288.77 |
| **Total** | **40,919,294.58** |

A000365

| | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Albany Hotel** | $ 1,114,034 | $ 920,026 | $ 345,980 | $ 874,971 | $ 1,302,035 | $ 499,915 | $ 195,681 | $ 319,871 | $ 246,442 | **$ 5,818,954** |
| **Grand Hyatt** | 345 | 1,150 | 28,954 | 1,696,391 | 1,577,577 | 115,071 | 28,830 | 128,967 | 28,295 | **3,605,581** |
| **Rosewood** | 47,084 | 51,723 | 152,113 | 80,562 | 149,534 | 109,946 | 16,431 | 46,179 | 153,924 | **807,493** |
| **Hyatt Services Caribbean** | - | - | - | 1,369,292 | - | - | - | - | - | **1,369,292** |
| **Six Stars Catering** | - | - | 9,240 | 68,790 | 163,729 | 209,275 | 276,500 | 169,200 | 77,300 | **974,034** |
| **Other Catering** | 43,025 | 235,850 | 400,467 | 149,666 | 334,419 | 238,893 | 543,115 | 65,912 | 301,713 | **2,313,061** |

A000366

# **EXHIBIT G**

A000367

## FTX TERMS OF SERVICE

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)    the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)    the FTX Application Programming Interface (**"API"**); and

(C)    any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

(together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)    FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)    Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.    **STRUCTURE OF TERMS**

1.1    The Terms comprise:

1.1.1    the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

1

A000368

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2  the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our Privacy Policy, Security Policy and Fee Schedule (**"FTX Policies"**); and

1.1.3  the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2  To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, Fee Schedule, Privacy Policy, Security Policy and other FTX Policies.

1.3  **IMPORTANT:** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

2.  **RISK DISCLOSURES**

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1  **No advice and no reliance**

2.1.1  FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2  You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3  FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2  **Digital Asset transfers and volatility**

2.2.1  Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

A000369

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

## 2.3    Supply and value of Digital Assets

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

## 2.4    Margin trading

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

## 2.5    Complex products

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

A000370

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3　USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4　FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

## 2.6　Blacklisted addresses and forfeited Assets

2.6.1　FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2　In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

## 2.7　Software protocols and operational challenges

2.7.1　The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2　You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3　You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4　Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

A000371

2.7.5    Digital Assets depend on the availability and reliability of power, connectivity, and hardware.  Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

## 2.8    Compliance

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 2.9    Legislative and regulatory changes

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

## 2.10    No deposit protection

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

## 2.11    Digital Asset Distributions not supported

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

## 2.12    Reliance on third parties

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

## 3.    APPLICABLE LAWS AND REGULATIONS

## 3.1    Compliance with Applicable Laws

3.1.1    You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2    Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

5

3.2     **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3     **Export controls**

3.3.1   The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A)     you are in a prohibited jurisdiction as set forth at Location Restrictions (**"Restricted Territories"**);

(B)     you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C)     you intend to transact with any Restricted Territories or Restricted Persons;

(D)     you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E)     the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2   We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4.      **ELIGIBILITY**

4.1     In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1   If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2   If you are registering to use the Services on behalf of a legal entity, then:

(A)     you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B)     the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C)     the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

6

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3    You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4    You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5    You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6    You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2    If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

## 5.    REGISTRATION PROCESS; IDENTITY VERIFICATION

5.1    When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2    In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3    You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4    Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5    If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6    We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

7

6.    **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1    You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2    You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3    You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4    FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5    In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.    **ORDER BOOK AND CONVERT**

7.1    FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2    The Convert function on the Platform also allows you to submit instructions ("**Convert Instructions**") to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

A000375

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3    The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4    We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5    You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6    You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7    Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8    Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9    Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10    You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

8.    **ACCOUNT FUNDING**

8.1    **Funding - General**

8.1.1    In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2    You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

9

8.2    **Digital Assets**

8.2.1    The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2    You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3    The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4    You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5    FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6    All Digital Assets are held in your Account on the following basis:

(A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)    You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7    FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8    It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

10

A000377

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9    You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10   When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11   You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12   It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

## 8.3    Fiat currency

8.3.1    Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2    Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3    E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4    E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5    You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

11

A000378

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

## 9.    UNCLAIMED OR ABANDONED PROPERTY

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

A000379

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

## 10.    DEBIT ACCOUNT BALANCE

10.1    If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2    If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3    If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

10.3.1    you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

10.3.2    you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

10.3.3    you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

## 11.    THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

## 12.    ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION

12.1    FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

12.1.1    refuse to let you open an Account, suspend your Account, or terminate your Account;

12.1.2    decline to process any instruction or Order submitted by you; and/or

12.1.3    limit, suspend or terminate your use of one or more, or part of, the Services.

12.2    Such actions will not relieve you from your obligations pursuant to the Terms.

12.3    Such actions may be taken as a result of a number of factors, including without limitation:

A000380

12.3.1   as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2   as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3   where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4   If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5   Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6   Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7   You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8   We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1   your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2   to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3   you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9   Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10   Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

## 13.   RESTRICTED ACTIVITIES

In connection with your use of the Services, you agree that you will not:

13.1.1   violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2   provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3   infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4   engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

13.1.5   distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6   use a web crawler or similar technique to access our Services or to extract data;

13.1.7   reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8   perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9   take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10  transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11  otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12  transfer any rights granted to you under the Terms;

13.1.13  engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14  engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15  assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14.   ELECTRONIC TRADING TERMS

14.1   FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2   A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3   In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4   We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

15

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5  FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6  Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7  The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

15.  **STAKING**

15.1  When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2  The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

16.  **MARGIN TRADING**

16.1  This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2  Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

A000383

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3    When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4    Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5    The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

## 17.    FORKS AND DISTRIBUTIONS

17.1    As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2    FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3    If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4    The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

A000384

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5  In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18.  ATTACKS ON BLOCKCHAIN NETWORKS

18.1  FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2  Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19.  SITE; THIRD PARTY CONTENT

19.1  FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2  The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3  We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20.  AVAILABILITY

20.1  We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

A000385

20.2 You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3 FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

## 21. RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES

21.1 We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2 If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

## 22. UPDATES TO THE TERMS

22.1 We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2 If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

## 23. FEES

23.1 In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2 On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3 You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

A000386

24. **TAXES**

24.1 You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2 FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25. **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1 **License**

25.1.1 FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2 Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3 "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2 **API use**

25.2.1 Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2 FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3 FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3 **Third Party Applications**

25.3.1 We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

20

A000387

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2    If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3    You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4    In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

26.   **PRIVACY POLICY**

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

27.   **CONFIDENTIALITY**

27.1   You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2   You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3   The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1    in the public domain through no breach of the Terms;

27.3.2    known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3    required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4   If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5   Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6   Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

A000388

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7   The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8   The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9   The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

## 28.   COOKIES

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

## 29.   INDEMNIFICATION; RELEASE

29.1   You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2   You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3   You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

## 30.   LIMITATION OF LIABILITY; NO WARRANTY

30.1   NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

A000389

30.1.1　FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2　FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3　TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2　SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1　INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2　INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3　YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4　YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1　THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2　THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3　THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

23

A000390

30.5    SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.     **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions will apply to your use of the Services as set forth in the Schedules attached hereto.

32.     **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

33.     **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide to us or one of our social media accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, in and to such Feedback, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

34.     **QUESTIONS AND CONTACT INFORMATION**

34.1    We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2    To contact us, please visit one of the links or channels above. For support with your Account, you may submit a support ticket at https://ftx.com/support. For legal and media inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide all relevant information, including your Account username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will endeavour to get back to you as soon as possible.

35.     **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to the Platform.

A000391

36. **FORCE MAJEURE AND RELIEF EVENTS**

36.1    FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1    any Force Majeure Event; or

36.1.2    any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37. **ASSIGNMENT AND SUBCONTRACTING**

37.1    You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2    FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38. **GENERAL**

38.1    **Entire agreement**

38.1.1    You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2    You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3    You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2    **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3    **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4    **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

A000392

assigns.

### 38.5 Variation and waiver

38.5.1 Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2 No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

### 38.6 No partnership or agency

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

### 38.7 Set off

38.7.1 Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2 FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

### 38.8 Equitable remedies

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

### 38.9 Third party rights

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1 the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2 no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

### 38.10 Electronic signature

The Terms may be entered into by electronic means.

A000393

38.11    **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12    **Arbitration**

38.12.1    Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2    This arbitration agreement shall be governed by English law.

38.12.3    The seat of the arbitration shall be Singapore.

38.12.4    The language of the arbitration shall be English.

38.12.5    The number of arbitrators shall be one.

38.12.6    Each party agrees that:

(A)    any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B)    combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7    This agreement to arbitrate shall:

(A)    be binding upon the parties, their successors and assigns;

(B)    survive the termination of these Terms.

38.12.8    Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13    **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

27

## SCHEDULE 1

## DEFINITIONS AND INTERPRETATION

1.    **DEFINITIONS**

1.1    As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)     acts of God, flood, drought, earthquake or other natural disaster;

(ii)    epidemic or pandemic;

(iii)   terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)   nuclear, chemical or biological contamination or sonic boom;

(v)    any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)   collapse of buildings, fire, explosion or accident; and

(vii)  any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2.    **INTERPRETATION**

2.1    **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1    a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2    a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3    the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4    a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5    a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2    **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

A000396

2.3 **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1 a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2 a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3 a reference to an individual includes that individual's estate and personal representatives.

2.4 **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5 **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6 **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1 the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2 general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7 **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8 **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

A000397

**SCHEDULE 2**

**SERVICE SCHEDULE**

| Specified Service | Spot Market |
|---|---|
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

31

A000398

**SCHEDULE 3**
**SERVICE SCHEDULE**

| Specified Service | Spot Margin Trading |
|---|---|
| **Specified Service description** | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | **IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement.<br><br>The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk.<br><br>The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins.<br><br>The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000399

| Risk disclosures | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |
|---|---|

A000400

**SCHEDULE 4**

**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | **OTC / Off-exchange Portal (OEP Portal)** |
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000401

## SCHEDULE 5
## SERVICE SCHEDULE

| Specified Service | Futures Market |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after. |
| | Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24. |
| | You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins. |
| | **IMPORTANT:** Section 16 of the General Terms applies to this service. |
| | Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors. |
| | In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

| | |
|---|---|
| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A000403

# SCHEDULE 6
## SERVICE SCHEDULE

| Specified Service | Volatility Market (Options Contacts) |
|---|---|
| Specified Service description | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date. |
| | If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies. |
| | You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date. |
| | The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money". |
| | The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration. |
| | Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |
| | If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

A000404

| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
|---|---|
| **Risk disclosures** | See Section 2 of the General Terms. |

A000405

**SCHEDULE 7**
**SERVICE SCHEDULE**

| Specified Service | Volatility Market (MOVE Volatility Contracts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. |
| | MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. |
| | 1.  Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. |
| | 2.  Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. |
| | 3.  Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. |
| | You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

A000406

| | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
|---|---|
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

A000407

## SCHEDULE 8
## SERVICE SCHEDULE

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

A000408

| | |
|---|---|
| | ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.<br><br>By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.<br><br>If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specific Service. |
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors.<br><br>• **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying.<br><br>• **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.<br><br>• **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets. |

A000409

**SCHEDULE 9**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.

In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of:

- Tomorrow's MOVE Volatility contract
- Next weeks' MOVE contract, and the two weeks after that
- Next Quarter's MOVE contract, and the quarter after that

and

- -1x BTC-PERP (Short)

IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long).

BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk.

YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

A000410

REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors.

By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specified Service.

| | |
|---|---|
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.<br><br>• **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.<br><br>• **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

A000411

|  | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |

A000412

## SCHEDULE 10
## SERVICE SCHEDULE

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider.<br><br>Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index.<br><br>Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC.<br><br>You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins.<br><br>You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform.<br><br>You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins.<br><br>Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable).<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

A000413

## SCHEDULE 11
## SERVICE SCHEDULE

| Specified Service | NFT Market |
| --- | --- |
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion. <br><br> Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens. <br><br> NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all. <br><br> NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it. <br><br> While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion. <br><br> You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so. <br><br> There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value. <br><br> NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

A000414

PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING.

A000415

## SCHEDULE 12
## SERVICE SCHEDULE

| Specified Service | NFT Listing |
| --- | --- |
| **Specified Service description** | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. |
| | If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail. |
| | Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise. |
| | **Intellectual property** |
| | You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content. |
| | By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates. |
| | You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork. |
| | **Prohibited activities** |
| | You will not: |

A000416

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

A000417

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

A000418

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

A000419

**SCHEDULE 13**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**
**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

---

**1.      FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES**

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a)     your deposit of fiat currency to Digital Assets; and

b)     your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

---

**2.      FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA**

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or  financial products.

---

A000420

3.    **STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

4.    **YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the *Corporations Act 2001* (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

5.    **DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the *Privacy Act 1988* (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

A000421

## SCHEDULE 14
## SERVICE SCHEDULE
## TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

A000422

**SCHEDULE 15**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO JAPAN USERS ONLY**
**(Updated September 19, 2022)**

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

A000423

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are ***non-recourse*** with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

A000424

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

A000425

別紙 15

サービスに関する別紙

日本のユーザーにのみ適用される規約

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

FTX トレーディングは、P2P 貸借暗号資産の貸出人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸出人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸出人となることはありません。

当社のユーザーのみが、借受人又は貸出人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

A000426

## 貸出し

お客様が P2P 貸借暗号資産取引の貸人人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

## 借受け

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

A000427

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**責任財産は本借受人の口座において本借受人が保有する資産に限定されます**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出を含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

A000428

## SCHEDULE 16
## SERVICE SCHEDULE
## TERMS APPLICABLE TO UK USERS ONLY
### (Updated September 29, 2022)

---

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

---

A000429

# EXHIBIT H

A000430

## FTX EXCHANGE: TERMS OF SERVICE

The following terms and conditions of service (the "**Terms**") constitute an agreement between you and FTX Trading LTD ("**FTX Trading**," "**we**," or "**us**"), a company incorporated in Antigua and Barbuda, and apply to your use of FTX Cryptocurrency Derivatives Exchange ("**FTX**" or the "**Exchange**") as a user ("**User**", "**you**" or "**your**") to buy, sell, exchange, hold, or otherwise transact in Digital Assets (as defined below), use the FTX Application Programming Interface ("**API**"), or use any other services offered through the FTX website (ftx.com) (the "**Site**") (together, the "**Services**").  By registering for an FTX account ("**Account**") or using the Services, you agree that you have read, understood, and accept these Terms as well as our Privacy Policy and Security Policy, and you acknowledge and agree that you will be bound by such terms and policies.

Our Services are not offered to entities or persons who have their registered office or place of residence in the United States of America or any Restricted Territory as defined in Section 33.

As used throughout these Terms, "Digital Assets" means bitcoin, ethereum or any other digital asset, cryptocurrency, virtual currency, or token that are available to transact in using the Exchange.  FTT is the exchange token of the FTX ecosystem and is not offered in the United States or to U.S. persons.  Before beginning to use the Exchange or any other products or services offered by FTX Trading, you should ensure you have reviewed the fee schedule.

Section 27 of these Terms governs how they may be changed over time. If after reading these Terms in their entirety you are still unsure of anything or you have any questions, please feel free to contact us.

### 1.  APPLICABLE LAWS AND REGULATIONS

Your conduct on the Exchange is subject to the laws, regulations, and rules of any applicable governmental or regulatory authority, including, without limitation, all applicable tax, anti-money laundering ("**AML**") and counter-terrorist financing ("**CTF**") provisions.

You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with and be legally bound by these Terms and all applicable laws and regulations (including without limitation those stated in this Section 1, where applicable), and failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.  For the avoidance of doubt, continued use of your Account, and the receipt of all trading fee discounts and rebates, is conditioned on your continued compliance at all times with these Terms and all applicable laws and regulations.

### 2.  ELIGIBILITY

If you are registering to use the Services as an individual, you must be at least 18 years of age, and you must not have been previously been suspended or removed from the Exchange or any

A000431

other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

If you are registering to use the Services on behalf of a legal entity, you represent and warrant that (i) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (ii) you are duly authorized by such legal entity to act on its behalf; and (iii) such organization (and any affiliate entity) must not have been previously suspended or removed from the Services or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

By accessing or using the Services, you further represent and warrant that you are not a Restricted Person nor are you a resident of a Restricted Territory (each as defined in Section 33) and you will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed under Section 19.

Notwithstanding the foregoing, FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements, depending on your location.

## 3. REGISTRATION PROCESS; IDENTITY VERIFICATION

When registering your Account, you must provide current, complete, and accurate information for all required elements on the registration page, including your full legal name.  You are the only person authorized to use your Account and you may not share your Account credentials with any other person.  You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill.  You permit us to keep a record of such information and authorize us to make any inquiries, directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries.  When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

In certain circumstances, we may require you to submit additional information about yourself, your business, or your transactions, provide records, and complete other verification steps (such process, "**Enhanced Due Diligence**").  You represent and warrant that any and all information provided to us pursuant to these Terms or otherwise is true, accurate and not misleading in any respect.  If any such information changes, it is your obligation to update such information as soon as possible.  Failure to provide such information in a timely fashion may result in the suspension of your ability to use the Services (until you provide such information) or the closure of your Account.

We reserve the right to maintain your account registration information after you close your Account for business and regulatory compliance purposes, subject to applicable law and regulation.

### 4. AML AND CTF COMPLIANCE

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the FTX platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take all the necessary steps to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

### 5. INITIAL FUNDING; THIRD PARTY TRANSFERS

In order to fund your Account and begin trading, you must first procure Digital Assets. FTX supports deposits and withdrawals for a number of Digital Assets, including certain U.S. Dollar-pegged Digital Assets (each a "**Stablecoin**"). You may deposit Stablecoins that you already own by generating an address within your Account and sending your Stablecoins to such address, after which they should appear in your "USD Stablecoins (USD)" balance. The Exchange does not directly support the deposit of fiat currencies, but subject to eligibility requirements, you may be able to convert fiat currencies to Stablecoins using FTX's separate OTC Service and subsequently transfer such Stablecoins to the Exchange for trading.

FTX enables you to exchange ("**Convert**") one Digital Asset for another Digital Asset. When you request to Convert a Digital Asset or Stablecoin, you will be quoted a price for such conversion. The price quoted will depend on market conditions, and you are under no obligation to execute a trade at any price quoted to you. FTX Trading makes no promises as to the timing or availability of the ability to convert Digital Assets via the Exchange.

It is your responsibility to ensure you send all Digital Assets, including Stablecoins, to the correct address provided for that particular Digital Asset. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your account or the specific Digital Asset sent), such Digital Asset may be lost forever. If you send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

You assume all liability for any losses incurred as a result of sending Digital Assets to an incorrect address (such as an address not associated with your account or an address not associated with the specific Digital Asset). FTX Trading is not responsible for any losses or for taking any actions to attempt to recover such Digital Assets. If the funds are recoverable, we may in our sole discretion attempt to recover the funds, but such recovery efforts are in no way guaranteed. Please also be aware that if you attempt to deposit ETH to your Account by

sending it via a smart contract, your funds may not be automatically credited, and may take time to recover.  Should you encounter any of these issues, you may [contact us](#) us to request assistance.

FTX Trading makes no representations or warranties regarding the amount of time that may be required to complete transfer of your Digital Assets from a third party wallet or other source and have said Digital Assets become available in your Account.

When you elect to transfer Digital Assets from your Account to a third party wallet or other location, it is always possible the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting our platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected transfer.

### 6.  FUTURES CONTRACTS

The futures listed by FTX include three contracts for each Digital Asset or index (each a "**Futures Contract**").  These include two quarterly Futures Contracts (with expiration at the end of the current and subsequent quarters) as well as perpetual Futures Contracts.

Futures trading on FTX is high risk.  In order to trade Futures Contracts on FTX, you must post collateral.  Depending on market movements, your position may be liquidated and you may sustain a total loss of Digital Assets.  This is because futures trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. If you are uncomfortable with this level of risk, you should not trade futures contracts.

You agree to maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, as such requirements may be modified from time to time.  If the value of the collateral in your Account falls below the maintenance margin requirement, FTX Trading may seize and liquidate any or all of your positions and assets to reduce your leverage.  If, after your positions and assets are liquidated, your Account still contains insufficient Digital Assets to restore your margin ratio to the required amount, you will be responsible for any additional Digital Assets owed.

FTX Trading may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, including, but not limited to closing futures positions held in any Digital Asset or index that FTX Trading plans to delist from the Exchange in accordance with Section 20.

Under certain market conditions, it may be difficult or impossible to liquidate a position.  This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on our platform.  In the event that market conditions make it impossible to execute such orders, you may be unable to limit your losses.  The use of leverage can lead to large losses as well as gains.

## 7. LEVERAGED TOKENS

Leveraged Tokens are "ERC-20" digital tokens issued by FTX Trading that operate on the Ethereum blockchain ("**Leveraged Tokens**").  FTX offers Leveraged Tokens for each underlying Digital Asset or index ("**Underlying**").  Each Leveraged Token has an associated account on FTX that takes leveraged positions on perpetual futures contracts, and can be created or redeemed for its share of the Digital Assets of that account.

Users may create Leveraged Tokens by depositing Stablecoins and redeem Leveraged Tokens for an equivalent amount of Stablecoins.  The Leveraged Token will automatically rebalance to add or remove exposure based on the size of the creation or redemption.  Users are charged or credited an amount of Stablecoins equal to the number of Leveraged Tokens being created or redeemed multiplied by the Net Asset Value of the Leveraged Token as of the creation or redemption time.

Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("**BULL**"), -100% or -1x ("**HEDGE**"), or -300% or -3x ("**BEAR**") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period.  A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period.

A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing.  Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying.  Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns.

## 8. FORKS AND DISTRIBUTIONS

As a result of the decentralized and open source nature of Digital Assets it is possible that sudden, unexpected, or controversial changes ("**Forks**") can be made to any Digital Asset that may change the usability, functions, value or even name of a given Digital Asset.  Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a "**Dominant Digital Asset**") and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a "**Non-Dominant Digital Asset**").

FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork.  Forks of Digital

Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on FTX.  When trading or holding Digital Assets using your Account, you should operate under the assumption that FTX will never support any Fork of such Digital Asset.

If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers, and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support.   If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

FTX does not generally offer support for the distribution of assets based on a triggering fact or event, such as the possession of another asset (each an "**Airdrop**"), the provision of rewards or other similar payment for participation in a Digital Asset's protocol ("**Staking Rewards**"), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the FTX platform (collectively, "**Digital Asset Distributions**").  FTX Trading may, in its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on FTX for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored ("**Downtime**").  This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning.  During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork.  FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 9.  ATTACKS ON BLOCKCHAIN NETWORKS

FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks.  In the event of an attack, FTX Trading reserves the right to take commercially reasonable actions, including, but not limited to, if we confirm that a Digital Asset's network is compromised or under attack, immediately halting trading, deposits, and withdrawals for such Digital Asset.  If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of FTX and you assume all liability for any lost value or stolen property.

A000436

## 10. API USE

Subject to your compliance with these Terms and any other agreement which may be in place between you and FTX Trading related to your use of the API, FTX Trading hereby grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on FTX.  You agree to not use the API or data provided through the API for any other commercial purpose.  You access and use the API entirely at your own risk, and FTX Trading will not be responsible for any actions you take based on the API.

FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity.  You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.  FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of these Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

## 11. ACCOUNT SUSPENSION AND CLOSURE

FTX Trading may, in its sole and absolute discretion, without liability to you or any third party, refuse to let you open an Account, suspend your Account, or terminate your Account or your use of one or more of the Services.  Such actions may be taken as a result of a number of factors, including without limitation account inactivity, failure to respond to customer support requests, failure to positively identify you, a court order, or your violation of these Terms.  We may also temporarily suspend access to your Account, in the event that a technical problem causes system outage or Account errors, until the problem is resolved.

You may terminate this agreement at any time by closing your Account in accordance with these Terms.  In order to do so, you should contact us for assistance in closing your Account.  You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading.

We encourage you to withdraw any remaining balance of Digital Assets prior to issuing a request to close your Account.  We reserve the right to restrict or refuse to permit withdrawals from your Account if (i) your Account has otherwise been suspended or closed by us in accordance with these Terms; (ii) to do so would be prohibited by law or court order, or we have determined that the Digital Assets in you Account were obtained fraudulently; or (iii) you have not completed the required identity verification procedure.  You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.  Upon closure or suspension of your Account, you authorize FTX Trading to cancel or suspend pending transactions.

A000437

In the event that you or FTX Trading terminates this agreement or your access to the Services, or deactivates or closes your Account, you remain liable for all activity conducted with or in connection with your Account while it was open and for all amounts due in connection with such activity.

### 12. RISK DISCLOSURES

The following risks associated with Digital Assets and the Services is not exhaustive.

**No advice**

FTX Trading does not advise on the merits of any particular transactions, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, or legal advice in connection with the Services. To the extent that we or our representatives provide trading recommendations, market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision to buy or sell Digital Assets is the User's decision and FTX Trading will not be liable for any loss suffered.

You accept the risk of trading Digital Assets. In entering into any transaction on FTX, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of the transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction or any underlying Digital Asset.

**Digital Asset transfers and volatility**

Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value. Factors beyond FTX Trading's control, such as regulatory activity, market manipulation, or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks, or other unforeseeable reasons. As a general matter, Users with limited trading experience and low risk tolerance should not engage in active trading on FTX. Speculating on the value of Digital Assets is high risk and Users should never trade more than they can afford to lose.

Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on FTX does not indicate FTX Trading's approval or disapproval of the underlying technology regarding any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as

A000438

to the suitability of the Digital Asset traded under these Terms and assume no fiduciary duty to Users in connection with such use of the Services.

Users accept all consequences of sending Digital Assets to an address off the FTX platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely.  For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to an entity that will not return your Digital Assets, or may return your Digital Assets but first requires action on your part, such as verification of your identity.

**Futures and leveraged products**

Trading of Futures Contracts and Leveraged Tokens may not be suitable for all Users and should only be used by those who understand the consequences of seeking daily inverse or leveraged results.

Futures Contracts involve margin and leverage, and as such, you may feel the effects of any losses immediately.  If movements in the markets for a Futures Contract or the underlying Digital Asset decrease the value of your position in such Future Contract, you may be required to have or make additional collateral available as margin.  If your Account is under the minimum margin requirements set by the Exchange, your position may be liquidated at a loss, and you will be liable for the deficit, if any, in your Account.

Unlike Futures Contracts, Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading, including but not limited to:

- *Market Price Variance Risk:* Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the underlying Digital Asset.  The market price for a Leveraged Token will fluctuate in response to changes in the value of the token's holdings, supply and demand for the token and other market factors.

- *Inverse Correlation Risk:* Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Digital Asset rises, a result that is opposite from holding the underlying asset.

- *Portfolio Turnover Risk:* Leveraged Tokens may incur high portfolio turnover to manage the exposure to the underlying Digital Asset.  Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs.  Each of these factors could have a negative impact on the performance of a Leveraged Token.

A000439

- *Interest Rates:* Leveraged Tokens take positions in futures contracts to achieve their desired leverage.  These futures might trade at a premium or discount to spot markets in the applicable Digital Asset as a reflection of prevailing interest rates in cryptocurrency markets.  Thus, a Leveraged Token could outperform or underperform the Digital Asset's returns due to a divergence between the two markets.

## Supply and value of Digital Assets

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

You acknowledge and agree that Digital Assets and/or FTX features available in one jurisdiction may not be available for trading or to access, as applicable, in another.

## Blacklisted addresses and forfeited funds

Leveraged Tokens are Digital Assets built on the Ethereum blockchain.  FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Leveraged Tokens (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates these Terms ("**Blacklisted Addresses**").  In the event that you send Leveraged Tokens to a Blacklisted Address, or receive Leveraged Tokens from a Blacklisted Address, FTX Trading may freeze such Leveraged Tokens and take steps to terminate your Account.

In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and you may forfeit any rights associated with your Leveraged Tokens, including the ability to redeem your Leveraged Tokens for U.S. Dollars. FTX Trading may also be forced to freeze Leveraged Tokens in the event that we receive a legal order from a valid government authority requiring us to do so.

## Software protocols and operational challenges

The software protocols that underlie Digital Assets are typically open source projects, which means that (i) the development and control of such Digital Assets is outside of FTX's control and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

You are aware of and accept the risk of operational challenges.  FTX may experience sophisticated cyber attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services.  You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction

A000440

failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading accountable for any related losses.

All Users understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your assets stored on our platform. You claim full responsibility for monitoring such technological changes and understanding their consequences for your Digital Assets. Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks involved associated with Digital Assets use generally or your use of our Services

**Compliance**

You are responsible for complying with applicable law. You agree that FTX is not responsible for determining whether or which laws may apply to your transactions, including but not limited to tax law. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

**Legislative and regulatory changes**

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, exchange, and value of Digital Assets.

**No deposit protection**

Digital Assets held in your Account are not eligible for any public or private deposit insurance protection.

**Digital Asset Distributions not supported**

Certain Digital Assets are built on protocols that support Digital Asset Distributions, including, but not limited to, Forks, Staking Rewards and Airdrops (as defined in Section 8 above). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX is not responsible for losses you may incur related to staking.

### 13. RIGHT TO CHANGE OR REMOVE FEATURES AND SUSPEND OR DELAY TRANSACTIONS

A000441

We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability.  We may decline to process any order and may limit or suspend your use of one or more Services at any time, in our sole discretion.  Suspension of your use of any of the Services will not affect your rights and obligations pursuant to these Terms.

We may, in our sole discretion, decline to process orders if (i) we believe the transaction is suspicious; (ii) the transaction may involve fraud or misconduct; (iii) it violates applicable laws; or (vi) it violates these Terms.  Where permitted by law, we will notify you by the end of the business day if we have suspended processing your orders and, if possible, provide our reasons for doing so and anything you can do to correct any errors leading to the stoppage.

### 14. FEES

In consideration for the use of the Services, you agree to pay to FTX the appropriate fees, as set forth in our fee schedule displayed on the Site ("**Fee Schedule**"), which FTX Trading may revise or update in its sole discretion from time to time.  On request, FTX may make available an alternative fee schedule ("**Alternative Fee Schedule**") to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX in its sole discretion from time to time.  You authorize FTX to deduct any applicable fees from your Account at the time you make a given transaction.  Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

### 15. PROMOTIONS

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere.  You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to FTX.

### 16. SECURITY OF USER INFORMATION

You are responsible for maintaining the confidentiality and security of any and all account names, User IDs, passwords, and any other security feature that you use to access the Services.  You are responsible for (i) keeping your email address up to date in your Account profile and (ii) maintaining the confidentiality of your User information and the security of your Account, which includes the enabling of all relevant security features.  You agree to notify FTX immediately if you become aware of any unauthorized use of the Services or any other breach of security regarding the Services.  FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information.

A000442

We shall not bear any liability for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack.  If you question the authenticity of a communication purporting to be from FTX, you should login to your Account through the Site, not by clicking links contained in emails.

## 17. PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used.  You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 18. RESTRICTED ACTIVITIES

In connection with your use of the Services, you will not:

- violate or assist any party in violating any law, statute, ordinance, regulation or any rule of any self-regulatory or similar organization of which you are or are required to be a member through your use of the Services;
- provide false, inaccurate, incomplete or misleading information;
- infringe upon FTX's or any third party's copyright, patent, trademark, or intellectual property rights;
- engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;
- distribute unsolicited or unauthorized advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;
- use a web crawler or similar technique to access our Services or to extract data;
- reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;
- perform any unauthorized vulnerability, penetration or similar testing on the API;
- take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;
- transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;
- otherwise attempt to gain unauthorized access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;
- transfer any rights granted to you under these Terms;
- engage in any other activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct; or

A000443

- engage in any behavior which is unlawful, violates these Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion.

## 19. ELECTRONIC TRADING TERMS

FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset, Leveraged Token, or Futures Contract at any time, based on a number of factors, including changes in characteristics.

A transaction on FTX may fail for several reasons, including without limitation to change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. We are under no circumstances liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures on the Site. You have full responsibility to determine and inquire into the failure of any transaction which you initiate.

In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to these Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

We may refuse to execute a trade, or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, or the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on FTX, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in these Terms. FTX Trading reserves the right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorization to make a transaction, except with respect to partially filled orders.

FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an order or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

FTX provides Users with a platform that allows their orders to be matched with the orders of other Users. Orders may be partially filled or may be filled by a number of orders, depending on the trading activity at the time an order is placed. FTX's relationship with you under these Terms is as a trading platform provider only and does not act as principal or counterparty with respect to trades entered into on the platform. Notwithstanding the foregoing, (i) FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected

A000444

on User trades, and (ii) affiliates of FTX may execute trades on the platform; provided, however, that such affiliates shall not be afforded any priority in trade execution.

The Digital Assets available for purchase through the Services may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods.  You acknowledge that while FTX Trading uses commercially reasonable methods to provide exchange rate information to you through our Services, the exchange rate information we provide may differ from prevailing exchange rates made available by third parties.  Similarly, the actual market rate at the time of your trade may be different from the indicated prevailing rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in actual versus indicated rates.

### 20. COMMUNICATIONS

These Terms are provided to you and concluded in English.  We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

### 21. FEEDBACK

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide on our platform or one of our social media accounts, regarding FTX or the Services (collectively, "**Feedback**") that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading.  FTX Trading will own exclusive rights, including all intellectual property rights, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

### 22. OWNERSHIP OF DIGITAL ASSETS

You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services are either owned by you or that you are validly authorized to carry out transactions using such Digital Assets and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity.

### 23. TAXES

You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments.  It is your responsibility to determine what, if any, taxes apply to your activities on the Exchange, and to collect, report, and remit the correct tax to the appropriate tax authority. FTX Trading is not responsible for

A000445

determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

### 24. INDEMNIFICATION; RELEASE

You agree to indemnify and hold FTX Trading, its affiliates, and service providers, and each of their officers, directors, agents, joint venturers, employees, and representatives harmless from any claim or demand (including attorneys' fees and any losses, fines, fees, or penalties imposed by any regulatory authority) arising out of your breach of these Terms, or your violation of any law or regulation.

For the purpose of this Section 24, the term "**losses**" means all net costs reasonably incurred by us or the other persons referred to in this Section which are the result of the matters set out in this Section 24 and which may relate to any claims, demands, causes of action, debt, cost, expense or other liability, including reasonable legal fees (without duplication).

If you have a dispute with one or more Users or third parties, you release FTX Trading (and its affiliates and service providers, and each of their officers, directors, agents, joint ventures, employees, and representatives) from any and all claims, demands, and damages (actual and consequential) of every kind and nature arising out of or in any way connected with such disputes.  If you have a dispute with anyone other than FTX Trading, you release us from liability associated with that dispute.

### 25. LIMITATION OF LIABILITY; NO WARRANTY

YOU EXPRESSLY UNDERSTAND AND AGREE THAT FTX TRADING AND OUR AFFILIATES AND SERVICE PROVIDERS, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND REPRESENTATIVES WILL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY DAMAGES, OR DAMAGES FOR LOSS OF PROFITS INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES (EVEN IF FTX TRADING HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, RESULTING FROM: (I) THE USE OR THE INABILITY TO USE THE SERVICES; (II) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; (III) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR (IV) ANY OTHER MATTER RELATING TO THE SERVICES.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.  ACCORDINGLY, SOME OF THE LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU.  IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE SERVICES OR

A000446

WITH THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USE OF THE SERVICES AND CLOSE YOUR ACCOUNT.  THE SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED.  FTX TRADING, OUR AFFILIATES, AND OUR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.  FTX TRADING MAKES NO WARRANTY THAT (I) THE SERVICES WILL MEET YOUR REQUIREMENTS, (II) THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, OR (III) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

### 26. FORCE MAJEURE

FTX Trading shall have no liability for any failure or delay resulting from any abnormal or unforeseeable circumstances outside our reasonable control, the consequences of which would have been unavoidable despite all efforts to the contrary, including without limitation governmental action or acts of terrorism, earthquake, fire, flood, or other acts of God, labor conditions, delays or failures caused by problems with another system or network, mechanical breakdown or data-processing failures or where we are bound by other legal obligations.

### 27. GOVERNING LAW; VENUE AND ARBITRATION

The laws of Antigua and Barbuda shall govern these Terms.  Except as otherwise required by local law, any dispute between you and FTX Trading related in any way to, or arising in any way from, our Services or these Terms ("**Dispute**") shall be finally settled on an individual, non-representative basis in binding arbitration in accordance with the Antigua and Barbuda Arbitration Act (Cap 33), as modified by these Terms or in accordance with rules on which we may mutually agree.  Any arbitration shall take place in Antigua and Barbuda.  The arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorized by law.

### 28. AMENDMENTS

We may amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date.  The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised agreement and shall apply on a going-forward basis with respect to transactions initiated after the posting date.  In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your Account.  You agree that we shall not be liable to you or any third party as a result of any losses suffered by any modification or amendment of these Terms.

## 29. ASSIGNMENT

You may not transfer or assign these Terms or any rights or obligations you have under these Terms without our prior written consent or otherwise and any such attempted assignment shall be void.  We reserve the right to freely assign or transfer these Terms and the rights and obligations of these Terms, to any third party at any time without notice or consent.  If you object to such transfer or assignment, you may stop using our Services and terminate this agreement by contacting us and requesting to close your account.

## 30. SURVIVAL

Upon termination of your Account or this agreement for any other reason, all rights and obligations of the parties that by their nature are continuing will survive such termination.

## 31. THIRD PARTY APPLICATIONS

If you grant express permission to a third party to connect to your Account, either through the third party's product or through FTX, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under this agreement.  Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

## 32. SITE; THIRD PARTY CONTENT

FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date.  FTX Trading will update the information on the Site as necessary to provide you with the most up to date information, but you should always independently verify such information.  The Site may also contain links to third party websites, applications, events or other materials ("**Third Party Content**").  Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services.  FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

## 33. LIMITED LICENSE; IP RIGHTS

FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to these Terms, to access and use the Services solely for approved purposes as determined by FTX Trading.  Any other use of the Services is expressly prohibited.  FTX Trading and its licensors reserve all rights in the Services and you agree that these Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

A000448

Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part.  If you violate any portion of these Terms, your permission to access and use the Services may be terminated pursuant to these Terms.  "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors.  You may not copy, imitate, or use them without FTX Trading's prior written consent.  All right, title, and interest in and to the Site, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

### 34. UNCLAIMED OR ABANDONED PROPERTY

If FTX Trading is holding funds in your Account, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time, applicable law may require us to report these funds as unclaimed property to the applicable jurisdiction.  If this occurs, FTX Trading will try to locate you at the address shown in our records, but if FTX Trading is unable to locate you, we may be required to deliver any such funds to the applicable jurisdiction as unclaimed property.  FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds, as permitted by applicable law.

### 35. LEGAL COMPLIANCE

The Services are subject to all applicable export control restrictions, and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if (i) you are a resident, national or agent of Cuba, Crimea and Sevastopol, Germany, Iran, North Korea, Pakistan, Sudan, Syria, Vietnam, or any other country to which the United States, the United Kingdom or the European Union embargoes goods or imposes similar sanctions ("**Restricted Territories"**); (ii) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government or by the European Union ("**Restricted Persons**"); (iii) you intend to transact with any Restricted Territories or Restricted Persons; (iv) you you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or (v) the publication or availability of the Services is prohibited or contrary to local law or regulation, or could subject FTX to any local registration or licensing requirements.

### 36. ENTIRE AGREEMENT; THIRD PARTY RIGHTS

The failure of FTX Trading to exercise or enforce any right or provision of the Agreement shall not constitute a waiver of such right or provision.  If any provision of these Terms shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms shall otherwise remain in full force and effect and remain enforceable between the parties.

The headings and any explanatory text are for reference purposes only and in no way define, limit, construe, or describe the scope or extent of such section.  These Terms, including FTX's policies governing the Services referenced herein, the Privacy Policy, and the Security Policy, constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

These Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and other affiliates of FTX Trading, which each shall be a third party beneficiary of these Terms, and no other person shall assert any rights as a third party beneficiary hereunder.  If some future court judgment deems any particular provision of these Terms unenforceable, the rest of the Agreement is still valid.

### 37. QUESTIONS AND CONTACT INFORMATION

We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise Users to check those channels before contacting support.

Telegram: https://t.me/FTX_Official
Twitter: https://twitter.com/FTX_Official
WeChat: ftexchange
Blog: https://blog.ftx.com/
Email: support@ftx.com

To contact us, please visit one of the links or channels above.  For support with your Account, you may email us at support@ftx.com.  Please provide all relevant information, including your FTX username and transaction IDs of any related deposits.  Although we make no representations or provide no warranties as to the speed of response, we will get back to you as soon as possible.

# EXHIBIT I

# FTX EXCHANGE: TERMS OF SERVICE

The following terms and conditions of service (the "**Terms**") constitute an agreement between you and FTX Trading LTD ("**FTX Trading**," "**we**," or "**us**"), a company incorporated in Antigua and Barbuda, and apply to your use of FTX Cryptocurrency Derivatives Exchange ("**FTX**" or the "**Exchange**") as a user ("**User**", "**you**" or "**your**") to buy, sell, exchange, hold, or otherwise transact in Digital Assets (as defined below), use the FTX Application Programming Interface ("**API**"), or use any other services offered through the FTX website (ftx.com) (the "**Site**") (together, the "**Services**").  By registering for an FTX account ("**Account**") or using the Services, you agree that you have read, understood, and accept these Terms as well as our Privacy Policy and Security Policy, and you acknowledge and agree that you will be bound by such terms and policies.

Our Services are not offered to entities or persons who have their registered office or place of residence in the United States of America or any Restricted Territory as defined in Section 33.

As used throughout these Terms, "Digital Assets" means bitcoin, ethereum or any other digital asset, cryptocurrency, virtual currency, or token that are available to transact in using the Exchange.  FTT is the exchange token of the FTX ecosystem and is not offered in the United States or to U.S. persons.  Before beginning to use the Exchange or any other products or services offered by FTX Trading, you should ensure you have reviewed the fee schedule.

Section 27 of these Terms governs how they may be changed over time. If after reading these Terms in their entirety you are still unsure of anything or you have any questions, please feel free to contact us.

## 1.  APPLICABLE LAWS AND REGULATIONS

Your conduct on the Exchange is subject to the laws, regulations, and rules of any applicable governmental or regulatory authority, including, without limitation, all applicable tax, anti-money laundering ("**AML**") and counter-terrorist financing ("**CTF**") provisions.

You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with and be legally bound by these Terms and all applicable laws and regulations (including without limitation those stated in this Section 1, where applicable), and failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.  For the avoidance of doubt, continued use of your Account, and the receipt of all trading fee discounts and rebates, is conditioned on your continued compliance at all times with these Terms and all applicable laws and regulations.

## 2.  ELIGIBILITY

If you are registering to use the Services as an individual, you must be at least 18 years of age, and you must not have been previously been suspended or removed from the Exchange or any

A000452

other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

If you are registering to use the Services on behalf of a legal entity, you represent and warrant that (i) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (ii) you are duly authorized by such legal entity to act on its behalf; and (iii) such organization (and any affiliate entity) must not have been previously suspended or removed from the Services or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

By accessing or using the Services, you further represent and warrant that you are not a Restricted Person nor are you a resident of a Restricted Territory (each as defined in Section 33) and you will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed under Section 19.

Notwithstanding the foregoing, FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements, depending on your location.

### 3.  REGISTRATION PROCESS; IDENTITY VERIFICATION

When registering your Account, you must provide current, complete, and accurate information for all required elements on the registration page, including your full legal name.  You are the only person authorized to use your Account and you may not share your Account credentials with any other person.  You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill.  You permit us to keep a record of such information and authorize us to make any inquiries, directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries.  When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

In certain circumstances, we may require you to submit additional information about yourself, your business, or your transactions, provide records, and complete other verification steps (such process, "**Enhanced Due Diligence**").  You represent and warrant that any and all information provided to us pursuant to these Terms or otherwise is true, accurate and not misleading in any respect.  If any such information changes, it is your obligation to update such information as soon as possible.  Failure to provide such information in a timely fashion may result in the suspension of your ability to use the Services (until you provide such information) or the closure of your Account.

We reserve the right to maintain your account registration information after you close your Account for business and regulatory compliance purposes, subject to applicable law and regulation.

### 4.  AML AND CTF COMPLIANCE

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF.  These standards are designed to prevent the use of the FTX platform for money laundering or terrorist financing activities.  We take compliance very seriously and it is our policy to take all the necessary steps to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

### 5.  INITIAL FUNDING; THIRD PARTY TRANSFERS

In order to fund your Account and begin trading, you must first procure Digital Assets.  FTX supports deposits and withdrawals for a number of Digital Assets, including certain U.S. Dollar-pegged Digital Assets (each a "**Stablecoin**").  You may deposit Stablecoins that you already own by generating an address within your Account and sending your Stablecoins to such address, after which they should appear in your "USD Stablecoins (USD)" balance.  The Exchange may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.  A partial list of fiat currencies can be found [here](here).

FTX enables you to exchange ("**Convert**") one Digital Asset for another Digital Asset.  When you request to Convert a Digital Asset or Stablecoin, you will be quoted a price for such conversion.  The price quoted will depend on market conditions, and you are under no obligation to execute a trade at any price quoted to you.  FTX Trading makes no promises as to the timing or availability of the ability to convert Digital Assets via the Exchange.

It is your responsibility to ensure you send all Digital Assets, including Stablecoins, to the correct address provided for that particular Digital Asset.  If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your account or the specific Digital Asset sent), such Digital Asset may be lost forever.  If you send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

You assume all liability for any losses incurred as a result of sending Digital Assets to an incorrect address (such as an address not associated with your account or an address not associated with the specific Digital Asset).  FTX Trading is not responsible for any losses or for taking any actions to attempt to recover such Digital Assets.  If the funds are recoverable, we may in our sole discretion attempt to recover the funds, but such recovery efforts are in no way guaranteed.  Please also be aware that if you attempt to deposit ETH to your Account by

A000454

sending it via a smart contract, your funds may not be automatically credited, and may take time to recover.  Should you encounter any of these issues, you may contact us us to request assistance.

FTX Trading makes no representations or warranties regarding the amount of time that may be required to complete transfer of your Digital Assets from a third party wallet or other source and have said Digital Assets become available in your Account.

When you elect to transfer Digital Assets from your Account to a third party wallet or other location, it is always possible the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting our platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected transfer.

## 6.  FUTURES CONTRACTS

The futures listed by FTX include three contracts for each Digital Asset or index (each a "**Futures Contract**").  These include two quarterly Futures Contracts (with expiration at the end of the current and subsequent quarters) as well as perpetual Futures Contracts.

Futures trading on FTX is high risk.  In order to trade Futures Contracts on FTX, you must post collateral.  Depending on market movements, your position may be liquidated and you may sustain a total loss of Digital Assets.  This is because futures trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. If you are uncomfortable with this level of risk, you should not trade futures contracts.

You agree to maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, as such requirements may be modified from time to time.  If the value of the collateral in your Account falls below the maintenance margin requirement, FTX Trading may seize and liquidate any or all of your positions and assets to reduce your leverage.  If, after your positions and assets are liquidated, your Account still contains insufficient Digital Assets to restore your margin ratio to the required amount, you will be responsible for any additional Digital Assets owed.

FTX Trading may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, including, but not limited to closing futures positions held in any Digital Asset or index that FTX Trading plans to delist from the Exchange in accordance with Section 20.

Under certain market conditions, it may be difficult or impossible to liquidate a position.  This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on our platform.  In the event that market conditions make it impossible to execute such orders, you may be unable to limit your losses.  The use of leverage can lead to large losses as well as gains.

A000455

### 7.  LEVERAGED TOKENS

Leveraged Tokens are "ERC-20" digital tokens issued by FTX Trading that operate on the Ethereum blockchain ("**Leveraged Tokens**").  FTX offers Leveraged Tokens for each underlying Digital Asset or index ("**Underlying**").  Each Leveraged Token has an associated account on FTX that takes leveraged positions on perpetual futures contracts, and can be created or redeemed for its share of the Digital Assets of that account.

Users may create Leveraged Tokens by depositing Stablecoins and redeem Leveraged Tokens for an equivalent amount of Stablecoins.  The Leveraged Token will automatically rebalance to add or remove exposure based on the size of the creation or redemption.  Users are charged or credited an amount of Stablecoins equal to the number of Leveraged Tokens being created or redeemed multiplied by the Net Asset Value of the Leveraged Token as of the creation or redemption time.

Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("**BULL**"), -100% or -1x ("**HEDGE**"), or -300% or -3x ("**BEAR**") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period.  A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period.

A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying.  Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns.

### 8.  FORKS AND DISTRIBUTIONS

As a result of the decentralized and open source nature of Digital Assets it is possible that sudden, unexpected, or controversial changes ("**Forks**") can be made to any Digital Asset that may change the usability, functions, value or even name of a given Digital Asset.  Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a "**Dominant Digital Asset**") and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a "**Non-Dominant Digital Asset**").

FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork.  Forks of Digital

Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on FTX.  When trading or holding Digital Assets using your Account, you should operate under the assumption that FTX will never support any Fork of such Digital Asset.

If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers, and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support.   If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

FTX does not generally offer support for the distribution of assets based on a triggering fact or event, such as the possession of another asset (each an "**Airdrop**"), the provision of rewards or other similar payment for participation in a Digital Asset's protocol ("**Staking Rewards**"), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the FTX platform (collectively, "**Digital Asset Distributions**").  FTX Trading may, in its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on FTX for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored ("**Downtime**").  This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning.  During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork.  FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 9.  ATTACKS ON BLOCKCHAIN NETWORKS

FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks.  In the event of an attack, FTX Trading reserves the right to take commercially reasonable actions, including, but not limited to, if we confirm that a Digital Asset's network is compromised or under attack, immediately halting trading, deposits, and withdrawals for such Digital Asset.  If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of FTX and you assume all liability for any lost value or stolen property.

**10. API USE**

Subject to your compliance with these Terms and any other agreement which may be in place between you and FTX Trading related to your use of the API, FTX Trading hereby grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on FTX.  You agree to not use the API or data provided through the API for any other commercial purpose.  You access and use the API entirely at your own risk, and FTX Trading will not be responsible for any actions you take based on the API.

FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity.  You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.  FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of these Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

**11. ACCOUNT SUSPENSION AND CLOSURE**

FTX Trading may, in its sole and absolute discretion, without liability to you or any third party, refuse to let you open an Account, suspend your Account, or terminate your Account or your use of one or more of the Services.  Such actions may be taken as a result of a number of factors, including without limitation account inactivity, failure to respond to customer support requests, failure to positively identify you, a court order, or your violation of these Terms.  We may also temporarily suspend access to your Account, in the event that a technical problem causes system outage or Account errors, until the problem is resolved.

You may terminate this agreement at any time by closing your Account in accordance with these Terms.  In order to do so, you should contact us for assistance in closing your Account.  You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading.

We encourage you to withdraw any remaining balance of Digital Assets prior to issuing a request to close your Account.  We reserve the right to restrict or refuse to permit withdrawals from your Account if (i) your Account has otherwise been suspended or closed by us in accordance with these Terms; (ii) to do so would be prohibited by law or court order, or we have determined that the Digital Assets in you Account were obtained fraudulently; or (iii) you have not completed the required identity verification procedure.  You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.  Upon closure or suspension of your Account, you authorize FTX Trading to cancel or suspend pending transactions.

In the event that you or FTX Trading terminates this agreement or your access to the Services, or deactivates or closes your Account, you remain liable for all activity conducted with or in connection with your Account while it was open and for all amounts due in connection with such activity.

### 12. RISK DISCLOSURES

The following risks associated with Digital Assets and the Services is not exhaustive.

**No advice**

FTX Trading does not advise on the merits of any particular transactions, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, or legal advice in connection with the Services.  To the extent that we or our representatives provide trading recommendations, market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice.  Any decision to buy or sell Digital Assets is the User's decision and FTX Trading will not be liable for any loss suffered.

You accept the risk of trading Digital Assets.  In entering into any transaction on FTX, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of the transaction and the underlying Digital Asset.  You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction or any underlying Digital Asset.

**Digital Asset transfers and volatility**

Trading in Digital Assets can be extremely risky and volatile.  Digital Assets may have unique features that make them more or less likely to fluctuate in value.  Factors beyond FTX Trading's control, such as regulatory activity, market manipulation, or unexplainable price volatility, may affect market liquidity for a particular Digital Asset.  Blockchain networks may go offline as a result of bugs, Forks, or other unforeseeable reasons.  As a general matter, Users with limited trading experience and low risk tolerance should not engage in active trading on FTX.  Speculating on the value of Digital Assets is high risk and Users should never trade more than they can afford to lose.

Understanding Digital Assets requires advanced technical knowledge.  Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks.  The listing of a Digital Asset on FTX does not indicate FTX Trading's approval or disapproval of the underlying technology regarding any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset.  We provide no warranty as

to the suitability of the Digital Asset traded under these Terms and assume no fiduciary duty to Users in connection with such use of the Services.

Users accept all consequences of sending Digital Assets to an address off the FTX platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely.  For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to an entity that will not return your Digital Assets, or may return your Digital Assets but first requires action on your part, such as verification of your identity.

**Futures and leveraged products**

Trading of Futures Contracts and Leveraged Tokens may not be suitable for all Users and should only be used by those who understand the consequences of seeking daily inverse or leveraged results.

Futures Contracts involve margin and leverage, and as such, you may feel the effects of any losses immediately.  If movements in the markets for a Futures Contract or the underlying Digital Asset decrease the value of your position in such Future Contract, you may be required to have or make additional collateral available as margin.  If your Account is under the minimum margin requirements set by the Exchange, your position may be liquidated at a loss, and you will be liable for the deficit, if any, in your Account.

Unlike Futures Contracts, Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading, including but not limited to:

- *Market Price Variance Risk:* Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the underlying Digital Asset.  The market price for a Leveraged Token will fluctuate in response to changes in the value of the token's holdings, supply and demand for the token and other market factors.

- *Inverse Correlation Risk:* Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Digital Asset rises, a result that is opposite from holding the underlying asset.

- *Portfolio Turnover Risk:* Leveraged Tokens may incur high portfolio turnover to manage the exposure to the underlying Digital Asset.  Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs.  Each of these factors could have a negative impact on the performance of a Leveraged Token.

- *Interest Rates:* Leveraged Tokens take positions in futures contracts to achieve their desired leverage.  These futures might trade at a premium or discount to spot markets in the applicable Digital Asset as a reflection of prevailing interest rates in cryptocurrency markets.  Thus, a Leveraged Token could outperform or underperform the Digital Asset's returns due to a divergence between the two markets.

**Supply and value of Digital Assets**

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

You acknowledge and agree that Digital Assets and/or FTX features available in one jurisdiction may not be available for trading or to access, as applicable, in another.

**Blacklisted addresses and forfeited funds**

Leveraged Tokens are Digital Assets built on the Ethereum blockchain.  FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Leveraged Tokens (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates these Terms ("**Blacklisted Addresses**").  In the event that you send Leveraged Tokens to a Blacklisted Address, or receive Leveraged Tokens from a Blacklisted Address, FTX Trading may freeze such Leveraged Tokens and take steps to terminate your Account.

In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and you may forfeit any rights associated with your Leveraged Tokens, including the ability to redeem your Leveraged Tokens for U.S. Dollars.  FTX Trading may also be forced to freeze Leveraged Tokens in the event that we receive a legal order from a valid government authority requiring us to do so.

**Software protocols and operational challenges**

The software protocols that underlie Digital Assets are typically open source projects, which means that (i) the development and control of such Digital Assets is outside of FTX's control and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

You are aware of and accept the risk of operational challenges.  FTX may experience sophisticated cyber attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services.  You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction

failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks.  You agree not to hold FTX Trading accountable for any related losses.

All Users understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your assets stored on our platform.  You claim full responsibility for monitoring such technological changes and understanding their consequences for your Digital Assets.  Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks involved associated with Digital Assets use generally or your use of our Services

**Compliance**

You are responsible for complying with applicable law.  You agree that FTX is not responsible for determining whether or which laws may apply to your transactions, including but not limited to tax law.  You are solely responsible for reporting and paying any taxes arising from your use of the Services.

**Legislative and regulatory changes**

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, exchange, and value of Digital Assets.

**No deposit protection**

Digital Assets held in your Account are not eligible for any public or private deposit insurance protection.

**Digital Asset Distributions not supported**

Certain Digital Assets are built on protocols that support Digital Asset Distributions, including, but not limited to, Forks, Staking Rewards and Airdrops (as defined in Section 8 above).  FTX Trading is not obligated to support any such Digital Asset Distributions for Users.  If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX.  If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you.  Staking may subject your Digital Assets to additional risks and FTX is not responsible for losses you may incur related to staking.

## 13. RIGHT TO CHANGE OR REMOVE FEATURES AND SUSPEND OR DELAY TRANSACTIONS

We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability.  We may decline to process any order and may limit or suspend your use of one or more Services at any time, in our sole discretion.  Suspension of your use of any of the Services will not affect your rights and obligations pursuant to these Terms.

We may, in our sole discretion, decline to process orders if (i) we believe the transaction is suspicious; (ii) the transaction may involve fraud or misconduct; (iii) it violates applicable laws; or (vi) it violates these Terms.  Where permitted by law, we will notify you by the end of the business day if we have suspended processing your orders and, if possible, provide our reasons for doing so and anything you can do to correct any errors leading to the stoppage.

### 14. FEES

In consideration for the use of the Services, you agree to pay to FTX the appropriate fees, as set forth in our fee schedule displayed on the Site ("**Fee Schedule**"), which FTX Trading may revise or update in its sole discretion from time to time.  On request, FTX may make available an alternative fee schedule ("**Alternative Fee Schedule**") to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX in its sole discretion from time to time.  You authorize FTX to deduct any applicable fees from your Account at the time you make a given transaction.  Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

### 15. PROMOTIONS

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere.  You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to FTX.

### 16. SECURITY OF USER INFORMATION

You are responsible for maintaining the confidentiality and security of any and all account names, User IDs, passwords, and any other security feature that you use to access the Services.  You are responsible for (i) keeping your email address up to date in your Account profile and (ii) maintaining the confidentiality of your User information and the security of your Account, which includes the enabling of all relevant security features.  You agree to notify FTX immediately if you become aware of any unauthorized use of the Services or any other breach of security regarding the Services.  FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information.

A000463

We shall not bear any liability for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack.  If you question the authenticity of a communication purporting to be from FTX, you should login to your Account through the Site, not by clicking links contained in emails.

## 17. PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used.  You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

## 18. RESTRICTED ACTIVITIES

In connection with your use of the Services, you will not:

- violate or assist any party in violating any law, statute, ordinance, regulation or any rule of any self-regulatory or similar organization of which you are or are required to be a member through your use of the Services;
- provide false, inaccurate, incomplete or misleading information;
- infringe upon FTX's or any third party's copyright, patent, trademark, or intellectual property rights;
- engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;
- distribute unsolicited or unauthorized advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;
- use a web crawler or similar technique to access our Services or to extract data;
- reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;
- perform any unauthorized vulnerability, penetration or similar testing on the API;
- take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;
- transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;
- otherwise attempt to gain unauthorized access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;
- transfer any rights granted to you under these Terms;
- engage in any other activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct; or

A000464

- engage in any behavior which is unlawful, violates these Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion.

## 19. ELECTRONIC TRADING TERMS

FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset, Leveraged Token, or Futures Contract at any time, based on a number of factors, including changes in characteristics.

A transaction on FTX may fail for several reasons, including without limitation to change in prices, insufficient margin, or unanticipated technical difficulties.  FTX Trading makes no representation or warranty that any transaction will be executed properly.  We are under no circumstances liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner.  Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures on the Site.  You have full responsibility to determine and inquire into the failure of any transaction which you initiate.

In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to these Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software.  If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

We may refuse to execute a trade, or impose trade amount limits or restrictions at any time, in our sole discretion without notice.  Specifically, we reserve the right to refuse to process, or the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on FTX, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in these Terms.  FTX Trading reserves the right to halt deposit activity at our sole discretion.  A User may not change, withdraw, or cancel its authorization to make a transaction, except with respect to partially filled orders.

FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise.  The User's remedy in the event of an error will be limited to seeking to cancel an order or obtaining a refund of any amounts charged to the User.  FTX Trading cannot guarantee such cancellations or refunds will always be possible.

FTX provides Users with a platform that allows their orders to be matched with the orders of other Users.  Orders may be partially filled or may be filled by a number of orders, depending on the trading activity at the time an order is placed.  FTX's relationship with you under these Terms is as a trading platform provider only and does not act as principal or counterparty with respect to trades entered into on the platform.  Notwithstanding the foregoing, (i) FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected

on User trades, and (ii) affiliates of FTX may execute trades on the platform; provided, however, that such affiliates shall not be afforded any priority in trade execution.

The Digital Assets available for purchase through the Services may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods.  You acknowledge that while FTX Trading uses commercially reasonable methods to provide exchange rate information to you through our Services, the exchange rate information we provide may differ from prevailing exchange rates made available by third parties.  Similarly, the actual market rate at the time of your trade may be different from the indicated prevailing rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in actual versus indicated rates.

### 20. COMMUNICATIONS

These Terms are provided to you and concluded in English.  We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

### 21. FEEDBACK

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide on our platform or one of our social media accounts, regarding FTX or the Services (collectively, "**Feedback**") that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading.  FTX Trading will own exclusive rights, including all intellectual property rights, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

### 22. OWNERSHIP OF DIGITAL ASSETS

You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services are either owned by you or that you are validly authorized to carry out transactions using such Digital Assets and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity.

### 23. TAXES

You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments.  It is your responsibility to determine what, if any, taxes apply to your activities on the Exchange, and to collect, report, and remit the correct tax to the appropriate tax authority. FTX Trading is not responsible for

determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

### 24. INDEMNIFICATION; RELEASE

You agree to indemnify and hold FTX Trading, its affiliates, and service providers, and each of their officers, directors, agents, joint venturers, employees, and representatives harmless from any claim or demand (including attorneys' fees and any losses, fines, fees, or penalties imposed by any regulatory authority) arising out of your breach of these Terms, or your violation of any law or regulation.

For the purpose of this Section 24, the term "**losses**" means all net costs reasonably incurred by us or the other persons referred to in this Section which are the result of the matters set out in this Section 24 and which may relate to any claims, demands, causes of action, debt, cost, expense or other liability, including reasonable legal fees (without duplication).

If you have a dispute with one or more Users or third parties, you release FTX Trading (and its affiliates and service providers, and each of their officers, directors, agents, joint ventures, employees, and representatives) from any and all claims, demands, and damages (actual and consequential) of every kind and nature arising out of or in any way connected with such disputes.  If you have a dispute with anyone other than FTX Trading, you release us from liability associated with that dispute.

### 25. LIMITATION OF LIABILITY; NO WARRANTY

YOU EXPRESSLY UNDERSTAND AND AGREE THAT FTX TRADING AND OUR AFFILIATES AND SERVICE PROVIDERS, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND REPRESENTATIVES WILL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY DAMAGES, OR DAMAGES FOR LOSS OF PROFITS INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES (EVEN IF FTX TRADING HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, RESULTING FROM: (I) THE USE OR THE INABILITY TO USE THE SERVICES; (II) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; (III) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR (IV) ANY OTHER MATTER RELATING TO THE SERVICES.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.  ACCORDINGLY, SOME OF THE LIMITATIONS SET FORTH ABOVE MAY NOT APPLY TO YOU.  IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE SERVICES OR

A000467

WITH THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USE OF THE SERVICES AND CLOSE YOUR ACCOUNT.  THE SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED.  FTX TRADING, OUR AFFILIATES, AND OUR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.  FTX TRADING MAKES NO WARRANTY THAT (I) THE SERVICES WILL MEET YOUR REQUIREMENTS, (II) THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, OR (III) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

### 26. FORCE MAJEURE

FTX Trading shall have no liability for any failure or delay resulting from any abnormal or unforeseeable circumstances outside our reasonable control, the consequences of which would have been unavoidable despite all efforts to the contrary, including without limitation governmental action or acts of terrorism, earthquake, fire, flood, or other acts of God, labor conditions, delays or failures caused by problems with another system or network, mechanical breakdown or data-processing failures or where we are bound by other legal obligations.

### 27. GOVERNING LAW; VENUE AND ARBITRATION

The laws of Antigua and Barbuda shall govern these Terms.  Except as otherwise required by local law, any dispute between you and FTX Trading related in any way to, or arising in any way from, our Services or these Terms ("**Dispute**") shall be finally settled on an individual, non-representative basis in binding arbitration in accordance with the Antigua and Barbuda Arbitration Act (Cap 33), as modified by these Terms or in accordance with rules on which we may mutually agree.  Any arbitration shall take place in Antigua and Barbuda.  The arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorized by law.

### 28. AMENDMENTS

We may amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date.  The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised agreement and shall apply on a going-forward basis with respect to transactions initiated after the posting date.  In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your Account.  You agree that we shall not be liable to you or any third party as a result of any losses suffered by any modification or amendment of these Terms.

### 29. ASSIGNMENT

You may not transfer or assign these Terms or any rights or obligations you have under these Terms without our prior written consent or otherwise and any such attempted assignment shall be void.  We reserve the right to freely assign or transfer these Terms and the rights and obligations of these Terms, to any third party at any time without notice or consent.  If you object to such transfer or assignment, you may stop using our Services and terminate this agreement by contacting us and requesting to close your account.

### 30. SURVIVAL

Upon termination of your Account or this agreement for any other reason, all rights and obligations of the parties that by their nature are continuing will survive such termination.

### 31. THIRD PARTY APPLICATIONS

If you grant express permission to a third party to connect to your Account, either through the third party's product or through FTX, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under this agreement.  Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

### 32. SITE; THIRD PARTY CONTENT

FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date.  FTX Trading will update the information on the Site as necessary to provide you with the most up to date information, but you should always independently verify such information.  The Site may also contain links to third party websites, applications, events or other materials ("**Third Party Content**").  Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services.  FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

### 33. LIMITED LICENSE; IP RIGHTS

FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to these Terms, to access and use the Services solely for approved purposes as determined by FTX Trading.  Any other use of the Services is expressly prohibited.  FTX Trading and its licensors reserve all rights in the Services and you agree that these Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

A000469

Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part.  If you violate any portion of these Terms, your permission to access and use the Services may be terminated pursuant to these Terms.  "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors.  You may not copy, imitate, or use them without FTX Trading's prior written consent.  All right, title, and interest in and to the Site, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

## 34. UNCLAIMED OR ABANDONED PROPERTY

If FTX Trading is holding funds in your Account, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time, applicable law may require us to report these funds as unclaimed property to the applicable jurisdiction.  If this occurs, FTX Trading will try to locate you at the address shown in our records, but if FTX Trading is unable to locate you, we may be required to deliver any such funds to the applicable jurisdiction as unclaimed property.  FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds, as permitted by applicable law.

## 35. LEGAL COMPLIANCE

The Services are subject to all applicable export control restrictions, and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if (i) you are a resident, national or agent of Cuba, Crimea and Sevastopol, Germany, Iran, North Korea, Pakistan, Sudan, Syria, Vietnam, or any other country to which the United States, the United Kingdom or the European Union embargoes goods or imposes similar sanctions ("**Restricted Territories"**); (ii) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government or by the European Union ("**Restricted Persons"**); (iii) you intend to transact with any Restricted Territories or Restricted Persons; (iv) you you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or (v) the publication or availability of the Services is prohibited or contrary to local law or regulation, or could subject FTX to any local registration or licensing requirements.

## 36. ENTIRE AGREEMENT; THIRD PARTY RIGHTS

The failure of FTX Trading to exercise or enforce any right or provision of the Agreement shall not constitute a waiver of such right or provision.  If any provision of these Terms shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms shall otherwise remain in full force and effect and remain enforceable between the parties.

The headings and any explanatory text are for reference purposes only and in no way define, limit, construe, or describe the scope or extent of such section.  These Terms, including FTX's policies governing the Services referenced herein, the Privacy Policy, and the Security Policy, constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

These Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and other affiliates of FTX Trading, which each shall be a third party beneficiary of these Terms, and no other person shall assert any rights as a third party beneficiary hereunder.  If some future court judgment deems any particular provision of these Terms unenforceable, the rest of the Agreement is still valid.

## 37. QUESTIONS AND CONTACT INFORMATION

We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise Users to check those channels before contacting support.

Telegram: https://t.me/FTX_Official
Twitter: https://twitter.com/FTX_Official
WeChat: ftexchange
Blog: https://blog.ftx.com/
Email: support@ftx.com

To contact us, please visit one of the links or channels above.  For support with your Account, you may email us at support@ftx.com.  Please provide all relevant information, including your FTX username and transaction IDs of any related deposits.  Although we make no representations or provide no warranties as to the speed of response, we will get back to you as soon as possible.

A000471

# EXHIBIT J

A000472

Get Started for Free

Contact Us

# AWS Customer Agreement

*Please note that as of April 1, 2016, customers located in India contract with our India based AWS Contracting Party, as provided in Section 14. See the AWS India FAQ for more information.

*Please note that as of July 1, 2018, customers located in Europe, the Middle East, or Africa (other than South Africa) contract with our European based AWS Contracting Party, as provided in Section 14. See the AWS Europe FAQ for more information.

*Please note that as of August 1, 2020, customers located in South Africa contract with our South Africa based AWS Contracting Party, as provided in Section 14. See the AWS South Africa FAQ for more information.

*Please note that as of November 1, 2020, customers located in Brazil contract with our Brazil based AWS Contracting Party, as provided in Section 14. See the AWS SBL FAQ for more information.

*Observe que, a partir de 1º de novembro de 2020, os usuários localizados no Brasil celebrarão contrato com a nossa Parte Contratante da AWS sediada no Brasil, conforme prevê a Cláusula 14. Consulte as Perguntas Frequentes sobre a AWS SBL para obter mais informações. Consulte aqui a versão em português deste Contrato do Cliente AWS.

*Please note that as of December 1, 2020, customers located in South Korea contract with our South Korea based AWS Contracting Party, as provided in Section 14. See the AWS South Korea FAQs for more information.

*Please note that as of October 1, 2021 for customers using the invoicing payment method and as of February 1, 2022 for customers using the credit card payment method, customers located in Canada contract with our Canada based AWS Contracting Party, as provided in Section 14. See the AWS Canada FAQs for more information.

A000473

*Please note that as of October 1, 2021 for customers using the invoicing payment method and as of February 1, 2022 for customers using the credit card payment method, customers located in Singapore contract with our Singapore based AWS Contracting Party, as provided in Section 14. See the AWS Singapore FAQs for more information.

*Please note that as of November 1, 2021 for customers using the invoicing payment method and as of February 1, 2022 for customers using the credit card payment method, customers located in Japan contract with our Japan based AWS Contracting Party, as provided in Section 14. See the AWS Japan FAQs for more information.

*Please note that as of November 1, 2021, customers located in Australia contract with our Australia based AWS Contracting Party, as provided in Section 14. See the AWS Australia FAQs for more information.

*Please note that as of November 1, 2021, customers located in New Zealand contract with our New Zealand based AWS Contracting Party, as provided in Section 14. See the AWS New Zealand FAQs for more information.

*Please note that as of October 1, 2022 for customers using payment methods other than American Express credit card and as of November 1, 2022 for customers using American Express credit card payment method, customers located in Malaysia contract with our Malaysia based AWS Contracting Party, as provided in Section 14. See the AWS Malaysia FAQs for more information.


# Last Updated: December 13, 2022

See What's Changed

This AWS Customer Agreement (this "**Agreement**") contains the terms and conditions that govern your access to and use of the Service Offerings (as defined below) and is an agreement between the applicable AWS Contracting Party specified in Section 14 below (also referred to as "**AWS**," "**we**," "**us**," or "**our**") and you or the entity you represent ("**you**" or "**your**"). This Agreement takes effect when you click an "I Accept" button or check box presented with these terms or, if earlier, when you use any of the Service Offerings (the "**Effective Date**"). You represent to us that you are lawfully able to enter into contracts (e.g., you are not a minor). If you are entering into this Agreement for an entity, such as the company you work for, you represent to us that you have legal authority to bind that entity. Please see Section 14 for definitions of certain capitalized terms used in this Agreement.

# 1. Use of the Service Offerings.

1.1 Generally. You may access and use the Services in accordance with this Agreement. Service Level Agreements and Service Terms apply to certain Service Offerings. You will comply with the terms of this Agreement and all laws, rules and regulations applicable to your use of the Service Offerings.

1.2 Your Account. To access the Services, you must have an AWS account associated with a valid email address and a valid form of payment. Unless explicitly permitted by the Service Terms, you will only create one account per email address.

1.3 Third-Party Content. Third-Party Content may be used by you at your election. Third-Party Content is governed by this Agreement and, if applicable, separate terms and conditions accompanying such Third-Party Content, which terms and conditions may include separate fees and charges.

## 2. Changes.

2.1 To the Services. We may change or discontinue any of the Services from time to time. We will provide you at least 12 months' prior notice if we discontinue material functionality of a Service that you are using, or materially alter a customer-facing API that you are using in a backwards-incompatible fashion, except that this notice will not be required if the 12 month notice period (a) would pose a security or intellectual property issue to us or the Services, (b) is economically or technically burdensome, or (c) would cause us to violate legal requirements.

2.2 To the Service Level Agreements. We may change, discontinue or add Service Level Agreements from time to time in accordance with Section 12.

## 3. Security and Data Privacy.

3.1 AWS Security. Without limiting Section 10 or your obligations under Section 4.2, we will implement reasonable and appropriate measures designed to help you secure Your Content against accidental or unlawful loss, access or disclosure.

3.2 Data Privacy. You may specify the AWS regions in which Your Content will be stored. You consent to the storage of Your Content in, and transfer of Your Content into, the AWS regions you select. We will not access or use Your Content except as necessary to maintain or provide the Service Offerings, or as necessary to comply with the law or a binding order of a governmental body. We will not (a) disclose Your Content to any government or third party or (b) move Your Content from the AWS regions selected by you; except in each case as necessary to comply with the law or a binding order of a governmental body. Unless it would violate the law or a binding order of a governmental body, we will give you notice of any legal requirement or order referred to in this Section 3.2. We will only use your Account Information in accordance with the Privacy Notice, and you consent to such usage. The Privacy Notice does not apply to Your Content.

## 4. Your Responsibilities.

4.1 Your Accounts. Except to the extent caused by our breach of this Agreement, (a) you are responsible for all activities that occur under your account, regardless of whether the activities are authorized by you or undertaken by you, your employees or a third party (including your contractors, agents or End Users), and (b) we and our affiliates are not responsible for unauthorized access to your account.

A000475

4.2 Your Content. You will ensure that Your Content and your and End Users' use of Your Content or the Service Offerings will not violate any of the Policies or any applicable law. You are solely responsible for the development, content, operation, maintenance, and use of Your Content.

4.3 Your Security and Backup. You are responsible for properly configuring and using the Service Offerings and otherwise taking appropriate action to secure, protect and backup your accounts and Your Content in a manner that will provide appropriate security and protection, which might include use of encryption to protect Your Content from unauthorized access and routinely archiving Your Content.

4.4 Log-In Credentials and Account Keys. AWS log-in credentials and private keys generated by the Services are for your internal use only and you will not sell, transfer or sublicense them to any other entity or person, except that you may disclose your private key to your agents and subcontractors performing work on your behalf.

4.5 End Users. You will be deemed to have taken any action that you permit, assist or facilitate any person or entity to take related to this Agreement, Your Content or use of the Service Offerings. You are responsible for End Users' use of Your Content and the Service Offerings. You will ensure that all End Users comply with your obligations under this Agreement and that the terms of your agreement with each End User are consistent with this Agreement. If you become aware of any violation of your obligations under this Agreement caused by an End User, you will immediately suspend access to Your Content and the Service Offerings by such End User. We do not provide any support or services to End Users unless we have a separate agreement with you or an End User obligating us to provide such support or services.

## 5. Fees and Payment.

5.1 Service Fees. We calculate and bill fees and charges monthly. We may bill you more frequently for fees accrued if we suspect that your account is fraudulent or at risk of non-payment. You will pay us the applicable fees and charges for use of the Service Offerings as described on the AWS Site using one of the payment methods we support. All amounts payable by you under this Agreement will be paid to us without setoff or counterclaim, and without any deduction or withholding. Fees and charges for any new Service or new feature of a Service will be effective when we post updated fees and charges on the AWS Site, unless we expressly state otherwise in a notice. We may increase or add new fees and charges for any existing Services you are using by giving you at least 30 days' prior notice. We may elect to charge you interest at the rate of 1.5% per month (or the highest rate permitted by law, if less) on all late payments.

5.2 Taxes.

(a) Each party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that are imposed on that party upon or with respect to the transactions and payments under this Agreement. All fees payable by you are exclusive of Indirect Taxes, except where applicable law requires otherwise. We may charge and you will pay applicable Indirect Taxes that we are legally obligated or authorized to collect from you. You will provide such information to us as reasonably required to determine whether we are obligated to collect Indirect Taxes from you. We will not collect, and you will

not pay, any Indirect Tax for which you furnish us a properly completed exemption certificate or a direct payment permit certificate for which we may claim an available exemption from such Indirect Tax. All payments made by you to us under this Agreement will be made free and clear of any deduction or withholding, as may be required by law. If any such deduction or withholding (including but not limited to cross-border withholding taxes) is required on any payment, you will pay such additional amounts as are necessary so that the net amount received by us is equal to the amount then due and payable under this Agreement. We will provide you with such tax forms as are reasonably requested in order to reduce or eliminate the amount of any withholding or deduction for taxes in respect of payments made under this Agreement.

(b) If the applicable AWS Contracting Party is Amazon Web Services India Private Limited (AWS India) (formerly known as Amazon Internet Services Private Limited), the parties agree that the provisions of this Section 5.2(b) will apply.

You acknowledge that AWS India may display the applicable fees and charges for the Service Offerings on the Site in USD (or such other currency as AWS India may deem fit). However, AWS India will invoice you in INR calculated and converted in accordance with the conversion rate determined by us on the date of invoice ("INR Equivalent Fees"). You will only be liable to pay the INR Equivalent Fees indicated in each invoice.

We will invoice you from our registered office at the address of your establishment (as registered with the tax authorities, if applicable) receiving the Services in accordance with the applicable indirect tax laws.

All fees and charges payable under this Agreement will be exclusive of applicable national, state or local indirect taxes ("Taxes") that AWS India is legally obligated to charge under Indian tax laws. For the purpose of this clause, local indirect taxes include Goods and Services Tax ("GST"), which includes the Central Goods and Services Tax ("Central Tax"), the State Goods and Services Tax ("State Tax"), the Union Territory Goods and Services Tax ("UT Tax"), the Integrated Goods and Services Tax ("Integrated Tax") as may be applicable. The Taxes charged by AWS India will be stated in the invoice pursuant to applicable laws. AWS India may charge and you will pay any applicable Taxes, which are stated separately on the invoice. As per the statutory requirement under GST, you will provide all necessary information such as the correct GST registered address, legal name and GSTIN ("GST Information") in order for AWS India to issue correct GST invoices as per the applicable legal requirements. In the event, the GST invoice is incorrect, you will inform us in a timely manner, to enable AWS India to correct the GST tax invoice. AWS India will determine the place of supply for the Services based on the GST Information provided by you and accordingly, charge GST (CGST and SGST/UTGST or IGST) on its invoice. Any withholding taxes that may be applicable to the fees and charges payable to us are for our account. You will pay the fees and charges in our invoice in full (gross) without applying any withholding taxes. If you separately deposit applicable withholding taxes on such fees and charges to the applicable government treasury and issue us a withholding tax certificate evidencing such deposit, following receipt of the withholding tax certificate in original form, we will reimburse you an amount equal to the taxes that are evidenced as deposited.

A000477

## 6. Temporary Suspension.

6.1 Generally. We may suspend your or any End User's right to access or use any portion or all of the Service Offerings immediately upon notice to you if we determine:

(a) your or an End User's use of the Service Offerings (i) poses a security risk to the Service Offerings or any third party, (ii) could adversely impact our systems, the Service Offerings or the systems or Content of any other AWS customer, (iii) could subject us, our affiliates, or any third party to liability, or (iv) could be fraudulent;

(b) you are, or any End User is, in breach of this Agreement;

(c) you are in breach of your payment obligations under Section 5; or

(d) you have ceased to operate in the ordinary course, made an assignment for the benefit of creditors or similar disposition of your assets, or become the subject of any bankruptcy, reorganization, liquidation, dissolution or similar proceeding.

6.2 Effect of Suspension. If we suspend your right to access or use any portion or all of the Service Offerings:

(a) you remain responsible for all fees and charges you incur during the period of suspension; and

(b) you will not be entitled to any service credits under the Service Level Agreements for any period of suspension.

## 7. Term; Termination.

7.1 Term. The term of this Agreement will commence on the Effective Date and will remain in effect until terminated under this Section 7. Any notice of termination of this Agreement by either party to the other must include a Termination Date that complies with the notice periods in Section 7.2.

7.2 Termination.

(a) Termination for Convenience. You may terminate this Agreement for any reason by providing us notice and closing your account for all Services for which we provide an account closing mechanism. We may terminate this Agreement for any reason by providing you at least 30 days' advance notice.

(b) Termination for Cause.

(i) By Either Party. Either party may terminate this Agreement for cause if the other party is in material breach of this Agreement and the material breach remains uncured for a period of 30 days from receipt of notice by the other party. No later than the Termination Date, you will close your account.

A000478

(ii) By Us. We may also terminate this Agreement immediately upon notice to you (A) for cause if we have the right to suspend under Section 6, (B) if our relationship with a third-party partner who provides software or other technology we use to provide the Service Offerings expires, terminates or requires us to change the way we provide the software or other technology as part of the Services, or (C) in order to comply with the law or requests of governmental entities.

7.3 Effect of Termination.

(a) Generally. Upon the Termination Date:

(i) except as provided in Section 7.3(b), all your rights under this Agreement immediately terminate;

(ii) you remain responsible for all fees and charges you have incurred through the Termination Date and are responsible for any fees and charges you incur during the post-termination period described in Section 7.3(b);

(iii) you will immediately return or, if instructed by us, destroy all AWS Content in your possession; and

(iv) Sections 4.1, 5, 7.3, 8 (except Section 8.3), 9, 10, 11, 13 and 14 will continue to apply in accordance with their terms.

(b) Post-Termination. Unless we terminate your use of the Service Offerings pursuant to Section 7.2(b), during the 30 days following the Termination Date:

(i) we will not take action to remove from the AWS systems any of Your Content as a result of the termination; and

(ii) we will allow you to retrieve Your Content from the Services only if you have paid all amounts due under this Agreement.

For any use of the Services after the Termination Date, the terms of this Agreement will apply and you will pay the applicable fees at the rates under Section 5.

## 8. Proprietary Rights.

8.1 Your Content. Except as provided in this Section 8, we obtain no rights under this Agreement from you (or your licensors) to Your Content. You consent to our use of Your Content to provide the Service Offerings to you and any End Users.

8.2 Adequate Rights. You represent and warrant to us that: (a) you or your licensors own all right, title, and interest in and to Your Content and Suggestions; (b) you have all rights in Your Content and Suggestions

necessary to grant the rights contemplated by this Agreement; and (c) none of Your Content or End Users' use of Your Content or the Service Offerings will violate the Acceptable Use Policy.

8.3 Intellectual Property License. The Intellectual Property License applies to your use of AWS Content and the Services.

8.4 Restrictions. Neither you nor any End User will use the Service Offerings in any manner or for any purpose other than as expressly permitted by this Agreement. Neither you nor any End User will, or will attempt to (a) reverse engineer, disassemble, or decompile the Services or AWS Content or apply any other process or procedure to derive the source code of any software included in the Services or AWS Content (except to the extent applicable law doesn't allow this restriction), (b) access or use the Services or AWS Content in a way intended to avoid incurring fees or exceeding usage limits or quotas, or (c) resell the Services or AWS Content. The AWS Trademark Guidelines apply to your use of the AWS Marks. You will not misrepresent or embellish the relationship between us and you (including by expressing or implying that we support, sponsor, endorse, or contribute to you or your business endeavors). You will not imply any relationship or affiliation between us and you except as expressly permitted by this Agreement.

8.5 Suggestions. If you provide any Suggestions to us or our affiliates, we and our affiliates will be entitled to use the Suggestions without restriction. You hereby irrevocably assign to us all right, title, and interest in and to the Suggestions and agree to provide us any assistance we require to document, perfect, and maintain our rights in the Suggestions.

## 9. Indemnification.

9.1 General. You will defend, indemnify, and hold harmless us, our affiliates and licensors, and each of their respective employees, officers, directors, and representatives from and against any Losses arising out of or relating to any third-party claim concerning: (a) your or any End Users' use of the Service Offerings (including any activities under your AWS account and use by your employees and personnel); (b) breach of this Agreement or violation of applicable law by you, End Users or Your Content; or (c) a dispute between you and any End User. You will reimburse us for reasonable attorneys' fees, as well as our employees' and contractors' time and materials spent responding to any third party subpoena or other compulsory legal order or process associated with third party claims described in (a) through (c) above at our then-current hourly rates.

9.2 Intellectual Property.

(a) Subject to the limitations in this Section 9, AWS will defend you and your employees, officers, and directors against any third-party claim alleging that the Services infringe or misappropriate that third party's intellectual property rights, and will pay the amount of any adverse final judgment or settlement.

(b) Subject to the limitations in this Section 9, you will defend AWS, its affiliates, and their respective employees, officers, and directors against any third-party claim alleging that any of Your Content infringes or misappropriates that third party's intellectual property rights, and will pay the amount of any adverse final judgment or settlement.

A000480

(c) Neither party will have obligations or liability under this Section 9.2 arising from infringement by combinations of the Services or Your Content, as applicable, with any other product, service, software, data, content or method. In addition, AWS will have no obligations or liability arising from your or any End User's use of the Services after AWS has notified you to discontinue such use. The remedies provided in this Section 9.2 are the sole and exclusive remedies for any third-party claims of infringement or misappropriation of intellectual property rights by the Services or by Your Content.

(d) For any claim covered by Section 9.2(a), AWS will, at its election, either: (i) procure the rights to use that portion of the Services alleged to be infringing; (ii) replace the alleged infringing portion of the Services with a non-infringing alternative; (iii) modify the alleged infringing portion of the Services to make it non-infringing; or (iv) terminate the allegedly infringing portion of the Services or this Agreement.

9.3 Process. The obligations under this Section 9 will apply only if the party seeking defense or indemnity: (a) gives the other party prompt written notice of the claim; (b) permits the other party to control the defense and settlement of the claim; and (c) reasonably cooperates with the other party (at the other party's expense) in the defense and settlement of the claim. In no event will a party agree to any settlement of any claim that involves any commitment, other than the payment of money, without the written consent of the other party.

## 10. Disclaimers.

THE SERVICE OFFERINGS ARE PROVIDED "AS IS." EXCEPT TO THE EXTENT PROHIBITED BY LAW, OR TO THE EXTENT ANY STATUTORY RIGHTS APPLY THAT CANNOT BE EXCLUDED, LIMITED OR WAIVED, WE AND OUR AFFILIATES AND LICENSORS (A) MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE SERVICE OFFERINGS OR THE THIRD-PARTY CONTENT, AND (B) DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED OR EXPRESS WARRANTIES (I) OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR QUIET ENJOYMENT, (II) ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE, (III) THAT THE SERVICE OFFERINGS OR THIRD-PARTY CONTENT WILL BE UNINTERRUPTED, ERROR FREE OR FREE OF HARMFUL COMPONENTS, AND (IV) THAT ANY CONTENT WILL BE SECURE OR NOT OTHERWISE LOST OR ALTERED.

## 11. Limitations of Liability.

WE AND OUR AFFILIATES AND LICENSORS WILL NOT BE LIABLE TO YOU FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES (INCLUDING DAMAGES FOR LOSS OF PROFITS, REVENUES, CUSTOMERS, OPPORTUNITIES, GOODWILL, USE, OR DATA), EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, NEITHER WE NOR ANY OF OUR AFFILIATES OR LICENSORS WILL BE RESPONSIBLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) YOUR INABILITY TO USE THE SERVICES, INCLUDING AS A RESULT OF ANY (I) TERMINATION OR SUSPENSION OF THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SERVICE OFFERINGS, (II) OUR DISCONTINUATION OF ANY OR ALL OF THE SERVICE OFFERINGS, OR, (III) WITHOUT LIMITING ANY OBLIGATIONS UNDER THE SERVICE LEVEL AGREEMENTS, ANY UNANTICIPATED OR

UNSCHEDULED DOWNTIME OF ALL OR A PORTION OF THE SERVICES FOR ANY REASON; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; (C) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY YOU IN CONNECTION WITH THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SERVICE OFFERINGS; OR (D) ANY UNAUTHORIZED ACCESS TO, ALTERATION OF, OR THE DELETION, DESTRUCTION, DAMAGE, LOSS OR FAILURE TO STORE ANY OF YOUR CONTENT OR OTHER DATA. IN ANY CASE, EXCEPT FOR PAYMENT OBLIGATIONS UNDER SECTION 9.2, OUR AND OUR AFFILIATES' AND LICENSORS' AGGREGATE LIABILITY UNDER THIS AGREEMENT WILL NOT EXCEED THE AMOUNT YOU ACTUALLY PAY US UNDER THIS AGREEMENT FOR THE SERVICE THAT GAVE RISE TO THE CLAIM DURING THE 12 MONTHS BEFORE THE LIABILITY AROSE. THE LIMITATIONS IN THIS SECTION 11 APPLY ONLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

## 12. Modifications to the Agreement.

We may modify this Agreement (including any Policies) at any time by posting a revised version on the AWS Site or by otherwise notifying you in accordance with Section 13.10; provided, however, that we will provide at least 90 days' advance notice in accordance with Section 13.10 for adverse changes to any Service Level Agreement. Subject to the 90 day advance notice requirement with respect to adverse changes to Service Level Agreements, the modified terms will become effective upon posting or, if we notify you by email, as stated in the email message. By continuing to use the Service Offerings after the effective date of any modifications to this Agreement, you agree to be bound by the modified terms. It is your responsibility to check the AWS Site regularly for modifications to this Agreement. We last modified this Agreement on the date listed at the beginning of this Agreement.

## 13. Miscellaneous.

13.1 Assignment. You will not assign or otherwise transfer this Agreement or any of your rights and obligations under this Agreement, without our prior written consent. Any assignment or transfer in violation of this Section 13.1 will be void. We may assign this Agreement without your consent (a) in connection with a merger, acquisition or sale of all or substantially all of our assets, or (b) to any affiliate or as part of a corporate reorganization; and effective upon such assignment, the assignee is deemed substituted for AWS as a party to this Agreement and AWS is fully released from all of its obligations and duties to perform under this Agreement. Subject to the foregoing, this Agreement will be binding upon, and inure to the benefit of the parties and their respective permitted successors and assigns.

13.2 Entire Agreement. This Agreement incorporates the Policies by reference and is the entire agreement between you and us regarding the subject matter of this Agreement. This Agreement supersedes all prior or contemporaneous representations, understandings, agreements, or communications between you and us, whether written or verbal, regarding the subject matter of this Agreement (but does not supersede prior commitments to purchase Services such as Amazon EC2 Reserved Instances). We will not be bound by, and specifically object to, any term, condition or other provision that is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) including for example, any term, condition or other provision (a) submitted by you in any order, receipt, acceptance, confirmation, correspondence or other document, (b) related to any online registration, response to any Request for Bid,

A000482

Request for Proposal, Request for Information, or other questionnaire, or (c) related to any invoicing process that you submit or require us to complete. If the terms of this document are inconsistent with the terms contained in any Policy, the terms contained in this document will control, except that the Service Terms will control over this document.

13.3 Force Majeure. We and our affiliates will not be liable for any delay or failure to perform any obligation under this Agreement where the delay or failure results from any cause beyond our reasonable control, including acts of God, labor disputes or other industrial disturbances, electrical or power outages, utilities or other telecommunications failures, earthquake, storms or other elements of nature, blockages, embargoes, riots, acts or orders of government, acts of terrorism, or war.

13.4 Governing Law. The Governing Laws, without reference to conflict of law rules, govern this Agreement and any dispute of any sort that might arise between you and us. The United Nations Convention for the International Sale of Goods does not apply to this Agreement.

13.5 Disputes. Any dispute or claim relating in any way to your use of the Service Offerings, or to any products or services sold or distributed by AWS will be adjudicated in the Governing Courts, and you consent to exclusive jurisdiction and venue in the Governing Courts, subject to the additional provisions below.

> (a) If the applicable AWS Contracting Party is Amazon Web Services, Inc., Amazon Web Services Canada, Inc., Amazon Web Services Korea LLC or Amazon Web Services Singapore Private Limited, the parties agree that the provisions of this Section 13.5(a) will apply. Disputes will be resolved by binding arbitration, rather than in court, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this Agreement, except that if Amazon Web Services Canada, Inc. is the applicable AWS Contracting Party the Ontario Arbitration Act will apply to this Agreement. There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would. To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, which are available at www.adr.org or by calling 1-800-778-7879. Payment of filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. We will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or at a mutually agreed location. We and you agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. If for any reason a claim proceeds in court rather than in arbitration we and you waive any right to a jury trial. Notwithstanding the foregoing we and you both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.

A000483

(b) If the applicable AWS Contracting Party is Amazon Web Services South Africa Proprietary Limited, the parties agree that the provisions of this Section 13.5(b) will apply. Disputes will be resolved by arbitration in accordance with the then-applicable rules of the Arbitration Foundation of Southern Africa, and judgment on the arbitral award must be entered in the Governing Court. The Arbitration Act, No. 42 of 1965 applies to this Agreement. The arbitration will take place in Johannesburg. There will be three arbitrators. The fees and expenses of the arbitrators and the administering authority, if any, will be paid in equal proportion by the parties.

**(c) If the applicable AWS Contracting Party is Amazon AWS Serviços Brasil Ltda., the parties agree that the provisions of this Section 13.5(c) will apply. Disputes will be resolved by binding arbitration, rather than in court, in accordance with the then-applicable Rules of Arbitration of the International Chamber of Commerce, and judgment on the arbitral award may be entered in any court having jurisdiction. The arbitration will take place in the City of São Paulo, State of São Paulo, Brazil. There will be three arbitrators. The fees and expenses of the arbitrators and the administering authority, if any, will be paid in equal proportion by the parties. The parties agree that the existence of and information relating to any such arbitration proceedings will not be disclosed by either party and will constitute confidential information. The Governing Courts will have exclusive jurisdiction for the sole purposes of (i) ensuring the commencement of the arbitral proceedings; and (ii) granting conservatory and interim measures prior to the constitution of the arbitral tribunal.**

(d) If the applicable AWS Contracting Party is Amazon Web Services Australia Pty Ltd, the parties agree that the provisions of this Section 13.5(d) will apply. Disputes will be resolved by arbitration administered by the Australian Center for International Commercial Arbitration ("ACICA") in accordance with the then-applicable ACICA Arbitration Rules, and judgment on the arbitral award may be entered in any court having jurisdiction. The arbitration will take place in Sydney, Australia. There will be three arbitrators. The fees and expenses of the arbitrators and the administering authority, if any, will be paid in equal proportion by the parties. The parties agree that the existence of and information relating to any such arbitration proceedings will not be disclosed by either party and will constitute confidential information.

(e) If the applicable AWS Contracting Party is Amazon Web Services New Zealand Limited, the parties agree that the provisions of this Section 13.5(e) will apply. Disputes will be resolved by arbitration administered by the New Zealand Dispute Resolution Centre ("NZDRC") in accordance with the then-applicable Arbitration Rules of NZDRC, and judgment on the arbitral award may be entered in any court having jurisdiction. The arbitration will take place in Auckland, New Zealand. There will be three arbitrators. The fees and expenses of the arbitrators and the administering authority, if any, will be paid in equal proportion by the parties. The parties agree that the existence of and information relating to any such arbitration proceedings will not be disclosed by either party and will constitute confidential information.

(f) If the applicable AWS Contracting Party is Amazon Web Services Malaysia Sdn. Bhd., the parties agree that the provisions of this Section 13.5(f) will apply. Disputes will be resolved by arbitration

administered by the Singapore International Arbitration Centre ("SIAC") in accordance with the then-applicable Arbitration Rules of SIAC, and judgment on the arbitral award may be entered in any court having jurisdiction. The arbitration will take place in Singapore. There will be three arbitrators. The fees and expenses of the arbitrators and the administering authority, if any, will be paid in equal proportion by the parties. The parties agree that the existence of and information relating to any such arbitration proceedings will not be disclosed by either party and will constitute confidential information.

(g) If the applicable AWS Contracting Party is AWS India, the parties agree that the provisions of this Section 13.5(g) will apply.  Disputes will be resolved by binding arbitration, rather than in court. Arbitration will be conducted by a panel consisting of three (3) arbitrators, with one (1) nominated by each party and the third chosen by the two (2) arbitrators so nominated. The decision and award will be determined by the majority of the panels and shall be final and binding upon the parties. The arbitration will be conducted in accordance with the provisions of the Arbitration and Conciliation Act, 1996 of India, as may be in force from time to time. The arbitration proceedings will be conducted in English, and the seat of the arbitration will be New Delhi. The cost of the arbitration, including fees and expenses of the arbitrator, shall be shared equally by the parties, unless the award otherwise provides. The courts at New Delhi shall have the exclusive jurisdiction for all arbitral applications. The Parties agree that the existence of and information relating to any such arbitration proceedings will not be disclosed by either party. Notwithstanding the foregoing, any party may seek injunctive relief in any court of competent jurisdiction for any actual or alleged infringement of such party's, its Affiliates' or any third party's intellectual property or other proprietary rights.

13.6 Trade Compliance. In connection with this Agreement, each party will comply with all applicable import, re-import, sanctions, anti-boycott, export, and re-export control laws and regulations, including all such laws and regulations that apply to a U.S. company, such as the Export Administration Regulations, the International Traffic in Arms Regulations, and economic sanctions programs implemented by the Office of Foreign Assets Control. For clarity, you are solely responsible for compliance related to the manner in which you choose to use the Service Offerings, including your transfer and processing of Your Content, the provision of Your Content to End Users, and the AWS region in which any of the foregoing occur. You represent and warrant that you and your financial institutions, or any party that owns or controls you or your financial institutions, are not subject to sanctions or otherwise designated on any list of prohibited or restricted parties, including but not limited to the lists maintained by the United Nations Security Council, the U.S. Government (e.g., the Specially Designated Nationals List and Foreign Sanctions Evaders List of the U.S. Department of Treasury, and the Entity List of the U.S. Department of Commerce), the European Union or its Member States, or other applicable government authority.

13.7 Independent Contractors; Non-Exclusive Rights. We and you are independent contractors, and this Agreement will not be construed to create a partnership, joint venture, agency, or employment relationship. Neither party, nor any of their respective affiliates, is an agent of the other for any purpose or has the authority to bind the other. Both parties reserve the right (a) to develop or have developed for it products, services, concepts, systems, or techniques that are similar to or compete with the products, services, concepts, systems, or techniques developed or contemplated by the other party, and (b) to assist third party developers or systems integrators who may offer products or services which compete with the other party's products or services.

13.8 Language. All communications and notices made or given pursuant to this Agreement must be in the English language. If we provide a translation of the English language version of this Agreement, the English language version of the Agreement will control if there is any conflict.

13.9 Confidentiality and Publicity. You may use AWS Confidential Information only in connection with your use of the Service Offerings as permitted under this Agreement. You will not disclose AWS Confidential Information during the Term or at any time during the 5-year period following the end of the Term. You will take all reasonable measures to avoid disclosure, dissemination or unauthorized use of AWS Confidential Information, including, at a minimum, those measures you take to protect your own confidential information of a similar nature. You will not issue any press release or make any other public communication with respect to this Agreement or your use of the Service Offerings.

13.10 Notice.

(a) To You. We may provide any notice to you under this Agreement by: (i) posting a notice on the AWS Site; or (ii) sending a message to the email address then associated with your account. Notices we provide by posting on the AWS Site will be effective upon posting and notices we provide by email will be effective when we send the email. It is your responsibility to keep your email address current. You will be deemed to have received any email sent to the email address then associated with your account when we send the email, whether or not you actually receive the email.

(b) To Us. To give us notice under this Agreement, you must contact AWS by facsimile transmission or personal delivery, overnight courier or registered or certified mail to the facsimile number or mailing address, as applicable, listed for the applicable AWS Contracting Party in Section 14 below. We may update the facsimile number or address for notices to us by posting a notice on the AWS Site. Notices provided by personal delivery will be effective immediately. Notices provided by facsimile transmission or overnight courier will be effective one business day after they are sent. Notices provided registered or certified mail will be effective three business days after they are sent.

13.11 No Third-Party Beneficiaries. Except as set forth in Section 9, this Agreement does not create any third-party beneficiary rights in any individual or entity that is not a party to this Agreement.

13.12 U.S. Government Rights. The Service Offerings are provided to the U.S. Government as "commercial items," "commercial computer software," "commercial computer software documentation," and "technical data" with the same rights and restrictions generally applicable to the Service Offerings. If you are using the Service Offerings on behalf of the U.S. Government and these terms fail to meet the U.S. Government's needs or are inconsistent in any respect with federal law, you will immediately discontinue your use of the Service Offerings. The terms "commercial item" "commercial computer software," "commercial computer software documentation," and "technical data" are defined in the Federal Acquisition Regulation and the Defense Federal Acquisition Regulation Supplement.

13.13 No Waivers. The failure by us to enforce any provision of this Agreement will not constitute a present or future waiver of such provision nor limit our right to enforce such provision at a later time. All waivers by us must be in writing to be effective.

A000486

13.14 Severability. If any portion of this Agreement is held to be invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect. Any invalid or unenforceable portions will be interpreted to effect and intent of the original portion. If such construction is not possible, the invalid or unenforceable portion will be severed from this Agreement but the rest of the Agreement will remain in full force and effect.

13.15  Account Country Specific Terms.  You agree to the following modifications to the Agreement that apply to your AWS Contracting Party as described below:

(a)  If the applicable AWS Contracting Party is Amazon Web Services Australia Pty Ltd, the parties agree as follows:

If the Services are subject to any statutory guarantees under the Australian Competition and Consumer Act 2010, then to the extent that any part of this Agreement is unenforceable under such Act, you agree that a fair and reasonable remedy to you will be limited to, at our election, either: (i) supplying the Services again; or (ii) paying for the cost of having the Services supplied again.

(b)  If the applicable AWS Contracting Party is Amazon Web Services Japan G.K., the parties agree as follows:

(i)  The following sentence is added at the end of Section 8.5 (Suggestions):

"The foregoing assignment includes the assignment of the rights provided under Article 27 (Rights of Translation, Adaptation, etc.) and Article 28 (Right of the Original Author in the Exploitation of a Derivative Work) of the Copyright Act of Japan, and you agree not to exercise your moral rights against us, our affiliates or persons who use the Suggestions through the consent of us or our affiliates."

(ii)  The following sentences are added at the end of Section 11 (Limitation of Liability):

"THE DISCLAIMER OR THE DAMAGES CAP IN THIS SECTION MAY NOT BE APPLIED TO DAMAGES CAUSED BY EITHER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IF SUCH DISCLAIMER OR THE DAMAGES CAP ARE DEEMED AGAINST PUBLIC POLICY UNDER ARTICLE 90 OF THE CIVIL CODE.  IN THAT EVENT, THE SCOPE OF THE DISCLAIMER SHALL BE NARROWLY CONSTRUED IN SUCH MANNER AND THE DAMAGES CAP MAY BE INCREASED BY SUCH MINIMUM AMOUNT SO THAT THE DISCLAIMER OR THE DAMAGES CAP HEREUNDER WOULD NOT BE DEEMED AGAINST PUBLIC POLICY UNDER ARTICLE 90 OF THE CIVIL CODE."

# 14. Definitions.

"Acceptable Use Policy" means the policy located at http://aws.amazon.com/aup (and any successor or related locations designated by us), as may be updated by us from time to time.

"Account Country" is the country associated with your account. If you have provided a valid tax registration number for your account, then your Account Country is the country associated with your tax registration. If you have not provided a valid tax registration, then your Account Country is the country where your billing address is located, except if you have a credit card associated with your AWS account that is issued in a

A000487

different country and your contact address is also in that country, then your Account Country is that different country.

"Account Information" means information about you that you provide to us in connection with the creation or administration of your AWS account. For example, Account Information includes names, usernames, phone numbers, email addresses and billing information associated with your AWS account.

"API" means an application program interface.

"AWS Confidential Information" means all nonpublic information disclosed by us, our affiliates, business partners, or our or their respective employees, contractors or agents that is designated as confidential or that, given the nature of the information or circumstances surrounding its disclosure, reasonably should be understood to be confidential. AWS Confidential Information includes: (a) nonpublic information relating to our or our affiliates or business partners' technology, customers, business plans, promotional and marketing activities, finances and other business affairs; (b) third-party information that we are obligated to keep confidential; and (c) the nature, content and existence of any discussions or negotiations between you and us or our affiliates. AWS Confidential Information does not include any information that: (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to you at the time of your receipt from us; (iii) is received from a third party who did not acquire or disclose the same by a wrongful or tortious act; or (iv) can be shown by documentation to have been independently developed by you without reference to the AWS Confidential Information.

"AWS Content" means Content that we or any of our affiliates provide in connection with the Services or on the AWS Site to allow access to and use of the Services, including APIs; WSDLs; sample code; software libraries; command line tools; proofs of concept; templates; and other related technology (including any of the foregoing that are provided by our personnel). AWS Content does not include the Services or Third-Party Content.

"AWS Contracting Party" means the party identified in the table below, based on your Account Country. If you change your Account Country to one identified to a different AWS Contracting Party below, you agree that this Agreement is then assigned to the new AWS Contracting Party under Section 13.1 without any further action required by either party.

| Account Country | AWS Contracting Party | Facsimile | Mailing Address |
|---|---|---|---|
| Australia | Amazon Web Services Australia Pty Ltd (ABN: 63 605 345 891) | N/A | Level 37, 2-26 Park Street, Sydney, NSW, 2000, Australia |
| Brazil* | Amazon AWS | N/A | A. Presidente Juscelino |

A000488

| | | | |
|---|---|---|---|
| | Serviços Brasil Ltda. | | Kubitschek, 2.041, Torre E - 18th and 19th Floors, Vila Nova Conceicao, São Paulo, Brasil |
| Canada | Amazon Web Services Canada, Inc. | N/A | 120 Bremner Blvd, 26th Floor, Toronto, Ontario, M5J 0A8, Canada |
| India | Amazon Web Services India Private Limited (formerly known as Amazon Internet Services Private Limited), having its registered office at Unit Nos. 1401 to 1421 International Trade Tower, Nehru Place, New Delhi 110019, India | 011-47985609 | Unit Nos. 1401 to 1421 International Trade Tower, Nehru Place, Delhi 110019, India. |
| Japan | Amazon Web Services Japan G.K. | N/A | 1-1, Kamiosaki 3-chome, Shinagawa-ku, Tokyo, 141-0021, Japan |
| Malaysia | Amazon Web Services Malaysia Sdn. Bhd. | N/A | Level 15, Boutique Office 1 (B01-C), Menara 2, KL Eco City, No. 3, Jalan Bangsar, Kuala Lumpur, 59200, Malaysia |
| New Zealand | Amazon Web Services New Zealand Limited | N/A | Level 5, 18 Viaduct Harbour Ave, Auckland, 1010, New Zealand |
| Singapore | Amazon Web Services Singapore Private Limited | N/A | 23 Church Street, #10-01, Singapore 049481 |
| South Africa | Amazon Web Services South Africa Proprietary Limited | 206-266-7010 | Wembley Square 2, 134 Solan Road, Gardens, Cape Town, 8001, South Africa |

A000489

| South Korea | Amazon Web Services Korea LLC | N/A | L12, East tower, 231, Teheran-ro, Gangnam-gu, Seoul, 06142, Republic of Korea |
| Any country within Europe, the Middle East, or Africa (excluding South Africa) ("EMEA")** | Amazon Web Services EMEA SARL | 352 2789 0057 | 38 Avenue John F. Kennedy, L-1855, Luxembourg |
| Any country that is not listed in this table above. | Amazon Web Services, Inc. | 206-266-7010 | 410 Terry Avenue North, Seattle, WA 98109-5210 U.S.A. |

*Brazil is your Account Country only if you have provided a valid Brazilian Tax Registration Number (CPF/CNPJ number) for your account. If your billing address is located in Brazil but you have not provided a valid Brazilian Tax Registration Number (CPF/CNPJ number), then Amazon Web Services, Inc. is the AWS Contracting Party for your account.

**See https://aws.amazon.com/legal/aws-emea-countries for a full list of EMEA countries.

"AWS Marks" means any trademarks, service marks, service or trade names, logos, and other designations of AWS and its affiliates that we may make available to you in connection with this Agreement.

"AWS Site" means http://aws.amazon.com (and any successor or related locations designated by us), as may be updated by us from time to time.

"AWS Trademark Guidelines" means the guidelines and trademark license located at http://aws.amazon.com/trademark-guidelines/ (and any successor or related locations designated by us), as may be updated by us from time to time.

"Content" means software (including machine images), data, text, audio, video, or images.

"End User" means any individual or entity that directly or indirectly through another user (a) accesses or uses Your Content, or (b) otherwise accesses or uses the Service Offerings under your account. The term "End User" does not include individuals or entities when they are accessing or using the Services or any Content under their own AWS account, rather than under your account.

"Governing Laws" and "Governing Courts" mean, for each AWS Contracting Party, the laws and courts set forth in the following table:

| AWS Contracting Party | Governing Laws | Governing Courts |
| --- | --- | --- |

A000490

| Amazon Web Services India Private Limited | The laws of India | The courts in New Delhi, India |
|---|---|---|
| Amazon Web Services Australia Pty Ltd (ABN: 63 605 345 891) | The laws of New South Wales | The courts of New South Wales |
| Amazon AWS Serviços Brasil Ltda. | The laws of Brazil | The courts of the City of São Paulo, State of São Paulo |
| Amazon Web Services Canada, Inc. | The laws of the Province of Ontario, Canada and federal laws of Canada applicable therein | The provincial or federal courts located in Toronto, Ontario, Canada |
| Amazon Web Services EMEA SARL | The laws of the Grand Duchy of Luxembourg | The courts in the district of Luxembourg City |
| Amazon Web Services, Inc. | The laws of the State of Washington | The state or Federal courts in King County, Washington |
| Amazon Web Services Japan G.K. | The laws of Japan | The Tokyo District Court |
| Amazon Web Services Korea LLC | The laws of the State of Washington | The state or Federal courts in King County, Washington |
| Amazon Web Services Malaysia Sdn. Bhd. | The laws of Malaysia | The courts of Malaysia |
| Amazon Web Services New Zealand Limited | The laws of New Zealand | The courts of New Zealand |
| Amazon Web Services Singapore Private Limited | The laws of the State of Washington | The state or Federal courts in King County, Washington |
| Amazon Web Services South Africa Proprietary Limited | The laws of the Republic of South Africa | The South Gauteng High Court, Johannesburg |

"Indirect Taxes" means applicable taxes and duties, including, without limitation, VAT, service tax, GST, excise taxes, sales and transactions taxes, and gross receipts tax.

"Intellectual Property License" means the separate license terms that apply to your access to and use of AWS Content and Services located at https://aws.amazon.com/legal/aws-ip-license-terms (and any successor or

A000491

related locations designated by us), as may be updated by us from time to time.

"Losses" means any claims, damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees).

"Policies" means the Acceptable Use Policy, Privacy Notice, the Site Terms, the Service Terms, the AWS Trademark Guidelines, all restrictions described in the AWS Content and on the AWS Site, and any other policy or terms referenced in or incorporated into this Agreement, but does not include whitepapers or other marketing materials referenced on the AWS Site.

"Privacy Notice" means the privacy notice located at http://aws.amazon.com/privacy (and any successor or related locations designated by us), as may be updated by us from time to time.

"Service" means each of the services made available by us or our affiliates, including those web services described in the Service Terms. Services do not include Third-Party Content.

"Service Level Agreement" means all service level agreements that we offer with respect to the Services and post on the AWS Site, as they may be updated by us from time to time. The service level agreements we offer with respect to the Services are located at https://aws.amazon.com/legal/service-level-agreements/ (and any successor or related locations designated by us), as may be updated by us from time to time.

"Service Offerings" means the Services (including associated APIs), the AWS Content, the AWS Marks, and any other product or service provided by us under this Agreement. Service Offerings do not include Third-Party Content.

"Service Terms" means the rights and restrictions for particular Services located at http://aws.amazon.com/serviceterms (and any successor or related locations designated by us), as may be updated by us from time to time.

"Site Terms" means the terms of use of the AWS Site located at http://aws.amazon.com/terms/ (and any successor or related locations designated by us), as may be updated by us from time to time.

"Suggestions" means all suggested improvements to the Service Offerings that you provide to us.

"Term" means the term of this Agreement described in Section 7.1.

"Termination Date" means the effective date of termination provided in a notice from one party to the other in accordance with Section 7.

"Third-Party Content" means Content made available to you by any third party on the AWS Site or in conjunction with the Services.

"Your Content" means Content that you or any End User transfers to us for processing, storage or hosting by the Services in connection with your AWS account and any computational results that you or any End User derive from the foregoing through their use of the Services. For example, Your Content includes Content that

A000492

you or any End User stores in Amazon Simple Storage Service. Your Content does not include Account Information.

Legal ∨ **AWS Customer Agreement** ∨

**Get Started for Free**

Create Free Account

Sign In to the Console

## Learn About AWS

What Is AWS?

What Is Cloud Computing?

AWS Diversity, Equity & Inclusion

What Is DevOps?

What Is a Container?

What Is a Data Lake?

AWS Cloud Security

What's New

Blogs

Press Releases

## Resources for AWS

Getting Started

Training and Certification

AWS Solutions Portfolio

Architecture Center

Product and Technical FAQs

Analyst Reports

AWS Partners

## Developers on AWS

Developer Center

SDKs & Tools

.NET on AWS

Python on AWS

Java on AWS

PHP on AWS

JavaScript on AWS

## Help

Contact Us

File a Support Ticket

Knowledge Center

AWS re:Post

AWS Support Overview

Legal

A000493

Legal

AWS Careers

<div style="border:1px solid orange; text-align:center; padding:20px;">
Create an AWS Account
</div>

    

Amazon is an Equal Opportunity Employer: *Minority / Women / Disability / Veteran / Gender Identity / Sexual Orientation / Age.*

**Language**

عربي |

Bahasa Indonesia |

Deutsch |

English |

Español |

Français |

Italiano |

Português |

Tiếng Việt |

Türkçe |

Русский |

ไทย |

日本語 |

한국어 |

中文 (简体) |

中文 (繁體)

Privacy

|

Site Terms

|

Cookie Preferences

|

© 2022, Amazon Web Services, Inc. or its affiliates. All rights reserved.

A000494

# EXHIBIT K

A000495

To: dmills@dmills.com[dmills@dmills.com]
From: Sam Bankman-Fried[san@ftx.com]
Sent: Thur 11/10/2022 5:50:28 PM (UTC)
Subject: Fw: FTX / Binance

Case 22-11068-JTD    Doc 3371   Filed 03/23/23   Page 519 of 1243

—

Sam Bankman-Fried
.

---------- Forwarded message ----------
From: sam@ftx.com
Date: November 9, 2022 at 9:27 PM EST
Subject: FTX / Binance
To: ryanpinder@bahamas.gov.bs
Cc: joebankman@gmail.com, can@ftx.com, rsalame@ftx.com, constance@ftx.com, crolle@scb.gov.bs, allyson@clementmaynard.com

Hi all,

I'm really sorry about the delayed responses here -- it's been a hectic week but that's on me.  Myself, and Joe (cc'ed), will be responsive going forward.

And I'm also deeply sorry for ending up in this position in the first place.

I'll give the answers I can give right now and try to get to the others ASAP.

1) Right now we are focused on one thing: making customers whole.  We are focusing exclusively on doing that this week.  We are ceasing all nonessential operations beyond that.  I am doing everything I can to try to do right by our customers.

2) I have not briefed the securities commission.  I would be more than happy to have a phone call with you, the PM, and the SCB in the next few days to give a thorough overview of the situation.

3) I am cautiously optimistic that we will be able to survive the turmoil and have enough liquidity for all customer withdrawals, and that is my sole focus this week.  I will keep you guys updated.

4) We are investigating a more thorough answer to this question; we did not intend to, but are concerned that poor risk management lead to a liquidity issue.

5) As you saw, Binance did not end up following through on their transaction.  However, we are in the middle of a separate process to make users whole; we will know within a week if that comes through.  So far, we have strong indications of interest that would be more than enough to cover all liquidity needs; we are working on confirming those.  I am cautiously optimistic that we will be able to.

6) We are deeply grateful for what The Bahamas has done for us, and deeply committed to it.  We are also deeply sorry about this mess.

As part of this: we have segregated funds for all Bahamian customers on FTX.  And **we would be more than happy to open up withdrawals for *all* Bahamian customers on FTX, so that they can, *tomorrow, fully* withdraw *all* of their assets, making them fully whole**.  It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country, and could open it up immediately if you reply saying you want us to.  If we don't hear back from you, we are going to go ahead and do it tomorrow.

—

Sam Bankman-Fried

A000496

On November 9, 2022 at 6:00 PM EST ryanpinder@bahamas.gov.bs wrote:

Thank you Sam.  Joe, Constance, Ryan - please provide me with a brief and answers to the questions below so I can provide the Prime Minister an update

Ryan


**L. Ryan Pinder, K.C.**
**Senator, Attorney General of The Commonwealth of The Bahamas**
**Office of the Attorney-General and Ministry of Legal Affairs**
Paul L. Adderley Building
No. 18 John F. Kennedy Drive
P. O. Box N-3007
Nassau, N.P., The Bahamas


-----"Sam Bankman-Fried" <sam@ftx.com> wrote: -----
To: "RYAN PINDER" <ryanpinder@bahamas.gov.bs>
From: "Sam Bankman-Fried" <sam@ftx.com>
Date: 11/09/2022 04:16PM
Cc: "Can Sun" <can@ftx.com>, "rsalame@ftx.com" <rsalame@ftx.com>, "constance@ftx.com" <constance@ftx.com>, "Joe Bankman" <joebankman@gmail.com>
Subject: Re: FTX / Binance

Hey!

Sorry giving updates as I can.  Things moving quickly.

I can't give as confident answers as I'd like to all of those.  My currently only priority is doing right by customers, and doing whatever I can for that; right now that means prioritizing, above everything else, getting funding to fill the liquidity gap so that all customers can be made liquid.

cc'ing Joe/Constance/Ryan who can give more details.


—
Sam Bankman-Fried


On November 9, 2022 at 8:03 AM EST ryanpinder@bahamas.gov.bs wrote:

Thank you Dan and Can,

As I understand the structure, FTX.com (the entity subject of the LOI with Binance) is the trading platform and exchange operations and in a corporate structure separate from FTX Digital Markets, the Bahamian licensed entity.  FTX DM however is in a corporate structure with Alameda Research who is an upstream shareholder of FTX DM.  We are mindful of the balance sheet exposure that is reported for Alameda to FTT whose value has collapsed in the open market.  As such, The Government of The Bahamas would like to ask some questions, and get an update on the current situation.  I will be briefing the Prime Minister later today.  Can you please assist with a briefing update as well as addressing the following questions:

1) Has a decision been made on the operations of FTX DM in The Bahamas?  If so, what are they?

2) Has the Securities Commission been briefed on the matters affecting FTX and the reciprocal effects on FTX DM, the regulated entity?  If so, please forward that brief.

3) What is the financial situation of Alameda and do you anticipate it to survive the current market turmoil?

4) At any time, and especially in the recent months and currently, has any company in the corporate structure of FTX DM, inclusive of Alameda, leveraged or exposed client assets in any way and for any purpose?

5) What are the timeframes to complete the Binance transaction, assuming it goes through, and how would that affect Alameda, FTX DM and the US operations of FTX?

6) What is the ongoing commitment to The Bahamas?

Ryan

**L. Ryan Pinder, K.C.**
**Senator, Attorney General of The Commonwealth of The Bahamas**
**Office of the Attorney-General and Ministry of Legal Affairs**
Paul L. Adderley Building
No. 18 John F. Kennedy Drive
P. O. Box N-3007
Nassau, N.P., The Bahamas

-----"Daniel Friedberg" <dan@ftx.com> wrote: -----
To: "Can Sun" <can@ftx.com>, "RYAN PINDER" <RYANPINDER@bahamas.gov.bs>
From: "Daniel Friedberg" <dan@ftx.com>
Date: 11/08/2022 04:58PM
Cc: sam@ftx.com
Subject: Re: FTX / Binance

Hi Ryan - sorry for the delay. Can is on island and will coordinate.

On Tue, Nov 8, 2022 at 11:29 AM RYAN PINDER <RYANPINDER@bahamas.gov.bs> wrote:

Good morning, I know it must be a hectic time.  Is there more information you can share with us regarding the
purported LOI between FTX and Binance?

Ryan

**L. Ryan Pinder, K.C.**
**Senator, Attorney General of The Commonwealth of The Bahamas**
**Office of the Attorney-General and Ministry of Legal Affairs**
Paul L. Adderley Building
No. 18 John F. Kennedy Drive
P. O. Box N-3007
Nassau, N.P., The Bahamas

This e-mail message and the information and any attachments contained herein are confidential to the
addressee and may be subject to professional privilege. No other person may place any reliance on this e-
mail nor its contents, nor copy or distribute it to any other person or use the contents in any unauthorised
manner without the express permission of the sender. If you are not the addressee of this e-mail, or an
employee or agent responsible for delivering this message to the addressee, please delete it and notify the
sender as soon as possible. Thank You.

This e-mail message and the information and any attachments contained herein are confidential to the
addressee and may be subject to professional privilege. No other person may place any reliance on this e-mail
nor its contents, nor copy or distribute it to any other person or use the contents in any unauthorised manner
without the express permission of the sender. If you are not the addressee of this e-mail, or an employee or
agent responsible for delivering this message to the addressee, please delete it and notify the sender as soon
as possible. Thank You.

This e-mail message and the information and any attachments contained herein are confidential to the addressee and may
be subject to professional privilege. No other person may place any reliance on this e-mail nor its contents, nor copy or
distribute it to any other person or use the contents in any unauthorised manner without the express permission of the
sender. If you are not the addressee of this e-mail, or an employee or agent responsible for delivering this message to the
addressee, please delete it and notify the sender as soon as possible. Thank You.

# EXHIBIT L

A000499



Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

**URGENT**

VIA EMAIL: giancarlo@tether.to; michael@tether.to

12 November 2022

Jean-Louis Van der Velde
CEO
Tether International Limited
c/o SHRM Trustees (BVI) Limited
Trinity Chambers,
Road Town, Tortola
British Virgin Islands

**Attention: Giancarlo Devasini**

Dear Sir/Madam,

### Re:  Lifting of Freeze and Accounts for and/or in the name of FTX Digital Markets Limited and Related Parties

Further to our letter of instruction dated 10 February 2022 to freeze the subject account(s), I hereby instruct you to please burn the tether coins that were frozen and simultaneously mint new tether coins for the equivalent amount and transfer all USDT coins to the Fireblocks wallet of the Securities Commission of The Bahamas.

The wallet's address is 0x2a4F8d77bAde18256b1BDB3cF8782645037f60d3.

Your cooperation in this matter is appreciated, particularly given the urgency associated with this matter.

Yours sincerely,

Christina Rolle
Executive Director

A000500

# EXHIBIT M

A000501

Message

| | |
|---|---|
| **From:** | Christina Rolle [crolle@scb.gov.bs] |
| **on behalf of** | Christina Rolle <crolle@scb.gov.bs> [crolle@scb.gov.bs] |
| **Sent:** | 11/14/2022 4:08:40 AM |
| **To:** | Gary Wang [gary@ftx.com] |
| **CC:** | sam@ftx.com; bsimms@lennoxpaton.com; zx.gary@gmail.com; Sam Bankman-Fried [11235813sam@gmail.com] |
| **Subject:** | RE: AWS lockout |

Thank you, Gary.
Take care and kind regards,

**From:** Gary Wang [mailto:gary@ftx.com]
**Sent:** 13 November 2022 6:24 PM
**To:** Christina Rolle <crolle@scb.gov.bs>
**Cc:** sam@ftx.com; bsimms@lennoxpaton.com; zx.gary@gmail.com; Sam Bankman-Fried <11235813sam@gmail.com>
**Subject:** Re: AWS lockout

Hi all, the remaining tokens are listed on tab 3 of the spreadsheet I sent earlier, copied below for your convenience:

| coin | blockchain | number of tokens | USD value |
|---|---|---|---|
| USDT | trx | 46690792.99 | $ 46,732,856.73 |
| BNB | bep2 | 17308.90737 | $ 14,235,353.84 |
| APT | aptos | 890658.6913 | $ 4,308,116.09 |
| LUNC | terra | 9577363748 | $ 1,769,034.86 |
| WRX | bep2 | 9806469.892 | $ 1,337,602.49 |
| AURY | sol | 2887323.687 | $ 923,943.58 |
| BUSD | bep2 | 183193.9884 | $ 183,193.99 |
| TAPT | aptos | 33906.93139 | $ 108,502.18 |
| FTT | bep2 | 41393.64248 | $ 86,802.47 |
| ETHBULL | bep2 | 33484.68396 | $ 81,083.95 |
| BULL | bep2 | 587.7671203 | $ 25,462.28 |
| USDC | algo | 9891.165084 | $ 9,891.17 |
| BTC | btc | 0.54992613 | $ 9,270.47 |
| ANC | terra | 105001.7798 | $ 5,908.02 |
| BNB | bsc | 6.680362083 | $ 5,494.13 |
| USDC | avax | 5227.396147 | $ 5,227.40 |
| XRP | xrp | 5151.516392 | $ 1,939.46 |
| USTC | terra | 60945.73978 | $ 1,475.59 |
| LTC | ltc | 10.19414715 | $ 619.57 |
| SUN_OLD | trx | 10.4793016 | $ 349.66 |
| ETH | eth | 0.147988468 | $ 188.85 |
| ETH | arbitrum | 0.093278583 | $ 119.03 |
| ETH | stark | 0.063793588 | $ 81.41 |
| FTT | erc20 | 13.72662555 | $ 28.78 |
| DOGE | doge | 331.1273836 | $ 27.52 |
| TRX | trx | 441.70879 | $ 24.34 |
| WAVAX | avax | 4.002234785 | $ 24.01 |

A000502

| | | | |
|---|---|---|---|
| AVAX | avax | 0.961323646 $ | 13.21 |
| BCH | bch | 0.12066502 $ | 12.27 |
| USDC | trx | 10.730696 $ | 10.73 |
| RUNE | bep2 | 9.15816368 $ | 10.47 |
| FXS | erc20 | 0.975327436 $ | 4.37 |
| BEAR | bep2 | 14852.12675 $ | 3.58 |
| XRPBULL | bep2 | 118027.0301 $ | 1.30 |
| NEAR | near | 0.581592359 $ | 1.11 |
| CTX | terra | 0.73122 $ | 0.48 |
| SOL | sol | 0.028121017 $ | 0.45 |
| GMT | erc20 | 0.94232151 $ | 0.39 |
| SUN | trx | 10.05160247 $ | 0.32 |
| ALGO | algo | 0.96504 $ | 0.28 |
| MATIC | matic | 0.297615936 $ | 0.26 |
| JST | trx | 10.09481744 $ | 0.23 |
| JET | sol | 0.999999998 $ | 0.07 |
| EOSBEAR | bep2 | 24066.34778 $ | 0.05 |
| FTM | ftm | 0.228814857 $ | 0.05 |
| LUNA2 | terra2 | 0.025 $ | 0.04 |
| EOSBULL | bep2 | 435971.4242 $ | 0.03 |
| ETHW | ethw | 0.006361809 $ | 0.02 |
| HT | heco | 0.00095275 $ | 0.01 |
| ETHBEAR | bep2 | 5258.298603 $ | 0.00 |
| BTT | trx | 10.2338851 $ | 0.00 |
| BAO | erc20 | 0.506805211 $ | 0.00 |
| XRPBEAR | bep2 | 595.6231114 $ | 0.00 |
| BEAR | erc20 | 0.029167009 $ | 0.00 |
| XRPBULL | erc20 | 0.120457993 $ | 0.00 |
| SOS | erc20 | 0.993149889 $ | 0.00 |
| LINK_WH | sol | 0.00000001 $ | 0.00 |
| KIN | erc20 | 0.008149317 $ | 0.00 |
| EOSBULL | erc20 | 0.717997447 $ | 0.00 |
| ALGOBULL | erc20 | 0.49915755 $ | 0.00 |
| ATLAS | sol | 0.0000001 $ | 0.00 |
| KIN | sol | 0.00002 $ | 0.00 |
| STEP | sol | 0.000000006 $ | 0.00 |
| GST | sol | 0.000000001 $ | 0.00 |
| STETH | erc20 | 1E-18 $ | 0.00 |

Gary

On Sun, Nov 13, 2022 at 5:09 PM Christina Rolle <crolle@scb.gov.bs> wrote:

> Thanks for letting us know, Sam,
> Please provide details of the assets (type and number of tokens) that were remaining.
> With kind regards,

A000503

Sent from my Galaxy



**Christina Rolle**  Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100          fax: (242) 356-7530          Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau,
The Bahamas

Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.



**Christina Rolle**  Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100          fax: (242) 356-7530          Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau,
The Bahamas

Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.

-------- Original message --------
From: Sam Bankman-Fried <sam@ftx.com>
Date: 11/13/22 4:56 PM (GMT-05:00)
To: Christina Rolle <crolle@scb.gov.bs>, bsimms@lennoxpaton.com
Cc: gary@ftx.com, "'zx.gary@gmail.com'" <zx.gary@gmail.com>, Sam Bankman-Fried
<11235813sam@gmail.com>

**A000504**

Subject: AWS lockout

Hey all,

I understand you guys moved almost all of the assets last night!

As of now, it looks like Gary has been locked out of AWS by the Delaware Chapter 11 team--we're looking into details but it looks like he isn't able to transfer any of the remaining assets out because of that unless/until that was reversed.

Sam

—

Sam Bankman-Fried

A000505

CONFIDENTIAL TREATMENT REQUESTED BY FTX                     FTX_000031665

# EXHIBIT N

**To:**      crolle@scb.gov.bs[crolle@scb.gov.bs]
**From:**   Gary Wang[gary@ftx.com]
**Sent:**    Sun 11/13/2022 6:25:31 AM (UTC)
**Subject:** Transfer logs

[logs.zip](#)
[ftx.com hot wallets.xlsx](#)

A000507

Message

| | |
|---|---|
| **From:** | Christina Rolle [crolle@scb.gov.bs] |
| on behalf of | Christina Rolle <crolle@scb.gov.bs> [crolle@scb.gov.bs] |
| **Sent:** | 11/13/2022 8:16:09 AM |
| **To:** | Gary Wang [gary@ftx.com] |
| **Subject:** | RE: Transfer logs |

Thank you.


Sent from my Galaxy




**Christina Rolle**  Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100          fax: (242) 356-7570          Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau,
The Bahamas

Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.

-------- Original message --------
From: Gary Wang <gary@ftx.com>
Date: 11/13/22 2:16 AM (GMT-05:00)
To: Christina Rolle <crolle@scb.gov.bs>
Subject: Re: Transfer logs

My cell phone number is 856 701 0065

On Sun, Nov 13, 2022 at 1:25 AM Gary Wang <gary@ftx.com> wrote:

A000508

CONFIDENTIAL TREATMENT REQUESTED BY FTX                                                      FTX_000031661

# **EXHIBIT O**

A000509

| | |
|---|---|
| **To:** | Christina Rolle[crolle@scb.gov.bs]; bsimms@lennoxpaton.com[bsimms@lennoxpaton.com] |
| **Cc:** | gary@ftx.com[gary@ftx.com]; zx.gary@gmail.com[zx.gary@gmail.com]; Sam Bankman-Fried[11235813sam@gmail.com] |
| **From:** | Sam Bankman-Fried[sam@ftx.com] |
| **Sent:** | Sun 11/13/2022 9:56:57 PM (UTC) |
| **Subject:** | AWS lockout |

Hey all,

I understand you guys moved almost all of the assets last night!

As of now, it looks like Gary has been locked out of AWS by the Delaware Chapter 11 team--we're looking into details but it looks like he isn't able to transfer any of the remaining assets out because of that unless/until that was reversed.

Sam

—

Sam Bankman-Fried
.

A000510

# EXHIBIT P



**SB** Sam Bankman-Fried                                                                                                                                          7:01 PM
we're about to announce that withdrawals opened up for BAhamians

:ack: 6    👍 1

**SB** Sam Bankman-Fried                                                                                                                                          7:01 PM
heads up

**SB** Sam Bankman-Fried                                                                                                                                          7:01 PM
per SCB's wishes

A000512

# EXHIBIT Q

A000513

Sunday, November 13, 2022

💬 mpdm-11235813sam--zx.gary--zach--ryne-1

**ZD Zach Dexter**    4:07 AM
@Gary Wang there has apparently been a large FTT mint/transfer - we have no ability to address this given the AWS situation. can you figure out what's going on there?

**ZD Zach Dexter**    4:08 AM
I don't think anyone knows where those keys are

**GW Gary Wang**    4:08 AM
was directed by bahamas regulators to transfer the FTT

**ZD Zach Dexter**    4:09 AM
I see

**ZD Zach Dexter**    4:09 AM
Thanks for responding

**RM Ryne Miller**    4:10 AM
Sent it where may I ask?

**RM Ryne Miller**    4:11 AM
As long as it's custodied somewhere safe, we can sort it out as the time goes. Have you got a new custodian? 🙏

➕ 1

A000514

# **EXHIBIT R**

A000515

## AWS PRIVATE PRICING ADDENDUM

This Addendum supplements the Agreement and is entered into by and between the parties listed on this page.

**Addendum Effective Date:** The date the last party signs this Addendum.

| AMAZON WEB SERVICES, INC. | ALAMEDA RESEARCH LTD ("you") |
|---|---|
| DocuSigned by:<br>By: *Matthew Sullivan*<br>Name: Matthew Sullivan<br><br>Title: Authorized Signatory<br><br>Date signed: November 16, 2020 | DocuSigned by:<br>By: Gary Wang<br>Name: Gary Wang<br><br>Title: Chief Technology Officer<br><br>Date signed: November 18, 2020 |

A000516

## 1. Pricing Terms.

| Term | Meaning |
|------|---------|
| **Discount Term** | December 1, 2020 – November 30, 2023 |
| **Contract Year** | Contract Year 1:  December 1, 2020 – November 30, 2021 |
| | Contract Year 2:  December 1, 2021 – November 30, 2022 |
| | Contract Year 3:  December 1, 2022 – November 30, 2023 |
| **Eligible Payer Accounts** | ▉▉▉▉▉▉▉ |
| **Cross-Service Discount** | ▉▉▉ |
| **Spend Commitment** | Contract Year 1: ▉▉▉▉ |
| | Contract Year 2: ▉▉▉▉ |
| | Contract Year 3: ▉▉▉▉ |
| **Commitment-Eligible Fees** | The following amounts, which count towards your Spend Commitment: |
| | (a)  the following fees incurred under Eligible Accounts (excluding fees paid for by applying the Available Balance in accordance with Section 5, excluding taxes, and net of any applicable discounts and refunds): |
| | (i)  fees for use of Services in Eligible Regions; and |
| | (ii) ▉▉ of fees for purchases on AWS Marketplace; and |
| | (b)  fees incurred for use of products and services sold by Elemental Technologies LLC, for so long as it is an AWS Affiliate (excluding taxes, and net of any applicable discounts and refunds). |

AWS Private Pricing Addendum
**AMAZON CONFIDENTIAL**
▉▉▉▉▉▉▉

legal

Page **2** of **5**
2020-11-14
P5

A000517

**2.    Discount.** AWS will apply the Cross-Service Discount to fees for use of Eligible Services. AWS will apply any discounting expressed as a percentage to Public Pricing. The discounting under this Addendum may not be combined with any other discounts (including with any discounts on the AWS Site). AWS will apply the Cross-Service Discount except where any component of an Eligible Service is entitled to discounting under another agreement. AWS will apply the discounting under this Addendum during the Discount Term so long as you are complying with the terms of this Addendum.

**3.    Commitment.** You agree to incur Commitment-Eligible Fees during each Contract Year at least equal to the corresponding Spend Commitment. If the Commitment-Eligible Fees incurred during a Contract Year are less than the corresponding Spend Commitment, then you will pay AWS a Spend Commitment Shortfall Payment.

**4.    Payments.** Except as otherwise provided in this Addendum, you will pay all fees for use of Eligible Services and other amounts due under this Addendum via check or wire transfer and in accordance with the payment terms of the Agreement. You will make all payments in a payment currency supported by AWS. As of the Addendum Effective Date, AWS, Inc. accepts payment in U.S. dollars. All payment obligations under this Addendum will survive expiration or termination of this Addendum. Any AWS Party may request payment from you under this Addendum.

**5.    Available Balance.** During the term of this Addendum, AWS will apply the Available Balance to fees and any taxes for use of Eligible Services, provided that any portion of the Available Balance that is paid to an AWS Party in a currency other than U.S. dollars will only be applied to fees and any taxes for use of Eligible Services provided by that AWS Party. The Available Balance is nonrefundable, will not reduce your Spend Commitment Shortfall Payment obligations, and is not a deposit for or credit toward the purchase of any services after the Discount Term. After the Discount Term, AWS will invoice you for an amount equal to any remaining Available Balance, and the Available Balance will be applied against such invoiced amount.

**6.    Term; Termination.**
    a.  **Term.** The term of this Addendum commences on the Addendum Effective Date and ends on the last day of the Discount Term.
    b.  **Termination.** This Addendum will automatically terminate upon any termination of the Agreement. Notwithstanding any termination for convenience rights in the Agreement, neither AWS nor you may terminate the Agreement for convenience during the term of this Addendum. Each party may terminate this Addendum for cause upon written notice if the other party is in material breach of this Addendum, provided that the breaching party will have 30 days from receipt of the notice to cure any material breach that can be cured.
    c.  **Effect of Termination.**
        i.    **Termination by You.** If you terminate this Addendum or the Agreement for cause, any Spend Commitment Shortfall Payment obligations arising after the effective date of such termination will not apply.
        ii.   **Termination by AWS.** If AWS terminates this Addendum or the Agreement for cause, you will pay AWS the Return Amount. Following such payment, any Spend Commitment Shortfall Payment obligations arising after the effective date of such termination will not apply.



**7.      Enterprise Support.**  Unless the Eligible Accounts are already enrolled, AWS will, starting on the first day of the Discount Term, enroll the Eligible Accounts in AWS Enterprise Support.  You and your Affiliates will maintain any such enrollment throughout the term of this Addendum.

**8.      References.**  You grant to AWS and its Affiliates a non-exclusive, worldwide, royalty-free right and license to use your company name and logos (provided promptly by you to AWS and its Affiliates, upon AWS's or its Affiliate's request) to identify you as an Amazon Web Services customer.  This license will survive after the term of this Addendum, provided you may terminate this license at any time after termination of this Addendum by giving AWS and its Affiliates at least 30 days' written notice.  Upon termination of this license, AWS and its Affiliates will remove your company name and logos from the AWS Site, but AWS and its Affiliates may continue to use your company name and logos in any other items produced before termination of this license.

**9.      Affiliates.**  If any Eligible Accounts are owned by one of your Affiliates and not by you directly, then you and all such Affiliates will be jointly and severally liable for all of your obligations under this Addendum.  You represent and warrant that: (a) you have the full power and authority to enter into this Addendum and legally bind your Affiliates to the terms of this Addendum; and (b) all Eligible Accounts that are owned by an Affiliate were and will be opened by such Affiliate for use by such Affiliate or agents or subcontractors performing work on behalf of such Affiliate.  All use of the Services by any of such Affiliates under Eligible Accounts will be governed by the agreement between AWS and such Affiliate governing its use of the Services.

**10.     Nondisclosure.**  Each party agrees that the existence and terms of this Addendum are not publicly known and will not be disclosed by that party.

**11.     Miscellaneous.**  Any exercise of rights under this Addendum will be without prejudice to any other rights or remedies a party has under this Addendum or the Agreement.  With respect to the subject matter hereof, this Addendum, together with the Agreement as amended by this Addendum: (a) is intended by the parties as the final, complete and exclusive expression of the terms of their agreement; and (b) supersedes all prior agreements and understandings (whether oral or written) between the parties.  If there is a conflict between the Agreement and this Addendum, this Addendum will prevail.  If there is a conflict between this Addendum and any other amendment or addendum to the Agreement or to this Addendum, the document later in time will prevail.  This Addendum may be executed in two or more counterparts.  All currency values in this Addendum are in U.S. dollars.

**12.     Definitions.**  Capitalized terms have the meanings set forth in the Agreement or described on the AWS Site unless otherwise defined in this Addendum.

**"Affiliate"** means any entity that directly or indirectly controls, is controlled by or is under common control with that party.

**"Agreement"** means the AWS Customer Agreement available at http://aws.amazon.com/agreement or other written agreement between AWS and you governing your use of the Services.

**"Available Balance"** means the remaining balance of any Spend Commitment Shortfall Payment paid to AWS during the term of this Addendum.

A000519

"**AWS**" means Amazon Web Services, Inc. ("**AWS, Inc.**") and each other entity identified at https://aws.amazon.com/legal/aws-contracting-party that has agreed, following your request, to become a party to this Addendum based on the location you have set for an Eligible Account (each, an "**AWS Party**").

"**Eligible Accounts**" means the following AWS accounts: (i) the Eligible Payer Accounts, other than any Eligible Payer Account that AWS agrees to remove at your request; (ii) any AWS account that AWS agrees to add as an Eligible Payer Account at your request; and (iii) any Member Accounts joined via AWS Organizations to an Eligible Payer Account; provided that this Addendum: (x) applies only to AWS accounts that have been opened by you or your Affiliates for use by you or your Affiliates, that are associated with a location that corresponds to an AWS Party, and that are registered with email addresses issued by you or your Affiliates; and (y) will not apply to any Eligible Payer Account that is joined via AWS Organizations to an AWS account that is not an Eligible Account.

"**Eligible Regions**" means the AWS regions and locations listed at https://regionslist.s3.amazonaws.com/Eligible+Regions.pdf.

"**Eligible Services**" means all Services used in Eligible Regions under Eligible Accounts except the Services listed at https://ineligibleserviceslist.s3.amazonaws.com/s3.amazonaws.com/Ineligible+Services.pdf. AWS may only add a Service to this list within 30 days after such Service is made generally available to the public.

"**Public Pricing**" means the pricing for the Eligible Services as described on the AWS Site.

"**Return Amount**" means the amount of the total discounting received under this Addendum.

"**Spend Commitment Shortfall Payment**" means an amount equal to the Spend Commitment for the applicable Contract Year less the Commitment-Eligible Fees incurred during such Contract Year.

A000520

# EXHIBIT S

A000521



# Amazon Web Services, Inc. Invoice

Email or talk to us about your AWS account or bill, visit aws.amazon.com/contact-us/

Account number:

████████████████

Bill to Address:
Alameda Research, LLC
ATTN:
2000 CENTER ST STE 400
BERKELEY , CA , 94704-1996 , US

| Invoice Summary | |
|---|---|
| Invoice Number: | |
| | Please include this invoice number with your payment |
| Invoice Date: | November 2 , 2022 |
| **TOTAL AMOUNT DUE ON December 2 , 2022** | ████ |

This invoice is for the billing period October 1 - October 31 , 2022

Greetings from Amazon Web Services, we're writing to provide you with an electronic invoice of your transactions on the AWS Marketplace. Additional information about your bill, individual service charge details, and your account history are available on the Account Activity Page.

## Summary

| AWS Marketplace Charges | |
|---|---|
| Charges | ████ |
| Credits | ███ |
| Tax | ███ |
| **Total for this invoice** | ████ |

## Detail for Consolidated Bill

| NGINX Plus Standard - Ubuntu AMI sold by Nginx Software, Inc. | ███ |
|---|---|
| Charges | ███ |
| VAT ** | ██ |
| GST | ██ |
| Estimated US sales tax to be collected | ██ |
| CT | ██ |
| **JFrog Artifactory Cloud - Artifact Repository to Accelerate Your DevOps sold by JFrog, Inc** | ███ |
| Charges | ███ |
| VAT ** | ██ |
| GST | ██ |
| Estimated US sales tax to be collected | ██ |
| CT | ██ |

* May include estimated US sales tax, VAT, ST, GST and CT.
Amazon Web Services, Inc. is registered under the Singapore GST Overseas Vendor Registration Pay-Only Regime and GST registration number is M90373009E
AWS, Inc. is a "Registered Foreign Supplier" under Japanese Consumption Tax Law and therefore AWS, Inc. is required to declare and pay consumption tax in respect of this transaction (as a "Digital Service") to the Japan Tax Authority.
** This is not a VAT, ST or GST invoice. Related tax invoices can be accessed by going to the Bills page on your Billing Management Console.
**** Please reference the tax invoice for a breakout of the Canadian taxes by type
† Usage and recurring charges for this statement period will be charged on your next billing date. The amount of your actual charges for this statement period may differ from the charges shown on this page. The charges shown on this page do not include any additional usage charges accrued during this statement period after the date you are viewing this page. Also, one-time fees and subscription charges are assessed separately, on the date that they occur.
All charges and prices are in US Dollars
All AWS Services are sold by Amazon Web Services, Inc.

**Electronic funds transfer details:**
Bank Name: Wells Fargo NA
Account Name: Amazon Web Services, Inc.
Bank Address:
420 Montgomery Street
San Francisco CA 94163
Checking Account Number:
ABA Routing Number: ████████
Wire Routing Number: ████████
SWIFT Code: ████████

**or Mail payment to:**
Amazon Web Services, Inc.
PO BOX 84023
Seattle, WA 98124-8423, US

A000522

1

| NGINX Plus Basic - Ubuntu AMI sold by Nginx Software, Inc. | ██████ |
| Charges | █████ |
| VAT ** | ███ |
| GST | ████ |
| Estimated US sales tax to be collected | ███ |
| CT | ████ |

* May include estimated US sales tax, VAT, ST, GST and CT.
Amazon Web Services, Inc. is registered under the Singapore GST Overseas Vendor Registration Pay-Only Regime and GST registration number is M90373009E
AWS, Inc. is a "Registered Foreign Supplier" under Japanese Consumption Tax Law and therefore AWS, Inc. is required to declare and pay consumption tax in respect of this transaction (as a "Digital Service") to the Japan Tax Authority.

**\*\* This is not a VAT, ST or GST invoice. Related tax invoices can be accessed by going to the Bills page on your Billing Management Console.**

**\*\*\*\* Please reference the tax invoice for a breakout of the Canadian taxes by type**

† Usage and recurring charges for this statement period will be charged on your next billing date. The amount of your actual charges for this statement period may differ from the charges shown on this page. The charges shown on this page do not include any additional usage charges accrued during this statement period after the date you are viewing this page. Also, one-time fees and subscription charges are assessed separately, on the date that they occur.
All charges and prices are in US Dollars
All AWS Services are sold by Amazon Web Services, Inc.

Electronic funds transfer details:
Bank Name: Wells Fargo NA
Account Name: Amazon Web Services, Inc.
Bank Address:
420 Montgomery Street
San Francisco CA 94163
Checking Account Number: ████████
ABA Routing Number: ██████
Wire Routing Number: ██████
SWIFT Code: ███████

or Mail payment to:
Amazon Web Services, Inc.
PO BOX 84023
Seattle, WA 98124-8423, US

A000523

## Please remit payment to Amazon Web Services:

Preferred method of payment is by Electronic Funds Transfer (EFT). Please ensure to reference the invoice number in the descriptive text field of your electronic funds transfer payment.

If you have any questions regarding payment for this invoice, please email aws-receivables-support@email.amazon.com

| Electronic funds transfer details: | or Mail payment to: |
| --- | --- |
| Bank Name: Wells Fargo NA | Amazon Web Services, Inc. |
| Account Name: Amazon Web Services, Inc. | PO BOX 84023 |
| Bank Address: | Seattle, WA 98124-8423, US |
| 420 Montgomery Street | |
| San Francisco CA 94163 | |
| Checking Account Number: ▇▇▇▇▇ | |
| ABA Routing Number: ▇▇▇▇ | |
| Wire Routing Number: ▇▇▇▇ | |
| SWIFT Code: ▇▇▇▇ | |

All web services are sold by Amazon Web Services, Inc.

The above charges include charges incurred by your account as well as by all accounts you are responsible for through Consolidated Billing.

Thank you for using Amazon Web Services.

Sincerely,
**The Amazon Web Services Team**

This message was produced and distributed by Amazon Web Services, Inc., 410 Terry Avenue North, Seattle, Washington 98109-5210. AWS will not be bound by, and specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of the AWS Customer Agreement or AWS Enterprise Agreement between AWS and you (whether or not it would materially alter such AWS Customer Agreement or AWS Enterprise Agreement) and which is submitted in any order, receipt, acceptance, confirmation, correspondence or otherwise, unless AWS specifically agrees to such provision in a written instrument signed by AWS.

3

A000524

Payer account number

███████████████



# LINKED ACCOUNT ALLOCATION

To learn more about how charges are allocated across linked accounts visit
https://docs.aws.amazon.com/awsaccountbilling/latest/aboutv2/con-bill-blended-rates.html

| Activity By Account | |
|---|---|
| ██████████████████████ | ██████ |
| Charges | █████ |
| Credits | █████ |
| Estimated US sales tax to be collected | █████ |
| ftxus ███████████ | █████ |
| Charges | █████ |
| Credits | █████ |
| Estimated US sales tax to be collected | █████ |
| Alameda Research ███████████ | ██████ |
| Charges | █████ |
| Credits | █████ |
| Estimated US sales tax to be collected | █████ |
| CT | █████ |
| Total allocated for this invoice | ███████ |

For line item details, please visit the Account Activity Page aws.amazon.com
* May include estimated US sales tax, VAT, ST, GST and CT.
Amazon Web Services, Inc. is registered under the Singapore GST Overseas Vendor Registration Pay-Only Regime and GST registration number is M90373009E
AWS, Inc. is a "Registered Foreign Supplier" under Japanese Consumption Tax Law and therefore AWS, Inc. is required to declare and pay consumption tax in respect of
this transaction (as a "Digital Service") to the Japan Tax Authority.
** This is not a VAT, ST or GST invoice. Related tax invoices can be accessed by going to the Bills page on your Billing Management Console.
**** Please reference the tax invoice for a breakout of the Canadian taxes by type

A000525

Payer account number

██████████████



## Summary for Linked Account

| ████████████████ | | ███████ |
|---|---|---|
| Charges | | ████ |
| Credits | | ████ |
| Estimated US sales tax to be collected | | ████ |
| Account ██████████ total allocated for this invoice | | ██████ |

## Detail for Linked Account

| JFrog Artifactory Cloud - Artifact Repository to Accelerate Your DevOps sold by JFrog, Inc | ████ |
|---|---|
| Charges | ████ |
| Estimated US sales tax to be collected | ████ |

For line item details, please visit the Account Activity Page aws.amazon.com
* May include estimated US sales tax, VAT, ST, GST and CT.
Amazon Web Services, Inc. is registered under the Singapore GST Overseas Vendor Registration Pay-Only Regime and GST registration number is M90373009E
AWS, Inc. is a "Registered Foreign Supplier" under Japanese Consumption Tax Law and therefore AWS, Inc. is required to declare and pay consumption tax in respect of
this transaction (as a "Digital Service") to the Japan Tax Authority.
** This is not a VAT, ST or GST invoice. Related tax invoices can be accessed by going to the Bills page on your Billing Management Console.
**** Please reference the tax invoice for a breakout of the Canadian taxes by type

A000526

Payer account number

████████████████





| Summary for Linked Account | |
|---|---|
| ftxus ████████████████ | ██████ |
| Charges | ████ |
| Credits | ███ |
| Estimated US sales tax to be collected | ███ |
| Account ████████████ total allocated for this invoice | ██████ |

| Detail for Linked Account | |
|---|---|
| NGINX Plus Standard - Ubuntu AMI sold by Nginx Software, Inc. | ████ |
| Charges | ████ |
| Estimated US sales tax to be collected | ███ |

For line item details, please visit the Account Activity Page aws.amazon.com
* May include estimated US sales tax, VAT, ST, GST and CT.
Amazon Web Services, Inc. is registered under the Singapore GST Overseas Vendor Registration Pay-Only Regime and GST registration number is M90373009E
AWS, Inc. is a "Registered Foreign Supplier" under Japanese Consumption Tax Law and therefore AWS, Inc. is required to declare and pay consumption tax in respect of
this transaction (as a "Digital Service") to the Japan Tax Authority.
** This is not a VAT, ST or GST invoice. Related tax invoices can be accessed by going to the Bills page on your Billing Management Console.
**** Please reference the tax invoice for a breakout of the Canadian taxes by type

A000527

Payer account number



| Summary for Linked Account | |
|---|---|
| Alameda Research ▇▇▇▇▇▇▇ | ▇▇▇▇ |
| Charges | ▇▇▇ |
| Credits | ▇▇ |
| Estimated US sales tax to be collected | ▇▇ |
| CT | ▇▇ |
| Account ▇▇▇▇▇▇ total allocated for this invoice | ▇▇▇ |

| Detail for Linked Account | |
|---|---|
| NGINX Plus Basic - Ubuntu AMI sold by Nginx Software, Inc. | ▇▇▇ |
| Charges | ▇▇▇ |
| Estimated US sales tax to be collected | ▇▇ |
| CT | ▇▇ |

For line item details, please visit the Account Activity Page aws.amazon.com
* May include estimated US sales tax, VAT, ST, GST and CT.
Amazon Web Services, Inc. is registered under the Singapore GST Overseas Vendor Registration Pay-Only Regime and GST registration number is M90373009E
AWS, Inc. is a "Registered Foreign Supplier" under Japanese Consumption Tax Law and therefore AWS, Inc. is required to declare and pay consumption tax in respect of this transaction (as a "Digital Service") to the Japan Tax Authority.
** This is not a VAT, ST or GST invoice. Related tax invoices can be accessed by going to the Bills page on your Billing Management Console.
**** Please reference the tax invoice for a breakout of the Canadian taxes by type

A000528

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) **FOR PUBLICATION** |
| | ) |
| CELSIUS NETWORK LLC, *et al.*, | ) Chapter 11 |
| | ) Case No. 22-10964 (MG) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

### MEMORANDUM OPINION AND ORDER
### REGARDING OWNERSHIP OF EARN ACCOUNT ASSETS

*A P P E A R A N C E S[1]:*

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors*
601 Lexington Avenue
New York, NY 10022
By:    Joshua Sussberg, Esq.
       Patrick J. Nash, Jr., Esq.
       Ross M. Kwasteniet, Esq.
       Christopher S. Koenig, Esq.
       Dan Latona, Esq.

WHITE & CASE LLP
*Attorneys for the Official Committee of Unsecured Creditors*
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
By:    Gregory Pesce, Esq.
       Andrea Amulic, Esq.
       Michael Andolina, Esq.
       Aaron Colodny, Esq.
       Samuel P. Hershey, Esq.
       David Turetsky, Esq.
       Keith Wofford, Esq.

---

[1]    Numerous *pro se* creditors made or joined in objections. The names of these creditors are identified in footnotes 4, 6, 8, 11, 14, 18, 20, and 22.

OFFICE OF THE UNITED STATES TRUSTEE
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014
By:     Shara Cornell, Esq.
        Brian Masumoto, Esq.
        Mark Bruh, Esq.

MILBANK LLP
*Attorneys for Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP*
55 Hudson Yards
New York, NY 10001
By:     Dennis F. Dunne, Esq.
        Nelly Almeida, Esq.

1850 K Street, NW, Suite 1100
Washington, DC 20006
By:     Andrew M. Leblanc, Esq.
        Melanie Westover Yanez, Esq.

JONES DAY
*Attorneys for CDP Investissements, Inc.*
555 South Flower Street, 50th Fl.
Los Angeles, CA 90071
By:     Joshua M. Mester, Esq.

TEXAS STATE SECURITIES BOARD AND THE TEXAS DEPARTMENT OF BANKING
P. O. Box 12548
Austin, Texas 78711
By:     Layla D. Milligan, Esq.
        Abigail R. Ryan, Esq.
        Roma N. Desai, Esq.

VERMONT DEPARTMENT OF FINANCIAL REGULATION
*Attorneys for the State of Vermont*
89 Main Street
Montpelier, VT 05620
By:     Jennifer Rood, Esq.

A000530

MCELROY, DEUTSCH, MULVANEY & CARPENTER LLP
*Attorneys for the New Jersey Bureau of Securities*
570 Broad Street
Newark, NJ 07102
By:     Jeffrey Bernstein, Esq.

225 Liberty Street, 36th Fl.
New York, NY 10281
By:     Nicole Leonard, Esq.

THE STATE OF WASHINGTON
P.O. Box 40100
Olympia, WA 98504
By:     Robert Ferguson, Esq.
        Stephen Manning, Esq.

NATIONAL ASSIOCIATION OF ATTORNEYS GENERAL
*Attorneys for the States of Alabama, Arkansas, California, District Of Columbia, Hawaii, Idaho, Maine, North Dakota, Oklahoma, and South Carolina*
1850 M St., NW, 12th Fl.
Washington, DC 20036
By:     Karen Cordry, Esq.

COAN, PAYTON & PAYNE, LLC
*Attorneys for Joe Breher*
999 18th Street, Suite S3100
Denver, CO 80202
By:     Steven T. Mulligan, Esq.

BERNSTEIN-BURKLEY, P.C.
*Attorneys for Stuart McLean, Keith Ryals, Jennifer Ryals, Kim David Flora, Brett Flora, and Courtney Burks Steadman*
601 Grant Street, 9th Fl.
Pittsburgh, PA 15219
By:     Mark A. Lindsay, Esq.

FOX ROTHSCHILD LLP
*Attorneys for Nuno Saraiva*
49 Market Street
Morristown, NJ 07960
By:     Michael R. Herz, Esq.

A000531

WEIR GREENBLATT PIERCE LLC
*Attorneys for Matthew Pinto*
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107
By:    Bonnie R. Golub, Esq.
       Jeffrey S. Ciancuilli, Esq.
       Michael P. Broadhurst, Esq.

MILES & STOCKBRIDGE P.C.
*Attorneys for Josh Tornetta*
100 Light Street, 10th Fl.
Baltimore, MD 21202
By:    Joel L. Perrell Jr., Esq.

VENABLE LLC
*Attorneys for Ignat Tuganov*
1270 Avenue of the Americas, 24th Fl.
New York, NY 10020
By:    Jeffrey S. Sabin, Esq.
       Carol Weiner Levy, Esq.
       Arie Peled, Esq.

600 Massachusetts Avenue, NW
Washington, DC 20001
By:    Andrew J. Currie, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Who owns the cryptocurrency assets deposited in Earn Accounts (defined below) by Celsius's account holders before the July 15, 2022 petition date (the "Petition Date")? This is a gating issue at the center of many disputes in this case. As explained below, the Court concludes, based on Celsius's unambiguous Terms of Use, and subject to any reserved defenses, that when the cryptocurrency assets (including stablecoins, discussed in detail below) were deposited in Earn Accounts, the cryptocurrency assets became Celsius's property; and the cryptocurrency assets remaining in the Earn Accounts on the Petition Date became property of the Debtors' bankruptcy estates (the "Estates").

4

A000532

At the Petition Date, Celsius had approximately 600,000 accounts in its Earn program ("Earn Program," and such assets, including any proceeds thereof, the "Earn Assets" and such accounts, the "Earn Accounts"). These Earn Accounts held cryptocurrency assets with a market value of approximately $4.2 billion as of July 10, 2022. (*Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions*, "Mashinsky Declaration," ECF Doc. 23, ¶ 49.) Included in the Earn Accounts at the Petition Date were a type of cryptocurrency known as stablecoins, valued at $23 million as of September 2022. (*Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief*, "Original Motion," ECF Doc. # 832, ¶ 9.)

The issue of ownership of the assets in the Earn Accounts is a contract law issue. The Debtors and Committee argue that the cryptocurrency assets deposited in Earn Accounts were owned by the Debtors and are now property of the Estates. Many Earn account holders ("Account Holders") argue that the Account Holders, rather than Celsius, own the cryptocurrency assets in the Earn Accounts and that cryptocurrency assets should promptly be returned to them.

Celsius adopted eight versions of the Terms of Use (collectively, the "Terms of Use" and each a version (e.g., "Terms Version 8"), which are detailed as exhibits A-1 through A-8 to the *Declaration of Alexander Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms Dating Back to February 18, 2018* ("Terms Affidavit," ECF Doc. # 393). For the avoidance of doubt this opinion refers to the "Terms of Use" identified in the Amended Motion as "Terms Version 8," and Terms Version 8 (effective April 15, 2022) is the controlling document for this memorandum opinion.

5

A000533

The Debtors and the Official Committee of Unsecured Creditors ("Committee") contend that under unambiguous provisions in Terms Version 8, a clickwrap contract governed by New York law, Celsius held "**all right and title to such Eligible Digital Assets, including ownership rights**" in the cryptocurrency assets (including stablecoins) in the Earn Accounts. (*See* ECF Doc. # 1325 ¶ 39 (citing Terms Version 8 § 13) (emphasis added)). The Debtors' uncontroverted evidence shows that 99.86% of the Earn Account holders accepted Terms Version 6 or a later version. ("Original Blonstein Declaration," ECF Doc. # 1327, ¶ 20.) Earlier Terms Versions 1–5 of the Terms of Use, in effect beginning on February 1, 2018, and updated at various dates by new versions, were also clickwrap contracts accepted by the overwhelming percentage of Earn Account holders.

If the cryptocurrency assets in the Earn Accounts are owned by the Debtors, the Account Holders are unsecured creditors and their recovery depends on the distributions to unsecured creditors under a confirmed chapter 11 plan, or under the Bankruptcy Code's priority rules in the event of liquidation. A fundamental principle of the Bankruptcy Code is equality of distribution. There simply will not be enough value available to repay all Account Holders in full. If only some Account Holders prevail with their arguments that they own the cryptocurrency assets in their accounts, they hope to recover 100% of their claims, while most of the Account Holders are left as unsecured creditors and may recover only a small percentage of their claims.

The Debtors and the Committee argue that under settled legal precedent the unambiguous language of the Terms of Use controls the ownership issue, making extrinsic evidence inadmissible, and, therefore, the cryptocurrency assets in the Earn Accounts are property of the estate. The objecting Account Holders argue that the Terms of Use are either clear that the Account Holders own the assets in the Earn Accounts, or the Terms of Use are ambiguous,

6

preventing the Court from resolving the issue of ownership without considering extrinsic evidence. The objectors say that numerous statements by Celsius's former Chief Executive Officer ("CEO"), Alex Mashinsky, and possibly other extrinsic evidence, demonstrate that the Account Holders have always owned the assets in the Earn Accounts.

The Debtors filed an amended motion[2] that "only seeks two broadly applicable rulings: (i) that the plain language of the Terms of Use unambiguously provides that the cryptocurrency assets in the Earn Program are the property of the Debtors' estates and (ii) that the Terms of Use are an enforceable contract (subject to certain individualized contract formation defenses). In other words, the Amended Motion seeks a presumption that each Account Holder is party to a binding contract with the Debtors, which presumption is rebuttable to the extent an Account Holder succeeds on an individual contract formation defense in the future." (*Debtors' Reply in Support of Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* ("Debtors' Reply," ECF Doc. # 1578, ¶ 3.))

The Amended Motion also seeks authority for the Debtors to sell approximately $18 million (in value) of stablecoins in the Earn Accounts, arguing that such stablecoins are property of the Estates and that a sale by the Debtors is permissible under section 363(c)(1) of the Bankruptcy Code in the ordinary course of business, or alternatively, under section 363(b)(1) other than in the ordinary course of business. The United States Trustee ("U.S. Trustee") and multiple state securities regulators argue that a sale of stablecoins should not be approved at the present time because the Debtors have sufficient liquidity at least over the next few months. The

---

[2]     *Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (ii) Permitting the Sale of Stablecoin in the Ordinary Course and (iii) Granting Related Relief* ("Amended Motion," ECF Doc. # 1325).

A000535

Committee argues that the proposed sale would not be in the ordinary course of business (under

section 363(c)(1)) but should be approved under section 363(b)(1) because the Debtors have

shown a good business reason for the sale (to pay ongoing administrative expenses). The Court

concludes it is unnecessary to resolve whether the proposed sale of stablecoins would be in the

ordinary course of business because the sale should be approved outside the ordinary course of

business. In the exercise of its business judgment, the Debtors have established a good business

reason to permit the sale.

## I. **BACKGROUND**

### A. **The Original Motion**

On September 15, 2022, the Debtors filed the Original Motion seeking authority to sell

certain stablecoins in their possession in the ordinary course of business to fund operating

expenses, including the costs of administering these chapter 11 cases. (*See generally* Original

Motion.) The Debtors received numerous responses to the Original Motion, most of which

raised concerns regarding the title and ownership status of the stablecoins the Debtors proposed

to sell. The Original Motion did not explicitly seek a determination on the ownership of Earn

Assets.

### B. **The Amended Motion**

Subsequently, on November 11, 2022, the Debtors submitted the Amended Motion with a

broader scope, seeking entry of an order (i) establishing ownership of assets in the Debtors' Earn

Program (as defined below) (ii) permitting the sale of stablecoins in the ordinary course and (iii)

granting related relief. In support of the Amended Motion the Debtors submitted declarations of

Chris Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial

Officer ("Ferraro Declaration," ECF Doc. # 1326); Oren Blonstein, Head of Innovation and

8

Chief Compliance Officer ("Original Blonstein Declaration," ECF Doc. # 1327 and the "Supplemental Blonstein Declaration, ECF Doc. # 1584); and Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, a restructuring advisory firm ("Campagna Declaration," ECF Doc. # 1328).

Prior to the filing of the Amended Motion, on October 21, 2022, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Related Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* ("Final Cash Management Order," ECF Doc. # 1152). Pursuant to paragraph 5 of the Final Cash Management Order, the Debtors cannot liquidate or convert any cryptocurrency into cash absent an order of the Court. The Court observed that the Debtors' liquidity is anticipated to tighten significantly in the new year. (*See generally* Campagna Declaration; *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures in Connection with the Sale of Substantially All the Debtors' Assets,* ECF Doc. # 1167, at 19) ("[T]he reality is that the Debtors will have significant liquidity issues to continue operating in 2023.").

The Amended Motion garnered a significant response from individual creditors, state regulatory agencies, the U.S. Trustee, and the Committee. In total, the Court received over thirty fives responses to the Amended Motion.

The Amended Motion seeks two categories of relief. First, the Amended Motion seeks to establish the Debtors' title and ownership rights over the cryptocurrency assets placed into the Earn Program and any proceeds thereof. If the Debtors own the Earn Assets, the Earn Assets

A000537

became property of the Debtors' bankruptcy estates ("Estates") when the Debtors filed for relief

under Chapter 11 of the Bankruptcy Code on the Petition Date. Second, the Amended Motion

also seeks authority to sell multiple variations of a cryptocurrency called "stablecoin" in the

ordinary course of business to create liquidity to fund the Debtors' business. Each issue is

discussed in turn.

### 1. Ownership of Earn Assets

The Debtors' Amended Motion seeks a determination that under the Terms of Use,

accepted by Celsius Account Holders when they opened their accounts (and, accepted

modifications thereof), the cryptocurrency assets in the Earn Accounts presumptively are

property of the estate.

The Debtors assert that ownership of the Earn Assets is an issue of contract interpretation

and that the Terms of Use constituted a valid and enforceable contract between Celsius and its

Account Holders. (Amended Motion, ¶ 3.) The Amended Motion relies on the elements of

contract formation (mutual assent, consideration, and an intent to be bound by the contract) and

submits that each amendment to the Terms of Use was binding on Account Holders who

transferred their assets to the platform before the effectiveness of the subsequently amended

Terms of Use (e.g., an Account Holder who deposited coins in July 2020 is bound by the Terms

of Use version currently in effect). (*See generally id.* ¶¶ 18–37.)

The Debtors contend that the Terms Version 8 are explicit and unambiguous with respect

to the ownership of Earn Assets. (Amended Motion ¶ 3.) Terms Version 8 states the following:

> In consideration for the Rewards payable to you on the Eligible Digital
> Assets using the Earn Service . . . and the use of our Services, **you grant
> Celsius . . . all right and title to such Eligible Digital Assets, including
> ownership rights, and the right, without further notice to you, to hold
> such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to
> pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise**

A000538

**transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.** You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise rights of ownership;

2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

3. **In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.**

(*Id.* (quoting Terms Version 8) (emphasis added).)

The Debtors state that the above excerpt is in addition to at least four other references (express or implied) to Earn Assets (including income thereon) being the Debtors' property. (Amended Motion ¶ 40 (citing Terms Version 8 §§ 2, 4, 10, 12).)

Moreover, the Debtors assert that, to the extent prior versions of the Terms of Use are relevant, they also support the Debtors' position. (*Id.* ¶ 41.) The Debtors represent that every version of the Terms of Use has (i) allowed the Debtors to make unilateral updates to the Terms of Use and (ii) been clear that the Debtors had the right to "pledge and repledge from time to time" assets transferred to the Debtors. (*Id.* ¶ 43.) Celsius states that, starting with Terms Version 2, each iteration explicitly stated that the Debtors had "all attendant rights of ownership" to such assets. (*Id.*)

11

## 2. Sale of Stablecoins

The Debtors contend that because the Earn Assets, including stablecoins, are property of the Estates, the Debtors can sell stablecoins to create liquidity to fund administrative expenses associated with these bankruptcy cases. (*Id.*) The Ferraro Declaration asserts that, before the Petition Date, the Debtors monetized stablecoin assets as needed to fund operations in the ordinary course of business. (Ferraro Declaration ¶ 25.) As of the filing of the Amended Motion, the Debtors or their affiliates held eleven different forms of stablecoins totaling approximately $23 million in their "Fireblocks account." (Campagna Declaration ¶ 10.) The Amended Motion seeks Court authority to sell approximately $18 million worth of stablecoins free and clear of another party's interests and maintains that the stablecoins are not subject to any encumbrances defined under section 363(f) of the Bankruptcy Code (discussed in further detail below). (Amended Motion ¶¶ 49, 54.)

The Debtors assert that although cryptocurrency presents a novel issue, the relief it requests—to sell assets akin to unencumbered inventory—is not. (*Id.* ¶ 50.) The Amended Motion submits that the sale of stablecoins is a reasonable exercise of the Debtors' business judgment to fund the significant cost of administering the Estates while the Debtors' income has been substantially reduced. (*Id.* ¶ 53.) The Debtors assert that selling stablecoins would meaningfully extend its liquidity runway. (Campagna Declaration ¶ 9.) Furthermore, the Debtors note that they have reserved sufficient stablecoins to avoid prejudice to any creditors of the Custody Program, Withhold Program, or Borrow Program whose rights are reserved pending a ruling on ownership of these assets. (*Id.* ¶ 10.)

A000540

## C.    Summary of Responses

The Amended Motion garnered responses from nearly thirty creditors, fourteen states, the

Committee, the U.S. Trustee, and other parties.  The creditors' responses share common features

and arguments, as do the responses from states.  Those filings are each discussed as a group.

### 1.    Objection of the U.S. Trustee

The U.S. Trustee filed a limited objection to the Amended Motion.  Most significantly,

the U.S. Trustee takes no position on whether the cryptocurrency assets in the Earn Accounts are

property of the Estates.  The U.S. Trustee's limited objection argues only that the Court should

not permit the Debtors to sell stablecoins at the present time.  ("U.S. Trustee Objection," ECF

Doc. # 1489, at 2–3.)  The U.S. Trustee contends that the Original and Amended Motions lack

the required evidentiary basis showing that (1) the Debtors own and therefore have the authority

to sell the stablecoins and, if they do, (2) what the proceeds of the sale of stablecoins will fund.

(U.S. Trustee Objection at 2.)

First, the U.S. Trustee asserts, the Debtors commingled assets of their customers in such a

way that it is unclear how the Debtors can accurately identify the owners of the stablecoins.  (*Id.*)

Even if the Debtors can establish ownership, the U.S. Trustee also questions how a stablecoins

sale may impact the Debtors' ability to make distributions "in kind" to customers.  (*Id.*)

Second, the U.S. Trustee states that the Original and Amended Motions fail to explain

how the proceeds of the sale of $18 million worth of stablecoins will be used.  (*Id.*)  The U.S.

Trustee submits that the sale will provide one month of additional liquidity beginning in March

2023 based on the Ferraro and Campagna declarations.  (*Id.* at 2–3.)  The U.S. Trustee contends

that the Debtors must explain how this future liquidity justifies a current sale, and further claims

that the Amended Motion should state that it intends to use the proceeds solely for administrative

13

expenses, if that is indeed the case. (*Id.* at 3.) Finally, the U.S. Trustee asserts that the Debtors fail to explain the extent to which the proceeds of any stablecoins will be used to fund the mining business or GK8, an affiliate. (*Id.*)

### 2. Limited Objection of the Committee

The Committee filed a Limited Objection to the Amended Motion ("Committee Objection," ECF Doc. # 1502). The Committee noted that 55% of the Debtors' currently existing customers were already customers prior to July 22, 2022. (*Id.* ¶ 3.) The Committee contended that the unambiguous Terms of Use are binding on these customers considering the Debtors' screen shots and testimony demonstrating how these customers accepted Terms Version 6. (*Id.*) However, the Committee asserted that the Debtors had not provided any evidence or testimony showing how the 44% of account holders who created accounts after July 22, 2021 accepted the Terms of Use, notwithstanding the Committee requests that the Debtors do so. (*Id.*) The Committee stated the Court cannot determine whether the Terms of Use is binding on this latter 44% of customers until the Debtors cure this evidentiary gap. (*Id.*)

Notably, the Committee asserted that the Terms Version 8 unambiguously provides that Account Holders who elected to participate in the Earn Program transferred title to their relevant digital assets to Celsius and authorized Celsius to sell or otherwise use such digital assets in its sole discretion without further permission from the Account Holders. (Committee Objection ¶ 4.) Furthermore, each version of the Terms of Use since September 2020 contained a similar, unambiguous statement. (*Id.*) Therefore, the Committee argued that to the extent that the Court determines that a customer entered an enforceable contract through any version of the Terms of Use after September 2020, that customer agreed to transfer ownership of digital assets to Celsius. (*Id.* ¶ 5.)

A000542

In evaluating the Debtors' Terms of Use and various arguments relating to the use of the word "loan," the Committee contended that the transfer of title and the creation of a loan are not mutually exclusive concepts. (*Id.*) More importantly, the Committee asserted, reading the reference to a "loan" in the Terms of Use to mean that title did not transfer would require the reader to ignore several provisions from the Terms of Use, including provisions regarding the transfer of title and Celsius's ability to sell or otherwise transfer digital assets (including rights of ownership). (*Id.*) The Committee stated that it is a bedrock principle of contract interpretation that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony. (*Id.* ¶ 6.)

The Committee's primary objection was to the disposal of proceeds from a sale of stablecoins for purposes other than to fund the Estates. Although the Committee argued that a sale would not be in the ordinary course of business, it believes the Debtors have established cause to sell stablecoins outside of the ordinary course of business to fund these cases provided that they are being operated for the benefit of the Estates. (*Id.* ¶ 7.)

### 3. Objections of States

#### a. State of Vermont

The State of Vermont filed a limited objection to the extent that the Amended Motion seeks to spend proceeds from a sale of stablecoin because (i) ownership of Earn Assets has not been determined; (ii) as demonstrated by the Examiner's[3] Interim Report (ECF Doc. # 1411), the

---

[3] On August 18, 2022, the United States Trustee filed a *Motion for Entry of an Order Directing the Appointment of an Examiner.* (ECF Doc. # 546.) On September 14, 2022, this Court entered an order directing the United States Trustee to appoint an examiner. (ECF Doc. # 820.) On September 29, 2022, the United States Trustee filed a Notice of Appointment. (ECF Doc. # 920.) That same day, this Court entered an order appointing an Examiner. (ECF Doc. # 923.)

A000543

Debtors did not segregate Earn Assets from Custody and Withhold Assets; and (iii) the Debtors

should not spend funds unnecessarily while the future of these Chapter 11 proceedings remains

unclear. ("Vermont Objection," ECF Doc. # 1484, ¶ 8.) Should the Court permit the Debtors to

sell stablecoins, Vermont requests that any proceeds be placed in escrow. (*Id.* at 3.)

As a practical matter, Vermont is concerned that the Debtors' commingling of Earn

Assets with Custody and Withhold Assets will make it difficult to determine who owns which

assets. (*Id.* ¶ 12.) Vermont states that it does not take a position on the ownership of Earn

Assets, but notes that it is not clear, based on the Terms of Use provided by the Debtors, how

ownership could be conveyed from Account Holders to Celsius in a temporary fashion. (*Id.* ¶

11.) The State of Washington joins in the Vermont Objection. ("Washington Joinder," ECF

Doc. # 1497.)

### b. State of New Jersey

The State of New Jersey filed an objection and reservation of rights ("New Jersey

Objection," ECF Doc. # 1498). New Jersey asserts that Celsius operated in violation of the

state's securities laws by selling unregulated securities. It contends that any determination on the

ownership of Earn Assets is premature while the Examiner completes her investigation, and that

any determination of ownership should be made with the procedural safeguards present in an

adversary proceeding. (New Jersey Objection at 2.) New Jersey takes the position that the Earn

Assets are owned by Celsius's customers. (*Id.*) To the extent the Court permits the sale of

stablecoins, New Jersey requests that the proceeds be held in escrow subject to a determination

of ownership and until after the Examiner providers her final report. (*Id.*)

16

A000544

### c. State of Texas

The Texas State Securities Board and Department of Banking (collectively, "Texas") objects to the Amended Motion because it asserts that the Debtors' process for the Amended Motion is expedited, premature, and should be done through an adversary proceeding with the appropriate safeguards provided by the Bankruptcy Rules. ("Texas Objection," ECF Doc. # 1496, ¶ 1.) Texas contends that a contract may not have been formed between the Debtors and its customers because the Debtors have not offered sufficient documentation to show that Account Holders actually agreed to the Terms of Use. (*Id.* ¶¶ 16–17.) Should the Court find that the stablecoins are property of the Estates, Texas objects to the use of any proceeds from a sale to pay administrative costs, and instead contends that proceeds should be held for the benefit of creditors and addressed through a confirmable reorganization plan or liquidation. (*Id.* ¶ 25.)

### d. Coordinating States Objection

The States of Alabama, Arkansas, California, Hawaii, Idaho, Maine, North Dakota, Oklahoma, and South Carolina, and the District of Columbia (collectively, the "Coordinating States") object to the Amended Motion ("Coordinating States Objection," ECF Doc. # 1492). The Coordinating States assert that the Terms of Use have evolved over time, and it is not clear that customers really understood the nature of these changes. (Coordinating States Objection at 3.) The Coordinating States note that the Debtors are under investigation in several states for marketing securities without necessary registrations and without complying with state regulatory frameworks and federal law, and therefore the Debtors cannot rely on the arguably unlawful Terms of Use to determine the purported ownership of these assets and what rights they have in them. (*Id.*)

17

A000545

With respect to the language in the Terms of Use, the Coordinating States note that "loan" was used ubiquitously, and that the Terms of Use states that "you grant Celsius, . . . for the duration of the period during which the Eligible Digital Assets are *loaned* to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights." (*Id.* at 4 (emphasis added in the Coordinating States Objection).) The Coordinating States contend that Account Holders would not meaningfully understand the Terms of Use to be a transfer of ownership because customers could withdraw their assets without notice or conditions whenever and in the same form as the initial deposit. (*Id.* at 4–5.)

Finally, the Coordinating States submit that an actual transfer of ownership would have constituted a taxable event, yet the Debtors paid no taxes on these transactions. (*Id.* at 4.) Washington joins in the Coordinating States Objection. (*See* Washington Joinder.)

4. Creditor Responses

The Court received over twenty responses from creditors, some *pro se* and some represented by counsel, objecting to the Amended Motion (collectively, "Creditor Responses"). A common objection is that the Terms of Use are ambiguous within the four corners of the document because the Terms of Use, despite the key transfer of title and ownership clause that the Debtors rely on, ubiquitously use the terms "loan" and "lending" to describe the transaction whereby Account Holders deposit assets into Earn Accounts.[4] Therefore, a layperson would understand the Terms of Use to leave title and ownership of Earn Assets to Account Holders while temporarily providing use of the assets to Celsius. (*Id.*)

---

[4]    "Gallagher Objection," ECF Doc. # 1416; Wohlwend Objection; "Little Objection," ECF Doc. # 1463; "Flora Objection," ECF Doc. # 1464; "Saraiva Objection," ECF Doc. # 1485; "Breher Joinder," ECF Doc. # 1486; "Ryals Objection," ECF Doc. # 1490; "McLean Objection," ECF Doc. # 1491; Tornetta Joinder; "Hoffing Objection," ECF Doc. # 1506; "Pinto Joinder," ECF Doc. # 1499; "Herrmann Omnibus Objection," ECF Doc. # 1519; Frishberg Joinder; "Steadman Joinder," ECF Doc. # 1537; "Flora Joinder," ECF Doc. # 1538; "Jelbert Objection," ECF Doc. # 1545 (the Jelbert Objection was untimely).

18

Creditors also assert that Celsius's statements on its website, social media, and particularly the statements of former Chief Executive Officer Alexander Mashinsky in his "Ask Mashinsky Anything" videos constituted an oral modification of the contract such that, notwithstanding the written Terms of Use, the transactions between the Account Holders and Debtors did not transfer title and ownership to the Earn Assets.[5]

Several creditors, in addition to the Coordinating States and Washington, contend that if Account Holders transferred title to their assets to Celsius then the transaction would have created a taxable event, yet Celsius did not pay taxes on these transactions or issue tax documents to Account Holders.[6] As a procedural matter, several creditors believe this issue should be handled via an adversary proceeding, rather than by motion practice.[7] Others submit that a decision determining Earn Asset ownership is premature at this stage of the Debtors' bankruptcy proceedings because the Debtors' business was a Ponzi scheme, which the Examiner's forthcoming final report may demonstrate.[8] If so, they assert that the underlying contract formed by the Terms of Use is void as a matter of public policy.[9] Creditors state that a decision is also premature because the Debtors' liquidity will not run out until March 2023.[10] Finally, some creditors believe that a decision at this stage is premature because the expedited

---

[5]     Gallagher Objection; Saraiva Objection; Ryals Objection; McLean Objection; Tornetta Joinder; Pinto Joinder; Frishberg Joinder; Steadman Joinder; Flora Joinder.

[6]     Wohlwend Objection; Saraiva Objection; Breher Joinder; Tornetta Joinder; Pinto Joinder, "Georgiou Objection," ECF Doc. # 1517; Herrmann Omnibus Objection; Frishberg Joinder.

[7]     Saraiva Objection; Tornetta Joinder; Pinto Joinder; Frishberg Joinder.

[8]     "Tuganov Objection," ECF Doc. # 1495; Herrmann Omnibus Objection.

[9]     *Id.*

[10]    Ubierna Objection.

19

A000547

schedule to determine ownership of the Earn Assets violated the creditors' individual due process rights.[11]

The Creditor Responses contend that they have several defenses to contract formation and modification that apply to creditors as a class, which render the contract void and unenforceable, including that (i) the contract lacked consideration[12]; (ii) the contract was unconscionable, because Celsius, a company with access to sophisticated legal advice, obtained title and ownership to significant assets of laypersons via a complex Terms of Use document and modifications thereto[13]; (iii) Celsius failed to uphold its fiduciary duties under the contract established by the Terms of Use[14]; (iv) Account Holders lacked the requisite intent to transfer ownership[15]; (v) when Account Holders agreed to updated Terms of Use they may not have understood that they were agreeing to a contract and instead may have wanted to see the balance of their account(s)[16]; (vi) Celsius fraudulently misrepresented its product and finances, therefore the Account Holders should not be bound by the Terms of Use[17]; and (vii) Celsius operated illegally by violating the securities laws of several states.[18]

---

[11]    "Frishberg Objection," ECF Doc. # 1400.

[12]    Ryals Objection; McLean Objection; Tornetta Joinder; Pinto Joinder; Frishberg Joinder; Steadman Joinder; Flora Joinder.

[13]    Ryals Objection; McLean Objection; Tornetta Joinder; Pinto Joinder; Herrmann Omnibus Objection; Frishberg Joinder; Steadman Joinder; Flora Joinder.

[14]    "Medley Objection," ECF Doc. # 1507.

[15]    Altunbay Objection.

[16]    Ubierna Objection.

[17]    Gallagher Objection.

[18]    Gallagher Objection; Little Objection; Saraiva Objection; Ryals Objection, McLean Objection; Tornetta Joinder; Pinto Joinder; "Altunbay Objection," ECF Doc. # 1511; Frishberg Joinder; "Ubierna Objection," ECF Doc. # 1535; Steadman Joinder; Flora Joinder.

A000548

Finally, several responses raise breach of contract claims[19], some of which raise

individual contract claims regarding the creditor's specific account circumstances.[20]  Additional

responses assert that Celsius commingled assets, therefore, there is no factual difference between

Earn, Custody, and Withhold Accounts and this Amended Motion relies on a factually inaccurate

premise (i.e., that the Earn Assets are legally different from the Custody and Withhold Assets).[21]

At least one creditor argues that to the extent that Celsius issued withdrawals while it was

insolvent, those transactions were funded by incoming deposits and were therefore fraudulent

conveyances, which should be returned to the depositing Account Holder.[22]

In addition to Creditor Responses, creditor Immanuel Herrmann submitted three letters

signed by creditors.  Four hundred fifty-two (452) creditors join the objections of creditors Eric

Wohlwend and Rebecca Gallagher.  (*See* "452 Creditor Joinder," ECF Doc. # 1599, joining the

Wohlwend Objection and Gallagher Objection.)  Three hundred forty (340) creditors join the

objection of Keith and Jennifer Ryals.  (*See* "340 Creditor Joinder, ECF Doc. # 1602, joining

Ryals Objection.)  Three hundred ninety-seven (397) creditors signed a statement of

dissatisfaction with the Committee Objection, asserting that the Committee, through its

objection, abdicated its responsibility to represent creditors interests.  (*See* "397 Creditor

Statement," ECF Doc. # 1559.)  The 397 Creditor Statement also calls for the Court to add

creditors to the Committee to better represent the interests of unsecured creditors.  (*Id.*)

---

[19]     Frishberg Objection; Saraiva Objection; Pinto Joinder.

[20]     *See, e.g.,* Medley Objection; Altunbay Objection (asserting that the "clickwrap" style agreement is not
enforceable because it was not in the Account Holder's native language, therefore the Account Holder could not
fully understand the terms); "Romauld Objection," ECF Doc. # 1554 (same) (this objection was untimely); Georgiou
Objection; Ubierna Objection.

[21]     Altunbay Objection.

[22]     "Crews Objection," ECF Doc. # 1515.

A000549

5. The Debtors' Reply

On December 2, 2022 the Debtors filed the Debtors' Reply and the Supplemental Blonstein Declaration, which substantially responded to the Committee Objection. The Debtors' Reply maintains that a valid, enforceable contract was formed by the Terms of Use between Celsius and each Account Holder who accepted the Terms of Use (Debtors' Reply ¶¶ 15–17), and that the Terms of Use unambiguously state that Earn Assets are the Debtors' property and therefore became property of the Estates when the Debtors filed for bankruptcy (*id.* ¶¶ 18–19). Finally, the Debtors reassert that they may sell stablecoins in the ordinary course of business and, if the Court disagrees, that the Court should nonetheless approve the sale as an exercise of the Debtors' sound business judgment. (*Id.* ¶¶ 21–23.)

The Debtors rebut explicit and implicit statements by creditors regarding the Debtors' motives (*see, e.g.,* Debtors' Reply ¶ 5) and reject certain creditors' arguments that the Amended Motion is procedurally improper and should be addressed in an adversary proceeding. (*Id.* ¶ 24.) The Debtors reiterate that they seek a declaratory judgment establishing a presumption that each Account Holder is party to a binding contract with the Debtors, which presumption is rebuttable to the extent an Account Holder succeeds on an individual contract formation defense in the future. (*Id.* ¶ 25.)

## II.  LEGAL STANDARD

### A.  Property of the Bankruptcy Estate Under the Bankruptcy Code

The Debtors contend that the Earn Assets are property of the Estates. Section 541 of the Bankruptcy Code provides, in relevant part, that:

A000550

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541(a)(1).

The Estates therefore consist of "all legal or equitable interests of the debtor in property as of the commencement of the case." *In re Lehman Bros. Holdings. Inc.*, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010) (emphasis removed) (citing 11 U.S.C. § 541(a)(1)).

Section 363(c)(1) of the Bankruptcy Code allows a debtor to enter certain transactions in the ordinary course of business, and provides:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

The Court may approve transactions which are not in the ordinary course of business if the debtor demonstrates a "sound business purpose" for the transaction. *See* 11 U.S.C. § 363(b)(1); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that judicial approval under section 363 of the Bankruptcy Code requires a showing that there is a good business reason); *see also In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same).

With respect to the procedural requirements governing disputes over estate property ownership, the Bankruptcy Rules do not require every declaratory action to be brought as an adversary proceeding, only those that relate to a subject that is already required to be brought as

23

A000551

an adversary proceeding. FED. R. BANKR. P. 7001(9) (requiring an adversary proceeding for any

matters "relating to any of the foregoing" issues described in sections 1–8 of Rule 7001[23] that

must be brought as an adversary proceeding under this rule).

### B. Elements of a Valid, Enforceable Contract

The Terms of Use expressly provide that they are governed by New York law. (Terms

Version 8 § 33.) No one argues to the contrary. The governing legal principles do not appear to

vary substantially even if the law of other states applied. In the absence of any asserted conflict

in legal rules, the Court can, in any event, apply New York law as the forum state law. *See*

*Paypolitan OU v. Marchesoni*, 21-CV-5397 (RA) (RWL), at *8 n.6 (S.D.N.Y. Aug. 26, 2022);

*see also Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221, 307 (S.D.N.Y. 2019).

The Debtors assert that the Earn Assets are property of the Estates because the Terms of

Use that Account Holders accepted constituted a valid, enforceable contract which accorded title

to and ownership of the Earn Assets to the Debtors. A contract requires an offer and acceptance

thereof (mutual assent), consideration, and an intent to be bound. *See Register.com, Inc. v.*

*Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (reciting the requirements for formation of a

contract).

---

[23]    Issues required to be brought as an adversary proceeding under Fed. R. Bankr. P. 7001 include a "(1) a
proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the
trustee, or a proceeding under §554(b) or §725 of the Code, Rule 2017, or Rule 6002; (2) a proceeding to determine
the validity, priority, or extent of a lien or other interest in property, but not a proceeding under Rule 3012 or Rule
4003(d); (3) a proceeding to obtain approval under §363(h) for the sale of both the interest of the estate and of a co-
owner in property; (4) a proceeding to object to or revoke a discharge, other than an objection to discharge under
§§727(a)(8),1 (a)(9), or 1328(f); (5) a proceeding to revoke an order of confirmation of a chapter 11, chapter 12, or
chapter 13 plan; (6) a proceeding to determine the dischargeability of a debt; (7) a proceeding to obtain an injunction
or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief;
and (8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12,
or chapter 13 plan provides for subordination; (9) a proceeding to obtain a declaratory judgment relating to any of
the foregoing; or (10) a proceeding to determine a claim or cause of action removed under 28 U.S.C. § 1452." Rule
7001(10), requiring an adversary proceeding to determine a claim or cause of action removed under 28 U.S.C.
§1452, is not relevant here.

A000552

These requirements are not different for electronic contracts, and courts have adapted traditional principles of contract formation to fit the digital era. *See id.* at 403 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."); *see, e.g., Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 384–85 (E.D.N.Y. 2015) ("Most Americans now do some business over the Internet—whether making purchases or participating in a community at the pleasure of a forum host. When we do, we are almost always presented (clearly or opaquely) with contractual terms governing our use of the site. The studies conducted to date and their implications reinforce the need to reconsider principles underlying contract law, developed in an age of paper and orality.") (internal citations omitted).

### 1. Mutual Assent (Offer and Acceptance)

Traditionally, mutual assent was conceptualized as the culmination of a bargaining process, with an emphasis on both parties' intent to be bound following an active negotiation of terms. Donald P. Harris, *Trips and Treaties of Adhesion Part II: Back to the Past or a Small Step Forward?*, 2007 Mich. St. L. Rev. 185, 191 ("Adhesion Contracts") ("The exemplary contract is one between parties of relatively equal bargaining power, and achieved through a negotiation process that reflects this power balance.") (citing E. Allan Farnsworth, Contracts § 4.26 (4th ed. 2004)).

Digital contracts between companies and consumers—here, Account Holders—often involve a fundamentally different process, where consumers' participation is limited to deciding if they will participate. *See Register.com*, 356 F.3d at 403 ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the

25

A000553

terms, which accordingly become binding on the offeree."); *see also* Adhesion Contracts at 192

("The only alternative to complete adherence is outright rejection.").

Given consumers' passive role in negotiating many electronic contracts, the issue of

mutual assent often turns on whether a consumer should have been aware that they were being

bound by the relevant terms. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–75 (2d Cir. 2017)

("Where there is no evidence that the offeree had actual notice of the terms of the agreement, the

offeree will still be bound by the agreement if a reasonably prudent Account Holder would be on

inquiry notice of the terms."). To determine what a "reasonably prudent Account Holder" would

have been aware of, courts generally evaluate the method of manifesting acceptance and the

conspicuousness of the terms that were purportedly accepted. *See Valelly v. Merrill Lynch,*

*Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (discussing the means

for manifesting acceptance); *Uber Techs.*, 868 F.3d at 75–78 (evaluating the conspicuousness of

a Terms of Service hyperlink).

With respect to the first inquiry, courts have categorized electronic contracts based

on the process for accepting their terms. The primary categories are (i) "scrollwrap" agreements,

(ii) "clickwrap" agreements, and (iii) "browsewrap" agreements.[24] Under this framework, the

Debtors' Terms of Use are a "clickwrap" agreement, which require an Account Holder to

manifest assent by clicking a button confirming that they accept the terms or a button that

implies that they have accepted the terms, but do not necessarily require the Account Holder to

---

[24] *See Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2020) ("Clickwrap agreements are generally defined by the requirement that Account Holders 'click' some form of 'I agree' after being presented with a list of terms and conditions. Browsewrap agreements, on the other hand, are usually found 'where a website's terms and conditions are . . . posted on the website via a hyperlink at the bottom of the screen' and a Account Holder's assent is given merely by his or her use of the website and nothing more.") (internal citations omitted); *Uber Techs.*, 868 F.3d at 75 ("Some online agreements require the Account Holder to scroll through the terms before the Account Holder can indicate his or her assent by clicking 'I agree.'") (citing *Berkson*, 97 F. Supp. 3d at 386, 398 (labeling such agreements "scrollwraps")).

A000554

actually view the terms.  (Original Blonstein Declaration ¶ 18.)  Clickwrap contracts are routinely enforced under New York law.  *Whit v. Prosper Funding LLC*, No. 15-00136 (GHW), 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) ("In New York, clickwrap agreements are valid and enforceable contracts.") (quoting *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08-05463 (CM), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011)).

The second, and closely related, aspect courts evaluate is how apparent it was that the contract's terms would apply to the assenting party.  The ultimate inquiry is "whether [a reasonable pe[rson] . . . would have known about the terms and the conduct that would be required to assent to them."  *Uber Techs.*, 868 F.3d at 74–75.  In making this determination, courts look to see if the terms were "reasonably conspicuous," with an emphasis on considerations like the clutter on the page that contained the terms (or a link thereto), whether hyperlinks were in a different color or style of font, and the presence (or absence) of spatial and temporal coupling with acceptance.  *See*, *e.g.*, *Uber Techs.*, 868 F.3d at 74–75 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her.")

### 2.  Consideration

A contract must also be supported by "consideration."  This requirement is not exacting—each party must simply receive "something of value."  *Apfel v. Prudential-Bache Secs. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) (observing that anything with "real value in the eye of the law" can serve as consideration) (quoting *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953)).  Courts generally will not opine on the adequacy of consideration.  *Id.* ("Absent

A000555

fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial

scrutiny.") (citations omitted).

### 3. Modification

A contract that provides for modification may be modified and requires the same

elements as an original contract formation. *Janover v. Bernan Foods, Inc.*, 901 F. Supp. 695,

700 (S.D.N.Y. 1995) ("[T]here is no question that a contract may be modified if the contract

provides for its modification."); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 159

(S.D.N.Y. 2014) (stating that modification of a contract requires the same elements as contract

formation).[25] Under New York law, "[i]n general . . . a written agreement that expressly states it

can be modified in writing cannot be modified orally." *Towers Charter & Marine Corp. v.

Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (applying New York state law). The party

seeking to enforce an alleged contract bears the burden of establishing the contract to be

enforced. *See Paz v. Singer Co.*, 542 N.Y.S.2d 10, 11 (App. Div. 1st Dep't 1989) ("It is black

letter law that the burden of proving the existence, terms and validity of a contract rests on the

party seeking to enforce it.").

With respect to consideration in the context of a contract modification, a service

provider's notice of a change to the terms of service and a customer's choice to continue using

the service is valid consideration. *See Byrne v. Charter Commc'ns*, 581 F. Supp. 3d 409, 419 (D.

Conn. 2022) ("[T]he service provider is required to provide notice of the intended change [to the

terms], and the customer has the choice of accepting the new arrangement or ceasing to use the

services, and these respective promises by the parties together are sufficient to constitute valid

---

[25]     *See also In re Coudert Bros.*, 487 B.R. 375, 393–94 (S.D.N.Y. 2013) ("Under New York law, it is
[f]undamental to the establishment of a contract modification [that] proof of each element requisite to the
formulation of a contract be shown.") (internal quotation marks omitted).

consideration.") (citing *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159 (5th Cir. 2004)).

### C. Contract Interpretation

Under New York law, when a contract's terms are unambiguous, courts must apply them as written. *In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."). Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. *See*, *e.g.*, *W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162 (1990).

A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 570 (2002). Extrinsic evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous. *Innophos, Inc. v Rhodia, S.A.*, 38 A.D.3d 368, 369 (1st Dept. 2007), *aff'd*, 10 N.Y.3d 25 (2008). Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 28 A.D.3d 175, 177 (1st Dept. 2006) (internal quotation marks and citation omitted).

### III. DISCUSSION

The issues before the Court are (a) whether the Terms of Use are a contract by which complete title and ownership of Earn Assets transferred from Account Holders to Celsius when the Account Holders deposited cryptocurrency in their Earn Accounts; and (b) if so, whether the Debtors may sell stablecoins in the ordinary course of business or outside the ordinary course of business.

A000557

For the reasons detailed below, the Court finds, on the evidence before it, that the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors. The Court also finds that stablecoins, like other Earn Assets, are property of the Estates and the Debtors may sell the stablecoins outside of the ordinary course of business to provide liquidity for these Chapter 11 proceedings.

To be clear, this finding does not mean holders of Earn Assets will get nothing from the Debtors.[26] Account Holders have unsecured claims against the Debtors in dollars or in kind (depending on the terms of any confirmed plan). The amount of allowed unsecured claims is subject to later determination in this case (through the claims allowance process) and may potentially include damages asserted by Account Holders, including breach of contract, fraud or other theories of liability.

The Court has read every submission filed in connection with the Amended Motion and appreciates the significant time and effort that creditors, regulators and other parties in interest have undertaken on these very important issues. But based on the unambiguous contract terms, subject to any reserved defenses, the Court finds and concludes that the cryptocurrency assets deposited in Earn Accounts are presumptively property of the estate and not property of the Account Holders.

---

[26]     The Court notes that even if the Terms of Use indicated that coins were property of the customers, which they do not, as Debtors' counsel pointed out at the December 5, 2022 hearing "we do not have enough coin to give everybody their coin back in kind." (December 5, 2022 H'rg Tr. 109:21–24). Thus, even if the contract's terms conferred title on customers, customers would still not get back 100% of their coins. The Court is committed to overseeing a fair process that ensures that all creditors are made as whole as possible.

A000558

Based on the limited scope of findings sought by the Amended Motion,[27] the Court's decision does not determine the ownership of assets in the Debtors' Custody Program, Withhold Accounts, or Borrow Program or whether any individual Account Holder has valid defenses to the contract between Account Holders and the Debtors. The Court's findings also do not decide the rights of any state or state agencies regarding whether Celsius violated state securities laws by marketing unregistered securities.[28]

### A.   Ownership of Earn Assets

Determining ownership of the Earn Assets requires a two-step inquiry regarding (i) whether the Terms of Use formed a valid, enforceable contract between the Debtors and each Account Holder who accepted the Terms of Use, including whether subsequent versions of the Terms of Use constitute a valid, enforceable modification of a contract; and (ii) if the answer to the former questions is in the affirmative, whether the Terms of Use unambiguously transferred title and ownership of Earn Assets from Account Holders to the Debtors when Account Holders deposited their assets into the Earn Program.

### 1.   The Terms of Use Formed a Valid, Enforceable Contract

A valid, enforceable contract requires mutual assent (i.e., one party makes an offer and the other party accepts the offer), consideration (i.e., each party exchanges a service or good),

---

[27]   *See* Amended Motion § 16 ("For the avoidance of doubt, this Amended Motion does not seek findings with respect to (x) the ownership of assets in the Debtors' Custody Program, Withhold Accounts, or Borrow Program or (y) whether any Account Holder has valid defenses to the purported contract between Account Holders and the Debtors under the Terms of Use, and all parties' rights are reserved with respect to each of the foregoing.").

[28]   The Court makes no determination as to these security issues but notes that if Earn Assets are determined to be securities, it is likely that Earn Account holders would still be unsecured creditors. Section 510(b) of the Bankruptcy Code subordinates claims "arising from" the purchase or sale of a security to the claims of general unsecured creditors. 11 U.S.C. § 510(b). Thus, here to the extent that creditors argue that they have recission claims for the unlawful sale of security, these claims would likely squarely fall within the broad reach of section 510(b)'s claim "arising from" the purchase or sale of a security. 11 U.S.C. § 510(b); *see In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold share of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b).")

A000559

and intent to be bound (i.e., both parties intended to enter into the contract). *See Register.com, Inc.*, 356 F.3d at 427. Accounts Holders entered a contract with the Debtors governed by the Terms of Use through a "clickwrap" agreement (*see, e.g.,* Original Blonstein Declaration ¶ 18), which requires a user to manifest assent by clicking a button confirming that they accept the terms, or a button that implies that they have accepted the terms, but do not necessarily require the user to view the terms.

Exhibits to the Supplemental Blonstein Declaration provide screen captures of the sign-up process for users who signed up via the website, for all Terms of Use versions, and the mobile app for the effective period of Terms Versions 5 through 8. (Supplemental Blonstein Declaration, Exhibits A–E.) The Supplemental Blonstein Declaration explains that applicants could not advance to the next page and complete sign up unless they agreed to the Terms of Use. (*Id.* ¶ 6.)

New York Courts overwhelmingly accept "clickwrap" agreements as sufficient to constitute mutual assent. *Uber Techs.*, 868 F.3d at 75 ("Courts routinely uphold clickwrap agreements for the principal reason that the Account Holder has affirmatively assented to the terms of agreement by clicking 'I agree.'"). The Restatement (Second) of Contracts further supports the validity and enforceability of a clickwrap contract in Comment B, "Assent to known terms," where it recognizes the common knowledge that many users never read the full terms of a clickwrap agreement before checking an "agree" box. Restatement (Second) of Contracts, § 211 cmt. b. It explains, in relevant part:

> Customers do not in fact ordinarily understand or even read the standard terms. They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. *But they understand that they are assenting to the terms not read or not understood*, subject to such limitations as the law may impose.

A000560

(*Id.* (emphasis added).)

Here, the Original Blonstein Declaration provides testimony demonstrating that 99% of Account Holders completed this sign-up process and affirmatively assented to the contract terms contained in the Terms of Use effective at the time of sign-up. (Original Blonstein Declaration ¶ 14.)[29] The Court finds that Account Holders understood that they were assenting to a contract governed by the Terms of Use even if the Account Holders chose to read some or none of the provisions. The Court empathizes with the frustrations Account Holders may feel if they did not read or understand the specific terms of the Terms of Use. Frankly, though, the rules provide needed certainty and predictability required for modern commerce in the digital era. The law in the Second Circuit is clear that clickwrap contracts such as the Terms of Use are valid and binding. The Debtors have sufficiently shown the mutual assent element of contract formation.

With respect to consideration, the Terms of Use clearly spell out the "benefit of the bargain": "Our Earn Service allows you to earn a financing fee from Celsius, referred to as 'Rewards,' in the form of Digital Assets . . . in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof." (Terms Version 8 § 4.D.) The Ryals Objection argues that the Debtors' consideration is illusory because the Terms of Use allow the Debtors to opt-out of fulfilling their end of the bargain.[30] However, the Debtors put

---

[29]     Of the approximately 600,000 Account Holders listed on the Debtors schedules, 89% created accounts by first accepting Terms Version 5 or later, while 10% first accepted Terms 4 or earlier. (Original Blonstein Declaration ¶ 14.) The Debtors lack records for 1% of Account Holders. (*Id.*)

[30]     Ryals Objection ¶¶ 13–15 ("If the Terms of Use are determined to govern the relationship of the parties, it is evident from the language that any ultimate obligations of the Debtors' were illusory in nature . . . The Debtors . . . drafted the Terms of Use in such a way to create options and circumstances under which the Debtors could walk away from any obligation.); *id.* ("A contract lacks consideration when the obligation of one party is illusory, meaning only one side is bound to perform." (citing *Curtis Props. Corp. v. Greif Cos.*, 212 A.D.2d 259, 628 N.Y.S.2d 628, 632 (1st Dep't 1995)).

A000561

forth evidence that the Debtors' consideration was the payment of proceeds from Earn Assets to Account Holders as "rewards."[31] The Ryals Objection concedes that the Debtors fulfilled this promise (Ryals Objection ¶ 15), and no party submits evidence that the Debtors did not do so.

Nor does any party provide evidence that Celsius and its Account Holders, as a class or as an individual, lacked intent to be bound by the contract terms. Certain Creditor Responses argue that the Account Holders did not intend certain effects of the contract,[32] but no objection argues that *all* Account Holders lacked intent to enter a contract governed by the Terms of Use. Moreover, many responses to the Amended Motion attempt to hold Celsius to a different reading of the contract terms, i.e., that Account Holders retained title of Earn Assets under the Terms of Use. That certain Account Holders disagree with the Debtors' reading of the Terms of Use is a contract interpretation issue discussed *infra* at III.A.3.

For the foregoing reasons, the Debtors have convincingly argued that the three elements required to form a valid, enforceable contract were satisfied by the Account Holders' acceptance of the Terms of Use via the clickwrap agreement.

### 2. Updated Terms of Use Constituted Valid, Enforceable Contract Modifications

Modification to a contract requires the same elements—mutual assent, consideration, and intent to be bound—that are required to form an original contract. Each version of the Terms of Use allowed the Debtors' modification of the contract terms and provided that the Account

---

[31]  *See supra*, Terms Version 8 § 4.D. ("Our Earn Service allows you to earn a financing fee from Celsius, . . . in exchange for entering into open-ended loans of your Eligible Digital Assets . . . .").

[32]  *See, e.g.,* Altunbay Objection.

A000562

Holders' continued use of the platform following an update constituted consent to the updated Terms of Use.[33]

The Terms of Use, beginning with Terms Version 1, provide that (i) the Debtors can unilaterally modify the Terms of Use without notice and (ii) the Account Holders' continued use of the platform following an update constitutes consent to the amended Terms of Use. (*See* "Terms Affidavit Modification Provisions," Terms Affidavit Ex. A-1 at "Changes to Terms," Ex. A-2 § 31, Ex. A-3 § 32, Ex. A-4 § 32, Ex. A-5 § 32, Ex. A-6 § 31, Ex. A-7 § 31, and Ex. A-8 § 31.) The Terms Affidavit and Original Blonstein Declaration provide evidence that the Debtors could modify the contract and that Account Holders' continued use of the platform constituted acceptance of the updated Terms of Use, even if the Account Holders did not affirmatively accept the updated terms. (*See id.*; Original Blonstein Declaration ¶ 15.)

Notwithstanding the language in the Terms of Use permitting modification by the Debtors, the Debtors specifically required all Account Holders to affirmatively accept Terms Version 6, thus replacing the existing contract for any Account Holders who opened an account before Terms Version 6 became effective. (*See* Original Blonstein Declaration ¶ 16.) The Supplemental Blonstein Declaration provides evidence showing the affirmative consent that Celsius required Account Holders to give to continue using the platform when Terms Version 6 became effective, as well as the communications distributed for the updates to Terms Versions 7 and 8. (Supplemental Blonstein Declaration ¶¶ 4–15, Ex. F, G.)

Acceptance of Terms Version 6 occurred on the Debtors' platform. (*See* Original Blonstein Declaration ¶ 18.) Regardless of whether an Account Holder accessed the platform

---

[33]     *See* Amended Motion ¶ 36 ("Each historical iteration of the Terms of Use provided that the Debtors could amend the Terms of Use by posting them to their website, that the amended terms would replace the prior terms, and that continued use of the Debtors' services following such posting would be deemed consent to the updated terms.").

A000563

from a mobile device or a computer, an in-application pop-up window appeared, stating in large letters: "We have updated our Terms." (*See Id.* ¶ 18, Exhibit C.) The pop-up then noted that "[i]t's tempting to skip reading Terms, but it's important to establish what you can expect from continuing using our product. These are not all of the changes, please read the updated Terms in full." (*See id.*) This text was followed by a few bullets highlighting key changes and a hyperlink reading "Read the full Terms," which linked to the full Terms of Use. (*Id.*) Below the hyperlink, the pop-up contained three check boxes adjacent to statements, one of which was "I have read and agree to the new Terms." (*Id.*) In addition, the acceptance button itself included the word "Agree." (*Id.*)

   This process requires an Account Holder to view a pop-up stressing the importance of reading the updated Terms of Use and required two clicks (one check box, one "Accept"). The pop-ups contained hyperlinks to read the updated Terms of Use, and Account Holders were informed of the impact of declining the updated Terms of Use. The pop-ups appear clean and compact, and contained pertinent information in close proximity with a clearly-bounded or full-screen window. Together, these characteristics meet the standard for "clear and conspicuous." *See, e.g.*, *Uber Techs.*, 868 F.3d at 74–75 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her." (internal citations omitted)).

   If an Account Holder did not affirmatively accept the updated Terms Version 6 within two weeks, the Account Holder's account was suspended until such time as the Account Holder affirmatively accepted the latest version of the Terms of Use. (*Id.* ¶ 18.)

A000564

It is not until Terms Version 8 that the Terms of Use provide for modification in writing. (*Id.*, Ex. A-8, "Introduction.") Therefore, as certain of the Creditor Responses correctly point out, the evidence does not support Debtors' argument that the Terms of Use provided for modification in writing, therefore prohibiting oral modification as a matter of law. (*See* Amended Motion ¶ 47 ("Under New York law, '[i]n general . . . a written agreement that expressly states it can be modified in writing cannot be modified orally.'" *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990).) Nonetheless, because modifications to a contract require the same three elements as an original contract, the modifications alleged by the Creditor Responses lack evidence.

Multiple Creditor Responses argue that the Debtors modified the Terms of Use through advertisements, media uploaded to Celsius's social media channels, and the oral statements of Alex Mashinsky. (*See, e.g.* Gallagher Objection at 6.) As a threshold matter, this media was not submitted to the Court as evidence and the Court may consider only evidence admitted into the record. The Court provided a chance for objectors to submit evidence. None did.[34] Even if this media was submitted as evidence, advertisements and other statements like those identified by certain creditors generally do not constitute offers, and an offer is a necessary predicate for any "amendment" to the Terms of Use.[35] *See Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 122–24 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000) ("The general rule is that an advertisement

---

[34] "Do any of the objectors wish to offer evidence in support of their objections? . . . Hearing no response, the Court determines that the objectors have rested as well." (December 5, 2022 H'rg Tr. 103:20–23.)

[35] New York law also strictly limits the use of extrinsic evidence to prove the proper interpretation of a contract. *See, e.g.*, *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008) ("New York's parol evidence rule generally bars admission of extrinsic evidence to vary or contradict the terms of a fully integrated writing.").

A000565

does not constitute an offer.") (internal quotation marks omitted). No Creditor Response asserts that this media satisfied the three elements of contract formation or modification—these responses hew closer to contract interpretation, rather than modification, arguments.

The Court concludes that updates to the Terms of Use constituted valid modifications of the contract that an Account Holder entered when they created an account with Celsius.

### 3. The Terms of Use Unambiguously Transfer Ownership of Earn Assets to the Debtors

Having established that a valid contract was formed between the Debtors and its Account Holders, the Court's next inquiry is if the Terms of Use are unambiguous with respect to whether Account Holders retained ownership or transferred ownership of cryptocurrency assets by depositing the assets into Earn Accounts. A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 570 (2002). Under New York Law, contracts are interpreted and enforced in accordance with their plain meaning and their clear and unambiguous terms. *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020); *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 825 (Bankr. S.D.N.Y. 2010) ("[T]he ultimate objective in interpreting an agreement is to determine "the intention of the parties as derived from the language employed.") (quoting *Tom Doherty Assocs. Inc. v. Saban Entm't Inc.*, 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994)).

Terms Version 1 does not contain any clauses regarding Celsius taking rights of ownership upon deposit of Earn Assets. (*See generally* Terms Affidavit, Ex. A-1.) Terms Versions 2–4 contains the following text that discusses ownership, but not transfer of title:

> In consideration for the rewards earned on your Account and the use of our Services, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets available in your account in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such

A000566

> Digital Assets, separately or together with other property, with all attendant rights of ownership . . . . You acknowledge that with respect to assets used by Celsius pursuant to this paragraph.
>
> (i) You may not be able to exercise certain rights of ownership.

(Terms Affidavit, Ex. A-4 § 14.)

Terms Version 5 introduced the transfer of title clause that has been the subject of scrutiny in this matter. Every version of the Terms of Use beginning with Terms Version 5 includes a clause that Account Holders "grant Celsius . . . all right and title to such Digital Assets, including ownership rights" (the "Transfer of Title Clause"). (Terms Affidavit, Ex. A-5 § 14, A-6 § 13, A-7 § 13, A-8 § 13.) Account Holders who agreed to Terms of Use Version 5 or later, whether by signing up for the first time or by continuing to use the platform with an existing account, entered a contract which contained unambiguous and clear language regarding transfer of title and ownership of assets in Earn Accounts. At the hearing on this matter, Blonstein testified that 90% of Account Holders representing 99% of Earn Assets had assented to Terms Version 6 or later. (December 5, 2022 H'rg Tr. 103:3–7.) Thus, the Court finds that title to and ownership of all Earn Assets unequivocally transferred to the Debtors and became property of the Estates on the Petition Date.

The crux of many objections to the Amended Motion is that Celsius's ubiquitous use of the word "loan," "lending," and other variations sits in direct conflict with the singular clause transferring all title and rights of ownership to the Debtors. These responses argue that this creates an ambiguity within the four corners of the contract. But the use of the term "loan," or variations of that term, do not contradict transfer of ownership of cryptocurrency assets to Celsius. The Account Holders argue that a layperson's understanding of the term "loan" means the Account Holder retains ownership of their Earn Assets but temporarily allows the use of the

A000567

assets by the Debtors[36]—but the Court cannot ignore the plain and clear language in the Transfer of Title Clause.

Further, even if the Court found that Account Holders loaned digital assets to Celsius, Account Holders would still be unsecured creditors. It is blackletter law that a loan of money or property to another creates a debtor-creditor relationship. *In re Masterwear Corp.*, 229 B.R. 301, 310 (Bankr. S.D.N.Y. 1999) ("Under New York law, a bank and its depositor stand in a debtor-creditor relationship that is contractual in nature. The bank owns the deposit, the depositor has a claim to payment against the bank, and the bank has a corresponding obligation to pay its depositor. Accordingly, a bank's temporary freeze of an account, without more, is 'neither a taking of possession of [the depositor's] property nor an exercising of control over it, but merely a refusal to perform its promise.'") (internal citations omitted). And absent a perfected security interest in tangible or intangible property, in the event of the debtor's bankruptcy, the creditor holds only an unsecured claim. *See In re Motors Liquidation Company*, 430 B.R. 65, 96 (S.D.N.Y. 2010) ("Indeed, by definition, an unsecured creditor has no particularized property interest in the Debtors' estates."); *see also* 4 COLLIER ON BANKRUPTCY ¶ 506.03[1] (16th ed. 2022) ("As a threshold matter, a claim cannot be a "secured claim" for purposes of section 506(a) unless it is secured by a "lien" on some specific item of property in which the estate has an interest, or, alternatively, is a claim that is subject to a right of setoff.").

But, more importantly:

> By current definition, cryptocurrency is not money because it is not a medium of exchange created, authorized, or adopted by a domestic or foreign government, or by an intergovernmental organization or by

---

[36] The Vermont Objection observes that the Terms of Use uses the term "loan" to describe the transaction between the Account Holder and the Debtors even in the clause purportedly transferring ownership to Celsius: "You grant Celsius . . . for the duration of the period during which the Digital Assets are *loaned* to us . . . all right and title to such Digital Assets, including Ownership rights." (Vermont Objection (citing Terms Versions 6–8 (emphasis added).)

A000568

agreement between two or more countries. Moreover, since cryptocurrency, NFTs and other digital assets are intangible and therefore not capable of possession, a security interest currently can be perfected only by the filing of a financing statement in the digital asset as a general intangible.

Lorraine S. McGowen, TRANSFERRING DIGITAL ASSETS (INCLUDING CRYPTOCURRENCIES) UNDER PROPOSED AMENDMENTS TO THE UNIFORM COMMERCIAL CODE, The Quarterly Journal of INSOL International, 4TH Quarter 2022, at 16 (discussing proposed amendments to the Uniform Commercial Code, creating a new Chapter 12 to govern the transfer (whether as a sale or as a financing) of digital assets, including cryptocurrency, digital tokens and non-fungible tokens).

Thus, even if the parties' contract purports to provide the creditor with a security interest in property, unless the security interest is perfected under applicable non-bankruptcy law, a trustee can assert strong-arm power under section 544(a) of the Bankruptcy Code to avoid the lien. 11 U.S.C. § 544(a). *See also In re Castle Ventures, Ltd.*, 167 B.R. 758, 765 (Bankr. E.D.N.Y. 1994) ("However, section 544(a) of the Code, also referred to as the 'strong arm' clause, allows a trustee in bankruptcy to avoid liens and security interests against the debtor's estate which were not properly perfected under state law prior to the debtor's bankruptcy filing.").

Here, the language in the Terms of Use transferring all ownership interest to Celsius in the cryptocurrency assets deposited in the Earn Accounts makes it very clear that no ownership interest or lien in favor of the Account Holders was intended.[37] And certainly no lien in favor of the Account Holders was perfected. *U.S. v. Joyeros*, 410 F. Supp. 2d 121, 125 (E.D.N.Y. 2006) ("General, unsecured creditors lack a particularized interest in *specific* assets. [A]lthough general creditors can claim an interest in their debtors' estates, they cannot claim an interest in

---

[37] *See* Terms of Use Version § 4.D (not granting a security interest to users and, to the contrary, providing that "once such Eligible Digital Assets are received by Celsius . . . they shall be Celsius' property, in every sense and for all purposes.")

any *particular* asset that makes up that estate." (internal citation omitted) (emphasis added)); *see also In re Castle Ventures, Ltd.*, 167 B.R. at 765 ("If an unperfected security interest is avoided by the trustee, the secured creditor loses the lien and is reduced to the status of a general unsecured creditor.").

To read the Terms of Use such that "loan" overrides the unequivocal language transferring title and ownership of assets deposited into Earn Accounts to Celsius would be to read the Transfer of Title Clause out of the contract entirely. As the Committee notes, "it is a bedrock principle of contract interpretation that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony." (Committee Objection ¶ 6.)

The Court can read "lend" in harmony with the Transfer of Title Clause, and the transfer of title and the creation of a loan are not mutually exclusive concepts. As an example, the Committee notes that, in the securities context, it is common for a loan of securities to a broker to also constitute a transfer of title thereto (or the incidents of ownership thereof) so that the broker can sell, lend, hypothecate, or rehypothecate the securities. (Committee Objection ¶ 6.) In that instance, title to the securities is transferred to the securities broker, and the securities broker has a contractual obligation to return equivalent securities (but not the exact same securities) to the initial transferor. (*Id.*)

Therefore, notwithstanding the frequent use of the word "loan" in the Terms of Use and the colloquial interpretation of a "loan" as a transaction in which the entity making the loan (here, the Account Holder) retains ownership over the asset being loaned (here, the cryptocurrency), the Terms Versions 5 and later are consistent and clear: Account Holders

A000570

granted Celsius "all right and title to such Eligible Digital Assets, including ownership rights." (Terms § 13.)

### B.     Creditors' Rights with Respect to Defenses to Contract Formation and Breach of Contract Claims are Reserved for the Claims Resolution Process

Many of the Creditors' Responses consist of (i) contract interpretation arguments that rely on extrinsic evidence,[38] which, as discussed *supra* at II.C., the Court may not consider; or (ii) individual circumstances that present colorable contract defense claims that may have merit in the claims resolution process, but do not bear on the question of title and ownership presented in the Amended Motion. Even valid contract defenses would not necessarily give rise to Account Holders claims to ownership of the cryptocurrency assets they deposited.

A common concern raised by Creditor Responses is that statements by former Celsius CEO, Alex Mashinsky, influenced Account Holder decisions to join Celsius, keep coins on Celsius's platform, and deposit additional assets. State responses further note that Celsius may have violated state securities laws, rendering the entire contract void for all Account Holders. These parties could have colorable defenses to contract formation as individuals and as a group.

The Court takes seriously potential violations of state law and non-bankruptcy federal law, as well as the litany of allegations including, but not limited to, fraudulent inducement into the contract, fraudulent conveyance, breach of contract, and that the contract was unconscionable. These allegations may (or may not) have merit, and the creditors' rights with respect to such claims are explicitly reserved for the claims resolution process. But importantly, as a prerequisite to those claims, the Court first must establish that a contract was formed and must interpret the contract terms. In other words, a hypothetical determination that the Debtors

---

[38]     Moreover, the objecting parties did not submit evidence at the December 5, 2022 hearing. The evidence admitted includes the Ferraro Declaration, Campagna Declaration, Original Blonstein Declaration, Supplemental Blonstein Declaration, and the Terms Affidavit. No other evidence was offered.

A000571

breached the contract with an account holder or that Alex Mashinsky's statements fraudulently induced a creditor to open an account requires a preliminary finding that there was a contract between Celsius and the Account Holders and a determination of each party's rights and obligations under this contract. The Court makes that finding here. Specifically, the Court finds that there was a valid contract between Celsius Account Holders and Celsius and that the contract terms unambiguously transferred all right and title of digital assets to Celsius.

### C.  Stablecoins May Be Sold as an Approved Transaction Outside of the Ordinary Course of Business

Because the Court finds that Earn Assets are property of the Estates, it follows that stablecoins, as a type of cryptocurrency among Earn Assets, also belong to the Estates. The Debtors seek to sell stablecoins in the ordinary course of business. The "ordinary course of business" standard was intended to allow a debtor in possession the flexibility required to run its business. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("The framework of section 363 is designed to allow a trustee (or debtor-in- possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight."). "Ordinary course of business" is not defined within the Bankruptcy Code.

In contrast, the Court may approve transactions which are not in the ordinary course of business if the debtor demonstrates a "sound business purpose" for the transaction. *See* 11 U.S.C. § 363(b)(1). It is unnecessary here to determine whether the sale of stablecoins will be in the ordinary course of business—particularly, now, that Celsius may not have any ordinary course of business. The Court finds that the Debtors have shown sufficient cause to permit the sale of stablecoins outside of the ordinary course of business and need not reach the question of whether the Debtors have shown that such a transaction is within the ordinary course of business.

A000572

A rare point of agreement among all parties is that the Debtors' liquidity is precipitously running out.[39] The Debtors need to generate liquidity to fund these Chapter 11 cases and continue down the path either of a standalone plan reorganization, a section 363(b) sale, or even a liquidation plan. The Debtors project that additional liquidity will be needed in early 2023. The Debtors demonstrate a sound business justification for selling stablecoins, and the Court agrees that it is appropriate to grants authority to do so.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that Earn Assets in Earn Accounts constitute property of the Estates, and that the Debtors may sell stablecoins outside of the ordinary course of business. The Court does not take lightly the consequences of this decision on ordinary individuals, many of whom deposited significant savings into the Celsius platform. As has been said repeatedly in this opinion, creditor's rights with respect to various defense to and breach of contract claims are reserved. Creditors will have every opportunity to have a full hearing on the merits of these arguments during the claims resolution process.

**IT IS SO ORDERED.**

Dated:      January 4, 2023
            New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge

---

[39]      *See, e.g.,* U.S. Trustee Objection; Campagna Declaration at 19.  To the extent the U.S. Trustee argues that the Debtors' do not face a liquidity crisis and have not established cause to sell stablecoin, that objection is overruled.

A000573

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> SAMUEL BANKMAN-FRIED, FTX TRADING LTD D/B/A FTX.COM, AND ALAMEDA RESEARCH LLC, <br><br> Defendants. | Case No. _____ <br><br><br> **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

## I.  SUMMARY

1.      Samuel Bankman-Fried ("Bankman-Fried") co-founded Alameda Research LLC ("Alameda"), a digital asset trading and investment firm, in Berkeley, California in 2017.  In May 2019, he and others launched FTX Trading Ltd. b/d/a FTX.com ("FTX Trading") and various subsidiaries, affiliates, and related entities, collectively doing business as "FTX.com" or simply "FTX," a centralized digital asset exchange. (These parties are collectively referred to as "Defendants").  Alameda and FTX were large and well-known players in the digital asset industry, and Bankman-Fried was their young, high-profile leader.

2.      At its peak, the daily trading volume on FTX.com was over $20 billion, and  it had garnered a $32 billion valuation.  FTX had prominent paid sponsorships, including the naming rights to a professional sports arena in Miami, celebrity endorsements, and a 2022 Super Bowl commercial that touted FTX as "the safest and easiest way to buy and sell crypto."

1

A000574

3.      On November 11, 2022, Bankman-Fried's empire abruptly collapsed.  FTX customers and the world at large discovered that FTX, through its sister-company Alameda, had been surreptitiously siphoning off customer funds for its own use—and over $8 billion in customer deposits were now missing.

4.      Beginning no later than May 2019 and continuing through at least November 11, 2022 (the "Relevant Period"), Bankman-Fried owned, operated, and/or controlled FTX Trading, along with its numerous subsidiaries and related entities around the world, all doing business as FTX.com.   He also owned, operated, and/or controlled Alameda and its various subsidiaries and related entities, as well as numerous other related entities in the digital asset industry. Throughout the Relevant Period, Alameda operated as a primary "market maker" on FTX.com, providing liquidity to its various digital asset markets, and also performed a number of other key functions for the exchange. Bankman-Fried operated Defendant entities as a common enterprise.

5.      Throughout the Relevant Period, and unbeknownst to all but a small circle of insiders, FTX customers deposits,  including fiat currency and digital assets such as bitcoin (BTC) and ether (ETH), that were intended to be used for trading or custodies on FTX, were regularly accepted, held by, and/or appropriated by Alameda for its own use.

6.      At Bankman-Fried's direction, FTX executives created features in the underlying code for FTX that allowed Alameda to maintain an essentially unlimited line of credit on FTX. FTX Trading executives also created other exceptions to FTX's standard processes that allowed Alameda to have an unfair advantage when transacting on the platform, including quicker execution times and an exemption from the platform's distinctive auto-liquidation risk management process.

A000575

7.     Throughout the Relevant Period, at the direction of Bankman-Fried and at least one Alameda executive,  Alameda used FTX funds, including customer funds, to trade on other digital asset exchanges and to fund a variety of high-risk digital asset industry investments.

8.     Bankman-Fried and other FTX executives also took hundreds of millions of dollars in poorly-documented "loans" from Alameda that they used to purchase luxury real estate and property, make political donations, and for other unauthorized uses.

9.     Throughout the Relevant Period, Defendants, through a web of subsidiaries, affiliates, and other related entities (collectively the "FTX Enterprise") misappropriated customer funds for their own use and benefit.

10.    Despite this, FTX Trading represented, in its Terms of Service and elsewhere, that customers were the "owner[s]" of all assets in their accounts, had "control" over the assets at all times, and that those assets were "appropriately safeguarded and segregated" from FTX's own funds.

11.    Through this conduct and the conduct further described herein, Defendants violated Section 6(c)(1) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. §180.1(a) (2021).  Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this complaint and similar acts and practices, as more fully described below.

12.    Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

A000576

## II.   JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

14.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Southern District of New York and engaged in acts and practices in violation of the Act and Regulations within this District.

## III.   PARTIES

### A.   The CFTC

15.    Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act ("CEA") and Regulations promulgated thereunder.

### B.   Defendants

16.    **Samuel Bankman-Fried** ("Bankman-Fried") is a United States citizen who has resided in various locations during the Relevant Period, most recently in the Bahamas.  Bankman-Fried is the founder and majority owner of FTX Trading, Alameda, and FTX US.  Bankman-Fried resided in and performed work for FTX Trading and Alameda in various locations during the Relevant Period, including in the United States.  He has never been registered with the Commission in any capacity.

A000577

17.     **FTX Trading Ltd.** ("FTX Trading") is a corporation registered in Antigua and Barbuda.  FTX Trading Ltd. along with its subsidiaries and affiliate entities, including without limitation FTX Digital Markets  Ltd. ("FTXDM"), located in the Bahamas, collectively did business as "FTX.com" or "FTX" and operated the digital asset trading exchange during the Relevant Period.  FTX Trading had numerous employees, including key personnel, that were based in and perform work from the United States, including in this District.  FTX Trading had regularly engaged in advertising and promotional activities in the United States. None of the FTX Trading entities has ever been registered with the Commission in any capacity.  FTX Trading is currently in Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court for the District of Delaware.

18.     **Alameda Research LLC** ("Alameda") is a Delaware limited liability company. Alameda, along with its parent, subsidiary, and affiliate entities collectively operated and did business as the digital asset trading and investment firm "Alameda."  Alameda was founded in, maintained offices in, and had numerous employees, including key personnel, that were based in and perform work from the United States during the Relevant Period.  None of the Alameda entities has been registered with the Commission in any capacity.  Alameda is currently in Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court for the District of Delaware.

19.     During the Relevant Period, FTX Trading, Alameda Research, together with other entities under the majority ownership and control of Bankman-Fried operated as a single, integrated common enterprise under the sole ultimate authority of Bankman-Fried as their mutual owner.  They are referred to collectively in this complaint as the "FTX Enterprise."  Bankman-Fried regularly exercised control over each of the component entities of the FTX Enterprise throughout the Relevant Period, including regularly serving as signatory on core corporate agreements, as well as corporate bank accounts and trading accounts, many of which were held in

the U.S. The FTX Enterprise failed to observe corporate formalities, including failure to segregate funds, operations, resources, and personnel, or to properly document intercompany transfers or funds and other resources. The entities regularly shared office space, systems, accounts, and communications channels. On information and belief, assets flowed freely between the FTX Enterprise entities, often without documentation or effective tracking.

## IV.   STATUTORY BACKGROUND AND LEGAL FRAMEWORK

20.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

21.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies, such as bitcoin (BTC), ether (ETH), and tether (USDT), which are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.  Certain digital assets are "commodities," including bitcoin (BTC), ether (ETH), tether (USDT) and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

22.     In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts on digital assets, including bitcoin and ether futures and options, by

A000579

boards of trade registered with the Commission, including the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange ("CBOE").

23.     Section 6c(1) of the CEA, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

24.     CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a), promulgated pursuant to the authority in CEA Section 6(c)(1), makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

25.     Section 13c(b) of the Act, 7 U.S.C. § 13c(b) provides that "any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation."

A000580

## V.    FACTS

### A.    Founding of Alameda and the FTX Trading Exchange

26.    Bankman-Fried co-founded Alameda in November 2017 in Berkeley, California. Initially, Alameda primarily engaged in high-frequency digital asset arbitrage trading. This practice consisted of using proprietary algorithmic quantitative computer programs, commonly known as "bots," to identity arbitrage opportunities due to price differentials between various digital asset platforms. Alameda engaged in high-frequency arbitrage trading across a large variety of digital asset exchanges, including certain exchanges operating in the United States.

27.    In a June 29, 2019 "white paper" Alameda represented that within a year of its inception, it had "become the largest liquidity provider and market maker in the [digital asset] space," trading "$600 million to 1 billion a day" and accounting for "roughly 5% of global volume in digital asset trading."

28.    Throughout the Relevant Period, Bankman-Fried has owned 90% of Alameda. Bankman-Fried was CEO of Alameda until October 2021, at which time he selected and appointed two co-CEOs to replace him.

29.    Even after stepping down as CEO of Alameda, Bankman-Fried continued to maintain control over Alameda. For example, Bankman-Fried remained a signatory on Alameda Research's bank accounts and an authorized trader for Alameda's accounts with CFTC registered futures commission merchants. Bankman-Fried also maintained direct decision-making authority over all of Alameda's major trading, investment, and financial decisions. This authority was exercised at least in part through Bankman-Fried's regular, often daily participation in various in-person and mobile chat communications with senior personnel at Alameda.

30.    Over time, Alameda expanded its activities into a number of new digital asset business models, including making large equity investments in various companies in the digital

A000581

asset industry, including by securing large loans from digital asset lending platforms to enable it to increase the size and variety of its digital asset industry investments.

31.     By late 2018, Bankman-Fried and others employed at Alameda's offices in Berkeley, California had begun building the centralized digital asset derivatives exchange, whcih would ultimately become FTX.  The platform development was funded, in part, by another digital asset exchange, Binance, which, upon information and belief, had acquired an approximately 20% stake in FTX in or before November 2019.

32.     In early 2019, Bankman-Fried and others moved to Hong Kong to finalize and launch the FTX Trading platform to the public.  The FTX.com website was launched and made available to the public by no later than May 2019.  Bankman-Fried was at all times during the Relevant Period the majority shareholder of FTX trading and related entities.

33.     FTX offered trading in a large variety of digital assets, including digital commodities such as bitcoin, ether, tether, and others.  FTX operated primarily as a derivatives exchange and offered trading in various types of options, futures, swaps, perpetual swaps, and other digital commodity derivative products.  FTX allowed customers to place buy (long) and sell (short) orders in an electronic order book, and matched customer orders via its "trading engine" or "matching engine."  FTX also offered a number of additional services related to the trading of digital asset products.  For example, FTX operated a peer-to-peer (P2P) margin lending program where customers could offer margined and leveraged offerings to one another.

34.     Customers could access the FTX platform through the FTX.com website, through a mobile application, and through an Application Programming Interface (API).  FTX also offered an off-exchange "over the counter" (OTC) portal that enabled customers to connect and request

A000582

quotes for spot digital assets and trade directly, rather than placing resting orders on a central limit order book.

35.     In marketing materials and in communications with federal regulators and others, FTX touted its auto-liquidation risk management engine, cross-margin functionality, and backstop liquidity provider ("BLP") programs as unique features that limited risk.  Alameda was a leading participant in the BLP program.

36.     FTX relied on Alameda resources, funds, and personnel to carry out a number of core functions for the FTX.com platform, including creating liquid submarkets for all of the products offered on FTX Trading, maintaining an appropriate balance of various digital assets on the exchange, and supporting the "peer to peer" margin lending program.

37.     FTX grew quickly.  By June 2019,  for example, just months after its launch, according to FTX, the daily volume of futures trading on FTX often exceeded $100 million. Beginning no later than 2020, FTX Trading was consistently ranked as one of largest digital asset exchanges in the world by trading volume.  In 2021, according to FTX, FTX entities held approximately $15 billion in assets on their platforms, FTX entities accounted for approximately 10% of global digital asset volumes, and they transacted $16 billion of volume per day.

38.     Because of the perception of potential conflicts of interest between FTX and Alameda, Defendants and their employees understood that it was important to present a public perception that there was strong separation between Alameda and FTX.  On information and belief, this was one key motivation for Bankman-Fried's resignation as CEO of Alameda.  Bankman-Fried and others also reinforced a separate spheres narrative in their public statements.  For example, in August 2022, during a media appearance, Alameda's CEO said the following with respect to the nature of the relationship between FTX and Alameda:

A000583

They're both owned by Sam [Bankman-Fried], obviously. So ultimately, sort of aligned incentives in that way. We keep them quite separate in terms of day-to-day operations. We definitely have a Chinese wall in terms of information sharing to ensure that no one in Alameda would get customer information from FTX or anything like that, or any sort of special treatment from FTX. They really take that pretty seriously.

39. Such public representations by and on behalf of Defendants did not reflect reality. Throughout the Relevant Period, Alameda and FTX continued to share office space, first in Berkeley, California and later in Hong Kong and the Bahamas. They also shared key personnel, technology and hardware, intellectual property, and other resources. Bankman-Fried and other senior management at Alameda and FTX also had widespread access to each other's systems and accounts.

40. In January 2020, Bankman-Fried and others established a separate group of operating entities operating a digital asset exchange specifically for U.S. persons. These entities collectively did business as "FTX US" and were incorporated primarily in the State of Delaware. The FTX US entities also held various registrations, including as a licensed Money Transmitter under the laws of the State of South Dakota. FTX US offered trading to U.S. persons in a large number of digital assets, including but not limited to spot digital commodities.

41. In October 2021, FTX US acquired a commodity derivatives company called LedgerX LLC, which then began doing business as "FTX US Derivatives." FTX US Derivatives operated as a CFTC-registered Designated Contract Market ("DCM"), Derivatives Clearing Organization ("DCO"), and Swap Execution Facility ("SEF"). FTX US Derivatives maintained separate bank accounts and, upon information and belief, appropriately segregated and accounted for customer funds at all relevant times.

42. During the Relevant Period, FTX Trading purported to block U.S.-based customers from using its exchange to transact in digital asset products, and to instead direct those U.S.

A000584

customers to transact exclusively through the FTX US and FTX US Derivatives entities.  On information and belief, some U.S. persons and entities were able to use FTX Trading to transact in digital assets, including digital commodity products, futures, options, swaps, and derivatives.

<div align="center">

**C.**     **FTX and Alameda Comingled, Mishandled, and Misappropriated FTX Trading Customer Funds From the Moment of FTX's Launch**

</div>

43.     At the time Bankman-Fried and others launched FTX, FTX have the requisite bank accounts to accept and hold customer funds.  Instead, customers seeking to deposit "fiat" currency (i.e. traditional government-issued currency) into their FTX accounts were directed to wire their funds to bank accounts that were owned and controlled by Alameda.  Some or all of those bank accounts were opened in the name of an entity called North Dimension, a Delaware-registered wholly-owned subsidiary of Alameda that, on information and belief, deliberately did not have a name that was readily-identifiable with Alameda.  Certain of these bank accounts were located and based in the U.S.

44.     Once received, FTX customer funds were not segregated from Alameda funds or placed into accounts designated as being "for the benefit of" (FBO) FTX customers.  When FTX customer funds were deposited into Alameda bank accounts, Alameda personnel manually credited FTX customer accounts with the corresponding amount of fiat currency on FTX internal ledger system. Customers accessing their FTX accounts would be able to observe on the exchange's website (and later mobile application) that their funds had been posted to their FTX accounts, even though the funds actually remained in Alameda-controlled bank accounts.

45.     For a small subset of customer deposits, Alameda exchanged customer deposit funds to fiat-backed stablecoins such as USDC and USDT (which are generally understood to be pegged 1:1 and backed 1:1 by U.S. Dollars) and then transferred an equivalent amount of such stablecoins to FTX's digital asset wallets.  Alameda treated fiat currency and stablecoins as

<div align="center">12</div>

fungible and this was the designated method for crediting customer accounts for fiat bank deposits. While this happened occasionally, customer funds typically remained solely in bank accounts in the name of Alameda, where they continued to be comingled with Alameda's own funds.

46.     The Alameda-owned bank accounts holding FTX customer fiat funds were collectively reflected on FTX's internal ledger systems as the "fiat@ftx" account.  During the Relevant Period, this account held a balance of as much as $8 billion in customer funds.

47.     By approximately August 2020, FTX had opened its own FBO fiat bank accounts. However, FTX Trading customer funds that had previously been wired to Alameda and reflected in the "fiat@ftx" group of Alameda bank accounts were not transferred to FTX's bank accounts. Furthermore, even after August 2020, at least some FTX customers continued to send fiat deposits to Alameda-owned accounts.

48.     Consistently from the launch of FTX and throughout the Relevant Period, Alameda accessed and used FTX customer funds for Alameda's own operations and activities, including to fund its trading, investment, and borrowing/lending activities.  Alameda's use of FTX customer funds included both customer fiat deposits that were sent to Alameda-owned bank accounts and customer digital asset deposits and holdings that Alameda accessed via the unbounded withdrawal capabilities of its FTX Trading account.

### D.     Misrepresentations Related to the Operations of FTX and Alameda

49.     The use of customer funds by Alameda was not authorized by FTX customers, and FTX customers were not made aware that their funds were being used by Alameda.  To the contrary, FTX's Terms of Service expressly prohibited such use of customer funds.  Specifically, Section 8.2.6 of the FTX Trading Terms of Service states:

All Digital Assets are held in your Account on the following basis:

A000586

(A)     Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)     None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)     You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

50.     Defendants were aware of the need to segregate and protect customer assets.  In fact, FTX developed internal policy documents relating to the protection of customer assets.  For example, in an FTXDM  policy document entitled "Safeguarding of Assets & Digital Token Management Policy" dated August 2021, this affiliated entity of FTX Trading indicated that:

FDM has a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds. This includes customer assets that may be held by third party service providers. FDM will ensure that:

● Customer assets (both fiat and virtual assets) are segregated from its own assets;

● Customer assets (both fiat and virtual assets) will be clearly designated and easily identifiable;

● All third-party service providers are aware that customer funds do not represent property of FDM and are therefore protected from third-party creditors; and

● All third-party providers are aware that customer assets are held in trust.

Regarding customer fiat assets, FDM will maintain customer accounts with a regulated credit, e-money or payment institution that is acceptable to the Securities Commission of The Bahamas (SCB). Customer accounts will be designated as such, and the monies contained therein will be appropriately ring-fenced and protected from claims against FDM.

Customer monies will be appropriately ring-fenced to protect from:

A000587

- The unlikely event FDM becomes insolvent;

- The use of customer monies being used to benefit others; and

- FDM using customer monies to finance its own operations.

Written notice will be provided to the relevant regulated credit, e-money, or payment institution to clarify that the assets contained are held by us on trust for our customers and they are not entitled to combine the account any other account, or to exercise any right of set-off or counterclaim against the money in those accounts, in respect of any debt owed by us.

All customer accounts will be under the dual signatory of two directors or of one director, together with a senior member of the management team.

51.     Throughout the Relevant Period, Bankman-Fried and other representatives of FTX consistently and repeatedly reiterated, in a variety of contexts, that customer assets were properly segregated and custodied by FTX at all times, in conformance with both FTX's Terms of Service and generally understood best practices for derivatives exchanges, which presume a requirement for customer disclosure and consent in order to engage in rehypothecation of customer assets (i.e. re-use of deposited assets).

52.     Such statements about the treatment and custody of customer assets include misstatements that Bankman-Fried and others made and/or caused to be made to the U.S. Congress, the CFTC, and/or other federal and state government agencies, investors, and in public venues such as Twitter.

53.     For example, during February 9, 2022 testimony before the U.S. Senate Committee on Agriculture, Nutrition and Forestry, Bankman-Fried, while advocating for the implementation of legislation regarding digital assets and the extension of certain legal protections to digital asset exchanges, testified as follows with respect to FTX's treatment of customer funds:

> FTX has policies and procedures for its platforms today that reflect this basic principle by maintaining liquid assets for customers withdrawals, including a sufficient balance of digital assets funded by the company for

A000588

its non-U.S. platform. The resources are funded to provide sufficient cover against user losses under certain events and extreme scenarios in order to, among other purposes, ensure a customer without losses can redeem its assets from the platform on demand.

[…]

In keeping with this principle, FTX provides a user experience that enables any user to easily view account balances for all assets, for all of its platforms, in real time. By logging in to the customer's account at FTX, the customer can immediately view the types of assets they own held in custody by FTX. The assets are ledgered and easily identifiable to the user (but held in an omnibus wallet in the case of the customer's tokens in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX. Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms.

54.     Contrary to such representations and without disclosure to FTX customers, Alameda and FTX  comingled funds and freely used FTX customer funds as if they were their own, including as capital to deploy in their own trading and investment activities.  On information and belief, Bankman-Fried, his parents, and other FTX and Alameda employees used FTX customer funds for a variety of personal expenditures, including luxury real estate purchases, private jets, documented and undocumented personal loans, and personal political donations.

55.     On information and belief, comingled funds, including FTX customer funds, were also furtively used by Bankman-Fried and FTX for extensive marketing and promotional expenses in the U.S., including a Super Bowl commercial and the sponsorship of a sports stadium in Miami, Florida.  Many of these advertisements, including the Super Bowl commercial, touted FTX as "the safest and easiest way to buy and sell crypto."  These promotional activities were carried out in the U.S. to generally promote "FTX" rather than specifically "FTX US."  On information and belief, some of these promotional activities were paid for or guaranteed by FTX Trading entities.

A000589

### E.    Alameda's Relationship with and Special Privileges on FTX

56.    From the launch of FTX, Alameda operated as a primary market maker on FTX Trading.  In that capacity, Alameda acted as an always-available buyer and seller of digital assets in order to provide sufficient liquidity and an available trading counterparty to FTX customers. Over time, FTX acquired additional institutional market makers, but Alameda remained a high-volume market maker throughout the Relevant Period.

57.    Alameda also performed a number of other functions for FTX.  For example, Alameda helped FTX maintain an acceptable balance of various digital assets, and particularly stablecoins, in its wallets.  To do so, Alameda was authorized to make large exchanges of various stablecoins on behalf of FTX Trading, using FTX Trading's assets rather than its own.

58.    Alameda enjoyed certain essential and undisclosed benefits and privileges on FTX. These advantages were programmed into the code for FTX Trading at the direction of Bankman-Fried.  For one, Alameda was exempt from FTX's "auto-liquidation" risk engine functions, which would automatically liquidate (sell) a customer's open position when their "Maintenance Margin Fraction" fell below a certain determined level.  All customers who took on too much leverage or risk on FTX would thus be auto-liquidated by the exchange.  Alameda was exempt from this—it could not be liquidated on FTX Trading under any conditions.  This exception was hard coded into FTX's system.  This advantage was not publicly disclosed during the Relevant Period.  The existence of this and other advantages directly contradicted public statements made by and on behalf of Defendants.

59.    Alameda's account on FTX also had a special designation in the FTX Trading code, labeled as an "allow negative flag," which allowed Alameda to execute a transaction even if it did not have the funds available in its account to do so.  Alameda also had an essentially unbounded

A000590

credit limit in the FTX database. On at least one occasion during the Relevant Period, Alameda had reached a previously-set borrowing limit for its FTX account. In response, Bankman-Fried directed FTX personnel to raise the borrowing limit to a level that would be unlikely to ever be exceeded. On information and belief, FTX personnel ultimately raised Alameda's borrowing limit to be many tens of billions of dollars. Alameda's borrowed funds could also be withdrawn from FTX. These features, in combination, allowed Alameda unlimited ability to borrow and withdraw and digital assets directly from FTX Trading to put towards its off-platform activities. This functionality existed separate and apart from Alameda's more limited participation in FTX Trading's P2P margin lending program.

60. Alameda's ability to withdraw unlimited funds from FTX Trading was not publicly disclosed during the Relevant Period. On information and belief, Defendants were aware of and responsible for these functionalities throughout the Relevant Period.

61. Alameda also enjoyed order execution timing privileges for its transactions on FTX Trading. Alameda, like many other institutional customers, transacted on FTX through the API rather than the standard front-end website or mobile application. However, while most or all other customers of API had their transaction orders routed through the FTX system, Alameda was able to bypass certain portions of the system and gain faster access to the API. As a result, Alameda's transaction orders were received several milliseconds faster than those of other API users. In the high-frequency trading sector, this is a significant time advantage. This was not publicly disclosed during the Relevant Period. On information and belief, Defendants were aware of and responsible for these functionalities throughout the Relevant Period.

62. Alameda also enjoyed an additional execution time privilege as a result of not being subject to certain automated verification processes, because the above features of its account made

18

A000591

it unnecessary to carry out certain automated steps like verifying available funds before executing a transaction.  Other FTX Trading customers, in contrast, were subject to an automated review process when placing orders to ensure that they had sufficient funds in their accounts to execute the requested transaction.  By avoiding this "account API lock" process, Alameda gained another significant speed advantage.  Similarly, if other customer placed several orders at once, these checks occurred in sequential order, so that each transaction could be confirmed as viable.  This did not apply to the Alameda account. These advantages were not publicly disclosed during the Relevant Period.  On information and belief, Defendants were aware of and responsible for these functionalities throughout the Relevant Period.

63.    Defendants were aware of and participated in facilitating the foregoing privileges afforded to Alameda, both with respect to Alameda's advantages on FTX and with respect to Alameda's ability to misappropriate FTX customer funds.

64.    At the direction and under the control of Bankman-Fried, Alameda used large amounts of capital, including capital derived from FTX customer funds, to undertake significant illiquid investments and transactions, including long-term equity holdings in a variety of digital asset companies and large acquisitions of relatively illiquid digital assets.

65.    One of Alameda's most significant holdings was the FTT digital asset.  FTT was the FTX "exchange token" and could be used to obtain discounted trading fees for transactions on FTX Trading.  On information and belief, Alameda did not pay to acquire its FTT holdings.

66.    FTX consistently used one third of the trading revenues it collected to buy FTT tokens in the marketplace and "burn" them—a mechanism to permanently take the tokens out of circulation by sending them to a smart wallet from which they could never be withdrawn.  On a weekly basis, FTX Trading announced on Twitter the quantity of FTT it had bought and burned

that week.  On information and belief, this was intended to raise the value of the FTT tokens that remained in circulation, and thereby the value of the FTT that Alameda held.

67.     Alameda's FTT holdings were a significant portion of its balance sheet and a significant portion of all FTT in circulation.  Alameda valued its FTT holdings on its balance sheet at the market price at which FTT was traded, without applying any discount to reflect that it could not have sold its significant FTT holdings into the marketplace without causing a sharp reduction in its trading price.

68.     Alameda also held extremely large quantities of several other illiquid digital assets relative to their circulation volumes, and likewise did not apply a discount to the value of those holdings on its balance sheet.

69.     Alameda relied on its significant holdings of FTT and similar illiquid tokens, valued at the market value of the asset without discount, as collateral to support a number of large loans from various digital asset lending platforms.  During the Relevant Period, Alameda took out a large number loans, at times totaling as much as $10 billion in notional value during the Relevant Period.

## F.     **Misappropriation of Customer Funds**

70.      By early 2022, Alameda had invested several billion dollars in directional, unhedged, illiquid, and/or long-term investments.  To fund these investment activities, Alameda had relied on billions of dollars of loans from digital asset lending platforms, traditional bank lines of credit, and its unlimited borrowing abilities on the FTX, including its access to customer funds.

71.     In approximately spring 2022, the digital asset markets as a whole experienced a significant downturn.  This downturn came to a head in May 2022 with the crash of two significant and widely-traded digital assets, whose value crashed essentially to zero.  There was significant

A000593

contagion from this event, including a major decline in the value of bitcoin, ether and other digital assets.  The devaluation of such central and high-volume digital assets resulted in major credit defaults throughout the digital asset industry, as the value of collateral guaranteeing various loans declined.  As a result, a number of digital asset lenders and market participants made margin calls on borrowers, liquidated open positions, recalled loans, and/or collapsed entirely, including into bankruptcy.

72.     In approximately May and/or June 2022, Alameda was subject to a large number of such margin calls and loan recalls.  It did not have sufficient liquid assets to service its loans. Instead, at the direction of Bankman-Fried, Alameda greatly increased its usage of FTX customer funds to meet its external debt obligations.  Alameda was able to rely on its undisclosed ordinary-course access to FTX credit and customer funds to facilitate these large withdrawals, which were several billion dollars in notional value.  Defendants were aware of and responsible for this misappropriation of FTX customer funds.

73.     By approximately mid-2022, FTX's internal ledgers reflected that the balance of Alameda's fiat liability to FTX totaled approximately $8 billion, a staggering amount that exceeded FTX total lifetime revenue.

74.     Publicly during this time, Defendants portrayed that they remained highly profitable and liquid.  Following the market crash of May 2022, Bankman-Fried, through Alameda and other entities, bailed out several digital asset companies with loans or acquisitions.  Bankman-Fried portrayed these activities as being benevolent and for the benefit of the digital asset industry. In connection with the acquisition of one such digital asset lending platform from a bankruptcy sale, on October 2, 2022 Bankman-Fried tweeted that "our bids are generally determined by fair

A000594

market price, no discounts; goal isn't to make money buying assets at cents on the dollar, it's to pay $1 on the $1 and get the $1 back to customers."

75.     On information and belief, Bankman-Fried stated privately that he was pursuing an aggressive acquisition strategy during this time at least in part to gain access to additional sources of capital that could be used to support his existing businesses and fill the hole in customer funds that had been created.

76.     Bankman-Fried had acknowledged this large outstanding balance to a small group of key personnel of FTX and Alameda throughout the Relevant Period. In one such conversation, Bankman-Fried indicated to an FTX executive that he was not concerned with Alameda's liability on FTX because it was sufficiently collateralized by Alameda's holdings of FTT tokens—the same tokens whose market price Alameda's trading desk was actively trying to control.

77.     At least in part to remediate the risk that Alameda's large liability would be discovered, at Bankman-Fried's direction, FTX executives reallocated Alameda's approximately $8 billion in liabilities to a customer account on FTX's  systems that Bankman-Fried would later refer to as "our Korean friend's account" and/or "the weird Korean account." This was technically a sub-account of Alameda, but unlike other Alameda sub-accounts on FTX, it was not opened under an "@alameda-research.com" identifier and was not otherwise readily identifiable as being an Alameda-associated account.  The system notes associated with the account described it as "FTX fiat old."  As a result, it was no longer apparent on FTX's ledgers that Alameda had an $8 billion negative balance on its FTX account.

78.     The same type of "allow negative flag" and exemption from liquidation characteristics were applied to the so-called Korean account as was applicable to the Alameda main account and other sub-accounts.

A000595

### G.    Contemplated Shutdown of Alameda

79.    In or around September 2022, Bankman-Fried drafted and shared a document that questioned whether Alameda should be permanently shut down.  The document, titled "We came, we saw, we researched" began: "I only started thinking about this today, and so haven't vetted it much yet. But: I think it might be time for Alameda Research to shut down.  Honestly, it was probably time to do that a year ago."

80.    Bankman-Fried went on to lay out a number of reasons for the suggestion to shut down Alameda, including "[t]he fact that we didn't hedge as much as we should have alone cost more in EV [expected value] than all the money Alameda has ever made or ever will make"; "[i]n the current environment, capital is really expensive, and Alameda doesn't justify it"; and "Alameda is making some money trading, but not enough to justify its existence[.]"  These admissions were directly contrary to contemporaneous public statements that Bankman-Fried and Alameda were making regarding Alameda's profitability.

81.    Bankman-Fried also laid out a number of "large downsides" to shutting down Alameda, including those that reflected the interconnectedness between Alameda and FTX Trading's operations such as "[l]ess liquidity on FTX" and the observation that "given the amount that Alameda is doing, we *can't* really shut it down." (emphasis in original).

82.    Bankman-Fried also drafted a contemplated Twitter thread to announce the shutdown of Alameda, and concluded: "I feel really uncertain what's right! So I guess my plan is that, this coming weekend, we should just make a call, and enact it before next Monday, one way or another. Thoughts?"

83.    Alameda was not shut down at this time or at any point during the Relevant Period.

A000596

## H.    November 2022 Collapse of FTX Trading and Alameda

84.    On November 2, 2022, the online digital asset news publication Coindesk.com published an article titled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet," and subtitled: "Alameda had $14.6 billion of assets as of June 30, according to a private document CoinDesk reviewed. Much of it is the FTT token issued by FTX, another Bankman-Fried company." This article reported on a purported leaked Alameda balance sheet that showed that, at least as of June 30, 2022, an extremely high portion of Alameda's $14.6 billion in assets consisted of the FTT token.

85.    On November 6, 2022, in response to this article, the CEO of Binance tweeted that, "[d]ue to recent revelations that have came [*sic.*] to light," he would be selling the remainder of his significant FTT holdings, which he acquired during the buyout from FTX seed investment.

86.    In consultation with Bankman-Fried and others, the CEO of Alameda responded on Twitter that Alameda would be willing to buy back all of Binance and Zhao's FTT holdings at $22 per token.   At the direction of Bankman-Fried and the Alameda CEO, FTX personnel began liquidating Alameda's investments and trade positions to rapidly free up capital for FTT buybacks. Nevertheless, the market value of FTT steadily declined.

87.    On the evening of November 6, as they monitored and reacted to the movements in FTT prices and the contagion effects on the digital asset market more broadly, Bankman-Fried, and Alameda executives expressed surprise that these events had not had a larger negative impact on the prices of bitcoin, saying in a chat message:

> [former Alameda executive 1]: "I'm surprised BTC isnt down more"
>
> [former Alameda executive 2]: "me too"
>
> Bankman-Fried: "yea me 3"

A000597

88.     At this time, bitcoin market prices, including on U.S. exchanges, had indeed begun to decline, likely as a direct or indirect result of the events described herein.

89.     At the same time, an increasing number of FTX customers began requesting to withdraw their funds from the exchange. FTX personnel initially managed to keep FTX's systems operating quickly enough to keep up with withdrawals, but soon fell behind.

90.     By late in the day on November 7, it was apparent to Defendants that FTX did not have sufficient funds to cover all customer withdrawals, and that there were not sufficient funds held in various FTX accounts to cover all customer deposit obligations.

91.     Bankman-Fried and other key personnel of FTX and Alameda acknowledged internally that this shortfall was not merely a matter of having sufficient liquid funds on hand to cover customer withdrawals in the short term; rather, FTX customer funds were irrevocably lost because Alameda had misappropriated them.

92.     That same day, the Alameda traders who had been liquidating Alameda's open positions to free up capital for FTT buybacks were directed to instead  sell everything that could be sold quickly from Alameda's holdings, to maximize open lines of credit or any other available sources of capital, and generally do anything possible to quickly obtain billions of dollars in capital to send to FTX.

93.     Bankman-Fried, reinforcing this instruction, confirmed a trader's summation of the directive as "close everything down to generate capital, maximally aggressive" to "liquidate all positions." Bankman-Fried responded that "there is definitely a fair bit of urgency"  and asked for the "ETA on getting at least $2b of USD."

A000598

94.     On or about November 7,  FTX executives were also asked to evaluate the solvency of FTX US.  They were readily able to carry out this request because FTX personnel had access to and oversight of the FTX US (but not FTX US Derivatives) code, database, and ledgers in the ordinary course of their duties.  The FTX executives ultimately identified a shortfall they did not understand and were unable to quantify on FTX US.

95.     Bankman-Fried quickly indicated that he would fill the hole at FTX US from liquidation of Alameda assets.  On November 8, Bankman-Fried directed Alameda traders to prioritize meeting FTX US capital requirements and to send excess capital to FTX US.  On information and belief, Alameda sent in excess of $185 million to FTX US to fill its shortfall.

96.     Later that same day on November 8, an Alameda executive indicated in a chat message that "apparently part of what's going on is that alameda actually has a long USDT/short USD margin position on FTX US that we aren't tracking?" and said "which is why FTX US has less USD than we thought it should."

97.     In direct contradiction of this internal series of events, on November 7, in public statements and various Twitter messages, Bankman-Fried and others acting on behalf of FTX continued to portray the shortfall that was causing customers to be unable to withdraw their funds as merely a liquidity problem.  They affirmatively (and falsely) stated that FTX continued to be solvent and that all customer deposits were safe. For example, Bankman Fried tweeted:



611 Retweets     407 Quote Tweets     2,599 Likes

A000599



98.     On information and belief, this and other tweets posted by Bankman-Fried on November 7-8, 2022 were intended to dissuade FTX customers from requesting to withdraw their funds from Defendants' exchanges.

99.     This and other iterations of proposed tweets by Bankman-Fried were debated and rewritten among a small group of Defendants' key employees and other of Bankman-Fried's confidants.  On information and belief, several individuals expressed concerns that Bankman-Fried's tweet was inaccurate and/or misleading.

100.    At the same time as Bankman-Fried was making these public assurances, he and numerous others acting on behalf of FTX Trading were also reaching out to as many sources of funding as possible in an attempt to quickly raise several billion dollars to cover the shortfall in customer funds.  As their calculation of the amount of the shortfall grew from $1-2 billion, to $2-4 billion, to as much as $8 billion, the number of viable potential rescue options diminished. Numerous parties declined to bail out FTX regardless of the favorable terms being offered.

101.    At approximately this same time, Bankman-Fried prepared or caused to be prepared a balance sheet to be shared with prospective investors showing the assets and liabilities of the companies.  That balance sheet was unorthodox in a number of respects. Most notably, the balance

A000600

sheet included an $8 billion negative balance from a "hidden, poorly internally labeled 'fiat@' account."

102.    Upon information and belief, the "fiat@" account was in fact well-known to and understood by Bankman-Fried, who had previously directly managed and directed its use and characterization on the FTX systems.

103.    On November 8, Bankman-Fried called the CEO of Binance CEO to offer to sell FTX Trading to him in its entirety.  Binance initially accepted the offer and announced the news on Twitter, saying: "[t]his afternoon, FTX asked for our help. There is a significant liquidity crunch. To protect users, we signed a non-binding LOI [Letter of Intent], intending to fully acquire FTX.com and help cover the liquidity crunch. We will be conducting a full DD in the coming days."  Defendants thereafter provided Binance with various information in response to their due diligence inquiries in furtherance of the LOI.

104.    On the morning of November 9 at approximately 10 AM ET, after the announcement of the Binance acquisition, the CEO of Alameda held and "all-hands" meeting with Alameda's staff.  In that meeting, the CEO stated that earlier that year, in response to an accounting or book-keeping problem, Bankman-Fried and other individuals had decided to use FTX customer funds for Alameda.  The CEO indicated that FTX had always allowed Alameda to borrow customer funds, and that FTX did not require collateral from Alameda, though in practice the collateral was Alameda's FTT.  Shortly after this meeting, most of Alameda's staff resigned.

105.    On November 9, just one day after announcing the deal, Binance announced it would not be able to move forward with the deal to acquire FTX, saying: "[a]s a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged

A000601

US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com."

106.    With the prospects of acquisition or bailout investment being unlikely, executives of Defendant entities and FTX US began advocating strongly for Bankman-Fried to move the companies towards bankruptcy and halt all remaining customer withdrawals from the platforms.

107.    On November 10, FTX and FTX US halted all trading and withdrawals, and Bankman-Fried announced that Alameda was being wound down. Bankman-Fried also posted a lengthy Twitter thread purporting to explain how he "f[***]ed up."

108.    On November 10, at approximately 4:00 am ET, Bankman-Fried signed a document resigning his position as CEO of FTX Trading and, as majority owner of all the FTX Trading and Alameda companies, authorizing the appointment of an independent CEO and the filing of Chapter 11 bankruptcy proceedings.

109.    The next day, on November 11, 134 separate companies simultaneously filed for Bankruptcy as part of those proceedings, which are ongoing and being jointly administered in the U.S. Bankruptcy Court for the District of Delaware.

110.    In his initial declaration submitted shortly after the filing of the Bankruptcy petition, the FTX Enterprise's newly-appointed CEO said the following of the situation he encountered at the FTX Enterprise entities:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.

29

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

111.    In the days and weeks since Bankman-Fried resigned from the companies, he has continued to make widespread public statements, provide explanations, and  make admissions, including in live interviews.  Several of his statements admit key facts pled herein. For example, in a November 15 chat message interview with a Vox publication reporter, which Bankman-Fried has confirmed he participated in, he characterized the course of relevant events as follows:

> like, 'oh FTX doesn't have a bank account, I guess people can wire to Alameda's to get money on FTX' … 3 years later … 'oh f**** it looks like people wired $8b to Alameda and oh god we basically forgot about the stub account that corresponded to that and so it was never delivered to FTX'

**I.      Impact of These Events on Digital Commodity Futures Markets**

112.    The foregoing series of events had a significant, observable negative impact on digital commodity markets. For example, between the release of the November 2 Coindesk article and the November 9 announcement that Binance declined to acquire FTX Trading, the price of bitcoin futures fell more than 23%, to two-year low prices.

113.    Various data visualizations demonstrate a clear connection between the foregoing events and the price movement of digital commodities, including bitcoin and ether.

114.    The foregoing conduct by Defendants caused, directly or in directly, significant negative price impact on the value of commodities in interstate commerce in the U.S., including bitcoin and ether spot and futures prices, as illustrated in the following three market data charts.

115.    The following chart is a visualization of the price movement of bitcoin and ether digital commodity spot and futures prices on various major exchanges at the time of the foregoing

events. On information and belief, the significant price movement demonstrated in this chart is a result of the conduct described herein.



116.    The following chart is a visualization of the impact of various of the foregoing market events on bitcoin futures prices on the U.S. CME exchange, with several of the key foregoing events identified on the price and time line. On information and belief, the significant price movement demonstrated in this chart is a result of the conduct described herein:

31

A000604



117.    The following chart is a visualization of the impact of various of the foregoing market events on ether futures prices on the U.S. CME exchange, with several of the key foregoing events identified on the price and time line. On information and belief, the significant price movement demonstrated in this chart is a result of the conduct described herein:

A000605



## VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I: FRAUD
### AGAINST ALL DEFENDANTS

#### Violations of Section 6c(1) of the Act, 7 U.S.C. § 9(1), and
#### Regulation 180.1(a)(1),(3), 17 C.F.R. 180.1(a)(1),(3) (2021)

118.   The allegations set forth in paragraphs 1 through 117 are re-alleged and incorporated herein by reference.

119.   During the Relevant Period, Defendants intentionally or recklessly, in connection with contracts of sale of commodities in interstate commerce, directly or indirectly: used or employed, or attempted to use or employ, a scheme or artifice to defraud; and/or engaged in, or

A000606

attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on customers of FTX Trading.

120.    As a result of the foregoing conduct, Defendants' fraudulent conduct violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1),(3), 17 C.F.R. § 180.1(a)(1),(3).

121.    Defendants are directly liable for their actions in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1),(3), 17 C.F.R. § 180.1(a)(1)-(3).

122.    Defendant Bankman-Fried directly or indirectly controlled the FTX Trading and Alameda entities and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)(3) committed by FTX Trading and Alameda.  Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Bankman-Fried is also liable as control person for each of FTX Trading and Alameda's violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1),(3), 17 C.F.R. § 180.1(a)(1),(3).

123.    The acts and omissions of Bankman-Fried and other officers, employees, or agents acting for FTX Trading and/or Alameda described in this Complaint were done within the scope of their office, employment, or agency with FTX Trading and/or Alameda.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2021), FTX Trading and/or Alameda are liable as principals for each act, omission, or failure of Bankman-Fried and the other officers, employees, or agents acting for FTX Trading and/or Alameda, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1),(3).

124.    Each and every use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on

A000607

FTX Trading customers is alleged as a separate and distinct violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1),(3), 17 C.F.R. § 180.1(a)(1)-(3).

### COUNT II: FRAUDULENT MISSTATEMENTS OF MATERIAL FACT AND MATERIAL OMISSIONS

### AGAINST ALL  DEFENDANTS

**Violations of Section 6c(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(2), 17 C.F.R. 180.1(a)(2) (2021)**

125.    The allegations set forth in paragraphs 1 through 129 are re-alleged and incorporated herein by reference.

126.    During the Relevant Period, Defendants intentionally or recklessly, directly or indirectly made, or attempted to make, in connection with contracts of sale of commodities in interstate commerce, untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading.

127.    As a result of the foregoing conduct, Defendants' fraudulent conduct violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2).

128.    Defendants are directly liable for their actions in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2).

129.    Defendant Bankman-Fried directly or indirectly controlled the FTX Trading and Alameda entities and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(2) committed by FTX Trading and Alameda.  Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Bankman-Fried is also liable as control person for each of FTX Trading and Alameda's violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

A000608

130.     The acts and omissions of Bankman-Fried and other officers, employees, or agents acting for FTX Trading and/or Alameda described in this Complaint were done within the scope of their office, employment, or agency with FTX Trading and/or Alameda.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, FTX Trading and/or Alameda are liable as principals for each act, omission, or failure of the other officers, employees, or agents acting for FTX Trading and/or Alameda, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1),(3).

131.     Each and every untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading is alleged as a separate and distinct violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2).

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.     An order finding that Defendants Samuel Bankman-Fried, FTX Trading Ltd. b/d/a FTX.com, and Alameda Research LLC (collectively, "Defendants"), collectively and through their officers, employees, and agents, violated Section 6c(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2021).

B.     An order of permanent injunction prohibiting Defendants and any other person or entity associated with them, from engaging in conduct described above, in violation of Section 6c(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2021).

C.     An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

A000609

(i)  trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a(40));

(ii) entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2021)), or digital assets that are commodities, as that term is described herein, for Defendants' own accounts or for any account in which they have a direct or indirect interest;

(iii)having any commodity interests or digital assets that are commodities, as that term is described herein, traded on Defendants' behalf;

(iv)controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities, as that term is described herein;

(v) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital assets that are commodities, as that term is described herein;

(vi)applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021);

(vii)      acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

A000610

D.     An order directing Defendants and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.     An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or amount Defendants and any customer or investor whose funds were received by Defendants a result of the acts and practices that constituted violations of the Act, as described herein;

F.     An order requiring Defendants to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G.     An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act, as described herein;

H.     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.     Such other and further relief as the Court deems proper.

A000611

## VIII.  **DEMAND FOR JURY TRIAL**

Plaintiff CFTC hereby demands a jury trial.


Dated:  December 13, 2022

Commodity Futures Trading Commission

By its attorneys:

*/s/ Jack Murphy*
_____

Nina Ruvinsky (*Pro Hac Vice Forthcoming*)
Trial Attorney
*nruvinsky@cftc.gov*

Carlin Metzger (*Pro Hac Vice Forthcoming*)
Senior Trial Attorney
*cmetzger@cftc.gov*
312-596-0536

Elizabeth N. Pendleton (*Pro Hac Vice Forthcoming*)
Chief Trial Attorney
*ependleton@cftc.gov*

Robert T. Howell (*Pro Hac Vice Forthcoming*)
Deputy Director
*rhowell@cftc.gov*

Commodity Futures Trading Commission
Ralph Metcalfe Federal Office Building
77 W. Jackson, Suite 800
Chicago, Illinois 60604
(312) 596-0700
(312) 596-0714 (fax)

John C. Murphy *(Local Counsel)*
Trial Attorney
*jmurphy@cftc.gov*
290 Broadway, 6th Floor
New York, NY 10007
646-746-9700
646-746-9888 (fax)

*Attorneys for Plaintiff*

A000612

*Commodity Futures Trading Commission*

A000613



FTX **US**

Exchange   Apps   Products ⌄   Markets ⌄   Support   Sign in   More ⌄   Create account

FTX Policy / Legislation

# FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms

March 10, 2022

## Introduction

FTX strongly believes that ensuring investor protections is critical to the successful operations of digital-asset platforms, including our own, as well as to ensuring a positive user experience for our customers. FTX also believes that non-intermediated "direct access" markets, such as the FTX exchanges, can and do provide a level of investor protection that meets and exceeds the policy goals and purposes of traditional investor protection regulation (notwithstanding the absence of an intermediary or "broker"). Technology continues to displace the need for an investor to rely on intermediaries and brokers to access certain markets or asset classes, and one of the most important innovations of the digital-asset industry is a simplified market structure that does not need to rely on intermediaries for access to markets. From this observation, this paper addresses the key investor protection principles (described below) applicable to any market and the ways in which non-intermediated "direct access" digital-asset platforms can and do provide these protections for their users.

The goal of this paper is to support two critical propositions:

A000614



FTX believes will be an overall risk-reducing market structure, for the benefit of investors.

- To the extent that legacy regulations or policies would assume or require an intermediary to provide these protections, we believe that approach often imposes unnecessary burdens and costs (including fees and both capital and operational inefficiency) on investors and markets without any corresponding benefit–and any such rules should be updated and modernized.

If market structure policy is truly to be technology neutral (which is an important and often stated principle expressed by policy makers), market regulators must acknowledge that intermediated market structures are due, in many instances, to the fact that technology was less robust when those markets were first developed. While intermediaries previously were helpful because the cost and complexity of accessing (1) a market for trading assets or (2) the assets themselves (especially when securities, for example, were in material or paper form) were substantial enough that it was economically efficient for an investor, especially an individual investor, to rely on an intermediary to provide such access and attendant services. However, intermediated market access is NOT an *a priori* first principle of market structure design, and technology has meaningfully changed what is possible.

Today, the only tools necessary to access a centralized market place for assets directly are (1) a computer or mobile device; (2) relevant "trading" software accessible on that hardware; (3) access to broadband services to transfer data over the Internet, and (4) an application programming interface (API) to allow the trading software to be built and integrate with the trading platform's software. As a result, while investors might elect to use intermediaries for various reasons, those intermediaries are no longer indispensable for gaining access to financial products if the investor has the aforementioned tools.

We believe this has led to the possibility of the reduction of many types of risks, as explained in **FTX's Key Principles for Market Regulation of Crypto-Trading Platforms** (hereinafter "**Market Regulation Key Principles**"; see https://www.ftxpolicy.com/). Combined with other best practices and enhanced risk-management techniques utilized by FTX, this simplified market structure forms the basis for our argument that a well designed and operated non-intermediated



platform operators should be allowed to provide these protections, and be held accountable for them, rather than insisting that they be fulfilled by intermediaries on the platform.

While not the core goal of this paper, we also note that intermediation can reduce transparency and information available to the customer. Traditionally, most users are not given full market data; neither are they allowed full access to exchanges, preventing equitable access. FTX's disintermediated structure ensures that all users have equal access to its information and markets.

## Key Investor-Protection Principles

Ultimately, all policies affecting the operation of a digital-asset market ensure the protection of the investor on the platform, and FTX's **Market Regulation Key Principles** paper addresses those.   Here we focus on specific principles related to the core of protecting customers' interests and their assets kept on a digital-asset platform. These include (1) maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request; (2) ensuring the environment where customer assets are custodied, including digital wallets, are kept secure; (3) ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets; (4) ensuring appropriate management of risks including market, credit/counterparty, and operational risks; and (5) avoiding or managing conflicts of interest. Each of these is addressed in turn.

### 1. Maintaining Adequate Resources to Return a Customer's Assets

A hallmark of the investor-protection regimes for markets globally and in the U.S. are requirements to ensure that the intermediary holding a customer's assets has adequate liquid resources available at all times to ensure that the customer can redeem her assets when she chooses. Often these policies are designed to ensure that there is (1) **no delay** in returning customer securities upon request, or (2) **no shortfall,** where an amount lesser than the value of the customer's asset can be returned to the customer. This principle often involves other restrictions on the custodian, including, for example, a restriction of the use of customer assets to

A000616



FTX **⫶** US    Exchange    Apps    Products ⌄    Markets ⌄    Support    Sign in    More    Create account

similar and also requires a cushion of resources to be held by the entity managing a customer's derivatives positions to ensure timely return of customer assets.

FTX recommends policy makers consider a policy embodying this principle for digital-asset platform operators: fashioning a requirement, to be reflected in the platform's policies and procedures or otherwise, where the platform operator is accountable for keeping adequate liquid resources to ensure it can deliver customer assets back to the customer upon their request. This principle is sound for all asset types, and while the policy today tends to fall on intermediaries, it can just as easily be applied to the platform operator; in general it should apply to whichever entity is custodying customer assets. Such a policy as applied to digital-asset platform operators would be independent of other requirements to ensure adequate capital to cushion losses (see discussion below).

To the extent existing regulations have implemented this principle by fashioning restrictions on intermediaries, most market supervisors – including those in the U.S. – have other authorities that would permit appropriate or conditional application of such a duty on a market operator. The fact that customer assets include digital assets and tokens in principle need not alter the basic policy of ensuring there is the availability of liquid assets.

FTX has policies and procedures for its platforms today that reflect this basic principle by maintaining liquid assets for customers withdrawals, including a sufficient balance of digital assets funded by the company for its non-U.S. platform. The resources are funded to provide sufficient cover against user losses under certain events and extreme scenarios in order to, among other purposes, ensure a customer without losses can redeem its assets from the platform on demand.

### 2. Securing Environment Where Customer Assets Are Custodied

Another key customer-protection principle is making sure that the environment itself, where customer assets are kept, is safe and secure. Existing market regulation often looks to the requirements of other financial custodians and intermediaries that also custody assets as a proxy for safety and security. For example, U.S. policy has the concept of requiring the use of a "qualified custodian" for the custody of



clearinghouse is subject to sufficiently rigorous standards and supervision that it can be entrusted with safekeeping customer assets. In any case, this principle mandates that appropriate arrangements to safeguard the clients' rights in client assets and minimise the risk of loss and misuse are in place, which can be accomplished by ensuring that the custodian of the assets maintains adequate levels of financial integrity, physical and cyber security, as well as transparency to customers about the locus and availability of their assets.

Regarding a digital-asset platform operator, the assessment of whether the environment delivers on this principle is different from that for traditional assets because the ecosystem often involves traditional fiat currencies as well as digital assets and tokens related to public blockchains. For digital assets, the digital wallet is central to the custody arrangements. For fiat currency, FTX and other other platform operators will necessarily rely on licensed banking institutions to custody a customer's fiat currency; for traditional, non-tokenized securities, the custody function will follow the lines of the traditional market structure, unless some exemption is provided to allow some other arrangement – in the U.S., for example, existing regulations would require that custody be performed by a licensed intermediary legally permitted to custody such securities. (It certainly would be interesting, however, for policy makers to consider permissioning platform operators with the proven resources to custody these assets as well – again, derivatives regulation allows clearinghouses to custody assets.

For digital assets, however, where policy is much less developed, custody involves control of private keys to digital wallets, and physical security involves the safekeeping of those private keys. When digital assets are left in the custody of platform operators such as FTX, safekeeping private keys can be performed in-house by the platform operator, or by the platform operator contracting with a third-party (the platform operator would remain accountable for regulatory requirements under this arrangement). Notably, both approaches have been permitted by market regulators and embraced by market participants.

Multiple architectures exist for the storage of private keys, which can be accomplished through use of a "hot wallet," cold storage, multi-signature wallet, or even by a smart-contract wallet. To be sure, policy makers could decide if a



their preferred custody approach by electing to transact with the platform operator
that offers it. This approach necessarily would require that a platform operator
adequately disclose its wallet architecture and security practices. In any case,
limiting access to the private keys under custody through appropriate
permissioning, and ensuring adequate cyber-security protections, are critical to
discharging this principle regarding securing the environment where assets are
kept.

Some have suggested that allowing the platform operator to serve as the digital-
asset custodian might present a conflict of interest for the platform operator,
presenting more opportunities for misuse or misallocation of customer assets. It is
far from clear to FTX that contracting with a third party for custody would in every
instance lower the risks of misuse or misallocation of a customer asset, particularly
when the platform operator would presumably remain accountable and, indeed,
liable in every case; and each additional party added to a customer's experience
adds another potential point of failure. We believe that rather than focus on any
perceived conflict, policy makers should instead focus on the first principles
described above for asset safekeeping (i.e., regular auditing of the cybersecurity
aspects of the custody plan along with auditing the actual assets held in custody),
and perhaps consider requiring the platform operator to disclose any remaining
potential conflicts while developing policies and procedures to address them.

FTX uses both approaches, using a third-party custodian in part for the U.S.
derivatives platform and a proprietary in-house custody solution for the other
platforms. For its in-house wallet solution and to maximize security, FTX leverages
best-practice, hot- and cold-wallet standards whereby only a small proportion of
assets held are exposed to the Internet and the rest are stored offline. FTX policies
and procedures also address and dictate other key components to the security of
private keys, including applicable multi-signature arrangements, as well as the
storage of backup relevant backup information. FTX's custody solutions comply with
all relevant regulations, including those of the U.S. CFTC, and the company takes
pride in the confidence in our security measures our customers have given to us.

### 3. Ensuring Appropriate Ledgering and Disclosures of Assets to Protect Against Misuse



a customer's assets is not misallocating or misusing those assets, particularly in furtherance to their own purposes at the expense of the customer's best interests. The basic concept here is that there should be controls in place to ensure the custodian has books and records that keep track of and identify which customer owns what, and there is adequate regulatory and customer reporting, as well as independent auditing, to verify the same.

In keeping with this principle, FTX provides a user experience that enables any user to easily view account balances for all assets, for all of its platforms, in real time. By logging in to the customer's account at FTX, the customer can immediately view the types of assets they own held in custody by FTX. The assets are ledgered and easily identifiable to the user (but held in an omnibus wallet in the case of the customer's tokens in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX. Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms.

Relatedly, and previewing the risk management discussion below, FTX ensures redundancy, resiliency, and disaster-recovery preparedness by using multiple geographically dispersed cloud and data service vendors and facilities to ensure industry-leading 24/7 service.

### 4. Conducting Adequate Risk Management to Protect Digital Assets

The next key principle is ensuring that any market participant in possession of customer assets is performing adequate risk management to protect those assets, regardless of their particular role in the ecosystem. There are multiple types of relevant risks that are inherent to any market structure, including but not limited to credit or counterparty risk, market risk, funding liquidity risk, and operational risk. (All of these in turn have a bearing on or contribute to systemic risk within the overall ecosystem.)

Credit and counterparty risk refers to the risk that a counterparty will fail to perform its obligations. Market risk is defined as the potential for losses arising from the change in value of an asset. Liquidity risk is the potential that a position in an asset



breakdowns, or communication-network failures, they also can include losses caused by external factors such as "acts of God" or other naturally occurring events.

Market participants in any market, including digital-asset market operators, must address each of these risks to ensure against substantial or catastrophic losses that could lead to existential threats against their own firm, thereby imperiling the assets of their customers. In general, policy makers that develop market regulation have required that both market operators as well as intermediaries manage risk by developing appropriate policies and procedures to address them, which contemplate the use of quantitative methods to measure risk, pricing products according to their risks, establishing risk limits, active management of risks through hedging and other techniques, and the building of cushions to absorb losses.

FTX is a full-stack infrastructure provider, combining the matching engine and the clearing function on the same platform, providing a unified user experience for the trading of assets as well as the clearing and settlement of those assets. FTX's ***Market Regulation Key Principles*** addressed other risk-management considerations for the trading venue itself, but here we focus particularly on risk management embedded in the clearing and settlement functions that relate to investor protections.

Clearinghouses in traditional markets again are subjected to substantial regulatory rigor and are required to develop written policies, procedures, and controls that establish an appropriate risk-management framework which, at a minimum, clearly identifies and documents the range of the aforementioned risks and more to which the DCO is exposed, addresses the monitoring and management of the entirety of those risks, and provides a mechanism for internal audit. Public policy typically provides clearinghouses discretion in setting, modeling, validating, reviewing and back-testing margin requirements that build the cushion to absorb potential losses, but must develop such requirements nonetheless; those models are then evaluated by appropriate regulators. Clearinghouses are required by regulation to frequently check the adequacy of initial-margin requirements, value initial margin assets, back test products that are experiencing significant market volatility, and conduct stress tests with respect to each large trader who poses significant risk.



requirements of U.S. policy. First, the FTX international exchange imposes on its users a dynamic maximum leverage limit depending on their absolute position, which is limited to maximum leverage of 20 times the notional value of the user's account, and substantially lower in the case of larger positions. The limit is calculated as a function of market liquidity and volatility, along with the positions and collateral that the user holds. Second, FTX platforms check customer-account levels and asset amounts, including those used to collateralize positions, multiple times per minute as opposed to once per day, as standard policy requires today. Third, customer positions are liquidated if the net balance of all of a customer's positions becomes negative, or positions fall below the maintenance-margin threshold, and the FTX risk engine performs this function automatically. FTX uses an advanced and user-friendly liquidation process that gradually reduces a user's position to bring it to solvency, instead of closing the entire position. Fourth, FTX's risk-management program requires that digital-asset collateral be placed on the platform itself, rather than pledged but not delivered to the platform, to ensure the platform has immediate access to the collateral for purposes of managing market risks. And fifth, FTX's markets are open 24 hours a day, 7 days a week, which protects against delayed management of customer positions or market conditions, and the consequent build-up of market risk.

FTX undertakes this risk-management program without any reliance on intermediaries, depending only on its own systems and personnel. Historically, in traditional market structures, intermediaries provided a first or outer layer of risk management, as the entity typically responsible for onboarding customers and maintaining the customer relationship, and thereby exposing that intermediary to all of the attendant risks from that relationship. Market operators and clearinghouses are beneath or within that outer layer and, as explained above, also engage in management of the risks outlined above.





In traditional market structure, any type of breakdown in the risk management at the *outer* layer of the intermediated market structure exposes the *inner* layer to consequent risks. This is so because those intermediaries are members of the trading platform as well, and the effects of a risk-management breakdown can be transferred to the trading platform as well as to the other members of the trading platform. Policy makers refer to this concept as interconnection risk. Arguably, the existence of this outer layer created through intermediation increases the opportunities for risk-management failure because there are so many more points of potential lapses or failure. Many of these can be inconsequential to the overall ecosystem, but some or many can be consequential.

The simplified market structure native to the digital-asset ecosystem poses fewer interconnection risks within the system because the outer layer of participants is folded into the inner layer – investors access the digital-asset platform directly. Likewise, without intermediaries bringing their customers to the trading platform, the trading platform is not exposed to risk-management failures by an intermediary, and can focus instead on its own risk-management program. This in turn simplifies the role of the supervisory community overseeing such platforms, who by focusing on the risk management of the platform operator can dispense with concerns about the platform's members who are not intermediaries. Again, this concept is key to FTX's view that the market structure for our platforms is **risk reducing** compared to those found in traditional markets.



resources and capabilities (operational and financial) of the intermediary and whether they are delivering on other key investor protections, which in part depends on the level of supervision of the intermediary *vis a vis* the level of supervision of the platform. As a general matter, the supervision of clearinghouses as it relates to risk management in particular is equal to or greater than that for intermediaries, with heightened financial integrity and reporting standards. And as explained above, FTX risk management is designed and has been implemented to improve upon those standards in multiple ways.

Fewer interconnections, combined with superior risk-management practices at the platform level, while delivering on core investor protections, leads to a superior and risk-reducing market structure that better protects investors.

### 5. Avoiding Conflicts of Interest

The final principle is that in order to ensure the investor's interests are protected, conflicts of interest between the investor and the entity offering the products should be eliminated, mitigated and/or managed appropriately. Once again, in traditional capital markets the policy focus has been on intermediaries who offer access to investment products or otherwise sell the products to their customers directly, and today there are considerable requirements directed at intermediaries. Although not all existing regulations related to conflicts will apply, to the extent that policy makers wish to apply the relevant measures to the digital-asset space, this could be accomplished rather smoothly by shifting the burden of those measures from intermediaries to the platform operator as needed.

Policy governing traditional markets generally takes two approaches to addressing conflicts of interest: expressly prohibiting certain types of conduct, and requiring policies and procedures that involve affirmative steps to identify areas of risk for conflicts, and measures to mitigate or eliminate those conflicts. As an example of the former, most securities regimes, including in the U.S., expressly prohibit misstatements or misleading omissions of material facts, and fraudulent or manipulative acts and practices, related to the purchase or sale of investment products.



discourage entities from offering or recommending products that the investor does not sufficiently understand or possess the resources to use properly. Other regimes are less prescriptive and generally focus on the financial wherewithal of a customer seeking access to a trading market, on the premise of ensuring creditworthiness and an ability to meet financial obligations on the platform, along with risk-related disclosures.

FTX favors an approach that provides equal access to all investors, and follows sufficiently robust listing standards that ensure adequate information about the listing is provided to the customer. But if policy makers preferred to impose a heightened standard more similar to what is found in securities markets, for example, they would need to impose that responsibility on the platform operator, which again could easily be accomplished.

In any case, whether intermediaries are involved in the market or not, conflicts inevitably arise when each actor is pursuing its commercial or economic interests. The key point for this particular principle is that when they do, there are familiar methods for eliminating or mitigating those conflicts, even as they apply to platform operators. FTX conducts its business with a goal of maximizing our customer's interest, but supports reasonable policy measures to eliminate or mitigate conflicts that impose those responsibilities directly on the platform.

# Crypto investing made simple

## Company
About

Jobs

## Resources
Blog

Help center

## Legal
Legal Information

Terms of service

A000625



Apps    Products ⌄    Markets ⌄    Support    Sign in    More ⌄    Create account

Contact us

FTX Whitelabel

and Consumer
Disclosures



© 2022  FTX US

West Realm Shires Services, Inc., d/b/a FTX US (NMLS #1957771)

A000626



# Testimony of  Sam Bankman-Fried
# Co-Founder and CEO of FTX

"Examining Digital Assets - Risks, Regulation, and Innovation."
Hearing Before the U.S. Senate Committee on Agriculture, Nutrition and Forestry

February 9, 2022
10:00am ET

## Introduction

Chair Stabenow, Ranking Member Boozman, members of the committee and distinguished guests, thank you for inviting me to testify before this committee today.  It is an honor and a privilege to be before you to share some information and insights into the digital-asset industry as this committee, this chamber and the Congress as a whole deliberate on a variety of key topics stemming from this exciting space.  Along with my colleagues and teammates at FTX, I am pleased to provide you with as much information as you need in order to ensure a fully informed and robust conversation around whether and how this committee could address some of these key topics.

## Background on FTX

The FTX group of companies (FTX Group or FTX) was established by three American citizens, Samuel Bankman-Fried, Gary (Zixiao) Wang and Nishad Singh, with international operations commencing in May 2019 and the U.S. exchange starting in 2020.  The business was established in order to build a digital-asset trading platform and exchange with a better user experience, customer protection, and innovative products, and to provide a trading platform robust enough for professional trading firms and intuitive enough for first-time users.  In the U.S., the company operates a federally regulated spot exchange that is registered with the Department of Treasury (via FinCEN, as a money services business) and also holds a series of state money transmission licenses.  Our U.S. derivatives business is licensed by the U.S. Commodity Futures Trading Commission (CFTC) as an exchange and clearinghouse.  FTX US also holds a FINRA broker dealer license. FTX's international exchange, which is not available to U.S. users, holds a series of marketplace licenses and registrations in many non-U.S. jurisdictions.

The core founding team had unique experience to develop an exchange given their experiences in scaling large engineering systems at premier technology companies, combined with trading experience on Wall Street.  This brought to the effort an understanding of how to build the best platform from scratch, as well as what that platform should look like, unencumbered by legacy technology or market structure.  ***FTX has aimed to combine the best practices of the traditional financial system with the best from the digital-asset ecosystem***.



<u>Early International Success.</u>  The international FTX.com exchange has been extremely successful since its launch. This year around $15 billion of assets are traded daily on the platform, which now represents approximately 10% of global volume for crypto trading. The FTX team has grown to over 200 globally, the majority of whom are responsible for compliance and customer support.    The FTX Group's primary international headquarters and base of operations is in the Bahamas, where the company is registered as a digital asset business under The Bahamas' Digital Assets and Registered Exchanges Act, 2020 (DARE).



In addition to offering competitive products, the FTX platforms have built a reputation as being highly performant and reliable exchanges. Even during bouts of high volatility in the overall digital-asset markets, the FTX.com exchange has experienced negligible downtime and technological performance issues when compared to its main competitors. We believe the dual-track focus on customers and reliability, plus compliance and regulation, are key reasons why FTX has also experienced the fastest relative volume growth of all exchanges since January 2020.

The core product consists of the FTX.com web site that provides access to a market place for digital assets and tokens, and derivatives on those assets.  Platform users also can access the market through a mobile device with an FTX app.  The core product also consists of a vertically integrated, singular technology stack that supports a matching engine for orders, an application programming interface or API, a custody service and wallet for users, and a settlement, clearing and risk-engine system.  In a typical transaction, the only players involved are the buyers, sellers, and the exchange, without any other intermediaries.

The FTX Group has operations in and licenses from dozens of jurisdictions around the world, including here in the U.S and in Europe.  At the time of this writing the FTX platforms have millions of registered users, and the FTX US platform has around one million users.  For FTX.com, roughly 45 percent of users and customers come from Asia, 25 percent from the European Union (EU), with the remainder coming

A000628



from other regions (but not the U.S. or sanctioned countries, which are blocked). In comparison to the international exchange, nearly all users of FTX.us are from the U.S.

U.S. Operations. FTX services U.S. customers through the FTX US businesses, which includes the spot exchange, FTX US Derivatives, the NFT marketplace, and a soon-to-go-live FINRA broker dealer (FTX Capital Markets). FTX US is housed under a separate corporate entity from FTX international and is headquartered in Chicago, IL. It has a similar governance and capital structure to the overall corporate family, and also has its own web site, FTX.us, and mobile app. As with FTX.com, the core product is an exchange for both a spot market for digital assets as well as a market for derivatives on digital assets. Like other crypto-platforms in the U.S., the spot market is primarily regulated through state money-transmitter laws.

The U.S.-derivatives-market product is provided by FTX US Derivatives, which was formed through the acquisition and re-branding of LedgerX and is being integrated with the overall FTX US platform. The product offers futures and options contracts on digital assets (or commodities) to both U.S. and non-U.S. persons. FTX US Derivatives operates with three primary licenses from the U.S. Commodity Futures Trading Commission (CFTC): a Designated Contract Market (DCM) license, a Swap Execution Facility (SEF) license, and a Designated Clearing Organization (DCO) license. Prior to its acquisition, this business was the first crypto-native platform issued a DCO license by the CFTC in 2017, which was a milestone for the agency and the digital-asset industry. That license was later amended in 2019 to permit the clearing of futures contracts on all commodity classes and not just digital assets.

Commitment to a Diverse Workforce. We are proud of our workforce at FTX and believe that one of our key strengths is a culture of mutual respect and cooperation. This type of culture is borne from the diversity of our team, which necessitates a spirit of empathy, understanding and humility. These traits in our workforce are good for business and are much of the reason we have been successful at understanding our customers and their needs, and executing on products that meet their needs. FTX has employees from all over the world with diverse ethnic backgrounds, and 60 percent of women in our workforce are in senior management positions. The majority of our global leadership comes from diverse backgrounds.

Commitment to Mitigating Climate Impacts. FTX is very serious about minimizing our impact on the global environment where we live and work, and as a company we have taken several important steps to ensure this. Here, I would like to share several key points to explain why FTX's environmental impact is *de minimis*, but nonetheless explain the additional steps the company has taken to reduce even further this impact. *First*, FTX has no factories or physical products and therefore does not leverage global shipment networks, a substantial source of energy consumption. FTX has a small workforce with a small physical-office footprint, renting only a few small offices spread out around the world, and operates online. FTX corporate operations, therefore, do not have direct impacts on climate change at a globally relevant scale.

*Second*, while digital asset deposits to and withdrawals from FTX platforms unavoidably require some energy consumption as public blockchains facilitate and record those transactions, on FTX over 80 percent of deposits and withdrawals use low-cost, carbon-efficient Proof of Stake (PoS) blockchains. These PoS networks contrast with Proof of Work (PoW) blockchains such as the Bitcoin (BTC) blockchain, which consume significant amounts of energy to maintain the network. By using PoS blockchains for the vast majority of FTX deposits and withdrawals, FTX massively reduces the overall climate impact of blockchains. To facilitate the

3



remaining approximately 20 percent of deposits and withdrawals, energy consumption is relatively small, but FTX subsidizes the blockchain network fees to share in paying the costs of that energy consumption. Separate from deposits and withdrawals, transactions and transfers on the FTX exchanges themselves (which is the overwhelming majority of our user activity - 100% of our $15 billion in average daily trading volume occurs on the exchange itself) do not require public blockchain activity and require only the amount of energy needed to run a cloud-based trading venue.

*Third*, FTX also has endeavored to take ownership of our portion of the environmental costs of mining associated with public blockchains and has purchased carbon offsets to neutralize those costs. Estimating the costs of energy consumption and carbon output associated with blockchain mining is difficult because mining is decentralized, and discerning how much energy is coming from which source is elusive. Nonetheless, FTX estimates that it costs $1 million per year to take ownership of those costs, and has purchased a total of 100,000 tons of carbon offsets through two providers for $1,016,000. Additionally, FTX through its affiliated arm, FTX Climate, created a comprehensive program to focus on the most impactful solutions to climate change possible. In addition to achieving carbon neutrality, our initial program funds research that we believe can have an outsized impact, as well as supports other special projects and carbon-removal solutions. FTX plans to spend at least $1 million per year through FTX Climate. Those interested in learning more about these initiatives can find more information at https://www.ftx-climate.com.

*Fourth*, FTX believes energy consumption by PoW blockchains and its impacts should be assessed within the appropriate context, which we believe should include consideration of their benefits, an understanding of their differences with PoS networks and how each type of network is being leveraged and growing, as well as a comparison to other energy-consuming activities or even industries. For example, BTC has delivered benefits to many as measured by access to financial products, asset transmission, and wealth creation, which should be weighed against the network's energy costs.[1]

Additionally, while PoW networks attract attention for their energy consumption, transactional activity on PoS networks is growing substantially due to their ability to process a greater number of transactions in a shorter period of time at a lower cost. FTX believes these PoS networks will become increasingly important over time, which will continue to minimize the overall climate impact of blockchains. And finally, the energy consumption by PoW blockchains is relatively small when compared to other industries to which the BTC network in particular is often compared.[2] Of assets whose futures trade on CFTC-regulated venues, BTC actually ranks fairly low in terms of environmental impact, relative to traditional, physically mined commodities, oil, livestock, and other environmentally impactful assets.

<u>Commitment to Giving Back</u>. FTX is committed to improving the lives not just of our customers through superior products, but also the lives of those in the broader global community. Toward this end, FTX created the FTX Foundation, which was founded with the goal of donating to the world's most effective

---

[1] See "Everything We Want Costs Energy, Including Bitcoin," by Benjamin Powers, *Coindesk*, Apr. 22, 2021; https://www.coindesk.com/tech/2021/04/22/everything-we-want-costs-energy-including-bitcoin/; see also "The Bitcoin Mining Network: Trends, Average Creation Costs, Electricity Consumption & Sources," *CoinShares Research*, June 2019 Update, https://coinshares.com/assets/resources/Research/bitcoin-mining-network-june-2019-fidelity-foreword.pdf
[2] See "On Bitcoin's Energy Consumption: A Quantitative Approach to a Subjective Question," *Galaxy Digital Mining*, May 2021, Rachel Rybarcyzk, Drew Armstrong, Amanda Fabiano. https://docsend.com/view/adwmdeeyfvqwecj2.

4



charities. FTX has pledged to donate one percent of net revenue from fees to the foundation, and its founders have pledged to donate the majority of what they make. FTX, its affiliates, and its employees so far have donated over $50 million to help save lives, prevent suffering, and ensure a brighter future.

## Discussion

At the committee's request, in this discussion I will address the following topics: (1) an overview of the products offered by FTX; (2) the current U.S. regulatory landscape and existing regulatory gaps; and (3) a vision for the CFTC as a digital-assets market regulator for the U.S. Throughout this discussion I distinguish our non-U.S. and U.S. businesses by referring to FTX International and FTX US, respectively, where relevant. Furthermore, I will use 'digital assets' generally to refer to digital asset tokens that are generally considered to be a commodity rather than a security.

## 1.    FTX Products and Their Role in the Digital-Asset Economy

<u>Core Product: Digital Asset Exchange</u>.  As briefly explained above, FTX's core products are its digital asset exchanges, FTX.com, FTX.us and FTX US Derivatives ([https://derivs.ftx.us/](https://derivs.ftx.us/)) – FTX.us and FTX US Derivatives are being integrated into one user-experience platform and web site. While FTX.com offers both spot market and derivatives trading, those two categories are separated in the United States, with spot market trading on FTX.us and derivatives trading offered through FTX US Derivatives.

On FTX.com and FTX.us, users can trade digital assets with other users for cash, stablecoins and other digital assets. On the spot markets, users can set a variety of different order types on a central limit order book (CLOB). Users are able to offer orders at a specific price (limit order) or trade on the book at the best price shown. A robust price and time priority matching engine sits in between these orders to connect buyers and sellers and display the best available prices.

Futures and volatility contracts related to digital assets also are listed on the platforms as well, with or without leverage. On FTX.com, leverage is limited to a maximum of 20x (i.e., minimum margin of 5%), and much less in most cases; as of now leveraged trading is not available to users of FTX.us (although there is facilitation of other forms of credit to Eligible Contract Participants -- see below). The FTX.com platforms have listed quarterly-settled (as well as perpetual) futures contracts that are cash settled. Additionally, MOVE volatility contracts are offered on FTX.com and are similar to futures except, instead of expiring to the price of a digital asset, they expire to the USD amount that the price of BTC has moved in a day, week or quarter. FTX.com also offers BTC options for trading. Finally, FTX US Derivatives offers to U.S. users both BTC and Ethereum (ETH) derivatives.

To cover initial and maintenance margins, derivatives and leveraged-product users can post collateral in the form of cash, stablecoins or other digital assets held in their account. The exchanges also have integrated risk-management and back-office systems to perform clearing and settlement of trades, which includes updating records of ownership of the digital asset or digital asset futures and options contracts traded (clearing), and transferring value between users' accounts (settlement), using either delivery versus payment or delivery versus delivery. Importantly, FTX's risk model avoids the systemic warehousing of such risks over a weekend or other



period of market closure, and instead addresses at-risk positions and accounts immediately, in real time, 24/7/365.

Off-exchange Portal for Arranging and Matching User Orders.  FTX also offers an off-exchange portal that enables users to connect with other, large users, enabling them to request quotes for spot digital assets and trade directly. This facility forwards requests for quotes to large users, returning prices offered and enabling users to then place an order.  The portal is similar to other facilities found in traditional markets where a central limit order book is not used to match trades.

Third-Party Lending.  FTX platform users can lend their digital assets to those who seek them for spot trading. Users (including eligible users on FTX.us) wishing to trade digital assets they do not have may borrow them from users willing to lend them by posting collateral in the form of cash, stablecoins or other digital assets held in their account.  The FTX platform maintains a borrow/lending book and matches users wanting to borrow with those willing to lend.

NFT Marketplace.  FTX operates a marketplace for users to mint, buy and sell non-fungible tokens (NFTs). NFTs are tokens that are not fungible with any other tokens. They can take a number of forms and, for example, can be redeemed for a physical object, or an experience (such as a movie or phone call), or can be linked to a digital image, etc. FTX's NFT marketplace is conducted through an auction system. Alternatively, users can purchase directly at the prevailing selling price set by the seller. Users can choose to display their NFT collection on the FTX NFT marketplace portal, and/or to continue to buy or sell on the NFT marketplace.

FTX Pay.  FTX Pay is a service offered to merchants to accept payments in digital assets or fiat. Users have the option to top up their FTX accounts with ACH or credit cards, which are then used to make payments to enrolled merchants. For digital asset payments, the relevant user's FTX account would be debited by an amount in the chosen digital asset that is equivalent to the amount that is payable to the merchant.  FTX facilitates the payments to the merchant by providing the payment infrastructure.  This allows merchants to accept digital asset payments, without having to assume any volatility risk for the assets.

Staking.  FTX.com offers the ability for users to "stake" certain supported digital assets on the platform. By staking such digital assets, users can earn staking rewards; in addition, for some tokens, users can receive and unlock certain benefits on FTX, such as reduced trading fees, withdrawal fees, as well as other rewards. Generally, users can "unstake" their digital assets at any time, subject to an unstaking or unbonding period.

Types of Digital Assets on FTX Platforms.  FTX has developed listing standards and a framework for determining which digital assets to list on the platforms.  Part of that framework entails evaluating the assets to assess factors such as security, compliance risk, legal risk, technological risk and other factors. **On FTX.com**, which again is unavailable to U.S. users, FTX has listed approximately 100 stablecoins and other digital assets on its spot exchange. Digital assets include tokens such as Bitcoin (BTC), Ether (ETH), Uniswap Protocol Token (UNI), Chain Link token (LINK), Solana (SOL), and Aave (AAVE).

**On FTX.us**, the company has taken what we believe to be a conservative approach to listing digital assets for trading.  Consequently, there are far fewer tokens listed for trading on FTX.us due to much stricter listing standards for this platform.  Care has been taken to avoid listing assets with features viewed to be similar

6



to securities in the U.S. The assets and tokens listed more closely resemble BTC and ETH, two tokens expressly addressed by the CFTC to be commodities subject to its jurisdiction.

**On FTX US Derivatives**, users can trade a Bitcoin Mini Option or Ethereum Deci Option, a Next-Day Bitcoin Mini Swap or Next-Day Ethereum Deci Swap, and a Bitcoin Mini Future. All of these contracts are fully collateralized. FTX is in discussions with the CFTC about expanding our derivatives offerings to U.S. customers.

In sum, the products available now in the digital-asset economy and on the FTX platforms are very similar to ones found in the traditional finance space. A key differentiator from traditional finance is that investors can get access to all of them without going through multiple intermediaries. FTX believes the market structure for digital-asset platforms is risk reducing compared to others because it facilitates more effective risk management and eliminates unnecessary points of failure. In addition, all market data is made public and free -- all users are given full knowledge of the orderbook and trades. Easy access to financial products and solutions on one, easy-to-use platform is a powerful feature that empowers investors, consumers and entrepreneurs. By simplifying access to these tools, users of the products can focus more on the core of their everyday financial goals and needs while making more informed decisions -- ultimately this is what FTX believes will promote financial inclusion and economic security for more people.

## 2.    Current Regulatory Landscape for Digital Assets and the Role of the CFTC

The current U.S. landscape for the regulation of the trading of digital assets is a patchwork of federal market regulations and state-level money-transmission laws. As explained above, FTX US offers "cash" or "spot" markets as well as derivatives markets through FTX US Derivatives,[3] but the regulatory treatment of each type of market is different. **For cash markets** in the U.S., if a digital asset is a security as defined by the Securities Act of 1933, then the digital asset is subject to the jurisdiction of the SEC, and the asset as well as any platform that lists it for trading generally must be registered with the SEC. A digital asset that does not meet the definition of a security under U.S. law would generally still meet the definition of a "commodity" under the Commodity Exchange Act (CEA).[4] Historically, the CFTC generally has not exercised jurisdiction over the operation of spot markets for commodities (with few exceptions), but FTX believes the CFTC could assert jurisdiction over digital-asset spot markets under certain circumstances,[5] even where the agency has not done so to date – more on this below.

In any case, there are no U.S. platform operators of only **cash markets** for digital assets supervised by the SEC or the CFTC at the moment. Many states have taken the view that their money-transmission laws

---

[3] Cash or spot markets are markets where the asset being purchased is delivered immediately. Derivatives markets are ones where contracts or agreements between two parties are traded, and the contract's value is based upon an agreed-upon referenced asset or set of assets, like an index.

[4] "The term 'commodity' means . . . all . . . goods and articles, except onions (as provided by section 13–1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in." See CEA section 1a(9).

[5] See *Retail Commodity Transactions Involving Certain Digital Assets ("Actual Delivery Guidance")*, 85 Fed. Reg. 37734 (June 24, 2020), https://www.cftc.gov/sites/default/files/2020/06/2020-11827a.pdf .

A000633



apply to digital-asset platforms that have customers in their states, which requires state licensure, but these laws do not possess the hallmarks of federal market regulation and their market-integrity and investor-protection principles.[6]  At the time of this writing, FTX US and the other largest U.S. digital-asset platforms offering cash markets have many state money-transmission licenses and continue to pursue others.  A money-transmission business also implicates the U.S. Bank Secrecy Act and by doing so must register with the U.S. Department of Treasury via FinCEN, unless otherwise exempted; FTX US is so registered.

*For derivatives markets* in the U.S., if the digital asset referenced in the contract is a commodity and not a security, the trading of derivatives on that digital asset is subject to the jurisdiction of the CFTC.  The CFTC today oversees the trading of BTC and ETH derivatives on multiple U.S. trading platforms, including FTX US Derivatives, which as mentioned lists futures, swaps and options on these digital assets.  FTX believes that there are many other digital assets that are not securities, and so derivatives on those digital assets would fall under the CFTC's jurisdictions as well and could be listed by appropriately registered platforms such as FTX US Derivatives.

This patchwork of regulations increases the operational complexity of digital-asset platform operators, decreases capital efficiencies for customers, and hampers the ability of platform operators to optimize their risk-management programs.  It also reveals gaps in *federal market oversight* due to the interplay of the CFTC and SEC regimes:

- First, the scope of the CFTC's jurisdiction does not indisputably apply to all *cash markets* for (non-security) digital assets, and consequently U.S. customers of the operators of these markets do not have the benefit of legally enforceable, market-integrity and investor-protection requirements of those markets enforced by a federal market regulator; and
- Second, not all digital assets indisputably meet the definition of a security under U.S. law, and consequently there are not clear, consistent and enforceable disclosure standards to inform investors about key information to assess risk relating to those digital assets.

As such, there is *no* clear market oversight for spot trading of (non-security) digital commodities.

Additionally, along with the unclear application of the "securities" definition as it applies to some digital assets, these gaps to date have discouraged participation by many in the U.S. digital-asset markets, including entrepreneurs, institutional market participants and other investors.  In part due to these points, the vast majority of trading volumes in digital-assets markets (which FTX estimates to be roughly 95% of global volume) takes place on non-U.S. trading platforms, even though much of the human and intellectual capital driving the industry comes from U.S. persons – many of whom have left the U.S. to build and grow their businesses.[7]  FTX believes this current state is harmful to U.S. competitiveness and is denying our country many of the benefits from the growing digital-asset industry, including attracting to the U.S. more capital formation, the best of the global workforce, intellectual property and tax revenue.  In addition, hundreds of billions of

---

[6] FinCen defines money transmission as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."  See 31 C.F.R. § 1010.100(ff)(5)(i)(A).

[7] See https://ftx.com/volume-monitor for data on trading volume on offshore versus US platforms.



dollars of digital asset stablecoins are currently backed by the USD dollar, a state that clear and consistent regulatory guidelines could help maintain

U.S. Retail Commodity Transactions and the CFTC's Actual Delivery Guidance. Another piece of the U.S. regulatory patchwork for digital assets is the CFTC's treatment of retail commodity transactions. The CEA provides that a commodity transaction (including one involving a digital asset) must be listed on a CFTC-registered market, and is subject to CFTC's anti-fraud authority, if (1) it involves a retail participant, and (2) leverage, financing or margin is offered or used, *unless* the sale "results in actual delivery within 28 days".[8] The CFTC provided guidance to the public about how to interpret "actual delivery" under the statute – thus, there are circumstances when a retail, digital-asset transaction **would** fall under the CFTC's jurisdiction, and others when it would not.[9] I discuss below FTX's views about how bringing all retail commodity transactions involving (non-security) digital assets under CFTC jurisdiction would be beneficial to the public.

The Regulation of Stablecoins. Another important part of the digital-asset ecosystem globally and in the U.S. are stablecoins, which are frequently used as a means to transfer collateral to and from digital-asset platforms, and used as collateral once on the platform. Their regulatory treatment also is part of the overall patchwork of regulations that apply to the digital-asset ecosystem. There are several stablecoins used on U.S.-based digital-asset platforms that have been issued by U.S. state-regulated trust companies, and thus have the benefit of state-level prudential supervision.[10] Other stablecoins, some widely used, are not issued by a U.S. institution licensed at the federal or state level. The ***President's Working Group on Financial Markets'*** recently released "Report on Stablecoins" ("***PWG Report***") provided a number of recommendations for the regulatory treatment of stablecoins, and FTX has shared its own recommendations for how to ensure the safety and soundness of stablecoins (included here as an exhibit), the core of which is a robust auditing and registration framework overseen by a federal agency.[11]

There are other regulatory issues affecting the digital-asset industry in the U.S., but the foregoing are the most relevant to this committee. Next I address how this committee, the Congress and the CFTC could rationalize the regulatory framework for digital assets and pursue policies that would better protect investors and increase U.S. competitiveness.

## 3.    A Vision for the CFTC as a Digital-Asset Supervisor

The CFTC already has considerable experience and expertise in the regulation of digital assets, and FTX believes the Congress would be wise to leverage that expertise for the benefit of the public as well as the digital-asset industry. The CFTC authorized the first BTC-derivative-contract listing in 2014, nearly 8 years ago,[12] and the FTX US Derivatives business – the first crypto-native platform approved by the CFTC – has been

---

[8] See CEA section 2(c)(2)(D).
[9] *See id.* at n.5.
[10] Paxos Standard ("PAX"),issued by Paxos Trust Company, and the Gemini Dollar ("GUSD"), issued by Gemini Trust Company, are issued by Trust companies regulated by the New York State Department of Financial Services ("NYDFS").
[11] See Exhibit A to this testimony; FTX's recommendations also can be found at https://www.ftxpolicy.com/stablecoins.
[12] See TeraExchange, LLC's Filing under CFTC Regulation 40.2, Certification of BTC Swaption Contract, April 24, 2014; https://teraexchange.com/style/images/rnd/instr/Tera%2040.2%20Filing%20-%202014-22%20Listing%20of%20Swaption.pdf.



licensed and supervised by the CFTC for nearly 5 years.[13]  The CFTC-licensed, more traditional exchanges with some of the largest global volumes of derivatives-trading activity have had digital-asset derivatives trading on their platforms for more than 4 years, all under active supervision by the exchanges themselves as self-regulatory organizations, in addition to the oversight of the CFTC.

These facts show that there has been substantial capacity building at the CFTC over years regarding digital assets.  No other market regulator from a mature, major global economy can make this claim of experience from and expertise about the digital-asset ecosystem, and the Congress should actively consider how the agency can build on this to better deliver market-integrity and investor-protections goals to the public and ensure the benefits of the industry's growth can be maximized in the U.S.  The following are recommendations for this committee that would achieve those goals.

<u>Expand the CFTC's Jurisdiction over Digital-Asset Spot Transactions</u>.  FTX recommends broadening the CFTC's jurisdiction to include, at a minimum, all spot transactions in (non-security) digital assets involving retail investors, regardless of whether the transactions currently fall within CFTC's jurisdiction under CEA section 2(c)(2)(D).  This recommendation is consistent with relatively recent steps the Congress has taken to expand the CFTC's jurisdiction over retail cash markets, including through the passage of the Dodd-Frank Act in 2010.  This could be accomplished in several specific ways.

*First,* Congress should encourage the CFTC to work with industry to permit retail commodity transaction contracts related to digital assets to be listed on boards of trade registered with the CFTC, pursuant to the agency's existing authority over these transactions as established by CEA section 2(c)(2)(D) and as affirmed in the 2020 Actual Delivery Guidance.  This would clearly promote the public interest and would not require further legislation, being consistent with the current authority of the CFTC.

*Second*, Congress could eliminate the 28-day "actual delivery" period in the CEA as it relates to digital-asset transactions, on the basis that doing so would clearly bring to more of these retail transactions the full panoply of protections from the CEA, which FTX believes also would clearly promote the public interest.[14]

*Third*, Congress could more broadly amend the CEA so that the CFTC has jurisdiction over all (non-security) digital-asset spot trading activity, not just retail commodity transactions under CEA section 2(c)(2)(D), and derivatives involving (non-security) digital assets.  Such a step also should involve a consideration of the appropriate disclosure regime for digital assets that ensures investors are adequately informed of their risks.[15]

In the meanwhile, the Congress in general should actively encourage the CFTC to appropriately broaden its interpretation of its authority over digital-asset spot transactions in order to better rationalize and condense the patchwork of regulations governing U.S. digital-asset activity, facilitating the offering of both market types on one platform.  In my prior congressional testimony and in ***FTX's Key Principles for the***

---

[13] See CFTC Orders Granting DCO, SEF and DCM licenses to LedgerX.

[14] This approach would encompass those crypto transactions that, per the 2020 Actual Delivery Guidance, are not offset in any way, and whose proceeds are fully withdrawn to external, customer-controlled wallets within 28 days.

[15] See 'Token Issuances' at <u>https://www.ftxpolicy.com/areas-for-crypto-regulation</u> for a sketch of a possible disclosure regime for digital asset issuances.

A000636



***Market Regulation of Crypto-Trading Platforms (Market Regulation Key Principles)***, FTX explained the benefits of offering these two market types under one unified system, with one rule book and one technology platform to manage risks related to all trading activity in customer accounts.[16] This approach facilitates one collateral and risk-margin program for customer accounts holding both cash and derivatives positions, allowing the platform to better manage market risk, and reducing operational risk owing to a single technology stack for the front end (the user interface) to the back end (settling and risk managing positions). Public policy should permit this one-rule-book model due to its risk-reducing and customer-protection attributes.

*Fourth*, as recommended in ***FTX's Market Regulation Key Principles***, Congress, the CFTC and the SEC should pursue a scheme where a digital-asset platform operator could opt into a program of joint supervision by the CFTC and SEC when there is joint jurisdiction over digital assets listed on the platform (e.g., when listings include non-security digital assets as well as digital assets that are securities).   Under these circumstances, FTX recommends that one of the market regulators serve as the primary regulator, and the other as the secondary regulator, for market oversight.   This type of paradigm is familiar to market regulators globally and also could include the accommodation of one rule book, one matching engine and risk engine supported by one technology stack. FTX believes this approach could largely be created under existing CFTC and SEC authorities, but Congress should encourage the agencies to leverage their authorities today with these goals in mind, and consider legislating such an approach when feasible.

<u>Embrace the Direct-Membership Market Structure of Digital-Asset Platforms</u>.   The CFTC should continue to permit and embrace a market structure that allows investors to become direct members of the CFTC-licensed exchanges and clearinghouses that offer digital assets, without the need for intermediation. FTX's CFTC-regulated business has been operating with this type of market structure for nearly 5 years, without any loss of customer funds or significant platform outages, and has demonstrated that such a business model can comply with the CEA and continue to deliver on important investor protections embodied by the CEA.   U.S. policy should remain market-structure neutral and allow non-intermediated markets for digital-asset products, so long as key investor protections can be adequately ensured.   Every major incumbent U.S. derivatives trading venue offers a direct member clearing solution, and certain incumbent platforms have the majority of their users as direct members–this is not a new concept for the CFTC and its surveillance and risk teams.

FTX released this week ***FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms ("Investor Protection Key Principles")***, where we identified the most important components of an investor-protection regime (which the CEA and CFTC rules also reflect), and how FTX offers those protections today with the direct-membership model.[17]   These components include:

- maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request;
- ensuring the environment where customer assets are custodied, including digital wallets, are kept secure;
- ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets;

---

[16] See Exhibit B to this testimony, and https://www.ftxpolicy.com/.
[17] See Exhibit C to this testimony, and https://www.ftxpolicy.com/investor-protections.



- ensuring appropriate management of risks including market, credit/counterparty, and operational risks; and
- avoiding or managing conflicts of interest.

While the CFTC's rules reflect these important principles today, they often contemplate an intermediary such as a "futures commission merchant" bearing the responsibility of those protections to the investor.  The CFTC wisely has allowed the more-modern market structure so long as those investor protections are ensured and enforced.

The **Investor Protection Key Principles** touch on two key points that I reiterate here and the CFTC has recognized.  *First*, technology advances have enabled a non-intermediated market structure that, combined with effective platform operations, can provide the above-identified protections more effectively, ultimately leading to an overall risk-reducing market structure, for the benefit of investors. *Second*, to the extent that legacy regulations or policies would assume or require an intermediary to provide these protections, that approach often imposes unnecessary burdens and costs (including fees and both capital and operational inefficiency) on investors and markets and obscures market-data without corresponding benefit.  The CFTC and Congress should address and update any such rules through continued, appropriate interpretations in the case of the CFTC, and refinements to corresponding legislation in the case of Congress, to ensure equitable access to financial markets.

<u>Ensure the Safety and Soundness of Stablecoins</u>.  Stablecoins have become a critical component of the digital-asset ecosystem, and policy makers have raised concerns about their growing market size and whether the lack of uniform federal oversight presents systemic concerns. While the **PWG Report** investigated bank-like supervision for **all** stablecoin issuers, such an approach might not be necessary so long as the core requirements of stablecoin oversight are met.  These include:

- Daily attestations of what assets (cash, bonds, etc.) are backing a stablecoin;

- Periodic audits to confirm the asset backing is as claimed;

- Federal oversight and ability to inspect the assets;

- Haircuts for assets with moderate risk; and

- An open line for law enforcement to blacklist addresses and persons associated with financial crimes.

The CFTC could play an important role in creating a workable framework with these requirements.

*First*, the Congress could give the CFTC authority to license stablecoin issuers and subject them to these core requirements, perhaps by creating and authorizing a new registration scheme for stablecoin issuers or by otherwise allowing them to seek an existing CFTC license with new commiserate authorities, such as a DCO license.  Indeed, a DCO is well accustomed to taking custody of assets, providing relevant reports to ensure their safekeeping, undergoing related audits (see **FTX's Investor Protection Key Principles**), and managing risks



through appropriate collateral management and marking to market. The appropriate duties and responsibilities of a stablecoin issuer are much the same.

*Second*, the CFTC without any new legislation could require DCOs providing settlement and clearing services for digital-asset platforms to condition the acceptance of stablecoins as collateral by the DCO on the stablecoin issuer meeting these same core requirements, and the stablecoin issuer providing the needed attestations and audits to verify they are being met. The CFTC could require this through review and enforcement of DCO policies and procedures related to the DCO's approved risk-management program. To be sure, considerable public policy could be made through creative use of the CFTC's existing authorities as suggested, leading to standardized practices for stablecoin issuers that would protect the safety and soundness of the broader financial system.

We believe there is some urgency to create a practical regulatory solution that promotes disclosure and transparency, but that does not inhibit the value that stablecoins provide to markets and market participants. All aspects of digital asset regulation will be iterative and done in phases. For stablecoins, getting a general principles-based disclosure and transparency requirement in place now (perhaps via CFTC guidance, as a follow-on to certain CFTC stablecoin enforcement initiatives), while deferring a decision on the approach to some of the broader questions (such as whether "registration" is required and which agency should oversee that registration), would deliver a substantial amount of regulatory value.

<u>Adequately Fund the CFTC to Ensure Resources to Protect Digital-Asset Investors</u>. Finally, the successful implementation of most of the foregoing recommendations would depend on the CFTC having adequate resources to do so. FTX supports reasonable steps to provide those resources, including by contributing its own fair share of funds for use by the CFTC to expand its purview over digital assets. A program for generating and conveying such resources to the CFTC could be designed in a variety of different ways, and FTX stands ready to engage with this committee and the Congress more broadly to assist in designing and contributing to such a program.

## Conclusion

FTX is grateful to this committee for the opportunity to share information about the digital-asset industry, our business, as well as the recommendations for how the CFTC in particular can contribute to the industry's growth. FTX believes the CFTC and this committee could play an even more prominent role in the digital-asset ecosystem and bring greater investor protections by closing some of the regulatory gaps identified in this testimony. FTX believes that such efforts would combine the best aspects of traditional finance and digital-asset innovations, one of our primary goals, and further empower investors and consumers by consolidating access to the tools they seek for economic security, all in one place, and from a singular, risk-reducing platform.



<u>**Exhibit A**</u>

# Stablecoin Regulation

Note: As global regulators continue to consider whether and how to regulate various components of the digital asset ecosystem, we think it is important to share our perspective on how a practical, responsible, and thoughtful approach to regulation might look. This post is not a comment on the current regulations surrounding stablecoins, a legal interpretation of them, or advice on the suitability of transacting in or owning a given stablecoin. This post is an exploration of what a hypothetical new regulatory framework for stablecoins could look like, engineered towards solving for key regulatory priorities and preserving critical usability features.

## <u>Context on stablecoin regulation</u>

As the cryptocurrency industry matures, it's vital that a robust regulatory regime grows alongside it which takes seriously its duty to protect consumers, ensure transparency, and prevent illicit activity, while still allowing for innovation and growth.

Stablecoins play a crucial role in the cryptocurrency ecosystem; the majority of all transactions in crypto are settled via stablecoins, and they are one of the most promising payment tools for the broader financial sector. It is also, as of now, unclear exactly what regulatory regime stablecoins will end up being placed in.

## <u>What is a stablecoin?</u>

Let's start with the core question: what exactly is a stablecoin?

There are a wide variety of stablecoin designs that have been utilized in the cryptocurrency ecosystem. For illustrative purposes, in this article we will assume a stablecoin on the US Dollar, although parallel assets do exist on EUR, GBP, and other currencies. We will also imagine that it is 1:1; that is, 1 token represents 1 US Dollar. We will imagine that the token's ticker to be STBC.

In this construct, this imaginary stablecoin, STBC, is a blockchain-based asset that can be exchanged for a US Dollar. That would typically be accomplished through the following mechanics and arrangements:

<u>Reserves</u>: typically a stablecoin is backed by one or more USD accounts or other similar assets, generally held at a bank, in an account under the name of the stablecoin sponsor, issuer, or other similar body. The USD value of the assets should be at least the supply of the stablecoin.



<u>Token</u>: a blockchain-based token, STBC, where one token represents $1 (as supported by the creation / redemption process, described below). These could be issued by a private company, a central bank, or a decentralized protocol.

<u>Creation/Redemption</u>: In order to create 1 STBC token, an eligible user must send $1 to the reserve account. In return, the protocol mints 1 new STBC token and sends it to the user.

Similarly, an eligible user may send 1 STBC token back to the protocol to redeem it for $1. The protocol destroys the token and sends $1 back to the user.

## **What are the benefits of stablecoins?**

We believe that stablecoins are one of the most important innovations of the cryptocurrency industry.

Let's say you want to send $20 to a friend. What are your options?

a) You could hope that both you and your friend use the same peer-to-peer transfer app (e.g. Venmo), and then separately each of you figure out how to send money to/from that app.

b) You could send a $20 wire transfer to your friend. This would likely take a day and cost $5+ in fees; and if it's international, it might take a week and cost substantially more in fees.

c) You could send $20 via ACH, if both you and your friend use US-based USD bank accounts. Then, the transfer would not fully settle for months, exposing both parties to "chargeback risk".

d) You could go to an ATM, withdraw $23 paying a $3 fee, and hand $20 to your friend, who would then have to find a way to use the physical dollar bills.

e) You could send 20 STBC to your friend's cryptocurrency wallet; if you use an efficient blockchain (or both use the same exchange), it will arrive in less than a minute, costing a tiny fraction of a penny in fees.

Option (e), the stablecoin, has a compelling case here as an efficient means of transfer.

Taking our real world use case a step further, consider that a user wants to build a blockchain based application. How should the application's users contribute and withdraw assets?

Here, the users face the same potential options and cost structures as before; once again, stablecoins are the cheapest, safest, fastest way for a user to engage with that application.

## **What are the risks of stablecoins?**

15



There are three major intertwined risks associated with stablecoins.

## Reserve volatility risk

If the stablecoin is backed by something other than US Dollars in a bank account, the asset might depreciate against USD. If, for instance, you were to back a stablecoin with 1,000,000 tokens issued with $1,000,000 of the SPY (S&P500) ETF, and stock markets decreased 5% in price, you would be left with only $950,000 backing 1,000,000 stablecoins–meaning that the "stable" token had in fact fallen in value, at least in regards to the reserves it is purported to be redeemable for!

Unlike investment products where customers gain from appreciation in the assets backing the product, there is generally no way for a stablecoin to be worth more than $1, as customers can always create more for $1 each. This means that the core philosophy behind the assets backing a stablecoin should be to focus on assets with low volatility which are very similar to USD. US Treasury bonds may be an appropriate asset for a stablecoin's reserves; if Bitcoin is used, it has to be overcollateralized to an extent that there is very little risk of loss to the stablecoin holders. Backing 100 stablecoins with $101 of BTC is untenably risky: a mere 2% decrease in bitcoin markets would cause the stablecoin to be under-backed and no longer fully redeemable for $1. Backing 100 stablecoins with $400 of BTC, on the other hand, is substantially more defensible, as there is very little risk of a 75% move before the reserves would have a chance to de-risk. Any stablecoin issuer or designer must have a transparent, robust risk model to mitigate the volatility of its reserves, including determining which assets are appropriate for its reserves.

## Redemption risk

A related worry is that a user might own 1,000 STBC, go to the issuer to redeem their STBC, and be denied.

This might happen if the reserves had in fact run out of dollars and so there was nothing left to redeem STBC for; this would likely imply the reserves had not been in USD, and had fallen in value.

Alternatively, this could happen if the issuer arbitrarily decides to block your redemption, possibly to try to keep more impressive metrics for STBC.

Either way, the lack of ability to redeem (or a lack of transparency related to redemption process and requirements) presents a risk to the user.

## Financial crimes

One final risk of stablecoins is that they could be used for financial crimes, or to finance illicit activities.

Any stablecoin issuer or designer must include creation, redemption, and use mechanics that, in harmonization with regulation, address and avoid this use case.



## What is a sensible stablecoin regulatory framework?

As noted above, we believe that stablecoins have presented a significant positive use case to the world, and they continue to hold the potential to revolutionize the payments and remittances industry. Stablecoins could in the future revolutionize the payments industry, drastically reducing friction and transaction costs, delivering to many around the world the benefits that come with having access to reliable and usable value transmission. As such, we think it is important to ensure that the ongoing regulatory discussions around the approach to a framework for stablecoins be based on a practical structure that solves equally for usability, reliability, transparency, consumer protection, and the identification and prevention of financial crimes.

We look forward to engaging with regulators on examples of what such a framework might look like. There are many different approaches and we remain open and excited for feedback and engagement from regulators and from other participants in the cryptocurrency industry.

As outlined above, there are real risks associated with stablecoins, and any framework should work to mitigate those.

As such, while we look forward to continuing dialogue on the details, we would be in favor of a proposal for a transparency-based reporting and registration regime for stablecoins.

A proposed framework might look like the following:

a) All stablecoins issued to US users must be registered on an official list of "regulated stablecoins" under the oversight of one or more US regulatory department(s).

b) The registration itself would be focused on transparency and reporting, on a notice filing basis, coupled with clear obligations on recordkeeping, reporting, and regular examination. The regulatory departments authorizing the program would have the ability to decertify registered stablecoins.

c) The registration would involve publishing a daily Reserves List which details what the total net value of the stablecoin's reserves are, and breaks that down into exact quantities of specific categories (e.g. "100 USD in Bank XYZ; $95 of short-term US treasury bills; $50 of Tier-1 commercial paper of US companies; $30 of Tier-1+ commercial paper of European companies; $10 of [other suitable assets as permitted by the regulation and by that stablecoin's registration document]")

d) The registration would require that the issuer maintain "sufficient" reserves. This could be defined by a set of haircuts on various types of reserves. E.g., perhaps a 0.10% haircut on USD in an FDIC insured bank account; a 1% haircut on short-term US treasury bills; a 10% haircut on Tier-1 commercial paper; a 15% discount on Tier-1 commercial paper; a 20% haircut on EUR, GBP, JPY, CHF, CAD, AUD, SGD, HKD, etc.; and a 50% haircut on bitcoin.

e) The registration would require semi-annual audits by an accounting firm to confirm that the reserves are as represented.



f) The registration would require stablecoins to have clear and transparent redemption requirements (e.g. based on Know Your Customer documentation) and a clear customer complaint process if a redemption is denied.

g) To address financial crimes, all registered stablecoins would have to be on a public ledger, and the creation and redemption process must be sufficiently structured in order to ensure that stablecoins associated with illegal activity (as observed via on-chain surveillance and analytics tools, via a suite of standard blockchain surveillance software) cannot be redeemed.

As noted above, this is a basic strawman framework for how the key components of a potential stablecoin registration program might look. Each of these points are designed to preserve the usability of stablecoins while solving for regulatory considerations that need addressing. If designed in the right way, this framework could enhance the ultimate usability of stablecoins. We very much look forward to engaging with policymakers, regulators, and market participants on these concepts.

A000644



**Exhibit B**

# FTX's Key Principles for Market Regulation of Crypto-Trading Platforms

In this piece we identify a series of ten principles (and in some instances, proposals) that should guide policy makers and regulators as they build the regulatory framework for spot and derivatives crypto markets.  FTX does not propose specific legislation here but rather principles and proposals that could be reflected in policy making, whether in the form of legislation, rulemaking or other regulatory action.  Many of these principles are familiar to traditional securities and derivatives markets, but some of the principles reflect market-structure choices made by FTX and other crypto-platform operators that we believe lead to superior outcomes for investors and, indeed, the public.  FTX therefore believes public policy should not only permit these choices but promote those that lead to such outcomes.  Some of the discussion here focuses on the U.S. marketplace but the principles and proposals are applicable in any jurisdiction globally.  FTX appreciates being able to engage in this dialogue with policy makers and regulators, and we are always happy to pursue follow-up discussions with interested parties.  See our prior policy blog posts at https://www.ftxpolicy.com. .

## 1.     Proposing One Primary Market Regulator with One Rule Book for Spot and Derivatives Listings

In the U.S. regulatory ecosystem, spot markets and derivatives markets are subject to different regulatory programs, and this can lead to inefficient and non-optimized market structures.  In this post we propose as a solution an alternative regulatory approach that would provide market operators the ability to opt in to a unified regulatory regime for spot and derivatives marketplaces, through a primary regulator model.

As many know, the CFTC is the primary regulator of commodity derivatives marketplaces, while the SEC is the primary regulator of cash securities marketplaces, and the two agencies share oversight responsibility for certain aspects of security derivatives marketplaces.

In parallel, there is a further regulatory split for spot markets (sometimes called "cash markets" in the traditional commodities or securities context), where the applicable regulatory program depends on whether the product

19



being traded is categorized as a security (where the SEC regulates) or a commodity that is not a security (where the states largely regulate, via money transmitter or money services business licensing).

Against that backdrop, and particularly outside of the U.S., we observe that many crypto-native trading-market operators offer for trading both spot transactions on crypto assets as well as derivatives on those assets, under a unified rule book, one collateral and risk-margin program, and a single technology stack.  This model is generally not found in the U.S. given the jurisdiction's historically fragmented approach to market regulation. Nonetheless, we believe that for traded crypto markets, the key principles for market regulation (customer and investor protection, market integrity, preventing financial crimes, and system safety and soundness) generally apply equally across spot and derivatives markets, and commodities and securities markets.  That is, the regulatory label on a given product or market need not change the core goals of regulation, and the same rulesets should generally apply across all markets.  For that reason, we strongly support offering a single unified regulatory program for crypto market operators.

Specifically, in jurisdictions where there is a primary derivatives-market regulator separate and distinct from a primary cash-markets regulator (such as in the U.S.), policy makers and regulators should seek to permit qualified crypto markets operators to run a single  rule book, risk program, and technology stack, approved and overseen by a primary regulator (perhaps chosen by the marketplace on an opt-in basis and supported thereafter by inter-regulator cooperation and information sharing, with the possibility of the primary regulator shifting if the underlying product mix evolves in a certain way), that governs the listing and trading of both spot cash transactions in crypto assets as well as derivatives on crypto assets.

Much of this can be achieved today under existing statutory authority and with creativity and cooperation by and among market regulators.  With some specific issues, however, clarity might be needed from legislation. Under the current U.S. paradigm, for example, we acknowledge that it is unlikely to be absolutely clear at any given moment, absent legislation, whether all of the crypto products listed on such a venue are definitively "within" or "without" the jurisdiction of either of the markets regulators.  However, between two possible regulatory solutions under this paradigm - which are (1) that regulators can prohibit the marketplace altogether (via indecision, decree, or a combination of the two), or (2) that regulators can innovate and cooperate to ensure that key regulatory and policy goals are met in a clear and robust way while also permitting the marketplace to operate - we think the second approach offers a compelling option.

Said more explicitly, in jurisdictions where there are two mature market regulators, FTX proposes the permissibility and adoption of  a reasonable and rigorous framework that would allow a crypto-markets platform operator to elect one market regulator as its primary regulator for a unified spot and derivatives trading book, subject to adherence to a cooperative framework in which the other market regulator acts a secondary regulator while maintaining appropriate visibility into the platform's operations, but not day-to-day supervisory responsibilities.  (Indeed, a similar approach is used today when a market regulator from one jurisdiction "recognizes" the framework of a different jurisdiction where a primary, "home" regulator resides, and then defers to that primary regulator's regulations and rulesets so long as they are sufficiently comparable.)

We propose a functional-based approach, where the regulation and the trading venue rule books that comply with that regulation should be largely modeled after existing market regulations for securities and derivatives markets, on the basis that most jurisdictions will follow this same approach.  FTX believes that there is a unique

A000646



current opportunity for U.S. regulators to take a leadership position in the global crypto markets regulatory discussion, and we believe that modelling a primary regulator model on existing market regulation will foster standardization and harmonization of regulation globally, paving the way for international adoption and reciprocal jurisdictional recognition.

To underscore why we are so focused on these regulatory issues - it is because we believe that getting crypto market regulation appropriately calibrated is critical for the continued development of healthy, transparent, and well functioning global crypto markets, which we believe will deliver knock-on positive effects to the global economy as a whole.  And we think our proposed approach, in addition to solving for regulatory uncertainty and fragmentation, would also reduce operational complexity by allowing matching engines for both spot and derivatives transactions to operate on the same platform with the same user interface.  This in turn would reduce operational risk to the platform, and promote capital efficiency by allowing collateral in support of both order books to rest on the same platform.  In the rest of this piece, we discuss in more detail various additional practical benefits of crypto market place operators being subject to unified primary regulator oversight.

## 2.     Full-Stack Infrastructure Providers and Maintaining Market-Structure Neutrality

Regulation should be market-structure agnostic, provided that the core regulatory issues (identified above as customer and investor protection, market integrity, preventing financial crimes, and system safety and soundness) are addressed.  Technology has enabled any capable entity to perform the various functions involved with the pre-trade, execution, and post-trade phases of the lifecycle of an asset trade or transaction in a single regulatory stack - in fact, to split up those functions, from a technology perspective and when building a market from the ground up, would require a forced and artificial deconstruction.

However, one of the things that prohibits an entity from taking on any or all of these functions can be the specifications of a regulation.  To say it another way, much of current market structure is a creation of regulatory artifact rather than a reflection of a thoughtful and holistic approach to marketplace design, efficiency, transparency, and risk management.  FTX built and continues to evolve its trading ecosystem with the latter approach in mind.

We believe that so long as the various needed functions necessary to the lifecycle of a transaction are being met, policy makers would do well to remain otherwise neutral on how a market is structured (so long as appropriate customer protections also are in place, discussed below).  For one example, most market regulation today envisions an intermediated market place where an intermediary such as a broker interfaces directly with a customer (think back to calling in, or mailing in, your order to a broker that had access to the physical exchange floor).  In contrast, crypto-asset platforms largely dispense with this mode in favor of a direct-membership market structure, where end investors onboard directly to the platform for trading, and not through an intermediary or broker (although service providers such as Internet and data-center providers are involved).



A non-intermediated market allows all users to get the same access to market data (consider that FTX's data is free, globally, versus much of the global trading venue industry where data fees are a material commercial component of the business), connectivity, and key features related to functionality and risk management, regardless of the sophistication of the user. The positive implications of this are potentially enormous, and are only just beginning to be seen, interestingly, around the direct-to-consumer crypto marketplace models. The public is better served if the barrier to entry to transact competitively with global markets is an internet connection, rather than a $100,000 (or more) data-subscription fee and a costly fee- or commission-based relationship with a broker that merely plugs you into the trading venue's technology. Non intermediated markets create a more level playing field that's often lacking in many traditional financial systems, whose market structures have created a number of challenges including real and perceived conflicts of interests between intermediaries and their customers.



Consequently, a direct membership market structure should be expressly permitted (not required, but permitted) so long as the relevant customer protections continue to be afforded, in this case by the platform provider.

## 3.    Custody of Crypto Assets -- Key Functional and Disclosure Requirements

For crypto assets, the asset is safekept in a wallet, where custody can be performed by the asset owner or by a wallet holder on the customer's behalf. Where custody is performed on a customer's behalf by a platform operator or intermediary, appropriate safeguards should be disclosed in policies and procedures of the custodian. Key areas of focus and disclosure should include: wallet architecture; whether insurance is provided by the custodian; how private keys are kept secure, managed and transferred; managing risks related to insider collusion or fraud; and physical security of data centers.

Importantly, in the case of platform operators, consideration should be given to the increasingly common practice of using third-party providers for data centers (i.e., cloud-service providers) as well as custodial services. In these instances, the platform operator will not itself perform these functions but nonetheless will be held responsible by users for them, and users should be given visibility into how third parties will address the aforementioned issues. Market supervisors should require regulated platform operators to perform regular diligence on their vendors and to have sufficient business continuity and disaster-and-recovery programs in place in connection with their vendor suite.

A000648



4.    **Full-Stack Market Infrastructure Providers and the Lifecycle of a Trade -- Addressing Risk Related to Token Issuance and Asset Servicing, Orderly Markets and Settlement of Trades, Cross Margining and Risk Management of Positions**

Again, native crypto-trading platforms integrate into a whole the system for custody, issuing tokens, settlement of trades, and risk managing positions with one technology stack. In creating or fine-tuning a regulatory framework for these platforms, policy makers should ensure that market supervisors understand this system through well developed and clear policies and procedures disclosed by the platform operator. The framework should address the following key issues related to the lifecycle of a spot or derivatives trade.

<u>Token Issuance and Asset Servicing</u>

Token issuers who have access to the platform for purposes of issuing a token should be governed by disclosed policies and procedures that explain the listing standards for tokens. In some cases, existing securities laws will apply, in which case the policies and procedures should explain how such laws are complied with by the platform as it relates to issuing the security tokens.

This document does not address whether existing securities laws should be amended to account for distributed-ledger technologies and new methods of issuing securities in tokenized form. Suffice it to say here that some of the traditional requirements for central securities depositories might not be appropriate for platforms that offer these services, but others will be.

To the extent a token is not a security but has some security-like features at some point in time, and policy makers otherwise have not addressed whether such tokens should be treated as securities, a platform operator in any case should be required to disclose, or otherwise facilitate disclosure of (i.e., most material information for a token can be easily found on the Web, and a platform could direct a platform user to this information), key material information about the token issuer as part of the platform's listing standards.

Likewise, in the case of all tokens, the platform operator should develop and disclose policies and procedures for how a token issuer will interact with the platform for purposes of facilitating asset servicing, so that supervisors and platform users both can understand and assess the risks to the platform posed by token-issuance functionality. This would be especially relevant in the case of security tokens, where dividend payments and changes in ownership, for example, would impact the token and the owner of the token.

<u>Market Surveillance</u>



Good public policy would require that a crypto-platform operator has policies and procedures concerning the practices and technology used to perform market surveillance of the platform's trading environments in order to curb market manipulation and promote orderly markets. This is standard policy for traditional supervised markets and should be carried over to supervised crypto markets as well.

## Settlement

With regard to settlement, our recommended policy would require the platform operator to have clear and transparent policies and procedures that explain when settlement of a transaction becomes final, and the conditions and circumstances under which the platform provider would reverse settlement due to errors, etc. By and large, regulated venues do this today in their terms of service, etc., and we think it is important they continue to do so.

One of the hallmarks of the FTX trading experience is to allow users to pair in a transaction nearly any combination of assets for purposes of settlement -- for example, a user could exchange BTC for USDC or for SOL. Sound policy would allow the platform to settle transactions by pairing the assets with any of the others listed on the platform, including stable coins or cash fiat currencies (see below for discussion of stable coins) but also other crypto assets, so long as the platform otherwise made clear how and when settlement becomes final.

Another hallmark of full stack trading experiences is access to credit to ensure and promote liquidity on the platform. Public policy should allow platform operators to facilitate the provisioning of credit to platform users so long as this service and function are well documented and explained to the supervisor and market participants on the platform. This is a clear example of where services previously provided by intermediaries can be solved by the trading venue itself.

Because crypto platforms have led the way in exchange innovation, public policy should anticipate that crypto firms will become more and more integrated with traditional payment rails and similar systems. Policy makers should consider whether and when to expressly delineate under what circumstances these platforms could access government-sponsored payment systems created for the settlement of securities, for example. Other policy initiatives will address whether and under what circumstances securities, including government-issued securities, can be reflected in tokenized form, but if such tokenization is permitted, an otherwise properly supervised platform operator should be allowed to access existing payment systems to facilitate settlement of such securities, even if interaction with that system is not on a real-time basis. Such a policy is recommended because otherwise access to this payment system would involve an intermediary, introducing various types of counterparty, operational, and credit risks to the platform that would not be in the interests of the participants on the platform (which itself would be highly supervised under our proposed framework).

## Cross Margining and Risk Management



The regulatory framework for crypto should clearly allow for the cross-margining of both derivatives and spot positions on the platform with any and all assets permitted in the customer wallet and account, subject to appropriate risk weights and haircuts, as applicable. For the settling and risk management of crypto asset transactions on a crypto platform, the settlement and risk systems are automated and the relevant software interacts with the wallet and account that contain customer assets.

A well-designed regulatory framework would allow a single platform to perform all risk functions, and require the appropriate standards on those functions. For example, in addition to the custody requirements mentioned above, the settlement and risk-management systems should be appropriately explained to the market supervisor through the platform's rule book, and the regulator should be made aware of major changes to the system.

Sound policy also should ensure that risk-management systems used by a platform operator are configured to prevent customer accounts from going net negative across positions. A risk-management system that effectively performs this function with this goal, including through liquidations of customer positions, should not be allowed to do so in an arbitrary manner. Instead, the rules, risk parameters and business logic that trigger any actions taken by the customer platform as it relates to customer assets should be clearly disclosed and appropriately explained to the supervisor as well as the platform users in the platform's rule book, which should be approved by the primary market supervisor.

In permissioning the use of a risk-management system for clearance and settlement, policy makers should take care to remain technology and methodology neutral, so long as the platform operator can effectively demonstrate its responsibilities can be adequately met.

## 5.    Trading Platform Providers -- Ensuring Regulatory and Market Reporting

Regulatory reporting of transactional activity should be required in order to provide market supervisors appropriate visibility into the trading platform, and to better allow supervisors to police for market manipulation and other unfair trade practices.

Policy makers should consider carefully how best to provide this data -- a requirement should be considered that would mandate that trading platforms create an API for the beneficial use of market supervisors to directly ingest data from the platform itself, rather than require a separate entity to undertake reporting responsibilities.

With respect to market reporting, a hallmark of the crypto-asset industry (as previewed above) is the provisioning of market data to users free of charge. Policy makers should carefully consider the standards under which platforms are permitted to charge users a fee for the provisioning or use of market data related to trading that takes place on said platform along with the implications of that activity for market access, transparency, and fairness policy initiatives. The right standards could incentivize the platform operators to focus on risk management, user experience, and product innovation for competitive advantage rather than fees based on trading activity brought to the platform by the user.



## 6.    Ensuring Customer Protections

As suggested, crypto-asset platforms have ushered in an evolution of market structure in favor of a non-intermediated model, where entities separate from the platform are not needed in order to access the platform and the trading environment.

In this market structure, however, key customer protections should remain in place.  From a policy perspective, one approach could be a very general and non-prescriptive one that requires that platform providers or intermediaries develop and disclose policies and procedures to ensure the best interests of all customers are protected at all times, and leave it to the entity's discretion.  This would allow investors to choose a platform provider based on the robustness of those policies and procedures.

If a more detailed or prescriptive approach is favored, such an approach should consider whether specific requirements related to practices impacting platform customers such as front-running trading activity, market manipulation, general risk disclosures related to the assets and instruments listed for trading, appropriate and non-misleading communications with customers, and avoidance of entering into conflicts of interest with customers.  Again, appropriate customer-protection requirements can be borrowed from the traditional finance space -- the key is to ensure that the platform provider can provide them rather than insisting that an intermediary perform the function.  FTX believes that market place operators are properly positioned (perhaps best positioned) to deliver these types of disclosures and materials to users in a way that can be built directly into the trading venue user interface/user experience.

## 7.    Ensuring Financial Responsibilities are Met

As with traditional markets, ensuring that customer assets are protected to the maximum extent possible should be a principle for regulating crypto-asset markets.

Again, the prominence of the wallet as a tool for storing assets is key to the crypto-asset space, and apart from requirements to ensure that the wallet itself is safely maintained and secured, policy makers should ensure that customers have access to real-time information about their account levels at all times (and redundant access paths, in the event of disruptions on one access path), particularly if and when a platform operator commingles customers' assets in an omnibus manner.   If a platform provider elects to provide this infrastructure, operational complexity can be substantially reduced while customer assets are meaningfully protected.

In the case of a platform operator or an intermediary, policy makers should consider whether to adopt a minimum capital requirement (or other financial wherewithal condition) to ensure there are adequate resources to address operational and other types of risks that could jeopardize customer assets in custody.  For platform operators, this could take the form of ensuring operational resiliency but in addition also ensuring adequate resources to address defaults and liquidations performed by a risk-management system (see above discussion on platform risk management).  The goal should be to ensure platform operators need not depend on off-platform resources for settlement and risk management.



With respect to margining customer accounts, there should be a policy that expressly allows portfolio margining of all customer positions in all assets on the platform. This risk-management approach promotes capital efficiency and reduces operational risks to the platform or intermediary managing the customer account.

## 8.   Ensuring Stable Coins Used on Platform Meet Appropriate Standards

A platform operator that permits the use of stable coins for settlement of transactions should be required to explain the standards the platform operator uses in deciding which stable coins it permits for such purposes. FTX has articulated and explained its policy recommendations for stable coin issuers (see https://blog.ftx.com/policy/context-stablecoin-regulation/).

The reason such a policy is recommended is that stable coins are exposed to reserve-volatility as well as redemption risk, and platform users should be entitled to some understanding of whether and to what extent those risks could impact their activity on the platform, including their impact on settlement of transactions (which might not be direct, but nonetheless indirect).

For example, a stable coin backed by risky and volatile assets and not transparently backed by an adequate amount of such assets with appropriate haircuts, could become exposed to price risk. This price risk could interfere with settlement finality on the platform, insofar as the value of the stable coin delivered as payment for the crypto assets in a transaction on the platform are suddenly not equal. Ensuring that stable coins allowed for use on the platform meet adequate standards set by the platform operator (or by public policy makers if applicable) mitigates this risk, and should better protect the users of the platform.

## 9.   Full-Stack Infrastructure Providers -- Ensuring Appropriate Cybersecurity Safeguards are Kept

Market regulators in recent years have developed comprehensive cybersecurity requirements for market infrastructure providers. Policy makers should either apply the relevant safeguards already in place for exchanges, or otherwise require that the platform provider develop and disclose to market participants its policies and procedures regarding cybersecurity safeguards. In the case of platform operators already licensed by a market regulator, system-safeguard requirements already will be in place. In the case of platform operators not already licensed, one consideration for policy makers is to adopt a policy that helps facilitate standardization of these safeguards domestically as well as globally.

## 10.   Full-Stack Infrastructure Providers -- Ensuring Anti-Money Laundering and Know Your Customer Compliance



Platform operators must perform appropriate KYC as part of user onboarding and must conduct regular anti-money laundering surveillance of user activity (both on the trading venue and via the scrutiny of related on-chain transfers in and withdrawals out).  Many platforms, including FTX, use a combination of vendors and internal compliance personnel to assist with these functions today.  However accomplished, it is critical that crypto market place regulation continues to require significant focus on the performance of KYC and AML obligations.  To ensure this, market place operators should be performing periodic self-audits and should also be subject to regular review and exam by their primary regulator on these requirements.



Exhibit C

# FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms

## Introduction

FTX strongly believes that ensuring investor protections is critical to the successful operations of digital-asset platforms, including our own, as well as to ensuring a positive user experience for our customers. FTX also believes that non-intermediated "direct access" markets, such as the FTX exchanges, can and do provide a level of investor protection that meets and exceeds the policy goals and purposes of traditional investor protection regulation (notwithstanding the absence of an intermediary or "broker"). Technology continues to displace the need for an investor to rely on intermediaries and brokers to access certain markets or asset classes, and one of the most important innovations of the digital-asset industry is a simplified market structure that does not need to rely on intermediaries for access to markets. From this observation, this paper addresses the key investor protection principles (described below) applicable to any market and the ways in which non-intermediated "direct access" digital-asset platforms can and do provide these protections for their users.

The goal of this paper is to support two critical propositions:

- The investor protection principles we describe in this paper can be provided directly by a digital-asset exchange or platform, using a non-intermediated market model, at an effectiveness level that exceeds relying on a series of intermediaries to provide similar protections and that ultimately leads to what FTX believes will be an overall risk-reducing market structure, for the benefit of investors.
- To the extent that legacy regulations or policies would assume or require an intermediary to provide these protections, we believe that approach often imposes unnecessary burdens and costs (including fees and both capital and operational inefficiency) on investors and markets without any corresponding benefit–and any such rules should be updated and modernized.

If market structure policy is truly to be technology neutral (which is an important and often stated principle expressed by policy makers), market regulators must acknowledge that intermediated market structures are due, in many instances, to the fact that technology was less robust when those markets were first developed. While intermediaries previously were helpful because the cost and complexity of accessing (1) a market for trading assets or (2) the assets themselves (especially when securities, for example, were in material or paper form) were substantial enough that it was economically efficient for an investor, especially an individual investor, to rely on



an intermediary to provide such access and attendant services. However, intermediated market access is NOT an *a priori* first principle of market structure design, and technology has meaningfully changed what is possible.

Today, the only tools necessary to access a centralized market place for assets directly are (1) a computer or mobile device; (2) relevant "trading" software accessible on that hardware; (3) access to broadband services to transfer data over the Internet, and (4) an application programming interface (API) to allow the trading software to be built and integrate with the trading platform's software. As a result, while investors might elect to use intermediaries for various reasons, those intermediaries are no longer indispensable for gaining access to financial products if the investor has the aforementioned tools.

We believe this has led to the possibility of the reduction of many types of risks, as explained in ***FTX's Key Principles for Market Regulation of Crypto-Trading Platforms*** (hereinafter "**Market Regulation Key Principles**"; see https://www.ftxpolicy.com/). Combined with other best practices and enhanced risk-management techniques utilized by FTX, this simplified market structure forms the basis for our argument that a well designed and operated non-intermediated "direct access" digital-asset platform can be ***risk reducing*** relative to traditional market infrastructure. Building on FTX's **Market Regulation Key Principles**, this paper continues the discussion about critical investor protections and our view that platform operators should be allowed to provide these protections, and be held accountable for them, rather than insisting that they be fulfilled by intermediaries on the platform.

While not the core goal of this paper, we also note that intermediation can reduce transparency and information available to the customer. Traditionally, most users are not given full market data; neither are they allowed full access to exchanges, preventing equitable access. FTX's disintermediated structure ensures that all users have equal access to its information and markets.

## Key Investor-Protection Principles

Ultimately, all policies affecting the operation of a digital-asset market ensure the protection of the investor on the platform, and FTX's ***Market Regulation Key Principles*** paper addresses those.[18] Here we focus on specific principles related to the core of protecting customers' interests and their assets kept on a digital-asset platform. These include (1) maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request; (2) ensuring the environment where customer assets are custodied, including digital wallets, are kept secure; (3) ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets; (4) ensuring appropriate management of risks including market, credit/counterparty, and operational risks; and (5) avoiding or managing conflicts of interest. Each of these is addressed in turn.

---

[18] *See* https://www.ftxpolicy.com/.



1. <u>Maintaining Adequate Resources to Return a Customer's Assets</u>

A hallmark of the investor-protection regimes for markets globally and in the U.S. are requirements to ensure that the intermediary holding a customer's assets has adequate liquid resources available at all times to ensure that the customer can redeem her assets when she chooses. Often these policies are designed to ensure that there is (1) ***no delay*** in returning customer securities upon request, or (2) ***no shortfall,*** where an amount lesser than the value of the customer's asset can be returned to the customer.[19] This principle often involves other restrictions on the custodian, including, for example, a restriction of the use of customer assets to finance other business expenses or initiatives.[20] To ensure adequate liquid assets, familiar policies require a reserve of funds or qualified securities that is at least equal in value to the net cash owed to customers.[21] U.S. derivatives policy is very similar and also requires a cushion of resources to be held by the entity managing a customer's derivatives positions to ensure timely return of customer assets.[22]

FTX recommends policy makers consider a policy embodying this principle for digital-asset platform operators: fashioning a requirement, to be reflected in the platform's policies and procedures or otherwise, where the platform operator is accountable for keeping adequate liquid resources to ensure it can deliver customer assets back to the customer upon their request. This principle is sound for all asset types, and while the policy today tends to fall on intermediaries, it can just as easily be applied to the platform operator; in general it should apply to whichever entity is custodying customer assets. Such a policy as applied to digital-asset platform operators would be independent of other requirements to ensure adequate capital to cushion losses (see discussion below).

To the extent existing regulations have implemented this principle by fashioning restrictions on intermediaries, most market supervisors – including those in the U.S. – have other authorities that would permit appropriate or conditional application of such a duty on a market operator. The fact that customer assets include digital assets and tokens in principle need not alter the basic policy of ensuring there is the availability of liquid assets.

FTX has policies and procedures for its platforms today that reflect this basic principle by maintaining liquid assets for customers withdrawals, including a sufficient balance of digital assets funded by the company for its non-U.S. platform. The resources are funded to provide sufficient cover against user losses under certain events

---

[19] *See, e.g.,* SEC Rule 15c3-1, Rule 15c3-3 Adopting Release, Exch. Rel. No. 9775, 1972 WL 125434, at *1 (Sept. 14, 1972). *See also* FINRA Rule 2150.

[20] *Id.*

[21] The amount of net cash owed to customers is computed pursuant to a formula provided by the rule. While the formula itself is somewhat complex, it embodies a basic concept for the responsible stewardship of customer cash: if a broker-dealer owes more to its customers than its customers owe to it, the broker-dealer must set aside at least an amount equal to that difference so that it is readily available to repay customers. *See also* https://www.sec.gov/divisions/enforce/customer-protection-rule-initiative.shtml.

[22] *See, e.g.,* CEA Sections 4d(a)(2), 4d(f), and 30.7. The CFTC's customer-protection rules for FCMs are very similar, and the rules embody, inter alia, the concepts of "segregation of customer assets" as well as "targeted residual interest," which like the SEC's requirements require that adequate resources provided by the FCM itself, in this case, are included in the customer's segregated account to ensure there is efficient and adequate return of customer assets upon request.

A000657



and extreme scenarios in order to, among other purposes, ensure a customer without losses can redeem its assets from the platform on demand.

2.  <u>Securing Environment Where Customer Assets Are Custodied</u>

Another key customer-protection principle is making sure that the environment itself, where customer assets are kept, is safe and secure.  Existing market regulation often looks to the requirements of other financial custodians and intermediaries that also custody assets as a proxy for safety and security.  For example, U.S. policy has the concept of requiring the use of a "qualified custodian" for the custody of customer cash and securities,[23] which in many instances is another intermediary that is also supervised and otherwise equipped to ledger and track a specific customer's funds.[24]  Interestingly, the U.S. derivatives regulator explicitly recognizes that a clearinghouse is subject to sufficiently rigorous standards and supervision that it can be entrusted with safekeeping customer assets.[25]  In any case, this principle mandates that appropriate arrangements to safeguard the clients' rights in client assets and minimise the risk of loss and misuse are in place, which can be accomplished by ensuring that the custodian of the assets maintains adequate levels of financial integrity, physical and cyber security, as well as transparency to customers about the locus and availability of their assets.[26]

Regarding a digital-asset platform operator, the assessment of whether the environment delivers on this principle is different from that for traditional assets because the ecosystem often involves traditional fiat currencies as well as digital assets and tokens related to public blockchains.  For digital assets, the digital wallet is central to the custody arrangements.  For fiat currency, FTX and other other platform operators will necessarily rely on licensed banking institutions to custody a customer's fiat currency; for traditional, non-tokenized securities, the custody function will follow the lines of the traditional market structure, unless some exemption is provided to allow some other arrangement – in the U.S., for example, existing regulations would require that custody be performed by a licensed intermediary legally permitted to custody such securities.  (It certainly would be interesting, however, for policy makers to consider permissioning platform operators with the proven resources to custody these assets as well – again, derivatives regulation allows clearinghouses to custody assets.)

For digital assets, however, where policy is much less developed, custody involves control of private keys to digital wallets, and physical security involves the safekeeping of those private keys.  When digital assets are left in the custody of platform operators such as FTX, safekeeping private keys can be performed in-house by the

---

[23] Under the SEC's framework, "qualified custodians" typically include banks, broker-dealers, and futures commission merchants.  *See* SEC Rule 206(4)-2(c)(3).

[24] *See, e.g.*, Securities Exchange Act of 1934 Rule 15c3-3.  The CFTC's rules mandate that customer assets held at an FCM be segregated and  clearly identified as customer assets, and be custodied by a bank or trust company, a registered clearing house, or another FCM.  *See* CEA Sections 4d(a) and 4d(b) and CFTC Regulation 1.11.

[25] In the United States, some CFTC regulated clearinghouses already have direct clearing relationships with traders and are therefore holding customer funds without using intermediaries.

[26] *See IOSCO Final Report on Recommendations Regarding the Protection of Client Assets* ("*IOSCO–Protection of Assets*"), Principle 3 (Jan. 2014)  http://www.iosco.org/library/pubdocs/pdf/IOSCOPD436.pdf.

A000658



platform operator, or by the platform operator contracting with a third-party (the platform operator would remain accountable for regulatory requirements under this arrangement).  Notably, both approaches have been permitted by market regulators and embraced by market participants.

Multiple architectures exist for the storage of private keys, which can be accomplished through use of a "hot wallet," cold storage, multi-signature wallet, or even by a smart-contract wallet.  To be sure, policy makers could decide if a particular approach should be allowed or prohibited based on a particular policy emphasis – each approach has trade offs related to security and efficiency – but at this time, the best policy approach is likely allowing market participants to decide their preferred custody approach by electing to transact with the platform operator that offers it.  This approach necessarily would require that a platform operator adequately disclose its wallet architecture and security practices.  In any case, limiting access to the private keys under custody through appropriate permissioning, and ensuring adequate cyber-security protections, are critical to discharging this principle regarding securing the environment where assets are kept.

Some have suggested that allowing the platform operator to serve as the digital-asset custodian might present a conflict of interest for the platform operator, presenting more opportunities for misuse or misallocation of customer assets.  It is far from clear to FTX that contracting with a third party for custody would in every instance lower the risks of misuse or misallocation of a customer asset, particularly when the platform operator would presumably remain accountable and, indeed, liable in every case; and each additional party added to a customer's experience adds another potential point of failure.  We believe that rather than focus on any perceived conflict, policy makers should instead focus on the first principles described above for asset safekeeping (i.e., regular auditing of the cybersecurity aspects of the custody plan along with auditing the actual assets held in custody), and perhaps consider requiring the platform operator to disclose any remaining potential conflicts while developing policies and procedures to address them.

FTX uses both approaches, using a third-party custodian in part for the U.S. derivatives platform and a proprietary in-house custody solution for the other platforms.  For its in-house wallet solution and to maximize security, FTX leverages best-practice, hot- and cold-wallet standards whereby only a small proportion of assets held are exposed to the Internet and the rest are stored offline.  FTX policies and procedures also address and dictate other key components to the security of private keys, including applicable multi-signature arrangements, as well as the storage of backup relevant backup information.  FTX's custody solutions comply with all relevant regulations, including those of the U.S. CFTC, and the company takes pride in the confidence in our security measures our customers have given to us.

    3.   <u>Ensuring Appropriate Ledgering and Disclosures of Assets to Protect Against Misuse</u>



Another key investor-protection principle is making sure there is adequate bookkeeping (and related records) to track the customer's assets, combined with appropriate disclosure and reporting.[27]  This is to ensure that whoever is in control of a customer's assets is not misallocating or misusing those assets, particularly in furtherance to their own purposes at the expense of the customer's best interests.  The basic concept here is that there should be controls in place to ensure the custodian has books and records that keep track of and identify which customer owns what, and there is adequate regulatory and customer reporting, as well as independent auditing, to verify the same.

In keeping with this principle, FTX provides a user experience that enables any user to easily view account balances for all assets, for all of its platforms, in real time.  By logging in to the customer's account at FTX, the customer can immediately view the types of assets they own held in custody by FTX.  The assets are ledgered and easily identifiable to the user (but held in an omnibus wallet in the case of the customer's tokens in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX.  Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms.

Relatedly, and previewing the risk management discussion below, FTX ensures redundancy, resiliency, and disaster-recovery preparedness by using multiple geographically dispersed cloud and data service vendors and facilities to ensure industry-leading 24/7 service.

### 4.  Conducting Adequate Risk Management to Protect Digital Assets

The next key principle is ensuring that any market participant in possession of customer assets is performing adequate risk management to protect those assets, regardless of their particular role in the ecosystem.  There are multiple types of relevant risks that are inherent to any market structure, including but not limited to credit or counterparty risk, market risk, funding liquidity risk, and operational risk.  (All of these in turn have a bearing on or contribute to systemic risk within the overall ecosystem.)

Credit and counterparty risk refers to the risk that a counterparty will fail to perform its obligations.  Market risk is defined as the potential for losses arising from the change in value of an asset.  Liquidity risk is the potential that a position in an asset cannot be unwound due to a lack of depth or a disruption in the market for the asset.  Operational risk includes a risk of loss from a failure of internal processes at an organization, which can be caused by human error, technology-system breakdowns, or communication-network failures; they also can include losses caused by external factors such as "acts of God" or other naturally occurring events.[28]

---

[27] *See IOSCO–Protection of Assets*, Principles 1 through 3.

[28] For source of definitions, see T*he Joint Forum of the Basel Committee on Banking Supervision, the International Organization of Securities Commissions, and the International Association of Insurance Supervisors, Risk Management Practices and Regulatory Capital*, November 2001, p. 15, at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD122.pdf.



Market participants in any market, including digital-asset market operators, must address each of these risks to ensure against substantial or catastrophic losses that could lead to existential threats against their own firm, thereby imperiling the assets of their customers. In general, policy makers that develop market regulation have required that both market operators as well as intermediaries manage risk by developing appropriate policies and procedures to address them, which contemplate the use of quantitative methods to measure risk, pricing products according to their risks, establishing risk limits, active management of risks through hedging and other techniques, and the building of cushions to absorb losses.[29]

FTX is a full-stack infrastructure provider, combining the matching engine and the clearing function on the same platform, providing a unified user experience for the trading of assets as well as the clearing and settlement of those assets.  FTX's ***Market Regulation Key Principles*** addressed other risk-management considerations for the trading venue itself, but here we focus particularly on risk management embedded in the clearing and settlement functions that relate to investor protections.

Clearinghouses in traditional markets again are subjected to substantial regulatory rigor and are required to develop written policies, procedures, and controls that establish an appropriate risk-management framework which, at a minimum, clearly identifies and documents the range of the aforementioned risks and more to which the DCO is exposed, addresses the monitoring and management of the entirety of those risks, and provides a mechanism for internal audit.[30]  Public policy typically provides clearinghouses discretion in setting, modeling, validating, reviewing and back-testing margin requirements that build the cushion to absorb potential losses, but must develop such requirements nonetheless; those models are then evaluated by appropriate regulators.[31] Clearinghouses are required by regulation to frequently check the adequacy of initial-margin requirements, value initial margin assets, back test products that are experiencing significant market volatility, and conduct stress tests with respect to each large trader who poses significant risk.

FTX platforms improve upon these requirements today in a number of material respects, and indeed the FTX US derivatives platform complies with the specific requirements of U.S. policy.  First, the FTX international exchange imposes on its users a dynamic maximum leverage limit depending on their absolute position, which is limited to maximum leverage of 20 times the notional value of the user's account, and substantially lower in the case of larger positions. The limit is calculated as a function of market liquidity and volatility, along with the positions and collateral that the user holds.  Second, FTX platforms check customer-account levels and asset amounts, including those used to collateralize positions, multiple times per minute as opposed to once per day,

---

[29] *See id.*

[30] *See, e.g.*, Derivatives Clearing Organization General Provisions and Core Principles ("DCO Final Rule"), 76 Fed.Reg. 69334, 69,335 (Nov. 8, 2011); *see also* Standards for Risk Management and Operations of Clearing Agencies ("Clearing Agency Rule"), SEC Rule 17Ad-22, 17 CFR Part 240.

[31] *See id.*



as standard policy requires today.  Third, customer positions are liquidated if the net balance of all of a customer's positions becomes negative, or positions fall below the maintenance-margin threshold, and the FTX risk engine performs this function automatically.  FTX uses an advanced and user-friendly liquidation process that gradually reduces a user's position to bring it to solvency, instead of closing the entire position.  Fourth, FTX's risk-management program requires that digital-asset collateral be placed on the platform itself, rather than pledged but not delivered to the platform, to ensure the platform has immediate access to the collateral for purposes of managing market risks.  And fifth, FTX's markets are open 24 hours a day, 7 days a week, which protects against delayed management of customer positions or market conditions, and the consequent build-up of market risk.

FTX undertakes this risk-management program without any reliance on intermediaries, depending only on its own systems and personnel.  Historically, in traditional market structures, intermediaries provided a first or outer layer of risk management, as the entity typically responsible for onboarding customers and maintaining the customer relationship, and thereby exposing that intermediary to all of the attendant risks from that relationship.  Market operators and clearinghouses are beneath or within that outer layer and, as explained above, also engage in management of the risks outlined above.



In traditional market structure, any type of breakdown in the risk management at the *outer* layer of the intermediated market structure exposes the *inner* layer to consequent risks.  This is so because those intermediaries are members of the trading platform as well, and the effects of a risk-management breakdown can be transferred to the trading platform as well as to the other members of the trading platform.  Policy makers refer to this concept as interconnection risk. Arguably, the existence of this outer layer created through intermediation increases the opportunities for risk-management failure because there are so many more points of



potential lapses or failure. Many of these can be inconsequential to the overall ecosystem, but some or many can be consequential.

The simplified market structure native to the digital-asset ecosystem poses fewer interconnection risks within the system because the outer layer of participants is folded into the inner layer – investors access the digital-asset platform directly. Likewise, without intermediaries bringing their customers to the trading platform, the trading platform is not exposed to risk-management failures by an intermediary, and can focus instead on its own risk-management program. This in turn simplifies the role of the supervisory community overseeing such platforms, who by focusing on the risk management of the platform operator can dispense with concerns about the platform's members who are not intermediaries. Again, this concept is key to FTX's view that the market structure for our platforms is *risk reducing* compared to those found in traditional markets.

One corollary to this concept is that involving intermediaries in the market structure ***does not*** by definition lead to greater investor protections, as some have argued. Instead, greater protections would depend entirely on the risk-management resources and capabilities (operational and financial) of the intermediary and whether they are delivering on other key investor protections, which in part depends on the level of supervision of the intermediary *vis a vis* the level of supervision of the platform. As a general matter, the supervision of clearinghouses as it relates to risk management in particular is equal to or greater than that for intermediaries, with heightened financial integrity and reporting standards. And as explained above, FTX risk management is designed and has been implemented to improve upon those standards in multiple ways.

Fewer interconnections, combined with superior risk-management practices at the platform level, while delivering on core investor protections, leads to a superior and risk-reducing market structure that better protects investors.

5. Avoiding Conflicts of Interest

The final principle is that in order to ensure the investor's interests are protected, conflicts of interest between the investor and the entity offering the products should be eliminated, mitigated and/or managed appropriately. Once again, in traditional capital markets the policy focus has been on intermediaries who offer access to investment products or otherwise sell the products to their customers directly, and today there are considerable requirements directed at intermediaries. Although not all existing regulations related to conflicts will apply, to the extent that policy makers wish to apply the relevant measures to the digital-asset space, this could be accomplished rather smoothly by shifting the burden of those measures from intermediaries to the platform operator as needed.

Policy governing traditional markets generally takes two approaches to addressing conflicts of interest: expressly prohibiting certain types of conduct, and requiring policies and procedures that involve affirmative steps to identify areas of risk for conflicts, and measures to mitigate or eliminate those conflicts. As an example of the



former, most securities regimes, including in the U.S., expressly prohibit misstatements or misleading omissions of material facts, and fraudulent or manipulative acts and practices, related to the purchase or sale of investment products.[32]

An example of the latter approach is a "best interest" or "suitability" requirement for entities offering investment products to their customers, again typically intermediaries in the case of traditional markets.  This type of policy seeks to discourage entities from offering or recommending products that the investor does not sufficiently understand or possess the resources to use properly.[33]  Other regimes are less prescriptive and generally focus on the financial wherewithal of a customer seeking access to a trading market, on the premise of ensuring creditworthiness and an ability to meet financial obligations on the platform,[34] along with risk-related disclosures.[35]

FTX favors an approach that provides equal access to all investors, and follows sufficiently robust listing standards that ensure adequate information about the listing is provided to the customer.  But if policy makers preferred to impose a heightened standard more similar to what is found in securities markets, for example, they would need to impose that responsibility on the platform operator, which again could easily be accomplished.

In any case, whether intermediaries are involved in the market or not, conflicts inevitably arise when each actor is pursuing its commercial or economic interests.  The key point for this particular principle is that when they do, there are familiar methods for eliminating or mitigating those conflicts, even as they apply to platform operators.  FTX conducts its business with a goal of maximizing our customer's interest, but supports reasonable policy measures to eliminate or mitigate conflicts that impose those responsibilities directly on the platform.

---

[32] *See, e.g.*, Section 15(c) of the Exchange Act.
[33] *See, e.g.,* SEC Regulation Best Interest (BI), FINRA Rule 2111.  This type of policy seeks to discourage entities from offering or recommending products that the investor does not sufficiently understand or possess the resources to use properly.  To accomplish this, some policy regimes require the intermediary to collect relevant information about the customer/investor in order to ascertain the customer's investment profile, and then have policies and procedures for assessing suitability based on that information.
[34] *See, e.g.,* CFTC Rule 38.602, Rule 38.604, Rule 39.12, all of which speak to financial fitness and wherewithal.
[35] See, e.g,. CFTC Rule 1.55 and 33.7.

A000664



A000665



**SBF** ✔
@SBF_FTX · **Follow**

Backstopping customer assets should always be primary. Everything else is secondary.

1:29 PM · Jun 27, 2022                                           ⓘ

❤ **2.8K**      💬 Reply      ⬆ Share

**Read 280 replies**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 22-cv-10794 |
| v. ) ) ) | JURY TRIAL DEMANDED |
| CAROLINE ELLISON and ZIXIAO "GARY" WANG, ) ) ) ) | |
| Defendants. ) ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Caroline Ellison ("Ellison") and Zixiao "Gary" Wang ("Wang," together with Ellison, "Defendants"), alleges as follows:

## SUMMARY

1.     From at least May 2019 through November 2022, Defendants, together with Samuel Bankman-Fried ("Bankman-Fried") and others, engaged in a scheme to defraud equity investors in FTX Trading Ltd. ("FTX"), the crypto asset trading platform of which Bankman-Fried and Wang were co-founders, at the same time that they were also defrauding the platform's customers.[1] FTX raised more than $1.8 billion from investors, including U.S. investors, who bought an equity stake in FTX believing that FTX had appropriate controls and risk management measures.  Unbeknownst to those investors (and to FTX's trading customers), Bankman-Fried

---

[1] Bankman-Fried was charged by the Commission on December 13, 2022, in *Securities and Exchange Commission v. Samuel Bankman-Fried*, 22-cv-10501 (S.D.N.Y.).  The allegations herein are focused on the conduct and knowledge of Ellison and Wang, as well as Bankman-Fried.  Other individuals were both aware of and participated in some aspects of the fraud scheme described herein.

A000667

was orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire. Defendants were active participants in the scheme and engaged in conduct that was critical to its success.

2.       Throughout this period, Bankman-Fried portrayed himself as a responsible leader of the crypto community.  He touted the importance of regulation and accountability.  He told the public, including investors, that FTX was both innovative and responsible.  Customers around the world believed his lies, and sent billions of dollars to FTX, believing their assets were secure on the FTX trading platform.  But Bankman-Fried and Wang improperly diverted customer assets to Alameda Research LLC and its subsidiaries ("Alameda"), the crypto asset hedge fund that they had founded and co-owned and that Ellison ran.  Wang created and participated in the creation of the software code that allowed Alameda to divert FTX customer funds.  Ellison, in turn, used the misappropriated FTX customer funds for Alameda's trading activity.  And Bankman-Fried used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations.

3.       Working with Bankman-Fried, Defendants hid the scheme from FTX's equity investors, including U.S. investors, from whom FTX sought to raise billions of dollars in additional funds.  Bankman-Fried repeatedly cast FTX as an innovative and conservative trailblazer in the crypto markets.  He told investors and prospective investors that FTX had top-notch, sophisticated automated risk measures in place to protect customer assets, that those assets were safe and secure, and that Alameda was just another platform customer with no special privileges.  Defendants knew or were reckless in not knowing that these statements were false and misleading.  In truth, Bankman-Fried and Wang, with Ellison's knowledge and consent, had

A000668

exempted Alameda from the risk mitigation measures and had provided Alameda with significant special treatment on the FTX platform, including a virtually unlimited "line of credit" funded by the platform's customers.

4.      Beyond its "line of credit" with FTX, Ellison, at Bankman-Fried's direction, caused Alameda to borrow billions of dollars from third party lenders.  Those loans were backed in significant part by Alameda's holdings of FTT—an illiquid crypto asset security that was issued by FTX and provided to Alameda at no cost.  Ellison, acting at the direction of Bankman-Fried, engaged in automated purchases of FTT tokens on various platforms in order to increase the price of those tokens and inflate the value of Alameda's collateral, which allowed Alameda to borrow even more money from external lenders at increased risk to the lenders and to FTX's investors and customers, all in furtherance of the scheme.

5.      While Bankman-Fried spent lavishly on office space and condominiums in The Bahamas, and sank billions of dollars of customer funds into speculative venture investments, his house of cards began to crumble.  When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans.  Despite the fact that Alameda had, by this point, already taken billions of dollars of FTX customer assets, it was unable to satisfy its loan obligations.  Bankman-Fried, with Defendants' knowledge, directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors.  Ellison then used FTX's customer assets to pay Alameda's debts.

6.      Even as it was increasingly clear that Alameda and FTX could not make customers whole, Bankman-Fried and Defendants continued to misappropriate FTX customer funds.  Through the summer of 2022, Bankman-Fried, with Defendants' knowledge, directed

A000669

hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives, including Wang. All the while, Bankman-Fried continued to make misleading statements to investors about FTX's financial condition and risk management. Defendants were aware that Bankman-Fried was making these statements, and knew or were reckless in not knowing that they were false and misleading. Even in November 2022, faced with billions of dollars in customer withdrawal demands that FTX could not fulfill, Bankman-Fried and Ellison, with Wang's knowledge, misled investors from whom they needed money to plug a multi-billion-dollar hole. This brazen, multi-year scheme finally came to an end when FTX, Alameda, and their tangled web of affiliated entities filed for bankruptcy on November 11, 2022.

## **VIOLATIONS**

7. By engaging in the conduct set forth in this Complaint, Defendants violated Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

8. Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

## **NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

9. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §§ 78u(d)(1)].

10. The Commission seeks a final judgment: (i) permanently enjoining Defendants

4

from engaging in the acts, practices, transactions and courses of business alleged herein;
(ii) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon
pursuant to Section 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)]; (iii)
imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15
U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];
(iv) imposing an officer and director bar on each Defendant pursuant to Section 20(e) of the
Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.
§ 78u(d)(2)]; (v) prohibiting Defendants from participating in the offer or sale of securities
including crypto asset securities pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C.
§ 78u(d)(5)]; and (vi) ordering such other and further relief the Court may find appropriate
pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and
22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27
of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  In connection with the conduct
alleged in this Complaint, Defendants, directly or indirectly, made use of the means or
instruments of transportation or communication in, and the means or instrumentalities of,
interstate commerce, or of the mails.

12.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of
the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].
Among other acts, false and misleading statements that were part of the fraudulent scheme
alleged herein were made to investors residing in this District.

A000671

## DEFENDANTS

13.     **Caroline Ellison ("Ellison")**, age 28, was employed at Alameda beginning in or around March 2018.  Ellison was the co-CEO at Alameda from in or around October 2021 to in or around August 2022, when she became the sole CEO.[2]  Ellison's employment at Alameda was terminated on or about November 18, 2022.  Ellison, a United States citizen, resided in Hong Kong and The Bahamas during the relevant period.

14.     **Zixiao "Gary" Wang ("Wang")**, age 29, was a co-founder and the Chief Technology Officer of FTX and co-founder and 10% owner of Alameda.  Wang's employment at FTX was terminated on or about November 18, 2022.  During the relevant period, Wang, a United States citizen, resided in Hong Kong and The Bahamas.

## RELEVANT PARTIES AND ENTITIES

15.     **Samuel Bankman-Fried ("Bankman-Fried")**, age 30, was a co-founder and majority owner of FTX and, prior to stepping down on November 11, 2022, its CEO.  He was also a co-founder and majority owner of Alameda.  He resided in Hong Kong and The Bahamas.

16.     **FTX Trading Ltd. (d/b/a FTX.com) ("FTX")** is an Antigua and Barbuda limited corporation.  FTX's principal place of business was in Hong Kong and The Bahamas. FTX operated a global crypto asset trading platform and began operations in or around May 2019.  FTX was available to customers in most countries, but was not permitted to provide services to customers in the United States and several other countries.  FTX was founded by Bankman-Fried, Wang, and Nishad Singh ("Singh").  On or about November 11, 2022, FTX and certain of its affiliates filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware, Case No. 22-11068 (Bankr. Del.).

---

[2] Ellison served as CEO of Alameda Research Ltd., a subsidiary of Alameda Research LLC.  For clarity, as set forth in paragraph 17, the complaint refers to Alameda Research LLC and its subsidiaries collectively as "Alameda."

A000672

17.     **Alameda Research LLC** is a Delaware company that had operations in the United States, Hong Kong, and The Bahamas.  Alameda Research LLC and its subsidiaries, including Alameda Research Ltd., are collectively referred to herein as "Alameda."  Alameda was a quantitative trading firm specializing in crypto assets (a "crypto hedge fund").  Bankman-Fried and Wang co-founded Alameda in or around October 2017, and, prior to Alameda's bankruptcy filing, had been its sole equity owners, with Bankman-Fried owning 90%, and Wang owning 10%, of the company.  Bankman-Fried was CEO of Alameda from its inception until in or around October 2021, at which time Ellison and Sam Trabucco ("Trabucco") became co-CEOs.  In or around August 2022, Ellison became the sole CEO.  Alameda has filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 22-11068 (Bankr. Del.).

## FACTS

### A.     Bankman-Fried, Actively Supported by Defendants, Created a Complex Web of Entities, with FTX and Alameda at Its Center.

18.     In or around October 2017, Bankman-Fried and Wang founded Alameda, a quantitative trading firm specializing in crypto assets.[3]

19.     At inception, Alameda was focused on arbitrage trading strategies, but went on to employ other strategies including market making, yield farming (pooling of crypto assets in exchange for interest or other rewards), and volatility trading.  Alameda also offered over-the-counter trading services, and made and managed other debt and equity investments.

20.     At first, Bankman-Fried was responsible for trading operations, and Wang

---

[3] Crypto assets are unique digital assets maintained on a cryptographically-secured blockchain.  A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.  Crypto tokens may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

A000673

handled the engineering and programming functions. Over time, Alameda hired additional employees, including Singh (in or around December 2017), Ellison (in or around March 2018), and Trabucco (in or around 2019). By the end of 2021, Alameda had approximately 30 employees. At times, Alameda shared office space and employees with FTX.

21.     Bankman-Fried remained the ultimate decision-maker at Alameda, even after Ellison and Trabucco became co-CEOs in or around October 2021. Bankman-Fried directed investment and operational decisions, frequently communicated with Alameda employees, and had full access to Alameda's records and databases.

22.     Ellison was a trader at Alameda during the time Bankman-Fried acted as CEO. When Ellison became co-CEO in 2021, and continuing through November 2022, Ellison was responsible for Alameda's day-to-day operations. Though Ellison made some trading decisions, she frequently consulted with Bankman-Fried, particularly about strategic issues and significant trades.

23.     In or around 2018, Bankman-Fried began work on building a crypto asset trading platform. Together with Wang and Singh, Bankman-Fried ultimately founded FTX, which began operations in or around May 2019.

24.     FTX offered its customers a number of services. For example:

a.      FTX offered a "spot market," a trading platform through which customers could trade crypto assets with other FTX customers in exchange for fiat currency (*i.e.*, currency such as U.S. Dollars) or other crypto assets.

b.      FTX offered "spot margin trading" services, which allowed FTX customers to trade using assets they did not have (*i.e.*, to trade "on margin") by posting collateral in their FTX accounts and borrowing crypto

8

A000674

assets through the "spot market" on the FTX platform. FTX also allowed
customers to lend their crypto assets to other FTX customers who would
then use those crypto assets to spot trade.

c.     FTX offered an off-platform (over-the-counter or "OTC") portal that
enabled customers to connect and request quotes for spot crypto assets and
to conduct trades.

25.     Bankman-Fried was the ultimate decision-maker at FTX from the platform's
inception in or around May 2019 until he resigned as CEO on or about November 11, 2022 ("the
Relevant Period"). Wang and Singh were the lead engineers responsible for writing the software
code for FTX, including the code that allowed for the services described above.

26.     In or around January 2020, Bankman-Fried, Wang, and Singh founded FTX US, a
crypto asset trading platform designed primarily for customers in the United States.[4]

27.     Over time, Bankman-Fried expanded his holdings to include a number of
companies focused on making and managing private (or "venture") investments.

28.     This interconnected web of companies grew to include over 100 separate entities,
with Bankman-Fried at the top and Alameda, his crypto hedge fund, at the center.

29.     Throughout the Relevant Period, in multiple public statements, Bankman-Fried
held himself out as a visionary leader in the crypto industry, and touted his efforts to create a
regulated and thriving crypto asset market. He conducted an intensive public relations campaign
to brand himself and his companies as honest stewards of crypto.

30.     The reality was very different: From the start, contrary to what FTX investors
and trading customers were told, Bankman-Fried, actively supported by Defendants, continually

---

[4] FTX US is the d/b/a for a subsidiary of West Realm Shires Inc., a separate legal entity from FTX Trading Ltd. that
provided different services. FTX US's conduct is not the subject of the allegations in this complaint.

A000675

diverted FTX customer funds to Alameda and then used those funds to continue to grow his empire, using billions of dollars to make undisclosed private venture investments, political contributions, and real estate purchases.

31.     At the same time, throughout the Relevant Period, Bankman-Fried, with Defendants' knowledge, solicited equity investors by touting FTX's controls and risk management, ultimately raising at least $1.8 billion from investors in exchange for various classes of stock in FTX through multiple fundraising rounds, including raising:  (1) approximately $8 million from the sale of shares of FTX Series A preferred stock, with fundraising completed in or around August 2019; (2) approximately $1 billion from the sale of shares of FTX Series B preferred stock, with fundraising completed in or around July 2021; (3) approximately $420 million from the sale of shares of FTX Series B-1 stock, with fundraising completed in or around October 2021; and (4) approximately $500 million from the sale of shares of FTX Series C stock, with fundraising completed in or around January 2022.  Of this total, approximately $1.1 billion was invested in FTX by approximately 90 investors based in the United States.

32.     For the entire span of the Relevant Period, while raising money from equity investors, Bankman-Fried, and those speaking at his direction and on his behalf, with the knowledge of Defendants, claimed in widely distributed public forums and directly to investors that:  FTX was a safe crypto asset trading platform; FTX had a comparative advantage due to its automated risk mitigation procedures; and FTX and its customers were protected from other customers' losses due to FTX's automated liquidation process.  As discussed further herein, these statements and others were misleading in light of Bankman-Fried's failure to disclose to FTX investors the diversion of FTX customer funds to Alameda, which he then used for his own

A000676

purposes, including loans to himself. Similarly, Bankman-Fried's statements concerning the separation of FTX and Alameda, made throughout the Relevant Period, were misleading because he did not disclose the special treatment afforded to Alameda on FTX, including its virtually unlimited "line of credit" at FTX, its ability to carry a negative balance in its FTX customer account, and its exemption from FTX's automated liquidation process—none of which any other customer of the platform enjoyed, but which changed the risk profile of FTX. Defendants were aware that Bankman-Fried was making false or misleading statements in order to raise money for FTX from equity investors. At times, they were in close proximity to these discussions, and directly or indirectly supported Bankman-Fried in providing false and misleading information to investors.

33.     Bankman-Fried also misrepresented the risk profile of investing in FTX throughout the Relevant Period by failing to disclose FTX's exposure to Alameda and, relatedly, that the collateral Alameda deposited on FTX consisted largely of illiquid, FTX-affiliated tokens, including FTT, the price of which Alameda was actively manipulating. In addition to these material omissions, Bankman-Fried also made material misrepresentations to FTX investors about FTX's risk management and its relationship with Alameda. As detailed below, Bankman-Fried made these material misstatements throughout the Relevant Period, and the entire time he was raising or attempting to raise funds for FTX—from the time FTX began operations in May 2019 through its ultimate demise in November 2022. Again, Defendants were aware that Bankman-Fried was making these false or misleading statements and that he was doing so in order to raise money from equity investors, and they directly or indirectly supported him in doing so.

**B.     Defendants Used Alameda to Carry Out the Fraudulent Scheme.**

34.     Alameda (and its many subsidiaries) served a number of essential functions in

A000677

Bankman-Fried's growing web of companies. For example, Alameda was the primary market maker on FTX at the time of FTX's inception in 2019. In this capacity, Alameda, at Bankman-Fried's direction, was tasked with creating liquidity on FTX to allow the platform to function more efficiently. Bankman-Fried also made venture investments through an Alameda subsidiary. Most crucially, Bankman-Fried used Alameda to house FTX customer assets and to deploy those assets, under Bankman-Fried's direction, to help grow his empire.

35.    From the inception of FTX, Defendants and Bankman-Fried diverted FTX customer funds to Alameda, and continued to do so until FTX's collapse in November 2022.

36.    Defendants and Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (*e.g.*, U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw down from a virtually limitless "line of credit" at FTX, which was funded by FTX customer assets.

37.    As a result, there was no meaningful distinction between FTX customer funds and Alameda's own funds. Bankman-Fried and Wang thus gave Alameda and Ellison *carte blanche* to use FTX customer assets for Alameda's trading operations and for whatever other purposes Bankman-Fried and Ellison saw fit. In essence, Bankman-Fried and Wang placed billions of dollars of FTX customer funds into Alameda. Bankman-Fried then used Alameda as his personal piggy bank to buy luxury condominiums, support political campaigns, and make private investments, among other uses. Ellison used these funds for Alameda's operations, including speculative trading strategies and servicing Alameda's debt to third-party lenders. Defendants knew that none of this was disclosed to FTX equity investors or to the platform's trading customers.

A000678

### i. FTX Customers Deposited Billions of Dollars into Alameda-Owned Bank Accounts, Which Alameda Spent on Its Own Trading Operations and to Expand Bankman-Fried's Empire.

38.     From the start of FTX's operations in or around May 2019 until at least 2021, FTX customers deposited fiat currency (*e.g.*, U.S. Dollars) into bank accounts controlled by Alameda.  Billions of dollars of FTX customer funds were so deposited into Alameda-controlled bank accounts.  Ellison was aware that Alameda was receiving FTX customer funds.

39.     At least some of these bank accounts were not in Alameda's name, but rather in the name of North Dimension Inc. ("North Dimension"), an Alameda subsidiary.  North Dimension's website does not disclose any connection to Alameda.  Ellison knew that Bankman-Fried had directed FTX to have customers send funds to North Dimension in an effort to hide the fact that the funds were being sent to an account controlled by Alameda.

40.     Alameda did not segregate these customer funds, but instead commingled them with its other assets, and used them indiscriminately to fund its trading operations and Bankman-Fried's other ventures.

41.     This multi-billion-dollar liability was reflected in an internal account in the FTX database that was not tied to Alameda but was instead called "fiat@ftx.com."  Characterizing the amount of customer funds sent to Alameda as an internal FTX account had the effect of concealing Alameda's liability in FTX's internal systems.  Defendants knew that FTX customer funds were being sent to Alameda-controlled bank accounts and that Alameda's liability was reflected in the "fiat@ftx.com" account.

42.     In quarterly balance sheets that Ellison prepared, and that were provided to Alameda's third-party lenders, Alameda tracked this liability as a "loan," but did not specify that the "loan" was from FTX.  Instead, Ellison, at Bankman-Fried's direction, combined this liability with loans Alameda had received from third-party lenders to obscure Alameda's intertwined

13

A000679

financial relationship with FTX.

43.     Alameda was not required to pay interest on the liability reflected in the "fiat@ftx.com" account.

44.     In 2022, FTX began trying to separate Alameda's portion of the liability in the "fiat@ftx.com" account from the portion that was attributable to FTX (*i.e.*, to separate out customer deposits sent to Alameda-controlled bank accounts from deposits sent to FTX-controlled bank accounts).  Alameda's portion—which amounted to more than $8 billion in FTX customer assets that had been deposited into Alameda-controlled bank accounts—was initially moved to a different account in the FTX database.  However, because this change caused FTX's internal systems to automatically charge Alameda interest on the more than $8 billion liability, Bankman-Fried directed that the Alameda liability be moved to an account that would not be charged interest.  This account was associated with an individual that had no apparent connection to Alameda.  As a result, this change had the effect of further concealing Alameda's liability in FTX's internal systems.

> ii.     **The FTX Platform, By Design, Granted Special Treatment to Alameda, Including Features that Allowed Alameda to Divert FTX Customer Assets.**

45.     In addition to receiving cash deposits directly from FTX customers, Alameda benefited from undisclosed features of the FTX platform, which were embedded in software code developed by Wang and other FTX engineers, and which allowed Alameda to divert FTX customer assets.  For example:

> a.     *Negative Balance*:  Alameda was able to maintain a negative balance in its customer account at FTX.  Bankman-Fried directed FTX engineers, including Wang, to write software code in or around August 2019, and to update it in or around May 2020, ultimately allowing Alameda to maintain a negative balance in

A000680

its account, untethered from any collateral requirements.  No other customer

account at FTX was permitted to maintain a negative balance.

    b.   *Line of Credit*:  On multiple occasions, Bankman-Fried directed FTX engineers,

including Wang, to increase the amount by which Alameda could maintain a

negative balance in its account.  In effect, this gave an unofficial "line of credit"

to Alameda, since Alameda was able to draw down on its FTX customer account

and use those funds—which were actually the funds deposited by *other* FTX

customers—for its own trading.  At Bankman-Fried's direction, Wang and others

continually raised the limit on Alameda's "line of credit" to the point where it

grew to tens of billions of dollars and effectively became limitless.  No other FTX

customer had a similar "line of credit."

    c.   *Liquidation Exemption*:  In or around May 2020, Bankman-Fried directed FTX

engineers, including Wang, to exempt Alameda from the "auto-liquidation"

feature of FTX's spot margin trading services.  As a result, Alameda's collateral

could fall below the requisite margin levels without triggering the automatic

liquidation of its account.  Alameda was the only customer exempted from FTX's

automatic account liquidation.

    46.    Defendants were both aware that these special privileges were afforded to

Alameda—and only Alameda.  Defendants were also both aware that the existence of these

special privileges, which were put in place at Bankman-Fried's direction, were hidden from

FTX's investors.  These privileges permitted Alameda to draw on FTX customer assets to a

virtually unlimited extent for its own uses.  Because its own FTX trading account was able to

maintain a negative balance of billions of dollars, unbacked by sufficient collateral—as a direct

A000681

result of software code implemented by Wang and others—Alameda was able to divert billions of dollars in FTX customer assets. Alameda and Ellison did just that in 2022.

### iii. In 2022, Alameda Diverted Billions More in FTX Customer Assets.

47. Starting in or around 2021, Bankman-Fried directed Ellison to have Alameda borrow billions of dollars from third-party crypto asset lending firms in order to fund Bankman-Fried's venture investments and for his personal use. Certain of these loans included provisions permitting the lenders to demand re-payment at any time.

48. In or around May 2022, as prices of crypto assets were dropping precipitously, several of these lenders demanded re-payment from Alameda. Because Alameda did not have sufficient assets to cover all of these obligations, Bankman-Fried directed Ellison to draw on Alameda's "line of credit" from FTX, which, based on the software code that Wang had previously created, allowed Alameda to borrow virtually limitless funds from FTX. Billions of dollars of FTX customer funds were thus diverted to Alameda and used by Alameda to re-pay its third-party loan obligations.

49. Because Alameda now had billions of dollars more in liability to FTX (on top of the billions of dollars reflected in the "fiat@ftx.com" account), Bankman-Fried—concerned that this enormous liability would alarm Alameda's lenders—directed Ellison to hide this "line of credit" in Alameda's balance sheet. Ellison did so and presented this information to lenders, knowing that it was materially misleading.

50. Despite the fact that Alameda now owed FTX billions of dollars with no immediate prospects of raising capital to pay off its "line of credit," Bankman-Fried continued to direct Ellison to draw on the Alameda "line of credit" in the summer of 2022. The customer funds diverted to Alameda were used, among other things, to provide hundreds of millions of dollars in "loans" to Bankman-Fried and other FTX executives, as well as hundreds of millions

A000682

more to fund additional venture investments.

> **iv.    Bankman-Fried, with Defendants' Knowledge and Consent, Assured Investors that FTX Customer Assets Were Secure, and Hid Alameda's Close Relationship with FTX.**

51.    Throughout the Relevant Period, Bankman-Fried was directly involved in soliciting potential investors in FTX.  Bankman-Fried met, and otherwise communicated, with FTX investors, including investors based in the United States.  Along with another FTX employee, Bankman-Fried was the point-person for investor relations at FTX.  Defendants knew that Bankman-Fried was meeting with and soliciting funds from equity investors.

52.    FTX's Terms of Service, which were publicly available on FTX's website and accessible to investors, assured FTX customers that their assets were secure, providing:  "you control the Digital Assets held in your Account;" "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX;" and "none of the digital assets in your account are the property of, or shall or may be loaned to, FTX Trading."  The Terms of Service further provided:  "Once we receive fiat currency we may issue you an equivalent amount of electronic money ("E-Money")…which represents the fiat currency that you have loaded" and "[y]ou may redeem all or part of any E-Money held in your Account at any time."

53.    Similarly, FTX posted on its website a document entitled, "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," in which FTX represented that it "segregates customer assets from its own assets across our platforms."  FTX further represented in that document that it maintained "liquid assets for customer withdrawals…[to] ensure a customer without losses can redeem its assets from the platform on demand."

54.    In addition to making this document available to the public on its website, FTX specifically provided it to potential investors, including a U.S. investor who had invested $35 million in FTX's Series B fundraising round in July 2021.  As described above, these statements

A000683

to the public, customers, and investors were false—FTX did not segregate its customer assets from its own assets, and, as events would later demonstrate, did not maintain liquidity to allow customer withdrawals on demand.

55.     FTX investors were provided with FTX's audited financial statements, and FTX represented in its purchase agreements that those financial statements "fairly present in all material respects the financial condition and operating results of" FTX.  These audited financial statements, which do not include information about Alameda's undocumented "line of credit" from FTX and other information discussed herein, were, at the very least, materially misleading. Indeed, FTX's current CEO has voiced "substantial concern as to the information presented in these audited financial statements."

56.     Throughout the Relevant Period, Bankman-Fried made public statements assuring that customer assets were safe at FTX.  For example, he stated in a tweet on or about June 27, 2022:  "Backstopping customer assets should always be primary.  Everything else is secondary." He likewise tweeted on or about August 9, 2021:  "As always, our users' funds and safety comes first.  We will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

57.     Bankman-Fried also told investors, and directed other FTX and Alameda employees to tell investors, that Alameda received no preferential treatment from FTX.  For example, Bankman-Fried told the Wall Street Journal in or around July 2022:  "There are no parties that have privileged access."  Likewise, in a Bloomberg article published in or about September 2022, Bankman-Fried claimed that "Alameda is a wholly separate entity" than FTX. In the same article, Ellison is quoted as stating about Alameda:  "We're at arm's length and don't get any different treatment from other market makers."  Similarly, in an interview in or about

A000684

August 2022, Ellison claimed that FTX and Alameda were separate companies, that Alameda received no special treatment on the FTX platform, and that there was an ethical wall between them preventing sharing of customer information between FTX and Alameda.  Bankman-Fried made similar statements directly to investors.

58.     Defendants were aware of the substance of Bankman-Fried's statements about FTX customer assets—including the security of the assets and the manner in which they would be handled—and about the relationship between Alameda and FTX.  Given their involvement in the fraudulent scheme outlined herein, Defendants knew or were reckless in not knowing that these statements to investors were false and misleading and that they were important to FTX's investors.  Defendants further knew or were reckless in not knowing that these statements were intended to make FTX more attractive to investors and potential investors.

### C.  Defendants Knew that FTX Had Poor Controls and Deeply Inadequate Risk Management Procedures, in Stark Contrast to Bankman-Fried's Claims that It Was a Mature, Conservative Company.

59.      From its inception, FTX had poor controls and fundamentally deficient risk management procedures.  Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Alameda, FTX, and executives, including Bankman-Fried, Wang, and Singh.  This reality was a sharp contrast to the image of FTX that Bankman-Fried consistently portrayed to the public and to investors—a mature company that managed funds and risk in a conservative, rigorous manner.

60.     FTX invested significant resources to develop and promote its brand as a trustworthy company.  For example, in materials provided to one investor in or around June 2022, FTX cultivated and promoted its reputation:

FTX has an industry-leading brand, endorsed by some of the most

A000685

> trustworthy public figures, including Tom Brady, MLB, Gisele
> Bundchen, Steph Curry, and the Miami Heat, and backed by an
> industry-leading set of investors.  FTX has the cleanest brand in
> crypto.

61.     FTX also promoted itself as a company that was willing to work collaboratively

with regulators and lawmakers.  In the same materials, FTX claimed:  "FTX is also the only

major digital asset venue to maintain positive, constructive relationships with regulators and

lawmakers."

62.     Defendants knew or were reckless in not knowing that the reality was far different

than what Bankman-Fried presented to FTX's investors and customers.

### i.     The FTX Automated Risk Engine

63.     Bankman-Fried repeatedly touted FTX's automated risk mitigation protocols—

which he called FTX's "risk engine"—to the public, and prospective investors, as a safe and

reliable way for crypto asset trading platforms to manage risk.  FTX engineers, led by Wang,

developed the software code that created the "risk engine."  In essence, the software code

implemented a series of rules that were designed to reduce risk in any individual client's account

by automatically triggering certain actions (*e.g.*, to sell collateral in an account when an account

was overly extended).

64.     Bankman-Fried promoted the concept of "24/7" automated risk monitoring as an

innovative benefit of crypto asset markets, including at a hearing on or about December 8, 2021,

to the U.S. House of Representatives Committee on Financial Services, where Bankman-Fried

concluded his remarks by stating:

> And the last thing I will say is if you look at what precipitated
> some of the 2008 financial crisis, you will see a number of
> bilateral, bespoke, non-reported transactions happening between
> financial counterparties, which then got repackaged and
> releveraged again and again and again, such that no one knew how
> much risk was in that system until it all fell apart.  If you compare

A000686

that to what happened on FTX or other major cryptocurrencies in use today, there is complete transparency about the full open interest. There is complete transparency about the positions that are held. There is a robust, consistent risk framework applied.

65. In addition to generally promoting the benefits of automated risk engines, Bankman-Fried repeatedly claimed that FTX's own risk engine was especially sophisticated and carefully calibrated. In a submission to the Commodity Futures Trading Commission, FTX touted its automated system, claiming that it calculated a customer's margin level every 30 seconds; and that if the collateral on deposit fell below the required margin level, FTX's automated system would sell the customer's portfolio assets until the collateral on deposit exceeded the required margin level.

66. These statements were materially false and misleading because of a critical omission: Bankman-Fried did not reveal that the automatic risk engine did not apply to the accounts of its most important customer—Alameda. As discussed above, Wang and other FTX engineers—as part of Defendants' and Bankman-Fried's fraudulent scheme—had created a special feature in the software code to exempt Alameda from the rules of the "risk engine." This was a critical special benefit that Bankman-Fried afforded Alameda: Alameda's collateral on deposit was allowed to fall below FTX's required margin level without FTX liquidating any part of Alameda's portfolio. Ellison was aware of, and took advantage of, this special undisclosed benefit.

67. Defendants knew, or were reckless in not knowing, that Bankman-Fried's statements regarding FTX's risk engine misled FTX's investors by representing that its risk engine would protect FTX customer funds and would limit FTX's exposure to any single customer, while failing to disclose that Bankman-Fried had directed Wang to ensure that the engine not apply to one of its largest customers.

21

A000687

68.     As Bankman-Fried acknowledged in a network television interview on or about December 1, 2022:  "I wasn't even trying, like, I wasn't spending any time or effort trying to manage risk on FTX."  Bankman-Fried continued:  "What happened, happened—and, if I had been spending an hour a day thinking about risk management on FTX, I don't think that would have happened."

### ii.     The Valuation of Alameda's Collateral

69.     The collateral that Alameda had on deposit, consisting largely of enormous positions in illiquid crypto assets issued by FTX and Bankman-Fried (including the "FTT" token, the "exchange token" for FTX, as described below), compounded the undisclosed risk to FTX's investors.

### a.   *Alameda Overvalued Its Collateral by Ignoring Significant Liquidity Issues.*

70.     Defendants and Bankman-Fried valued the FTX-affiliated tokens at trading prices, but the collateral deposited by Alameda was not worth the value assigned to it.  Alameda and FTX collectively owned the majority of these tokens, and only a small portion of the FTX-affiliated tokens were in circulation.  As such, the tokens were illiquid, and, as Defendants and Bankman-Fried knew or were reckless in not knowing, if Alameda or FTX tried to sell Alameda's holdings, market prices for the tokens would fall, thereby driving down the value of Alameda's deposited collateral at FTX.  As a result, even if FTX had liquidated Alameda's portfolio, the sales of those thinly traded tokens would not have generated sufficient funds to cover the amount Alameda borrowed from FTX.

71.     Defendants and Bankman-Fried were well aware of the impact of Alameda's positions on FTX's risk profile.  On or about October 12, 2022, for example, Bankman-Fried, in a series of tweets, analyzed the manipulation of a digital asset on an unrelated crypto platform.

A000688

In explaining what occurred, Bankman-Fried distinguished between an asset's "current price" and its "fair price," and recognized that "large positions – especially in illiquid tokens – can have a lot of impact." Bankman-Fried asserted that FTX's risk engine required customers to "fully collateralize a position" when the customer's position is "large and illiquid enough." But Bankman-Fried knew, or was reckless in not knowing, that by not mitigating for the impact of large and illiquid tokens posted as collateral by Alameda, FTX was engaging in precisely the same conduct, and creating the same risk, that he was warning against. Defendants too knew that Alameda was drawing down on a virtually unlimited line of credit from FTX, collateralized by what they knew or were reckless in not knowing was a large illiquid position.

72.     The reality of FTX's exposure to the risk created by the valuation of Alameda's positions stood in stark contrast to Bankman-Fried's assertions about risk management at FTX in his October 2022 Twitter analysis, in which he described FTX's approach and claimed that constructing the rules for FTX's risk engine in a manner that is "conservative, and handles apparent large moves gracefully" is "probably the most important thing we do at FTX." Bankman-Fried further claimed, contrasting FTX to the failed endeavor: "There are a bunch of other risk engine protection and sanity checks, too, which would have caught something like this."

73.     Not only did Bankman-Fried fail to tell investors that he had exempted Alameda from FTX's risk engine, he also falsely told certain investors that FTX had no exposure to FTT at all. In late summer 2021, for example, Bankman-Fried told a potential U.S. investor in FTX's series B fundraising round that FTX did not hold FTT and, consequently, the investor would not have any exposure to FTT. The investor ultimately invested $30 million. For the reasons described above, Defendants and Bankman-Fried knew or were reckless in not knowing that at

A000689

the time that Bankman-Fried made those representations, they were false and misleading. Specifically, Defendants and Bankman-Fried knew or were reckless in not knowing that any investment in FTX carried significant exposure to FTT, as the token was, among other things, posted as collateral for billions of dollars that FTX had loaned to Alameda to engage in speculative investments.

> b. *Alameda Manipulated the Market Price of FTT and, as a Result, Further Inflated the Value of Its Collateral.*

74. Ellison, at Bankman-Fried's direction, caused Alameda to manipulate the price of FTT by purchasing large quantities of FTT on the open market to prop up its price. This manipulative activity was in furtherance of Defendants' scheme because it allowed Ellison and Alameda to engage in further borrowing, while concealing Alameda's true risk exposure.

> 1. <u>FTT Was Offered and Sold as an Investment Contract and, Therefore, as a Security.</u>

75. On or about July 29, 2019, FTX launched a crypto asset known as "FTT."[5] FTX launched FTT as an "exchange token" for the FTX platform (*i.e.*, the crypto asset or token associated with a crypto trading platform).

76. Before launching the FTX platform in or around May 2019, FTX had minted 350 million FTT tokens in or around April 2019. Of the 350 million tokens minted, 175 million were allocated to FTX as "company tokens," and 175 million were designated as non-company tokens. The company tokens were set to "unlock" (or become available for trading) over a three-year period after a so-called initial exchange offering ("IEO") of the token.

77. From the time of its offering, FTT was offered and sold as an investment contract and therefore a security.

---

[5] FTT was available for trading on FTX, but not on FTX US.

A000690

78.     Of the 175 million non-company tokens, FTX offered and sold approximately 73 million FTT in so-called "pre-sales" to investors, at prices ranging from $0.10 to $0.80.  FTX raised approximately $10 million from these sales of FTT prior to the IEO.  The pre-sale tokens were programmed to unlock between one to three months after the IEO.  FTX did not manage separate, segregated accounts for investors, but instead pooled all proceeds from the pre-sale and the IEO of FTT and treated them interchangeably.

79.     FTX used the pooled proceeds from FTT sales to fund the development, marketing, business operations, and growth of FTX, depending on the success of FTX and its management team in developing, operating, and marketing the trading platform.  If demand for trading on the FTX platform increased, demand for the FTT token could increase, such that any price increase in FTT would benefit holders of FTT equally and in direct proportion to their FTT holdings.  The large allocation of tokens to FTX incentivized the FTX management team to take steps to attract more users onto the trading platform and, therefore, increase demand for, and increase the trading price of, the FTT token.

80.     As a result of FTX and its management team's large holdings of FTT, the interests of the company and its management team were aligned with those of investors in FTT.

81.     FTX's FTT marketing materials—consisting of an FTT "whitepaper" and information posted on FTX's website—described FTT as "the token powering the FTX ecosystem."  The publicly available information led FTT holders to reasonably expect to share in FTX's growth and future earnings, and from appreciation in the value of FTT.

82.     The FTT whitepaper specifically highlighted the profit potential of the token.  For example, the whitepaper included the following statements:  "We launched FTX in April and already have among the world's most liquid orderbooks" and "[o]ur goal is to become as

A000691

profitable as Bitmex and OkEx within a year." On the FTX website, FTT purchasers were offered a 5% bonus of tokens during the first three days of the IEO if they pre-funded their FTX wallets to purchase FTT, providing a potential immediate profit to investors. FTX also represented that FTT would be listed at $1.00 on July 29, 2019, and the "pre-sales" were at prices ranging from $0.10 to $0.80, which provided purchasers an immediate profit potential based on the announced listing price.

83.     The FTX whitepaper further explained: "We have carefully designed incentive schemes to increase network effects and demand for FTT, and to decrease its circulating supply." The FTT materials stated that the token provided investors with fee rebates and discounts on FTX, and the ability to use the token as collateral for futures positions as well as for "margin trading" that FTX promised to launch "in the future." The FTT materials referred to potential gains from FTX's future repurchase and burning of FTT (the "buy and burn" program), to be funded by FTX's revenues.[6]

84.     The FTX whitepaper also explained that "[c]ustomers who hold a certain amount of FTT for a period of time will receive lower FTX futures fees" and that this "will further increase demand for FTT."

85.     FTT was marketed as an investment that would appreciate in value as it grew and expanded in other ways. FTX represented that it "carefully designed incentive schemes to increase network effects and demand for FTT, and to decrease its circulating supply." These incentives included that FTT would be listed on FTX and thus could be traded, and FTX's "buy

---

[6] Generally speaking, "exchange tokens" purport to provide incentives, benefits, and investment returns to holders and to traders on crypto asset trading platforms. For example, "exchange tokens" may offer fee discounts with respect to crypto asset trading platform fees, or offer other benefits, essentially incentivizing the platform's traders or users to allocate additional funds to the platform's ecosystem. Trading platforms may also offer "exchange tokens" to their customers in exchange for the customers bringing trading liquidity or other customers or funds to the platform.

A000692

and burn" program would purchase FTT, thus boosting demand, and then burn those purchased tokens in order to decrease the supply of FTT and increase its price.

86.     FTX marketed FTT by encouraging purchasers to believe that its platform would succeed and provide a return based on that success.  The FTT whitepaper emphasized "Why Invest? -- All-Star Team," and highlighted the importance of the management team's experience and success in developing crypto asset trading systems.  For example, the whitepaper stated that FTX's "greatest strength lies in the team behind it" and touted FTX's "Track Record of Proven Success" based on the background and experience of its management team.  The FTT materials made clear that FTX's core management team's efforts would drive the growth and ultimate success of FTX.  The whitepaper also advertised that certain features gave FTX an advantage over competing platforms, including industry-leading risk management systems and its liquidation engine model.

87.     FTX also marketed FTT as an asset that could be used in an "earn program" or in "staking programs" (*i.e.*, a program promising interest payments on deposited assets), as additional ways in which investors could earn returns from FTT.

88.     FTX's whitepaper tied the prospects of FTT's investors to the growth of the FTX platform, and noted that FTX would undertake various "Strategies to Acquire Users and Grow Volume," including the employment of influential spokespeople.

89.     FTX's whitepaper also stated that "[t]here are many ways FTT will be used as we add more products and features to FTX.  For instance, when we launch a spot exchange in the future, FTT will be used for initial exchange offerings."

90.     As a result of the above representations and the economic reality at that time, FTT investors had a reasonable expectation of profiting from FTX's efforts to deploy investor funds

A000693

to create a use for FTT and bring demand and value to their common enterprise.

### 2. Alameda and Ellison, at Bankman-Fried's Direction, Manipulated the Market Price of FTT.

91.     In July 2019, when FTX launched FTT, Alameda received a substantial portion of the 350 million FTT tokens that were minted, including all of the "company tokens" that were allocated to FTX. Alameda did not pay for these tokens

92.     Alameda programmed its automated trading tools (or "bots") to conduct trades and execute transactions to purchase FTT at specific prices. On more than one occasion, Alameda and Ellison, at Bankman-Fried's direction, actively engaged in the trading of FTT with the goal of supporting the price of the token. On these occasions, Alameda adjusted the trading parameters of its trading bots in order to support the price of FTT.

93.     For example, in 2019, there was downward pressure on the price of FTT as the token was being unlocked for early-stage investors. Bankman-Fried became concerned about, among other things, the psychological effect of the price of FTT dropping below a specific threshold, and instructed Ellison to have Alameda purchase FTT to support the price and avoid that outcome. In another instance in 2021, the price of FTT was again facing downward pressure from external events, this time related to substantial sales of FTT by a third party. Bankman-Fried again instructed Ellison to have Alameda purchase FTT on trading platforms to support the price. In addition, as described further below in paragraph 106, in November 2022, Ellison engaged in further deceptive conduct to support the price of FTT.

94.     By manipulating the price of FTT, Ellison and Bankman-Fried caused the valuation of Alameda's FTT holdings to be even more inflated. As described above, Alameda's FTT holdings were a substantial part of the collateral Alameda used to borrow funds from external lenders. By overstating the value of the collateral on Alameda's balance sheet, Ellison

A000694

and Bankman-Fried concealed Alameda's true risk exposure from those lenders, and misled investors about FTX's risk exposure—all in furtherance of the fraudulent scheme.

### iii. Loans to FTX Executives and Real Estate Purchases

95.     The FTX funds transferred to Alameda were used not only for Alameda's proprietary trading, but also to fund loans to FTX executives, including Bankman-Fried himself, and to fund personal real estate purchases.  Between March 2020 and September 2022, Bankman-Fried executed promissory notes for loans from Alameda totaling more than $1.338 billion, including two instances in which Bankman-Fried was both the borrower in his individual capacity and the lender in his capacity as CEO of Alameda.  Ellison knew, or was reckless in not knowing, about these "loans."

96.     Bankman-Fried also used commingled funds from Alameda to make large political donations and to purchase tens of millions of dollars in Bahamian real estate for himself, his parents, and other FTX executives.  Specifically, in 2020 and 2021, Wang executed promissory notes with Alameda totaling approximately $224.7 million.  The funds borrowed under the promissory notes in Wang's name were not intended for Wang's personal use but were instead used by Bankman-Fried for other purposes, including additional venture investments. However, Wang did withdraw approximately $200,000 in funds for his own purposes.

97.     The loans to Bankman-Fried, Wang, and other individuals were poorly documented, and at times not documented at all.  Similarly, the record keeping regarding the purchase and ownership of real estate was poorly organized and documented.  Defendants knew, or were reckless in not knowing, that neither the fact of the loans and purchases, nor the poor documentation of significant company liabilities and expenditures, was disclosed to investors.

A000695

**D. Despite the Precarious Financial Position of FTX and Alameda, Bankman-Fried and Ellison Continued to Use FTX Customer Assets in the Summer of 2022, Including to Rescue Distressed Crypto Firms and to Further Mislead Investors.**

98.     In May 2022, the crypto markets plummeted due to a significant loss in value of certain crypto assets and networks and the collateral effects on the interrelated markets. Bankman-Fried characterized FTX, and himself, as playing an important role in stabilizing the industry.  Bankman-Fried entered into a series of transactions with other members of the industry, providing credit to and taking over other failing firms.  On or about June 21, 2022, after giving a $250 million line of revolving credit to BlockFi, a global crypto financial services company, to provide the company with access to capital to ease liquidity concerns, Bankman-Fried tweeted:  "We take our duty seriously to protect the digital asset ecosystem and its customers."

99.     At the same time that Bankman-Fried was positioning himself as a hero in the industry, however, the plummeting value of crypto assets was impacting Alameda, and as a result impacting FTX.  As discussed above, as a result of the same market conditions impacting BlockFi's liquidity, many of Alameda's lenders demanded repayment of loans they had made to Alameda.  Ellison, at the direction of Bankman-Fried, drew down billions of dollars from its "line of credit" from FTX to repay some of Alameda's loans—money that came from FTX's spot market funded by FTX customers.

100.     Thus, in the summer of 2022, Defendants and Bankman-Fried knew, or were reckless in not knowing, that FTX was in a precarious financial condition.  However, Bankman-Fried and Ellison, with Wang's knowledge, continued to spend hundreds of millions of dollars to purchase and support other crypto companies, and allowed Alameda to use FTX customer funds to repay its debts.  In addition, Bankman-Fried, Wang, and other FTX executives continued to

A000696

withdraw customer funds in the form of the poorly documented and undisclosed "loans" described above.  Specifically, on or about July 22, 2022, Bankman-Fried loaned himself $136 million and, on or about September 28, 2022, Wang signed a promissory note to Alameda for $13.7 million, which was used by Bankman-Fried for a venture investment.  Defendants and Bankman-Fried knew, or were reckless in not knowing, of the significant financial risk these "loans" posed to both Alameda and FTX.  Collectively, Defendants' and Bankman-Fried's actions in the summer of 2022 further imperiled FTX's financial condition.

101.    Defendants knew or were reckless in not knowing that Bankman-Fried continued to present a false and misleading positive account of FTX to investors, despite FTX's tenuous financial condition at this time.  In a meeting with FTX's U.S. investors in September 2022, for example, an FTX presentation included the claim that:  "Outside of BlockFi, we didn't increase our exposure to crypto."  This statement was false and misleading:  the customer funds that FTX diverted to Alameda, including customer funds that Ellison used to repay Alameda's lenders, were collateralized in part by Alameda's FTT holdings.  Defendants and Bankman-Fried knew or were reckless in not knowing that, as a result, FTX's exposure to crypto, including its own FTT token, increased substantially as Alameda increased its borrowing, backed by FTT as collateral, in the second quarter of 2022.

102.    In that same meeting with FTX investors, FTX also represented that certain investments did not involve the assets of FTX or its customers.  Contrary to that representation, two $100 million investments made by FTX's affiliated investment vehicle, FTX Ventures Ltd., were funded with FTX customer funds that had been diverted to Alameda.

A000697

**E.** **Even as the Scheme Was Spiraling Out of Control, Bankman-Fried and Ellison, with Wang's Knowledge, Continued to Mislead Investors and the Public About FTX's True Financial Condition.**

103.    On or about November 2, 2022, CoinDesk, a crypto news website, published an article stating that based on its review of an Alameda balance sheet it had obtained, Alameda held a large position in FTT and other FTX-associated tokens.  At Bankman-Fried's direction, Ellison responded on Twitter to reassure investors and the public that Alameda was financially sound.  Ellison did so on or about November 6, 2022, tweeting that the balance sheet referenced in the CoinDesk article (and elsewhere by that point) "is for a subset of our corporate entities, we have > $10 billion of assets that aren't reflected there."  Ellison continued:  "…given the tightening in the crypto credit space this year we've returned most of our loans by now."  The tweet was designed to provide false reassurance to customers by implying that Alameda had additional assets that meant its financial condition was stronger than the balance sheet suggested.  At the same time, the tweet omitted the fact that the balance sheet did not accurately reflect the significant debt that Alameda owed to FTX.  In contrast to the positive message in her tweet, at that point, Ellison knew, or was reckless in not knowing, that Alameda was insolvent.

104.    On or about November 6, 2022, the CEO of Binance, a crypto asset trading platform, announced that "[d]ue to recent revelations that have came [sic] to light," Binance would liquidate its FTT holdings.  Binance held FTT then valued at more than $500 million, which it had received from FTX as part of Bankman-Fried's buyout of Binance's equity in FTX as an early round investor.

105.    Binance's announcement caused many FTX customers to withdraw their funds from FTX.  Defendants and Bankman-Fried knew or were reckless in not knowing that given Alameda's large FTT holdings, any further drop in the value of FTT threatened the solvency of FTX, given Alameda's multi-billion-dollar liabilities.  With the knowledge and consent of the

32

A000698

Defendants, Bankman-Fried engaged in a frantic campaign to prevent this outcome by assuring investors and the public that FTX was financially sound.

106.     Specifically, to prevent a collapse in the market price of FTT that Binance's sales might cause, Ellison, at Bankman-Fried's direction, tweeted an offer to buy Binance's entire stake, for $22 per token ("@cz_binance if you're looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!").  When Ellison sent this message she knew, or was reckless in not knowing, that in order for Alameda to be able to actually purchase Binance's FTT for $22 per token, Alameda would have to draw down additional funds from FTX itself, further extending its line of credit, or obtain funds from third-party lenders without disclosing its own tenuous financial condition.  Despite this, Ellison posted the tweet in an effort to support and increase the price of FTT, again using Alameda to impact the price of FTT in furtherance of Defendants' scheme.

107.     Similarly, attempting to maintain public and investor confidence in FTX, Bankman-Fried tweeted on or about November 7, 2022:  "FTX is fine.  Assets are fine … FTX has enough to cover all client holdings.  We don't invest client assets (even in treasuries).  We have been processing all withdrawals, and will continue to be …."  That tweet was false and misleading, and Bankman-Fried later deleted it.  Defendants and Bankman-Fried knew that FTX, at Bankman-Fried's direction, had allowed Alameda to invest "client assets" and that Alameda had in fact done so, using FTX customer funds to make investments far riskier than "treasuries."

108.     The next day, November 8, 2022, FTX paused all customer withdrawals, and the price of FTT plummeted by approximately 80%.  Alameda's collateral on deposit was worth far less than the amount Alameda had borrowed from FTX.  FTX was left with billions of dollars in effectively unrecoverable loans.

A000699

109.     Facing a solvency crisis, Bankman-Fried searched for investors who could provide additional funding.  On or about November 8, 2022, the CEO of Binance tweeted:  "FTX asked for our help. There is a significant liquidity crunch. To protect users, we signed a non-binding LOI, intending to fully acquire http://FTX.com and help cover the liquidity crunch. We will be conducting a full DD [due diligence] in the coming days."

110.     It only took one day, however, for Binance to decide not to acquire FTX.  On or about November 9, Binance announced:  "As a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of http://FTX.com."

111.     FTX customers withdrew approximately $5 billion from the platform that day.

112.     At the same time, Bankman-Fried sought emergency funding from other investors, including U.S. investors, to cover a shortfall at FTX of approximately $8 billion.  As part of this effort, Bankman-Fried circulated a balance sheet to potential investors that listed a negative $8 billion entry labeled as a "hidden, poorly internally labeled 'fiat@ account.'"  This entry was a reference to the above-described fiat@ftx.com account and reflected FTX customer funds deposited in Alameda's bank accounts.

113.     During a meeting with Alameda employees on or about November 9, 2022, Ellison admitted that she, Bankman-Fried, Wang, and Singh were aware that FTX customer funds had been used by Alameda.

114.     On the morning of November 10, 2022, confronting the implosion of FTX and Alameda, Bankman-Fried tweeted:  "1) I'm sorry.  That's the biggest thing. I f*cked up, and should have done better."[7]  In the same tweet thread, Bankman-Fried announced that Alameda

---

[7] Expletives have been redacted in part with asterisks.

was "winding down trading" and soon would not trade on FTX at all. Bankman-Fried maintained that "FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!)." And he stated, among other things, that he was trying to "raise liquidity," claiming "[t]here are a number of players who we are in talks with, LOIs [letters of intent], term sheets, etc."

115. The next day, November 11, 2022, Bankman-Fried resigned from FTX. Shortly thereafter, FTX and approximately 100 affiliated entities, including FTX US, filed for Chapter 11 bankruptcy protection. Wang's employment with FTX and Ellison's employment with Alameda were terminated on or about November 18, 2022.

## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

#### (Violations of Section 17(a)(1) and (3) of the Securities Act)

116. The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 115.

117. By reason of the conduct described above, Defendants, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting knowingly, recklessly, or, as to (ii), negligently, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

118. By reason of the conduct described above, Defendants violated Securities Act Sections 17(a)(1) and (a)(3) [15 U.S.C. § 77q(a)(1) and (a)(3)].

A000701

## SECOND CLAIM FOR RELIEF

## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

## (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder)

119. The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 115.

120. By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers of the securities.

121. By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

A. Permanently restraining and enjoining Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B. Ordering Defendants pay disgorgement plus prejudgment interest of all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to

A000702

Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

      C.     Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

      D.     Ordering Defendants barred from acting as an officer or director pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

      E.     Prohibiting Defendants from participating, directly or indirectly, including, but not limited to, through any entity controlled by them, in the issuance, purchase, offer, or sale of any securities, including crypto asset securities, provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities, including crypto asset securities, for their own personal accounts; and

      F.     Granting such other and further relief as this Court may deem just and proper.

A000703

## JURY DEMAND

The Commission demands trial by jury.

DATED:  New York, New York
           December 21, 2022

                                               Respectfully submitted,

                                               Jorge G. Tenreiro
                                               David L. Hirsch (not admitted in SDNY)
                                               Ladan F. Stewart
                                               Amy Harman Burkart
                                               David J. D'Addio
                                               SECURITIES AND EXCHANGE
                                                COMMISSION
                                               100 Pearl Street, Suite 20-100
                                             New York, New York 10004
                                             (212) 336-0153 (Stewart)
                                             Email: StewartLa@sec.gov

                                             *Attorneys for the Plaintiff*

A000704

NITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .  Chapter 11
                                    .  Case No. 22-11068 (JTD)
FTX TRADING LTD., *et al.,*          .
                                    .
                                    .  Courtroom No. 5
                                    .  824 Market Street
           Debtors.                 .  Wilmington, Delaware 19801
                                    .
                                    .  Wednesday, January 11, 2023
. . . . . . . . . . . . . . . .  9:00 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN T. DORSEY
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:          Adam Landis, Esquire
                         LANDIS RATH & COBB LLP
                         919 Market Street, Suite 1800
                         Wilmington, Delaware 19801

                         Andrew G. Dietderich, Esquire
                         James L. Bromley, Esquire
                         Brian D. Glueckstein, Esquire
                         Alexa J. Kranzley, Esquire
                         SULLIVAN & CROMWELL LLP
                         125 Broad Street
                         New York, NY 10004


(APPEARANCES CONTINUED)

Audio Operator:          Jermaine Cooper

Transcription Company:   Reliable
                         The Nemours Building
                         1007 N. Orange Street, Suite 110
                         Wilmington, Delaware 19801
                         Telephone: (302)654-8080
                         Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    <u>APPEARANCES (CONTINUED)</u>:

2    For the U.S. Trustee:        Juliet Sarkessian, Esquire
                                  OFFICE OF THE UNITED STATES TRUSTEE
3                                 844 King Street, Suite 2207
                                  Lockbox 35
4                                 Wilmington, Delaware 19801

5    For the Movants:            David Finger, Esquire
                                  FINGER & SLANINA, LLC
6                                 1201 North Orange Street
                                  Wilmington, Delaware 19801
7
     For the Committee:          Kris Hansen, Esquire
8                                 Erez Gilad, Esquire
                                  PAUL HASTINGS LLP
9                                 MetLife Building
                                  200 Park Avenue
10                                New York, New York 10166

11   For the Ad Hoc
     Committee of Non-US
12   Customers:                  Matthew Harvey, Esquire
                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                                1201 North Market Street
                                  Suite 1600
14                                Wilmington, Delaware 19801

15   For Paradigm
     Operations:                 Sidney Levinson, Esquire
16                                DEBEVOISE & PLIMPTON LLP
                                  919 3rd Avenue
17                                New York, New York 10022

18

19

20

21

22

23

24

25

A000706

1                          <u>INDEX</u>

2    <u>MOTIONS</u>:                                              <u>PAGE</u>

3    Agenda
4    Item 20:  Motion of Debtors for Entry of Interim and        16
               Final Orders (I) Authorizing the Debtors to
5              Maintain a Consolidated List of Creditors in
               Lieu of Submitting a Separate Matrix for Each
6              Debtor, (II) Authorizing the Debtors to Redact
               Or Withhold Certain Confidential Information
7              Of Customers and Personal Information of
               Individuals And (III) Granting Certain Related
8              Relief [D.I. 45; Filed 11/19/22]

9              Court's Ruling:                                   102
10
     Agenda
11   Item 22:  Motion for Entry of Interim and Final Orders      109
               (A) Authorizing the Debtors, in Their Sole
12             Discretion, to Provide Indemnification and
               Exculpation to Certain Individuals, (B)
13             Authorizing Certain Actions Pursuant to Section
               363 of the Bankruptcy Code, and (C) Granting
14             Certain Related Relief
               [D.I. 94; Filed 11/22/22]
15
16             Court's Ruling:                                   113

17   Agenda
     Item 21:  Motion of Debtors for Entry of Interim and Final  113
18             Orders (I) Authorizing the Debtors to (A)
               Operate a Post-Petition Cash Management System,
19             (B) Maintain Existing Business Forms, and (C)
               Perform Intercompany Transactions, (II) Granting
20             A partial Waiver of the Deposit Guidelines Set
               Forth in Section 345(b), and (III) Granting
21             Related Relief
               [D.I. 47; Filed 11/19/22]
22
23             Court's Ruling:                                   139

24

25

A000707

1                              <u>INDEX</u>

2  <u>MOTIONS</u>:                                              <u>PAGE</u>

3  Agenda
4  Item 24: Motion of Debtors for Entry of Orders (I)(A)      140
           Approving Bid Procedures, Stalking Horse
5          Protections and the Form and Manner of Notices
           For the Sale of Certain Businesses; (B)
6          Approving Assumption and Assignment Procedures
           And (C) Scheduling Auction(s) and Sale Hearings
7          And (II)(A) Approving the Sale(s) Free and Clear
           Of Liens, Claims, Interests, and Encumbrances
8          And (B) Authorizing Assumption and Assignment
           Of Executory Contracts and Unexpired Leases
9          [D.I. 233; Filed 12/15/22]

10         Court's Ruling:                                   162

11

12  <u>STATUS CONFERENCE</u>:                                   <u>PAGE</u>

13  Agenda
    Item 30: Motion of the United States Trustee for Entry    163
14          Of an Order Directing the Appointment of an
            Examiner [D.I. 176; Filed 12/1/22]
15

16

17  WITNESSES CALLED
    BY THE DEBTOR:                                           <u>PAGE</u>
18
         <u>KEVIN COFSKY</u>
19       Direct examination by Mr. Glueckstein              21
         Cross-examination by Ms. Sarkessian                33
20       Cross-examination by Mr. Finger                    41
         Redirect examination by Mr. Glueckstein            51
21

22  <u>EXHIBITS</u>:                                            <u>PAGE</u>

23
    Declaration of Brian Glueckstein                        140
24

25

                                                        A000708

1        (Proceedings commence at 9:03 a.m.)

2        (Call to order of the Court)

3              THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5              So, before we begin, let me just remind everyone

6    about proper decorum, both in the courtroom and for those who

7    are appearing online through the Zoom call.  It's important

8    that we maintain proper courtroom decorum.

9              If you are on the Zoom call, please leave your

10   camera off and your line muted, unless you wish to be heard

11   regarding one of the matters that are before the Court today.

12   And disruptions won't be tolerated; anyone disrupting on the

13   Zoom call will be removed immediately and not allowed back

14   in.

15             Before we begin, I also want to address -- excuse

16   me -- a letter that I received from four U.S. Senators.  It's

17   an inappropriate *ex parte* communication, number one.  And

18   number two, I want to make perfectly clear that I will make

19   my decisions on the matters referred to in the letter based

20   only upon admissible evidence and the arguments of parties-

21   in-interest presented in open court.

22             I'm not going to docket -- I am going to docket the

23   letter; in fact, I did that this morning.  But it will have

24   no impact whatsoever in my decisions in this case, which will

25   only be based upon the facts and law presented by the

1  parties.

2         So, with that, we'll proceed.

3         MR. LANDIS:  Good morning, Your Honor, and may it

4  please the Court.  Adam Landis from Landis, Rath & Cobb,

5  counsel to FTX Trading Limited and its affiliated debtors.

6         We're here today, Your Honor, on second-day relief.

7  We filed an amended agenda.  It's 27 pages long, Your Honor,

8  with 30 items on it.  But thanks to the very hard work of

9  many people in this room and lots of people out of it, I'm

10 pleased to say that we have a limited number of matters that

11 Your Honor is going to have to hear and decide today.

12         But before we get into the agenda, I'd like to cede

13 the podium to Mr. Dietderich, who will give the Court and

14 parties-in-interest an update as to activities that have been

15 going on since we were last before you.

16         THE COURT:  All right.  Thank you.

17         MR. DIETDERICH:  Thank you, Mr. Landis.

18         Good morning, Your Honor.  May it please the Court,

19 I have a short case update for the record.

20         The debtors filed for Chapter 11 60 days ago and

21 the level of activity since has been extraordinary.  We've

22 identified over 9 million customer accounts with about 120

23 billion in associated transactions.  We are engaged in a

24 complex effort now to recreate petition date claim values for

25 every customer.

1          We are building financial statements from the
2    ground up using the general ledger and bank transaction
3    records, rather than the previous incomplete and unreliable
4    financial statements of the debtors.  This will put us in the
5    position to describe the financial results of the debtors
6    accurately for the first time.
7          We have located over $5 billion of cash, liquid
8    cryptocurrency, and liquid investment securities, measured at
9    petition date value.  This does not describe any value to
10   holdings of dozens of illiquid cryptocurrency tokens, where
11   our holdings are so large relative to the total supply that
12   our positions cannot be sold without substantially affecting
13   the market for the token.
14         The 5 billion in liquid assets also does not
15   include approximately 425 million of crypto at petition date
16   values in the custody of the Securities Commission of the
17   Bahamas.  That position was valued at about 170 million at
18   the end of 2020.  It contains a large amount of FTT and is
19   highly volatile.
20         We have started a strategic review process for our
21   assets.  We have established data rooms and solicited
22   interest for the four operating subsidiaries subjecting to
23   the bidding procedures motion today.
24         We also are well underway on plans to monetize over
25   300 other nonstrategic investments with a book value of over

1 | $4.6 billion.

2 |        We have established, Your Honor, cooperative

3 | relationships with the joint provisional liquidators in our

4 | only subsidiaries that are subject to separate proceedings,

5 | Australia and the Bahamas.

6 |        Our recently announced cooperation agreement with

7 | the JPL in the Bahamas is an important first step to align

8 | incentives and maximize joint recoveries.  The principle of

9 | that agreement is simple:  It does not matter who collects a

10 | dollar for customers, as long as the customers get it.

11 |        We've established a task force with the Official

12 | Committee of Creditors and the Bahamas JPL to explore

13 | alternatives for the sale or reorganization of the

14 | international platform.

15 |        We have cooperated and spent countless hours

16 | providing information to law enforcement.

17 |        These 60 days have already seen Mr. Bankman-Fried

18 | indicted, arrested, extradited, released on bail, and plead

19 | not guilty, with a trial date set.

20 |        We have seen Ms. Ellison and Mr. Wang plead guilty,

21 | make public plea statements, and cooperate with law

22 | enforcement.

23 |        And we have learned about what happened.  We know

24 | how Sam Bankman-Fried instructed Gary Wang to create the

25 | Alameda backdoor, a secret way for Alameda to borrow from

1  customers on the exchange without permission.  Mr. Wang

2  created this backdoor by inserting a single number into

3  millions of lines of code for the exchange, creating a line

4  of credit from customers to Alameda, to which customers did

5  not consent.  And we know the size of that line of credit, it

6  was $65 billion.

7       We know what Alameda did with the money.  It bought

8  planes, houses, threw parties, made political donations.  It

9  made personal loans to its founders.  It sponsored the FTX

10 Arena in Miami, a Formula One team, the League of Legends,

11 Cochella, and many other businesses, events, and

12 personalities.

13      It gambled on cryptocurrency investments, often

14 unsuccessfully.  And it made debt and equity investments in

15 diverse businesses, many at prices that greatly exceeded

16 market value at the time of the investment.

17      We know that all this has left a shortfall in value

18 to repay customers and creditors.  The amount of the

19 shortfall is not yet clear.  It will depend on the size of

20 the claims pool and our recovery efforts.  But every week, we

21 come closer to completing the work necessary to estimate

22 recoveries for the purposes of a plan of reorganization.

23      We also have begun to engage on the central legal

24 issues in the case.  These include the nature of customer

25 entitlements, are they property or claims, and how to close

1   out derivatives to calculate petition date claim amounts.

2           Finally, we have established great working

3   relationships with the U.S. Trustee, our new Official

4   Committee of Creditors -- welcome -- and regulatory

5   stakeholders around the world.  Many people and many

6   institutions have worked hard to get us here today.  Chapter

7   11 is a fish bowl and we welcome that, in this case more than

8   most.

9           And as a result of the effort by so many, we stand

10  before you with only limited open issue on our second-day

11  relief.  This is despite the volume and the unique nature of

12  many of the issues everyone has faced together.

13          Unless you have questions for me, Your Honor, I

14  propose we move directly to the agenda.  As Mr. Landis

15  mentioned, it is an extremely long agenda, but it is mostly

16  matters that have either been adjourned or reflected in

17  orders that have been either entered or in agreed form.

18          For our point today, Your Honor -- maybe -- I'll

19  cede -- also, Mr. Hansen is raising his hand.  I'll cede the

20  podium to him, if he would like to make some preliminary

21  remarks.

22          THE COURT:  Okay.  Thank you.

23          Mr. Hansen.

24          MR. HANSEN:  Good morning, Your Honor.  Kris Hansen

25  with Paul Hastings, proposed counsel to the official

1    committee.  Just quick introductions.  My partners Erez Gilad

2    and Gabe Sasson are here with me today, as are Mr. Lunn and

3    Mr. Poppiti, with our proposed co-counsel at Young Conaway.

4         The committee has also selected FTI Consulting as

5    it's financial advisor and Jefferies as its investment

6    banker.

7         Your Honor, the committee worked very hard behind

8    the scenes with the debtors and the United States Trustee to

9    try to make this hearing as consensual as it could be, and we

10   appreciate the willingness of both parties to approach the

11   motions on for today in a constructive manner.

12        With this being the committee's first formal

13   appearance before the Court since its formation, I wanted to

14   just take a moment to share a little bit of information about

15   the committee and provide the Court with the committee's

16   perspective on the cases at this time, if that would be okay.

17        THE COURT:  That's fine.  Thank you.

18        MR. HANSEN:  Thank you, Your Honor.

19        Your Honor, first, the committee is comprised of

20   nine members, including three individuals and six entities

21   from eight different jurisdictions, spanning from Singapore

22   to California.  The committee members have broad exposure

23   across the FTX exchange platforms and, sadly, share the

24   moniker of "victim" with the millions of other customers who

25   were defrauded by FTX.

1          The committee members understand the seriousness of

2     their task to serve as fiduciaries for all creditors in these

3     cases.  And to that end, they will check the debtors at every

4     step of these cases and take independent actions and generate

5     their own initiatives to recover assets and maximize the

6     distribution to creditors as rapidly as they can.

7          To date, the committee members have been active,

8     engaged, and hard at work with the committee professionals in

9     helping to resolve near-term issues, inserting itself in the

10    investigation and asset tracing efforts that are underway by

11    the debtors, and pushing the analysis of larger issues, such

12    as whether the exchanges can be restarted and a restructuring

13    path can be pursued as a complement to the asset recovery,

14    monetization, and distribution efforts.  And it's important

15    to note that it's not too soon to start that exercise.

16         The committee also believes strongly in the

17    principles noted at the outset of our reservation of rights

18    on the debtors' motion to approve the bidding procedures.

19    These cases need to be transparent, credibility needs to be

20    restored, and creditors need to know that they can trust the

21    Chapter 11 process.

22         As part of this effort, the committee is preparing

23    a multifaceted approach for communicating with the global

24    creditor community in these cases, which will include

25    dissemination of information, not only through the standard

1  committee website, but through various forms of social media.

2  The committee is aware of the disappointment of customers and

3  creditors with the information-sharing efforts in some of the

4  large, crypto-related cases, and we're trying to learn from

5  that to do better here.

6         The magnitude and complexity of the global fraud

7  and the lack of the corporate controls and recordkeeping

8  present significant challenges to the realization of the

9  committee's objectives, but the committee will work

10  tirelessly to make its goals a reality.

11         We appreciate the few minutes, Your Honor, and the

12  committee looks forward to working through these cases with

13  you, the United States Trustee, the Department of Justice,

14  the Bahamian liquidators, and the other parties-in-interest.

15  And you'll hear more from us as we go through each motion

16  today.

17         Do you have any questions for me, Your Honor?

18         THE COURT:  No, no questions.  Thank you very much.

19  Appreciate the --

20         MR. HANSEN:  Thank you.

21         THE COURT:  -- introductions and the update.

22         I may institute something that I did during the

23  Mallinckrodt bankruptcy, when I have dozen-page agendas with

24  a lot of items that are moved off.  I know the local rule

25  says you have to list everything in them.  What I did in

 1  Mallinckrodt was say, if an item has been adjourned or has

 2  been resolved -- well, if it's been adjourned, specifically,

 3  you don't have to list everything out in that.  Just put in

 4  the motion and that it's been adjourned to a different date.

 5         MR. LANDIS:  Thank you, Your Honor.  For the

 6  record, Adam Landis.  I see that you're directing that at me,

 7  and we will --

 8         THE COURT:  Yes.

 9         MR. LANDIS:  -- absolutely take our cues from what

10  we were involved with in Mallinckrodt.

11         And I also would be remiss if I didn't extend some

12  appreciation to chambers for the patience with which everyone

13  has dealt with us as we've tried to get matters --

14         THE COURT:  Sure.

15         MR. LANDIS:  -- on the agenda.  So thank you for

16  that and we will take that advice.

17         THE COURT:  All right.  Thank you.  Okay.

18         MS. KRANZLEY:  Thank you, Your Honor.  Good

19  morning.  For the record, Alexa Kranzley from Sullivan &

20  Cromwell, proposed counsel for the debtors.

21         Your Honor, if acceptable to you, I will cover the

22  matters that are listed on the agenda that have been

23  resolved, so I'll go slightly out of order.

24         THE COURT:  Okay.

25         MS. KRANZLEY:  I'll start with Item Number 19 on

1  the agenda.

2        THE COURT:  Well, let me interrupt you first, Ms.

3  Kranzley.  I did see the three additional COCs this morning,

4  and I did enter those right before I came on the bench --

5        MS. KRANZLEY:  Oh --

6        THE COURT:  -- so those are entered, as well.

7        MS. KRANZLEY:  Great.  So then I think I only have

8  one agenda item to address with you, which is Item Number 25

9  and 26, which is actually the motion of North American League

10  of Legends to compel rejection or, in the alternative, relief

11  from the automatic stay to terminate the sponsorship

12  agreement.

13        Your Honor, while this is a third-party motion, the

14  debtors had filed a motion to reject contracts on December

15  30th at Docket Number 333, which includes the sponsorship

16  agreement that's the subject of this.  We have been working

17  with the counterparties.  We have an agreed-to stipulation.

18  And I understand from counsel that there will -- they will be

19  filing a certification of counsel with the stipulation later

20  today.

21        THE COURT:  Okay.  I remember that from the last

22  hearing.

23        MS. KRANZLEY:  Yes.

24        THE COURT:  Yeah.

25        MS. KRANZLEY:  So I think, with that, I'll hand the

1  podium to Mr. Glueckstein.

2         THE COURT:  Okay.  Thank you.

3         MR. GLUECKSTEIN:  Good morning, Your Honor.

4         THE COURT:  Good morning.

5         MR. GLUECKSTEIN:  Brian Glueckstein, Sullivan &

6  Cromwell, on behalf of the debtors.

7         Your Honor, the first contested matter on the

8  agenda today is listed at Agenda Item Number 20, which is the

9  debtors' motion for final relief, asking the Court to

10 authorize consolidated creditor matrix and to redact certain

11 customer and creditor information.

12        Your Honor, we filed a declaration at Docket Number

13 411, the declaration of Kevin Cofsky, in support of the

14 relief requested today.  Mr. Cofsky is here in the courtroom

15 and available.  We would like to admit Mr. Cofsky's

16 declaration into evidence in support of this motion at this

17 time.

18        THE COURT:  Okay.  Is there any objection?

19        MR. FINGER:  Yes, Your Honor.

20        THE COURT:  Step forward.

21        MR. FINGER:  Good morning, Your Honor.

22        THE COURT:  Good morning.

23        MR. FINGER:  David Finger for the media objectors.

24        Actually, I was going to file -- I was going to ask

25 -- request -- make a motion to strike Mr. Cofsky's

1  declaration.  I'm not sure if he's testifying as a fact

2  witness, which I don't think he is, but to the extent he is,

3  there's no indication that he has firsthand knowledge of the

4  matters about which he's testifying.  And if he's testifying

5  as an expert, he has not established his expertise.  There is

6  nothing indicating that he has any experience in the

7  cryptocurrency market.

8            He testifies at a couple of paragraphs, Paragraph 7

9  and 8, of his "understanding," in quotes, but does not

10 identify the source of his understanding, so that the Court

11 can determine the credibility of those understandings.

12           He also testifies repeatedly as to his "belief,"

13 again in quotes, as to certain conclusions.  That's in

14 Paragraphs 8, 9, 11, and 13.  He does not offer any objective

15 support for his subjective belief.

16           Now the U.S. Supreme Court in --

17           THE COURT:  Hold on one second, Mr. Finger.  I

18 don't know if we're -- can we -- he -- it's kind of -- I

19 don't know if the people in the back of the courtroom can

20 hear.  I think those microphones needs to be turned up maybe

21 a little bit.

22           MR. FINGER:  I can try to talk louder.

23           THE COURT:  Or you can lift them.  And talking

24 louder would be helpful, too, yes.

25           MR. FINGER:  All right.  The Supreme Court in

1  Daubert said, to satisfy the requirement of specialized

2  knowledge to qualify as an expert, there must be more than a

3  subjective belief or unsupported speculation.

4          As Mr. Cofsky did not provide support for his

5  beliefs and understandings, he does not meet the requirements

6  for an expert and his declaration should, therefore, be

7  stricken.

8          THE COURT:  All right.  Mr. Glueckstein?

9          MS. SARKESSIAN:  Your Honor, I have a similar

10  objection.

11          THE COURT:  Oh, go ahead --

12          MS. SARKESSIAN:  Could I --

13          THE COURT:  -- Ms. Sarkessian.

14          MS. SARKESSIAN:  Thank you, Your Honor.  If it

15  pleases the Court, Juliet Sarkessian on behalf of the U.S.

16  Trustee.

17          I thought it might make sense for me to --

18          THE COURT:  Yes.

19          MS. SARKESSIAN:  -- give my objection now, so that

20  debtors' counsel can address everything at the same time.

21          So, in -- I -- first of all, the U.S. Trustee does

22  agree that some of the testimony in Mr. Cofsky's declaration

23  appears to be of the nature of an expert witness and his

24  expertise in this area has not been established.

25          And in particular, in paragraph -- well, I have

1   questions to ask Mr. Cofsky about the statements in Paragraph

2   7 of his declaration, depending -- as to whether that's based

3   on personal knowledge.  So, depending on his answers, I may

4   object to that.

5          But with respect to Paragraph 11, he has statements

6   like "it is common knowledge."

7          And then later in the paragraph:

8          "-- potential buyers of the debtors' assets will

9   likely ascribe material value to the debtors' customer lists"

10          That's speculation.

11          And then I also object, in Paragraph 12, at the

12   end, he cites a valuation expert that is somebody other than

13   himself and quotes out of, I guess it's a book.  So we object

14   to that as hearsay.

15          And again, I do have some questions with respect to

16   some of the information in Paragraph 7, to determine if

17   that's based on his personal knowledge, and then I also have

18   cross-examination for the witness, as well.

19          THE COURT:  All right.

20          MS. SARKESSIAN:  Thank you, Your Honor.

21          THE COURT:  Any other objections?

22       (No verbal response)

23          THE COURT:  All right.  Mr. Glueckstein.  I'll tell

24   you up front, Mr. Glueckstein.  If I have an objection to the

25   admissibility of a declaration, I usually just allow -- or

1   require that the witness just testify live, and maybe we can

2   resolve some of these issues by testimony.  But go ahead, if

3   you have anything else.

4          MR. GLUECKSTEIN:  That's fine, Your Honor.  Mr.

5   Cofsky is the debtors' proposed investment banker.  He's

6   offering his opinions in the declaration with respect to

7   matters that are raised by the motion today.  We think it is

8   admissible.

9          But if it's Your Honor's preference, I'm happy to

10  call Mr. Cofsky and walk through the issues in his

11  declaration live.

12         THE COURT:  All right.  Let's do that.  Let's call

13  Mr. Cofsky to the stand and we'll do it live and deal with

14  any objections as they come.

15     (Participants confer)

16         THE COURT:  Mr. Cofsky, please take the stand and

17  remain standing for the oath.

18         THE COURT OFFICER:  Please raise your right hand.

19  Please state your full name and spell your last name for the

20  Court.

21         THE WITNESS:  Kevin Michael Cofsky, C-o-f-s-k-y.

22  KEVIN COFSKY, WITNESS FOR THE DEBTORS, AFFIRMED

23         THE COURT OFFICER:  You may be seated.

24         MR. GLUECKSTEIN:  Your Honor, may I approach the

25  witness and give him a copy of his declaration?

1          THE COURT:  Yes.  Could you hand me --

2          MR. GLUECKSTEIN:  Yes.

3          THE COURT:  I can't seem to find it.  I usually

4   have these things --

5          MR. GLUECKSTEIN:  I --

6          THE COURT:  -- electronically, but I can't --

7          MR. GLUECKSTEIN:  I have --

8          THE COURT:  -- find it.

9          MR. GLUECKSTEIN:  -- a copy for you, as well, Your

10  Honor.

11         THE COURT:  Okay.  Thank you.  Thank you.

12                    DIRECT EXAMINATION

13  BY MR. GLUECKSTEIN:

14  Q    Good morning, Mr. Cofsky.

15  A    Good morning.

16  Q    Mr. Cofsky, can you provide a little bit of background

17  about your experience to the Court this morning?

18  A    Yes.  Would you like me to go through education or --

19  Q    Just a little --

20  A    -- professional --

21  Q    -- bit about --

22  A    -- experience?

23  Q    -- your work experience and qualifications in the --

24  yeah, in the area and scope in which you are performing

25  services for the debtors.

1          THE COURT:  Mr. Cofsky, can you please move the

2    microphone closer to you, so we can --

3          THE WITNESS:  Yes, sir.

4          THE COURT:  -- make sure we hear you?  Thank you.

5          THE WITNESS:  I studied finance at the Wharton

6    School of Business as an undergraduate.  I was a financial

7    analyst at Houlihan Lokey for two years, from 1992 to 1994.

8          After law school and practicing law for a period of

9    time, I returned to investment banking in 2001.  I was with a

10   firm called the Beacon Group, as well as Evercore Partners,

11   where I was a managing director in the restructuring group.

12         I joined a small firm that merged into Perella

13   Weinberg Partners upon its founding in 2006, and I have been

14   with the firm since that time.  I've been a partner with the

15   firm since 2015.

16   BY MR. GLUECKSTEIN:

17   Q    And can you describe for the Court just generally the

18   scope of work which yourself and your colleagues at Perella

19   are proposed to assist the debtors with in these cases?

20   A    Yes.  We are the proposed investment banker for the

21   debtors.  We've been working with the other professionals and

22   with the management team and the board on a wide range of

23   issues, including understanding the assets of the debtors,

24   evaluating potential for reorganization of some of the

25   businesses, as well as potential sales of the businesses.

1  And in general, our mandate is to explore different potential

2  avenues to maximize the value of the debtors' assets through

3  this process.

4  Q    In your experience, Mr. Cofsky, have -- prior to this

5  case, have you been involved in situations where the

6  monetization of businesses includes the monetization of

7  things such as customer assets or customer lists?

8  A    Yes, I have been.

9  Q    Can you elaborate on that at all, in terms of the types

10 of work you've done in that area?

11 A    Yes.  Most recently, we've been involved in the Celsius

12 bankruptcy case, pursuant to which the customer -- the value

13 and the potential value of the customers has been at issue.

14 But we've also seen -- while we are not running the sale

15 process, we have been evaluating that.  And we appreciate the

16 extent to which potential acquirers of that business have

17 evaluated the value of the customers and their various

18 positions on that platform.

19 Q    Are there other examples that you can recall where the

20 question of customer assets or customer lists have been at

21 issue in transactions that you or your team have been

22 involved in, in the past?

23 A    Yes.  The -- the identity and value of customers are

24 often considered to be quite valuable in the context of

25 retail businesses, consumer-facing businesses --

1          MS. SARKESSIAN:  Your Honor, I'm going to object.

2          THE COURT:  Basis?

3          MS. SARKESSIAN:  I think he's testifying about what

4  potential buyers look for, and he does not have personal

5  knowledge about that.

6          THE COURT:  Well, he's an investment banker.  He

7  buys and sells companies, right?

8          MS. SARKESSIAN:  I think, Your Honor, if he could

9  be more specific about the basis of that knowledge and

10 exactly who he's talking about.

11         THE COURT:  Well, is that a foundation for his

12 knowledge, Mr. Glueckstein?

13 BY MR. GLUECKSTEIN:

14 Q    Mr. Cofsky, can you back up a half-step and explain to

15 the Court your role in your transactions that you can recall

16 that have involved customer assets in the past?

17 A    Yes.  I want to try to be specific because this is a

18 unique situation.  And I would refer most specifically to, in

19 my declaration, I think, the other exchanges the other crypto

20 companies and the extent to which they clearly have indicated

21 that they value the identity of customers.  And they have --

22 all of the other crypto companies that we have evaluated have

23 programs in place to compensate for the provision of that

24 information.

25      We have also been a party to situations, as I indicated,

1  most recently in the Celsius case, where we have seen that

2  bids have explicitly provided incremental value for each

3  customer that is acquired.

4  Q    Have you, Mr. Cofsky, considered as part of your work as

5  proposed investment banker in this case the debtors' customer

6  list that they have available to them here?

7  A    I'm sorry.  Can you repeat that question, please?

8  Q    In the context of -- in the context of the work that

9  you've done -- that you're doing as the debtors' proposed

10 investment banker in this case, have you considered the

11 debtors' customer list as part of the strategic review that

12 you've undertaken?

13 A    Yes, we have.

14 Q    With respect to the ongoing strategic review, have you,

15 as the debtors' investment banker, formed a view as to

16 whether there is value in the debtors' customer list?

17 A    Yes, we have, and we do believe that there's value in

18 those assets.

19 Q    And can you explain for the Court the basis for that

20 conclusion?

21 A    Yes.  We believe that, whether the exchanges are

22 reorganized or whether they are sold in connection with our

23 process, both the exchanges that we're currently marketing,

24 as well as the core business that we're currently evaluating,

25 we believe that the value of the business is maintained and

1  maximized by ensuring that competitors are not able to

2  solicit those customers and onboard them onto their platforms

3  in a manner which would result in a reduction in the value of

4  the estate.

5       So, for example, if other businesses that compete with

6  FTX had the identity and were able to locate these customers,

7  solicit them, put them on their platform while FTX is in

8  bankruptcy and not currently operating in the ordinary

9  course, that would reduce the value of the estate.

10      Whether the estate, ultimately, is able to reorganize

11 its core business or whether third parties are evaluating the

12 acquisition of those exchanges, they will place, in our view,

13 a greater value on those exchanges if all of the customers

14 are maintained on that platform and have not found another

15 exchange on which to transact.

16 Q    Mr. Cofsky, with respect to -- we've been talking about

17 the customer information, do you view it important to

18 maintain, during your strategic review process, the anonymity

19 of both names, in addition to contact information, or are

20 contact information alone sufficient?

21 A    We -- it's a very good question and we -- we looked into

22 that.  We -- we reviewed the customer lists.  There are a

23 number of -- excuse me -- customers whose names are unique.

24 And we were able to, very quickly, locate them through

25 searches on social media, as well as other professional

1  relationship databases.  And we came to the conclusion that

2  it would be quite easy to locate, identify, and contact those

3  customers, even starting with only the customer names.  And

4  that relates to individuals, as well as businesses.

5  Q    Mr. Cofsky, if you could look at the declaration that

6  you submitted in this case that's in front of you.

7  A    Yes, I have it.

8  Q    And it's filed at Docket Number 411, entitled:

9         "Declaration of Kevin M. Cofsky in Support of the

10 Debtors' Motion for Entry of an Order Authorizing the Debtors

11 to Redact or Withhold Certain Customer Information."

12       Mr. Cofsky, were you involved in preparing the

13 declaration that was submitted to the Court at Docket Number

14 411?

15 A    I was.

16 Q    And do you believe, to the best of your knowledge, that

17 the information presented in that -- in your declaration

18 reflects your views, again, to the best of your knowledge?

19 A    Yes, I do.

20 Q    Okay.  If you can go to Paragraph 12 of your

21 declaration.  You state in the first sentence there:

22       "Additionally, it is well established that customer

23 information such as names and contact information are

24 separately valued intangible assets of an entity."

25       Do you see that?

1   A     I do.

2   Q     Can you explain to the Court the basis for the

3   statements that you made there in Paragraph 12 and beyond

4   that sentence in Paragraph 12?

5   A     Yes.  I'd answer that in a number of ways:

6          First, as indicated further in this particular

7   paragraph, in the context of a "business combination," as

8   that's designed by Accounting Standard Codification 805,

9   intangible assets are valued and allocated in a certain

10   manner, and customer-related assets, customer lists are a

11   component of that.  We thought that that was significant.

12          I also indicated in the paragraph, having reviewed some

13   academic literature, the -- in particular, the book by

14   Jeffrey Cohen, Intangible Assets:  Valuation and Economic

15   Benefit, again, the value ascribed to customer lists,

16   particularly the economic value that is indicated

17   particularly by instances where companies choose to keep that

18   information secret, to the extent that they can.

19          In addition, as I had indicated in the prior paragraphs,

20   it was very relevant, in our view, significant as we

21   evaluated this particular situation and the landscape -- the

22   competitive landscape within which this company operates,

23   that all of its competitors value this information.  This is

24   a new and expanding field.  And it's not entirely clear to

25   businesses that are seeking to expand their asset base and

1  their customer list exactly who they should be targeting.

2      And so all of the competitors that we looked at

3  indicated that they provide economic -- that they ascribe

4  economic value to these customers.  And the indication, the

5  evidence of that was -- I won't read through the words on the

6  page, but Binance and Coinbase and Kraken and Kucoin all

7  provide financial incentives for the referral of customers

8  and the retention of customers.

9      We also reviewed the bids that had been submitted in the

10 Voyager case and in the Celsius case and took note of the

11 fact that, not only were customer assets and lists being

12 acquired in -- and a value ascribed to the business itself,

13 but that there were actually incremental elements of value

14 which would be allocated to each customer that went onto the

15 acquirers platform.  And in the initial case of the prior bid

16 from FTX to Voyager, to the extent that customers maintained

17 their accounts on the platform for a period of time, they

18 would -- they would receive incremental value.  And so there

19 was specific value acscribed to each customer -- the name,

20 the identity, the assets -- as they moved onto the platform

21 of the buyer.

22 Q    Thank you.

23     With respect, Mr. Cofsky, if you look at Paragraph 13 of

24 your declaration, the last paragraph there.

25 A    Yes.

1  Q    You wrote in the declaration in the last sentence:

2         "I believe an important component of that strategy

3  is maintaining the confidentiality of customers' identities

4  and personal identifying information."

5       And then you end by saying:

6         "Disclosing those customer lists would therefore

7  jeopardize the debtors' ability to maximize value."

8       Do you see that there?

9  A    I do.

10 Q    Do you stand by that testimony this morning?

11 A    I do.

12 Q    And can you elaborate for the Court your view as to why

13 disclosing the customer lists would jeopardize the abilitiy

14 to maximize value?

15 A    Yes.  As I indicated, whether we reorganize, are able to

16 reorganize the businesses, or whether there will be an

17 acquisition of the core business and the other exchanges, we

18 believe that the business itself is comprised of a number of

19 components, and a significant component of the business is

20 the customers themselves.

21      The customer assets are obviously important.  But what

22 the customers choose to do going forward will be a

23 significant driver of value.  And we think that third parties

24 will place significant value on that in a sale process.  So,

25 to the extent that those customer lists, the identity of the

1  customers are able to be maintained without broad disclosure,

2  that will give buyers confidence that what they are buying is

3  actually of value, and that they alone will be able to

4  maximize the value of putting those customers onto their

5  platform.

6       I think the same logic holds for a reorganized entity.

7  To the extent that the exchange is able to be rehabilitated

8  and reorganized, it will, in our view, have more value if

9  those customers have not been poached and are -- by

10  competitors, and are, therefore, not transacting on another

11  exchange.

12  Q   Mr. Cofsky, Paragraph 6 of your declaration you

13  submitted to the Court, if you'd turn there.  It says -- you

14  write in the first sentence:

15            "The debtors, with the assistance of PWP, have

16  commenced an extensive outreach effort as part of marketing

17  the debtors; businesses and assets for potential sale."

18       Do you see that?

19  A   Yes, I do.

20  Q   And that sentence is accurate --

21  A   Yes.

22  Q   -- correct?

23  A   Yes, that's correct.

24  Q   Do you have any sense, at this time, how long the

25  process of outreach and monetization of assets and

1  reorganization is likely to take?

2  A    We have filed the bidding procedures for the four

3  exchanges, as you know, and have a time frame enumerated in

4  the bidding procedures.  We've had significant interest in

5  those assets to date.  We would expect that we will be in a

6  position to evaluate those potential -- if the Court approves

7  the bidding procedures and if we move forward with that

8  process, we would be in a position to evaluate those bids

9  relative to a standalone reorganization of those exchanges in

10 a matter of months.  I don't want to be too specific because

11 we're at the earlier stages of that process and there's a lot

12 of work that needs to be done.

13         Similarly, the core exchange, as the UCC counsel

14 indicated earlier, it's not too soon, and we have already

15 initiated a review of a reorganization of the core exchange

16 and that process is ongoing.  We, as you know, have not

17 launched a sale process with respect to the core exchange,

18 but we expect to run a simultaneous reorganization, as well

19 as sale process for that exchange.

20         I -- it's difficult to say with too much

21 specificity at this point, given the -- given the work that

22 will need to be done and the collaboration with the UCC on --

23 on the broader exchange process, the sale as well as the

24 reorganization efforts.  But I would expect that we'll be

25 talking a matter of months before that type of a sale and

1   evaluation of a reorganization will be initiated robustly.

2   Q    Thank you, Mr. Cofsky.

3          MR. GLUECKSTEIN:  No further direct, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          Cross.

6          MS. SARKESSIAN:  Thank you, Your Honor.  For the

7   record, Juliet Sarkessian on behalf of the U.S. Trustee.

8          Your Honor, I just have a question, a

9   clarification.  Debtors' counsel asked the witness, you know,

10  did you participate the declaration, is it true and correct

11  to the best of your knowledge, information, and belief.  I

12  just want to be clear that the affidavit itself is not coming

13  into evidence and it is only the witness' testimony that is

14  coming into evidence.

15         THE COURT:  That's correct.

16         MS. SARKESSIAN:  Thank you.

17                      CROSS-EXAMINATION

18  BY MS. SARKESSIAN:

19  Q    Mr. Cofsky, you spoke about doing a search using just

20  the names of a number of the debtors' customers to see if you

21  could find other contact information based on their names,

22  correct?

23  A    Yes.

24  Q    And by "contact information," I assume, you know, an

25  email address, a street address, something -- telephone

1  number, something of that nature?

2  A    Yes, as well as information on social media platforms

3  and ability to identify the individual -- we believe identify

4  the individuals and their interest in crypto.

5  Q    And identify them in a way that you could communicate

6  with them?

7  A    Yes.

8  Q    How many names did you do that search for?

9  A    I directed my team to evaluate that.  I believe, of the

10  9 million customers, it was not close to 9 million, more than

11  a dozen, dozens, I believe; enough that, once we had a

12  sufficiently high probability of hit rate, we believed that

13  was indicative of our ability to identify these customers.

14  Q    So let me try to pinpoint this down.  Are you saying a

15  dozen, a few dozen?  What's the correct number?

16  A    I -- I don't have a specific number.  I believe it was

17  in the high teens.

18  Q    In the high teens.

19  A    Yes.

20  Q    Okay.  So less than 20 people.

21  A    I believe that we chose to search for under 20, and our

22  hit rate on those names was very high.  In other words, we

23  were able to, based on the names, locate information and be

24  able to correspond with -- we didn't correspond with, but we

25  believe we would be able to correspond with customers over 50

1  percent of the names that we searched on.

2  Q    Okay.  So you searched less than 20; and, out of those

3  20 names, about 50 percent you would have been able to -- you

4  were able to get some type of con -- some type of contact

5  information or some way to contact those individuals.

6  A    It was over 50 percent.  I don't know the specific

7  probability.  But yes, I think that generally characterizes

8  my comments.

9  Q    Okay.  And you did not run any of these searches

10  yourself.

11  A    I actually did run one or two.  But -- but in general, I

12  asked my team to do that, yes.

13  Q    And the names you picked, did you say that they were

14  unusual names, as compared to a Sue Brown or something like

15  that?

16  A    Yeah.  It's a good question because, to the extent that

17  there are generic names -- John Smith, Mary Jones -- yes, we

18  agreed that would be difficult to identify the specific

19  person.  We looked at names that were not of that type.

20      And in general, I was also very interested, I reviewed

21  the customer list myself to -- to assure myself that this was

22  an accurate assessment and to evaluate, to your point,

23  whether I thought that these names, in and of themselves,

24  were meaningful.  And there were -- again, I didn't do a

25  search of the 9 million customer names to give -- and I can't

1  give you a specific probability or percentage.  But a

2  significant -- the vast majority of the names were not of

3  that type, were not of the John Smith/Mary Jones type.

4  Q    Meaning the vast majority of the names that you searched

5  or the vast majority of the 9 million names are not --

6  A    I can't say the 9 million names.  I -- I looked through

7  the database and scrolled through the first several hundred

8  largest, so I went through in customer size order.  And the

9  vast majority of the names I saw were of a unique type that I

10 believed were not of the John Smith/Mary Jones type, where it

11 would not necessarily be useful to do a search for those.

12 Q    Were a good number of those names not, I guess I would

13 say common, say American names?  Were they names that might

14 be names of people living in other countries or names with --

15 you know, not a Sue Brown, that -- Sue Brown is a very

16 American name.  You know, we have customers, right?  All over

17 the world, right?

18 A    Yes.

19 Q    And so a name that might sound a little unusual in the

20 United States might not be that unusual in India or China.

21 Isn't that true?

22 A    I -- I think I understand your question.  In my

23 experience, there's a wide variety of names in the United

24 States.  We didn't place a lot of value in whether the name

25 sounded western or sounded Asian, for example.  We did a --

1  we tried to have a -- just an unbiased perspective as we did

2  the search.

3  Q    Are you personally familiar or knowledgeable about how

4  common a particular name might be in China or India?

5  A    I -- I -- I'm not sure how to answer that question.

6  What I can tell you is that, when we did the searches, to the

7  extent that there was a -- if there had been a large result

8  set from a particular search, such that we didn't believe

9  that we would actually be able to locate and contact and

10 correspond with a customer, then that would have put that

11 name, regardless of the reason, in the category of names that

12 we did not believe we could actually contact through a

13 search, again, regardless of whether it was a common name or

14 for any other reason; they didn't have a social media

15 presence, they protected their identification.  I -- I didn't

16 speculate.

17 Q    Thank you.

18      Now, with respect to non-individuals, institutional

19 customers -- and I understand that it would probably be

20 pretty easy to locate contact information for an

21 institutional customer, right?  You agree with that, right?

22 A    Depending on the institution, it may be easier, yes.

23 Institutions generally have more of a footprint.

24 Q    Although, there are -- I guess there are some

25 institutional customers that might not be that easy to find

1  contact information for.  You're saying smaller institutional

2  customers -- I -- institute -- I shouldn't use

3  "institutional."

4       Non-individuals.  Are there some non-individual

5  customers that might be harder to find contact information

6  for, with just the name and nothing else?

7  A   I -- I'm -- can you repeat the question?  I'm not sure

8  exactly what you're --

9  Q   Okay.  I'll move on.

10 A   -- asking.

11 Q   I'll move on to a different question.

12      With respect to non-individual customers -- I'm trying

13 to think of the best way to put this.  Companies that are

14 looking for -- competitors of the debtors, the people -- the

15 competitors you're concerned might poach customers.  With

16 respect to non-individual customers, institutional customers,

17 aren't there sources that those competitors could go to, to

18 find potential institutional customers that are interested in

19 cryptocurrency or keeping accounts on cryptocurrency

20 exchanges, other than looking at a customer list of a

21 particular -- of the debtors', for example?

22 A   I'm sure, if there are places where businesses that are

23 seeking to acquire customers -- I'm sure, if there are

24 indicators of interest in crypto, those businesses that are

25 seeking customers have already utilized those external

1    sources.  I don't know how that -- I guess I understand your

2    question, but I'm trying to be careful about how I answer it

3    only because I -- I -- I don't want to inadvertently share

4    information about the customers.  But there are a number of

5    institutional customers that are unique, and the names of

6    those -- excuse me -- institutions may not be widely known to

7    the public or to the competitors in this industry.

8         And so I don't know -- I don't believe that simply --

9    that the existence of other information sources materially

10   changes my testimony here.  I think the -- the critical

11   element here is that these institutions and individuals have

12   indicated by their activity on the exchange that they

13   participate in this particular activity and that they would

14   be valuable to a competitor or someone interested in

15   acquiring this business in the future precisely because they

16   have participated in this activity.

17   Q    Now, Mr. Cofsky, is it your understanding that, prior to

18   the bankruptcy filing, that all of the accounts of the

19   debtors' customers were frozen?

20   A    Yes, I believe that's correct.

21   Q    And they've been frozen since that time, correct?

22   A    To the best of my knowledge, yes.

23   Q    Are you aware that there are allegations of billions of

24   dollars of customer -- funds in customer accounts were

25   effectively raided to make loans to Alameda; are you aware of

1  those allegations?

2         MR. GLUECKSTEIN:  Objection, Your Honor.  I think

3  we're pretty outside of the scope of the testimony for this

4  motion.

5         THE COURT:  What's the relevance to his testimony,

6  Ms. Sarkessian?

7         MS. SARKESSIAN:  I believe that this witness'

8  testimony is that these customer names should not be

9  disclosed because they could be subject to poaching.  My

10 point is that I want to ask this witness to sort of develop

11 what the situation was coming into the bankruptcy with

12 respect to these customers and whether these customers might

13 be interested in moving their funds out of the debtors'

14 accounts for reasons that have absolutely nothing to do with

15 potentially being contacted by some other competitor.

16        I mean, this is not a regular case where, you know,

17 a business is having some financial trouble, they file for

18 bankruptcy, they might be able to reorganize.  They could be

19 able to keep the customers; or, if they sell the business,

20 the customers may want to go with it.

21        I would suspect that these customers may be rather

22 upset about the current situation; and, therefore, I don't

23 think poaching is the real problem here.  If the concern is

24 that these customers are going to leave the platform, I think

25 they may be leaving the platform for reasons that don't have

1   to do with poaching.  So that was my -- what I was trying to

2   develop with the witness.  But I guess I can save that for

3   oral argument --

4            THE COURT:  Okay.

5            MS. SARKESSIAN:  -- if we want to do it that way.

6            THE COURT:  Yeah, I think it is outside the scope

7   of his direct testimony, so ...

8            MS. SARKESSIAN:  Thank you, Your Honor.  I think

9   that finishes my cross-examination --

10            THE COURT:  Okay.

11            MS. SARKESSIAN:  -- of this --

12            THE COURT:  Thank you.

13            MS. SARKESSIAN:  -- of this witness on this

14   particular motion.  I will have cross on one of the other

15   motions.

16            THE COURT:  Understood.  Thank you.

17            Mr. Finger.

18            MR. FINGER:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20   BY MR. FINGER:

21   Q    Good morning, Mr. Cofsky.

22   A    Good morning.

23   Q    Just a couple of preliminary questions, if I may, before

24   we get into heavier stuff.

25        In your affidavit, you say you're a partner at Perella

1  Weinberg Partners, LP, correct?

2  A    Correct.

3  Q    And that is the debtors' proposed investment banker.  I

4  don't know if the Court (indiscernible) to that effect --

5          UNIDENTIFIED:  I'm sorry.

6  Q    -- but --

7          UNIDENTIFIED:  Could I just --

8          THE COURT:  Yeah.  We're having a hard time hearing

9  you, Mr. Finger.  You're going to have to speak up and --

10         UNIDENTIFIED:  Maybe move the mic.

11         MR. FINGER:  Yeah, I'm sorry, Your Honor.

12         THE COURT:  All right.

13         MR. FINGER:  Age has done its number on my voice.

14  BY MR. FINGER:

15  Q    You -- Perella is the proposed investment banker for the

16  debtors, correct?

17  A    Correct.

18  Q    Okay.  When were you asked to make this declaration, to

19  the best of your recollection?

20  A    I -- I don't recall if it was before the New Year --

21  Q    Okay.

22  A    -- or somewhere thereabouts.  Over the holidays, I

23  believe.

24  Q    So sometime in December.  Is that fair?

25  A    Yes, I believe that's correct.

1  Q    At Paragraph 4 of your affidavit -- declaration, you

2  identify a number of matters you've worked on.  Do you see

3  that?

4  A    I do.

5  Q    Which of those involved cryptocurrency?

6  A    None of those involved cryptocurrency.

7  Q    Okay.  Page -- at Paragraph 7 of your declaration, you

8  say that -- in the second sentence:

9        "A hallmark feature of cryptocurrency is a holder's

10 ability to remain anonymous to the public."

11       Do you see that?

12 A    Yes, I do.

13 Q    Okay.  Do you know whether -- are you familiar with

14 Bitcoin?

15 A    I am.

16 Q    Okay.  Do you know whether Bitcoin can be traced to the

17 holder?

18 A    I wouldn't put it in quite those terms.  When you say

19 "traced to the holder," I know that Bitcoin can be traced on

20 the blockchain and it can be traced to the wallet.  And so,

21 to the extent that one is able to identify the owner of the

22 wallet, one can trace to a particular user.  But tracing to

23 the wallet is not necessarily the same as tracing the -- it -

24 - identifying the owner of the wallet.

25 Q    Well, do you agree -- strike that.

1      Are you familiar with circumstances where authorities

2   have recovered Bitcoin or other type of cryptocurrency --

3   A    I'm --

4   Q    -- by --

5   A    -- generally --

6   Q    -- tracing it to the holder?

7   A    I'm generally aware of that, yes.

8   Q    Okay.  Now I want to turn to the statement you make in

9   Paragraph 9:

10           "I do not believe that it would be difficult to

11  look up and, in the case of the debtors' competitors, poach

12  the debtors' customers if their names were to be made

13  public."

14      Now the U.S. Trustee has asked you some questions on

15  that, and I'll try not to duplicate.

16      First, practically, the names you get, do they include a

17  middle initial?

18  A    In some cases, yes.

19  Q    Okay.  Would you agree that it might be harder to trace

20  someone, to find someone absent a middle initial?

21  A    I think it -- you say "harder."  Than what?

22  Q    If you --

23  A    Harder than what?

24  Q    I'm sorry.  I apologize.

25      If you have two names, Joe Smith, let's say, and one

1  says Joe Smith, and the other one says Joseph R. -- Joe R.

2  Smith.  Would the "R" be an identifier that could make it

3  easier to locate, track down the owner?

4  A    If your question is -- if you don't mind, I'm trying to

5  be helpful here.  The greater the lever of the identifying

6  information, as a logical matter, I would agree the easier it

7  would be to identify that particular user.

8  Q    Okay.

9  A    In this case, we -- we didn't look at the customer list

10  and simply speculate about whether we would be able to locate

11  and potentially correspond with users.

12  Q    Uh-huh.

13  A    We actually did the searches to determine whether that

14  would be the case.  So I -- I don't disagree with the logic

15  of incremental information being more useful than less

16  information, but we didn't rely upon the logic alone.

17  Q    Thank you.

18       Now, in response to questions from the U.S. Trustee, you

19  discussed the methodology your team used and the results they

20  recovered, correct?

21  A    Generally, yes, although I didn't go into too much

22  detail about the methodology.

23  Q    Have you made any documentation during that process to

24  either the U.S. Trustee or me?

25  A    You're asking have we provided any documentation with

1  respect to those searches and the results of those searches.

2  Q    Well perhaps I'm being presumptuous, so let me step

3  back.

4       In the course of that procedure were there written

5  notes, or reports, or results that were represented to you?

6  A    I did not review any written reports.  I don't know if

7  they exist.  I had conversations with my team.

8  Q    Okay.  So you are reporting to us statements made by

9  your team, correct?

10  A    That is correct.

11  Q    Do you know whether there was any documentation, be it

12  email, be it written findings, regarding this process and the

13  results -- and/or the results.

14  A    Yeah, I don't know.  As I said, I specifically recall

15  that I spoke with the team and directed them to undertake

16  these searches and then we followed up with a physical

17  conversation regarding the results.  I don't know if there

18  was any correspondence among the team members, but I don't

19  recall having reviewed a report on this question.

20  Q    So do you -- as best as you can recall, did your team

21  report back to you orally?

22  A    Yes.  That is correct.

23  Q    So there is no way -- strike that.

24       You would agree with me there is no way anyone, the

25  U.S. Trustee, me, or the Court, can validate what your team

1  did, is that correct, independently?

2  A     I think it would be -- it shouldn't be particularly

3  difficult to independently validate.  I think it would be --

4  I don't think you need to have this customer list in order to

5  undertake your own assessment of whether given a particular

6  set of individuals' contact information or names you would be

7  able to locate those individuals online and be able to find

8  enough information to be able to contact them.

9  Q     But I think you agreed, in response to questions from

10 the U.S. Trustee, that the degree of difficulty depends on

11 the degree of commonality of the name, correct?

12 A     I don't think that is exactly what I said.

13 Q     I am paraphrasing.  I agree.

14 A     Yeah, I want to be clear that to the extent that there

15 are names of the John Smith, Mary Jones type it would be very

16 difficult to identify -- it would be more difficult to ensure

17 that identification of that particular individual would be

18 the individual on the customer list just given the common

19 nature of the name.

20     So when we reviewed the customer lists I personally

21 reviewed the customer list to determine and evaluate the

22 extent to which the predominance were of that type of not and

23 my conclusion was that they were substantially not of that

24 type.  But, yes, I would agree that to the extent that there

25 is a very common name it would be more difficult to locate

A000751

1   that particular individual.

2   Q     Let me make sure I understand; did you review -- how

3   did you select the names?

4   A     I reviewed the customer lists to ensure -- to assure

5   myself, in the first instance, that -- I wanted to understand

6   the relative size, concentration. I wanted to understand the

7   extent to which the names of the institutions or the

8   individuals were unique or general in nature.

9       I then asked my team, whose more technologically savvy

10  then I am, to see if they would be able to locate these

11  individuals or institutions by using generally available

12  search technologies.  And the response was relatively quick

13  that there was a high hit rate in being able to locate these

14  individuals.

15      To be clear, the information that we were able to

16  locate was of a type that gave us a relatively high degree of

17  confidence that these were the right individuals.  We didn't

18  correspond with them and so we can't say with absolute

19  certainty, but their social media footprint indicated that

20  they had a significant interest in crypto.  And we evaluated

21  their postings on various social media platforms, etc., which

22  gave us a high level of confidence that the individual who we

23  were searching for was actually the individual that we had

24  located.

25  Q     Again, I am going to bear dance a little bit; you said

1  you reviewed the client list, correct?

2  A     The customer list, that's correct, yes.

3  Q     How many customers are on that list?

4        (No verbal response)

5  Q     I'll make it a little easier; as the opening today

6  counsel for the debtors used the number 9 million.  Does that

7  seem about right?

8  A     I have seen the number 9 million.  I did not search

9  through 9 million.

10 Q     How many did you search through?

11 A     Hundreds.  I -- so I had an Excel spreadsheet with that

12 information and it had the identifying information and the

13 entitlement amount.  I scrolled down, I can't say

14 specifically, but several hundred because I was interested to

15 know exactly -- again, as I indicated, I don't want to take

16 up too much time repeating myself, but I wanted to make sure

17 that, again, these would be unique names and identifiers.

18 Q     And what did you -- what methodology did you use to

19 determine that the 100 or 200 that you looked at were, in

20 terms of commonality, the names were representative of the

21 list as a whole?

22         MR. GLUECKSTEIN:  Your Honor, I'm just going to

23 object.  This was all asked and answered by the United States

24 Trustee.

25         THE COURT:  I think we did go through this

1  already, Mr. Finger.

2          MR. FINGER:  We did, but I don't think that --

3  maybe I'm wrong, but I don't think there was any specific

4  question regarding how the determination was made as to

5  whether this sampling is a representative sampling.

6          THE COURT:  I will give you some leeway, go ahead.

7  Let's not retread ground we have already been through.

8          THE WITNESS:  I didn't have a sophisticated

9  methodology. I used my judgment that after having gone

10 through page after page, after page, after page and seeing

11 relatively the same type of information that that would be

12 consistent.  I knew I wasn't going to search through

13 millions.

14         So after I scrolled through I believe that I also

15 asked my team to do a sampling. I didn't want to just focus

16 on the largest 20 customers, for example, but to be clear I

17 just exercised my judgment and I didn't have a specific

18 rubric or algorithm.

19 BY MR. FINGER:

20 Q    Did you have any guidelines in determining how common

21 or uncommon a given name would be other than your instinct?

22 A    Yeah, again, I did not have anything other than my own

23 judgment and my team's judgment to base that decision on.

24         MR. FINGER:  Thank you.  I have no other

25 questions.

1        THE COURT:  Thank you.

2        Anyone else wish to cross?

3    (No verbal response)

4        THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6  BY MR. GLUECKSTEIN:

7  Q    Mr. Cofsky, just very briefly.

8        Counsel just pointed you to Paragraph 4 of your

9  declaration.  That reflects certain experience.  Do you see

10 that?

11 A    Yes.

12 Q    Outside of what is listed there in Paragraph 4 can you

13 just state for the Court -- I believe you addressed this in

14 your overview at the beginning, but can you state for the

15 Court experience you have specifically in the area of

16 cryptocurrency in related companies?

17 A    Yes.  I have been involved in a number of other crypto

18 related situations including several capital raises for

19 bitcoin minors and other crypto companies; not specifically

20 focused on bitcoin, but other cryptocurrencies and other

21 business models as well, including IPO advisory and liability

22 management, both representing the company as well as

23 representing creditor groups.

24        MR. GLUECKSTEIN:  Thank you.

25        No further questions, Your Honor.

1              THE COURT:  Thank you.

2              Thank you, sir.  You may step down.

3              THE WITNESS:  Thank you.

4          (Witness excused)

5              THE COURT:  Any further evidence, Mr. Glueckstein?

6              MR. GLUECKSTEIN:  No, Your Honor.  We are prepared

7    to move to argument.

8              THE COURT:  Let me ask if the other objecting

9    parties have any evidence they wish to introduce.

10             MR. FINGER:  No, Your Honor.

11             MS. SARKESSIAN:  No, Your Honor.

12             THE COURT:  Thank you.  Go ahead.

13             MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

14   Brian Glueckstein for the debtors.

15             Your Honor, with respect to this motion most, but

16   not all, as we have just heard, of the relief requested in

17   the motion to protect the debtor's customer list and their

18   creditors and to streamline disclosures is uncontested this

19   morning.  The purpose of the debtor's request to redact

20   sensitive personal information of customers and other

21   stakeholders is to protect the value to the debtor's customer

22   list as an asset and to protect sensitive personal

23   identifying information of creditors.

24             There is no objection to redacting the addresses

25   of individual customers and other individual creditors.  That

1  information, subject to the Court's approval today, would

2  remain redacted.

3        The U.S. Trustee and the media objectors do object

4  to the debtor's redacting customer and creditor names.  And

5  with respect to the U.S. Trustee's objection the addresses of

6  non-individuals.

7        The objectors cite the general principals of the

8  right to public access to records and bankruptcy disclosure

9  requirements.  They do not articulate any specific harm being

10  suffered that requires disclosure today of the names and

11  institutional addresses on an immediate basis.  Nor do the

12  objectors recognize, in our view, the Court's role in

13  modifying those requirements for cause shown.

14        Your Honor, the debtors have been working hard to

15  strike the correct balance on this difficult issue

16  particularly in the still early stages of these Chapter 11

17  cases to ensure the protection of their assets and customer

18  information, but understanding the need for disclosure and

19  transparency.

20        Your Honor, these Chapter 11 cases, as we have

21  been hearing from when we first stood in front of you, are

22  unprecedented.  The debtors recognize that they have

23  generated significant public interest.  These cases also

24  present unprecedented challenges, but the relief requested,

25  including the redaction of customer names, has precedent in

1  this Court.

2         In Your Honor's well-reasoned opinion in <u>Cred</u>

3  where redaction of both names and identifying information of

4  a crypto currency platform's customers was permitted.  The

5  Court's reasoning applies here, but we submit the facts and

6  the evidence before the Court here are overwhelming against

7  immediate disclosure given the debtor's customer lists have

8  more than 9 million names and addresses on them.

9         The U.S. Trustee invites the Court to rip-up

10 precedent in this district and instead to simply adopt the

11 conclusions reached in the <u>Celsius</u> case by Judge Glenn in New

12 York.  We submit, Your Honor, that decision is an outlier and

13 certainly should not be wholesale adopted here, and it

14 doesn't need to be.

15        In order to strike an appropriate balance as to

16 the disclosure while providing the debtors and other parties

17 more time to evaluate options and ensure all restructuring

18 options for the debtor's assets, the debtors and their assets

19 remain available.  We are limiting our request today, as

20 reflected in our reply papers, with the support of the

21 creditors committee, to the redaction of names in the debtors

22 -- of the debtor's customers and addresses of institutional

23 customers for an additional six months subject to the right

24 to request further extensions of the redaction authority.

25        These redactions are appropriate and necessary to

1   protect the debtor's commercial information pursuant to

2   Section 107(b) of the Bankruptcy Code.  Section 107(b), as

3   the Court is aware, of course, permits the Court to protect

4   for cause the debtor's confidential information.

5           Mr. Cofsky's testimony before the Court makes

6   clear that the debtor's customer list, in his opinion as the

7   debtor's proposed investment banker charged with maximizing

8   the value of assets in such a process, including both names

9   and contact information are a key asset and a source of

10  value, potential source of value, at a minimum, for the

11  debtors.

12          Mr. Cofsky's testimony this morning explained the

13  companies that operate crypto asset management platforms work

14  to identify new customers, attract, and enroll them, and

15  establish them as customers.  Mr. Cofsky concluded that the

16  debtors would be harmed by the disclosure of customer names

17  even with the redaction of addresses.

18          We heard on cross-examination questions about

19  exactly how hard it would be, and is it easier or harder with

20  the middle initial to identify these customers and contact

21  them.  We would submit, Your Honor, that the level -- the

22  question before the Court today is not whether every one of

23  the debtor's customers could be or even would be immediately

24  contacted by competitors.

25          Mr. Cofsky's testimony and the positon of the

1  debtors is that we believe there is significant evidence that

2  that is likely to happen, at least with respect to

3  significant customers, with respect to customers that are not

4  known, as Mr. Cofsky testified this morning, in his view are

5  not widely known to be customers in the crypto currency and

6  digital asset space.

7          We would submit, Your Honor, that the conclusion

8  of the debtor's proposed investment banker is highly

9  probative of the limited question that is before the Court.

10 The Court's conclusion in Cred overruled a similar objection

11 from the U.S. Trustee on similar grounds.  The Court

12 concluded there that the debtor's customer list had some

13 "intrinsic value."  We believe here that is clear.  Where

14 we're talking about more than 9 million customers compared to

15 the 6,500 or so that were at issue in Cred.

16         Importantly, as I noted, while the case to keep

17 customer names and -- customer names confidential is, in our

18 view, compelling the debtors are seeking this relief today

19 only for a limited period of six months with the right to

20 reserve to seek extensions.

21         Your Honor, I also want to briefly address the

22 U.S. Trustee's arguments that granting this relief for any

23 period of additional time would somehow hinder the

24 administration of these cases?  We believe that is not true

25 at all.  All of the necessary information, Your Honor, is

1  being served, will continue to be served, and provided to

2  parties in interest as required.  The debtors have worked

3  when other parties have needed to serve documents to take on

4  that responsibility and to serve documents on the debtor's

5  creditor list where that, as I say, is necessary.

6           As in the interim order the proposed final order

7  that we submitted includes the Court's language that was

8  developed in Cred making clear that all parties in interest

9  retain the right to seek copies of any redacted documents

10  from the debtors or, if necessary, from the Court.

11          Your Honor, importantly, we believe that this

12  balance is appropriate for today.  If the redactions are

13  granted on this basis to preserve the debtor's assets, to

14  allow the strategic review process that is discussed, that's

15  at issue -- I'm sorry, before the Court in connection with

16  the bidding procedures today, the discussions that are

17  underway that Mr. Dietderich referred to in his opening

18  remarks, to allow all of that work to continue, and to

19  mature, to hopefully a plan or sale process that benefits all

20  stakeholders.

21          We're asking for the limited relief to maintain

22  that customer list in confidence for a period of six months.

23  If redactions are granted today on that basis the debtors are

24  not asking the Court, and we submit the Court doesn't need to

25  reach the issue at this time, of the propriety of redacting

1  customer names more permanently on the basis of Section

2  107(c)(1).  We reserve the rights on that issue, of course,

3  ands to come back to the Court, but we don't believe that

4  that issue needs to be adjudicated and we understand that

5  that question presents some difficult issues for not only the

6  Court, but for the debtors and other parties in interest.

7        Lastly, Your Honor, the debtors do request that

8  the Court authorize the redaction of individual non-customer

9  creditor and equity holder names to comply with the GDPR.

10  It's briefed in our papers.  That relief has historically,

11  from what we see, been relatively routinely granted by

12  Court's in this district.  The U.S. Trustee did not object to

13  that relief with respect to the interim order, but has

14  objected to it on a final basis.

15        We believe that the U.S. Trustee is taking that

16  position which seems to be a significant departure based on

17  the Courts' reasoning in Celsius.  We submit, Your Honor,

18  that that position is somewhat short-sided.  Citizens of the

19  covered countries have a heightened expectation of privacy as

20  a result of local law.  And as detailed in our reply papers

21  we do not believe there is a basis for the Court to conclude

22  that the GDPR does not apply to the debtors, and regardless

23  there is really no need to subject the debtors to potential

24  fines for violations which would only harm all stakeholders.

25        So with that additional relatively modest piece we

1  are limiting the relief today to the question around

2  maintaining the redactions with respect to the debtor's

3  customer list in its entirety including names and addresses

4  of institutional customers for a period of six months for

5  entry to the order with all parties rights reserved.

6            Thank you.

7            THE COURT:  Let me ask you a couple questions.

8  Does it matter that the customers here are not the exclusive

9  customers of the debtors?

10           MR. GLUECKSTEIN:  I don't think so, Your Honor,

11 because from our perspective, of course, there are customers

12 that probably, and I assume with 9 million if these are

13 people active in crypto, have investments on different

14 platforms.  And to the extent that those customers are

15 accessible through other sources, of course, they can be

16 contacted.

17           The question though before the Court, and that Mr.

18 Cofsky was testifying about this morning, is whether or not

19 we should put on the docket of this Court, effectively, 9

20 million names that allow the debtor's competitors and

21 potential acquirers of the debtor's assets and businesses

22 giving them the roadmap to say these are the folks, here are

23 the significant customers, they seek claim entitlement

24 amounts, let me try to contact those people.

25           So it's not a question of exclusivity, it's a

1  question of exclusivity with respect to the list that the

2  debtors have complied over time, you know, spending its own

3  resources to put this together, whether that asset should be

4  preserved.  We submit that it is, that it should.

5           THE COURT:  Why six months?  What is the

6  significance of asking for six months?

7           MR. GLUECKSTEIN:  There isn't a significance, Your

8  Honor, other then, I would say, a couple of things.

9           First, we want to try to be reasonable here and

10  take this incrementally.  We are not -- based on this we're

11  not asking for a permanent authority to redact on the basis

12  of preservation of the assets, again, with rights on 107(c)

13  reserved.

14           We looked at how long we think it will take to

15  move forward with a process to make, at least, a

16  determination as to whether the customer lists are part of a

17  sale process, are integral to a reorganization plan.  Are we

18  going to be standing here in six months and be able to -- can

19  I say definitively that in six months all of these issues

20  will be worked through?  I can't, but we think it's a

21  reasonable period of time where our thinking will be

22  substantially advanced from where it is today.  Is there a

23  magic to six versus eight or five, no, but we thought it was

24  a reasonable period of time.

25           The other piece, Your Honor, there are some

1   complications.  We know.  We discussed them at the first day

2   hearing with Your Honor around claims.  You know, once we set

3   a bar date and how the claims reconciliation process is

4   effected by these redactions.  Those are issues we are still

5   working through.

6           We don't believe, for a number of reasons,

7   including because of the SOFAs and schedules extension that

8   is before Your Honor today that we are going to be in a

9   position to set an early bar date in this case so that the

10  six month period factors into that to.  We don't think we're

11  going to be up against having to address some of the issues

12  that we discussed back in November around what happens after

13  we filed a bar date and all those claims remain.

14          THE COURT:  Well the bid procedure motion that you

15  have on that's for purposes of seeking to sell -- I think Mr.

16  Cofsky actually testified that the entities that are sought

17  to be sold pursuant to those procedures are exchanges,

18  correct?

19          MR. GLUECKSTEIN:  They are.

20          THE COURT:  So -- and that -- what is the --

21  remind me the proposed timeline for the sale of those assets

22  or, at least, the bidding is supposedly done by the end of

23  the month, right?

24          MR. GLUECKSTEIN:  I believe its -- I believe the

25  process in the bid procedures as contemplated -- I will refer

1 │ to Mr. Dietderich on the schedule.

2 │     MR. DIETDERICH:  Your Honor, Andrew Dietderich,

3 │ Sullivan & Cromwell.

4 │     It's a staggered schedule for the different

5 │ businesses, but it will take a couple of months, at least, to

6 │ get done.

7 │     THE COURT:  Okay.  And by then we will have some

8 │ understanding, at least from that process, as to whether or

9 │ not the creditor lists are going to be important to potential

10 │ purchasers.

11 │     MR. GLUECKSTEIN:  We will have some indication,

12 │ Your Honor.  As Mr. Cofsky testified this morning the main --

13 │ what I would call the main exchanges, right, so FTX.com, FTX

14 │ US, the main exchanges are not subject to the current

15 │ process.  We will be informed by the localized exchange in

16 │ Japan, for example, as to the relevance there, but I think

17 │ Mr. Cofsky testified this morning that the process for the

18 │ main exchanges will take longer because that process is not

19 │ yet formally underway as far as bidding procedures.  There

20 │ are lots of discussions that are ongoing.

21 │     I do think it is a good observation.  We are going

22 │ to start to be able to be informed by the different data

23 │ points.  The work that the professionals are doing, the

24 │ strategic review that is underway, and the sale process of

25 │ these other exchanges to have an understanding as to the

1  customer list.

2          So for all those reasons, Your Honor, we developed

3  six months as a proposal because we thought it was a very

4  reasonable next step.

5          THE COURT:  Thank you.

6          MR. DIETDERICH:  Your Honor, may I give you --

7  sorry to speak out of order, but Mr. Dietderich again.  May I

8  give you the actual proposed dates; now these are the

9  earliest possible sale hearing dates for the various

10  businesses, but they range from February 27th to March 27th.

11          The other point that may be factually relevant for

12  your consideration is we did, in the cooperation agreement

13  with the JPL in the Bahamas, commit to them that we would

14  work during a six month period on our project to consider a

15  potential reorganization of the international platform.  And

16  this customer information and data would, of course, be

17  important in connection with that work with them.

18          THE COURT:  Thank you.

19          Anything further?

20          MR. GLUECKSTEIN:  No.  Absent any other questions

21  from Your Honor I will cede the podium.

22          THE COURT:  Mr. Hansen.

23          MR. HANSEN:  Good morning, Your Honor.  Kris

24  Hansen with Paul Hastings, proposed counsel for the official

25  committee once again, Your Honor.

1        So, Your Honor, the official committee joins in

2   the debtor's arguments.  We filed a joinder to that effect on

3   the docket as well.  I wanted to add a couple of points for

4   the Court with respect to this issue.

5        Regarding the six months we collaborated on that.

6   We talked about how you create value associated with the

7   assets that the debtors are thinking about selling or

8   reorganizing.  And as you heard from Mr. Cofsky's testimony,

9   there is inherent value within the customer list associated

10  with these businesses.  And as the Court is, obviously, well

11  aware in connection with non-crypto businesses sometimes

12  parties will pay for customer list alone, sometimes the

13  customer list goes with those assets.

14       So the purchase and sale of customer information

15  is a vital component of any type of a retail oriented entity

16  and business.  And, obviously, from an exchange perspective

17  there were an awful lot of retail investors here.  And so

18  there is inherent value within those lists.  I think that is

19  uncontroverted.  I think everyone here agrees with that.

20       So in balancing that we looked at it and said

21  we've got two major tasks here.  One is to assess the value

22  associated with these assets from a sale perspective.  Two is

23  to assess the value associated with these assets from a

24  potential "reboot" is how we've been referring to it on our

25  side.

1          The reboot is complicated.  There are global

2    regulatory issues associated with rebooting the exchanges.

3    Everywhere that the exchanges operate there are regulatory

4    requirements that have to be met including the United States

5    and globally.  So it takes time to think through how that

6    works.  So it can't just simply be restarted in its existing

7    or prior form because there were issues associated with it

8    which, in some ways, we're here dealing with.

9          So it's a complicated exercise among many

10   professionals on all sides to be able to figure out exactly

11   what the steps are that are necessary to be able to think

12   about the reboot, but that reboot may unlock incredible value

13   for creditors and customers in connection with these cases

14   because it may open the ability to have something that is a

15   going concern, that could be sold, or could be distributed

16   from an equitization standpoint in connection with a more

17   fundamental plan of reorganization.

18         Then, obviously, with respect to the sales you

19   have the four assets that the debtor is seeking to sell at

20   the moment.  We have more to say about that later when we

21   come to the bidding procedures, but with respect to Embed,

22   LedgerX, FTX Europe, and FTX Japan, as Your Honor noted, two

23   of them are -- so LedgerX and Embed are non-debtors and those

24   are currently operating.

25         So the customers of those entities and the

1  information associated with those entities, to the extent

2  that they overlap with the information that debtor is seeking

3  to protect here those are ongoing businesses which are

4  interacting every day.  There could be damage done to the

5  value of those businesses by disclosure of those customers.

6           Similarly with respect to FTX Europe and FTX

7  Japan, from the committee's perspective, we're just rolling

8  up our sleeves. We are trying to understand what it is that

9  is being sold here and what the value is.  And tracking back

10  to Mr. Cofsky's testimony and the point I made a moment ago

11  there is inherent value in the customer list.  And so when we

12  look at it and say if that information was disclosed today

13  without the opportunity to do more diligence to determine the

14  inherent value in them that could do damage and it could

15  seriously reduce the amount of distributable assets to

16  creditors in connection with the cases.  That would be a bad

17  thing.

18           From our perspective, Your Honor, in a situation

19  where there has been a global fraud and no one yet knows what

20  the recoveries in these cases are going to be we need to make

21  sure that we preserve the assets as best as we possibly can.

22  We understand the competing interests that the media and the

23  United States Trustee have noted with respect to

24  transparency, but we just don't believe that there is a true

25  interest in the media for in the broader universe of parties

1   -- potential party's interest in the cases of understanding

2   who the customers were.

3            You have to think about like what is the purpose

4   behind that versus the very clear and articulated purpose of

5   trying to preserve value.  So when we come back to that six

6   month window and we ourselves, on the committee side, with

7   our professionals have said it's going to take a significant

8   period of time to really understand the reboot and really

9   understand the asset sales.

10           To Your Honor's point, the earliest dates, which

11  we think are too early, come up on February 27th and March

12  27th with respect to the assets that are currently being

13  sold.  We will get a better look at the real interest of

14  parties associated with the customer lists within that

15  window, but we probably won't have the (indiscernible)

16  because we think those are coming on too quickly.

17           So, again, Your Honor, and I would echo Mr.

18  Glueckstein's point with respect to 107(c).  107(c) we do

19  believe that -- and at a further hearing we can get into with

20  the Court, to the extent that the Court wants us to, that

21  there are real risks to customers in connection with the

22  disclosure of identities.  There are news stories and

23  information that demonstrates that there have been

24  kidnappings, there have been thefts, there have been other

25  types of violent acts committed against people within the

1  crypto community and that is a very real risk and a very real

2  concern.

3          With respect to the information that we're talking

4  about today and the reason to protect it under 107(b) it's

5  absolutely crystal clear that this is commercial information

6  of the debtors and that it has value, and that there is a

7  very clear case to be made that Your Honor can protect that

8  information for the temporal period that we've asked under

9  107(b).  We reserve rights on 107(c) and if the Court would

10  like further briefing on that and testimony on that we can do

11  that, but we think you have enough of a record to cover it

12  from a 107(b) perspective today.

13          So, Your Honor, if you had questions for me I

14  would be happy to answer them.

15          THE COURT:  No, no questions.  Thank you.

16          MR. HANSEN:  Thank you.

17          THE COURT:  Could we turn up the microphones on

18  the stand.  It's as high as it will go.  Everybody has got to

19  keep your voices up.  I mean I can barely hear some of it and

20  I'm sure the people in the back probably can't hear it very

21  well.

22          Anyone else want to speak in support before we go

23  to the objectors?

24      (No verbal response)

25          MR. HARVEY:  Excuse me, Your Honor, and may I

1  please the Court Matthew Harvey from Morris, Nichols, Arsht &

2  Tunnell on behalf of an ad hoc committee of non-US customers

3  of FTX.com.

4          We filed a joinder in this motion of the debtors,

5  Your Honor.  We support the debtors in their efforts to seal

6  this.  I think from the customer's perspective they have the

7  107(c) issue which is not going forward today in terms of

8  their own interest and protecting their own information, but

9  also the debtors and the committee have identified, I think

10 rightly, the customer list and the potential value in either

11 a sale or restart of the platform as an avenue for recovery

12 for members of our ad hoc

13         We do think it's important, particularly for the

14 preliminary matter, the debtors have requested for six months

15 to protect this information to allow the process to play out

16 and allow the debtors to determine the best path forward with

17 this customer list.

18         THE COURT:  Thank you.

19         MR. HARVEY:  Thank you, Your Honor.

20         THE COURT:  Ms. Sarkessian.

21         MS. SARKESSIAN:  Your Honor, would it be possible

22 to have a five minute break?

23         THE COURT:  Certainly.  Well let's make it --

24 let's make it 10 minutes just so everybody has -- well we got

25 a lot of people here, let's make it 15 minutes so everybody

1   has time to use the facilities.

2           So we will recess for 15 minutes.

3           MS. SARKESSIAN:  Thank you.

4       (Recess taken at 10:39 a.m.)

5       (Proceedings resumed at 10:58 a.m.)

6           THE COURTROOM DEPUTY:  All rise.

7           THE COURT:  Please be seated.

8           Ms. Sarkessian.

9           MS. SARKESSIAN:  Your Honor, Mr. Finger asked if

10  he could go first.

11          THE COURT:  Okay.

12          MR. FINGER:  Your Honor, at the outset of my

13  comments I move to strike the debtors reply because it

14  introducing new material which should have been included in

15  his opening brief, and has been raised for the first time.

16  For example, Paragraph 17 debtors invoke Japanese law.  Two

17  laws, the acclimate protection of personal information and

18  the Financial Instruments and Exchange Act.  They should be

19  waived; however, because they have raised them to protect my

20  client.

21          The first one, the APPI Section 17(3) allows the

22  use of such information when doing so is necessary to

23  cooperate with a "national government organ" of a foreign

24  company.  Now there can be a debate back and forth as to what

25  that means.  Usually when Courts deal with foreign nation's

1  law expert testimony is required.

2          The point here is that --

3          THE COURT:  Not always.

4          MR. FINGER:  Not always.  I --

5          THE COURT:  I can look it up in Martindale-Hubbell

6  and that is sufficient.

7          MR. FINGER:  I don't -- I never mean to -- but

8  there has been nothing provided to this Court showing that

9  this article section does not apply.  And as for the

10  Financial Instruments and Exchange Act that law applies to

11  securities trading.  Most crypto is not deemed a security and

12  so it's outside FIEA's jurisdiction.  Some tokens are, but

13  debtors have not established that their crypto falls within

14  the jurisdiction of the FIEA.

15          Similarly, for the same reasons --

16          THE COURT:  Well this isn't just their crypto,

17  right?

18          MR. FINGER:  I understand.  Yes, Your Honor.  The

19  crypto involved -- I will make a -- crypto involved in this

20  matter.

21          THE COURT:  It doesn't mean the debtors in this

22  case have more than just their own crypto on the exchange.

23  They were in exchange for all types of crypto, right.

24          MR. FINGER:  But the point being that if it is not

25  -- if the crypto involved, be it their own or their

1   customers, is not within that limited categories then it is

2   outside the jurisdiction of FTI.  This is a red herring.

3         For similar reasons, Your Honor, we want to strike

4   the testimony of Mr. Cofsky.  His testimony -- first, his

5   affidavit was provided three days ago with no real

6   opportunity to test it.  Not even in this Court we've had no

7   opportunity to depose Mr. Cofsky or his staff who worked on

8   this thing.  His testimony was very general.  They looked

9   through social media, they picked certain names.  We had no

10  opportunity to test that.  They were obligated to provide

11  this information in their opening motion.

12        But now let's turn to the justifications given for

13  sealing.

14        THE COURT:  Just to close the loop on this, Mr.

15  Finger, I will deny both of those motions.

16        MR. FINGER:  All right. Thank you, Your Honor.

17        The justification for sealing, they claim the risk

18  of identity theft and cyber scams.  Think about all of the

19  creditor's lists that have been publicly identified in

20  bankruptcies over the decades.  Let's just even limit it to

21  when Pacer came along.  With all of that there is absolutely

22  no evidence presented to this Court that there are any

23  identity theft or scams occurred as a result of those

24  creditor lists being made public.  It's no counter to say

25  this case is different because it involves crypto currency.

1           THE COURT:  I think they're not pursuing the

2    107(c) basis for sealing the customer list at this point.

3           MR. FINGER:  Not the customer list, but this is

4    also a list of creditors.

5           THE COURT:  Well I guess there's a question, are

6    they creditors, or are they customers, or are they both.  It

7    could be both, but I don't know.  At this point in the case I

8    don't know.

9           MR. FINGER:  The fact that that is not established

10   -- well, never mind I will withdraw that.

11          The fact is identity thieves don't care what the

12   nature of the business is, they just want names to use.

13          Your Honor heard some testimony about commonality

14   of names.  In fact, Your Honor, I did an experiment last

15   night through a website called TruthFinder.com.  I put in

16   Your Honor's name and came back with 58 people who share your

17   name; 57, I'm sorry.  Now, in candor, that lists the

18   differentiation because it included middle names and middle

19   initials.

20          We have no objection to redaction of middle names

21   or middle initials, but there is nothing before the Court

22   that tells the Court how many of the names that have been on

23   the list do not have multiple people with those names. Its, I

24   think, a stretch to say, well, if we're able to go through

25   five or six people of the same name and we come up with them.

1  Even Mr. Cofsky testified that it becomes harder if it's a

2  common name.  To extrapolate from that is harder when there

3  are numerous people sharing the same name, but that is

4  shooting in the dark and that is not enough of a threat.

5         Of course, using identity theft as a justification

6  for sealing leads to the conclusion that all creditors or

7  customer lists in every bankruptcy can be sealed to protect

8  the creditors.  Your Honor will be creating a per say rule.

9  Debtors have not provided any polling of a random sampling of

10  their customers to assess their fears of disclosure for cyber

11  bullying or cyber scamming and identity theft.  None of the

12  debtor's customers here is claiming concerns.

13         THE COURT:  I think you had one ad hoc group that

14  came forward and was supportive of the debtors.

15         MR. FINGER:  The ad hoc group, as I understand it,

16  were claiming their concern is not under cyber scamming, but

17  as to their rights under foreign law to confidentiality.

18         Turning to the poaching and reducing the

19  commercial value of the list, again, this goes back to how

20  common the names are, and there's been no effort to try to

21  segregate; it's the baby in the bath water.  William Smith,

22  Maria Garcia, James Johnson, Daniel Brown, Thomas Miller.

23  Again, the Google search said that these are examples of

24  common names of the most common name combination in the

25  United States.

1          So the potential for poaching, I respectfully

2    submit, is not enough. Its high evidentiary standard they

3    have to meet and the fact we provided cases to Your Honor --

4    in responses to Your Honor which says that.  A statement that

5    something could happen and in the absence of evidence showing

6    it is likely to happen or will happen does not satisfy the

7    first amendment evidentiary standard.

8          As for the GDPR I would draw the Court's attention

9    to a case In Re Avandia Marketing Sales Practices & Products

10   Liability, it's an Eastern District of Pennsylvania case in

11   2020, 484 F. Supp 2d, 249.  The Court ruled that applying

12   principles of comity, denial of public access based upon a

13   foreign law would be contrary or prejudicial to the interests

14   of the United States, but even apart from that Section 49.1

15   of the GDPR says there is an exception to the requirements of

16   that law for "the establishment, exercise or defense of legal

17   claims."  Defendants have not even mentioned this, but

18   certainly not have established that the exception is

19   (indiscernible).

20         Debtors argue at Paragraph 3 of their reply that

21   the objectors did not articulate any bonafides reason for

22   disclosure at this time; however, this confuses the burden.

23   Judicial documents are presumptively public and the public is

24   entitled to see them as soon as their filed and they become

25   part of the judicial record.  The purpose of public access is

1  to ensure public confidence in our Courts and their rulings.

2  The burden is on the debtor to explain why sealing is

3  appropriate and not vice versa.

4          We also believe it's inappropriate to ask for a

5  six month stay or delay with no assurances -- certainly no

6  assurances that that will be the end of it, but even in the

7  event that there are assurances I quote from the Supreme

8  Court case Elrod v. Burns:

9          "The loss of first amendment freedoms, even for

10  minimal periods of time, unquestionably constitutes

11  irreparable injury."

12          Public access is derived from the first amendment

13  as does Section 107.

14          Paragraph 16 of their reply debtors reiterate that

15  the customers are identified the value of the business "could

16  be materially harmed, diminished or disputed."  As I

17  mentioned earlier, we cited cases in our brief which they did

18  not respond to in their reply, our brief in the opposition

19  stating that speculating as to what could happen as opposed

20  to showing with evidence what will happen is insufficient to

21  meet their evidentiary burden.  There is a case out of

22  California we cited in our brief, but also the Celsius case

23  out of New York states the same thing.

24          As to the In Re Cred case I was not involved, Your

25  Honor was.  I will not presume to imagine Your Honor's

1   considerations in that case.  But an objective reading of

2   Your Honor's opinion seems to think that the Court was not

3   necessarily focusing on evidentiary requirements or the

4   argument that there was no evidence supporting sealing.

5   Since then the Celsius case has come out and while if another

6   Court and is not binding on Your Honor, Your Honor is free to

7   consider it as persuasive precedent in reassessing the Cred

8   case.

9         At Paragraph 28 of their reply the debtors cite to

10   a number of cases where this Court has allowed redacting

11   names pursuant to GDPR; however, defendants fail to point out

12   that with the exception of the last one of those cases listed

13   those motions were granted as unopposed which there was no

14   opposition.  And unopposed -- orders based on unopposed

15   motions have no precedential value.

16         The last one was proposed by the trustee and there

17   was no new analysis in it.  So it lacked persuasive force.

18         So in sum there is no competent evidence that any

19   of the evils asserted by the debtors, identity theft,

20   devaluation of the customer list by poaching, violations of

21   international law, present a genuine or substantial risk.

22   All the debtors have presented to the Court are speculation

23   unsupported by competent evidence; however, to the extent

24   that redaction is required it must be limited, as limited as

25   possible, to meet the goals.

1        Redacting the addresses allows this and I throw in
2   redacting middle names and initials.  This is sufficient and
3   if the Court is inclined to redact that should be the limit
4   of it.

5        Unless Your Honor has any questions I yield the
6   podium.

7        THE COURT:  Thank you, Mr. Finger.

8        MS. SARKESSIAN:  Thank you, Your Honor.  Again,
9   for the record, Juliet Sarkessian on behalf of the U.S.
10  Trustee.

11       Your Honor, the bankruptcy process operates like
12  the rest of the Court system on the bedrock principle of
13  American jurisprudence that the public has a right to access
14  of judicial records and only under very limited circumstances
15  may a Federal Court restrict of deny that access.  Here, the
16  debtors are seeking a very wholesale redaction of a lot of
17  information on any papers to be filed.  That is what they
18  say, any papers to be filed in this Court or may, otherwise,
19  made publicly available in the Chapter 11 cases.

20       They are looking to redact names, addresses, email
21  addresses of all customers whether they be individuals or
22  entities, the names, addresses and email addresses of all
23  non-customer individual creditors or equity holders if they
24  are citizens of the UK or member nations of the EU, and maybe
25  now Japan. I am not quite clear about that.  And then also

1  the addresses and email addresses of all other creditor or

2  equity holders who are individuals regardless of their

3  citizenship.  Of course, the U.S. Trustee has said we do not

4  object to the redaction of addresses residential or any

5  addresses with respect to individuals; whether they be

6  citizens of the EU, the United States, or anywhere else.

7          Now the debtor's counsel started out stating that

8  bankruptcy is a fishbowl.  We have heard this many times.

9  And, in fact, that the debtors welcome that.  The committee

10 said the cases need to be transparent.  We agree with that;

11 however, that is not what has happened in this case.

12         In the interim order entered on this motion the

13 debtors -- excuse me, the Court allowed the debtors to file a

14 creditor matrix under seal with a redacted version then to be

15 filed.  It's been two months.  There is no creditor matrix on

16 file, not under seal, not redacted, nothing.  I double

17 checked last night, I sent an inquiry to debtor's counsel to

18 make sure I had not missed it, it's my understanding, and

19 they can correct me if I'm wrong, that is still not on file.

20         So we don't know who any of the creditors are in

21 this case, be it customers or anybody else.  We don't know

22 who the top 50 creditors are because that was all redacted.

23 We don't have any monthly operating reports.  The first ones

24 were due December the 21st.  I don't know when we're going to

25 see any monthly -- actual monthly operating reports.  The

1  debtors have proposed to file some type of aggregated report

2  of some kind that is not a monthly operating report and then

3  later at some point in time, we don't know when, they will

4  start filing proper monthly operating reports.

5        We don't have schedules, we don't have statement

6  of financial affairs, we don't have Rule 2015.3 reports.

7  Yes, we have now come to an agreement about when those are

8  going to be filed, but the majority of them will not be filed

9  until March the 15th.  The debtors have reserved the right to

10 ask for further extensions.

11       So we have very little information here. This is

12 the opposite of a fishbowl.  And redacting customer and other

13 creditor information to the extent that the debtors are

14 seeking is only going to add to that lack of transparency.

15 And here what we are talking about is we're talking about

16 redaction as very essential documents that are part of the

17 bankruptcy case; the creditor matrix, the schedules, the

18 statement of financial affairs, professional disclosures they

19 have been redacted as well to the extent that there was a

20 reference to a customer name or an individual creditor.

21 Those were redacted.

22       So these are all really critical documents that

23 are part of the bankruptcy process.  And there needs to be --

24 the case law says, that we have cited, there needs to be a

25 showing of extraordinary circumstances and compelling need

1   for these types of redactions, before any type of redactions,

2   but especially on such fundamental documents that are part of

3   the core of the bankruptcy case.

4        Here the debtor has really nothing more than some

5   vague statements, and I will get it into, in a minute, Mr.

6   Cofsky's testimony, but very, very limited testimony or

7   evidence about something that requires a showing of

8   extraordinary circumstances.  We do not believe they have met

9   their burden and it is the debtor's burden here to establish

10  that the information can be sealed under either 107(b) or

11  107(c).

12        If Your Honor could bear with me for a moment,

13  please.

14        So 107(b)(1) talks about confidential commercial

15  information.  Now the debtors and the committee keep

16  referring to a customer list.  It's not a customer list, it's

17  a list of creditors.  It's the creditor matrix, it's the list

18  of creditors in the schedules, in a professional disclosure,

19  and it's a reference to somebody who is a creditor.  They may

20  also be a customer, but we're not talking about a separate

21  document that is a customer list.

22        I suppose what the debtors would say was, well, we

23  have so many customers who were creditors that if you looked

24  at the creditor matrix, whenever it may be filed, that one

25  could assume that most of those people are customers and not

1   other kinds of creditors.  There is not going to be any

2   distinction, there is not going to be like a separate section

3   that these are customer creditors and these are other

4   creditors.  It's a creditor matrix.  Same thing with the

5   schedules, there is no distinction -- I mean there is a

6   distinction based on priority if it's a general unsecured

7   claim, but there is not a distinction between creditor

8   customers and creditors who are some other kind of creditor.

9           With respect to -- even assuming that the debtors

10  would be correct in making that argument that competitors

11  will just assume that everybody on that list is as customer,

12  Your Honor made the point that many of these customers may

13  not be exclusive customers, they may already dealing with

14  competitors.

15          With respect to -- I think the point is very

16  important in terms of poaching.  Again, all we are talking

17  about for individuals are their names and no other

18  information.  Yes, for institutional or non-individual

19  creditors the U.S. Trustee believes that it is appropriate to

20  include their addresses as well as their names, but for the

21  individuals it would just be their names.

22          Mr. Cofsky's testimony that, well, just a name

23  alone, just a customer name alone would give you an ability

24  to find information to contact them.  That was based on not

25  even any work he personally did.  He had a staff look at less

1  than 20 names on the -- out of the 9 million names less than

2  20, there was no methodology that was explained as to how

3  they picked the names, although he indicated -- I believe he

4  indicated they looked for names that were not extremely

5  common; although, again, I would make the point that there

6  are names that might be uncommon in the US, that look

7  uncommon to us because we're not familiar with them, that

8  might be very common in other parts of the world.  I am

9  always surprised I see names and I think, oh, that is an

10  unusual name and then find out, oh, that's actually very

11  common in Japan, China, or whatever the country might be.

12          So we don't have any methodology.  There was less

13  than 20, that's nothing.  And out of the less than 20 he

14  said, well, more than 50 percent we could get information on.

15  So it wasn't even out of the 20 or less then 20, you know, we

16  were able to get information on all of them.  That's a very,

17  very slender thread, based on hearsay evidence, but even if

18  it wasn't, a very slender thread to say, all right, because

19  of less than 20, 50 percent of those, you were able to find

20  some contact information, whether that's the same person or

21  not, who knows, but potentially, it could be the same

22  customer.  That's a very, very slender thread to say,

23  therefore, you may redact all customer names from every

24  single document that's going to be filed in the case.

25          Now, let's talk for a moment about this six-month

 1   restriction.  Six months is a really long time in the

 2   bankruptcy world; as Your Honor is aware, a lot happens.  In

 3   this case, during these six months, we are hopefully, going

 4   to have schedules and statements filed.  This information is

 5   relevant to that.  Sales will be taking place.  Hopefully, a

 6   creditors matrix will be filed at some point.  A lot happens

 7   in six months.

 8          And then, of course, at six months, they're going

 9   to come back and they may still ask for another extension.

10   But even if it's only six months, that information is

11   important information to be out there, and, again, we're

12   going to be getting schedules and statements that have so

13   much redacted, they're probably going to be next to worthless

14   for anybody who doesn't see the unredacted version.

15          And, Your Honor, I would also like to make the

16   point that I was trying, very ineffectively, to make with

17   Mr. Cofsky.  This is not a situation where you're coming in,

18   where the customers of the debtor, you know, are likely to be

19   happy with the situation.  Well, maybe that's true in all

20   bankruptcy cases, but you have a very extraordinary situation

21   here.  You have a situation where the customer accounts were

22   frozen prior to the bankruptcy filing and have been frozen

23   since then.  These customers, the online customers cannot get

24   access to cash, coin, whatever might be in those accounts.

25   No access.

1        At the same time, they learned that there were

2   allegations of a massive fraud, that customer accounts were

3   raided and the funds were transferred to Alameda in the

4   amount of $10 billion of customer funds.  So, it's probably

5   reasonable to think that these individuals, these customers

6   with all of this happening, if they're going to other

7   platforms.  Well, they can't have access to their funds yet,

8   but when the time comes when they have access to their

9   accounts, they may be looking for competitors or they may be

10  looking to transfer this to traditional banks.

11       So, you know, it's not a situation where you have

12  a customer base that might be relatively happy, the debtor

13  files for bankruptcy, and now you're worried, you know, they

14  would be happy, but now you have competitors coming and

15  poaching them.  I would say, you know, I think it's

16  reasonable to assume that these customers, many of them, are

17  very unhappy with the current situation and are probably, you

18  know, very well may, on their own, be looking to transfer

19  when they can or maybe, like, I would say ripe for the

20  poaching if any competitor came along.  So, I think the

21  situation is different than other types of cases.

22       Then I want to talk a minute about the 107(c)

23  argument.  So, if I understand correctly, the debtors are now

24  saying that they want to hold off that argument until another

25  time.  Their motion made an argument under 107(c).  They

1  cited that statute.  We responded.  Our objection was filed

2  on December the 12th.  They've had, virtually, a month.

3  They've had plenty of time.  The Committee addressed it.

4         I don't understand this.  Like, if they had any

5  evidence to put on that point, today was the day to put on

6  the evidence and there was no evidence that in name alone,

7  could subject an individual to any type of harm, be it by --

8  I don't know if it was the Ad Hoc Committee's counsel,

9  somebody talked about kidnapping with a name.  We don't even

10 know what country these people live in.  There's no evidence

11 of that.  There's no evidence of identity theft, based upon a

12 name and nothing else.  There's no evidence presented that a

13 customer's accounts could be hacked with just a name.  No

14 evidence on that.  Or that the person's safety could be

15 compromised.

16        And the Ad Hoc Committee, of course, cited to Your

17 Honor's ruling in Cred, also cited to Judge Owens' ruling in

18 Clover, and they attached the transcript.  Clover had to do

19 with residential addresses, not, you know, names.  Not names

20 alone.  I think there were 10 members of the European Union

21 in there and there wasn't much discussion of that, but apart

22 from those 10, they were talking about residential addresses;

23 again, we are not objecting to that.

24        And, frankly, Your Honor, if you get to the point

25 where you are redacting individual creditor's names, not the

1   addresses, but their names, as well, with the idea that,

2   otherwise, there could be identity theft, the amount of

3   sealed filings in this court would be enormous, I mean, every

4   single, including Chapter 7 and Chapter 13 cases.  Debtor's

5   name, the individual creditors, all those -- proofs of claim

6   filed by individual creditors, is all of this going to be

7   filed under seal?  It's not a workable -- it's not workable

8   and there's nothing under 107(c) that would support redacting

9   names based on the idea that, otherwise, there could be

10  identity theft.  But, again, there's been no evidence and if

11  there was, this was the day to put on the evidence on that

12  point.

13          So, to recite an issue on the burden of proof, we

14  cited the Third Circuit case, Cendant Corp., that the debtors

15  have the burden of proof on 107(b), as well as 107(c).  And

16  under 107(b), again, the debtors must establish and

17  demonstrate an extraordinary circumstance and compelling need

18  to obtain protection.  That's from Food Management, which I

19  believe is actually from the Southern District.

20          I'll also mention that, you know, in Mr. Mosley's

21  declaration, which came -- that was filed in support of the

22  initial motion, he used the term, he said public

23  dissemination of customer lists could give the debtors'

24  competitors unfair advantage.  He didn't say, "would"; he

25  said, "could."  So, that's a very low level of argument to

1 | meet an extraordinary-circumstances test.

2 |    So, let's speak a little bit about foreign law.

3 | First of all, as we stated in our objection, we're in a

4 | United States Federal Court.  United States federal law

5 | controls over foreign law.  We cited a Supreme Court case on

6 | that point.  Not in this exact connection, but with regard to

7 | a French blocking statute.  But beyond that, as Mr. Finger

8 | made the point, and we made the point in our objection, that

9 | this does fall within the exception of the GDPR because this

10 | is a legal proceeding and there's a legal claims exception

11 | for that.

12 |    Now, the debtors, in their reply -- in their

13 | initial motion, the debtors' discussion of the GDPR was in

14 | one paragraph, paragraph 20.  It references the GDPR.  It

15 | doesn't even provide a citation as to where to find it.  It

16 | doesn't quote from it.  It says the GDPR may apply to the

17 | debtors -- may -- and it doesn't even say what it is that the

18 | GDPR protects, other than it says home addresses of

19 | individuals, which again, not an issue -- we're not objecting

20 | to that.  So, obviously, we spent a lot of our objection

21 | going into the details of the GDPR.

22 |    But I want to look at in the reply, the debtors

23 | did make two arguments, with respect to the GDPR, that I

24 | would like to address.  So, the first one, in paragraph 25 of

25 | their reply, the debtors argue that while the U.S. Trustee

1   notes that processing of personal data is lawful if it is,

2   "necessary for compliance with the legal obligation to which

3   the controller is subject," the U.S. Trustee ignores that any

4   such legal obligation, "should have a basis in union or

5   member-state law," not in U.S. law.  And they cite

6   Article 40 -- excuse me -- Recital 45 of the GDPR.

7            Recital 45 of the GDPR says, for the debtors to

8   process information, meaning, to collect information, code

9   it, transform it to a usable format, the processing has to be

10  legal under the laws of the EU or its individual member

11  states.  The recital does not say anything about compliance

12  with laws outside of the EU.

13           And Recital 45 is not relevant to what we're

14  talking about.  It's a different issue.  It's not talking

15  about an exception for when this information can be

16  disclosed; it's talking about the way in which the

17  information is processed.  It must be processed under the law

18  of the applicable EU state.

19           The second argument that the debtors make in

20  paragraph 26 of their reply says that the U.S. Trustee is

21  conflating transferring of information with processing of

22  information.  They -- so, they -- I believe the argument is

23  that the exception in Article 45 [sic] that allows the

24  disclosure in connection with legal proceedings, applies only

25  to the transfer of personal data, not the processing of

1   personal data, and that what the -- that the disclosure would

2   be processing, not transferring.

3           There's no authority cited for this position.

4   We -- you know, I can't say that I can cite any authority for

5   the contrary position, but they cite no authority to say that

6   there's some distinction here and that or the exception in

7   Article 49 [sic] only applies to processing and not actually

8   disclosing in connection with a legal proceeding.

9           With respect to Japanese law, I mean, that was not

10  raised.  It was not mentioned that their motion.  We saw it

11  for the first time, Sunday at 4:00 p.m.  I have not been able

12  to reach an expert in Japanese law since Sunday.  There was

13  not any official translation of these Japanese statutes that

14  were provided.  They do not -- the debtor does not quote the

15  operative provisions.  There's obviously no expert witnesses

16  to testify about Japanese law.  They just put in their reply,

17  This law -- these two statutes apply and these statutes do

18  not have any exception for legal proceedings.

19          So, I, really, I am not in a position to say

20  anything about Japanese law, other than the fact that this

21  was something that was -- should have been brought up in the

22  initial motion and that would have given us more time to

23  respond to that.

24          So, Your Honor, another point I want to bring up

25  that we mentioned in our objection that is significant is

1  that if you shall determines that to whatever degree Your

2  Honor would grant the motion for file information under

3  seal -- I'm sorry -- to whatever degree Your Honor would

4  allow the debtors to redact information from the court

5  filings, the unredacted versions of those documents must be

6  filed under seal with the Court.

7          Now, the debtors in their reply said, Well, of

8  course we'll do that, but the proposed order only states that

9  the creditor matrix must be filed under seal.  That was a

10 compromise when we were discussing it at the interim stage.

11         The order, I would request, to the degree that

12 anything is allowed to be redacted, that the order provide

13 that the unredacted version must be filed with the Court.

14 And I would also ask --

15         THE COURT:  That's a requirement of the Local

16 Rules, isn't it?

17         MS. SARKESSIAN:  Yes, it is, Your Honor.

18         But I don't want anybody to say, Well, the order

19 doesn't say it has to be done.  The order only talks about

20 redaction, it doesn't talk about sealing, and therefore, the

21 order somehow trumps the rule.

22         So, I just want that to be clear that those

23 filings will be made.  And it would also be nice to know when

24 the creditor matrix is going to be filed, both, in a -- if it

25 is to be sealed, in a sealed version, and in a redacted

1 version, as well.

2          If Your Honor could just give me a moment to make

3 sure that I've covered everything.

4      (Pause)

5          MS. SARKESSIAN:  So, Your Honor, unless Your Honor

6 has any questions for me, my argument is concluded.

7          THE COURT:  Thank you.

8          MR. GLUECKSTEIN:  Your Honor, for the record,

9 Brian Glueckstein for the debtors.  Just a couple points very

10 briefly.

11          Just to take the last point first, the debtors, of

12 course, will file any documents in this case that need to be

13 filed under seal, under seal, according to the Local Rules

14 and I will make that representation that Ms. Sarkessian has

15 asked for.  That's not an issue.

16          With respect to --

17          THE COURT:  Of the creditor matrix, you mean?

18          MR. GLUECKSTEIN:  With respect to the creditor

19 matrix, Your Honor, the creditor -- we're conflating a couple

20 of issues.  As has been well-documented, and we have

21 disclosed to the Court, there are significant issues with us

22 filing the entirety of the customer list, from a timing

23 perspective, access to data and information.  The Court may

24 recall we required additional time and we had to come up with

25 a creative process to get our top-50 list done in order to

1  view information that we couldn't fully access in terms of

2  the informational databases.

3        Those lists are on file in redacted form.  The

4  unredacted forms have been filed.  We sealed the top-50

5  lists.  Ms. Sarkessian and the U.S. Trustee's Office, of

6  course, has them.

7        With respect to the timing of the full creditor

8  matrix, that issue, Your Honor, you know, we're trying to,

9  you know, we're trying to get kind of clarity on the timing.

10 It's the volume of the nine-million-plus names and contact

11 information, accessing the systems is taking time.  We are

12 working as hard as we can to get that on file and we will

13 file that, if we're authorized to redact the information

14 we've asked for today for the six-month period.  That, of

15 course, will be filed, the full nine-plus-million names under

16 seal as soon as we're in a position to do so, which we hope

17 is very soon.

18        What we will do, and what we can undertake to do,

19 Your Honor, is file what we have now and what we've been

20 using for service, file that, and then update it as we get

21 the full nine-million-plus names into the matrix.  So, we're

22 happy to do that, Your Honor.

23        THE COURT:  So, let me ask you this, you're not

24 proposing that you would redact from filings?  One of the

25 things Ms. Sarkessian raises is that you want to redact not

1  just the creditor matrix or the customer lists, but also any

2  reference to any customer or creditor in any other filing in

3  the court.  And I'm assuming you're not proposing to do that

4  if that particular customer has already self-identified.

5          MR. GLUECKSTEIN:  We have not, Your Honor, and

6  that's another issue that Ms. Sarkessian raised, right, this

7  idea that there are customers who want to go to competitors

8  or want to move their accounts, which, of course, we

9  understand.  And they're not in the position, certainly, to

10 take their account at FTX at this point because of the

11 Chapter 11 process, but they're certainly free to go to a

12 competitor, self-identify themselves to a competitor, and

13 open an account somewhere else if they haven't already.

14         And, of course, we did as this issue some at the

15 first day hearing, any creditor or customer is free to come

16 forward and participate in this case, identify themselves

17 publicly, identify themselves in the docket of this court.

18 The documents -- and we have, of course, no issue with that

19 and wouldn't seek to restrict that -- from the perspective of

20 the documents that Ms. Sarkessian was reflecting -- was

21 commenting on this morning, the creditor matrix, the top-50

22 list, the SOFAs, the schedules, these are all documents that

23 we are required to file, right.  Those are documents the

24 debtors are required to compile and provide and would result

25 in us affirmatively, with or without their consent, as part

1   of the bankruptcy process, and we understand there are

2   obligations of the bankruptcy process, to identify the names

3   of those customers.

4           Ms. Sarkessian referenced the idea, well, nobody

5   would know.  You have all these names.  It's a creditor list.

6   It's not a customer list.

7           Our top-50 list, even the redacted versions that

8   are on file publicly, do delineate between customers and non-

9   customer creditors -- trade creditors and customers.  And so,

10  that information, if it were to be unredacted today, people

11  could see very easily of the top-50 creditors, which of those

12  are customers, meaning customers who hold accounts on the

13  various exchanges at FTX.

14          So, the distinction that Your Honor references, we

15  agree with.  Obviously, there's nothing in what Your Honor

16  would be ordering that would prevent any party from self-

17  identifying if they so choose.

18          THE COURT:  So, is there a -- excuse me -- a way

19  to delineate between -- you refer to the top-50 creditor

20  list.  That's been sealed in its entirety or redacted in its

21  entirety, right?

22          MR. GLUECKSTEIN:  It has not been redacted in its

23  entirety, Your Honor.  It has been filed in a redacted form

24  that redacts the information that we asked, and that the

25  Court authorized, pursuant to the interim order.  So, we have

1  redacted names and addresses of individuals and of

2  institutions who are customers, pursuant to the Court's

3  interim order and it's reflected as such.  But those

4  documents are on file in redacted form under seal.

5          THE COURT:  So, what I'm trying to get at is, is

6  there a way to delineate on the creditor lists, between who

7  is a creditor, who is a customer, and who is both, and be

8  able to disclose those who are solely creditors, publicly,

9  without disclosing those who are customers and creditors?

10         MR. GLUECKSTEIN:  You know, it goes to the

11  question, it's a question of what information for the full

12  nine million, of whether that's a meaningful field that

13  exists or that would have to be kind of independently

14  reviewed and populated, and I'm not sure of the answer to

15  that, Your Honor.  We'd have to look into that.

16         I think the number, from a volume perspective, is

17  very small, comparative -- in relative comparison to the

18  customers.  What we've been talking about here, by and large,

19  and why we've been seeking to protect, when we talk about the

20  customer list, the customers at the main debtors, at the

21  exchanges, are where the volume is and that's where we

22  believe the value is, and that's what Mr. Cofsky testified

23  about this morning.

24         So, you know, that does implicate, of course,

25  the 107(c) issues, which we are not pressing today.  But I

1  think, you know, we would have to see -- honestly, Your

2  Honor, we would have to see whether we could make that

3  delineation for all, kind of non-customer creditors.  I

4  suspect that we could, but I think that would take some work,

5  but I suspect that we could.

6          THE COURT:  Well, in the top-50 lists --

7          MR. GLUECKSTEIN:  Certainly, in the top-50 lists,

8  we have that information.

9          THE COURT:  -- are there those who now have been

10 disclosed, who are solely creditors, not customers?

11         MR. GLUECKSTEIN:  Not by name, Your Honor, because

12 the interim order had the 107(c) relief in it.

13         THE COURT:  Okay.

14         MR. GLUECKSTEIN:  So, at this point, all of the

15 names are redacted from that customer list that are subject

16 to the interim order.  So, the relief that we asked for in

17 the interim order, because it did include the 107(c) relief,

18 is broader than what we're talking about now.

19         THE COURT:  Okay.

20         MR. GLUECKSTEIN:  You know, I think on the GDPR

21 issues, Your Honor, those are certainly secondary here.  We

22 do think it's relevant.  We did brief the appropriate

23 sections.  You know, absent questions, we're happy to stand

24 on the briefing on that issue and, otherwise, I'm happy to

25 answer any other questions that the Court may have.

1          THE COURT:  Thank you, no questions.

2          MR. HANSEN:  Your Honor, Kris Hansen with Paul

3   Hastings, on behalf of the Committee.

4          Just quickly, to address the one point that

5   Ms. Sarkessian raised regarding 107(c), we do believe those

6   issues are real and to the extent that the Court wanted to

7   hear further evidence with respect to 107(c), we would ask

8   for a continuance of the hearing on that basis, so that we

9   could come back and provide more robust information to you.

10  It would consist of information that's available from a

11  public perspective, so newspaper articles, et cetera, that

12  you could take judicial notice of, but we, also, would

13  probably seek to put witnesses on, as well, to talk about

14  what has happened with respect to criminal and other type of

15  activity within the crypto space.

16          I don't know, today, whether we would be able to

17  link that to the disclosure of a name from a bankruptcy case,

18  but I think we could link it to disclosure of names,

19  otherwise, that people are able to find out through social

20  media and other avenues.  But I wanted to make sure the Court

21  understood, procedurally, where from the Committee stands, if

22  you need information and more information on 107(c), we would

23  like to have a continuance on that basis.

24          We think the record is very clear on 107(b) that

25  you have what you need in order to grant the relief that the

1  debtors and the Committee are jointly seeking.

2          THE COURT:  Thank you.

3          MR. HANSEN:  Thank you, Your Honor.

4          MR. GLUECKSTEIN:  Your Honor, if I could just

5  clarify one point?

6          THE COURT:  Go ahead.

7          MR. GLUECKSTEIN:  I might have misspoke.

8          So, just to be clear, Your Honor has pointed out

9  to me in an answer to Your Honor's question, currently, on

10  our top-50 lists, we have disclosed non-customer names.  So,

11  for example, there are certain vendors at the non-exchange

12  entities, because we have filed silos -- filed siloed top-50

13  lists.  So, if there was, for example, a vendor providing

14  services who is a non-customer, that information has already

15  been disclosed and would be under the relief asked for today.

16          THE COURT:  Is that for all creditors, solely

17  creditors, or just some?

18          MR. GLUECKSTEIN:  Yes.

19          THE COURT:  For all?

20          MR. GLUECKSTEIN:  All.

21          THE COURT:  Okay.  Thank you.

22          MS. SARKESSIAN:  Your Honor, can I just --

23          THE COURT:  Go ahead.

24          MS. SARKESSIAN:  Your Honor, with that -- for the

25  record, Juliet Sarkessian on behalf of the U.S. Trustee --

1    Your Honor's questions made me think of something with

2    respect to the top-50 lists.  Of course, you know, we formed

3    a Committee and I believe all the members of the Committee

4    were on that top-50 list.  Their names were redacted because,

5    at the time, it was subject to Your Honor's order.

6             Your Honor did indicate at the first -- or one of

7    the hearings that if somebody is going to be on the

8    Committee, they have to be willing to have their name

9    disclosed, and we did file the notice of the appointment with

10   their names.  Since that is now -- and I understood that that

11   was -- we discussed it with all the Committee members.

12   Nobody had an issue with that.  That has been disclosed.

13            Can the top-50 list be revised, in terms of

14   redaction, to now unredact the information, with respect to

15   those particular creditors, whose names have been disclosed?

16            THE COURT:  Well, it certainly makes

17   servicemembers to me.  I don't see why it can't be done.

18            MR. GLUECKSTEIN:  That can be done, Your Honor.

19   Frankly, once we have clarity around the scope of what's

20   staying or not being redacted, we will update the documents,

21   as appropriate.

22            THE COURT:  Okay.

23            MR. GLUECKSTEIN:  But we certainly understand that

24   point.

25            THE COURT:  Okay.  Thank you.

1          MS. SARKESSIAN:  Your Honor, the only other thing

2    I, again, would emphasize, I am confused about why there

3    would be another hearing about 107(c).  That was in the

4    initial motion.  Everybody knew today was the day of the

5    hearing on these issues.  If they had evidence to present,

6    they should have presented it, so I would object to a

7    continuance on that basis.  We were ready, willing, and able

8    to go forward today.  Nobody told us in advance that they

9    wanted a continuance.

10          THE COURT:  Well, I understand that and ordinarily

11    I would say, Yes, today was the day and you need to put on

12    your evidence.  I'm not going to grant any continuances.

13          But we're talking about individuals here who are

14    not present, individuals who may be at risk if their name and

15    information is disclosed.  And if that is the case, I want to

16    make sure I'm doing the right thing by those people.

17          MS. SARKESSIAN:  I understand, Your Honor.

18          THE COURT:  So --

19          MS. SARKESSIAN:  Again, I would stress, we are not

20    objecting to their addresses, email addresses, telephone

21    numbers being redacted; we're only talking about names.

22          THE COURT:  I understand.

23          MS. SARKESSIAN:  Thank you, Your Honor.

24          THE COURT:  Mr. Hansen?

25          MR. HANSEN:  Yes, Your Honor.  Again, Kris Hansen,

1  with Paul Hastings on behalf of the Committee.

2         Your Honor, with respect to the individual

3  creditor names that are on the Committee, the notice that the

4  U.S. Trustee filed for individuals does not include their

5  addresses or their information; it just has their names.  For

6  the institutions, it obviously includes their addresses.

7         So, when the debtors make their disclosure with

8  respect to the top 50 for those parties, we would ask,

9  consistent with the notice that was filed from the U.S.

10 Trustee, with respect to their appointment, that we do

11 maintain that information under seal.

12         THE COURT:  Is that an issue?

13         MS. SARKESSIAN:  The U.S. Trustee has no

14 objection.  We're in complete agreement.

15         THE COURT:  Okay.  Thank you.

16         Anyone else?

17    (No verbal response)

18         THE COURT:  All right.  Well, this case certainly

19 presents extraordinary circumstances just by the nature of

20 the case itself.  The fact that we have a list of people who

21 may be customers, may be creditors, may be both, and I don't

22 know who -- which is which, and they are -- there are nine

23 million of them, I'm reluctant at this point to say I'm going

24 to require the disclosure.

25         I think the debtor did put on sufficient evidence

1  to show that customer lists -- and I think it goes without

2  saying that a customer list in any bankruptcy case is

3  something that is protected by 107(b) as a trade secret.

4  Companies hold those things very closely and don't want them

5  disclosed.

6        The difficulty here is I don't know who's a

7  customer and who's not, who's just a regular creditor.  So,

8  at this point, I'm going to overrule the objections and allow

9  them to remained sealed at this point, but I'm not going to

10 leave it open for six months.  I'm going to -- I would

11 approve an order that extended it for three months.  By then,

12 I think, based on the testimony and the arguments of counsel,

13 we'll have a better sense of whether or not the customer

14 lists is something that purchasers of these assets find value

15 in and whether they are interested in making sure that they

16 remain anonymous at this point.

17       On the 107(c) issue, as I already indicated, I do

18 want more on that because I do want to make sure I'm

19 protections the interests of these individuals.  And it's

20 interesting, because if you look at 107(a) and -- or excuse

21 me -- 107(c), it refers to protecting information and

22 refer -- and -- excuse me -- in defining what identification

23 means, it refers to the Criminal Code 18 -- Title 18,

24 Section 128(d).  And if you look at 128(d), it says that the

25 information includes names, numbers, or any combination of

1   those two that would allow the identification of an

2   individual.  So, certainly, the Criminal Code recognizes that

3   disclosure of a name could result in the identification of an

4   individual and if that individual needs protecting, we need

5   to make sure that that is happening.

6          I don't have enough on the record today to say

7   that 107(c) applies, but I want to make sure that I'm doing

8   the right thing.  So, I will, in connection with any

9   further -- I guess the question, then, is do I hold that

10  hearing before the three months is up?  And I think in order

11  to make sure that we have a fulsome record and that the

12  parties have the opportunity to engage in discovery, if

13  necessary, to identify people who might come in and testify,

14  I want to make sure that they have the opportunity.  So,

15  we'll schedule a further hearing on the 107(c), in connection

16  with the 107(b) follow-up in three months.

17         I do want to make sure that the debtors are, in

18  compiling the nine million names, if there is a way to

19  identify them if they are just a creditor and not a customer,

20  I expect that to be done.  And I would like to have a status

21  conference on that question, alone, within the next -- I

22  think we have another hearing scheduled on the 20th.  So,

23  let's have a status conference on the 20th on the question of

24  how difficult it would be for the debtors to provide a list

25  of creditors and/or customers and distinguish between

1  creditors and customers.  And if you can just identify just

2  customers on the list or, excuse me, just creditors on the

3  list, I would expect that those names would be disclosed;

4  again, not disclosing for individual's names -- excuse me --

5  addresses or telephone numbers or other identifying

6  information.

7          But if there is -- if there are customers who

8  are -- I keep confusing these two -- if there are creditors

9  on that list of nine million who are institutions or

10 corporations and they are only creditors, then their full

11 identifying information should be disclosed, as required by

12 the Code.

13         So, with that, I'm going to ask the parties to

14 meet-and-confer and come up with a form of order that

15 reflects what my rulings are today.

16         Are there any questions or did I miss anything

17 that the parties want me to make sure that I've addressed?

18         MR. GLUECKSTEIN:  From the debtors' perspective,

19 no, Your Honor, that's very clear.  Thank you.

20         THE COURT:  Okay.  Ms. Sarkessian or Mr. Finger,

21 any concerns, other than the fact that I ruled against you?

22         MR. FINGER:  I'll take judicial notice.

23    (Laughter)

24         MR. FINGER:  Nothing more, Your Honor.

25         THE COURT:  Okay.  Thank you.

1          MS. SARKESSIAN:  And, Your Honor, I apologize if I

2   missed it.  Did you make a particular ruling regarding

3   individual creditors who are not customers, but are members

4   of the U.K. or European Union or Japan?

5          THE COURT:  No, I did not address that.  That's

6   another question and that's a difficult one.  I don't

7   think -- I don't have any evidence on that.  All I have is

8   the arguments of counsel.

9          Let's include that when we talk in three months,

10  because I would like further evidence on that and maybe have

11  someone come in and testify about the foreign law and how it

12  affects, but I think, you know, I understand Mr. Finger and

13  Ms. Sarkessian have pointed out that they don't believe that

14  the European Code would apply here, but I think even

15  Mr. Finger recognized that could be argued either way.  So,

16  it's a question, so I'd like to know what the answer to that

17  question is.  Would this actually prejudice the debtors

18  somehow?  If it would subject the debtors to large fines,

19  and, you know, we've seen all this in the press where

20  companies in Europe have had large fines imposed against

21  them.  It's certainly not something that I want to have

22  happen to the debtors here.  And it raises questions about

23  whether I could even stop that.  Does the automatic stay

24  apply to the European Union seeking to impose a fine against

25  the debtors for violating disclosures?  I don't know.  So,

1  those are all open issues I need to have further -- might

2  need further briefing, too, on those issues.

3          MS. SARKESSIAN:  And, Your Honor, just for

4  clarity, so between now and the three months, do those names

5  remain sealed?

6          THE COURT:  Yes, until we -- when we get to the

7  status conference next Friday, if the debtors can come in and

8  say, We can provide a list of the nine million names and

9  identify those that are solely creditors, then I might revise

10  my order to say that those people's names and identifying

11  information should be disclosed, except for individuals, at

12  least with the constitutional creditors.

13          MS. SARKESSIAN:  And, Your Honor, maybe another

14  thing that we maybe could discuss at that status conference

15  would be to the degree that the debtors aren't able to cull

16  out which individuals are, in fact, citizens of the U.K., the

17  EU, and potentially Japan?

18          THE COURT:  If that's possible, that would be

19  helpful, if we know how many people.  From my -- I think from

20  the first day hearing, I think I recollect there was some

21  testimony in the declaration about how many of these people

22  are not U.S. citizens; they're foreign citizens.  So, it may

23  be most, if not all of them.  I don't think all of them would

24  be, but at least most of them might be foreign citizens.  I

25  don't know.

1          MS. SARKESSIAN:  And, Your Honor, they may be

2    foreign citizens, but they might be citizens of India or

3    someplace that's not controlled.

4          THE COURT:  Right.

5          MS. SARKESSIAN:  I just -- I'm not sure that we've

6    heard testimony about the debtors' ability to determine

7    citizenship of its customers.  So, again, maybe that's

8    something that can be discussed at the status conference, do

9    they have the ability to determine what the citizenship is so

10   that they can know whether or not to redact the name.

11         THE COURT:  Right.  I think that's right, yes.

12         MS. SARKESSIAN:  Thank you, Your Honor.

13         MR. GLUECKSTEIN:  That's fine, Your Honor.  We'll

14   be happy to address that issue at that point.

15         THE COURT:  Okay.  All right.

16         All right.  Well, thank you.  Anything else?  So,

17   I'll look forward to the certification of counsel to the

18   order so far.

19         MR. GLUECKSTEIN:  No, I think on that issue, that

20   is it, Your Honor.  We're happy to move forward with the

21   agenda unless Your Honor would like to address any other

22   issues?

23         THE COURT:  Let me see.  Mr. Finger?

24         MR. FINGER:  May I be excused?

25         THE COURT:  Yes, thank you.

1          All right.  Let's go forward.

2          MR. GLUECKSTEIN:  All right.  Thank you, Your

3   Honor.

4          I'm going to take one item, if I may, if it

5   pleases the Court, just Agenda Item 22, slightly out of

6   order, and then I will turn things over to Mr. Dietderich.

7   Agenda Item 22, Your Honor, is the debtors' motion to

8   authorize, provide indemnification, and exculpation on a

9   final basis to certain individuals taking actions to secure

10  at-risk cryptocurrency and cash.  The motion was filed under

11  seal prior to -- in connection to the first day hearing at

12  Docket 95.  An interim order was entered at Docket 140 and

13  subsequently unsealed after a discussion with the Court

14  recently at Docket 323.

15         Your Honor, there have been no objections filed

16  with regard to the motion.  The debtors have received

17  informal comments and have had discussions at length with the

18  United States Trustee and the official Committee.

19         In response to those comments received, the

20  debtors did file a revised, proposed order last night.  The

21  motion, Your Honor, was filed, as the Court will recall, on

22  an emergency basis when it became clear in the initial days

23  of these cases that certain of the debtors' cryptocurrency

24  and cash assets were at significant risk of being hacked,

25  stolen, lost, or compromised, if not immediately moved and

1   secured.  This required individuals to act quickly, on behalf

2   of the debtors, to take actions in a difficult environment.

3          Those assets included crypto and other digital

4   assets that were held or maintained on third-party exchanges,

5   or in so-called hot wallets, that are not maintained on

6   third-party exchanges.  There were cash assets held in bank

7   accounts around the world and in certain cases, on third-

8   party brokerages, where securities and other assets were

9   being held.

10          I am pleased to report to the Court that very

11   significant progress, and Mr. Dietderich alluded to this,

12   this morning, has been made on the work that was done and

13   necessary for which this motion and an interim order has been

14   integral, but the work to locate and secure assets remains

15   ongoing.  Transfers of cryptocurrency are subject to certain

16   inherent risks.  Some of those risks are very amplified, here

17   in these cases, due to the inadequacy of prior controls

18   before the debtors' current management team got in and put

19   them in place.

20          As a result, the protection for a limited number

21   of individuals on the frontline of this work remains

22   critically important.  I do want to note for the record,

23   based on discussions with the Committee, that the debtors are

24   okay with the requests from them to be sure that to the

25   extent there are indemnification payments that ultimately

1   need to be made under the order, that the debtors will seek

2   payment from any applicable insurance policies and that the

3   debtors retain all rights of subrogation with respect to

4   obligations that might arise under this order.

5          I think the Committee is going to want to be heard

6   on this, as well, but from the debtors' perspective, Your

7   Honor, we would ask that the order be entered.

8          THE COURT:  Okay.  Thank you.

9          Mr. Hansen?

10         MR. HANSEN:  Yes, Your Honor.  Again, Kris Hansen

11  with Paul Hastings, on behalf of the Committee.

12         Your Honor, that was really our main point, with

13  respect to the indemnification motion, which is that if

14  indemnification payments are going to be made, that the

15  debtor use its best efforts, first, to look to applicable

16  insurance, which is not only D&O insurance, it's other

17  professional liability insurance, as well.  As the motion

18  makes clear, they look to include parties in connection with

19  that who may be covered by their own insurance.  And so, we

20  want to make sure that insurance assets are used to make

21  those payments, if at all possible, and that if the debtor

22  needs to advance payments first, that it has subrogation

23  rights to move against that insurance.

24         Ideally, we would include that in the order so

25  that it's clear.  Obviously, we've all stated it here on the

1  record, so if we could include it in the order, that would be

2  the Committee's favored approach.

3          THE COURT:  Okay.  Is there any objection to

4  revising the order, Mr. Glueckstein?

5          MR. GLUECKSTEIN:  No, Your Honor.  We're happy to

6  sit back down the Committee and discuss the order further and

7  submit an agreed-upon form of order.

8          THE COURT:  Okay.  Thank you.

9          Was the Committee the only objection on that?

10          MR. GLUECKSTEIN:  Yeah, I don't know if the U.S.

11  Trustee has anything further on this motion.

12          MS. SARKESSIAN:  Yes, Your Honor.  Again, for the

13  record, Juliet Sarkessian on behalf of the U.S. Trustee.

14          I believe we have worked out all of our issues

15  with the debtors on this.  I think the only thing I just want

16  to make clear on the record is the proposed final order will

17  have an exhibit.  The exhibit needs to be filed under seal,

18  but the order itself, once it gets entered, should -- the

19  order itself should not be under seal.  The exhibit is a list

20  of people's names that are going to be covered by the order

21  getting the indemnification and exculpation.

22          We've had some trouble with -- a seal order in the

23  past got entered under seal, so I just want to make sure that

24  it's clear that the order, itself, is not under seal, but the

25  exhibit will be, I guess, right?  I think that's what we

1  need.

2          MR. GLUECKSTEIN:  That's correct, Your Honor.

3  We're not looking to seal the order.  We've unsealed, now,

4  with the Court's permission, the interim order.

5          Ms. Sarkessian is correct, we will, and we have,

6  in fact, filed under seal, already, the list of names that's

7  contemplated -- that is contemplated to be attached to the

8  order.  And so, when we submit the final order for Your

9  Honor's review and signature, the order, then, would be on

10  the docket, but the exhibit to that order would remain filed

11  under seal.

12          THE COURT:  Okay.  That's fine.  I did see that

13  list already.  I saw it this morning.

14          MR. GLUECKSTEIN:  Thank you, Your Honor.

15          THE COURT:  All right.  So that one, again, will

16  be submitted under COC?

17          MR. GLUECKSTEIN:  Yes, once we agree on the

18  additional language with the Committee, we'll submit that

19  under COC.

20          THE COURT:  Okay.  Thank you.

21          MR. GLUECKSTEIN:  And with that, Your Honor, I

22  will cede the podium to Mr. Dietderich to address cash

23  management.

24          THE COURT:  Okay.

25          MR. DIETDERICH:  Hello, again, Your Honor.  For

1  the record, Andy Dietderich, Sullivan & Cromwell, for the

2  debtors.

3           I have Docket 21, the cash management order.  Your

4  Honor, on this one, all objections have been resolved, in our

5  view, other than one objection from the U.S. Trustee.  Before

6  addressing that objection, I wanted to -- I have a sentence

7  to read into the record and a couple general points to the

8  Court.  I also want to talk about the evidentiary record here

9  for just a moment.

10          From the debtors' perspective, we believe the U.S.

11  Trustee has an objection that's a pure point of law, which is

12  about whether or not the Court has authority to grant

13  superpriority status to claims against the cash management

14  system.  I do not believe her objection goes to the

15  reasonableness of that decision and we do have a record, of

16  course, for the reasonableness of the cash management system

17  from Mr. Mosley's prior declaration, which is on the docket

18  from the interim hearing.

19          So, I'd like to go ahead and proceed on that

20  assumption, but to the extent that Ms. Sarkessian does have

21  an objection to the reasonableness of the cash management

22  procedure, we do reserve the right to call Mr. Mosley, put

23  him on the stand, and ask him a few questions.

24          THE COURT:  Why don't we find out before we go?

25          MS. SARKESSIAN:  Your Honor, it's a pure legal

1    argument.  I'm not making any argument about the

2    reasonableness of any decision that the debtors have made in

3    this regard, just whether it's permissible under the Code.

4              THE COURT:  Okay.  Thank you.

5              MR. DIETDERICH:  Okay.  Thank you, Ms. Sarkessian.

6              On that basis, Your Honor, the evidentiary record

7    here is we're relying on is the declaration of Mr. Mosley in

8    support of first day relief, Docket 57; his supplemental

9    declaration, Docket 93; and although we're not relying on it

10   for evidence, for the Court's information, there is a second

11   supplemental declaration of Mr. Mosley, last evening, which

12   is generally applicable with the 13-week cash forecast, and

13   that's at Docket 460.

14             So, Your Honor, we have, in order to resolve the

15   objection from Evolve Bank, which is one of the banks where

16   we have accounts that are nominally recorded as FBO accounts,

17   we have a little bit of language to read into the record.

18   So, in paragraph 13 of the form of order, where it speaks

19   about the rules for closing FBO accounts, we have committed

20   with Evolve that we will not close the accounts at their bank

21   without notice and a further order of the Court.  And so, we

22   will be submitting a revised form of order where the language

23   that will make that clear and we have text that we've worked

24   out with counsel to Evolve.

25             Second, Your Honor, we have some objections from

1  shareholders.  So, a couple of shareholders have surfaced,

2  represented by our friends at Debevoise, and they've reviewed

3  this order.  They have, I believe, an objection or a

4  reservation of rights, one or the other, one file.  And we've

5  worked out with them that we've made some commitments to them

6  to share information informally, that they've accepted, and

7  on that basis, I believe their objection is resolved.

8          With respect to the overall motion, Your Honor,

9  this is really the same cash management system that we

10 proposed earlier, so there's been no substantial change to

11 the management system we're proposing going forward, with one

12 exception.  During the interim period, we had some gates on

13 the ability to move, to make advances from silo to silo.

14 There was a hard cap on the movement of money from silo to

15 silo.

16         We've had a number of discussions with the

17 Committee about what the right approach is to this case, in

18 terms of movement of money in the cash management system

19 across silos and we've agreed with them on a flexible

20 procedure where we will use a budgeting and projection

21 process and involve them periodically in that process.  And

22 to the extent that we agree that it's appropriate and prudent

23 to move money from the silos, we're permitted to do that

24 under the cash management system and our business judgment

25 with the committee's involvement.

1        However, to the extent that the Committee

2   disagrees, either with the projections about amount of silo

3   movement or we have variances from time to time that are

4   larger than beyond a certain cap, in that circumstance, the

5   Committee can come back to Your Honor on an accelerated

6   schedule with an objection.

7        And we think that's an appropriate basis.  You

8   know, we will be moving money between the silos, only to the

9   extent that we think this obviously creates a reliable,

10  administrative claim.  We have substantial, unencumbered

11  asset value at all of the silos.  The question might just be,

12  really, a question of working capital, until we're able to

13  monetize some of the assets and some of the pockets that we

14  have.

15       There's been no objection, Your Honor, that goes

16  to that mechanism.  The objections that we've resolved went

17  to more of question, should we charge interest and how should

18  the mechanics of the details work?

19       So, with that, Your Honor, I'll turn to the

20  remaining objection that we have, which is the objection of

21  the U.S. Trustee on the legal question of whether or not Your

22  Honor has the authority to grant superpriority status to

23  advances under a cash management system.  There's not a lot

24  of case law that will be helpful to us on this point.  I

25  think we have a reading of the Bankruptcy Code that says that

1   which is not prohibited by the Bankruptcy Code, and we have

2   an evidentiary basis of reasonableness for, Your Honor can

3   award under 105.

4         We also think for the reasons that we put in the

5   papers, which I don't need to rehearse, that the proper

6   allocation of risk in a system with many debtors between

7   administrative creditors, so it's really a question of

8   allocation of risks among different administrative creditors

9   in a common system, that if the advances by the cash

10   management pool are given the superpriority status, the

11   consequence of doing so is that the first loss if there was a

12   problem, and heaven forbid, we don't expect there to be a

13   problem, but if there ever was a problem anywhere in part of

14   our system, the superpriority protects the cash management

15   system and the other debtors against a localized problem and

16   it allocates, first, administrative loss to the

17   administrative creditors of that particular debtor.

18         The converse rule, a rule that says it was an

19   ordinary administrative advance, the problem with that rule

20   in our mind is that it, then, socializes any loss, any

21   administrative loss among administrative creditors in our

22   case, all over the world.  And so, this superpriority status

23   for administrative advances, we believe, is consistent with

24   the approach that had been taken by the debtors that have

25   really thought it through in the complicated cases, in

1 particular, cross-border cases.  It's consistent with the

2 way -- and, again, without evidence on this, Your Honor, but

3 from -- I'll speak, just informally, from personal

4 experience -- it's the way international companies think

5 about cash management, making sure the system is protected,

6 as opposed to any particular arm of the organization, and we

7 believe it's the reasonable approach, you know, on the facts

8 of our particular case.

9        In terms of the pure legal issue, we see nothing

10 in the Code that prohibits Your Honor from doing it.  The

11 U.S. Trustee, in respect to the argument, says there's only

12 two circumstances where superpriority expense can be awarded

13 by a debtor and we think those are two circumstances --

14 excuse me -- where the Code contemplates it, but it -- it's

15 not otherwise permitted.  And to the extent we do so on the

16 record, so that all of our administrative creditors know that

17 the advances have superpriority status, we think there's

18 adequate notice to do it.  In some ways, the greater power

19 implies the lesser.  We should be able to incur

20 administrative debt at one of our subsidiaries on the

21 understanding that the person we're dealing with knows that

22 advances against the cash management system do have a

23 priority.

24        Now, the last thing I'll say, Your Honor, is this

25 doesn't come up super often because of DIP financing and the

1  arrangements of DIP financing often supercede this, and it's

2  embedded in the cash management system that's somewhat

3  connected, at least, to the DIP loan.  Here, we don't have a

4  DIP loan, so there's a little bit more attention on the

5  question, but those are my remarks on it and I'm happy to

6  cede the podium to Ms. Sarkessian and she can give you the

7  contrary view.  Thank you.

8            THE COURT:  Thank you.

9            I think the Committee wants to weigh in first.

10  Hold on one second.  We have a -- I want to make sure --

11       (Pause)

12            THE COURT:  The Zoom video went out?  They can

13  still hear me, though?

14       (Pause)

15            THE COURT:  That means everybody else has to dial

16  back in?

17       (Pause)

18            THE COURT:  A technical glitch.

19            MR. DIETDERICH:  I hope it's nothing I said.

20            THE COURT:  It happened when you stood up.  I

21  don't know.

22       (Laughter)

23            THE COURT:  All right.  Unfortunately, we have to

24  have IT come up and take a look at what's happening here.

25  So, let's take a recess until we can get this resolved,

1   hopefully, pretty quickly.  Just let me know when we're

2   ready.

3        All right.  We'll recess until we get this fixed.

4   Thank you.

5        (Recess taken at 12:17 p.m.)

6        (Proceedings resumed at 12:40 p.m.)

7             THE COURT:  Okay.  Ready to go.

8             MR. GILAD:  Good afternoon, Your Honor.  Erez

9   Gilad, Paul Hastings, LLP, proposed counsel to the official

10  Creditors' Committee.

11            Your Honor, I rise only to make some comments,

12  with respect to the cash management motion.  We, as a

13  Committee, support the cash management and wanted to describe

14  to the Court that we have spent a fair amount of time

15  negotiating and improving the terms of the cash management

16  order.

17            Our approach to the cash management system in the

18  proposed form of order was to facilitate the use of a

19  centralized cash management system, which all else being

20  equal, is rather common to complex corporations of this size,

21  but at the same time, reflecting the realities of the case,

22  preserving parties' rights, with respect to assets of the

23  debtors, offering visibility into movement of cash, and

24  enacting appropriate safeguards for the benefit of the

25  debtors' estates.

1          To that end, as counsel indicated earlier, we did

2    negotiate an extensive regime of reporting, that is weekly

3    and monthly reporting, delivery of monthly budgets of various

4    tests, intercompany reconciliation reports as well,

5    consultation rights, and opportunities for the Committee to

6    step in and seek relief before the Court, if there are

7    certain objections to either, to the budget or any

8    disbursements that sought in excess of a 10 percent variance.

9    There's also a negotiated result with respect to imposing a

10   cap on transfers to nondebtors.

11          We think, all in, these provisions strike the

12   appropriate balance between assuring the proper movement of

13   cash and the efficient administration of the case, which,

14   frankly, benefits all constituents, but also affords

15   appropriate protection to the debtors' estates.  And it's

16   important to note that as part of the negotiated result, we

17   did incorporate language into the cash management order which

18   provides a fulsome reservation of rights for the benefit of

19   parties, with respect to entitlements regarding customer

20   funds, and also a fulsome reservation of rights with respect

21   to the rights to assert whatever rights or remedies they

22   have, notwithstanding the silo creation, and notwithstanding

23   the movement of cash between accounts and between silos.  So,

24   we thought that that was similarly important for the benefit

25   of constituents in the case both, customers and creditors

1    alike.

2            From the perspective of the legal issue that's

3    been presented in terms of the admin priority versus

4    superpriority, obviously, the debtors' intent here is to

5    ensure that to the extent that there is movement of cash,

6    that the appropriate estates are protected.  In terms of the

7    superpriority status, again, our perspective there is that

8    the debtors' view is that it's simply additive protection for

9    the benefit of the transferor estate.

10            It's my understanding that from a process and

11    notice perspective, at least, I believe that the interim form

12    of order included the establishment of a superpriority claim,

13    with respect to the transferor estate, so I view it from that

14    perspective, I think it's been on notice now, for purposes of

15    the second day hearing, that that relief would be requested.

16    So, I think that notice, coupled with the comments made by

17    counsel that we don't believe that there's any prohibition

18    against the Court affording superpriority status, we support

19    the relief requested by the debtors.

20            Unless Your Honor has any questions, I believe

21    that's all I have to say.

22            THE COURT:  All right.  Thank you.  No questions,

23    thank you.

24            MR. GILAD:  Thank you, Your Honor.

25            THE COURT:  Okay.  Let's see.  We have another

1  speaking in support of?

2          MR. LEVINSON:  In support, yes, Your Honor.

3          THE COURT:  Okay.  Go ahead.

4          MR. LEVINSON:  Good morning.  Sidney Levinson,

5  Debevoise & Plimpton, for Paradigm operations.

6          Paradigm is a substantial stakeholder in these

7  bankruptcy cases, including about 280 million of equity

8  investments in two of the silos, West Realm Shires and FTX

9  Trading Ltd.

10         We've heard Mr. Gray and others take aim at the

11  poor recordkeeping of the debtors prior to the bankruptcy

12  filing, and we recognize that the process of identifying the

13  assets and the liabilities of each debtor, as well as the

14  prepetition intercompany claims and relationships that exist

15  among them is very much a work in progress.  I mean, it's

16  fair to say none of us really know at this moment how all of

17  that is going to shake out, but given that state of affairs,

18  it's absolutely vital for all stakeholders to be able to

19  preserve the status quo as of the petition date to the

20  fullest extent possible and to maintain the separateness of

21  the various debtor entities to the fullest extent possible so

22  that each of the individual debtors and their respective

23  stakeholders aren't prejudiced by anything that's going to be

24  happening during the bankruptcy cases.

25         The cash management order, obviously, has some

1   impact on that status quo and, accordingly, there need to be

2   protections implemented to minimize that threat.

3            We engaged in informal discussions, we did also

4   file a limited objection, but those informal discussions have

5   been ongoing with the debtors for several weeks to address

6   our concerns and in fact the revised form of order includes

7   many of the suggestions that we had made with respect to the

8   form of order.  And given that, as well as the commitments

9   that Mr. Dietderich referred to in his comments, Paradigm is

10  withdrawing its remaining objections.

11           I would, if I may, Your Honor, just like to be

12  heard briefly on the United States Trustee's limited legal

13  objection because the inclusion of super-priority claims is

14  fundamental to our support of the current cash management

15  order in its current form.

16           Now, contrary to their position, I would submit

17  that the Bankruptcy Court does in fact authorize, expressly

18  authorize the grant of the super-priority claim and I think

19  that express authority can be found in Section 363(e), which

20  governs the use of property in which an entity has an

21  interest.  If I can indulge Your Honor just to read from

22  363(e):  "Notwithstanding any other provision of this

23  section, at any time, on request of an entity that has an

24  interest in property used, sold, or leased, or proposed to be

25  used, sold, or leased, by the trustee, the Court, with or

1   without a hearing, shall prohibit or condition such use,

2   sale, or lease as is necessary to provide adequate protection

3   of such interests."

4          Now, here, the debtors and non-debtors whose funds

5   are being used have an interest in these proceeds and are

6   entitled to request a grant of adequate protection from the

7   debtors that are in fact receiving those proceeds or the

8   benefit of those proceeds.  Section 361 authorizes the grant

9   of adequate protection in many forms, including the

10   realization of the indubitable equivalent of an interest in

11   such funds.

12          And one thing that 361 makes clear is that a mere

13   administrative expense priority is not sufficient by itself

14   to provide adequate protection.  Thus, we would submit a

15   super-priority claim is the bare minimum that would be

16   required to provide adequate protection and, indeed, if it

17   turns out that any form of adequate protection turns out to

18   be insufficient, the entity advancing such funds would be

19   entitled to a super-priority claim under Section 507(b).

20          So we think the United States Trustee's limited

21   objection is misplaced not only for all the reasons outlined

22   by the debtors in their paper and by Mr. Dietderich today,

23   but also by that provision as well, and that this Court does

24   in fact have the authority to grant super-priority claims and

25   we respectfully request that Your Honor approve that

1  provision.

2          Unless Your Honor has any questions --

3          THE COURT:  No questions.  Thank you, Mr.

4  Levinson.

5          MR. LEVINSON:  Thank you.

6          MR. WORALDEIN:  Good afternoon, Your Honor, Elie

7  Woraldein, Debevoise & Plimpton, a separate Debevoise &

8  Plimpton team, on behalf of certain Lightspeed Funds, here

9  together with our co-counsel Cole Schotz.

10          I'll be very brief, Your Honor, because I don't

11  want to repeat a lot of the points that were raised by

12  Paradigm, as well as the committee.  Our interests and the

13  concerns that Paradigm Lightspeed had are very similar to the

14  concerns of the committee, as well as the concerns of

15  Paradigm.

16          But, very briefly, as noted in our reservation of

17  rights, which is Docket Number 389, Lightspeed Funds are

18  substantial equity holders in several of the debtor entities.

19  Based upon the debtors' public filings and statements thus

20  far in the case, the debtors have acknowledged that certain

21  FTX entities in the WRS silo, as well as certain other

22  entities, are solvent.

23          So, as noted in our brief, Lightspeed -- the

24  Lightspeed Funds' concerns were that it's imperative in this

25  case to preserve the status quo, for all of the reasons noted

1  by Paradigm's counsel just a moment, that it's imperative to

2  maintain corporate formalities and preserve the status quo,

3  especially at this early stage of the Chapter 11 case, and we

4  must do that to the greatest extent possible in order to

5  ensure that the rights of legitimate stakeholders are

6  preserved.  Lightspeed was concerned that the original motion

7  and proposed order as originally drafted -- the debtors were

8  able to transfer funds from debtor entities to non-debtor

9  entities and vice versa and that's how they were intending to

10 fund these Chapter 11 cases, the concern of Lightspeed was

11 that those initial proposals didn't have sufficient

12 safeguards to protect the interests of those solvent debtor

13 entities, as well as the various stakeholders of those debtor

14 entities and, therefore, the original proposed order left a

15 substantial risk that solvent FTX entities will be funding --

16 seeing their cash being used to the benefit of other debtor

17 entities.

18         And this wasn't only a concern of the Lightspeed

19 Funds, this is a concern that all stakeholders -- as, you

20 know, the committee noted as well that it's important that

21 different stakeholders, obviously, have different claims

22 against different legal entities, so it's imperative to

23 preserve and maintain corporate formalities in order to

24 ensure that each stakeholder against the individual debtor

25 entity could preserve the status quo of whatever cash or

1  rights or assets they have.

2          As noted earlier, we're happy to report we have,

3  in light of the revisions to the proposed order, most

4  importantly, the grant of the super-priority claim, as

5  discussed earlier -- and I won't repeat those legal arguments

6  that were already mentioned -- we believe that they will

7  satisfy Lightspeed Funds' concerns at this time and we're

8  going to withdraw our reservation of rights and any

9  outstanding concerns in light of the extensive back-and-forth

10  arm's length discussions we've had with FTX's counsel over

11  the last few weeks.

12          However, we will note just for the record that

13  we'll continue to monitor these cases carefully, especially

14  in light of the reservation of rights for the various issues

15  in the proposed order, namely interest, allocation of

16  expenses, and some of the other points, which are all issues

17  that are reserved for later in the Chapter 11 case, but the

18  Lightspeed Funds will maintain careful monitoring of the case

19  just to ensure that the debtor entities are maintaining

20  corporate formalities, transparency, as we heard earlier in

21  the hearing, the key of tracing and monitoring all the cash

22  flows during the Chapter 11 case just to ensure that no

23  specific debtor entities and their various stakeholders are

24  prejudiced at the expense of other debtor entities.

25          So, unless the Court has any questions, that's all

1    I intended to add to the record.

2             THE COURT:  Okay.  Thank you --

3             MR. WORALDEIN:  Thank you.

4             THE COURT:  -- no questions.

5             Anyone else in support?

6        (No verbal response)

7             THE COURT:  Okay.  Ms. Sarkessian?

8             MS. SARKESSIAN:  Again, Juliet Sarkessian on

9    behalf of the U.S. Trustee.

10            Your Honor, the -- as Your Honor is of course well

11   aware, the priority scheme of the Bankruptcy Code is a key

12   part of the Bankruptcy Code, it is crucial and it's set forth

13   under 507.  There are only two grounds in the Code where

14   super -- we call it super priority, it's an administrative

15   claim that has priority over all other administrative claims,

16   there's only two places in the Code that provide for that,

17   one is under 364(c) in connection with DIP financing and the

18   other is under 507(b) for adequate protection of prepetition

19   liens.

20            So now Counsel for Paradigm had just argued that

21   super priority could be granted under 3 --

22            THE COURT:  You might need to lower the microphone

23   some.

24            MS. SARKESSIAN:  Oh, I'm sorry, yeah.  Thank you,

25   Your Honor.

1       On the super priority, it could be allowed under

2   363(e), but if you -- and it does talk about adequate

3   protection there, but if you turn back to 507(b) -- and

4   507(b) does reference 363 -- it says, if under 362, 363, or

5   364 of this title, if the trustee provides -- or, of course,

6   debtor-in-possession -- provides adequate protection of an

7   interest of a holder of a claim secured by a lien on property

8   of the debtor.  So it is limited to that, there must be a

9   lien.  So I don't think that -- it's my understanding that

10  the transfers we're talking about here between debtors or

11  between non-debtor affiliates to debtors are not going to be

12  secured by a lien and certainly not on a prepetition lien.

13      So the debtors' argument -- and other parties have

14  argued that, well, just because the Code points out two

15  places that allow for super priority claims does not mean

16  that super priority claims are otherwise prohibited.

17      The priority -- again, the priority of claims

18  under the Bankruptcy Code is a key portion of the Code.  And

19  so when the Code says there's two places where you get a

20  super priority claim and there's no other provision where you

21  could say, all right, well, this -- you know, maybe under

22  this one, and that's it, that is it.  Otherwise, what you

23  come up with is, well, then what's the standard for super

24  priority claims?  I mean, we know it would of course have to

25  be a post-petition claim, but then what's the standard?  Is

1   it just whatever the debtor thinks should be a super priority

2   claim?

3            I've heard talk about, well, there was plenty of

4   notice.  If there's no statutory authority to grant something

5   under the Code, then giving people notice about it doesn't

6   resolve that problem.  It's great to give parties notice, but

7   you have to have a statutory provision to hang your hat on.

8            Again, what are the parameters, who decides and

9   what are the parameters of other super priority claims that

10  are not referenced in the Code?  You know, here, what the

11  debtor is saying is it's basically elevating claims between

12  themselves and non-debtor affiliates into the debtor, that

13  those claims are being elevated over claims of ordinary post-

14  petition vendors and service providers.  They're the ones

15  that are being effectively -- they're having their claims

16  subordinated, effectively, without, again, there being

17  anything in the Code to provide for that.

18           And the other problem is, is when you start

19  expanding super priority to cover other things that are not

20  specified in the Code, eventually, it becomes meaningless

21  because, you know, everybody is going to get super priority.

22  I mean, for example, if you say, well, maybe you view these

23  transfers between the debtors as post-petition DIP financing,

24  in which case please file a motion to get that approved, but,

25  well, then one could say that a vendor -- if a vendor is

1  selling goods on 30-day terms, that's giving the debtors

2  post-petition credit, do they get a super priority claim?  I

3  mean, where does it stop?  Because if everybody gets super

4  priority, then super priority is completely meaningless.

5          And, you know, somebody had said this is usually

6  not an issue because usually there's DIP financing, under the

7  Code, they get super priority, and that's the end of it.

8  They're not going to share super priority with, you know,

9  inter-debtor transfers, you know, we don't have that here,

10 but that doesn't mean -- just because we don't have a DIP

11 financer, it does not mean a super priority status can be

12 given without authority under the Code just because it's

13 convenient for the debtors or because they gave notice to

14 parties.

15         And, you know, as we mentioned in our objection, I

16 mean, here there is -- I guess I would say it's somewhat

17 ironic that -- you know, I've been told by debtors' counsel

18 that the majority of these transfers between debtors are

19 going to be loans from the Alameda Silo to the dot.com silo.

20 That is not in the motion.  The motion actually has very

21 little information about what these transfers are and why

22 they're needed or the amounts or anything.  That's what I was

23 told, I assume that's true.  And, of course, we have no

24 prepetition allegations of money from customer accounts in

25 the dot.com silo being rated and sent to Alameda.  Now,

1  Alameda is going to be lending money to the dot.com silo and

2  getting super priority status.  There's something that's, I'd

3  say, troubling about that.

4         And I understand that there's reservation of

5  rights, you know, put in the order so that if later on it's

6  determined that money that's -- that Alameda has really

7  belongs to customers of other debtors, you know, that those

8  rights are reserved, but, again, elevating those types of

9  transfers from the Alameda silo to the dot.com silo over

10  ordinary course professionals -- not professionals, excuse me

11  -- well, actually, they are elevated over ordinary course

12  professionals as well.  And the professionals are here and if

13  they want to voluntarily subordinate their claims, then

14  that's fine, they can do that, somebody can consent to that,

15  but there's certainly no evidence that the numerous -- I'm

16  assuming numerous vendors and service providers to these

17  debtors post-petition have agreed to have their claims

18  subordinated to claims between the debtors or claims from

19  non-debtor affiliates to the debtors that take place after

20  the petition date.

21         THE COURT:  Well, isn't there protections built in

22  to avoid the issue of Alameda loaning money to the dot.coms

23  and the question being, well, is the money that Alameda is

24  loaning belong to somebody else, and that's being preserved,

25  right?  I mean, the only thing that the super priority claim

1   will do is make sure that any money loaned goes back to

2   Alameda and then the question of whether that money actually

3   belongs to Alameda, or some of the other debtors or customers

4   or whatever the case may be, is something that can be decided

5   at a later time?

6          MS. SARKESSIAN:  Yes, Your Honor, it is my

7   understanding that that is being preserved, but it does not

8   -- it doesn't address the issue of not having statutory

9   authority to expand super priority claims beyond what is

10  specified under the Code.

11         THE COURT:  Okay, I understand your point.

12         MS. SARKESSIAN:  Unless Your Honor has any further

13  questions, that concludes my argument.

14         THE COURT:  Okay.  Thank you, Ms. Sarkessian.

15         MR. DIETDERICH:  Thank you, Ms. Sarkessian.

16         Very briefly, Your Honor, Andy --

17         THE COURT:  You might need to raise the

18  microphones back up again just to make sure --

19         MR. DIETDERICH:  Sure, sorry.  Understood,

20  understood.  We should leave one low and one high, maybe.

21         Your Honor, just very, very briefly.  One factual

22  correction is we're talking about liabilities to the cash

23  management system, under no circumstances are we granting

24  super priority status to a claim by a non-debtor.  So even a

25  non-debtor subsidiary won't have super priority status under

1  the cash management system; this is for inter-debtor advances

2  only.

3         The only other thing I'd say is that there's lots

4  -- you know, practical arguments about this.  I think the

5  question before the Court is whether Your Honor has authority

6  to grant super priority status.  And, again, I submit that,

7  with respect to Ms. Sarkessian's position, there's no case

8  cited that you don't have the authority, there's no case

9  cited for the reading of the Bankruptcy Code that says that,

10 in the absence of a specific reference to super priority, you

11 can't grant super priority status, and there's no case cited

12 for her particular reading of 105, despite lots of

13 jurisprudence about how 105 is applied to circumstances where

14 the Code is, as it is in so many things in our practice,

15 silent on a particular practical issue.

16        Congress did not think about the question of how

17 to run intercompany cash management systems in a multi-

18 jurisdictional debtor.  I can assure you without having to

19 look to it, we're not going to find that in the legislative

20 history of the Bankruptcy Code.  But what it did do is it

21 gave the debtors discretion, put a creditors committee in

22 charge to oversee us, and gave Your Honor the authority

23 where, if something is not prohibited by the Code under 105

24 and consistent with what needs to be done in a case, to issue

25 the relief on that basis.

1            I think there is an interesting argument whether

2    you would have authority under 363(e) to do it as adequate

3    protection for a use of property of one debtor by another

4    debtor, and whether a debtor is an entity within the meaning

5    of 363(e).  We didn't make that argument; I think it's an

6    interesting argument.  I think we're just standing under

7    basic 105 authority and we think that's sufficient.

8            THE COURT:  Okay.  Thank you.

9            MS. SARKESSIAN:  Your Honor, if I could just

10   address this one factual issue.  I'm looking at the proposed

11   final order that was given to me last night that I'm not sure

12   if it's been filed yet, but the language says the net post-

13   petition liabilities at any time, from any debtor to any

14   other debtor -- and then they go silo pooling account -- and

15   then they have from any non-debtor affiliate to any debtor

16   under the post-petition cash management system shall be

17   entitled to super priority.  That's paragraph 5.

18           So, if that's wrong, we can change that, but I'm

19   reading that to say transferred from a non-debtor affiliate

20   to a debtor gets super priority.

21           MR. DIETDERICH:  Ms. Sarkessian, thank you.  Let

22   me look, a quick look.

23       (Pause)

24           MR. DIETDERICH:  I think that's correct, I think

25   that is wrong.  That speaks to an obligation nonsensically

1  from a non-debtor to the system having super priority status,

2  which is an overdraft.  Obviously, you can't award super

3  priority status to the obligations of a non-debtor because

4  you don't have authority over the non-debtor.

5          So that can be -- that's --

6          MS. SARKESSIAN:  That can be taken out?

7          MR. DIETDERICH:  -- an excellent catch and we can

8  fix that in the form of the order, and thank you very much

9  for that.

10          MS. SARKESSIAN:  At least my work is worth

11  something.

12          MR. DIETDERICH:  It's worth a great deal.

13      (Laughter)

14          MR. DIETDERICH:  And that's not -- and, for the

15  record, that is by far not Ms. Sarkessian's only very good

16  catch in our documentation.

17          THE COURT:  Oh, I know.  She catches a lot of

18  stuff.

19          MS. SARKESSIAN:  Thank you, Your Honor.  Well, I'm

20  glad we were able to say that.

21          THE COURT:  All right.  Okay.  Well, the only

22  question is whether I have the authority to grant super

23  priority status under 105 and I think that I do.  It's not an

24  issue that has, obviously, come up in the past because there

25  is no case law on it, but a number of courts have entered

1  them in situations such as this.

2          And, again, we have an unusual situation here.

3  There's no DIP financing, the debtors are operating on their

4  -- whatever cash they have available, and some might not have

5  the cash to do it.  And so I think this is consistent with

6  105, to the extent that 105 is intended to provide the Court

7  with the ability to fashion resolutions where the Code might

8  not provide a specific resolution, but it's necessary to

9  protect the interests of the constituencies involved in the

10 case.  And, here, I have all of the constituencies agreeing

11 that this is good for the case and good for their individual

12 constituencies.

13         So I will overrule the objection and will enter

14 the order subject to the revisions.  And you can work with

15 Ms. Sarkessian and, again, submit this under COC once you

16 have a revised form of order.

17         MR. DIETDERICH:  Thank you, Your Honor.

18         I think the last -- not the last -- I'm sorry, if

19 you could just give me a second.

20      (Pause)

21         MR. DIETDERICH:  The last motion for Your Honor to

22 consider today is the bidding procedures motion, Docket 24.

23 I was going to say last, but we also of course have the

24 status conference on schedule -- or the scheduling

25 conference.

A000843

1          THE COURT:  Okay.

2          MR. DIETDERICH:  So, Your Honor, the bidding

3  procedures motion, before we start here, we do have an

4  evidentiary record on bidding procedures today.  There are

5  two declarations to move into evidence.  The first is a

6  declaration of my partner Brian Glueckstein at Docket 412.

7  This is simply putting in front of the Court the privacy

8  policies for the various debtors.  And, again, Ms. Sarkessian

9  can confirm, but I do not believe we have an objection on

10  anything that goes to the consumer ombudsman issue -- if I'm

11  saying that correctly, ombudsman, I've always had trouble

12  with that word.

13          THE COURT:  Ombudsman, I believe.

14          MR. DIETDERICH:  Ombudsman.  The -- I believe that

15  the consensus is that no ombudsman is required in the case,

16  but Ms. Sarkessian can confirm.

17          And so I would just ask to move the declaration of

18  Mr. Glueckstein into evidence.

19          THE COURT:  Okay.  Is there any objection?

20      (No verbal response)

21          THE COURT:  It's admitted without objection.

22      (Glueckstein declaration received in evidence)

23          MR. DIETDERICH:  The second is the declaration of

24  Kevin Cofsky, who we heard from earlier, at Docket 413, and

25  I'd like to move that into evidence at this time as well.

1          I think Ms. Sarkessian may have a comment about

2   that declaration.

3          THE COURT:  Okay.

4          MS. SARKESSIAN:  For the record, Juliet Sarkessian

5   on behalf of the U.S. Trustee.

6          I object to the provision -- well, the statements

7   in paragraph 17 of Mr. Cofsky's declaration concerning bid

8   protections.  He addresses -- you know, he gives an opinion

9   that certain bid protections are, you know, common, et

10  cetera.  No -- the Court is not -- nobody is asking the Court

11  to approve bid protections at this time.  This is not

12  relevant.  We would ask that this -- there may be something

13  else in paragraph 17 that doesn't relate to bid protections

14  and I don't object to that, but anything relating to his

15  opinion or his testimony about bid protections, we would ask

16  that it be stricken at this time, you know, without prejudice

17  if they want to submit that, if later on the debtors are

18  requesting bid protections, and there is a procedure --

19  within the proposed bid procedures order, there is a

20  procedure whereby they can do that if they find a stalking

21  horse.  At that time, if they want to put in -- and, in fact,

22  we would say they would need to put in evidence to support it

23  -- they can do that at that time.

24          THE COURT:  Okay.  Mr. Dietderich?

25          MR. DIETDERICH:  Your Honor, Andy Dietderich.  We

1  disagree.  We think Mr. Cofsky's paragraph has actually been

2  drafted with respect to the basic situation, which is that we

3  are neither approving a sale nor the grant of stalking horse

4  protections today.  However, we are publicly announcing to

5  the world that bidding protections, stalking horse

6  protections are available.  And, in addition, we're

7  shortening the notice period for people to object to those

8  stalking horse protections.

9         So Mr. Cofsky's declaration is not intended to

10 prejudice anybody's ability to argue that bidding protections

11 given to a particular bidder in any circumstance are

12 unreasonable or inappropriate.  What they say is that, based

13 on his experience with bidding procedures generally, bidding

14 protections, as reflected in what we're doing publicly, are

15 appropriate and customary for sale transactions of this type

16 and in amounts that are reasonably and generally consistent

17 with such amounts in comparable circumstances.  He's not

18 saying that as applied to the facts of any particular bidder

19 or situation that they will be reasonable, but they're

20 reasonable generally.

21         In addition, he's saying that having this publicly

22 helps, quote, the ability to attract a prospective stalking

23 horse bidder by offering the bidding protections.

24         So it helps us as the debtor to have a banker who

25 has expertise in this area be able to say to anybody who

1  might be interested in putting forth a stalking horse bid

2  that, generically, this kind of stalking horse protection is

3  reasonable and customary for the circumstances.  We will not

4  be making any assurances to a bidder that bidding protections

5  will be granted to them in the particular facts of their

6  circumstances, nor do we mean to prejudice in any way the

7  ability of Ms. Sarkessian or the committee or any other

8  stakeholder to argue that the bidding protections as applied

9  to a particular bidder are unreasonable.

10          On that basis, we'd like to have the evidentiary

11  record that we were proposing.

12          THE COURT:  All right.  I'll overrule the

13  objection and take the testimony for what it is,

14  Ms. Sarkessian.  It certainly is not intended to indicate

15  that these bid protections will, in fact, be granted and

16  everyone's rights are reserved to object in the future, once

17  we have potential bidders lined up and are asking for bid

18  protections.

19          MS. SARKESSIAN:  Your Honor, will my ability to

20  cross-examine the witness later, if there are bid protections

21  being sought, will that be preserved or do I need to cross-

22  examine him now?

23          THE COURT:  Oh, no, absolutely preserved.  You

24  can -- you'll be able to cross him on anything when we get to

25  that point.

1            MS. SARKESSIAN:  Thank you, Your Honor.

2            MR. DIETDERICH:  Your Honor, the other concerns --

3   so, as we move down to the merits of the bidding procedures

4   order, Your Honor, I believe that all concerns have been

5   addressed and objections resolved, other than the objections

6   of the U.S. Trustee and Mr. Mallon (phonetic), the Mallon

7   objection that's on the docket.

8            Before I address the specifics of those, I'd like

9   to make a few general points for the Court and for the

10  record.  The first is, by far, the most important.  We have

11  not made a decision to sell anything and we're not asking you

12  permission to sell anything today.  This effort is part of a

13  process to look at all of our options across the very

14  complicated set of assets.  These particular businesses have

15  been identified earlier, because they are less integrated,

16  and sometimes not integrated at all, into the operations of

17  FTX.

18            Ledger X is a separately regulated exchange, a

19  derivative exchange with a different business model,

20  regulated by the CFDC.  It has regulatory capital

21  requirements, a relationship with its regulators, et cetera.

22  Embed (phonetic) is not regulated to the same -- in the same

23  way, but is separate.

24            Japan is in Japan, subject to pretty intense

25  regulation by the Japanese authorities.  The Japanese rules

1  for cryptocurrency are totally different than our rules.

2  Japan requires, for a cryptocurrency business, the

3  segregation in cold wallets, of all of the cryptocurrency

4  responding to customer entitlements and it has very strict

5  rules about entrust relationships that are established under

6  law and segregation rules that are established under law for

7  cryptocurrency and cash.  A completely different profile from

8  what's happening in any other exchange transactions.

9          And Europe, of course, has a Cyprus exchange that

10  has been run independently with a different customer base.

11  All of these businesses were actually recently acquired by

12  FTX; they weren't originally developed as part of the

13  development of the international platform.  They were all

14  recent acquisitions that have not been fully folded in to

15  FTX's operations, which is one of the primary reasons that we

16  believe there may be independent value.

17          But again, this is price discovery.  This is the

18  ability to create an option to sell if the debtors and the

19  consulting professionals believe it's appropriate under the

20  circumstances.  And I just want to assure everyone that there

21  has been no decision.  Our Board hasn't decided to sell

22  anything and we would need to present the business case to

23  our Board, based on the facts and circumstances.

24          The second is related, that we don't know if we're

25  going to sell the businesses, how we're going to sell the

1  businesses.  So, there's a comment from the U.S. Trustee that

2  we should have a form of asset purchase agreement.  We don't

3  have a form of asset purchase agreement, because we don't

4  know if it's an asset purchase.  It might be a stock sale.

5  It might be a merger.  We might sell one of the businesses in

6  combination with one of the other businesses.

7         What will determine this will be indications of

8  interest that we have not received and our sense, again,

9  working with the consulting professionals on how to make the

10 most money to return to creditors and customers.

11        There is a question whether some of these

12 businesses have synergies with businesses that we are looking

13 at retaining or possibly reorganize or selling separately,

14 for example, the international platform, or even the U.S.

15 exchange.  The question on synergies, of course, is not that

16 you wouldn't sell something because they're synergies, but on

17 whether or not the buyer is paying you enough to compensate

18 for the loss of those synergies if you kept the asset.  These

19 are synergistic to other buyers, just as they might be

20 synergistic to us, and so we're going to look at the price

21 determine -- that determines out of the marketing process in

22 order to make decisions.  We do have substantial interest so

23 far in all of these assets.

24        The other thing I'd note is just that -- and I

25 mentioned this in my preliminary remarks about this motion,

1  that we do have a shortened procedure for relief, a shortened

2  objection period for stalking horse protections, and so Your

3  Honor should just be aware of that.

4           I'd like to turn to the objection for the U.S.

5  Trustee.  As I mentioned, the first objection was that we

6  should have a form of asset purchase agreement.  Again, we

7  don't know that we're going to be using that particular form

8  of a transaction.  We might.  We're highly likely to for some

9  of these assets, and when we have a form of asset purchase

10 agreement, we've committed to put that in front of people,

11 well in advance of any auction.

12          Obviously, if we have a stalking horse, the

13 stalking horse will have an important role to play in what's

14 in the asset purchase agreement.  And there's many bidders in

15 many auctions where we run the auction off the back of a

16 specific asset purchase agreement or structure that our

17 stalking horse believes is important to the stalking horse.

18          A related objection is a request that we commit to

19 the U.S. Trustee now to preserve "all books and records."  We

20 absolutely intend to retain copies of books and records for

21 the businesses we're selling for a long list of reasons.  And

22 any standard form asset purchase agreement, there's a set of

23 covenants about records retention.  We're not able to retain

24 records in most circumstances for any purpose whatsoever;

25 generally, there's a purpose limit on our ability to retain

1   records when we sell a company.  One of those purposes is

2   always our ability to investigate or our ability to relate to

3   regulators, our ability to do our taxes.  And so, the debtors

4   are not going to lose access to anything that has to do with

5   causes of action or investigations in connection with an

6   asset purchase agreement, but again, with respect, I think

7   the objection is premature, until we have an asset purchase

8   agreement to show to stakeholders so they can review this

9   provision and determine whether or not it's adequate.

10          We're not going to commit today.  We're not

11  willing to commit today to simply preserve all books and

12  records with such simple language.

13          The other objection from the U.S. Trustee is that

14  we are not agreeing now that we will never release claims

15  against the employees.  So, we have committed, because it's

16  obvious and easy to do, that we are not releasing claims

17  against Sam Bankman-Fried, Gary Wang, Caroline Ellison,

18  Nishad Singh, or I believe we have some language, any of

19  their family or related persons.  But releases of employees

20  are sometimes an important part of the disposition of a

21  business when you're the buyer because the value of some of

22  these businesses is in the people, and as the buyer, you want

23  the people protected.  The last thing you want to do if you

24  buy a business is to have rank-and-file employees sued by the

25  person you just bought the business from.

1            Now, this raises a related point and it's

2    important to say, I think, for the record, as a more broad --

3    as a more -- something more for Your Honor to understand,

4    based on the review of Mr. Ray and his team so far, we have

5    no indication that rank-and-file employees of the debtors,

6    generally, were complicit in fraudulent activity.  Neither

7    the indictment of Mr. Bankman-Fried, nor the pleas of

8    Ms. Ellison or Mr. Wang, include criminal charges against the

9    debtors as enterprises.  Indeed, from my initial remarks,

10   Your Honor, I explained that at least the core part of the

11   fraud could be implemented with a single number in the Code

12   for the platform put in by programmers.

13            The nature of this is still under investigation to

14   be decided, but, you know, for the sake of all of the

15   employees of FTX, we have no indication that this was the

16   kind of problem that results in a which will charge against

17   an enterprise, as opposed to against individuals at the top.

18            MS. SARKESSIAN:  Your Honor, I have to object.  I

19   feel like there's testimony, factual testimony being given

20   here.

21            THE COURT:  I agree and I take no note of it.

22   It's not in evidence.

23            MS. SARKESSIAN:  Thank you.

24            MR. DIETDERICH:  And that is exactly my point, and

25   my point is that this is a sale objection and that when we

1  have a sale transaction, and if that sale transaction

2  involves the release of employees, we will have to make an

3  evidentiary showing that we have a business judgment for that

4  release.  But right now, it's a sale objection; it's not

5  before the Court.  And we would submit, respectfully, it's

6  not appropriate to restrict our ability to solicit interest

7  in these companies on a basis that we have to commit now for

8  what's going to be in our sale order or in our asset purchase

9  agreement.

10          THE COURT:  Okay.  Thank you.

11          MR. DIETDERICH:  One other thing, Your Honor,

12  before I leave -- sorry -- Mr. Mallon, his objection --

13          THE COURT:  Yes?

14          MR. DIETDERICH:  -- alleges a security interest

15  arising, as best I can understand it, under Swiss law.  That

16  objection, obviously, can be resolved by its sale objection,

17  but in addition, we're able to attach a lien to the extent he

18  had a security interest on the proceeds of the sale, that

19  will, of course, resolve in connection with a sale.  So, we

20  think that objection should be overruled and the matter

21  reserved for the sale hearing.  Thank you.

22          THE COURT:  Thank you.

23          MR. HANSEN:  Your Honor, Kris Hansen with Paul

24  Hastings, on behalf of the Committee.

25          Just before Ms. Sarkessian goes, I wanted to note

1  our reservation of rights.  I'll be brief.  I know we're

2  running long today.

3          Your Honor, the Committee is taking a very

4  cautious approach to this bidding procedures motion.  It's

5  early days in the case and as I mentioned before, we have a

6  lot of concerns about value preservation and value

7  maximization.  And so, we support the debtors' view that this

8  is a "wait and see" process.  We have a number of issues that

9  we've identified in our reservation of rights from timing to

10  access to information, to be able to make decisions for the

11  debtors and the Committee and for the Court, but also for

12  bidders to be able to make those decisions.  And I won't go

13  through them all individually here, I would just, again,

14  refer the Court to our reservation of rights, but I did want

15  to make sure that the Court understood from the Committee's

16  perspective, we may be back, to the extent the debtor seeks

17  to sell an asset and Committee disagrees with that, we may

18  raise an objection at that point in time.

19          And it's about value maximization and it's about

20  alternatives.  One of the things that Mr. Dietderich alluded

21  to is the connectivity of these businesses or maybe the lack

22  thereof, to the broader platform.  And as I mentioned earlier

23  to the Court, the Committee is hard at work with the debtors

24  to try to understand what the parameters are for potentially

25  restarting the exchanges and reorganizing this enterprise.

1   And when we move quickly to sell off pieces of the business,

2   we need to understand their connectedness.

3         And so, yes, Ledger X, from a factual perspective,

4   Embed, and others were purchased more recently, but we don't

5   know if they're entirely severable, (indiscernible) if that

6   severance of them from the broader platform will have a

7   deleterious effect on the value of the enterprise as a whole.

8   So, that's something that we're keeping an eye on.  We

9   recognize this process is moving quite quickly, so we're

10  doing our work quickly, as well, but we just wanted to note

11  our reservation for the Court.

12        THE COURT:  Okay.  Thank you.

13        MR. HANSEN:  Thank you, Your Honor.

14        MR. HARVEY:  Good afternoon, Your Honor.  May I

15  please the Court?  Matthew Harvey from Morris, Nichols, Arsht

16  & Tunnell, on behalf of the Ad Hoc Committee of non-U.S.

17  customers of FTX.com.

18        I rise, Your Honor, only to say a couple of

19  sentences of our resolution with the debtors.  Your Honor, we

20  filed a limited objection to the sale.  We discussed our

21  limited objection with the debtors in connection with, excuse

22  me, a larger role of the Ad Hoc Committee -- with the larger

23  role of the Ad Hoc Committee as serving and ensuring that

24  FTX.com customers have access to information and an

25  opportunity to be heard, whether there may be conflicts --

 1   and maybe "conflicts" isn't even the right word -- with the

 2   debtors or the official Committee.

 3          We were pleased with the debtors' acknowledgment

 4   and discussion with us of the group's role in the cases and

 5   representations regarding further cooperation going forward

 6   and, accordingly, we're withdrawing our objection.  Thank

 7   you.

 8          THE COURT:  Okay.  Thank you.

 9          Anyone else?  Ms. Sarkessian?

10          Your Honor, our objection set forth, I would say,

11   four categories of objections.  We have resolved two of them.

12   So the first objection was going ahead with the sale without

13   having adequate information and that included both -- I guess

14   I may have used the form asset purchase agreement -- any type

15   of sale agreement, whether it be stock sale, asset sale,

16   there is no form of sale agreement and, of course, there is

17   no schedules and statements or Rule 2015.3 reports.

18          We have resolved that.  The debtors are going to

19   be filing forms of whether it be asset purchase agreements,

20   stock purchase agreement, whatever it is, at least two weeks

21   before the sale date of any sale.  They are also going to

22   give the U.S. Trustee and the committee, even before that,

23   before its uploaded to the data room, they are going to give

24   the forms to us.

25          With respect to the schedules and statements an

1  order has been -- a proposed order has been submitted, maybe

2  Your Honor has already signed it, where the schedules and

3  statements will be filed for the asset sales, at least, two

4  weeks prior to the sale which will give my office enough time

5  to take a 341.  Then the same will be done for the Rule

6  2015.3 reports for those debtors who are selling stock in

7  non-debtor subsidiaries.  They would be filing that report,

8  at least, two weeks.  So I will still have to do two 341

9  Meetings on those, but at least I won't have to do three.  So

10 that is definitely an improvement.  So that has been

11 resolved.

12          The other thing was, essentially, a reservation of

13 rights regarding the ombudsman because there was nothing in

14 the record about the debtor -- the privacy policies for these

15 particular businesses and now they have put in that evidence.

16 They have attached all the privacy policies.  I think there

17 is an even an official translation of the Japanese one.  And

18 based on our review of that we believe that the debtor has

19 established that a consumer privacy ombudsman would not be

20 required with respect to these particular sales.  So we are

21 not pursuing that objection.

22          So what remains, and -- so there's two issues that

23 remain.  I think on the records retention, you know, we just

24 want to make sure nothing is lost that the debtors are

25 retaining all records that could potentially be relevant in

1  any civil criminal proceeding.  You know, we will look to see

2  what the wording is when we see if there is a sale agreement,

3  but, you know, we are glad that they are willing to do that

4  and we think that that is very important.

5        We just want to make sure that everything is

6  preserved and there is not some type of discretion, I guess I

7  would say, from the debtor's viewpoint of -- and we

8  understand that the original records will be transferred, we

9  are just talking about copies here.  But we don't want them

10 to say, well, we're not going to keep a copy of this because

11 the debtor makes the determination that it doesn't think it's

12 going to be relevant down the line in some proceeding.

13       Well a regulator might have a different view of

14 that.  So we think the widest -- I mean, again, we're talking

15 about saving copies of documents almost all of which, I am

16 going to guess, are electronic.  So I don't think it would be

17 any burden on the debtor.  I don't think that needs to be

18 addressed now.  I agree with that.  I just wanted to put it

19 on the radar.

20       The issue does need to be addressed now is we are

21 very concerned about the possibility that the debtor is going

22 to be selling or welcoming offers to purchase causes of

23 action against current or former -- it's not just rank and

24 file employees, its directors, its officers, or employees.

25 That specifically is mentioned in the bid procedures that if

1   someone is interested in purchasing it they have to indicate

2   that.  So I think they're welcoming that type of thing.

3          Yes, after we made our objection or we -- after we

4   conveyed our objection to the debtors on this regard they put

5   in a paragraph in the order that said, okay, with respect to

6   Mr. Bankman-Fried and three other top officers we agree, we

7   will not sell any causes of action against them or their

8   family members.  And that is a good first step, but I think

9   that it seems that the debtors have concluded, at this very

10  early stage of the case, before there has been an

11  investigation, an examination by an independent entity into

12  possible causes of action arising out of the debtors -- the

13  events that cause the debtor to file for bankruptcy.

14         Before that has taken place they have reached the

15  conclusion that there is only four people at the top that

16  were responsible for all of this and that out of the hundred

17  plus companies of the debtors that there was nobody else, be

18  it other officers or other employees, that either assisted

19  them in wrongdoing, or aiding and abetting, or were negligent

20  and missed something they should have seen, turned a blind

21  eye maybe nobody else was, maybe it was only four people that

22  committed this, allegedly, massive fraud involving billions

23  of dollars and nobody else in the organization and none of

24  their professionals and nobody else knew about it.

25         There needs to be an investigation before those

1    causes of action are sold.  You know, okay, there's a

2    business in Japan.  Where is the evidence that nobody in

3    Japan was involved with any wrongdoing?  Where is the

4    evidence that nobody in Japan knew about any of this?  We

5    don't know.  It's too early.

6           So we feel that given the situation that there

7    should be added to that list, you know, not just four names;

8    any officers or directors, any employees, any family members

9    of officers, directors, any companies that are controlled by

10   officers or directors, again former or current, or controlled

11   among an officer and their family members.  I mean there is a

12   wide range here.

13          These causes of action should not be sold at this

14   point in time.  Now the debtors say, oh, well, you know, we

15   can deal with that at the sale.  Here is the problem: right

16   now we have no purchase agreement to look at.  We have no

17   idea what they are proposing in this regard.  We are going to

18   be getting, potentially, if there's stalking horses, seeing a

19   stalking horse asset purchase agreement or a stock purchase

20   agreement.  We are going to have seven days to review it and

21   make an objection; it's a very small period of time.

22          There is going to be schedules.  There will be

23   schedules about which causes of action are going to be

24   purchased.  There might be placeholders in those schedules.

25   I mean we have seen this many a time.  Schedules aren't

1  filed, they're not ready yet.  Then we go to the auction

2  maybe somebody else or another stalking horse wins.  Now you

3  have a tiny window of a few days between the auction and the

4  sale hearing where they're negotiating the purchase

5  agreement; that gets filed, you know, maybe a day before the

6  sale hearing.

7      Again, a lot of times, oh, the schedules aren't

8  attached, they're not finished, or here they are, but they

9  can be amended.  They can be amended up until the time of the

10  closing or even after the closing.  So we're going to be

11  scrambling trying to figure out its hidden somewhere in there

12  are they selling causes of action.  I mean it's not going to

13  be like there is a bright shining light on it.

14      That is a real concern. It's going to be a very

15  small period of time to look at it and we might not see it.

16  It might not even be included or, again, they could amend

17  later after the sale hearing.  That is typically said, oh, we

18  have the right to amend the schedules.

19      So in this case, given what the situation is, this

20  early on, before an independent investigation we think it is

21  just completely inappropriate to be selling -- to be even

22  considering selling these types of claims. If the debtors are

23  willing to have a prohibition against claims against the top

24  four they should be willing to expand that to all directors,

25  officers, employees, again, companies that are controlled by

1  them, and professionals, prepetition professionals; no claims

2  against them should be sold.

3          So that is what we think is appropriate at this

4  point in time.  And if the debtors cannot do that, if they

5  say we're not able to do that then maybe the sale should be

6  put off.  Maybe it's too early to do the sales if that is the

7  situation because we don't have the information, we don't

8  have the investigation, and you are going ahead with a sale.

9  So either that has to be carved out of the sale or you have

10  to wait to do the sale until that investigation is complete.

11  That is what the U.S. Trustee thinks one choice or the other.

12  You cannot move forward at this stage of the case without an

13  independent investigation selling causes of action against

14  directors, officers, employees or professionals.

15          THE COURT:  Well isn't there a way -- I mean, I

16  certainly would consider any requests from the U.S. Trustee

17  if the debtors were trying to jam the Trustee at the time of

18  a sale hearing that you didn't have time to conduct whatever

19  review you needed to do, to raise whatever objections you

20  needed to raise at the time of the sale hearing.

21          We don't even know yet whether the debtors are

22  even going to sell these assets.  And we don't know whether

23  it's going to be an APA, a merger, a stock purchase; we don't

24  know at this point.  I think they're -- I think the debtors

25  are trying to dip their toe into the water to see what

1  happens, see what kind of interest they receive.  I think

2  it's important to be allowed to do that.

3        We always have -- we have a lot of cases where

4  there's an expedited sale process for one reason or another.

5  I understand your concerns about whether there is other

6  people who might have been at fault other than these four

7  executives that have been specifically named.  And I would

8  also, perhaps, say to the debtors that if they do receive a

9  stalking horse bid that includes the purchase of causes of

10  action that they immediately notify the U.S. Trustee so that

11  its not hidden in a gigantic sale agreement, that you have

12  some advanced notice that the issue is live. It might not be.

13  They might not want to buy the causes of action.  They might

14  just want to buy the platform or the assets and leave the

15  employees behind, I don't know at this point.

16        MS. SARKESSIAN:  Your Honor, could we -- I mean

17  following up on that idea, I think it should be -- we would

18  appreciate it if it was more than just letting us know. Of

19  course, we would like to know.  We think this is important

20  enough that there be a filing that highlights so that

21  everybody can see if the debtors were selling causes of --

22        THE COURT:  I agree, that should be done.  It can

23  be done like we do with a motion to approve a DIP.  You know,

24  we have certain requirements that certain things have to be

25  highlighted in that motion so that everyone knows that it's

1  in there so we can fashion a form of order that includes that

2  when they file -- when they receive a stalking horse bid and

3  they file it they include in that filing something that

4  highlights for everybody that they're proposing to sell the

5  causes of action.

6          That helps alleviate some of the time issues for

7  you and for others who might want to object.  And I am

8  certain that Mr. Hansen and his colleagues, on behalf of the

9  committee, are going to be investigating whether there are

10  causes of action against any of these other employees.  And

11  hopefully we will have some understanding of that as well

12  before we get to the point where the sales are being sought

13  to be approved.

14          MS. SARKESSIAN:  Your Honor, thank you.  I

15  appreciate that.  I think, again, it could also come up,

16  again, assuming if the stalking horse bidder is either not

17  the winning bidder or is the winning bidder, but the

18  agreement gets amended, which is possible, right, I mean

19  after the auction, okay, we agree to pay more, but then we

20  want these causes of action.  Again, at whatever stage if

21  causes of action are being sold that they be highlighted.  So

22  whether it's a stalking horse stage, whether it's the winning

23  bidder at the auction, and now they're filing their purchase

24  agreement to highlight that.

25          THE COURT:  I agree.

1          MS. SARKESSIAN:  Specifically, not just we're

2    selling causes of action, what causes of action.

3          THE COURT:  I agree.

4          MS. SARKESSIAN:  Thank you, Your Honor.

5          THE COURT:  That makes sense.

6          MR. DIETDERICH:  Thank you, Your Honor.  Andy

7    Dietderich.

8          We can confirm that is a great approach to the

9    solution.  In fact, that is exactly why we actually had it

10   called out in the solicitation of indications of interest

11   because we knew we had a special process to run for any

12   bidder that wanted to do the release.

13         THE COURT:  Okay.

14         MR. DIETDERICH:  So thank you, Your Honor.  With

15   that I don't think there is any other comments on the sale

16   order.  So I would respectfully ask the Court to enter the

17   order.

18         THE COURT:  Well we need to revise the order.

19         MR. DIETDERICH:  Revise the order, of course.

20         THE COURT:  Then submit it under COC and we will

21   get it entered.

22         MR. DIETDERICH:  All right.  Thank you.

23         With that I think the only business -- the only

24   remaining business is the scheduling matter.

25         THE COURT:  Okay.

1          Mr. Bromley, go ahead.

2          MR. BROMLEY:  Good afternoon.  May I please the

3  Court, Jim Bromley of Sullivan & Cromwell on behalf of the

4  debtors, Your Honor.

5          This is the time that we need to deal with the

6  scheduling of the motion for the appointment of an examiner.

7  The motion has been filed by the U.S. Trustees Office.  We

8  have consulted with the Office of the U.S. Trustee and the

9  creditor's committees counsel.  And the view of the debtors

10 and the creditor's committee's counsel is that the hearing

11 that has been reserved on the 8th of February, which is an

12 omnibus hearing date, is the appropriate date to go forward

13 with the motion for the examiner.

14         We, the debtors, are cognizant that the motion has

15 been filed for some time, but the date has been held in

16 abeyance.  We do have certain limited discovery requests to

17 make of the U.S. Trustees Office.  We will have submissions

18 ourselves that we will be making, both evidentiary and legal.

19 Our suggestion is that the papers and our declarations in

20 support of our papers be filed on Monday, January 30th.  That

21 would give the U.S. Trustees Office time to respond and to

22 seek to depose any witnesses that we have.

23         We would suggest, as well, that the U.S. Trustees

24 Office, and the committee, and we consult for a pretrial

25 order that would be submitted to the Court no later than

1 Friday the 3rd of February.

2        THE COURT:  Ms. Sarkessian, any -- well, let me

3 ask Mr. Hansen first.  Now that we have a committee we need

4 to know your view as well.

5        MR. HANSEN:  Exactly, Your Honor.  So we agree

6 with Mr. Bromley.  Again, its Kris Hansen with Paul Hastings

7 on behalf of the committee.  We agree with Mr. Bromley in

8 terms of the dates.

9        I just wanted to point out for the Court that we

10 also may have evidence to present.  We will make that

11 decision in enough time to let Ms. Sarkessian know so that

12 she can similarly take discovery of our witness as well if we

13 have that.

14        THE COURT:  Well I currently have an omnibus

15 hearing on the 8th scheduled at one for this case, and I have

16 two other matters on that morning.  So if we're going to have

17 an extensive evidentiary presentation I may need to move the

18 date or if I can't I will move the other matters and move

19 this one up for the full day.  It sounds like we may need a

20 full day for this hearing.

21        MR. HANSEN:  I think between argument and

22 potential evidence I don't know that it would take a full

23 day, but I think you should reserve that, Your Honor.

24        THE COURT:  Okay.

25        MR. HANSEN:  Jim, I'm not sure if you have a

1  different view.

2          MR. BROMLEY:  I agree with that, Your Honor.

3          THE COURT:  All right.  Let me hear from Ms.

4  Sarkessian.

5          MS. SARKESSIAN:  Thank you, Your Honor.  For the

6  record Juliet Sarkessian on behalf of the U.S. Trustee.

7          Your Honor, we understand from the last hearing

8  that Your Honor had the February 20th date that is scheduled

9  in this case that Your Honor has the entire day for this case

10 if I am correct about that.

11         THE COURT:  February 20th?

12         MS. SARKESSIAN:  I'm sorry, January 20th.  I don't

13 know why I keep saying February.  January 20th.

14         THE COURT:  That's a holiday, Court holiday.

15         MS. SARKESSIAN:  January 20th.  Friday, January

16 20th which I believe had been scheduled primarily for a

17 hearing -- well, there's a few things:

18         There's a hearing in connection with the Robinhood

19 stock which has been seized.  And I believe last time around

20 debtor's counsel indicated that might be moot because of the

21 seizure.  There were also fi

22         The U.S. Trustee believes that that would be the

23 best date for the hearing on the examiner, in part, because

24 we do have issues with certain of the retention applications

25 that are scheduled for hearing on January the 20th that the

1  scope of the retentions encompasses work that might be done

2  by an examiner.  So we think that argument, sort of,

3  dovetails with the examiner motion and it makes sense to have

4  them both heard at the same time.

5        Our examiner motion has been on file since

6  December the 2nd.  So, obviously, has had more than enough

7  time to address that.  We recognize that committee counsel

8  has not been -- was retained on, I believe, December the

9  20th, but nevertheless, you know, there has been a good

10  amount of time to respond.  So we would ask for that.

11        Absent in the alternative we would ask if Your

12  Honor has a date.  We too were concerned about February the

13  8th not being adequate time with it being scheduled at 1 p.m.

14  So we were wondering if Your Honor has a date between the

15  20th, January 20th and the February the 8th that would have

16  more time available then the 8th.

17        The other thing I would say is that, you know, the

18  U.S. Trustee would need to get the reply on file three days -

19  - three business days prior to the hearing.  So we would --

20  given how long parties have had our motion we would like to

21  have, at least, a week between when the objections are filed

22  and when our reply is due.

23        If, for example, Your Honor was to say put the

24  hearing on the 8th since our reply would be due February the

25  3rd we would want objections filed to January the 27th to

1   give us one week.

2           THE COURT:  Okay.  All right.  I do think I need

3   to -- the 20th doesn't work, I don't think, for this.  It's

4   too soon.  There is outstanding discovery.  If it hasn't

5   already been issued it will be issued, I assume.

6           Are you taking any discovery?

7           MS. SARKESSIAN:  I have received no discovery. I

8   am trying to imagine what possible discovery there could be

9   against the U.S. Trustee, but I have not received any.

10          We have not seen an objection, so we don't know

11  who their witnesses are.  We have no idea if they're, in fact

12  -- Your Honor, the U.S. Trustees position is that this is

13  mandatory under the code and, therefore, there is not a need

14  to have any evidence.  It's legally mandatory.  Nevertheless,

15  we understand that the parties may want to put on evidence,

16  but we don't know who they plan to put on, what they plan to

17  put on; we have no idea.

18          THE COURT:  I think you're familiar with my

19  position on the mandatory nature of the appointment of an

20  examiner.

21          MS. SARKESSIAN:  Yes, Your Honor.

22          THE COURT:  For the record, I do not believe it's

23  mandatory.

24          MS. SARKESSIAN:  Yes.

25          THE COURT:  Let's do this: I think the 8th -- I

 1   want to make sure we have a full day. I am going to

 2   reschedule this for February 6th which is Monday of that

 3   week.  We will start at 9:30 a.m. The debtors and the

 4   committee's responses will be due by the 25th.  Then the

 5   Trustee will have until the 1st.

 6            So you have a week, Ms. Sarkessian, for your

 7   reply.

 8            MS. SARKESSIAN:  Yes, Your Honor.  Thank you.

 9            THE COURT:  Then we will have the hearing on the

10   6th.  If there is a -- pretrial orders are always helpful for

11   me.  So if there is -- if we're going to have an evidentiary

12   hearing on the 6th let's have a pretrial order by close of

13   business on the 3rd.  So 5 p.m. on the 3rd.

14            Mr. Bromley and Mr. Hansen, one, if you are going

15   to take discovery of the U.S. Trustee, please, do that

16   immediately so that Ms. Sarkessian knows that she needs to do

17   some discovery work.

18            Ms. Sarkessian, in light of my view on the

19   mandatory nature of the appointment of an examiner I don't

20   know if that now opens up for you your desire to take

21   discovery of the debtors, but if you do you should do that,

22   obviously, as soon as possible.

23            MS. SARKESSIAN:  Understood, Your Honor.

24            THE COURT:  Did I miss anything?  Did I cover all

25   of the issues?  Do I have all of the dates that we need for

1 everybody?

2          MR. BROMLEY:  I think that is all of the dates

3 that we need, Your Honor.  Thank you very much.

4          THE COURT:  Okay.  Ms. Sarkessian, anything else?

5          MS. SARKESSIAN:  I don't -- I think those are all

6 the dates in connection with the examiner motion.

7          THE COURT:  Okay.  Thank you.

8          All right.  Are we done?  Oral argument 12

9 minutes.

10          MR. GLUECKSTEIN:  30 seconds.

11      (Laughter)

12          MR. GLUECKSTEIN:  We really appreciate the Court

13 indulging us for such a long hearing today.

14          The only other scheduling matter I wanted to

15 raise, Your Honor -- Brian Glueckstein for the debtor.  There

16 was reference to the January 20th hearing.  We did elude to

17 this in the status conference a week ago, we have been in

18 touch with counsel for BlockFi and we are asking to adjourn

19 the hearing on the 20th with respect to our motion to enforce

20 the automatic stay with respect to the Robinhood issues.

21 BlockFi has a related motion, an evidentiary motion, that is

22 part and parcel of that hearing.

23          We are asking at this time that that hearing be

24 adjourned to a date to be determined.  We will come back to

25 the Court in light of the Government seizure of the shares.

 1  There was a proceeding in the BlockFi bankruptcy case earlier

 2  this week and that parties are continuing to talk about next

 3  steps there with respect to all of the issues involving the

 4  Robinhood shares.  We would benefit from some time.

 5          So we would ask, with Your Honor's permission,

 6  that we adjourn that hearing on those two issues.  There are

 7  other things, of course, scheduled that day, the retention

 8  motions and status conference that Your Honor ordered this

 9  morning on the redaction issues.  But with respect to the

10  debtor's motion and related evidentiary issue we ask that

11  that be adjourned.

12          THE COURT:  What is BlockFi's position on the

13  continuance of their motion?

14          MR. GLUECKSTEIN:  They represented to me -- they -

15  - we had an email exchange this morning where they said they

16  were okay with us so representing.

17          THE COURT:  Okay.  We will take that off then for

18  the 20th; both of those off for the 20th.

19          Anything else before we adjourn?

20      (No verbal response)

21          THE COURT:  All right.  Thank you all very much.

22  We are adjourned.  I will see everybody on the 20th.

23          (Proceedings concluded at 1:48 p.m.)

24

25

1                          CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                January 12, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                January 12, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                 January 12, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                       January 12, 2023

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., FTX TRADING LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-_____(JTD) |
| FTX DIGITAL MARKETS LTD., BRIAN C. SIMMS, KEVIN G. CAMBRIDGE, and PETER GREAVES, and J. DOES 1–20 | |
| Defendants. | |

## COMPLAINT

Plaintiff-Debtors Alameda Research LLC ("Alameda Research"), Alameda

Research Ltd., FTX Trading Limited ("FTX Trading"), West Realm Shires, Inc., West Realm

Shires Services, Inc. (a/k/a, FTX US and "FTX US"; collectively, "Plaintiffs" or "Debtors"), which

have each filed a bankruptcy petition in the above-captioned bankruptcy cases, bring this

complaint (the "Complaint") against FTX Digital Markets Ltd. ("FTX DM"), Brian C. Simms,

---

[1] The last four digits of Alameda Research LLC's tax identification number is 4063. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Kevin G. Cambridge, and Peter Greaves, in their capacity as the joint provisional liquidators of FTX DM (collectively, the "Joint Provisional Liquidators" or "JPLs"), and certain currently unidentified individuals or entities identified for the time being as J. Does 1–20 who have either directed and/or aided and abetted the actions of FTX DM or others in the formation of FTX DM, (the "Does"; together with FTX DM and the JPLs, the "Defendants") and allege the following based upon personal knowledge as to themselves and their acts based upon their investigation to date, and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.      This adversary proceeding (the "Adversary Proceeding") is, among other things, about venue.  It is brought by Plaintiffs pursuant to sections 541, 544, 548, 550, and 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), the Declaratory Judgment Act, 28 U.S.C. § 2201, and sections 1304 and 1305 of Delaware Code title 6, in response to serial threats by the JPLs to attempt to relocate these global bankruptcy cases (the "Chapter 11 Cases") to The Bahamas.  Lacking any basis to dismiss these Chapter 11 Cases or transfer venue, the JPLs instead claim that FTX DM—a non-Debtor—is the constructive owner of FTX.com's property (including fiat and cryptocurrency, intellectual property, and customer relationships) as a matter of non-bankruptcy law.  Since FTX DM is the subject of proceedings in The Bahamas, the JPLs insist that the question of ownership be resolved in The Bahamas.  Indeed, they have claimed to the FTX Debtors that it is their fiduciary duty under the laws of The Bahamas to do so.

2.      FTX DM did not succeed to *any* property owned by FTX.com.  Yet the JPL's assertions continue to balloon in size and volume (though never attaining substance), with the JPLs making public statements, statements to third parties outside of The Bahamas, statements to government officials outside of The Bahamas, and filings in this Court—all asserting that FTX

A000877

DM is somehow the owner of the entire FTX.com exchange. More recently, the JPLs have threatened avoidance actions against even direct recipients of preferential payments made by Debtor Alameda Trading Ltd.

3.     Without this Court's prompt intervention, the JPLs—fiduciaries with no constituency but themselves—will continue to assert baseless claims that will harm FTX.com customers and all other creditors of the FTX Debtors. In this adversary proceeding, the Debtors seek a declaratory judgment that FTX DM has no ownership interest in any of the Debtors' property and that the transactions (and all documents and structures supporting such transactions) that Sam Bankman-Fried and his co-conspirators used in an attempt to hide assets behind the veil of FTX DM are avoidable as fraudulent transfers under sections 544, 548, and 550 of the Bankruptcy Code, and sections 1304 and 1305 of Delaware Code title 6. If the FTX Debtors succeed in this Adversary Proceeding, there will be no property of FTX DM for local proceedings in The Bahamas to resolve.

4.     The JPLs' claim to ownership of FTX.com's property is based largely on constructive, equitable, and other *non-documentary* arguments that depend upon the false premise that FTX DM was the center of the FTX Group.[2] Nothing could be further from the truth. FTX DM was no more than a short-lived provider of limited "match-making" services for customer-to-customer transactions, on the cryptocurrency exchange built, owned, and operated by Debtor FTX Trading, its immediate corporate parent. Over 90% of customers who used the FTX.com exchange were customers before FTX DM even became operational in May 2022 and, once operational,

---

[2]     As set forth in the Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings (the "Declaration") [Chapter 11 D.I. 24], the Debtors' affairs are comprised broadly of four groups of business, also known as "silos." [*Id.* at ¶¶ 9–10.] The Debtors refer collectively to all four silos as the "FTX Group". [*Id.*] As used in this Complaint, the term "FTX Group" has only the meaning set forth in the Declaration.

A000878

FTX DM never earned a dollar of third-party revenue.  FTX DM was an economic nullity within the FTX Group.

5.       FTX DM was a legal nullity as well.  The peculiar history of FTX DM is a classic example of abuse of the corporate form.  It was created as a front to facilitate a conspiracy to defraud the Debtors' customers—a conspiracy to which three individuals have already pled guilty and for which a fourth, Mr. Bankman-Fried, is under indictment—rendering any and all transactions related to FTX DM avoidable.  FTX DM was part of the mature phase of that conspiracy.  It was formed and functioned as an offshore haven for a continuous fraudulent scheme, as well as a conduit through which the fruits of that fraudulent scheme could be channeled to insiders and third parties outside of the reach of any independent and effective regulatory authority.  Fortunately, Mr. Bankman-Fried and his cohorts were unable to spirit away *all* of the Debtors' property, both practically and as a matter of law, because these Chapter 11 Cases were commenced and Mr. Bankman-Fried and his Bahamian supporters lost the first stage of what Mr. Bankman-Fried described as the "jurisdictional battle vs. Delaware."  [Chapter 11 D.I. 24 ¶ 76.]  Mr. Bankman-Fried can no longer fight that battle now that the U.S. District Court for the Southern District of New York has imposed strict pretrial release conditions upon him.

6.       The JPLs inherited the corporate shell that Mr. Bankman-Fried and his co-conspirators built to harbor their fraudulent enterprise in The Bahamas and now use it to continue the jurisdictional battle.  In doing so, they continue to cast confusion over the true ownership of the Debtors' property and waste the Debtors' assets in the process.  Most recently, the JPLs have insisted on filing in The Bahamas an application that seeks "binding directions and declarations" from a Bahamian court that the FTX Debtors and their global stakeholders do not own core assets—in advance of this Court deciding the same issues.  The FTX Debtors will respond to any

A000879

request to lift the stay to proceed with the JPLs' application when filed by the JPLs. But enough is enough. The FTX Debtors seek a merits determination from this Court as promptly as the matter can be litigated and resolved.

## JURISDICTION AND VENUE

7. This Adversary Proceeding relates to Plaintiffs' Chapter 11 Cases filed with this Court on November 11 and 14, 2022 (the "Petition Date").[3]

8. Plaintiffs bring this Complaint pursuant to Rules 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), sections 541, 544, 548 and 105(a) of the Bankruptcy Code, and sections 1304 and 1305 of Delaware Code title 6. Declaratory relief is appropriate pursuant to Bankruptcy Rule 7001(9) and the Declaratory Judgment Act, 28 U.S.C. § 2201.

9. This Adversary Complaint is a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (B), (O) and (P).

10. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

11. Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409, and venue in this Court is consistent with the interests of justice, judicial economy, and fairness. Courts typically defer to a plaintiff's choice of forum. In addition, this Adversary Proceeding asserts claims by Plaintiffs as debtors-in-possession in a chapter 11 proceeding, and therefore should be heard by the Bankruptcy Court overseeing its chapter 11 proceedings. This Court's extensive

---

[3] November 11, 2022 is the Petition Date for all of the above-captioned debtors and debtors-in-possession, except for Debtor West Realm Shires Inc., whose Petition Date is November 14, 2022.

A000880

familiarity with the facts and background of these Chapter 11 Cases, and with the Chapter 15 proceeding filed by FTX DM in this Court, supports this Court adjudicating this action. Accordingly, Plaintiff submits that this Court is the proper venue for this Adversary Proceeding.

12.     Pursuant to rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), Plaintiff consents to the entry of a final order or judgment by the Court on these claims to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

13.     Plaintiffs in this case are Debtors Alameda Research, Alameda Research Ltd., FTX US, West Realm Shires, Inc., and FTX Trading, all of which are debtors-in-possession in the above-captioned chapter 11 case.  Plaintiffs Alameda Research, West Realm Shires, Inc., and FTX US are incorporated under Delaware law.  Plaintiff Alameda Research Ltd. is incorporated under the law of the British Virgin Islands.  Plaintiff FTX Trading is incorporated under the law of Antigua and Barbuda.

14.     No trustee has been appointed for Plaintiffs in the Chapter 11 Cases and Plaintiffs continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Accordingly, Plaintiffs have the authority to file this Complaint commencing, and thereafter to prosecute, this Adversary Proceeding.

15.     Defendant FTX DM is an international business company incorporated in the Commonwealth of The Bahamas, which operated for a short period of time as a digital assets business under the Digital Assets and Registered Exchanges Act, 2020 (the "DARE Act") as

A000881

amended, Statute Laws of The Bahamas. The principal address and office for FTX Digital is Building 27, Veridian Corporate Centre West Bay Street, Nassau, N.P.

16. The Defendant JPLs were appointed as joint provisional liquidators pursuant to a Petition for Winding Up Order application by the Securities Commission of The Bahamas and an Order for Appointment of Provisional Liquidator issued on November 10, 2022 by the Commercial Division of the Supreme Court of the Commonwealth of The Bahamas (the "Bahamian Court").

17. Acting on behalf of FTX DM, the JPLs filed a Chapter 15 Petition for Recognition of a Foreign Proceeding on November 15, 2023. *In re FTX Digital Markets Ltd.*, No. 22-11217 (Bankr. D. Del) ("Chapter 15") D.I. 1 (the "Chapter 15 Petition") ¶ 47. This Court granted the Chapter 15 Petition on February 15, 2023, finding that it had jurisdiction over the Petition and the Defendants.

18. Defendants J. Does 1–20 are certain currently unidentified individuals or entities who have either directed and/or aided and abetted the actions of FTX DM or others in the formation of FTX DM. Plaintiffs reserve the right to amend this Complaint to specify the identities of J. Does 1–20 as they become identified.

## FACTUAL BACKGROUND

### A. The FTX Entities Are Founded

19. Mr. Bankman-Fried and Zixiao "Gary" Wang founded Alameda Research in November 2017. Mr. Bankman-Fried, Mr. Wang, and Nishad Singh founded FTX Trading (a/k/a FTX.com) in April 2019 and West Realm Shires, Inc. and FTX US in January 2020. Caroline Ellison became co-CEO of Alameda Research in 2021, and the sole CEO of Alameda Research upon the resignation of Samuel Trabucco in August 2022. Ms. Ellison's employment was terminated in November 2022.

A000882

20.     Upon its creation in April 2019, FTX Trading operated an exchange and trading platform which allowed customers to buy, sell, exchange, hold, or otherwise transact in digital assets, use the FTX Application Programming Interface (the "API"), and use any other services through the FTX.com website (the "Site").

21.     FTX DM existed as a corporate entity for just over 16 months.  It was incorporated in the Commonwealth of The Bahamas ("The Bahamas") on July 22, 2021.  Its registration to operate as a Digital Asset Service Provider (but not a Digital Token Exchange) was approved by the Securities Commission of The Bahamas (the "Commission") on September 20, 2021.  FTX DM began operations on May 13, 2022 and operated for just under six months, from May 13, 2022 to November 10, 2022.  As explained below, FTX DM's entire existence fell within the scope of the criminal conspiracy, to which Mr. Bankman-Fried's co-conspirators have already pled guilty.  Indeed, its very formation and existence was in furtherance of that conspiracy.

**B.     The Co-Conspirators Begin to Use the FTX Entities to Perpetrate Fraud**

22.     From at least 2019 and through November 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and Ms. Ellison (the "Co-Conspirators"), variously used Alameda Research, FTX Trading, and FTX DM to engage in a colossal criminal conspiracy.  The aim of much of this improper activity was to use funds from various other FTX entities to prop up Alameda Research, which sustained billions of dollars in trading losses under Ms. Ellison's and Mr. Bankman-Fried's direction.

- As he admitted by guilty plea, from at least in or about 2019 and through November 2022, Mr. Wang conspired to and actually did defraud the customers of FTX Trading by misappropriating customers' deposits and lending customers' deposits to Alameda Research, conspired to commit commodities fraud by implementing changes to the code of FTX.com to permit Alameda Research to incur a negative balance on FTX.com, and conspired to commit securities fraud by lying to investors regarding FTX Trading's financial condition. Information & Waiver of Indictment, *United*

-8-

A000883

*States* v. *Wang*, No. 22-cr-00673 (LAK) (S.D.N.Y. Dec. 19, 2022), ECF Nos. 6–7.

- As he admitted by guilty plea, from at least in or about 2019 and through November 2022, Mr. Singh conspired to and actually did defraud the customers of FTX Trading by misappropriating customers' deposits and lending customers' deposits to Alameda Research, conspired to commit commodities fraud by misappropriating their FTX Trading's customers' deposits, conspired to commit securities fraud by lying to investors about FTX Trading's financial condition and the relationship between FTX Trading and Alameda Research, conspired to commit money laundering, and conspired to make unlawful political contributions and to defraud the Federal Election Commission (the "FEC"). Superseding Information & Waiver of Indictment, *United States* v. *Singh*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 28, 2023), ECF Nos. 90–91.

- As she admitted by guilty plea, from at least in or about 2019 and through November 2022, Ms. Ellison conspired to and actually did defraud the customers of FTX Trading by misappropriating customers' deposits and lending customers' deposits to Alameda Research, conspired to and actually did defraud lenders regarding Alameda Research's financial condition, conspired to commit commodities fraud by misappropriating customers' deposits, conspired to commit securities fraud by lying to investors regarding FTX Trading's financial condition, and conspired to commit money laundering. Information & Waiver of Indictment, *United States* v. *Ellison*, No. 22-cr-00673 (LAK) (S.D.N.Y. Dec. 19, 2022), ECF Nos. 8–9.

- As alleged in a pending superseding indictment, for the period beginning at least in or about 2019 and running through November 2022, Mr. Bankman-Fried conspired to and actually did commit wire fraud, conspired to and actually did defraud FTX Trading customers, conspired to and actually did commit securities fraud on FTX Trading investors, conspired to and actually did commit fraud on Alameda Research's lenders, conspired to and actually did commit bank fraud, conspired to operate an unlicensed money transmitting business, conspired to commit money laundering, and conspired to make unlawful political contributions and to defraud the FEC. Superseding Indictment, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

23.     In addition to committing fraud to directly sustain Alameda Research, Mr. Bankman-Fried (and/or others acting at his direction) used FTX DM as the centerpiece of a fraudulent scheme ancillary to the first, this one to funnel FTX Trading customer deposits and

A000884

other valuable property and rights to The Bahamas, out of the reach of American regulators and courts.

24.     Mr. Bankman-Fried, and others at his direction, maintained a close, accommodating relationship with Bahamian law enforcement agencies, including, among others, the Commission, and with the Attorney General and Prime Minister of The Bahamas.  Indeed, Mr. Bankman-Fried aimed to leverage that relationship to minimize his criminal and civil exposure should the massive fraud be discovered.

25.     To accomplish the fraudulent scheme, Mr. Bankman-Fried (and/or others acting at his direction) planned to transfer property and rights from FTX Trading to FTX DM, ostensibly regulated by The Bahamas.  At no time were the Co-Conspirators authorized to do so by the law of any jurisdiction or the corporate charters of either FTX Trading or FTX DM.

26.     For example, after founding FTX DM, Mr. Bankman-Fried (and/or others acting at his direction) transferred approximately $143 million of fiat currency belonging to FTX Trading and Alameda into accounts in FTX DM's name at Farmington State Bank (d/b/a Moonstone Bank, "Moonstone") and Silvergate Bank ("Silvergate").  Mr. Bankman-Fried and those acting on his behalf obtained no reasonably equivalent value for FTX Trading or Alameda in exchange for these transfers.  And the transfer of such a significant sum to a shell entity was not within the ordinary course of business for FTX Trading or Alameda.  The true purpose of the transfers were to defraud creditors of FTX or Alameda and to benefit insiders, including the Co-Conspirators themselves.

27.     In additional furtherance of the scheme, in May 2022, Mr. Bankman-Fried (and/or others acting at his direction) secretly introduced new terms of service (*see infra*, ¶¶ 38–42), without altering the front page of the document that FTX Trading's customers reviewed on a

A000885

click-through basis (if at all) or otherwise distinguishing the new terms from the old.  Those new

terms of service altered the annexed schedules to allegedly give FTX DM a role as a "service

provider" in the day-to-day operations of FTX Trading.  But at no point in this scheme did FTX

DM ever provide services for FTX Trading commensurate with the magnitude of the Co-

Conspirators' transfers on its behalf.

28.     When FTX DM was created, and at all times since, Mr. Bankman-Fried

(and/or others acting at his direction) knew or should have known that Alameda and FTX Trading

were not solvent and, nevertheless, made the transfers with the intent to avoid U.S. regulators and

to remove assets from the reach of their creditors in the event of inevitable bankruptcy proceedings.

29.     The Co-Conspirators were unable to implement their ancillary fraudulent

scheme before the Debtors and FTX DM entered bankruptcy and liquidation, respectively.

**C.     The FTX Entities Enter Bankruptcy**

30.     On November 10, 2022, the Commission filed a petition for provisional

liquidation of FTX DM with the Supreme Court of The Bahamas.  The Bahamian Court granted

the petition and appointed Brian Simms as the provisional liquidator.  On November 14, 2022, the

Bahamian Court entered an order appointing Kevin G. Cambridge and Peter Greaves as additional

liquidators.  Collectively, Simms, Cambridge, and Greaves are the JPLs.

**D.     FTX DM and the JPLs Begin Wrongfully Claiming the Debtors'
        Property**

31.     From the moment of their appointment, the JPLs have repeatedly claimed

their ownership of the Debtors' property and have attempted to relocate these proceedings to The

Bahamas.  Indeed, on November 15, 2022, the JPLs filed the Chapter 15 Petition that incorrectly

averred, among other things, that FTX Digital's "creditors include all account holders with assets

stored in the exchange's custodial wallets."  Chapter 15 Petition at ¶ 47.  Moreover, in his

-11-

declaration in support of the Chapter 15 Petition, Brian Simms averred that "the FTX network of companies that established the FTX Brand (the "FTX Brand"), . . . were managed and operated by FTX Digital [Markets] in The Bahamas . . . ," and that "[d]espite the seemingly complex structure of the FTX Brand companies, the entire FTX Brand was ultimately operated from a single location: The Bahamas." [D.I. 2 at ¶¶ 33, 37.]

32.    Since then, the JPLs have continued to assert those same baseless claims to the Debtors' property in the following filings and their accompanying declarations:

- An emergency motion for provisional relief filed on November 16, 2022. [Chapter 15 D.I. 7.]

- A *second* emergency motion for provisional relief, sought before obtaining a ruling on the first, filed on December 9, 2022. [Chapter 15 D.I. 27.]

- A motion to dismiss the chapter 11 case of FTX Property Holdings, filed on December 12, 2022. [Chapter 11 D.I. 213.]

- A *third* motion for provisional relief filed on December 23, 2022. [Chapter 15 D.I. 55.]

33.    The JPLs then asserted at their chapter 15 recognition hearing that billions of dollars held by the Debtors in the United States were the property of FTX DM. [Chapter 15 D.I. 103.]

**E.    FTX DM Never Obtained Claims or Interests in the Debtors' Property**

34.    Despite the JPLs' baseless assertions, FTX DM never obtained claims or interests in the Debtors' property.

*i.    FTX DM Had No Interests Under the Original FTX Trading Terms of Service*

35.    The JPLs' central—and mistaken—theory is that the Co-Conspirators' efforts to transfer the property of Debtor FTX Trading to FTX DM, including by introducing new terms of service, in fact effectuated a transfer of that property. That theory is fatally flawed; neither

A000887

the new terms nor any other action in fact effectuated a transfer of FTX Trading property to FTX DM.

36.     The relationship between customers and FTX Trading was governed by the 2019 and 2020 Terms of Service (the "Original Terms of Service"), and later by the Terms of Service dated May 13, 2022 (the "New Terms of Service").  Under both the Original Terms of Service and the New Terms of Service, the customer relationship was solely between FTX Trading and the customer.

37.     The Original Terms of Service and other records identified by the Debtors during their ongoing investigation demonstrate that:

- FTX Trading owns, and for all relevant periods has owned, the API.

- FTX Trading owns, and for all relevant periods has owned, the Site.

- At all times, through and including the present date, all customer accounts for the Site were maintained in the AWS cloud environment, which was managed by FTX Trading.

- At all times, through and including the present date, all fee income generated by customers using the Site (other than those for FTX Japan and Singapore) was paid to FTX Trading.

- No customer that opened an account on the Site prior to May 13, 2022 ever had a relationship with FTX DM, whether contractual, service, or otherwise.

- No customer that opened an account on the Site prior to May 13, 2022 ever effectively transferred or novated any part of its contractual relationship with FTX Trading to FTX DM.

- During calendar year 2021, FTX Trading generated over $1 billion in third-party revenue.

- During the first three quarters of 2022, FTX Trading generated over $700 million in third-party revenue.

A000888

ii. *FTX DM Obtained No Interests Under the New FTX Trading Terms of Service*

38.     During its six-month operational lifespan, FTX DM had a limited mandate and a limited balance sheet, merely providing certain "Specified Services" as a "Service Provider" under the New Terms of Service.  At all times during FTX DM's lifespan, FTX Trading continued to own and operate the exchange and platform.

39.     To that end, the New Terms of Service demonstrate that FTX Trading is and was the *sole* custodian of funds provided by customers and the *sole* issuer and redeemer of e-money (*i.e.*, converted fiat currency deposited by customers) on FTX.com.  Under those terms, FTX DM never obtained any interests in the underlying property.

40.     The New Terms of Service demonstrate the following:

- FTX Trading was the sole owner and operator of the FTX.com exchange.

- FTX Trading is the named counterparty to the New Terms of Service, just as it was for the Original Terms of Service.

- FTX Trading was therefore in privity of contract with every customer.  The New Terms of Service never transferred or novated the Original Terms of Service to FTX DM.

- In fact, FTX DM did not exist, or was not licensed to conduct business, for those customers who signed the Original Terms of Service.

- Under the New Terms of Service, FTX DM is not the named party, but is identified as one of several "Service Providers" that provides "Specified Services."

- Section 1.3 and the Service Schedules of the New Terms of Service explain that the "Specified Services" to be provided by FTX DM all involve providing technology to facilitate certain transactions on the FTX.com platform "*with other users*."  The Specified Services did not include trading as principal or entering into privity of contract with any customer with respect to any trade.

- Section 8.3 of the New Terms of Service expressly contemplates bilateral transactions between *FTX Trading* and each customer with respect to transactions in fiat currency.

-14-

A000889

- Likewise, Section 8.3.2 of the New Terms of Service provides for a transaction directly between *FTX Trading* and the customer. This transaction is not a Specified Service; indeed, it is not a match-making function at all, but a direct transaction between FTX Trading and the customer.

- The receipt of fiat currency and issuance of e-money is not a Specified Service, necessarily excluding FTX DM from inclusion as a party to that term.

41.     Additionally, the Debtors' review of other records from their ongoing investigation demonstrates the following:

- FTX DM is 100% owned by FTX Trading.

- FTX DM was licensed by the Commission as a Digital Assets Service Provider ("DASP") under section 6(d) of the DARE Act, and not as a Digital Token Exchange ("DTO"), under section 6(a) of the DARE Act.

- As a DASP, FTX DM was not in the business of providing, and not authorized to provide, distinct custodial services.

- $10 million was deposited into an account in FTX DM's name with Fidelity Bank and Trust (Bahamas) Limited ("Fidelity Bahamas"), which sum represented the estimated cost of an orderly wind-down of FTX DM's business over a six-month period.

- The $10 million deposited in FTX DM's name with Fidelity Bahamas was provided by FTX Trading.

- All FTX.com accounts opened after May 13, 2022 that held digital assets or e-money were maintained in the AWS cloud environment of which Alameda Research was the account owner, not FTX DM.

- The AWS cloud environment was and is located outside of the Bahamas.

- FTX DM never generated revenue from third parties or customers.

- All transactional fees earned under the New Terms of Service were paid to FTX Trading.

- FTX DM only generated intercompany or related-party revenue, which was paid to it primarily by FTX Trading, as well as other related parties.

A000890

- FTX DM earned approximately $604,000 net income during calendar year 2021 and approximately $5.17 million net income through the first three quarters of 2022.

- In the first three quarters of 2022, FTX DM had total operating expenses of approximately $73 million, including over $40 million labeled "other expenses." [Chapter 11 D.I. 337 Exs. E, F.] These "other expenses" include over $15 million for "Hotels and Accommodation" paid primarily to three hotels in The Bahamas: the Albany ($5.8 million), the Grand Hyatt ($3.6 million), and the Rosewood ($807,000). [Chapter 11 D.I. 337 ¶ 17.]

42.     Under both the Original and New Terms of Service, *only* FTX Trading was listed on the first page that customers would have viewed—and *only* FTX Trading was the contractual counterparty facing any customers or entering into any transactions with any customer to receive or return cash. Neither FTX DM nor any other subsidiary exercised ownership or control over any currency on the FTX Trading platform.

43.     Moreover, in early 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and certain others (the "Executive Employees") each signed offers of employment with FTX DM. Each of the Executive Employees also executed an Invention Assignment Agreement, which was affixed to their offers of employment. The Invention Assignment Agreement defines "Company" as "FTX Digital Markets Ltd" and "FTX" as "FTX Trading Limited, an entity organized under the laws of Antigua and Barbuda."

44.     The Invention Assignment Agreement provides, in pertinent part:

> **Relationship to FTX Trading.** I understand that all Inventions and other work product that I develop are being developed by the Company for FTX. Accordingly, I consent to the assignment of all such works by the Company to FTX, and I understand and acknowledge that ***FTX is the owner of all of the Inventions or other intellectual property created by me in my course of employment***. I further understand that FTX is a third party beneficiary to this Agreement and has the full right to directly enforce any rights of the Company under this Agreement.
>
> (emphasis added).

A000891

45.     Indeed, it was standard practice for all offers of employment at FTX DM to append an Invention Assignment Agreement.  When signing any such offers of employment at FTX DM, employees expressly agreed to and acknowledged FTX Trading's ownership of all intellectual property and inventions created while they were employed by FTX DM.

46.     Accordingly, any intellectual property regarding the API or the Site belonged to Debtor FTX Trading Ltd., and never to FTX DM.

47.     The design of the FTX.com trading system, the Original and New Terms of Service, and the Debtors' investigation to date of FTX DM demonstrate that FTX DM was never more than a mere interchangeable sub-custodian or agent for FTX Trading.  It never acquired an interest in any underlying property.

     *iii.*   *Even If There Were Transfer or Novation, Any and All Transfers of Property Undertaken to FTX DM Are Avoidable*

48.     As alleged in the indictment of Mr. Bankman-Fried, "from at least in or about 2019, up to and including in or about November 2022," FTX Trading and Alameda Research co-founder Sam Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled . . . through a pattern of fraudulent schemes . . . ."  Superseding Indictment ¶ 1, *United States* v. *Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

49.     In particular, "this multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed" Mr. Bankman-Fried, "through Alameda, to access and steal FTX customer deposits without detection."  *Id.* ¶ 4.

50.     As set forth above (*see infra*, ¶¶ 38–42), Mr. Bankman-Fried and his agents devised the New Terms of Service, among other things, in furtherance of this scheme.  In doing so, they intended, at least in part, to facilitate the transfer of FTX Trading property to FTX DM to

A000892

hinder, delay, or defraud its creditors.  They had no power to do so under their operative corporate charters or under any law.

51.  Further, any transfer of FTX Trading property to or through FTX DM by the Co-Conspirators, whether attempted or actually consummated, was fraudulent because it was not made in exchange for *any* value, let alone *reasonably equivalent* value.

52.  At all relevant times since 2019, Mr. Bankman-Fried, at a minimum, was well aware that the transfers of FTX Trading property to or through FTX DM were made or attempted while FTX Trading was already insolvent and for the sole purpose of avoiding and/or frustrating independent regulatory oversight and hindering repayment of the FTX Group's creditors.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT THAT FTX DM HAS NO OWNERSHIP INTEREST IN THE DEBTORS' CRYPTOCURRENCY (AGAINST ALL DEFENDANTS EXCEPT J. DOES)

53.  The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

54.  This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

55.  At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

56.  The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

A000893

57.     Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

58.     In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

59.     FTX DM has no ownership interest of any kind in any cryptocurrency owned by or in the custody of Plaintiffs.

60.     Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in any cryptocurrency owned by or in the custody of Plaintiffs.

<div align="center">

**COUNT II**
**DECLARATORY JUDGMENT THAT FTX DM HAS NO INTEREST**
**IN THE DEBTORS' FIAT CURRENCY**
**(AGAINST ALL DEFENDANTS EXCEPT J. DOES)**

</div>

61.     The allegations in paragraphs 1 through 522 are adopted as if fully set forth herein.

62.     This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

63.     At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

64.     The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

65.     Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

66.     In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

<div align="center">-19-</div>

67. FTX DM has no ownership interest of any kind in any fiat currency owned by or in the custody of Plaintiffs.

68. Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in any fiat currency owned by or in the custody of Plaintiffs.

### COUNT III
### DECLARATORY JUDGMENT THAT FTX DM HAS NO INTEREST IN THE DEBTORS' INTELLECTUAL PROPERTY (AGAINST ALL DEFENDANTS EXCEPT J. DOES)

69. The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

70. This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

71. At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

72. The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

73. Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

74. In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

75. FTX DM has no ownership interest of any kind in any intellectual property owned by or in the custody of Plaintiffs.

76. Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in the intellectual property owned by or in the custody of Plaintiffs.

A000895

## COUNT IV
## DECLARATORY JUDGMENT THAT FTX DM HAS NO INTEREST
## IN THE DEBTORS' CUSTOMER INFORMATION
## (AGAINST ALL DEFENDANTS EXCEPT J. DOES)

77.     The allegations in paragraphs 1 through 522 are adopted as if fully set forth herein.

78.     This claim for relief arises under 28 U.S.C. § 157(b), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Bankruptcy Code sections 541 and 105(a), and Bankruptcy Rules 7001(2) and (9).

79.     At all times, FTX Trading was the party to the terms of service governing the relationship with FTX customers.

80.     The New Terms of Service, dated May 13, 2022, did not constitute a novation or otherwise transfer or grant any ownership interest to FTX DM.

81.     Under the New Terms of Service, FTX DM, at most, operated as a sub-agent of FTX Trading.

82.     In any event, the New Terms of Service were devised as a part of Mr. Bankman-Fried's conspiracy to defraud the Debtors' customers.

83.     FTX DM has no ownership interest in any customer information owned by or in the custody of Plaintiffs.

84.     Plaintiffs are entitled to declaratory judgment that FTX DM has no ownership interest of any kind in any customer information owned by or in the custody of Plaintiffs.

A000896

## COUNT V
## IN THE ALTERNATIVE, ANY TRANSFERS TO OR THROUGH FTX DM
## WERE FRAUDULENT AND AVOIDABLE PURSUANT TO 11 U.S.C.
## §§ 544, 548(A)(1)(B) AND OTHER APPLICABLE LAW
## (AGAINST ALL DEFENDANTS)

85.     The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

86.     This alternative claim for relief arises under 28 U.S.C. § 157(b), Bankruptcy Code sections 541, 544, 548(a)(1)(B), and 105(a), Bankruptcy Rules 7001(2) and (9), and sections 1304 and 1305 of Delaware Code title 6.

87.     At all times, Mr. Bankman-Fried (and/or others acting at his direction) were without legal power or authority to transfer or attempt to transfer Plaintiffs' property, including contractual rights, to or through FTX DM.

88.     The Plaintiffs did not receive reasonably equivalent value in exchange for the transfers of Plaintiffs' property to or through FTX DM by Plaintiffs.  Indeed, Plaintiffs did not receive any discernable value or benefit in exchange for the transfers.

89.     At all times, any transfers of Plaintiffs' property to or through FTX DM were made when Plaintiffs were insolvent.  In the alternative, (i) the Plaintiffs became insolvent as a result of the transfers; (ii) Plaintiffs were caused by Mr. Bankman-Fried (and/or others acting at his direction) to engage in a business or a transaction for which they had unreasonably small capital; (iii) Plaintiffs were caused by Mr. Bankman-Fried (and/or others acting at his direction) to incur debts intended or believed to be beyond the Plaintiffs' ability to pay as such debts matured; or (iv) Plaintiffs were caused by the Co-Conspirators to undertake transfers for the benefit of insiders—including the Co-Conspirators themselves—outside of the ordinary course Plaintiffs' businesses.

A000897

90.     Specifically, before, on, and after the dates of the transfers, the sum of

Plaintiffs' debts exceeded the fair value of its assets, and the fair value of its assets was less than

the amount required to pay its liabilities on existing debts as they became due.  Indeed, the

Plaintiffs knew, or should have known, that at the time of the transfers they could not reasonably

satisfy their liabilities and indebtedness, as they matured or accrued, with either existing assets or

with revenue they could reasonably generate as a going concern.

91.     The transfers were made within two years of the Petition Date.

92.     Based upon the foregoing, any transfers of Plaintiffs' property to or through

FTX DM by the Co-Conspirators, and by any of the J. Doe Defendants, are avoidable as

constructive fraudulent transfers.

## COUNT VI
## IN THE ALTERNATIVE, ANY TRANSFERS TO OR THROUGH FTX DM WERE
## FRAUDULENT AND AVOIDABLE PURSUANT TO 11 U.S.C. §§ 544, 548(a)(1)(A)
## AND OTHER APPLICABLE LAW
## (AGAINST ALL DEFENDANTS)

93.     The allegations in paragraphs 1 through 522 and 88 through 90 are adopted

as if fully set forth herein.

94.     This alternative claim for relief arises under 28 U.S.C. § 157(b), Bankruptcy

Code sections 541, 544, 548(a)(1)(A), and 105(a), Bankruptcy Rules 7001(2) and (9), and sections

1304 and1305 of Delaware Code title 6.

95.     At all times, Mr. Bankman-Fried (and/or others acting at his direction) were

without legal power or authority to transfer or attempt to transfer Plaintiffs' property, including

contractual rights, to or through FTX DM.

96.     At all times, any transfers of Plaintiffs' property to or through FTX DM by

Mr. Bankman-Fried (and/or others acting at his direction) were made or attempted with actual

A000898

intent to hinder, delay, or defraud Plaintiffs' creditors, as further demonstrated by, *inter alia*, the following indicia of fraud:

     i.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were *not* for reasonably equivalent value in exchange from FTX DM;

     ii.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, occurred while Plaintiffs' liabilities exceeded their assets and they were insolvent;

     iii.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were made to or for the benefit of insiders—including the Co-Conspirators themselves;

     iv.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were done in secret;

     v.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were made outside of the ordinary course of business;

     vi.     any transfers of Plaintiffs' property to or through FTX DM by Mr. Bankman-Fried (and/or others acting at his direction), whether attempted or consummated, were made in order to facilitate and perpetuate fraud.

A000899

97.     The transfers were made within two years of the Petition Date.

98.     Accordingly, any transfers of Plaintiffs' property to or through FTX DM by the Co-Conspirators, and by any of the J. Doe Defendants, are avoidable as actual fraudulent transfers.

**COUNT VII**
**RECOVERY OF ANY FRAUDULENT AND AVOIDABLE TRANSFERS**
**PURSUANT TO 11 U.S.C. § 550**
**(AGAINST ALL DEFENDANTS)**

99.     The allegations in paragraphs 1 through 52 are adopted as if fully set forth herein.

100.    Plaintiffs are entitled to avoid any fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1) (collectively, the "Avoidable Transfers").

101.    Defendant FTX DM was the initial transferee of the Avoidable Transfers and one or more of the J. Doe defendants may have been the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

102.    Pursuant to 11 U.S.C.§ 550(a), Plaintiffs are entitled to recover from Defendants the Avoidable Transfers, plus interest thereon to the date of payment and the costs of this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant the following relief against the Defendants:

1.     A declaratory judgment that FTX DM has no ownership interest in the Debtors' cryptocurrency;

2.     A declaratory judgment that FTX DM has no ownership interest in the Debtors' fiat currency;

-25-

A000900

3.      A declaratory judgment that FTX DM has no ownership interest in the Debtors' intellectual property;

4.      A declaratory judgment that FTX DM has no ownership interest in the Debtors' customer information;

5.      A finding and order that any transfer or transfers of property or contractual rights to FTX DM are avoidable as fraudulent transfers, either actual or constructive; and

6.      An order that Plaintiffs may recover any fraudulent transfers plus interest thereon to the date of payment, as well as the costs of this action.

-26-

A000901

Dated: March 19, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Matthew B. McGuire
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

A000902

MCJGellP

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                        22 Cr. 673 (RA)

 5   CAROLINE ELLISON,

 6                                         Plea
                  Defendant.
 7   ------------------------------x

 8
                                          New York, N.Y.
 9                                        December 19, 2022
                                          4:30 p.m.
10

11   Before:

12                    HON. RONNIE ABRAMS,

13                                        District Judge

14
                         APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   DANIELLE SASSOON
     NICOLAS ROOS
18        Assistant United States Attorney

19   ANJAN SAHNI
     PETER G. NEIMAN
20   STEPHANIE AVAKIAN
     NICK WERLE
21        Attorneys for Defendant

22   Also Present:

23   Lea Harmon, Pretrial Services Officer

24

25
```

MCJGellP

1          (Case called)

2          LAW CLERK:    Counsel, please state your name for the

3    record.

4          MS. SASSOON:    Good afternoon, your Honor.  Danielle

5    Sassoon and Nick Roos for the United States.  And with us at

6    counsel's table is Lea Harmon from pretrial services.

7          THE COURT:    Good afternoon to all of you.

8          MR. SAHNI:    Good afternoon, your Honor.  Anjan Sahni,

9    Peter Neiman, Stephanie Avakian and Nick Werle from WilmerHale

10    on behalf of Ms. Caroline Ellison.

11          THE COURT:    Good afternoon to all of you.

12          I do want to note for the record that Mr. Sahni and I

13    worked together at the US attorney's office many years ago.

14          You can be seated.

15          As I said in my endorsement earlier today, I do not

16    believe that Ms. Ellison has met the high standard for closing

17    the courtroom.  I intend to file her letter requesting as much

18    together with my endorsement once the other filings in this

19    matter have been unsealed.  And I'll address the related

20    sealing issues at the end of this proceeding.

21          So, Ms. Ellison, I understand that you wish to plead

22    guilty to Counts One through Seven of the superseding

23    information; is that correct?

24          THE DEFENDANT:    Yes.

25          THE COURT:    So before deciding whether to accept you

1   plea, I'm going to ask you certain questions so that I can be

2   sure you understand your rights and that you are pleading

3   guilty voluntarily and because you are guilty and not for any

4   other reason.  It's important that you answer my questions

5   honestly and completely, but if at any time you have questions

6   about anything, feel free to ask me or feel free to consult

7   with your counsel; okay?

8            THE DEFENDANT:   Okay.

9            THE COURT:   Could you please place Ms. Ellison under

10   oath.

11            (Defendant sworn)

12            THE COURT:   So you are now under oath.  You should

13   know if you answer any of my questions falsely, you could be

14   charged with a separate crime of perjury.

15            Do you understand that?

16            THE DEFENDANT:   Yes.

17            THE COURT:   So I'm going to start by asking you

18   questions to ensure that you are competent to plead guilty.

19   These are questions I ask of everyone in your situation.

20            How old are you?

21            THE DEFENDANT:   28.

22            THE COURT:   How far did you go in school?

23            THE DEFENDANT:   I got a bachelor's degree.

24   ████             ████████

25   ████████████████████

A000905

1

2

3

4

5

6

7

8            THE COURT:    Have you ever been hospitalized for mental

9    illness, alcoholism or drug addiction?

10            THE DEFENDANT:    No.

11            THE COURT:    In the past 24 hours, have you taken any

12   drugs, medicine or pills or drunk any alcoholic beverages?

13            THE DEFENDANT:    I had one beer at about 8:00 p.m. last

14   night.  That's it.

15            THE COURT:    Is your mind clear today?

16            THE DEFENDANT:    Yes.

17            THE COURT:    And do you understand what's happening in

18   these proceedings?

19            THE DEFENDANT:    Yes.

20            THE COURT:    Does either counsel have any doubt as to

21   Ms. Ellison's competence to plead guilty at this time?

22            MS. SASSOON:    No doubt, your Honor.

23            MR. SAHNI:    No, your Honor.

24            THE COURT:    On the basis of Ms. Ellison's responses to

25   my questions and my observations of her demeanor here in court

MCJGellP

1    and representations of counsel, I find that she's fully

2    competent to enter an informed plea of guilty at this time.

3               Have you had enough time and opportunity to discuss

4    your case with your attorneys, including the nature of the

5    charges to which you intend to plead guilty to and any possible

6    defenses you may have?

7               THE DEFENDANT:    Yes, I have.

8               THE COURT:    Have you had enough time to discuss with

9    them the consequences of pleading guilty and the sentence which

10   may be imposed?

11              THE DEFENDANT:    Yes.

12              THE COURT:    Are you satisfied with their

13   representation of you?

14              THE DEFENDANT:    Yes.

15              THE COURT:    So I understand, as I noted, that you

16   intend to plead guilty to the charges contained in a

17   superseding information, which is a document containing a

18   formal accusation brought by the government.

19              Have you received a copy of the superseding

20   information?

21              THE DEFENDANT:    Yes, I have.

22              THE COURT:    And have you read it?

23              THE DEFENDANT:    Yes.

24              THE COURT:    Have you discussed it with your attorneys?

25              THE DEFENDANT:    Yes.

1              THE COURT:    Would you like me to read it out loud or

2     do you waive its public reading?

3              THE DEFENDANT:    I waive the public reading.

4              THE COURT:    So under our legal system, before you or

5     anyone else can be charged with a felony offense, the

6     government is obligated to go to a grand jury, which must

7     decide whether there's probable cause to believe that an

8     offense was committed and that you committed it, and that

9     decision can result in what's called an indictment.  I want to

10    make sure that you understand that by allowing the government

11    to charge you by way of this superseding information, you are

12    giving up your right to being charged by a grand jury in an

13    indictment.

14             THE DEFENDANT:    Yes, I do.

15             THE COURT:    And I have a waiver of indictment form

16    that you appear to have signed.

17             Did you just sign this waiver of indictment form?

18             THE DEFENDANT:    Yes.

19             THE COURT:    And did you discuss it with your attorneys

20    before signing it?

21             THE DEFENDANT:    Yes.

22             THE COURT:    Were any threats or promises made -- other

23    than by the prosecution in the written plea agreement -- to get

24    you to waive indictment?

25             THE DEFENDANT:    No.

A000908

1              THE COURT:    Does any counsel believe that Ms. Ellison

2     has not knowingly and voluntarily waived her right to be

3     charged by a grand jury?

4              MR. SAHNI:    No, your Honor.

5              MS. SASSOON:    It appears her waiver is knowing, your

6     Honor.

7              THE COURT:    I find that Ms. Ellison has knowingly and

8     voluntarily waived her right to be charged by a grand jury and

9     authorize the filing of the information.

10             So what now I'm going to do is explain certain

11    constitutional rights that you have to you.  These are rights

12    that you will be giving up if you enter a guilty plea.

13             First, under the Constitution and laws of the United

14    States, you have a right to plead not guilty to the charges in

15    the superceding information.

16             Do you understand that?

17             THE DEFENDANT:    Yes.

18             THE COURT:    If you did plead not guilty, you would be

19    entitled under the Constitution to a speedy and public trial by

20    jury to those charges.

21             Do you understand that?

22             THE DEFENDANT:    Yes.

23             THE COURT:    In advance of trial, if you went to trial,

24    you would have the opportunity to seek suppression of any or

25    all of the evidence against you, on the basis that it was

A000909

MCJGellP

1    obtained in violation of the Constitution.

2              Do you understand that?

3              THE DEFENDANT:    Yes.

4              THE COURT:    At trial, again, if you chose to go to

5    trial, you would be presumed innocent.  That means that you

6    would not have to prove that you were innocent.  Instead, the

7    government would need to prove your guilt beyond a reasonable

8    doubt before you could be found guilty.  So even if you did

9    nothing or said nothing at trial, you could not be convicted

10   unless a jury of 12 people agreed unanimously that you are

11   guilty.

12             Do you understand that?

13             THE DEFENDANT:    Yes.

14             THE COURT:    During trial, if you chose to go to trial,

15   the witnesses for the prosecution would have to come to court

16   and testify in your presence, where you could see them and hear

17   them and your lawyer could cross-examine them.  If you wanted

18   to, your lawyer could offer evidence on your behalf.  You would

19   be able to use the Court's power to compel witnesses to come to

20   court to testify truthfully in your defense, even if they

21   didn't want to come.

22             Do you understand that?

23             THE DEFENDANT:    Yes.

24             THE COURT:    And at trial, again, if you went to trial,

25   you would have the right to testify if you wanted to, but you

A000910

MCJGellP

1     would also have the right not to testify.  And if you chose not

2     to testify, that could not be used against you in any way.  So

3     no inference or suggestion of guilt could be made from the fact

4     that you chose not to testify.

5              Do you understand that?

6              THE DEFENDANT:   Yes.

7              THE COURT:    At trial and every stage of your case, you

8     would be entitled to be represented by an attorney.  And if you

9     could not afford an attorney, one would be appointed at public

10    expense, meaning free of cost, to represent you.

11             Do you understand that?

12             THE DEFENDANT:   Yes.

13             THE COURT:    If you were convicted at trial, if you

14    chose to go to trial, you would have the right to appeal that

15    verdict to a higher court.

16             Do you understand that?

17             THE DEFENDANT:   Yes.

18             THE COURT:    As I said before, you have the right to

19    plead not guilty.  So even as you sit here right now for

20    purposes of entering a guilty plea, you have the right to

21    change your mind and to go to trial.  If you do plead guilty

22    and I accept your plea, there will be no trial and you will be

23    giving up the rights that I just described.

24             Do you understand that?

25             THE DEFENDANT:   Yes.

A000911

MCJGellP

1          THE COURT:    If you plead guilty, I will sentence you

2      at the appropriate time based on your admissions, after

3      considering whatever submissions I get from you and from your

4      lawyers and from the government, as well as a presentence

5      report prepared by the probation department.  But there will be

6      no appeal with respect to whether the government could use the

7      evidence it has against you or with respect to whether you did

8      or did not commit the crime.

9          Do you understand that?

10          THE DEFENDANT:    Yes.

11          THE COURT:    If you plead guilty, you also have to

12      understand that you are giving up your right not to incriminate

13      yourself since I'm going to ask you certain questions here in

14      court today in order to satisfy myself that you are in fact

15      guilty as charged.

16          Do you understand that?

17          THE DEFENDANT:    Yes.

18          THE COURT:    So I understand that you intend to plead

19      guilty to Counts One through Seven of the superseding

20      information, and that includes conspiracy to commit wire fraud

21      on customers, wire fraud on customers, conspiracy to commit

22      wire fraud on lenders, wire fraud on lenders, conspiracy to

23      commit commodities fraud, conspiracy to commit securities fraud

24      and conspiracy to commit money laundering.

25          Would the government please state the elements of the

A000912

MCJGellP

1    offenses in question.

2              MS. SASSOON:    Yes, your Honor.

3              Counts One and Three charge the defendant with

4    conspiracy to commit wire fraud in violation of 18 USC 1349.

5    This has two elements:

6              First, the existence of the conspiracy to commit wire

7    fraud, and I'll walk through the elements of wire fraud in a

8    moment; and

9              Second, that the defendant knowingly and willfully

10   became a member and joined in the conspiracy.

11             The elements of wire fraud -- and wire fraud is also

12   charged in Counts Two and Four in the superseding

13   information -- are as follows:

14             First, that there was a scheme or artifice to defraud

15   or to obtain money or property by materially false and

16   fraudulent pretenses, representations or promises;

17             Second, that the defendant knowingly participated in

18   the scheme or artifice to defraud with knowledge of its

19   fraudulent nature and with specific intent to defraud, or that

20   she knowingly and intentionally aided and abetted others in the

21   scheme; and

22             Third, that in the execution of that scheme, the

23   defendant used or caused the use of interstate or international

24   wires, and wires refers to use of the telephone, text messages,

25   emails, and it also refers to wire transfers of funds.

A000913

MCJGellP

1          Count Five charges conspiracy to commit commodities

2     fraud in violation of 18 USC §371.  Conspiracy under 371 has

3     three elements:

4          First, that two or more persons entered the unlawful

5     agreement charged in the specific count of the indictment;

6          Second, that the defendant knowingly and willfully

7     became a member of that conspiracy; and

8          Third, that one of the members of the conspiracy

9     knowingly committed at least one overt act in furtherance of

10    the conspiracy.

11         Count Five charges the defendant with conspiracy to

12    commit commodities fraud in violation of Title 7 United States

13    Code §91 and 13(a)(5) and Title 17 Code of Federal Regulations

14    §180.1.  And there are three elements to this crime:

15         First, in connection with any swap or contract of sale

16    of any commodity in interstate commerce or contract for future

17    delivery on or subject to the rules of any registered entity;

18         Second, the defendant or one of her coconspirators did

19    any one of the following:  A, employed or attempted to use or

20    employ a manipulative device, scheme or artifice to defraud; B,

21    made or attempted to make an untrue or misleading statement of

22    a material fact or omitted to state a material fact necessary

23    in order to make the statements made not untrue or misleading;

24    or C, engaged or attempted to engage in an act, practice or

25    course of business that operated or would operate as a fraud or

MCJGellP

1    deceit upon any person; and

2                Third, that the defendant acted knowingly, willfully

3    and with the intent to defraud.

4                Count Six charges a conspiracy to commit securities

5    fraud in violation of Title 18 United States Code §371.  I

6    listed the elements of 371, so I'll now state the elements of

7    securities fraud in violation of Title 15 United States Code

8    §78JB and 78FF and Title 17 Code of Federal Regulations

9    §240.10b-5.  There are three elements:

10               First, that in connection with the purchase or sale of

11   securities, the proposed defendant either employed a device,

12   scheme or artifice to defraud or made an untrue statement of

13   material fact or omitted to state a material fact which made

14   what was said under the circumstances misleading, or three,

15   engaged in an act, practice or course of business that operated

16   or would operate as a fraud or deceit upon a purchaser or

17   seller;

18               Second, the defendant acted knowingly, willfully, and

19   with intent to defraud; and

20               Third, that the defendant knowingly used or caused to

21   be used any means or instruments of transportation or

22   communication in interstate commerce or the use of the mails in

23   furtherance of the fraudulent conduct.

24               The last count, Count Seven, charges the defendant

25   with conspiracy to commit money laundering in violation of 18

A000915

MCJGellP

1   USC §1956(h).  The elements of money laundering conspiracy are:

2            First, that two or more people entered into an

3   unlawful agreement to commit money laundering; and

4            Second, that the defendant knowingly and willfully

5   entered into the agreement.

6            Count Seven charges two objects of the conspiracy:

7            First, a concealment object, that the defendant

8   conducted or attempted to conduct a financial transaction which

9   must in some way or degree have affected interstate or foreign

10  commerce;

11           Second, that the financial transaction at issue

12  involved the proceeds of specified unlawful activity, which

13  here is alleged to have been a wire fraud scheme;

14           Third, that the defendant knew that the financial

15  transaction involved the proceeds of some form of unlawful

16  activity; and

17           Fourth, that the defendant knew that the transaction

18  was designed in whole or in part to either disguise the nature,

19  location, source, ownership or control of the proceeds of the

20  unlawful activity.

21           The second object of the money laundering conspiracy

22  is engaging in money transactions of over $10,000 in property

23  derived from specified unlawful activity.  The elements are:

24           First, that the defendant engaged in a monetary

25  transaction in or affecting interstate commerce;

A000916

MCJGellP

1          Second, that the monetary transaction involved

2     criminally derived property of a value greater than $10,000;

3          Third, that the property was derived from specified

4     unlawful activity;

5          Fourth, that the defendant acted knowing that the

6     transaction involved proceeds of a criminal offense; and

7          Fifth, that the transaction took place in the United

8     States.

9          If this case proceeded to trial, the government would

10    also have to prove venue in the Southern District of New York

11    by a preponderance of the evidence.

12          THE COURT:    Thank you.

13          Ms. Ellison, I know that was a lot of legalese, but

14    the real question is:  Do you understand if you were to go to

15    trial, the government would need to prove all of the elements

16    of those crimes to a jury beyond a reasonable doubt, as well as

17    venue at a lower standard, by a preponderance of the evidence?

18          Do you understand that?

19          THE DEFENDANT:    Yes.

20          THE COURT:    So now let's discuss the maximum

21    penalties.  The maximum means the most that could possibly be

22    imposed.  It doesn't necessarily mean it is the sentence you

23    will receive.  But you have to understand that by pleading

24    guilty, are you exposing yourself to the possibility of

25    receiving any combination of punishments up to the maximums I'm

A000917

MCJGellP

1  about to describe.

2         So the maximum sentences for Counts One, Two, Three

3  and Four are all the same, so I'm going to read them together,

4  okay, at once.  So with respect to your liberty, the maximum

5  term of imprisonment for each of the four counts, One through

6  Four, is 20 years in prison.

7         Do you understand that?

8         THE DEFENDANT:   Yup.

9         THE COURT:   Any term of imprisonment that you do

10  receive may be followed by a term of supervised release of

11  three years on each count.

12         Do you understand that?

13         THE DEFENDANT:   Yup.

14         THE COURT:   Supervised release means that, if you are

15  sentenced to prison, after you are released from prison, you

16  will be subject to the supervision of the probation department,

17  you will be required to obey certain rules, and if you violate

18  those rules, you can be returned to prison without a jury trial

19  to serve additional time even beyond your original sentence.

20         Do you understand that?

21         THE DEFENDANT:   Yup.

22         THE COURT:   You should also understand that there is

23  no parole in the federal system.  So if you are sentenced to

24  prison, you will not be released early on parole.  Although,

25  there is a limited opportunity to earn credit for good

A000918

1    behavior.

2              Do you understand that?

3              THE DEFENDANT:    Yes.

4              THE COURT:    Now, in addition to these restrictions on

5    your liberty, the punishment for these crimes may also include

6    certain financial penalties.  The maximum allowable fine on

7    each of Counts One through Four is $250,000, twice the gross

8    pecuniary gain derived from the offense or twice the gross

9    pecuniary loss to persons other than yourself resulting from

10   the offense, whichever is greatest.

11             Do you understand that?

12             THE DEFENDANT:    Yes.

13             THE COURT:    I'm also required to impose a mandatory

14   special assessment or fee of $100 on each count.

15             Do you understand that?

16             THE DEFENDANT:    Yes.

17             THE COURT:    In addition, I must order restitution to

18   any persons or entities injured as a result of your criminal

19   conduct, and I can order you to forfeit all property derived

20   from the offense or used to facilitate the offense.

21             So do you understand that those are the maximum

22   penalties for each of Counts One through Four?

23             THE DEFENDANT:    Yes.

24             THE COURT:    Now, we're going to turn to Counts Five

25   through Six.  And again, I'm going to group these and talk

A000919

1   about them together.

2           With respect to your liberty on Counts Five and Six,

3   the maximum term of imprisonment for each count is five years.

4           Do you understand that?

5           THE DEFENDANT:    Yes.

6           THE COURT:    Any term of imprisonment may be followed

7   by a term of supervised release of three years on each count.

8   And in addition, the punishment, again, includes certain

9   financial penalties.  The maximum allowable penalty is, again,

10  $250,000 for each of Counts Five and Six or twice the gross

11  pecuniary gain derived from the offense or twice the gross

12  pecuniary loss to persons other than yourself resulting from

13  the offense, whichever is greatest.

14          Do you understand that?

15          THE DEFENDANT:    Yes.

16          THE COURT:    Again, I'm required to impose a mandatory

17  special assessment of $100 on each count.  And I must order

18  restitution to any persons or entities injured as a result of

19  your criminal conduct, and I can order you to forfeit all

20  property derived from the offense or used to facilitate the

21  offense.

22          And then lastly, on Count Seven, that has a maximum

23  term of imprisonment of 20 years and a maximum term of

24  supervised release of three years, a maximum allowable fine of

25  $500,000 or twice the value of the property involved in the

A000920

MCJGellP

1    transaction, whichever is greater.

2                    Do you understand that?

3                    THE DEFENDANT:    Yes.

4                    THE COURT:    I'm also required to impose the mandatory

5    special assessment of $100, as I mentioned earlier, on each of

6    these counts.  And I must, again, order restitution to any

7    persons or entities injured as a result of your criminal

8    conduct, and I can order you to forfeit all property derived

9    from the offense or used to facilitate the offense.

10                   Do you understand that these are the maximum penalties

11   for each of the counts, Counts One through Seven?

12                   THE DEFENDANT:    Yes.

13                   THE COURT:    Do you understand that the total maximum

14   sentence of incarceration on Counts One through Seven of the

15   superseding information is 110 years in prison?

16                   THE DEFENDANT:    Yes.

17                   THE COURT:    Is Ms. Ellison now serving a state or

18   federal sentence or otherwise being prosecuted or investigated

19   elsewhere, as far as you know?

20                   MS. SASSOON:    No, your Honor, not criminally

21   investigated.

22                   THE COURT:    Understood.  Thank you.

23                   So you should be aware that the punishments that I

24   have just described are those that may be part of a sentence.

25   Being convicted of a felony may have other consequences.

1          Are you a United States citizen?

2          THE DEFENDANT:   Yes.

3          THE COURT:    Then you should understand that as a

4    result of your guilty plea, you may lose certain valuable civil

5    rights, to the extent that you have them now, such as the right

6    to vote, the right to hold public office, the right to serve on

7    a jury and the right to possess any kind of firearm.

8          Do you understand that?

9          THE DEFENDANT:   Yes.

10         THE COURT:    So now we're going to talk about the

11   sentencing guidelines.  In imposing sentence, federal judges

12   are required to consider the recommendations of the federal

13   sentencing guidelines.  The guidelines are a complicated set of

14   rules for determining an appropriate sentence.  And although,

15   at one time, they were mandatory -- meaning judges were

16   required to follow them -- they are no longer mandatory or

17   binding on judges, but nonetheless, judges must consider the

18   guidelines and properly calculate them before imposing

19   sentence.

20         Ultimately, though, a judge is required to give the

21   sentence that she believes best satisfies the purposes of the

22   criminal law as set forth in a provision of the law, which is

23   18 United States Code §3553(a), even if that's higher or lower

24   than a guidelines recommendation.

25         Do you understand all of that?

A000922

MCJGellP

1              THE DEFENDANT:   Yes.

2              THE COURT:    Did you discuss the sentencing guidelines

3    with your attorneys?

4              THE DEFENDANT:   Yes.

5              THE COURT:    And do you understand that they're only

6    recommendations to the Court?

7              THE DEFENDANT:   Yes.

8              THE COURT:    Now, I understand that you have entered

9    into a written plea agreement with the government; is that

10   correct?

11             THE DEFENDANT:   Yes.

12             THE COURT:    I have before me an agreement that's dated

13   December 18th, addressed to your attorneys, signed by various

14   representatives on behalf of the government.  I'm going to mark

15   it as Court Exhibit 1.  And I'm going to ask my law clerk just

16   to show it to you and ask you if your signature is on the last

17   page.

18             Is that your signature?

19             THE DEFENDANT:   Yes.

20             THE COURT:    Before you signed this agreement, did you

21   read the entire agreement?

22             THE DEFENDANT:   Yes.

23             THE COURT:    And did you discuss it with your

24   attorneys?

25             THE DEFENDANT:   Yes.

A000923

MCJGellP

1          THE COURT:    I understand it's a somewhat lengthy

2     document, it contains some technical legal language.  But after

3     reviewing it and discussing it with your attorneys, do you

4     understand all of the terms of the agreement?

5          THE DEFENDANT:    Yes.

6          THE COURT:    Do you have any questions about it?

7          THE DEFENDANT:    No.

8          THE COURT:    I'm going to ask the government to

9     summarize the primary terms of the agreement.

10          MS. SASSOON:    Yes, your Honor.

11          The agreement begins by outlining the seven charges to

12     which Ms. Ellison will plead guilty and the penalties

13     associated with those charges.  It specifies that the defendant

14     is agreeing to waive any defense related to venue with respect

15     to the seven charges in the information.  The defendant admits

16     to the forfeiture allegations and states that she understands

17     she'll be making restitution with respect to the charges.

18          The agreement then describes some of the terms of the

19     defendant's cooperation with the government and the obligations

20     she's committing to in order to fulfill her cooperation with

21     the government.  It then outlines essentially the defendant's

22     immunity that she's receiving under this agreement, both for

23     the charges in Counts One through Seven and also other conduct

24     in which she has engaged and disclosed to the government.

25          On page 4, the agreement outlines what the government

1    will do if the defendant provides substantial assistance to the

2    government and upholds her end of the cooperation agreement,

3    including informing the Court of her assistance and making a

4    motion under United States Sentencing Guidelines §5K1.1, while

5    noting that her sentence is ultimately going to be determined

6    by the Court at the time of sentencing.

7              On page 5, the agreement outlines the proposed bail

8    package to the Court for the defendant.  And the agreement also

9    notes that the defendant has chosen not to request discovery

10   materials and understands that the government will also not be

11   producing any discovery or material under *Brady* and *Giglio.*

12             THE COURT:    Thank you.

13             Ms. Ellison, is that consistent with your

14   understanding of this agreement?

15             THE DEFENDANT:    Yes, it is.

16             THE COURT:    I'm just going to follow up just very

17   briefly with two of them.

18             I want you to understand that it's up to the

19   government and not to me to decide whether whatever cooperation

20   you provide is productive enough for the government to file the

21   5K1.1 motion it mentioned and recommend a sentence that's below

22   the sentencing guidelines.

23             Do you understand that's up to the government?

24             THE DEFENDANT:    Yes.

25             THE COURT:    You should also understand that even if

A000925

1  the government does that, it's ultimately up to me to decide

2  whether to give you any credit and, if so, how much for any

3  cooperation you may have provided.

4           Do you understand that?

5           THE DEFENDANT:   Yes.

6           THE COURT:    Did you willingly sign this agreement?

7           THE DEFENDANT:   Yes, I did.

8           THE COURT:    Are you willingly pleading guilty today?

9           THE DEFENDANT:   Yes.

10          THE COURT:    Has anyone threatened, bribed or forced

11  you either to sign the plea agreement or to plead guilty?

12          THE DEFENDANT:   No.

13          THE COURT:    Other than what's in the plea agreement,

14  has anyone offered you any inducement to plead guilty?

15          THE DEFENDANT:   No.

16          THE COURT:    Has anyone made any promise to you as to

17  what your sentence will be?

18          THE DEFENDANT:   No.

19          THE COURT:    Do you understand that if anyone has

20  attempted to predict what your sentence will be that that

21  prediction will be wrong?

22          Do you understand that?

23          THE DEFENDANT:   Yes.

24          THE COURT:    And I say that because no one here knows

25  for sure what your sentence will be -- your lawyers don't, the

A000926

MCJGellP

 1    government doesn't, I don't -- because that's not going to be

 2    determined until a later date, after I get a presentence report

 3    from the probation department, I calculate the guidelines, I

 4    get submissions from you, the government and the probation

 5    department.

 6            But even if your sentence is different from what you

 7    had hoped for or expected, you won't be allowed to withdraw

 8    your plea on that basis.

 9            Do you understand that?

10            THE DEFENDANT:    Yes.

11            THE COURT:    So now that you have been advised of the

12    charges against you and the possible penalties you face and the

13    rights you are giving up, is it still your intention to plead

14    guilty?

15            THE DEFENDANT:    Yes, it is.

16            THE COURT:    So I'm going to ask you the official

17    question as to whether you are guilty or not guilty with

18    respect to each of the seven counts, one at a time.

19            So with respect to Count One of the superseding

20    information, conspiracy to commit wire fraud on customers, how

21    do you plead?

22            THE DEFENDANT:    Guilty.

23            THE COURT:    And with respect to Count Two, wire fraud

24    on customers, how do you plead?

25            THE DEFENDANT:    Guilty.

A000927

1  |  THE COURT:    With respect to Count Three, conspiracy to

2  |  commit wire fraud on lenders, how do you plead?

3  |  THE DEFENDANT:    Guilty.

4  |  THE COURT:    With respect to Count Four, wire fraud on

5  |  lenders, how do you plead?

6  |  THE DEFENDANT:    Guilty.

7  |  THE COURT:    With respect to Count Five, conspiracy to

8  |  commit commodities fraud, how do you plead?

9  |  THE DEFENDANT:    Guilty.

10  |  THE COURT:    With respect to Count Six, conspiracy to

11  |  commit securities fraud, how do you plead?

12  |  THE DEFENDANT:    Guilty.

13  |  THE COURT:    With respect to Count Seven, conspiracy to

14  |  commit money laudering, how do you plead?

15  |  THE DEFENDANT:    Guilty.

16  |  THE COURT:    Now, tell me in your own words what you

17  |  did that makes you believe that you are guilty of these crimes.

18  |  THE DEFENDANT:    Yeah, so from approximately March 2018

19  |  through November 2022 --

20  |  THE COURT:    I'm going to ask you to speak very slowly,

21  |  please.  Thank you.

22  |  THE DEFENDANT:    From approximately March 2018 through

23  |  November 2022, I worked at Alameda Research, a cryptocurrency

24  |  trading firm principally owned by Sam Bankman-Fried.  At

25  |  Alameda Research, I first worked as a cryptocurrency trader and

1    was later appointed by Mr. Bankman-Fried as the co-CEO and

2    eventually CEO of Alameda Research Ltd., the subsidiary that

3    housed the firm's main trading and market making operations.

4    In those roles, I reported to Mr. Bankman-Fried.

5              From 2019 through 2022, I was aware that Alameda was

6    provided access to a borrowing facility on FTX.com, the

7    cryptocurrency exchange run by Mr. Bankman-Fried.  I understood

8    that FTX executives had implemented special settings on

9    Alameda's FTX.com account that permitted Alameda to maintain

10   negative balances in various fiat currencies and crypto

11   currencies.  In practical terms, this arrangement permitted

12   Alameda access to an unlimited line of credit without being

13   required to post collateral, without having to pay interest on

14   negative balances and without being subject to margin calls or

15   FTX.com's liquidation protocols.  I understood that if

16   Alameda's FTX accounts had significant negative balances in any

17   particular currency, it meant that Alameda was borrowing funds

18   that FTX's customers had deposited onto the exchange.

19             While I was co-CEO and then CEO, I understood that

20   Alameda had made numerous large illiquid venture investments

21   and had lent money to Mr. Bankman-Fried and other FTX

22   executives.  I also understood that Alameda had financed these

23   investments with short-term and open-term loans worth several

24   billion dollars from external lenders in the cryptocurrency

25   industry.  When many of those loans were recalled by Alameda's

A000929

1    lenders in and around June 2022, I agreed with others to borrow

2    several billion dollars from FTX to repay those loans.  I

3    understood that FTX would need to use customer funds to finance

4    its loans to Alameda.  I also understood that many FTX

5    customers invested in crypto derivatives and that most FTX

6    customers did not expect that FTX would lend out their digital

7    asset holdings and fiat currency deposits to Alameda in this

8    fashion.

9            From in and around July 2022 through at least

10   October 2022, I agreed with Mr. Bankman-Fried and others to

11   provide materially misleading financial statements to Alameda's

12   lenders.  In furtherance of this agreement, for example, we

13   prepared certain quarterly balance sheets that concealed the

14   extent of Alameda's borrowing and the billions of dollars in

15   loans that Alameda had made to FTX executives and to related

16   parties.  I also understood that FTX had not disclosed to FTX's

17   equity investors that Alameda could borrow a potentially

18   unlimited amount from FTX, thereby putting customer assets at

19   risk.  I agreed with Mr. Bankman-Fried and others not to

20   publicly disclose the true nature of the relationship between

21   Alameda and FTX, including Alameda's credit arrangement.

22            I also understood that Mr. Bankman-Fried and others

23   funded certain investments in amounts more than $10,000 with

24   customer funds that FTX had lent to Alameda.  The investments

25   were done in the name of Alameda instead of FTX in order to

1    conceal the source and nature of those funds.

2            I am truly sorry for what I did.  I knew that it was

3    wrong.  And I want to apologize for my actions to the affected

4    customers of FTX, lenders to Alameda and investors in FTX.

5    Since FTX and Alameda collapsed in November 2022, I have worked

6    hard to assist with the recovery of assets for the benefit of

7    customers and to cooperate with the government's investigation.

8    I am here today to accept responsibility for my actions by

9    pleading guilty.

10            THE COURT:    You mentioned that you knew that what you

11    were doing was wrong.  Did you also know that it was illegal?

12            THE DEFENDANT:    Yes.

13            THE COURT:    Does the government want to make a proffer

14    with respect to venue?

15            MS. SASSOON:    Yes.

16            With respect to venue and wires, your Honor, if the

17    case proceeded to trial, the government would prove that

18    certain acts in furtherance of each of the counts took place in

19    the Southern District of New York, including communications

20    with investors who were in New York, Tweets that were viewed by

21    customers and investors who were in the Southern District of

22    New York.  Among other things, that FTX had an office in the

23    Southern District of New York.  And in addition to that, that

24    the defendant has agreed to waive venue with respect to the

25    charges.

A000931

1        In terms of wires, the proof at trial would include

2     evidence of wires transmitted in furtherance of the charges,

3     including emails, transmission of funds and Tweets.

4        THE COURT:   And what would the government's evidence

5     beyond that be if you were to go to trial against Ms. Ellison?

6        MS. SASSOON:   With respect to wires?

7        THE COURT:   With respect to all of the seven counts.

8        MS. SASSOON:   I see, your Honor.

9        The evidence against Ms. Ellison would include witness

10    testimony, as well as documentary and physical evidence, to

11    include signal communications, emails, documents transmitted to

12    investors and lenders, documents collected from FTX, including

13    evidence from FTX's software database and its code.

14       THE COURT:   Are there any additional questions you

15    would like me to ask Ms. Ellison?

16       MS. SASSOON:   No.  Thank you, your Honor.

17       THE COURT:   Do both parties agree that there's a

18    sufficient factual predicate for the guilty plea?

19       MS. SASSOON:   Yes, your Honor.

20       MR. SAHNI:   Yes, your Honor.

21       THE COURT:   Ms. Ellison, do you also admit to the

22    forfeiture allegation in the superseding information?

23       THE DEFENDANT:   Yes.

24       THE COURT:   Ms. Ellison, because you acknowledge that

25    you are in fact guilty as charged in Counts One through Seven

A000932

1    of the superseding information and because I'm satisfied that

2    you understand your rights, including your right to go to

3    trial, and that you are aware of the consequences of your plea,

4    including the sentence which may be imposed, because I find

5    that you are knowingly and voluntarily pleading guilty, I

6    accept your guilty plea to Counts One through Seven of the

7    superseding information.

8            Should we set a control date for sentencing

9    approximately, maybe, a year out?

10           MS. SASSOON:    Yes, your Honor.  We would propose a

11   control date maybe a year from now.

12           THE COURT:    Why don't we set a control date for

13   sentencing on December 19th of 2023.

14           Now, let's talk about bail.  I understand that the

15   parties have agreed on a bail package, which was in the plea

16   agreement.  I have read the pretrial services report, but I

17   would be happy to hear further from any of the parties if they

18   would like to be heard.

19           MS. SASSOON:    Yes, your Honor.

20           The government stands by the proposal in the plea

21   agreement.  I know there's some additional conditions in the

22   pretrial services report.  We don't think the travel

23   restrictions or the monetary restrictions are necessary, based

24   on the information we have about the defendant.

25           THE COURT:    Would pretrial like to be heard, or is

A000933

1    that not necessary?  It's up to you.

2              MS. HARMON:    I don't think so, your Honor.

3              THE COURT:    Thank you.

4              So I'm going to grant that request.  Having reviewed

5    the pretrial services report, among other things, Ms. Ellison

6    has no criminal history and strong ties to the community, and

7    thus, I am releasing her on the following bail conditions:  A

8    $250,000 personal recognizance bond signed by her, travel

9    restricted to the continental United States, for her to

10   surrender all travel documents and refrain from making any new

11   applications, supervision will be as directed by pretrial

12   services, and she must adhere to all other standard conditions

13   of release.

14             Just to be clear, the government is not recommending

15   that the bond be signed by anybody other than Ms. Ellison?

16             MS. SASSOON:    That's correct, your Honor.

17             That was based on discussion withs defense counsel

18   about the feasibility of having a prompt cosigner and our

19   confidence that Ms. Ellison does not pose a flight risk.

20             THE COURT:    In light of that representation, I will

21   sign off on the bail conditions as requested.

22             Ms. Ellison, you should understand that if you don't

23   appear for any court proceedings for which you are scheduled to

24   appear, including sentencing, that you could be charged with a

25   separate crime of bail jumping and subject to additional fines

MCJGellP

1    and prison sentence in addition to whatever sentence you may

2    receive for the crimes to which you pleaded guilty.

3            Do you understand that?

4            THE DEFENDANT:    Yes.

5            THE COURT:    Moreover, if you violate any of the

6    conditions of your release, a warrant will be issued for your

7    arrest.  That may lead to revocation of your bail with

8    forfeiture of the bond that's being executed, as well as your

9    being detained.  And you could be prosecuted for contempt of

10   court as well.

11           Do you understand that?

12           THE DEFENDANT:    Yes.

13           THE COURT:    In addition, if you commit any crimes

14   while on release, that may lead to more severe punishment than

15   you would get for committing the same crimes at any other time

16   and, in addition, would likely constitute a breach of your

17   agreement with the government.

18           Do you understand that?

19           THE DEFENDANT:    Yes.

20           THE COURT:    Finally, I should just advise you that

21   it's a crime to try and influence any juror or witness or any

22   person who may have information about the case or to retaliate

23   against anyone who may have provided information in the case or

24   otherwise attempt to obstruct justice.

25           Do you understand that?

A000935

MCJGellP

1          THE DEFENDANT:    Yes.

2          THE COURT:    Should we talk next about sealing and the

3    government's request that the documents in connection with this

4    proceeding, as well as the transcript, be sealed and docketing

5    delayed until tomorrow?  I'm happy to hear you out.

6          MS. SASSOON:    Yes, your Honor.

7          As has been reported in the media, it's our

8    understanding that the defendant had some -- it was our

9    expectation that he was going to consent to extradition today,

10   and there have been some hiccups in the Bahamian courtroom.

11   We're still expecting extradition soon, but given that he has

12   not yet entered his consent, we think it could potentially

13   thwart our law enforcement objectives to extradite him if

14   Ms. Ellison's cooperation were disclosed at this time.  We're

15   therefore seeking a limited period of sealing until he's

16   brought here and presented in the Southern District of New

17   York.

18         THE COURT:    And my understanding is that there's no

19   objection from the defendant; is that correct?

20         MR. SAHNI:    That's correct, your Honor.

21         THE COURT:    So that application is granted.

22         I agree the compelling law enforcement interests

23   support an order directing that filings and other docket

24   entries temporarily be made under seal.  Exposure of

25   cooperation could hinder law enforcement officials' ability to

A000936

MCJGellP

1    continue the ongoing investigation and, in addition, may affect

2    Mr. Bankman-Fried's decision to waive extradition in this case.

3              Although there is a qualified right of public access

4    to court documents, the Second Circuit has recognized that

5    documents may be filed under seal to protect, among other

6    things, further ongoing law enforcement efforts.  And the

7    Second Circuit has specifically recognized that the docketing

8    and the applications to seal those materials could themselves

9    be prejudicial and that, in such cases, the applications

10   themselves and related notes to the docket could be sealed.

11   And I'm just going to cite *Alacantara* for that.

12             So the transcript of this proceeding shall thus remain

13   sealed and docketing delayed until -- and you don't want it

14   based on tomorrow, just until Mr. Bankman-Fried is presented

15   here in this district; is that correct?

16             MS. SASSOON:    That's correct.

17             And at this point, I think it's unlikely that it will

18   be by noon tomorrow.

19             THE COURT:    Understood, for the reasons I just noted.

20             Are there any further applications on either side?

21             MS. SASSOON:    Not from the government.  Thank you,

22   your Honor.

23             MR. SAHNI:    No, your Honor.  Thank you.

24             THE COURT:    We're adjourned.  Thank you.

25             (Adjourned)

A000937

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4        v.                    22 Cr. 673 (RA)

5   ZIXIAO WANG,

6

7        Defendant.

8                             Plea
    ------------------------------x
9
                              New York, N.Y.
10                            December 19, 2022
                              11:00 a.m.
11

12  Before:

13
                         HON. RONNIE ABRAMS,
14
                         District Judge
15
                         APPEARANCES
16
    DAMIAN WILLIAMS
17      United States Attorney for the
        Southern District of New York
18  BY:  NICOLAS ROOS
         DANIELLE SASSOON
19       Assistant United States Attorneys

20  ILAN GRAFF
    ALEX MILLER
21      Attorneys for Defendant

22  ALSO PRESENT:
    Evelyn Alvayero, U.S. Pretrial Services
23

24

25

A000938

1          (Case called)

2          MR. ROOS:    Good morning, your Honor.

3          Nick Roos, Danielle Sassoon, and Evelyn Alvayero, from

4     pretrial services.

5          THE COURT:    Good morning to all of you.

6          MR. GRAFF:    Good morning, your Honor.  Ilan Graff for

7     Mr. Wang, who is standing to my right.

8          I am joined by my colleague Alex Miller.

9          THE COURT:    Good morning to all of you.  You can be

10    seated.  So are we all ready to get started?

11         MR. ROOS:    Yes, your Honor.

12         THE COURT:    Mr. Wang, I understand that you wish to

13    plead guilty to Counts One through Four of the information.

14         Is that correct?

15         THE DEFENDANT:    Yes, your Honor.

16         THE COURT:    Okay.  Before deciding whether to accept

17    your plea, I am going to ask you certain questions so that I

18    can be sure that you understand your rights and that you are

19    pleading guilty voluntarily and because you are guilty and not

20    for some other reason.  So it is important that you answer my

21    questions honestly and completely.

22         If at any time you are having trouble understanding

23    anything or you want to talk to your lawyer, just let me know.

24         THE DEFENDANT:    Yes, your Honor.

25         THE COURT:    Mr. Fields, could you please place

1    Mr. Wang under oath.

2             (Defendant sworn)

3             THE COURT:    All right.

4             You are now under oath.  So you should know that if

5    answer any of my questions falsely, you could be charged with a

6    separate crime, perjury.

7             Do you understand that?

8             THE DEFENDANT:    Yes, your Honor.

9             THE COURT:    I am going to start by asking you some

10   questions to ensure that you are competent to plead guilty.

11   These are questions that I ask of everyone in your position.

12            So, first, how old are you?

13            THE DEFENDANT:    Twenty-nine.

14            THE COURT:    How far did you go in school?

15            THE DEFENDANT:    I graduated college.

16            THE COURT:    Are you currently or have you recently

17   been under the care of a medical professional, psychiatrist, or

18   other mental health care provider?

19            THE DEFENDANT:    No, your Honor.

20            THE COURT:    Have you ever been hospitalized for mental

21   illness, alcoholism, or drug addiction?

22            THE DEFENDANT:    No.

23            THE COURT:    In the past 24 hours have you taken any

24   drugs, medicine, or pills or drunk any alcoholic beverages?

25            THE DEFENDANT:    No.

A000940

1              THE COURT:    Is your mind clear today?

2              THE DEFENDANT:    Yes, your Honor.

3              THE COURT:    Do you understand what's happening in

4    these proceedings?

5              THE DEFENDANT:    Yes, your Honor.

6              THE COURT:    Does either counsel have any doubts as to

7    the defendant's competence to plead guilty at this time?

8              MR. ROOS:    No, your Honor.

9              MR. GRAFF:    No, your Honor.

10             THE COURT:    On the basis of Mr. Wang's responses to my

11   questions and my observations of his demeanor here in court and

12   representations of counsel, I find that he is fully competent

13   to enter an informed plea of guilty at this time.

14             Have you had enough time and opportunity to discuss

15   your case with your attorney, including the nature of the

16   charges to which you intend to plead guilty, any possible

17   defenses you may have, and the rights that you will be giving

18   up by pleading guilty?

19             THE DEFENDANT:    Yes, your Honor.

20             THE COURT:    All right.  Has your attorney discussed

21   with you the consequences of pleading guilty?

22             THE DEFENDANT:    Yes, your Honor.

23             THE COURT:    All right.  Are you satisfied with your

24   attorney's representation of you?

25             THE DEFENDANT:    Yes, your Honor.

1        THE COURT:    Okay.  So now what I want to talk about is

2   the charging instrument.  It a superseding information.  That's

3   the document, the charge that the government is seeking to file

4   in this case.

5        Have you received a copy of the superseding

6   information?

7        It's titled S1 22 Cr. 673.

8        THE DEFENDANT:    Yes, your Honor.

9        THE COURT:    Have you reviewed it?

10        THE DEFENDANT:    Yes.

11        THE COURT:    Have you discussed it with your attorney?

12        THE DEFENDANT:    Yes.

13        THE COURT:    So under our legal system, before you or

14   anyone else can be charged with a felony offense, the

15   government is obligated to go to a grand jury, which must

16   decide whether there's probable cause to believe that an

17   offense was committed and that you committed it.  And that

18   decision may result in what's called an indictment.

19        I want to make sure that you understand that by

20   allowing the government to charge you by way of this

21   information, you are waiving, or giving up, your right to be

22   charged by a grand jury in an indictment?

23        Do you understand that?

24        THE DEFENDANT:    Yes, your Honor.

25        THE COURT:    Do I have the signed waiver of indictment

A000942

1   forms?

2           Do you have a signed version?

3           MR. ROOS:    We have a signed one.  I think we probably

4   actually should sign it again because it is already witnessed.

5   So I have a second copy.  I will just pass it back to counsel

6   right now.

7           THE COURT:    Why don't you do that.  All right.

8           So, Mr. Wang, I understand and witnessed that you just

9   signed this waiver of indictment form.

10          Did you discuss this form before signing it with your

11  attorney?

12          THE DEFENDANT:    Yes, your Honor.

13          THE COURT:    Okay.  Again, you understand that you are

14  agreeing to give up your right to be charged by a grand jury?

15          Do you understand that?

16          THE DEFENDANT:    Yes.

17          THE COURT:    Were any threats or promises made other

18  than by the prosecution in the written plea agreement to get

19  you to waive indictment?

20          THE DEFENDANT:    No, your Honor.

21          THE COURT:    Okay.  Does either counsel have any reason

22  to believe that Mr. Wang has not knowingly and voluntarily

23  waived his right to be charged by a grand jury?

24          MR. ROOS:    No, your Honor.

25          MR. GRAFF:    No, your Honor.

1           THE COURT:    Okay.

2           I find that he has knowingly and voluntarily waived

3    his right to be charged by a grand jury, and I authorize the

4    filing of the superseding information.

5           Now what I am going to do is I am going to explain

6    certain constitutional rights that you have.  These are rights

7    that you will be giving up if you enter a guilty plea.

8           So, first, under the Constitution and laws of the

9    United States, you have a right to plead not guilty to the

10   charges in that superseding information.

11          Do you understand that?

12          THE DEFENDANT:    Yes, your Honor.

13          THE COURT:    If you did plead not guilty, you would be

14   entitled under the Constitution to a speedy and public trial by

15   jury of those charges.

16          Do you understand that?

17          THE DEFENDANT:    Yes, your Honor.

18          THE COURT:    In advance of trial, if you chose to go to

19   trial, you would have the opportunity to seek suppression of

20   any or all of the evidence against you on the basis that it was

21   obtained in violation of the Constitution.

22          Do you understand that?

23          THE DEFENDANT:    Yes, your Honor.

24          THE COURT:    At trial, again, if you chose to go to

25   trial, you would be presumed innocent.  That means that you

A000944

1     would not have to prove that you were innocent. Instead, the

2     government would need to prove your guilt beyond a reasonable

3     doubt before you could be found guilty.

4                    So even if you did nothing or said nothing at trial,

5     again, if you chose to go to trial, you could not be convicted

6     unless a jury of 12 people agreed unanimously that you are

7     guilty.

8                    Do you understand that?

9                    THE DEFENDANT:    Yes, your Honor.

10                   THE COURT:    During trial, if you chose to go to trial,

11    the witnesses for the prosecution would have to come to court

12    and testify in your presence, where you could see them and hear

13    them and your lawyer could cross-examine them.

14                   If you wanted to, your lawyer could offer evidence on

15    your behalf. You would be able to use the Court's power to

16    compel or force witnesses to come to court to testify

17    truthfully in your defense, even if they didn't want to come.

18                   Do you understand that?

19                   THE DEFENDANT:    Yes, your Honor.

20                   THE COURT:    At trial, again, if you went to trial, you

21    would have the right to testify if you wanted to, but you would

22    also have the right not to testify, and if you chose not to

23    testify, that could not be used against you in any way. So no

24    inference or suggestion of guilt would be made from the fact

25    that you chose not to testify.

A000945

1          Do you understand that?

2          THE DEFENDANT:    Yes, your Honor.

3          THE COURT:    All right.  At trial and at every stage

4   your case, you would be entitled to be represented by an

5   attorney.  And if you could not afford an attorney one would be

6   appointed at public expense, meaning free of cost, to represent

7   you?

8          Do you understand that?

9          THE DEFENDANT:    Yes, your Honor.

10          THE COURT:    If you are convicted at trial, you would

11   have the right to appeal that verdict to a higher court.

12          Do you understand that?

13          THE DEFENDANT:    Yes, your Honor.

14          THE COURT:    As I said before, you have the right to

15   plead not guilty.  So even as you sit here right now for

16   purposes of entering a guilty plea, you have the right to

17   change your mind and to go to trial.  But if you do plead

18   guilty and I accept your plea, there will be no trial, and you

19   will be giving up the rights that I just described.

20          If you plead guilty, all that will remain to be done

21   is for me to impose sentence at the appropriate time.  I will

22   enter a judgment of guilty and sentence you on that basis after

23   considering whatever submissions I get from you, from your

24   lawyer, the government, as well as a presentence report

25   prepared by the probation department.  But there will be no

A000946

1  appeal with respect to whether the government could use the

2  evidence it has against you or with respect to whether you did

3  or did not commit the crime.

4          Do you understand that?

5          THE DEFENDANT:    Yes, your Honor.

6          THE COURT:    If you plead guilty, you will also have to

7  give up your right not to incriminate yourself, because I am

8  going to ask you certain questions here in court today in order

9  to satisfy myself that you are in fact guilty as charged.

10          Do you understand that?

11          THE DEFENDANT:    Yes, your Honor.

12          THE COURT:    Okay.  So I understand that you seek to

13  plead guilty to Counts One through Four of the superseding

14  information and admit to the forfeiture allegation.

15          I am going ask the government to please state the

16  elements of the offenses in question.

17          MR. ROOS:    Yes, your Honor.

18          Counts One and Two of the information charge the

19  defendant respectively with conspiracy to commit wire fraud and

20  wire fraud.

21          The elements of the first count, conspiracy to commit

22  wire fraud are:

23          First, the existence of a conspiracy to commit wire

24  fraud; and

25          Second, that the defendant knowingly and willfully

A000947

1    became a member of and joined in the conspiracy.

2            The elements of wire fraud itself, which is the object

3    of Count One and the substantive crime of Count Two, are:

4            First, that there was a scheme or artifice to defraud

5    or to obtain money or property by materially false or

6    fraudulent pretenses, representations, or promises;

7            Second, that the defendant knowingly participated in

8    the scheme or artifice to defraud with knowledge of its

9    fraudulent nature and with the specific intent to defraud or

10   that he knowingly and intentionally aided and abetted others in

11   the scheme; and

12           Third, that in the execution of that scheme, the

13   defendant used or caused the use of interstate or foreign

14   wires.

15           Counts Three and Four of the indictment both charge

16   the defendant with a violation of Title 18, United States Code,

17   Section 371.

18           Count Three is a conspiracy to commit commodities

19   fraud.

20           Count Four is a conspiracy to commit securities fraud.

21           The conspiracy under Section 371 has three elements:

22           First, that two or more persons entered into an

23   unlawful agreement charged in the specific count;

24           Second, that the defendant knowingly and willfully

25   became a member of that alleged conspiracy; and

A000948

1    Third, that one of the members of the conspiracy

2    knowingly committed at least one overt act in furtherance of

3    the conspiracy.

4    So for Count Three the object of the conspiracy is a

5    conspiracy to commit commodities fraud, in violation of Title

6    7, United States Code, Section 9(1)(13)(a)(5) and Title 17 Code

7    of Federal Regulations 180.1.

8    There are three elements to this crime:

9    First, in connection with any swap or contract of sale

10    of any commodity in interstate commerce or contracts for future

11    delivery on or subject the rules of any registered entity;

12    Second, the defendant or any of his coconspirators did

13    any one or more of the following:

14    (a) employed, attempted, to use or employ a

15    manipulative device, scheme, or artifice to defraud;

16    (b) made or attempted to make an untrue or misleading

17    statement of a material fact or omitted to state a material

18    fact necessary in order to make statements not untrue or

19    misleading; or

20    (c) engaged or attempted to engage in an act,

21    practice, or course of business that operated or would operate

22    as a fraud or deceit upon a person; and

23    Third, that defendant acted knowingly, willfully, and

24    with the intent to defraud.

25    Finally, for Count Four, the object of the 371

A000949

1    conspiracy is a violation of Title 15, United States Code,

2    Section 78j(b) and 78ff and Title 17, Code of Federal

3    Regulations, Section 240.10b-5.  That's securities fraud.

4    There are three elements of securities fraud:

5                    First, that in connection with the purchase or sale of

6    a security the proposed defendant:

7                    (1) Employed a defendant scheme or artifice to

8    defraud;

9                    (2) Made an untrue statement of material fact or

10   omitted to state a material fact, which made what was said

11   under the circumstances misleading; or

12                   (3) Engaged in an act, practice, or course of business

13   that operated or would operate as a fraud or deceit upon a

14   purchaser or seller.

15                   Second, the defendant acted knowingly, willfully, and

16   with intent to defraud; and

17                   Third, that the defendant knowingly used or caused to

18   be used any means or instrument of transportation or

19   communication in the interstate commerce or the use of the

20   mails in furtherance of the fraudulent conduct.

21                   And, finally, the government would have to prove by a

22   preponderance of the evidence venue.

23                   THE COURT:    All right.  Thank you.

24                   So, Mr. Wang, I want to make sure you understand that

25   if you were to go to trial on these charges the government

1  would need to prove each of the elements that were mentioned

2  beyond a reasonable doubt in addition to proving venue, but

3  that is a lower legal standard.

4         Do you understand that?

5         THE DEFENDANT:   Yes, your Honor.

6         THE COURT:   So now I am going to discuss the maximum

7  penalties for this crime or these crimes.  The maximum penalty

8  means the most that could possibly be imposed.  It doesn't

9  necessarily mean it's the sentence you will receive.  But you

10 have to understand that by pleading guilty you are exposing

11 yourself to the possibility of receiving any combination of

12 punishments up to the maximums that I am just about to

13 describe.

14        So with respect to Counts One and Two, the maximum

15 terms of imprisonment for each of those crimes is 20 years in

16 prison.

17        Do you understand that?

18        THE DEFENDANT:   Yes, your Honor.

19        THE COURT:   Any term of imprisonment you do receive

20 may be followed by a term of supervised release of three years

21 on each count.  Supervised release means that if you are

22 sentenced to prison, after you are released from prison, you

23 will be subject to the supervision of the probation department.

24 You will be required to obey certain rules, and if you violate

25 those rules, you can be returned to prison without a jury trial

A000951

1   to serve additional time even beyond your original sentence.

2          Do you understand that?

3          THE DEFENDANT:   Yes, your Honor.

4          THE COURT:   You should also understand that there's no

5   parole in the federal system.  If you're sentenced to prison,

6   you will not be released early on parole, although there is a

7   limited opportunity to earn credit for good behavior.

8          Do you understand that?

9          THE DEFENDANT:   Yes, your Honor.

10          THE COURT:    In addition to these restrictions on your

11   liberty, the punishment for these crimes includes certain

12   financial penalties.

13          The maximum allowable final for each count -- again,

14   we are talking about Counts One and Two -- is $250,000, twice

15   the gross pecuniary gain derived from the offense or twice the

16   gross pecuniary loss to persons other than yourself resulting

17   from the offense.

18          Do you understand that?

19          THE DEFENDANT:   Yes, your Honor.

20          THE COURT:    There's also a mandatory special

21   assessment, or fee, of $100 for each of these crimes.

22          Do you understand that?

23          THE DEFENDANT:   Yes, your Honor.

24          THE COURT:    In addition, I must order restitution to

25   any persons or entities injured as a result of your criminal

A000952

1    conduct, and I can order you to forfeit all property derived

2    from the offense or used to facilitate the offense.

3              Do you understand that as well?

4              THE DEFENDANT:    Yes, your Honor.

5              THE COURT:    So now I am going to turn to Counts Three

6    and Four.

7              With respect to your liberty on each of those counts,

8    the maximum term of imprisonment for each count is five years.

9    Any term of imprisonment may be followed by a term of three

10    years of supervised release.  The maximum allowable fine is

11    again $250,000 on each count, twice the gross pecuniary gain

12    derived from the offense, twice the gross pecuniary loss to

13    persons other than yourself resulting from the offense,

14    whichever is higher.

15              Do you understand that?

16              THE DEFENDANT:    Yes, your Honor.

17              THE COURT:    I am also, again, required to impose a

18    mandatory special assessment, or fee, of $100 on each of those

19    counts.

20              And, again, I must order restitution to any persons or

21    entities injured as a result of your criminal conduct and can

22    order you to forfeit all property derived from these offenses

23    or used to facilitate these offenses.

24              Do you understand that these are the maximum penalties

25    for Counts Three and Four?

A000953

1          THE DEFENDANT:    Yes, your Honor.

2          THE COURT:    All right.  Do you understand in addition

3   that the total maximum sentence of incarceration on Counts One,

4   Two, Three, and Four of this information is 50 years in prison?

5          THE DEFENDANT:    Yes, your Honor.

6          THE COURT:    Is Mr. Wang now being prosecuted elsewhere

7   that we know of?

8          MR. ROOS:    No, your Honor.

9          THE COURT:    All right.  So, Mr. Wang, you should be

10  aware that the punishments that I have just described are those

11  that may be part of a sentence, but being convicted of a felony

12  may have other consequences.

13         Are you a United States citizen?

14         THE DEFENDANT:    Yes, your Honor.

15         THE COURT:    All right.  Then you should understand

16  that, as a result of your guilty plea, you may lose certain

17  valuable civil rights to the extent that you have them now,

18  such as the right to vote, the right to hold public office, the

19  right to serve on a jury and the right to possess any kind of

20  firearm.

21         Do you understand that?

22         THE DEFENDANT:    Yes, your Honor.

23         THE COURT:    Now, I am going to talk about the

24  sentencing guidelines.  In imposing sentence, federal judges

25  are required to consider the recommendations of the federal

A000954

1    sentencing guidelines.

2            The guidelines are a complicated set of rules for

3    determining an appropriate sentence.  At one time they were

4    mandatory; judges were bound to follow them.  They are no

5    longer mandatory, but judges must nonetheless consider the

6    guidelines in determining an appropriate sentence, although

7    ultimately I am going to look to the factors set forth in a

8    provision of the law, 18 United States Code, Section 3553(a),

9    and impose a sentence that I believe best satisfies the

10    purposes of the criminal law as set forth in that statute, even

11    if it's higher or lower than the guidelines recommendation.

12            Do you understand all of that?

13            THE DEFENDANT:    Yes, your Honor.

14            THE COURT:    Did you discuss the sentencing guidelines

15    with your attorneys?

16            THE DEFENDANT:    Yes, your Honor.

17            THE COURT:    Do you understand that the guidelines are

18    only recommendations to the court?

19            THE DEFENDANT:    Yes, your Honor.

20            THE COURT:    Okay.  Now, I understand that you have

21    entered into a written plea agreement with the government.  I

22    have what appears to be an original copy of that agreement.

23    It's dated December 18, and addressed to your attorneys,

24    Mr. Graff and Mr. Miller, and signed by various representatives

25    on behalf of the government.

1          I am marking it as Court Exhibit No. 1.

2          I am going to ask my law clerk, Mr. Fields, to show it

3    to you.

4          Is that your signature on the last page?

5          THE DEFENDANT:    Yes, your Honor.

6          THE COURT:    Before signing this agreement, did you

7    read it?  Did you read the entire agreement?

8          THE DEFENDANT:    Yes, your Honor.

9          THE COURT:    Did you discuss it with your attorneys?

10         THE DEFENDANT:    Yes, your Honor.

11         THE COURT:    I recognize that it's a somewhat lengthy

12   document and it contains some technical and legal language, but

13   after discussing it with your attorneys, do you understand all

14   the terms of the agreement?

15         THE DEFENDANT:    Yes, your Honor.

16         THE COURT:    Okay.  I am going to ask the government to

17   summarize the primary terms of the agreement, please.

18         MR. ROOS:    Yes, your Honor.

19         So the first page through the second page of the

20   document describe the charges in the information, the

21   penalties, and the understanding that the defendant will be

22   pleading guilty to those.  Also on the second page are the

23   provisions relating to admitting the forfeiture allegations and

24   agreeing to pay restitution.  There is a requirement on page 2

25   relating to the defendant's agreement to cooperate with the

1  government.

2       There is on page 3 a discussion of what the defendant

3  will not be further prosecuted for, which includes a

4  description of the counts in the information as well as some

5  additional relevant conduct.

6       And then there are a series of additional provisions

7  through the remainder of the agreement that describe the

8  defendant's rights and certain rights that he is giving up by

9  pleading guilty.  As one of those I would just highlight, there

10  is a waiver of venue which appears actually on the second page

11  of the agreement.

12       THE COURT:    Okay.

13       Is all of that consistent, Mr. Wang, with your

14  understanding of this agreement?

15       THE DEFENDANT:    Yes, your Honor.

16       THE COURT:    Do you have any questions about the

17  agreement?

18       THE DEFENDANT:    No, your Honor.

19       THE COURT:    Okay.  All right.

20       I am just going to follow up on one or two terms.

21       I want to make sure that you understand it is up to

22  the government and not to me, not to the Court, to decide

23  whether any cooperation you provide has been productive enough

24  for the government to file what we call the 5K1 motion and

25  recommend a sentence below the sentence recommended by the

A000957

1  sentencing guidelines.

2         Do you understand that?

3         That is up to the government.

4         THE DEFENDANT:    Yes, your Honor.

5         THE COURT:    But even if the government decides to make

6  such a motion, it's going to be up to me to decide whether to

7  give you credit for that cooperation and, if so, how much and

8  how it should affect the sentence.

9         Do you understand that?

10        THE DEFENDANT:    Yes, your Honor.

11        THE COURT:    Okay.  Did you willingly sign this plea

12  agreement?

13        THE DEFENDANT:    Yes, your Honor.

14        THE COURT:    And are you willingly pleading guilty?

15        THE DEFENDANT:    Yes, your Honor.

16        THE COURT:    Has anyone threatened, bribed, or forced

17  you to sign the plea agreement or to plead guilty?

18        THE DEFENDANT:    No, your Honor.

19        THE COURT:    Other than what's in this agreement, has

20  anyone offered you any inducement to plead guilty?

21        THE DEFENDANT:    No, your Honor.

22        THE COURT:    Has anyone made any promise as to what

23  your sentence will be?

24        THE DEFENDANT:    No, your Honor.

25        THE COURT:    I ask that because I want to make sure you

A000958

1   understand that if anyone attempts to predict or has attempted

2   to predict what your sentence will be, that that prediction

3   could be wrong.

4           I say that because no one in this courtroom, not the

5   government, not your attorney, not even I know what your

6   sentence will be.  That won't be determined until a later date

7   after the probation department has drafted a presentence report

8   and I've done my own independent calculation of the guidelines

9   and I have reviewed whatever submissions I get from you and

10  your lawyer and the government as well as the presentence

11  report.

12          So I just want to make sure you understand that even

13  if your sentence is different from what you had hoped for or

14  expected you won't be allowed to withdraw your plea on that

15  basis.

16          Do you understand that?

17          THE DEFENDANT:    Yes, your Honor.

18          THE COURT:    Okay.  You have not submitted a consent

19  order of forfeiture to date.

20          Is that correct?

21          MR. ROOS:    That's correct, your Honor.

22          THE COURT:    Okay.  I just wanted to make sure.  I

23  don't have that before me.

24          Okay.  So now that you have been advised, Mr. Wang, of

25  the charges against you and the possible pents you face and the

A000959

1    rights that you are giving up, is it still your intention to

2    plead guilty to these four charges?

3                    THE DEFENDANT:    Yes, your Honor.

4                    THE COURT:    So now I am going ask you the official

5    question with respect to each count which is how do you plead,

6    guilty or not guilty?

7                    So first with respect to Count One of the superseding

8    indictment, which is a conspiracy to commit wire fraud on

9    customers, how do you plead?

10                   THE DEFENDANT:    Guilty, your Honor.

11                   THE COURT:    Now, with respect to Count Two, wire fraud

12   on customers, how do you plead?

13                   THE DEFENDANT:    Guilty, your Honor.

14                   THE COURT:    With respect to Count Three, conspiracy to

15   commit commodities fraud, how do you plead?

16                   THE DEFENDANT:    Guilty, your Honor.

17                   THE COURT:    And with respect to Count Four, conspiracy

18   to commit securities fraud, how do you plead?

19                   THE DEFENDANT:    Guilty, your Honor.

20                   THE COURT:    And do you admit to the forfeiture

21   allegation that's in this information?

22                   THE DEFENDANT:    Yes, your Honor.

23                   THE COURT:    Okay.

24                   So now tell me in your own words what you did that

25   makes you believe that you are guilty of these crimes.

A000960

1      THE DEFENDANT:    Between 2019 and 2022 --

2      THE COURT:    I am going to ask you to just speak very

3  slowly and very loudly.  It can be difficult to hear in this

4  courtroom because of the high ceilings.

5      Thank you.

6      THE DEFENDANT:    Between 2019 and 2022, as part of my

7  employment at FTX, I was directed to and agreed to make certain

8  changes to the platform's code.  I executed those changes,

9  which I knew would Alameda Research special privileges on the

10  FTX platform.

11      I did so knowing that others were representing to

12  investors and customers that Alameda had no such special

13  privileges and people were likely investing in and using FTX

14  based in part on those misrepresentations.

15      I knew what I was doing was wrong.  I also knew that

16  the misrepresentations were being made by telephone and

17  internet, among other means, and that assets traded on FTX

18  included some assets that the U.S. regulators regard as

19  securities and commodities.

20      THE COURT:    When you did this, did you know that what

21  you were doing was wrong and was illegal?

22      THE DEFENDANT:    Yes.

23      THE COURT:    Would the government like to ask any

24  additional questions?

25      MR. ROOS:    No additional questions, your Honor.

A000961

1           The government would just proffer that there is a

2   basis for venue.  In addition to the waiver, there's wires that

3   go through the Southern District of New York, investors located

4   in the Southern District of New York.

5           THE COURT:    All right.

6           And, Mr. Graff, any objection to that?

7           I understand that you are waiving venue.

8           Is that correct?

9           MR. GRAFF:    That's correct, your Honor.

10          No objection.

11          THE COURT:    Okay.

12          Could the government please summarize what its

13  evidence would be if you were to go to trial against Mr. Wang.

14          MR. ROOS:    Certainly, your Honor.

15          It would consist of witness statements, Signal

16  communications and Slack communications, financial records, and

17  records from FTX in the form of code and database, among other

18  things.

19          THE COURT:    All right.

20          Do the government and defense counsel agree that there

21  is a sufficient factual predicate for the guilty plea?

22          MR. ROOS:    Yes, your Honor.

23          MR. GRAFF:    Yes, your Honor.

24          THE COURT:    Mr. Wang, because you acknowledge that you

25  are in fact guilty as charged in the information, and because

A000962

1  I'm satisfied is that you are aware of your rights, including

2  your right to go to trial, and that you are aware of the

3  consequences of your plea, including the sentence which may be

4  imposed, I find that you are knowingly and voluntarily pleading

5  guilty.  I accept your guilty plea to Counts One, Two, Three,

6  and Four of the information.

7          I know we need to talk about bail and a few other

8  things, but should we set a control date for sentencing at this

9  time?

10         MR. ROOS:    Yes, your Honor.  We would suggest a date

11 fairly significantly far out, but I think a control date is

12 fine.

13         THE COURT:    What would you propose?  Nine months?  A

14 year?

15         MR. ROOS:    A year probably.

16         THE COURT:    All right.

17         Mr. Fields, can you just look on the calendar.  And

18 just look at December 19 of next year and see if it is a

19 weekday, please.  Why don't we set a control date for December

20 19, 2023.

21         Now we have to talk about bail.  I understand that the

22 pretrial services does not have a written pretrial services

23 report, but would like to report that orally.  That is

24 something as a matter of course that is kept confidential.  So

25 my question is how would you like to present that to the Court

A000963

1    in light of the fact that that is normally a document that is

2    not publicly disclosed?

3                MS. ALVAYERO:    Your Honor, pretrial requests that the

4    report be done orally in chambers.

5                THE COURT:    Okay.  Is there any objection to that?

6                MR. GRAFF:    None from the defense, your Honor.

7                MR. ROOS:    That is fine, your Honor.

8                THE COURT:    Again, because this is a document that is

9    as a matter of course kept confidential and not publicly

10   disclosed, I think that is appropriate, but we are not going to

11   discuss anything else.  So why don't we go into my robing room

12   and the parties, Mr. Wang, his attorneys, and the government,

13   can all come as well.  That will be done orally on the record

14   with the court reporter.

15               Okay.  That will be sealed from the transcript.  I

16   understand we have another sealing issue down the line, but why

17   don't we deal with this one first.

18               MR. ROOS:    Your Honor, just two other matters?

19               THE COURT:    Sure.

20               MR. ROOS:    One is I think, since he waived indictment

21   and the information was therefore entered today, he technically

22   needs to be arraigned.  Your Honor already reviewed the

23   substance of the information, so we would just ask on the

24   record that the defendant waive the public reading, if he

25   chooses, of the information.

1      THE COURT:   Okay.  Sure.

2      So, Mr. Wang, I asked you at the beginning if you had

3  reviewed the information and discussed it with your attorney.

4      Do you waive its public reading?

5      Just so you know, you have a right to have me read it

6  oud loud in court.  Do you waive, or give up, that right such

7  that I won't read it publicly in court?

8      THE DEFENDANT:   Yes, your Honor.

9      THE COURT:   Okay.

10     Do you want to have this oral report with respect to

11  the pretrial services report and then come back into court, or

12  do you want to talk about sealing and then I will make my bail

13  determination.  I think I have to make my bail determination in

14  open court, so I intend to do that.  I could also do it in

15  written fashion.  It can be sealed, but it needs to be public,

16  and then I need to justify the sealing.

17     So do you have a suggestion for the order of events?

18     MR. ROOS:   I think your Honor was inclined to go back

19  now.  That's fine with us.  My colleague just pointed out that

20  I think your Honor maybe has something right after this.

21     THE COURT:   I have something at 12:20.  I have a hard

22  stop, but I am available until 12:15 really.  So I am available

23  for the next half hour.

24     MR. ROOS:   I guess, like, in the interest of maybe

25  just doing everything in the courtroom now, and then we can

1    conclude with whatever in chambers, although if your Honor

2    would prefer another way, that's fine.

3                THE COURT:    That is fine.  But either way we either

4    have to come back in, or you have to submit a letter to me with

5    the bail conditions.

6                MR. ROOS:    Right.  We can come back out then.

7                I think that's fine.

8                THE COURT:    All right.  Why don't we go in my robing

9    room.  Then we will come back, and if there are any, I

10   understand that there's consent on bail, but if anyone would

11   like to say anything on the record with respect to bail, they

12   will do so at that time.

13               All right.

14               (Pages 29 to 32 sealed)

15

16

17

18

19

20

21

22

23

24

25

A000966

1        THE COURT:    Everyone can be seated.

2        So the pretrial services report has been read to me

3   orally as well as to the parties.  I understand from the

4   agreement that the parties have reached an agreement and would

5   like to make that proposal.

6        Do you want to just do so orally now?

7        MR. ROOS:    May I just confer with defense counsel?

8        THE COURT:    Sure.

9        MR. ROOS:    So, your Honor.

10        THE COURT:    On page 4 of the agreement.

11        MR. ROOS:    Correct.  On page 4 is the parties'

12   agreement, $250,000 personal recognizance bond.

13        So, combined, one financially responsible person,

14   travel restricted to the continental United States, the

15   defendant to surrender all travel documents and refrain from

16   making any new applications supervision as directed by pretrial

17   services, and adherence to all other standard conditions of

18   release, which I think are largely the conditions of pretrial

19   services.

20        There's one that I just discussed with defense

21   counsel, which is a proposal of no contact with codefendants or

22   other witnesses.  I think we are fine with the codefendant, no

23   contact with codefendant.  I think for, just based on some of

24   the people in the defendant's life, I think it will be

25   impractical to impose the condition of no contact with other

1  witnesses, so we would ask just that that condition be no

2  contact with codefendants.

3          THE COURT:   Okay.  All right.

4          Again, Mr. Graff, you are all right with adding that

5  condition?

6          MR. GRAFF:   Yes, your Honor.

7          THE COURT:   With respect to codefendants?

8          MR. GRAFF:   Yes, your Honor.

9          THE COURT:   All right.

10          That application is granted.

11          I think, as noted, it's consistent with what was

12  recommended by pretrial services.

13          Among other things, Mr. Wang has strong ties in the

14  community and no criminal history, among other things.  So I am

15  going to grant that request.

16          Now, Mr. Wang, you should understand that if you don't

17  appear for any court proceedings that you are ordered to appear

18  for or for sentencing you could be charged with a separate

19  crime of bail jumping and subject to an additional prison

20  sentence or fine in addition to whatever sentence you do

21  receive.

22          Do you understand that?

23          THE DEFENDANT:   Yes, your Honor.

24          THE COURT:   Okay.  You should also understand that if

25  you violate any condition of your release, a warrant for your

A000968

1    arrest may be issued.  The will lead to revocation of your bail

2    with forfeiture of the bond, the $250,000 bond that is being

3    executed on your behalf, as well as to your being detained and

4    that you could be prosecuted for contempt of Court.

5            Do you understand that?

6            THE DEFENDANT:    Yes, your Honor.

7            THE COURT:    All right.  You should also understand

8    that if you commit any crime while on release, that may lead to

9    a more severe punishment than you would get for committing the

10   same crime and additional time -- at a different time I should

11   say.  In addition, you would be violating the agreement that

12   you signed with the government.

13           Do you understand that?

14           THE DEFENDANT:    Yes, your Honor.

15           THE COURT:    All right.

16           Finally, I will just note that it is a crime to try

17   and influence any juror or witness or any person who may have

18   information about the case or to retaliate against anyone who

19   may have provided information or otherwise attempt to obstruct

20   justice.

21           Do you understand that as well?

22           THE DEFENDANT:    Yes, your Honor.

23           THE COURT:    All right.  Thank you.

24           How long does Mr. Wang have to get the cosigner to

25   sign the bond?

A000969

1          MR. ROOS:   Two weeks.

2          THE COURT:   Okay.  That's fine.

3          Thank you.  All right.

4          So we have discussed bail.  I understand that there is

5    an application to seal today's transcript as well as to delay

6    docketing of the various documents as will as the transcript.

7          MR. ROOS:   That's correct, your Honor.  We submitted a

8    two-page letter dated today to your Honor.  We provided a copy

9    to defense counsel.

10          It asks for the sealing and delayed docketing for

11   today's proceeding until the later of either tomorrow at noon

12   or the presentment of codefendant Samuel Bankman-Fried,

13   whichever is later.

14          THE COURT:   Okay.  All right.

15          MR. ROOS:   At that time it these would all become

16   unsealed.

17          THE COURT:   That application is granted.

18          I will note that there are legitimate law enforcement

19   interests that support an order directing that these filings

20   and docket entries in this case be made under seal for that

21   period of time.  Exposure of any possible cooperation could

22   hinder law enforcement's ability to conduct and continue the

23   ongoing investigation as well as to further law enforcement's

24   other interests in connection with this prosecution.

25          Although there is a qualified right of public access

1    to court documents, the Second Circuit has recognized that

2    documents may be filed under seal to protect, among other

3    things, ongoing law enforcement efforts.  *See United States v.*

4    *Cojab* and *Haller*.

5              The Second Circuit has also recognized that even

6    docketing the applications to seal can be prejudicial, and in

7    such cases the applications themselves and related notes to the

8    docket could be sealed.  *See United States v. Alcantara*.

9              I am going to ask you to reach out to my chambers as

10   soon as these documents can be unsealed by way of letter, and

11   we will do so promptly.

12             Are there any other applications at this time?

13             MR. ROOS:    Not from the government, your Honor.

14             MR. GRAFF:    Nor from the defense.  Thank you, Judge.

15             THE COURT:    Thank you.  We are adjourned.

16             (Adjourned)

17

18

19

20

21

22

23

24

25

A000971

N2SZZSINP-DC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      22 Cr. 673 (LAK)

NISHAD SINGH,

                                  Plea
          Defendant.

------------------------------x

                                New York, N.Y.
                                February 28, 2023
                                11:20 a.m.

Before:

                       HON. LEWIS A. KAPLAN,

                                  District Judge

                      APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
DANIELLE SASSOON
NICOLAS ROOS
ANDREW ROHRBACH
SAMUEL RAYMOND
    Assistant United States Attorneys

COOLEY LLP
    Attorneys for Defendant
BY:  ANDREW GOLDSTEIN
    RUSSELL CAPONE

Also Present:

KRISTIN ALLAIN, FBI
LUKE BOOTH, FBI

A000972

N2SZZSINP-DC

1          (Case called; appearances noted)

2          THE COURT:  Good morning.  I understand that your

3    client wishes to waive indictment and enter a plea; is that

4    right?

5          MR. GOLDSTEIN:  That's correct, Judge Kaplan.

6          THE COURT:  Okay.  Andy, please swear the defendant.

7          (Defendant sworn)

8          THE COURT:  Mr. Singh, I understand you want to enter

9    a plea of guilty; is that correct?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Before I accept your plea, I'm going to

12    ask you some questions to establish to my satisfaction that you

13    are pleading guilty because you are guilty and not for some

14    other reason.  If you don't understand anything I ask or you

15    have a desire, at any point, to talk to your attorney, just let

16    me know, and we will take care of whatever the problem is.  All

17    right?

18          THE DEFENDANT:  Understood.

19          THE COURT:  OK.  I take it you were born in the United

20    States, and that English is your first language; is that right?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  OK.  Do you understand that you are now

23    under oath, and that if you answer any of my questions falsely,

24    your answers later could be used against you in a further

25    prosecution for perjury or making a false statement?

A000973

N2SZZSINP-DC

1          THE DEFENDANT:  Yes.

2          THE COURT:  How old are you?

3          THE DEFENDANT:  Old, you said?

4          THE COURT:  Yes.

5          THE DEFENDANT:  27 years old.

6          THE COURT:  How far did you go in school?

7          THE DEFENDANT:  I got a bachelor's degree.

8          THE COURT:  Are you under the care of a doctor or a

9   mental health professional at this point?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Let me narrow it then.

12          Are you under the care of a mental health

13   professional?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  And what sort of a mental health

16   professional?

17          THE DEFENDANT:  A psychiatrist.

18          THE COURT:  And for what malady?

19          THE DEFENDANT:  Anxiety and depression.

20          THE COURT:  All right.  Have you been hospitalized in

21   the past for mental illness?

22          THE DEFENDANT:  No.

23          THE COURT:  Have you had any medicine, pills,

24   narcotics, or alcohol in the last 24 hours?

25          THE DEFENDANT:  I've had anxiety and depression

A000974

N2SZZSINP-DC

1   medication.

2          THE COURT:  And what have you had in the last 24

3   hours?

4          THE DEFENDANT:  Clonopin and Lexapro for anxiety and

5   depression.

6          THE COURT:  And do either of those drugs or the

7   combination of those drugs interfere with your ability to

8   engage in rational thought?

9          THE DEFENDANT:  No, they do not.

10         THE COURT:  Is your mind clear this morning?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Do either counsel have any doubt as to the

13   defendant's competence to plead.

14         Ms. Sassoon?

15         MS. SASSOON:  Government does not, your Honor.

16         THE COURT:  Sir?

17         MR. GOLDSTEIN:  We do not, your Honor.

18         THE COURT:  On the basis of Mr. Singh's responses to

19   my questions, I find that he is fully capable to enter an

20   informed plea.

21         Now, Mr. Singh, do you understand that you are

22   entitled under the constitution to be charged with a federal

23   crime of this nature only on the basis of an indictment

24   returned by a grand jury, but that you waived that right and

25   agreed to be charged on the basis only of an information signed

A000975

N2SZZSINP-DC

1    by the United States Attorney?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  You should find before you a document

4    marked as Court Exhibit A, which I understand to be the waiver

5    of indictment.

6            Did you sign that document?

7            THE DEFENDANT:  Yes, your Honor.

8            THE COURT:  Did you read it before you signed it?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Did you discuss its implications fully

11   with your attorneys?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Did you knowingly and voluntarily waive

14   your right to be prosecuted only on the basis of a grand jury

15   inditement?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Have you had an adequate opportunity to

18   discuss the case with your lawyers?

19           THE DEFENDANT:  Yes.

20           THE COURT:  And are you satisfied with your lawyers

21   and their representation of you?

22           THE DEFENDANT:  Yes.

23           THE COURT:  I'm now going to describe your rights

24   under the constitution and laws.  Please listen carefully, I'm

25   going to ask at the end whether you understood everything I

A000976

N2SZZSINP-DC

1   said.

2          You're entitled to a speedy and public trial by jury

3   on the charges contained in the information against you.  If

4   there were a trial, you would be presumed innocent and the

5   government would be obliged to prove you guilty by competent

6   evidence and beyond a reasonable doubt before you could be

7   found guilty.  You would not have to prove that you're

8   innocent.  You would be entitled to be represented by a lawyer

9   at every stage of your case.  If you couldn't afford a lawyer,

10  a lawyer would be provided for you at public expense.  The

11  government would have to bring its witnesses into court to

12  testify in your presence.  Your lawyer could cross examine the

13  government's witnesses.  Your lawyer could object to evidence

14  offered by the government, and your lawyer also could offer

15  evidence in your defense.  You would have the right to the

16  issuance of subpoenas, which are a form of compulsory process

17  issued by the Court to compel the attendance of witnesses to

18  testify in your defense.  You would have the right to testify,

19  if you chose to do so.  You would also have the right not to

20  testify.  And if you elected not to testify no inference of

21  guilt could be drawn from that fact.

22          You have the right to enter a plea of not guilty even

23  now.  But if you plead guilty, and I accept the plea, there

24  will be no further trial of any kind.  You will waive your

25  right to a trial and all the other rights that I just

A000977

N2SZZSINP-DC

1  mentioned.  I'll enter a judgment of guilty and sentence you on

2  the basis of your guilty plea after I consider a presentence

3  report.

4          You'll also have to waive your right not to

5  incriminate yourself because I'm going to ask you questions

6  about what you did in order to satisfy myself that you are

7  guilty as charged.

8          Do you understand what I said so far?

9          THE DEFENDANT:  Yes, your Honor, I understand.

10          THE COURT:  Have you received a copy of the

11  information that contains the written charges against you?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Have you discussed it fully with your

14  attorneys?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Have you discussed the charges in the

17  information to which you intend to plead guilty with your

18  counsel?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Do you understand that you are charged in

21  Count One of the information with conspiracy to commit wire

22  fraud on customers of FTX in violation of 18 U.S. Code 1349.

23          Do you understand that's the charge in Count One?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Ms. Sassoon, please state the elements of

A000978

1    the charge.

2              MS. SASSOON:  Yes, your Honor.

3              Count One charges the defendant with conspiracy to

4    commit wire fraud, as you noted, in violation of 18 U.S.C.

5    Section 1349.  There are two elements:

6              First, the existence of the conspiracy to commit wire

7    fraud;

8              And, second, that the defendant knowingly and

9    willfully became a member of and joined in the conspiracy.

10             The crime of wire fraud, which is both the object of

11   Count One and the offense charged in Count Two, which is

12   substantive wire fraud under 18 U.S.C. Section 1343, has three

13   elements, which I can describe now.

14             THE COURT:  Please.

15             MS. SASSOON:  First, there is a scheme or artifice to

16   defraud or to obtain money or property by materially false and

17   fraudulent pretenses, representations or promises;

18             Second, that the defendant knowingly participated in

19   the scheme or artifice to defraud with knowledge of its

20   fraudulent nature and with specific intent to defraud, or that

21   he knowingly and intentionally aided and abetted others in the

22   scheme.

23             And, third, that the execution of that scheme the

24   defendant used or caused the use of interstate or international

25   wires.  "Wires" referring to the use of telephone, text

A000979

1    message, emails and also refers to wire transfer of funds.

2            With respect to that count and all others in the

3    information, if the case proceeded to trial, the government

4    would also have to prove venue by a preponderance of the

5    evidence.  Although, any defense based on venue is based in the

6    plea agreement here.

7            THE COURT:  Thank you.

8            Mr. Singh, do you understand that in order to convict

9    you on Count One, the government would have to prove the two

10   elements that Ms. Sassoon described to you beyond a reasonable

11   doubt, and but for your waiver of venue would have had to prove

12   the propriety of that count being brought in this court by a

13   preponderance of the evidence.

14           Do you understand those elements?

15           THE DEFENDANT:  I understand.

16           THE COURT:  And do you understand the government's

17   burden of proof, as I just described it to you, with respect to

18   those elements?

19           THE DEFENDANT:  Yes, your Honor.

20           THE COURT:  Do you understand that the maximum

21   possible penalty for Count One is 20 years' imprisonment.  The

22   greater of a fine of $250,000, or twice the gross gain, or

23   twice the gross loss, plus an order of restitution, a mandatory

24   special assessment of $100, a term of supervised release of

25   three years.  And if you were released on supervised release,

A000980

N2SZZSINP-DC

1   and found to have violated the terms thereof, you could be

2   sentenced to an additional prison term of two years without

3   credit for any time served on release.

4           Do you understand that?

5           THE DEFENDANT:  I understand.

6           THE COURT:  Ms. Sassoon, I accurately stated the

7   consequences of a violation of supervised release, did I?

8           MS. SASSOON:  Yes, your Honor.

9           THE COURT:  Thank you.

10          Now, do you understand that you are charged in

11  Count Two of the information with the substantive crime of wire

12  fraud on customers of FTX and aiding and abetting the same in

13  violation of 18 U.S. Code 1343 and 2.  And I point out this is

14  the substantive crime of wire fraud as opposed to a conspiracy

15  to commit wire fraud; that is the subject of Count One.

16          Do you understand that's the charge in Count Two?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Ms. Sassoon already stated the three

19  elements of the substantive crime of wire fraud.

20          Do you understand the elements of that charge as

21  stated a moment ago by the government?

22          THE DEFENDANT:  I do.

23          THE COURT:  And once again, as on all of the counts of

24  this indictment, do you understand that to convict you on

25  Count Two, the government would have to prove those three

A000981

N2SZZSINP-DC

1   elements beyond a reasonable doubt?

2                THE DEFENDANT:  Yes.

3                THE COURT:  And do you understand that the maximum

4   possible penalty for the substantive crime of wire fraud is

5   exactly the same as that on Count One?

6                THE DEFENDANT:  Yes, your Honor, I understand.

7                THE COURT:  Do you understand that you are charged in

8   Count Three with conspiracy to commit commodities fraud?

9                THE DEFENDANT:  Yes.

10               THE COURT:  At this time, I'll ask Ms. Sassoon to

11   state the elements of conspiracy to commit wire fraud.

12               MS. SASSOON:  Thank you, your Honor.  And I appreciate

13   this has been broken up because it's a lot of elements.

14               THE COURT:  Yes.

15               MS. SASSOON:  So Count Three charges the defendant

16   with participating in an illegal conspiracy in violation of

17   18 U.S.C. Section 371.  And I'll note that Counts Four and Six

18   likewise charge conspiracies under that statute, although with

19   different objects.  Conspiracy under the offense clause 371 has

20   three elements:

21               First, that two or more persons entered the unlawful

22   agreement charged in the specific count of the information;

23               Second, that the defendant knowingly and willfully

24   became a member of that alleged conspiracy;

25               And, third, that one of the members of the conspiracy

A000982

N2SZZSINP-DC

1    knowingly committed at least one overt act in furtherance of

2    the conspiracy.

3            The object of the conspiracy charged in Count Three,

4    as your Honor noted, is commodities fraud.  In violation of

5    Title 7, United States Code, Sections 9, 1, and 13(a)(5) and

6    Title 17 CFR section 180.1.

7            There are three elements to this crime:

8            First, in connection with any swap or contract of sale

9    of any commodity or interstate commerce or contract for future

10   delivery to on or subject the rules of any registered entity.

11           And, second, the defendant or any of his

12   coconspirators did anyone or more of the following:

13           A, employed or attempted to use or employ a

14   manipulative, device, scheme or artifice to defraud.

15           B, made or attempted to make an untrue or misleading

16   statement of a material fact or omitted to state a material

17   fact necessary to make the statements made not untrue or

18   misleading;

19           Or C, engaged or attempted to engage in an act,

20   practice, or course of business that operated or would operate

21   as a fraud or deceit upon any person;

22           And, third, that the defendant acted knowingly,

23   willfully and with the intent to defraud.

24           THE COURT:  Thank you.

25           Do you understand, Mr. Singh, the elements of the

A000983

N2SZZSINP-DC

1    charge of conspiracy to commit commodities fraud as

2    distinguished from the substantive offense of commodities

3    fraud?

4              THE DEFENDANT:  I do.

5              THE COURT:  And do you understand that to convict you

6    on this charge, the government would have to prove the elements

7    of conspiracy to commit wire fraud beyond a reasonable doubt?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  Do you understand that the maximum

10   possible penalty in the event of conviction on Count Three

11   would be five years' imprisonment, plus a fine, restitution, a

12   mandatory special assessment, and a term of supervised release,

13   all identical to those on Count One?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you understand that you are charged in

16   Count Four of the information with conspiracy to commit

17   securities fraud?

18             THE DEFENDANT:  Yes.

19             THE COURT:  I'll ask Ms. Sassoon to state the elements

20   of that crime.

21             MS. SASSOON:  Yes.  So I already noted the elements of

22   a conspiracy under Section 371.  So I'll now turn to the object

23   of the conspiracy charge in Count Four, which is securities

24   fraud in violation of Title 15, United States Code, Section

25   78j(b) and 78ff, and Title 17 CFR, Section 240.10b-5.  There

A000984

N2SZZSINP-DC

1    are three elements of securities fraud:

2          First, is that in connection with the purchase or sale

3    of securities, the defendant either employed a device, scheme,

4    or artifice to defraud, or made an untrue statement of a

5    material fact or omitted to state a material fact which made

6    what was said under the circumstances misleading, or engaged in

7    an act, practice, or course of business that operated or would

8    operate as a fraud or deceit upon a purchaser or seller;

9          Second, that the defendant acted knowingly, willfully,

10   and with intent to defraud.

11         And, third, that the defendant knowingly used or

12   caused to be used any means or instruments of transportation or

13   communication in interstate commerce or the use of the mails in

14   furtherance of the fraudulent conduct.

15         THE COURT:  Thank you.

16         Mr. Singh, do you understand the elements of the

17   charge of conspiracy to commit wire fraud?

18         THE DEFENDANT:  Yes, I do.

19         THE COURT:  And do you understand that to convict you

20   on that count, the government would have to prove each of those

21   elements beyond a reasonable doubt?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Do you understand that the maximum

24   possible penalty in the event of conviction on Count Four is

25   exactly the same as on Count Three?

A000985

N2SZZSINP-DC

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  Do you understand that you are charged in

3     Count Five with conspiracy to commit money laundering?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Ms. Sassoon?

6          MS. SASSOON:  Count Five charges the defendant, as

7     your Honor noted, with conspiracy to commit money laundering in

8     violation of 18 U.S.C. Section 1956(h) money laundering

9     conspiracy are:

10         First, that two or more people entered into an

11    unlawful agreement to commit money laundering;

12         And, second, that the defendant knowingly and

13    willfully entered into the agreement.

14         Count Five charges that there were two objects of the

15    conspiracy:

16         One, concealment of money laundering;

17         And, two, spending money laundering;

18         For the first object, concealment money laundering,

19    there are three elements:

20         First, that the defendant conducted or attempted to

21    conduct a financial transaction which must, in some way or

22    degree, have affected interstate or foreign commerce;

23         Second, that the financial transaction at issue

24    involved the proceeds of specified unlawful activity, which

25    here is the proceeds of the wire fraud scheme charged in Count

A000986

1    Two;

2          Third, that the defendant knew that the financial

3    transaction involved the proceeds of some form of unlawful

4    activity, and that the defendant knew that the transaction was

5    designed in or in part either to disguise the nature and

6    location, source, ownership, or control of the proceeds of the

7    unlawful activity.  So I think that's actually four elements,

8    your Honor.

9          The second object of Count Five is engaging in a

10   monetary transaction of over $10,000 in property derived from

11   specified unlawful activity.  The elements of this object are:

12         First, that the defendant engaged in a monetary

13   transaction in or affecting interstate commerce;

14         Second, that the monetary transaction involved

15   criminally derived profit of a value greater than $10,000.

16         And, third, that the property was derived from

17   specified unlawful activity; again, here, wire fraud proceeds

18   from the scheme alleged in Count Two.

19         Finally, that the defendant acted knowing that the

20   transaction involved proceeds of the criminal offense, and that

21   the transaction took place in the United States.

22         THE COURT:  Thank you.

23         Did you understand, Mr. Singh, the elements of this

24   charge as stated by the government?

25         THE DEFENDANT:  Yes, your Honor.

A000987

N2SZZSINP-DC

1          THE COURT:  Do you understand that to convict you on

2     this charge, the government would have to prove each of those

3     elements beyond a reasonable doubt?  Subject to this caveat, to

4     the extent that there is a charge of conspiracy, the government

5     would have to prove beyond a reasonable doubt only one of the

6     alleged objects of the conspiracy rather than all.

7          Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand that the maximum

10    possible penalty of this crime is the same as on Count One?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Do you understand that you are charged in

13    Count Six with conspiracy to defraud the United States and

14    willfully violate the Federal Election Campaign Act?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Ms. Sassoon?

17         MS. SASSOON:  Yes.  Thank you, your Honor.

18         And I believe just with respect to Count Five the fine

19    provision is slightly different than for the other charge as

20    noted in the plea agreement.

21         THE COURT:  OK.  Please enlighten us.

22         MS. SASSOON:  A maximum fine pursuant to 18 U.S.C.

23    Section 1956(a)(1)(B), the greatest of $500,000, or twice the

24    value of the property involved in the transaction.

25         THE COURT:  Thank you.  I stand corrected.

A000988

N2SZZSINP-DC

1          Mr. Singh, did you understand that what was just said?

2          THE DEFENDANT:  I understand.

3          THE COURT:  All right.

4          MS. SASSOON:  Turning now to Count Six of the

5    information, it charges the defendant with another conspiracy

6    under 18 U.S.C. Section 371, whose elements I previously

7    delineated.  The object of this conspiracy is conspiring to

8    violate the Federal Election Campaign Act and to defraud the

9    Federal Election Commission.  So I'll walk through those

10   objects now.

11         The first object is the object of making a political

12   contribution in the name of another person in violation of

13   Section 30122 of Title 15 of the United States Code.  The

14   elements of that offense are:

15         One, making one or more contributions;

16         Two, in the name or names of one or more persons other

17   than the true source of the funds.

18         Three, with the aggregate amount of such contribution

19   being $25,000 or more in a calendar year;

20         And, four, doing so knowingly and willfully.

21         The second object of the conspiracy is making a

22   political contribution from a corporation.  Under the federal

23   election laws, corporations are prohibited from making direct

24   contributions to political candidates.  It is unlawful for any

25   corporation to make such a contribution in violation of

A000989

N2SZZSINP-DC

1   Section 30118 of Title 15 of the United States Code.  The

2   elements of this object are:

3          One, making one or more contributions to candidates.

4          Two, via corporation.

5          Three, with the aggregate amount of such contribution

6   being $25,000 or more in a calendar year.

7          And, four, that it was done knowingly and willfully.

8          The final object is a conspiracy to defraud the

9   Federal Election Commission.  The elements are 12 or more

10  persons agreed to impair, impede, obstruct or defeat by

11  fraudulent or dishonest means the lawful, regulatory and/or

12  enforcement function of an agency.

13         And, two, the defendant knowingly became a member of

14  that conspiracy.

15         And, three, an overt act in furtherance of that

16  conspiracy was committed.

17         THE COURT:  Thank you.

18         Mr. Singh, do you understand the elements of the

19  charges just stated by the government?

20         THE DEFENDANT:  I do.

21         THE COURT:  Do you understand that to convict you on

22  this count, the government would have to prove each of those

23  essential elements beyond a reasonable doubt, but subject also

24  to the same qualification I indicated to you with respect to

25  the previous count, namely, that they need to prove only one of

A000990

N2SZZSINP-DC

1    the several alleged objects of the alleged conspiracy?

2             THE DEFENDANT:  Yes, understood.

3             THE COURT:  Do you understand that the maximum

4    possible penalty for Count Six is the same as on Count Three?

5             THE DEFENDANT:  Yes, understood.

6             THE COURT:  Do you understand that you will be

7    sentenced on each of these six counts?

8             THE DEFENDANT:  Yes.

9             THE COURT:  Do you understand that the sentences could

10   be imposed either concurrently or consecutively, and that if

11   you were sentenced to the statutory maximum on each of the six

12   counts, the term of imprisonment would be the total of the

13   terms imposed on each of the six counts?

14            THE DEFENDANT:  Yes, I understand.

15            THE COURT:  So that if the sentences were imposed

16   consecutively and the sentences were the maximum term of

17   imprisonment, you could actually be imprisoned under a sentence

18   calling for 75 years in jail?

19            THE DEFENDANT:  I understand.

20            THE COURT:  Do you understand that if you enter a plea

21   of guilty, you've agreed to forfeit to the United States any

22   money or property you received or gained as a result of the

23   offenses charged in the indictment or that were used to commit

24   the offenses?

25            THE DEFENDANT:  Yes, I understand.

A000991

N2SZZSINP-DC

```
 1              THE COURT:  The forfeiture order has been signed, has
 2   it?
 3              MS. SASSOON:  Yes, your Honor.
 4              THE COURT:  All right.  Andy, do we have that marked?
 5              THE DEPUTY CLERK:  I did not mark it.
 6              THE COURT:  You did not mark it?
 7              THE DEPUTY CLERK:  I believe it's up there.
 8              THE COURT:  Let's mark one of them as Court Exhibit C.
 9              THE DEPUTY CLERK:  Should this go before the
10   defendant?
11              THE COURT:  Yes, please.
12              Mr. Singh, the clerk has placed before you a document
13   marked Court Exhibit C.
14              Is that your signature on the last page?
15              THE DEFENDANT:  Yes, your Honor.
16              THE COURT:  Did you read it before you signed it?
17              THE DEFENDANT:  Yes.
18              THE COURT:  Did you have the advice of counsel before
19   you signed it?
20              THE DEFENDANT:  Yes.
21              THE COURT:  And are you satisfied with the advice you
22   received from your counsel?
23              THE DEFENDANT:  Yes.
24              THE COURT:  And did you sign it voluntarily and
25   knowingly?
```

A000992

N2SZZSINP-DC

1          THE DEFENDANT:  I did.

2          THE COURT:  Do you know its terms?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Ms. Sassoon, do you have any need to go

5     any farther with that?

6          MS. SASSOON:  No.  Thank you, your Honor.

7          THE COURT:  OK.  I'm now going to describe the

8     sentencing process, Mr. Singh.  I'm sure that Mr. Capone and

9     Mr. Goldstein have done that already, but it's my job to do it

10    as well.

11         The law requires that you be sentenced in accord with

12    the Sentencing Reform Act and that I take into account the

13    United States Sentencing Guidelines.  The sentencing guides, in

14    turn, require that I take into account the actual conduct in

15    which you've engaged, which may be more extensive than what's

16    charged in the information, that I consider the victim or

17    victims of your offense, if there were any, the role that you

18    played, whether you engaged in any obstruction of justice, and

19    whether you've accepted responsibility for your actions, and

20    your criminal history, if you have one.  The guidelines provide

21    for the computation of a range of a minimum and a maximum

22    months of imprisonment.  You may be sentenced within that

23    guideline range.  The Court must consider the guideline range

24    and various other factors enumerated in the guidelines and in

25    the Sentencing Reform Act as well as factors articulated in

A000993

N2SZZSINP-DC

1   Section 3553 of Title 18 of the U.S Code.  But the Court is not

2   obliged to follow the sentencing guidelines.  The only thing

3   you can be sure of about the sentence in your case is that I

4   can't sentence you to something more severe than the statutory

5   maximum that I just explained to you a few minutes ago.

6           Do you understand that?

7           THE DEFENDANT:  I understand, your Honor.

8           THE COURT:  The probation department will be preparing

9   a written report setting forth the results of an investigation

10  that will conduct into your background and into the offenses to

11  which you are pleading guilty.  It's only after it does that

12  that the probation office will state its view as to what they

13  think the applicable sentencing guideline range should be.  The

14  Court isn't bound by the probation department's view either.

15          Now, I understand you entered into a plea agreement.

16  And we're going to discuss that in a little more detail in a

17  minute.

18          Do you have it in front of you?  It's marked as Court

19  Exhibit B?

20          THE DEFENDANT:  Oh, I do have it in front of me.

21          THE COURT:  And does it bear your signature?

22          THE DEFENDANT:  Yes, it does, your Honor.

23          THE COURT:  And did you read it carefully before you

24  signed it?

25          THE DEFENDANT:  Yes.

A000994

N2SZZSINP-DC

1          THE COURT:  Did you discuss it fully with your

2    attorneys before you signed it?

3          THE DEFENDANT:  I did.

4          THE COURT:  Do you have any unanswered questions about

5    it?

6          THE DEFENDANT:  I do not.

7          THE COURT:  For all the reasons I just articulated to

8    you, it's impossible to say for certain what your guideline

9    range will be or what sentence will be imposed.  If anyone has

10   tried to predict either one of those things to you, whatever

11   prediction you heard may be wrong.  Whoever made the prediction

12   may not have all the information that the Court will have when

13   you are sentenced.  The only thing, just to repeat, that you

14   can be sure of is that the sentence can't be more than the

15   statutory maximum.

16         I know you stated earlier that you were a born in the

17   United States and therefore are a citizen.  I'm obliged it

18   advise you that if you are not a U.S. citizen, a finding that

19   you are guilty of a felony may have a negative impact on your

20   immigration status and any application you may have in the

21   future for permission to remain in the United States or become

22   a citizen.  You may be subject to an order of deportation or

23   removal as a result of this guilty plea if are you not a U.S.

24   citizen.

25         Do you understand that?

A000995

N2SZZSINP-DC

1            THE DEFENDANT:  Yes, your Honor.  I understand.

2            THE COURT:  OK.  It's important that you understand

3    also that you won't be able to withdraw your guilty plea on the

4    ground that any prediction you may have heard about the

5    guideline range or the sentence turns out to be incorrect.

6            Do you understand that?

7            THE DEFENDANT:  I understand.

8            THE COURT:  Do you understand anything -- everything I

9    said?

10            THE DEFENDANT:  Yes.

11            THE COURT:  Maybe I should ask whether you understood

12    anything I said.

13            THE DEFENDANT:  Yes, to both.

14            THE COURT:  But I have no doubt in your case that you

15    understood every word of it.

16            Has anyone offered you any inducements or threatened

17    you or anyone else or forced you in way to plead guilty?

18            THE DEFENDANT:  No.

19            THE COURT:  Now, we already talked about the plea

20    agreement.  Has anyone made any promises to you other than what

21    whatever is set forth in that document that induced you to

22    plead guilty?

23            THE DEFENDANT:  No, your Honor.

24            THE COURT:  Has anyone made any promises or assurances

25    to you as to what your sentence will be?

A000996

N2SZZSINP-DC

1      THE DEFENDANT:  No, your Honor.

2      THE COURT:  OK.  Now, there are a couple of other

3  technicalities that need to be complied with.  Before we go on

4  to the next part of this proceeding, I direct the prosecution,

5  once again, to comply with its obligations under *Brady v.*

6  *Maryland* and its progeny to disclose to the defense all

7  information, whether admissible or not, that is favorable to

8  the defendant, material either to guilt or to punishment and

9  known to the prosecution.  Possible consequences of

10  noncompliance may include dismissal of individual charges, or

11  the entire case, exclusion of evidence, and professional

12  discipline, or court sanctions on the attorneys responsible.  I

13  will be preparing another written order, once again, describing

14  all of this and the possible consequences of failing to meet

15  it.  And, once again, I direct the prosecution to review and

16  comply with that order.

17      Does the prosecution, again, confirm that it

18  understands its obligations and will comply with them?

19      MS. SASSOON:  Yes, your Honor.  The government

20  understood its obligation.

21      I would just note on the bottom of page 5 into page 6

22  of the agreement is a paragraph of about the defendant choosing

23  not to request discovery material and understanding that if he

24  had not entered a plea of the guilty, the government would be

25  required to produce Rule 16 material and further be required to

A000997

N2SZZSINP-DC

1    produce material pursuant to *Brady* and Rule 5(f) and, if the

2    defendant proceeded to trial, impeachment material under

3    *Giglio*.

4              THE COURT:  Do you understand what counsel just read

5    to you?

6              THE DEFENDANT:  Yes, I understand.

7              THE COURT:  Thank you.  And you understood it when you

8    signed the plea agreement?

9              THE DEFENDANT:  Yes, I did.

10             THE COURT:  OK.  Now, we need to go through the

11   charges.

12             Did you, as charged in Count One of the information,

13   conspire with one or more other persons to commit wire fraud on

14   customers of FTX?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Please tell me, in your own words, what

17   you did, that in your mind, makes you guilty of that offense.

18             MR. GOLDSTEIN:  Your Honor, Mr. Singh prepared an

19   allocution that groups the facts of Counts One through Four

20   together and then Counts Five and Six together.  Could he

21   proceed in that way?

22             THE COURT:  We could do it that way.  Just let me

23   cover the other three counts.

24             Did you, as charged in Count Two of the information,

25   commit the substantive crime of wire fraud on customers of FTX

N2SZZSINP-DC

1    or aid and abet in doing so?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Did, you as charged in Count Three of the

4    information, conspire to commit commodities fraud?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Did you, as charged in Count Four of the

7    information, conspire to commit securities fraud?

8              THE DEFENDANT:  Yes.

9              THE COURT:  All right.  Now, tell me what you did

10   that, in your mind, makes you guilty of all four offenses those

11   charged in Counts One through Four.

12             THE DEFENDANT:  In 2017, I began working at Alameda

13   Research as an engineer.  In 2019, at the request of Sam

14   Bankman-Fried and Gary Wang, I moved from Alameda to FTX and

15   similarly began working as an engineer.  Eventually, I became

16   the head of engineering at FTX, where I was responsible for

17   coding, other aspects of FTX's platform, and managing junior

18   members of the engineering team.

19             By mid-2022, I understood that Alameda was borrowing

20   funds from FTX that belonged to other customers.  I understood

21   that customers were not aware of this, and had not consented to

22   such borrowing.

23             In June of 2022, I participated in an effort to more

24   precisely track the amount of customer money that Alameda had

25   borrowed from FTX and confirmed that it was several billion

A000999

1  dollars' worth.

2          By early September 2022, I came to understand that

3  Alameda could not repay what it owed.  I knew that Sam

4  Bankman-Fried then tried to raise additional funds from

5  investors, and I understood that investors would not have been

6  told the full truth about FTX's financial condition.

7          In addition, despite understanding at that point, that

8  Alameda was in substantial debt to FTX customers, in my role as

9  a member of the leadership team, I agreed to certain

10  expenditures that originated with Alameda funds, and were,

11  therefore effectively coming from FTX customer money.  This

12  involved electronic messages and other wire communications.

13          In addition, at Sam Bankman-Fried's direction, I took

14  actions to make it appear that FTX's revenues were higher than

15  what they were.

16          In 2022, I provided that misleading information to

17  auditors.  I understood that that information would be used by

18  Sam Bankman-Fried and others in attempting to raise or in

19  raising funds from investors.

20          I knew at that time that I participated in each of

21  these events that my conduct was wrong.

22          THE COURT:  All right.  I have a couple of questions.

23          You said a few moments ago that in 2022 you came to

24  understand that investors would not have been told various

25  things in connection with the raising of additional capital.

A001000

N2SZZSINP-DC

1   Did I understand you correctly?

2           THE DEFENDANT:  That's correct.

3           THE COURT:  How did you come to understand that?

4           THE DEFENDANT:  I -- can I have one movement to --

5           (Defendant conferred with counsel)

6           THE COURT:  Please.

7           THE DEFENDANT:  Your Honor, I knew that Sam was

8   attempting to raise from investors.  I knew that affirmatively.

9   I had the strong belief that he would not share FTX's full

10  financial condition with them.

11          THE COURT:  Well, how did you come to have that

12  belief?

13          THE DEFENDANT:  From discussions with Sam.

14          THE COURT:  So is that something he told you?

15          THE DEFENDANT:  Not explicitly, your Honor.  But I

16  understood it implicitly that he would not share FTX's full

17  financial condition.

18          THE COURT:  All right.

19          And near the end of your prepared statement, you

20  indicated and possibly you can read it, again, it must have

21  been the last paragraph.

22          THE DEFENDANT:  Sure, your Honor.

23          At Sam Bankman-Fried's direction, I took actions to

24  make it appear that FTX's revenues were higher than they were.

25  In 2022, I provided that misleading information to auditors.  I

A001001

N2SZZSINP-DC

1    understood that the information would be used by Sam

2    Bankman-Fried and others in raising or attempting to raise

3    funds from investors.

4              THE COURT:  OK.  How did you come to have that

5    understanding.

6              THE DEFENDANT:  I understood this information made its

7    way into the financials like, the formal GAAP audited

8    financials.  And that those were part of what was provided to

9    prospective investors.

10             THE COURT:  And how did you know they were provided to

11   investors?

12             THE DEFENDANT:  I think I had that general

13   understanding from overhearing conversations at FTX about what

14   information was provided to investors.

15             THE COURT:  Conversations with whom?

16             THE DEFENDANT:  With Sam Bankman-Fried and others.

17             THE COURT:  All right.  Is the allocution on those

18   counts satisfactory to the government?

19             MS. SASSOON:  Yes, your Honor, if I may, I will

20   provide a proffer on some jurisdictional --

21             THE COURT:  I was going to ask you that next.

22             MS. SASSOON:  There was mention of wire

23   communications, but I just wanted to proffer that for Counts

24   One and Two, which were the wire fraud counts, wires in the

25   form of Slack communications, customer wire transfer deposits

A001002

N2SZZSINP-DC

1    and other bank wires went through the Southern District of New

2    York in connection with these crimes.  For Count Three,

3    commodities fraud, the government would prove that FTX.com

4    permitted trading of crypto derivates, such as future

5    contracts, which would constitute commodities under the

6    statute.  And for Count Four, securities fraud, the government

7    would prove that equity investors in FTX would receive stock,

8    which constitute a security under the relevant statute.

9              THE COURT:  Thank you.

10             Mr. Singh, do you agree with what Ms. Sassoon said?

11             THE DEFENDANT:  I do.

12             THE COURT:  OK.  Now, let's go to Count Five.

13             THE DEFENDANT:  This is the campaign finance charge.

14             THE COURT:  Well, you're getting ahead of me.  I'm

15   sure you are a smart fellow, but let me get there first.

16             Did you, as charged in Count Five, conspire to commit

17   money laundering?

18             THE DEFENDANT:  Yes.

19             THE COURT:  All right.  What did you do that, in your

20   mind makes you guilty of money laundering conspiracy?

21             MR. GOLDSTEIN:  Just, again, your Honor, his

22   allocution --

23             THE COURT:  You want to take both counts together?

24             MR. GOLDSTEIN:  Yes.

25             THE COURT:  Did you, as charged in Count Six, conspire

A001003

N2SZZSINP-DC

1   to defraud the United States and willfully to violate the

2   Federal Election Campaign Act?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Please tell me, in your own words, what it

5   is you did that, in your mind, makes you guilty of the crimes

6   charged in Counts Five and Six.

7          THE DEFENDANT:  In 2022, I agreed with others at FTX

8   and Alameda to make political donations in my name that were

9   funded in part by transfers from Alameda.  Although I agreed

10  politically with many of the donations, I did not select the

11  candidates and the political action committees who received the

12  donations.  And I understood that the donations were in part

13  for the benefit of Sam Bankman-Fried and FTX and their ability

14  to be politically influential.

15          I also understood that any reporting of the donations

16  would conceal that the money came from Alameda.  And I knew at

17  that time that Alameda money had to be coming, effectively,

18  from FTX customer funds.

19          I knew that this misleading information about the

20  campaign donations, that said that I made the donations, would

21  be reported by the government.  And at the time I was not sure

22  whether my conduct was unlawful because I wasn't familiar with

23  the campaign finance rules, but I knew my conduct was wrong.

24  And I chose not to ask questions that would have made it clear

25  that facilitating these donations was unlawful.

A001004

N2SZZSINP-DC

1          THE COURT:  Did you understand that there was a

2    substantial risk that what you did was prohibited by law?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  And did you consciously act to avoid

5    learning whether, in fact, it violated the law or not?

6          THE DEFENDANT:  May I have one moment to discuss with

7    counsel?

8          THE COURT:  Please.

9          (Defendant conferred with counsel)

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Is the allocution satisfactory to the

12    government?

13          MS. SASSOON:  Yes, your Honor.

14          And with respect to Count Five, the money laundering

15    charge, the government would prove that wire transfers occurred

16    within the Southern District of New York.

17          THE COURT:  Thank you.

18          Do you agree with what Ms. Sassoon just said?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  OK.  How do you now plead to the charges

21    in Counts One through Six, guilty or not guilty?

22          THE DEFENDANT:  I plead guilty.

23          And, your Honor, I'm unbelievably sorry for my role in

24    all of this and the harm that it's caused.  I'm hoping that in

25    accepting responsibility, assisting the government, and

A001005

N2SZZSINP-DC

1    forfeiting assets, I can begin to make it right.

2              THE COURT:  Thank you.

3              Are you pleading guilty because you, in fact, are

4    guilty of those crimes.

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  OK.  You may be seated.

7              I will accept the plea of guilty.  A judgment of

8    guilty will enter.  The defendant acknowledges that he is, in

9    fact, guilty as charged in the information.  He knows that he

10   has a right to a trial.  He knows what the maximum possible

11   sentence is.  And he has an understanding of the applicable

12   sentencing guidelines.  I find that the plea is voluntary and

13   supported by an independent basis in fact containing each of

14   the essential elements of the offense.

15             Now, Mr. Singh, as I told you, the probation

16   department will prepare a presentence report to assist in

17   sentencing you.  You're going to be interviewed by the

18   probation officer who does that.  It's important that you be

19   truthful and accurate with the probation officer.  The report

20   may well be quite important in my decision as to what to

21   sentence you to.  You and your lawyers will have the right to

22   examine and comment on the report and to speak on your behalf

23   before you are sentenced.

24             Any written submissions on behalf of the defendant

25   must be submitted to chambers not later than three weeks before

A001006

N2SZZSINP-DC

1    the sentencing date.

2          Do we have a control date for sentencing?

3          MS. SASSOON:  The parties would propose a date

4    approximately 18 months from now.

5          THE COURT:  Andy.

6          THE DEPUTY CLERK:  Sure, Judge.

7          Judge, 18 months from now, how about November 13,

8    2024, Judge?

9          THE COURT:  Sentencing is set for November 13, 2024,

10   at 10:00 a.m.

11         Now, it's premature, I'm sure, to set a date for the

12   submission of the prosecution case summary, yes?

13         MS. SASSOON:  Yes, your Honor.

14         THE COURT:  What do you propose?  Do you want to say

15   September of 2024?

16         MS. SASSOON:  Yes, your Honor.  Thank you.

17         THE COURT:  The prosecution case summary will be

18   submitted to probation no later than September 1st, 2024.  And

19   leave it to probation and the defense to work out an interview

20   date, unless somebody has a better idea.  Now --

21         MS. SASSOON:  Yes, your Honor.  And we have a trial

22   date in this matter for Samuel Bankman-Fried, and after that

23   trial date we can circle back with the Court about setting

24   other deadlines related to Mr. Singh's sentencing.

25         THE COURT:  Now, there's an application with respect

N2SZZSINP-DC

1     to the filing of redacted copies of the superseding

2     information.  And the forfeiture preliminary order of

3     forfeiture.

4             Any objection to any of that?  Have you all agreed on

5     that?

6             MS. SASSOON:  Yes, your Honor.  And there's a related

7     redaction to the plea agreement that I know doesn't get filed

8     on the docket, but to the extent there is a public version made

9     available to interested parties, we would redact identical

10    language from the employment.

11            THE COURT:  Well, it's not the Court's practice to

12    make them available.

13            MS. SASSOON:  I know that our office sometimes

14    provides it given that it's a court exhibit.

15            THE COURT:  OK.

16            MS. SASSOON:  And I would just note that the

17    redactions, we would provide unredacted copies in the course of

18    executing the forfeiture.  So to the extent that we need to

19    coordinate the forfeiture of shares and the like, we would

20    provide the unredacted copy to parties that we would need to

21    coordinate with for purposes of executing forfeiture.

22            THE COURT:  Mr. Capone, anything on that?

23            MR. GOLDSTEIN:  Mr. Goldstein.  No, your Honor, no

24    objection.

25            THE COURT:  Oh, excuse me.  I should know better.

A001008

N2SZZSINP-DC

1          OK.  Now, let's take a bail.  Who's going to handle

2     that for the government?

3          MS. SASSOON:  The government has a proposed bail

4     package for your Honor's consideration set forth in the plea

5     agreement on page 5.  And the proposed conditions are a

6     $250,000 personal recognizance bond signed by one financially

7     responsible person, travel restricted to the Continental United

8     States, surrender of travel documents, with no new

9     applications, supervision as directed by pretrial services, and

10    other standard conditions of supervision.  And I think relevant

11    context here is that this defendant voluntarily traveled back

12    to the United States from the Bahamas shortly after the

13    implosion of FTX, in part for the purpose of beginning meetings

14    with the government.  And so, principally, for that reason,

15    along with his cooperation, we don't have concerns that these

16    conditions will not be sufficient.

17         THE COURT:  All right.  I find that the conditions are

18    sufficient.

19         And does the government want to submit a bail order,

20    or do you trust your luck with Andy?

21         MS. SASSOON:  I always trust Andy, Your Honor.

22         THE COURT:  OK.  Mr. Singh, you understand what the

23    bail conditions are?

24         THE DEFENDANT:  I do, your Honor.

25         THE COURT:  You understand you absolutely have to

A001009

N2SZZSINP-DC

1   comply with them, yes.

2          THE DEFENDANT:  Yes.

3          THE COURT:  And you understand if you don't show up as

4   required for sentencing, you could be prosecuted for escape?

5          THE DEFENDANT:  I missed a word from that, your Honor.

6   Sorry.  If I don't show up at what for sentencing?

7          THE COURT:  If you don't show up, as directed, for

8   sentencing, you could be prosecuted for escape and subject to

9   another prison term?

10          THE DEFENDANT:  I understand your Honor.

11          THE COURT:  OK.  Anything else this morning?

12          MS. SASSOON:  May I have one moment, your Honor?

13          THE COURT:  Please.

14          MS. SASSOON:  Nothing from the government.  Thank you,

15   your Honor.

16          MR. GOLDSTEIN:  Your Honor, we understand that

17   Mr. Singh will sign the bond and be released today.

18          THE COURT:  Say again, please?

19          MR. GOLDSTEIN:  We understand that Mr. Singh will be

20   able to sign the bond and be released on those conditions

21   today.

22          THE COURT:  OK.

23          MS. SASSOON:  Yes, your Honor.

24          THE COURT:  Fine.  OK.  I thank you all.  And we'll

25   sort out all the paper here in due course.   * * *

A001010



**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SAMUEL BANKMAN-FRIED,
a/k/a "SBF,"

Defendant.

**SUPERSEDING INDICTMENT**

S3 22 Cr. 673 (LAK)

## **Overview**

1.      From at least in or about 2019, up to and including in or about November 2022,
SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, corrupted the operations of the
cryptocurrency companies he founded and controlled—including FTX.com ("FTX") and Alameda
Research ("Alameda")—through a pattern of fraudulent schemes that victimized FTX customers,
investors, financial institutions, lenders, and the Federal Election Commission ("FEC").
Exploiting the trust that FTX customers placed in him and his exchange, BANKMAN-FRIED
stole FTX customer deposits, and used billions of dollars in stolen funds for a variety of purposes,
including, among other things, to support the operations and investments of FTX and Alameda; to
fund speculative venture investments; to make charitable contributions; to enrich himself; and to
try to purchase influence over cryptocurrency regulation in Washington, D.C. by steering tens of
millions of dollars of illegal campaign contributions to both Democrats and Republicans.

2.      Founded in 2019, FTX, the global cryptocurrency exchange led by SAMUEL
BANKMAN-FRIED, a/k/a "SBF," the defendant, grew quickly, and with it grew BANKMAN-
FRIED's public profile, political influence, and personal fortune. In promoting FTX and its
smaller sister company FTX.US, which he also controlled, BANKMAN-FRIED represented

himself as the figurehead of a trustworthy and law-abiding segment of the cryptocurrency industry that was focused not only on profits, but also on investor and client protection. Likewise, in public statements, including in testimony before the United States Senate, BANKMAN-FRIED represented that FTX had a focus on "consumer protection," had adopted "principles for ensuring investor protections on digital asset-platforms," including "avoiding or managing conflicts of interest," and that "as a general principle FTX segregates customer assets from its own assets across our platforms." As recently as late 2022, BANKMAN-FRIED boasted about FTX's profits and portrayed himself as a savior of the cryptocurrency industry, making venture investments and acquisitions purportedly to assist struggling industry participants. BANKMAN-FRIED used FTX.US to further burnish his image, spending millions of dollars on celebrity advertisements for FTX.US during the 2022 Super Bowl that promoted FTX.US as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.

3.      In fact, and as SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, well knew, FTX—which by early 2022 claimed to handle approximately $15 billion in daily trading volume on its platforms—was not focused on investor or client protection, nor was it the legitimate business that BANKMAN-FRIED claimed it was. Contrary to BANKMAN-FRIED's promises to FTX customers that the exchange would protect their interests and segregate their assets, BANKMAN-FRIED routinely tapped FTX customer assets to provide interest-free capital for his and Alameda's private expenditures, and in the process exposed FTX customers to massive, undisclosed risk. In addition, while BANKMAN-FRIED publicly claimed that FTX operated independently from Alameda's cryptocurrency trading and investments in other companies, by his design, the reality was otherwise. BANKMAN-FRIED controlled FTX, FTX.US, and Alameda

2

A001012

and used them to prop each other up, notwithstanding conflicts of interests and outright lies to the contrary.

4.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, perpetrated this multi-billion-dollar fraud through a series of systems and schemes that allowed BANKMAN-FRIED, through Alameda, to access and steal FTX customer deposits without detection. For instance, in 2021, FTX began to accept customer fiat deposits into an Alameda-affiliated bank account that itself was established through a fraudulent scheme that BANKMAN-FRIED directed. This account functioned as a mechanism for the routine and brazen misappropriation of those deposits. BANKMAN-FRIED also caused the creation of secret loopholes in the computer code that powered FTX's trading platform—loopholes that allowed Alameda to incur a multi-billion-dollar negative balance on FTX that BANKMAN-FRIED knew Alameda could not repay. Further, BANKMAN-FRIED concealed from both Alameda's lenders and FTX's equity investors the fact that Alameda had taken billions of dollars from FTX. And at relevant times, BANKMAN-FRIED required his co-conspirators and others who worked for him to communicate using encrypted and ephemeral messaging platforms that self-deleted, thereby preventing regulators and law enforcement from later obtaining a record of his misdeeds.

5.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, used the FTX customer funds he misappropriated and caused to be misappropriated to, among other things, support the trading and operations of Alameda, fund acquisitions and venture investments, and finance in substantial part BANKMAN-FRIED's unlawful political influence campaign, which involved flooding the political system with tens of millions of dollars in illegal contributions to both Democrats and Republicans made in the names of others in order to obscure the true source of the money and evade federal election law.

A001013

6.    In or about early November 2022, an internet news organization leaked what appeared to be Alameda's balance sheet, revealing publicly that Alameda's solvency was dependent on the multi-billion-dollar valuation that Alameda assigned to its holdings of FTT, FTX's proprietary digital currency, which was illiquid and difficult to value.  Following this revelation, substantial numbers of FTX customers began seeking to withdraw their funds from FTX.  Knowing that FTX had misappropriated billions of dollars in customer funds, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, tried to reassure FTX customers, and slow customer withdrawals from FTX, with what he knew were false public claims about the ability of FTX to repay customer deposits, the security of FTX's customer assets, and the status of Alameda's balance sheet.  BANKMAN-FRIED also transferred funds putatively belonging to Alameda to fill an approximately $45 million hole in customer assets on FTX.US.

7.    In or about November 2022, in a last-ditch effort to secure sufficient liquid capital to satisfy FTX customer withdrawals, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, doubled down on his fraudulent schemes by soliciting billions of dollars in additional capital investments from existing and potential investors in FTX, many of whom he had previously defrauded.   In soliciting this additional capital, BANKMAN-FRIED made more false representations to potential investors about the source of the multi-billion-dollar hole in FTX's balance sheet caused by his misappropriation of customer deposits and his own knowledge of how the hole originated.

8.    The efforts of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, to raise sufficient capital to satisfy the demand for customer withdrawals failed.  In November 2022, FTX halted trading and entered bankruptcy along with Alameda, FTX.US, and dozens of related entities.  Left in FTX's wake were thousands of customers who had trusted BANKMAN-FRIED,

4

FTX, and FTX.US with billions of dollars in savings and investment capital and found themselves overnight unable to withdraw their funds and unsure about whether they would ever be repaid.

### Background on Alameda Research and FTX

9.    In or about November 2017, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, founded Alameda, a quantitative cryptocurrency trading firm that had operations in the United States, Hong Kong, and The Bahamas.  At the time, Alameda principally engaged in high-frequency cryptocurrency arbitrage trading, and also some market making, pooling of digital assets to earn interest (called yield farming), and other forms of cryptocurrency trading.  At times, Alameda was financially successful.  In or about 2019, FTX described Alameda as the "largest liquidity provider and market maker" in the digital asset space, trading "$600 million to 1 billion a day" and accounting for "roughly 5% of global volume" in digital asset trading.  BANKMAN-FRIED and Gary Wang were the sole equity owners of the firm, and BANKMAN-FRIED was the CEO of Alameda from in or about November 2017 until in or around October 2021, at which time he passed the title to two Alameda employees.  Even after BANKMAN-FRIED was no longer CEO, however, he remained Alameda's ultimate decisionmaker, and directed, among other things, trading strategy, investment decisions, and venture spending.

10.    In or around May 2019 and while still the CEO of Alameda, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, founded and served as the CEO of FTX Trading Ltd., a global cryptocurrency exchange that, through several subsidiary entities, did business as FTX.  FTX offered customers the ability to trade in cryptocurrencies such as bitcoin, ether, and stablecoins, as well as crypto derivatives such as options, swaps, and futures.  FTX also offered customers a "spot market" for trading cryptocurrency with other FTX customers in exchange for other cryptocurrencies or traditional currency, also known as fiat (referred to below generally as

A001015

"dollars"), such as U.S. dollars. FTX also eventually added a "spot margin trading and borrowing" service, which permitted FTX customers who opted into the service to either lend their crypto assets to other customers for spot trading, or trade on credit using borrowed crypto assets by posting collateral and borrowing crypto assets through the spot market on FTX.

11.     From its launch, FTX grew rapidly. By in or about 2020, FTX was one of the largest digital asset exchanges in the world based on trading volume, and by in or about early 2022, FTX claimed to handle approximately $15 billion in daily trading volume on its platforms.

12.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, raised at least $1.8 billion dollars from investors, including investors based in the United States and the Southern District of New York, in exchange for various classes of stock in FTX. This money was raised through multiple fundraising rounds, including: (1) a fundraising completed in or around August 2019 of approximately $8 million; (2) a fundraising completed in or around July 2021 of approximately $1 billion; (3) a fundraising completed in or around October 2021 of approximately $420 million; and (4) a fundraising completed in or around January 2022 of approximately $500 million. BANKMAN-FRIED continued efforts to fundraise for FTX at least up to and including November 2022.

**BANKMAN-FRIED's Multiple Schemes to Defraud**

At BANKMAN-FRIED's direction, FTX Fraudulently Opened and Used Bank Accounts Affiliated with Alameda to Receive Customer Deposits and Transmit Funds

13.     From FTX's founding in or about 2019, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, sought to use the United States financial system, and in particular, bank accounts in the United States, to promote FTX's business. In particular, after FTX launched in or around May 2019, and in order to attract customers and their assets, including U.S. dollars, FTX needed bank accounts that would allow FTX customers to deposit dollars with FTX that could be

6

A001016

used to purchase cryptocurrency assets and pay for transactions. When FTX was founded, however, many U.S. banks were reluctant to do business with cryptocurrency companies, and those banks that were willing to open accounts for cryptocurrency companies had extensive customer due diligence and licensing requirements, with which FTX was not compliant.

14. Because FTX did not have its own bank accounts for holding customer deposits, for a period of time in or around 2019 and 2020, FTX instructed customers to wire dollar deposits to bank accounts that were owned or controlled by Alameda, which at the time SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also controlled as the CEO. These Alameda accounts had been opened as trading accounts and had been used almost exclusively for Alameda's trading purposes until they were also employed as accounts for FTX to receive and transmit its customer deposits and withdrawals. Alameda never informed the banks where these accounts were held that these accounts in Alameda's name began to be used in substantial part by FTX to accept customer deposits for, and as a vehicle for customer withdrawals from, FTX's cryptocurrency exchange.

15. During the time period in which FTX was using Alameda bank accounts to receive and transmit customer deposits, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others, made efforts to open bank accounts for this purpose in FTX's name. In particular, BANKMAN-FRIED, through Alameda employees, attempted to open an account for FTX at a bank in California ("Bank-1"), the deposits of which were insured by the Federal Deposit Insurance Corporation and where Alameda already had bank accounts. Bank-1 made clear, however, that it would not open an account for customer deposits and withdrawals absent evidence that FTX was licensed and registered, including federal registration as a money services business, and that, in any event, Bank-1 would need to conduct an enhanced due diligence process before

7

opening any account used to process customer deposits and withdrawals.

16. In or about January 2020, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, contacted Bank-1 about opening an FTX account. BANKMAN-FRIED learned from Bank-1 that BANKMAN-FRIED should not attempt to open an account for FTX, an international platform, at that time. He was further told that if he wished to open an account to process customer deposits and withdrawals for FTX.US, FTX's business in the United States, FTX.US would need to register as a money services business. While BANKMAN-FRIED did later register FTX.US as a money services business in 2020, no attempts were made to make FTX a licensed money services business and BANKMAN-FRIED never sought to have FTX or Alameda comply with the regulatory requirements of licensure. Instead, FTX continued to use Alameda trading accounts to accept customer deposits and process customer withdrawals.

17. In part to obscure the relationship between FTX and Alameda, and in order to overcome Bank-1's refusal to open a bank account for FTX without extensive due diligence and licensing, in or about August 2020, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, directed the incorporation of a new U.S.-based entity, North Dimension. BANKMAN-FRIED was listed as sole owner, CEO, and president of North Dimension, which had no employees or business operations outside of its bank account. BANKMAN-FRIED and others chose the name "North Dimension" in part to conceal that there was a relationship between North Dimension and Alameda from FTX customers and from banks approving transactions with the North Dimension bank account. BANKMAN-FRIED also directed the creation of a website for North Dimension and used a credit card in his name to fund the hosting services for the website.

18. Aware of the fact that Bank-1 would not open an exchange account or account for receiving customer deposits for an entity without the appropriate registration and enhanced due

A001018

diligence, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and other Alameda employees told Bank-1 a false story, namely, that North Dimension sought to open an account to function as a trading account connected to Alameda's existing trading accounts, instead of the truth, which was that the North Dimension account would function as an account to receive and transmit FTX customer deposits. Under BANKMAN-FRIED's supervision, employees of Alameda completed an account application that falsely stated that the purpose of the North Dimension bank account was for "trading" and "market making." Bank-1 was also given a completed North Dimension due diligence questionnaire—which BANKMAN-FRIED signed— that falsely stated that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account" and that North Dimension "also participates in direct peer-to-peer, OTC purchases and sales with certain third parties for its own account." Furthermore, despite the fact that North Dimension was created for the purpose of transmitting customer deposits on and off the FTX exchange, the due diligence questionnaire falsely claimed that North Dimension was not a money services business.

19.     In or about April 2021, Bank-1 approved the opening of the North Dimension account, without enhanced due diligence or review by Bank-1's executive committee, as would have been required had the true purposes of North Dimension's account been disclosed to Bank-1.

20.     Once the North Dimension bank account was opened, FTX directed customer dollar deposits to the North Dimension account. Thereafter, when FTX customers deposited or withdrew fiat currency, Alameda personnel, who maintained control over the North Dimension account and acted under the direction and supervision of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators, manually credited or subtracted the customer's FTX account with the corresponding amount of fiat currency on an internal ledger system. Customers could

A001019

then convert their deposits to a range of cryptocurrencies and traditional currencies, engage in various types of trading, and make withdrawals denominated in various types of cryptocurrencies and traditional currencies. FTX charged fees and generated revenues from many of these activities, using the fraudulently obtained access to a U.S. bank account. Customers could also convert various cryptocurrencies and traditional currencies to dollars on their FTX account, and withdraw the dollars from FTX. FTX sent customer withdrawals by wire transfer from the North Dimension bank account, and by at least summer 2021 charged a fee for dollar withdrawals.

### The Misappropriation of Customer Deposits

21.     Despite representations SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, made and caused to be made to the contrary, FTX never held customer funds in dedicated accounts for the benefit of customers or segregated from Alameda's assets. Rather, with the knowledge and under the supervision of BANKMAN-FRIED, Alameda commingled FTX customer funds with Alameda assets in Alameda accounts.   With BANKMAN-FRIED's knowledge and at his direction, Alameda regularly took money from accounts funded by or that included funds from FTX customers, including the North Dimension account. Alameda ultimately spent billions of dollars of those FTX customer funds, among other things, to finance Alameda's trading and expenses, to make venture investments directed by BANKMAN-FRIED, and to bankroll tens of millions of dollars in campaign contributions made in the names of individuals but in fact funded from Alameda accounts.

22.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, was able to accomplish this scheme not only by causing FTX customers to deposit money into accounts controlled by Alameda, but also by secretly building Alameda's capacity to misuse FTX customer funds into the computer code that operated the FTX trading platform.

10

A001020

23. In or about July 2019, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, publicly claimed that: "Alameda is a liquidity provider on FTX but their account is just like everyone else's." Such representations continued through 2022, with BANKMAN-FRIED asserting, for example, that "[t]here are no parties that have privileged access" on FTX, and that "Alameda is a wholly separate entity." Contrary to those representations, BANKMAN-FRIED had caused FTX's computer code and software to allow Alameda to accrue a negative balance on FTX's exchange. That modification to FTX's code, along with others implemented at BANKMAN-FRIED's direction, made Alameda's account unlike those of other customers. While FTX typically would have automatically liquidated a client's account once its negative balance exceeded the amount of any posted collateral, net of fees, FTX permitted Alameda to maintain a negative balance, draw on a multi-billion-dollar line of credit, borrow funds from FTX without sufficient collateral, evade auto-liquidation, and withdraw funds off the exchange. Over time, BANKMAN-FRIED directed that Alameda's credit limit be raised to approximately $65 billion, which in practice permitted Alameda to draw on FTX accounts funded by customer assets on an unlimited basis—in amounts that exceeded FTX revenue and tapped into customer funds.

24. Over time, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, hid the close relationship between FTX and Alameda and his continued involvement in and control of both FTX and Alameda in order to minimize the appearance of potential conflicts of interest and to prevent further scrutiny that might uncover his schemes. To publicly distance himself from Alameda, BANKMAN-FRIED stepped down as CEO of Alameda in or about October 2021, and named Caroline Ellison, a long-time associate and co-conspirator in the fraudulent scheme, and another individual as co-CEOs of Alameda. But in practice, BANKMAN-FRIED continued routinely to direct investment and operational decisions at Alameda and exercised supervisory

11

control over it.

25.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also took steps to conceal that his multi-billion-dollar venture investments and expenditures were funded by transfers originating with Alameda, and therefore funded with FTX customer funds.  For example, BANKMAN-FRIED directed Ellison to change the name of Alameda entities that were funding venture capital investments by FTX so that it would not be apparent that the money was coming from Alameda.  Similarly, BANKMAN-FRIED personally borrowed more than $1 billion from Alameda and oversaw similar borrowing by other FTX executives, which was then principally used to make investments in the name of BANKMAN-FRIED and his associates, rather than in the name of Alameda.  This conduct served to conceal the close connection to Alameda, as well as the criminal source of the funds.  At the same time, BANKMAN-FRIED falsely projected ignorance about Alameda's affairs.

26.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, also deceived FTX investors about the exchange's relationship with Alameda, and about the safety of the exchange more generally, through the use of audited financial statements provided to investors.  In the course of the audits underlying the financial statements, BANKMAN-FRIED and those acting at his direction misled auditors and avoided providing information about FTX customers, including Alameda, and about the commingling of customer assets with Alameda funds, as well as Alameda's enormous line of credit on the exchange.  When one co-conspirator expressed concern to BANKMAN-FRIED about auditors disapproving of the commingling of customer assets with Alameda funds, BANKMAN-FRIED assured that co-conspirator that the auditors would not find out.  The audited financials were then used to falsely reassure customers and investors that FTX had proper risk management controls and systems for storing customer assets.

12

A001022

BANKMAN-FRIED Directed Alameda to Misappropriate Billions of Dollars in FTX Customer
Funds to Repay Alameda's Lenders

27.     In or around June 2022, the cryptocurrency markets experienced a downturn.
SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, through Alameda, was heavily
invested in the cryptocurrency industry through cryptocurrency trading and related illiquid venture
investments.  As a result of the market downturn, Alameda faced demands for repayment from
multiple third-party cryptocurrency lenders on substantial outstanding loans.  While Alameda was
obligated to repay the loans on demand, Alameda lacked the funds to repay these lenders.

28.     Rather than allow Alameda to default on its loans, which would have jeopardized
the survival of both Alameda and FTX, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the
defendant, authorized Alameda to draw down billions of dollars in customer assets from FTX and
to use those assets to repay Alameda's lenders.  The billions of dollars that BANKMAN-FRIED
caused Alameda to draw from FTX greatly exceeded FTX's revenue, liquid capital, and available
funds under FTX's relatively small peer-to-peer lending program.  BANKMAN-FRIED was able
to divert billions of dollars in FTX customer funds to Alameda undetected as a result of the features
to benefit Alameda that he had directed be built into FTX's code and software.

29.     Shortly after authorizing the misappropriation billions of dollars of FTX customer
funds to repay Alameda's loans, in or about July 2022, SAMUEL BANKMAN-FRIED, a/k/a
"SBF," the defendant, tweeted, "Backstopping customer assets should always be primary.
Everything else is secondary."

30.     Even after SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had
misappropriated billions of dollars of FTX customer funds to repay Alameda's lenders,
BANKMAN-FRIED continued to direct discretionary investments, charitable contributions, and
political donations using Alameda funds, including by directing that Alameda continue to draw on

13

A001023

its line of credit on FTX.

31.     Although SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had caused Alameda to repay lenders using FTX customer funds, Alameda still had at least hundreds of millions of dollars in outstanding loans, and had to provide financial information to its creditors. BANKMAN-FRIED directed Ellison to devise a way to mislead those creditors about the money Alameda had "borrowed" from FTX, as well as about the substantial personal loans Alameda had made to FTX executives, and together, BANKMAN-FRIED and Ellison provided false and misleading financial statements to creditors.

BANKMAN-FRIED Made Unlawful Political Contributions to Acquire Bipartisan Influence

32.     As he used Alameda to siphon off FTX's customer funds and deploy them for political causes, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, became one of the largest publicly reported political donors for the 2022 midterm elections.  But his effort to influence politics did not stop there.  To avoid certain contributions being publicly reported in his name, BANKMAN-FRIED conspired to and did have certain political contributions made in the names of two other FTX executives ("CC-1" and "CC-2").  Those contributions were made directly to candidates in the names of those FTX executives, but with FTX and Alameda funds.

33.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, perpetuated his campaign finance scheme at least in part to improve his personal standing in Washington, D.C., increase FTX's profile, and curry favor with candidates that could help pass legislation favorable to FTX or BANKMAN-FRIED's personal agenda, including legislation concerning regulatory oversight over FTX and its industry.  To accomplish these goals, BANKMAN-FRIED caused substantial contributions to be made in support of candidates of both major political parties and across the political spectrum.  BANKMAN-FRIED, however, did not want to be known as a left-

14

A001024

leaning partisan, or to have his name publicly attached to Republican candidates. In those instances when he wanted to obscure his association with certain contributions, BANKMAN-FRIED and others conspired to and did have those contributions made in the names of CC-1 and CC-2.

34.     As part of this scheme, contributions were coordinated to be made in the names of the two FTX straw donors to candidates they did not necessarily support or know. These straw donations were instead made for purposes of furthering the political agenda of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, while providing him cover to avoid being associated with certain contributions, and concealing that the source of the contributions was in fact Alameda.

35.     SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators selected CC-1 to be the face of BANKMAN-FRIED's and FTX's more left-leaning spending. CC-1 ultimately became—at least in name—one of the largest Democratic donors in the 2022 midterm elections and made donations to further BANKMAN-FRIED's agenda that CC-1 otherwise would not have made.

36.     For instance, in or around 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others agreed that he and his co-conspirators should contribute at least a million dollars to a super PAC that was supporting a candidate running for a United States Congressional seat and appeared to be affiliated with pro-LGBTQ issues, and selected CC-1 to be the contributor. A political consultant working for BANKMAN-FRIED asked CC-1 to make the contribution and told CC-1, "in general, you being the center left face of our spending will mean you giving to a lot of woke shit for transactional purposes." CC-1 expressed discomfort with making the contribution in his name, but agreed there was not anyone "trusted at FTX [who was] bi/gay" in a position to

15

A001025

make the contribution. At the direction of BANKMAN-FRIED and individuals working for him, CC-1 nonetheless contributed to the PAC.

37. Likewise, it was the preference of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, to keep contributions to Republicans "dark." In keeping with that preference, CC-2, who publicly aligned himself with conservatives, made contributions to Republican candidates that were directed by BANKMAN-FRIED and funded by Alameda.

38. From at least in or around March 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators began coordinating political contributions paid for using FTX and Alameda funds through an encrypted, auto-deleting Signal chat called "Donation Processing." From time to time, BANKMAN-FRIED and his co-conspirators substituted other individuals in BANKMAN-FRIED's place for contributions originally intended to be made in BANKMAN-FRIED's name. For instance, shortly before the midterm elections, an FTX employee was directed to "wire $107k from [BANKMAN-FRIED] personal to New York State Democratic Committee," but then was asked by BANKMAN-FRIED to "update this to a 107k contribution from [CC-1]."

39. In total, between in or about the fall of 2021 and the November 2022 election, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and the two FTX executives who served as straw donors as part of his scheme—CC-1 and CC-2—collectively made millions of dollars in contributions, including in "hard money" contributions to federal candidates from both major political parties.

40. The money used to make these political donations originated from Alameda bank accounts, and included funds that had been deposited by FTX customers. Notwithstanding his awareness of the campaign finance laws, in order to conceal the true source of the funds, SAMUEL

A001026

BANKMAN-FRIED, a/k/a "SBF," the defendant, agreed with others that funds for contributions would be transferred from Alameda's bank accounts, which also contained FTX customer funds, to bank accounts in the name of the donors, and then quickly transferred from those individuals' bank accounts to political campaigns.

41.     In total, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators made over 300 political contributions, totaling tens of millions of dollars, that were unlawful because they were made in the name of a straw donor or paid for with corporate funds. In dozens of instances, BANKMAN-FRIED's use of straw donors allowed him to evade contribution limits on individual donations to candidates to whom he had already donated. As a result of this fraudulent conduct, BANKMAN-FRIED and his co-conspirators caused false information to be reported by campaigns and PACs to the FEC, which had the result of impairing and impeding the FEC's reporting and enforcement functions.

42.     To further conceal the scheme, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and his co-conspirators recorded the outgoing wire transfers from Alameda to individuals' bank accounts for purposes of making contributions as Alameda "loans" or "expenses." But unlike other loans that were made to FTX executives, including to BANKMAN-FRIED, CC-1, and CC-2, these outgoing wire payments were not documented in agreements or on term sheets, and there were no set interest rates, no interest payments, no collateral, and no evidence of repayment. While employees at Alameda generally tracked loans to executives, the transfers to BANKMAN-FRIED, CC-1, and CC-2 in the months before the 2022 midterm elections were not recorded on internal Alameda tracking spreadsheets. Instead, an internal Alameda spreadsheet noted over $100 million in political contributions, even though FEC records reflect no political contributions by Alameda for the 2022 midterm elections to candidates or PACs.

17

A001027

43.     In or around November 2022, as FTX customer withdrawals were surging and FTX was experiencing a solvency crisis (as described below), and just days before the midterm elections, CC-1 messaged SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, that he was concerned about the "maybe 80m" of "donations/personal/etc that went through my bank [account] and are in my name." CC-1 proposed a back-dated transaction to undo any sort of debt he might owe as a result of wire transfers being recorded on Alameda's ledger as "loans." BANKMAN-FRIED asked CC-1 how they would go about doing it, and CC-1 proposed a retroactive sale of certain cryptocurrencies "earlier in 2022" to remove the $80 million liability CC-1 had to FTX/Alameda, which would have further concealed the campaign finance scheme.     The transaction was not, however, completed before FTX's collapse.

<div align="center">BANKMAN-FRIED's Lies During FTX's Collapse</div>

44.     On or about November 2, 2022, an online news publication published an article that appeared to leak Alameda's balance sheet, disclosing that the predominant portion of Alameda's $14.6 billion of assets comprised Alameda's holdings of FTX's digital token, FTT.  Prior to November 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had engineered the price of FTT, including by directing that Alameda buy large amounts of the token to maintain its price when it was dropping, and to keep such price manipulation a secret.  Over time, FTT became a sizeable asset on Alameda's balance sheet despite its illiquidity, and Alameda began using it as collateral to obtain billions of dollars in loans from third-party lenders for Alameda, which exponentially increased Alameda's ability to obtain sizeable loans, while at the same time leaving Alameda exposed to significant financial risk.

45.     After the November 2, 2022 leak showing Alameda's assets comprised mostly FTT, commentary expressing fear, uncertainty, and doubt about the value of FTT, and in turn the

<div align="center">18</div>

A001028

prospects of FTX as an exchange, spread across the internet.

46. In an effort to tamp down those concerns about FTX, Alameda, and FTT, at the direction of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, Ellison tweeted on or about November 6, 2022: "A few notes on the balance sheet info that has been circulating recently: - that specific balance sheet is for a subset of our corporate entities, we have > $10b of assets that aren't reflected there . . . . given the tightening in the crypto credit space this year we've returned most of our loans by now." This tweet was misleading in several respects. First, while Alameda had by that time repaid most of its loans to external lenders, it had done so by misappropriating billions of dollars of FTX customer funds that it still owed to FTX. Second, the supposed additional $10 billion in assets included not only the loans Alameda had made to related-parties, like BANKMAN-FRIED and other FTX executives, but also the value of investments made by BANKMAN-FRIED with that money, even though those investments were not owned or controlled by Alameda.

47. That same day, on or about November 6, 2022, the CEO of another cryptocurrency exchange tweeted that he had decided to liquidate approximately $2.1 billion of FTT held by his exchange. Soon after, Ellison, in consultation with SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others, and in an effort to prevent the collapse of FTT's value, tweeted in response that if the CEO was "looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!" The effort to blunt the effect of the threatened sale of FTT was unsuccessful. The value of the FTT token fell and many FTX customers sought to withdraw their assets from FTX, resulting not only in the plummeting of FTT's value, but also the equivalent of a cryptocurrency bank run of several billion dollars.

48. Because SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, had

19

A001029

misappropriated FTX customer assets for use by Alameda, however, FTX lacked the funds to meet surging customer demands for withdrawals of their deposits. At BANKMAN-FRIED's direction, Alameda began liquidating its assets and using the proceeds to satisfy FTX customer withdrawals. On or about November 6, 2022, BANKMAN-FRIED sent CC-1 a screenshot of a message from Ellison that read, in part: "I just had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with one way or another."

49.     In an attempt to stem the withdrawals from FTX and forego a solvency crisis, on or about November 7, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, posted a series of false and misleading tweets. First, he tweeted: "A competitor is trying to go after us with false rumors. FTX is fine. Assets are fine." He added in a second tweet, in part, "FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries). We have been processing all withdrawals, and will continue to be." In a third tweet about FTX, BANKMAN-FRIED stated: "It's heavily regulated, even when that slows us down. We have GAAP audits, with > $1B excess cash. We have a long history of safeguarding client assets, and that remains true today."

50.     Despite his false assurances, the fraudulent scheme of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, caused significant negative price impact on the value of commodities in interstate commerce in the United States, including bitcoin and ether spot and future prices.

51.     Customer withdrawals continued to surge and threaten the solvency of FTX. Beginning on or about November 7, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others acting at his direction, began contacting existing and potential investors for

A001030

a multi-billion-dollar bailout. BANKMAN-FRIED supplied existing and potential investors with what purported to be FTX's balance sheet, showing that FTX had approximately $9.6 billion of assets versus approximately $8.9 billion of liabilities, which would yield a positive net equity of approximately $700 million. The balance sheet noted, however, that FTX had an additional liability of $8 billion in a "Hidden, poorly internally labled [sic] 'fiat@' account," and that FTX had experienced $5 billion in customer withdrawals on November 6, 2022. Beneath these two line items, BANKMAN-FRIED stated: "There are many things I wish I could do differently than I did, but the largest are represented by these two things: the poorly labeled internal bank-related account, and the size of customer withdrawals during a run on the bank."

52. In fact, and as SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, well knew, the "[h]idden, poorly internally labled [sic] 'fiat@' account," was the multi-billion-dollar entry on FTX's ledger reflecting the amount of FTX customer fiat deposits accepted into Alameda's bank accounts that had not been maintained for the benefit of customers or repaid to FTX, and of which BANKMAN-FRIED was aware throughout the relevant time period. The labeling of the account was deliberate: BANKMAN-FRIED had previously authorized moving the ledger entry of Alameda's fiat liability from an account with "fiat" in its name, into a subaccount under the last name of an Alameda intern. On or about November 6, 2022, in the course of directing CC-1 and others to calculate Alameda assets and liabilities for purposes of estimating available funds to meet customer withdrawal demands, BANKMAN-FRIED specifically told CC-1 to include this subaccount in his calculations, describing it as the account that "has the old fiat@ account."

53. On or about November 9, 2022, it became clear to FTX and Alameda employees that the companies would not survive the solvency crisis because there were not sufficient funds

21

A001031

to cover customer withdrawals, and there was no third party willing to bailout FTX. That day, Ellison addressed Alameda employees in an all-hands meeting. Ellison acknowledged that earlier that year, she, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, Wang, and CC-1 had decided to use, and used, FTX customer assets to pay Alameda's debts to lenders.

54.    At the same time that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, was trying to address FTX's solvency crisis caused by the misappropriation of FTX customer assets, he prioritized certain disbursements at the expense of satisfying FTX customer withdrawals. For example, on or about November 8, 2022, the general counsel of FTX.US, in a Signal chat that included BANKMAN-FRIED and several close associates, demanded: "I need to know the fucking truth about FTX US right now." Soon thereafter, on or about November 9, 2022, BANKMAN-FRIED was told in the same Signal chat that there was an approximately $45 million deficit in FTX.US customer assets. BANKMAN-FRIED responded that he had transferred $46 million from Alameda to FTX.US. On or about November 8, 2022, FTX suspended customer withdrawals. Shortly thereafter, however, BANKMAN-FRIED reopened withdrawals only for customers in The Bahamas, resulting in millions of dollars being preferentially withdrawn from the exchange, while other customers of FTX had no true access to it.

55.    To conceal his activities and the activities of his co-conspirators during the unraveling of FTX, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant communicated with his employees over Signal, an ephemeral messaging application. BANKMAN-FRIED had previously instructed employees to communicate over Signal, and directed that employee Signal messages be set to auto-delete after brief periods of time, in part to prevent the preservation of evidence that could be used against him. In November 2022, the general counsel of FTX.US warned employees that they should preserve documents because of the involvement of regulators,

22

and then posted in a company Slack channel that FTX would need to be shut down. BANKMAN-FRIED, however, deleted the general counsel's message about FTX being shut down, continued to use Signal messaging, and proceeded to delete some of his own statements on Twitter, including his tweets about customer assets being "fine."

56.     Before resigning from FTX, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, met with one of FTX's in-house attorneys to discuss what, if any, legal explanation BANKMAN-FRIED could provide for the use of customer funds in response to questions from potential investors. BANKMAN-FRIED and the attorney discussed and dismissed several potential explanations as inadequate. In particular, they considered whether BANKMAN-FRIED could claim that Alameda had borrowed from customers who had opted into FTX's peer-to-peer borrow/lend program. BANKMAN-FRIED and the attorney, however, quickly dismissed the explanation because Alameda's borrowing greatly exceeded the funds lent through the FTX borrow/lend program, even if Alameda had been the only borrower. BANKMAN-FRIED, however, later publicly embraced the explanation that he earlier had acknowledged privately was unsupported by the facts: that Alameda did not misuse FTX customer funds but permissibly borrowed funds that customers had opted in to FTX's peer-to-peer lending program.

57.     On November 11, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, resigned from FTX, and FTX and approximately one hundred affiliated entities, including FTX.US, and Alameda filed for Chapter 11 bankruptcy protection.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Commit Wire Fraud on Customers of FTX)

The Grand Jury charges:

58.     The allegations contained in paragraphs 1 through 57 of this Indictment are

23

repeated and realleged as if fully set forth herein.

59. From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

60. It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud customers of FTX by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud on Customers of FTX)

The Grand Jury further charges:

61. The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

62. From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF,"

24

the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud,

and for obtaining money and property by means of false and fraudulent pretenses, representations

and promises, transmitted and caused to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with

others, engaged in a scheme to defraud customers of FTX by misappropriating those customers'

deposits, and using those deposits to pay expenses and debts of Alameda to make investments, and

for other purposes.

<div align="center">(Title 18, United States Code, Sections 1343 and 2.)</div>

<div align="center">

**COUNT THREE**
**(Conspiracy to Commit Fraud on Customers of FTX in Connection with Purchase and Sales of Derivatives)**

</div>

The Grand Jury further charges:

63. The allegations contained in paragraphs 1 through 57 of this Indictment are

repeated and realleged as if fully set forth herein.

64. From at least in or about 2019, up to and including in or about November 2022, in

the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF,"

the defendant, and others known and unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to commit an offense against the United States,

to wit, commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5),

and Title 17, Code of Federal Regulations, Section 180.1.

65. It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED,

a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly, would and

did, directly and indirectly, use and employ, and attempt to use and employ, in connection with a

<div align="center">25</div>

A001035

swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (a) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (b) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (c) engaging, and attempting to engage in an act, practice, and course of business, which operated and would operate as a fraud and deceit upon a person, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), to wit, BANKMAN-FRIED agreed with others to defraud customers of FTX trading or intending to trade futures, options, swaps, and derivatives by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

<div align="center">Overt Act</div>

66.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: in or about June 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others misappropriated FTX customer deposits in order to, among other things, satisfy loan obligations owed by Alameda Research.

<div align="center">(Title 18, United States Code, Section 371.)</div>

<div align="center">**COUNT FOUR**</div>
<div align="center">**(Fraud on Customers of FTX in Connection with Purchase and Sales of Derivatives)**</div>

The Grand Jury further charges:

67.     The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

<div align="center">26</div>

A001036

68.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of material fact and omitting to state a material fact necessary in order to make the statements made not untrue and misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, to BANKMAN-FRIED, along with others, engaged in a scheme to defraud customers of FTX trading or intending to trade futures, options, swaps, and derivatives by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda, and to make investments, and for other purposes.

(Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Conspiracy to Commit Securities Fraud on Investors in FTX)

The Grand Jury further charges:

69.     The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

70.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF,"

27

A001037

the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

71. It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly would and did, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, BANKMAN-FRIED agreed with others to engage in a scheme to defraud investors in FTX by providing false and misleading information to those investors regarding FTX's financial condition and the relationship between FTX and Alameda.

## Overt Act

72. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: on or about September 18, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, caused an email to be sent to an FTX investor in New York, New York that contained

28

materially false information about FTX's financial condition.

(Title 18, United States Code, Section 371.)

## COUNT SIX
### (Securities Fraud on Investors in FTX)

The Grand Jury further charges:

73.    The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

74.    From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud investors in FTX by providing false and misleading information to those investors regarding FTX's financial condition and the relationship between FTX and Alameda.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

A001039

## COUNT SEVEN
### (Conspiracy to Commit Wire Fraud on Lenders to Alameda Research)

The Grand Jury further charges:

75. The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

76. From at least in or about June 2022, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Sections 1343.

77. It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud, including through the use of interstate wires, lenders to Alameda by providing false and misleading information to those lenders regarding Alameda's financial condition.

(Title 18, United States Code, Section 1349.)

30

A001040

## COUNT EIGHT
### (Wire Fraud on Lenders to Alameda Research)

The Grand Jury further charges:

78. The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

79. From at least in or about June 2022, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud, including through the use of interstate wires, lenders to Alameda by providing false and misleading information to those lenders regarding Alameda's financial condition.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINE
### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

80. The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

81. From at least in or about October 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine,

31

conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

82. It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did execute, and attempt to execute, a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, as defined in Title 18, United States Code, Section 20, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, BANKMAN-FRIED, along with others, in order to open a bank account and to obtain customer deposits and fees, falsely represented to a financial institution that the account would be used for trading and market making, even though BANKMAN-FRIED knew that the account would be used to receive and transmit customer funds in the operation of a cryptocurrency exchange, and thereafter, in connection with using the account for the receipt and transmission of customer funds, omitted material facts in a manner that made what was communicated misleading.

(Title 18, United States Code, Section 1349.)

## COUNT TEN
### (Conspiracy to Operate an Unlicensed Money Transmitting Business)

The Grand Jury further charges:

83. The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

84. From at least in or about October 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the

32

United States, to wit, operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

85. It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, in violation of Title 18, United States Code, Section 1960.

### Overt Act

86. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere: Alameda and FTX employees, at the direction of SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, caused FTX customers to send wire transfers and sent wire transfers to FTX customers, some of which were received in and were transmitted through the Southern District of New York.

(Title 18, United States Code, Section 371.)

### COUNT ELEVEN
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

87. The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

88. From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF,"

33

the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

89. It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, in an offense in and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction, to wit, one or more monetary transfers, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud alleged in Count Two of this Indictment, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

90. It was a further part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, within the United States, would and did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, the wire fraud alleged in Count Two of this Indictment, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWELVE
**(Conspiracy to Make Unlawful Political Contributions and Defraud the FEC)**

The Grand Jury further charges:

91. The allegations contained in paragraphs 1 through 57 of this Indictment are repeated and realleged as if fully set forth herein.

34

A001044

92.     From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States, in violation of Title 18, United States Code, Section 371, and willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States by engaging in violations of federal law involving the making, receiving, and reporting of a contribution, donation, or expenditure, in violation of Title 52, United States Code, Sections 30109(d)(1)(A) & (D).

93.     It was part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office, joint fundraising committees, and independent expenditure committees in the names of other persons, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A) & (D).

94.     It was a further part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office and joint fundraising committees by a corporation, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30118 and 30109(d)(1)(A).

95.     It was a further part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did defraud the United States, and an agency thereof, by impairing, obstructing, and defeating the lawful functions of a department and agency of the United States through deceitful and dishonest means, to wit, the

35

Federal Election Commission's function to administer federal law concerning source and amount restrictions in federal elections, including the prohibitions applicable to corporate contributions and conduit contributions, in violation of Title 18, United States Code, Section 371.

## Overt Act

96.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, was committed in the Southern District of New York and elsewhere: in or about 2022, SAMUEL BANKMAN-FRIED a/k/a "SBF," the defendant, and one or more other conspirators agreed to and did make corporate contributions to candidates and committees in the Southern District of New York that were reported in the name of another person.

(Title 18, United States Code, Section 371.)

## **FORFEITURE ALLEGATION**

97.    As a result of committing the offenses alleged in Counts One, Two, Seven, Eight, and Nine of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses, and the following specific property:

a.    55,273,469 shares of the stock of Robinhood Markets Inc. from Account Number 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

b.    $20,746,713.67 in United States currency formerly on deposit in Account Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

c.    $49,999,500 in United States currency formerly on deposit in Account

36

A001046

Number 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank" held in the name of "FTX Digital Markets," seized by the Government on or about January 4, 2023;

  d. $5,322,385.32 in United States currency formerly held on deposit in Account Number 0000005090042549 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

  e. $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

  f. $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

  g. $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 19, 2023;

  h. Any and all monies, assets, and funds contained in Binance account number 94086678;

  i. Any and all monies, assets, and funds contained in Binance.us account number 35000066; and

  j. Any and all monies, assets, and funds contained in Binance.us account number 35155204.

  98. As a result of committing the offenses alleged in Counts Five and Six of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

  99. As a result of committing the offenses alleged in Counts Ten and Eleven of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and

A001047

personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offenses, and the following specific property:

a.      55,273,469 shares of the stock of Robinhood Markets Inc. from Account Number 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

b.      $20,746,713.67 in United States currency formerly on deposit in Account Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023;

c.      $49,999,500 in United States currency formerly on deposit in Account Number 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank" held in the name of "FTX Digital Markets," seized by the Government on or about January 4, 2023;

d.      $5,322,385.32 in United States currency formerly held on deposit in Account Number 0000005090042549 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

e.      $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

f.      $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

g.      $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 19, 2023;

h.      Any and all monies, assets, and funds contained in Binance account number 94086678;

i.      Any and all monies, assets, and funds contained in Binance.us account number 35000066; and

j.      Any and all monies, assets, and funds contained in Binance.us account number 35155204.

100.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred

38

A001048

or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON
2/22/23

DAMIAN WILLIAMS
United States Attorney

2/22/23 - Superseding Indictment Filed - No Warrants
USMS
Valerie Figueredo

A001049

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) (Jointly Administered) |
| Debtors. | **Hearing Date:  TBD** **Objection Deadline:  TBD** |

**MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN**
**ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER**

Andrew R. Vara, United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, files this Motion (the "Motion") for the entry of an order directing the appointment of an examiner pursuant to 11 U.S.C. § 1104(c). In support thereof, the U.S. Trustee respectfully represents:

## I.   PRELIMINARY STATEMENT

Over the course of eight days in November, beginning with reports of significant problems with one debtor's (Alameda Research) balance sheet, the Debtors suffered a virtually unprecedented decline in value—from a market high of $32 billion just earlier this year—and a severe liquidity crisis after a proverbial "run on the bank" amid revelations of multiple corporate failures and misuse of customer funds facilitated by "software to conceal" it.  *Declaration of John J. Ray in Support of Chapter 11 Petitions and First Day Pleadings* ("Ray") [D.I. 24] ¶ 65.  The

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

result is what is likely the fastest big corporate failure in American history, resulting in these "free fall" bankruptcy cases. Debtors' approximately one million worldwide creditors,[2] outside investors, and regulators are demanding answers to what happened and how. The CEO provided an initial answer in his "first day" testimony: there was a "complete failure of corporate controls and [] a complete absence of trustworthy financial information . . . . From compromised systems integrity . . . to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented." Ray ¶ 4. Like the bankruptcy cases of Lehman, Washington Mutual Bank, and New Century Financial before them, these cases are exactly the kind of cases that require the appointment of an independent fiduciary to investigate and to report on the Debtors' extraordinary collapse.

The appointment of an independent examiner would be in the interests of the Debtors' creditors and other parties in interest in the Debtors' estates, consistent with Code section 1104(c)(1). An examiner could—and should—investigate the substantial and serious allegations of fraud, dishonesty, incompetence, misconduct, and mismanagement by the Debtors, the circumstances surrounding the Debtors' collapse, the apparent conversion of exchange customers' property, and whether colorable claims and causes of action exist to remedy losses. The appointment of an examiner is mandatory under 11 U.S.C. § 1104(c)(2) because the Debtors' fixed, liquidated, unsecured debts to its customers alone far exceed section 1104(c)(2)'s $5 million threshold.

---

[2]     The Debtors' customers constitute most of their creditors. *Mot. of Debtors for Entry of an Order (I) Modifying Certain Creditor List Requirements; (II) Authorizing the Debtors to Serve Certain Parties by E-Mail; and (III) Granting Related Relief* [D.I. 9] ¶¶ 19, 22.

2

An examination is preferable to an internal investigation under the facts of these cases because the findings and conclusions of the examination will be public and transparent, which is especially important because of the wider implications that FTX's collapse may have for the crypto industry. Mr. Ray and FTX's new management have done valuable preliminary work in untangling some of these issues. But the questions at stake here are simply too large and too important to be left to an internal investigation. Although the U.S. Trustee does not question the qualifications, competence, or good faith of Mr. Ray, his role in these cases is that of a fiduciary for the Debtors' estates with objectives that may not necessarily be aligned with those of all other interested parties. By contrast, because an examiner would be able to act as a true neutral as to all affected parties, an examiner's findings likely would enjoy broader acceptance and credibility than an examination conducted by any stakeholder in these cases. An examiner may also allow for a faster and more cost-effective resolution of these cases by allowing Mr. Ray to focus on his primary duty of stabilizing the debtors' businesses while allowing the examiner to investigate the Debtors' collapse and prior management. The Motion should be granted.

## II.     JURISDICTION, VENUE AND STANDING

1.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334. This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012. Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

2.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia*

3

*Gas Sys., Inc.*), 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest

standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco*

*D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a

"watchdog"). Specifically, the U.S. Trustee is charged with "monitoring the progress of cases

under title 11 and taking such actions as the United States trustee deems to be appropriate to

prevent undue delay in such progress." 28 U.S.C. § 586(a)(3)(G).

3.     The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11

U.S.C. § 307.

### III.     FACTUAL BACKGROUND

#### A.   *The Debtors' Businesses*

4.     The Debtors' businesses have been divided into four "silos" by its new

management: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-

Debtor subsidiaries (the "WRS Silo"), which includes the businesses known as "FTX US,"

"LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among

other businesses; (b) a group composed of Debtor Alameda Research LLC and its Debtor-

subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC,

Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures

Ltd. (the "Ventures Silo"); and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor

and non-Debtor subsidiaries (the "Dotcom Silo"), including the exchanges doing business as

"FTX.com" and similar exchanges in non-U.S. jurisdictions. Ray ¶ 9.

4

5.      Each of the four Silos was controlled by Samuel Bankman-Fried ("Bankman-Fried").  Minority equity interests in the Silos were held by Zixiao "Gary" Wang (Chief Technology Officer) and Nishad Singh (Director of Engineering) who, together with Bankman-Fried, co-founded the business.  The WRS Silo and Dotcom Silo also have third-party equity investors, including investment funds, endowments, sovereign wealth funds, and families.  No single investor other than the co-founders owns more than 2% of the equity of any Silo.  *Id.* ¶ 10.

6.      The WRS Silo includes FTX US, an exchange for spot trading in digital assets and tokens.  FTX US was founded in January 2020, is available to U.S. users, and according to statements by Bankman-Fried, had approximately one million users as of August 2022.  *Id.* ¶ 12.  The WRS Silo made loans and investments, including a loan of FTT tokens to BlockFi Inc. in a principal amount of FTT tokens valued at $250 million as of September 30, 2022.  *Id.* ¶ 17.  Upon information and belief, FTT is a cryptocurrency created by one or more of the FTX Debtors.

7.      The Alameda Silo is a "crypto hedge fund" with a diversified business that trades and speculates in digital assets and related loans and securities for the account of its owners, Bankman-Fried (90%) and Mr. Wang (10%).  The Alameda Silo operated quantitative trading funds specializing in crypto assets.  The Alameda Silo's strategies included arbitrage, market making, yield farming, and trading volatility.  The Alameda Silo offered over-the-counter trading services.  The Alameda Silo also made and managed other debt and equity investments.  *Id.* ¶ 22.

8.      The Venture Silo makes and manages private investments, which are held in Debtors Clifton Bay Investments, LLC, Clifton Bay Investments Ltd., FTX Ventures Ltd., Island Bay Ventures Inc. and, potentially, in affiliated companies.  *Id.* ¶ 27.

A001054

9.      The Dotcom Silo includes FTX.com, the trade name for the business conducted by the parent company in the Dotcom Silo, FTX Trading Ltd., which is organized in Antigua. FTX.com is a digital asset trading platform and exchange founded by Bankman-Fried, Mr. Wang, and Mr. Singh which commenced operations in May 2019.  The Dotcom Silo also holds certain marketplace licenses and registrations in certain non-U.S. jurisdictions, including the European Union and Japan.  The FTX.com platform is not available to U.S. users.  *Id.*  ¶ 33.  In addition to its core digital asset exchange, the Dotcom Silo offered an off-exchange portal that enabled users to connect and request quotes for spot digital assets and trade those assets directly.  The portal enabled users to lend their digital assets to other users for spot trading and matched users wanting to borrow with those willing to lend.  *Id.* ¶ 34.

10.      The FTX.com platform grew quickly to become one of the largest cryptocurrency exchanges in the world.  *Id.* ¶ 35.  Bankman-Fried apparently claimed that, by the end of 2021, around $15 billion of assets were on the platform, which handled approximately 10% of global volume for crypto trading at the time.   Bankman-Fried also claimed that FTX.com, as of July 2022, had "millions" of registered users, but those figures have not been verified by Mr. Ray's team.  *Id.*

11.      Digital assets generally include cryptocurrency such as Bitcoin (BTC) and are transacted on digital ledgers known as a blockchain.  Control over those sorts of digital assets is dependent upon control over the relevant "private key" (like a password or PIN).  If a person

6

A001055

controls the relevant private key (a unique alpha-numeric code), that person can conduct transactions of the digital assets secured by that private key.[3]

12. A digital asset exchange allows customers to convert fiat currency to digital assets, to store digital assets within provided wallets, and to exchange a digital asset for another form of digital asset.[4]

### B. The FTX Debtors' Customer Contracts

13. Section 8.2.6 of the FTX Trading Terms of Service with its customers, dated May 13, 2022, a copy of which is attached as **Exhibit A**,[5] provides:

> All Digital Assets are held in your Account on the following basis:
>
> (A) ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading***. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> (B) ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading***.
>
> (C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

---

[3] Kevin Roose, *The Latecomer's Guide to Crypto*, N.Y. TIMES (March 18, 2022), https://www.nytimes.com/interactive/2022/03/18/technology/cryptocurrency-crypto-guide.html (hereinafter "*Guide to Crypto*").

[4] *Guide to Crypto*.

[5] https://help.ftx.com/hc/article_attachments/9719619779348/FTX_Terms_of_Service.pdf.

A001056

Ex. A (FTX Trading Terms of Service), p. 10, § 8.2.6 (emphasis added).

### C.  *Reported Misconduct of the Debtors' Management*

14.     In May and June of 2022, according to news reports, Alameda suffered severe losses from many deals it was engaged in, including a $500 million loan on which its borrower defaulted.[6] *The New York Times* has reported that Bankman-Fried was heavily involved in the decision-making for all of Alameda's "big trades."[7]

15.     On or about November 2, 2022, *CoinDesk* published that a substantial part of Alameda's $14.6 billion in assets were held in FTT, the cryptocurrency created by the FTX Debtors, per Alameda's June 30, 2022, balance sheet.[8]

16.     *The Wall Street Journal* reported that Bankman-Fried said in investor meetings during the week of November 6 that Alameda owed FTX about $10 billion based on loans FTX extended to Alameda to fund risky bets.[9]  The $10 billion came from money customers had

---

[6]  Angus Berwisk and Tom Wilson, *Exclusive: Behind FTX's fall, battling billionaires and a failed bid to save crypto*, REUTERS (Nov. 10, 2022, 5:46 P.M.), https://www.reuters.com/technology/exclusive-behind-ftxs-fall-battling-billionaires-failed-bid-save-crypto-2022-11-10/.

[7]  David Yaffe-Bellany, *Embattled Crypto Exchange FTX Files for Bankruptcy*, N.Y. TIMES (Nov. 11, 2022), https://www.nytimes.com/2022/11/11/business/ftx-bankruptcy.html; Tracy Wang, et al., *Sam Bankman-Fried's crypto empire 'was run by a gang of kids in the Bahamas' who all dated each other*, FORTUNE (Nov. 11, 2022, 6:14 A.M.), https://fortune.com/2022/11/11/sam-bankman-fried-crypto-empire-ftx-alameda-run-gang-kids-bahamas-who-all-dated-each-other/.

[8]  Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Nov. 9, 2022 10:44 A.M.), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/

[9]  Vicky Ge Huang, et al., *FTX Tapped Into Customer Accounts to Fund Risky Bets, Setting Up Its Downfall*, WALL ST. J. (Nov. 11, 2022, 12:16 P.M.),

deposited on the exchange for trading purposes. *Id.* Bankman-Fried described the decision to

move FTX customer property to Alameda as a "poor judgment call." *Id.* The $10 billion

constituted more than half of the approximately $16 billion in customer funds on the FTX

cryptocurrency exchange. *Id.*

17.     According to a Reuters report dated November 9, 2022, Bankman-Fried issued an

apology to all FTX employees via an internal messaging application that stated: "I'm deeply sorry

that we got into this place, and for my role in it. That's on me, and me alone, and it sucks, and I'm

sorry, not that that it makes it any better."[10]  That same day, *The Wall Street Journal* reported that

Alameda CEO Caroline Ellison—joined by Bankman-Fried and two other members of FTX Digital

Markets Ltd.'s ("FTX Digital") management team (Messrs. Wang and Singh)—told Alameda

employees that they were aware of the decision to send customer funds to Alameda. [11]

Specifically, according to the report, Ms. Ellison stated that "FTX used customer money to help

Alameda meet its liabilities." *Id.*

---

https://www.wsj.com/articles/ftx-tapped-into-customer-accounts-to-fund-risky-bets-setting-up-its-downfall-11668093732.

[10]    Hannah Lang and Angus Berwisk, *Crypto's FTX CEO looking at all options as Binance deal collapses*, REUTERS (Nov. 10, 2022, 1:29 A.M.), https://www.reuters.com/markets/currencies/ftx-turmoil-causes-crypto-concern-sending-token-prices-sliding-2022-11-09/.

[11]    Dave Michaels, et al., *Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds*, WALL ST. J. (Nov. 12, 2022, 2:42 P.M.), https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238.

A001058

### D. Actions by Bahamian Regulators[12]

18.     On November 10, 2022, the Securities Commission of the Bahamas suspended the business license of one of the Debtors' affiliates, FTX Digital, and froze its assets.  Simms ¶ 10. On that date, the Commission filed a petition in the Bahamas Supreme Court for an order that FTX Digital be wound up because (1) it was insolvent according to the Companies (Winding Up Amendment) Act, 2011, (2) the Bahamas Commission suspended its license, and (3) it was in breach of its duties under the Digital Assets and Registered Exchanges Act, 2020.  *Id.*

19.     On November 10, 2022, a hearing took place in the Bahamas Court.  The Bahamas Court issued an order directing that FTX Digital be placed into provisional liquidation and appointed Brian C. Simms as Joint Provisional Liquidator over FTX Digital (the "Provisional Liquidation Order").  On November 14, 2022, the Bahamian Court appointed Brian C. Simms, Kevin G. Cambridge, and Peter Greaves as Joint Provisional Liquidators.  Simms ¶ 16.

20.     On November 15, 2022, a Chapter 15 Petition for Recognition of a Foreign Proceeding was filed in the Bankruptcy Court for the Southern District of New York, No. 22-11516 (MEW) (the "chapter 15 case").

21.     In his declaration in support of the chapter 15 case, the Joint Provisional Liquidator of FTX Digital, Mr. Simms, asserted that "the Joint Provisional Liquidators' findings to date indicate that serious fraud and mismanagement may have been committed with respect to FTX

---

[12]   The information in this section of the Motion regarding Bahamian proceedings is taken from the *Declaration of Brian Cecil Simms KC in Support of Petition for Recognition Under Chapter 15 of the Bankruptcy Code* ("Simms") [D.I. 2], Nov. 15, 2022, in *In re FTX Digital Markets Ltd.*, a Debtor in a Foreign Proceeding, No. 22-11516 (MEW) (Bankr. S.D.N.Y.).  The U.S. Trustee does not have independent knowledge of any proceedings outside of the United States.

10

A001059

Digital and the FTX Affiliates." Simms ¶ 17. "FTX Affiliates" is defined in the Simms

Declaration to include the Debtors who filed their chapter 11 cases in this Court.[13] *Id.* ¶ 14.

22.     On November 17, 2022, the above-captioned Debtors filed a motion in this Court to

transfer venue of the chapter 15 case to this Court. D.I. 22. On November 22, 2022, this Court

entered an order transferring venue of the chapter 15 case to this Court. D.I. 131.

### E. The Debtors' Chapter 11 Cases

23.     On the Petition Date, FTX Trading Ltd. and its debtor-affiliates filed the voluntary

petitions that initiated these cases.

24.     The U.S. Trustee has solicited for interest in serving on—but not yet formed—an

official committee of unsecured creditors.

25.     The only documents the Debtors filed on the petition date were their petitions. The

first day declaration, which is traditionally filed with the petition in large chapter 11 cases in this

District, was not filed until six days later. Nor were any motions or applications filed on the

petition date. What are traditionally considered first day motions did not begin to be filed until

November 14, 2022, and continued to be filed through November 19, 2022. The hearing to

consider the Debtors' first day relief was held on November 22, 2022.

26.     The petitions state that the Debtors' liabilities are between $10 billion and $50

billion. D.I. 1. Based on the information in the unaudited balance sheets addressed in Mr. Ray's

first day declaration, it appears that the Debtors' fixed, liquidated, unsecured debts, other than

---

[13]     The U.S. Trustee has not verified ownership of the entities listed on the Debtors' "preliminary"
corporate structure chart or determined whether the entities are otherwise "affiliated." Ray Ex. B
(preliminary corporate structure chart); *see* 11 U.S.C. § 101(2) (defining "affiliate").

A001060

debts for goods, services, or taxes, or owing to an insider, far exceed $5 million.  Ray ¶¶ 20, 25, 31, and 38.

27.    The Debtors' petitions each attached an "Omnibus Corporate Authority" signed by Bankman-Fried dated November 10, 2022.  That document reflects that Bankman-Fried "authorize[d], instruct[ed] and consent[ed] [to]" certain "corporate actions with respect to all members of the FTX Group," including the following:

- "the appointment of John J. Ray III (the "CEO") as Chief Executive Officer," whose power included authority "in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code . . . with respect to all members of the FTX Group;"

- the "appointment of Mr. Stephen Neal (if willing to serve) as the Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of FTX Trading Ltd," and of Alameda Reach Ltd. and West Realm Shires Inc.;[14] and

- "if the CEO shall so determine, the appointment of one or more individuals chosen by the CEO and not affiliated with me as director of other members of the FTX Group."

D.I. 1.

28.    The Omnibus Corporate Authority also reflected that it was Bankman-Fried's "wish that the CEO [Mr. Ray] consult with [Bankman-Fried's] counsel at Paul, Weiss, Rifkind, Wharton

---

[14]    Mr. Neal is not mentioned in Mr. Ray's first day declaration as one of the newly appointed directors. Ray ¶ 47.

A001061

& Garrison LLP with respect to the foregoing director appointments" referenced in the Omnibus Corporate Authority.[15]  *Id.*

29.     Mr. Ray's first day declaration included the following facts regarding the Debtors' directors and officers:

a.  Mr. Ray was appointed the CEO of the Debtors on the Petition Date, after Bankman-Fried resigned as CEO.  Mr. Ray does not indicate who appointed him.  Ray ¶ 1.  As noted above, the Omnibus Corporate Authority signed by Bankman-Fried reflects that he "authorize[d], instruct[ed] and consent[ed]" to Mr. Ray's appointment.  D.I. 1.

b.  Mr. Ray's first official act was to authorize the chapter 11 filings of the Debtors and the commencement of these cases.  Ray ¶ 2.  But the Omnibus Corporate Authority attached to the Debtors' petitions was signed solely by Bankman-Fried.  D.I. 1.

c.  Mr. Ray states that "new independent directors" have been appointed to what Mr. Ray calls the "the primary companies in the FTX Group," with one separate director being appointed to each of the WRS, the Alameda, and the Ventures Siloes and two other directors to the Dotcom Silo.[16]  Ray ¶ 47. Mr. Ray does not disclose who appointed these directors.  Mr. Ray does not indicate whether Bankman-Fried's counsel was consulted with respect to the appointments.  He also does not indicate whether these new directors are the only directors on the Debtors' boards or whether any directors from the prepetition period remain.

---

[15]  On or about November 18, 2022, Paul Weiss terminated its representation of Bankman-Fried, citing conflicts of interest.  *Paul Weiss Drops Ex-FTX CEO Bankman-Fried on Conflicts*, BLOOMBERG LAW (Nov. 21, 2022 11:01 A.M.), https://news.bloomberglaw.com/business-and-practice/paul-weiss-drops-ex-ftx-ceo-bankman-fried-as-client-on-conflicts.

[16]  With respect to the new directors referenced in Mr. Ray's declaration, there is no overlap of names between the four Silos of the Debtors' business.

A001062

30.     Other than the replacement of Bankman-Fried as CEO by Mr. Ray, it is not clear what other officers or employees of the Debtors, if any, have been removed or replaced.  Nor have the Debtors disclosed whether they are investigating if any of the officers and employees who remain at the Debtors were involved in any of the misfeasance or malfeasance that Debtors may have committed, which, according to Mr. Ray's first day declaration, includes the following:

a.  The Debtors' use of "software to conceal the misuse of customer funds."  Ray ¶ 65.

b.  The absence of "appropriate corporate governance," including the absence of board meetings of certain Debtors.  *Id.* ¶ 46.

c.  The absence of any accounting department.  *Id.* ¶ 58.

d.  The existence of audit opinions for certain aspects of the Debtors' business over which Mr. Ray has "substantial concerns as to the information presented."  *Id.* ¶ 56.

e.  The existence of unaudited balance sheets and financial statements as to which Mr. Ray does not have confidence.  *Id.* ¶¶ 18, 23, 28, 36 and 56.

f.  The absence of any locatable unaudited financial statements for the Alameda or Venture Silos of the Debtors.  *Id.* ¶ 57.

g.  The absence of centralized control of the Debtors' cash.  *Id.* ¶ 50.

h.  The absence of an "accurate list of bank accounts and account signatories," and "insufficient attention to the creditworthiness of banking partners around the world."  *Id.*

i.  The absence of "appropriate books and records, or security controls, with respect to [the Debtors'] digital assets."  *Id.* ¶ 65.  Mr. Ray reports that Bankman-Fried

14

A001063

and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group, with certain exceptions. *Id.*

j. The Debtors engaging in "[u]nacceptable management practices," such as "the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world." *Id.* ¶ 65.

k. The absence of complete books and records for the Debtors' investments in assets other than cryptocurrency. *Id.* ¶ 69.

l. The absence of appropriate disbursement controls. Mr. Ray reports that "corporate funds of the FTX Group were used to purchase homes and other personal items for employees and advisors." *Id.* ¶¶ 62-63.

m. The "absence of lasting records of decision-making." *Id.* ¶ 71.

n. The absence of liquidity forecasting. *Id.* ¶ 54.

o. The likelihood of "a multitude of intercompany claims." *Id.* ¶ 49.

p. The absence of information sufficient to determine who worked for the Debtors as of the Petition Date, and "unclear records and lines of responsibility" for such employees. *Id.* ¶ 59.

31. Shortly after these cases were commenced, there were alleged hacks on the Debtors' exchange which "resulted in more than $600 million in digital assets leaving the exchange's wallets in a flurry of withdrawals."[17] The Bahamian government stated in the wake of the hacks that it had seized assets of FTX Digital and moved same to a digital wallet it controlled for

---

[17] Krisztian Sandor, *FTX Hack or Inside Job? Blockchain Experts Examine Clues and a 'Stupid Mistake'*, COINDESK (Nov. 21, 2022, 12:57 P.M.), https://www.coindesk.com/business/2022/11/14/ftx-hack-or-inside-job-blockchain-experts-examine-clues-and-a-stupid-mistake/.

15

A001064

safekeeping.[18]  The Debtors contend that the Bahamian government's actions "flaunted" U.S.

bankruptcy law.  *Emergency Mot. Pursuant to Fed. R. Bankr. P. 1014(b) (I) to Transfer Chapter 15*

*Proceeding Relating to FTX Digital Markets Ltd. and (II) for a Stay* [D.I. 22] ¶¶ 6, 7.

## IV.  BASIS FOR RELIEF

### A.  *The Appointment of an Examiner Is Mandated*

32.     Under 11 U.S.C. § 1104(c), if the Court has not ordered the appointment of a

chapter 11 trustee, then:

> [O]n request of a party in interest or the United States trustee, and after
> notice and a hearing, the court **shall** order the appointment of an examiner to
> conduct such an investigation of [the Debtors] as is appropriate, including an
> investigation of any allegations of fraud, dishonesty, incompetence,
> misconduct, mismanagement, or irregularity in the management of the
> affairs of [the Debtors] of or by current or former management of [the
> Debtors], if -
>
> (1)  such appointment is in the interests of creditors, any equity security
>       holders, and other interests of the estate; *or*
>
> (2)  [the Debtors'] fixed, liquidated, unsecured debts, other than debts for
>       goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

33.     Based on the information in the Debtors' petitions and in Mr. Ray's first day

declaration, it appears that the Debtors' fixed, liquidated, unsecured debts, other than debts for

goods, services, or taxes, or owing to an insider, substantially exceed the $5 million threshold of

---

[18]  *Bahamas Regulator Confirms FTX Asset Seizure After Hack Accusation*, REUTERS (Nov. 18, 2022, 1:18
P.M.), https://www.reuters.com/technology/bahamas-regulator-says-it-assumed-control-digital-assets-
ftx-2022-11-18/.

A001065

Code section 1104(c)(2).[19]  Ray ¶¶ 20, 25, 31, and 38.  The custodial funds due to customers

through the FTX US platform alone are over a hundred million dollars.  *Id.* ¶ 20.  Accordingly, the

appointment of an examiner under that section to investigate the affairs of the Debtors is

mandatory.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01

(6th Cir. 1990) ("[Section 1104(c)(2)] plainly means that the bankruptcy court 'shall' order the

appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million if

the U.S. trustee requests one."); *In re Loral Space & Communications Ltd.,* No. 04 Civ. 8645RPP,

2004 WL 2979785, at *4, 5 (S.D.N.Y. Dec. 23, 2004) (reversing bankruptcy court's decision

denying appointment of examiner where $5 million debt threshold under section 1104(c)(2) was

met and parties seeking appointment had standing to do so); *In re UAL Corp.,* 307 B.R. 80, 83-86

(Bankr. N.D. Ill. 2004) ("best reading of the statute" is that appointment of an examiner is

mandatory if the requirements of section 1104(c)(2) are satisfied); *see also In re Mechem Fin. of*

*Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988); *In re The Bible Speaks*, 74 B.R. 511, 514

(Bankr. D. Mass.1987); *In re 1243 20th Street, Inc.*, 6 B.R. 683, 685 n.3 (Bankr. D.C. 1980); *In re*

*Lenihan,* 4 B.R. 209, 211 (Bankr. D.R.I. 1980).

     34.    Although this Court has authority under Code section 1104(c)(2) to specify (and

thereby effectively limit) the appropriate scope of an examination, the "as is appropriate" language

in that statutory subsection does not confer discretion upon this Court to decide whether an

examiner should be appointed once it is clear that the statute's monetary threshold is met.  *See*

*Loral,* 2004 WL 2979785, at *5 ("[i]t is [the bankruptcy court's] duty to fashion the role of an

---

[19]   It is unclear whether each Debtor individually satisfies the $5 million debt threshold under section
1104(c)(2).  Accordingly, the U.S. Trustee requests that the Court direct the appointment of an examiner
under section 1104(c)(1) for any debtor which does not meet the threshold.  The vagaries of the balance
sheets of these interrelated Debtors should not limit the examiner's investigation.

examiner to avoid substantial interference with the ongoing bankruptcy proceedings."); *UAL Corp.*, 307 B.R. at 85 n.2 (construing the "as is appropriate" language in section 1104(c)(2) to vest discretion in the bankruptcy court nullifies its mandate). Here, given that there is a substantial basis to believe that Bankman-Fried and other managers of the Debtors mismanaged the Debtors or engaged in fraudulent conduct, this Court should authorize an examiner to investigate "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor[s] of or by current or former management of the debtor[s]." 11 U.S.C. § 1104(c).

### B.   The Appointment of an Examiner Is in the Best Interests of the Debtors' Creditors and Other Parties in Interest

35.     Finally, even if an examiner were not mandated under section 1104(c)(2), this Court should direct the appointment of an examiner under section 1104(c)(1) because the appointment would be in the best interests of the Debtors' estates, their creditors, and equity security holders. Here, the published news reports cited in this Motion, taken together with Mr. Ray's first day declaration, provide reasonable grounds to suspect that Bankman-Fried and others participated in actual fraud, dishonesty, or criminal conduct in the management of the Debtors. Additionally, although Bankman-Fried has been replaced as the Debtors' CEO as of the Petition Date, it is unclear how many of the Debtors' other officers who were in place prepetition—and may have participated in fraud, dishonesty, or mismanagement—remain.

36.     An investigation by an examiner into the alleged conversion by the FTX Trading arm of the Debtors of $10 billion of customers' property to lend to its affiliate Alameda, in violation of the express provisions in FTX's customer contracts, and into the use of software to

A001067

conceal such misuse is unquestionably in the interests of the Debtors' creditors and other interests of the estates. The many instances of what Mr. Ray describes as a "complete failure of corporate controls and [] a complete absence of trustworthy financial information as occurred here" (Ray ¶ 5), such as those detailed in paragraph 30 of this Motion, also warrant examination.

37.    An appointment of an examiner would also be in the interests of the Debtors' creditors and other parties in interest in the Debtors' estates, consistent with Code section 1104(c)(1), because there is an actual conflict of interest between Debtors FTX Trading Ltd. and Alameda Research. FTX Trading has a claim against Alameda Research in the billions of dollars on behalf of its customers in connection with one or more loans of allegedly converted customer funds that FTX Trading had no right to make in the first instance. Such an immense, out-of-the-ordinary course claim of one Debtor against another, especially one that involves the alleged conversion of customer funds, calls out for independent scrutiny by an independent examiner.

38.    The interests of the Debtors' estates and their creditors are best served by permitting an independent examiner to investigate the Debtors' prepetition activities and to identify colorable claims that the estates may assert, including claims that may be asserted between Debtors. The Debtors' financial affairs and business operations need to be reviewed by a disinterested person with clear authority to untangle the mess and provide transparency to all parties in interest. This is especially true where, as here, there are colorable claims that certain of the Debtors misappropriated $10 billion of their customers' assets to fund the operations and investments of other Debtors.

19

A001068

39.     Even in their early stages, these cases have been highly contentious,[20] and the parties affected by FTX's collapse are likely to have even more sharply diverging interests over matters such as the ownership of particular assets and remedies.  For this reason, it is imperative that the investigation be conducted not by any person who will be directly involved in these disputes, but by a truly neutral examiner as the cases proceed.

40.     The U.S. Trustee understands that Mr. Ray and FTX's new management have done valuable preliminary work in untangling some of these issues.  But the questions at stake here are simply too large and too important to be left to an internal investigation.  Although the U.S. Trustee has no reason to question the qualifications, competence, or good faith of Mr. Ray, as an officer of the Debtors (and as an appointee of prior management), he cannot act as a true neutral, especially as to parties whose objectives may conflict with those of these Debtors.

41.     This is not simply the U.S. Trustee's position.  Others have noted the important distinctions between investigations conducted by independent examiners and those by fiduciaries for economic stakeholders.  Indeed, the economic predispositions of debtors in possession and committees are an important and intentional part of the Code's structure, but those predispositions prevent their neutrality:

> Unlike examiners, neither trustees nor committees are neutrals charged with finding truth. They occupy adversarial roles and must advance the interests of particular constituencies.  Trustees of insolvent estates owe fiduciary obligations to general

---

[20] *See, e.g.,* Amrith Ramkumar, *Bahamian Attorney General Defends Handling of FTX Collapse*, WALL ST. J. (Nov. 27, 2022, 8:15 P.M.), https://www.wsj.com/articles/bahamian-attorney-general-defends-handling-of-ftx-collapse-11669597384 (criticizing statements made by management and professionals of the Debtors in these chapter 11 cases); Katanga Johnson, *FTX Tensions Intensify as Bahamas Blasts Company's New Chief Ray,* BLOOMBERG NEWS (Nov. 28, 2022, 8:28 P.M.), https://www.bloomberg.com/news/articles/2022-11-28/ftx-tensions-intensify-as-bahamas-blasts-company-s-new-chief-ray (criticizing Mr. Ray's "intemperate statements" and "urg[ing] prudence and accuracy in all future filings [in this bankruptcy court]").

A001069

creditors and are duty-bound to maximize the value of the estate. They are not neutrals as to any claims or defenses that affect the estate. Indeed, trustees' personal economic interests are purposely aligned with the goal of estate maximization. Similarly, creditors' committees consist of creditors from particular interested constituencies who serve and negotiate on behalf of those constituencies. As I have noted elsewhere, in the hands of a committee, investigations are generally used strategically to advance the committee's position in plan negotiations. Unsurprisingly, trustee- and committee-led investigations quickly and naturally fall into the adversarial model.

<p style="text-align:center">*       *       *</p>

So far, examiner appointments in major Chapter 11 cases have been few and far between and reserved for the most elite lawyers. Recent examiners conducting inquisitorial investigations have been self-conscious in breaking new methodological ground, zealous in protecting their own reputations for integrity and good judgment, and cautious in their use of inquisitorial methods. Their investigations have been remarkably well executed and yielded successful results.

Daniel J. Bussel, *Ethics for Examiners*, 84 FORDHAM L. REV. 2073, 2074-75 (2016) (all footnotes omitted).

42.     A section 1104 examination is also preferable to an internal investigation under the facts of these cases because the findings and conclusions of the examination will be public and transparent, which is especially important here because of the wider implications that FTX's collapse may have for the crypto industry.

43.     Unlike robust investigations by bankruptcy examiners, "settlements in bankruptcy [resulting from committee or trustee investigations] avoid assigning culpability, pretermit fact-finding, and may manipulate consent doctrines in ways that undermine legitimacy in the eyes of the public and aggrieved constituencies." *Id.* at 2075. With such a precipitous and devastating failure in these cases affecting stakeholders worldwide, any investigation here must not only be legitimate and independent but also must be seen as beyond reproach by stakeholders and the public. Every party in interest, including Debtors' CEO, acknowledges that FTX's entire business is surrounded

A001070

by unanswered questions. On this there is universal agreement. But the questions here are much broader than in a typical chapter 11 case; they are not merely about where money flowed or who can sue whom. Rather, they are larger questions about the fundamentals of these cases. Was this an unsuccessful business or a successful fraud? In other words, is there anything to save here? Moreover, examiner reports in bankruptcy cases with potentially broad economic implications serve the public interest as well as those of the economic stakeholders. Among others, the examiner reports in Lehman Brothers and New Century Financial[21] stand as examples of the bankruptcy system serving the public interest in transparency and accountability.

44.     If the Court is concerned about potential duplication of work already performed, it can permit the examiner to have access to any work product already created. An examiner may also allow for a faster and more cost-effective resolution of these cases by allowing Mr. Ray to focus on his primary duty of stabilizing the Debtors' businesses while allowing the examiner to conduct the investigation. This is particularly true as new management continues to confront post-petition hacks and diversion of assets by apparently malign actors, as discussed at the first day hearing.

45.     The U.S. Trustee acknowledges that parties in interest will have concerns about how much an examination will cost and how the examiner's investigation will intersect with FTX's newly undertaken internal investigation. But those concerns do not negate the need for an examiner. Instead, they can be resolved by the Court and the U.S. Trustee using the tools already at their disposal to supervise the examiner: budgets and information sharing protocols can be

---

[21]   Vikas Bajaj, *An Inside Look at a Subprime Lender's Collapse,* N.Y. TIMES (Mar. 27, 2008), https://www.nytimes.com/2008/03/27/business/worldbusiness/27iht-account.1.11463355.html ("The [examiner's] 580-page report is the most comprehensive document made public about the failings of a mortgage business.").

A001071

established, and the examiner and the Debtors can coordinate to ensure that nobody is duplicating

the work of the other.  These matters can be negotiated once an examiner is appointed.

## V.    CONCLUSION

WHEREFORE the U.S. Trustee requests that this Court enter an order directing the

appointment of an examiner and granting such other and further relief as the Court finds just and

appropriate.

Dated:  December 1, 2022
       Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By: */s/ Juliet M. Sarkessian*
Juliet M. Sarkessian
Trial Attorney
Benjamin A. Hackman
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
juliet.m.sarkessian@usdoj.gov
benjamin.a.hackman@usdoj.gov

-and-

David Gerardi
Trial Attorney
One Newark Center
1085 Raymond Boulevard
Suite 2100
Newark, NJ  07102
(973) 645-3014 (Phone)
(973) 645-5993 (Fax)
david.gerardi@usdoj.gov

23

A001072

# EXHIBIT A

A001073

## 8.2    Digital Assets

8.2.1    The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2    You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3    The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4    You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5    FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6    All Digital Assets are held in your Account on the following basis:

(A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)    You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7    FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8    It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

A001074

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re* <br><br> FTX TRADING LTD., *et al.*,[1] <br><br> Debtors. | :   Chapter 11 <br> : <br> :   Case No. 22-11068 (JTD) <br> :   (Jointly Administered) <br> : <br> : <br> :   **RE: D.I. _____** <br> : |

## ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

Upon consideration of the *Motion of the United States Trustee* (the "U.S. Trustee") *for Entry of an Order Directing the Appointment of an Examiner* (the "Motion"); and finding that due and sufficient notice of the Motion was given; and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2); and after due deliberation and sufficient cause appearing therefor, based upon the record, the Court finds that there is the basis for appointment of an examiner, pursuant to 11 U.S.C. § 1104(c). Based on the foregoing, it is hereby ORDERED as follows:

1. The Motion is GRANTED.

2. The U.S. Trustee is directed to appoint an examiner (the "Examiner") pursuant to 11 U.S.C. § 1104(c).

3. The Examiner shall: (a) investigate any allegations of fraud, dishonesty,

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors and (b) otherwise perform the duties of an examiner set forth in section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code (collectively the "Investigation").

4.       The Debtors and any official committee(s) of unsecured creditors appointed (the "Committee(s)") shall fully cooperate with the Examiner in the performance of any of the Examiner's duties and the Investigation, and that the Debtors and the Committee(s) shall use their respective best efforts to coordinate with the Examiner to avoid unnecessary interference with, or duplication of, the Investigation.

5.       The Debtors shall provide to the Examiner all non-privileged documents and information within their possession that the Examiner deems relevant to perform the Investigation. If the Examiner seeks the disclosure of documents or information as to which the Debtors assert a claim of privilege, or otherwise objects to disclosing, including on the basis that the request is beyond the scope of the Investigation, and the Examiner and the Debtors are unable to reach a resolution on whether or on what terms such documents or information should be disclosed to the Examiner, the matter may be brought before the Court for resolution.

6.       Neither the Examiner nor the Examiner's representatives or agents shall make any public disclosures concerning the performance of the Investigation or the Examiner's duties until the Examiner's report is filed with the Court.

7.       The Examiner shall cooperate fully with any governmental agencies (such cooperation shall not be deemed a public disclosure as referenced above), including, but not limited to, any federal, state or local government agency that may be investigating the Debtors, their management or their financial condition, and the Examiner shall use best efforts to coordinate with such agencies in order to avoid unnecessary interference with, or duplication of, any investigations

2

A001076

conducted by such agencies.

8.      The Examiner may retain counsel and other professionals if he or she determines that such retention is necessary to discharge his or her duties, with such retention to be subject to Court approval under standards equivalent to those set forth in 11 U.S.C. § 327.

9.      The Examiner and any professionals retained by the Examiner pursuant to any order of this Court shall be compensated and reimbursed for their expenses pursuant to 11 U.S.C. §§ 330, 331 and any administrative order governing interim compensation and reimbursement of expenses of professionals which may be entered in these cases.  Compensation and reimbursement of the Examiner shall be determined pursuant to 11 U.S.C. § 330, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to standards equivalent to those set forth in 11 U.S.C. § 330.

10.      Before commencing the Investigation, the Examiner shall meet and confer with representatives from the Committee(s), the Debtors, and any other party that the Examiner deems appropriate to discuss the Investigation.

11.      Within fifteen (15) days after entry of the order approving the appointment of the Examiner is entered on the docket in these cases, the Examiner shall propose a work plan and shall provide his or her estimated costs for the Investigation consistent with this Order, which shall be subject to the approval of the Court on ten (10) days' notice to all parties that have requested notice pursuant to Bankruptcy Rule 2002.  Notwithstanding the foregoing, the parties required to receive notice may waive such requirement in writing.

12.      The Examiner shall have the standing of a "party in interest" with respect to the matters that are within the scope of the Investigation and shall be entitled to appear and be heard at any and all hearings in these cases.

A001077

13.      Nothing in this Order shall impede the right of the U.S. Trustee or any other party in interest to request any other lawful relief.

A001078

Investors' Compensation Scheme Ltd v West Bromwich Building Society, Investors' Compensation Scheme Ltd v Hopkin & Sons (a firm), Alford v West Bromwich Building Society, Armitage v West Bromwich Building Society

Overview    |    **[1998] 1 All ER 98**,    |    [1998] 1 WLR 896,    |    [1998] 1 BCLC 493, [1997] CLC 1243, [1997] NLJR 989, [1997] PNLR 541

---

# Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwich Building Society and others; Armitage v West Bromwich Building Society and others [1998] 1 All ER 98

HOUSE OF LORDS

LORD GOFF OF CHIEVELEY, LORD LLOYD OF BERWICK, LORD HOFFMANN, LORD HOPE OF CRAIGHEAD AND LORD CLYDE

21, 22, 23 APRIL, 19 JUNE 1997

**Investment business — Investors Compensation Scheme — Assignment of action to scheme — Interpretation of contractual document — Matrix of fact — Badly drafted document — Document to be interpreted to reflect parties' intention.**

The claimants (the **investors**) submitted a claim to the **Investors Compensation Scheme** Ltd (the ICS) for **compensation** in respect of negligent advice provided by brokers who had sold them home income plans in contravention of rules made under the Financial Services Act 1986. Under the home income plans the **investors** obtained mortgage loans from the respondent building society which were invested in equity-linked single premium bonds to provide income for the **investors**. The plans proved to be disastrous to the **investors**, who found their homes liable to repossession by the building society. The ICS required the **investors** to sign a claim form, which included an assignment to the ICS by the claimant of all his rights arising out of the transaction against the financial advisers and anyone else, subject to section 3(b). That clause excluded from the assignment 'Any claim (whether sounding in rescission for undue influence or otherwise) that you [the **investor**] have or may have against the [building society] in which you claim an abatement of sums which you would otherwise have to pay to that Society in respect of sums borrowed by you from that Society in connection with the transaction and dealings giving rise to the Claim'. The **investors** brought proceedings against the building society claiming damages for negligence, misrepresentation and

rescission of their mortgages and the question arose whether the **investors'** actions had been assigned to the ICS, and whether the assignment was valid and effective to enable the ICS to maintain the actions. The judge held: (i) that section 3(b) of the claim form was to be construed as if it excepted from the assignment to the ICS only claims sounding in rescission; and (ii) that an assignment of part of the remedies available to the **investors** (ie a claim for damages) while the **investors** retained other remedies (ie a claim for rescission) was invalid, because it was not possible to assign different remedies in respect of the same chose in action. On appeal, the Court of Appeal upheld the judge's decision that the **investors'** claims for damages for misrepresentation or

*[\*99]*

breach of duty had not been validly assigned to the ICS but on the different grounds that on its ordinary and natural meaning section 3(b) excepted from the assignment of the **investors'** rights all possible claims of any kind in which the **investors** claimed against the building society an abatement or reduction of the amount due under the mortgage loans. The ICS appealed to the House of Lords.

**Held** – (Lord Lloyd of Berwick dissenting) The matrix of fact against which a contractual document was to be construed included anything which would have affected the way in which the language of the document would have been understood by a reasonable man. Although the court would as a matter of common sense normally apply the presumption that words were to be given their natural and ordinary meaning, if it was clear from the background that the parties, for whatever reason, had

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

used the wrong words or syntax or that something must have gone wrong with the language used, the court was not obliged to attribute to the parties an intention which they plainly could not have had. Notwithstanding the words used, section 3(b) of the claim form was to be construed to reflect the fact that the parties intended that an **investor** should assign to the ICS his claim for damages while retaining any claim for an abatement of his debt which arose out of a claim for rescission whether for undue influence or otherwise. Furthermore, although between them the ICS and an **investor** could not recover from the building society more than the loss actually suffered by the **investor**, there was nothing invalid in the **investor** retaining and pursuing the right to rescission, which could not in any event be assigned, while at the same time assigning his right to damages. It followed that all claims for damages and **compensation** had been validly assigned to the ICS and such claims could be maintained by the ICS but not by **investors** in their actions. However, the **investors** retained the right to claim rescission of their mortgages on such terms as the court considered just. The appeal of the ICS would therefore be allowed (see p 100 *g h*, p 114 *a e h* to p 115 *f*, p 116 *a*, p 118 *g* and p 119 *e h* to p 120 *e*, post).

**Notes**

For **compensation schemes** for the purpose of compensating **investors**, see Supplement to 32 *Halsbury's Laws* (4th edn) para 343.

**Cases referred to in opinions**

*Antaios Cia Naviera SA v Salen Rederierna AB, The Antaios* [1984] 3 All ER 229, [1985] AC 191, [1984] 3 WLR 592, HL.

*Barclays Bank plc v O'Brien* [1993] 4 All ER 417, [1994] 1 AC 180, [1993] 3 WLR 786, HL.

*Charter Reinsurance Co Ltd v Fagan* [1996] 3 All ER 46, [1997] AC 313, [1996] 2 WLR 726, HL.

*Investors Compensation Scheme Ltd v Cheltenham and Gloucester Building Society* (1 November 1995, unreported), Ch D.

*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] 3 All ER 352, [1997] 2 WLR 945, HL.

*Porter v National Union of Journalists, Pritchard v National Union of Journalists* [1980] IRLR 404, HL.

*Prenn v Simmonds* [1971] 3 All ER 237, [1971] 1 WLR 1381, HL.

*R v Investors Compensation Scheme Ltd, ex p Bowden* [1995] 3 All ER 605, [1996] AC 261, [1995] 3 WLR 289, HL.

*[\*100]*

*Reardon Smith Line Ltd v Hansen-Tangen, Hansen-Tangen v Sanko Steamship Co* [1976] 3 All ER 570, [1976] 1 WLR 989, HL.

*Schuler (L) AG v Wickman Machine Tool Sales Ltd* [1973] 2 All ER 39, [1974] AC 235, [1973] 2 WLR 683, HL.

*Wilson v United Counties Bank Ltd* [1920] AC 102, [1918–19] All ER Rep 1035, HL.

**Appeal**

The **Investors Compensation Scheme** Ltd (the ICS) appealed with leave of the Appeal Committee of the House of Lords given on 27 February 1997 from the decision of the Court of Appeal (Leggatt, Swinton Thomas and Mummery LJJ) ((1996) Times, 8 November) delivered on 1 November 1996 dismissing the ICS's appeal from the decision of Evans-Lombe J ((1996) Times, 10 October) delivered on 3 October 1996 on the trial of certain preliminary issues whereby the judge held in actions against the respondent, the West Bromwich Building Society (WBBS), by Eric John Alford, Gladys Armitage and others (the **investors**) and the ICS, and against Hopkin & Sons and other firms of solicitors, by the ICS, that the **investors'** claims had not been validly assigned to the ICS. Philip Haring, one of the **investors** intervened on their behalf. The facts are set out in the opinion of Lord Hoffmann.

*Geoffrey Vos QC, Denis Brock* of *Clifford Chance* and *Guy Morpuss* (instructed by *Clifford Chance*) for the ICS.

*David Oliver QC, Andrew Hochhauser QC* and *Vernon Flynn* (instructed by *Eversheds*, Birmingham) for WBBS.

*Jonathan Sumption QC* and *Mark Cannon* (instructed by *Reynolds Porter Chamberlain)* for Hopkin & Sons.

*Nicholas Strauss QC* and *Neil Kitchener* (instructed by *Barnett Sampson* and *J Keith Park & Co*, St Helens) for

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

Mr Haring.

*Their Lordships took time for consideration.*

19 June 1997. The following opinions were delivered.

## LORD GOFF OF CHIEVELEY.

My Lords, I have had the opportunity of reading in draft the speech of my noble and learned friend Lord Hoffmann. I agree with the conclusion which he has reached as to the construction to be placed upon section 3(b) of the **Investors Compensation Scheme** claim form and, for the reasons given by him, I would answer the questions directed by Evans-Lombe J to be tried as preliminary issues in the manner proposed by my noble and learned friend. I would therefore allow the appeal.

## LORD LLOYD OF BERWICK.

My Lords,
**Background**

This is the second occasion on which the House has had to consider the **scheme** for compensating **investors** set up under s 54 of the Financial Services Act 1986. On the first occasion I described the rules made by the Securities and Investments Board under s 54(6) of the Act as being needlessly confusing and obscure. On this occasion it is not the rules that are primarily in issue, but a single clause in the claim form which **investors** are required to sign when making a claim for **compensation**; and the problem arises not from any obscurity of the language (the meaning is, I think, tolerably clear) but from slovenly drafting.

*[\*101]*

The general background to the home income plans, and the reasons why so many **investors** have come to grief, have already been described in the judgments in the earlier appeal, and need not be repeated here. The particular background to the present appeals are proceedings brought by two groups of **investors** against West Bromwich Building Society (WBBS) for damages for negligence at common law and under s 2(1) of the Misrepresentation Act 1967. They also claim rescission of their mortgages on the ground of misrepresentation and undue influence, equitable **compensation**, damages in lieu of rescission under s 2(2) of the 1967

Act, and a variety of other remedies. Some of these remedies overlap.

The **Investors Compensation Scheme** Ltd (the ICS) have also commenced proceedings against WBBS in which they claim as assignees of the **investors'** rights against WBBS. They assert that all the **investors'** claims against WBBS have been validly assigned to the ICS, with the exception of the **investors'** claim for rescission. It follows that there are competing claims against WBBS for the same damages, by the **investors** on the one hand and the ICS on the other. The resolution of the issue which thus arises indirectly between the ICS and the **investors** depends on the true construction of the claim form, and in particular on the scope of the provisions relating to the assignment of the **investors'** rights against third parties.

As between the ICS and WBBS there is a further issue. For WBBS allege in the alternative that if the question of construction is resolved in favour of the ICS, and the **investors** have purported to assign their claims for damages against WBBS, then the assignment is void or unenforceable on grounds of public policy.

In addition to their claim against WBBS, the ICS have brought proceedings against numerous firms of solicitors, in which they claim damages for negligence in advising their clients in relation to the home income plans. These proceedings are also brought as assignees under the claim form. But there are two important differences. In the first place, there is no issue as to the meaning or scope of the assignment in the case of claims against the solicitors. Secondly (and no doubt for the same reason) none of the **investors** have brought their own proceedings against the solicitors. So there is no underlying conflict between the ICS and the **investors** in relation to the ICS claim against the solicitors. The solicitors' defence is the same as the alternative argument advanced by WBBS, namely that the assignment is void or unenforceable on grounds of public policy.

Before turning to the question of construction, it is convenient to set out the main provisions of the claim form. The form is addressed to the individual **investor**. In section 2 it sets out the amount of the **compensation** to which the recipient is entitled under the **scheme**. Section 3(a) sets out the claimants' declaration. It provides (in a typical case) as follows:

'I/we hereby claim **compensation** for losses amounting to £20,345 as a result of the default of Fisher Prew-

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

Smith.

'I/we believe … that I/we have a claim against the firm in respect of negligent acts and/or advice given by Fisher Prew-Smith on or after 28 August 1988 …

'I/we confirm that I/we have received no **compensation** of any kind in respect of amounts owed to me/us at the date of default by Fisher Prew-Smith or any other person …

… I/we also confirm that I/we do not expect to receive any such **compensation** in the future …

'I/we understand that subject to section 3(b) below

1. I/we are not obliged to make a claim under this **scheme**.

*[*102]*

2. **Investors Compensation Scheme** Ltd. … will take over my/our rights and claims against Fisher Prew-Smith and other third parties on the payment of any **compensation** as described in the Transfer of Rights at section 4 of this form …'

The claimants' declaration is then signed by the **investor**.

Section 3(b) on which the present appeal turns, sets out a counter-declaration by the ICS. It provides:

'I.C.S. agrees that the following claims shall not be treated as a "Third Party Claim" [as defined in section 4 of this form] for the purposes of this agreement and that the benefits of such claims shall enure to you absolutely: Any claim (whether sounding in rescission for undue influence or otherwise) that you have or may have against the West Bromwich Building Society in which you claim an abatement of sums which you would otherwise have to repay to that Society in respect of sums borrowed by you from that Society in connection with the transaction and dealings giving rise to the claim (including interest on any such sums).'

Section 4 is headed **'Investor**'s Agreement and Acknowledgment (Rights Against Participant Firm)'. It provides as follows:

'1. I/we agree that my/our rights against the Participant Firm in respect of the Claim shall pass to **Investors Compensation Scheme** Ltd. ("I.C.S.") on payment of **compensation** pursuant to the Financial Services (**Compensation** of **Investors**) Rules 1990 ("the Rules") …

'3. I/we acknowledge that under the Rules on payment of the amount of £20,345·4315 I/we will no longer have the

right to make a claim against the Participant Firm in respect of the Claim and that any such right will be vested in I.C.S. pursuant to the Rules, and I/we further acknowledge that any sums which would otherwise be payable to me/us in respect of the Claim by the Participant Firm, or by any trustee appointed under the Financial Services Act 1986, shall be paid instead to I.C.S. …

'5. I/we agree that in the event of my/our receiving any moneys or assets in respect of the Claim from the Participant Firm or from any trustee appointed under the Financial Services Act 1986 I/we will forthwith pay or transfer them to I.C.S.

'6. I/we hereby assign absolutely to I.C.S. each and every Third Party Claim and the benefit thereof …

'12. In this document, "Third Party Claim" means any right, claim or cause of action which the claimant has or may have against any person other than the Participant Firm or against any fund or property in the hands of any person other than the Participant Firm and arising out of the circumstances giving rise to the Claim or otherwise relating to the Claim whether such claims shall arise in debt, breach of contract, tort, breach of trust or in any other manner whatsoever (and including all sums to which I/we may become entitled under sections 6 and 61 of the Financial Services Act 1986).'

Section 4 is then signed by the **investor**. There follows an explanatory note. Paragraphs 1, 2 and 3 are all concerned with the assignment of claims against the Participant Firm, in this case Fisher Prew-Smith. Paragraph 4 is concerned with the assignment of third party claims. It provides:

*[*103]*

'You also agree that I.C.S. should be able to use any rights which you now have against anyone else in relation to the claim. Examples might be directors of the firm or other persons also responsible for causing the loss for which you are being compensated. You give up all those rights and transfer them to I.C.S. (paragraph 6).'

So much for the general shape of the claim form. I now return to section 3(b). It provides for an exception in respect of third party claims assigned under para 6 of section 4. Mr Vos QC on behalf of the ICS submits that the exception is confined to claims against WBBS for rescission. Mr Oliver QC on behalf of WBBS and Mr Strauss QC on behalf of the **investors** submit that the exception covers all claims against WBBS whether for rescission or not, in which the **investor** claims a reduction in the amount due under the mortgage loan.

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

This is not the first time the court has had to consider the meaning of section 3(b). The same question arose in proceedings brought by the ICS against Cheltenham and Gloucester plc, formerly known as Cheltenham and Gloucester Building Society. In that case Evans-Lombe J, who has had overall charge of the litigation, ordered, and subsequently tried, a preliminary issue as to the construction of section 3(b). He held that the more natural meaning of the words was that for which the **investors** contend; in other words that the exception covers all possible claims against Cheltenham and Gloucester, and is not limited to claims for rescission. However, he went on to reject what he regarded as the more natural meaning of the words on the ground that it produced a 'ridiculous' result, contrary to the 'demonstrable purpose of the parties in entering into the claim forms'. He thus upheld the ICS's construction even though it meant, in his view, doing violence to the language of the claim form.

When the present proceedings were before Evans-Lombe J, he repeated his view that the **investors'** construction was the more natural meaning of the words, but held once again that such meaning was displaced by a consideration of the surrounding circumstances, and in particular by the need for an 'efficient system' to enable the ICS to recover its outlay. However, the learned judge went on to hold that the purported assignment in favour of the ICS was invalid, on the grounds that the assignment of some but not all the remedies available against WBBS in respect of a single cause of action is ineffective in law. Since the assignment was invalid, it followed that the **investors** were free to pursue their claims for damages against WBBS

The ICS appealed to the Court of Appeal. The Court of Appeal agreed with Evans-Lombe J that the **investors'** construction accords with the natural meaning of the words. But unlike the judge they did not regard the result as commercially ridiculous. Leggatt LJ, who gave the leading judgment, said: 'There is simply no warrant for limiting the rights retained to claims for or consequent upon rescission.' I find myself in complete agreement with the Court of Appeal.
**The question of construction**

A useful starting point for ascertaining the meaning of section 3(b) of the claim form is to put oneself in the position of the ordinary **investor** to whom the claim form is addressed. This was the approach adopted by the House in *Porter v National Union of Journalists,*

*Pritchard v National Union of Journalists* [1980] IRLR 404. The question in that case concerned the proper construction of the rules of the National Union of Journalists. Lord Diplock said (at 407):

[*104]

'I turn then to the interpretation of the relevant rules, bearing in mind that their purpose is to inform the members of the NUJ of what rights they acquire and obligations they assume vis-a-vis the union and their fellow members, by becoming and remaining members of it. The readership to which the rules are addressed consists of ordinary working journalists, not judges or lawyers versed in the semantic technicalities of statutory draftsmanship.'

The purpose of the claim form was to inform the **investor** in relatively non-technical language what his rights and liabilities were to be on receipt of **compensation** under the **scheme**. No doubt the **investor** would start by reading the explanatory note, as he is invited to do before signing section 4. He would notice that the first three paragraphs of the explanatory note are all dealing with his right to claim against the defaulting firm, Fisher Prew-Smith. This would not surprise him. For it was the firm of Fisher Prew-Smith which led him into his disastrous investment. He would well understand that the ICS might wish to recover some or all of its outlay from that firm: see para 2 of the explanatory note. He might then turn to section 4 itself. He would at once notice that the heading of section 4 refers specifically to '*Rights against Participant Firm*'. Next he would find that the first five paragraphs of section 4 are all dealing with the claim against Fisher Prew-Smith. He would infer that the claim against Fisher Prew-Smith was of primary importance to the ICS; otherwise it would hardly have been given such prominence.

Next he would read para 4 of the explanatory note. He would note that he was to give up his rights against 'anyone else' in relation to the claim (ie the claim against Fisher Prew-Smith). The examples given are any rights he might have against a director of Fisher Prew-Smith 'or any persons also responsible' for causing his loss. He might or might not at that stage envisage a claim against WBBS; probably not. Certainly the reference to 'other persons' in the context of the directors of Fisher Prew-Smith does not serve to highlight a possible claim against WBBS. If he were in doubt, he would turn to para 6 of section 4, note the definition of third party claim in para 12, and so come to section 3(b).

Case 22-50514-JTD    Doc 13-1    Filed 03/24/23    Page 1107 of 1244

Page 6 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

On a quick reading of section 3(b) our hypothetical reasonable **investor** would notice that it excludes from the definition of third party claim any claim which he might have against WBBS for an 'abatement' of sums due under his mortgage. The benefit of any such claim was to enure to him absolutely. In other words it was *not* to pass to the ICS under any circumstances. He would probably not pause over the words in brackets, recognising that words in brackets do not ordinarily govern the meaning of the rest of the sentence, especially if the parenthesis starts with the word 'whether' and ends with the words 'or otherwise'. He might well, in passing, understand the words in brackets as being the equivalent of 'whether or not sounding in rescission for undue influence'. He would then come to 'abatement'. This would strike him as an unusual word in the context. So he would turn to his lawyer (who is assumed to be at his elbow) and ask him whether abatement has some special meaning in law. His lawyer would reply that abatement has a technical meaning in the law of nuisance, and in connection with contracts for the sale of goods and the provision of services. But otherwise it simply means reduction. It has no technical meaning in relation to rescission. Counsel were unable to point to a single case in which the word had been used in that connection. So the **investor** would understand that if he still owed money on his mortgage, as would almost always be the case, he would

*[*105]*

retain the right to sue WBBS in order to reduce his outstanding debt. Again, this would not surprise him. For in most cases he would not have recovered full **compensation** from the ICS, and in some cases nothing like full **compensation**. Certainly he would wish to have all defences available should WBBS start proceedings against him for recovery of the loan.

So the position would be that he, the **investor**, would retain his right to sue WBBS for a reduction of the mortgage debt, but the ICS would obtain the right to sue Fisher Prew-Smith and 'third parties' other than WBBS, on the understanding that the ICS would reassign those rights on request, should they not be needed: see para 5 of the explanatory note. This would strike the **investor** as fair and reasonable. At this stage our hypothetical **investor** would feel that he understood his rights and obligations well enough and would sign section 4.

Is there, then, any reason why the courts should not give section 3(b), and the claim form as a whole, the same meaning as the **investor**? (I shall refer to this as

'the plain meaning'.) The objections fall into two groups. The first group of objections relate to the language of section 3(b); the second group of objections relate to the legal and commercial consequences of adopting the plain meaning. I suspect that none of these objections would occur to anyone other than a lawyer.

**The meaning of the language**

The objection to the plain meaning is the inclusion of the words 'for undue influence' after 'rescission'; for any lawyer would know that there are other grounds on which the **investor** might claim rescission, for example on the ground of misrepresentation. Why, therefore, should the draftsman have specifically included one of the grounds on which the **investor** might claim rescission, but not others?

We do not know the answer to this question. It may be that if one had access to the preliminary drafts of the claim form, or to the mind of the draftsman himself, the answer would emerge clearly enough. It may be that a claim for rescission on the ground of undue influence was, for some reason, uppermost in the draftsman's mind; so he put the words in. But we cannot go into the draftsman's mind. We having nothing to go on but the words he has used. The inclusion of undue influence is odd, but not so odd as to obscure the meaning. 'Or otherwise' must relate back to 'whether sounding in rescission'. Any other construction would leave 'whether' hanging in the air. So 'or otherwise' covers claims in contract and tort. It is not limited to other grounds for claiming rescission. The drafting is slovenly. But I do not have any great difficulty with the meaning.

It is said that the plain meaning would make the words in brackets otiose. So indeed it would. But words in brackets are often otiose, especially brackets in the format '(whether … or otherwise)'. They show that the general words which precede the parenthesis are not limited to any particular kind of claim, but cover all claims so long as they are claims for reduction of sums due.

What are the alternatives? Mr Vos submits that section 3(b) means 'any claims sounding in rescission (whether for undue influence or otherwise) in which you claim an abatement …' I agree with Evans-Lombe J that such a construction does violence to the language. I know of no principle of construction (whether by reference to what Lord Wilberforce said in *Prenn v Simmonds* [1971] 3 All ER 237–242, [1971] 1 WLR 1381–1386 or otherwise) which would enable the court to take words from within

the brackets, where they are clearly intended

*[*106]*

to underline the width of 'any claim', and place them outside the brackets where they have the exact opposite effect. As Leggatt LJ said in the Court of Appeal, such a construction is simply not an available meaning of the words used; and it is, after all, from the words used that one must ascertain what the parties meant. Purposive interpretation of a contract is a useful tool where the purpose can be identified with reasonable certainty. But creative interpretation is another thing altogether. The one must not be allowed to shade into the other.

So with great respect to those taking a different view, I do not regard the present case as raising any question of ambiguity, or of choosing between two possible interpretations. The construction advocated by the **investors**, though it gives rise to the oddity which I have mentioned, is a permissible construction of the words used. The ICS's construction is not.

Nor does the ICS construction avoid one of the main objections which is raised against the **investors'** construction. If 'whether sounding in rescission for undue influence or otherwise' is otiose on the **investors'** construction, so also is 'whether for undue influence or otherwise' on the ICS's construction. Indeed the objection is all the greater, since a claim for rescission would necessarily result in an abatement, if by abatement is meant the financial adjustment which takes place in any event on rescission of a contract, and which would in this case be limited (if Mr Vos' argument is correct) to repayment of WBBS's charges and an adjustment in the rate of interest on the loan. On that view, section 3(b) would be an elaborate way of saying very little indeed.

**The legal and commercial consequences**

If Evans-Lombe J is right that the **investors'** construction is the more natural meaning of section 3(b) and if, a fortiori, the Court of Appeal is right that the ICS's construction is not even a possible meaning of the language used, then it would take a very strong case indeed before I would reject the former meaning in favour of the latter. As Lord Mustill said in *Charter Reinsurance Co Ltd v Fagan* [1996] 3 All ER 46, [1997] AC 313:

'If … the words "actually paid" can only as a matter of language and context mean what the syndicates maintain, I would hesitate long before giving them any other meaning, just because the result would be

extraordinary.'

What then are the consequences of the **investors'** construction which are said to be so extraordinary, or so 'very unreasonable' (the expression used by Lord Reid in *L Schuler AG v Wickman Machine Tool Sales Ltd* [1973] 2 All ER 39, [1974] AC 235), and which Evans-Lombe J described as producing a ridiculous result? I start with the commercial consequences. It is said that the ICS would have wanted to take over the **investors'** claim against WBBS, as well as their claim against Fisher Prew-Smith, since WBBS would be worth suing, whereas Fisher Prew-Smith, being insolvent, would not. Secondly it is said that the **investors** would have little incentive to sue WBBS, once they had received **compensation** from the ICS. A third objection was that the **investors** would not be entitled to claim on their own behalf, once they had accepted **compensation**. This third objection is now accepted as being wrong in law, and is no longer relied on.

By way of answer to the second objection, Mr Strauss pointed out that since, in the generality of cases, **investors** had received only between half and three-quarters of their losses by way of **compensation**, they would have every

*[*107]*

incentive to look elsewhere for a remedy. Over 500 **investors** have in fact done so, by bringing claims against Cheltenham and Gloucester, WBBS and other building societies. So it does not look as if the **investors** have been shy or backward in pursuing their rights.

As to the first objection, the structure and language of the claim form, and the express provisions of s 54(2)(e) of the 1986 Act, do not suggest that claims against participant firms were expected to be valueless. (It is common ground that 'person' in s 54(2)(e) means, and means only, the participant firm.) It is true that Fisher Prew-Smith is in liquidation. But other participant firms are not. Moreover the building societies are not the only third parties likely to be worth suing. It must not be forgotten that the ICS has brought proceedings against 197 firms of solvent solicitors. In any event it is not for the court to speculate on what the parties would have wanted. I accept, of course, as Mr Vos observed, that the ICS is not a charity. But it is far from being an ordinary commercial organisation. Its raison d'être is the **compensation** of **investors**.

Even so, if the ICS had undertaken to compensate the **investors** in full then one might perhaps have expected

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

the ICS to insist on a transfer of all third party rights. But that is not what has happened. It is common ground that **investors** have retained rights of some kind against WBBS. That being so it would seem to me as likely as not, commercially, that the agreement would provide for the **investors** to retain the whole of their rights against WBBS, including the right to claim damages in reduction of their loans. Such a consequence cannot be regarded as 'ridiculous' or 'extraordinary' or 'very unreasonable'.

Various other so-called anomalies are mentioned in Mr Vos' written submissions by way of reply. For example, a conscientious **investor** who had used his **compensation** to pay off his mortgage would lose his rights against WBBS, since there would then be no sum to be abated, whereas a less conscientious **investor** who had spent his **compensation** on a holiday would retain his rights in full. I agree with Mr Vos that there are theoretical anomalies on the **investors'** construction, though how likely they would be to arise in practice is another question. Where I disagree with him is in his evaluation of these anomalies. In my judgment they fall far short of the sort of absurdity which would justify the rejection of what I have called the plain meaning of section 3(b). They do not prompt the comment 'whatever else the parties may have had in mind, they cannot have meant *that'*.

As for the legal consequences, the difficulties are all on the other side. Both Evans-Lombe J and the Court of Appeal were of the view that the splitting of mutually inconsistent remedies in respect of a single cause of action against WBBS meant that the purported assignment was void for uncertainty, as well as being contrary to public policy. My noble and learned friend Lord Hoffmann has found a way round that difficulty. But the difficulty does not arise at all on the **investors'** construction. If the whole of the **investors'** rights against WBBS are retained, the question of splitting remedies, and 'dividing the indivisible' simply does not arise.

For the above reasons I would hold that on the true construction of the claim form the **investors'** claims against WBBS have been retained by the **investors**, and have not been assigned to the ICS. It follows that the question whether if there had been an assignment, it would have been valid or invalid does not call for an answer. In the result, therefore, I would uphold the reasoning of the Court of Appeal and dismiss the main appeal.

*[\*108]*

**The claim against the solicitors**

I can deal with the remaining point quite briefly, since I agree with your Lordships that the **investors'** claims against their solicitors have been validly assigned to the ICS, and that this part of the appeal should therefore be allowed. There can be no doubt that para 6 of section 4 purports to transfer to the ICS the **investors'** rights against the solicitors. There is no issue as to the meaning of para 6 in that connection. The only question is whether the assignment is effective in law. Evans-Lombe J dealt with the point briefly at the end of his judgment. Having held that it was not possible in law to assign some but not all remedies in respect of a single cause of action, he went on to conclude that the same reasoning must also apply, logically, to the claim against the solicitors, since the solicitors might wish to bring in WBBS as third parties.

Mr Sumption QC supports the judge's conclusion. He submitted that the purported assignment is void, because it is legally impossible for the **investors** to assign their right to claim against the solicitors while retaining the right to claim against WBBS in respect of the same loss. Mr Sumption was not able to point to any authority in support of this submission. He relies instead on the traditional antipathy of the courts to the assignment of bare rights to litigate. Alternatively he submits that if there can be an assignment at all in such circumstances, it will only be effective in law if the parties have agreed as to their respective priority. In the absence of agreement, the court has no means for deciding between competing claimants in regard to the same loss.

Since the claims against WBBS and the solicitors give rise to separate causes of action, the problem of splitting remedies in respect of the *same* cause of action, which Evans-Lombe J and the Court of Appeal regarded as insoluble, does not arise in so acute a form. I believe it could be solved satisfactorily by sensible case management. But I need not develop the matter further. For Mr Sumption concedes that if the main appeal is allowed, as your Lordships propose, then the appeal in the solicitors' action must also be allowed.

**LORD HOFFMANN.**

My Lords, the **Investors Compensation Scheme** was set up pursuant to s 54 of the Financial Services Act 1986 to provide a **compensation** fund for people who have unsatisfied claims against persons authorised

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

under the Act to carry on investment business. The rules under which the **scheme** is administered provide that, on paying **compensation**, the company managing the **scheme** is to take over the applicant's rights against the authorised person and also, if the management company so determines, any rights he may have against other persons relating to the subject matter of his claim.

In 1992 the management company, called the **Investors Compensation Scheme** Ltd (the ICS), began to receive a large number of claims from home owners, mainly elderly retired people, who had been advised by authorised persons, independent financial advisers belonging to the Financial Intermediaries, Managers and Brokers Regulatory Association (FIMBRA), to enter into **schemes** called 'home income plans'. These **schemes** had been marketed by the financial advisers in conjunction with certain building societies during the late 1980s and involved the owners mortgaging their homes to secure advances at enhanced rates of interest which they mainly invested in equity-linked bonds. The subsequent fall in equities and house prices and the rise in interest rates had caused the owners severe losses. They had claims against the financial advisers for negligence and breach of their statutory duties under the

*[*109]*

1986 Act as well as possible claims against the building societies and the solicitors who had acted in connection with the mortgages.

The ICS drafted a claim form for the home owner claimants (whom I shall call 'the **investors**') to sign. We shall have to examine it later in some detail. For the moment it is enough to say that it contained an assignment to the ICS of all the **investor**'s rights arising out of the transaction against the financial advisers and anyone else, subject to a reservation of certain rights against the building society. This reservation, in section 3(b) of the form, has given rise to this litigation. Evans-Lombe J, who had to determine its meaning as a preliminary issue, thought that it was trying to reserve to the **investor** a part of his rights against the building society but that an assignment to the ICS of his remaining rights was legally impossible and invalid. An assignment of the **investor**'s rights in respect of the same losses against the solicitors was also legally impossible and the whole assignment was therefore a failure. The Court of Appeal disagreed with the judge about the meaning of section 3(b). They thought it was

intended to reserve to the **investor** the whole of his rights against the building society. But they agreed that if it had been intended to assign part, it would have been ineffective. They also agreed that the assignment of rights against the solicitors was invalid. The unanimous view of the judge and the Court of Appeal was therefore that the ICS had no title to claim against either the building societies or the solicitors. From this decision the ICS appeals to your Lordships' House.

My Lords, I must start by setting out the material provisions of s 54 of the 1986 Act, the rules under which the **scheme** is operated and the claim form which the **investors** signed. First, the Act:

'**54.**—(1) The Secretary of State may by rules establish a **scheme** for compensating **investors** in cases where persons who are or have been authorised persons are unable, or likely to be unable, to satisfy claims in respect of any description of civil liability incurred by them in connection with their investment business.

(2) Without prejudice to the generality of subsection (1) above, rules under this section may—(a) provide for the administration of the **scheme** and, subject to the rules, the determination and regulation of any matter relating to its operation by a body appearing to the Secretary of State to be representative of, or of any class of, authorised persons; (b) establish a fund out of which **compensation** is to be paid; (c) provide for the levying of contributions from, or from any class of, authorised persons and otherwise for financing the **scheme** and for the payment of contributions and other money into the fund; (d) specify the terms and conditions on which, and to the extent to which, **compensation** is to be payable and in any circumstances in which the right to **compensation** is to be excluded or modified; (e) provide for treating **compensation** payable under the **scheme** in respect of a claim against any person as extinguishing or reducing the liability of that person in respect of the claim and for conferring on the body administering the **scheme** a right of recovery against that person, being, in the event of his insolvency, a right not exceeding such right, if any, as the claimant would have had in that event; and (f) contain incidental and supplementary provisions …'

Next, the rules. They are called the Financial Services (**Compensation** of **Investors**) Rules 1990 and were made by the Securities and Investments Board, exercising the powers under s 54 delegated by the Secretary of State. In these rules, the ICS is called 'the management company' and the financial advisers and

*[*110]*

other authorised persons are called 'the participant firms'. For present purposes it is necessary to refer only

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

to the following rules:

'2.02 *Payment of **compensation***

1. The Management Company is responsible for paying **compensation** to **investors** in accordance with these rules.

2. The Management Company may pay **compensation** where it is satisfied, on the basis of evidence provided by an **investor** or which is available to it from other sources, that: a. an eligible **investor** has duly applied for **compensation**; b. the **investor** has a claim against a participant firm in default … c. the participant firm is unable or likely to be unable to meet the claim within a reasonable period; and d. the **investor** has agreed, to the satisfaction of the Management Company, that the whole or any part of his rights in the claim and, if the Management Company so determines, any rights of his in a claim against any other person which relate to the subject matter of the claim, should pass to it …

2.10 *Recoveries*

1. Where, in connection with the payment of **compensation**, an **investor** agrees that the whole or any part of his rights in a claim against any person are to pass to the Management Company, the payment of **compensation** extinguishes the liability of that person to the **investor** in respect of that claim or part and confers on the Management Company a right of recovery against that person which is otherwise identical to the **investor's** former rights in the claim or part thereof.'

Finally we must look at the claim form. Various editions were produced in 1992 but for present purposes nothing turns on the differences. This case concerns a form used for claims in respect of a financial adviser called Fisher Prew-Smith Financial Services Ltd (FPS), which had marketed its home income plan in conjunction with the West Bromwich Building Society (WBBS). I shall refer to the one which was in use in July 1993.

Sections 1 and 2 dealt with the personal details of the claimants and the amount of **compensation** payable. Section 3(a) was called 'Claimant's Declaration' and contained the following statements:

'… I/we confirm that we have received no **compensation** of any kind in respect of the amounts owed to us at the date of default by [F.P.S.] or any other person …

I/we also confirm that I/we do not expect to receive any such **compensation** in the future. Any such **compensation** received by me/us, I/we will pay to [I.C.S.] in accordance with section 4 attached hereto.

I/we understand that, subject to section 3(b) below …

2. [I.C.S.] in its capacity as administrator of the **Scheme** will take over my rights and claims against [F.P.S.] and other third parties on the payment of any **compensation** as described in the Transfer of Rights at section 4 of this form. Any amount received will be paid direct to [I.C.S.] and any amounts (less costs and interest) which exceed the **compensation** payment will be paid to me/us.'

Section 3(b), which has given rise to all the difficulty, reads as follows:

'I.C.S. agrees that the following claims shall not be treated as a "Third Party Claim" [as defined in section 4 of this form] for the purposes of this

*[\*111]*

agreement and that the benefits of such claims shall enure to you absolutely: Any claim (whether sounding in rescission for undue influence or otherwise) that you have or may have against the [W.B.B.S.] in which you claim an abatement of sums which you would otherwise have to pay to that Society in respect of sums borrowed by you from that Society in connection with the transaction and dealings giving rise to the claim (including interest on any such sums).'

Finally, section 4 contained a statement that:

'I/we, the Claimant, agree and acknowledge as follows:

1. I/we agree that my/our rights against [F.P.S.] in respect of the Claim shall pass to [I.C.S.] on payment of **compensation** …

2. I/we agree that we will accept the sum of £ … from I.C.S. in satisfaction of my/our entitlement to **compensation** under the Rules in respect of the Claim.

3. I/we acknowledge that under the Rules on payment of the amount of £ … I/we will no longer have the right to make a claim against [F.P.S.] in respect of the Claim and that any such right will be vested in I.C.S. pursuant to the Rules, and I/we further acknowledge that any sums which would otherwise be payable to me/us in respect of the Claim by [FPS] … shall be paid instead to I.C.S.

4. So far as any rights in respect of the Claim would otherwise remain vested in me/us, I/we agree that I/we assign those rights to I.C.S. to the extent of the amount of the said **compensation** and **Scheme** interest paid.

5. I/we agree that in the event of my/our receiving any moneys or assets in respect of the Claim from [F.P.S.] … I/we will forthwith pay or transfer them to I.C.S.

6. I/we hereby assign absolutely to I.C.S. each and every Third Party Claim and the benefit thereof.

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

7. I.C.S. agrees and acknowledges that in the event that it recovers any monies in respect of a Third Party Claim, it will pay to you a sum equivalent to the aggregate of:— (a) the moneys which I.C.S. has recovered in respect of the Third Party Claim; and (b) any monies which I.C.S. has recovered in respect of the Claim; and (c) any monies which I.C.S. has recovered pursuant to clause 5 or 6 above; less (i) the amount of **compensation** which I.C.S. had paid to you; (ii) such amount in respect of interest as I.C.S. considers just; and (iii) the costs which I.C.S. has incurred in effecting, or in attempting to effect, any such recovery.

8. I/we agree that I/we will provide all reasonable co-operation and assistance that I.C.S. asks me/us to give in connection with any pursuit by I.C.S. of claims corresponding to the Claim and of any Third Party Claim, including the provision of documents, the provision of statements, the swearing of affidavits and the attendance at court to give oral evidence.

9. I.C.S. may give a good receipt to any person in respect of any Third Party Claim the benefit of which is assigned by this document.

10. I.C.S. will conduct all proceedings and settlement negotiations regarding claims assigned by you reasonably and with due regard to your interests as well as its own.

11. I.C.S. will re-assign to you at your request any claim which it and, if relevant its insurers decide at any time not to pursue or to pursue further.

*[\*112]*

12. In this document, "Third Party Claim" means any right, claim or cause of action which the claimant has or may have against any person other than [F.P.S.] or against any fund or property in the hands of any person other than [F.P.S.] and arising out of the circumstances giving rise to the Claim or otherwise relating to the Claim, whether such claims shall arise in debt, breach of contract, tort, breach of trust or in any other manner whatsoever …'

Although the form was obviously trying not to use too much legalese, it could not have been easy for the ordinary retired home owner to understand. It referred to technical concepts like 'sounding in rescission' and 'in debt, breach of contract, tort, breach of trust or in any other manner whatsoever'. The ICS therefore also provided an explanatory note, which was a model of clarity:

'1. Under this document, once you have received your **compensation** from I.C.S., you will not be able to sue the "Participant Firm" mentioned above in relation to the claim which led to that **compensation**. This is because your claim is being met by I.C.S. instead. (Paragraphs 2 and 3).

2. But I.C.S. in turn may wish to recover some or all of its outlay to you by suing the firm, and you promise to help I.C.S. if I.C.S. decides to do so (Paragraph 8).

3. Further, since you are being compensated in relation to this claim, you should not expect any more money for it from the firm (or liquidator) (second half of paragraph 3); and any money sent to you because of it (e g by the liquidator) is really due to I.C.S. instead of to you, so you must pay the money to I.C.S. (paragraph 5).

4. You also agree that I.C.S. should be able to use any rights which you now have against anyone else in relation to the claim. Examples might be directors of the firm or other persons also responsible for causing the loss for which you are being compensated. You give up all those rights and transfer them to I.C.S. (paragraph 6).'

Before I turn to the question of construction, I must provide some of the background to how this litigation has come about. A number of the home owners instructed a firm of solicitors called Barnett Sampson to negotiate their claims. The rules provided that claims were to be met 'only where the Management Company considers that this is essential in order to provide fair **compensation** to the **investor**' (r 2.04(1)). The ICS decided that it would not pay **compensation** in respect of various heads of claim: in particular, that it would not reimburse money which the homeowners had given away or spent on themselves, or fees paid to lawyers and other professionals, or damages for illness, anxiety and stress. Barnett Sampson's clients challenged this decision in proceedings for judicial review but this House decided in *R v **Investors Compensation Scheme Ltd, ex p Bowden*** [1995] 3 All ER 605, [1996] AC 261 that the ICS had acted within its powers.

The ICS then commenced proceedings against various building societies for **compensation** for breach of statutory duty under the 1986 Act and damages for breach of duty at common law, claiming to sue as assignee of the **investors**. In proceedings against Cheltenham and Gloucester plc (previously the Cheltenham and Gloucester Building Society) the society took the point that section 3(b) of the claim form reserved to the **investor** all claims against the society and that the ICS therefore had no title to sue. Evans-Lombe J ordered this question to be tried

*[\*113]*

Case 22-50514-JTD    Doc 13-1    Filed 03/24/23    Page 1113 of 1244

Page 12 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

as a preliminary issue and on 1 November 1995 gave a judgment in which he held that the only right reserved by section 3(b) was the right of the mortgagor, on rescission of the mortgage, to an adjustment of the mortgage debt as part of the mutual restoration of benefits consequent upon rescission. The assignment of the **investor**'s right to damages for misrepresentation or breach of duty was unaffected. A year later the same point came before Evans-Lombe J in proceedings by the ICS against WBBS. By this time, the ICS had also commenced proceedings against a large number of firms of solicitors who had acted for **investors** in connection with the home income plans. A number of **investors** represented by Barnett Sampson (the Alford plaintiffs) and another firm of solicitors (the Armitage plaintiffs) had also commenced separate proceedings against WBBS for rescission of their mortgages and damages. Evans-Lombe J therefore directed preliminary issues on the question of who, as between the ICS and the **investors**, had the title to sue WBBS for damages. These are the proceedings which are the subject of this appeal to your Lordships' House.

My Lords, I start with the construction of section 3(b). Evans-Lombe J followed his own decision in the earlier *Cheltenham and Gloucester* case and I shall first summarise his reasoning and then that of Leggatt LJ in the Court of Appeal. Evans-Lombe J focused on the words 'any claim (whether sounding in rescission for undue influence or otherwise) that you have … against the … Society in which you claim an abatement of sums which you would otherwise have to repay to that Society …' According to ordinary rules of syntax, 'any claim' is the antecedent of 'that you have' and the words 'or otherwise' in the adjectival parenthesis mean that it does not limit the breadth of 'any claim'. It follows that claims of any description are reserved as long as they amount to claims for an 'abatement' of what is owing to the society. There are various ways in which the amount owing might be abated but one would be on account of a set-off against the society's liability for damages. Thus the syntax of the words following 'any claim' points to a wide meaning of 'abatement' which includes the effect of cross-claims.

Evans-Lombe J then turned to the background against which the language in the claim form had been used. Two features seemed to him odd. First, the building society and the solicitors were the only solvent parties against which the **investors** were likely to have any claim. As between the building society and the solicitors,

the former would certainly be the prime target. It had profited from the home income plans by lending money at enhanced rates of interest on safe security (maximum of 50% of value) at a time when lenders were falling over themselves to lend as much money as possible. One might expect that the ICS, having paid **compensation** to the **investor**, would take over his claim against the building society. If not, the **investor** might well be over-compensated. Other provisions of the form, like cl 7, seemed to assume that the ICS would do the suing and account to the **investor** for the net recovery in excess of the **compensation** paid. But there was no provision for the **investor** having to pay anything back to the ICS. This pointed to the ICS being entitled to any recoverable damages.

Secondly, the parenthesis seemed very strange against the background of the law. If it was exhaustive, why was 'sounding in rescission for undue influence' singled out? What about rescission on other grounds, or claims for breach of statutory or common law duty? It was rather like providing in a lease of a flat that the tenant should not keep 'any pets (whether neutered Persian cats or otherwise)'. Something seemed to have gone wrong.

*[\*114]*

Considerations of this kind led the judge to conclude in the *Cheltenham and Gloucester* case that the wider construction of 'any claim' and 'abatement' led to a 'ridiculous commercial result which the parties to the claim forms were quite unlikely to have intended' and that it was clear that 'the drafting of the second paragraph of section 3(b) was mistaken'. He therefore concluded that the meaning intended by the parties was that the **investor** should retain any claim for an abatement of his debt which arose out of a claim for rescission, whether for undue influence or otherwise. This could be fitted easily into the **scheme** of the law because the old equitable remedy of rescission included, as part of the restitutio in integrum, an accounting for benefits and indemnity against liabilities which could result in an abatement of the mortgage debt. Such a remedy was quite separate from a common law action for misrepresentation or breach of statutory duty. But the learned judge seems to have had some misgivings about his interpretation: he said that was doing violence to the natural meaning of the words and altering the drafting of the paragraph in a way 'more appropriate to rectification than the process of construction'. In the present case, however, the judge adhered to his construction and gave some additional reasons.

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

In the Court of Appeal, Leggatt LJ said, on the authority of *Alice Through the Looking Glass*, that the judge's interpretation was 'not an available meaning of the words'. 'Any claim (whether sounding in rescission for undue influence or otherwise)' could not mean 'Any claim sounding in rescission (whether for undue influence or otherwise)' and that was that. He was unimpressed by the alleged commercial nonsense of the alternative construction.

My Lords, I will say at once that I prefer the approach of the learned judge. But I think I should preface my explanation of my reasons with some general remarks about the principles by which contractual documents are nowadays construed. I do not think that the fundamental change which has overtaken this branch of the law, particularly as a result of the speeches of Lord Wilberforce in *Prenn v Simmonds* [1971] 3 All ER 237–242, [1971] 1 WLR 1381–1386 and *Reardon Smith Line Ltd v Hansen-Tangen, Hansen-Tangen v Sanko Steamship Co* [1976] 3 All ER 570, [1976] 1 WLR 989, is always sufficiently appreciated. The result has been, subject to one important exception, to assimilate the way in which such documents are interpreted by judges to the common sense principles by which any serious utterance would be interpreted in ordinary life. Almost all the old intellectual baggage of 'legal' interpretation has been discarded. The principles may be summarised as follows.

(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as the 'matrix of fact', but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this

distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of

*[*115]*

this exception are in some respects unclear. But this is not the occasion on which to explore them.

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax (see *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] 3 All ER 352, [1997] 2 WLR 945.

(5) The 'rule' that words should be given their 'natural and ordinary meaning' reflects the commonsense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said in *Antaios Cia Naviera SA v Salen Rederierna AB, The Antaios* [1984] 3 All ER 229, [1985] AC 191:

> '… if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense.'

If one applies these principles, it seems to me that the judge must be right and, as we are dealing with one badly drafted clause which is happily no longer in use, there is little advantage in my repeating his reasons at greater length. The only remark of his which I would respectfully question is when he said that he was 'doing violence' to the natural meaning of the words. This is an over-energetic way to describe the process of interpretation. Many people, including politicians, celebrities and Mrs Malaprop, mangle meanings and syntax but nevertheless communicate tolerably clearly

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

what they are using the words to mean. If anyone is doing violence to natural meanings, it is they rather than their listeners.

I shall, however, make four points supplemental to those of the learned judge. First, the claim form was obviously intended to be read by lawyers and the explanatory note by laymen. It is the terms of the claim form which govern the legal relationship between the parties. But in construing the form, I think that one should start with the assumption that a layman who read the explanatory note and did not venture into the claim form itself was being given an accurate account of the effect of the transaction. It is therefore significant that para 4 of the note says categorically and without qualification that the **investor** gives up all his rights against anyone else and transfers them to the ICS. If the effect of the claim form was that the **investor** retained his claim against the building society, para 4 of the note was very misleading. Secondly, this leads to the conclusion that section 3(b) was intended only to deal with the possibility that a lawyer might argue that some right was a 'claim' when it would not be regarded as a claim by a layman. This is a fair description of the possibility of a reduction of the mortgage debt as part of the equitable taking of accounts upon rescission, which would not result in the **investor** receiving any money but merely having to pay less to WBBS. Thirdly, any lawyer would think it extremely odd for the ICS to take an assignment of the **investor's** claim for damages against the solicitors and

*[*116]*

leave the **investor** with a claim for the same damages against WBBS. He would be likely to wonder whether this was conceptually possible and, as I shall explain, I think that his doubts would be well founded. The **investor** and the ICS could not between them recover more than the loss which the **investor** had actually suffered. As a matter of common sense, one would therefore expect that the ICS either had a right to the damages or it did not. It would seem eccentric to leave this question to be decided (if such a thing were possible) by a race to judgment. Fourthly, no lawyer in his right mind who intended simply to say that all claims against the WBBS were reserved to the **investor** would have used the parenthesis. Nor, unless he intended to limit the reservation to the amount, if any, which happened to be outstanding on the mortgage, would he have described them as claims 'in which you claim an abatement of the sums which you would otherwise have to repay'. And it is difficult to think of any reason for such an arbitrary limitation.

Finally, on this part of the case, I must make some comments upon the judgment of the Court of Appeal. Leggatt LJ said that his construction was 'the natural and ordinary meaning of the words used'. I do not think that the concept of natural and ordinary meaning is very helpful when, on any view, the words have not been used in a natural and ordinary way. In a case like this, the court is inevitably engaged in choosing between competing unnatural meanings. Secondly, Leggatt LJ said that the judge's construction was not an 'available meaning' of the words. If this means that judges cannot, short of rectification, decide that the parties must have made mistakes of meaning or syntax, I respectfully think he was wrong. The proposition is not, I would suggest, borne out by his citation from *Alice Through the Looking Glass*. Alice and Humpty Dumpty were agreed that the word 'glory' did not mean 'a nice knock-down argument'. Anyone with a dictionary could see that. Humpty Dumpty's point was that 'a nice knock-down argument' was what *he* meant by using the word 'glory'. He very fairly acknowledged that Alice, as a reasonable young woman, could not have realised this until he told her, but once he had told her, or if, without being expressly told, she could have inferred it from the background, she would have had no difficulty in understanding what he meant.

The next question is whether, given the reservation of rights in section 3(b), the assignment of claims to **compensation** and damages against WBBS was valid. As we have seen, the judge and the Court of Appeal thought that they were not. Evans-Lombe J said that the 'fundamental problem' was that one could assign a chose in action but not a particular remedy by which that chose in action was enforced. He said:

> 'However what was here sought to be assigned was not the chose in action but part of the remedies which the original holder of the chose in action, the **investor**, held prior to the purported assignment. It follows … that what was purportedly assigned was not a chose in action and accordingly any attempted assignment is void.'

In the Court of Appeal Leggatt LJ accepted the submission of Mr Oliver QC that—

> 'the assignment for which the ICS contends attempts to divide the indivisible. Whatever else can be assigned, one remedy cannot be assigned whilst retaining a potentially alternative remedy. Since the purpose of

*[*117]*

> section 3(b) is to procure a reduction in sums payable in respect of a mortgage, it is capable of constituting an alternative to rescission.'

(I should say that, as a matter of construction of the judgment, I think that by using the word 'rescission' Leggatt LJ meant 'damages'.)

My Lords, I agree that a chose in action is property, something capable of being turned into money. *Snell's Equity* (29th edn, 1990) p 71 defines choses in action as 'all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession'. At common law, for reasons into which it is unnecessary to discuss, choses in action could not be assigned. In equity, they could. Assignment of a 'debt or other legal thing in action' was made possible at law by s 136 of the Law of Property Act 1925. In each case, however, what is assignable is the debt or other personal right of property. It is recoverable by action, but what is assigned is the *chose*, the thing, the debt or damages to which the assignor is entitled. The existence of a remedy or remedies is an essential condition for the existence of the chose in action but that does not mean that the remedies are property in themselves, capable of assignment separately from the *chose*. So, for example, there may be joint and several liability; a remedy for the recovery of a debt or damages may be available against more than one person. But this does not mean that there is more than one chose in action. The assignee either acquires the right to the money (or part of the money) or he does not. If he does, he necessarily acquires whatever remedies are available to recover the money or the part which has been assigned to him. So far, therefore, I am in complete agreement with the learned judge and the Court of Appeal.

It is in applying these principles to the agreement constituted by the claim form that I respectfully differ. Let us consider what rights the **investor** might have had when he signed the form. He may have had a claim for damages in respect of the loss which he had suffered on account of entering into the transaction. This may have included money which he had lost on the ill-advised investment in an equity-linked bond, fees which he paid to advisers to extricate himself from his predicament, high rates of interest paid to the building society, possibly even money spent under the impression that he could afford to do so. The persons liable for this loss might have been the financial adviser, the building society and his solicitor. The building society, for example, might have been liable for participating in misrepresentations made by the financial adviser in the course of a joint **scheme** for marketing home improvement plans, or in breach of its duties

under the 1986 Act. I am not suggesting that any building society was actually liable on this basis, but only that the claim form contemplates this as a possibility. This right of damages would have been a chose in action, a right to recover money, which was capable of assignment in equity and under s 136 of the Law of Property Act 1925.

The **investor** might in addition have had a right against the building society to rescission of his mortgage. Or he might have such a right without having any claim for damages. For example, he might have been able to show that the building society had actual or constructive knowledge of undue influence exercised by the financial adviser: compare *Barclays Bank plc v O'Brien* [1993] 4 All ER 417, [1994] 1 AC 180. This would entitle him to rescission but not damages. By itself, the right to rescission would have done little to solve the **investor's** problems because it would have been a condition of rescission that the **investor** should restore the benefits which he had received in return for the mortgage: the building society's advance and a reasonable rate of interest for having the use of

*[\*118]*

the money. His real complaint was not merely that his house was mortgaged but that he no longer had the money to pay back to the building society. Until he had obtained **compensation** or damages, he would usually be unable to do so. Nevertheless, one can imagine reasons why it would be more advantageous to the **investor**, even after obtaining his **compensation**, to claim rescission of the mortgage rather than simply paying it off. For example, the reasonable rate of interest which a court might fix as a condition of rescission might be less than the higher rate due under the contract (some of which he had already paid) and so, on the taking of accounts for the purposes of rescission, there might be an abatement of what he would otherwise have to repay.

Now it is important to notice that a claim to rescission is a right of action but can in no way be described as a chose in action or part of a chose in action. It is a claim to be relieved of a mortgage, and such a claim can be made only by the owner of the mortgaged property. The owner cannot assign a right to rescission separately from his property because it would make no sense to acquire a right to have someone else's property relieved of a mortgage. Likewise, the possibility of an abatement of the debt as part of the process of rescission is not a chose in action which can be assigned. It is simply part

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

of the process of rescission, which is a right attached to the ownership of the house itself.

*[*119]*

It can therefore be seen that in reserving to the **investor** any claim to an abatement of the mortgage debt consequent upon rescission, section 3(b) was not cutting down the scope of the chose in action which was assigned to the ICS. The possibility of an abatement could never have formed part of that chose in action and could never have been assigned separately from the house itself. One might therefore ask: what was the point of section 3(b)? The answer, I would suggest, is lawyerly caution. The draftsman wanted to make it clear that if, for example, the **investor** brought an action for rescission, any abatement of the debt which he secured was not something for which he would be accountable to the ICS. In my view, it was a mistake. The draftsman muddled up two separate questions. One is the extent of the assignment to the ICS and the other is the extent to which the **investor** is accountable to the ICS for any benefit he may receive. The two are not necessarily the same.

As this case shows, a right of action such as a claim for rescission of a mortgage may be unassignable as a chose in action, but there is no reason why the parties cannot agree that the **investor** is to be accountable to the ICS for all or part of the improvement in his financial position as a result of exercising his right to rescission. The words 'the benefits of such claim shall enure to you absolutely' in section 3(b) show that the draftsman's concern was with accountability for benefits. He wanted to make it clear that the **investor** would not be accountable for benefits derived from a claim for rescission. But the language he used referred to the extent of the assignment, for which purpose the exception in section 3(b) was unnecessary. Hence all the litigation: if you say something which is unnecessary, people suspect that you must mean something else. However, there was one thing which section 3(b) was not and could not be, and that was a reservation of a remedy which would ordinarily form part of the chose in action assigned by the ICS.

It is of course true that there are other links between the claim for damages and the claim for rescission. The facts giving rise to liability would have a great deal in common, so that if both claims were being made, by the ICS in the one case and the **investor** in the other, it would be sensible to try both cases together. But this can often happen when the same facts give rise to claims by different people

and there are procedural means for dealing with the possibility of duplicated evidence and conflicting decisions. For example, in *Wilson v United Counties Bank Ltd* [1920] AC 102, [1918–19] All ER Rep 1035 the breach by a bank of its contract to supervise Major Wilson's business while he was fighting in France gave rise to a claim for financial loss to the business and to general damages for injury to his credit and reputation. The House of Lords held that upon his bankruptcy the former claim was statutorily assigned to his trustee while the latter remained vested in him. He and the trustee joined as plaintiffs in the action and, if they had not done so, the bank would have been entitled to have their actions consolidated.

In addition, the damages recoverable by the ICS as assignee may be affected by whether or not the mortgage has been rescinded. If there has been no rescission, the damages may be calculated on the basis that the transaction has involved the **investor** in liability to pay a high rate of interest. If there has been rescission, the damages will be on the footing that the **investor** has only had to pay a reasonable rate. If the building society is to pay on the former basis, it is entitled to require that the **investor** affirm the mortgage and if the ICS cannot procure this, it may be necessary to assess damages on the footing that rescission will take place. If there is a dispute over the matter, the **investor** may have to be joined as a plaintiff, to avoid a situation in which the building society both resists a claim to rescission and has damages assessed on the basis that rescission has taken place. But these again are problems capable of solution by procedural means.

The fact that the exercise by the **investor** of a right to rescission may affect the quantum of the damages recoverable by virtue of the assignment to the ICS does not, however, mean that the **investor** has attempted to assign different remedies in respect of the same chose in action. What was assigned was the right to damages, whatever the quantum might be. It is not unusual for the quantum of damages to be affected by other proceedings which the person injured may bring, whether against a person liable for damages or someone else. For example, if one assumes that the financial adviser was solvent and that the **investor** had no cause of action whatever against the building society for damages but the possibility of rescission of the mortgage on the basis of constructive notice, the quantum of damages recoverable from the financial

Case 22-50514-JTD    Doc 13-1    Filed 03/24/23    Page 1118 of 1244

Page 17 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

adviser by the **investor**, or by the ICS as his assignee, would be affected by whether or not the **investor** took successful proceedings for rescission. No one would think this an odd state of affairs and in principle I do not see that it makes any difference that the claim for damages and the claim for rescission are both against the building society.

My Lords, I think that if the rights of the **investor** are properly analysed, it will become clear that cl 6 of section 4 of the claim form is a complete and effectual assignment of the whole of the **investor**'s claim to **compensation** and damages to the ICS. Section 3(b) may well have been unnecessary, but this conclusion seems to me preferable to attributing to the parties an intention, as, in their different ways, the judge and the Court of Appeal have done, to do six impossible things before breakfast and then regretfully saying that they could not be done. I would therefore allow the appeal. The first two questions which the judge directed to be tried as preliminary issues and the answers I suggest your Lordships should give are as follows.

*Question* 1: (a) Whether, upon the true construction of the express and (if any) implied terms of the ICS claim form, any (and if so which and to what extent) of the claims which the Alford and Armitage **investors** advance in the actions numbered Ch 1995 A 2266 and 3129 have been assigned to the ICS and (b) if so,

                                                                    *[\*120]*

whether such assignment is valid and effective and what consequences (if any) does it have as to the ability of those **investors** to maintain the actions.

*Answer.* Upon the true construction of the ICS claim form, all claims for damages and **compensation** have been validly assigned to the ICS and such claims cannot be maintained by the **investors** in their actions. The **investors** retain the right to claim rescission of their mortgages upon such terms as the court may consider just.

*Question 2:* (a) Whether, upon the true construction of the express and (if any) implied terms of the ICS claim form and in the light of the answer to issue 1, any (and if so which and which parts thereof) of the claims which the ICS advances in the actions numbered CH 1995 I 7087 and 8106 have been assigned to the ICS and (b) if so, is such assignment valid and effective and does it enable the ICS to maintain the actions.

*Answer.* (a) All (b) Yes.

The remaining questions do not arise.

**LORD HOPE OF CRAIGHEAD.**

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Hoffmann. For the reasons he gives I also would allow the appeal and would answer the questions which the judge directed to be tried as preliminary issues in the way he has suggested.

**LORD CLYDE.**

My Lords, I have had the advantage of reading a draft of the speech of my noble and learned friend Lord Hoffmann. For the reasons he has given, I too would allow the appeal.

Appeal allowed.

Celia Fox Barrister.

---

**End of Document**

HOUSE OF LORDS

SESSION 2008–09
**[2009] UKHL 38**
*on appeal from:[2008] EWCA Civ 183*

# OPINIONS
## OF THE LORDS OF APPEAL
## FOR JUDGMENT IN THE CAUSE

## Chartbrook Limited (Respondents) *v* Persimmon Homes Limited and others (Appellants) and another (Respondent)

### Appellate Committee

### Lord Hope of Craighead
### Lord Hoffmann
### Lord Rodger of Earlsferry
### Lord Walker of Gestingthorpe
### Baroness Hale of Richmond

**Counsel**

*Appellant*:
Christopher Nugee QC
Julian Greenhill
(Instructed by Mayer Brown International)

*Respondent*:
Robert Miles QC
Timothy Morshead
(Instructed by Carter-Ruck )

*Hearing dates:*

31 MARCH, 1 and 2 APRIL 2009

## ON
## WEDNESDAY 1 JULY 2009

# HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT
## IN THE CAUSE

### Chartbrook Limited (Respondents) *v* Persimmon Homes Limited
### and others (Appellants) and another (Respondent)

## [2009] UKHL 38

## LORD HOPE OF CRAIGHEAD

My Lords,

1.      I have had the privilege of reading in draft the opinion of my noble and learned friend, Lord Hoffmann.  Like my noble and learned friend, Lord Walker of Gestingthorpe, whose opinion I have also had the privilege of reading, I agree with all his reasoning and I share Lord Walker's admiration for the way it has been expressed.  For the reasons they give I would allow the appeal.

2.      I agree that Persimmon's argument that the House should take account of the pre-contractual negotiations raises an important issue.  Every so often the rule that prior negotiations are inadmissible comes under scrutiny.  That is as it should be.  One of the strengths of the common law is that it can take a fresh look at itself so that it can keep pace with changing circumstances.  But for the reasons that have been set out by Lord Hoffmann I think that the arguments for retaining the rule have lost none of their force since *Prenn v Simmonds* [1971] 1 WLR 1381 demonstrated, as Lord Wilberforce put it at p 1384, the disadvantages and danger of departing from established doctrine.

3.      In the Court of Appeal Lawrence Collins LJ said that the policy reasons for the rule have not been fully articulated: [2008] EWCA Civ 183, para 106.  I am not sure, with respect, that everyone would agree with him.  Lord Gifford did his best to explain what they are in his dissenting opinion in *Inglis v Buttery* (1877) 5 R 58, 69-70.  When that

case came before this House Lord Blackburn said that they set out exactly what he himself thought: (1878) 3 App Cas 552, 577. As Lord Gifford explained, the very purpose of a formal contract is to put an end to the disputes which would inevitably arise if the matter were left upon what the parties said or wrote to each other during the period of their negotiations.  It is the formal contract that records their bargain, however different it may be from what they may have stipulated for previously

4.      Lord Blackburn clearly saw no conflict between the exclusionary rule and Lord Justice Clerk Moncreiff's proposition that the Court was entitled to be put in the position that the parties stood before they signed: (1877) 5 R 58, 64.  In *River Wear Commissioners v Adamson* (1877) 2 App Cas 743, 763 he had already acknowledged that the court should look beyond the language of the contract and see what the circumstances were with reference to which the words were used.  As he put it, the meaning of words varies according to the circumstances with respect to which they are used.  It was the reasons that Lord Gifford articulated in *Inglis v Buttery* (1877) 5 R 58, 69-70, that persuaded him that to admit evidence of prior negotiations would be a step too far.  I think that what appealed to Lord Blackburn still holds true today.  If more is needed, Lord Hoffmann's analysis provides it.  As he has indicated, it would only be if your Lordships were confident that the rule was impeding the proper development of the law or contrary to public policy that it would be right for it to be departed from.  That this is so has not, as I see it, been demonstrated.

**LORD HOFFMANN**

My Lords,

5.      On 16 October 2001 Chartbrook Ltd ("Chartbrook") entered into an agreement with Persimmon Homes Ltd ("Persimmon"), a well-known house-builder, for the development of a site in Wandsworth which Chartbrook had recently acquired. The structure of the agreement was that Persimmon would obtain planning permission and then, pursuant to a licence from Chartbrook, enter into possession, construct a mixed residential and commercial development (commercial premises below, flats above, parking in the basement) and sell the properties on long leases. Chartbrook would grant the leases at the direction of Persimmon, which would receive the proceeds for its own account and

2

pay Chartbrook an agreed price for the land. Planning permission was duly granted and the development was built, but there is a dispute over the price which became payable.

6.     Schedule 6 contained the relevant provisions.  The price was defined as the aggregate of the Total Land Value and the Balancing Payment. The Total Land Value was made up of three parts: Total Residential Land Value, Total Commercial Land Value and Total Residential Cark Parking Land Value. Total Residential Land Value was to be £76.34 per square foot multiplied by the area for which planning permission for flats was granted. Total Commercial Land Value was £38.80 per square foot multiplied by the area for which planning permission for shops and other commercial uses was granted.  And Total Residential Cark Parking Land Value was £3,024 multiplied by the number of spaces for which planning permission was granted.  The Schedule set out the dates upon which the Total Land Value was to be paid.  In principle, payment would fall due as each flat, shop or parking space was sold. But there was also a backstop provision for payment of specified percentages of the Total Land Value (so far as not already paid) by dates commencing about two and a half years after the grant of planning permission and ending about two years later, by which time the whole sum was due, whether the properties had been sold or not.

7.     The provisions about Total Land Value are all quite straightforward and only require the insertion of the appropriate figures from the planning permission (which are not in dispute) into the formulae provided.  The other element in the price is the Balancing Payment. For reasons concerned with its drafting history which need not be explored, the Schedule defines the Balancing Payment as the Additional Residential Payment ("ARP") and then goes on to define the latter expression. So when I refer to the ARP, that means the Balancing Payment.

8.     The definition of the ARP, over which the whole dispute turns, is outwardly uncomplicated:

> "23.4% of the price achieved for each Residential Unit in excess of the Minimum Guaranteed Residential Unit Value less the Costs and Incentives."

A001099

9.     This contains three more defined concepts.  Residential Unit means a flat.  The Minimum Guaranteed Residential Unit Value ("MGRUV") means the Total Residential Land Value divided by the number of flats.  And Costs and Incentives ("C & I") mean the additional expense which Persimmon might have to incur to induce someone to buy a flat; for example, by providing fittings better than specification or paying legal expenses. Such payments are economically equivalent to a reduction in the price achieved.

10.    Chartbrook says that the meaning of the definition is perfectly simple. You take the price achieved, deduct the MGRUV and the C & I and calculate 23.4% of the result.  That gives you a figure for an individual flat which, together the figures for similar calculations on all the other flats, makes up the ARP or Balancing Payment. That and the Total Land Value is the price.  On the agreed figures, that produces a Total Land Value of £4,683,565 and an ARP of £4,484,862, making £9,168,427 in all. The judge (Briggs J) [2007] EWHC 409 (Ch) and a majority of the Court of Appeal (Tuckey and Rimer LJJ) [2008] EWCA Civ 183 agreed.

11.    This construction is certainly in accordance with conventional syntax, at any rate, up to the point at which one decides when C & I should be deducted.  As Briggs J said (at para 53) —

> "ARP means 23.4% of something. To the question '23.4% of what?' the clear answer is the excess of the price achieved for each Residential Unit over the MGRUV, less the Costs and Incentives."

12.    I do not think that the syntax helps one to decide whether C & I should be deducted before or after calculating the 23.4%, that is to say, whether there is a notional pause for breath after "MGRUV", represented in the passage I have quoted from the judgment by a comma which does not appear in the contract.  That is a grammatical ambiguity which must be resolved by considering the business purpose of providing for a deduction of C & I.  But the judge was clearly right about the effect of the syntax employed in the first part of the definition.

13.    Persimmon, on the other hand, says that the purpose of dividing the price into Total Land Value and ARP was to give Chartbrook a minimum price for its land, calculated on current market assumptions,

A001100

and to allow for the possibility of an increase if the market rose and the flats sold for more than expected. It is agreed that, at the time of the agreement, the parties expected that a 700 square foot flat would sell for about £200,000 or so, maybe slightly more. The MGRUV at £76.34 a square foot for such a flat was £53,438 or 26.7% of a price of £200,000. If the realised price was £228,000, it would represent 23.4%. The purpose of the ARP was to provide that if the flats sold for more than £228,000, Chartbrook would be entitled to the amount by which 23.4% of the higher price exceeded the £53,438 MGRUV. What the definition therefore means is that you deduct C & I from the realised price to arrive at the net price received by Persimmon, then calculate 23.4% of that price, and the ARP is the excess of that figure over MGRUV. On this calculation, ARP is £897,051, compared with Chartbrook's claim for £4,484,862. In the Court of Appeal Lawrence Collins LJ, dissenting, held that Persimmon's construction was correct.

14.    There is no dispute that the principles on which a contract (or any other instrument or utterance) should be interpreted are those summarised by the House of Lords in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912-913. They are well known and need not be repeated. It is agreed that the question is what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean. The House emphasised that "we do not easily accept that people have made linguistic mistakes, particularly in formal documents" (similar statements will be found in *Bank of Credit and Commerce International SA v Ali* [2002] 1 AC 251, 269, *Kirin-Amgen Inc v Hoechst Marion Roussel Ltd* [2005] RPC 169, 186 and *Jumbo King Ltd v Faithful Properties Ltd* (1999) 2 HKCFAR 279, 296) but said that in some cases the context and background drove a court to the conclusion that "something must have gone wrong with the language". In such a case, the law did not require a court to attribute to the parties an intention which a reasonable person would not have understood them to have had.

15.    It clearly requires a strong case to persuade the court that something must have gone wrong with the language and the judge and the majority of the Court of Appeal did not think that such a case had been made out. On the other hand, Lawrence Collins LJ thought it had. It is, I am afraid, not unusual that an interpretation which does not strike one person as sufficiently irrational to justify a conclusion that there has been a linguistic mistake will seem commercially absurd to another: compare the *Kirin-Amgen* case [2005] RPC 169 at pp. 189-190. Such a division of opinion occurred in the *Investors Compensation Scheme* case

A001101

itself.  The subtleties of language are such that no judicial guidelines or statements of principle can prevent it from sometimes happening.  It is fortunately rare because most draftsmen of formal documents think about what they are saying and use language with care. But this appears to be an exceptional case in which the drafting was careless and no one noticed.

16.    I agree with the dissenting opinion of Lawrence Collins LJ because I think that to interpret the definition of ARP in accordance with ordinary rules of syntax makes no commercial sense.    The term "Minimum Guaranteed Residential Unit Value", defined by reference to Total Residential Land Value, strongly suggests that this was to be a guaranteed minimum payment for the land value in respect of an individual flat.    A guaranteed minimum payment connotes the possibility of a larger payment which, depending upon some contingency, may or may not fall due. Hence the term "Additional Residential Payment". The element of contingency is reinforced by paragraph 3.3 of the Sixth Schedule, which speaks of the "date of payment *if any* of the Balancing Payment." (My emphasis).

17.    The judge declined to regard the terms Total Land Value and Minimum Guaranteed Residential Unit Value as indicative of an intention that MGRUV was to be the minimum Chartbrook would receive as the land value of a flat because both terms were defined expressions.    They might just as well have been algebraic symbols. Indeed they might, and I strongly suspect that if they had been, they would have made it clear that the parties were intending to give effect to Persimmon's construction. But the contract does not use algebraic symbols. It uses labels. The words used as labels are seldom arbitrary. They are usually chosen as a distillation of the meaning or purpose of a concept intended to be more precisely stated in the definition. In such cases the language of the defined expression may help to elucidate ambiguities in the definition or other parts of the agreement: compare *Birmingham City Council v Walker* [2007]  2 AC 262, 268.  I therefore consider that Lawrence Collins LJ was right to take into account the connotations of contingency to be derived from the defined terms.

18.    On Chartbrook's construction, there is virtually no element of contingency at all. ARP is payable in every case in which the flat sells for more than £53,438.  Chartbrook submits that is still a contingency. Who could tell whether or not the market for flats in Wandsworth might not collapse?    In the Court of Appeal, Rimer LJ accepted that submission. He said that the "relevant language", i.e. the language of

contingency, was "strictly consistent also with Chartbrook's construction."

19.    My Lords, I cannot believe that any rational parties who wished to make provision for such a catastrophic fall in the housing market (itself an unlikely assumption) would have adopted so precise a sum to represent their estimate of what might happen. Why £53,438?   That was the agreed minimum figure for that part of the value of a flat attributable to the *land* which Chartbrook was selling. It was clearly based upon a careful and precise estimate of current market prices and building costs. But how could this figure have been appropriate as a minimum expected *sale* price of the entire flat at some future date? If the parties were wanting to guess at some extraordinary fall in the market against which Chartbrook was to be protected, why £53,438? Why not £50,000 or £60,000, or £100,000?  A figure chosen to represent someone's fears about a possible collapse in the market could only have been based upon wild speculation, not the kind of calculation which produces a figure like £53,438.   That figure cannot have been meant to play the part in the calculation which Chartbrook's construction assigns to it. It must have been intended to function as a minimum land value, not a minimum sale price. To compare it with the realised sale price would not be comparing like with like.

20.    It is of course true that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says.  The reasonable addressee of the instrument has not been privy to the negotiations and cannot tell whether a provision favourable to one side was not in exchange for some concession elsewhere or simply a bad bargain.  But the striking feature of this case is not merely that the provisions as interpreted by the judge and the Court of Appeal are favourable to Chartbrook.  It is that they make the structure and language of the various provisions of Schedule 6 appear arbitrary and irrational, when it is possible for the concepts employed by the parties (MGRUV, C & I etc) to be combined in a rational way.

21.    I therefore think that Lawrence Collins LJ was right in saying that ARP must mean the amount by which 23.4% of the achieved price exceeds the MGRUV. I do not think that it is necessary to undertake the exercise of comparing this language with that of the definition in order to see how much use of red ink is involved.  When the language used in an instrument gives rise to difficulties of construction, the process of interpretation does not require one to formulate some alternative form of

7

words which approximates as closely as possible to that of the parties. It is to decide what a reasonable person would have understood the parties to have meant by using the language which they did. The fact that the court might have to express that meaning in language quite different from that used by the parties ("12th January" instead of "13th January" in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749; "any claim sounding in rescission (whether for undue influence or otherwise)" instead of "any claim (whether sounding in rescission for undue influence or otherwise)" in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896) is no reason for not giving effect to what they appear to have meant.

22.     In *East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61 Brightman J stated the conditions for what he called "correction of mistakes by construction":

> "Two conditions must be satisfied: first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake. If those conditions are satisfied, then the correction is made as a matter of construction."

23.     Subject to two qualifications, both of which are explained by Carnwath LJ in his admirable judgment in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336, I would accept this statement, which is in my opinion no more than an expression of the common sense view that we do not readily accept that people have made mistakes in formal documents.   The first qualification is that "correction of mistakes by construction" is not a separate branch of the law, a summary version of an action for rectification.  As Carnwath LJ said (at p. 1351, para 50):

> "Both in the judgment, and in the arguments before us, there was a tendency to deal separately with correction of mistakes and construing the paragraph 'as it stands', as though they were distinct exercises. In my view, they are simply aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended."

8

24.     The second qualification concerns the words "on the face of the instrument".   I agree with Carnwath LJ (at pp 1350-1351) that in deciding whether there is a clear mistake, the court is not confined to reading the document without regard to its background or context.  As the exercise is part of the single task of interpretation, the background and context must always be taken into consideration.

25.     What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed.  All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant.  In my opinion, both of these requirements are satisfied.

26.     That leaves the question of the deduction of C & I, which the judge and the majority of the Court of Appeal regarded as an insuperable obstacle to Persimmon's construction. I cannot see why this should be so. Everyone agrees that the only sum from which C & I can rationally be deducted is the headline price achieved on the sale, so as to arrive at the net amount received by Persimmon. That is accordingly what the parties must have meant. You deduct the C & I from the nominal price achieved and the ARP is the excess, if any, of 23.4% of that net sum over the MGRUV.  Giving this meaning to the provision about C & I does not in any way weaken or affect the argument for interpreting the rest of the definition in a way which gives ARP a rational meaning. To say, as Rimer LJ said, that it requires "rewriting", or that it "distorts the meaning and arithmetic of the definition" is only to say that it requires one to conclude that something has gone wrong with the language – not, in this case, with the meanings of words, but with the syntactical arrangement of those words.  If however the context drives one to the conclusion that this must have happened, it is no answer that the interpretation does not reflect what the words would conventionally have been understood to mean.

27.     If your Lordships agree with this conclusion about the construction of the contract, the appeal must be allowed.  There is no need to say anything more.  But Persimmon advanced two alternative arguments of very considerable general importance and I think it is appropriate that your Lordships should deal with them.  The first was that (contrary to the unanimous opinion of the judge and the Court of Appeal) the House should take into account the pre-contractual negotiations, which in the opinion of Lawrence Collins LJ (at paragraph 132), were determinative confirmation of Persimmon's argument on

9

construction. The second was that the judge and the Court of Appeal had misunderstood the principles upon which rectification may be decreed and that if Persimmon had failed on construction, the agreement should have been rectified.

28.    The rule that pre-contractual negotiations are inadmissible was clearly reaffirmed by this House in *Prenn v Simmonds* [1971] 1 WLR 1381, where Lord Wilberforce said (at p. 1384) that earlier authorities "contain little to encourage, and much to discourage, evidence of negotiation or of the parties' subjective intentions." It is clear that the rule of inadmissibility has been established for a very long time. In *Inglis v John Buttery & Co* (1878) 3 App Cas 552, 577 Lord Blackburn said that Lord Justice Clerk Moncreiff (at (1877) 4 R 58, 64) had laid down a principle which was nearly accurate but not quite when he said that in all mercantile contracts "whether they be clear and distinct or the reverse, the Court is entitled to be placed in the position in which the parties stood before they signed". The only qualification Lord Blackburn made was to reject Lord Moncreiff's view that the Court was entitled to look at the pre-contractual negotiations because unless one did so, one could not be fully in the position in which the parties had been.

29.    Instead, Lord Blackburn preferred (at p. 577) the opinion of Lord Gifford ((1877) 4 R 58, 69-70):

> "Now, I think it is quite fixed - and no more wholesome or salutary rule relative to written contracts can be devised - that where parties agree to embody, and do actually embody, their contract in a formal written deed, then in determining what the contract really was and really meant, a Court must look to the formal deed and to that deed alone. This is only carrying out the will of the parties. The only meaning of adjusting a formal contract is, that the formal contract shall supersede all loose and preliminary negotiations - that there shall be no room for misunderstandings which may often arise, and which do constantly arise, in the course of long, and it may be desultory conversations, or in the course of correspondence or negotiations during which the parties are often widely at issue as to what they will insist on and what they will concede. The very purpose of a formal contract is to put an end to the disputes which would inevitably arise if the matter were left upon verbal negotiations or upon mixed communings partly consisting

A001106

of letters and partly of conversations. The written contract is that which is to be appealed to by both parties, however different it may be from their previous demands or stipulations, whether contained in letters or in verbal conversation. There can be no doubt that this is the general rule, and I think the general rule, strictly and with peculiar appropriateness applies to the present case."

30.     To allow evidence of pre-contractual negotiations to be used in aid of construction would therefore require the House to depart from a long and consistent line of authority, the binding force of which has frequently been acknowledged: see *Bank of Scotland v Dunedin Property Investment Co Ltd* 1998  SC 657, 665 ("well-established and salutary", per Lord President Rodger; *Alexiou v Campbell* [2007] UKPC 11 ("vouched by…compelling authorities", per Lord Bingham of Cornhill.)  The House is nevertheless invited to do so, on the ground that the rule is illogical and prevents a court from, as the Lord Justice Clerk in *Inglis v John Buttery & Co* (1878)  3 App Cas  552 said, putting itself in the position of the parties and ascertaining their true intent.

31.     In   *Prenn   v   Simmonds*   [1971]   1   WLR   1381,   1384   Lord Wilberforce said by way of justification of the rule:

"The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing   and   until   the   final   agreement,   though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions,   itself   a   doubtful   process,   help   on   the construction   of   the   contractual   words?   If   the   same expressions are used, nothing is gained by looking back: indeed,   something   may   be   lost   since   the   relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to. It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, of the transaction, objectively   ascertained,   may   be   a   surrounding   fact.

11

Cardozo J. thought so in the *Utica Bank* case. And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get 'agreement' and in the hope that disputes will not arise. The only course then can be to try to ascertain the 'natural' meaning. Far more, and indeed totally, dangerous is it to admit evidence of one party's objective - even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised."

32.    Critics of the rule, such as Thomas J in New Zealand (*Yoshimoto v Canterbury Golf International Ltd* [2001] 1 NZLR 523, 538-549) Professor David McLauchlan ("Contract Interpretation: What is it About?" (2009) 31:5 Sydney Law Review 5-51) and Lord Nicholls of Birkenhead ("My Kingdom for a Horse: The Meaning of Words" (2005) 121 LQR 577-591) point out that although all this may usually be true, in some cases it will not. Among the dirt of aspirations, proposals and counter-proposals there may gleam the gold of a genuine consensus on some aspect of the transaction expressed in terms which would influence an objective observer in construing the language used by the parties in their final agreement.  Why should court deny itself the assistance of this material in deciding what the parties must be taken to have meant? Mr Christopher Nugee QC, who appeared for Persimmon, went so far as to say that in saying that such evidence was unhelpful, Lord Wilberforce was not only providing a justification for the rule but delimiting its extent. It should apply only in cases in which the pre-contractual negotiations are actually irrelevant.  If they do assist a court in deciding what an objective observer would have construed the contract to mean, they should be admitted. I cannot accept this submission. It is clear from what Lord Wilberforce said and the authorities upon which he relied that

A001108

the exclusory rule is not qualified in this way.  There is no need for a special rule to exclude irrelevant evidence.

33.     I do however accept that it would not be inconsistent with the English objective theory of contractual interpretation to admit evidence of previous communications between the parties as part of the background which may throw light upon what they meant by the language they used. The general rule, as I said in *Bank of Credit and Commerce International SA v Ali* [2002]  1 AC 251, 269, is that there are no conceptual limits to what can properly be regarded as background.  Prima facie, therefore, the negotiations are potentially relevant background. They may be inadmissible simply because they are irrelevant to the question which the court has to decide, namely, what the parties would reasonably be taken to have meant by the language which they finally adopted to express their agreement. For the reasons given by Lord Wilberforce, that will usually be the case. But not always. In exceptional cases, as Lord Nicholls has forcibly argued, a rule that prior negotiations are always inadmissible will prevent the court from giving effect to what a reasonable man in the position of the parties would have taken them to have meant. Of course judges may disagree over whether in a particular case such evidence is helpful or not. In *Yoshimoto v Canterbury Golf International Ltd* [2001]  1 NZLR 523. Thomas J thought he had found gold in the negotiations but the Privy Council said it was only dirt. As I have said, there is nothing unusual or surprising about such differences of opinion. In principle, however, I would accept that previous negotiations may be relevant.

34.     It therefore follows that while it is true that, as Lord Wilberforce said, inadmissibility is normally based in irrelevance, there will be cases in which it can be justified only on pragmatic grounds. I must consider these grounds, which have been explored in detail in the literature and on the whole rejected by academic writers but supported by some practitioners.

35.     The first is that the admission of pre-contractual negotiations would create greater uncertainty of outcome in disputes over interpretation and add to the cost of advice, litigation or arbitration. Everyone engaged in the exercise would have to read the correspondence and statements would have to be taken from those who took part in oral negotiations.  Not only would this be time-consuming and expensive but the scope for disagreement over whether the material affected the construction of the agreement (as in the *Yoshimoto* case) would be considerably increased. As against this, it is said that when a

dispute over construction is litigated, evidence of the pre-contractual negotiations is almost invariably tendered in support of an alternative claim for rectification (as in *Prenn v Simmonds* and in this case) or an argument based on estoppel by convention or some alleged exception to the exclusionary rule. Even if such an alternative claim does not succeed, the judge will have read and possibly been influenced by the evidence. The rule therefore achieves little in saving costs and its abolition would restore some intellectual honesty to the judicial approach to interpretation.

36.    There is certainly a view in the profession that the less one has to resort to any form of background in aid of interpretation, the better.  The document should so far as possible speak for itself.  As Popham CJ said in the *Countess of Rutland's Case* (1604) 5 Co Rep 25b, 26a:

> "it would be inconvenient, that matters in writing made by advice and on consideration, and which finally import the certain truth of the agreement of the parties should be controlled by averment of the parties to be proved by the uncertain testimony of slippery memory."

37.    I do not think that these opinions can be dismissed as merely based upon the fallacy that words have inherent or "available" meanings, rather than being used by people to express meanings, although some of the arguments advanced in support might suggest this. It reflects what may be a sound practical intuition that the law of contract is an institution designed to enforce promises with a high degree of predictability and that the more one allows conventional meanings or syntax to be displaced by inferences drawn from background, the less predictable the outcome is likely to be. In this respect, it is interesting to consider the reaction to the statement of principle in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896,912-913, which was viewed with alarm by some distinguished commercial lawyers as having greatly increased the quantity of background material which courts or arbitrators would be invited to consider: see Lord Bingham's recent paper ("A New Thing Under the Sun: The Interpretation of Contract and the ICS Decision" (2008) 12 Edinburgh LR 374-390) and Spigelmann CJ, "From Text to Contract: Contemporary Contractual Interpretation" (2007) 81 ALJ 322. As Lord Bingham pointed out, there was little in that statement of principle which could not be found in earlier authorities.  The only points it decided that might have been thought in the least controversial were, first, that it was not necessary to find an

14

"ambiguity" before one could have any regard to background and, secondly, that the meaning which the parties would reasonably be taken to have intended could be given effect despite the fact that it was not, according to conventional usage, an "available" meaning of the words or syntax which they had actually used.

38.    Like Lord Bingham, I rather doubt whether the *ICS* case produced a dramatic increase in the amount of material produced by way of background for the purposes of contractual interpretation. But pre-contractual negotiations seem to me capable of raising practical questions different from those created by other forms of background. Whereas the surrounding circumstances are, by definition, objective facts, which will usually be uncontroversial, statements in the course of pre-contractual negotiations will be drenched in subjectivity and may, if oral, be very much in dispute. It is often not easy to distinguish between those statements which (if they were made at all) merely reflect the aspirations of one or other of the parties and those which embody at least a provisional consensus which may throw light on the meaning of the contract which was eventually concluded. But the imprecision of the line between negotiation and provisional agreement is the very reason why in every case of dispute over interpretation, one or other of the parties is likely to require a court or arbitrator to take the course of negotiations into account.  Your Lordships' experience in the analogous case of resort to statements in Hansard under the rule in *Pepper v Hart* [1993]  AC 593 suggests that such evidence will be produced in any case in which there is the remotest chance that it may be accepted and that even these cases will be only the tip of a mountain of discarded but expensive investigation. *Pepper v Hart* has also encouraged ministers and others to make statements in the hope of influencing the construction which the courts will give to a statute and it is possible that negotiating parties will be encouraged to improve the bundle of correspondence with similar statements.

39.    Supporters of the admissibility of pre-contractual negotiations draw attention to the fact that Continental legal systems seem to have little difficulty in taking them into account. Both the *Unidroit Principles of International Commercial Contracts* (1994 and 2004 revision) and the *Principles of European Contract Law* (1999) provide that in ascertaining the "common intention of the parties", regard shall be had to prior negotiations: articles 4.3 and 5.102 respectively.  The same is true of the United Nations Convention on Contracts for the International Sale of Goods (1980). But these instruments reflect the French philosophy of contractual interpretation, which is altogether different from that of English law.  As Professor Catherine Valcke explains in an

A001111

illuminating article ("On Comparing French and English Contract Law: Insights from Social Contract Theory") (16 January 2009), French law regards the intentions of the parties as a pure question of subjective fact, their *volonté psychologique*, uninfluenced by any rules of law. It follows that any evidence of what they said or did, whether to each other or to third parties, may be relevant to establishing what their intentions actually were. There is in French law a sharp distinction between the ascertainment of their intentions and the application of legal rules which may, in the interests of fairness to other parties or otherwise, limit the extent to which those intentions are given effect.    English law, on the other hand, mixes up the ascertainment of intention with the rules of law by depersonalising the contracting parties and asking, not what their intentions actually were, but what a reasonable outside observer would have taken them to be. One cannot in my opinion simply transpose rules based on one philosophy of contractual interpretation to another, or assume that the practical effect of admitting such evidence under the English system of civil procedure will be the same as that under a Continental system.

40.    In his judgment in the present case, Briggs J thought that the most powerful argument  against admitting evidence of pre-contractual negotiations was that it would be unfair to a third party who took an assignment of the contract or advanced money on its security.  Such a person would not have been privy to the negotiations and may have taken the terms of the contract at face value. There is clearly strength in this argument, but it is fair to say that the same point can be made (and has been made, notably by Saville LJ in *National Bank of Sharjah v Dellborg* [1997] EWCA Civ 2070, which is unreported, but the relevant passage is cited in Lord Bingham's paper in the Edinburgh Law Review) in respect of the admissibility of any form of background.  The law sometimes deals with the problem by restricting the admissible background to that which would be available not merely to the contracting parties but also to others to whom the document is treated as having been addressed. Thus in *Bratton Seymour Service Co Ltd v Oxborough* [1992] BCLC 693 the Court of Appeal decided that in construing the articles of association of the management company of a building divided into flats, background facts which would have been known to all the signatories were inadmissible because the articles should be regarded as addressed to anyone who read the register of companies, including persons who would have known nothing of the facts in question.  In *The Starsin* (*Homburg Houtimport BV v Agrosin Private Ltd* [2004] 1 AC 715) the House of Lords construed words which identified the carrier on the front of a bill of lading without reference to what it said on the back, on the ground that the bankers to whom the bill would be tendered could not be expected to read the small

print. Ordinarily, however, a contract is treated as addressed to the parties alone and an assignee must either inquire as to any relevant background or take his chance on how that might affect the meaning a court will give to the document. The law has sometimes to compromise between protecting the interests of the contracting parties and those of third parties. But an extension of the admissible background will, at any rate in theory, increase the risk that a third party will find that the contract does not mean what he thought. How often this is likely to be a practical problem is hard to say. In the present case, the construction of the agreement does not involve reliance upon any background which would not have been equally available to any prospective assignee or lender.

41.    The conclusion I would reach is that there is no clearly established case for departing from the exclusionary rule. The rule may well mean, as Lord Nicholls has argued, that parties are sometimes held bound by a contract in terms which, upon a full investigation of the course of negotiations, a reasonable observer would not have taken them to have intended. But a system which sometimes allows this to happen may be justified in the more general interest of economy and predictability in obtaining advice and adjudicating disputes. It is, after all, usually possible to avoid surprises by carefully reading the documents before signing them and there are the safety nets of rectification and estoppel by convention. Your Lordships do not have the material on which to form a view. It is possible that empirical study (for example, by the Law Commission) may show that the alleged disadvantages of admissibility are not in practice very significant or that they are outweighed by the advantages of doing more precise justice in exceptional cases or falling into line with international conventions. But the determination of where the balance of advantage lies is not in my opinion suitable for judicial decision. Your Lordships are being asked to depart from a rule which has been in existence for many years and several times affirmed by the House. There is power to do so under the *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234. But that power was intended, as Lord Reid said in *R v National Insurance Comrs, Ex p Hudson* [1972] AC 944, 966, to be applied only in a small number of cases in which previous decisions of the House were "thought to be impeding the proper development of the law or to have led to results which were unjust or contrary to public policy". I do not think that anyone can be confident that this is true of the exclusionary rule.

42.    The rule excludes evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It does not exclude the use of

A001113

such evidence for other purposes: for example, to establish that a fact which may be relevant as background was known to the parties, or to support a claim for rectification or estoppel.  These are not exceptions to the rule. They operate outside it.

43.    There is however a group of cases in which judges have found an exception to the exclusionary rule and your Lordships will have to decide whether such an exception can be justified.  The leading case is the decision of Kerr J the *Karen Oltmann* (*Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd* [1976]  2 Lloyd's Rep 708.  This concerned a time charter for 2 years (14 days more or less in charterers' option) which contained a break clause:

> "Charterers to have the option to redeliver the vessel after 12 months' trading subject to giving three months' notice".

44.    The issue was whether "after 12 months' trading" meant that the break clause could be operated only at the end of the first year or at any time during the second year.  The judge said that he was entitled to look at telexes by which the fixture was negotiated in which the parties discussed various lengths of break clauses and were clearly using the word "after" to mean "on the expiry of" rather than "at any time after the expiry of".  He justified the admissibility of this evidence on the following principle (p 712):

> "If a contract contains words which, in their context, are fairly capable of bearing more than one meaning, and if it is alleged that the parties have in effect negotiated on an agreed basis that the words bore only one of the two possible meanings, then it is permissible for the court to examine the extrinsic evidence relied upon to see whether the parties have in fact used the words in question in one sense only, so that they have in effect given their own dictionary meaning to the words as the result of their common intention. Such cases would not support a claim for rectification of the contract, because the choice of words in the contract did not result from any mistake. The words used in the contract would ex hypothesi reflect the meaning which both parties intended."

A001114

45.    In his judgment in this case, Lawrence Collins LJ said of this principle (in paragraph 121) that he doubted whether it differed in any material respect from admitting evidence of prior negotiations in construing a contract.  Indeed, the case is frequently cited as an example of an exception which undermines the rule: see for example Professor McLauchlan, "Contract Interpretation: What is It About?" (2009) 31:5 Sydney Law Review 5-51. It is true that evidence may always be adduced that the parties habitually used words in an unconventional sense in order to support an argument that words in a contract should bear a similar unconventional meaning.  This is the "private dictionary" principle, which is akin to the principle by which a linguistic usage in a trade or among a religious sect may be proved: compare *Shore v Wilson* (1842) 9 Cl & F 355.  For this purpose it does not matter whether the evidence of usage by the parties was in the course of negotiations or on any other occasion. It is simply evidence of the linguistic usage which they had in common.  But the telexes in the *Karen Oltmann* did not evidence any unconventional usage.  There was no private dictionary. The case involved a choice between two perfectly conventional meanings of the word "after" in a particular context. In my opinion Lawrence Collins LJ was right in saying that the admission of the evidence infringed the exclusionary rule. It is perhaps significant that the evidence merely confirmed the meaning which Kerr J, as an experienced commercial judge, would in any case have given to the clause.

46.    What would have been the position if Kerr J had thought that, without the evidence of the telexes, he would have construed the clause in the opposite sense?  He said that rectification would not be available because "The words used in the contract would ex hypothesi reflect the meaning which both parties intended."   I do not understand this, because, on this hypothesis, the telexes would show that the words (as construed by the judge) did *not* reflect the meaning which both parties intended. And it is generally accepted that Brightman J was right in *Re Butlin's Settlement Trusts* [1976] Ch 251 in holding that rectification is available not only when the parties intended to use different words but also when they mistakenly thought their words bore a different meaning.

47.    On its facts, the *Karen Oltmann* was in my opinion an illegitimate extension of the "private dictionary" principle which, taken to its logical conclusion, would destroy the exclusionary rule and any practical advantages which it may have. There are two legitimate safety devices which will in most cases prevent the exclusionary rule from causing injustice. But they have to be specifically pleaded and clearly established. One is rectification. The other is estoppel by convention,

which has been developed since the decision in th*e Karen Oltmann*: see *Amalgamated Investment & Property Co. Ltd. v. Texas Commerce International Bank Ltd*. [1982] QB 84. If the parties have negotiated an agreement upon some common assumption, which may include an assumption that certain words will bear a certain meaning, they may be estopped from contending that the words should be given a different meaning. Both of these remedies lie outside the exclusionary rule, since they start from the premise that, as a matter of construction, the agreement does not have the meaning for which the party seeking rectification or raising an estoppel contends.

48.    The last point is whether, if Chartbrook's interpretation of the agreement had been correct, it should have been rectified to accord with Persimmon's interpretation.   The requirements for rectification were succinctly summarized by Peter Gibson LJ in *Swainland Builders Ltd v Freehold Properties Ltd* [2002] 2 EGLR 71, 74, para 33:

> "The party seeking rectification must show that:
>
> (1)    the parties had a common continuing intention, whether or not amounting to an agreement, in respect of a particular matter in the instrument to be rectified;
> (2)    there was an outward expression of accord;
> (3)    the intention continued at the time of the execution of the instrument sought to be rectified;
> (4)    by mistake, the instrument did not reflect that common intention."

49.    To explain how the claim for rectification arose, I must summarise the relevant pre-contractual exchanges between the parties. They began by discussing a proposal for an outright sale of the land by Chartbrook to Persimmon at a price calculated by reference to such planning permission as Chartbrook might obtain. In early 2001 this structure was abandoned and Persimmon in a letter dated 1 February 2001 proposed the building licence arrangement eventually agreed.   The letter included the following passages:

> "we would be prepared to pay you 29.8% of the net sales proceeds generated from the private sale residential

A001116

element of the scheme and a further 45% of the net sales revenue generated from the disposal of the commercial element of the site. We would pay you this proportion of the income regardless of the development costs incurred by my Company and the quantum of accommodation that we ultimately obtain planning permission for…By tying your land value to a percentage of the income, you will also automatically share in any sales uplift that we experience."

50.     This offer of a straightforward sharing of the proceeds was modified in a letter dated 6 February 2001 by the addition of what were described as "guaranteed backstop dates and minimum payments":

"Upon receipt of the purchase monies, the revenue will be apportioned to Chartbrook on the basis of 29.8% of the net revenue achieved from the disposal of the private sale residential units and 45% of the net revenue from the disposal of the commercial units. In addition, we are prepared to provide you with guaranteed backstop dates and minimum payments that will be made regardless of the actual performance of the project both in terms of timescales and costs. I set out on the attached schedule our proposals concerning this element of the deal.

Based on the current scheme for 80 units, and 9020 sq ft of commercial floor space, the minimum land value we are prepared to pay to Chartbrook on the disposal of each residential unit is £67,000, together with a further minimum payment of £400,000 on the disposal of the commercial unit. If as a result of improvements in the market, Chartbrook are entitled to more than the minimum payments I suggest an equalisation calculation takes place following the disposal of the last unit…

Within the contract, I…suggest that a formula is included whereby the land value is calculated using the following inputs:

Private Sale Residential Accommodation…..94.96/sq ft…

21

A001117

> Once the total land value has been calculated, a simple formula can then be applied to divide the land values by the number of units, in order for us to calculate the guaranteed payments that you will receive on the sale of each plot…"

51.   On 12 February there was a further modification to make separate provision for the sales of car parking spaces, but the overall offer for land value remained the same.  The judge found (paragraph 110) that Chartbrook accepted this offer in principle and Persimmon's solicitors were instructed to draft an agreement. Their draft was attached to an e-mail dated 1 March 2001 and contained essentially the same formulae for calculating the price as those in the final agreement. The definition of "Additional Residential Payment" was (save for the percentage figure) in precisely the same words as those of the final agreement.

52.   Between March and May Chartbrook acquired some additional adjoining land and Persimmon revised its cost estimates.  The result was a change in the figures but not in the formulae.  In a letter dated 24 May 2001 Persimmon offered a new total land value of £7,191,947.  The letter contained a table setting out —

> "the minimum guaranteed  land values that you will receive for the respective elements of the scheme, together with the percentage of sales revenue that you will also be entitled to if the project performs better than is currently anticipated"

53.   The figures in the table were 23.4% for "percentage of sales revenue" and £53,333 for "minimum value per plot."   The judge found that this offer was also accepted in principle and the new figures were inserted into the final contract. The words of the definition of ARP in the final draft remained (subject to the change in the percentage figure) exactly the same as in the first draft.

54.   It is I think clear that a reasonable person who read the February and May letters in the light of the background known to the parties would have taken them to have been intending that Chartbrook should receive an ARP if, but only if, "the project performs better than is currently anticipated".

A001118

55.    Persimmon's case on rectification at the trial was that the letter of 24 May 2001 was an outward expression of the common and continuing intention of the parties and (if Chartbrook was right about its true construction) the definition had been drafted in the mistaken belief that it gave effect to that common intention.  On the other hand, the evidence of the two principals of Chartbrook, Mr Vantreen and Mr Reeve, was that they had made no mistake. The definition accorded exactly with what they had thought they were being offered in the letters of February and May 2001. Indeed, they said they would not have done the deal for any less.  It was put to them in cross-examination that no rational person could have understood the letters in the sense which they claimed and Mr Vantreen was caused some little difficulty by the fact that, on his copy of the May 2001 letter, he had calculated the amount which (on Persimmon's construction of the definition) the sale price of a 700 sq ft flat would have to exceed before any ARP became payable (£228,000). This calculation would have been irrelevant on his own construction of the definition and he was unable to explain why he had made it. Nevertheless the judge accepted the evidence of Mr Reeve and Mr Vantreen that they had honestly believed that the definition (as they claimed to have understood it) was what had been agreed and they were not been mistaken.  The judge therefore held that the mistake was not common to both parties and dismissed the claim for rectification.

56.    The case was argued at trial on the assumption that rectification required both parties to be mistaken about whether the written agreement reflected what they believed their prior consensus to have been. In the Court of Appeal, Persimmon challenged the finding of fact about what Mr Reeve and Mr Vantreen had believed, but not the underlying proposition of law. The Court of Appeal unanimously dismissed this part of the appeal on the ground that it could not disturb the findings of fact. There are accordingly concurrent findings of fact about the states of mind of Mr Reeve and Mr Vantreen.  Your Lordships indicated at the hearing that in accordance with the usual practice, you would not re-examine them: see *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd*  [1997] AC 254, 274-275.

57.    In the printed case, however,  Persimmon (encouraged by articles in the Law Quarterly Review by Marcus Smith ("Rectification of Contracts for Common Mistake*, Joscelyne v Nissen* and Subjective States of Mind" (2007) 123 LQR 116-132 and Professor McLauchlan ("The 'Drastic' Remedy of Rectification for Unilateral Mistake" (2008) 124 LQR 608-640)) asked for leave to challenge, for first time, the proposition of law. Mr Nugee submitted that the judge and the Court of Appeal had been wrong in their assumption about what a party had to be

23

mistaken about. Rectification required a mistake about whether the written instrument correctly reflected the prior consensus, not whether it accorded with what the party in question believed that consensus to have been. In accordance with the general approach of English law, the terms of the prior consensus were what a reasonable observer would have understood them to be and not what one or even both of the parties believed them to be. In the present case, submitted Mr Nugee, the prior consensus was contained in the May letter, which made it clear that the terms were to be as contended for by Persimmon. If the definition in the final agreement did not have that meaning, it was not in accordance with the prior consensus and if Mr Reeve and Mr Vantreen believed that it was, then they, like the representatives of Persimmon, were mistaken.

58.   Mr Robert Miles QC, for Chartbrook, objected to Persimmon being given leave to advance this argument. He said that if the point had been taken at the trial, the evidence might have taken a different shape. I rather doubt this, but as I understand that the Committee shares my view that Persimmon is entitled to succeed without rectification, the question is academic. Nevertheless, as it has been very well and fully argued, I propose to express an opinion about it.

59.   Until the decision of the Court of Appeal in *Joscelyne v Nissen* [1970] 2 QB 86 there was a view, based upon dicta in nineteenth and early twentieth century cases, that rectification was available only if there had been a concluded antecedent contract with which the instrument did not conform. In *Lovell and Christmas Ltd v Wall* (1911) 104 LT 85, 88 Sir Herbert Cozens-Hardy MR said that rectification "may be regarded as a branch of the doctrine of specific performance". It presupposed a prior contract and required proof that, by a common mistake, the final completed agreement as executed failed to give proper effect to the prior contract. In *Joscelyne*'s case the Court of Appeal declared itself puzzled by the reference to specific performance, but I think it is clear enough that the Master of the Rolls had in mind a contractual obligation to execute a lease, conveyance, settlement or similar instrument, giving rise to a specifically enforceable obligation to do so. A failure to execute a document giving effect to the terms of the agreement would be a breach of that obligation and the court, in rectifying the instrument, would be specifically performing the agreement. Since the decision in *Joscelyne's* case extended the availability of rectification to cases in which there had been no enforceable prior agreement, specific performance is plainly an inadequate explanation of the doctrine. But for present purposes the significance of cases like *Lovell and Christmas Ltd v Wall* (1911) 104 LT 85 is that the terms of the contract to which the subsequent

A001120

instrument must conform must be objectively determined in the same way as any other contract. Thus the common mistake must necessarily be as to whether the instrument conformed to those terms and not to what one or other of the parties believed those terms to have been.

60.    Now that it has been established that rectification is also available when there was no binding antecedent agreement but the parties had a common continuing intention in respect of a particular matter in the instrument to be rectified, it would be anomalous if the "common continuing intention" were to be an objective fact if it amounted to an enforceable contract but a subjective belief  if it did not. On the contrary, the authorities suggest that in both cases the question is what an objective observer would have thought the intentions of the parties to be. Perhaps the clearest statement is by Denning LJ in *Frederick E Rose (London) Ltd v William H Pim Jnr & Co Ld* [1953]  2 QB 450, 461:

> "Rectification is concerned with contracts and documents, not with intentions. In order to get rectification it is necessary to show that the parties were in complete agreement on the terms of their contract, but by an error wrote them down wrongly; and in this regard, in order to ascertain the terms of their contract, you do not look into the inner minds of the parties - into their intentions - any more than you do in the formation of any other contract. You look at their outward acts, that is, at what they said or wrote to one another in coming to their agreement, and then compare it with the document which they have signed. If you can predicate with certainty what their contract was, and that it is, by a common mistake, wrongly expressed in the document, then you rectify the document; but nothing less will suffice."

61.    Likewise in the *Olympic Pride (Etablissements Georges et Paul Levy v Adderley Navigation Co Panama SA* [1980] 2 Lloyd's Rep 67, 72, Mustill J said:

> "The prior transaction may consist either of a concluded agreement or of a continuing common intention. In the latter event, the intention must have been objectively manifested. It is the words and acts of the parties

25

demonstrating their intention, not the inward thoughts of the parties, which matter."

62.    An example of the application of this objective ascertainment of the terms of the prior transaction is *George Cohen Sons & Co Ltd v Docks and Inland Waterways Executive* (1950)  84 Lloyd's Rep 97 in which a landlord negotiating a new lease proposed to the tenant that "the terms and conditions contained in the present lease to be embodied in the new lease where applicable."  The tenant accepted this offer, but the new lease as executed made the tenant liable for repairs which under the old lease had been the responsibility of the landlord. In answer to a claim for rectification, the landlord said that the new lease was in accordance with what he had understood to be the effect of his offer. The Court of Appeal said that this was irrelevant. What mattered was the objective meaning of what the landlord had written.  Sir Raymond Evershed MR said, at p 107:

> "If the defendants…did misconstrue [the letter] that is unfortunate for them, but at least they cannot be heard to say that their letter was intended to mean anything other than that which the words convey to the reader as a piece of ordinary English."

63.    As against these authorities, there are two cases upon which Mr Miles relied. The first is *Britoil plc v Hunt Overseas Oil Inc* [1994] CLC 561, in which the Court of Appeal by a majority (Glidewell and Hobhouse LJJ, Hoffmann LJ dissenting) refused to rectify an agreement which was alleged not to be in accordance with what had previously been agreed in summary heads of agreement. Hobhouse LJ, who gave the majority judgment, affirmed the decision of Saville J, who said that the defendants had failed to establish that there was a prior common agreement or intention in terms that the court could ascertain or (which is probably another way of saying the same thing) that the definitive agreement failed to reflect that prior agreement. In other words, the language of the heads of agreement was too uncertain to satisfy the requirement stated by Denning LJ in *Rose's* case that one should be able to "predicate with certainty what their contract was".  Hobhouse LJ noted that Saville J "did not base himself upon any consideration of the evidence as to the actual state of mind of the parties" and in my opinion the case lends no support to the view that a party must be mistaken as to whether the document reflects what he subjectively believes the agreement to have been.

26

64.     The other case is the decision of Laddie J in *Cambridge Antibody Technology Ltd v Abbott Biotechnology Ltd* [2005] FSR 590, in which he rejected a submission that evidence of the subjective state of mind of one of the parties contained in statements which had not been communicated to the other party ("crossed the line") was inadmissible. In my opinion, Laddie J was quite right not to exclude such evidence, but that is not inconsistent with an objective approach to what the terms of the prior consensus were. Unless itself a binding contract, the prior consensus is, by definition, not contained in a document which the parties have agreed is to be the sole memorial of their agreement.  It may be oral or in writing and, even if the latter, subject to later variation. In such a case, if I may quote what I said in *Carmichael v National Power plc* [1999] 1 WLR 2042, 2050 - 2051:

> "The evidence of a party as to what terms he understood to have been agreed is some evidence tending to show that those terms, in an objective sense, were agreed. Of course the tribunal may reject such evidence and conclude that the party misunderstood the effect of what was being said and done."

65.     In a case in which the prior consensus was based wholly or in part on oral exchanges or conduct, such evidence may be significant. A party may have had a clear understanding of what was agreed without necessarily being able to remember the precise conversation or action which gave rise to that belief.  Evidence of subsequent conduct may also have some evidential value.  On the other hand, where the prior consensus is expressed entirely in writing, (as in *George Cohen Sons & Co Ltd v Docks and Inland Waterways Executive* (1950) 84 Lloyd's Rep 97) such evidence is likely to carry very little weight. But I do not think that it is inadmissible.

66.     In this case there was no suggestion that the prior consensus was based on anything other than the May letter. It is agreed that the terms of that letter were accepted by Chartbrook and no one gave evidence of any subsequent discussions which might have suggested an intention to depart from them. It follows that (on the assumption that the judge was right in his construction of the ARP definition) both parties were mistaken in thinking that it reflected their prior consensus and Persimmon was entitled to rectification.

27

67.   Since, however, I think that the judge and the majority of the Court of Appeal were wrong on the question of construction, I would allow the appeal on that ground.


**LORD RODGER OF EARLSFERRY**


My Lords,


68.   I have had the privilege of considering the speeches of my noble and learned friends, Lord Hoffmann and Lord Walker of Gestingthorpe, in draft.   For the reasons which they give, I consider that the construction favoured by Persimmon is appropriate.   In particular, it seems to me that once you grasp the general structure of schedule 6 of the agreement, as described by Lord Walker in para 79 of his speech, the appropriate interpretation becomes clear.


69.   Like Lord Hoffmann, I would decline counsel's elegant but, in the event, unnecessary invitation to revisit the rule in *Prenn v Simmonds* [1971] 1 WLR 1381.   No-one could possibly say that the rule is based on some error of law or misconception.   On the contrary, the main pros and cons of having regard to prior negotiations when interpreting a formal contract have been known and discussed for centuries.   The present law represents a choice which was already second nature to the Earl of Eldon LC as long ago as *Millers v Miller* (1822) 1 Sh App 309. When interpreting a clause in a marriage contract which had been preceded by "a vast deal of correspondence", the Lord Chancellor assured the House that he did not recollect a case to which he had given more earnest attention, but still gave the correspondence short shrift, at p 317:


> "My Lords, all the previous correspondence I lay entirely out of the case, because I cannot conceive that any thing can be more dangerous than the construing deeds by the effect of letters and correspondence previous to the execution of them."

Subsequently, at p 319, he described the possibility of looking at the effect of the correspondence as "a very singular thing".   Some sixty years later, with rather more deliberation, the House affirmed that approach in *Inglis v John Buttery* (1873) 3 App Cas 552 and, a century

A001124

after that, reaffirmed it in *Prenn v Simmonds* [1971] 1 WLR 1381.  The rule could scarcely be more firmly embedded in our law.

70.    Of course, in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443 the House departed from a rule, of which Lord Denning had said some fifteen years previously, "if there is one thing clear in our law, it is that the claim must be made in sterling and the judgment given in sterling":  *In re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007, 1068-1069.  But not only was that rule essentially procedural:  in addition, the House could point to a change of circumstances which seemed to cry out for intervention.  Here, by contrast, the rule about prior negotiations forms part of the law of evidence and there are no particular pressing circumstances which call for a change.  The House is simply being asked to make a fresh policy decision and, in effect, to legislate to provide for a different rule.  The wisdom of the proposed change is, however, debatable.  So, if there is to be a change, it should be on the basis of a fully informed debate in a forum where the competing policies can be properly investigated and evaluated.  Although counsel presented the rival arguments with conspicuous skill, your Lordships' House in its judicial capacity is not that forum.

71.    Like Lord Walker, I see no reason to differ from what Lord Hoffmann has said on rectification.


**LORD WALKER OF GESTINGTHORPE**


My Lords,


72.    I shall first address, on a traditional approach, the issue of construction raised in this appeal.  That approach requires the court to consider the disputed definition of "Additional Residential Payment" in the context of the agreement as a whole, and the parties' shared understanding of the general situation and the aim of the transaction they were entering into.


73.    The owner (Chartbrook) had assembled a site off Wandsworth High Street, London SW18 (Numbers 1,3,5,7 and 9 Hardwicks Way), with valuable potential for development.  Under the agreement dated 16

A001125

October 2001 the developer (Persimmon Homes, a subsidiary of a well-known quoted company which guaranteed the developer's obligations) had the responsibility of applying for planning permission for a mixed commercial and residential development in a form approved by the owner.   The agreement was conditional on the developer obtaining planning permission in a satisfactory form within 15 months (subject to extension in certain circumstances).    If planning permission in a satisfactory form was obtained the owner would continue as registered owner of the site, but would execute a charge of the property as security for its obligations to the developer.   The developer would occupy the site as a licensee and carry out the development at its own expense, including responsibility for insurance.   The developer's obligations in carrying out the residential development (by the construction of flats) were not prescribed in detail.   Its obligations in carrying out the commercial development were limited to what were described as "core and shell works".

74.    As the flats were developed they were to be marketed by the developer, at its own expense, and sold (together with parking spaces) on 125-year leases at escalating ground rents. The commercial development, when the core and shell works were completed, was to be sold to a nominee of the owner on a 125-year lease at a peppercorn rent. There was to be a premium calculated at the rate of £110 per square foot of the net internal area of the commercial premises (plus VAT).   The developer was also to negotiate the eventual sale of the freehold subject to all these leases.   The owner was under an obligation to grant all the necessary leases and to make the eventual transfer of the freehold.

75.    As I have mentioned, the agreement did not provide in detail for the specification or cost of the construction by the developer of the residential part of the development – that is, the flats.   The owner had to approve the planning application, and the developer had to meet NHBC standards, but that was all.   In particular, the developer did not commit itself to any particular level of expenditure, with two minor exceptions: the developer undertook to spend a sum of at least £250,000 on planning gain through an agreement under section 106 of the Town and Country Planning Act 1990, and to pay at least £25,000 in compensation to adjoining owners for the loss of rights to light.   There was also an unquantified contingency sum for dealing with possible pollution in the sub-structure.   These three items were to be deducted in computing the Total Residential Land Value ("TRLV") for the purposes of schedule 6 (the Price) but there was nothing at all in the agreement providing for the developers' overall profit as such to be computed and brought into the bargain.

76.   All this is background, but to my mind relevant background, to the problem at the heart of this appeal, that is the correct construction of the definition of the Additional Residential Payment ("ARP") set out in para.1 of schedule 6. The ARP (also pointlessly relabelled as the Balancing Payment) is one of two components which had to be aggregated to make up the Price—that is, the total consideration payable by the developer to the owner.  The other component was the Total Land Value ("TLV"), that is the aggregate of (i) the TRLV already mentioned; (ii) the Total Commercial Land Value ("TCLV") and (iii) the Total Residential Car Parking Land Value ("TRCPLV").   Under para 3 of schedule 6 the TLV was payable by instalments over 52 months, starting nine months after the grant of planning permission, and the ARP was payable on completion of the last residential sale or six months after the completion of the development, whichever was the earlier.

77.   Each of the three components of the TLV was defined by a formula.  The TRLV was to be computed by reference to the net internal area of the residential units for which planning permission was obtained at the rate of £76.34 per square foot ("less the section 106 money and less the rights of light money and less the sub-structure assumptions additional cost").   The TCLV was to be computed by reference to the net internal area of the commercial premises for which planning permission was obtained, at the rate of £38.80 per square foot.   The TRCPLV was to be £3,024 multiplied by the number of residential parking places for which planning permission was obtained.

78.   Both parties were experienced in the property world—the owner as a land dealer, the developer as a developer—and they shared the knowledge that the site (including units 1 and 3 Hardwicks Way which the owner acquired during the negotiations), with the benefit of planning permission on favourable terms, would have a market value in the general region of £5m.   They hoped that planning permission for residential development would be granted for up to 100 flats with an aggregate internal area of 50,000 to 60,000 square feet.   The background facts known to the parties included the recent takeover by the developer's group of Beazer Homes Ltd, as a result of which the developer decided that it could not afford an outright purchase of the Wandsworth site. Instead the purchase was to be funded out of the proceeds of the disposal of the development, and the owner would expect to be compensated for the deferment of its consideration.

A001127

79.    The definitions that I have already mentioned, and others, such as Costs and Incentives ("C&I"), that I have yet to come to, can be quite confusing. It is important, I think, to discern and keep in mind the general structure of schedule 6 of the agreement. The components of the price referable to the commercial development (TCLV) and the residential parking (TRCPLV) were to be calculated under the simple formulae already mentioned (together they eventually amounted to about £1.727m).   By contrast, the price for the residential development was to consist of two elements, the TRLV and the ARP.   The TRLV is agreed to be approximately £4.684m, reflecting the approved residential internal area of rather over 61,000 square feet at £76.34 per square foot. The question is how much this sum has to be increased by the ARP to make up the owner's total consideration for the residential development.

80.    The ARP is defined as follows:

> "23.4% of the price achieved for each Residential Unit in excess of the Minimum Guaranteed Residential Unit Value ['MGRUV'] less the [C&I]"

The amount of the C&I is agreed to have been relatively trivial – a little less than £250,000 for all 100 flats – and I put it aside for the moment, while recognising that it plays an important part in the technicalities of the argument on construction. If this item is disregarded for the moment the disputed text can be set out in a simplified form, using "RP" (for residential price) where the judge and the Court of Appeal referred to Unit Price:

> "23.4% of the RP in excess of the MGRUV".

81.    The MGRUV was defined as meaning:

> "for each Residential Unit [ie each flat] the [TRLV] divided by the number of Residential Units for which Planning Permission is granted".

Under the planning permission eventually granted on 23 August 2002 there were to be exactly 100 flats, which simplifies the arithmetic. Nevertheless it may be unfortunate that the draftsman chose to define the ARP by a formula referring to the MGRUV rather than by referring directly to the TRLV (to which the MGRUV is directly linked, being, as

A001128

events turned out, one per cent of it).   The use of the two linked formulae rather than one, and the fact that the formulae are not set out in mathematical notation, make it harder to keep clearly in mind the structure of the arrangements contained in schedule 6.

82.   Briggs J expressed the issue in paras 20 and 21 of his judgment:

> "Leaving aside for the moment the point at which the C&I are deducted, the broad commercial effect of each of the parties' rival submissions may be summarised as follows. Chartbrook's case was that it was entitled to a 23.4% share of the net proceeds of sale of each Residential Unit in excess of a minimum guaranteed amount (being the unitised Total Residential Land Value of £76.34 per square foot of Residential Net Internal Area).  Put another way, its stake in the residential part of the development was to be the whole of the first £76.34 per square foot of net sales value, and 23.4% of the surplus.
>
> By contrast, Persimmon's case was that Chartbrook was to receive an additional payment only if 23.4%  of the net sales price amounted to more than the Minimum Guaranteed Residential Unit Value.  Put more broadly, Chartbrook's stake in the residential part of the development was whichever was the greater of :
> (i)      23.4% of the net residential sales price; and,
> (ii)     the guaranteed minimum of £76.34 per square foot of Residential Net Internal Area."

83.   That is, with great respect to the judge, a confusing way of putting it, because it fails to distinguish between the two elements of the price for the residential development and to make clear whether it is addressing both elements, or only the ARP.   The owner was to get the TRLV in any event, as the most important component of the TLV (a point that may be reflected in the expression "in excess of" in the definition of the ARP).   Indeed paras 20 and 21 of the judgment are to my mind two ways of describing the same result, unless the judge intended para 20 to state the owner's view of the ARP alone, and para 21 to state the developer's view of the TRLV and the ARP operating in conjunction.

84.    In his brief judgment Rimer LJ quoted the definition of the ARP and observed in para 183:

> "There is nothing unclear, uncertain or ambiguous about that.    It is clear, certain and unambiguous and its arithmetic is straightforward".

Tuckey LJ agreed. With profound respect to both of them, I totally disagree.    The definition is obviously defective as a piece of drafting. To start with defects that can be spotted and remedied fairly easily, the draftsman could not decide whether he was dealing with the flats ("each Residential Unit") collectively or individually.    The MGRUV was one-hundredth of the TRLV, but the C&I was plainly defined as a single aggregate figure.

85.    Much more significantly and problematically, the draftsman has failed to notice the ambiguity of the formula "$x$ per cent of the RP in excess of the MGRUV less the C&I".    The ambiguity could be resolved by the use of mathematical notation, as the judge observed in paras 18 and 19 of his judgment (though he did not mention that there was also a choice to be made as to putting another set of brackets round MGRUV – C&I, so producing four possibilities rather than two).

86.    Treated acontextually, the formula "$x$ per cent of A in excess of B" is undoubtedly ambiguous.    It can mean ($x/100$ x A)-B or $x/100$(A-B).    If required to guess I would opt for the latter meaning, because the expression "in excess of" has been used rather than "less", and to my mind "in excess of" suggests a focus on B as an integer and distances it from the percentage.    But I readily accept that this would be little more than guesswork.

87.    In a contract negotiated between businessmen there always is a commercial context.  If a contracting party agrees to pay the whole of some budgeted cost (B, say £100,000) and also agrees to pay 25% of the eventual actual cost (A, say £140,000) in excess of the budgeted costs, he would expect to pay a total of £110,000. Both elements of the obligation are, as it were, in the same currency, that is, cost, and the wording of the second element naturally translates into the formula $\frac{1}{4}$ (A-B), as ($\frac{1}{4}$A)-B would be commercial nonsense.    The owner can therefore give plausible examples in which $\frac{1}{4}$(A-B) would obviously be the right answer.    But the present appeal is not such a case.

34

88.    In this case the very significant difference between the results produced by the competing formulae is demonstrated in the figures set out in para 14 of the judgment of Lawrence Collins LJ in the Court of Appeal.  The difference between the two bottom lines (£5,580,616 and £9,168,427) is £3,587,811.    That difference figure is 76.6% of the TRLV (£4,683,565).  On the owner's case it gets one hundred times the MGRUV as the TRLV, but in effect has to give credit for only 23.4% of it in the calculation of the ARP.  That seems to be a fairly surprising bargain for commercial men to make.  It becomes not merely surprising but totally incredible if one takes account of the fact that although schedule 6 does not in terms state that the ARP is to have no value unless the actual receipts from sales of flats exceed the TRLV, that is implicit in its structure. On the owner's construction any such limitation is contradicted, and the ARP has a substantial value even if the sales do not reach the "trigger point" of £20.015m (23.4% of which is £4.684m).

89.    This can be illustrated by considering the effect of the competing formulae (set out in paras 18 and 19 of the judge's judgment, but continuing to exclude C&I for the present) for assumed residential sale price totals (RP) of £18m, £20m, £20.015m (the trigger point),  £22m and £23.849m (the actual result):

| RP | Owner's Construction | | Developer's Construction | |
|---|---|---|---|---|
| | 23.4%(**RP**-MG) = | **ARP** | (23.4%**RP**)-MG = | **ARP** |
| **18.000** | 23.4%(18.000-4.684) = | **3.116** | (23.4% x 18.000)-4.684 = | **Negative** |
| **20.000** | 23.4% (20.000-4.684) = | **3.584** | (23.4% x 20.000)-4.684 = | **Negative** |
| **20.015** *Trigger Point* | 23.4%(20.015-4.684) = | **3.587** | (23.4%x 20.015)-4.684 = | **Zero** |
| **22.000** | 23.4%(22.000-4.684) = | **4.052** | (23.4% x 22.000)-4.684 = | **0.464** |
| **23.849** *Actual Result* | 23.4%(23.849-4.684) = | **4.485** | (23.4% x 23.849)- 4.684 = | **0.897** |

RP = Total actual receipts from residential sales
MG = Total Residential Land Value (100 x MGRUV)
All amounts in £m

A001131

The figures are, on the owner's construction, commercial nonsense. They would bring the owner a total of £7.8m for the residential development (£4.684m + £3.116m) even if sales of flats were disastrously low at £18m.  The idea of the TRLV (linked as it is to the MGRUV) as a guaranteed minimum would be totally subverted.

90.    The judge accepted that there was some force in the developer's reliance on the words "if any" which occur in para 3.3 of schedule 6 with reference to the Balancing Payment (alias the ARP).   He saw less force in the submission that he should give weight to the natural meaning of the expressions "minimum", "guaranteed" and "additional" in the definitions of the MGRUV and the ARP, on the ground that by the use of a special definition "[t]he word or phrase is stripped of its natural meaning"(para 61). In preferring the owner's submissions the judge attached particular weight to the difficulty (for the developer) of explaining the words "less the C&I".   The judge observed (paras 55-57):

> "An equally serious problem with Persimmon's construction is what to do with the subtraction of the C&I. It is common ground that the Costs and Incentives have a linear relationship with the amount of the price achieved for each Residential Unit.  For example, Persimmon may agree the sale of a flat for £250,000 after incurring Costs and Incentives of say £50,000 or, with the same commercial consequence, sell the same flat for £200,000 but incur no Costs and Incentives.  Typical Incentives would include payment of the purchaser's legal fees or stamp duty, or the installation of special features such as wooden floors, over and above the standard fit-out specification.
>
> One would expect Chartbrook's profit share to be unaffected, one way or the other, by the decision of Persimmon to sell a particular flat by one or other of those methods (high price plus Incentives or low price without Incentives).  Chartbrook's construction, under which the Costs and Incentives are deducted from the price achieved for each Residential Unit before the application of the 23.4% share, fulfils precisely that expectation.
>
> By contrast, Persimmon's construction deducts the C&I from the 23.4% of the price achieved for the Residential

36

Unit before the net amount is compared with the MGRUV, to ascertain whether there is any excess.  By comparison with Chartbrook's construction, that calculation magnifies the negative effect of C&I by a factor of more than 3 in comparison with the positive effect of the increase in the Residential Unit Price attributable to the C&I."

91.    Lawrence Collins LJ took a different view, and I unhesitatingly prefer his view.   His reasons are set out clearly in paras 90 to 94 of his judgment, and I cannot usefully add much to them.   But I would make a few further comments.

92.    The first is as to the perceived problem about C&I.   It is true that from the developer's point of view it made little or no difference (except perhaps for timing and tax) whether or not, in relation to a particular flat, it spent an extra £2,000 on parquet flooring or granite worktops and managed to sell the flat for £2,000 more as a result.   But it did make a marginal difference to the owner, as its ARP was calculated (in some way or other, on any view) by reference to the total achieved by residential sales: that is, by reference to the developer's turnover and not by reference to the developer's profit (the judge's reference to "Chartbrook's profit share" was not therefore entirely apposite).   So (to adopt the expression used in the courts below) C&I had a linear relationship for the developer, but not for the owner.   It would therefore have made sense for the parties to have agreed that C&I expenditure and allowances should be deducted from the total obtained for residential sales for the purposes of these computations (rather as the section 106 money and the rights of light money were to be disregarded in computing the TRLV).   But it would not make sense to deduct the whole of the C&I from 23.4 per cent of the total obtained for residential sales.

93.    Rimer LJ gave an example (para 185) to reinforce his view about the C&I.   His example produces very odd results but that is partly because the figures taken are unrealistic.   If one takes more realistic figures (such as a normal average sale price of £200,000 with C&I of £2,500 and an MGRUV of £47,500) the result is much less surprising. But it is still anomalous and makes no commercial sense, as Lawrence Collins LJ observed. An ARP of (23.4% of [RP less C&I]) less MGRUV does make commercial sense, and in my opinion it is well within the principles in *Antaios Cia Naviera v Salen Rederiana AB* [1985] AC 191, 201 and *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912-913, to read the agreement in that way.

A001133

94.    I am sure that Lawrence Collins LJ was right to give a lot of weight to the terms "minimum", "guaranteed" and "additional" in the relevant definitions.    There is a good deal of authority, if authority is needed, to give weight to the natural meaning of words in a definition. In relation to statutory definitions there are the observations of my noble and learned friend, Lord Hoffmann, in *Macdonald v Dextra Accessories Ltd* [2005] 4 All ER 107, para 18 and *Birmingham City Council v Walker* [2007] 2AC 262, para 11 and Lord Scott of Foscote in *Oxfordshire County Council v Oxford City Council* [2006] 2 AC 674, paras 82-83.    I would apply the same principle to a definition in a commercial contract.

95.    That brings me back to what I said earlier about the need, in the midst of a thicket of rather confusing definitions, to keep in mind the general structure of the bargain.   As part of the TLV the owner was to receive the TRLV,   the total residential land value, representing the estimated value attributable to land which would (on the agreement becoming unconditional) have the benefit of a favourable planning permission for residential development (but on which development had not yet taken place). The developer was to bear all the costs of the development.  The owner was also to have the prospect of an additional payment, the ARP.  As regards the residential development the bargain could have been expressed between businessmen as "a guaranteed minimum of the first £76.34 per square foot of residential internal area from the total proceeds of the flats, and 23.4% of the excess" (indeed the judge, in para 20 of his judgment, summarised the owner's case in very similar terms, except that he used "surplus" rather than "excess").  If one approaches it in that way, the developer's case as to the meaning of the definition is not merely linguistically possible, but is linguistically (as well as commercially) compelling.  The owner's case becomes plausible only if one concentrates on the ARP, forgetting the TRLV (to which the MGRUV is directly linked).  Lawrence Collins LJ dealt with this point quite briefly, in paras 81 and 93 of his judgment.  He must have thought it unnecessary to spell it out more fully.    But as he ended in the minority I have dealt with the point more fully.

96.    Since preparing this opinion I have had the privilege of reading in draft the opinion of my noble and learned friend, Lord Hoffmann.  In paras 1 to 22 of his opinion Lord Hoffmann reaches precisely the same conclusion as I have reached in regard to the correct construction, by traditional methods, of the agreement.  I agree with all his reasoning, which is essentially the same as my own, but more trenchantly expressed.  I have however thought it worthwhile setting out my own more pedestrian route to the conclusion that this House should, without

A001134

having to depart from established principles of construction, allow the appeal and dismiss Chartbrook's claim.

97.     I have also read with interest and admiration Lord Hoffmann's observations, in the remaining part of his opinion, on the important questions that we do not have to decide.  I would not differ from any of these views.  In particular, I agree that *Karen Oltmann* is a questionable application of the "private dictionary" principle, since the meaning of the English word "after" can hardly be equated to the use of a technical or trade term.

## BARONESS HALE OF RICHMOND

My Lords,

98.     I too have had the privilege of reading in draft the opinions of my noble and learned friends, Lord Hoffmann and Lord Walker of Gestingthorpe. For the reasons they give, together with those of Lawrence Collins LJ in the Court of Appeal, I agree that Persimmon's construction of this contract is correct and that this appeal should be allowed.

99.     But I have to confess that I would not have found it quite so easy to reach this conclusion had we not been made aware of the agreement which the parties had reached on this aspect of their bargain during the negotiations which led up to the formal contract. On any objective view, that made the matter crystal clear. This, to me, increased the attractions of accepting counsel's eloquent invitation to reconsider the rule in *Prenn v Simmonds* [1971] 1 WLR 1381, the pot so gently but effectively stirred by Lord Nicholls of Birkenhead in his Chancery Bar Association lecture of 2005 ([2005] 121 LQR 577). My experience at the Law Commission has shown me how difficult it is to achieve flexible and nuanced reform to a rule of the common law by way of legislation. In the end abolition may be the only workable legislative solution, as eventually happened with the hearsay rule (Law Com No 216 (1993), *The Hearsay Rule in Civil Proceedings*). Even that can prove difficult if, on analysis, the view is taken that the rule has no real content, as with the parol evidence rule (Law Com No 154 (1986), *The Parol Evidence Rule*). The courts, on the other hand, are able to achieve step-by-step

A001135

changes which can distinguish cases in which such evidence is "helpful" from cases in which it is not.

100.   However, the approach to rectification adopted by Lord Hoffmann would go a long way towards providing a solution. If the test of the parties' continuing common intentions is an objective one, then the court is looking to see whether there was such a prior consensus and if so what it was. Negotiations where there was no such consensus are indeed "unhelpful". But negotiations where consensus was reached are very helpful indeed. If the language in the eventual contract does not reflect that consensus, then unless there has been a later variation of it, the formal contract should be rectified to reflect it. It makes little sense if the test for construing their prior consensus is different from the objective test for construing their eventual contract. This situation is, and should be, quite different from the situation where one party is mistaken as to its meaning and the other party knows this – the latter should not be permitted to take advantage of the former.

101.   For those reasons, I would respectfully associate myself, as does Lord Walker, with the views of Lord Hoffmann on the issues which we do not have to decide. In particular, I would like to express my admiration for the skill and charm with which both issues were argued by counsel on each side. It is perhaps surprising that questions of such practical and theoretical importance in the law of contract should still be open to debate and development. But that is also the great strength of the common law.

A001136



Michaelmas Term
**[2011] UKSC 50**
*On appeal from: [2010] EWCA Civ 582*

# JUDGMENT

# Rainy Sky S. A. and others (Appellants) *v* Kookmin Bank (Respondent)

**before**

**Lord Phillips, President**
**Lord Mance**
**Lord Kerr**
**Lord Clarke**
**Lord Wilson**

## JUDGMENT GIVEN ON

## 2 November 2011

**Heard on 27 July 2011**

| *Appellants* | *Respondent* |
|---|---|
| Mark Howard QC | Guy Philipps QC |
| Michael Ashcroft QC | James Cutress |
| (Instructed by Ince & Co | (Instructed by Linklaters |
| LLP) | LLP) |

**LORD CLARKE, (WITH WHOM LORD PHILLIPS, LORD MANCE, LORD KERR AND LORD WILSON AGREE)**

*Introduction and factual background*

1.     This appeal raises a short question of construction of shipbuilder's refund guarantees given pursuant to six shipbuilding contracts ("the Contracts"). The Contracts, which were all dated 11 May 2007, were between each of the first to sixth claimants ("the Buyers") and Jinse Shipbuilding Co Ltd ("the Builder"). Under the Contracts the Builder agreed to build and sell one vessel to each of the Buyers. The price of each vessel was US\$33,300,000, payable in five equal instalments of US\$6,660,000 due at specified points of time, with the final instalment payable on delivery.[1]  By Article X.8 of the Contracts it was a condition precedent to payment by the Buyers of the first instalment that the Builder would deliver to the Buyers refund guarantees relating to the first and subsequent instalments in a form acceptable to the Buyers' financiers. As envisaged by Article X.8, by letter dated 22 August 2007 the respondent, Kookmin Bank ("the Bank"), issued six materially identical "Advance Payment Bonds" ("the Bonds"), one to each of the Buyers. The seventh claimant ("the Assignee") is the assignee of the benefit of the Bonds.

2.     On 29 August 2007, the Buyers each paid the first instalment of US\$6,660,000 due under the Contracts. On 29 September 2007, the first claimant paid the second instalment of US\$6,660,000 under the contract to which it is a party.

3.     In 2008 the Builder experienced financial difficulties and in late January 2009 it entered into and/or became subject to a debt workout procedure under the Korean Corporate Restructuring Promotion Law 2007. On 25 February 2009 the Buyers wrote to the Builder notifying it that this development triggered Article XII.3 of the Contracts and demanding an immediate refund of all the instalments paid, together with interest at 7% per annum. The Builder refused to make any refund on the ground that Article XII.3 of the Contracts had not been triggered as alleged.  The dispute between the Buyers and the Builder has been submitted to arbitration pursuant to Article XIV.3 of the Contracts.

-----

[1] There was subsequently a small reduction in the overall price and a corresponding reduction in the final instalment for each vessel but that is immaterial to the issues in the appeal.

4.     On 23 April 2009, the Buyers wrote to the Bank demanding repayment under the Bonds of the instalments paid under the Contracts. The Bank refused to pay. It did so initially on the ground that it was not obliged to pay pending resolution of the dispute between the Buyers and the Builder. That argument was subsequently rejected by Simon J ("the Judge") and there was no appeal to the Court of Appeal against that part of his order: [2009] EWHC Civ 2624 (Comm). The Bank subsequently raised a separate, and logically prior, argument that, on their true construction, the Bonds did not cover refunds to which the Buyers were entitled pursuant to Article XII.3 of the Contracts.

5.     That argument was also rejected by the Judge, who gave summary judgment for the Assignee, but succeeded in the Court of Appeal, which gave summary judgment for the Bank against the Buyers and the Assignee.  In the Court of Appeal Sir Simon Tuckey agreed with the Judge but the majority, comprising Thorpe and Patten LJJ, held the Bank's argument to be correct: [2010]  EWCA Civ 582. The orders of the Judge and the Court of Appeal were made on 29 October 2009 and 27 May 2010 respectively. The Court of Appeal refused permission to appeal.

6.     The Buyers appeal to this Court pursuant to permission granted by the Court.  The issue is whether, on the true construction of paragraph 3 of the Bonds, the Buyers are entitled to payment under the Bonds in respect of refunds to which they are entitled under Article XII.3 of the Contracts. No-one suggested that the successful parties should not have summary judgment in their favour.

*The Bonds*

7.     I begin with the Bonds because it was common ground that all depends upon the true construction of the Bonds and that the terms and meaning of the Contracts are only relevant to the extent that they inform the true construction of the Bonds. The paragraphs in the letter comprising the Bonds were not numbered but both the Judge and the Court of Appeal referred to them by number for convenience of reference and I will do the same. As so numbered the relevant parts of each Bond were these:

> "[1]   We refer to the … Contract entered into between … the Builder and yourselves for the construction and delivery of … the 'Vessel' to be delivered before [31 July 2009]. Other terms and expressions used in this Bond shall have the same meaning as in the Contract, a copy of which has been provided to us.
>
> [2]     Pursuant to the terms of the Contract, you are entitled, upon your rejection of the Vessel in accordance with the terms of the

Contract, your termination, cancellation or rescission of the Contract or upon a Total Loss of the Vessel, to repayment of the pre-delivery instalments of the Contract Price paid by you prior to such termination or a Total Loss of the Vessel (as the case may be) and the value of the Buyer's Supplies delivered to the Shipyard (if any) together with interest thereon at the rate of ... (7%) per annum (or ... (10%) per annum in the case of a Total Loss of the Vessel) from the respective dates of payment by you of such instalments to the date of remittance by telegraphic transfer of such refund.

[3]   In consideration of your agreement to make the pre-delivery instalments under the Contract and for other good and valuable consideration (the receipt and adequacy of which is hereby acknowledged), we hereby, as primary obligor, irrevocably and unconditionally undertake to pay to you, your successors and assigns, on your first written demand, all such sums due to you under the Contract (or such sums which would have been due to you but for any irregularity, illegality, invalidity or unenforceability in whole or in part of the Contract) PROVIDED THAT the total amount recoverable by you under this Bond shall not exceed US $[26,640,000] ... plus interest thereon at the rate of ... (7%) per annum (or ... (10%) per annum in the case of a Total Loss of the Vessel) from the respective dates of payment by you of such instalments to the date of remittance by telegraphic transfer of such refund.

[4]   Payment by us under this Bond shall be made without any deduction or withholding, and promptly on receipt by us of a written demand (substantially in the form attached) signed by two of your directors stating that the Builder has failed to fulfil the terms and conditions of the Contract and as a result of such failure, the amount claimed is due to you and specifying in what respects the Builder has so failed and the amount claimed. Such claim and statement shall be accepted by us as evidence for the purposes of this Bond alone that this amount claimed is due to you under this Bond.

[5]   Our liability under this Bond shall not be affected by … (v) any insolvency, re-organisation or dissolution of the Builder, or (vi) any other matter or thing which may operate to discharge or reduce our liability hereunder.

…"

8.   The Bonds further provided that they were assignable, that they were governed by English law and that all disputes arising out of them were to be determined by the Commercial Court.

A001141

9.      The resolution of the issue between the parties depends upon the true construction of paragraph [3]. The Bank promised to pay on demand "all such sums due to you under the Contract". The question is what was meant by "such sums". Only two possibilities were suggested. The Buyers said (and the Judge and Sir Simon Tuckey held) that the expression "such sums" referred back to the "pre-delivery instalments" in the first line. They said that the purpose of the Bond was to guarantee the refund of pre-delivery instalments and that the promise was therefore to refund pre-delivery instalments. By contrast the Bank said (and Thorpe and Patten LJJ held) that the expression "such sums" was a reference back to the sums referred to in paragraph [2], namely the repayment of the pre-delivery instalments paid prior to a termination of the Contract or a Total Loss of the vessel and the value of the Buyer's Supplies in the case of a Total Loss. On the Buyers' analysis the Bond guaranteed pre-delivery instalments which were repayable under Article XII.3 in the case of any insolvency event, whereas on the Bank's analysis it did not.

*The Contracts*

10.     It is common ground that the terms of the Contracts are relevant to the true construction of the Bonds. They are referred to in the Bonds and provide the immediate context in which the Bonds were entered into.  They are thus plainly an important aid to the meaning of the Bonds.

11.     Article X of the Contracts provided, so far as material as follows:

"ARTICLE X: PAYMENT

5.      REFUND BY THE BUILDER

…

The payments made by the Buyer to the Builder prior to delivery of the Vessel shall constitute advances to the Builder. If the Vessel is rejected by the Buyer in accordance with the terms of this Contract, or if the Buyer terminates, cancels or rescinds this Contract pursuant to any of the provisions of this Contract specifically permitting the Buyer to do so, the Builder shall forthwith refund to the Buyer in US dollars, the full amount of total sums paid by the Buyer to the Builder in advance of delivery together with interest thereon as herein provided within thirty (30) banking days of acceptance of rejection.

... The interest rate of the refund … shall be seven per cent (7%) per annum …

If the Builder is required to refund to the Buyer the installments paid by the Buyer to the Builder as provided in this Paragraph, the Builder shall return to the Buyer all of the Buyer's Supplies as stipulated in Article XIII which were not incorporated into the Vessel and pay to the Buyer an amount equal to the cost to the Buyer of those Buyer's Supplies incorporated into the Vessel.

6.    TOTAL LOSS

If there is a total loss or a constructive total loss of the Vessel prior to delivery thereof, the Builder shall proceed according to the mutual agreement of the parties hereto either:

(a) to build another vessel in place of the Vessel so lost ... provided that the parties hereto shall have agreed in writing to a reasonable cost and time for the construction … or

(b) to refund to the Buyer the full amount of the total sums paid by the Buyer to the Builder under the provisions of Paragraph 2 of this Article and the value of Buyer's Supplies delivered to the Shipyard, if any, together with interest thereon at the rate of ten percent (10%) per annum ...

If the parties hereto fail to reach such agreement within two (2) months after the Vessel is determined to be a total loss or constructive total loss, the provisions of (b) hereinabove shall be applied."

…

8.    REFUND GUARANTEE

The Builder shall as a condition precedent to payment by the Buyer of the first installment deliver to the Buyer an assignable letter of guarantee issued by a first class Korean Bank .... to Buyer's Financiers for the refund of the first installment, and at the same time, together with the letter of guarantee relating to the first installment, Builder shall also deliver to the Buyer an assignable letter of guarantee issued by a first class Korean Bank .... for the refund of the respective installments following the way of the payment stipulated in this Article. The refund guarantees by the Builder to the Buyer shall be indicated pre-delivery installments plus interest as aforesaid to the Buyer under or pursuant to paragraph 5 above in the form annexed hereto as Exhibit 'A' which is yet to be agreed…

In the event that the Refund Guarantees, for all installments, have not been provided to the Buyer in a form acceptable to the Buyer's financiers and have not been issued by an entity acceptable to

> Buyer's financiers, by the 31st of August 2007 then the Buyer may cancel this Contract without penalty on either side."

It is common ground that no form of guarantee was in fact annexed to the Contracts.

12.    Article XII provided, so far as relevant:

> "ARTICLE XII: BUILDER'S DEFAULT
>
> …
>
> 3.    If the Builder shall apply for or consent to the appointment of a receiver, trustee or liquidator, shall be adjudicated insolvent, shall apply to the courts for protection from its creditors, file a voluntary petition in bankruptcy or take advantage of any insolvency law, or any action shall be taken by the Builder having an effect similar to any of the foregoing or the equivalent thereof in any jurisdiction, the Buyer may by notice in writing to the Builder require the Builder to refund immediately to the Buyer the full amount of all sums paid by the Buyer to the Builder on account of the Vessel and interest thereon at seven percent (7%) per annum on the amount to be refunded to the Buyer, computed from the respective date such sums were paid by the Buyer to the date of remittance of the refundable amount to the Buyer and immediately upon receipt of such notice the Builder shall refund such amount to the Buyer. Following such refund the Builder may, but shall not be obliged to, by notice in writing to the Buyer given within ten (10) business days terminate this contract. If the Builder does not so terminate the Contract the Buyer's obligation to pay further installments prior to delivery of the Vessel under Article X 2(a),(b),(c) and (d) shall be suspended and the full Contract price shall be paid to the Builder upon delivery of the Vessel in the manner contemplated by Article X paragraph 2(e)."

13.    The Contracts contained a number of provisions which entitled the Buyer to cancel the contract, namely Articles III.1 and XII.1 (delay) and Article III.2(b), 3(c), 4(d) and 5(d) (insufficient speed, excessive fuel consumption, deficient deadweight or cargo capacity).  Some of those provisions specifically entitled the Buyer to a refund of all advance payments following cancellation. Others did not, although in such cases Article X.5 would apply and have the same effect. The Contracts also contained in Article XIII further detailed provisions relating to Buyer's Supplies.

*The correct approach to construction*

14.    For the most part, the correct approach to construction of the Bonds, as in the case of any contract, was not in dispute. The principles have been discussed in many cases, notably of course, as Lord Neuberger MR said in *Pink Floyd Music Ltd v EMI Records Ltd* [2010] EWCA Civ 1429; [2011] 1 WLR 770 at para 17, by Lord Hoffmann in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, passim, in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912F-913G and in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101, paras 21-26. I agree with Lord Neuberger (also at para 17) that those cases show that the ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant.  As Lord Hoffmann made clear in the first of the principles he summarised in the *Investors Compensation Scheme* case at page 912H, the relevant reasonable person is one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

15.    The issue between the parties in this appeal is the role to be played by considerations of business common sense in determining what the parties meant. Sir Simon Tuckey said at para 19 of his judgment that there was no dispute about the principles of construction and the Bank so submitted in its skeleton argument. However, I do not think that is quite correct.

16.    At para 18 Sir Simon identified the question of construction substantially as set out in para 9 above and said at para 19:

> "There is no dispute about the principles of construction to be applied in order to answer this question. The court must first look at the words which the parties have used in the bond itself. The shipbuilding contract is of course the context and cause for the bond but is nevertheless a separate contract between different parties. If the language of the bond leads clearly to a conclusion that one or other of the constructions contended for is the correct one, the Court must give effect to it, however surprising or unreasonable the result might be. But if there are two possible constructions, the Court is entitled to reject the one which is unreasonable and, in a commercial context, the one which flouts business common sense. This follows from the House of Lords decisions in *Wickman Machine Tools Sales Limited v Schuler AG* [1974] AC 235, where at 251 Lord Reid said:

> 'The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear.'

and *The Antaios* [1984] AC 191, where at 201 Lord Diplock said:

> 'If detailed and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense it must yield to business common sense.'"

17.    As I read his judgment, Patten LJ did not put the question in quite the same way. This can be seen from paras 35 to 44 of his judgment. At para 35 he referred to Sir Simon Tuckey's approach at para 19 (as quoted above). He also referred to para 18(iii) of the Judge's judgment, where the Judge described the Bank's construction of the Bond as having the surprising and uncommercial result of the guarantee not being available to meet the Builder's repayment obligations in the event of insolvency. Patten LJ noted that the Judge appeared to have taken that into account as a factor in favour of the Buyers' construction of paragraph [3] of the Bonds. Patten LJ added that the Judge's approach was the same as that of Sir Simon Tuckey.

18.    Patten LJ then referred to the cases mentioned above and expressed his conclusion in principle thus at para 42:

> "In this case (as in most others) the Court is not privy to the negotiations between the parties or to the commercial and other pressures which may have dictated the balance of interests which the contract strikes. Unless the most natural meaning of the words produces a result which is so extreme as to suggest that it was unintended, the Court has no alternative but to give effect it its terms. To do otherwise would be to risk imposing obligations on one or other party which they were never willing to assume and in circumstances which amount to no more than guesswork on the part of the Court."

19.    Finally, at paras 43 and 44, Patten LJ quoted from the speeches of Lord Wilberforce in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384-5 and of Lord Hoffmann in *Chartbrook* at para 20, where they discussed the reason for the rule excluding evidence of pre-contractual negotiations.  In particular they stressed the

irrelevance of the parties' subjective intentions and noted that the mere fact that a term in the contract appears to be particularly unfavourable to one party or the other is irrelevant. As Lord Hoffmann put it, the term may have been agreed in exchange for some concession made elsewhere in the transaction or it may simply have been a bad bargain.

20.      I entirely accept those caveats. However, it seems to me to be clear that the principle stated by Patten LJ in para 42 is different from that stated by the Judge in his para 18(iii) and by Sir Simon Tuckey in para 19. It is not in my judgment necessary to conclude that, unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning.

21.      The language used by the parties will often have more than one potential meaning. I would accept the submission made on behalf of the appellants that the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other.

22.      This conclusion appears to me to be supported by Lord Reid's approach in *Wickman* quoted by Sir Simon Tuckey and set out above. I am of course aware that, in considering statements of general principle in a particular case, the court must have regard to the fact that the precise formulation of the proposition may be affected by the facts of the case. Nevertheless, there is a consistent body of opinion, largely collated by the Buyers in an appendix to their case, which supports the approach of the Judge and Sir Simon Tuckey.

23.      Where the parties have used unambiguous language, the court must apply it. This can be seen from the decision of the Court of Appeal in *Co-operative Wholesale Society Ltd v. National Westminster Bank plc* [1995] 1 EGLR 97. The court was considering the true construction of rent review clauses in a number of different cases. The underlying result which the landlords sought in each case was the same. The court regarded it as a most improbable commercial result. Where the result, though improbable, flowed from the unambiguous language of the clause, the landlords succeeded, whereas where it did not, they failed. The court held that ordinary principles of construction applied to rent review clauses and applied the principles in *The Antaios (Antaios Compania Naviera SA v Salen Rederierna AB)*

[1985] AC 191. After quoting the passage from the speech of Lord Diplock cited above, Hoffmann LJ said, at p 98:

> "This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

24.     The court also comprised Leggatt and Simon Brown LJJ.  Simon Brown LJ at p 101 said that, having regard to the improbable result for which the landlords contended, only the most unambiguous of such clauses could properly be found to bear the landlords construction and that in the case of only one of the leases did the clause "unambiguously …achieve the improbable result for which the landlords contend".  The case is of interest because Simon Brown LJ considered that, of the other three cases, one unambiguously failed to achieve the result sought by the landlords, whereas, of the other two, he said this at p 102:

> "For my part, I would accept that the more obvious reading of both favours the landlord's construction. I am persuaded, however, that they are capable of being, and therefore, for the reasons already given, should be, construed differently."

That case is therefore an example of the adoption and application of the principle endorsed by the Judge and by Sir Simon Tuckey. See also *International Fina Services AG v Katrina Shipping Ltd, The Fina Samco* [1995] 2 Lloyd's Rep. 344, where Neill LJ said at page 350 it was necessary when construing a commercial document to strive to attribute to it a meaning which accords with business common sense.

25.     In 1997, writing extra-judicially ("Contract Law: Fulfilling the reasonable expectations of honest men") in 113 LQR 433, 441 Lord Steyn expressed the principle thus:

> "Often there is no obvious or ordinary meaning of the language under consideration. There are competing interpretations to be considered. In choosing between alternatives a court should primarily be guided by the contextual scene in which the stipulation in question appears. And speaking generally commercially minded judges would regard the commercial purpose of the contract as more

A001148

important than niceties of language. And, in the event of doubt, the working assumption will be that a fair construction best matches the reasonable expectations of the parties."

I agree. He said much the same judicially in *Society of Lloyd's v Robinson* [1999] 1 All ER (Comm) 545, 551:

> "Loyalty to the text of a commercial contract, instrument, or document read in its contextual setting is the paramount principle of interpretation. But in the process of interpreting the meaning of the language of a commercial document the court ought generally to favour a commercially sensible construction. The reason for this approach is that a commercial construction is likely to give effect to the intention of the parties. Words ought therefore to be interpreted in the way in which a reasonable commercial person would construe them. And the reasonable commercial person can safely be assumed to be unimpressed with technical interpretations and undue emphasis on niceties of language".

26.    Similar assistance is at hand nearer at home.  In *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd* [2001] CLC 1103, 1118-1119; [2011] EWCA Civ 1047; [2001] 2 All ER (Comm) 299, Mance LJ said:

> "13.    Construction, as Sir Thomas Bingham MR said in *Arbuthnott v Fagan* [1995] CLC 1396 at p 1400 is thus 'a composite exercise, neither uncompromisingly literal nor unswervingly purposive'. To para (5), one may add as a coda words of Lord Bridge in *Mitsui Construction Co Ltd v A-G of Hong Kong* (1986) 33 BLR 14, cited in my judgment in *Sinochem International Oil (London) Ltd v Mobil Sales and Supply Corp* [2000] CLC 878 at p 885. Speaking of a poorly drafted and ambiguous contract, Lord Bridge said that poor drafting itself provides:
>
>> 'no reason to depart from the fundamental rule of construction of contractual documents that the intention of the parties must be ascertained from the language that they have used interpreted in the light of the relevant factual situation in which the contract was made. But the poorer the quality of the drafting, the less willing the court should be to be driven by semantic niceties to attribute to the parties an improbable and unbusinesslike intention, if the language used, whatever it may lack in precision, is reasonably capable of an interpretation which attributes

> to the parties an intention to make provision for contingencies inherent in the work contracted for on a sensible and businesslike basis.'
>
> …
>
> 16    ... in my judgment the subclause has no very natural meaning and is, at the least, open to two possible meanings or interpretations - one the judge's, the other that it addresses two separate subject-matters. In these circumstances, it is especially important to undertake the exercise on which the judge declined to embark, that is to consider the implications of each interpretation. In my opinion, a court when construing any document should always have an eye to the consequences of a particular construction, even if they often only serve as a check on an obvious meaning or a restraint upon adoption of a conceivable but unbusinesslike meaning. In intermediate situations, as Professor Guest wisely observes in *Chitty on Contracts* (28th edn) vol 1, para. 12-049, a 'balance has to be struck' through the exercise of sound judicial discretion."

27.    More generally, in *Homburg Houtimport BV v Agrosin Private Ltd*: *The Starsin* [2004] 1 AC 715, para 10 Lord Bingham referred to

> "the rule to which Lord Halsbury LC alluded in *Glynn v Margetson & Co* [1893] AC 351, 359, 'that a business sense will be given to business documents. The business sense is that which businessmen, in the course of their ordinary dealings, would give the document."

28.    Three other cases merit brief reference.  The same approach was adopted by Arden LJ in *In the Matter of Golden Key Ltd (In Receivership)* [2009] EWCA Civ 636, paras 29 and 42 and by this Court in *In Re Sigma Finance Corporation (in administrative receivership)* [2009] UKSC 2; [2010] 1 All ER 571, where Lord Mance said at para 12 that the resolution of an issue of interpretation in a case like the present was an iterative process, involving checking each of the rival meanings against other provisions of the document and investigating its commercial consequences.

29.    Finally, it is worth setting out two extracts from the judgment of Longmore LJ in *Barclays Bank plc v HHY Luxembourg SARL* [2010] EWCA Civ 1248; [2011] 1 BCLC 336, paras 25 and 26:

> "25.    The matter does not of course rest there because when alternative constructions are available one has to consider which is

the more commercially sensible. On this aspect of the matter Mr Zacaroli has all the cards. ...

26.     The judge said that it did not flout common sense to say that the clause provided for a very limited level of release, but that, with respect, is not quite the way to look at the matter. If a clause is capable of two meanings, as on any view this clause is, it is quite possible that neither meaning will flout common sense. In such circumstances, it is much more appropriate to adopt the more, rather than the less, commercial construction."

30.     In my opinion Longmore LJ has there neatly summarised the correct approach to the problem. That approach is now supported by a significant body of authority. As stated in a little more detail in para 21 above, it is in essence that, where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense.  For these reasons I prefer the approach of the Judge and Sir Simon Tuckey to that of Patten LJ, which is to my mind significantly different on this point.

*Application to the facts*

31.     As indicated above, two possible interpretations of paragraph [3] of the Bonds were advanced. It was conceded on behalf of the Bank in the Court of Appeal that both constructions were arguable. I did not understand Mr Guy Philipps QC to resile from that position on behalf of the Bank in this Court.  In any event, in my judgment there are indeed two possible interpretations.

32.     The strength of the Bank's interpretation is that it is not easy to see the point of paragraph [2] of the Bonds if the Buyers' interpretation of paragraph [3] is correct. On the other hand, the Buyers' interpretation is straightforward. It is that, reduced to its essentials, the Bank's promise in paragraph [3] was that "in consideration of your [ie the Buyers'] agreement to make the pre-delivery instalments … we hereby, as primary obligor, promise to pay to you, your successors and assigns, on your first written demand, all such sums due to you under the Contract …". In the absence of paragraph [2] there could be no doubt that the reference to 'such sums' was a reference to the 'pre-delivery instalments' at the beginning of paragraph [3]. That makes perfect sense because one would naturally expect the parties to agree (and the Buyers' financiers to insist) that, in the event, for example, of the insolvency of the Builders, the Buyers should have security for the repayment of the pre-delivery instalments which they had paid.

33.     The question is whether the presence of paragraph [2] leads to a different conclusion. It was submitted with force by Mr Philipps on behalf of the Bank that it did. He correctly submitted that paragraph [3] must be construed in its context and that part of the context was paragraph [2], which was of course the immediately preceding paragraph. He submitted that the only purpose there can have been for including paragraph [2] in the Bonds was to identify the scope of paragraph [3]. He further submitted that no other sensible explanation for the inclusion of paragraph [2] had been advanced on behalf of the Buyers.

34.     I accept the submission that no very good reason was advanced on behalf of the Buyers for the inclusion of paragraph [2] in the Bonds. The best they could do was to say that it was a preamble to the operative provision in paragraph [3], that it simply set out some of the Buyers' rights under the Contracts and that it was not intended to identify the scope of the Bank's liability under the Bonds. Patten LJ accepted at para 50 that the Buyers' construction was arguable but said that, in his view, it was not the meaning that the document would convey to a reasonable person reading it with knowledge of the terms of the Contracts. This must I think mean that he took the view that, although it was arguable that it had that effect, it did not in fact do so.  Otherwise the Buyers' construction could not in any relevant sense have been said to be arguable and Patten LJ would surely not have described it as such.  Patten LJ made this clear in para 51 (quoted below), where he described the alternative constructions as not being in any way evenly balanced. The position is thus that, although he regarded both constructions as arguable in the sense that the Bonds might convey either construction to a reasonable person reading the Bonds with knowledge of the terms of the Contracts, in his view the Bank's construction was plainly to be preferred.  If Patten LJ went further later in para 51, where he said that the fact that cover for the insolvency of the Builder was desirable did not justify a departure from what would otherwise be "the natural and obvious construction of the bond", I respectfully disagree because I do not regard the Bank's construction as being the natural and ordinary meaning of the Bonds.

35.     I have considered the competing arguments for myself and have concluded that they are much more finely balanced than suggested by Patten LJ and the Bank. In para 48 Patten LJ expressed the view that paragraph [2] of the Bonds reproduced the terms of Article X.5 and Article X.6 of the Contracts and therefore complied with Article X.8. In para 49 he concluded that the obvious purpose of paragraph [2] was to give the addressee of the Bonds a clear statement of the Builder's obligations under the Contracts "which are to be covered by the guarantee and one which is consistent with the terms of the Builder's obligations to provide the bond under Article X.8 of the contract".

36.     For my part, I would not entirely accept that analysis. Paragraph [2] of the Bonds did reproduce the terms of Article X.5 and Article X.6 of the Contracts but it does not seem to me that it complied with the requirements of Article X.8. As I

see it, Article X.8 did not provide for the terms in which the Bonds were to be issued. It provided that two letters of guarantee were to be provided, the first by a first class Korean Bank or Guarantee Insurance Company for the refund of the first instalment and the second issued by "a first class Korean Bank or Guarantee Insurance Company acceptable to the Buyer's financiers for the refund of the respective installments following the way of the payment stipulated in this Article".  The first paragraph of Article X.8 included this:

> "The refund guarantees by the Builder to the Buyer shall be indicated pre-delivery instalments plus interest as aforesaid to the Buyer under or pursuant to paragraph 5 above in the form annexed hereto as Exhibit 'A' which is yet to be agreed."

37.     In fact there was no form annexed to the Contracts, so it is far from clear what was meant by the sentence of the first paragraph of Article X.8 just quoted. As I see it, it was left that the parties would agree the final form of the Bonds referable to the second and subsequent instalments.  Moreover both the identity of the issuer of the Bonds and the form of the Bonds were to be acceptable to the Buyers' financiers. That was made clear by the second paragraph of Article X.8 which is quoted in para 11 above. I would accept the submission made on behalf of the Buyers that it is clear that neither Article X.5 nor Article X.8 was intended to set out all the circumstances in which the refund guarantees should operate. For example, there was no cross-reference in Article X.8 to the Builder's obligation under Article X.6 of the Contracts to refund the instalments paid in the event of actual or constructive total loss, although it is common ground that the Bonds did cover that obligation. In short, Article X.8 did not purport to dictate the final scope of the Bonds.  In particular, it did not require that the guarantees should cover refund obligations only under Article X.5 and Article X.6 of the Contracts.

38.     There is a further curiosity in paragraph [2] of the Bonds. In describing the Buyers' rights under the Contracts, it did not limit their rights to a refund of the pre-delivery instalments of the price. It extended them to the case where the Buyers were entitled to "the value of the Buyer's Supplies delivered to the Shipyard (if any)", although in so doing it failed accurately to reflect the contractual position in relation to termination as opposed to total loss, since under Article X.5 of the Contracts the obligation on termination was to return the Supplies, and only to (re)pay their value insofar as already incorporated into the Vessel.  It would seem to follow from the Bank's submission that para [2] defined the scope of the Bank's obligations under para [3] that the expression "all such sums due to you under the Contract" included both the obligations to refund identified in para [2] and the obligation to pay the value of the Buyer's Supplies" (whatever that might cover). That was indeed the submission advanced in the Bank's skeleton argument in the Court of Appeal. It is however a submission that is no longer advanced by either party. That is no doubt because the difficulty with

it is that the Bonds were described as "Advance Payment Bonds" and the amount of each bond was US$26,640,000, which was the total amount of the second and subsequent instalments of the price, and because interest was only payable under para [3] of the Bonds "from the respective dates of payment by [the Buyers] of such instalments", thus leaving no room for a right to payment of the value of Buyer's Supplies under the Bonds.

39.    Sir Simon Tuckey took a different view of the construction of the critical clauses of the Bonds from that of Patten and Thorpe LJJ. He did so in para 28, where he was considering whether in the particular circumstances of the case the Judge should have had regard to considerations of commercial and business common sense.  He said this:

> "But should the judge's approach in this case have been more restricted as Mr Philipps contends? I do not think so. The title to Article X as a whole is "Payment" but it contains an assortment of different terms. Article X.8 is drafted on the basis that the form of guarantee which the parties contemplated would be annexed to the agreement. That would be the document to look at if one was trying to discover from the contract what the Buyer was looking for, not the reference back to Article X.5. This reference back is poorly drafted and quite capable of referring simply to the opening sentence of paragraph 5. It is difficult to construe it in a way which restricts the refund obligations which the bond was to cover, not least because there is no reference to the Article X.6 obligation to a refund following total or constructive loss of the vessel which both parties agree was to be covered by the bond. By the same token, no significance should be attached to the omission of the Article XII.3 refund obligation. Nor do I think there is anything in Mr Philipps' further point. On the happening of an Article XII.3 event the Buyer was entitled to a refund of its advance payments '*immediately*'. If that did not happen the contract was in a state of limbo: neither party could terminate at that stage. If the Builder did not proceed with the construction of the vessel, as would be extremely likely if it was insolvent, the Buyer could terminate for delay under Article XII.l but, under the terms of this article, only after 90 days plus 14 days notice. Only then could it call on the Bond. I cannot see how any Buyer (or its financiers) could possibly be satisfied with this as a remedy in the situation where the Builder was insolvent or nearly so."

I agree with Sir Simon Tuckey and prefer his approach to that of the majority in the Court of Appeal.

40.    In all these circumstances, because of the difficulties in construing para [2] as setting out the sums due under the Bond, if I were focusing only on the language of the clause, I would be inclined to prefer the Buyers' construction to that of the Bank.  I note in passing in this regard that the construction advanced by the Bank was something of an afterthought. However, I recognize that, on the Buyers' construction, it is not easy to see why paragraph [2] was included in the Bond at all, and that the Bank's construction is arguable.  This case is therefore a good example of the kind of case referred to in the authorities to which I have referred. Since the language of paragraph [3] is capable of two meanings it is appropriate for the court to have regard to considerations of commercial common sense in resolving the question what a reasonable person would have understood the parties to have meant.

41.    As noted at para 17 above, at his para 18(iii) the Judge described the Bank's construction of the Bonds as having what he called the surprising and uncommercial result that the Buyers would not be able to call on the Bonds on the happening of the event, namely insolvency of the Builder, which would be most likely to require the first class security. I agree with Sir Simon Tuckey that an appellate court is entitled to take account of the fact that an experienced judge of the Commercial Court reached that conclusion.  In any event, Sir Simon Tuckey expressed essentially the same view in strong terms at para 30:

> "On the Bank's construction the Bonds covered each of the situations in which the Buyers were entitled to a return or refund of the advance payments which they had made under the contracts apart from the insolvency of the Builder. No credible commercial reason has been advanced as to why the parties (or the Buyers' financiers) should have agreed to this. On the contrary, it makes no commercial sense. As the judge said, insolvency of the Builder was the situation for which the security of an advance payment bond was most likely to be needed. The importance attached in these contracts to the obligation to refund in the event of insolvency can be seen from the fact that they required the refund to be made immediately. It defies commercial common sense to think that this, among all other such obligations, was the only one which the parties intended should not be secured. Had the parties intended this surprising result I would have expected the contracts and the bonds to have spelt this out clearly but they do not do so."

I agree.

42.    Patten LJ's view to the contrary is summarised at para 51:

"For the reasons which I have given, I do not regard the alternative constructions of paragraph (3) advanced on this appeal as being in any way evenly balanced. I also agree with Mr Philipps that it is impermissible to speculate on the reasons for omitting repayments in the event of insolvency from the bond. Although the judge is right to say that cover for such event was, objectively speaking, desirable, that is not sufficient in itself to justify a departure from what would otherwise be the natural and obvious construction of the bond. There may be any number of reasons why the Builder was unable or unwilling to provide bank cover in the event of its insolvency and why the Buyer was prepared to take the risk. This is not a case in which the construction contended for would produce an absurd or irrational result in the sense described in the cases I have referred to and merely to say that no credible commercial reason has been advanced for the limited scope of the bond does, in my view, put us in real danger of substituting our own judgment of the commerciality of the transaction for that of those who were actually party to it."

43.    As Hoffmann LJ put it, after quoting from Lord Diplock's speech in *The Antaios* [1985] AC 191, if the language is capable of more than one construction, it is not necessary to conclude that a particular construction would produce an absurd or irrational result before having regard to the commercial purpose of the agreement.  See, for example, per Hoffmann LJ quoted at para 23 above, where he said:

"But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

See also the quotation from Longmore LJ at para 29 above, where he said that, if a clause is capable of two meanings, it is quite possible that neither meaning will flout common sense, but that, in such a case, it is much more appropriate to adopt the more, rather than the less, commercial construction.

44.    In para 51 Patten LJ appears to have accepted that no credible commercial reasons were advanced for the limited scope of the Bonds being advanced by the Bank. Mr Philipps submitted that it was not necessary for the Bank to address the question but I have no doubt that if he or the Bank had been able to think of a credible reason for excluding repayments in the event of the Builder's insolvency, such a reason would have been at the forefront of the Bank's case.

45.    In these circumstances I would, if necessary, go so far as to say that the omission of the obligation to make such re-payments from the Bonds would flout common sense but it is not necessary to go so far. I agree with the Judge and Sir Simon Tuckey that, of the two arguable constructions of paragraph [3] of the Bonds, the Buyers' construction is to be preferred because it is consistent with the commercial purpose of the Bonds in a way in which the Bank's construction is not.

46.    I note that Thorpe LJ was initially inclined to agree with the conclusions of the Judge but, in the event, agreed with Patten LJ without giving any independent reasons of his own.

*CONCLUSION*

47.    For these reasons I would allow the appeal and restore the order of the Judge.

A001157



**Trinity Term**
**[2015] UKSC 36**
*On appeal from: [2013] EWCA Civ 902*

# JUDGMENT

# Arnold (Respondent) *v* Britton and others (Appellants)

**before**

**Lord Neuberger, President**
**Lord Sumption**
**Lord Carnwath**
**Lord Hughes**
**Lord Hodge**

## JUDGMENT GIVEN ON

## 10 June 2015

**Heard on 26 January 2015**

*Appellants*
Timothy Morshead QC
Rawdon Crozier
(Instructed by Fursdon
Knapper Solicitors)

*Respondent*
Michael Daiches

(Instructed by Morgan la
Roche Solicitors)

**LORD NEUBERGER: (with whom Lord Sumption and Lord Hughes agree)**

1.     This appeal concerns the interpretation of service charge contribution provisions in the leases of a number of chalets in a caravan park in South Wales.

*The facts*

2.     The facts may be summarised as follows (although they are more fully set out by Lord Carnwath in paras 81 to 103).

3.     Oxwich Leisure Park is on the Gower Peninsular, and contains 91 chalets, each of which is let on very similar terms. The five leases which we have seen were granted between 1978 and 1991, either for a premium (of less than £20,000) or in return for the lessee constructing the chalet. Each of the 91 chalets was let on a lease which was for a term of 99 years from 25 December 1974 and reserved a rent of £10 per annum increasing by £5 for each subsequent period of 21 years. Para (2) of the recital of each lease contains the statement that the chalets on the Leisure Park were intended to be subject to leases "upon terms similar in all respects to the present demise".

4.     Clause 3 of each lease contains various covenants by the lessee, and it is introduced by the words:

> "The lessee hereby covenants with the lessor and with and for the benefit of the owners and lessees from time to time during the currency of the term hereby granted of the other plots on the estate so far as the obligations hereinafter mentioned are capable of benefitting them …"

The covenants that follow concern use, repair, alienation and the like. Crucially for present purposes, clause 3(2) is a covenant to pay an annual service charge. Each lease also contains covenants by the lessor. One such covenant is to provide services to the Park, such as maintaining roads, paths, fences, a recreation ground and drains, mowing lawns, and removing refuse. The lessor also covenants in clause 4(8) that leases of other chalets "shall contain covenants on the part of the lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit".

A001160

5.      Twenty-five of the chalets are said by the respondent, the current owner of the Leisure Park and the landlord under the leases, to be subject to leases containing a service charge provision in clause 3(2), which requires the lessee to pay for the first year of the term a fixed sum of £90 per annum, and for each ensuing year a fixed sum representing a 10% increase on the previous year – ie an initial annual service charge of £90, which increases at a compound rate of 10% in each succeeding year. The issue on this appeal is whether the respondent's interpretation of clause 3(2) in those 25 leases is correct.

6.      Of the 25 leases in question, 21 were granted between 1977 and 1991. Prior to the grant of most of those 21 leases, the other 70 chalets had been the subject of leases granted from the early 1970s. In each of those 70 leases, clause 3(2) was a covenant by the lessee:

> "To pay to the Lessor without any deduction in addition to the said rent a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part thereof."

The effect of this clause, at least on the face of it, is that the initial service charge of £90 per annum was to be increased on a compound basis by 10% every three years, which is roughly equivalent to a compound rate of 3% per annum.

7.      The 21 leases referred to in para 6 have two slightly different versions of clause 3(2), but the clause can be set out in the following form (with the words shown in bold included in 14 of the 21 leases, but not in the other seven):

> "To pay to the Lessor without any deductions in addition to the said rent **as** a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal **and renewal of the facilities of the Estate** and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year **or part** thereof."

8.      To complicate matters a little further, the service charge clause in four of these 21 leases (being three of the seven which did not include the words in bold in the preceding quotation), had the word "for" before "the yearly sum of Ninety

A001161

Pounds". These four leases also included a proviso to the effect that, so long as "the term hereby created is vested in the [original lessees] or the survivor of them", clause 3(2) would be treated as being in the form set out in para 6 above. This proviso has ceased to have effect as these four leases are no longer vested in the original lessees.

9.     Finally, the service charge clause in four of the 70 leases referred to in para 6 above were varied pursuant to deeds of variation executed between October 1998 and August 2002 so as to be identical to that set out in para 7 above, including the words in bold.

*The issues between the parties*

10.    As already explained, the respondent, the current landlord, contends that the service charge provisions in clause 3(2) of the 25 leases referred to in paras 6 to 9 above have the effect of providing for a fixed annual charge of £90 for the first year of the term, increasing each subsequent year by 10% on a compound basis. The appellants, the current tenants under 24 of the 25 leases, primarily contend that the respondent's construction results in such an increasingly absurdly high annual service charge in the later years of each of the 25 leases that it cannot be right. They argue that, properly read, each service charge clause in the 25 leases requires the lessee to pay a fair proportion of the lessor's costs of providing the services, subject to a maximum, which is £90 in the first year of the term, and increases every year by 10% on a compound basis. In other words, the appellants argue that, in effect, the words "up to" should be read into the clause set out in para 7 above, between the words "the provision of services hereinafter set out" and "the yearly sum of Ninety Pounds". The appellants also have an alternative contention, based on the provisions of recital (2), the opening words of clause 3 and the provisions of clause 4(8) of their leases, namely that the lessor cannot recover more by way of service charge than could be recovered under each of the first 70 leases.

*The evidence*

11.    Apart from the documents themselves and the published Retail Price Index (RPI) for each of the years 1970-2010, there is no evidence as to the surrounding circumstances in which the 21 leases were executed, other than the fact that the four leases referred to in para 8 above were granted to individuals connected with the lessor. Following a request from the court, we were also told that three of the four deeds of variation referred to in para 9 above were entered into with the lessor's daughter as lessee.

12.    I do not find it surprising that we have not been provided with any further evidence. So far as the wording of clause 3(2) is concerned, there may have been letters or notes of discussions in connection with the original drafting and granting (and, in the four cases referred to in para 9 above, the amending) of the leases. But, even if such notes or letters had survived, I very much doubt that they would have thrown any light on what was intended to be the effect of the drafting of the various forms of clause 3(2). Even if they had done, they would probably have been inadmissible as I strongly suspect that they would merely have shown what one party thought, or was advised, that the clause meant. If such documents had shown what both parties to the lease in question intended, they would probably only have been admissible if there had been a claim for rectification.

13.    As to the possibility of other material, I am unconvinced that, even if it existed, evidence of the original level of services, the original cost of the services or any investigations made on behalf of a potential lessee in relation to the original services and their cost would have assisted on the issue of what clause 3(2) of any of the 25 leases meant. The provisions for increase at the end of clause 3(2) of each lease were plainly included to allow for inflation, and the only evidence which appears to me to be potentially relevant would be contemporary assessments of the actual and anticipated annual rate of inflation, and, as already mentioned, we have the RPI for each of the years in question.

*Interpretation of contractual provisions*

14.    Over the past 45 years, the House of Lords and Supreme Court have discussed the correct approach to be adopted to the interpretation, or construction, of contracts in a number of cases starting with *Prenn v Simmonds* [1971] 1 WLR 1381 and culminating in *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900.

15.    When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see *Prenn* at pp 1384-1386 and *Reardon Smith*

*Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989, 995-997 per Lord Wilberforce, *Bank of Credit and Commerce International SA (in liquidation) v Ali* [2002] 1 AC 251, para 8, per Lord Bingham, and the survey of more recent authorities in *Rainy Sky*, per Lord Clarke at paras 21-30.

16.    For present purposes, I think it is important to emphasise seven factors.

17.    First, the reliance placed in some cases on commercial common sense and surrounding circumstances (eg in *Chartbrook*, paras 16-26) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

18.    Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.

19.    The third point I should mention is that commercial common sense is not to be invoked retrospectively. The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. Judicial observations such as those of Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251 and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191, 201, quoted by Lord Carnwath at para 110, have to be read and applied bearing that important point in mind.

20.    Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the

natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21.    The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22.    Sixthly, in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56, 2012 SCLR 114, where the court concluded that "any … approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered into" the contract (see paras 17 and 22).

23.    Seventhly, reference was made in argument to service charge clauses being construed "restrictively". I am unconvinced by the notion that service charge clauses are to be subject to any special rule of interpretation. Even if (which it is unnecessary to decide) a landlord may have simpler remedies than a tenant to enforce service charge provisions, that is not relevant to the issue of how one interprets the contractual machinery for assessing the tenant's contribution. The origin of the adverb was in a judgment of Rix LJ in *McHale v Earl Cadogan* [2010] EWCA Civ 14, [2010] 1 EGLR 51, para 17. What he was saying, quite correctly, was that the court should not "bring within the general words of a service charge clause anything which does not clearly belong there". However, that does not help resolve the sort of issue of interpretation raised in this case.

*Discussion: interpretation of clause 3(2)*

24.    When one turns to clause 3(2) of each of the 91 leases of the chalets in Oxwich Park, the natural meaning of the words used, at least until one considers the commercial consequences, seems clear. The first half of the clause (up to and including the words "hereinafter set out") stipulates that the lessee is to pay an annual charge to reimburse the lessor for the costs of providing the services which he covenants to provide, and the second half of the clause identifies how that service charge is to be calculated.

25.    The fact that the second half of the clause results in the service charge being a fixed sum, rather than a sum dependent on the costs to the lessor of providing the contractual services is readily explicable. As stated in Wonnacott's *The History of the Law of Landlord and Tenant in England and Wales* (2012), p 106, clauses which provide for charges which vary with the costs of providing services have resulted, at least since around 1960, in "more trouble between landlord and tenant than anything else". Further, legislation which started to come into force in 1972 has rendered it progressively more difficult for an "amateur landlord" (to use Wonnacott's expression) to recover a disputed service charge calculated on such a basis. The fact that the second half of the clause goes on to provide for a fixed increase in the annual sum is also readily explicable: the parties assumed that the cost of providing the services in sterling terms would increase, or, to put the same point another way, they assumed that the value of money would fall.

26.    Davis LJ concisely explained the thinking behind the clause in the course of his judgment in the Court of Appeal, [2013] EWCA Civ 902, para 52:

> "Lack of correspondence between outlay and receipt is the almost inevitable consequence of such a clause if the parties have elected for a fixed charge formula. It has a similarity with a liquidated damages clause: it represents the parties' estimate at the outset for the future with neither guarantee nor even expectation of entire coincidence with the eventual outcome. But the advantage is certainty. The parties know from the outset where they stand. Moreover, it is a surrounding circumstance legitimately to be taken into account here that the leases were made at a time of inflation – in some years, very significant inflation – which the parties, objectively and commercially speaking, could be expected to want to confront. They chose to do so by this particular formula of increase."

27.    In those seven leases where the word "as" is not included, I suppose that it might be said that this is not clear unless words such as "quantified in the sum of"

were included in order to link the two halves of the clause, but that is, to my mind, a really pedantic argument. Although perfectionist drafting might suggest the inclusion of such words, it seems to me that the absence of such words cannot fairly be invoked to suggest ambiguity or a lack of clarity. The reasonable reader of the clause would see the first half of the clause as descriptive of the purpose of clause 3(2), namely to provide for an annual service charge, and the second half as a quantification of that service charge.

28.    It is true that the first part of the clause refers to a lessee paying a "proportionate part" of the cost of the services, and that, unless inflation increases significantly in the next 50 years, it looks likely that the service charge payable under each of the 25 leases may exceed the cost of providing services to the whole of the Leisure Park. However, if, as I believe is clear, the purpose of the second part of the clause is to quantify the sum payable by way of service charge, then the fact that, in the future, its quantum may substantially exceed the parties' expectations at the time of the grant of the lease is not a reason for giving the clause a different meaning. As already explained, the mere fact that a court may be pretty confident that the subsequent effect or consequences of a particular interpretation was not intended by the parties does not justify rejecting that interpretation.

29.    However, given the way things have turned out, it is tempting to latch onto the absence of words such as "quantified in the sum of", and to see the two halves of clause 3(2) as mutually inconsistent in their effect. This would be on the ground that the first half of the clause requires the lessee to pay a "proportionate part" of the cost to the lessor of providing services, whereas the latter half requires the lessee to pay a sum which could exceed the whole of that cost. On that basis, it might be said that the court can reject or modify one half to give effect to the real intention of the parties – see eg *Walker v Giles* (1848) 6 CB 662. However, as explained in para 24 and 25 above, this argument would, in my view, involve the court inventing a lack of clarity in the clause as an excuse for departing from its natural meaning, in the light of subsequent developments.

30.    Were it not for the percentage increases of 10% per annum specified in the 25 service charge clauses which are being considered on this appeal, coupled with the subsequent history of inflation in the United Kingdom, that would be the end of it. Thus, it seems to me that the original 70 leases (referred to in para 6 above), with a clause 3(2), which provided for increases of about 3% per annum (at a time when inflation was running at a significantly higher rate), should plainly be interpreted in the way in which the respondent contends. However, the consequences of the annual sum of £90 being increased annually by 10% on a compound basis are plainly unattractive, indeed alarming, to a lessee holding a chalet under one of the 25 leases. If one assumes a lease granted in 1980, the service charge would be over £2,500 this year, 2015, and over £550,000 by 2072. This appears to be an alarming outcome for the lessees, at least judging by how things look in 2015, because annual inflation in

the last 15 years has hardly ever been above 4%, indeed has been under 3% for ten of those years, and has notoriously been falling recently almost to the point of turning negative, whereas the service charge over that period has increased, and will continue to increase, by 10% per annum.

31.     The appellants argue that these figures illustrate the extreme unlikelihood of the parties to the 21 leases (or to the four subsequent deeds of variation), and in particular the lessees, having intended to agree that the original £90 service charge would be automatically increased by 10% annually on a compound basis. Accordingly, they contend, the latter half of clause 3(2) should be interpreted as imposing a maximum on the annual service charge recoverable by the lessor. In other words, the effect of the clause is said to be that the lessor is entitled to an appropriate percentage of the annual cost of providing the contracted services, subject to a maximum – which was initially £90, but which increases by 10% compound annually.

32.     Despite the unattractive consequences, particularly for a lessee holding a chalet under one of the 25 leases, I am unconvinced by this argument. It involves departing from the natural meaning of clause 3(2) in each of those leases, and it involves inserting words which are not there.

33.     Further, the appellants' argument involves attributing to the parties to the 25 leases an intention that there should be a varying service charge and that the lessor (or some other unspecified person) should assess the total costs of the services and determine the appropriate proportion of the cost of the contractual services to allocate to each chalet. Although I accept that it has an element of circularity, it appears to me that the average reader of clause 3(2) would have thought that those are exercises which the clause seems to have been designed to avoid.

34.     Although there are one or two very small errors in the drafting, I do not consider that anything has gone significantly wrong with the wording of clause 3(2) of any of the 25 leases. As already explained, I would reject the notion that, on a natural reading, the two parts of the clause do not relate to each other, or appear to say different things, even in the seven cases where the word "as" is not included: as the Court of Appeal said, the first half imposes a liability for an annual service charge and the second half explains how it is to be assessed. I do not think that the reference to part of a year in the closing words of the clause (para 7 above refers), or the inclusion of an unnecessary "for" (para 8 above refers), in some of the 25 leases can possibly justify departing from the natural meaning of clause 3(2). At best the reference to part of a year is meaningless. However, given that the 99 year term of each lease ran from Christmas 1974, all of them would have ended part way through a year, as they would also have been very likely to do if surrendered or forfeited. Furthermore, the fact that some clauses refer not merely to "repair

maintenance and renewal", but also to "renewal of facilities on the Estate" seems to me to be irrelevant to the issue on this appeal.

35.    Quite apart from the fact that the effect of clause 3(2) appears clear in each lease as a matter of language, I am far from convinced by the commercially-based argument that it is inconceivable that a lessee would have agreed a service charge provision which had the effect for which the respondents contend, at least in the 1970s and much of the 1980s. Although I would have expected most solicitors to have advised against it, and imprudent though it undoubtedly has turned out to be (at least so far), a lessee could have taken the view that a fixed rate of increase of 10% per annum on a fixed initial service charge, at a time when annual inflation had been running at a higher rate for a number of years (well over 10% per annum between 1974 and 1981, indeed over 15% per annum for six of those eight years; although it was less than 10% per annum after 1981), was attractive or at least acceptable.

36.    If inflation is running at, say 10% per annum, it is, of course, very risky for both the payer and the payee, under a contract which is to last around 90 years, to agree that a fixed annual sum would increase automatically by 10% a year. They are taking a gamble on inflation, but at least it is a bilateral gamble: if inflation is higher than 10% per annum, the lessee benefits; if it is lower, the lessor benefits. On the interpretation offered by the appellants, it is a one way gamble: the lessee cannot lose because, at worst, he will pay the cost of the services, but, if inflation runs at more than 10% per annum, the lessor loses out.

37.    The fact that a court may regard it "unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money" over many decades (to quote Gibbs J in *Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd* [1981] HCA 3, (1981) 145 CLR 625, 639) is nothing to the point. People enter into all sorts of contracts on the basis of hopes, expectations and assessments which no professional expert would consider prudent, let alone feel able to "predict with accuracy". I have little doubt that many fortunes have been both made and lost (and sometimes both) by someone entering into such a contract.

38.    In terms of commercial justification, the analysis in paras 34 and 35 above becomes more difficult to invoke the further one moves on from 1981, the last year when inflation was above 10% per annum, although in 1990 it almost hit that figure. Accordingly, while I think the analysis comfortably applies to the 21 leases referred to in paras 6 to 8 above, which were granted between 1977 and 1990, it is unconvincing in relation to the four leases whose service charge provisions were amended around 2000, as mentioned in para 9 above.

A001169

39.    It seems rather extraordinary that a lessee under a lease which provided for an increase in a fixed service charge at the rate of 10% over three years should have agreed to vary the lease so that the increase was to be at the rate of 10% per annum, at a time when inflation was running at around 3% per annum. However, I do not accept that this justifies reaching a different result in relation to any of the four leases which were varied in 2000. Three of them are relatively easily explicable, as the lessee who agreed the variation was closely connected with the lessor. The fact that they were subsequently assigned is, I accept, remarkable, but that later fact cannot affect the interpretation of the deeds. As to the fourth deed, it was, on any view, an improvident variation to have agreed, but, as already explained, that is not enough to justify the court rewriting the contract under the guise of interpreting it. Further, given that, at least in my view, there could be no ground for suggesting that the original clause 3(2) in the three leases (providing as it did for an annual increase of around 3%) had any effect other than that for which the respondent contends, it is particularly difficult to suggest that the substituted clause, which changed the annual increase to 10%, but was otherwise identically worded (save that it included the word "as" and was therefore even clearer), should have a different effect.

40.    I note in this connection that, at a time when inflation was running at well over 10% per annum from 1974 to 1980 (possibly excepting 1984), the lessor was granting leases which provided, in effect, for increases in the £90 at the rate of about 3% per annum (para 6 above refers). Of course, that cannot be taken into account when interpreting any of the 25 leases, but it shows the lessor was prepared to take what appears to have been an unwise decision which was not entirely dissimilar from the unwise decision which, in my view, the lessees under the 25 leases took.

41.    I do not think that this is a case where the approach adopted by this court in *Aberdeen City Council* can assist the appellants. Unlike that case, this is not a case where one of the parties has done something which was not contemplated by the contract. It is clear that the 10% per annum increase in clause 3(2) was included to allow for a factor which was out of the control of either party, namely inflation. In my judgment, there is no principle of interpretation which entitles a court to re-write a contractual provision simply because the factor which the parties catered for does not seem to be developing in the way in which the parties may well have expected.

42.    It also appears to me that there is a degree of inconsistency in the appellants' case. That case is, of course, ultimately based on the unlikelihood of a lessor and lessee of a single chalet agreeing that an initial annual service charge of £90 should be increased at a rate which could well lead to the annual charge being an absurdly high figure – possibly more than the cost of providing the services for the whole Leisure Park. But it is also rather unlikely (albeit less unlikely, I accept) that they will have agreed a ceiling on the annual service charge which would become so absurdly high that it would be meaningless. In other words, it can be said with some

A001170

force that the appellants' solution to the problem which they identify does not actually address the problem: it merely changes its commercial consequences.

43.    I should add that, subject to the point dealt with in the next section of this judgment, I am unconvinced that any assistance can be gained from the differences between the various forms of clause 3(2). It seems to me positively unlikely that the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases. But, even if they had been so aware, it seems to me that it would assist the respondent's case, not that of the appellants. That is because, given that it appears clear that the second half of clause 3(2) in the earlier 70 leases operated to quantify the service charge, then it seems to me (as explained in the last sentence of para 39 above) that it is very unlikely that the parties can have intended the almost identically worded second half of clause 3(2) in the later 21 leases to have a very different effect from that in the earlier 70 leases.

44.    In his judgment at para 116, Lord Carnwath rightly points out that, even after he assigns the lease, the original lessee is bound for the duration (at least if it was granted before 1996). However, I do not see what that adds in this case: on any view, these leases involve long term commitments on both sides. I agree with his view in para 117 that a prospective lessee of a flat in a block or the like (as here) will normally be likely to have less negotiating freedom as to the terms than in relation to a "free standing" property. But so will the lessor, and either is free to walk away if he regards the terms as unsatisfactory.

45.    I am also unconvinced that the remedies available (whether in common law or under statute) to the parties in the event of a breach in connection with services or service charge, as discussed in Lord Carnwath's para 121-123, assists on the issue we have to decide. We are concerned with what a service charge clause means, not how it is being operated.

46.    Finally on this first point, Lord Carnwath makes some remarks about service charge provisions in his para 119. There will, I suspect, be many cases where his observations are very much in point: indeed, they may well be normally in point. However, the lessor has no duty to be "fair" when negotiating the terms of a lease (any more than the lessee does), although it may well be in his interest to be (or at least to appear to be) fair. But, whosever interpretation is correct, clause 3(2) was self-evidently not a "normal" service charge clause: on the respondent's case, the landlord might get more or less than the costs of providing the services; on the appellants' case, the landlord might get less than the costs of providing the services.

*Discussion: the effect of clause 4(8) and the terms of the other leases*

47.    The appellants, at the invitation of the court, argued that clause 4(8), which as explained in para 4 above required leases of chalets to be granted subject to identical or similar obligations, substantially mitigated the effect of clause 3(2) of their leases. They contended that clause 4(8), when read together with the opening words of clause 3 and para (2) of the recital to each lease, referred to in paras 3 and 4 above, enable them to limit the service charge which the landlord could otherwise recover under clause 3(2).

48.    The appellants' argument in this connection proceeds in two steps. First, as a result of clause 4(8), the opening words of clause 3, and para (2) of the recital in each of their leases, a term was implied into their leases to the effect that clause 3(2) was in the same terms as clause 3(2) of the leases of chalets which had already been granted – ie the 70 leases referred to in para 6 above. Secondly, in those circumstances the lessor is now precluded from recovering more by way of service charge than would be recoverable under the terms of the service charge provisions in the 70 leases – ie £90 plus 10% compounded every three years. While this argument has obvious attraction, I would reject it.

49.    The purpose of clause 4(8), the opening words of clause 3, and recital (2) was, I would accept, to create what is sometimes referred to as a "building scheme", but, at least in the present context is more accurately described as a letting scheme. Such a scheme, which is recognised and given effect to by equity, has to be apparent from the terms of the relevant leases (or, very unusually, from a side agreement entered into by each lessee with the lessor). A letting scheme involves properties within a given area being let on identical or similar terms, normally by the same lessor, with the intention that the terms are to be enforceable not only by the lessor against any lessee, but as between the various lessees – even by an earlier lessee of one property against a later lessee of another property. There is plainly a strong case for saying the combination of para (2) of the recital, the opening words of clause 3 and the provisions of clause 4(8) establishes that there is such a scheme in relation to the chalets in the Leisure Park. Accordingly, I am prepared to assume that there was envisaged that there would be a degree of reciprocity and mutual enforceability between the lessees of chalets when it came to the covenants they entered into.

50.    However, in my view, the appellants' reliance on the scheme in order to limit the service charges recoverable under clause 3(2) of their leases faces a number of problems.

51.    First, it seems to me to be unclear whether a provision such as clause 3(2) could be or was subject to the scheme. There is room for argument whether a letting

scheme can only extend, like freehold schemes, to restrictive covenants, or whether it can also extend to positive covenants (on the basis that positive covenants between lessor and lessee are enforceable as between their respective successors, whereas only restrictive covenants are enforceable as against successors of covenantors in relation to freeholds). Even if a leasehold scheme can extend to positive covenants, it is also questionable whether a lessee's covenant to pay a service charge, or any other sum of money to the lessor, can be within the ambit of a scheme.

52.    Secondly, in so far as they are dealing with the provisions of leases of other chalets, clause 4(8), and (arguably) the opening words of clause 3 and recital (2) appear to refer to future lettings, not to past lettings. It is quite a bold step to imply a term as to what has happened in the past from an express provision which is limited to the future. Having said that, there is considerable practical force in the contention that the scheme contemplated by the three provisions could only work if leases of all the chalets, past, present and future, were on the same terms.

53.    Thirdly, even if the appellants' argument based on an implied term was otherwise correct, there would still be considerable force in the contention that it would not exonerate the appellants from complying with their obligations under clause 3(2). It seems clear that, where there is a letting scheme, a tenant can enjoin the landlord from letting a property within the scheme area on terms which are inconsistent with the scheme. However, as far as I am aware, there is no case where the landlord has been held liable to a tenant in damages (or otherwise) for having let a property within the scheme area on such terms, prior to the grant of the tenant's lease.

54.    Fourthly, even if these arguments are all rejected, the closing words of clause 4(8) clearly permit a degree of variation between the terms of the leases of different chalets. If the second part of clause 3(2) is intended to reflect the level of projected inflation, then the parties may well have regarded it as almost inevitable that any annual or triennial adjustment would vary from time to time. On that basis, there may be no breach of any implied term anyway.

55.    However, it is unnecessary to address the four points identified in paras 51-54 above, because, in my judgment, there is a fatal flaw in the appellants' argument based on an implied term. In effect, the appellants' case is that the implied term in each of the 21 leases is that the lessor was not asking anything of the lessee which had not been, or would not be, required of lessees of other chalets, whether their leases were in the past or the future. However, it seems to me that, assuming everything else in the appellants' favour, that would not be the correct term to imply. As I see it, if there is an implied term along the lines argued for, it is that the already existing 70 leases of chalets contain a clause 3(2) identical with that in the

appellant's leases – ie that the 70 existing leases have service charges which increase at the compound rate of 10% per annum as in the 21 leases.

56.    In so far as it relates to the 70 existing leases, the implied term suggested by the appellants is inconsistent with both (a) an express term of the appellants' leases, namely clause 3(2) itself, and (b) what is implied in relation to future leases. As to point (a), the appellants' suggested implied term means that clause 3(2) involves a 10% increase every three years, whereas there is an express term to the effect that the 10% increase is every year; and it is a fundamental principle that one cannot imply a term which is inconsistent with an express term. As to point (b), any reader of an appellant's lease who was asked what future leases of chalets would contain by way of a service charge provision would answer that it would be the same as that in the instant lease – ie £90 pa subject to an increase of 10% per annum compounded; and the implied term applicable to future leases should be the same as that applicable to past leases.

57.    If the appellants are right in their contention that there is an implied term, the term which I would favour (as set out at the end of para 55 above) runs into neither of these difficulties. It amounts to saying that, as clause 3(2) of an appellant's lease means that the service charge is to be £90 pa increasing by 10% pa compounded, there is a term implied into the lease that that is what the existing leases provide and it is what future leases will provide.

58.    If, as the appellants contend, there is an implied term, but that is its correct characterisation, it is difficult to see how it can help them. An appellant can say that the fact that the 70 existing leases contain a different clause 3(2) means that there is a breach of the implied term, but it is hard to see what damage or other injury has been suffered if the respondent now insists on enforcing clause 3(2) of their leases against the appellants. If an appellant could show that the value of his lease was reduced because the lessor had not granted the first 70 leases with the same clause 3(2) as was in the appellant's lease, the consequent reduction in the value of that lease could well be the appropriate measure of damages. But I cannot at the moment see on what basis the breach can assist an appellant in resisting the full financial consequences of the clause 3(2) he entered into.

59.    I should add that, if, contrary to my view expressed in para 43 above, the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases (as Lord Carnwath suggests), it would negative any reliance which the lessees under the 21 leases could place on clause 4(8), as just discussed. This is because the later lessees would have known of, and accepted, the departure from the original clause 3(2).

*Conclusion*

60.    Accordingly, in agreement with the reasons given by Lord Hodge in this court, Davis LJ in the Court of Appeal and Morgan J in the High Court, I would dismiss this appeal, and I do not consider that the appellants are assisted by the additional argument raised in this court. I should, however, make five final points.

61.    First, the Court of Appeal suggested that the only way the lessees under the 25 leases could escape from their problems would be by surrendering or suffering forfeiture. In case this is misinterpreted, it is right to point out that surrender is consensual between lessee and lessor, and forfeiture involves unilateral action by a lessor, and so neither course can be forced on the lessor.

62.    Secondly, I have considerable sympathy with Lord Carnwath's conclusion that the appeal should be allowed (not least because it is a much more satisfactory outcome in common sense terms, particularly viewed as at today), and I acknowledge that his reasons are as powerful as his conclusion allows. However, for the reasons I have given, I cannot agree with him.

63.    Thirdly, the fact that four leases were granted to associates of the lessor with the proviso described in para 8 above, and that three of the deeds of variation described in para 9 above were entered into with a lessee who was a close relation of the lessor, is worthy of comment. It suggests that the lessor or her advisers may have appreciated the potential disadvantages of the clause now contained in the 25 leases. However, I do not see how it can assist the lessees on the issue in these proceedings, namely the interpretation of the clause in the 25 leases.

64.    Fourthly, as Lord Carnwath records in para 155 below, it appears that the respondent realistically recognises the unsatisfactory situation in which the lessees under the 25 leases find themselves, and is prepared to agree appropriate amendments to their leases. I hope that a fair and just amendment can be agreed.

65.    Finally, as Lord Carnwath also points out in paras 90-93 below, there are various statutory provisions which protect tenants against unreasonable service charges, but none of them apply here. The present case suggests that there may be a strong case for extending such provisions to cases such as the present, even though they involve a fixed sum payable by way of service charge. But that is a policy issue for Parliament, and there may be arguments either way.

## LORD HODGE: (agrees with Lord Neuberger)

66.    I agree that the appeal must be dismissed for the reasons which Lord Neuberger sets out. But it is a highly unsatisfactory outcome for the chalet tenants who are affected by the annual escalator of the service charge. It is not clear whether there are many long leases containing fixed service charges with escalators which are beyond the reach of statutory regulation. If there are, there may be a case for Parliament to consider extending the provisions that protect tenants against unreasonable service charges.

67.    Mr Morshead QC for the appellants submitted in his written case that what was important was "(a) that the risk [of inflation falling and remaining substantially below 10%] would have been obvious to the officious, reasonable bystander who must be imagined interrogating the actual parties and (b) that no reasonable person in the position of the parties, looking at the leases in their entirety and in context, would understand them to have intended that the tenants should assume that risk". He envisaged that in a hypothetical dialogue the officious bystander would warn the parties of the risks of their proposed contract and they would make it clear that that was not their intention.

68.    In the course of the debate we were referred directly or by reference to several cases concerning the remediation of a mistake by construction or the implication of a term. In my view they do not give the support that Mr Morshead needs.

69.    In *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2004] 1 AC 715 the mistaken omission of words in a clause was apparent because the bill of lading had been modelled on a standard clause. The person who had transposed the standard clause into the bill of lading had omitted a phrase in the standard clause in which the same word had appeared at the end of two consecutive phrases. The mistake was clear and it was apparent what correction was called for (paras 22 and 23 per Lord Bingham).

70.    In *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101 a definition, which contained a grammatical ambiguity, made no commercial sense if interpreted in accordance with the ordinary rules of syntax. The background to the deal and the internal context of the contract showed that there was a linguistic mistake in the definition, which the court was able to remove by means of construction. In his speech Lord Hoffmann (at p 1114) referred with approval to the judgment of Carnwath LJ in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336. In that case, which concerned a rent review clause in a lease, it was clear from the terms of the clause that its wording did not make sense. The court was assisted by an earlier agreement which set out the then intended clause containing a parenthesis,

of which only part had remained in the final lease. It was not clear whether the parties had mistakenly deleted words from the parenthesis, which they had intended to include, or had failed to delete the parenthesis in its entirety. But that uncertainty as to the nature of the mistake, unusually, did not matter as the outcome was the same on either basis.

71.     In *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56, 2012 SCLR 114 the internal context of the contract provided the answer. The sale contract provided for the payment to the vendor of a further sum on disposal of the land by the purchaser. Two of the methods of disposal required the parties to ascertain the market value of the property on disposal in calculating the additional payment and the other used the "gross sales proceeds" in calculating that payment. The purchaser sold the site at an under-value to an associated company, a circumstance which on the face of the contract the parties had not contemplated. The courts at each level interpreted the provision, which used the gross sales proceeds in the calculation, as requiring a market valuation where there was a sale which was not at arm's length. They inferred the intention of the parties at the time of the agreement from the contract as a whole and in particular from the fact that the other two methods of disposal required such a valuation. While this line of reasoning was criticised by Professor Martin Hogg ((2011) Edin LR 406) on the ground that it protected a party from its commercial fecklessness, it seems to me to be the correct approach in that case as the internal context of the contract pointed towards the commercially sensible interpretation.

72.     The context, whether internal to the contract or otherwise, provides little assistance in this case. Beyond the words of the relevant clauses, there is the context of the other provisions of each of the 25 individual leases which are at issue. They are long leases, having a term of 99 years. The court in interpreting the leases can and should take into account the great difficulty in predicting economic circumstances in the distant future and ask itself whether the parties really intended to do so.

73.     The court also can and should take into account the economic circumstances which prevailed at the time each lease was entered into. It is clear from the table which Lord Carnwath has set out in para 100 of his judgment that between 1974 and 1988 the use of a 10% annual escalator achieved a result which was not far off the diminution of the value of money in the difficult economic circumstances that then prevailed. The future was and is unknown.

74.     Little else is known and I do not think that it is appropriate to speculate about the extent to which lessees would have known the terms of earlier leases. In my view there is much to be said for the practice, which Lord Drummond Young and other judges have encouraged in Scotland, of requiring parties to give notice in their

written pleadings both of the nature of the surrounding circumstances on which they rely and of their assertions as to the effect of those facts on the construction of the disputed words: *MRS Distribution Ltd v DS Smith (UK) Ltd* 2004 SLT 631, para 14. Such notice of relevant facts, which are either admitted or proved at trial, would avoid disputes on appeal such as whether the affected lessees were aware of the earlier leases.

75.    While there are infelicities in the language of the relevant clauses in some of the leases and no clear explanation of minor changes in drafting, I am not persuaded that the meaning of the language is open to question when full weight is given to the very limited factual matrix with which the courts have been presented in this case. We are invited to construe that which reads on a first consideration as a fixed service charge with an escalator to deal with future inflation, as a variable service charge which is subject to a cap to which the escalator applies. I find that very difficult. In my view there is nothing in the relevant context to support the construction of the clause as creating a cap, other than the view, which events have fully justified, that it was unwise of the lessees to agree to a fixed service charge with an escalator based on an assumption that the value of money would diminish by 10% per year.

76.    This conclusion is not a matter of reaching a clear view on the natural meaning of the words and then seeing if there are circumstances which displace that meaning. I accept Lord Clarke's formulation of the unitary process of construction, in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, para 21:

> "[T]he exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."

77.    This unitary exercise involves an iterative process by which each of the rival meanings is checked against the provisions of the contract and its commercial consequences are investigated (*Re Sigma Finance Corp* ([2009] UKSC 2) [2010] 1 All ER 571, para 12 per Lord Mance). But there must be a basis in the words used and the factual matrix for identifying a rival meaning. The role of the construct, the reasonable person, is to ascertain objectively, and with the benefit of the relevant background knowledge, the meaning of the words which the parties used. The construct is not there to re-write the parties' agreement because it was unwise to

gamble on future economic circumstances in a long term contract or because subsequent events have shown that the natural meaning of the words has produced a bad bargain for one side. The question for the court is not whether a reasonable and properly informed tenant would enter into such an undertaking. That would involve the possibility of re-writing the parties' bargain in the name of commercial good sense. In my view, Mr Morshead's formulation (para 67 above), on which his case depends, asks the court to re-write the parties' leases on this illegitimate basis.

78.    Nor is this a case in which the courts can identify and remedy a mistake by construction. Even if, contrary to my view, one concluded that there was a clear mistake in the parties' use of language, it is not clear what correction ought to be made. The court must be satisfied as to both the mistake and the nature of the correction: *Pink Floyd Music Ltd v EMI Records Ltd* [2010] EWCA Civ 1429, para 21 per Lord Neuberger MR. This is not an unusual case, such as *KPMG* (above) in which a mistake was obvious on the face of the contract and the precise nature of the correction had no effect on the outcome.

79.    My conclusion that the court does not have power to remedy these long term contracts so as to preserve the essential nature of the service charge in changed economic circumstances does not mean that the lessees' predicament is acceptable. If the parties cannot agree an amendment of the leases on a fair basis, the lessees will have to seek parliamentary intervention.

## LORD CARNWATH: (dissenting)

*Preliminary comments*

80.    The contractual provisions in this case pose unusual interpretative challenges, which may call for unusual solutions. The leases with which we are concerned are of 25 chalets within Oxwich Leisure Park, in South Wales. It is an estate of 91 such chalets first developed in 1974. It is in an attractive holiday location close to Oxwich Beach on the Gower Peninsular. The challenges arise from a combination of factors. The intention, stated in the preamble to each lease, was that they should be "upon terms similar in all respects …". Yet we are faced with five forms of service charge provision, agreed over a period of some 20 years, the variations in which at first sight defy rational analysis. As interpreted by the Court of Appeal, they would lead over the course of the leases to supposedly "proportionate" service charges becoming wholly disproportionate to the costs of the relevant services, to extreme and arbitrary differences between the treatment of different groups of leases within the estate, and to the prospect in the foreseeable future of potentially catastrophic financial consequences for the lessees directly concerned.

A001179

81.    It does not help that, remarkably, the case has come to us with minimal evidence to explain the circumstances, or "factual matrix", in which these variations were agreed at different times, or even simply to add some context or colour to the bare legal and statistical analysis. That applies even to the most recent, and most surprising, of the transactions, effected as recently as 2000, and to which Mrs Arnold the present respondent was herself a party. Nor have we been told anything about how the clauses have been operated in practice at any time: for example how the estate has been managed and what costs incurred by the lessor, what service charge payments have been demanded of the various categories of lessee, and what has happened to any surplus.

82.    It is to be borne in mind also that in the early 1970s (when this clause was first devised) variable service charge provisions were a relatively "new and modern" addition to the law, prompted in part by rapidly increasing prices (see Mark Wonnacott, *The History of the Law of Landlord and Tenant in England and Wales* (2012) p 105; *Hyams v Titan Properties Ltd* (1972) 24 P & CR 359). Since then, it is said in the same history (*ibid* p 106), service charges have caused "more trouble between landlord and tenant than anything else", but they have in turn been regulated by statute to such an extent as to make it "all but impossible for an amateur landlord to recover (a service charge) in the event of a dispute". Whether or not that extreme view is justifiable, the need for special measures to safeguard the interests of lessees has been acknowledged by the legislature, which has thus for the most part relieved the courts of responsibility for developing a common law response to the problems.

83.    As I shall explain, these leases are a rare example of a category of residential lease which has slipped through the statutory net. That is of no direct relevance to the legal issues before us, save that it may help to explain why no ready solutions are to be found in the authorities. Furthermore, in so far as policy has a part to play in the development of the common law, it may be legitimate to seek guidance in the approaches adopted by the legislature in analogous contexts (see *Johnson v Unisys Ltd* [2003] 1 AC 518 para 37, per Lord Hoffmann).

*The leases*

84.    The first lease was granted on 26 October 1974. Of the others most were granted during the 1970s, and are not directly involved in the present dispute. The 25 with which we are concerned were granted (or varied) in the period from 1980 to 2000. Whenever granted, all the leases (with one immaterial exception) were expressed as being for terms of 99 years starting from 25 December 1974, and for a yearly rent of £10, increasing by £5 for every subsequent period of 21 years. Each lease began with a preamble which described the "lessor" as the owner of the land edged pink on the attached lay-out plan ("the estate") and stated:

A001180

> "(2) It is intended to erect chalets on the estate and to grant leases upon terms similar in all respects to the present demise."

The lessees' covenants (clause 3) limited the use to that of a "holiday residence of a single family" from March to October (clause 3(12)).

85.    It seems from the examples before us that the earliest leases were granted in return for lessees' covenants to construct chalets in accordance with plans approved by the lessors (eg chalet 40 - lease dated 9 August 1977, clause 3(3)). Later chalets, presumably after erection of chalets by the lessor or others, were granted without such a covenant but for a premium (eg £13,000 for chalet 76 - lease dated 22 September 1980; £16,500 for chalet 96 –lease dated 1 July 1985). Otherwise no issue arises on the lessee's covenants other than clause 3(2) relating to service charges, to which I will come.

86.    The lessors in turn covenanted to provide various common services. They included constructing and maintaining the roads and footways (unless or until becoming maintainable at public expense), mowing lawns, maintaining a recreation ground, keeping fences and drains in good repair, issuing regulations, and arranging refuse collection and a regular patrol to discourage vandalism during the unoccupied period (clause 4). By clause 4(viii) the lessors covenanted:

> "(viii) That the Leases granted by the Lessors of all other plots on or comprised in the estate shall contain covenants on the part of the Lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit."

87.    Five leases have been selected for the purpose of showing the different versions of clause 3(2) relevant to the dispute. The principal difference is between the original leases, granted between 1974 and 1980, in which an initial service charge figure of £90 is increased by 10% every three years ("the triennial formula"), and later leases in which it is increased by 10% every year ("the annual formula"). The five versions were applied as follows (the selected lease in each case is indicated in brackets):

> i)    *Version 1* (Chalet 40, dated 9 August 1977) - This was the "original version", applied to 70 leases granted mainly during the 1970s. The first was granted on 26 October 1974. The rest followed at a steady rate over the next six years at an average of just over 12 per year, until 1980 when seven were granted in this form, the last on 9 July 1980. Four of these leases (granted

between August 1977 and July 1980) were varied in 2000 to incorporate the annual formula (see version 5 below).

ii)      *Version 2* (Chalet 76, dated 22 September 1980) - This version applied to 14 leases granted between August 1980 and February 1983, the first being dated 11 August 1980.

iii)     *Version 3* (Chalet 96 dated 1 July 1985) - This applied to three leases granted between July 1985 and January 1988.

iv)     *Version 4* (Chalet 29 dated 22 March 1991) - This applied to four leases granted between December 1988 and March 1991.

v)      *Version 5* (Deed of variation dated 20 August 2000) - This applied to four leases previously subject to version 1.

The lessors for the first three selected leases in this list were Mr A and Mr B Lewis; for version 4, Mrs J Short; and for version 5, Mrs Arnold, the present respondent. In the result the triennial formula now applies to 66 leases on the estate, the annual formula to 25.

88.     I now set out the five clauses, emphasising the parts which are material to the dispute:

i)      *Version 1 – triennial (1974-1980)*

"To pay to the Lessors without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years* of the term hereby granted increasing thereafter *by Ten Pounds per Hundred for every subsequent Three year period or part thereof.*"

ii)     *Version 2 – annual (1980-1983)*

"To pay to the Lessors without any deductions in addition to the said rent *as a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance and renewal *of the facilities of the Estate and the provisions* of services hereinafter set out the yearly sum of Ninety pounds and Value Added tax (if any) *for the first year of the term* hereby granted increasing thereafter *by ten pounds per hundred for every subsequent year or part thereof.*"

Apart from the change from the triennial to the annual 10% rate, other differences are the lengthening of the expression "… renewal and the provision of services" to "renewal of the facilities of the Estate and the provisions (*sic*) of services", and the inclusion of "as" before "a proportionate part".

iii)     *Version 3 – annual (1985-1988)*

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) *for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year thereof.*"

Changes from version 2 are: reversion to the expression "renewal and the provision of services", the omission of "as" before "a proportionate part", and the omission at the end of "or part (thereof)".

iv)     *Version 4 – annual subject to triennial proviso (1988-1991)*

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out *for* the yearly sum of Ninety Pounds and value Added tax [if any] *for the first year of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent year thereof.*"

This version was subject to a proviso:

A001183

"Provided always and it is hereby expressly agreed that *whilst the term hereby created is vested in the said William Richard Short and the said Janice Short or the survivor of them* then maintenance shall be calculated as follows:-

To pay to the Lessor without any deduction in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part thereof.*"

The main clause is identical to version 3 save for the insertion of "for" before "the yearly sum". The proviso had the effect of substituting temporarily the triennial formula as in version 1, but that has ceased to be operative following the disposal of the lease by the Shorts.

v)      *Version 5 – varied from triennial to annual (2000)*

In four of the original 1970s version 1 leases (triennial), a Deed of Variation dated 20th August 2000, at the same time as revising the extent of land demised, substituted with effect from the beginning of the lease a new clause 3(2) in the form of version 2 (annual formula).

89.    Although we have been invited to consider all five versions, the most important for the purposes of interpretation are the first (October 1974) and the second (August 1980), and the circumstances surrounding them. The first is not directly in issue but set the drafting pattern, and provided the background to what followed. The second saw the first incorporation of the controversial annual formula. The later versions are of more limited relevance, save in so far as they throw some light on how the clauses were interpreted in practice, or help to illustrate the relative merits of the rival interpretations.

*The statutory provisions*

90.    By sections 18-19 of the Landlord and Tenant Act 1985, a "service charge" (as defined) payable by a tenant of a "dwelling", is limited to an amount which reflects the costs "reasonably incurred" in the provision of services. The controls originally applied only to "flats" but were extended by amendment in 1987 to

include "dwellings" as defined (Landlord and Tenant Act 1987 section 60). It is not in dispute, in these proceedings at least, that the chalets are "dwellings" for this purpose. The issue is whether the charges are "service charges" as defined by section 18(1):

> "'service charge' means an amount payable by the tenant of a dwelling as part of or in addition to the rent –
>
>> (a) which is payable, directly or indirectly, for services, repairs, maintenance, improvements or insurance or the landlord's costs of management, and
>>
>> (b) the whole or part of which varies or may vary according to the relevant costs."

91.    The lessees submit that properly interpreted the clause imposes an obligation to pay a "proportionate part" of the costs incurred, subject only to an upper limit or cap determined by reference to the formula in the second part of the clause. On this footing it is an amount which "varies or may vary according to the relevant costs" (section 18(1)(b)). The respondent submits that charge is outside the statutory definition because the annual amount is fixed by that formula, without any reference to the costs actually incurred by the lessor. If the lessees are right, the amount of the charge is limited to the amounts reasonably incurred. If the lessor is right, there is no statutory limit or other control.

92.    Other safeguards for lessees were introduced by the 1987 Act, but none covers the present situation. Thus it introduced a new right for any party to a long lease (not only the lessee) of a "flat" to apply to the court (now the first-tier tribunal) for an order varying a lease on the grounds that it "fails to make satisfactory provision" in respect of various matters, one being the computation of service charges, but this did not apply to other forms of dwelling such as in this case. There is a more general provision, for application by "a majority of parties" for variation of a number of leases under a single lessor (section 75), but again it applies only to flats. On the other hand, section 40, which allows similar applications for variation of insurance provisions, applies to "dwellings" in general. It is difficult to detect any legislative purposes for these distinctions. The present case illustrates the potentially unfortunate consequences for parties to those rare forms of residential lease which for no apparent reason fall outside any of the protections given by the legislative scheme.

A001185

93.    For completeness, I note also that no issue arises in the present proceedings as to the possible application of other more general protections relating to unfair contractual terms. Sections 2 to 4 of the Unfair Contract Terms Act 1977 do not in any event apply to contracts relating to the creation or transfer of interests in land (Schedule 1, paragraph 1(b)). No such limitation appears in the Unfair Terms in Consumer Contracts Regulations 1999 (SI 1999/2083), which give effect in this country to EC Directive 93/13/EEC of 5 April 1993 on unfair terms in consumer contracts. The Directive was first transposed in 1994 Regulations (SI 1994/3159) which were later replaced by the 1999 Regulations. The 1994 Regulations came into effect on 1 July 1995, and therefore would not it seems apply to contracts concluded before that date (regulation 1; Chitty on Contracts para 37-087). Accordingly, it could be relevant if at all only to version 5 (2000).

*The proceedings*

94.    We know very little about the background to the present dispute. It first reached the courts in September 2011 in the form of an application by the appellant lessees to the county court for pre-action disclosure. The application was said to be in anticipation of a representative application to resolve an ambiguity in the service charge clause, which "appears to result in a variable service charge but on the other hand create a fixed service charge". It also spoke of the lessees' concerns that the sums collected by way of service charge were exceeding the amount of "legitimate" expenditure by "such a substantial amount as to produce a credit balance that should be held in a service charge trust account"; and also that the lessor had disposed of the former clubhouse for the park to provide accommodation for her daughter. They sought disclosure of information about the sums collected as service charge and the amounts expended since 2005.

95.    An order for disclosure was made on 20 September 2011, but was quickly met by an application by the lessor for declaratory relief relating to the interpretation of the service charge clause, following which the disclosure order was stayed pending the determination of these proceedings. The application sought in particular a declaration that on the true interpretation of the service charge clause, the sum payable was not a "service charge" within the meaning of section 18 of the Landlord and Tenant Act 1985. In the county court, HHJ Jarman QC determined the issue in favour of the lessees. But his decision was reversed on appeal to Morgan J, whose judgment was upheld by the Court of Appeal (Richards, Davis and Lloyd Jones LJJ). The lessees appeal to this court with permission granted by the court itself.

96.    The issue between the parties has throughout been very narrow: that is, whether the figure of £90 as inflated is to be read as a fixed amount, or as an upper limit or cap. That in turn depends on whether it is permissible and appropriate to

read in such words as "limited to" (Judge Jarman's words) or "up to" before the reference to "ninety pounds". As Mr Morshead submits in his printed case:

> "There is no need to undertake an elaborate drafting exercise. The necessary effect can be achieved by implying the words 'up to' before the words 'Ninety pounds'; and, in versions 2 and 5, deleting the word 'as'."

97.    Giving the single judgment in the Court of Appeal, Davis LJ rejected that approach, holding in substantial agreement with Morgan J that the addition of these words -

> "… would involve subverting the proper process of construction of the language actually used and would in truth involve the court rewriting the bargain the parties have made." (para 45)

He rejected the argument that this interpretation would consign the first part of the clause to "mere surplusage". Its function was to identify "the character of the payment to be made". The words "a proportionate part" were apt for a situation where "other lessees also are contributing to the overall service charge, which is in consequence to be apportioned between them". Although he accepted that the word "incurred" was "the language of actual outlay", it was "entirely explicable when one appreciates that this part of the sub-clause identifies the character of the payment being made" (paras 48-49). He also pointed to other difficulties in Mr Morshead's interpretation, in particular the problems of calculating a "proportionate" amount, and the lack of any protection for the lessor if the inflation regularly exceeded 10% (para 53).

*Inflation calculations*

98.    The judge was shown without objection two sets of tables, one showing the annual Retail Price Index (RPI) from 1948 to 2012, taken from figures published by the Office of National Statistics ("the inflation table"); the other, the effect of the increases of service charge compounded over the period of the leases in accordance with respectively the annual and the triennial formula ("the compounding table"). As I understand it, the information in these tables is accepted as forming part of the factual matrix against which it is appropriate to judge the parties' contractual intentions at the relevant dates. There are some minor but apparently immaterial differences between the hard-copy and electronic versions of the compounding table; I have used the latter.

A001187

99.    It is helpful to focus on the rates which would have been in immediate contemplation of the parties at dates when each of the five versions was first agreed: that is, 26 October 1974 (the date of the first lease on the estate incorporating version 1, rather than the 1977 lease which was used as an example at the hearing); 11 August 1980 (the first version 2 lease); 1 July 1985 (version 3); 1 December 1988 (the first version 4 lease); 20 August 2000 (version 5). The table below includes also the rate in contemplation at the date of the county court hearing (June 2012), and in the last year of the lease (2072). The figures in the compounding table are given for 25 December 1974, the commencement of the lease period, and for the same date in each subsequent year. For illustrative purposes I have taken the rate for the year commencing after each of the identified dates (ie 25 December next following each such date), which would have been the rate applicable to the first complete year under each new lease.

100.    The resulting figures (rounded) for annual service charges at each such years:

|      | Triennial | Annual | [Actual inflation] |
|------|-----------|--------|--------------------|
| 1974 | £90 | £90 | £90 |
| 1980 | £109 | £159 | £219 |
| 1985 | £132 | £257 | £310 |
| 1988 | £145 | £342 | £350 |
| 2000 | £212 | £1,073 | £557 |
| 2012 | £311 | £3,366 | £794 |
| 2072 | £1,900 | £1,025,004 | N/A |

[The last column shows for purposes of comparison the equivalent figures implied by actual inflation, arrived at by increasing the initial £90 by the recorded price increases over the period from 1974 to each of the selected years. Though not in evidence before us, those figures have been taken from the "inflation calculator" on the Bank of England's website, and are used for illustration only.]

101.    The rate of price increase during the 1970s can also be contrasted with the pattern in the previous and subsequent decades. Average annual inflation in the 1950s and 1960s was of the order of 3.5-4%. (It had averaged 2.5% in the 50 years from 1900 to 1950.) It then rose sharply to 6.4% in 1970 and 9.3% in 1973, followed by a much steeper rise to 16% in 1974 and an annual peak of 24.2% in 1975. It dropped to 8.3% in 1978 before rising again to 16% in 1980. The annual rate fell to 12% in 1981, and then to around 5-6% in the period 1983-85 (immediately before version 3), 4-5% in 1986-1988 (before version 4), and 3% in 2000 (version 5). It has remained at, or below, that low level ever since.

102.   The compounding table enables comparisons to be drawn between the contributions made respectively by the 66 "triennial" and the 25 "annual" leases over different periods, if the lessor is correct. For example, on the 1988 figures, the triennial leases would have contributed a total of £8,712 (66 x £132), slightly more than the total contribution of the annual leases (£8,550 = 25 x £342). On the basis of the figures in the third column, the combined total (£17,262) was still much lower than the figure required to keep pace with actual inflation since 1974 (91 x £350 = £31,850). The figures at or about the time of the hearing show a very different picture. On the 2012 figures the triennial leases would have been contributing a total of £18,612 (66 x £282) compared to £84,150 (25 x £3,366) contributed by the annual leases. The total amount (£102,762) was now substantially more than that required to keep pace with inflation (91 x £794 = £72,254). (These figures differ slightly from those in the submitted tables due to rounding.)

103.   The table also shows the amounts that, on the lessor's interpretation, would be payable under each formula over the whole period from 24 December 2013 to the end of the term (2072). The total amount payable during that period under each "annual" lease would be £11,238,016, compared to £53,386 payable for the same period under each "triennial" lease.

*Inflation and the factual matrix*

104.   There is no difficulty in principle in taking account of the calculations in the compounding table, which require no outside information, and could have been carried out by the parties (or a reasonable observer) at any of the relevant dates. On the Court of Appeal's interpretation, the figures show increases which appear extraordinary in themselves, in the light of modern conditions of low inflation. No less importantly, they result in dramatically increasing, and ultimately grotesque, differences between the amounts payable by the two different groups of lessees on the same estate. This consequence could and should have been anticipated at the time, certainly by the lessors who were parties to both groups of leases and responsible for maintaining reasonable equivalence between them.

105.   The use to be made of the historic inflation figures raises rather different questions. By agreeing to their use, the parties impliedly ask us to assume that the figures up to and including those for each of the relevant years (or the then most recently published figures) would been have been known to the parties at the time, and therefore must be taken as part of the relevant factual matrix. This is no doubt a reasonable working assumption to indicate the general trend as known to the public.

106.   It is however highly artificial  to be asked to take account of the bare statistics, without reference to the political and economic circumstances which surrounded

A001189

them, so far as they were common knowledge at the time. We are not required to assume total ignorance of current events, in the parties or their reasonable observers. It would not have been difficult to obtain information about contemporary perceptions of the direction of inflation, whether from official reports of the time, or from reports in the South Wales press. Even without such evidence, we are entitled in my view to assume knowledge of some of the key events: for example, of the dramatic rise in oil prices at the end of 1973 and again in 1979, each followed by a sharp increase in inflation in the following year; and also of the election in 1979 of a new Conservative government committed to controlling inflation. We are not required to assume that predictions about future inflation were made in a vacuum.

107.   We are also entitled, as part of the factual matrix, to take account of the nature and circumstances of the estate, as they would have been perceived by potential purchasers. It was planned as a holiday estate close to a popular beach. Potential buyers were likely to come from people already familiar with the area from previous visits with their families. It is fair to assume also that they would have regarded the acquisition of a holiday chalet, not simply as source of pleasure, but also as a long term investment for them and their families. They would have been keen to avoid undue financial burden or risk. It would be strange if they had not taken the opportunity to talk to existing residents about their own experiences of the estate and its management, and of the associated costs. This will become relevant when considering what knowledge of previous terms should be attributed to the first version 2 lessees.

*Approach to interpretation*

108.   In an unusual case such as this, little direct help is to be gained from authorities on other contracts in other contexts. As Tolstoy said of unhappy families, every ill-drafted contract is ill-drafted "in its own way". However, the authorities provide guidance as to the interpretative tools available for the task. The general principles are now authoritatively drawn together in an important passage in the judgment of Lord Clarke JSC in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, paras 14-30. As that passage shows, there is often a tension between, on the one hand, the principle that the parties' common intentions should be derived from the words they used, and on the other the need if possible to avoid a nonsensical result.

109.   The former is evident, as Lord Clarke emphasised, in the rule that "where the parties have used unambiguous language, the court must apply it" (para 23). However, in view of the importance attached by others to the so-called "natural meaning" of clause 3(2), it is important to note that Lord Clarke (paras 20-23) specifically rejected Patten LJ's proposition that -

> "… unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning."

In Lord Clarke's view it was only if the words used by the parties were "unambiguous" that the court had no choice in the matter.

110.    He illustrated the other side of the coin by quotations from Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251:

> "The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."

> and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191, 201:

> "If detailed and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense it must yield to business common sense."

As a rider to the last quotation, Lord Clarke cited the cautionary words of Hoffmann LJ (*Co-operative Wholesale Society Ltd v National Westminster Bank plc* [1995] 1 EGLR 97, 99):

> "This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

111.    I agree with Mr Morshead (questioning in this respect the approach of Davis LJ, para 35) that it may be unnecessary and unhelpful to draw sharp distinctions between problems of ambiguity and of mistake, or between the different techniques available to resolve them. In *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101, para 23, Lord Hoffmann cited with approval a passage of my own (in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336, para 50) where I

discussed the role of what is sometimes called "interpretation by construction". I criticised the tendency to deal separately with "correction of mistakes" and "construing the paragraph 'as it stands'", as though they were distinct exercises, rather than as "aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended". Lord Hoffmann added:

> "What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant." (para 25)

112.    Another permissible route to the same end is by the implication of terms "necessary to give business efficacy to the contract". I refer again to Lord Hoffmann's words, this time in *Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10, [2009] 1 WLR 1988, para 22, explaining the "two important points" underlined by that formulation:

> "The first, conveyed by the use of the word 'business', is that in considering what the instrument would have meant to a reasonable person who had knowledge of the relevant background, one assumes the notional reader will take into account the practical consequences of deciding that it means one thing or the other. In the case of an instrument such as a commercial contract, he will consider whether a different construction would frustrate the apparent business purpose of the parties. … The second, conveyed by the use of the word 'necessary', is that it is not enough for a court to consider that the implied term expresses what it would have been reasonable for the parties to agree to. It must be satisfied that it is what the contract actually means."

113.    *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56 is a useful recent illustration in this court of how these various principles may be deployed, to enable the court to achieve a commercially sensible result in the face of apparently intractable language. A contract for the sale of development land gave the council the right to an uplift (described as "the profit share") in certain defined circumstances, one being the sale of the property by the purchaser. The issue was the calculation of the profit share, which the contract defined as a specified percentage of the "estimated profit" (defined by reference to "open market value") or "the gross sale proceeds". The issue was how the definition should be applied in the case of a sale by the purchaser to an associated party at an undervalue. The court

held in agreement with the lower courts that, in that event, notwithstanding the apparently unqualified reference to gross sale proceeds, the calculation should be based on open market value.

114.    In a concurring judgment, with which all the members of the court agreed, Lord Clarke referred to his own judgment in *Rainy Sky* as indicating the "ultimate aim", that is:

> "… to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant; the relevant reasonable person being one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." (para 28)

As he pointed out, "on the face of it" the reference in the contract to the gross sale proceeds was a reference to the "actual sale proceeds" received by the appellants. It was not easy to conclude "as a matter of language" that the parties meant, not the actual sale proceeds, but the amount the appellants would have received on an arm's length sale at market value of the property; nor was it easy to conclude that the parties "must have intended" the language to have that meaning. He referred to the comment of Baroness Hale in the course of the argument that:

> "… unlike *Rainy Sky*, this is not a case in where there are two alternative available constructions of the language used. It is rather a case in which, notwithstanding the language used, the parties must have intended that, in the event of an on sale, the appellants would pay the respondents the appropriate share of the proceeds of sale on the assumption that the on sale was at a market price."

He thought the problem should be solved by implying a term to the effect that, in the event of a sale which was not at arm's length in the open market, an open market valuation should be used. As he explained:

> "If the officious bystander had been asked whether such a term should be implied, he or she would have said "of course". Put another way, such a term is necessary to make the contract work or to give it business efficacy."

He preferred the use of an implied term to "a process of interpretation", although "the result is of course the same". (paras 30-33)

115.    As Mr Morshead observes, the result in *Aberdeen City* could probably have been explained equally as a case of correction by interpretation. In any event, this example provides support for his proposition that, where an ordinary reading of the contractual words produces commercial nonsense, the court will do its utmost to find a way to substitute a more likely alternative, using whichever interpretative technique is most appropriate to the particular task.

*Residential leases*

116.    Long residential leases are an exceptional species of contract, and as such may pose their own interpretative problems. In no other context is a private individual expected to enter into a financial commitment extending for the rest of his or her life, and probably beyond. The original lessee may have been unaware that (at least under contracts before the Landlord and Tenant (Covenants) Act 1995) he was taking on a personal legal commitment which could continue even after he had disposed of any interest in the property itself (*Norwich Union Life Insurance Society v Low Profile Fashions Ltd* (1991) 64 P & CR 187). So far as it relates only to ground rent, the commitment is unlikely to be burdensome, and it may be readily accepted as a necessary incident of a valuable property interest. Service charges are a different matter, since the amounts may be substantial, and, apart from statute, the lessee is likely to have no direct control over the lessor's expenditure.

117.    Where the lease is for one of a number of units in a managed building or estate, provision has to be made for expenditure by the lessor on common services and maintenance, and for the cost to be shared between the lessees. Substantial equivalence of rights and obligations under such leases is normally important for all parties, both for the good management of the building or estate, and for harmony among those living within it. Equivalence can only be achieved by the lessor, who alone is party to them all. After the first lease has been negotiated and granted, later incoming lessees will usually have little choice in practice but to accept the covenants in the form dictated by the lessor. Their reasonable expectation will be that all have been granted in like terms, both in terms of covenants and in terms of sharing financial responsibility for services, with a view to ensuring fair distribution of the overall cost. Often that expectation and the lessor's responsibility for achieving it, will be expressed in the terms of the lease (as here, in the preamble and clause 4(viii)).

118.    Mr Daiches submits, correctly in my view, that the effect of such words is to create "a letting scheme, or local law, of negative obligations mutually enforceable in equity between all occupiers of the properties on the estate". He cites authorities such as *In re Dolphin's Conveyance* [1970] Ch 654, which related to an estate of freehold properties. Examples of the same principle as applied to leasehold developments are given in the textbooks (see *Megarry & Wade Law of Real*

*Property* 8th ed (2012), para 32-079). As I understand his argument, he asks us to infer that a clause such as 4(viii) has to "look to the future not the past", and that accordingly it is not to be construed as containing any implied representation as to previous leases. I cannot agree. In my view, the existence of such a scheme reinforces the view that each lessee has a legitimate interest in the form and content of all leases within the development, whenever granted. Even if, as in clause 4(viii), the lessor's responsibility is expressed as an obligation in respect of future leases, it should in its context (including the preamble) be read also as containing an implied representation that leases previously granted are also in substantially the same form.

119.   Provision for services is normally dealt with by reciprocal covenants, positive in form: by the lessor to arrange and pay for the carrying out of the necessary services, and by the lessees to pay their respective shares of the costs so incurred. There is no common format for such service charge covenants, and they can and do vary greatly between different buildings or estates. Unlike negative covenants, it seems that they are not mutually enforceable as such, but the expectation is that they will have been drafted to ensure that the lessees' financial obligations are shared fairly between them all. Again this is in the interests of good management and harmony within the development for both lessor and lessees. Differences may be necessary to cater for differences in size of the individual units or other features, but otherwise they will normally be in a standard form in all the leases.

120.   In the courts below there was some discussion of the "restrictive" approach said to be appropriate to service charge provisions (*McHale v Earl Cadogan* [2010] 1 EGLR 51, para 17 per Rix LJ). I agree, if by this it is meant that the court should lean towards an interpretation which limits such clauses to their intended purpose of securing fair distribution between the lessees of the reasonable cost of shared services.

121.   Support for this approach is to be found also in the disparity in practice between the potential remedies available to each party for breach by the other. A lessor who fails to maintain services at the level thought appropriate by the lessees is in principle open to enforcement action in court. But the practical effect of such action for the lessees is uncertain in the absence of a precise definition of what he is required to provide. If there has been a complete breakdown of services, they may be able to obtain injunctive relief or appointment of their own manager. In less extreme circumstances the form of remedy or the extent of any damages may be difficult to define.

122.   By contrast, the lessor's remedies for breach of the service charge clause are all too clear. In the Court of Appeal, Davis LJ was apparently content to assume that the charges might "*in extremis*, force some of these lessees into surrender or forfeiture" (para 57). However, if by this he intended to imply that either escape-

route would be available to the lessees other than by agreement with the lessors, he would have been wrong. Apart from any special provision, the lessee's obligation, once the service charge has been determined, will have crystallised into a contractual obligation to pay a fixed amount. That is in principle enforceable by a simple action through the courts, and ultimately by forfeiture and bankruptcy. The legislature intervened long ago to provide some statutory relief against forfeiture (Law of Property Act 1925, section 146). But that provides no protection against enforcement of the personal liability to pay the contractual amount.

123.   As already explained, the scope for abuse has been recognised by the legislature in the special provision made for controlling "variable" charges as defined in the 1987 Act. Fixed service charges do not normally give rise to the same risk of abuse. The lessee is given the certainty of a fixed financial commitment, and the lessor has the advantage of simplified administration. Provision is needed to deal with price inflation. But if this is fixed by reference to an independent formula, such as an official inflation index, there is no significant risk to either party. The approach adopted in this case seems highly unusual, if not unique. Even where the legislature has not intervened, the courts have a responsibility in my view to ensure that such clauses are interpreted as far as possible not only to give effect to their intended purpose, but also to guard against unfair and unintended burdens being placed on the lessees.

*Interpretation of clause 3(2)*

124.   Against that general background, I come to consider the construction of clause 3(2) in its various versions. At first sight, the main principles seem reasonably clear:

  i)      The intention was that all the leases should be on terms as "similar … as the circumstances permit", and that it was the lessors' responsibility to achieve such equivalence (necessarily, since only they would be party to all of them) (preamble (2); clause 4(8))

  ii)     The commercial purpose of clause 3(2) was to enable the lessor to recover from the lessees the costs incurred by him in maintaining the estate on their behalf, the payment by each lessee being intended to represent a "proportionate" part of the expenses so incurred.

  iii)    Although there was a general description of the services which the lessor was contractually obliged to provide, the extent of those services was not precisely defined by the lessors' covenants (clause 4),

A001196

which left to them a large measure of discretion as to the amounts to be spent in practice.

In themselves, these features are typical and uncontroversial. It is at the next stage, in giving effect to those principles, that the clause becomes problematic.

125.    It is clear to my mind that something has gone wrong with the drafting, at least in the original wording, as it appeared in the 1974 version, and (apart from the change of inflation formula) was repeated in 1985 and 1988. The clause imposes an obligation to pay, but contains two different descriptions of the payable amount: by reference, first, to a "proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services …", and secondly, to a "yearly sum" determined by reference to a fixed formula. There are two linguistic problems. First, there is no grammatical connection to show the relationship between the two descriptions. Secondly, they are mutually inconsistent. A figure can be determined as a proportionate part of some other variable amount, or it can be a yearly sum, fixed by a predetermined formula; but it cannot be both. There is an inherent ambiguity which needs to be resolved.

126.    In the Court of Appeal Davis LJ thought that the first part of the clause was designed simply to identify "the character of the payment to be made" (para 48). I find that unconvincing. If the intention was to indicate no more than the purpose of the payment, one would have expected some such general words as "by way of contribution to the services", not a detailed and specific formula. Conversely, if the character of the contributions was to be that of payments determined by reference to a fixed formula and nothing else, the description in the first part was neither accurate nor useful. Proportionality had no part to play in such a fixed calculation, nor any relation to reality after 1980 if the court's interpretation is correct. Nor is it easy to explain the purpose of the specific reference to "expenses and outgoings incurred" by the lessor on a defined range of services, unless it was intended to play some material part in the calculation.

127.    At this point it is convenient to note the minor differences of wording in some later versions. A change such as the omission of the words "or part …" in version 3 can readily be dismissed as a copying error. Others give more room for argument. It would be tempting to read more significance into the word "as", which appears for the first time in the important 1980 version 2. Grammatically, it may be said (with Davis LJ – para 54), the insertion of the word "as" implies that the operative text is in the second part of the clause, the first part being merely descriptive. There are two difficulties with that explanation. First, for the reasons I have given, neither the reference to proportionality nor the detail of the formula in the first part is compatible with that limited sense. Secondly, there are linguistic indications the other way. The word "as" did not survive into any of the later versions, except the

2000 deed of variation (version 5), which seems to have been copied directly from version 2. Version 2 itself also saw the introduction of a new reference to expenditure on "the renewal of the facilities of the estate", which is hard to explain if the detail of the first part had no practical significance. Version 4 added to the mystery by adopting a different connecting word "for", this time in front of the second description ("*for* the yearly sum of ninety pounds"). That is even more difficult to interpret, but if anything it seems to imply that it was the first part of the clause which was the primary description. In the end I conclude that no persuasive guidance, one way or the other, is to be derived from these minor changes.

128.   There are only two realistic possibilities for the second part of the clause, which are those respectively adopted by Judge Jarman, on the one hand, and Morgan J and the Court of Appeal, on the other. Either it is a fixed amount which in effect supplants any test of proportionality under the first part; or it is no more than an upper limit to the assessment of a proportionate amount. I reject the theoretical alternative that it was designed as a lower limit for the benefit of the lessors. That interpretation would have made no sense at all in relation to version 1, agreed at a time when the possibility of inflation falling *below* 3% would have occurred to no-one as a risk requiring special provision, particularly for the lessor who unlike the lessees was in control the level of his own expenditure. There is thus no doubt that this part of the clause was originally designed for the benefit of the lessees, and I see no reason to think that its purpose had radically changed by the time of version 2.

129.   Davis LJ was concerned as to the practicalities of determining the "proportionate" amount of the qualifying expenditure. Morgan J (para 51) described it as "workable but not ideal". I do not see any great difficulty. The relevant items are precisely defined. The lessor has simply to demonstrate (to the lessees and if necessary to the court) that the expenditure has been properly incurred on those items, and that it has been divided "proportionately" between the lessees.

130.   I note that in *Hyams v Titan Properties* (see para 82 above), which was decided two years before the first of these leases, the court had to fix the terms of a new business lease under the Landlord and Tenant Act 1954 taking account of rapid price inflation. Buckley LJ recorded that "the modern practice generally accepted … was to make service charges payable on a proportional basis". In that case (where there were nine units) the court approved a clause "requiring the tenant to pay one-ninth of the cost of providing the services under the covenant in addition to the rent payable under the lease". There was no suggestion that this formulation was defective in the absence of specific machinery to settle the figure. The first half of clause 3(2) follows the same model, allowing for the fact that the precise number of units was probably not known at the outset, so that it was not possible to put in a specific fraction. The use of the same figure of £90 in all the leases (whatever its precise purpose) would have been a strong indication that equal shares were intended.

A001198

131.    I turn therefore to consider the two alternatives as applied to each of the five versions in its own context. In the words of the authorities, we must inquire "what a reasonable person would have understood the parties to have meant", that person being one who had "all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract", and who would have also taken into account "the practical consequences of deciding that it means one thing or the other". Where necessary the reasonable observer can be invited notionally to take on the more active role of "officious bystander", in order to interrogate the parties as to their common intentions.

*The five versions in context*

   *Version 1 (October 1974 - July 1980)*

132.    It is impossible to do more than guess at the common intentions of the parties to the first lease in relation to this part of clause 3(2). It is hard at first sight to see any rational basis for selecting a rate of 10% every three years, at a time when annual inflation was running at around twice that rate. At little over 3% per year, it was a little low even by reference to the inflation of the two previous decades, although it was in line with the historic long term average.

133.    In such inflationary conditions, there is no difficulty in understanding why it was acceptable to the lessees. It is the lessor's thinking which needs explaining. We know nothing of the first lessors (the Lewises). They may perhaps have been builders, themselves involved in the development of the estate, and so more able to absorb the initial costs of maintenance in their other expenditure. If so, to make the estate attractive to purchasers, they may have gambled on being able to bear the price increases during the early years, in the expectation of inflation falling to more reasonable levels in the near future. (Comparable optimism seems to have been reflected in their view of ground rent, which was to be increased by only 50% every 21 years.)

134.    In any event, their apparent generosity would be more explicable if, as may have been the case, the figure of £90 was based not simply on an estimate of current costs, but gave a reasonable margin for anticipated inflation in the short term. That possibility is borne out to some extent by the fact that the triennial formula survived, apparently without question, for six years of high inflation. If so, it is certainly possible that, even during that period, it was treated as a cap, the contributions being based on a share of actual expenditure from year to year. (Unlike Morgan J - para 32 - I see no basis, in the absence of evidence, for any positive inference that service charges were paid, then or later, "in accordance with the lessor's interpretation".)

A001199

135.   Since version 1 is not in issue, it is unnecessary to decide between the alternative interpretations at this stage. Version 1 does however provide the necessary background to the contentious versions which came later. It makes clear that the inclusion of a specific figure for inflation was designed originally for the benefit of the lessees not the lessor. It may also enable one to discount any intention on the part of the Lewises at least to take unfair advantage of their lessees.

*Version 2 (August 1980 – February 1983)*

136.   As I have said, the fact that it took the Lewises six years to react to the apparent disparity between the triennial formula and actual inflation suggests that, one way or another, they were able to maintain expenditure within the initial figure for some time. The change of heart may well have been triggered by the renewed jump in inflation in 1979, which reached its peak in summer 1980, although it is notable that the last version 1 lease was granted as late as July 1980. If the Court of Appeal is right, there was then in August 1980 a dramatic change in their thinking, from the exaggerated optimism which had prevailed over the last six years, to such abject pessimism about the future of the economy that they thought it reasonable to assume continuing 10% inflation for the remaining 93 years of the leases, and to expect their purchasers to share that assumption.

137.   If that is the correct interpretation, they would have been contemplating an impossibility, even for economists. In *Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd* [1981] HCA 3, (1981) 145 CLR 625, 639 Gibbs J spoke of the reasons for making no allowance for inflation in awards for future loss:

> "It is unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money during a period extending for several decades ahead. Whether inflation increases or is brought under control depends upon political and economic events and decisions at home and abroad as to whose occurrence it is not possible to do more than conjecture. Predictions as to the economic future in 30 years time may perhaps be made by a soothsayer but expert evidence cannot rationally be given on such a subject." (cited with approval by Lord Hope in *Helmot v Simon* [2012] UKPC 5, para 45)

If that is unreasonable for an economist, how much less likely is it as an explanation of the thinking of the lessors or lessees of these modest holiday chalets in August 1980?

A001200

138.   The improbability becomes even more striking when one compares the figures for the new and old groups of lessees. It is true that, even as a cap, the annual formula would result in the new lessees paying more initially than the existing lessees (£159 in 1980, compared to £109 under version 1). But over the period of the lease the differences become grotesque. On the Court of Appeal's interpretation the parties were accepting, as a mathematical certainty, that by the end of the lease period each lessee's service charges would have totalled over £11m, more than 200 times the amounts payable by the existing lessees. Put the other way, if the assumed prediction were correct, the lessees of more than two-thirds of the chalets on the estate would by then have contributed 200 times less than the figure necessary for the lessors' expenditure to keep pace with inflation. Even from the lessors' point of view, that scenario implied commercial disaster.

139.   Whatever the lessors' state of mind, it beggars belief that the new lessees would have been content to proceed on that basis. It is particularly improbable for a person of ordinary means investing perhaps limited savings in a holiday home. It is simply inconceivable that such a potential purchaser would have been willing to accept a prediction of continuing inflation at that level for over 90 years, and to take that as a basis for undertaking a contractual obligation lasting for the rest of his life and beyond without any escape route.

140.   There has been some discussion before us as to whether the lessees would have known of the comparable clauses in the previous leases. Mr Daiches asks us (and through us the reasonable observer) to proceed on the basis that the new lessees in 1980 would have been unaware of the triennial formula used in the previous leases, and says that is the basis on which the case has been approached hitherto. I am unwilling to make that assumption, which I regard as wholly unrealistic. It is not on any view an assumption that can be made in respect of versions 4 and 5, where the change was apparent on the face of the documents (see below).

141.   Even without direct information in the documents, a potential purchaser in 1980 could be expected to have wanted to satisfy himself about the existing arrangements within the estate, and would have had a legitimate interest in doing so. Absent bad faith, it is hard to see any reason why the lessor would have wished or felt able to hide information about the previous leases. In any event, it could readily have been discovered by talking to other lessees within the estate. In Lord Clarke's words, it would have been "background knowledge … reasonably … available to the parties" in the circumstances of the contract. I would accordingly approach the interpretation of version 2 on the assumption that both parties (like their reasonable observer) would have been aware of the proposed change from the triennial formula, and that they are to be taken as having accepted the change for what they regarded as good reasons.

142.    On the basis that it was intended as a cap, the lessees' thinking is understandable. They would have needed persuasion to take the leases on less generous terms than their predecessors. On the other hand, they would have understood that any assumptions made in 1974 about the prospects of an early fall in inflation had been falsified by events. They would have understood also that the lessor would find it difficult to support reasonable expenditure on services without some adjustment. We do not of course know what if anything may have been said about increasing future contributions from the existing lessees to ensure fair distribution. But from their own point of view, with current inflation at or around 20%, substitution of a limit of ten per cent might have been seen by them as an acceptable compromise for the immediate future, while allowing for a return to more normal levels in the medium term. That may not be a complete explanation, but it is at least plausible, unlike the alternative.

143.    As in the *Aberdeen Council* case, we can imagine the responses of lessor and lessee to questioning by the officious bystander as to the purpose of the clause. Did they really intend to enter into a contract which had the extraordinary long term implications outlined in the previous paragraphs? I find it hard to conceive of any other response than "of course not; it is a cap not a fixed amount". The alternative would have seemed absurd and unreasonable to both, as much to the lessor as to the lessees.

144.    The Court of Appeal thought they were applying the "natural meaning" of the clause, and that it was not the task of the court to relieve the lessees of a "bad bargain" entered into in different circumstances, albeit possibly without having done their arithmetic. For the reasons I have given, I am not convinced that the "natural meaning" is that adopted by the Court of Appeal, at least once one discounts the inclusion of the word "as" in version 2, or that, even if it is, it relieves the court of the obligation to seek a sensible result. On the other side of the coin, I agree with Mr Morshead that "bad bargain" is a gross understatement of the implications of their interpretation, which as he says were from the outset "not only stark but disastrous". Nor do I see any reason to assume that these contracting parties, treated (in Lord Hoffmann's words) as alive to the "practical consequences" of the alternative interpretations, should have been ignorant of the ordinary principles governing compound interest.

### Version 3 (1985)

145.    By this time inflation had fallen significantly to around 5-6%. Pessimistic thoughts about the future direction of inflation for the foreseeable future would have largely dissipated. If it was difficult in 1980, it would surely be impossible now, for the reasonable observer to imagine the parties committing themselves, even in the

medium term, to a fixed inflation figure of almost double the current rate. As a cap, it would hardly have attracted attention.

*Version 4 (1988)*

146.    By this time annual inflation had fallen to less than 5%. The annual formula produced a figure more than double that implied by the triennial formula, but one closely comparable to that resulting from actual inflation since 1974 (£342 compared to £350, in the table at para 100 above). If the then lessor, Mrs Short, was still charging her pre-1980 lessees by reference to the lower triennial rate, it raises a question of how she was covering her own expenditure on services, in circumstances where two-thirds of the leases were contributing at only half the rate implied by inflation since 1974. That may suggest either that she was able in practice to keep expenditure to a level significantly below that implied by inflation, or possibly that in order to maintain services at a reasonable level some of the pre-1980 lessees had been persuaded to pay more than their strict obligation.

147.    The only novel feature of this version is that it was subject to a proviso in effect substituting the triennial formula during the tenure of the named lessees. It appears to have escaped notice in the courts below that the example used for this version was in a lease between the lessor, Mrs J Short, and herself and a Mr W R Short (her husband) as joint lessees. Since the hearing it has been confirmed that she had the same interest in the other three "proviso" leases granted between 1988 and 1991. They were clearly not arms-length transactions.

148.    We know nothing about Mrs Short, or her thinking. It is difficult to understand how this special personal protection could have been reconciled with her obligation to the other post-1980 leases (under clause 4(viii)) to ensure that the covenants in these leases were as "similar … as the circumstances permit". It is even more difficult, at least on the Court of Appeal's interpretation, to understand how she would have explained the change to her future assignees, who were to lose that protection. The contrast between the two versions could not have been drawn more clearly to their attention. On the basis that the revised percentage figure was no more than a cap, they may plausibly have been content to accept an obligation to keep pace with inflation, in line with other post 1980-lessees. The alternative assumes that, at time when inflation rates were less than 5% and apparently falling, they knowingly accepted a continuing obligation to pay service charges increasing at twice that rate for the rest of the term. On any view that is absurd.

A001203

*Version 5 (2000)*

149.   By this time inflation had fallen to about 3%. The clause 3(2) figure was by now more than five times greater under the annual formula than under the triennial formula. As Mr Daiches accepts, the parties to these transactions were fully aware of the differences between the two versions. In those circumstances, whatever the changes in the extent of their holdings, there is on the face of it no rational explanation for four lessees agreeing not only to the loss of the protection of version 1, but to the substitution of a permanent obligation to pay service charges increasing at a rate three times the then current rate of inflation.

150.   Since these variations were agreed only 15 years ago, and since by this time the respondent, Mrs Arnold, was herself directly involved, it might have been thought that she at least would be able to throw some light on these extraordinary transactions. After the hearing, the parties were put on notice of the court's concern on this point, and invited to comment. It has emerged that three out of the four variations were agreed between Mrs Arnold and her daughter, Mrs Fraser (signed under a power of attorney by Mrs Arnold's son). The fourth was a Mrs Pace, of whom no information has been provided, save that she is apparently still the owner of the chalet, and she is named as one of the defendants in these proceedings.

151.   If there was in Mrs Arnold's thinking a rational explanation for these particular variations, she has not taken the opportunity to disclose it. Instead of such direct evidence, Mr Daiches remarkably asks us to imagine a series of "inferences" drawn by the parties (including his client and her daughter) and the reasonable observer. They would have inferred, he says, that version 1 lessees were paying less than the rates required by inflation and that there were in consequence "historic shortfalls" in the lessor's service charge income; and that the multiplier was to be increased, not only to take account of actual inflation since 1974, and to reflect the fact that it might once again rise to levels above that implied by the triennial formula, but also to compensate the lessor both for past shortfalls, and for the risk that he or she might not be able to persuade other lessees to agree to similar increases in the future.

152.   With respect to Mr Daiches I have to say that, even in this extraordinary case, I find these submissions quite astonishing. Given that his client and her daughter were the principal parties to these transactions, why on earth should the court be expected to draw "inferences" as to what was in their minds? Why should we speculate as to the extent of any "historic shortfalls", when she presumably has access to the actual accounts, and has resisted the lessees' requests for disclosure? What evidence is there that by 2000 anyone was seriously concerned about an imminent risk of return to double-digit inflation? Finally, what possible reason would these lessees have had for wishing to "compensate" the lessor for the past or

future financial consequences of imperfections in leases for which they were not responsible?

153.   With regard to the only independent party, Mrs Pace, Mr Daiches asks us to note that her variation was agreed shortly after the sale of the lease to her by the respondent herself. It should not be difficult, he says, to "infer that the purchase price paid by her to the respondent reflected her agreement to increase the multiplier". Although she is apparently one of the appellants represented by Mr Morshead, he has not volunteered any specific explanation on her behalf. He merely points to the difficulty of imagining any price reduction or other inducement sufficient to compensate her for "the devastating implications" of the multiplier if it operates as Mrs Arnold contends.

154.   In the absence of further evidence from either side, it is impossible to draw any clear conclusions about the purpose of these curious transactions. It is enough to observe that, viewed objectively, they are at least consistent with an interpretation which limits the lessees' future exposure to actual inflation, within a defined limit. On the lessors' interpretation, as with version 4, they make no sense at all.

*Conclusion*

155.   The true explanation for these wretchedly conceived clauses may be lost in history, but the problems for the parties are all too present and deeply regrettable. No doubt in recognition of such considerations, Mr Daiches, on behalf of Mrs Arnold, indicated that his client "fully understands the appellants' predicament and is sympathetic to it", and that if the appeal fails there would have to be a re-negotiation of the leases "for pragmatic if not for legal reasons". She wished it to be stated openly that –

> "… she is willing for the appellants' leases to be renegotiated on terms that would, among other things, involve the leases being varied by substituting an adjustment linked to the Consumer Price Inflation index instead of the current fixed adjustment of 10% per annum."

156.   Although on its face this indication seems helpful and realistic, it is not clear what it would mean in practical terms. It rightly acknowledges that the problems may well be incapable of truly satisfactory resolution by conventional legal analysis. The main obstacle may be that hinted at in Mr Daiches' post-hearing submission. That is the need to find some way of making good the shortfall resulting from the unrealistically low contributions required from more than two-thirds of the lessees under the pre-1980 leases. Even if the lessees' interpretation prevails, it will still

leave an unhappy imbalance between these lessees, and the version 1 lessees, who will be left paying substantially less than their proportionate share.

157.   Whatever the strict legal position, the other lessees may perhaps be persuaded that they have a common interest in the good management of the estate, and at least a moral obligation to contribute their fair share of its costs. A long-running dispute of this kind can hardly be conducive to the atmosphere appropriate to a holiday location, even for those not directly involved. It is to be hoped that some way can be found of bringing them into the discussions. On any view, the case seems to cry out for expert mediation, if it has not been attempted before, preferably not confined to the present parties. If thought appropriate, one possibility might be an application by consent to the President of the First-Tier Tribunal (Property Chamber – Residential Property) to appoint as mediator a senior judge of that tribunal, with the benefit of that tribunal's experience of dealing with service charge issues under statute. However, that must be a matter for the parties not this court.

158.   It is necessary therefore to return to the essential question: what in the view of a reasonable observer did clause 3(2) mean? It will be apparent from my detailed analysis that I regard the consequences of the lessor's interpretation as so commercially improbable that only the clearest words would justify the court in adopting it. I agree with HH Judge Jarman QC that the limited addition proposed by the lessees does not do such violence to the contractual language as to justify a result which is commercial nonsense.

159.   For these reasons, in respectful disagreement with the majority, I would have allowed the appeal and restored the order of HH Judge Jarman QC.

A001206



**Hilary Term**
**[2017] UKSC 24**
*On appeal from: [2015] EWCA Civ 839*

# JUDGMENT

# Wood (Respondent) *v* Capita Insurance Services Limited (Appellant)

**before**

**Lord Neuberger, President**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Hodge**

## JUDGMENT GIVEN ON

## 29 March 2017

**Heard on 7 February 2017**

*Appellant*
Edward Cumming

(Instructed by Enyo Law
LLP)

*Respondent*
Andrew Twigger QC

(Instructed by Birketts
LLP)

**LORD HODGE: (with whom Lord Neuberger, Lord Mance, Lord Clarke and Lord Sumption agree)**

1.     This appeal raises a question of contractual interpretation. It concerns an indemnity clause in an agreement dated 13 April 2010 ("the SPA") for the sale and purchase of the entire issued share capital of a company, Sureterm Direct Limited ("the Company"), which carries on business as a specialist insurance broker, primarily offering motor insurance for classic cars.

2.     The sellers of the Company were the respondent, Mr Andrew Wood ("Mr Wood"), who owned 94% of its share capital, and Mr Christopher Kightley and Mr Howard Collinge, who owned 1% and 5% of its share capital respectively. Each was a director of the Company and Mr Wood was its managing director. The purchaser was Capita Insurance Services Ltd ("Capita"). Mr Wood remained as managing director of the Company until the end of 2010. He brought proceedings against Capita arising out of the termination of his employment and Capita brought a counterclaim against him under the indemnity provision in the SPA, which is the subject matter of this appeal. Mr Kightley and Mr Collinge were, but are no longer, parties to the proceedings.

3.     It is not necessary to set out in any detail the circumstances in which Capita came to make its claim under the indemnity. It suffices to summarise Capita's claim as follows.

4.     In about August 2008 the Company began to sell motor insurance through online aggregator sites such as Confused.com. The sales were not completed online: potential customers obtained a quotation from the Company on the aggregator site and the Company then contacted the potential customer directly with a view to confirming their risk details before selling them the appropriate insurance policy.

5.     Shortly after Capita's purchase of the Company's share capital, employees of the Company raised concerns about the Company's sales processes, which had resulted in some customers paying substantially more than they had been quoted online. The employees alleged that the Company had presented customers with higher quotations without informing them why the quotations had increased. The Company had thus increased its own arrangement fees when neither the underwriting premium nor the risk profile had changed significantly. The Company responded to the allegations by carrying out a review of its sales between January 2009 and January 2011. This review revealed that in many cases the Company's telephone operators had misled customers into believing that an underwriter had

A001209

required a higher premium or that their risk profile was worse than it was or had pressurised the customer to make sure that a sale was made.

6.    Capita and the Company were obliged to inform the Financial Services Authority ("FSA") of the findings and did so on 16 December 2011. The FSA informed them that the customers had been treated unfairly and had suffered detriment and that there would have to be redress. After the FSA had conducted a risk assessment visit to the Company in November 2012, Capita and the Company agreed with the FSA to conduct a remediation scheme to pay compensation to customers who were identified as potentially affected by the Company's mis-selling. Capita alleges that it, the Company and Capita's other subsidiaries have suffered loss as a result of the mis-selling or suspected mis-selling of insurance products in the period before the completion of the sale under the SPA. Capita's claim is for £2,432.883.10, comprising an estimate of the compensation at £1.35m, interest of about £400,000 and the costs of the remediation scheme.

7.    It is appropriate to record that some of Capita's allegations are disputed, including the extent of the mis-selling and any detriment to customers. Other than, perhaps, the facts narrated in para 4 above (which do not appear to be disputed), they are not facts by reference to which the SPA is to be construed. But the circumstances in which Capita and the Company were required to set up the remediation scheme are of some importance because Mr Wood contends that they fall outside the scope of the indemnity clause which is the subject matter of this action. In particular, the requirement to compensate was not the result of a claim by one or more of the Company's customers or a complaint by those customers to the FSA or another public authority. It resulted, as I have said, from information about the internal review which Capita and the Company gave the FSA and the requirement by the FSA that compensation should be paid to the customers.

*Contractual interpretation*

8.    In his written case counsel for Capita argued that the Court of Appeal had fallen into error because it had been influenced by a submission by Mr Wood's counsel that the decision of this court in *Arnold v Britton* [2015] AC 1619 had "rowed back" from the guidance on contractual interpretation which this court gave in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900. This, he submitted, had caused the Court of Appeal to place too much emphasis on the words of the SPA and to give insufficient weight to the factual matrix. He did not have the opportunity to develop this argument as the court stated that it did not accept the proposition that *Arnold* had altered the guidance given in *Rainy Sky*. The court invited him to present his case without having to refer to the well-known authorities on contractual interpretation, with which it was and is familiar.

9.     It is not appropriate in this case to reformulate the guidance given in *Rainy Sky* and *Arnold*; the legal profession has sufficient judicial statements of this nature. But it may assist if I explain briefly why I do not accept the proposition that *Arnold* involved a recalibration of the approach summarised in *Rainy Sky*.

10.     The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning. In *Prenn v Simmonds* [1971] 1 WLR 1381 (1383H-1385D) and in *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989 (997), Lord Wilberforce affirmed the potential relevance to the task of interpreting the parties' contract of the factual background known to the parties at or before the date of the contract, excluding evidence of the prior negotiations. When in his celebrated judgment in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 Lord Hoffmann (pp 912-913) reformulated the principles of contractual interpretation, some saw his second principle, which allowed consideration of the whole relevant factual background available to the parties at the time of the contract, as signalling a break with the past. But Lord Bingham in an extra-judicial writing, *A new thing under the sun? The interpretation of contracts and the ICS decision* Edin LR Vol 12, 374-390, persuasively demonstrated that the idea of the court putting itself in the shoes of the contracting parties had a long pedigree.

11.     Lord Clarke elegantly summarised the approach to construction in *Rainy Sky* at para 21f. In *Arnold* all of the judgments confirmed the approach in *Rainy Sky* (Lord Neuberger paras 13-14; Lord Hodge para 76; and Lord Carnwath para 108). Interpretation is, as Lord Clarke stated in *Rainy Sky* (para 21), a unitary exercise; where there are rival meanings, the court can give weight to the implications of rival constructions by reaching a view as to which construction is more consistent with business common sense. But, in striking a balance between the indications given by the language and the implications of the competing constructions the court must consider the quality of drafting of the clause (*Rainy Sky* para 26, citing Mance LJ in *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299 paras 13 and 16); and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest: *Arnold* (paras 20 and 77). Similarly, the court must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms.

12.     This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial

consequences are investigated: *Arnold* para 77 citing *In re Sigma Finance Corpn* [2010] 1 All ER 571, para 10 per Lord Mance. To my mind once one has read the language in dispute and the relevant parts of the contract that provide its context, it does not matter whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each.

13.     Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the field of contractual interpretation. Rather, the lawyer and the judge, when interpreting any contract, can use them as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements. Some agreements may be successfully interpreted principally by textual analysis, for example because of their sophistication and complexity and because they have been negotiated and prepared with the assistance of skilled professionals. The correct interpretation of other contracts may be achieved by a greater emphasis on the factual matrix, for example because of their informality, brevity or the absence of skilled professional assistance. But negotiators of complex formal contracts may often not achieve a logical and coherent text because of, for example, the conflicting aims of the parties, failures of communication, differing drafting practices, or deadlines which require the parties to compromise in order to reach agreement. There may often therefore be provisions in a detailed professionally drawn contract which lack clarity and the lawyer or judge in interpreting such provisions may be particularly helped by considering the factual matrix and the purpose of similar provisions in contracts of the same type. The iterative process, of which Lord Mance spoke in *Sigma Finance Corpn* (above), assists the lawyer or judge to ascertain the objective meaning of disputed provisions.

14.     On the approach to contractual interpretation, *Rainy Sky* and *Arnold* were saying the same thing.

15.     The recent history of the common law of contractual interpretation is one of continuity rather than change. One of the attractions of English law as a legal system of choice in commercial matters is its stability and continuity, particularly in contractual interpretation.

*The Sale and Purchase Agreement*

16.     The SPA is a detailed and professionally drafted contract. It provided for the sale and purchase of the Company's share capital (clause 3) for the consideration of

£7,681,661 payable on completion (clause 4), and it also provided for deferred consideration (Schedule 8). Clause 1 contained the following definitions which are relevant to the construction of the disputed indemnity:

"**Authority** means any local, national, multinational, governmental or non-governmental authority, statutory undertaking, agency or public or regulatory body (whether present or future) which has jurisdiction over the Business or any decision, consent or licence which is required to carry out the Business and Authorities shall be construed accordingly.

**Company** means Sureterm Direct Ltd …

**Completion Date** means the date of this Agreement.

**Employees** has the meaning given to it at paragraph 6 of Schedule 4 [which refers to a list of all of the employees employed by the Company].

**FSA** means the Financial Services Authority and any body which supersedes it.

**Regulatory Authority** means any body by which any part of the Business is or was regulated pursuant to any Applicable Financial Services Laws (including, but not limited to, the FSA, the Personal Investments Authority Ltd, the General Insurance Standards Council, the Insurance Brokers Registration Council and including the Financial Services Ombudsman and any voluntary regulatory body with whose rules the Company has agreed to comply).

**Relevant Person** means an Employee or a former employee of the Company and any dependant of an Employee or a former employee of the Company.

**Shares** means all of the issued shares in the capital of the Company.

A001213

> **Warranties** means the Tax Warranties and the warranties set
> out in Schedule 4."

17.    Clause 7 dealt with warranties and indemnities. Each of the sellers severally
warranted to the buyer on a proportionate basis in terms of the Warranties (clause
7.1); the Warranties were qualified by matters which had been fairly disclosed in the
disclosure letter (clause 7.2); and where a Warranty was qualified by an expression
such as "so far as the Sellers are aware" that referred to the actual knowledge of the
sellers, who confirmed that they had made due and careful enquiry of the Company's
compliance manager, IT Director and HR Director (clause 7.3).

18.    The indemnity clause whose interpretation is in dispute is clause 7.11. It
provided:

> "The Sellers undertake to pay to the Buyer an amount equal to
> the amount which would be required to indemnify the Buyer
> and each member of the Buyer's Group against all actions,
> proceedings, losses, claims, damages, costs, charges, expenses
> and liabilities suffered or incurred, and all fines, compensation
> or remedial action or payments imposed on or required to be
> made by the Company following and arising out of claims or
> complaints registered with the FSA, the Financial Services
> Ombudsman or any other Authority against the Company, the
> Sellers or any Relevant Person and which relate to the period
> prior to the Completion Date pertaining to any mis-selling or
> suspected mis-selling of any insurance or insurance related
> product or service."

19.    This clause must be seen in its contractual context. Schedule 4 contained 30
pages of detailed warranties. In Part 12 of that Schedule, which concerned litigation,
disputes and investigations, the sellers warranted that they were not aware of
circumstances which were likely to give rise to any investigation or enquiry by any
Authority (para 12.4) and that no breach of contract, tort, statutory duty or law had
been committed for which the Company was or might be liable (para 12.5). Part 14
which was concerned with compliance and regulatory matters included the
following para:

> "14.1
>
> (a)    The Company conducts, and has conducted the Business
> in accordance with the requirements of all Competition laws

and Applicable Financial Services Laws applicable to the business and has not been and is not being investigated for any alleged non-compliance or infringement of such Competition Laws and Applicable Financial Services Laws. …

(c)     The Company has no reason to believe that any action will be taken against it in relation to any of its current or past activities based on any alleged non-compliance or infringement of any Competition Laws and Applicable Financial Services Laws."

20.     Part 14 also contained detailed warranties that the Company had complied with its regulatory obligations and that correspondence between the Company and all Regulatory Authorities had been disclosed, that the Company, its officers and employees had not been subject to any regulatory sanction and that no such sanction was likely or pending; and that the Company had not been subject to a regulatory investigation and, so far as the Sellers were aware, there were no circumstances which could give rise to a visit by any Regulatory Authority.

21.     Clause 8 of the SPA provided for limitations on the sellers' liability in Schedule 5, which in para 1 provided that the aggregate maximum liability of all claims under the SPA (with one exception) would not exceed the purchase price and that the liability of each seller would not exceed his proportionate liability (ie 94%, 5% and 1%). That limitation applied to claims under clause 7.11 as well as under the warranties. But paragraph 3 of Schedule 5 imposed time limits on the warranties by providing:

"3.1   Save in respect of a Warranty Claim or a claim under the Tax Covenant notified in writing to the Sellers prior to such a date, the Sellers will cease to be liable:

(a)     for any claim under the tax warranties or under the Tax Covenant on the seventh anniversary of Completion; and

(b)     for any other Warranty Claim on the second anniversary of Completion."

Thus in contrast to the indemnity under clause 7.11, the warranties relating to, among other things, regulatory compliance, had a lifespan of only two years.

22.    In a judgment dated 14 October 2014 ([2014] EWHC 3240 (Comm)) Popplewell J decided the preliminary issue of the interpretation of the indemnity clause and held, in effect, that it required Mr Wood to indemnify Capita even if there had been no claim or complaint by a customer. The Court of Appeal (Patten LJ, Gloster LJ and Christopher Clarke LJ) in a judgment written by Christopher Clarke LJ ([2015] EWCA Civ 839) disagreed. In its order dated 30 July 2015 the Court of Appeal declared that Mr Wood's liability under the indemnity in clause 7.11 of the SPA:

> "cannot arise unless the matter in respect of which indemnity is sought follows and arises out of either (i) a claim made against the Company, a Seller or a Relevant Person or (ii) a complaint registered with the FSA, the Financial Services Ombudsman or any other Authority against the Company, a Seller or a Relevant Person and, in either case, the claim or complaint (a) relates to the period prior to the Completion Date and (b) pertains to any mis-selling or suspected mis-selling of any insurance or insurance related product."

23.    Capita appeals against that order, arguing that the contractual indemnity is not confined to loss arising out of a claim or complaint.

24.    In this case both Popplewell J and the Court of Appeal have considered and weighed both the language of the disputed clause 7.11 and the commercial considerations. They have both started by examining the language but have reached opposing conclusions. This disagreement is not caused by any failure to apply the correct principles but is, in my view, the result of an opaque provision which, as counsel for each party acknowledged, could have been drafted more clearly.

25.    I have concluded that the Court of Appeal has come to the correct view as to the meaning of this difficult clause. I set out below my reasons, which are essentially the same as those which Christopher Clarke LJ presented.

*Discussion*

26.    Clause 7.11 has not been drafted with precision and its meaning is avoidably opaque. My preliminary view of the meaning of the clause on a first reading was consistent with the view which the Court of Appeal favoured, namely that the indemnity covered loss and damage which (a) followed and arose out of claims or complaints against the Company, the Sellers or any Relevant Person, (b) related to the period before completion and (c) pertained to the mis-selling or suspected mis-

selling of insurance products or services. But it is necessary to place the clause in the context of the contract as a whole, to examine the clause in more detail and to consider whether the wider relevant factual matrix gives guidance as to its meaning in order to consider the implications of the rival interpretations.

27.    The contractual context is significant in this case. The indemnity in clause 7.11 is an addition to the detailed warranties in Schedule 4. The mis-selling which clause 7.11 addresses is also covered by the warranty in paragraph 14.1 of Schedule 4 (para 18 and para 19 above). But liability for the Schedule 4 warranties is time-limited by Schedule 5. In particular paragraph 3.1(b) of that Schedule (para 20 above) required the Company to claim within two years of the completion of the sale and purchase. The scope of the clause 7.11 indemnity, breach of which gives rise to a liability which is unlimited in time, falls to be assessed in the context of those time-limited warranties.

28.    All of the parties to the SPA were commercially sophisticated and had experience of the insurance broking industry. Capita was not involved in the management of the Company before the share purchase. The Sellers were the directors and the only shareholders of the Company. They were the people who knew or ought to have known how the Company had operated its business; Capita would in all probability not have that knowledge. The parties to the SPA would have known this. That lack of knowledge explains why Capita required the disclosures in the disclosure letter and the detailed warranties in Schedule 4; but it does not assist the court to determine the scope of the indemnity clause. The court is not aware of the negotiations which led to the SPA; they are not relevant to the task of interpreting that agreement: *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101. Business common sense suggests that Capita had an interest in obtaining as broad an indemnity against the adverse consequences of mis-selling as it could obtain. But the sellers had given warranties of compliance with regulatory requirements, which covered such mis-selling, subject to the agreed limits of quantum and time. The sellers were exposed to a potential liability under those warranties for the two years after the Completion Date, during which Capita could learn of the Company's sales practices. One may readily infer that they had an interest in minimising their further exposure to liability after that time had elapsed. Business common sense is useful to ascertain the purpose of a provision and how it might operate in practice. But in the tug o' war of commercial negotiation, business common sense can rarely assist the court in ascertaining on which side of the line the centre line marking on the tug o' war rope lay, when the negotiations ended. I therefore turn to examining the clause in more detail before returning to the commercial context.

29.    In order to illustrate the competing contentions of the parties Popplewell J helpfully divided clause 7.11 into its constituent parts. I set that presentation out below with the addition in (B) of the sub-headings (i) and (ii) to assist my exegesis.

30.     Clause 7.11 thus divided provides:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against
>
> (1)     all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and
>
> (2)     all fines, compensation or remedial action or payments imposed on or required to be made by the Company
>
>> (A)     following and arising out of claims or complaints registered with the FSA, the Financial Services Ombudsman or any other authority against the Company, the Sellers or any Relevant Person
>>
>> (B)     (i) and which relate to the period prior to the Completion Date (ii) pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

31.     Counsel for Capita submitted that the clause should be read by treating (2) and (A) as a composite phrase so that the Sellers were bound to indemnify against both (1) and (2+A), each of which was subject to the two conditions in (B). This meant that it was only the fines etc in (2) which had to follow on or arise out of claims or complaints made to the FSA or other Authority against the Company etc as provided in (A). Thus, it was submitted, the indemnity covered all liabilities in (1) provided only that (i) they related to the period prior to the completion date and (ii) pertained to any mis-selling or suspected mis-selling of insurance products etc.

32.     Counsel for Mr Wood submitted that the clause was properly construed by treating both (1) and (2) as being subject to three conditions, namely (A), B(i) and (B)(ii). He submitted that (A) should be read as if there was a comma after "claims", so that it provided as a condition for the triggering of the indemnity under (1) or (2) that there must be either claims by customers, or complaints made to the regulatory authorities, in each case against the Company, the Sellers or any Relevant Person. Thus, on his approach, either a claim by a customer against the Company, the Sellers or an employee or former employee of the Company, or a complaint to a regulatory authority against the Company, the Sellers or an employee or former employee of the Company would trigger the indemnity if the two conditions in (B) were met.

33.    Both counsel accepted that, because of the breadth of the terms used in (1), the types of loss and damage in (1) covered all of the types of loss and damage in (2). Thus it was suggested that (2) must have been included only for the avoidance of doubt. This means that on Mr Wood's approach (2) was otiose while on Capita's approach the composite (2+A) was otiose. I find the latter proposition remarkable and unlikely for two reasons.

34.    First, and to my mind most significantly, (A) would serve no purpose by restricting the source of loss and damage if (A) governed only (2) and therefore (1) was unrestricted. (A) would not restrict the scope of the indemnity in any way. On Mr Wood's construction the words in (A) have a purpose as they limit the scope of both (1) and the otiose (2).

35.    Secondly, if one airbrushes out (2+A) as otiose, the clause does not specify against whom the actions, proceedings and claims in (1) are directed. The clause would read:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against
>
> all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and which relate to the period prior to the Completion Date pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

The identity of the persons against whom the relevant claims etc could be made so as to trigger the sellers' indemnity would, on Capita's approach, be left to implication. There must be a limit on who such persons could be as it would be absurd for Capita to have a claim against the Sellers for indemnity resulting from any mis-selling on its part before the Completion Date. But, even assuming that the target was mis-selling by or on behalf of the Company, it is far from obvious that the delimited class of persons would be "the Company, the Sellers or any Relevant Person".

36.    Capita made three further points against Mr Wood's interpretation. First, there is an element of tautology as the "claims" in (1) are said in (A) to follow and arise out of "claims". But as Christopher Clarke LJ observed, tautology in commercial contracts is not unknown and the verbal exuberance (or torrential drafting) of (1) makes tautology difficult to avoid.

37.     Secondly, Capita pointed out that there is a comma after "incurred" at the end of (1) and no comma after "Company" at the end of (2). This could support the separation of (1) from (2) and the conjunction of (2) and (A). Similarly, Mr Wood's interpretation would involve inserting in (A) a comma after "claims" and also after "any other Authority" so as to limit both the claims and the regulatory complaints to those against "the Company, the Sellers or any Relevant Person". Again in agreement with Christopher Clarke LJ I do not think that the use of commas in this clause is a strong pointer in favour of Capita's interpretation, both because there are no set rules for the use of commas and in any event the draftsman's use of commas in this clause is erratic.

38.     Thirdly, the draftsman used an adjectival participle at the start of (A) ("following and arising out of") and "changed tone" by using a relative pronoun ("and which") at the start of (B). But the use of the adjectival participle does not tie (A) exclusively into (2) because in (B) the adjectival participle ("pertaining to") unquestionably applies to both (1) and (2). These detailed points of style and syntax are of little assistance in construing an admittedly opaque clause.

39.     I return to the commercial context and the practical consequences of the rival interpretations. On Mr Wood's interpretation it requires a customer or customers to make a claim, or complaint to the regulatory authorities, against the Company, the sellers or a Relevant Person in order to trigger the indemnity. Thus if a whistle-blower alerted the regulatory authorities of suspected or actual mis-selling, or if (as in fact occurred) management, complying with their regulatory obligations, reported such mis-selling to the FSA, which ordered the payment of compensation, the indemnity would not be triggered. Yet in each case, the mis-selling before the date of completion causes the Company loss.

40.     The general purpose of clause 7.11, to indemnify Capita and its group against losses occasioned by mis-selling is clear. Had clause 7.11 stood on its own, the requirement of a claim or complaint by a customer and the exclusion of loss caused by regulatory action which was otherwise prompted might have appeared anomalous. But clause 7.11 is in addition to the wide-ranging warranties in Part 14 of Schedule 4 (paras 18 and 19 above) which probably covered the circumstances which eventuated. Capita had two years after completing the purchase to examine the sales practices of the Company's employees and so uncover any regulatory breaches in order to make a claim under the Schedule 4 indemnities. Prima facie that was not an unreasonable time scale. Indeed, Capita was able to send its findings to the FSA within 20 months of the Completion Date. It is not contrary to business common sense for the parties to agree wide-ranging warranties, which are subject to a time limit, and in addition to agree a further indemnity, which is not subject to any such limit but is triggered only in limited circumstances.

41.    From Capita's standpoint the SPA may have become a poor bargain, as it appears that it did not notify the sellers of a warranty claim within two years of Completion. But it is not the function of the court to improve their bargain.

42.    In this case, the circumstances which trigger that indemnity are to be found principally in a careful examination of the language which the parties have used.

*Conclusion*

43.    I would therefore dismiss the appeal.

A001221