

The LawTech
Delivery Panel



# Legal statement on cryptoassets and smart contracts

UK Jurisdiction Taskforce

November 2019

A001952

A001953



The LawTech
Delivery Panel

# Legal statement on cryptoassets and smart contracts

UK Jurisdiction Taskforce

November 2019

A001954

The members of the UK Jurisdiction Taskforce (UKJT) are:

Sir Geoffrey Vos (Chancellor of the High Court and Chair of the UKJT)

Lawrence Akka QC (Twenty Essex)

Sir Nicholas Green (Chair of the Law Commission of England and Wales, as an observer)

Richard Hay (Linklaters LLP)

Peter Hunn (Accord Project)

Mary Kyle (City of London Corporation)

Christopher Woolard (Financial Conduct Authority)

Sir Antony Zacaroli (Justice of the High Court)

The drafting team were:

Lawrence Akka QC, Twenty Essex

David Quest QC, 3 Verulam Buildings

Matthew Lavy, 4 Pump Court

Sam Goodman, Twenty Essex

A link to this Legal Statement can be found at: https://technation.io/about-us/lawtech-panel

Please direct any questions or comments on the Legal Statement to: UKJT@justice.gov.uk

# Contents

**Foreword** by Sir Geoffrey Vos, Chancellor of the High Court    **3**

**Introduction**    **4**

The public consultation    5

Scope    5

Structure of this Statement    6

**Summary**    **7**

Property    7

Smart Contracts    8

**Legal Statement**    **9**

Cryptoassets as property    9

What is a cryptoasset?    9

What is property, and why does it matter?    11

Ownership and transfer    13

The characteristics of property    15

Information    16

Possession and action    18

Conclusions on the principal questions    21

The ancillary questions    22

Security    25

Insolvency    26

Transferability and negotiability    26

Goods    29

Register    30

Smart Contracts    31

Ancillary questions    34

**Notes**                                                                                    **39**

**Appendices**                                                                               **47**

Appendix 1 - UKJT Consultation paper *The status of cryptoassets, DLT and smart contracts under English private law*, May 2019                              47

Appendix 2 - List of respondents to the consultation                                         53

Appendix 3 - List of specialist consultees                                                   56

# Foreword
## by Sir Geoffrey Vos, Chancellor of the High Court

I am delighted to welcome the publication by the UK Jurisdiction Taskforce ("UKJT") of a Legal Statement on the Status of Cryptoassets and Smart Contracts (the "Legal Statement").

In legal terms, cryptoassets and smart contracts undoubtedly represent the future.

I hope that the Legal Statement will go a long way towards providing much needed market confidence, legal certainty and predictability in areas that are of great importance to the technological and legal communities and to the global financial services industry.

There is no doubt that some of the matters covered by the Legal Statement will, in the future, be the subject of judicial decision. But my hope is that, in the meantime, the Legal Statement will provide a foundation for the responsible future utilisation of cryptoassets and smart contracts.

The Legal Statement has been prepared by Lawrence Akka QC, David Quest QC, Matthew Lavy and Sam Goodman, all of whom are experts in this field. It is not my role as a judge, nor that of the UKJT or its parent, the UK's LawTech Delivery Panel, to endorse the contents of the Legal Statement. Instead, the UKJT has promoted several rounds of public and private consultation so as to ensure that the drafting team were considering the right legal questions, and had the benefit of the most respected expert, technical, legal, judicial and academic opinion.

The objective of the Legal Statement is to provide the best possible answers to the critical legal questions under English law. I am sure that it will demonstrate the ability of the common law in general, and English law in particular, to respond consistently and flexibly to new commercial mechanisms.

I want to thank all those who have given freely of their time to make the Legal Statement possible.

A001958

# Introduction

1.  In May 2019, the UK Jurisdiction Taskforce issued its Consultation Paper (at Appendix 1) on the status of cryptoassets, distributed ledger technology and smart contracts in English[1] private law. The paper noted that the well-developed common law system of England and Wales was able to adapt to deal with such fast-changing technologies and was well positioned to provide a sound legal foundation for their development.

2.  In his foreword, the Chancellor of the High Court, Sir Geoffrey Vos, commented that perceived legal uncertainty was the reason for some lack of confidence amongst market participants and investors. Accordingly, we have been asked by the Taskforce to consider a number of legal questions concerning those areas of perceived uncertainty, and to provide our conclusions in this Legal Statement.

3.  The great advantage of the English common law system is its inherent flexibility. Rather than depending on the often cumbersome, time-consuming and inflexible process of legislative intervention, judges are able to apply and adapt by analogy existing principles to new situations as they arise. In commerce, the law is there to support and fulfil reasonable expectations.[2] It is "endlessly creative ... a living law, built on what has gone before, but open to constant renewal".[3] Time and again over the years the common law has accommodated technological and business innovations, including many which, although now commonplace, were at the time no less novel and disruptive than those with which we are now concerned. In no circumstances therefore are there simply no legal rules which apply.

4.  This Legal Statement is not a treatise or an academic paper; we have not set out to give a detailed explanation of the law of property or contract. Its purpose is to answer the questions we were asked and to state briefly our reasons in a form accessible to non-lawyers as well as lawyers. We focus on those aspects of cryptoassets and smart contracts that are potentially novel and distinctive and discuss the extent to which we consider that general legal principles apply.

5.  We are conscious that there is already a very large, and expanding, body of writing on those topics, by lawyers, academics and industry participants. It has been supplemented by the many detailed responses to the present consultation. It would not be practical to summarise or digest that material in this document, and we have not attempted to do so, although we hope that we have taken appropriate account of the views expressed.

6.  Finally, it is not our intention to say how the law should develop in future, though we hope that any proposals for law reform can build on this foundation.

A001959

## The public consultation

7.  The aim of the Consultation Paper was to ensure that so far as possible the questions which we have been asked to address are the right ones: those with which key stakeholders are most concerned. The Taskforce received over 140 written responses—a list of those responding is in Appendix 2—from a broad range of interests: academics and technologists, businesses and individuals, lawyers and non-lawyers. Many others shared their views at the well-attended public consultation meeting held in London on 4 June 2019.

8.  A very great majority of respondents thought that the questions posed were correct, though some differences of nuance and wording were suggested. A number of other questions were proposed. A few people provided their views on the answers to the questions. We are grateful to all of them alike, and we have found it very valuable to consider the input from a wide range of different sources. We are also grateful to the group of particularly well-qualified individuals who have taken the time to review and provide feedback on the draft of this Statement, who are listed in Appendix 2.

9.  Although the questions we have addressed are largely unchanged from those posed by the Consultation Paper, in providing our answers we have taken account of a number of issues which have been raised to the extent that we have thought it appropriate to do so, in the light of the scope and aims of this project.

## Scope

10.  As stated in the Consultation Paper, there are a number of areas of law which have intentionally been deemed out-of-scope. In particular we do not address the regulation of dealings in cryptoassets, because it seems more appropriate for regulation to follow the logically prior issues of common law characterisation. Similarly, the remedies which the law will provide in any particular circumstances follow on from an analysis of the relevant legal rights, and can be developed as necessary over time in appropriate cases.[4]

11.  The Taskforce considers that matters of taxation, criminal law, partnership law, data protection, intellectual property, consumer protection, settlement finality, regulatory capital, anti-money laundering and counter-terrorist financing are best dealt with by other bodies or organisations. We have not trespassed into issues relating to monetary policy or the nature of cryptoassets as money.

12.  Finally, we should note that the law can be highly fact-sensitive. We are unable in a document such as this to deal with areas where too many potential factual scenarios would need to be considered in order for us to provide any helpful answers. This Statement is not intended to be legal advice, for which readers should consult a lawyer, and nothing in it should be relied upon as being relevant to any particular circumstances.

## Structure of this Statement

13. The questions we have answered and our conclusions are set out below, following a short summary. We have provided a number of references in the endnotes for those who would like more detail.

14. We have provided some examples where we have thought it might be helpful, and Alice and Bob,[5] who are well known to cryptographers, make an appearance.

**Lawrence Akka QC,** Twenty Essex[6]

**David Quest QC,** 3 Verulam Buildings[7]

**Matthew Lavy,** 4 Pump Court[8]

**Sam Goodman,** Twenty Essex[9]

# Summary

## Property

15. Whether English law would treat a particular cryptoasset as property ultimately depends on the nature of the asset, the rules of the system in which it exists, and the purpose for which the question is asked. In general, however:

    (a) cryptoassets have all of the indicia of property;

    (b) the novel or distinctive features possessed by some cryptoassets—intangibility, cryptographic authentication, use of a distributed transaction ledger, decentralisation, rule by consensus—do not disqualify them from being property;

    (c) nor are cryptoassets disqualified from being property as pure information, or because they might not be classifiable either as things in possession or as things in action;

    (d) cryptoassets are therefore to be treated in principle as property.

16. This is likely to have important consequences for the application of a number of legal rules, including those relating to succession on death, the vesting of property in personal bankruptcy, and the rights of liquidators in corporate insolvency, as well as in cases of fraud, theft or breach of trust.

17. Cryptoassets cannot be physically possessed: they are purely "virtual". Accordingly, as a matter of law they cannot be the object of a bailment, and only some types of security can be granted over them, though we see no obstacle to the granting of other types of security. They are not documents of title, documentary intangibles or negotiable instruments (though some form of negotiability may arise in future as a result of market custom), nor are they instruments under the Bills of Exchange Act.

## Smart Contracts

18. There is a contract in English law when two or more parties have reached an agreement, intend to create a legal relationship by doing so, and have each given something of benefit. A smart contract is capable of satisfying those requirements just as well as a more traditional or natural language contract, and a smart contract is therefore capable of having contractual force. Whether the requirements are in fact met in any given case will depend on the parties' words and conduct, just as it does with any other contract.

19. The parties' contractual obligations may be defined by computer code (in which case there may be little room for "interpretation" in the traditional sense) or the code may merely implement an agreement whose meaning is to be found elsewhere (in which case the code is unimportant from the perspective of defining the agreement). Either way, however, in principle a smart contract can be identified, interpreted and enforced using ordinary and well-established legal principles.

20. English law does not struggle with the concept of anonymous or pseudonymous parties contracting; nor with the notion that a contract can be formed between individuals by virtue of them each having agreed to subscribe to a set of rules (as happens, for example, in a club). English law is fully equipped to deal not only with bilateral smart contracts but also those structured around Decentralised Autonomous Organisations (DAOs).

21. There are some legal rules which require certain documents to be "signed" or "in writing". In principle, a statutory "signature" requirement can be met by using a private key which is intended to authenticate a document, and a statutory "in writing" requirement can be met in the case of a smart contract whose code element is recorded in source code (although the analysis may be less straightforward where a smart contract is represented only in object code on a running system).

22. As we explain in detail below, English law is well able to deal with technological developments and it has an impressive track record of doing so.

# Legal Statement

## Cryptoassets as property

23.  The first group of questions we have been asked concerns the legal status of cryptoassets and, in particular, whether the law treats them as property. We approach those questions following a brief discussion of the general nature of cryptoassets and of property.

## What is a cryptoasset?

24.  In October 2008, the pseudonymous Satoshi Nakamoto published his now-famous paper, *Bitcoin: A Peer-to-Peer Electronic Cash System*.[10] Observing that commerce on the Internet relied almost exclusively on financial institutions serving as trusted third parties, Nakamoto proposed a new electronic payment system "based on cryptographic proof instead of trust", with digital tokens—*bitcoins*—taking the place of traditional currency. The first bitcoin came into existence in January 2009, not coincidentally at the height of the global banking crisis.[11]

25.  Many other systems have been developed since then to implement commercial applications using cryptographic techniques. The market continues to expand as new applications and new techniques are explored.

26.  Most applications involve dealings in assets of some kind, which therefore have to be represented digitally within the system. We use the term *cryptoasset* to refer generally to such a representation. However, that should not be understood as a term of art. Because of the great variety of systems in use and kinds of assets represented (ranging from purely notional payment tokens such as bitcoins to real-world tangible objects) it is difficult to formulate a precise definition of a cryptoasset[12] and, given the rapid development of the technology, that would not be a useful exercise. Indeed, there is no consistency even in the nomenclature, with *virtual* and *digital* also widely used to describe the kinds of things with which we are concerned.

27.  Instead, we have set out to identify and describe, in general terms, the features of cryptoassets that may be regarded as genuinely novel or distinctive, as compared with conventional assets, so that we can then consider whether and how those features might be relevant to issues of legal and proprietary status.

28.  A cryptoasset is ultimately defined by reference to the rules of the system in which
     it exists. Functionally, it is typically represented by a pair of data parameters, one
     public (in that it is disclosed to all participants in the system or to the world at large)
     and one private. The public parameter contains or references encoded information
     about the asset, such as its ownership, value and transaction history. The private
     parameter—the *private key*—permits transfers or other dealings in the cryptoasset to
     be cryptographically authenticated by digital signature. Knowledge of the private key
     confers practical control over the asset; it should therefore be kept secret by the holder.
     More complex cryptoassets may operate with multiple private keys (*multisig*), with
     control of the asset shared or divided between the holders.

29.  Dealings in a cryptoasset are broadcast to a network of participants and, once
     confirmed as valid, added to a digital ledger. The main function of the ledger is to
     keep a reliable history of transactions and so prevent *double-spending*, i.e. inconsistent
     transfers of the same cryptoasset to different recipients. The ledger may be *distributed*
     and *decentralised*, that is, shared over the network with no one person having a
     responsibility for maintaining it, or any right to do so. A common type of distributed
     ledger uses a *blockchain*, which comprises blocks of transactions linked together
     sequentially, but other models are also in use.

30.  An important feature of some systems is that the rules governing dealings are
     established by the informal consensus of participants, rather than by contract or
     in some other legally binding way. Consensus rules (employing methods such as
     *proof-of-work* or *proof-of-stake*) may also determine which version of the distributed
     ledger is definitive. The rules are self-enforcing in practice, even if not enforceable in
     law, because only transactions made in compliance with them and duly entered in the
     ledger will be accepted by participants as valid.

31.  Although not all systems possess all of them, we can therefore identify the principal
     novel and characteristic features of cryptoassets as being:

     (a)  **intangibility**;

     (b)  **cryptographic authentication**;

     (c)  use of a **distributed transaction ledger**;

     (d)  **decentralisation**; and

     (e)  rule by **consensus**.

32.  It is those features that have given rise to much of the debate about legal and
     proprietary status and on which we therefore focus our analysis.

33. Some cryptoassets are intended to represent or are linked to conventional assets external to the system, for example money or debt obligations, tangible goods or land, a share or unit in a company or fund, or a contractual right of some kind; those assets are sometimes referred to as *tethered*, *exogenous* or *off-chain*. Such an external asset is certainly property but what, if any, rights in it are conferred on the holder of the corresponding cryptoasset will depend on the contractual structure or legal rules of the system. For the present, we are concerned only with whether the cryptoasset itself (the *native* or *on-chain* asset) is property, as distinct from any other asset it might represent, although we return to the relationship between on-chain and off-chain assets below when we discuss whether cryptoassets can operate as instruments of title.

34. Many dealings in cryptoassets involve intermediaries such as brokers or custodians; that is the case even in systems, such as Bitcoin, that are designed to avoid the need for intermediation. What personal and proprietary rights the principal may have against an intermediary will depend on established rules of contract, tort and agency. That is outside the scope of the present discussion.

## What is property, and why does it matter?

35. Strictly, the term *property* does not describe a thing itself but a legal relationship with a thing: it is a way of describing a power recognised in law as permissibly exercised over the thing.[13] The fundamental proprietary relationship is *ownership*: the owner of a thing is, broadly, entitled to control and enjoy it to the exclusion of anyone else. However, ownership is just one kind of property right: property is a comprehensive term and can be used to describe many different kinds of relationship between a person and a thing.[14]

36. Why does it matter if a cryptoasset is capable of being property? It matters because in principle proprietary rights are recognised against the whole world, whereas other—personal—rights are recognised only against someone who has assumed a relevant legal duty. Proprietary rights are of particular importance in an insolvency, where they generally have priority over claims by creditors, and when someone seeks to recover something that has been lost, stolen or unlawfully taken. They are also relevant to the questions of whether there can be a security interest in a cryptoasset and whether a cryptoasset can be held on trust.

37. The term *property* is also part of the lexicon of the law: it is widely used in statutes and cases. It is important to understand whether the many statutory and common law rules applicable to property apply also to cryptoassets, and, if so, how. Of particular significance are the rules concerning succession on death, the vesting of property in personal bankruptcy, the rights of liquidators in corporate insolvency, and tracing in cases of fraud, theft or breach of trust. It would, to say the least, be highly unsatisfactory if rules of that kind had no application to cryptoassets.

38.  In some cases, what matters is not or not only whether a thing is property but whether it is a specific type of property. For example, certain proprietary remedies, such as conversion or lien, are available only in respect of *things in possession* (tangible property that can be the subject of physical possession and so physical control).[15] More generally, whether a thing is property, or a type of property, depends on the context and the reason why the question is being asked.[16] A thing may be property for one legal purpose but not for another; and some statutes expressly broaden or narrow the scope of what they treat as property.

39.  There is no general or comprehensive definition of property in statute or case law. Judges tend to approach the issue on a case-by-case basis, considering whether particular things are property for particular purposes. However, an important and authoritative description of the necessary characteristics of property can be found in *National Provincial Bank v Ainsworth*,[17] where Lord Wilberforce said that, before a right or an interest could be admitted into the category of property, it must be *definable, identifiable by third parties*, capable in its nature of assumption by third parties, and have some degree of *permanence or stability. Certainty, exclusivity, control* and *assignability* have also been identified in case law as characteristic of property rights.[18]

40.  Although possession of those characteristics may not always be sufficient, and they are not themselves capable of precise definition, a number of cases have treated them as important indicia of property.[19] In considering cryptoassets, our approach is therefore first to consider whether they possess those characteristics. If so, then, in our view, the law will treat them as property unless there is some special legal reason to disqualify them. We are confident that that is the right approach in circumstances where there is ample evidence that there is a large and active market in which cryptoassets are acquired and traded as things of value.

41.  Some take the view that the design of cryptoassets means that there is no need for traditional legal rules or processes. Law is irrelevant, it is sometimes said, because dealings are effected by non-legally-binding consensus between users, because cryptographic authentication and validation using strong encryption methods makes dealings irreversible, and because decentralisation and disintermediation means that there is no responsible party who can be compelled to act at the direction of a court. We do not agree. The design of cryptoassets may create some practical obstacles to legal intervention but that does not mean that cryptoassets are outside the law.

# Ownership and transfer

42. It is necessary at this point to say something about how, if cryptoassets are to be considered property, the concept of ownership might apply to them: a cryptoasset cannot meaningfully be treated as property unless it is possible in principle to determine who owns it, and how ownership is transferred.

43. The starting point, in our view, is that a person who has acquired knowledge and control of a private key by some lawful means would generally be treated as the owner of the associated cryptoasset, in much the same way that a person lawfully in possession of a tangible asset is presumed to be the owner. However, ownership also depends on the circumstances and on the rules of the relevant system. For example:

    (a) a person may hold the key on behalf of another, e.g. an employer or client, or as a custodian or intermediary, in which case ownership would be determined by established rules of agency or trust;

    (b) a cryptoasset may have multiple keys, in which case ownership may be shared or separated between the holders, perhaps by reference to different functions of the asset;

    (c) a person who has obtained a private key unlawfully, e.g. through hacking, could not be treated as the lawful owner;

    (d) how a cryptoasset is originally created depends on the rules of the system; for example, bitcoins are created as part of the *mining* process by which the ledger is constructed and validated;

    (e) there may be practical difficulties in identifying the owner in systems, such as Bitcoin, where transactions take place by reference only to anonymous address identifiers rather than named legal persons;

    (f) in non-anonymous systems where cryptoasset owners are identified in the transaction ledger, the status of the record (e.g. whether it treated as definitive or merely evidential) is likely to depend on what the participants have agreed as to its effect.

44. How is ownership transferred? That question requires consideration of what actually happens on a transfer. We have said above that a cryptoasset is functionally represented by a pair of data parameters, with the public parameter containing encoded information about the asset. In order to make a transfer within the cryptoasset system, the transferor typically modifies the public parameter, or generates a new one, so as to create a record of the transfer (including details of the transferee). The transferor then authenticates the record by digitally signing it with the private key. At that point, the cryptoasset becomes linked to the private key of the transferee and is

therefore under the transferee's exclusive control. Once the transaction is recorded in the ledger, any attempts by the transferor to transfer the cryptoasset again should not be accepted by the consensus.

45.  A transaction of that kind is sometimes described as *on-chain* because it is reflected in the ledger or blockchain. Although one can describe and conceptualise the process as a transfer (and that is the word we have used in this Statement), it is not really analogous to the delivery of a tangible object or the assignment of a legal right, where the same thing passes, unchanged, from one person to another. Instead, the transferor typically brings into existence a new cryptoasset, with a new pair of data parameters: a new or modified public parameter and a new private key. The data representing the "old" cryptoasset persists in the network, but it ceases to have any value or function because the cryptoasset is treated by the consensus as spent or cancelled so that any further dealings in it would be rejected.[20] The "new" cryptoasset is represented by new data and controlled by a new key. There is a closer analogy with a bank payment where no property in the payer's funds passes to the payee; instead new property is created by the credit to the payee's account.

46.  A transfer is completed, and a new cryptoasset is created, once the transferor authenticates and broadcasts it. It may take some time for a transaction to be entered onto the ledger and accepted by the consensus but in principle that should not prevent or delay the transferee's assumption of ownership of the cryptoasset. As we explain below, the ledger should not be regarded as a definitive record of title. However, until the transaction is on the ledger, there is a risk that the transferor will make a second transfer (i.e. double-spending the cryptoasset) and that that will be accepted on the ledger in priority to the first. The (first) transferee's cryptoasset would then not be recognised as validly transferred and so would in practice be worthless.

47.  Analysing a transfer in this way has a significant legal consequence. It is a general principle of the law[21] that someone who does not own a thing cannot validly confer ownership in it on someone else; so if Chuck steals a painting from Alice and sells it to Bob then Alice is still the owner and can require it to be returned to her, even if Bob acted in good faith and without knowledge of the theft. However, we do not think that that principle applies in the case of cryptoassets. That is because, adapting the previous example, the cryptoasset received by Bob is not the same thing as the cryptoasset held by Alice but is a newly created thing owned by Bob. And Alice's problem is not so much that she has been deprived of ownership or control of her cryptoasset but rather that, as result of Chuck's misconduct, the cryptoasset is now regarded by the consensus as spent or cancelled.[22]

48.  It is also possible, in principle, to make an *off-chain* transfer, where parties enter into an agreement to transfer a cryptoasset but where the transfer is not recorded in the transaction ledger and no new data parameters are created. We see no reason why such an agreement, if drafted appropriately, would not be recognised and enforced,

and it may sometimes be a convenient way of creating security over a portfolio of cryptoassets. However, an off-chain transfer creates practical difficulties: the transferor knows the private key (since no new key is generated) and so retains control of the cryptoasset and the ability to transfer it again, creating the risk for the original transferee that we have discussed above.

## The characteristics of property

49. We return to the characteristics of property referred to in the cases. We see no difficulty with *definability* or *certainty*. The public parameter of a cryptoasset, as explained in paragraph 28 above, interpreted in accordance with the rules of the relevant system, is sufficient in principle both to define the asset and to identify it to any person with access to the system network.[23]

50. The requirement for *control* and *exclusivity* is satisfied by the cryptographic authentication process, which permits the holder of the private key, and only that holder, to deal in the cryptoasset, and therefore to control it to the exclusion of others (subject to the powers of other keyholders where there are multiple private keys).

51. We have discussed above some of the issues that arise in connection with ownership and transfers of cryptoassets. The precise legal consequences of different kinds of transfers and other dealings in cryptoassets will have to be worked out on a case-by-case basis. We recognise that the analysis of off-chain transfers may be more complicated because they may give rise to a situation where more than one person knows the private key and so can exercise practical control over a cryptoasset. However, we see no reason to doubt that cryptoassets are in their nature capable of *assumption by third parties* and are, in that sense, *assignable,* even if some of the methods of assumption and assignment may be novel and even if identifying the legal owner in particular cases may not always be straightforward. They are clearly designed with the aim of being transferable between system participants.

52. As for *permanence*, cryptoassets appear to be as permanent as other conventional financial assets, which may exist only until they are, for example, cancelled, redeemed, repaid or exercised.

53. The consensus mechanism raises two issues relating to *stability*.

54. First, it may take some time for a consensus to form as to the state of the ledger and the validity and sequence of the transactions. In Bitcoin, for example, the top six blocks in the blockchain (containing, on average, an hour of transactions) are considered at risk of revision, in that any provisional consensus may change. Even older ledger records are theoretically vulnerable, although the probability of change becomes vanishingly small over time.

55.  Second, a change in the consensus rules may be proposed but not unanimously
     adopted, leading to a *fork* in the system where different groups of participants follow
     different rules, often recognising different transactions and keeping different ledgers.
     In effect, the cryptosystem divides into two systems, each with their own, separate
     cryptoassets and respective ledgers.

56.  Establishing absolute finality and immutability in relation to transactions may be
     legally or commercially important in some areas. However, even without resolving
     those issues, cryptoassets are in our view sufficiently permanent or stable to be treated
     as property, at least for a commercial cryptoasset system with a significant number of
     participants, an established history of transactions, and a generally stable set of rules.
     Even conventional assets are at risk of deterioration, corruption or loss.[24]

57.  We conclude that cryptoassets possess all the characteristics of property set out in the
     authorities.

58.  As far as we are aware, the proprietary status of cryptoassets specifically has not
     yet been the subject of any authoritative decision in any common law jurisdiction.
     We find some support, however, for our conclusion in a recent case in Singapore,
     *B2C2 v Quoine*.[25] The judge accepted (there being no argument to the contrary) that
     bitcoins could be the subject of a trust, and hence were property. He observed that
     "cryptocurrencies have the fundamental characteristic of intangible property as being
     an identifiable thing of value" and that they met all of the requirements in *National
     Provincial Bank*.

## Information

59.  We next consider whether cryptoassets possess any features that might disqualify them
     as property. One potential obstacle is that the courts have historically been reluctant
     to treat information in itself (as opposed to the medium in which it is recorded) as
     property.[26]

60.  A cryptoasset is represented by public and private data. As we have said, however,
     that data should be seen not as constituting the cryptoasset but rather as being,
     respectively, the record of it and the key to dealing in it. Thus, the commercial value of
     a cryptoasset is not in the recorded data itself but in the fact that the person possessing
     that data is able to effect and authenticate dealings in the cryptoasset in accordance
     with the rules of the system. Putting it another way, it is not what the data tells you but
     what it allows you to do. For example, a private key in the Bitcoin system is a 256-bit
     number generated randomly. The number is of no interest in itself; what is significant
     is the mathematical relationship between the number and the corresponding Bitcoin
     public address, which allows transactions from the address to be cryptographically
     signed and therefore authenticated.

61. Cryptoassets can in that respect be contrasted with other digital assets, such as databases or digital photographs or computer programmes, the value of which is in the very information that they contain or comprise. Cryptoassets can also be contrasted with trade secrets, business ideas, private communications or personal information, where, again, it is the information itself, and what it conveys, that is of interest and value. A cryptoasset does not convey anything, it is instead merely a token to be used within the system.

62. One of the principal difficulties in recognising information in general as property is that it is not in its nature exclusive. It can be easily duplicated, with the duplicate indistinguishable from the original and, usually, of equivalent commercial value. Once disseminated, information can be used simultaneously by different people. Unlike property, it cannot be alienated: if Alice gives a coin to Bob then she no longer has it; but if she gives information to him then they both know it. It has been said that information cannot therefore be transferred but only transmitted.[27] All of that makes it difficult to exercise practical control over information or to determine, in a meaningful way, who is the owner at any time.

63. Cryptoassets do not raise those difficulties. The data associated with a cryptoasset can be duplicated, but the transaction ledger and consensus mechanisms prevent the holder of the private key double-spending and so ensure that the asset cannot be under the simultaneous control of different persons. Even if the private key is copied and disseminated, for example where there is an off-chain transfer, the problem of control by multiple persons is likely to be temporary: exclusive control will be re-established as soon as the asset is transferred on-chain, whereupon it will come under the control of a different private key.[28] For the reasons given above, cryptoassets have the characteristics of certainty, exclusivity, control, assignability and permanence that information generally lacks. Moreover, the policy considerations around freedom of speech and expression that create further difficulties with recognising ownership of information have no application to cryptoassets.

64. We do not therefore consider that cryptoassets are disqualified from being property on the ground that they constitute information.

65. Our reasoning above applies to the cryptoasset viewed as a conglomeration of public data, private key and system rules. It does not apply to the private key viewed in isolation. That is no more than an item of pure information and, like a password or a telephone number, it cannot in itself be treated as property, although the legal rules concerning confidentiality might provide remedies to prevent wrongful disclosure or misuse.

# Possession and action

66.   The law has traditionally recognised two distinct types of personal property:[29] *things in possession* and *things in action*.[30]

67.   A cryptoasset is not a thing in possession because it not tangible and so cannot be possessed.[31] It is not enough that the private key gives practical control. Possession "is concerned with the physical control of tangible objects; practical control is a broader concept, capable of extending to intangible assets and to things which the law would not regard as property at all."[32]

68.   Whether a cryptoasset is a thing in action is more debatable. The term is generally used to mean a right of property that can be enforced by court litigation, or action, such as a debt or contractual right.[33] A cryptoasset would not normally be a thing in action on that definition. We have discussed above that a cryptoasset may be linked to legal rights external to the system, and that there may be rights against intermediaries, but in many systems the cryptoasset does not itself embody any right capable of being enforced by action.[34] In a fully decentralised system with consensus rules, such as Bitcoin, participants do not undertake any legal obligations to each other.

69.   However, the term *thing in action* has also been used more broadly as a kind of "catch-all" to refer to any property that is not a thing in possession.[35] Indeed, a precise and comprehensive definition of the term is elusive:

> *"The expression is found in the history of English law with so many meanings attached to it, and has been and still is employed to denote so many and such various classes of things, that it is impossible to give an accurate and complete definition of what it means and may include at the present day. The various kinds of property included under the term have little in common beyond the characteristic fact of their not being subjects of actual physical possession."*[36]

70.   The question matters, potentially, because it has been said that the law recognises as property only things in action and things in possession but not anything else. In the 19th century case of *Colonial Bank v Whinney*,[37] Fry LJ said: "All personal things are either in possession or in action. The law knows no tertium quid [third thing] between the two." It might be argued, therefore, that if a cryptoasset is neither a thing in possession nor a thing in action then it cannot be property at all. In our view, however, such an argument requires reading far more into Fry LJ's statement than he could have intended. One must also be cautious in seeking to apply a 19th century decision to a kind of asset that could not then have been imagined.

71.   The *Colonial Bank* case concerned a dispute about shares deposited as security for a loan. The borrower was declared bankrupt and there was a contest for the shares between the plaintiff bank and the trustee in bankruptcy. The case was not about the

scope of property generally: there was no dispute that the shares were property.[38] The relevant question was rather whether they were things in action within the meaning of the Bankruptcy Act 1883, an issue of statutory interpretation. If so, then they were excluded from the bankrupt estate by section 44 of that Act.

72. Lindley LJ and Cotton LJ held that the shares were not things in action. They relied principally on previous case law[39] where the court had come to a similar conclusion in relation to the predecessor statute, the Bankruptcy Act 1869. They also drew some support from sections 50(3) and 50(5) of the 1883 Act, which appeared to make a distinction between shares and things in action.

73. Fry LJ reached the opposite conclusion, reasoning principally from what he considered to be the essential nature of a share. A share constituted "the right to receive certain benefits from a corporation, and to do certain acts as a member of that corporation"[40] and was therefore, in his view, closely akin to a debt. He supported his conclusion by a comparison of shares to other, established, things in action, such as partnership interests and interests in funds.

74. Fry LJ's statement that "personal things" are either in possession or in action, and that there is no third category, may carry the logical implication that an intangible thing is not property if it is not a thing in action. It is not clear, however, whether Fry LJ intended that corollary and it should not in any case be regarded as part of the reasoning leading to his decision (and so binding in other cases). The question before him was whether the shares were things in action for the purpose of the Bankruptcy Act, not whether they were property, still less the scope of property generally.

75. Moreover, in making the statement Fry LJ attributed a very broad meaning to things in action. He approved a passage from *Personal Property* by Joshua Williams, which described things in action as a kind of residual category of property: "In modern times [sc. by the 19th century] ... several species of property have sprung up which were unknown to the common law ... For want of a better classification, these subjects of personal property are now usually spoken of as ... [things] in *action*. They are, in fact, personal property of an incorporeal nature...".

76. On appeal, the House of Lords also framed the question as one about statutory interpretation. They reversed the Court of Appeal's decision, approving the judgment and reasoning of Fry LJ. They did not explicitly address the issue of exhaustive classification between things in action and things in possession and said nothing about the definition of property. Lord Blackburn did say, however, that "in modern times lawyers have accurately or inaccurately used the phrase '[things] in action' as including all personal chattels that are not in possession".[41] Thus, to the extent that the House of Lords agreed with Fry LJ on the classification issue, that seems to have been on the basis that the class of things in action could be *extended* to all intangible property (i.e. it was a residual class of all things not in possession) rather than on the

basis that the class of intangible property should be *restricted* to rights that could be claimed or enforced by action.

77.    Our view is that *Colonial Bank* is not therefore to be treated as limiting the scope of what kinds of things can be property in law. If anything, it shows the ability of the common law to stretch traditional definitions and concepts to adapt to new business practices (in that case the development of shares in companies).

78.    *Colonial Bank* was referred to in *Allgemeine Versicherungs-Gesellschaft Helvetia v Administrator of German Property*[42] by Slesser LJ as showing "how the two conditions of [thing] in action and [thing] in possession are antithetical and how there is no middle term". Again, however, the case was not about the scope of property generally but about whether something that was undoubtedly property should be classified as a thing in possession or a thing in action.[43]

79.    Most recently, *Colonial Bank* was cited in 2014 in *Your Response v Datateam*.[44] In that case, the claimant sought to assert a lien over a database in digital form but faced the obstacle of the previous decision of the House of Lords in *OBG Ltd v Allan*[45] that there could be no claim in conversion for wrongful interference with a thing in action because it could not be possessed. In an attempt to distinguish the case from *OBG*, the claimant argued that, even if the database could not be regarded as a physical object, it was a form of intangible property different from a thing in action and so was capable of being possessed.

80.    The Court of Appeal rejected the argument. Moore-Bick LJ said that *Colonial Bank* made it "very difficult to accept that the common law recognises the existence of intangible property other than [things] in action (apart from patents, which are subject to statutory classification), but even if it does, the decision in *OBG Ltd v Allan* [2008] AC 1 prevents us from holding that property of that kind is susceptible of possession so that wrongful interference can constitute the tort of conversion."[46] He said that there was "a powerful case[47] for reconsidering the dichotomy between [things] in possession and [things] in action and recognising a third category of intangible property, which may also be susceptible of possession and therefore amenable to the tort of conversion" but the Court of Appeal could not do that because it was bound to follow the decision in *OBG*. The other members of the court agreed.

81.    The Court of Appeal did not, and did not need to, go so far as to hold that intangible things other than things in action could never be property at all, only that they could not be the subject of certain remedies. The intangible thing with which they were concerned was a database, which (as Floyd LJ said) would not be regarded as property anyway because it was pure information. They did not have to consider intangible assets with the special characteristics possessed by cryptoassets.

82. In other cases, the courts have found no difficulty in treating novel kinds of intangible assets as property. Although some of those cases are concerned with the meaning of property in particular statutory contexts, there are at least two concerning property in general. In *Dairy Swift v Dairywise Farms Ltd*,[48] the court held that a milk quota could be the subject of a trust; and in *Armstrong v Winnington*,[49] the court held that an EU carbon emissions allowance could be the subject of a tracing claim as a form of "other intangible property", even though it was neither a thing in possession[50] nor a thing in action.

83. A number of important 20th century statutes define property in terms that assume that intangible property is not limited to things in action. The Theft Act 1968, the Proceeds of Crime Act 2002, and the Fraud Act 2006 all define property as including things in action "and other intangible property". It might be said that those statutes are extending the definition of property for their own, special purposes, but they at least demonstrate that there is no conceptual difficulty in treating intangible things as property even if they may not be things in action. Moreover, the Patents Act 1977 goes further in providing, at s30, that a patent or application for a patent "is personal property (without being a thing in action)". That necessarily recognises that personal property can include things other than things in possession (which a patent clearly is not) and things in action.

84. We conclude that the fact that a cryptoasset might not be a thing in action on the narrower definition of that term does not in itself mean that it cannot be treated as property.

## Conclusions on the principal questions

*1.1 Under what circumstances, if any, would the following be characterised as personal property:*

*1.1.1  a cryptoasset; and*

*1.1.2  a private key?*

85. Whether English law would treat a particular cryptoasset as property ultimately depends on the nature of the asset, the rules of the system in which it exists, and purpose for which the question is asked. However:

(a)    cryptoassets have all of the indicia of property;

(b)    the novel or distinctive features possessed by some cryptoassets—intangibility, cryptographic authentication, use of a distributed transaction ledger, decentralisation, rule by consensus—do not disqualify them from being property;

(c) nor are cryptoassets disqualified from being property as pure information, or because they might not be classifiable either as things in possession or things in action;

(d) cryptoassets are therefore to be treated in principle as property;

(e) but a private key is not in itself to be treated as property because it is information.

## The ancillary questions

*1.2.1 If a cryptoasset is capable of being property:*

*(i) is that as a thing in possession, a thing in action or another form of personal property?*

*(ii) how is title to that property capable of being transferred?*

86. We have discussed these questions above. In summary:

(a) A cryptoasset is not a thing in possession. Whether it is a thing in action depends on how that term is used, i.e. whether it means a right that can be claimed by action or simply any thing that is not in possession. Our view is that if a cryptoasset does not embody a legally-enforceable right or obligation then it is neither necessary nor useful to classify it as a thing in action. If it is necessary to classify it at all, then a cryptoasset is best treated as being another, third, kind of property, as the court was prepared to do with the EU carbon emission allowances in *Armstrong v Winnington*.

(b) We would expect that the person with knowledge of a private key would generally be considered the owner of the cryptoasset (or the right in the asset) that the key controls, but that may depend on the circumstances and the rules of the system.

(c) As with other intangible assets, title can be vested or transferred by assignment or agreement of the owner. An on-chain transaction is best analysed as creating a new cryptoasset owned by the transferee. It is also possible to transfer a cryptoasset off-chain, although that may expose the transferee to the risk of double-spending by the transferor.

### *1.2.2 Is a cryptoasset capable of being the object of a bailment?*

87. Bailment is a temporary transfer of possession, but not ownership, of an object by one person to another, usually for a specific purpose.[51] An example is depositing goods in a warehouse, or leaving a coat in a cloakroom.

88. Because bailment, by its nature, requires the transfer of possession,[52] only a thing in possession can be the object of a bailment. It follows that the answer to Q1.2.2 is No.[53]

### 1.2.3  What factors would be relevant in determining whether English law governs the proprietary aspects of dealings in cryptoassets?

89.  The Business and Property Courts in England and Wales very often deal with commercial disputes which have a foreign element. For example, one or even all of the parties may not be based here, a relevant contract may expressly say that it is to be governed by another country's law, or a transaction may involve property which is situated abroad.

90.  The common law has developed rules for deciding when particular aspects of those disputes should be decided in accordance with another country's law. Also, particularly in relation to contractual and non-contractual liability, many rules are contained in statutes and European legislation.[54] This area of law, called the "conflict of laws", or private international law, is necessarily complex. What we say below is, therefore, high-level.

91.  Generally speaking, the law allows parties to agree which country's law should govern certain aspects of their business relationships and transactions.[55] People or companies who want English law to be used as far as possible, are well-advised to make sure that there is a clear agreement in place to that effect. For example, permissioned DLT implementations might say in their participation rules that English law applies.[56]

92.  Transactions involving property have an effect on people other than the direct parties. When it comes to assessing which country's laws should be used to determine their effect, the law considers the transacting party's choice to be of little relevance. Instead, to answer questions such as how property is to be classified, whether a proprietary security or other interest exists, and how and when a transfer of property affects third parties, judges have traditionally applied the law of the country where the property is situated at a relevant time.[57]

93.  That is largely for two reasons. First, at least when dealing with tangible property—things in possession—the country in which the asset is located is easily identified and third parties might reasonably suppose that the law of the country determines property issues. Secondly, that country has physical control over assets within its borders, and a court judgment which is in conflict with its laws will often be ineffective.[58]

94.  Intangible property cannot of course be seen or touched, so what is meant by its 'location' is not so obvious. Nevertheless the same rule is usually applied, even though the reason to do so is not as convincing. The law allocates an artificial location to certain types of intangible property, which is often the place in which some sort of control over the property might be exercised. Many things in action are therefore considered to be situated in the country where they are properly recoverable by action or can be enforced.[59] But the rules and how they apply are often difficult to state with any certainty.[60]

95. Some permissioned cryptoassets have some sort of central control in a particular country. So the proprietary aspects of dealings in them might sensibly be said to be governed by the laws of that country. And that will very likely be the case where, for example, a distributed ledger is merely a record of ownership of property in conventional 'real world' assets which can be said to have a particular location.

96. But for a truly decentralised system such as Bitcoin which does not involve things in action, it does not make much sense to say that there is any one country where the asset is recoverable or enforceable.

97. In the circumstances, we think that there is a good argument for saying that the normal rules should not apply. There is very little reason to try to allocate a location to an asset which is specifically designed to have none because it is wholly decentralised. We bear in mind that the purpose of the various rules is ultimately to identify the most appropriate law to govern a particular issue:

> *"A mechanistic application, without regard to the consequences, would conflict with the purpose for which they were conceived. They may require redefinition or modification, or new categories may have to be recognised accompanied by new rules ..., if this is necessary to achieve the overall aim of identifying the most appropriate law".*[61]

98. It is very difficult to say which rules would be used instead. When a tangible asset is in transit at the relevant time so that its location is really a matter of chance or is unknown, there is a suggestion that the law which governs the transaction between the parties might also be used to determine certain proprietary issues.[62] That sort of rule has some attraction to it in this context also. But various other solutions have also been suggested.[63]

99. Ultimately, we believe that these complex issues will best be resolved by legislation, most likely following international cooperation.[64] In the meantime, we tentatively suggest that the following factors might be particularly relevant in determining whether English and Welsh law governs the proprietary aspects of dealings in cryptoassets (in no particular order):

(a) Whether any relevant off-chain asset is located in England and Wales;

(b) Whether there is any centralised control in England and Wales;

(c) Whether a particular cryptoasset is controlled by particular participant in England and Wales (because, for example, a private key is stored here);

(d) Whether the law applicable to the relevant transfer (perhaps by reason of the parties' choice) is English law.

## Security

### *1.2.4  Can security validly be granted over a cryptoasset and, if so, how?*

### *1.2.5  If so, what forms of security may validly be granted over a cryptoasset?*

100.  If Bob lends money to Alice, he may be concerned about her ability to repay the loan. Bob might therefore ask Alice to provide security, in the form of rights over property belonging to her.[65] If Alice does not repay the loan, Bob can then enforce his rights against the property. That will often involve selling it to discharge the debt. Because Bob is a secured creditor, generally speaking his claims will have priority over the claims of any of Alice's unsecured creditors if Alice becomes insolvent. Bob may therefore be more likely to get all his money back.

101.  Security is usually granted voluntarily by a creditor, but can sometimes be created automatically by operation of law. In this Legal Statement, we are not concerned with non-consensual security.

102.  English law only recognises four kinds of consensual security: pledge, contractual lien, equitable charge and mortgage.[66] Pledges and liens can only be created if it is possible to transfer possession of an asset. Since cryptoassets cannot be possessed, they cannot be the object of a pledge or lien.

103.  If a particular cryptoasset is property, a mortgage or equitable charge can be created over it. This can be done in the same way that a mortgage or equitable charge can be created over other intangible property, and subject to the same requirements.[67]

104.  For example, if Alice transfers ownership of a cryptoasset to Bob, subject to Bob's agreement to retransfer it back to her when she has repaid the loan, this may create a mortgage.

105.  There are many ways in which technical means, such as smart contracts and multisig wallets, may be used to provide a creditor like Bob with factual control and other rights over a cryptoasset until and only until a debt is paid. But it does not follow that the law will recognise that security has been created just because these technical means may simulate the practical effect of a mortgage or charge.[68] Such 'simulated' security is sometimes called functional or quasi-security. Its holder may not have the same legal rights as a holder of true security. For true security to be created there must at least be a grant of some sort of proprietary interest.

106.  Distinguishing between true and quasi-security can be difficult, and depends on the particular circumstances. What matters is not so much whether the parties intended to create true security, but whether the particular rights and obligations which they have given each other mean that this is indeed what they have done.[69]

# Insolvency

### 1.2.6 Can a cryptoasset be characterised as "property" for the purposes of the Insolvency Act 1986?

107.    The Insolvency Act 1986 contains its own definition of property. Section 436(1) says:

> "property" includes money, goods, things in action, land and every description of property wherever situated and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property;

108.    That definition is very wide indeed. It has been said that "it is hard to think of a wider definition".[70] Many things which the common law would not classify as property may therefore be property for the particular purposes of the Insolvency Act. That is deliberate—when a person or a company becomes insolvent, it is usually advantageous to the creditors that as many valuable assets as possible be classified as property so that they can be gathered in, and if necessary sold, to pay off the debts.

109.    Since cryptoassets can be property at common law, we have no doubt that they can be property for the purposes of the Insolvency Act. If a particular cryptoasset is not property at common law, depending on circumstances it could still be property for the purposes of the Insolvency Act if it is, for example, within the words "obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property".

# Transferability and negotiability[71]

110.    We discussed above how ownership in a cryptoasset is transferred on-chain. However, where a cryptoasset is considered by participants to represent something else such as an external, off-chain "real world" asset, questions arise as to what is the effect of a transfer of the cryptoasset on title to the external asset or vice-versa. Within the system, this may well be dealt with by contractual terms binding on the participants, but disputes might still arise where a claim to the external asset is made by someone who is not a participant in the system or a party to a relevant agreement.

111.    Traditional paper-based commerce uses *documents of title* (or *documentary intangibles* —the distinction does not matter for the purpose of the present discussion) to facilitate dealings in certain kinds of assets. The key feature of a document of title is that it confers ownership rights on the holder that pass with physical transfer of the document: a transfer of the document therefore effects a transfer of the asset.

112. Cryptoassets are not documents which can be physically transferred and so, as explained below, do not fit easily into the existing law on documents of title. There is a functional analogy when they are used as tradeable tokens which represent off-chain assets, and it might be said that the token should be treated by the law in the same way that it would treat a document of title, so that a transfer of the token is effective to transfer the off-chain asset. However, documents of title are only recognised as such under statute or where there is an established mercantile usage,[72] neither of which (at least presently) applies in the case of cryptoassets.

### Could a cryptoasset be characterised as:

### 1.2.7  a documentary intangible?

113. Documentary intangibles are a particular type of intangible property.[73] They are commonly understood to be

> "instruments or documents that are so much identified with the obligation embodied in them that the appropriate way to perform or transfer the obligation is through the medium of the document. The abstract intangible right acquires such a degree of concretized expression that it takes on some of the characteristics of a chattel. The document recording the right it itself a tangible thing and thus a chattel, and the right is thoroughly fused with the document".[74]

114. They have three fundamental characteristics. First, there must be identified with an underlying right to something. Second, there must be a tangible document which can be physically possessed.[75] Third, the tangible document must be treated in mercantile usage as representing the underlying right itself, with the result that the right can be transferred by transferring the document.[76]

115. It is clear that a cryptoasset cannot be characterised as a documentary intangible. Aside from the fact that some cryptoassets do not embody a legal right to anything,[77] the very essence of cryptoassets is that they are purely digital stores of value, such that there is no need for a physical document. Whilst it may be conceivably be possible to design a new token so that it has the three characteristics set out above, we doubt in any event that the resulting asset could properly be called a cryptoasset as we have described them.

116. The functions of a documentary intangible could be replicated in electronic form.[78] However, since that electronic document could not be physically possessed, it could not be described as a documentary intangible (at least as that term is presently understood). We suspect that, given the proliferation of electronic documents, the current category of documentary intangibles will either decline or require fundamental redefinition. Indeed, there is already a term—dematerialisation—which refers to the process of replacing paper-based documentary intangibles with electronic functional equivalents.[79]

### 1.2.8 a document of title?

117.  Documents of title are documents which confer certain property ownership rights on the holder of the document. Crucially, those rights of ownership pass with the possession of the document. All documents of title are therefore documentary intangibles.[80] A document may become a document of title as a result of statute or established mercantile usage.[81]

118.  Given our conclusion that a cryptoasset cannot (at least today) be characterised as a documentary intangible, it follows that we do not think a cryptoasset could presently be characterised as a document of title.

119.  As with documentary intangibles, the proliferation of electronic documents may mean that the law will come to recognise electronic documents as documents of title. However, as the law currently stands, only physical documents may be documents of title. We note that, in order to get around this barrier, many parties provide in their contracts that certain electronic documents shall be treated (as between the parties) as documents of title. This is the approach taken to electronic bills of lading.[82]

### 1.2.8  negotiable?

120.  If particular property is *negotiable*, a good faith purchaser for value can acquire good title to it irrespective of any defect in the transferor's title.[83]

121.  Property can only become negotiable in one of two ways: by statute or by mercantile usage.[84] No relevant statute applies to cryptoassets. Any mercantile usage would need to be proved by factual evidence[85] unless it is particularly obvious.[86]

122.  As we have already said, English law can and will adapt to meet the usages of commerce. Judges are alive to the fact that, in modern times, mercantile usages can develop relatively quickly.[87] We are not, however, aware of any mercantile usage which treats cryptoassets as negotiable.

123.  Indeed, as far as we are aware, there are no examples of any intangible property at all having been sufficiently treated as negotiable to give rise to mercantile usage. Whilst this may suggest that only tangible property can become negotiable, we cannot see any reason as a matter of principle why intangible property could not become negotiable. So long as it is possible to transfer title to the property, it ought to be possible for either a statute or the custom of merchants to treat that property as negotiable. But as the law stands, we do not think that cryptoassets are negotiable in the sense in which the term is generally used.

124.  We do not think, however, that that is likely to be important in practice. The significance of negotiability is that it represents an exception to the general rule, discussed in paragraph 47 above, that no-one can transfer to another more rights

in something than he or she has. As we have explained, that general rule does not anyway apply to a cryptoasset because each on-chain transfer creates new property with a new title.

### 1.2.10  an "instrument" under the Bills of Exchange Act 1882?

125. The Bills of Exchange Act 1882, amongst other things, codifies the law relating to bills of exchange, cheques and promissory notes.

126. Our view is that a cryptoasset could not be characterised as an "instrument" under the Bills of Exchange Act 1882.[88] That is because the Act is premised on the concept of physical possession. For example, pursuant to section 2 of the Act (which contains a number of key definitions):

(a)  "'delivery' means transfer of possession, actual or constructive, from one person to another".

(b)  "'holder' means the payee or indorsee of a bill or note who is in possession of it, or the bearer thereof".

(c)  "'bearer' means the person in possession of a bill or note which is payable to the bearer".

127. Whilst as a matter of principle a statute ought to be read so as to accommodate technological change,[89] the principle that intangible property cannot be possessed is so well-established that we do not think it could be displaced by interpretation alone. That conclusion is reinforced by the international usage of bills of exchange, which necessitates a uniform approach to developments in the law.[90] It therefore seems to us that intangible property falls outside the scope of the Act.

## Goods

### 1.2.11 Can cryptoassets be characterised as "goods" under the Sale of Goods Act 1979?

128. Section 61(1) of the Sale of Goods Act 1979 defines "goods" as follows:

*"goods" includes all personal chattels other than things in action and money, and in Scotland all corporeal moveables except money; and in particular "goods" includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale; and includes an undivided share in goods;[91]*

129. On one view, cryptoassets which are property in a "third category"[92] are not things in action, and are therefore "goods" within that definition.[93]

130. We do not consider that to be the correct interpretation. There are numerous references to the "possession" of goods in the Act. It clearly assumes that all goods are capable of being possessed. In context therefore, we believe that the phrase "things in action" in section 61(1) means "every personal chattel which is not a thing in possession". In other words, it is used in the same sense of a residual category in which we have concluded Fry LJ and Lord Blackburn used it in *Colonial Bank v Whinney*.[94] For the particular purposes of the Sale of Goods Act, cryptoassets are "things in action", and are not to be characterised as "goods".

## Register

### *1.2.12 In what circumstances is a distributed ledger capable of amounting to a register for the purposes of evidencing, constituting and transferring title to assets?*

131. A distributed ledger acts as a reliable record in practice of which person, or which address-identifier, has control of a cryptoasset, because only dealings in a cryptoasset that are both consistent with the transaction history recorded in the ledger and signed with the relevant private key will be accepted as valid. It is not possible in practice to authenticate a transaction without the private key and very difficult[95] to manipulate the existing ledger.

132. The ledger cannot however be treated as a definitive record of *legal* rights unless statute has given it binding legal effect (as is the case with the Land Register). There is at present no such statute applicable to cryptoasset ledgers. This means that if a court is required to consider who owns a particular cryptoasset then it will not be bound by the position in the ledger.

133. It is possible, therefore, to establish a proprietary right in a cryptoasset outside the ledger, for example an interest under a trust or security arrangement, an interest acquired by tracing, or a title acquired "off-chain" by contract or by succession. The absence of a record of the interest may, however, affect its enforceability against someone who has acquired the cryptoasset in good faith.

134. It is also possible for participants in a particular system to agree that the ledger will be treated as the definitive record of *legal* rights or title as between the participants in that system.[96] However, such an agreement would not bind third parties who had not agreed to the rules of the system.

## Smart Contracts

135.  As with cryptoassets, it is difficult, and unlikely to be useful, to try to formulate a precise definition of smart contracts and so we have again sought instead to identify what it is about them that may be legally novel or distinctive. The characteristic feature, in our view, is *automaticity*: a smart contract is performed, at least in part, automatically and without the need for, and in some cases without the possibility of, human intervention.[97] That requires the terms of the contract to be recorded in computer-readable form, i.e. in code. Many smart contracts are embedded in a networked system that executes and enforces performance using the same techniques (cryptographic authentication, distributed ledgers, decentralisation, consensus) that we have already discussed in connection with cryptoassets.

### 2.1 In what circumstances is a smart contract capable of giving rise to binding legal obligations, enforceable in accordance with its terms?

136.  Should smart contracts be treated as contracts for legal purposes? Contract law is concerned with the enforcement of promises. It might be argued that the automaticity of smart contracts, and the mechanistic way in which computer code operates, means that there is strictly no need for a party either to promise performance or to resort to the law to enforce a promise by their counterparty: the code will simply do what it has been programmed to do. Even if that is right, however, we do not think it is a good reason for treating smart contracts as being different in principle from conventional contracts. The scope for legal intervention in smart contracts may be much reduced, to the extent that they may prevent intentional non-performance by a party and avoid or limit factual disputes and disputes about interpretation of terms. However, there will always be a risk that performance is affected by an event external to the code, for example a system failure, or that the code operates in an unexpected or unintended way, and in such cases any dispute must be capable of adjudication. It is open to parties to agree expressly that a smart contract is not legally binding, as they could with a conventional agreement, but we think that would be very unusual (and unwise) in a commercial context. In principle, therefore, and subject to the points made below, the ordinary rules of contract law apply to smart contracts.

137.  English law does not normally require contracts to be in any particular form.[98] It will enforce any promise (or at least award damages for breach) provided that the common law requirements for formation of a contract are met, and provided that there are no vitiating factors (such as duress, misrepresentation or illegality). The requirements for formation of a contract are three-fold: first, that agreement has, objectively, been reached between the parties as to terms that are sufficiently certain; secondly, that the parties intended (again, objectively) that they would be legally bound by their agreement; thirdly that, unless the contract is made by deed, each party to it must give something of benefit, which is referred to as "consideration"—a gratuitous promise in return for nothing is not generally enforceable.[99]

138. There will be 'agreement'—the first requirement—if Alice offers terms to Bob, and Bob accepts those terms by words or conduct. In a commercial context, agreement is generally found in, or at least evidenced by, a written document bearing signatures of the parties—but neither writing nor signature is a necessary precondition for a contract to be identified or for it to have force.

139. The second requirement—an intention to be legally bound—will be presumed unless someone proves that there was no such intention. That will be difficult to do;[100] in the commercial world at least, parties are entitled to expect that their counterparts intended to be bound by their promises, and very unusual circumstances would be needed to give rise to a conclusion that there was no such intention.

140. A contract may be bilateral or multilateral, in which case the parties makes promises to each other, or it may be unilateral, in which case one party makes an offer that can be enforced by anyone that complies with its terms. Whilst the majority of commercial contracts are bilateral or multilateral, unilateral contracts may be of some relevance to smart contracting, as we discuss below.

141. As we have said, there is no reason why the normal rules should not apply just because a potential contract is a smart contract. It follows that the question of whether, and under what circumstances, a smart contract is capable of giving rise to binding legal obligations turns on the question of whether, and under what circumstances, parties engaged in smart contracting are capable of reaching objective agreement as to terms, of intending to create a legally binding relationship, and of satisfying the requirement of consideration. Given that the term 'smart contracts' covers a multitude of different technologies and applications, not all of which can be individually considered in this Statement, we consider this question by reference to the automaticity characteristic discussed above.

142. The precise role played by the software in a smart contract can vary: Alice and Bob may contract on the basis that their obligations are defined by the code and that they abide by the behaviour of the code whatever it does; or they may contract on the basis that code will be used to implement their agreement but not to define it; or they may contract on some hybrid basis, where some obligations are defined by code, others merely implemented by code and perhaps others not involving code at all. There is a spectrum. However, in each case, the key question is what Alice and Bob actually intended and, specifically, whether intended to be bound by the behaviour of the code. This is an entirely conventional matter of analysing Alice's and Bob's words and conduct and determining in light of the admissible evidence what they (objectively) agreed. There is nothing novel in this: it is precisely what judges do on a regular basis when determining the basis on which parties have contracted.

143. A common smart contract scenario involves Alice and Bob contracting in natural language but calling for performance, or certain aspects of performance, to be

executed using code, typically (but not necessarily) on a distributed ledger. Perhaps the archetypal example of this contracting model is a Master Agreement pursuant to which transactions representing the purchase of financial instruments are executed on a blockchain. Whilst this sort of contract may involve "smarts" (i.e. code), the contract itself is entirely conventional and no novel questions of enforceability arise. The ramifications of a failure of the code to execute as intended (or at all) are matters for the natural language contract: either its terms have been complied with or they have not, something to be ascertained according to ordinary and well-established principles. This Statement is, in any event, not concerned with matters of enforceability as such.

144. Alice and Bob may instead contract on the basis of a contract that consists primarily of natural language but includes some terms (typically performance obligations) that are defined not in natural language but in code. The code will likely be both embedded in the contractual documentation and also deployed onto an execution platform. This also gives rise to no real difficulty: the question of whether an agreement has been reached, whether legal relations were intended and whether there is consideration can be assessed by reference to ordinary contractual principles. A question may arise as to whether Alice and Bob actually intended to be bound by the code in addition to their natural language terms, but that is unlikely to be a matter of doubt in practice as the position can be expected to be readily ascertainable by reference to what the natural language says. As noted above, the factual and legal analysis required to ascertain the position is in any event entirely conventional.

145. It is where Alice and Bob do not have a natural language contract at all, so that the supposed agreement exists solely in code that the contractual position moves furthest from familiar territory. Here, there should be no difficulty in identifying terms (they will comprise the source code). There should also be no difficulty in identifying consideration—it will often be readily identifiable from examination of the code or even merely of the code's behaviour. Where the code itself will not assist is with the question of whether an agreement has been reached at all (as the mere existence of code capable of executing contractual promises reveals nothing about whether Alice and Bob actually agreed to contract on the basis of such code) and whether they intended to create legal relations. Those questions will need to be answered by reference to evidence extrinsic to the code itself.

146. In a case where Alice has proffered the code and Bob has conducted himself in a way that amounts in a conventional sense to (objective) acceptance of the terms of that code, the analysis will be straightforward. Examples will include Bob indicating agreement in writing that he is willing to be bound by a particular code release, or accepting an offer to be bound by digitally signing the code. As the "contracting" diverges further from traditional contractual models, less conventional conduct will need to be considered, but the analysis that is in principle required will remain the same.

A001988

147. By way of example, suppose that Alice deploys some code to a distributed ledger platform that, in exchange for a cryptoasset, performs algorithmic investment. Bob, who is not known to Alice, stumbles across the code and transacts with it. This situation can be analysed as the formation of a unilateral contract: Alice has offered terms to the world (or, at least, to users of the distributed ledger platform); Bob, by choosing to transact, has accepted those terms and a contract has come into being. The question of whether Alice intended to be legally bound (the second requirement for an enforceable contract) is inevitably highly fact-specific. If the platform on to which she deployed her code was a development or test environment, or was a private platform to which Bob only gained access because it was insufficiently locked down, Alice will likely have little difficulty establishing that she did not intend (objectively) to be legally bound, and there will be no legally binding contract. If, on the other hand, Alice deployed her code on a public platform and advertised its presence, she will struggle to displace the presumption that she did indeed intend to be bound—the contract will be enforceable.

148. A further example is that of a Decentralized Autonomous Organisation (DAO), whereby the party that deploys the code to set up the DAO may have no intention to participate in it or to enter into any legally binding agreements with anyone—that party is simply deploying a platform, on which others interact in accordance with the "terms" of the smart contract running the DAO. The question is whether those transacting on the DAO, who may have no bilateral communication at all, can by the fact of their participation be said to have entered into a legally binding contract and, if so, with whom. Again, while the specific situation is novel, the underlying contractual predicament is not: it maps well on to the well-established concept of an unincorporated association, whereby the association itself has no legal status, but all of the members, because of their membership, are bound by the rules. Each member of the association contracts with the membership as a whole, agreement (objectively) being reached and intention to be bound being evidenced by the member's decision to join the association with awareness of the rules.[101] This is so, even if the members do not know the identities of the others.[102] There is no reason why precisely this analysis cannot be used for a DAO: a party who transacts with a DAO can be taken to have agreed to abide by and be legally bound by its terms.

## Ancillary questions

### 2.2.1 How would an English court apply general principles of contractual interpretation to a smart contract written wholly or in part in computer code?

149. When interpreting a contract, a judge strives to identify the intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean.[103] Notwithstanding that such an exercise

necessarily involves taking context into account, the modern approach to interpretation of commercial contracts is very much focused on the language: *"The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision."*[104] Unless the contractual language is unclear or unambiguous, a court will generally conclude that it means what it says: *"the clearer the natural meaning the more difficult it is to justify departing from it".*[105] Where courts do depart from the language of the contract in ascertaining its meaning, that is generally because the language is ambiguous, unclear or contradictory.

150.  At first blush, a smart contract that exists purely in code is not susceptible to the exercise of contractual interpretation at all, in part because interpretation is about ascribing meaning to natural language, and in part because code is generally clear, unambiguous and self-consistent (albeit that is not always the case, as discussed below). However, it is unnecessary to declare smart contracts as a special category of contracts to which the normal rules of interpretation are dis-applied. Rather, a smart contract consisting solely of code with no natural language element can in most circumstances be seen as an extreme example of a contract whose language is clear, with the result that there is no justification to depart from it. The practical result, however, is the same: we do not believe there are many circumstances in which an English court would hold that the "meaning" of a smart contract consisting solely of code was something other than that expressed in the code. That is not because there is anything special about such a smart contract. Rather, it reflects the entirely conventional position that where language is clear and unambiguous (which code generally is), it would require very unusual circumstances for a judge to conclude that the objective meaning was other than what the words (code) said.

151.  Although the code for a smart contract can *generally* be expected to be clear and unambiguous, this will not always be so. For example, a program might use a construction that is ill-defined in the programming language being used, with the result that it does not have a single ascertainable 'meaning'; or different compilers might treat a particular programmatic construction in a different way, leading to a question as to which behaviour was actually intended; or the running order of different parts of the code may affect its behaviour and thus, potentially, its 'meaning'.[106] In some cases, such ambiguities might be resolved by reference to other parts of the code that make the intended behaviour clear; however, there will likely also be cases where examination of the code alone will not be sufficient to ascertain contractual intention and, just as with natural language contracts, a judge will need to look beyond the four corners of the code to interpret it.

152.  A judge's task when interpreting a smart contract, then, is to determine, looking at the contract as a whole, and the admissible evidence, what the parties objectively intended their obligation to be. Where there is code involved, part of that exercise

will be a determination of whether the code (or part of it) was intended to *define* the obligations or whether it was intended merely to implement them. In the former case, an investigation of what the code actually does (possibly with the assistance of expert evidence) may be needed as part of the exercise of interpretation. Where a smart contract subsists solely in code, and where that code is unambiguous, the judge may well need to do no more than decide that the parties intend to be bound by the code—whatever it does. Where the code contains ambiguities, or where a contract consists both of code and natural language (where the court may need to understand how the two fit together) extrinsic evidence is likely to be needed. Where code merely *implements* an agreement, the question of what the code actually does will be irrelevant to interpretation; but investigation of the code may still be necessary if a dispute has arisen as to whether the code correctly implements the agreement.

### 2.2.2 Under what circumstances would an English court look beyond the mere outcome of the running of a computer code that is or is part of a smart contract in determining the agreement between the parties?

153. A judge will always be able to look beyond the mere outcome of a running computer programme to determine the agreement between the parties, because in order to ascertain the true intention of the parties it will be necessary to do so. The fact of the running code cannot, of itself, answer the question of whether the parties intended the code to define their obligations (or part of their obligations).

154. It is difficult to envisage in practice an agreement defined purely by reference to a running computer programme, without any reference either to natural language or the source code. That is because, in such circumstances, at least one of the parties would be contracting blind to the terms to which they were agreeing. Instead, an agreement by the parties to be bound by the behaviour of the running code would be much more likely to be found in their interactions and communications outside the code itself. That is where a judge would look to ascertain the contract's meaning. And in any event a judge will want to look behind the code itself in other circumstances. First, for example, it may be argued that the code needs to be rectified, i.e. changed because it does not properly reflect what the parties agreed. That can happen if both parties were mistaken as to what they thought the code would do, or even (in some cases) if only one party made a mistake.[107]

155. Secondly, just as with any other contract, a court will intervene in cases of duress, fraud, misrepresentation, and so on. As with interpretation, just because a contract is a smart contract does not mean that the normal and well-established rules do not apply.

### 2.2.3 Is a smart contract between anonymous or pseudo-anonymous parties capable of giving rise to binding legal obligations?

156.  We have no doubt that a smart legal contract between anonymous or pseudonymous parties is capable of giving rise to binding legal obligations. That is because there is no requirement under English law for parties to a contract to know each other's real identity. Indeed, many contracts are formed in circumstances in which (at least) one party does not know the real identity of the other party, for example, sales at auctions to the highest bidder or unilateral contracts, or where an agent contracts on behalf of a principal whose identity has not been made known.[108]

157.  Despite that, it is obvious that there are inherent risks in contracting with a party whose identity is likely to remain undiscoverable, not least in terms of identifying who can be sued if the contract is breached.[109]

### 2.2.4 Could a statutory signature requirement be met by using a private key?

158.  The answer to this question will of course depend on the particular statute, but our view is that a statutory signature requirement is highly likely to be capable of being met by means of a private key. That is because an electronic signature which is intended to authenticate a document will generally satisfy a statutory signature requirement,[110] and a digital signature produced using public-key cryptography is just a particular type of electronic signature.

159.  There are numerous cases which make clear that an electronic signature can satisfy a statutory signature requirement, including in relation to a statute that is now almost 400 years old.[111] In light of this, it is hard to envisage any statutory signature requirement which could not be met by using a private key.[112]

160.  Where a private key is used to sign a document, it may be the case that the signature itself is comprised solely of a signed message using signature authentication software confirming the validity of the signature. We understand this has led to some concern that the use of a private key may not fulfil a statutory signature requirement. In our view, this does not present a problem. The key question is not what the signature looks like, but whether or not it is clear that the party intended to authenticate the full terms of the document.[113]

### 2.2.5 Could a statutory "in writing" requirement be met in the case of a smart contract composed partly or wholly of computer code?

161.  Requirements that a contract be "in writing" or "evidenced in writing" are very rare in English law.[114] A contract can be made "in writing" only if all of it is in writing, though of course it can be "evidenced in writing" if only part of is.

162. The starting point is that it is clear that the mere fact that a document is in electronic form does not mean that it cannot meet a statutory "in writing" requirement; again, even in relation to a statute that is almost 400 years old.[115] The only question is whether there is something about computer code, as opposed to natural language, which would result in a different conclusion.

163. It is instructive to consider the Interpretation Act 1978, a piece of UK legislation which defines a number of words that are commonly used in statutes.[116] Schedule 1 defines "writing" as follows:

> *"Writing" includes typing, printing, lithography, photography and other modes of representing or reproducing words in a visible form, and expressions referring to writing are construed accordingly.*

164. Whether that part of a smart contract which consists of computer code can be said to be "in writing" will depend on the particular statute and circumstances. Our view is that, to the extent the relevant code can (1) be said to be representing or reproducing words; and (2) be made visible on a screen or printout, it is likely to fulfil a statutory "in writing" requirement.[117] The fact that the code might not be comprehensible to an uninitiated English speaker without an expert translator is irrelevant—many foreign human languages cannot generally be understood by an English speaker without an expert translator.

165. It seems to us that the requirements will be met in the case of source code and, to the extent it is in readable format, object code. We believe however that in very many cases the terms of the relevant contract will not be contained in the code itself; instead, the correct analysis will be that the parties have agreed to be bound by the effect of whatever the code does, rather than by what it says.

166. The Law Commission of England and Wales concluded around 18 years ago that messages sent by Electronic Data Interchange (in context, the exchange of digital information such as that sent by automatic retail stock re-ordering systems, designed to be acted upon by the software of the recipient system without the need for human intervention) would not fulfil a statutory "in writing" requirement. That was because "it is not intended that the EDI message itself should be read by any person. The EDI message is not therefore in a form (or intended to be in a form) in which it can be read".[118] Very recently, the Law Commission has noted that "This reasoning has implications for smart contracts if used for contracts which are required to be 'in writing'. We think that this would only affect cases where the smart legal contract is not in a form which can be read and where there is a requirement that the contract must be in 'writing'".[119]

167. This reasoning is slightly different from ours, but we agree with the conclusion that a smart contract which is in a form that cannot be read is not a "contract in writing".

# Notes

[1] As in the Consultation Paper, references to "English law" are to be read as references to "English and Welsh law".

[2] "Of great significance is the Common Law's attitude to the expectations of those it serves. Common law does not defeat the reasonable expectations of honest men." Johan Steyn, 'Contract Law: fulfilling the reasonable expectations of honest men' (1997) 113 LQR 433.

[3] Sir John Laws, *The Common Law Constitution, Hamlyn Lectures* (Cambridge University Press 2014) 9–10.

[4] It is a long-standing principle of law that where there is a right, there must be a remedy. *Ashby v White* [1703] 2 Ld Raym 938, 92 ER 126, at 953, 136 (Lord Holt CJ): "if the plaintiff has a right, he must of necessity have a means to vindicate and maintain it, and a remedy if he is injured in the exercise or enjoyment of it; and indeed it is a vain thing to imagine a right without a remedy; for want of right and want of remedy are reciprocal."

[5] <https://en.wikipedia.org/wiki/Alice_and_Bob> accessed 14 August 2019.

[6] <https://twentyessex.com/people/lawrence-akka/>

[7] <https://www.3vb.com/our-people/qc/david-quest-qc>

[8] <https://4pumpcourt.com/our-barristers.html#matthewlavy>

[9] <https://twentyessex.com/people/sam-goodman/>

[10] <https://bitcoin.org/bitcoin.pdf> accessed 4 September 2019.

[11] Encoded within the Bitcoin "genesis" record is the title of the front-page article in *The Times* on 3 January 2009: "Chancellor on brink of second bailout for banks".

[12] For some possible definitions, see the following:

- Financial Conduct Authority, 'CP19/3: Guidance on Cryptoassets' (January 2019): "Cryptoassets are cryptographically secured digital representations of value or contractual rights that use some type of distributed ledger technology (DLT) and can be transferred, stored or traded electronically." However, they "vary significantly in the rights they grant their owners, as well as their actual and potential uses".

- 'Cryptoassets' (Wikipedia, 2019) <https://en.wikipedia.org/wiki/Cryptocurrency> accessed 29 October 2019: "A cryptocurrency (or crypto currency) is a digital asset designed to work as a medium of exchange that uses strong cryptography to secure financial transactions, control the creation of additional units, and verify the transfer of assets."

- European Banking Authority, 'Report with Advice for the European Commission on Cryptoassets' (January 2019): "*Crypto-assets are a type of private asset that depend primarily on cryptography and distributed ledger technology as part of their perceived or inherent value.* A wide range of crypto-assets exist, including payment/exchange-type tokens (for example, the so-called virtual currencies (VCs)), investment-type tokens, and tokens applied to access a good or service (so-called 'utility' tokens)."

- See also the discussion in Apolline Blandin, Ann Sofie Cloots and ors, 'Global Cryptoasset Regulatory Landscape Study' (Cambridge Centre for Alternative Finance) 14–19 available at <https://www.jbs.cam.ac.uk/faculty-research/centres/alternative-finance/publications/cryptoasset-regulation/> accessed 15 October 2019.

[13]  *Yanner v Eaton* [1999] HCA 53 [17]

[14]  *Yanner v Eaton* (n 13).

[15]  *OBG Ltd v Allan* [2008] AC 1; *Your Response v Datateam Business Media* [2014] EWCA Civ 281, [2015] QB 41.

[16]  "A decision whether something is capable of being owned cannot be reached in a vacuum. It must be reached in context…": *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37 [28] (the context there being an action in tort for loss of stored sperm consequent upon breach of a duty to take reasonable care of it). "[T]he question 'can I own X', read as 'will the law characterise my relationship to X as "ownership"?', might well attract a different answer according to the reason why the question is asked": Tatiana Cutts, <https://twitter.com/TatianaCutts/status/1067009153753862144> accessed 4 September 2019.

[17]  *National Provincial Bank v Ainsworth* [1965] AC 1175.

[18]  *Fairstar Heavy Transport NV v Adkins* [2013] EWCA Civ 886.

[19]  *R v Toohey; Ex parte Meneling Station Pty Ltd* [1982] HCA 69, (1982) 158 CLR 327 at 342–343; *Re Celtic Extraction; Commonwealth of Australia v WMC Resources Ltd* (1998) 194 CLR 1; *B2C2 Ltd v Quoine Pte Ltd* [2019] SGHC(I) 03.

[20]  The consequences of this are dealt with below.

[21]  Sometimes expressed using the Latin maxim, *nemo dat quod non habet* (no-one may give what they do not have).

[22]  That does not mean that the victim of a cryptoasset fraud or theft is without a remedy. However, any remedy would likely be in trust or restitution, and so unavailable against a good faith purchaser or where it would be inequitable to require the cryptoasset to be returned. Remedial issues are outside the scope of this Legal Statement.

[23]  See for example the definition of a bitcoin in *Bitcoin* (n 10): "We define an electronic coin as a chain of digital signatures. Each owner transfers the coin to the next by digitally signing a hash of the previous transaction and the public key of the next owner and adding these to the end of the coin. A payee can verify the signatures to verify the chain of ownership."

[24]  David Fox, 'Cryptocurrencies in the Common Law of Property' in David Fox, Sarah Green (eds), *Cryptocurrencies in Public and Private Law* (Oxford 2019) para 6.40.

[25]  *B2C2 Ltd v Quoine Pte Ltd* (n 19) (Simon Thorley IJ). We note also that in *R v Teresko (Sergejs)* [2018] Crim LR 81, HHJ Lodder QC made an order under s 41(7) of the Proceeds of Crime Act 2002 permitting the police to sell bitcoins, which had previously been seized from the defendant pursuant to section 47C of the Act; he was presumably satisfied that bitcoins were within the definition of property in the Act, which includes "money; all forms of real or personal property; and things in action and other intangible or incorporeal property". See also *R v West (Grant)* (Southwark Crown Court, 23 August 2019) available at <http://news.met.police.uk/news/379015> accessed 29 October 2019.

[26]  *Your Response v Datateam Business Media* (n 15) [42].

[27]  Michael Bridge, Louise Gullifer and ors, *The Law of Personal Property* (Sweet & Maxwell 2017) para 9-031.

[28] If the private key is stolen then it may be the thief that takes control of the asset.

[29] By personal property here, we actually mean personal chattels, but this technicality is not important for present purposes.

[30] referred to in some cases by the older terms *choses in possession* and *choses in action*. We have replaced such usage with the more modern wording.

[31] Of course, the keys to a cryptoasset can be stored on a physical medium, which can be possessed, such as a USB drive or even a piece of paper. But that does not mean that the cryptoasset itself can be possessed.

[32] *Your Response* (n 26) [23].

[33] In *Torkington v Magee* [1902] 2 KB 427, Channell J described things in action as "all personal rights of property which can only be claimed or enforced by action and not by taking physical possession."

[34] The existence of a remedy is an essential condition for the existence of a thing in action: *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 898, 915.

[35] In *Colonial Bank v Whinney* (1886) 11 App Cas 426 (HL), 440 Lord Blackburn said that "in modern times lawyers have accurately or inaccurately used the phrase '[things] in action' as including all personal chattels that are not in possession".

[36] Halsbury's Laws of England, vol 13 (2017), para 1 fn (2).

[37] *Colonial Bank v Whinney* (1885) 30 Ch D 261 (CA), 285.

[38] as Fry LJ noted, they were deemed to be property by the Companies Clauses Consolidation Act.

[39] *Ex parte Union Bank of Manchester* Law Rep 12 Eq 354.

[40] *Colonial Bank* (n 37) 286.

[41] n 35 above.

[42] [1931] 1 KB 672, 704.

[43] It involved a dispute about the proceeds of sale of diamonds that had been seized by the British authorities as prize during World War I and later assigned by the German owner to his insurer. If the right in the diamonds that had been assigned was a thing in action within the meaning of section 6(1) of the Trading with the Enemy Act 1914 then under the Act the insurer could not enforce it.

[44] n 26.

[45] *OBG Ltd v Allan* (n 15).

[46] n 26 [42].

[47] As made by Sarah Green and John Randall QC in *The Tort of Conversion* (Hart 2009).

[48] *Dairy Swift v Dairywise Farms Ltd* [2000] 1 WLR 1177.

[49] *Armstrong v Winnington* [2012] EWHC 10, [2013] Ch 156.

[50] at least, in the narrow sense of something which can be claimed or enforced by action (*Armstrong v Winnington* at [61]).

[51] *Yearworth v North Bristol NHS Trust* [2009] EWCA Civ 37, [2010] QB 1 [48] (Lord Judge): "A bailment arises when, albeit on a limited or temporary basis, the bailee acquires exclusive possession of the chattel or a right thereto."

A001996

[52] *Ashby v Tolhurst* [1937] 2 KB 242, 255, (Romer LJ): "in order that there shall be a bailment there must a delivery by the bailor, that is to say, he must part with his possession of the chattel in question."

[53] Norman Palmer (ed), *Palmer on Bailment* (3rd edn, Sweet & Maxwell 2009) 1.27 discusses how property which cannot, strictly, constitute the subject matter of bailment may nonetheless *"become the subject of relationships and disputes akin to those arising under bailments"*.

[54] Principally, Regulation (EC) No 593/2008 of the European Parliament and of the Council of 17 June 2008 on the law applicable to contractual obligations (the "Rome I Regulation") and Regulation (EC) No 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (the "Rome II Regulation"). Given their titles, one might assume that between them the two Regulations cover all types of obligation. This is not the case. A number of matters are expressly excluded from their scope, and certain obligations (including, notably for the purposes of this Legal Statement, those relating to property) are considered by the law to be neither contractual nor non-contractual.

[55] Rome I Article 3, Rome II Article 14.

[56] For a more detailed analysis, including in relation to choice of law in public unpermissioned systems, see Andrew Dickinson, 'Cryptocurrencies and the Conflict of Laws' in *Cryptocurrencies in Public and Private Law* (n 24).

[57] That country's law is known as the *lex situs*.

[58] Lord Collins of Mapesbury and others (eds), *Dicey, Morris and Collins on the Conflict of Laws*, (15th Edn, Sweet & Maxwell 2012) para 22−025.

[59] *New York Life Insurance Co v Public Trustee* [1924] 2 Ch 101, 109 (CA). A debt, for example, is deemed to be situated in the country of the debtor's residence, because that is ultimately likely to be the place where the debt will be enforced against the debtor's assets.

[60] Dicey (n 58) para 24-051: "The choice of law rules which govern the assignment or transfer of intangible property are not easy to state with certainty. ... the choice of law rules for the assignment of intangible property have to cover an unusually wide range of legal situations, with the result that caution is required when stating and applying a rule to a factual context to which it has not previously been held to extend, or in applying a rule which is contractual in nature to a context which is not. It may even be argued that the category of "intangible things", the choice of law rules for the assignment of which were developed and refined by Dr Morris in order to state the common law rules of the conflict of laws, is no longer sufficiently coherent for it to be given a uniform rule for choice of law."

[61] *Raiffeisen Zentralbank Österreich AG v Five Star Trading LLC* [[2001] EWCA CIV 68, [2001] QB 825 [27] (Mance LJ).

[62] *Winkworth v Christie, Manson & Woods Ltd* [1980] Ch 496 at 512 (Slade J); Dicey (n 58) para 24E-016.

[63] See, for example, the *UNCITRAL Legislative Guide on Secured Transactions* (2010), Chapter X para 20, discussing the applicable law rules for the creation, third-party effectiveness and priority of security rights: "as intangible assets are not capable of physical possession, adopting the lex situs as the applicable conflict-of-laws rule would require the development of special rules and legal fictions for the determination of the actual location of various types of intangible asset. For this reason, the Guide does not consider the location of the asset as being the appropriate connecting factor for intangible assets and favours an approach generally based on the law of the location of the grantor".

[64] For a detailed discussion of the issues discussed in this section, including proposals for law reform, see the Financial Markets Law Committee, *Distributed Ledger Technology and Governing Law: Issues of*

*Legal Uncertainty* (2018), available at <http://fmlc.org/report-finance-and-technology-27-march-2018/> accessed 5 September 2019.

[65] It is also possible for a person to provide security for someone else's debt, or to a person other than the creditor, or for an obligation other than a debt. The word 'security' in this section does not refer to shares or bonds, which are often also called 'securities' (for example in The Financial Services and Markets Act 2000 (Regulated Activities) Order 2001). Nor does it refer to what are commonly called 'security tokens'. Whether certain cryptoassets are or should be regulated in the same way as traded shares is outside the scope of this Legal Statement.

[66] *Re Cosslett (Contractors) Ltd* [1998] Ch 495, 508 CA (Millett LJ).

[67] For example, in some circumstances, a requirement that the security be formally registered.

[68] cf *Your Response* (n 26) [23], [27].

[69] *Agnew v Commissioner of Inland Revenue* [2001] UKPC 28, [2001] 2 AC 710 [32].

[70] *Bristol Airport plc v Powdrill* [1990] Ch 744, 759 (Browne-Wilkinson VC); *In re GP Aviation Group International Ltd (in liquidation)* [2013] EWHC 1447 (Ch), [2014] 1 WLR 166 [25] "the definition ... is cast in the widest terms".

[71] Different considerations may arise if cryptoassets might be characterised as money—an issue which is outside the scope of this Statement.

[72] See Bridge (n 74) para 5-010. In *Dixon v Bovill* (1856) 3 Macq HL 1, 16 Lord Cranworth LC said: *"Independently of the law merchant and of positive statute the law does not enable any man by a written engagement to give a floating right of action at the suit of any one into whose hands the writing may come, and who may thus acquire a right of action better than the right of him under whom he derives title."*

[73] The term was coined by Professor Sir Roy Goode during the preparation of the 1971 Crowther Report on Consumer Credit (Cmnd. 4596, 1971).

[74] See Michael Bridge, *Personal Property Law* (4th edn, Clarendon Law Series 2015) 19.

[75] It is in the very nature of documentary intangibles, at least as the law currently stands, that the document can be physically possessed. See Smith and Leslie, *The Law of Assignment* (3rd edn, Oxford 2018) para 2.79: *"Thus, in the case of documentary intangibles, the document is essential to the right, and it is the transfer of the document that is critical to the transfer of the right."* This is why documentary intangibles have many of the attributes of things in possession.

[76] See Bridge (n 74) 19. See also Ewan McKendrick (ed), *Goode on Commercial Law* (5th edn, Butterworths 2015) para 2.56.

[77] The obvious exception to this is security tokens.

[78] Smith (n 75) para 9.43.

[79] Smith (n 75) para 32.49. One example of dematerialisation is the CREST system for shares used in the United Kingdom and Republic of Ireland.

[80] See the helpful discussion in Bridge, Gullifer (n 27) ch 5.

[81] Michael Bridge, Louise Gullifer and ors, *The Law of Personal Property* (Sweet & Maxwell 2017) para 5-029.

[82] See Aikens, Bools, Lord, *Bills of Lading* (2nd edn, Informa 2015) para 2.119.

[83] Smith (n 75) para 9.05.

A001998

84 See Bridge (n 74) para 5-010. In *Dixon v Bovill* (1856) 3 Macq HL 1, 16 Lord Cranworth LC said: *"Independently of the law merchant and of positive statute the law does not enable any man by a written engagement to give a floating right of action at the suit of any one into whose hands the writing may come, and who may thus acquire a right of action better than the right of him under whom he derives title."*

85 Thus, in *Bechaunaland Exploration Co v London Trading Bank Ltd* [1891] 2 QB 658 (QBD), 666-7, Kennedy J heard evidence from various experienced bankers.

86 such that a judge could to take judicial notice of it, as occurred in *Edelstein v Schuler & Co* [1902] 2 KB 144 (KBD), 155-6 (Bigham J).

87 See *Edelstein v Schuler & Co* [1902] 2 KB 144 (KBD), 154 (Bigham J): *"It is no doubt true that negotiability can only be attached to a contract by the law merchant or by a statute; and it is also true that, in determining whether a usage has become so well established as to be binding on the Courts of law, the length of time during which the usage has existed is an important circumstance to take into consideration; but it is to be remembered that in these days usage is established much more quickly than it was in days gone by; more depends on the number of the transactions which help to create it than on the time over which the transactions are spread; and it is probably no exaggeration to say that nowadays there are more business transactions in an hour than there were in a week a century ago. Therefore the comparatively recent origin of this class of securities in my view creates no difficulty in the way of holding that they are negotiable by virtue of the law merchant.......It is also to be remembered that the law merchant is not fixed and stereotyped...it is...capable of being expanded and enlarged so as to meet the wants and requirements of trade in the varying circumstances of commerce, the effect of which is that it approves and adopts from time to time those usages of merchants which are found necessary for the convenience of trade; our common law, of which the law merchant is but a branch, has in the hands of the judges the same facility for adapting itself to the changing needs of the general public; principles do not alter, but old rules of applying them change, and new rules spring into existence..."*

88 We note that this was also the view of the Law Commission and their correspondents in 2001: see the Law Commission, *Electronic Commerce – Formal Requirements in Commercial Transactions: Advice* (2001) paras 9.5– 9.7.

89 Diggory Bailey, Luke Norbury, *Bennion on Statutory Interpretation* (7th Edn, LexisNexis 2019) para 14.1; *Lockheed-Arabia v Owen* [1993] QB 806, 814.

90 Law Commission, *Electronic Commerce* (n 88) para 9.7.

91 Other, statutes define "goods" in different terms, e.g. Insolvency Act 1986 ss 183(4), 184(6): "'goods' includes all chattels personal"; Consumer Rights Act 2015 s 2(8): "'Goods' means any tangible moveable items, but that includes water, gas and electricity if and only if they are put up for supply in a limited volume or set quantity."

92 Paragraph 86 above.

93 Smith (n 75) para 2.67: *"This causes difficulty, since it is unclear whether intangible property existing outside the scope of the definition of a chose in action falls within the term 'personal chattels' or as an unarticulated exclusion from the scope of the Sale of Goods Act. For the sake of consistency, one would expect to treat all intangible property that is not a chose in action equivalently with choses in action: but the position is unclear."*

94 Paragraph 76 above. The Sale of Goods Act definition is taken largely unchanged from the earlier Sale of Goods Act 1893, passed only a few years after Fry LJ's judgment.

95 Although not impossible—the difficulty depends on the design of the system.

[96] Note that private contractual arrangements cannot override certain mandatory rules on ownership and legal title that apply in insolvency.

[97] See the distinction between positive and negative automation in Tatiana Cutts, 'Smart Contracts and Consumers' LSE Legal Studies Working Paper No. 1/2019, 3, available at <https://ssrn.com/abstract=3354272> accessed 15 October 2019.

[98] Except in specific cases such as contracts concerning equitable dispositions of land, guarantees and assignments of intellectual property rights. We deal below with statutory requirements that certain contracts must be made in writing.

[99] See e.g. *Re Hudson* (1885) 54 LJ Ch 811.

[100] *Edwards v Skyways Ltd* [1964] 1 WLR 349, 355.

[101] Section 82 of the Law of Property Act 1925 deals with the conceptual difficulty that a member of an association would (amongst others) be contracting with themselves as well as others, and provides that such agreements are enforceable '*in like manner as if the covenant or agreement had been entered into with the other person or persons alone*'.

[102] In *The Satanita* [1895] P 248; affirmed sub nom *Clarke v Dunraven* [1897] AC 59, it was held that a competitor in a regatta entered into contract with all other members, and that an owner of a damaged yacht was entitled to sue another competitor whose breach of the regatta rules had caused the damage, even though the parties were not known to each other.

[103] *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38.

[104] *Arnold v Britton* [2015] UKSC 36 [17] (Lord Neuberger).

[105] *Chartbrook* (n 103) [18].

[106] We believe that such issues are likely to be rare where smart contracts are developed using well-established, mature platforms and programming languages.

[107] It may not, of course, be possible for code recorded on a blockchain to be changed. In any event, the bar for rectification is a high one: '*before a written contract may be rectified on the basis of a common mistake, it is necessary to show either (1) that the document fails to give effect to a prior concluded contract or (2) that, when they executed the document, the parties had a common intention in respect of a particular matter which, by mistake, the document did not accurately record.*': *FSHC Group Holdings Ltd v Glas Trust Corporation Ltd* [2019] EWCA Civ 1361 [176] (Leggatt LJ). The other basis on which a contract may be rectified is where a party has taken advantage other the other party's unilateral mistake: '*where the party opposing the claim for rectification appreciated that the document departed from what had previously been negotiated between the parties, and that the other party was under a misapprehension, and the first party, though aware of this, forbore from drawing his attention to the error.*': *Holaw (470) Ltd v Stockton Estates Ltd* (2001) 81 P&CR 29 [41] (Neuberger J). In both cases, extrinsic evidence will inevitably be required.

[108] *Siu Yin Kwan v Eastern Insurance Co Ltd* [1994] 2 AC 199, 207 (Lord Lloyd): *"An undisclosed principal may sue and be sued on a contract made by an agent on his behalf within the scope of his actual authority"*.

[109] One answer to this issue may be the jurisdiction to commence proceedings and obtain judgment against *"Persons Unknown"* (see e.g. *CMOC Sales & Marketing Limited v Persons Unknown* [2018] EWHC 2230 (Comm)).

[110] We note that this has been the conclusion of the Law Commission on the two occasions on which it has examined this point. See Law Commission, *Electronic Commerce: Formal Requirements in*

*Commercial Transactions: Advice* (2001) and Law Commission, *"Electronic execution of documents"* (Law Com No 386, 2019).

[111] See *Golden Ocean Group Limited v Salgaocar Mining Industries Pvt Ltd & Or* [2011] EWCA Civ 265 [32] in relation to the Statute of Frauds 1677. See also *J Pereira Fernandes SA v Mehta* [2006] EWHC 813 (Ch) and *WS Tankship II BV v Kwangju Bank Ltd* [2011] EWHC 3103 (Comm) on the same point.

[112] See text to n 89 above. In that regard, it is clear that the use of electronic signatures has proliferated over recent years, as evidenced by EU and domestic legislation directly on the topic (see Directive on a Community framework for electronic signatures 1999/93/EC, Official Journal L 013 of 19/01/2000 p 12, EU Regulation 910/2014 of 23 July 2014 on electronic identification and the Electronic Communications Act 2000).

[113] *Newell v Tarrant* [2004] EWHC 772.

[114] Electronic Commerce (n 110) para 3.48.

[115] *Golden Ocean Group* (n 111).

[116] Interpretation Act 1978, s 5. This says that, in any Act, unless the contrary intention appears, the words and expressions in the Schedule to the Interpretation Act are to be construed in accordance with that Schedule.

[117] Any doubt could perhaps be resolved pursuant to s 8 of the Electronic Communications Act 2000, which provides Ministers with the power in certain circumstances to make subordinate legislation allowing for electronic communications to be used for the purpose of anything which is "required to be or may be done or evidenced in writing...".

[118] Electronic Commerce (n 110) para 3.19.

[119] Electronic execution of documents (n 110) fn 58.

# Appendices

## Appendix 1 - UKJT Consultation paper *The status of cryptoassets, DLT and smart contracts under English private law,* May 2019

This Appendix includes the body of the consultation paper that was issued in May 2019. The paper itself included substantial technical Annexes, namely:

Annex 1 – Questions to be addressed in the Legal Statement

Annex 2 – Overview and key features of DLT

Annex 3 – Cryptoassets

Annex 4 – Smart contracts

The full text of the consultation paper, including those Annexes, can be found at: www.lawsociety.org.uk/news/stories/cryptoassets-dlt-and-smart-contracts-ukjt-consultation/

A002002

**Consultation on the status of cryptoassets, distributed ledger technology and smart contracts under English private law[1]**

**1      Background to this consultation**

The development of distributed ledger technology ("**DLT**"), cryptoassets, smart contracts and associated technologies has far-reaching implications for financial markets, both domestically and internationally.

Nevertheless, the experience of market participants at present suggests that a lack of certainty regarding the legal status of cryptoassets, DLT and smart contracts could be hampering this development.[2]

This uncertainty does not solely arise in the context of English law and the jurisdiction of England and Wales.[3] However, creating a measure of confidence in these issues would increase confidence in the use of cryptoassets, DLT and smart contracts and bolster the use of English law and the jurisdiction of England and Wales in transactions concerning cryptoassets, as well as in smart contracts more generally.

English law, as a well-developed flexible common law system, has the ability to provide the certainty and predictability that the commercial community demands, and is well able to adapt to deal with fast-changing technologies. Consequently, English law and the jurisdiction of England and Wales are well-positioned to provide the legal foundation for the development of these technologies.

**2      Scope of this consultation**

The LawTech Delivery Panel ("**LTDP**") was established by the UK Government, the Judiciary and the Law Society of England and Wales and has as its overarching objective the promotion of the use of technology in the UK's legal sector.[4] The UKJT is one of six taskforces established by the LTDP for the purposes of achieving this objective.[5]

---

[1]   In this consultation paper, references to "English law" should be read as references to the law of England and Wales.

[2]   For example, respondents to the Financial Conduct Authority's April 2017 "Discussion Paper on distributed ledger technology" were particularly interested in the use of DLT in the capital markets sector, in particular, underpinning market trading infrastructure, including the use of smart contracts. However, respondents said that, before they would consider using those solutions at scale, they would have to be clearer on issues such as the legal status of cryptoassets and the enforceability of smart contracts. The Discussion Paper is accessible here:
https://www.fca.org.uk/publication/discussion/dp17-03.pdf (Accessed May 2019). See also paragraph 1.16 of the FCA's Feedback Statement published in December 2017, accessible here: https://www.fca.org.uk/publication/feedback/fs17-04.pdf (Accessed May 2019).

[3]   For example, we note that the European Union Blockchain Observatory Forum (in a report entitled "Scalability, Interoperability and Sustainability of Blockchains", published 6 March 2019) sets out in a list of recommendations the need to resolve the tensions between "GDPR and blockchain, the legal fiscal and accounting status of crypto assets, and the legal status of smart contracts, among others". The report is accessible here:
https://www.eublockchainforum.eu/sites/default/files/reports/report_scalaibility_06_03_2019.pdf (Accessed May 2019).

[4]   For further background on the LTDP, please see: https://www.lawsociety.org.uk/policy-campaigns/articles/lawtech-delivery-panel/ (Accessed May 2019).

[5]   LTDP taskforces have been established in the following areas: Ethics, Commercial Dispute Resolution, Investment, Education, Regulation, and UK Jurisdiction (i.e. the UKJT).

A002003

The objective of the UKJT is to demonstrate that English law and the jurisdiction of England and Wales together provide a state-of-the-art foundation for the development and use of DLT, smart contracts and associated technologies.

In pursuit of this objective, the UKJT is co-ordinating the preparation of an authoritative legal statement ("**Legal Statement**") on the status of cryptoassets and smart contracts under English private law. The intention is that the Legal Statement will either demonstrate that English private law already provides sufficiently certain foundations in relation to the relevant issues, or will highlight particular areas of uncertainty that may be ripe for further clarificatory steps to be taken.

The purpose of this consultation is to seek input from stakeholders as to the principal issues of perceived legal uncertainty regarding the status of cryptoassets and smart contracts under English private law to inform what should be addressed in the Legal Statement.

In Annex 1 (*Questions to be addressed in the Legal Statement*), we have set out what the UKJT considers to be the principal issues. However, ultimately, for the Legal Statement to serve its purpose, it must address those issues that market participants themselves are most concerned with. This is why we hope that key industry stakeholders will find time to participate in this consultation.

In Annex 2 (*Overview and key features of DLT*), we outline the key features of DLT. This informs the UKJT's understanding of the key legal issues arising in this context and, ultimately, those that will be addressed in the Legal Statement.

In Annexes 3 (*Cryptoassets*) and 4 (*Smart contracts*), we provide further detail on the technical aspects of cryptoassets and smart contracts, again, each with the intention of informing an understanding of the issues to be addressed in the Legal Statement.

### 3    Overview of the key issues of legal uncertainty included in this consultation

As this consultation and the Legal Statement are focused on private law, the questions identified in Annex 1 (*Questions to be addressed in the Legal Statement*) are accordingly limited in scope.

Quite intentionally, they do not cover certain other areas of law insofar as they relate to cryptoassets or smart contracts, including (among others) their regulatory characterisation and treatment, matters of taxation, criminal law, partnership law, data protection, consumer protection, settlement finality,[6] regulatory capital, anti-money laundering or counter-terrorist financing. We recognise that these are important areas, and ones in which market participants may feel there exists a degree of legal uncertainty in some instances. However, the UKJT feels that other bodies or organisations are better-placed to provide the necessary clarity on these issues, and so they do not form a part of this project.[7] The questions also do not address certain areas of perceived legal uncertainty where too many potential factual scenarios would need to be considered in order for any helpful answers to be provided.

---

[6]   For example, under the Financial Markets and Insolvency (Settlement Finality) Regulations 1999, as amended.

[7]   We note there are several projects underway which seek to address considerations in these areas. For example, the Basel Committee on Banking Supervision has published a "Statement on crypto-assets" (see: https://www.bis.org/publ/bcbs_nl21.htm (Accessed May 2019)), in which it has said that it will, in due course, clarify the prudential treatment of bank exposures to crypto-assets, and the Financial Conduct Authority has recently conducted a consultation on the regulatory characterisation and treatment of cryptoassets (see: https://www.fca.org.uk/publication/consultation/cp19-03.pdf (Accessed May 2019)).

A002004

We set out below some background on the questions which we have included in Annex 1 (*Questions to be addressed in the Legal Statement*).

### 3.1    Legal status of cryptoassets

Many aspects of the status of cryptoassets as a matter of English private law are considered by some to be unclear. In particular, notwithstanding that a significant amount of work has been undertaken in relation to a number of these issues by various academic, professional and public bodies, it is understood to be of general concern to the market that an authoritative response be given to the questions of whether, and, if so, the circumstances in which, a cryptoasset may be characterised under English law as property. The questions relevant to this are therefore set out in paragraphs 1.1 and 1.2 of Annex 1 (*Questions to be addressed in the Legal Statement*).

Property law matters both to users of a DLT system and to third parties dealing with those users. If a cryptoasset is not property, it cannot be owned. If it cannot be owned, it cannot be purchased, sold, otherwise transferred in law or rights to it asserted if it is stolen. Neither can a trust be declared, or security created, over it. The concept of a cryptoasset being recognised as property is therefore critical to the application of private law to transactions involving cryptoassets. If a cryptoasset is recognised as property, it is then necessary to understand the legal nature of that property. Traditionally, English law recognises physical things (*choses in possession*) and legal rights (*choses in action*) as property".[8] If a cryptoasset is recognised as property, does it fall into one of these categories or does it fall within some other category of property under English law? This is also critical to the application of private law to transactions involving cryptoassets because it is necessary to determine the location of property (its *situs*), under most legal systems, in order to determine the correct law governing transfers (alienation) of the property concerned.

Consequently, the response to the threshold question of whether a cryptoasset may be recognised under English law as property either dictates to a large degree or is materially relevant to the outcome of a series of ancillary questions, including whether certain types of security may validly be granted over it and its treatment for certain purposes as a matter of English insolvency law. These questions are set out in paragraphs 1.2.1 to 1.2.6 of Annex 1 (*Questions to be addressed in the Legal Statement*).

Equally, if a cryptoasset is capable of being recognised as property under English law, there is a series of additional questions as to other characterisations under English private law which may also be relevant. These questions include whether a cryptoasset may be characterised as a "documentary intangible" or as being "negotiable" (i.e. in the sense that a transferee may, by the mere transfer of a cryptoasset, acquire better title to that cryptoasset than that of its transferor), and whether cryptoassets may be recognised as "goods" for certain statutory purposes. These questions are set out in paragraphs 1.2.7 to 1.2.11 of Annex 1 (*Questions to be addressed in the Legal Statement*).

The UKJT also understands that there is uncertainty among market participants as to whether DLT records of cryptoassets are capable of amounting to a "register" for the purposes of evidencing, constituting and transferring title to certain types of securities under English law.

---

[8]    We do note, however, that in certain circumstances the courts have been prepared to recognise that certain intangible things, such as carbon emission allowances, which also do not clearly fall into either category of personal property are, nevertheless, capable of being recognised as property under English law. See *Armstrong DLW GmbH v Winnington Networks Ltd* [2012] EWHC 10 (Ch), for example.

A002005

This question is set out in paragraph 1.2.12 of Annex 1 (*Questions to be addressed in the Legal Statement*).

In Annex 3 (*Cryptoassets*), we discuss the meaning of the term "cryptoasset", building on the general overview of DLT provided in Annex 2 (*Overview and key features of DLT*). In doing so, we explain certain key features of cryptoassets within some commonly used DLT models, with the aim of providing the authors of the Legal Statement with a description of certain key common features, given the multiplicity of potential models which exist.

### 3.2   Enforceability of smart contracts

As noted by the Law Commission of England and Wales, to ensure that the English courts and English law remain competitive choices for business, there is a compelling case for reviewing the current English legal framework to ensure that it facilitates the use of smart contracts.[9]

It is understood that market participants attempting to replicate contractual arrangements written in prose using smart contracts, are principally concerned that the circumstances in which smart contracts are capable of giving rise to binding legal obligations be clarified. This question is set out in paragraph 2.1 of Annex 1 (*Questions to be addressed in the Legal Statement*).

The UKJT is aware that some market participants may question the merits of this exercise, given that some among them may view one of the benefits of smart contracts as being that they are sometimes considered to remove the need for parties to rely on a legal framework to enforce their rights against each other. However, if smart contracts are capable of giving rise to binding legal obligations, it will be important for parties to be aware of the circumstances in which this will be the case (notably if the parties' intention is not to create legal relations). It will also be important for parties to know if and how their rights might be enforced in the event that technology does not work as expected.

Again, depending on the answer to that principal question, a series of ancillary questions arises. Notably, how the general principles of contractual interpretation would be applied by an English court in the context of a smart legal contract and the circumstances in which a statutory signature or "in writing" requirement may be met in the context of smart legal contracts. These questions are set out in paragraph 2.2 of Annex 1 (*Questions to be addressed in the Legal Statement*).

In Annex 4 (*Smart contracts*), we discuss how the market currently understands the term "smart contract", again building on the general overview of DLT provided in Annex 2 (*Overview and key features of DLT*). In doing so, we explain at a high level certain of the key features of smart contracts, and how they differ as between different implementations. As with Annex 3 (*Cryptoassets*), the aim of this section is to inform and help circumscribe the answers that will be provided in the Legal Statement.

### 3.3   Application of English law

Readers may note that, with the exception of the question posed in paragraph 1.2.3 of Annex 1 (*Questions to be addressed in the Legal Statement*), the question of the extent to which English law would be the applicable law in relation to dealings or other arrangements involving cryptoassets or smart contracts is not dealt with directly.

---

[9]   The Law Commission of England and Wales, Thirteenth Programme of Law Reform (Dec. 2017), paragraphs 2.38 to 2.39. See: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/668113/13th-Programme-of-Law-Reform.pdf (Accessed May 2019).

A002006

The UKJT recognises that this is an area of much uncertainty for market participants. It is also of the view, however, that this is an issue which is highly fact-dependent, which limits the effectiveness of any attempt to provide a broad Legal Statement on the topic.

That said, the UKJT does consider that there would be value in setting out guidance within the Legal Statement as to the steps that may be taken by developers and participants to reduce uncertainty by ensuring, where desired, that English law will govern the relevant dealings or other arrangements, such as transactions within a DLT system or smart contracts to be deployed within such system.

### 4    Consultation questions

Your input is sought in relation to the following questions:

> 1.  Do consultees agree that the questions in Annex 1 (*Questions to be addressed in the Legal Statement*) to this consultation paper cover the principal issues as to the legal status of cryptoassets and smart contracts under English private law?
>
> 2.  If you disagree, what alternative questions or issues relating to the legal status of cryptoassets and smart contracts do you think need to be addressed?

### 5    Consultation process

This consultation will remain open for responses until 21 June 2019. Once this consultation has closed and the results have been considered, it is intended that the Legal Statement will be published in late summer of 2019. It will then be possible to see whether any further steps are necessary or appropriate.

Written responses to the consultation questions should be provided by:

(i)    completing the form set out at the following link: https://www.lawsociety.org.uk/news/stories/cryptoassets-dlt-and-smart-contracts-ukjt-consultation; or

(ii)    by email to UKJT@justice.gov.uk.

The UKJT will also be hosting a public event in order to receive feedback on the consultation questions in person. Further details on the public event, including details regarding registering for the event, can be found here: https://www.lawsociety.org.uk/news/stories/cryptoassets-dlt-and-smart-contracts-ukjt-consultation.

A002007

# Appendix 2 - List of respondents to the consultation

Laura Adde

Shazia Khan Afghan

Paul Airley, For Fladgate LLP

Dr Jason Allen

Alexandra Baddeley

Anurag Bana

Anthony Beaves

Joanna Benjamin, Cleary Gottlieb Steen & Hamilton LLP

Dishi Bhomawat, National Law University

Lee Braine, Barclays

James Burnie

Juan Cabrera

Jonathan Cardenas, Crowell & Morning LP

Phil Caton, Hill Dickinson LLP

Hilesh Chavda, Royds Withy King

Cecillia Chen

Bourn Collier, Green Woods GRM

Lyndon Coppin

Jennifer Craven, Pinsent Masons LLP

Akber Datoo

Bhavesh Dattani

Peter Davey, PD and Associates

Simon Davidson, Total

Emily Deane, STEP

Alfonso Delgado

Manu Duggal, Manu Duggal & Associates

Mateja Durovic, Dickson Poon School of Law, King's College London

Alice Edwards

David Ellis, W Legal

Henry Evans, Eversheds Sutherland

Henry Farrow

Henry Farrow

Matthew Feehily

Laura Feldman, Kings College London

Ross Finnie, Linklaters

Richard Folsom, Kemp Little

Hugo Forshaw, The Law Society

Michelle Foster, DKLM

Matthew Freeley

Emma Gilliot

Lars Gladhaug, University College London

Sandi Gollen

Catherine Goodman, Paul Hastings

Brian Gray, Brian Gray London

Ian Grigg

Shanel Grover

Dr Andres Guadamuz, University of Sussex

Sagar Gupta, Linklaters

Maria Gusinski

Selmin Hakki, Slaughter and May

Kirstin Halliwell, Trowers

Catherine Hammon, Osborne Clarke LLP

Jeff Hancock, getFIFO

Dr Edina Harbinja, University of Sussex

Kieran Hendrick, Withers LLP

Terry Hill, The Fry Group

Rachel Hillier, Capital Law

Paul Hobbs, Deloitte LLP

Charlie How

Peter Howes, Rite-Choice Ltd

Shahraq Hussain

Mehdi Husseini

Karen Ireland

Eitan Jankelewitz, Sheridans

Will Johnson, Nivaura

Suzanne Jeffers

Will Johnson, Nivaura

Jasmin Khalifa, Pinsent Masons LLP

Elizabeth Kiernan, Disney

Pavel Kilmov

Gareth Kristensen

Amila Kulasinghe, AMK Advisory

Dianna Kyles, Kings College London

Wendy Lawson-Shanks, IACCM

Steven Lightstone, Morgan, Lewis & Bockius UK LLP

James Loat, Globacap

Jelena Madir, European Bank for Reconstruction and Development

Lynn, McConnell, Custody Digital

Jim, McDonald, Wealdtech

Ciaran McGonagle, ISDA

Eva Micheler, LSE

David Michels, Cloud Legal Project

Professor Chris Millard, QMUL

Andrew Milne, CSM CMNO

Vince Ming

Danielle Murphy, Pinsent Masons LLP

Craig Neilson, Dentons

Michael Nicholls

Roisin Noonan

Bahar Noorizadeh

Matthew Nyman

Patrick O'Connell, Wiggin

Jannah Patchay, Markets Evolution

Oliver Pegden, Clifford Chance

Catherine Philips, Gowling WLG

Marc Piano, Fox Williams

Jennifer Poon, RBS Treasury Legal

Nishant Prasad, Nivaura

Tom Rhodes, Freshfields

Dermot Rice

Jules Becci de la Riviere

Jason Rix, Allen & Overy

Anne Rose, Mishcon de Reya LLP

Benjamin Ross, Bortstein LLP

Claire Royal, BNY Mellon

David Russel, Vodafone

Leigh Sugar, New Square Chambers

Jose Salazar

Adam Sanitt, Norton Rose Fullbight

Felicia Schiopu

Kate Scott, Clifford Chance

Cesar Serrano

Charitha Shashiraj, Linklaters LLP

Myshele Shaw, Euroclear

Amelia Slocombe

Sarah Smith, Dechert

Julia Smithers Excell, Whitecase

Ferdisha Snagg, Cleary Gottlieb Steen & Hamilton LLP

Liam Sorohan, Deloitte LLP

Macchi di Cellere Stefano, Macchi di Cellere Gangemi LLP

Simon Stokes, Blake Morgan LLP

Professor Konstantinos Stylianou, Leeds Law School

Suddankumar Subbaroyan, PWC

Luke Sully, Custody Digital

Andy Thomas

Victoria Thompson, CIT Legal

John Thorp, Amazon

Tjong Tjin Tai

Richard Tromans, Tromans Consulting

Raphael Uribe, W Legal Limited

Erwin de Vries, Tillburg University

Rupert Wall, Sidley

Ben Whitby

Claire Wiseman

Chris Wray

Matthew Wright

James Zengierski

Dr Mimi Zou, Oxford University

A002010

# Appendix 3 - List of specialist consultees

Sir Richard Aikens PC

Parma Bains, FCA

Gary Chu, UBS

Associate Professor Christopher Clack, UCL

Richard Cohen, Nivaura

Assistant Professor Tatiana Cutts, LSE

Oliver Dearie, Bank of England

Ian Dowglass, Euroclear

Ben Dyson, Bank of England

Dr Michèle Finck, Max Planck Institute for Innovation and Competition

Professor David Fox, University of Edinburgh

Professor Sir Roy Goode, University of Oxford

Tom Gover, HMT

Professor Sarah Green, University of Bristol

Professor Louise Gullifer, University of Cambridge

Andrew Hauser, Bank of England

Tom Hinton, London Stock Exchange

Will Johnson, Nivaura

Charles Kerrigan, CMS

Stephen Lewis, Law Commission

Dorothy Livingston, City of London Law Society

Ciaran McGonagle, ISDA

Siobhan McKeering, Law Commission

Declan McKeever, JP Morgan

Tolek Petch, Slaughter and May

Michel Rauchs, Cambridge Centre for Alternative Finance

Lakshmi Ravindran, Bank of England

Robert Sams, Clearmatics

Charlie Yeh, Apifiny

A002011

A002012

A002014

A link to this Legal Statement can be found at: https://technation.io/about-us/lawtech-panel

Please direct any questions or comments on the Legal Statement to: UKJT@justice.gov.uk

AA v Persons unknown who demanded Bitcoin on 10th and 11th October 2019 and others

*Overview*   |   **[2019] EWHC 3556 (Comm)**,   |   [2020] 4 WLR 35,   |   *[2020] 2 All ER (Comm) 704*,   |   *24 ITELR 513*

---

### *AA v Persons unknown who demanded Bitcoin on 10th and 11th October 2019 and others [2019] EWHC 3556 (Comm)*

Queen's Bench Division (Commercial Court)

Bryan J

13 December 2019Judgment

**MR. DARRAGH CONNELL** (instructed by **Brandsmiths SL Ltd**) for the **Claimant**

- - - - - - - - - - - - - - - - - - - - -

#### APPROVED JUDGMENT

#### MR. JUSTICE BRYAN:

#### <ins>INTRODUCTION</ins>

1.   There is before me today an application made by an applicant, an English insurer who requests to be anonymised, against four defendants. Those four defendants are: the first defendant, persons unknown who demanded Bitcoin on 10th and 11th October 2019; the second defendant, persons unknown who hold/controls 96 Bitcoins held in a specified Bitfinex Bitcoin address; the third defendant, iFINEX Inc trading as Bitfinex; and the fourth defendant, BFXWW INC also trading as Bitfinex.

#### <ins>BACKGROUND</ins>

2.   The application relates to the hacking of a Canadian insurance company that I will refer to simply as the Insured Customer. What happened in relation to that company is that a hacker managed to infiltrate and bypass the firewall of that insured customer, who happens to be an insurance company, and installed malware called BitPaymer. The effect of that malware was that all of the insured customer's computer systems were encrypted, the malware having first bypassed the system's firewalls and anti-virus software. The Insured Customer then received notes which were left on the encrypted system by the first defendant. In particular, there was a communication from the first defendant as follows:

"Hello [insured customer] your network was hacked and encrypted. No free decryption software is available on the web. Email us at […] to get the ransom amount. Keep our contact safe. Disclosure can lead to impossibility of decryption. Please use your company name as the email subject."

3.   The Insured Customer is insured with the applicant, (an English insurer), whom I shall refer to as "the Insurer"/"the Applicant". The Insurer is applying to be anonymised for reasons that I will come on to. The Insurer instructed, as is common in such cases, what is known as an Incident Response Company (IRC) that specialises in the provision of negotiation services in relation to crypto currency ransom payments. The Insured Customer is insured with the Insurer against cyber crime attacks.

4.  That entity, IRC, then was instructed by the Insurer to correspond with the first defendant on behalf of it and the Insured Customer so as to negotiate the provision of the relevant decryption software (the tool) which would allow the Insured Customer to re-access its data and systems.    Following initial emails from IRC asking the first defendant: "*To relay your terms of decryption*" the first defendant stated *"Hello, to get your data back you have to pay for the decryption tool, the price is $1,200,000 (one million two hundred thousand).    You have to make the payment in Bitcoins."*

5.  After several exchanges the first defendant agreed the value of the payment to recover the tool as follows:

"as an exception we can agree on US $950K for the tool.  You can send us a few encrypted files for the test decryption  ((do not forget to include the corresponding _readme files as well)."

6.  Given the importance to the Insured Customer to obtain access to its systems, the Insurer agreed to pay the ransom in return for the tool.

7.  In further correspondence which is exhibited before me, and following the testing of several encrypted files, the first defendant stated as follows:

"The Bitcoin address for the payment […] When sending the payment check the USD/BTC exchange rate on bitrex.com we have to receive no less than USD 950K in Bitcoins.  It takes around 40-60 minutes to get enough confirmations form [sic] the blockchain in order to validate the payment.  Upon

receipt we send you the tool."

8.    The payment of the ransom in Bitcoin was via an agent of the Insurer, who was referred to as JJ, and who assists with the purchase and transfer of crypto currencies, including Bitcoins. Acting on the Insurer's instructions and with its authority JJ purchased and transferred 109.25 Bitcoins to the address that was provided.

9.  The ransom was subsequently paid at 12.24 on 10th October 2019 and by way of email IRC requested confirmation from the first respondent:

"Please reply.    You have received $950,000 and I am hoping we can get what we need ASAP.  Thank you."

10.  The tool was indeed received on 11th October 2019 at 04.07 pacific daylight time by way of the following message:

"Hello,

Here is the tool

Download

[address]

Delete:

[address]

Password:

[address]

AA v Persons unknown who demanded Bitcoin on 10th and 11th October 2019 and others [2019] EWHC 3556 (Comm)

Execute the tool on every impacted host"

11.    The tool was a click through application that had to be executed on each of the Insured Customer's encrypted systems.  The time it took to decrypt the data varied from system to system due to the quantity of the files on each system and the system's own resources, like processor and memory.  The information before me is that it took decryption of 20 servers of the Insured Customer five days and 10 business days for 1,000 desktop computers.

12.    Following the payment of the ransom and the provision of the decryption tool, further investigations were undertaken on behalf of the Insurer by an employee who is also the deponent of an affidavit, dated 3rd December, in support of the various applications that are made before me.

13.    Those investigations involved contacting a specialist company who is a provider of software to track payment of crypto currency.  That company is Chainalysis Inc, which is a blockchain investigations firm operating in New York, Washington DC, Copenhagen, and London.  They are known in the public domain not least because their work was referred to in a recent High Court case of *Liam David Robertson v Persons Unknown,* CL-2019-000444, unreported, 15th July 2019, a decision of Moulder J, where she relied upon an analysis provided by that entity to track 80 Bitcoin to a wallet/account/address held by a crypto currency exchange called "Coinbase".

14.    In the present case, it was possible to track the Bitcoins that had been

transferred as a ransom.  Whilst some of the Bitcoins was transferred into "fiat currency" as it is known, a substantial proportion of the Bitcoin, namely, 96 Bitcoins, were transferred to a specified address.  In the present instance, the address where the 96 Bitcoins were sent is linked to the exchange known as Bitfinex operated by the third and fourth defendants.

15.  The Insurer is unable to identify the second defendant from the Bitcoin address referred to but that is information which is either held or likely to be held by the third and fourth defendants, to comply with their Know Your Customer ("KYC"), an anti-money laundering requirement.

## APPLICATION FOR HEARING TO BE IN PRIVATE

16.    Set against that background the first application that was made before me was for this hearing to be in private.  The important principle of open justice is one which is well established.  The origins and the rationale, for the principle, was stated by Lady Hale in *Cape Intermediate Holdings Ltd v Dring [2019] UKSC 38*, at [42] and [43], referring to *Scott v Scott* [1931] AC 417.

17.  The relevant provision of the CPR is CPR 39.2, which provides:

"39.2(1) The general rule is that a hearing is to be in public.  A hearing may not be held in private irrespective of the parties' consent unless and to the extent that the court decides it must be held in private applying, the provisions in paragraph (3).

"39.2(2) In deciding whether to hold a

hearing in private the court must consider any duty to protect or have regard to a right to freedom of expression which may be affected."

18.    CPR.39.2 was recently amended by the addition of a new subparagraph (2A) which provides:

"The court shall take reasonable steps to ensure that all hearings are of an open and public character save when a hearing is held in private."

19.    Subparagraph 39.2(3) provides:

A hearing, or any part of it, must be held in private if, and only to the extent that, the court is satisfied of one or more of the matters set out in sub-paragraphs (a) to (g) and that it is necessary to sit in private to secure the proper administration of justice—

(a) publicity would defeat the object of the hearing;

(b) it involves matters relating to national security;

(c) it involves confidential information (including information relating to personal financial matters) and publicity would damage that confidentiality;

(d) a private hearing is necessary to protect the interests of any child or protected party;

(e) it is a hearing of an application made without notice and it would be unjust to any respondent for there to be a public hearing;

(f) it involves uncontentious matters arising in the administration of trusts or in the administration of a deceased person's estate; or

(g) the court for any other reason considers this to be necessary to secure the proper administration of justice.

20.    The test is one of necessity and not of discretion: see *AMM v HXW [2010] EWHC 2457 (QB)*, per Tugendhat J. This is reflected in the wording of rule 39.2(3), such that a hearing or part of a hearing <u>must</u> be held in private if the court is satisfied that one or more of the factors specified in the subparagraphs (a) to (g) are satisfied and it is necessary to sit in private to secure the proper administration of justice. The court also needs to consider proportionality, namely whether the proper administration of justice can be achieved by a lesser measure or combination of measures such as imposing reporting restrictions, anonymising the parties, or restricting access to court records. This is because a private hearing will restrict the exercise of the Article 10 Convention right of freedom of expression, through prohibiting the disclosure of information.

21.    It is well established, as is acknowledged in this case by the Insurer, that the general principle that hearings be held in public is not to be lightly departed from in respect of civil proceedings. It is submitted, however, that there are compelling grounds, supported by credible and cogent evidence, as to why in this particular, and unusual, case the hearing should be held in private, relying upon the

AA v Persons unknown who demanded Bitcoin on 10th and 11th October 2019 and others [2019] EWHC 3556 (Comm)

grounds specified in 39.2(3)(a) (c) (e) and/or (g).

22.  First of all, in terms of publicity, it is said that publicity would defeat the object of the hearing.  The overarching purpose of the application is to assist the applicant in its efforts to recover crypto currency in the form of the 109.25 Bitcoins that were unlawfully extorted pursuant to what is characterised as an extortion/blackmail, perpetrated on the 10th and 11th October against the Insured Customer and resulting in financial loss to the Insurer.

23.  If the hearing were to be held in public there is a strong likelihood that the object of the application would be defeated.  First of all, there would be the risk, if not the likelihood, of the tipping off of persons unknown to enable them to dissipate the Bitcoins held at the second defendant's account with Bitfinex, the real possibility of reprisal or revenge cyber attacks on either the Insurer or indeed the Insured Customer by persons unknown, the possibility of copycat attacks on the Insurer, and/or the Insured Customer and the revealing of confidential information considering the Insurer's processes and the Insured Customer's systems which will be necessary on this application, in circumstances where the vulnerability of those very systems form the basis for the blackmail itself.  Ultimately, the applicant contends it is necessary for the court to sit in private to secure the proper administration of justice.

24.  There are previous authorities touching upon such matters.  For example, in cases concerning blackmail - and this is certainly analogous to that,

a ransom is being demanded and money is being extorted in return for the decrypting of computer systems -  it is more common for the court to permit hearings to be held in  private.  This is because the interests of freedom of expression are naturally tempered by the criminal conduct in question and the presence of blackmail will be an important factor and matter in determining privacy applications where injunctive relief is sought to thwart blackmailers as was noted by Warby J in *LJY v Persons Unknown* [2018] EMLR 19 at [29]:

"Generally, the court has taken the view that blackmail represents the misuse of freedom of speech rights. Such conduct will considerably reduce the weight attached to free speech and correspondingly increase the weight of the arguments in favour of restraint. The court recognises the need to ensure that it does not encourage or help blackmailers or deter victims of blackmail from seeking justice before the court.  All these points are well recognised ."

25.  It has also been recognised that these considerations apply in the event of ransom funds having already been paid.  That was emphasised in *NPV v QEL* [2018] EMLR 20 where the court permitted an interim application to be heard in private in the context of the ongoing blackmail of a businessman who demonstrated at least a prima facie case that he had already been blackmailed and an attempt was being made to continue that blackmail effort to obtain more money.  It was held in that case that the court had to *"adapt its procedures"* to ensure that it neither encouraged nor assisted blackmailers nor deterred victims of blackmail from

seeking justice from the courts. If the application had been heard in public the information which the claimant was trying to protect would have been destroyed by the court's own process. Further, at least until the return date when the issue could be reconsidered, the defendants would also be anonymised. The claimant was making serious allegations against the defendants and they had not yet had an opportunity to respond.

26.  It is said of particular relevance in present case is the case of *PML v Persons Unknown* [2018] EWHC 838 QB. In that matter, PML was the victim, as here, of a cyber attack by unknown hackers demanding £300,000 worth of Bitcoin and in default of payment certain information would be publicly disseminated.  PML made an interim application for, amongst other things, an interim anonymity order and orders to restrain the threatened breach of confidence and for delivery up and/or destruction of the stolen data.

27.  At the interim hearing which came before me, I sat in private and granted the injunction.  In doing so I made a series of further orders, including anonymising the claimant and restricting access to the court files. I was satisfied that the requirements of section 12(3) of the Human Rights Act 1998 were met.  I was also satisfied that the requirements under section 12(2) of the same Act were met, where the claimant appeared to be a victim of blackmail and there was a risk that, were the defendant to be given notice of the application, he would publish the relevant information and there were compelling reasons why the defendant had not been notified of the application. At the return hearing the court ordered

the application continue to be heard in private as the judge on the return date, Nicklin J, was satisfied that it was strictly necessary to hear the application in private  pursuant to CPR 39.3 (a) (c) and (g).    Of particular relevance was that the purpose of the proceedings would have been frustrated, or at least harmed, had the hearing been conducted in public.    It was necessary for the court to hear evidence and submissions relating to the blackmail activities of the persons unknown along with the nature of the attack in question.

28.  In the present case it is said that confidential material is involved, including details of the confidential cyber insurance policy held by the customer, the precise mechanism by which the cyber attack occurred, details of the confidential internal procedures of the Insurer and details of the way in which the Insurer had discovered the location of the Bitcoins, although I recognise  that a number of those pieces of information are probably in the public domain in any event  (at the level of detail which I have identified them), although further confidential information is also before me which I have had to consider.

29.  A recent example of a commercial case in which the court permitted the hearing of the application for interim relief in private is *Taher v Cumberland* [2019] EWHC 2589 QB.  In that case the court granted an order for the hearing of a committal application be heard in private for reasons which were set out at [76] of the judgment:

"I heard the Privacy Application at the beginning of the hearing, giving reasons in public for granting it, which I

summarise as follows:

i)  The Orders are principally concerned with preventing the defendants and, in particular, Mr Cumberland, directly or indirectly, from making or encouraging the making of disparaging statements about the claimants or in other ways acting to damage the business or reputation of the claimants. It will be necessary during the course of the hearing to consider various allegations and allegedly damaging statements made by Mr Cumberland, his motivations for making them and other relevant circumstances, the ventilation of which could have the damaging effect of which it is the purpose of this claim to prevent or avoid.

ii)  I was satisfied that the grounds set out in CPR 39.2(a) , (c) and (g) apply to this case and justify the hearing of the matter in private.

iii)  I considered whether it was necessary and proportionate to conduct the hearing in private or whether some lesser measure or combination of measures would suffice, such as imposing reporting restrictions, anonymising the parties or restricting access to court records. I was satisfied, however, that no lesser measure or combination of measures would provide the necessary protection, given the nature of the conduct alleged against Mr Cumberland (much of which, I note, he admitted during the course of the hearing) which would make it difficult, if not impossible, for the court effectively to police and enforce lesser measures.

iv)  I found it relevant to these considerations that the business of the claimants is one in which the reputation of the companies and of the leading individuals managing and operating them are of critical importance. Damage to reputation can lead to rapid and potentially massive losses for a business operating in the international financial services sector."

30.  I am satisfied that this is an appropriate case for the hearing to be heard in private, as I indicated at the start of the hearing saying I would give reasons in due course. My reasons are given now. First of all, I am satisfied for the purpose of CPR 39(3) that publicity would defeat the object of the hearing. It would potentially tip off the persons unknown to enable them to dissipate the Bitcoins; secondly, there would be the risk of further cyber or revenge attacks on both the Insurer and the Insured Customer by persons unknown; there would be a risk of copycat attacks on the Insurer and/or the Insured Customer and I am satisfied that in all the circumstances it is necessary to sit in private so as to secure the proper administration of justice.

31.  In terms of the application itself and the hearing before me, I am also satisfied that limb (c) is also applicable because during the course of this hearing I was provided with confidential information which I have not repeated during the course of this judgment and it was necessary for me to hear that confidential information properly to rule upon this application.

32.  Equally, (e) applies, it is as hearing of an application made without notice and it would be unjust for any respondent to be referred to in a public hearing.  That applies, in particular, to the third and fourth defendants who

have not yet had an opportunity to address this court, and as will become apparent, at the very least they have, by the nature of the Exchange that they run, become mixed up in the wrongdoing, perpetrated by the first and second defendants.

33.  I am satisfied that the sentiments expressed by Warby J in *LJY* apply here.  It is important in the context of blackmail and extortion that those who have suffered such wrongs should not be put off approaching the court and should be offered assistance in such circumstances, and blackmail itself represents a misuse of free speech, which will mean that the interests of justice and the interests of freedom of expression are naturally tempered by the civil and potentially criminal conduct in question.  I consider for the same reasons as I gave in the *PML* case that the requirements under section 12 of the Human Rights Act are also met in the present case.

34.  For very much the same reasons I am also satisfied that this application was properly made without notice to the first and second defendants.  Again, by the very nature of the relief sought, if the first and second defendants had been notified of this application, then steps could have been taken to thwart any order by moving the Bitcoins. These concerns are particularly important in the context of virtual currencies such as Bitcoin because they can be moved literally at the click of a mouse.

35.  So far as the position of the third and fourth defendants are concerned, this application is actually made ex parte on notice, by that I mean that the third and fourth defendants, who are

effectively the Exchange, who are holding the Bitcoin, were notified of this application.  I consider that it was appropriate to do so although they are mixed up, it is said, in the wrongdoing and indeed it is said on behalf of the claimant, as I shall come on to, that in fact there is a cause of action against them in the form of a restitutionary claim or a constructive trust. Essentially, they have become mixed up in this wrongdoing. At the present time there is no evidence that they are themselves perpetrators of the wrongdoing, rather, it is said, they have found themselves the holder of someone else's property, or at least that is how it is characterised for the purpose of this application by the claimant, with the result that there may be claims against them for restitution or as constructive trustees vis a vis, the Insurer.

36.  I also consider it is appropriate to anonymise the Insurer in the terms that I have identified, again because of the risk of retaliatory cyber attacks upon the Insurer just as much as upon the Insured Customer.

37.  It is likely that once the first and second defendants are served and/or the property is protected, I will lift the privacy in respect of this judgment so that it can be publically reported. It has been drafted in terms that will allow that to be done. The public reporting of judgments is an important aspect of the principle of open justice.

## NORWICH PHARMACAL/BANKERS TRUST APPLICATION

38.  Turning then to the nature of the claims and the relief that is sought, as the application came before me the

following relief was sought. First of all, a Bankers Trust order and/or a Norwich Pharmacal order requiring the third and fourth defendants to provide specified information in relation to a crypto currency account owned or controlled by the second defendant; and/or, a proprietary injunction in respect of the Bitcoin held at the account of the fourth defendant; and/or, a freezing injunction in respect of Bitcoin held at the specified account of the third or fourth defendant; and consequential orders to serve the same, including alternative service and service outside the jurisdiction.

39. As is rightly noted in the supporting skeleton argument, this application raises certain novel legal issues relating to crypto currencies. In this regard, the court has recently grappled with analogous issues in the cases of *Vorotyntseva v Money-4 Limited, trading as Nebeus.com* [2018] EWHC 2598 (Ch), a decision of Birss J, and *Liam David Robertson v Persons Unknown* (unreported 15th July 2019) a decision of Moulder J. In addition, my attention has been referred to the recent legal statement of the UK jurisdiction Task Force "Crypto Assets and Smart Contracts" dated 11th November 2019, about which more in due course.

40. During the course of oral argument before me, I explored in some considerable detail with Mr. Darragh Connell, counsel, who appears on behalf of the claimant Insurer, in relation to precisely what causes of actions were claimed, and what jurisdictional gateways there were for service out of the jurisdiction in relation to each of the claims.

41. Another point that arose and which I explored with Mr. Connell was in relation to the application for Bankers Trust or Norwich Pharmacal type relief against an entity (the two entities which are D3 and D4) who are out of the jurisdiction. It appears they are in fact BVI companies, although a number of their officers, including the chief financial officer and the chief technical officer, have close association with this jurisdiction, indeed it appears that the chief financial officer may be resident in this jurisdiction and that the chief technical officer has at least some association with this jurisdiction.

42. When corresponding with the third and fourth defendants putting them on notice of this application, an address in China was also identified. It is fair to say that D3 and D4, at the moment at least, have cooperated with the claimant in the following sense, which is that in email correspondence they have indicated that they are not able to comply with any order to identify anyone associated with the account, absent a court order, but that it is their practice to comply with the court order for any national jurisdiction. They had initially said that they were prepared to accept service by email which is their normal method of service but I have now been shown an email on 4th December 2019 whereby they have said they are required to be served in the British Virgin Islands.

43. In light of that there is also an application for alternative service against them using the email addresses with which there has been communication. I should also say that those communications copy in counsel from a set of chambers in London. It is assumed, therefore, that they have

London counsel, although enquiries were made this morning to ensure that counsel was not attending and the message that was passed back to me was that they did not have any instructions to attend on the application. It is fair to say, therefore, that on the application, so far as the third and fourth defendants were aware of it, adopted an essentially neutral stance in relation to the applications.

44.  As I say, I have explored with Mr. Connell both the causes of action that his client has and also the jurisdictional gateways which he relies upon for his various claims for relief. One potential complication that arises in relation to the Bankers Trust order and/or the Norwich Pharmacal order is that it would be requiring an institution out of the jurisdiction to provide information pursuant to a court order of the English court.  A question arises as to whether there is jurisdiction in this court to do that and to serve such an order out of the jurisdiction.

45.  The position in relation to that had not been definitively determined.  There is a decision of Waksman J in the case of *CMOC v Persons Unknown* [2017] EWHC 3599 Comm, in which an application was sought for worldwide freezing relief against persons unknown and one of the orders that the judge made at [10] related to Bankers Trust type relief and the judge said:

"It seems to me that, first of all, there is a good case for seeking the information in documents contained in the order which I am making in respect of the banks, because that is the critical source to discover what has happened to the money which has been paid out from the claimant's bank account in

London pursuant to the alleged fraud. I am satisfied there is jurisdiction to do that under Bankers Trust v. Shapira principles , and/or CPR 25.1(1)(g) . Secondly, there still has to be a case for service out even if no positive remedy is sought against those defendants other than the information. For present purposes I am satisfied that in relation to those banks which are situate outside the EU and outside this jurisdiction, that is covered by the fact that they are a necessary and proper party to the claims which have been brought against the perpetrator defendants; and in respect of service within the EU that Article 7.2 of the recast Brussels Regulation will apply, subject to the claimants filling out and attaching to the claim form, Form 510 where they certify to that effect."

46.  The learned judge on that occasion assumed that it would be possible to make a Bankers Trust order and serve it out of the jurisdiction on a foreign entity relying upon the necessary and proper party gateway.  However, I drew the claimant's attention to another decision, which is the decision of Teare J, in *AB Bank Ltd v Abu Dhabi Commercial Bank PJSC [2016] EWHC 2082 (Comm)*, which it appears Waksman J was not referred to.  In that case Teare J had to consider an application to serve a claim form out of the jurisdiction where there was a foreign bank innocently mixed up in a fraud that had been perpetrated and the question was whether Norwich Pharmacal/Bankers Trust type relief was a claim for an interim remedy for the purpose of the jurisdictional gateway in paragraph 3.1.5 of Practice Direction 6B.

47.  The learned judge concluded in

relation to various gateways, first of all, that it was not an interim remedy under section 25.1 of the Civil Jurisdiction Judgments Act 1982 but was indeed a final remedy.  Secondly, that it was not an injunction ordering an act within the jurisdiction on the facts of that case, and, thirdly, that the necessary and proper party gateway was not met either.  He said:

"29.  On 8 March 2016 ADCB Dubai, through its solicitors, stated that it was willing to write to the Central Bank to seek guidance as to whether the documents might be disclosed and was willing for the Claimant to join it in submitting a joint application to the Central Bank on the issue. On 9 March the Claimant, through its solicitors, requested more details about the proposed approach, doubted that the Central Bank would entertain a request from the Claimant and said that the will to disclose must come from ADCB Dubai. On 14 March 2016 the Claimant referred to the letter of 9 March 2016 and requested a detailed response. On 18 March 2016 ADCB Dubai said that it had made a reasonable offer to seek guidance from the Central Bank and to submit a joint application on the issue. ADCB Dubai was willing to agree the wording of an application and hoped that the Claimant's questions had been answered. However, there was no further response and so on 4 April 2016 ADCB Dubai wrote to the Central Bank informing it of this court's order and stating that it understood that "local regulations do not permit us to take action based on an order from a foreign court" and that it could only release customer information "where we receive an order from either a local court (ie UAE based) or Central Bank of UAE." ADCB Dubai went on to say that

it had been argued that its terms and conditions gave a discretion for release information to third parties but that it did not understand that "general contractual rights override regulations issued by our regulator." ADCB Dubai urgently requested the Central Bank to approve its interpretation or approve the release of documents pursuant to the UK court order.

30.  Counsel for the Claimant criticised the terms of the letter to the Central Bank dated 4 April 2016. I agree that it might have been better if clause 2 of ADCB Dubai's terms and conditions had been quoted and if a copy of Al Tamimi's advice had been appended. However, given the offer made by ADCB Dubai to agree the terms of any approach to the Central Bank I do not consider that ADCB Dubai can be criticised for the terms of their letter to the Central Bank.

31.  On 7 April 2016 the Bank replied as follows:

"While agreeing with your interpretation, you may proceed further in accordance with 2007 Treaty between UAE and UK on Mutual legal Assistance. While writing to the court, you may highlight the legal restriction on the bank to pass on any customer related information to third parties without prior approval of the Central Bank. It will therefore be necessary to follow the protocol given in the Treaty in order for the Central Bank of the UAE to pass on the required information to the court in the UK thought the proper channels."

48.  He concluded in that case that there was no gateway through which

AA v Persons unknown who demanded Bitcoin on 10th and 11th October 2019 and others [2019] EWHC 3556
(Comm)

the claim for Norwich Pharmacal relief could pass. He therefore set aside the order for service out of the jurisdiction.

49. Because of the potential difficulties that could possibly arise in relation to that, Mr. Connell partway through his application invited me to adjourn the Bankers Trust/Norwich Pharmacal aspect of the order. He also invited me to adjourn the aspect of the application which related to seeking a freezing injunction. Of course, the requirements under a freezing injunction would include a risk of dissipation that might well be satisfied, he would say, in relation to the first and second defendant but he would need to address the court in relation to the position of the third and fourth defendants. Realistically, if I might say so, Mr. Connell narrowed his application before me to one for a proprietary injunction against all four defendants pending any return date at which he reserved the right to pursue the other applications.

## PROPRIETARY INJUNCTION APPLICATION

50. In relation to the causes of action set out in the claim form, Mr Connell candidly recognised that it would be necessary to amend the claim form. One of the difficulties with the claim form as it was originally drafted (and I suspect that part of the reason for this was because of the application to anonymise) was that it was not as clear as it might have been precisely what causes of action were being claimed by the Insurer.

51. The potential complication is, of course, that in addition to being the Insurer, and having paid out the ransom from its own money, the Insurer

was both subrogated to the rights of the Insured Customer and, secondly, there was an express assignment of such rights as the Insured Customer had. The claim form therefore raised proprietary claims in restitution and/or constructive trustees or for the tort of intimidation and/or fraud and/or conversion. It is possible that at least some of those causes of actions are those of the Insured customer, although a subrogated claim could be brought, or a claim under the assignment could be brought, by the insurer in relation to the insured customer's rights.

52. However, again Mr. Connell accepted for the purposes of today's application that the claims, in which he would seek permission to serve out of the jurisdiction and in respect of which he was seeking relief at the hearing before me, would be limited to the claims of the Insurer in restitution and/or constructive trustee against all four defendants. The rationale for that is as follows. The Insurer has paid out the sum of $950,000, that $950,000 is property belonging to the Insurer, that was used to purchase Bitcoin and the proceeds of that money can be traced into the accounts with Bitfinex, so says Mr. Connell. Those Bitcoins are being held by Bitfinex as constructive trustee on behalf of the Insurer and/or the Insurer has restitutionary claims against the third and fourth defendants who are actually holding and have possession of property which belongs to the Insurer and to which they have no right to themselves and, equally, against the first and second defendants, who are the account holders of those accounts, who have wrongfully extorted that money and have no right to the money that belongs to the Insurer.

53.  I therefore turn to those causes of action.  I should say that it will be necessary for the claim form to be amended, first of all, to clarify exactly what causes of action are being sought under the details of the claim and against whom. The amendments will be to make claims against the first to fourth defendants for restitution and/or as constructive trustee to recover and take a proprietary claim over those monies, including delivery up of the Bitcoins and such matters.  I will discuss the precise terms of that claim form in due course with Mr. Connell, but he has indicated to me that he can give an undertaking to issue a claim form advancing those claims.

54.  I therefore turn to the relief that is sought and also the relevant jurisdictional gateways.

55.    Turning then to the relevant principles in relation to the granting of a proprietary injunction, the first and perhaps fundamental question that arises in relation to this claim for a proprietary injunction is whether or not in fact the Bitcoins, which are being held in this account of the second defendant with the third or fourth defendants are property at all.  Prima facie there is a difficulty in treating Bitcoins and other crypto currencies as a form of property: they are neither chose in possession nor are they chose in action.  They are not choses in possession because they are virtual, they are not tangible, they cannot be possessed.  They are not choses in action because they do not embody any right capable of being enforced by action.    That produces a difficulty because English law traditionally views property as being of only two kinds, choses in possession and choses in

action. In *Colonial Bank v Whinney* [1885] 30 Ch.D 261Fry LJ said:

"All personal things are either in possession or action.  The law knows no *tertium quid* between the two."

56.  On that analysis Bitcoins and other crypto currencies could not be classified as a form of property, which would prevent them being the subject of a proprietary injunction or a freezing injunction.    This exact issue has recently in November 2019 been the subject of detailed consideration by the UK Jurisdictional Task Force ("UKJT") which has published a legal statement on Crypto assets and Smart contracts, ("the Legal Statement").  The UKJT is chaired by Sir Geoffrey Vos, and Sir Antony Zacaroli is also a member. However, neither in their judicial capacity was responsible for the drafting of the legal statement, nor have either in their judicial capacities endorsed that legal statement. Indeed Sir Geoffrey Voss explained in the foreword to the Legal Statement: "*It is not my role as a judge nor that of the UKJT or its parent, the UK Lawtech Delivery Panel, to endorse the contents of the Legal Statement*".    Those responsible for drafting the Legal Statement were Laurence Akka QC, David Quest QC, Matthew Lavy and Sam Goodman.

57.  It follows that the legal statement is not in fact a statement of the law. Nevertheless, in my judgment, it is relevant to consider the analysis in that Legal Statement as to the proprietary status of crypto currencies because it is a detailed and careful consideration and, as I shall come on to, I consider that that analysis as to the proprietary status of crypto currencies is

compelling and for the reasons identified therein should be adopted by this court.

58. The difficulty identified in treating crypto currencies in property, as I say, starts from the premise that the English law of property recognises no forms of property other than choses in possession and choses in action. As I have already identified, crypto currencies do not sit neatly within either category. However, on a more detailed analysis I consider that it is fallacious to proceed on the basis that the English law of property recognises no forms of property other than choses in possession and choses in action. The reasons for this are set out between paragraphs 71 to 84 in the Legal Statement.

"71. The Colonial Bank case concerned a dispute about shares deposited as security for a loan. The borrower was declared bankrupt and there was a contest for the shares between the plaintiff bank and the trustee in bankruptcy. The case was not about the scope of property generally: there was no dispute that the shares were property. The relevant question was rather whether they were things in action within the meaning of the Bankruptcy Act 1883, an issue of statutory interpretation. If so, then they were excluded from the bankrupt estate by section 44 of that Act.

72. Lindley LJ and Cotton LJ held that the shares were not things in action. They relied principally on previous case law where the court had come to a similar conclusion in relation to the predecessor statute, the Bankruptcy Act 1869. They also drew some support from sections 50(3) and 50(5) of the 1883 Act, which appeared to make a distinction between shares and things in action.

73. Fry LJ reached the opposite conclusion, reasoning principally from what he considered to be the essential nature of a share. A share constituted "the right to receive certain benefits from a corporation, and to do certain acts as a member of that corporation" and was therefore, in his view, closely akin to a debt. He supported his conclusion by a comparison of shares to other, established, things in action, such as partnership interests and interests in funds.

74. Fry LJ's statement that "personal things" are either in possession or in action, and that there is no third category, may carry the logical implication that an intangible thing is not property if it is not a thing in action. It is not clear, however, whether Fry LJ intended that corollary and it should not in any case be regarded as part of the reasoning leading to his decision (and so binding in other cases). The question before him was whether the shares were things in action for the purpose of the Bankruptcy Act, not whether they were property, still less the scope of property generally.

75. Moreover, in making the statement Fry LJ attributed a very broad meaning to things in action. He approved a passage from Personal Property by Joshua Williams, which described things in action as a kind of residual category of property: "In modern times [sc. by the 19th century] … several species of property have sprung up which were unknown to the common law … For want of a better classification, these subjects of

personal property are now usually spoken of as ... [things] in action. They are, in fact, personal property of an incorporeal nature…".

76. On appeal, the House of Lords also framed the question as one about statutory interpretation. They reversed the Court of Appeal's decision, approving the judgment and reasoning of Fry LJ. They did not explicitly address the issue of exhaustive classification between things in action and things in possession and said nothing about the definition of property. Lord Blackburn did say, however, that "in modern times lawyers have accurately or inaccurately used the phrase '[things] in action' as including all personal chattels that are not in possession". Thus, to the extent that the House of Lords agreed with Fry LJ on the classification issue, that seems to have been on the basis that the class of things in action could be extended to all intangible property (i.e. it was a residual class of all things not in possession) rather than on the basis that the class of intangible property should be restricted to rights that could be claimed or enforced by action.

77. Our view is that Colonial Bank is not therefore to be treated as limiting the scope of what kinds of things can be property in law. If anything, it shows the ability of the common law to stretch traditional definitions and concepts to adapt to new business practices (in that case the development of shares in companies).

78. Colonial Bank was referred to in Allgemeine Versicherungs-Gesellschaft Helvetia v Administrator of German Property by Slesser LJ as showing "how the two conditions of [thing] in action and [thing] in possession are antithetical and how there is no middle term". Again, however, the case was not about the scope of property generally but about whether something that was undoubtedly property should be classified as a thing in possession or a thing in action.

79. Most recently, Colonial Bank was cited in 2014 in Your Response v Datateam. In that case, the claimant sought to assert a lien over a database in digital form but faced the obstacle of the previous decision of the House of Lords in OBG Ltd v Allan that there could be no claim in conversion for wrongful interference with a thing in action because it could not be possessed. In an attempt to distinguish the case from OBG, the claimant argued that, even if the database could not be regarded as a physical object, it was a form of intangible property different from a thing in action and so was capable of being possessed.

80. The Court of Appeal rejected the argument. Moore-Bick LJ said that Colonial Bank made it "very difficult to accept that the common law recognises the existence of intangible property other than [things] in action (apart from patents, which are subject to statutory classification), but even if it does, the decision in OBG Ltd v Allan [2008] AC 1 prevents us from holding that property of that kind is susceptible of possession so that wrongful interference can constitute the tort of conversion." He said that there was "a powerful case for reconsidering the dichotomy between [things] in possession and [things] in action and recognising a third category of intangible property, which may also be susceptible of possession and therefore amenable to the tort of

conversion" but the Court of Appeal could not do that because it was bound to follow the decision in OBG. The other members of the court agreed.

81. The Court of Appeal did not, and did not need to, go so far as to hold that intangible things other than things in action could never be property at all, only that they could not be the subject of certain remedies. The intangible thing with which they were concerned was a database, which (as Floyd LJ said) would not be regarded as property anyway because it was pure information. They did not have to consider intangible assets with the special characteristics possessed by cryptoassets.

82. In other cases, the courts have found no difficulty in treating novel kinds of intangible assets as property. Although some of those cases are concerned with the meaning of property in particular statutory contexts, there are at least two concerning property in general. In Dairy Swift v Dairywise Farms Ltd, the court held that a milk quota could be the subject of a trust; and in Armstrong v Winnington, the court held that an EU carbon emissions allowance could be the subject of a tracing claim as a form of "other intangible property", even though it was neither a thing in possession nor a thing in action.

83. A number of important 20th century statutes define property in terms that assume that intangible property is not limited to things in action. The Theft Act 1968, the Proceeds of Crime Act 2002, and the Fraud Act 2006 all define property as including things in action "and other intangible property". It might be said that those statutes are

extending the definition of property for their own, special purposes, but they at least demonstrate that there is no conceptual difficulty in treating intangible things as property even if they may not be things in action. Moreover, the Patents Act 1977 goes further in providing, at s30, that a patent or application for a patent "is personal property (without being a thing in action)". That necessarily recognises that personal property can include things other than things in possession (which a patent clearly is not) and things in action.

84. We conclude that the fact that a cryptoasset might not be a thing in action on the narrower definition of that term does not in itself mean that it cannot be treated as property."

59. The conclusion that was expressed was that a crypto asset might not be a thing in action on a narrow definition of that term, but that does not mean that it cannot be treated as property. Essentially, and for the reasons identified in that legal statement, I consider that a crypto asset such as Bitcoin are property. They meet the four criteria set out in Lord Wilberforce's classic definition of property in *National Provincial Bank v Ainsworth* [1965] 1 AC 1175as being definable, identifiable by third parties, capable in their nature of assumption by third parties, and having some degree of permanence. That too, was the conclusion of the Singapore International Commercial Court in *B2C2 Limited v Quoine PTC Limited* [2019] SGHC (I) 03 [142].

60.    There are also two English authorities to which my attention has been drawn where crypto currencies have been treated as property, albeit

that those authorities do not consider the issue in depth. They are, and I have already mentioned them, in *Vorotyntseva v Money -4 Limited t/a as Nebeus .com*, the decision of Birss J, where he granted a worldwide freezing order in respect of a substantial quantity of Bitcoin and Ethereum, another virtual currency, and the case of *Liam David Robertson*, where Moulder J granted an asset preservation order over crypto currencies in that case.

61. In those circumstances and for the reasons I have given, as elaborated upon in the Legal Statement which I gratefully as what I consider to be an accurate statement as to the position under English law, I am satisfied for the purpose of granting an interim injunction in the form of an interim proprietary injunction that crypto currencies are a form of property capable of being the subject of a proprietary injunction.

62. I therefore turn to the applicable principles in relation to a proprietary injunction. The basis upon which proprietary injunction is sought in respect of stolen funds is summarised in McGrath Commercial Fraud in Practice, 2nd edition, at paragraph 6.247 to 6.261. As Lord Browne-Wilkinson noted in *Westdeutsche Landesbank v Islington LBC* [1996] AC 669, when property is obtained by fraud equity imposes a constructive trust on the fraudulent recipient, the property is recoverable and traceable in equity. As confirmed by Scott J in *Poly Peck International PLC v Nadir (No.2) [1992] 4 All ER 769*, the *American Cyanamid* principles apply to a proprietary injunction. First there must be a serious issue to be tried, secondly, if

there is a serious issue to be tried, the court must consider whether the balance of convenience lies in granting relief sought. The balance of convenience involves consideration of the efficacy of damages as an adequate remedy, the adequacy of the cross- undertaking as to damages, and the overall balance of convenience, including the merits of the proposed claim.

63. As I say and for the reasons I have given, I am satisfied at least to the level required for the purposes of this application for interim relief that Bitcoins constitute property. I am satisfied that the test for a proprietary injunction against each of the four defendants, is also satisfied, that there is a serious issue to be tried as between the insurer and each of the four defendants in relation to the proprietary claims which I have identified, in relation to that Bitcoin which represents the proceeds of the monies paid out by the Insurer. Clearly, the ultimate strength of the claim against each of the four defendants is not a matter for determination before me today. I am satisfied that there is at least a serious issue to be tried against all four defendants. I should say that so far as the first and second defendants are concerned, I consider that the claims are very strong because those would appear to be those defendants who in fact committed the extortion and blackmail and obtained by way of ransom the sums concerned.

64. The position is less clear in relation to the third and fourth defendants who may simply have got mixed up in another's wrongdoing but certainly they are, as I understand it, holding Bitcoin

which belongs to the claimant which has (arguably) come into their possession in the furtherance of a fraud and in circumstances where they have no entitlement to retain that Bitcoin if the claimant demonstrates it is entitled to the relief which it seeks.

65. Therefore, I am satisfied that there is at least a serious issue to be tried which is all that is requited at this stage for an interim injunction. I am satisfied that the balance of convenience lies firmly in favour of granting relief in furtherance the Insurer's claimed proprietary rights. Equally I am satisfied that damages would not be an adequate remedy in circumstances where the 96 Bitcoins could be dissipated and I am satisfied that the insurer has a strong claim to the Bitcoins in question. The relief that is being proposed is either the same or very similar to the relief I note which was granted in terms of the asset preservation order granted by Moulder J (a copy of which I have been provided with).

66. However, in addition to a proprietary injunction, there is also ancillary relief as is usual in terms of providing information so that location of assets etc and where monies have moved to, for example, can be obtained. That is particularly apposite in the case of the first and second defendants, of course, because some of the money has in fact been converted into fiat currency but, equally, it may well be the case that because of the very rapid speed at which Bitcoins could be moved, that by the time this injunction is obtained that in fact some or all of the Bitcoins may have moved from the particular exchange or the particular account

within that exchange and ancillary information in relation to that is needed. I will revert to that.

67. First of all, however, I need to consider whether or not it is appropriate to grant service out of the jurisdiction in relation to the claims which are advanced. A number of gateways are relied upon under Practice Direction 6B. It is fair to say that an additional number of gateways were being considered in the context of the wider claims which I am going to adjourn, i.e. the claim for Norwich Pharmacal or Bankers Trust relief, as such, and also for a worldwide freezing injunction. The ones which are being claimed and relied upon for the purpose of the proprietary injunction, which is the matter in relation to which relief is being sought now is, first of all (2) a claim is made for an injunction order and the defendants be prevented from doing an act within the jurisdiction; (3) a claim is made against a person upon the whom the claim form has been served or will be served otherwise in reliance on this paragraph, and (a) there is between the claimant and the defendant a real issue which it is reasonable for the court to try and (b) the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim; (5) a claim is made for an interim remedy under section 25.1 of the Civil Jurisdiction and Judgments Act 1982; (9), a claim is made in tort where damage was sustained or will be sustained within the jurisdiction, or damage which has been or will be sustained that results from an act committed or likely to have been committed within the jurisdiction.

68. In the present case, I am satisfied that the claims which are sought in

terms of constructive trust and restitutionary claims, and the proprietary injunction that is sought in relation to those falls within (5), claim for interim remedy under section 25.1 of the Civil Jurisdiction and Judgments Act, as well as (9), claims in tort, where damage was sustained within the jurisdiction, the Insurer being an English insurance company who paid the money from, I am told, an English bank account and is registered here and therefore it is said has suffered loss in the money which was used to buy the Bitcoins which has ended up and has been traced through to wherever it is kept by Bitfinex.

69. I do not find it necessary to determine for present purposes whether or not the debate in relation to Bankers Trust and Norwich Pharmacal relief means that such an application - were it made - was one for interim relief or final relief because that application has been adjourned, so I express no view at the moment in relation to that.

70. So far as other gateways are concerned I consider that gateway (3) is potentially applicable because of the application of the other gateways that I have identified such that provided that any of the defendants can come within those other gateways, there are other defendants that would fall within the provisions of gateway (3). I say that also in relation to the third and fourth defendants because the relief that is being sought in terms of proprietary injunction and delivery up from them is actually substantive relief against them, i.e. the claimant is saying, "You are holding in your account Bitcoins which belonged to me, I suppose conceptually you have converted them and/or in any

event that you are holding them on constructive trust for me and therefore return them." This is not simply Bankers Trust or Norwich Pharmacal type relief which is once and for all relief. There is, therefore a prospect of a trial involving all four defendants.

71. Therefore, and for the reasons I have given, I am satisfied it is appropriate to serve the claim form out of the jurisdiction in relation to the causes of action that I have identified, i.e. the restitutionary and constructive trust causes of action which will be set out in the amended claim form which I will also grant permission both for amendment and to be served out of the jurisdiction.

72. That then raises a question in relation to alternative service. The applicable principles in relation to alternative service in relation to the claim form are set out at CPR 6.15 and at 6.27 in relation to other documents. 6.15 provides: *"(1) Where it appears to the court that there is a good reason to authorise service by a method or at a place not otherwise permitted by this Part, the court may make an order permitting service by an alternative method or at an alternative place.".*

73. One difficulty, of course, arises in relation to the first and second defendants, which is that because they are persons unknown it is not as yet known what jurisdiction they are in. They could be in this jurisdiction, in which case permission to serve out would not even be needed. They could be in any jurisdiction. This is not an unknown problem and the courts have grappled with this before. Two cases in particular that spring to mind are *LJY v Persons Unknown* [2017] EWHC 3230

QB, [2018] EMLR 19, where Warby J in the context of an individual C applying for an interim non-disclosure order restraining persons unknown D from publishing allegations of serious criminal misconduct and E being alerted to the possibility of publication in an anonymous letter received from D in which D invited C to make contact with them by "an unregistered and untraceable mobile phone, in that case the court granted, an application for an order requiring C to identify themselves and to provide an address for service and B authorising C in the event of D's non-compliance with that requirement to serve the claim form by the alternative method of filing it at court.

74.   Another relevant decision of Warby J's is *Clarkson plc v Persons Unknown* [2018] EWHC 417 QB, (7th March 2018).  In that case company C brought proceedings for an injunction to prevent unknown person D from disclosing or using confidential information illegally obtained from C's IT systems in circumstances where D threatened to publicise the information unless a very substantial sum was paid.  The court granted C an interim injunction prohibiting D from communicating or disclosing certain information to any third party or using it in any other way and made an order permitting C to serve the claim form on the email address used by D to make the blackmail threats.

75.   Turning first to the first and second defendants, I consider that this is an appropriate case for alternative service. There is good reason to do so.  It is not currently known where D1 and D2 are. I should say D1 and D2 are potentially one and the same person.   The alternative service that is sought is as

follows:   that   the   claimant   had permission to serve the order and all other documents required to be served in relation to the enforcement of the order or the proposed proceedings on the first and second defendants by email, by any address provided by the second and third defendants relating to the Bitcoin account identified at annex A, and by delivering or leaving it any physical   address   provided   by   the second and third defendants that relate to   the   Bitcoin   account   identified   at annex A, and it seems to me that it would be also appropriate to authorise service of the claim form by the alternative method of filing it at court, for   essentially   the   same   reasons   as were granted by Warby J in the *LJY* case.

76.   So far as the third and fourth defendants   are   concerned, communication to date has been by email and what is sought is service by email   to   three   email   addresses,   two previously used and one more recently used.   I   need   to   give   more   careful consideration   in   the   case   of   the   third and   fourth   defendants   because   they have   recently   communicated   saying that they require to be served in the BVI and therefore the cooperative approach which   they   had   been   indicating   they were   going   to   adopt,   that   they   could   be served by email which also appears to be their normal method of service, i.e. they accept service by email (which may reflect the fact that they are indeed a technology company), they have now indicated   they   want   to   be   served   in person in the BVI.  That does cause me some concern because they have also said in the same breath that they will cooperate with the court and any court order the court may make.

A002035

77.    I consider that there are three reasons why I should make an order for alternative against the third and fourth defendants as well.  The first is that this is really an urgent application.  It is very important that it comes to their attention quickly because it is concerned with the 96 Bitcoins which could be dissipated at any moment. That really leads on to the second point, which is that because of the very nature of Bitcoin they can be moved at the click of the mouse and therefore steps should be taken for the proprietary injunction to come to the attention of the account at the exchange at which the Bitcoin are held at the earliest possible opportunity. Thirdly, ultimately, these Bitcoin belong to the claimant, it is a proprietary claim, and it is important that the injunction is placed as soon as possible so that their rights are preserved and the risk of that property departing to an unknown location are minimised.

78.    For those reasons, and although it is exceptional to grant alternative service, I consider this is just the sort of case where there is good reason to grant alternative service and indeed even if the test is one of exceptional circumstances I am satisfied it is met for the reasons that I have identified. Therefore, I grant alternative service by email on the third and fourth defendants to the three email addresses that will be identified in the order.

79.    I should say that, as is apparent, the applications before me are on a without notice basis and therefore the claimants are under a duty of full and frank disclosure.  A number of matters have been raised before me orally today by Mr. Connell, as well as the matters which are set out in the supporting affidavit which I have borne well in mind, and I am not aware of any of those matters which militate against the granting of this order.  I have also asked whether there are any other matters which are required to be drawn to my attention.    Mr. Connell, on instructions, has told me that there are not.

80.    In the usual way there is a cross-undertaking in damages which clearly is appropriate.  I also have information before me which satisfied me that there is no requirement that that undertaking be fortified at least pending a return date.  By the nature of the relief which I am granting in terms of the order I consider that there should be a return date within a short period of time.  I will come on to the aspects of the order which deal with information but I consider a return date should be on Friday 20th December, first of all, because it seems to me that a period of about seven days is the right period for any first return date and secondly, I am conscious of the fact that after Friday it will be vacation and it will be better that if there are substantive issues arising that they are at least  either considered, or directions are given pending a further hearing,  at a hearing before the end of the legal term rather than this matter appearing before a vacation judge during the course of the vacation who may not have familiarity with the case or the issues that arise.    The return date will be Friday 20 December with a half day estimate.

81.    The other aspect of the injunction, the    proprietary    injunction,    is    an application that information be provided both in terms of the identity and address of D3 and D4 and that applies to all four defendants, i.e. that D3 and

D4 identify D1 and D2, equally D1 and D2 have to identify themselves, including their address, and any associated information that D3 and D4 may have in relation to D1 and D2. I am satisfied that that information is necessary to police the proprietary injunction that I have granted for the reasons that I have said and also I consider that the associated information would also be appropriate to be provided by way of pre-action disclosure in the action which the claimant is undertaking to commence forthwith against all four defendants. I will hear counsel in terms of the finalisation of the precise form of information to be provided.

82. In terms of timescale I can see no reason why that information should not be provided within short order. The claimant has been in correspondence with Bitfinex for some time. I have no doubt that Bitfinex has the ability to access its records and its KYC material to identify the information that is sought in relation to D1 and D2 and equally D1 and D2 clearly will know themselves that information.

83. What I am going to do is stagger the time by which the information has to be provided such that Bitfinex i.e. D3 and D4, should provide it by 4 p.m. next Wednesday, which I think is the 18th and that D1 and D2 provide the information by 4 p.m. on the 19th. I say that because until the information is supplied by D3 and D4 these proceedings may not come to the attention of D1 and D2 and so they would be unable to comply and it would be wrong in principle, it seems to me, to make the order for them to provide information at a time when it is possible the order may not have come to their attention.

84. That would mean, therefore, though, that everyone would have had to comply with the order by the return date.

85. Therefore, for the reasons I have given I am satisfied that it is an appropriate case for the granting of a proprietary injunction in the terms that I have identified against all four defendants, and for the reasons I have given, and it is appropriate to serve the amended claim form out of the jurisdiction and I give permission to do so under the gateways I have identified, together with alternative service for the reasons I have given.

86. I will adjourn the other applications for Bankers Trust/Norwich Pharmacal relief and for a worldwide freezing injunction to the return date in the first instance, no doubt in the meantime and in the light of the product of the order that has been obtained, it will be possible to give directions at that hearing as to what is to happen to those further applications. At that time, consideration can also be given, for example, in relation to orders for the provision of particulars of claim and in due course a defence so that any injunctions that are granted will either go to trial or can be brought to fruition within a relatively short period of time. Costs reserved.

87. I will now hear counsel in relation to the finalisation of the order.

……………………………….

AA v Persons unknown who demanded Bitcoin on 10th and 11th October 2019 and others [2019] EWHC 3556 (Comm)

---

**End of Document**

A002038

[2022] EWHC 280(QB)

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION

(reporting restrictions lifted,
and released for publication, 20 January 2022)

Case No:  QB-2022-000037

The Royal Courts of Justice
Strand
London
WC2A 2LL

Wednesday, 5th January 2022

Before:

THE HONOURABLE MR JUSTICE LANE

B E T W E E N:

SALLY JAYNE DANISZ

and

PERSONS UNKNOWN AND HUOBI GLOBAL LTD (T/A HUOBI)

MISS R L MULDOON appeared on behalf of the Applicant
NO APPEARANCE by or on behalf of the Defendants

JUDGMENT
(Approved)

*This Transcript is Crown Copyright. It may not be reproduced in whole or in part, other than in accordance with relevant licence or with the express consent of the Authority. All rights are reserved.*

*WARNING: reporting restrictions may apply to the contents transcribed in this document, particularly if the case concerned a sexual offence or involved a child. Reporting restrictions prohibit the publication of the applicable information to the public or any section of the public, in writing, in a broadcast or by means of the internet, including social media. Anyone who receives a copy of this transcript is responsible in law for making sure that applicable restrictions are not breached. A person who breaches a reporting restriction is liable to a fine and/or imprisonment. For guidance on whether reporting restrictions apply, and to what information, ask at the court office or take legal advice.*

MR JUSTICE LANE:

1. This is an application made *ex parte* for an interim proprietary injunction against both of the defendants cited in the claim form, a worldwide freezing order against persons unknown and a banker's trust disclosure order against the second defendant; and various ancillary orders.

2. I have dealt already with the issue of the mode of today's hearing which I ordered to be in private for reasons which I gave earlier.

3. The applicant seeks a prohibitory interim injunction, in terms of the draft order in front of me, that restrains the defendants, comprising in part, persons unknown, (although they have been identified as much as possible), and the second defendant, Huobi Global Limited, from dealing in the applicant's property either directly or indirectly.

4. This case is concerned with the cryptocurrency known as Bitcoin. The property which is the subject of the interim injunction is that known as 0.109998 Bitcoin.

5. This is said to have been misappropriated by the persons unknown but has been traced by an expert instructed by the claimant and whose report I have fully considered.

6. The Bitcoin is said to have been transferred to a so-called cryptocurrency end-wallet, ending 4932, at the exchange of the second defendant.

7. The applicant also seeks a worldwide freezing order, which would prohibit the persons unknown from unjustifiably disposing of or otherwise dealing with the 4932 Bitcoin in the wallet I have just mentioned.

8. The subject matter of the case can be dealt with relatively shortly. The claimant discovered a website known as Matic Markets Ltd and was encouraged by what she saw there to make investments in the form of Bitcoin, which she duly did, releasing £4,999.09 to it on 31 October, £4,979.13 on 2 November and £17,010.66 on 19 November, all in order to acquire certain Bitcoins described at paragraph 2.5 of Miss Muldoon's skeleton argument.

9. The claimant was encouraged to think that these Bitcoin investments had accrued in value, following her investment. However, when, in December 2021, she sought to withdraw the Bitcoin and any profit, her request was refused by the apparent representative of Matic, even though she had earlier been told that she could do both on demand.

10. Eventually, her suspicions became aroused and as I have said, she commissioned an expert report, authored by Robert Moore. The report makes grim reading. It is quite apparent that there is a good arguable case that the Matic operation, if I call it that, is wholly fraudulent and, it seems, run by organised criminals. Not only does it appear that the entity is engineered to misappropriate funds invested in it by investors such as the claimant, but it also appears to have the capacity to interfere with banking and other online transactions.

11. I am entirely satisfied, in accordance with Practice Direction 7A, that the High Court is the appropriate forum for these proceedings. I am also satisfied, for the reasons given by Miss Muldoon both in writing and orally in her extensive submissions today, that this is a case of exceptional urgency. It appears that a significant amount of the Bitcoin of the claimant may well have already been dissipated and that only a relatively small element of it may be presently under the control of the second defendant. This is a form of transaction whereby, at the click of a mouse, an asset can be dissipated.

12. The applicant has agreed to give undertakings, such as one would require to see in an application of this kind. I have probed the issue with Miss Muldoon, and I am satisfied that the undertakings have been properly given and that the claimant understands their significance.

13. In *AA v Persons Unknown, Re Bitcoin* [2019] EWHC 3556, Bryan J held that:

> "… for the purpose of granting an interim injunction, cryptocurrency

> such as Bitcoin is a form of property capable of being the subject of a proprietary injunction".

I respectfully agree and follow that finding.

14.    The relevant test is the well-known one of *American Cyanamid Co (No 1) v Ethicon Ltd* [1975] UKHL 1; namely, is there a serious issue to be tried and does the balance of convenience lie in favour of the injunction? I find there plainly is a serious issue to be tried. I am fully satisfied from the evidence that the Matic operation is, to put it at its mildest, highly problematic and is more likely or not to be thoroughly fraudulent.

15.    The balance of convenience clearly favours the granting of interim relief. As I have already said, dissipation appears already to have occurred to a substantial degree and it is, therefore, plainly necessary for any further dissipation to be ended and for the seeking of relief from the defendants to begin in earnest as soon as possible.

16.    I am entirely satisfied, for the reasons given by Miss Muldoon, that damages would not be an adequate remedy in this case and agree with her that there is, on the face of it, a very strong case, both substantively and for the injunctions sought.

17.    As far as the worldwide freezing order is concerned, there is a strong underlying cause of action. I am satisfied that the High Court in England and Wales has jurisdiction to hear the substantive claim; essentially, for the reasons given by Butcher J in the case of *Ion Science Ltd v Persons Unknown* (unreported, 21 December 2020). There, Butcher J held that:

> "The *lex situs* of a crypto asset is determined by the place where the person who owns it is domiciled in the present case".

18.    Applying that case, which seems to me to be entirely appropriate, there is no question but that the claimant is domiciled in England and Wales. Furthermore, she provided the funds to Matic from a bank account located in England and Wales.

19.    I accept that the position of the second defendant, as an exchange for the end-wallet having control over the 11.2 element of the Bitcoin, does not defeat the application. This is because the definition of "assets" includes all the assets that are held or controlled by a third party. The authority for that is *JSC BTA Bank v Ablyazov* [2015] UKSC 64.

20.    There is, for the reasons I have given, a risk of dissipation. An undertaking in damages, for the reasons I have given, would not be appropriate and there has been, I am satisfied, no delay. The claimant has acted very swiftly over the Christmas and the New Year period, not least in commissioning the expert report; and the balance of convenience favours the granting of the injunction.

21.    I shall also make what is described as a bankers trust disclosure order. This would compel the second defendant to disclose certain payment-related information about account holders of the end-wallet. Such an order appears to me to be entirely appropriate and necessary. There is a real prospect, in all the circumstances, that the supply of the information by the second defendant will lead to the location or preservation of the Bitcoin. It also is plain that the report discloses an arguable case that fraud has taken place.

22.    The applicant has given an undertaking only to use the information for the purposes specified, that is to say, the recovery of the Bitcoin; and there is the relevant undertaking given by the applicant to the second defendant.

23.    It is also necessary to make a freezing order in the terms sought by the claimant. Besides what I have already said in that regard, I am entirely satisfied that only by means of a freezing order is the claimant likely to receive some element of the Bitcoin over and above that which appears, at the moment, to be held by the second defendant.

24.     Therefore, the injunction, freezing order and disclosure order are appropriately sought and I propose to make them in the terms sought by Miss Muldoon, subject to minor changes to reflect the time at which this judgment is being given and the fact that it may, in the event, not be possible to serve until 6 January, which is tomorrow.

25.     I agree that service should be made outside the jurisdiction pursuant to CPR 63.6. I am satisfied that the relevant gateways in Practice Direction 6B 3.1 are met. Interim relief is sought and the cause of action amounts to a claim in tort, where the damage was sustained within the jurisdiction. There is also a good arguable case.

26.     Finally, I follow the judgment of Butcher J, in that the requirement for there to be exceptional circumstances is met in this case by the need for, as he put it, "hot pursuit", which is essential if the claimant's assets are to be secured. Given that there is a reasonable prospect of success, CPR 6.37(1)(b) is satisfied.

27.     I also give permission for alternative service. The whole nature of the Matic organisation is so problematic that there can be no certainty that the names of the persons with whom the claimant corresponded and spoke in that organisation were real ones. Nevertheless, we have their emails, and it seems, in all the circumstances, that it is appropriate for those addresses to be used by way of alternative service on those persons.

28.     Since no other information about where Matic might be served has come to light, despite the claimant's researches and those of the expert, it is plain that alternative service, so far as they are concerned, is necessary. I also consider, in the circumstances, that alternative service on the second defendant is appropriate, given the nature of the urgency of this matter.

29.     Accordingly, I give permission for alternative service pursuant to CPR 6.1(5) and 6.2(7). I reiterate the fact that, since we are dealing with cryptocurrency, time is manifestly of the essence.

**End of Judgment**

Transcript from a recording by Ubiqus
291-299 Borough High Street, London SE1 1JG
Tel: 020 7269 0370
legal@ubiqus.com

Ubiqus hereby certify that the above is an accurate and complete record of the proceedings
or part thereof

This transcript has been approved by the judge.

## *Director of Public Prosecutions v Briedis and another [2021] EWHC 3155 (Admin)*

Queen's Bench Division, Administrative Court (London)

Fordham J

23 November 2021 Judgment

**Martin Evans QC** and **Tom Rainsbury** (instructed by the Crown Prosecution Service) for the **Applicant**

The **Respondents** did not appear and were not represented

--------------------------

Hearing date: 23/11/21

Judgment as delivered in open court at the hearing

- - - - - - - - - - - - - - - - - - - - -

### Approved Judgment

I direct that no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

THE HON. MR JUSTICE FORDHAM

Note: This judgment was produced for the parties, approved by the Judge, after using voice-recognition software during an ex tempore judgment.

### MR JUSTICE FORDHAM :

Introduction

1.  There are two linked matters which have been listed together before the Court today, pursuant to directions given by McGowan J at a hearing on 20 October 2021.

2.  The first matter is an application dated 28 September 2021 and issued on 4 October 2021 by the DPP for a property freezing order ("PFO") pursuant to section 245A of the Proceeds of Crime Act 2002 ("the Act"). Section 245A falls within Part 5 of the Act, which is concerned with "civil recovery" of the "proceeds" of "unlawful conduct". PFOs are one of the species of civil orders which can be made, where justified by reference to the relevant provisions of Part 5, by the High Court. They are governed by section II of the Practice Direction on Civil Recovery Proceedings (White Book Vol.2 Section 3K) ("CRP:PD").

3.  The second matter is an application by the Crown Prosecution Service pursuant to section 42(3)(a) of the Act, to discharge "restraint orders" made on 1 August 2019 against the Respondents by the Crown Court, pursuant to section 41 of the Act. Sections 41 and 42 fall within Part 2 of the Act, which is concerned with "confiscation". Section 41 restraint orders are made by the Crown Court, in the context of criminal investigations and criminal proceedings. It is to the Crown Court that a section 42 application for discharge is also to be made. McGowan J directed that the second matter be listed before this Court today. That was so that these linked matters could be dealt with at the same time. Pursuant to section 8 of the Senior Courts Act 1981 the jurisdiction of the Crown Court is exerciseable by a judge of the High Court. For the purposes of today's hearing I am therefore sitting in a dual capacity.

4.  One of the links between the two matters is that – as Mr Rainsbury

helpfully and properly pointed out today – the continued existence of a criminal restraint order precludes property from being "recoverable" for the purposes of Part 5: see section 308(8). Unless the restraint orders are being discharged, and have been discharged, the PFO could not be granted. Another link between the two matters is that, if the restraint orders are being discharged, the risk of dissipation and associated need for the PFO, which is put forward as part of the justification for making it, arises. I will return to that point at the end.

### Notice

5.  This was an in-person hearing. One of the reasons for the adjournment granted by McGowan J a month ago was to ensure a proper and effective opportunity for the Respondents to be notified of these matters and able to make any representations to the Court about them. That was in circumstances where the DPP recognised that there was no justification for the PFO application being "made without notice" (s.245A(3)). I am satisfied that adequate notice and opportunity have been given. The papers have been served on the solicitors acting for both Respondents, including the detailed witness statement and exhibits which explain the basis of the application for the PFO sought.

### The PFO is not opposed

6.   In consequence, the CPS have been able to communicate with the two firms of solicitors who act for the Respondents in these matters. Those solicitors have in turn been able to communicate the position, which is that the PFO in the terms sought is not opposed by either of the Respondents. In the case of the First Respondent, Mr Logan of the CPS emailed the Court yesterday morning following a conversation with Mr Ramdath of Pillai & Jones solicitors, who was cc'd to that email and who had confirmed to Mr Logan that the First Respondent was not opposing the making of the PFO sought. In the case of the Second Respondent, Mr Ogunfolu of Olives Solicitors emailed Mr Logan on 19 November 2021, which email was cc'd to my clerk, confirming that the application for the PFO was not contested. Nor, naturally, is there any resistance on the part of the Respondents to the discharge of the section 41 restraint orders against them. Indeed, acceptance of the appropriateness pursuant to the statutory scheme of the making of the PFO sought carries necessarily within it acceptance that the restraint orders must first be discharged, since as I have explained that is one of the statutory prerequisites.

### Hearing in private/anonymity?

7.   This hearing was protectively listed using initials, as a precautionary administrative step taken by the listing office. The original versions of the DPP's three draft orders recorded that this Court would be "sitting in private". Clarification during yesterday confirmed that the DPP was not seeking a private hearing nor any order for anonymity, and would take a neutral position were any such application made. I made clear in email communications with all the lawyers during yesterday that I would consider any representations made on the question of a hearing in private or anonymity, were any such representations made. In the event no request or application was made for the hearing to be in private and no request or application was made for any anonymity. I dealt with these matters at the start of the hearing and made and

communicated my decision that the hearing should continue in public and without any anonymity order. That is what has happened. I said I would deal with these matters in my judgment as I am now doing.

8.  I note that PFOs do not fall within CRP:PD §11.1, which provides that hearings be in private unless the judge directs otherwise. In any event, the issues of private hearings and anonymity fall in my judgment to be addressed in accordance with a principled approach as reflected in the relevant authorities. I recognise the following: that the PFO is an interim order being sought at an early investigative stage so far as civil proceedings are concerned, there being now a civil recovery investigation and no claim yet on foot for a civil "recovery order"; that the threshold for the grant of a PFO is a relatively low one (in essence, a good arguable case that the identified property is or includes property obtained through unlawful conduct or its transactional replacement: ss.245A, 304-305); that the Respondents' Article 8 rights are in play; and that the PFO does not engage the 'higher ranking value' regarding Article 10 and what takes place 'in the criminal courts'. However, I am satisfied that the presumptive starting point is that proceedings should take place in public. Moreover, in my judgment, the public can be expected to understand that simply because an individual has been made the subject of an interim order of this kind that does not justify adverse conclusions about them. The Respondents have had sufficient time to instruct their legal representatives to make any request or application, and to substantiate it with submissions. Were there justification on the facts for them, orders for anonymity – but with the proceedings continuing in public and a judgment being delivered without the Respondents being named – would have been a more effective and proportionate order than directing a hearing in private. I was assisted by the discussion of the principles, and of the case-law, in the judgment in R (Javadov) v Westminster Magistrates' Court [2021] EWHC 2751 (Admin), especially at §§15-16, 26-30, 46, 51-55, 65 and 70. In all the circumstances, I was and am not satisfied that a hearing in private was necessary, nor that an anonymity order was necessary, in the circumstances of the present case, in relation to either of the two linked matters with which I am dealing.

The PFO application

9.  Pursuant to section 245A of the Act, the DPP (as a s.316(1) "enforcement authority") can apply to this Court for a PFO before having started proceedings for a civil recovery order (s.245A(1)). PFOs promote the statutory purpose of enabling recovery in civil proceedings of property which is or represents property obtained through unlawful conduct (s.240(1)). As is required, the PFO sought here specifies and describes the property to which it would apply (s.245A(2)(a)) and it prohibits the Respondents (s.245A(2)(b)) from selling, charging, dealing with or diminishing the value of the listed property except as permitted by the express terms of the order. Provision is made to allow written requests for the release of restrained funds to pay for legal representation (CRP:PD §7A). Provision is also made for persons affected by the order to apply to vary or discharge it on giving notice to the parties (CRP:PD §7.1(2)). I am empowered to make such an order (s.245A(4)) ("the court may make a property freezing order"), provided that

statutory conditions are satisfied (ss.245A(5) and (6)). I have to be satisfied, as I am, that there is a "good arguable case" that the property to which the application for the PFO relates is or includes "recoverable property", meaning property obtained through unlawful conduct, to which statutory provisions relating to tracing and mixing are applicable (ss.305 and 306). Although I am satisfied that this is not in play in the present case, if any of the property were not recoverable property the Court would need to be satisfied that it constitutes "associated property" (s.245) and which the DPP has taken all reasonable steps to establish the identity of any persons holding that associated property. The First Respondent is known to be outside the UK but the property is itself not outside the UK or a relevant part of the UK (s.282A). The property is listed in the draft PFO. Its value exceeds the statutory threshold (s.287). It consists of: cash in different currencies; watches; cryptocurrencies of different types (all of these being seized following searches of the Respondents home addresses in the UK in the execution of search warrants in December 2018); also a BMW X5 car of the First Respondent; and about £11,000 as the cash balance of three bank accounts in names said to be aliases of the Second Respondent. As I have explained it is a statutory pre-requisite that the restraint orders would need to be discharged – as I am satisfied it is appropriate that they will be – a matter to which I will return.

10.   I am satisfied that cryptocurrency, as cryptoassets, fall within the wide definition of "property" in section 316(4)(c) ("other intangible … property"), especially when viewed in the light of the purpose of these statutory powers. It would be a serious lacuna if cryptoassets fell outside the reach of this statutory scheme. In support of their inclusion, Mr Rainsbury helpfully showed me AA v Persons Unknown [2019] EWHC 3556 (Comm) [2020] 4 WLR 35where cryptoassets (Bitcoin) were held to constitute "property" at common law. Particularly helpful is §58 of that judgment, a passage citing §83 of a Legal Statement of the UK Jurisdictional Task Force, referring to "other intangible property" and §61 of the judgment, adopting that Statement. Mr Rainsbury accepted – and I will assume for the present purposes – that "good arguable case" focuses on "recoverable", and that I must be satisfied that this – objectively and legally correctly – is "property", as a prerequisite for being satisfied that the PFO is appropriate. I am so satisfied.

11.   The basis on which the DPP contends that the listed items are all "recoverable property" was set out in a helpful and detailed witness statement of the financial investigator working for the eastern region special operations unit, Graham Hughes, which statement and exhibits have been put before the Court as written evidence (CRP:PD §5.4), together with a skeleton argument by leading and junior counsel on behalf of the DPP, and helpful oral submissions today by Mr Rainsbury. In a nutshell, following a criminal police investigation starting in 2017 an evidential picture emerged which involves the Second Respondent having been identified as controlling certain bank accounts, in various names of individuals and entities, into which it is said that various third parties were deceived into transferring substantial sums of money, which sums were then swiftly dissipated by means

which included multiple purchases of foreign currency. The First Respondent has been identified as a key associate of the Second Respondent. Passports, identity documents, bank cards and other items have been seized and examined, together with the hardware wallets containing the cryptocurrencies, and various sources of evidence relied on as linking the Respondents to one another and to the alleged unlawful conduct. Reliance is placed on bank account analysis; evidence of the possession of identification documents in names other than their own; use of bank accounts opened with false identities; possession of items (including the BMW car) with values appearing to be incompatible with the Respondents' relatively modest declared earnings arising from their stated occupations; and the absence of any explanation for all these matters when they were interviewed.

12.   As Mr Hughes's witness statement puts it: "On the basis of the evidence in relation to the use of bank accounts opened with false identification documents and the items found during a search of the [Respondents'] home addresses" it is believed that the Respondents "committed offences of Fraud by False Representation, possession of articles for use in Fraud and money laundering", and "there would appear to be no reason why they would be in possession of numerous false identification documents other than for the purposes of large-scale fraud".

13.   The Respondents through their solicitors, as I have recorded, do not – having received the application and the materials in support of it – oppose the making of the PFO. I am satisfied that the statutory preconditions for the

making of such an order are made out by the DPP, on the evidence before the Court, and that the making of the order is justified and appropriate as a matter of judgment and discretion in the exercise of my statutory power, in the public interest and for the promotion of the statutory purpose. I am going to make the PFO in the terms sought. One of the circumstances relied on convincingly as giving rise to a risk of dissipation is the fact that the Part 2 criminal restraint orders, made by the Crown Court in August 2019, cannot properly now be maintained and fall to be discharged. Therein lies one of the important links between the two matters which are before me today. Another, as I explained at the outset, is that unless discharged the restraint orders would operate to preclude the PFO by reason of section 308(8). I am discharging them for reasons which I will now explain.

## Discharge of the criminal restraint orders

14.   The restraint orders were made by the Crown Court under section 41 of the Act, on the basis that a criminal investigation had been started with regards to offending and there were reasonable grounds to suspect that the alleged offenders (the Respondents) had benefited from criminal conduct (s.40(2)). The position now is that the criminal investigation has been concluded (in June 2021), the case having been adopted (in May 2021) for a civil recovery investigation. The reasons for adopting that course are all addressed in the evidence before the Court. The Respondents were informed (in June 2021) that no further action would be taken against them in the criminal forum. No application was made by them to discharge the restraint orders. But the prosecution wrote to the

Crown Court at the end of September 2021 explaining that there would now be an application by the CPS to discharge those restraint orders. As I have explained, that application has now come before me today. The CPS, as the person who had applied for the criminal restraint orders (s.42(3)(a)), has duly applied for their discharge. I am satisfied that discharge is appropriate in the exercise of the Crown Court's power (s.42(5)(a)), and in any event on the mandatory, statutorily-prescribed basis (on which Mr Rainsbury relied as his principal basis for the application) that within a reasonable time criminal proceedings have not started (see s.42(7)(a)). There is, as I have explained, no opposition to discharge. There is no challenge to my jurisdiction to deal with this matter. Accordingly, exercising the jurisdiction of the Crown Court, I will discharge the two restraint orders, and immediately thereafter make the PFO. As I explained at the outset, the former is a precondition to the latter, by reason of section 308(8).

Conclusion

15.  It follows that there remains in this case an appropriate interim 'holding order'. The case has become a civil recovery case (Part 5) not a criminal recovery case (Part 2). What was previously a criminal investigation has, since May 2021, become a "civil recovery investigation" (see s.341(2)). The section 41 restraint orders are now discharged. The section 245A PFO is now in place. Pursuant to its terms, and in accordance with CRP:PD §5A, I am specifying that the DPP must, on or before 20 May 2022, either start a claim for a civil recovery order or apply for a continuation of the PFO. The terms of the PFO to which the Respondents agreed, and which I make, record as to costs that "the costs of and occasioned by the application [for a PFO] are reserved".

23.11.21

---

**End of Document**

## *Litecoin Foundation Ltd v Inshallah Ltd and others [2021] EWHC 1998 (Ch)*

Intellectual Property and Enterprise Court

John Kimbell QC (sitting as an Enterprise Judge)

16 July 2021    Judgment

**JANE LAMBERT** (instructed by **JMW SOLICITORS LLP**) for the **Appellants**

**CHRISTOPHER SNELL** (instructed by **LAWDIT SOLICITORS**) for the **Respondents**

Hearing date: 8 July 2021

- - - - - - - - - - - - - - - - - - - - -

### APPROVED JUDGMENT

Covid-19 Protocol: This judgment was handed down remotely by circulation to the parties' representatives by email and release to BAILII. The date and time for hand-down is deemed to be 10.30 a.m. on 16 July 2021.

**John Kimbell QC (sitting as an Enterprise Judge):**

Introduction

1. This is an appeal from an order of District Judge Hart dated 27 September 2020. In that order she granted an injunction prohibiting the Defendants from using the trade name Litecoin or any other similar name.

Litecoin

2. Litecoin is a cryptocurrency, that is an electronic form of money created and sustained through cryptography.1 Litecoin was launched in October 2011 by Charles Lee, a computer scientist, formerly employed by Google. It is one of the many cryptocurrencies which followed in the wake of the launch of Bitcoin in 2009.2 Like Bitcoin, Litecoin

is a peer-to-peer decentralized network which may be used as a means of electronic payment for goods or services. Anyone with the relevant computer hardware and software can create or "mine" Litecoin. Alternatively, Litecoin can be purchased in the same way as any other currency. Cryptocurrencies are recognised as a form of property in English law.3 Whether purchased or mined Litecoin is usually stored in a digital wallet.

The Claimant

3. The Claimant ('**LFL**') is a not-for-profit organisation incorporated in Singapore on 3 April 2017. Charles Lee is the managing director of LFL. LFL's case was that it promoted and developed Litecoin.

The Defendants

4. The First Defendant ('**Inshallah**') and the Second Defendant ('**Nasjet**') are both companies incorporated in England. They are registered at the residential address of the Third Defendant ('**Mr Pepin**'). Mr Pepin is the sole director and shareholder of both Inshallah and Nasjet. Neither has ever traded, though Inshallah is the registered proprietor of a number of trade marks. Mr Pepin has for many years sold internet domain names and trade marks.

Inshallah's UK Trade Mark application

5. On 12 December 2017, Inshallah filed a UK trade mark application for a word mark for "LITECOIN" (in upper and lower case) in the relevant classes for "financial services" and "virtual currency" ('**the Inshallah TM Application**').

6. When LFL became aware of the

application, in early January 2018, it requested Inshallah to surrender or transfer its application. No agreement could be reached so LFL filed its own trade mark applications for LITECOIN. Nasjet opposed both these applications.

7.    A notice of objection was subsequently filed to the Inshallah TM Application by a company associated with LFL.

### Nasjet's change of name

8.    On 21 February 2018, Nasjet changed its name to "Litecoin Exchange Limited".

The Proceedings

9. In May 2018, LFL issued proceedings in the Intellectual Property Enterprise Court. The relief sought by LFL included the following:

i)    An injunction to restrain the Defendants from passing off any goods, services or business as the goods, services or business of LFL whether by the use of the trade name LITECOIN or any similar name or mark.

ii)    An injunction requiring Nasjet to change its name so that it does not contain the word LITECOIN.

iii)  An inquiry as to damages.

LFL's claims

10.    In its particulars of claim LFL alleged that it had built up a substantial reputation and goodwill in the UK in Litecoin, including amongst other things by developing and making available in the UK a number of different types of the electronic wallets for storing Litecoin (which were said to be used by over 5,000 people in the UK);

promoting the use of Litecoin on social media and elsewhere; and selling merchandise related to Litecoin to individuals based in the UK.

11.    LFL claimed that by filing the trade mark application Inshallah misrepresented that it had a bona fide intention to use the Litecoin mark in respect of the goods and services applied for and that this would cause the public to think that Inshallah is connected or associated with LFL's business.

12.    LFL further pleaded that the Inshallah TM Application was made in bad faith with the intention of extracting money from LFL as the owner of goodwill in the Litecoin trade name and that the application itself was an "instrument of fraud". In support of the instrument of fraud claim, LFL pleaded that "The Third Defendant has a history of registering trade marks and domain names vexatiously with a view to extracting payment from legitimate business owners". Annexes 5 – 10 to the Particulars of Claim contained the evidence which LFL relied upon in support of that allegation. The Inshallah TM Application was thus said to constitute passing off.

13.    The change of name by Nasjet was also said to amount to passing off and the act of registration of the change of name was also said to be an instrument of fraud for the same reason as the trade mark application, namely because it was in truth a means of extracting money from LFL.

14.    LFL pleaded that it has suffered loss and damage and would continue to do so unless the Defendants were restrained.

## The Defence

15. In their Defence, the Defendants:

    i)  Denied that LFL held any goodwill in the trade name "LITECOIN" in the UK.

    ii)  Denied that the intention of the Nasjet name change or the Inshallah TM

Application was to extract money from LFL.

    iii)  Denied that any previous dealings with trade marks or domain names was relevant to or supported the 'instrument of fraud' case.

    iv)  Denied that LFL was entitled to any of the relief sought.

## The issues for trial

16.  By a case management order HHJ Hacon QC determined that the following

issues be tried:

    i)  Whether LFL has goodwill in the trade name LITECOIN (or Litecoin).

    ii) Whether the Defendants' use of the sign Litecoin amounts to a misrepresentation to the public.

    iii)  Whether the Defendants' use of the sign Litecoin amounts to an instrument of fraud.

    iv)  If the answer to (ii) and (iii) is yes whether LFL has or is likely to suffer damage.

17.  Pending trial of these issues, it was agreed that the respective trade mark applications and the corresponding objections all be stayed. Nasjet also agreed to change its name from Litecoin Exchange Limited back to Nasjet.

## The trial

18.  The trial of these four issues took place over two days in December 2019. Mr Lee and Mr Pepin both gave oral evidence.

## The Judgment

19. In a careful and thorough 41-page judgment, the judge reached the following conclusions (references to numbered paragraphs are paragraphs in the judgment dated 25 March 2020):

    i)  LFL had built up sufficient goodwill in the trade name Litecoin within the UK to found an action in passing off (paragraphs 41 – 58).

    ii)  The Inshallah TM Application did give rise to a misrepresentation to the public (paragraphs 59 – 68) but Nasjet's registered change of name to 'Litecoin Exchange Limited' did not (paragraphs 69 – 70).

    iii)  Both the Inshallah TM Application and the registration of Nasjet's change of name constituted "instruments of fraud" (paragraph 71 – 78).

    iv) LFL had suffered damage and there was a likelihood of future damage (paragraphs 79 – 80).

## The hearing on 2 September 2020

20. At a hearing held on 2 September 2020 which was originally listed for the purposes of either assessing damages or giving directions for an assessment

of damage suffered, the judge held that no damages should be awarded to LFL. This was because LFL had not filed any evidence of any loss or damage flowing from the use of the Litecoin sign as an instrument of fraud beyond the costs of opposing the Inshallah TM Application and those costs ought, the judge held, properly to be sought in those proceedings.

The Order

21. The Judge's order following the judgment contained injunctions in the following form as follows:

"1. The Defendants shall not (whether by themselves, their directors, officers, agents, employees or agents or otherwise howsoever) pass off any goods, services or business as, or connected with or associated with with, the goods services of business of the Claimant, whether by the use of the trade name LITECOIN or any similar name or mark AND for the avoidance of doubt it is agreed and declared that changing the corporate name of First and/or Second Defendants to one that contains the word "LITECOIN" would breach this order.

2. The Defendants shall on or before 17:00 on 16 September 2020 destroy all articles in their possession, custody or control for use in trade which display, make reference to or are in any way related to the word LITECOIN or any similar word."

Permission to appeal

22. District Judge Hart herself gave the Defendants permission to appeal. Her reason was as follows:

"I agree with the submission that by dint of the facts this decision is, as a matter of law, at the edge of the court's jurisdiction. It is unusual in that I am unaware of another case where the alleged passing off has consisted of an application for a trademark. My decision depends on the decision of Aldous LJ in *One in a Million* and I do not think it is controversial to say that, as I expressed in my judgment, the precise boundaries of the reasoning in that decision are, with the greatest of respect, something that has caused pause for thought amongst authors and commentators. For that reason, I think that there is a real prospect of success"

The grounds of appeal

23. There are six grounds of appeal:

i)   The learned judge erred in law in finding that the claimant had goodwill or reputation in the UK;

ii) The judge was wrong to find that an application to register LITECOIN or to oppose the claimant's application was an actionable misrepresentation;

iii) The judge erred in finding that the fees of prosecuting or opposing a trade mark application constituted damage for the purposes of passing off;

iv)   The judge misapplied the ratio of British Telecommunications Plc and others v One In A Million Ltd. And Others [1999] 1 WLR 903('*One in a Million*') to the facts;

v)   The judge misapplied the ratio of Stannard v Reay [1967] RPC 589 to the facts of this case;

vi)   The judge took account of evidence that was irrelevant to the action before her, namely previous litigation involving

Mr Pepin and Domain Name Dispute resolution cases to which Mr Pepin had been a party.

The nature of the appeal

24.    Pursuant to CPR 63.19(3) the appeal from a District Judge following an IPEC Small Claims Track trial is heard by an Enterprise Judge sitting in the Chancery Division of the High Court. The parties were agreed that the appeal is otherwise governed by CPR Part 52. It follows that:

i)  The appeal is limited to a review of the decision of the lower court (CPR 52.21(1));

ii)  The appeal will only be allowed if the decision of the lower court was either (a) wrong; or (b) unjust because of a serious procedural or other irregularity in the proceedings in the lower court (CPR 52.21(3)).

25.  Grounds 1 – 5 appeared to me to be directed towards a submission that the decision to grant the two injunctions was wrong. Ground 6 extended at least in part into the territory of procedural error / serious irregularity.

26.  The following principles also apply to those parts of the judgment which contain findings of fact or evaluations of factual evidence:

Findings of fact

i)   An appeal court will only interfere with a trial judge's finding of fact and thus allow an appeal on the basis of a challenge where it properly determines that the finding of fact is unsupported by the evidence or where the decision is one which no reasonable judge could

have reached - see Haringey LBC v Ahmed & Ahmed *[2017] EWCA Civ 1861*, CA, at [29]–[31]; Henderson v Foxworth Investments Ltd *[2014] UKSC 41*; [2014] 1 W.L.R. 2600 at [62] and Hamilton v Allied Domecq Plc *[2006] SC 221*.

Evaluation of factual evidence

ii)  An appellate court must be cautious in reversing a trial judge's evaluation of facts, just as it must be in reversing a primary finding of fact (per Lord Hoffmann in Biogen Inc v Medeva Plc [1997] R.P.C. 1 at 45). This is because where a judge's evaluation of facts is challenged, it is properly understood to be very difficult for an appellate court to place itself in the position of the trial judge who would have had to take account of both written and oral evidence. The reasons for this approach are summarised in Fage UK Ltd v Chobani UK Ltd *[2014] EWCA Civ 5* at [114]–[115].

iii)    The proper approach on a challenge to an evaluative decision of a first instance judge is that "the appeal court does not carry out a balancing task afresh but must ask whether the decision of the judge was wrong by reason of some identifiable flaw in the judge's treatment of the question to be decided, 'such as a gap in logic, a lack of consistency, or a failure to take account of some material factor, which undermines the cogency of the conclusion'" – see Prescott v Potamianos *[2019] EWCA Civ 932* in a judgment of the court (McCombe, Leggatt and Rose LJJ) at [76].

**Ground 1: The Judge erred in law in finding that LFL had goodwill or reputation in the UK**

Litecoin Foundation Ltd v Inshallah Ltd and others [2021] EWHC 1998 (Ch)

## Ground 5 The Judge misapplied the ratio of Stannard v Reay

27.   It is convenient to consider Grounds 1 and 5 together.

28.   In paragraph 15 of her judgment, District Judge Hart recorded that Stannard v Reay [1967] RPC 589 was cited to her by LFL as authority for the proposition that a small amount of trading may be sufficient to establish goodwill. The judge accepted this proposition. She referred to the case again in paragraph 58(viii) her conclusion on the goodwill issue.

29.   Ms Lambert made the following criticisms of the Judge's reliance on Stannard v Reay [1967] RPC 589:

i)   The judge paid insufficient heed to the fact that the case involved an application for an interim injunction.  ii) The case was heavily dependent on its own facts, which are far removed from those of the present case.

iii) The case was misunderstood as standing for the proposition that a small amount of trading will *always* suffice for an action for passing off whereas in fact it is necessary to consider such factors as the size and extent of the market and the nature of the business.

30.   In my judgement, none of these criticisms are justified.

31.   Buckley J.'s judgment in Stannard v Reay [1967] RPC 589 is very short. It runs to little more than five pages in length. It is obvious that it concerns an interlocutory application to continue interim relief. There is no realistic possibility that the district judge overlooked this fact. Furthermore, in the paragraph immediately preceding the one in which Stannard v Reay is first referred to, the judge reminded herself that LFL had to prove its case on goodwill on the balance of probabilities.

32.   Regardless of the nature of the proceedings and any difference in the standard of proof, the point made in Stannard v Reay is that goodwill can be built up in a relatively short period of time – in that case over the course of only around three weeks. This is how the case is treated in *Wadlow, The Law of Passing off* (5th edition) 2016 at 3-14 ('**Wadlow**'). Having noted in paragraph 3-13 that while some businesses may be of such a nature that they are incapable of having any goodwill, the point is made that an action for passing off protects goodwill regardless of the size of the enterprise. Wadlow then says this:

"The acceptable limit is probably represented by Stannard v Reay in which an interlocutory injunction was granted to the proprietor of a mobile fish and chip van in a holiday resort. Given the transient nature of most of the plaintiff's custom the element of goodwill must have been small".

33.   In Lumos Skincare v Sweet Squared Ltd *[2013] EWCA Civ 590*, the Court of Appeal by a majority held that a claim for passing off was made out in respect of a business with "very modest goodwill". Although the finding that the Claimant in that case had proved protectable goodwill was not challenged on appeal. Lord Justice Lloyd (with whom McFarlane LJ agreed) noted:

Litecoin Foundation Ltd v Inshallah Ltd and others [2021] EWHC 1998 (Ch)

"His conclusion was that only a very modest goodwill had been generated in the LUMOS mark in relation to skincare products as at October 2010, that this goodwill related to a particular niche within the market, and that the Claimant was the owner of that very modest goodwill. He went on to point out that even a very modest goodwill can support a passing-off action, as in *Stannard v Reay* [1967] RPC 589"

34.   I mention this case because Ms Lambert referred me to the dissenting judgment of Rix LJ. At [102] Rix LJ expressed the view that <u>Stannard v Reay</u> had no practical relevance to the case under appeal. However, Rix LJ did not doubt the correctness of the proposition accepted by the judge at first instance. Indeed, Rix LJ's comment was "Of course it is true that a very modest goodwill can support an action for passing off". The dissenting judgment of Rix LJ in <u>Lumos</u> does not therefore persuade me that District Judge Hart was wrong to accept the submission made by LFL that a modest amount of goodwill is sufficient to support a common law action for passing off.

35.   I am also not persuaded that there is anything in Ms Lambert's second point. <u>Stannard v Reay</u> might be said to turn to some extent on its own particular facts. Indeed Rix LJ in the <u>Lumos</u> case referred to it as "two rivals competing head to head in what was, so to speak, a fish bowl". However, District Judge Hart was referred to and cited in her judgment at [5] the classic passage from <u>Reckitt & Coleman Ltd v Borden Inc & Ors</u> [1990] 1 WR 491 in which proof of goodwill is described as the first essential step in any passing off action. She also referred to <u>Harrods v Harrodian School</u> *[1996] RPC 697*

(CA); <u>Cranford Community College v Cranford College Ltd</u> [2014] EWHC 2999 IPEC and <u>Starbucks v British Sky Broadcasting</u> *[2015] UKSC 31*. Ms Lambert accepted in oral argument that the District Judge had directed herself correctly on the principles to be derived from those cases.

36.   I also reject the submission that District Judge Hart misunderstood <u>Stannard v Reay</u> as meaning that a small amount of trading was always sufficient for an action of passing off. There is no basis for that submission in the judgment. It is clear that the judge in fact accepted the submission that was made to her, namely that a small amount of trading *may* be sufficient to establish goodwill.

37.   Before considering the evidence, District Judge Hart appropriately reminded herself that:

i) Passing off does not protect a trade name in its own right, however distinctive.

ii) LFL had to prove on the balance of probabilities the existence of a business and of goodwill in that business within the jurisdiction of England and Wales.

iii)   What amounts to trading has been broadly interpreted. It extends beyond those selling goods and services.

iv)   Reputation acquired through advertising alone is insufficient.

v)   Goodwill may in principle be established in the supply of a not for profit service. The issue is whether the recipient can be classed as a customer.

Litecoin Foundation Ltd v Inshallah Ltd and others [2021] EWHC 1998 (Ch)

vi)  LFL needed to prove that "goodwill or reputation attached to the goods or services which he supplies in the mind of the purchasing public by association with the identifying 'get-up' (whether it consists simply of a brand name or a trade description, or the individual features of labelling or packaging) under which his particular goods or services are offered to the public, such that the get-up is recognised by the public as distinctive specifically of the plaintiff's goods or services."4

38.  In my view, therefore, the judgment contains no misdirection or misunderstanding of the legal principles governing the establishment of goodwill and did not misunderstand or misapply Stannard v Reay. That disposes of Ground 5.

39.  I also reject the submission that the judge fell into error in her evaluation of the factual evidence in reaching her conclusion on goodwill. The judge's factual findings as to the nature and extent of LFL's activities in the jurisdiction in paragraphs 41 – 57 (as summarised in paragraph 58) come nowhere close to being findings which no reasonable judge could make. The judge's assessment of the evidence was careful, nuanced and detailed. She rejected the evidence of Mr Lee in a number of respects but accepted it in other respects in particular where it was backed by contemporaneous documents.

40.  The judge's evaluation that sufficient goodwill had been generated by December 2017 to found a claim in passing off for all the reasons summarised in paragraph 58 (vi) – (vii) of the judgment does not in my

judgement contain any gap in logic, or lack of consistency, or a failure to take account of some material factor so as to undermine the cogency of the conclusion reached. It is a conclusion which in my judgment was open to the District Judge to reach on the evidence she had before her. Ms Lamberts' various oral arguments in support of the submission that the judge had fallen into error in finding that LFL had acquired goodwill in Litecoin as a trade name were all in reality attempts to re-argue the issue before me as if the appeal were by way of rehearing. This approach was not open to her in light of Prescott v Potamianos [2019] EWCA Civ 932.

Ground 2: the Judge erred in law in finding that an application to register Litecoin was an actionable misrepresentation

41.  In paragraph 66 of her judgment, the judge held as follows:

"I accept that the filing of a trade mark application fulfils the requirements identified by Aldous LJ in relation to representation by public filing"

42.  The judge reached this conclusion because she accepted the following submissions made by LFL:

i) since trade mark applications appear in a publicly accessible journal, the filing of the Inshallah TM Application was a public announcement to the world of a purported connection between Inshallah and the Litecoin trade name;

ii)  inherent in the application is an assertion of the right to use the sign and an intention to do so;

Litecoin Foundation Ltd v Inshallah Ltd and others [2021] EWHC 1998 (Ch)

iii)   in fact, Inshallah had no such connection or intention. Its intention was simply to seek to dishonestly benefit from and appropriate goodwill in accordance with a previous course of conduct; iv) the case therefore falls squarely within the ratio of *One In A Million*.

43.   In my judgement, the judge was correct to accept these submissions and to reach the conclusion she did in paragraph 66.

44.   Ms Lambert's raised three objections. She submitted: (a) An application to register or an opposition to the registration of a trade mark is not a representation as defined by Lord Oliver in Reckitt and Colman because an application to register a mark is not, of itself, a representation to the public that the applicant or opponent's goods or services or economic activity are in any way connected. At the very most, she submitted it can only be a step in preparation or facilitation of a representation; (b) Even if such application or opposition was a representation it could not have affected such goodwill as C may have enjoyed in the activities mentioned in para [41] of the judgment; and (c) Even if it was otherwise an actionable misrepresentation, it would be contrary to public policy to allow an action for passing off to inhibit the registration of trade marks.

45. Whether an application to register a trade mark involves a representation or not is to a very large extent a finding of fact. When filing the TM3 application form an applicant must confirm the following: "The trade mark is being used by the applicant, or with his or her consent, in relation to the goods or services shown, or there is a bona fide intention that it will be used in this way".5 By signing the this form, Mr Pepin on behalf of Inshallah, was, in my judgement, obviously making a clear representation of fact, namely that Litecoin was either already being used by Inshallah or that there was a bona fide intention on the part of Inshallah to use the name Litecoin in connection with a financial services or virtual currency business. I reject Ms Lambert's submission that the judge fell into error by not holding that the filing of a trade mark application is only a preparation for a potential (mis)representation.

46.   The judge's factual conclusion that there had been a misrepresentation is also in my judgement unassailable. Having heard Mr Pepin being cross examined in relation to an alleged history of making systematic and opportunistic registrations of domain names and trade names, she did not accept that Mr Pepin had any genuine intention to trade and exchange Litecoin (paragraphs 76 and 77).

47. As to Mrs Lambert's submission that any misrepresentation was not capable of affecting any goodwill LFL had in the mark Litecoin, that seems to me to fly in the face of common sense. The judge held that the intention in making the Inshallah TM Application was dishonest gain by the Defendants or a third party. The most obvious way in which that might have occurred is by seeking a payment from LFL in return for agreeing a transfer of the trademark. There is a clear misrepresentation because there is no bona fide intention by Inshallah to use the mark Litecoin as part of a virtual currency or financial services business.

48.   Mr Snell referred me to the following passage in the first instance decision in *One In A Million* which, though concerned with the registration of an internet domain name, applies equally well to the application by a company to register as a trade mark a name:

"There is only one possible reason why anyone who was not part of the Marks & Spencer Plc group should wish to use such a domain address, and that is to pass himself off as part of that group or his products off as theirs. Where the value of a name consists solely in its resemblance to the name or trade mark of another enterprise, the court will normally assume that the public is likely to be deceived, for why else would the defendants choose it?"6

49.   The same point was made by the Court of Appeal in response to a submission that mere registration of a domain name does not cause any damage to goodwill  or give rise to a likelihood of damage:

"The placing on a register of a distinctive name such as "marksandspencer" makes a representation to persons who consult the register that the registrant is connected or associated with the name registered and thus the owner of the goodwill in the name. Such persons would not know of One In A Million Ltd and would believe that they were connected or associated with the owner of the goodwill in the domain name they had registered. Further, registration of the domain name including the words "Marks & Spencer" is an erosion of the exclusive goodwill in the name which damages or is likely to damage Marks & Spencer Plc"7

50. Although, as the judge recognised, Litecoin is not as distinctive a name as Marks and Spencer and an application for a trade mark appears in the IPO online journal rather than a register, in my judgment, the same basic point applies. Any person consulting the public list of applications for trade marks would assume that Inshallah was connected with the owner of goodwill in the name of Litecoin.

51.   As to the suggestion that it is contrary to public policy for the law of passing off to be used to inhibit the registration of trade marks, Ms Lambert was not able to direct me to any support for such an argument either in case law, academic writing or practitioner textbook. The procedure available under the Trade Marks Act 1994 to challenge registration on the ground that it is not in good faith is not in my judgment intended to be an exclusive remedy. That much is clear from section 2(2) of the Trade Marks Act 1994 which provides:

"No proceedings lie to prevent or recover damages for the infringement of an unregistered trade mark as such; but nothing in this Act affects the law relating to passing off"

52.   In summary, in my judgment, District Judge Hart was right to accept LFL's case that the Inshallah TM Application constituted an actionable passing off for the same reasons as the registration of the domain names was in *One In A Million*.

53.   I would, if necessary, have in any event upheld the granting of the injunction on the basis of the judge's

findings in paragraphs 71 – 78 of the judgment that both the Inshallah TM Application and the registration of its name by Nasjet were instruments of fraud.

## Ground 3: the Judge erred in finding that the Fees of Prosecuting or Opposing a Trade

Mark Application constituted damage for the Purposes of Passing Off

54. There is no requirement for actual damage to be proved or even that it will certainly occur in order to obtain even a final injunction to prevent a passing off. It is enough that the court concludes that what is going on is calculated to infringe the claimant's rights in future.8 The judge decided to maintain the injunction notwithstanding the fact that she held no damages would be awarded. The existence of a mere *quia timet* action in the case of a threatened passing off by a company which has not even traded but which has made an application amounting to an instrument of fraud was expressly recognised by the Court of Appeal in *One in A Million*.9

55. Given the judge's finding of fact that both the Inshallah TM Application and the Nasjet change of name registration amounted to instruments of fraud, it was, in my judgement, open to the judge to grant the injunction sought without making any finding about whether the fees of prosecuting or opposing the Inshallah TM Application were recoverable as damages in an action for passing off. Ground 3 also therefore fails.

## Ground 4: The Judge misapplied the Ratio of One in A Million to the facts of this Case

## Ground 6: The Judge took Account of Evidence that was irrelevant to the Action before her, namely previous Litigation and UDRP Cases to which the Third Defendant had been a Party

56. These two grounds of appeal are closely linked and overlap. As developed in her skeleton argument and oral submissions, Ms Lambert complains that the judge formed an adverse view of Mr Pepin's character in part on the basis of irrelevant material and strained the ratio of *One in A Million* so as to apply it to this case.

57. As to the first point, it would appear to be the case that counsel for LFL at the trial drew the judge's attention to AG v Pepin [2004] EWHC 1246 in which certain findings were made about Mr Pepin's conduct of litigation, this clearly formed no part of her reasoning.

58. The judge did, however, take a view as to the conduct of Mr Pepin and companies controlled by him in relation to other trade names – see paragraphs 72 – 75 of the Judgment. This she was fully entitled to do. LFL had pleaded a case based on previous course of conduct involving applications to register trade marks in bad faith. The District Judge had the advantage of hearing Mr Pepin cross-examined on these allegations and she found his explanations unpersuasive.

59. The Court of Appeal in *One in A Million* held, at least when an instrument of fraud case is being advanced, the court should consider "the intention of the of the defendant, the type of trade and all the surrounding circumstances".10 LFL's claim was expressly advanced as an instrument of fraud and the court found

that case to be made out on the facts. It was therefore entirely appropriate for the Judge to consider the evidence of Mr Pepin's previous conduct in relation to other trade mark applications. There was, in my judgement, no misunderstanding or misapplication of the law as set out in *One in A Million* by the District Judge.

Disposal

60.    For the reasons given above, the appeal is dismissed.

---

End of Document



Home | Databases | WorldLII | Search | Feedback

# High Court of New Zealand Decisions

**You are here:** NZLII >> Databases >> High Court of New Zealand Decisions >> 2020 >> [2020] NZHC 728

Database Search | Name Search | Recent Decisions | Noteup | LawCite | Download | Help

## Ruscoe v Cryptopia Ltd (in liq) [2020] NZHC 728; [2020] 2 NZLR 809 (8 April 2020)

Last Updated: 28 October 2022

**IN THE HIGH COURT OF NEW ZEALAND CHRISTCHURCH REGISTRY**
**I TE KŌTI MATUA O AOTEAROA ŌTAUTAHI ROHE**

**CIV-2019-409-000544**
**[2020] NZHC 728**

| | |
|---|---|
| BETWEEN | DAVID IAN RUSCOE AND MALCOLM RUSSELL MOORE<br>Applicants |
| AND | CRYPTOPIA LIMITED (IN LIQUIDATION)<br>Defendant |

| | |
|---|---|
| Hearing: | 11 – 14 February 2020 |
| Memoranda Filed: | 02 March 2020 – J S Cooper QC for the Creditors<br>04 March 2020 – P G Watts QC for the Accountholders 10 March 2020 – S A Barker for the Applicant Liquidators |
| Appearances: | S A Barker, M A Harris and A E Cao for the Applicant Liquidators J S Cooper QC and J A R Barrow for the Creditors<br>P G Watts QC and S C I Jeffs for the Accountholders |
| Judgment: | 8 April 2020 |

**JUDGMENT OF GENDALL J**

This judgment was delivered by me on 8 April 2020 at 3:30 p.m. pursuant to Rule 11.5 of the High Court Rules

Registrar/Deputy Registrar Date:

RUSCOE v CRYPTOPIA LTD (IN LIQUIDATION) [2020] NZHC 728 [8 April 2020]

**Table of Contents**

| | |
|---|---|
| **Introduction** | [1] |
| **Background facts** | [5] |
| *(a) General* | [5] |
| *(b) What is cryptocurrency?* | [21] |
| *(c) How Cryptopia operated* | [22] |

(d) Cryptopia's terms and conditions                                    [23]

(e) Cryptopia's financial accounts                                      [32]

(f) SQL database and how Cryptopia generated income                     [34]

(g) The hack                                                            [38]

(h) Advertising and promotion                                          [41]

**The law – s 284 Companies Act 1993**                                 [43]

**The liquidator's application**                                       [46]

**Issue 1 – the property issue**                                       [50]

- An aside – what are the implications?                                 [50]

- What is "property" and why does it matter here?                      [63]

- The authorities                                                      [70]

   • B2C2 Ltd v Quoine Pte Ltd                          [77]

   • Other authorities                                  [85]

- The four requirements for a "property" interest                     [102]

(a) Identifiable subject matter                                       [104]

(b) Identifiable by third parties                                     [109]

(c) Capable of assumption by third parties                            [114]

(d) Some degree of permanence or stability                            [117]

- Conclusion on the four criteria                                     [120]

- Possible arguments against cryptocurrency being property            [122]

- Public policy arguments                                             [129]

- Conclusion                                                          [133]

**Issue 2 – The trusts issue**                                        [134]

A. The primary issue – are the digital assets held on trust for       [135]
accountholders?

Application to the facts of present case                              [140]

   • Certainty of subject matter                       [141]

   • Certainty of objects                              [148]

   • Certainty of intention                            [151]

Additional matters                                                   [167]

B. The remaining issues before the Court                             [188]

- Question (c) What happens if there is no trust or cryptocoins       [189]
are not property?

- Question (d) What are the terms of the trust(s) and when did the trust(s)   [192]
come into existence?

- Question (e) Inability to identify individual shareholders?         [199]

- Question (f) Recovery of stolen digital assets                     [203]

- Potential relevance of any fault of Cryptopia relating to the      [206]
lost digital assets

**Result**                                                           [209]

**Costs**                                                            [210]

**Introduction**

A002063

- [1] Cryptopia Ltd (in liquidation) (Cryptopia) was formed in 2014 as a cryptocurrency trading exchange. It had a short but tumultuous history. It was placed into liquidation in May 2019 after suffering a serious hack and the loss of some

  $30 million of cryptocurrency from its exchange.

- [2] Issues in the liquidation have arisen over just who owns the remaining cryptocurrency under the control of Cryptopia and what should happen now.

- [3] The applicants (the liquidators) apply to the Court for directions under s 284(1)(a) of the Companies Act 1993 relating to the categorisation and distribution of assets in the liquidation.

- [4] Two tasks before the liquidators are the subject of the assistance they seek from this Court. The first is in confirming just what are the assets in the liquidation. Once that matter which is the subject of the present application is determined, the liquidators say they intend to advance a further application to propose methods of distribution of the company's assets. The present application, counsel say, is therefore part one of a two-part process before distribution of Cryptopia's remaining assets can be achieved.

**Background facts**

*(a) General*

- [5] Cryptopia is a cryptocurrency exchange. Essentially, it is an online platform or exchange designed principally, among other things, to allow users to trade pairs of a vast range of cryptocurrencies between themselves, with Cryptopia charging fees for trades, deposits and withdrawals.

- [6] Cryptopia, was started by Rob Dawson and Adam Clark, essentially as a hobby. It described itself internally as: "Providing an auction house and marketplace, several stable nodes on the network, and a support framework for each coin accepted on the site."

- [7] Up to early 2017, Cryptopia's operations were reasonably modest, having attracted some 30,000 users. The number of users, however, expanded exponentially from November 2017 as the price of bitcoin a unit of account for a popular cryptocurrency known formally as Bitcoin,[1] more than trebled. Counsel have indicated that at that point the number of users would have been well in excess of 900,000, the majority being from outside New Zealand.

- [8] Specifically, between November 2017 and January 2018, the value of one bitcoin had increased from approximately USD 4,350 to almost USD 20,000. The number of registered accountholders at Cryptopia grew by over 940 per cent over the same period and company revenue and staff numbers grew significantly. As at 18 October 2019, after the company was liquidated, Cryptopia had 960,143 accountholders with a positive coin balance. Of that number, 104,186 are believed to be accountholders with a "deemed nil value", presumably because of the hack. The balance comprises a substantial number of accounts of only modest value.

- [9] Cryptopia's reach was global. New Zealand had the 26th largest number of accountholders (9,475) with 230 other countries and territories identified as accountholders by reference to internet protocol (IP) addresses. Certain problems with this IP address method of identification have been identified but, notwithstanding any anomalies, it is clear Cryptopia was operating as a global business.

- [10] Cryptopia enabled accountholders to trade approximately 900 cryptocoins, more than any other exchange in the world. It is clear, however, that some 400 of these cryptocoins had been delisted by Cryptopia and could not be traded at the time it was placed into liquidation.

- [11] The liquidators, as I understand it, have estimated Cryptopia currently holds cryptocurrency currently worth about NZD 170 million.

1. Lacking guidance on the correct manner to refer to cryptocurrencies from Coppard and others *New Zealand Law Style Guide* (3rd ed, Thomson Reuters, Wellington, 2018), I have decided to refer to them in

this way: the cryptocurrency *system* is to be capitalised (for example "... when Bitcoin was first developed..."); but the *unit of account* for a cryptocurrency is not to be capitalised (for example "... at the rate of one ethereum for 0.04 of a bitcoin."). This is consistent with the approach taken in the *Associated Press Stylebook Online*.

- [12] In January 2019 Cryptopia's servers were hacked. Somewhere between nine and 14 per cent of its cryptocurrency was stolen, this being valued at around NZD 30 million. Cryptopia temporarily suspended its operations before resuming them in March 2019. Soon after, in May 2019, Cryptopia's shareholders resolved by special resolution to place the company into liquidation.

- [13] As to the hack, this theft of what was about $30 million of several cryptocurrencies was effected by way of an unauthorised transfer of those cryptocurrencies to an undisclosed external exchange. It seems this transfer is irreversible.

- [14] The liquidators, as I have noted, have now applied to this Court under s 284(1)(a) Companies Act for guidance and directions. Counsel advise that to the best of their knowledge this is the first occasion on which issues of this type concerning cryptocurrency have been before the courts in New Zealand.

- [15] Essentially, the present application is run by the liquidators for directions on the legal status of a number of cryptocurrencies held by Cryptopia ("the digital assets") and in particular whether those digital assets are held on trust by the company.

- [16] Counsel for the liquidators make clear that the liquidators have no interest in whatever outcome is reached by the Court on the issues in the present application but simply wish to ensure the Court receives full argument on those issues.

- [17] Effectively, the tussle which is before the Court is one between the creditors of Cryptopia on the one hand and the accountholders who have invested in the various digital assets ("the accountholders") on the other.

- [18] Experienced senior counsel have been appointed by the Court to represent those classes of affected interests in the application – Ms Cooper QC for the creditors and Mr Watts QC for the accountholders (who have also been described here as "the potential trust beneficiaries").

- [19] In essence, therefore, the present application concerns the legal nature and status of the digital assets and of potential equitable interests in them. These digital assets, as I have noted, have an approximate value of about NZD 170 million.

- [20] The present contest over the digital assets is effectively one between the more than 800,000 accountholders holding a positive coin balance with Cryptopia, the company's estimated 37 trade and other creditors and its 90 shareholders.

*(b) What is cryptocurrency?*

- [21] At the outset it is useful to provide a definition of cryptocurrency generally. Counsel seem to accept that a most helpful description is found in a British report of the "UK Jurisdiction Taskforce" entitled *Legal Statement on Cryptoassets and Smart Contracts*.[2] The report was authored by four barristers, experts in this field and considers broadly the legal status of cryptoassets and, in particular, whether the law treats them as property. In the report, the authors provide what is a useful and non- technical summary of cryptoassets or cryptocurrency. This definition follows the heading in the report "What is a Cryptoasset?" It explains:

24. In October 2008, the pseudonymous Satoshi Nakamoto published his now-famous paper *Bitcoin: A Peer-to-Peer Electronic Cash System*. Observing that commerce on the Internet relied almost exclusively on financial institutions serving as trusted third parties, Nakamoto proposed a new electronic payment system "based on cryptographic proof instead of trust", with digital tokens – *bitcoins* – taking the place of

A002065

traditional currency. The first bitcoin came into existence in January 2009, not coincidentally at the height of the global banking crisis.

25. Many other systems have been developed since then to implement commercial applications using cryptographic techniques. The market continues to expand as new applications and new techniques are explored.

26. Most applications involve dealings in assets of some kind, which therefore have to be represented digitally within the system. We use the term *cryptoasset* to refer generally to such a representation. However, that should not be understood as a term of art. Because of the great variety of systems in use and kinds of assets represented (ranging from purely notional payment tokens such as bitcoins to real-

2. UK Jurisdiction Taskforce *Legal Statement on Cryptoassets and Smart Contracts* (The LawTech Delivery Panel, November 2019) [*Legal Statement on Cryptoassets and Smart Contracts*] <

https://technation.io/news/uk-takes-significant-step-in-legal-certainty-for-smart-contracts-and-

cryptocurrencies/>.

world tangible objects) it is difficult to formulate a precise definition of a cryptoasset and, given the rapid development of the technology, that would not be a useful exercise. Indeed, there is no consistency even in the nomenclature, with *virtual* and *digital* also widely used to describe the kinds of things with which we are concerned.

27. Instead, we have set out to identify and describe, in general terms, the features of cryptoassets that may be regarded as genuinely novel or distinctive, as compared with conventional assets, so that we can then consider whether and how those features might be relevant to issues of legal and proprietary status.

28. A cryptoasset is ultimately defined by reference to the rules of the system in which it exists. Functionally, it is typically represented by a pair of data parameters, one public (in that it is disclosed to all participants in the system or to the world at large) and one private. The public parameter contains or references encoded information about the asset, such as its ownership, value and transaction history. The private parameter – the *private key* – permits transfers or other dealings in the cryptoasset to be cryptographically authenticated by digital signature. Knowledge of the private key confers practical control over the asset; it should therefore be kept secret by the holder. More complex cryptoassets may operate with multiple private keys (*multisig*), with control of the asset shared or divided between the holders.

29. Dealings in a cryptoasset are broadcast to a network of participants and, once confirmed as valid, added to a digital ledger. The main function of the ledger is to keep a reliable history of transactions and so prevent *double-spending*, i.e. inconsistent transfers of the same cryptoasset to different recipients. The ledger may be *distributed* and *decentralised*, that is, shared over the network with no one person having a responsibility for maintaining it, or any right to do so. A common type of distributed ledger uses a *blockchain*, which comprises blocks of transactions linked together sequentially, but other models are also in use.

30. An important feature of some systems is that the rules governing dealings are established by the informal consensus of participants, rather than by contract or in some other legally binding way. Consensus rules (employing methods such as *proof-of-work* or *proof- of-stake*) may also determine which version of the distributed ledger is definitive. The rules are self-enforcing in practice, even if not enforceable in law, because only transactions made in compliance with them and duly entered in the ledger will be accepted by participants as valid.

31. Although not all systems possess all of them, we can therefore identify the principal novel and characteristic features of cryptoassets as being:

(a) **intangibility**;

A002066

(b) **cryptographic authentication**;

(c) use of a **distributed transaction ledger**;

(d) **decentralisation**; and

(e) ruled by **consensus**.

32. It is those features that have given rise to much of the debate about legal and proprietary status and on which we therefore focus our analysis.

33. Some cryptoassets are intended to represent or are linked to conventional assets external to the system, for example money or debt obligations, tangible goods or land, a share or unit in a company or fund, or a contractual right of some kind; those assets are sometimes referred to as *tethered*, *exogenous* or *off-chain*. Such an external asset is certainly property but what, if any, rights in it conferred on the holder of the corresponding cryptoasset will depend on the contractual structure or legal rules of the system. For the present, we are concerned only whether the cryptoasset itself (the *native* or *on-chain* asset) is property, as distinct from any other asset it might represent, although we return to the relationship between on-chain and off-chain assets below when we discuss whether cryptoassets can operate as assets of title.

34. Many dealings in cryptoassets involve intermediaries such as brokers or custodians; that is the case even in systems, such as Bitcoin, that are designed to avoid the need for intermediation. What personal and proprietary rights the principal may have against an intermediary will depend on established rules of contract, tort and agency. That is outside the scope of the present discussion.

(emphasis original, footnotes omitted)

*(c) How Cryptopia operated*

- [22] In two affidavits one of the liquidators, David Ruscoe described how Cryptopia itself operated. In his affidavit Timothy Brocket, Cryptopia's Director of Finance and Administration from 1 July 2018 up to the date of the company's liquidation, also offered some insight into the company's operations. In summary, the position seemed to be:

(a) Cryptopia provided an online platform or exchange that allowed accountholders to trade pairs of cryptocurrencies. In order to do so, a user was first required to register with Cryptopia to open an account and to make a deposit or purchase in one of the five "base currencies".

(b) The customer's deposit would be made into a "hot wallet" (a wallet connected to the internet) for the cryptocurrency in question. Once

deposited the currency could be left in the hot wallet to meet withdrawal requests from other users or be transferred to a "cold wallet" (a wallet not connected to the internet). Once an initial deposit was made to the exchange, the accountholder's wallet listed a coin balance equivalent to the deposit. The accountholder would then be able to use the services offered by the exchange, including selling and buying cryptocurrency.

(c) All cryptocurrency on the exchange was stored in digital (hot or cold) wallets. The distinction between the hot and cold wallets turns upon the way in which the data in the wallets was stored:

(i) Cold wallets were held offline preventing them from being hacked (at least by outsiders). It appears that 75 per cent of the cryptocurrency held by Cryptopia (by volume) was stored in cold wallets.

(ii) Hot wallets were online, hosted on servers physically located in Phoenix, Arizona (and potentially at some point prior also in the Netherlands). The balance of the cryptocurrency held by Cryptopia (or 25 per cent by volume) was located in hot wallets.

A002067

(d) When a trade occurred between two users on the exchange, the users' respective coin balances on the company's internal ledger would change to reflect the trade, but the balances in the company's digital wallets did not change.

(e) The trades and transfers that took place on the exchange did not affect the blockchain ledgers, (the general ledgers of ownership that exist for each cryptocurrency outside of the exchange). This is because at all times the coins remained held in Cryptopia's digital wallets.

(f) Whether a wallet was cold or hot (whether it was stored online or not) was not immutable. A wallet could be made hot by bringing it online or cold by taking it offline. Coins could also be transferred between

wallets. For instance, a new user will have deposited a particular coin to a hot wallet but Cryptopia may have then transferred it to a cold wallet for safekeeping.

(g) Although Cryptopia had one hot wallet per cryptocurrency, it may have had multiple cold wallets for the same cryptocurrency. Mr Ruscoe's evidence is that there were "separate cold wallets for supposed company holdings and customer holdings of the same currency." Cold wallets also appeared to serve a residual purpose of topping up hot wallets depending upon the volume or withdrawal requests for a particular coin.

(h) From the account holder's perspective, it made no difference if cryptocurrency was held in hot or cold wallets. In fact, they may have been unaware of this distinction. Each accountholder was able to transfer cryptocurrency (as reflected in their coin balance) to a privately held digital wallet, another Cryptopia account or an account hosted on another exchange.

(i) Similarly, from the account holder's perspective, it made no difference if trades were made inside or outside Cryptopia's exchange. There was, however, a mechanical difference to those trades resulting from how Cryptopia stored and managed the cryptocurrency traded on its platform:

(i) Trades within the exchange: a transfer of cryptocurrency between accountholders (two users of Cryptopia) was effected by corresponding adjustments to the accountholders' coin balances. As Cryptopia held the underlying cryptocurrency it did not need to make any changes to the wallets to effect the transactions. The transactions were recorded in Cryptopia's internal structured query language (SQL) database (or internal ledger of transactions).

(ii) Trades outside the exchange: as with an internal trade, a transaction to a wallet held outside the exchange involved an adjustment to the accountholder's coin balance. However, Cryptopia would have to transfer cryptocurrency from a hot wallet to the recipient who in turn would transfer cryptocurrency to another Cryptopia hot wallet. That transaction would be recorded on the relevant cryptocurrency's public ledger.

(j) Unlike transactions on the exchange which did not move coins between wallets, all cryptocurrency transactions that moved coins from one wallet (or address) to another required a private and public key. The public key is essentially the digital wallet address, and the private key is similar to a password, that is known only to the user. A new private key is generated each time cryptocurrency is transferred on the blockchain.

(k) Cryptopia exclusively held the private keys to its digital wallets that contained the cryptocurrencies traded on the exchange. As I understand it, accountholders did not have access to the private keys.

(l) Cryptopia charged a fee for each trade and a withdrawal fee. Cryptopia had its own accounts on the exchange so that when a trade took place the trade fee would be paid into Cryptopia's account for collecting trade fees.

A002068

(m) The cryptocurrency associated with Cryptopia's own account holdings on the exchange was held in Cryptopia's digital wallets and pooled along with user holdings.

(n) Cryptopia also charged various fees for services such as recovering cryptocurrency that had been accidentally transferred to another user on the exchange.

(o) Significantly, as I see it, Cryptopia's Customer Service Analyst Manual, an internal document, outlined the company's own perspective on what accountholders received from Cryptopia. The manual explained that:

Exchange services like Cryptopia manage and maintain wallets, and provide you with the functionality to send and receive transactions as well as securely hold[ing] the balances assigned to your account.

*(d) Cryptopia's terms and conditions*

- [23] The earliest record of any terms and conditions for Cryptopia appears to be a version dated January 2015. Although it is unclear whether Cryptopia may have had a version available prior to January 2015, it appears not.

- [24] What does seem clear is that the relationship between Cryptopia and the accountholders, especially at the outset, was not a well-documented one.

- [25] Turning to the language used by Cryptopia in those earliest Terms and Conditions introduced in January 2015, these relevantly state:

**Terms – Cryptopia**

**Terms and Conditions Website Terms of Use**

This website (site) is operated by Cryptopia Limited...your use of this site is governed by these terms of use. By access and browsing this site you agree to be bound by these terms of use. We make this site available to you in order to provide information about our products and services and enable you to purchase these products and services from us online.

...

**Marketplace Liability**

...

Cryptopia is a service to allow anyone to offer, sell and buy items at any time. *We are not involved in the actual transaction between Buyers and Sellers. We have no control over* and do not guarantee the quality, safety or legality of items advertised, the truth or accuracy of listings, the ability of Sellers to sell items, the ability of Buyers to pay for items, the timeliness of deliveries, or that a Buyer or Seller will actually complete a transaction. *We do not transfer legal ownership of items* from the Seller to the Buyer. Unless the Buyer and

the Seller agree otherwise, *the Buyer will become the item's lawful owner*

upon physical receipt of the item from the Seller.

...

**Right to use site and content**

You may use the site only for the purposes for which it is provided. You must not use this site for fraudulent or other unlawful activity or otherwise to do anything to damage or disrupt this site. Multiple accounts for the purpose of defrauding, circumventing bans, soliciting or abusing Cryptopia Ltd services will result in immediate termination of all related accounts, *including seizure of all on-site digital property*. Threats towards Cryptopia

A002069

Ltd, Cryptopia Ltd Staff will result in immediate termination of all related accounts, *including seizure of all on-site digital property*.

...

## Amendments

We may amend these terms of use from time to time, so you should check and read these terms of use regularly. By continuing to use this site after any such amendment, you are deemed to have agreed to the amended terms of use.

(emphasis added, all bold original)

- [26] These original terms and conditions seemed to apply unchanged until 7 August 2018 when a new "Terms and Conditions" document was introduced by Cryptopia. It seems this was crafted with legal assistance and may have resulted because of a view taken by Cryptopia executives at the time that more detailed terms and conditions were required.

- [27] These new 7 August 2018 Terms and Conditions, the parties have accepted, varied the earlier terms and conditions. Amongst other things, these varied Terms and Conditions relevantly stated:

## Introduction

A. These terms and conditions of use (terms) apply to the Cryptopia website and associated applications (the platform) and the services (services) operated and provided by Cryptopia Limited.

B. These terms, the platform and the services allow you to:

(i) Buy, sell and exchange supported coins through the platform.

(ii) Use fiat pegged tokens, when available; and

(ii) Store supported coins in our hosted wallets.

C. In these terms Cryptopia, we, us or our, means Cryptopia and you or your means the person accessing or interacting with the platform and/or the services.

...

## 2. Understanding your risks

Trading in coins is speculative and high risk. You may lose some or all of any money or coins that *you* hold or transact using the platform. *You* should not trade coins unless you can afford to lose *your* investment without hardship. **Please read the Cryptopia Risk Statement carefully for a summary of some of the risks that you must understand before you use the platform or services.**

...

## Your account

- **4.1 Opening an account**

(a) To use the platform and our services, you must open an account by completing our process through the platform. We can decline to open an account or provide a service, without notice and for any reason.

(b) We will require proof (satisfactory to us) of your identity when you open an account, to enable us to meet our obligations under the Applicable Law (in particular any anti money laundering or

countering financing of terrorism requirements). In addition, we may ask for such other information as we consider is necessary or desirable...

- **4.2 Using your Account**

  (a) Your account comprises *your* coin balances...including where applicable any fiat pegged tokens that you hold...and includes a record of all *your* transactions.

  (b) You agree to accept responsibility for all activities that occur under your account or password.

  (c) You must maintain the confidentiality and security of any information that can be used to access your account.

...

(a) You understand that anyone accessing your account will be able to enter into transactions using *your* coin balances and where applicable any fiat pegged tokens and we have no obligation to verify or take any

steps to verify any instruction received from you or appearing to be sent by you.

- **4.3 We can suspend your account**

  (a) We may suspend, limit or restrict access to your account, the platform any service, at any time without notice if:

  (i) You fail to pay any amounts owing under these terms to us or any other person when they are due.

  (ii) We become aware of a dispute over either the *ownership of any assets* in your account or the operation of the account.

...

(d) Subject to any applicable law, if we close your account:

...

  (iii) We may at our discretion provide you with access to the platform solely to the extent necessary to access to your account for a period of 90 days to allow you to transfer your

Coins to a different digital wallet or to redeem any fiat pegged tokens.

...

## 5 Your Coin balances

(a) *Your Coin balances* form part of your account, and allow *you* to send, receive and store supported Coins...in accordance with instructions received by you through the platform;

...

  (d) *Your Coin balances* are operated by us, and represent entries *in your name on the general ledger of ownership* of Coins maintained and held by us. This means the Coins in your deposit wallets may be pooled in our internal accounts with other users' Coins at any time.

  (e) *Each user's entry in the general ledger of ownership of Coins is held by us on trust for that user.*

- 6. **Fiat pegged tokens**

A002071

(a) Where we are able to do so...we may offer fiat pegged tokens to enable you to upload fiat dollars to your account in exchange for the equivalent pegged tokens which are tradeable on our platform.

...

(e) Fiat pegged tokens are not financial products in themselves and do not give you any rights or carry any obligation. They are a digital representation of fiat dollars *held on trust for you* in the custodial account. Under these terms *you hold the beneficial interest in these*

*fiat dollars* and can instruct us as trustee to deliver them to you at any time, subject to these terms...

### 7. Trading on the platform

...

- ### 7.2 Reversals, cancellations

(a) You cannot cancel, reverse, or change any transaction once it is submitted.

...

- ### 7.3 Agent

You appoint Cryptopia, and *Cryptopia accepts the appointment, as your agent* for any transaction in Coins that you have entered into through your account on the platform in accordance with these terms.

- ### 7.4 Location of transactions

All transactions through the platform are deemed to take place in New Zealand. On completion of the transaction, you are *deemed to take possession of your account and the assets in your account in New Zealand.*

### 8. Platform change and business disruptions

(a) We will use reasonable care in operating our platform, so as to limit disruptions to the platform, user accounts and their services. However, you accept that our platform will not necessarily be available uninterrupted or error-free and it may also be inaccessible from time to time while undergoing maintenance or upgrade work...

...

### 13. Fees and expenses

- ### 13.1 You agree to pay our fees.

You agree to pay all fees and expenses associated with or incurred by you in relation to your use of our services or platform which are published on our platform.

...

### 14. Taxes

By using our platform, you accept that it is up to you to understand whether and to what extent, any taxes apply to any *transactions you conduct* through our services or platform. We accept no responsibility for, nor make any representation in respect of, your tax liability.

...

### 19. Glossary

A002072

In these terms:

...

**Coin balance(s)** means any record of Cryptopia holding funds on the Cryptopia platform *on your behalf*.

...

**Custodial account** means the bank account held by Cryptopia *on behalf of users* for the purpose of receiving and transmitting fiat dollar funds matched to fiat pegged tokens.

**Services** means any services provided by us to you or any other user whether through the platform or outside of it, including *the purchase, sale and exchange of coins* and the provision of the platform, your account (including any fiat pegged tokens) in any Coin wallet.

(emphasis added, all bold original)

- [28] As Cryptopia's last Director of Finance and Administration, Mr Brocket deposed before me that he had responsibility for the accounting, financial reporting, budgeting, tax compliance, investments, insurance, people and culture, and audit functions of Cryptopia.

- [29] He confirmed in that affidavit that, based on his knowledge, there were only ever these two sets of Cryptopia's terms and conditions that applied to customers. This evidence was unchallenged before me. In particular, he stated:

From an operational perspective, there were no material changes to the way the business operated that resulted from the change to the terms and conditions in August 2018. An email was sent to all customers of which there were approximately 2.3 million users when the changes were effected.

- [30] Mr Brocket further deposed:

6. Cryptopia provided a trading platform...for accountholders to trade pairs of cryptocurrencies.

...

11. ...Accountholders could make deposits and withdrawals of enabled coins. Any accountholder could withdraw *its cryptocurrency* from the exchange into a privately held digital wallet, controlled by the accountholder or alternatively transfer cryptocurrency to another exchange, if the currency in question was traded on that other exchange or the exchange agreed to host it.
12. Trades...were carried out on the Cryptopia exchange through the use of order books that listed the available buy/sell orders. When the orders matched a trade would occur...

(emphasis added)

- [31] As to how Cryptopia would be paid for cryptocurrency transactions, Mr Brocket stated:

15. ...Cryptopia charged a trading fee charge of 0.2 per cent of the value of the trade...the trading fee was charged to the buyer and the seller.

16. If a seller wanted to trade one bitcoin, then she would have 1.002 BTC deducted from her account, of which 0.002 BTC would go to Cryptopia as the transaction fee on the sell side. The "purchaser" would receive 0.998 BTC, with the difference of 0.002 BTC being paid to Cryptopia as the fee on the buy side...

*(e) Cryptopia's financial accounts*

- [32] Lastly, before the Court are a range of Cryptopia's profit and loss statements and balance sheets for the period 1 January 2018 to 8 August 2018 and for the period around 2018/2019. What is clear from these financial accounts prepared by Cryptopia's in-house accountant is that details of its assets do not

A002073

include any cryptocurrency, other than the amounts in its platform that Cryptopia clearly held on its own account. Digital currency held on the platform for accountholders was not shown as an asset of or belonging to Cryptopia. Nor was any appropriate entry in the liabilities section of Cryptopia's balance sheets to show advances to the company from accountholders which financed the acquisition of these digital assets.

- [33] From GST returns which are before the Court, there is also no suggestion that digital trading of the large number of digital assets held for accountholders was undertaken in any way by Cryptopia on its own account.

*(f) SQL database and how Cryptopia generated income*

- [34] The SQL database was Cryptopia's internal database that recorded transactions carried out on the exchange and the coin balances of each account.
- [35] Cryptopia charged accountholders a fee for deposits, trades, withdrawals and listing coins. The company had several accounts on the exchange into which the fees were paid. These accounts had a corresponding SQL entry.

- [36] When a trade took place the trade fee would be credited to Cryptopia's fees account which would generate a corresponding entry on the SQL database. A weekly report was prepared by Cryptopia that summarised the trading fees generated in the previous week and converted these into New Zealand dollars.

- [37] The underlying holdings of Cryptopia itself were also reconciled into the company's accounting system, Xero, and recorded in the accounts as company assets. Appropriate journal entries would be created. This was set up like a bank account in Xero.

*(g) The hack*

- [38] As I have noted, Cryptopia was hacked, this occurring in January 2019. The parties estimate that the hackers stole approximately NZD 30 million worth of cryptocurrency from the exchange. That cryptocurrency was withdrawn from the exchange using the private keys for the currencies in question, so Cryptopia was not able to reverse the transactions. The hack is the subject of an ongoing police investigation but this is not as yet resolved.

- [39] Currently the liquidators are in the process of ascertaining the amount of cryptocurrency that was stolen and the amount that is left in Cryptopia's wallets. This process involves individually "standing up" the digital wallet for each cryptocurrency (of which there are approximately 500) and recreating each entry to protect the system from any malware that might be left over from the hack.

- [40] Once that process is completed, the liquidators will be able to carry out a reconciliation exercise between the actual cryptocurrency holdings that the company controls or owns and the accountholders' account balances recorded in the SQL database. The results of this process will assist the liquidators in determining not only what is available for distribution, but also the proportion of account balances or claims that can be distributed or paid once the present application is determined.

*(h) Advertising and promotion*

- [41] It seems from the available evidence before the Court that Cryptopia did not actively promote its business, at least until it adopted a new marketing strategy in July 2018 by which point its user numbers had already spiked.

- [42] Mr Ruscoe has confirmed that Cryptopia marketed itself through channels like Google and Trade Me advertisements and it promoted itself through banner advertisements and through some event sponsorship. The majority of this marketing seems to have been through online social media channels. On these aspects, Mr Watts for the accountholders submits that there are aspects of this advertising and

A002074

promotion which support the existence of trusts being established for the holding of accountholders' cryptocurrency. I will address this aspect further below.

### The law – s 284 of the Companies Act 1993

- [43] The application before me, as I have noted, is made under s 284(1)(a) of the Companies Act 1993. In terms of this provision, this Court on an application from, amongst others, a liquidator (as has happened here) has a supervisory jurisdiction to: "...give directions in relation to any matter arising in connection with the liquidation."

- [44] The authors of *Heath and Whale on Insolvency*, in commenting on the application of s 284 state:[3]

...if there is a difficulty at any stage of the administration, it is the liquidator's clear duty to inform the court and seek directions [under s 284 of the Act].

- [45] In addressing the liquidator's principal duties engaged in the liquidation of a company, s 253 of the Companies Act describes this duty as being:

...

(a) to take possession of, protect, realise, and distribute the assets, or the proceeds of the realisation of the assets, of the company to its creditors in accordance with this Act; and

3. Paul Heath and Michael Whale (eds) *Heath and Whale on Insolvency* (online ed, LexisNexis) at [22.8(e)] (footnote omitted).

(b) if there are surplus assets remaining, to distribute them, or the proceeds of the realisation of the surplus assets, in accordance with section 313(4)–

in a reasonable and efficient manner.

### The liquidators' application

- [46] In the liquidators' application to this Court orders are sought which they say relate to the following questions:

### As to the legal status of the Digital Assets

(a) Whether any or all of the various cryptocurrencies (digital assets) held by the liquidators of Cryptopia constitute "property" as defined in s 2 of the Companies Act 1993;

(b) Whether any or all of the Digital Assets are held on trust for any or all Account Holders (whether by way of express, implied, resulting, constructive, Quistclose Trust or otherwise);

(c) If the answer to question (a) or (b) is no, then to the extent that such digital assets are not "property" whether the applicant liquidators should satisfy claims of:

(i) Any Account Holder of the company (Account Holder) for the return of his/her/its digital assets; and

(ii) Unsecured creditors;

by conversion of such Digital Assets into fiat currency and paying such in accordance with Part 16 of the Companies Act 1993;

(d) If the answer to question (b) is yes in any respect, then:

A002075

(i) When did the Trust/s come into existence? When the company updated its terms and conditions on 7 August 2018 (Amended Terms), or at some alternative date?

(ii) What are the terms of the Trust/s?

(iii) Are the Digital Assets held on trust:

1. In an individual trust for each Account Holder, with the result that each Account Holder is the sole beneficiary of the Trust?

2. In one trust for the benefit (of) all Account Holders with the result that all Account Holders are co-beneficiaries of the same trust, or

3. In multiple trusts for the benefit of specific groups of Account Holders, with the result that Account Holders within a specific group are co-beneficiaries of same trust, or

4. On some other basis.

(e) What is the consequence of the applicant liquidators being unable to ascertain the identity of any Account Holder, and what consequences flow in relation to any Digital Assets associated with that account, specifically:

(i) Can the applicant liquidators close any such Accounts and retain any Digital Assets as assets of the company; or

(ii) Do any such Digital Assets fall to be dealt with pursuant to the Trustee Act 1956, or otherwise.

(f) If and to the extent that the applicant liquidators recover stolen Digital Assets, then are such to be dealt with by the applicant liquidators:

(i) In accordance with the determination sought above;

(ii) Pro rata according to the amounts recovered assessed against amounts stolen; or

(iii) As assets of the company.

(g) Directing that the reasonable fees and disbursements of Peter Watts QC, Jenny Cooper QC, Buddle Findlay and the liquidators shall be met, in the first instance, from the pool of realised Bitcoin holdings pursuant to paragraph 3(b) of the order of this Court dated 29 May 2019, on the basis that the fees are a necessary and reasonable expense of the liquidation, of and incidental to the protection, preservation, recovery, management and administration of the assets of Cryptopia, with the Court's decision as to the ultimate incidence of counsel's costs to be reserved until the originating application has been determined, or as otherwise ordered by the Court.

(h) Leave is reserved for the applicants to apply for such further ancillary orders as are necessary.

- [47] From the liquidators' application there appear to be two main issues for determination by the Court with a number of subsidiary issues flowing from this. As to the two main issues, they seem to be:

(a) Are cryptocurrencies a type of "property" in terms of the Companies Act and, linked to this, can cryptocurrencies form the subject matter of a trust?

(b) Was Cryptopia, in providing a cryptocurrency storage and exchange service for its customers, a trustee of the currency brought onto the exchange by accountholders and held by it?

- [48] In all the present circumstances, in essence the dispute before the Court, which is one between the accountholders and the creditors, simply concerns the proprietary effects of the digital assets in relation to Cryptopia, a New Zealand company in liquidation. The dispute is not one between participants in a

A002076

particular cryptocurrency system. In reality, the dispute is simply between the accountholders and the creditors (and possibly also the shareholders) of a limited liability company that operates a cryptocurrency exchange.

- [49] In that respect, counsel for all parties before me agreed that the law applicable to each of the issues in this case is New Zealand law. Mr Watts, counsel for the accountholders, went further and addressed the issue of applicable law relating to this case which I acknowledge and adopt. I am satisfied for present purposes, as counsel have agreed, that New Zealand law is to apply to the present issues before me.

## Issue 1 - The "property" issue

*An aside – what are the implications?*

- [50] Before me Mr Watts for the accountholders submitted that cryptocurrencies must be seen as a form of intangible personal property both at common law and within the definition contained in s 2 of the Companies Act. The liquidators and the creditors disagree with this. The creditors also contend that cryptocurrencies are not property capable of forming the subject matter of a trust at common law.

- [51] The accountholder's position, however, is that even if cryptocurrencies are not seen as personal property in the full sense, they are still assets capable of forming the subject matter of a trust.

- [52] On these aspects, Mr Watts contended that any finding by this Court that cryptocurrencies are not property would have profound and unsatisfactory implications for the law in New Zealand including in particular insolvency law,

  succession law, the law of restitution and commercial law more generally. Mr Watts maintained that Ms Cooper for the creditors is wrong to argue that these problems are sufficiently important that they should be left to Parliament for an appropriate remedy.

- [53] Turning to this first question as to whether the digital assets have the indicia of "property" and can form the subject matter of a trust, it is important to say something first about the general background to this issue.

- [54] Given that the application before the Court seeks directions as to how the liquidators should distribute the digital assets, the creditors' position is that the digital assets, along with Cryptopia's other remaining assets should be distributed on a pari passu basis, treating all accountholders and other unsecured creditors equally.

- [55] The position taken by the accountholders here is different, however. They say that the digital assets belong to them and, if need be, are held by Cryptopia in trust for the accountholders. As such those digital assets should be divided by currency and distributed to accountholders in proportion to their holding of each particular cryptocurrency as recorded in Cryptopia's SQL database.

- [56] Leaving aside those digital assets in issue here and the money held on trust to back the New Zealand dollar tokens (NZDTs), Cryptopia's assets on liquidation consist of:

  (a) a little over NZD 686,000 held in a bank account;

  (b) fixed assets with a book value of NZD 2 million but a likely realisable value as low as NZD 100,000; and

  (c) 344 bitcoin (having a present value of approximately NZD 4.6 million) recorded as being held by Cryptopia for its own account.

- [57] It is clear, therefore, that the pool available to creditors, which I understand number about 37 different parties, if the remaining digital assets are found to be held by Cryptopia on trust, would be

A002077

around NZD 5.4 million. This would mean that any creditors who were not also accountholders would recover less than 50 per cent of the

amount of their claims, given that it seems the total value of all creditors' claims is an estimated NZD 12.7 million (including about NZD 5 million owed to the Inland Revenue Department).

- [58] There may also be an issue here, according to Ms Cooper, for those accountholders who lost all their various holdings in the hack. In this regard, as I understand it, holders of ethereum cryptocurrency lost 100 per cent of their holdings in the hack. Thus, if the digital assets were divided by currency and in proportion to an accountholder's holding of each currency, those holders would receive nothing.

- [59] Ms Cooper has said that, in contrast, if the digital assets were to be available for distribution to all accountholders and creditors on a pari passu basis, the total pool of assets she estimates would be approximately NZD 217 million and the percentage recovery by each creditor would then be likely to be over 85 per cent of its total claim.

- [60] I set out these matters purely by way of background information. Mr Watts has properly identified that, even if they are accurate, these possible results are not strictly relevant and have no bearing on the true legal position to be reached by this Court in making its assessment of the questions before it.

- [61] I return now to consider what is the proper assessment of the Digital Assets here. Before me, all parties appeared to agree that the Digital Assets are "assets" in terms of the general definition of this word in certain sections of the Companies Act where this word appears.[4]

- [62] On the issue as to whether cryptocurrencies are a type of "property", however, the parties differ markedly. And, in any event, a first question must be asked why does this matter?

4. Companies Act 1993, s 253, addresses the principal duty of a liquidator to take possession of, protect, realise and distribute "assets" of the company to its creditors. Section 313 too deals with distribution of a company's surplus "assets".

*What is "property" and why does it matter here?*

- [63] Sarah Green, in a chapter called "Cryptocurrencies in the Common Law of Property" in her and David Fox's text *Cryptocurrencies in Public and Private Law* addresses this question:[5]

Property law matters both internally and externally to a cryptocurrency system. Internally – among the users of the system – property law is a justifiable ground for the recovery of coins or their value when they are stolen or transferred by fraud. The irreversibility of cryptocurrency transactions, in a purely technological sense, need not bar the reversal of their legal effect or the recognition that they are legally defective. Property law has its own systemic norms.

Essentially – to third parties dealing with users of the system – the recognition of cryptocurrencies as objects of property is no less important. It is only a matter of time before cryptocurrencies are used in transactions external to the block chain. Property is a gateway to many standard forms of transactions. A crypto-coin can never become the subject matter of a trust or a proprietary right of security, nor will it be an asset in a deceased person's estate, unless it is first recognised as an object of property. The same is true of a secured creditor or trust beneficiary enforcing their claim in property to the unsecured creditors of an insolvent coin-holder. The development of a viable cryptocurrencies derivative market may sometimes require that the primary assets from which secondary claims are constructed are capable of legal recognition as property.

- [64] And, in the UK Jurisdiction Taskforce's *Legal Statement on Cryptoassets and Smart Contracts*, there is a specific section entitled "What is property, and why does it matter?" [6] In this section the following paragraphs are useful to note:

     35. Strictly, the term property does not describe a thing itself but a legal relationship with a thing: it is a way of describing a power recognised in law as permissibly exercised over the thing. The

A002078

fundamental proprietary relationship is *ownership*: the owner of the thing is, broadly, entitled to control and enjoy it to the exclusion of anyone else. However, ownership is just one kind of property right: property is a comprehensive term and can be used to describe many different kinds of relationship between a person and a thing.

36. Why does it matter if a cryptocurrency asset is capable of being property. It matters because in principle proprietary rights are recognised against the whole world, whereas other – personal – rights are recognised only against someone who has assumed a relevant legal duty. *Proprietary rights are of particular importance in an insolvency, where they generally have priority over claims by*

5.   Sarah Green "Cryptocurrencies in the Common Law of Property" in David Fox and Sarah Green (eds) *Cryptocurrencies in Public and Private Law* (Oxford University Press, Oxford, 2019) at 141.

[6] *Legal Statement on Cryptoassets and Smart Contracts*, above n 2.

*creditors, and when someone seeks to recover something that has been lost, stolen, or unlawfully taken*. They are also relevant to the questions of whether there can be a security interest in a crypto asset and whether a crypto asset can be held on trust.

37. The term *property* is also part of the lexicon of the law: it is widely used in statutes and cases. It is important to understand whether the many statutory and common law rules applicable to property apply also to crypto assets and, if so, how. *Of particular significance are the rules concerning succession on death, the vesting of property on personal bankruptcy, the rights of liquidators in corporate insolvency, and tracing in cases of fraud, theft or breach of trust. It would, to say the least, be highly unsatisfactory if rules of that kind had no application to crypto assets*.

(emphasis added)

- [65] And:

41. Some take the view that the design of crypto assets means that there is no need for traditional legal rules or processes. Law is irrelevant, it is sometimes said, because dealings are effected by non-legally- binding consensus between users, because cryptographic authentication and validation using strong encryption methods makes dealings irreversible, and because decentralisation and disintermediation means that there is no responsible party who can be compelled to act at the direction of a court. We do not agree. *The design of crypto assets may create some practical obstacles to legal intervention but that does not mean that crypto assets are outside the law*.

(emphasis added)

- [66] As I have noted above, Mr Watts suggested too that a finding that cryptocurrencies are not property would have profound and unsatisfactory implications for New Zealand's law, including insolvency law, succession law, law of restitution and commercial law more generally.

- [67] Before me, although it seems the creditors may have recently changed their position here to some extent, essentially, they now contend that cryptocurrencies are not property nor are they capable of forming the subject matter of a trust at common law. The accountholders strongly dispute this position. Mr Watts contends that it should be a reasonably straightforward exercise for this Court to find that cryptocurrencies are in general a species of intangible personal property and are capable of being the subject matter of a trust.

- [68] And, before me, Mr Watts provided detailed and extensive submissions on this issue as to the status of cryptocurrencies as property for two reasons:

(a) This was given, first, the new opposition now from counsel to the creditors broadly accepted by counsel for the liquidator over this point; and

A002079

(b) Secondly, the fact that the status of cryptocurrencies as property has attracted significant attention around the common law world in recent years without, it seems, as yet receiving a definitive judicial analysis.

- [69] For present purposes it will become apparent that I reach the conclusion that the cryptocurrencies here situated in Cryptopia's exchange are a species of intangible personal property and clearly an identifiable thing of value. Without question they are capable of being the subject matter of a trust. I will now set out my reasons for this conclusion.

*The authorities*

- [70] This first issue outlined at para [46](a)] of this judgment asked the specific question whether any or all of the digital assets held by the liquidators are "property" within the definition outlined in s 2 of the Companies Act.

- [71] That section defines "property" as:

...property of every kind whether tangible or intangible, real or personal, corporeal or incorporeal, and includes rights, interests, and claims of every kind in relation to property however they arise.

- [72] Although there is a certain circularity with this definition, it is nevertheless inclusive and wide in that it extends "property" for the purposes of the Act to include "rights, interests, and claims of every kind in relation to property however they arise."

- [73] Courts in New Zealand have accepted that the definition of "property" in the Companies Act is a "wide" one and includes "money" despite money not being expressly included in the terms of the s 2 definition. This is clear from the

Supreme Court decision in *McIntosh v Fisk*.[7] There, the Court accepted it was arguable that "the payment of money by RAM would fall within s 292(3)(a) as a transfer of property by RAM due to the wide definition of "property" in s 2 of the Companies Act."[8]

- [74] Further, in *Chapman v Effective Fencing Ltd,* Associate Judge Faire held: [9]

The definition of "property" in s 2 in referring to "every kind" of property, is wide enough to cover money. Clearly money is "tangible" and "personal" property in terms of the definition.

- [75] Lord Wilberforce's opinion in the House of Lords in *National Provincial Bank Ltd v Ainsworth* is often cited as the classic statement of the characteristics of "property".[10] There, his Lordship said:

Before a right or an interest can be admitted into the category of property, or of a right affecting property, it must be definable, identifiable by third parties, capable in its nature of assumption by third parties, and have some degree of permanence or stability.

I will return to this definition shortly.

- [76] But first, I turn to several recent cases where the question of cryptocurrencies as "property" has been addressed to some extent. The first is a Singaporean case, *B2C2 Ltd v Quoine Pte Ltd*, which Ms Cooper in particular considered to be an important decision, given its factual setting was not dissimilar to the present case. [11]

*B2C2 Ltd v Quoine Pte Ltd*

- [77] Initially this involved a 2019 first instance decision of the Singapore International Commercial Court, a new division of the High Court of Singapore created in 2015. That decision was then appealed to

the Court of Appeal of Singapore and was the subject of a lengthy appeal judgment delivered this year.[12]
In the lower

[7] *McIntosh v Fisk* [2017] NZSC 78, [2017] 1 NZLR 863.

[8] At [55].

[9] *Chapman v Effective Fencing Ltd* HC Auckland CIV-2004-404-5905, 21 April 2005 at [34].

[10] *National Provincial Bank Ltd v Ainsworth* [1965] UKHL 1; [1965] AC 1175 (HL) at 1247–1248.

[11] *B2C2 Ltd v Quoine Pte Ltd* [2019] SGHC(I) 3, [2019] 4 SLR 17 [*B2C2* (SGHC)].

[12] *Quoine Pte Ltd v B2C2 Ltd* [2020] SGCA(I) 2 [*B2C2* (SGCA)]

court, all parties accepted that cryptocurrencies were a species of "property", a concession which
the judge, Thorley IJ[13] accepted was rightly made.

- [78] The case concerned a Singaporean cryptocurrency exchange operated by Quoine, in many ways like
  Cryptopia, on which B2C2 was a trader. Some trading was set up to occur automatically through
  computers connected to the exchange and was pre-programmed. The transactions which led to the
  litigation were conducted by way of algorithms created by Quoine and by B2C2. The trades in question
  resulted from pre-programmed requests to exchange cryptocoins of ethereum for bitcoin. Errors occurred
  in the programming and an unusual set of circumstances resulted in B2C2's computer offering ethereum
  for bitcoin at the rate of one ethereum for 10 bitcoin. The computer of another trader on that platform
  accepted that bid, seven such trades taking place ("the disputed trades"). The going rate of ethereum for
  bitcoin in the market at the time was one ethereum for 0.04 of a bitcoin. The effect of the automatic
  trading was that B2C2 sold ethereum at about 250 times its appropriate price. Quoine became aware of
  the mistake. It then reversed the trades which led to the litigation.

- [79] B2C2 sued Quoine in the High Court for breach of the contract between it as a trader and Quoine as
  the operator of the exchange and for breach of trust as a result of Quoine's having returned the bitcoin to
  the counterparty. A defence of mistake was raised in that Court but Thorley IJ held there was no basis for
  setting aside the trading and Quoine was accordingly liable to B2C2 for having wrongly reversed the
  trades. He upheld both B2C2's contract claim and its claim for breach of trust.

- [80] That breach of trust claim could have succeeded only if the bitcoins in question were an asset that
  could form the subject matter of a trust. At the lower court level, Quoine had conceded that Bitcoin was a
  species of "property" but it did not concede that there was any trust. Thorley IJ considered that the
  concession on the "property" point was rightly made and in his judgment his Honour stated:[14]

Cryptocurrencies are not legal tender in the sense of being a regulated currency issued by government but do
have the fundamental characteristic of intangible property as being an identifiable thing of value. Quoine drew
my

13. The "IJ" judicial office abbreviation refers to International Judge, an office of the Supreme Court of
    Singapore. Thus, references to Thorley IJ are to be read as "International Judge Thorley".

[14] At [142].

attention to the classic definition of a property right in the House of Lords decision of *National Provincial Bank
v Ainsworth* [1965] UKHL 1; [1965] 1 AC 1175 (HL) at 1248:

...it must be definable, identifiable by third parties, capable in its nature of assumption by third parties, and have
some degree of permanence or stability.

Cryptocurrencies meet all these requirements. Whilst there may be some academic debate as to the precise nature of the property right, in the light of the fact that Quoine does not seek to dispute that they may be treated as property in a generic sense, I need not consider the question further.

- [81] In the proceeding, as I have mentioned, B2C2 had alleged that Quoine's reversal of the disputed trades was in breach of contract and breach of trust. On the trust point there were no express words in Quoine's terms and conditions indicating an intention to create a trust. However, B2C2 argued Quoine had shown an intention to create a trust by holding traders' cryptocurrency in separate digital wallets from Quoine's own assets. Against that, Quoine submitted that a Risk Disclosure Statement it had provided notified customers that assets were not deposited in a trust account so customers may lose their assets in the case that Quoine was to be bankrupted or go into liquidation.

- [82] The High Court, in considering the first instance claims brought by B2C2, allowed them both on the basis of breach of contract and breach of trust. In finding there was a trust, the Court there held that the "decisive factor" was that the assets were held separately as members' assets rather than as part of Quoine's trading assets. The decision was appealed to the Court of Appeal as I have noted. On appeal the majority upheld the High Court's decision on the breach of contract aspect but overturned the decision on the breach of trust cause of action. On that breach of trust claim, a majority of the Court of Appeal rejected the International Judge's view that it was a "decisive factor" that the assets were held separately rather than as part of Quoine's trading assets. The Court of Appeal found the mere fact Quoine's assets were segregated from its customers cannot in and of itself lead to the conclusion that there was a trust. Further discussion of this trust aspect will follow later in my judgment.

- [83] On the "property" question, in its decision, the Court of Appeal also declined to decide whether Bitcoin as the cryptocurrency in question was "property" capable

  of forming the subject matter of a trust. In their decision the Court of Appeal in the majority judgment, delivered by Menon CJ, commented:[15]

There may be much to commend the view that cryptocurrencies should be capable of assimilation into the general concepts of property. There are, however, different questions as to the type of property that is involved. It is not necessary for us to come to a final position on this question in the present case.

- [84] This comment from the Court of Appeal, although not definitive, along with similar suggestions from other authorities, in my view, are of some help when considering this question as to whether the digital assets here could be regarded as "property".

*Other authorities*

- [85] A second case perhaps supporting this interpretation is a 2018 decision in *Vorotyntseva v Money-4 Ltd*.[16] There, Birss J sitting in the Chancery Division of the English High Court granted ex parte a proprietary freezing order over some bitcoin and ethereum currency, stating that the defendant in that case had not suggested that "cryptocurrency cannot be a form of 'property'".[17] No further discussion took place on the point.

- [86] In a not dissimilar Canadian decision, *Shair.Com Global Digital Services Ltd v Arnold*, the Supreme Court of British Colombia granted an ex parte preservation order to the plaintiff company against its former chief operating officer with respect to digital currencies that might still be in the defendant's possession.[18] Without providing any reasoning the Court accepted that cryptocurrencies could be property within the rules for preservation orders, noting that in the correspondence between the parties that had been filed for the proceeding the defendant had not denied that the plaintiff had an interest to pursue.

---

[15] *B2C2 (SGCA)*, above n 12 at [144].

[16] *Vorotyntseva v Money-4 Ltd* [2018] EWHC 2596 (Ch).

[17] At [13].

[18] *Shair.Com Global Digital Services Ltd v Arnold* 2018 BCSC 1512.

- [87] Recently, a decision of the English High Court in *AA v Persons Unknown* also held that cryptocurrencies are "property". [19] There, Bryan J granted an interim proprietary injunction against a cryptocurrency exchange over bitcoin which represented proceeds of ransom monies paid out to a hacker by the applicant insurance company. The hackers had installed malware into the insurance company's computer system, and demanded the company pay a ransom in bitcoin, to regain access to its system. The ransom was paid in bitcoin and transferred into the exchange. The insurance company applied to the Court for an interim proprietary injunction against the exchange over the bitcoin, amongst other things.

- [88] Only counsel for the applicant insurance company appeared at the hearing in that case and filed submissions. And, it seems the High Court there primarily relied on the *Legal Statement on Cryptoassets and Smart Contracts*, and that no other argument was addressed to the Court on the issue.[20]

- [89] It is also useful, as I see it, to turn to consider a diverse range of types of assets that have already been recognised elsewhere as "property" at equity. These examples of "property" also illustrate that they are capable of being the subject of a trust. They include:

(a) Any simple chose in action– even an oral contract can be the subject of an orally created trust with the result that a liquidator of a corporate trustee could not pursue the chose in order to obtain a money judgment for the benefit of unsecured creditors.[21]

(b) Non-enforceable debt claims – for example a barrister's claim that fees be paid by the relevant instructing solicitor was recently held in *Gwinnutt v George* to be part of the property belonging to a bankrupt barrister, even though the barrister had no legally enforceable right to the fees. In the circumstances of that case, in fact there was also no contract all between the barrister and the solicitors. [22]

[19] *AA v Persons Unknown* [2019] EWHC 3556, [2020] 4 WLR 35 at [57]–[59].

[20] *Legal Statement on Cryptoassets and Smart Contracts*, above n 2.

[21] See *Pearson v Lehman Brothers Finance SA* [2010] EWHC 2914 (Ch) at 258.

[22] *Gwinnutt v George* [2019] EWCA Civ 656, [2019] Ch 471.

(c) Payments through the banking system – money transactions have recently ceased to involve tangible coins or banknotes and usually take the form of electronic bank payments. Equity will apply its proprietary tracing rules to payments effected by these means, even though on transfer of money from one bank account to another this does not involve the transfer of anything in the literal sense from the payer to the payee and the recipient does not hold the same asset.[23]

(d) Copyright – although copyright has statutory recognition, it nevertheless provides a strong example of intangible property. The subject matter of copyright turns merely on combinations of sounds or shapes in two or three dimensions (including words or drawings) that are sufficiently distinctive to justify the law preventing others from reproducing them.[24] These sounds and shapes can exist in digital form. Although the resulting intellectual property needs to be identifiable, in many cases whether there has been a copyright infringement will involve an element of judgment in the tribunal called upon to adjudicate on the associated legal rights. These rights can be made the subject matter of a trust.

A002083

(e) Shares – shares in a company are another type of intangible property which typically has a more complicated existence than merely conferring a right to sue. Voting rights in relation to the appointment and removal of directors and in relation to other important company matters can be exercised. Shares are properly regarded as an item of property in equity even where they are non-transferrable or transferrable only to particular persons.[25]

(f) Licences/exemptions/quotas – modern statutory regulation frequently operated on the basis of blanket prohibitions coupled with defined

[23] See D Fox, "Property Rights in Money" Oxford University Press, Oxford, 2008, at [1.108]

[24] Section 14 Copyright Act 1994 sets out the statutory categories of recognised copyright, which are to include literary, dramatic, musical or artistic works, sound recordings, films, communication works and typographical arrangements of publicised editions.

[25] *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150 (Ch).

exemptions granted to individuals that allow each individual then to trade. Such exemptions function and are recognised as intangible items as property. Their value is not derived from a right to sue but the opposite, namely an immunity from prosecution.[26] Examples of this include export quotas, milk supply quotas, fishing quotas, petroleum exploration licences, waste disposal licences, and carbon credits. These tradeable rights can form the subject matter of a trust and where that happens the asset falls outside the estate of an insolvent trustee. There is a large body of case law that confirms such rights are a type of property and subject to normal property protections.[27]

(g) A trustee's rights of indemnity – a trustee's rights to be indemnified in respect of trust expenses has been held to confer a proprietary interest in the trust assets even though these assets are realised by self-help remedies rather than recourse to the courts: *Carter Holt Harvey Woodproducts Australia Pty Ltd v Commonwealth*.[28] Although these rights are not choses in action, they are a species of intangible property. The breadth of the sort of interests that may be the subject of a trust is also confirmed here at [84] as follows:[29]

To describe [the right of indemnity] as constituting a beneficial interest in the trust assets, and so as property, thus acknowledges the characteristic blending of personal rights and obligations with proprietary interests which is the "genius" of the trust institution. Such a beneficial interest falls naturally and ordinarily within the definition of "property" in s 9 of the Corporations Act.

Although a number of the examples outlined above do involve statutory licences and quotas and are within broad statutory definitions of the word "property" in the respective jurisdictions, the types of interest capable of forming the subject matter of a trust at equity, as I see it, are no less broad. A similar point was made by Mr Stephen

[26] *Armstrong DLW GmbH v Winnington Networks Ltd* [2012] EWHC 10 (Ch), [2013] Ch 156.

[27] See by way of example *Attorney General of Hong Kong v Nai-Keung* [1987] 1 WLR 1339 at 1342 (export quotas); *Swift v Dairywise Farms Ltd* [2000] 1 WLR 1177 at 1185 (milk quota) and *Commonwealth of Australia v WMC Resources Ltd* [1998] HCA 8; (1998) 194 CLR 1 (petroleum exploration licences, not being an interest in land).

[28] *Carter Holt Harvey Woodproducts Australia Pty Ltd v Commonwealth* [2019] HCA 20, (2019) 368 ALR 390.

[29] *Carter Holt Harvey*, above n 28, at [84] (footnotes omitted).

Morris QC sitting as a deputy High Court judge in *Armstrong DLW GmbH v Winnington Networks Ltd*:[30]

A002084

Whilst the cited case law concerned the meaning of "property" as specifically defined in various statutes, in my judgment, the reasoning of Morritt LJ (in *Celtic Extraction*) applies equally to the characteristics of property at common law. Indeed, Morritt LJ himself relied upon *National Provincial Bank v Ainsworth*.[31] Moreover the terms used in statutory definitions are themselves derived from common law concepts.

- [90] At this point it is useful also to interpolate three recent New Zealand cases which might be seen to be at the boundaries of the legal concept of "property". The first is *Dixon v R*.[32] In this case, which adopted a broad approach to the concept, the Supreme Court held that a digital copy of CCTV footage was "property" within the broad definition found in s 2 of the Crimes Act 1961. The defendant had downloaded a copy of certain footage without the consent of the owner of the computer on which the footage had been recorded. The Court held that computer data can be "property" and that making a copy of it involves a taking, even when the data is not protected by a password. The Supreme Court appeared to endorse the view that computer data would meet general definitions of property including that within s 4 of the Property Law Act 2007. Arnold J, writing the judgment of the Court, stated :[33]

We consider that interpreting the word "property" as we have is not only required by the statutory purpose and context but is also consistent with the common conception of "property".

- [91] The second case, a decision of Thomas J in the High Court is *Henderson v Walker*.[34] In that case Thomas J was prepared to apply the principles of *Dixon* in a private law setting and to extend the tort of conversion to purely personal digital information, including the content of private emails. However, her Honour also concluded merely making a copy of emails and other personal data would not amount to conversion. Refusing access to them or destroying them would be, nevertheless.

30. *Armstrong DLW GmbH v Winnington Networks Ltd*, above n 26 at [59] (citation omitted, footnote added).

[31] *Ainsworth*, above n 10.

[32] *Dixon v R* [2015] NZSC 147, [2016] 1 NZLR 678.

[33] At [51] (footnotes omitted).

[34] *Henderson v Walker* [2019] NZHC 2184.

- [92] In that case, Mr Walker in his capacity as liquidator of subsidiary companies of Property Ventures Limited (PVL) came into possession of a laptop belonging to PVL and of a tape drive that was a backup of PVL's server. There were a lot of personal, non-company emails sent by and to Mr Henderson, a principal of PVL, and some personal photographs on those devices. Mr Walker distributed at least some of these or allowed them to be distributed to third parties who should not have received this material. Mr Henderson sued Mr Walker, pleading some seven causes of action including breach of confidence, invasion of privacy and conversion. Thomas J held that in principle the common law action in conversion was available with respect to some of the actions which had occurred involving the computer data.

- [93] In my view, it is reasonable to conclude that the reasoning of Thomas J that this data was effectively "property" capable of being converted, could be properly extended to wrongful interferences with cryptocurrency or digital assets. Any person who gained unauthorised access to the private key attached to cryptocoins and used it would permanently deprive the proper possessor of the cryptocoins of that property and its value.

- [94] Another recent High Court decision in New Zealand, *Commissioner of Police v Rowland*, is also usefully noted here.[35] In that case this Court approved a settlement under the Criminal Proceeds (Recovery) Act 2009 that included quantities of two cryptocurrencies – bitcoin and ethereum. The question whether the cryptocurrencies were "property" that was amenable to forfeiture under that legislation, however, was not raised in the proceeding. An assumption was made that they did fall within

the definition in terms of that legislation. The definition of "property" in the Criminal Proceeds (Recovery) Act at s 5 provides:

**property—**

(a) means real or personal property of any kind—

(i) whether situated in New Zealand or a foreign country; and

(ii) whether tangible or intangible; and

(iii) whether movable or immovable; and

[35] *Commissioner of Police v Rowland* [2019] NZHC 3314.

(b) includes an interest in real or personal property

- [95] Turning back to the decisions noted above in *Dixon* and *Henderson*, in those cases the New Zealand courts involved have accepted that the orthodox position that information is not "property" does not attach to cases involving digital assets. There, digital files were seen as "property" by distinguishing them from "pure information".

- [96] So far as the Supreme Court was concerned in *Dixon v R*, in the context of the Crimes Act 1961, this was because the files (the digital footage) there:

(a) could be identified;

(b) had a value;

(c) were capable of being transferred; and

(d) had a physical presence, albeit one that could not be detected by means of unaided sensors.

- [97] In Thomas J's decision in this Court in *Henderson*, in the context of the tort of conversion, this was because it was possible to control and therefore possess the digital files (a large number of documents, emails and images). Possession required cognitive control and manual control. While traditionally the tort of conversion requires physical control and therefore tangibility, physical control is only one example of manual control. The two fundamental elements of manual control are excludability and exhaustibility – whether others can be excluded from the thing's control and when the thing's value can be deprived from others. In her decision Thomas J considered both were satisfied on the facts because:

(a) As to excludability: digital files have a material presence. They physically alter the medium on which they are held. The physical presence allows others to be excluded from the digital asset, either by physical control of the medium or by password protection.

(b) As to exhaustibility: digital files can be deleted or modified so as to render them useless or inaccessible.

- [98] These principles, in my view, apply equally in the present case to the cryptocurrencies at issue.

- [99] I turn now to the Companies Act. In that Act reference is made to both "property" and "assets". Assets are not defined in the Act other than the section specific definition at s 129 which applies to "major transactions". Section 129(2) provides:

...**assets** includes property of any kind, whether tangible or intangible

A002086

That definition is expressly limited to s 129 and the use of inclusive language supports the finding that the term "asset" might possibly be seen as wider in scope than "property".

- [100] The powers of liquidators in the Act are generally expressed to be over a company's "assets":

(a) Section 248(1)(a) provides that:

The liquidator has custody and control over the company's assets.

(b) Section 253 characterises the principal duty of a liquidator as:

(a) to take possession of, protect, realise and distribute the assets, or the proceeds of the realisation of the assets, of the company to its creditors in accordance with the act; and

(b) if there are surplus assets remaining, to distribute them, or the proceeds of the realisation of the surplus assets, in accordance with s 313(4) in a reasonable and efficient manner.

- [101] The term "asset" is used elsewhere in the Companies Act:

(a) The solvency test: the relevant limb of the test here is that: "the value of the company's assets is greater than the value of its liabilities...".[36]

[36] Companies Act, s 4(1)(b).

(b) Section 237 provides that the Court may make additional orders relating to (among other things):

...

(a) the transfer or vesting of real or personal property, assets, rights, powers, interests, liabilities, contracts, and engagements:

...

(c) Clause 1(1) of sch 7 requires the liquidator to pay:

...

(e) to any creditor who protects, preserves the value of, or recovers assets of the company for the benefit of the company's creditors by the payment of money or the giving of an indemnity,—

(i) the amount received by the liquidator by the realisation of those assets, up to the value of that creditor's unsecured debt; and

(ii) the amount of the costs incurred by that creditor in protecting, preserving the value of, or recovering those assets.

### The four requirements for a "property" interest

- [102] I return now to the classic statement of the characteristics of "property" outlined by Lord Wilberforce in *Ainsworth* essentially to recognise what constitutes a "property" interest, and then to apply this to each cryptocurrency at issue here.[37] In doing so, I need to say at the outset that I am satisfied the criteria for Lord Wilberforce's definition of "property" are clearly met in this case. I say this bearing in mind the indications I have outlined from the range of authorities noted above that support this conclusion. This is also in line with the approach adopted in the *Legal Statement on Cryptoassets and Smart Contracts* noted above.[38]

A002087

- [103] Lord Wilberforce's long-applied statement is outlined at [75] above. It outlines four requirements that I now address in turn.

[37] *Ainsworth*, above n 10.

[38] *Legal Statement on Cryptoassets and Smart Contracts*, above n 2, at [21].

### (a) Identifiable subject matter

- [104] The first requirement is that the asset in question needs to be definable. It needs to be capable of being isolated from other assets whether of the same type or of other types and thereby identified. It is possible, however, for there to be co-ownership (either at law or in equity) of a definable share of an identified bulk of like assets. The present situation, as I see it, is one of this sort.

- [105] Computer-readable strings of characters recorded on networks of computers established for the purpose of recording those strings, as I see it, are sufficiently distinct to be capable of then being allocated uniquely to an accountholder on that particular network. For the cryptocurrencies involved here, the allocation is made by what is called a public key – the data allocated to one public key will not be confused with another. This is the case even though the identical data is held on every computer attached to the network. Indeed, the working of the system is such that the distribution of the data across a large network of computers, when combined with cryptography that prevents individual networks from altering historic data over the network, assists in giving that data stability. It is these features that provide the basic underpinning for the existing cryptocurrencies.

- [106] This is in large measure similar to what occurs in the banking system where large and trusted international banks record balances in various numbered bank accounts held with them. The identifiability provided by cryptocurrency data recorded in the network of computers (called the "distributed ledger") is no less than the identifiability which results from the bank's inclusion of balances in their customers' numbered bank accounts. Equity regards such recorded bank balances as a type of property owned by the party in whose favour the balance is recorded.

- [107] The developer of the most widely known cryptocurrency (Bitcoin), Satoshi Nakamoto, who I have referred to above, argued in 2008: [39]

...an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party...

[39] Satoshi Nakamoto "Bitcoin: A Peer-to-Peer Electronic Cash System" (31 October 2008) Bitcoin <https://bitcoin.org/bitcoin.pdf> at 1.

will provide superior stability and reliability compared to the traditional banking system.

- [108] It is also the case, as I see it, that the public key so allocated to a cryptocurrency account might also be argued to be more readily identifiable than some asserted rights for example to copyright (which is acknowledged as "property") where issues of originality may be at play.

### (b) Identifiable by third parties

- [109] The second component of property outlined by Lord Wilberforce is that the thing needs to be identifiable by third parties. This element alludes to the thing identified having to have an owner capable of being recognised as such by third parties. The degree of control over the type of asset that a person has to have before the law recognises it as capable of being owned must involve an element of judgement but again I am satisfied here that cryptoassets clearly meet this criterion.

- [110] On this aspect, it has long been recognised by property lawyers that the power of an owner to exclude others from an asset provides a more important indicator of ownership than the power actively to use or benefit from that asset.

- [111] The unique strings of data recording the creation of and dealings with cryptocurrency are always allocated via the public key to a particular accountholder connected to the system. But that allocation by itself is unlikely to be recognised as creating an item of property if there is no element of excludability. So, if that accountholder's personal connection to the data via the public key could be lost through any person connected with the network being able to reallocate the cryptocurrency to any other colleague on the network without the consent of the accountholder, there might be some doubt whether the law would conclude that the accountholder owned the key.

- [112] The degree of control necessary for ownership (namely the power to exclude others) is achieved for cryptocurrencies by the computer software allocating to each public key a second set of data made available only to the holder of the account (the private key), and requiring the combination of the two sets of data in order to record a

  transfer of the cryptocurrency attached to the public key from one account to another. A varied public key and a new private key for the cryptocurrency are generated after each transfer of cryptocurrency. The private key, in effect, is like a PIN. Anyone who learns of the private key attached to a public key can transfer the public key but the private key, having been used once in respect of the public key, cannot be used again.

- [113] These features of cryptocurrencies inhibit two potential practices. First, the existence of the private key inhibits the possibility of involuntary transfers – it gives the power to exclude third parties from access. And secondly, the creation of a new private key after each transfer or disposition inhibits a holder from purporting to transfer the cryptocurrency data twice.

*(c) Capable of assumption by third parties*

- [114] The third of Lord Wilberforce's criteria, namely that the right or interest in question must be capable of assumption by third parties, generally involves two aspects:

  (a) Third parties must respect the rights of the owner in that property and will be subject to actions expressly devised by the law to give effect to proprietary rights if they assert their own claim to ownership without justification. Property has been said by its nature to be concerned with legal rights that affect strangers to bilateral transactions.[40] These third parties will also include insolvency officials of an insolvent trustee; and

  (b) Normally, but not always, an asset recognised by the law as an item of property will be something which is potentially desirable to third parties such that they would want themselves to obtain ownership of it. It might not matter that an asset has no current market value if there has been a market for the asset in the past. For example, in the case where polluted land has excessive clean-up costs, it may be worthless, but it will still be regarded as property.

[40] See Fox *"Cryptocurrencies in the Common Law of Property"*, above n 5, at [6.10].

- [115] Both aspects of this component of Lord Wilberforce's test are reflected in comments by Lord Bridge for the Privy Council in *Attorney-General of Hong Kong v Nai-Keung*, a case concerned with a charge of theft of an export quota brought under the theft ordinance of Hong Kong:[41]

It would be strange indeed if something which is freely brought and sold and which may clearly be the subject of dishonest dealing which deprives the owner of the benefit it confers were not capable of being stolen. Their Lordships have no hesitation in concluding that export quotas in Hong Kong, although not "things in action" are a form of "other intangible property.

A002089

- [116] I am satisfied here that cryptocurrencies meet both aspects of the assumption by third parties criterion outlined by Lord Wilberforce. There can be no doubt that cryptocurrencies can be, and many are, the subject of active trading markets.

*(d) Some degree of permanence or stability*

- [117] The last of Lord Wilberforce's criteria for determining whether something is capable of attracting proprietary status, in my view is also met here. This criterion requires that the thing needs to have some degree of permanence or stability, but as I see the position, it does not add much to the other three criteria noted above. It is true too that some assets will have little permanence yet undoubtedly be property, such as the example of the ticket to a football match which can have a very short life yet unquestionably it is regarded as property. Also unproblematic, as I see it, will be situations where the short life of an asset is the result of the deliberate process of transferring the value inherent in the asset so that one asset becomes replaced by another. As I have noted above, cryptocurrencies work in this manner but it is also true that bank payments use a similar process which is simply native to the type of property in question. This is not inimical to the asset's status as property.

- [118] The blockchain methodology which cryptocurrency systems deploy also greatly assist in giving stability to cryptocoins. The entire life history of a cryptocoin is available in the public recordkeeping of the blockchain. A particular cryptocoin stays fully recognised, in existence and stable unless and until it is "spent" through the

---

41 *Attorney-General of Hong Kong v Nai-Keung* [1987] 1 WLR 1339 (PC) at 1342.

use of the private key, which may never happen. Standard cryptocurrency systems do not provide for the arbitrary cancellation of coins.

- [119] While it is possible for cryptocurrencies to be wrongfully interfered with, by someone gaining unauthorised access to the private key or by hacking the address to which an owner intends to send a coin, these risks are not markedly greater than those borne by an owner of tangible property or a person relying on the integrity of a bank account record with or without the use of a PIN.

*Conclusion on the four criteria*

- [120] I am satisfied that cryptocurrencies meet the standard criteria outlined by Lord Wilberforce to be considered a species of "property". They are a type of intangible property as a result of the combination of three interdependent features. They obtain their definition as a result of the public key recording the unit of currency. The control and stability necessary to ownership and for creating a market in the coins are provided by the other two features – the private key attached to the corresponding public key and the generation of a fresh private key upon a transfer of the relevant coin.

- [121] This identical point is made in the *Legal Statement on Cryptoassets and Smart Contracts* which says that a cryptoasset is "a conglomeration of public data, private key and system rules."42

*Possible arguments against cryptocurrency being property*

- [122] Two arguments that are most commonly raised to suggest that cryptocurrencies do not have the status of "property" are:

  (a) The common law recognises only two classes of personal property: tangibles and choses in action. Cryptocurrencies are said to be neither.

  (b) Information is not generally recognised as a form of "property" and cryptocurrencies might be said to be a form of information.

---

42 *Legal Statement on Cryptoassets and Smart Contracts*, above n 2, at [65].

A002090

- [123] Although before me counsel for the creditors did not rely particularly on the first objection noted above, nevertheless I address it briefly. On this, I am satisfied the argument here is in fact a red-herring. This is because cases which might be perceived to be problematic in this area are not about the limits of what can be recognised as "property" but simply about the number of categories of "property" one needs. This accords with the well-known dictum of Fry LJ sitting in the English Court of Appeal in *Colonial Bank v Whinney* that all personal property must either be a chose in possession or a chose in action.[43]The argument follows that cryptocurrencies are neither a chose in possession nor a chose in action.

- [124] Essentially here, Fry LJ in his judgment did not seem to be taking a narrow view of what can be classified as property, but rather he was simply wanting to push all examples of property into one of two categories. There is nothing, as I see it, in Fry LJ's dictum that would lead a court to conclude that cryptocurrencies are not property. The most that could be said is that cryptocoins might have to be classified as choses in action. Indeed, it would be ironic that something that might be said to have more proprietary features than a simple debt is deemed not to be property at all when a simple debt qualifies.

- [125] For these reasons, this first argument advanced by some to support the claim that cryptocurrency is not property in my view is readily dismissed.

- [126] I turn now to the second argument suggesting that cryptocurrency does not have the status of property as noted at [122](b) above. This is to the effect that cryptocoins are just a type of information and that information is not property. The argument is based on the view that neither the common law nor equity recognises property in "information" and cryptocurrencies are said to be merely digitally recorded information. This argument, it is said, is supported by the 2014 decision of the English Court of Appeal in *Your Response Ltd v Datateam Business Media Ltd*.[44] In *Your Response*, the Court held that there could be no property in a database in the situation prevailing there, which involved a party contracted by a client to maintain and update a database of the client's customers. It was held that this party had no common law

---

[43] *Colonial Bank v Whinney* [1886] UKLawRpAC 34; (1885) 30 Ch D 261 (CA) at 285.

[44] *Your Response Ltd v Data Team Business Media Ltd* [2014] EWCA Civ 281, [2015] QB 41.

---

lien over the database for the fees owed to it. As I see it, however, the decision in *Your Response* does not go much further than to make a determination upon the particular facts of that case. I am satisfied it is an inconclusive precedent in a case such as the present.

- [127] And, in my view, it is wrong in any event to regard cryptocurrencies as mere information because:

(a) The whole purpose behind cryptocurrencies is to create an item of tradeable value not simply to record or to impart in confidence knowledge or information. Although cryptocoins are not backed by the promise of a bank, the combination of data that records their existence and affords them exclusivity is otherwise comparable to the electronic records of a bank. The use of the private key also provides a method of transferring that value. This might be seen as similar in operation to, for example, a PIN on an electronic bank account.

(b) And, generally, as I see it, cryptocoins are no more mere information than the words of a contract are. What allows a contract to be capable of being an item of property is not the words nor even the binding promise which is only a personal obligation, but the fact that equity recognises there is a unique relationship between the parties created by the words and then supplies a system for transferring the contractual rights. Similarly, a unique relationship and system of transfer exists with respect to the relevant data on the blockchain that makes up a cryptocoin.

(c) In *Boardman v Phipps* Lord Upjohn stated:

A002091

In general, information is not property at all. It is normally open to all who have eyes to read and ears to hear."[45]

This statement appears to confirm as a principle for not regarding information as property the fact that it can be infinitely duplicated.

[45] *Boardman v Phipps* [1966] UKHL 2; [1967] 2 AC 46 (HL) at 127.

Again, this is not true of cryptocoins where every public key recording the data constituting the coin is unique on the system where it is recorded. It is also protected by the associated private key from being transferred without consent.

(d) Cryptocurrency systems provide a more secure method of transfer than a mere assignment of a chose in action. It is possible in equity for the holder of a chose in action to assign it multiple times. Only one assignment will be effective to bind the debtor but the winner may not be the first assignee in time but rather the first assignee to notify the debtor. By way of contrast, a cryptocoin can not only be assigned in that way but it can also be sold only once.

- [128] I am satisfied that cryptocurrencies are far more than merely digitally recorded information. The argument that cryptocurrency is mere information and therefore it is not property is a simplistic one and, in my view, it is wrong in the present context. I dismiss it.

*Public policy arguments*

- [129] Lastly, I turn to certain public policy arguments here. It is widely known that at least some types of cryptocurrency are used by criminals for the transmission of funds across borders in order to pursue criminal activity and as a means of laundering the proceeds of past criminal activity. This is not exclusive, however. Cryptocurrencies have also become popular with honest people as a method of effecting payments and of investing. The traditional banking sector is itself widely reported to be already using block chain technology and to be planning to create trading platforms for cryptocurrencies.[46] Any failure by the general law to recognise cryptocurrencies as property, as I see it, would have little effect in reducing potential criminal activity. The banking system is subject to exploitation by the criminal fraternity just as other traditional assets are.

46. For instance, the Royal Bank of Canada: Erik Hertzberg "Bank of Canada lays groundwork for digital currency" *Bloomberg News* (online ed, New York, 26 February 2020)

<https://www.bloomberg.com/news/articles/2020-02-25/bank-of-canada-lays-groundwork-for- digital-currency>.

- [130] In my view, honest commercial developments may very well be hindered by a failure of the general law to recognise cryptoassets as property. This is notwithstanding any possible need for more formal regulation of cryptocurrencies.

- [131] The *Legal Statement on Cryptoassets and Smart Contracts* has also advocated dealing with the status of cryptocurrencies unencumbered by other legal issues including the need for regulation.[47] Similarly, in those cases where the status of cryptocurrencies as property has been assumed or conceded, including those I have noted above, no court has felt obliged to take a public policy objection. Further, before me Ms Cooper for the creditors raised no particular public policy arguments.

- [132] Overall, I am of the view that public policy questions here do nothing to harm the accountholders' contention that cryptocurrencies do have the status of property.

*Conclusion*

A002092

- [133] The answer to the question posed at [46](a) above is yes. I find that, for the reasons outlined above, all of the various cryptocurrencies are "property" within the definition outlined in s 2 of the Companies Act and also probably more generally. In addition, these digital assets, I find, being property, are capable of forming the subject matter of a trust.

## Issue 2 - The trusts issue

- [134] The second question relates to the issue whether any or all of the digital assets are held on trust for accountholders (whether by way of express, implied, resulting, constructive, Quistclose trust or otherwise). If the answer to this question is yes in any respect, then a range of further questions arise which are:

  (a) When did the trust(s) come into existence? When the company updated its terms and conditions on 7 August 2018 ("the amended terms"), or some alternative date?

  (b) What are the terms of the trust(s)?

[47] *Legal Statement on Cryptoassets and Smart Contracts*, above n 2, at 10 – 11.

  (c) Are the digital assets held on trust:

  (i) in an individual trust for each accountholder, with the result that each accountholder is the sole beneficiary of the trust?

  (ii) in one trust for the benefit of all accountholders with the result that all accountholders are co-beneficiaries of the same trust?

  (iii) in multiple trusts for the benefit of specific groups of accountholders with the result that accountholders within a specific group are co-beneficiaries of the same trust? or

  (iv) on some other basis?

  A. The primary issue – are the digital assets held on trust for accountholders?

- [135] On the primary question, the position advanced by the accountholders that the digital assets here are held on trust for the accountholders is strongly disputed by the creditors. That overall position for the accountholders is that Cryptopia is a trustee for the accountholders of the cryptocurrency it held for those parties as set out in the SQL database. The accountholders say first, the relevant trusts involve one separate trust for each type of cryptocurrency and secondly, the trusts all existed before any amended terms on 7 August 2018 may have come into effect. If this is not the case then they say, in any event, the amended terms simply confirmed Cryptopia's trustee status.

- [136] In response, the creditors' position is that any trust here is denied and accordingly it must follow first, that the accountholders are simply unsecured creditors of Cryptopia and secondly, that the subsidiary questions outlined at [134] above do not arise.

- [137] There are four main areas of difference between the accountholders and the creditors regarding this trusts issue:

  (a) The extent to which the Court can infer a trust in the present situation with what are said to be limited or no express verbal declarations to that effect.

  (b) As a matter of construction, was Cryptopia's principal duty in its exchange only to deliver a fixed quantity of currency when called for or was it to hold the relevant pools of cryptocurrency (including cryptocurrency that accountholders had themselves brought onto the platform) on behalf of those accountholders and to deal with each accountholder's share in the pool as directed by that

A002093

party? (This would also obviously include Cryptopia itself as a beneficiary with respect to its own specific holdings of cryptocurrency which it held personally on the exchange).

(c) The relevance to the trusts issue of the powers and amenities given to cryptocurrency in Cryptopia's terms and conditions provided to accountholders.

(d) Did the amended terms and conditions:

(i) Affect a variation of the trusts?

(ii) Apply automatically to all accountholders from 7 August 2018?

- [138] Turning to the primary contention advanced by Mr Watts for the accountholders that an express trust has been created here, comments in *Equity and Trusts in New Zealand* are usefully repeated:[48]

### 4.2.1 Introduction

To create a valid express trust, not only must any necessary formalities and the rule against perpetuities...be complied with, but three "certainties" must be satisfied.

The three certainties are:

48. Andrew Butler (ed) *Equity and Trusts in New Zealand* (2nd ed, Thomson Reuters, Wellington, 2009) at [4.2.1] (footnotes and cross-references omitted).

(a) intention;

(b) subject matter; and

(c) objects.

Certainty of intention is necessary to ensure the onerous burdens of trusteeship are not lightly imposed, while certainty of subject matter and objects is necessary to ensure the possibility of judicial supervision over the actions of the trustees and, ultimately, to ensure the court can administer the trust if the trustees cannot be found or fail to act properly. Where there is no certainty of intention, no trust exists, and the person holding legal title is the full owner. However, where it is clear that a trust was intended, but there is no certainty of subject matter and/or objects, the property falls into residue or is applied to a gift over as the case may be.

- [139] As to the issue of certainty of intention to create a trust, some useful comments are expressed in *Jacobs' Law of Trusts in Australia* which states: [49]

### Certainty of intention to create a trust

5.02 A court cannot hold that an express trust exists unless it is satisfied that there was the intention to create such a trust. The question will be whether there is language or conduct which shows a sufficiently clear intention to create such a trust. No formal or technical words are required; any apt expression of intention will do. The conclusion that the intention existed may be drawn as an inference from the available evidence. In order to infer intention, the Court may look to the nature of the transaction and the whole of the circumstances attending the relationship between the parties and known to them, including commercial necessity. If the inference to be drawn is that the parties intended to create or protect an interest in a third party and the trust relationship is the appropriate means of creating or protecting that interest or of giving effect to the intention, then an intention to create a trust may be inferred. Such a trust is an express, not a constructive trust and the earlier statement to infer such a trust no longer obtains, at least in Australia.

The overall question is whether in the circumstances of the case, and on the true construction of what was said and written, a sufficient intention to create a trust has been manifested. It is not necessary that the creator of the trust should know that the particular relationship intended to be created is in law a trust. A trust will be created,

whether or not the creator is aware of it, provided that in substance the creator's actions have the legal effect of creating the relationship which is known in law as a trust...In commercial documents, there will often be no suggestion that the parties in their written instrument did not mean what they said, or said what they meant. In such cases where there is no sham or illegality, the use of language expressing a trust in terms will be effective to supply the requisite intention.

49. JD Heydon, MJ Leeming and KS Jacobs *Jacobs' Law of Trusts in Australia* (8th ed, LexisNexis, Sydney, 2016) at [5.02].

**Application to the facts of the present case**

- [140] I turn first to determine the question whether the cryptocurrencies in issue here were held on an express trust by considering the three certainties needed outlined at

  [138] above.

*Certainty of subject matter*

- [141] It is useful to begin with a consideration of certainty of subject matter. On this, as I have found above, at law cryptocurrencies are "property" and are able to form the subject of a trust.

- [142] Here, the principal evidence relied upon is found in the affidavits of Mr Ruscoe and Mr Brocket. The issue arises here whether it can be established in fact which cryptocurrencies are subject to what trusts.

- [143] As a cryptocurrency exchange, Cryptopia maintained its own database of the accountholders and digital assets that it controlled, as I have noted, called the SQL database. The liquidators as I understand it are still in the process of reconciling this database.

- [144] What is clear here from the evidence before me is that in the current circumstances it appears all cryptocurrency holdings were held on trust by Cryptopia, although Cryptopia was itself one of the beneficiaries of some trusts relating to cryptocurrency which the company had itself introduced.

- [145] The accountholders' position is that there was a single trust created for each relevant cryptocurrency.[50] Beneficial co-ownership of the relevant currency was shared by relevant accountholders in proportion to the numbers of relevant cryptocoins that they had each contributed (either initially when new coins were acquired or as a result of trades between accountholders).

50. It appears there were some 900 types of cryptocoin traded on Cryptopia's exchange of which some 400 have now been de-listed.

- [146] As I have noted, Cryptopia was itself a beneficiary of some of those trusts for cryptocurrency it held itself. This applied whether it related to cryptocurrency held in hot wallets or cold wallets for the respective cryptocurrency.

- [147] Cryptopia itself kept and stored the private keys associated with acquisitions of each cryptocurrency in this case so that accountholders did not know the private key associated with any particular coin. There is no evidence before the Court to indicate the Cryptopia was a bailee of any currency. The subject matter of the various trusts being the cryptocurrencies was clearly recorded in Cryptopia's SQL database records and I am satisfied this provided sufficient certainty of subject matter here.

*Certainty of objects*

- [148] Here, I find that clearly from the point of view of principle, there can be no uncertainty in this case as to who the beneficiaries of the relevant trusts were. They can be taken to be those with positive coin balances for the respective currencies in Cryptopia's SQL database subject to such adjustments as may be needed when all remaining evidence in this case comes in. This is in line with Simon Thorley IJ's

decision in *B2C2* where his Honour concluded on the facts of that case that the beneficiaries of the single trust of cryptocurrency at issue were sufficiently certain, as they "...are identifiable from the individual accounts of each of the members."[51]

- [149] Although it is true here that, as the liquidators have indicated, they may have some difficulties finding out the true identities of some of the accountholders and making contact with them, meaning some evidential uncertainty may arise, the result may mean simply that particular beneficial interest claims in the cryptocurrency may not be established. However, as I see it, this would not invalidate the trust for those whose precise identities can be shown. Evidential uncertainty does not defeat a trust.[52]

- [150] In my view, there is no question that the requirement for certainty of objects is established here.

[51] *B2C2* (SGHC), above n 11 at [143].

[52] *Re Baden's Deed Trusts (No 2)* [1973] 1 Ch 9 (CA) at 19–20.

### Certainty of intention

- [151] The last of the requirements for a valid express trust is an intention in the settlor(s) to create a trust, objectively assessed.

- [152] Here the accountholders suggest that it is only necessary to show that Cryptopia intended to hold the digital assets on trust even though such an intention was probably held also by the accountholders themselves when transferring coins to Cryptopia.

- [153] On this, I am satisfied that Cryptopia manifested its intent through its conduct in creating the exchange without allocating to accountholders public and private keys for the digital assets it commenced to hold for them. The SQL database that Cryptopia created showed that the company was a custodian and trustee of the digital assets and effect needs to be given to this.

- [154] In addition, Cryptopia did not intend to and did not trade in the digital assets in its own right according to the evidence before me except to the extent that it too was a beneficiary of the trusts established.

- [155] As to the question when the intent to create the trusts was manifested, I am satisfied a trust came into existence for each of the cryptocurrencies as soon as Cryptopia came each time to hold a new currency for accountholders. Trusts in respect of each currency that Cryptopia held arose on those particular dates and certainly before 7 August 2018. I make that finding without needing to rely specifically on the amended terms created by the variation document. And, in any event, as I note above, Cyrptopia's last director of finance and administration, Mr Brocket, in his uncontested evidence, confirmed that effectively there was no material change to the way the business operated that resulted from the August 2018 variation to the terms and conditions.

- [156] Finally, it is not unusual in a case of an express trust for there to be a lack of some documentation as is apparent with Cryptopia's exchange platform in the present case.
- [157] For completeness, I note also a number of factors here which support the conclusions I have reached which are:

(a) At common law express trusts of personal property can come into existence and be evidenced orally or as a result of conduct including simply by force of the circumstances as between relevant parties.[53]

(b) It is not really necessary, even in a commercial context, that the settlor or other party involved in the relationship understand what a trust is, if the conduct including the arrangements between the parties objectively suggests that a trust was the appropriate legal consequence.[54]

A002096

(c) It is not a significant indicator against a trust that the fungible property of one party is mixed with the fungible property of another in a single pool, nor that the content of that pool and the identity of the beneficiaries is constantly changing.

- [158] On this last aspect, before me Ms Cooper for the creditors placed particular reliance on a decision of the Privy Council *Re Goldcorp Exchange Limited (In Receivership)*.[55] In this case the New Zealand company Goldcorp in receivership was a gold dealer. Essentially as part of its business it sold gold bullion to customers. The sales were to members of the public who had purchased "non-allocated" gold and received a "certificate of ownership" stating that the company would store and insure the gold for the customer. Brochures and oral statements from the company indicated that the customers' gold would be stored in a large bulk and audited "to ensure there are sufficient stocks to meet all commitments". The company went into receivership.

- [159] The *Goldcorp* case was essentially a Sale of Goods Act case. After noting that no legal or equitable title could have passed to the customers merely on the basis of the contract of sale (given it was a sale of unascertained, generic goods) the Board

[53] *Levin v Ikiua* [2010] NZCA 509, [2011] 1 NZLR 678; *Pearson v Lehman Brothers Finance SA* [2010] EWHC 2914 (Ch); *B2C2* (SGHC); and *Re Harvard Securities Ltd (in liq)* [1997] EWHC Comm 371; [1997] 2 BCLC 369 (Ch) at 371.

[54] *Pearson*, above n 53.

[55] *Re Goldcorp Exchange Limited (In Receivership)* [1994] 3 NZLR 385 (PC).

went on to consider whether the collateral promises found in the brochures and representations were effective to create a trust in favour of the customers. With respect to the non-allocated customers, the Board held that no trust existed.

- [160] There is no doubt that in *Goldcorp* customers were told duplicitous things when they purchased gold from the company. The misrepresentations made and the deceptions were huge and resulted in the company's managing director being charged criminally, convicted and imprisoned. The Privy Council had looked at whether there was a restitutionary trust but this argument for a trust was only collateral to a sale of goods argument for the sale of unascertained goods. It failed on its own facts in the *Goldcorp* situation for lack of certainty of subject matter and intention. The present case before me is quite different. It does not involve tangible goods and here Cryptopia is generally not a seller (apart from its limited sales of NZDT). It was just a custodian and provider of the trading and storage platform essentially.

- *[161] Goldcorp* primarily is simply a Sale of Goods Act case and one that in any event turns on its own facts. The *Goldcorp* case does not stand for no trust being a possibility here. It is readily distinguishable from the situation with Cryptopia before me.

- [162] Next, Ms Cooper for the creditors referred again to the *Quoine* decision in the Singapore Court of Appeal I mention above and she contended it was influential here and provided a number of close parallels with the present case. In *Quoine* the majority in the Court of Appeal upheld the High Court's decision allowing a breach of contract claim but overturned that Court's finding that there had been a breach of trust. Essentially, the majority determined that there was no trust due to a lack of certainty of intention to create a trust. Its reasoning on the trust issue was relatively brief but its main thrust was:

(a) An intention to create a trust is not to be inferred "simply because a court thinks it is an appropriate means of protecting or creating an interest". [144];

(b) The mere fact that assets are segregated by a trustee from other assets held by the trustee does not lead to the conclusion that there was a trust. [145];

A002097

(c) There was in fact no segregation since the evidence was that the amount of currency recorded in the database did not necessarily match what the company held in its wallets. [146] – [147]; and

(d) A term in the company's Risk Disclosure Statement providing as it did that if the company went bankrupt it would not be able to return customer assets and customers may suffer losses, was not consistent with the normal position of a trustee who becomes insolvent. [148].

- [163] Properly, Ms Cooper did acknowledge before me that the High Court and Court of Appeal decisions in *Quoine* were based on the particular facts of that case and its terms and conditions which did not refer to a "trust" in any way. This was quite unlike Cryptopia's terms and conditions. But, she maintained that factors such as first, Quoine operating a system where it had a database showing coins allocated to individual customer accounts but holding those digital assets in unsegregated wallets and, secondly, the need for Quoine to procure coin if a customer wanted to purchase a cryptocurrency were similar to Cryptopia's operations and provided close parallels. Accordingly, Ms Cooper, while acknowledging that *Quoine* is not binding on this Court, suggested that it provides some authority for a finding that no trust existed here over the cryptocurrency held in Cryptopia's wallets and that these digital assets should form part of the company's assets available for distribution to creditors.

- [164] It is clear that the construction of contractual and trust arrangements between parties must always remain a matter for the decision-making court in question. I do take into account the decision in *Quoine* in this light, and note also that I will leave on one side suggestions from Mr Watts that the Court of Appeal's judgment is open to criticism here in a number of respects.

- [165] Looking to the facts prevailing in *Quoine*:

(a) It appears that *Quoine* operated its platform in a different and much more active way than is in evidence here in relation to Cryptopia. *Quoine* was a major "market-maker". It was actively placing buy and sell orders on the system. It was the principal market-maker estimated to be responsible for around 98 per cent of the market-making trades on its platform. In addition, *Quoine* lent funds, including cryptocurrency, to other market-makers and did not attempt to ensure there was actual cryptocurrency in its wallets to match the loans. As a result, buyers contracted to deliver to *B2C2* more than 3000 bitcoins on various automated arrangements when they had only 13.52 bitcoins in their account with *Quoine*.

(b) In addition, *Quoine* was also engaged in futures trading which necessarily was trading not matched by actual currency.

(c) Customers of *Quoine* were also involved in transactions like the one in question as market-makers and not investors. In marked contrast there was no provision in the present case in Cryptopia's terms of trade that attempted to make customers subject to the risk of Cryptopia becoming insolvent and going into liquidation – quite the contrary.

(d) As I amplify below, in contrast to *Quoine* there were a number of other factors here pointing to Cryptopia being a trustee for its customers' cryptocurrency:

(i) The express trust provisions in the amended terms and conditions;

(ii) Other indicators of a trust both before and after August 2018 from the evidence;

(iii) Cryptopia's internal financial accounts and GST returns demonstrated that it did not assert any ownership in the

cryptocurrency beyond its beneficial interest in its own personal cryptocurrency as an accountholder.

(iv) The agency clause noted in cl 7.3 of the variation terms together with material in the customer service manuals and a legal opinion on these issues which is before the Court.

A002098

- [166] Overall, I am satisfied here that *Quoine* is readily distinguishable from the facts in the case before me. The factual arrangements in *Quoine* are different, as I see it, from the position that prevailed in Cryptopia's business undertakings here.

*Additional matters*

- [167] Cryptopia, it seems, operated for nearly five years. There is little evidence before the Court directed at how during this time Cryptopia managed to attract the many accountholders it did to its platform.

- [168] Nevertheless, I confirm again that I am satisfied there is sufficient evidence before me to conclude that in the course of Cryptopia's operations a series of express trusts in favour of accountholders arose in respect of their respective digital assets. Key details of those trusts and their changing subject matter and membership were held in the SQL database maintained throughout by Cryptopia.

- [169] Cryptopia confirmed throughout and operated on the basis that its whole purpose in establishing the cryptocurrency exchange was to provide a platform to enable accountholders to store their currency from which they could trade in cryptocurrency amongst themselves should they so wish. Generally, Cryptopia was not in the business of selling cryptocurrency but was rather just an exchange that charged fees for a service. This applied other than for a short period in relation to the cryptocurrency NZDT which it seems Cryptopia engaged in from about May 2017 until about 9 February 2018. With the exception of NZDT through this period, it is clear accountholders as customers of Cryptopia brought their own cryptocurrency onto Cryptopia's exchange, as I note at [22] above from the evidence of Mr Brocket.

- [170] In establishing what is frequently described throughout as an "exchange", Cryptopia and all other parties with whom it was connected no doubt had in mind that Cryptopia would be operating as an "exchange broker" in a legal sense. It is interesting to note that in *Black's Law Dictionary*, "exchange broker" is defined as "someone who negotiates money or merchandise transactions *for others*" (emphasis added). [56]

- [171] Issues of agency, as I see it, also arise here. Indeed in some of the documentation before me, Cryptopia is described as an "agent" for accountholders with regard to transactions entered into on their behalf.

- [172] I am satisfied too from material which is before the Court, that Cryptopia's web-based instruction pages and live customer interfaces clearly implied that accountholders would be depositing, buying, selling and owning their *own* cryptocurrency. Frequently, as I note at [27] above there is reference in the documentation to "*your* coin balances" (emphasis added). At [176] - [178] below there are also references to "*you*" and "*your*" relevant to matters of the ownership of the cryptoassets and their being traded (emphasis added). Although it is not altogether clear when these web-based instructions first went live, the evidence before me indicates they were certainly operating by April 2016. Those instructions might possibly have misled accountholders into thinking that they directly held the cryptocurrency in question rather than perhaps being only beneficial owners. But what is clear to me is that those instruction pages certainly do not suggest that accountholders were to have nothing more than a mere contract under which they would be unsecured creditors of Cryptopia with Cryptopia having the power to dispose of the cryptocurrency without an accountholder's consent. If Cryptopia was indeed holding these digital assets, then it was cryptocurrency that it had acquired only by virtue of the trust which accountholders had placed in it as custodian for them.

- [173] "Custodian" language has also featured with some prominence in this case. On this, *Black's Law Dictionary* describes a "custodian of property" as:

[56] Bryan A Garner *Black's Law Dictionary* (10th ed, Thomson Reuters, Eagan, 2014).

A custodian responsible for managing real or personal property. The custodian's duties generally include securing, safeguarding and maintaining the property in the condition received and accounting for any changes in it.

- [174] The Cryptopia Risk Statement also speaks of customers "owning" their own cryptocurrency. In addition, it warns customers of the many risks of their owning cryptocurrency and of using Cryptopia's platform. But it did not in any way suggest that one of the risks to be run by account holders was that Cryptopia would itself *own* the cryptocurrency legally and beneficially, let alone that this would be the position if Cryptopia were, as has happened, to go into liquidation.

- [175] Additionally, by the Risk Statement:

   (a) Clause 28 informed accountholders that Cryptopia may hold its own digital currencies on the platform, which indeed happened. There was no suggestion made that in fact Cryptopia beneficially owned *all* the digital currency on the platform.

   (b) Clause 29 addressed fees payable for using the platform. This did not suggest that any capital gains in the cryptocoins would enure to Cryptopia, which would have been the normal position had Cryptopia been the legal and beneficial owner of them.

- [176] I turn now to Cryptopia's "marketing strategy" of July 2018, details of which are before me. This was a strategy promoted by Cryptopia, which stated that Cryptopia was providing: "A trading platform for global cryptocurrency investors

   who want to trade safely", and that the company was "dedicated to ensuring *you* can deposit, trade and withdraw your cryptocurrency coins securely whilst offering world class service" (emphasis added).

- [177] Significantly here, customers were also referred to as "users" and not as "buyers". The strategy referred also to Cryptopia's "high level security" stating: "Rest easy: knowing *your* cryptoasset investments are securely protected" (emphasis added).
- [178] The accompanying fact sheet also contained the following statement: "Our mission is to enable the widespread adoption of digital currencies to give people control back of *their* money through faster, cheaper, and more efficient financial services" (emphasis added).

- [179] I turn now to say something more about the amended terms and conditions updated from 7 August 2018. Those terms, and in particular cls 5(d) and 5(e), and cls6(e)– (g) and (k) in respect of "fiat pegged tokens", contain express recognition that the cryptocurrencies held by Cryptopia for accountholders are held on trust for those accountholders. It is those accountholders it seems who retain the beneficial ownership throughout. Ms Cooper for the creditors has endeavoured to make something of the specific wording of cl 5(e) which, to repeat, states:

   (e) Each user's entry in the general ledger of ownership of coins is held by us, on trust, for that user.

   Ms Cooper contends that on its face this provision states that it is the "entry" in the ledger of ownership which is held "on trust" rather than the cryptocurrency itself. As I see it, this interpretation is wrong. It would lead to a nonsensical situation. Although that wording in cl 5(e) is not ideal, I am satisfied there can be no doubt that what was intended by the provision was that it is the cryptocurrency or coins themselves which are held by Cryptopia "on trust for" the particular accountholder.

- [180] Before me, Mr Barker for the liquidators pointed out that the evidence before the Court shows that approximately 536,662 accountholders did not engage with Cryptopia's exchange after the updated terms and conditions of 7 August 2018 were advised. Mr Barker went on to suggest that these amended terms, if anything, simply resulted in a variation of trust for the accountholders or, alternatively, created a new trust that operated only in favour of those accountholders who engaged with the exchange after the amended terms came into effect. On this, Mr Barker noted that any finding that some users or accountholders are beneficiaries of trusts and some are not could also pose potential prejudice to non-trust accountholders for the future. He was quick to point out that these issues were raised simply so that the consequences of any particular outcome could be clearly understood by the Court.

A002100

- [181] On these aspects, I disagree with Mr Barker's interpretation here. I have confirmed above that I am satisfied no variation of trust was involved in the amended terms. Those terms merely confirmed what were the existing trusts in operation. As I have noted, Mr Brocket, the only employee of Cryptopia to give evidence before me, this evidence also being uncontested, said the amended terms did not change the way the company had always operated. It was clear too, which Mr Barker for the liquidator accepted, that even if the amended terms improved the position of existing accountholders then the amendment must be seen as unobjectionable from their perspective.

- [182] As I see it, the amended terms on their face took immediate effect for all existing accountholders and it was therefore not necessary for an accountholder actively to use the Cryptopia platform post-August 2018 in order to get the benefit of those terms.

- [183] It must follow, therefore, that at no point in time were there separate sets of trust assets on the one hand, for accountholders under the historic terms and, on the other, for accountholders who had accepted the amended terms. Again, Mr Brocket in his evidence I have noted above confirmed as much. Nor, in my view, was it necessary to reach a position where individual trusts were seen as arising for each individual accountholder. I am satisfied that all accountholders by currency held their interests on exactly the same terms as other accountholders of that particular currency. That said, on all the evidence before me I conclude that Cryptopia acted as a bare trustee under a separate trust for each individual cryptocurrency held on its platform. All the accountholders for that one particular currency were simply beneficiaries under that one trust.

- [184] Ms Cooper for the creditors has endeavoured (unsuccessfully) to question this conclusion. I find that Cryptopia's principal duty under each of these respective trusts was to hold the relevant pool of currency, in many cases which the accountholders had brought onto the platform, on behalf of those accountholders (which might include Cryptopia itself as a beneficiary accountholder if it had personally acquired certain of those pool assets). As part of this Cryptopia as trustee was required to deal with each accountholder member's share in the pool as directed by the member.

- [185] In this respect, the powers and immunities given to Cryptopia in the terms and conditions which I have outlined at para [27] above, as I see it, are all proper provisions in trusts of this type.

- [186] And I confirm my conclusion finally that the amended terms and conditions of 7 August 2018 did not effect any particular variation of the trusts. Those amended terms applied automatically to all accountholders in the respective cryptocurrencies from 7 August 2018. And, indeed the standard trust arrangements for each cryptocurrency had related back to the original inception of Cryptopia.

- [187] In answer to the question raised at [46](b) I conclude that the various cryptocurrencies were at equity held on separate express trusts by Cryptopia for all of the accountholders.

  B. The remaining issues before the Court

- [188] I now need to turn to the remaining questions posed at para [46]:

*Question (c) – What happens if there is no trust or cryptocoins are not "property"?*

- [189] Question (c) of this paragraph, as it reads in the application, states:

If the answer to Question (a) is No, then to the extent that such digital assets are not "property" whether the applicant liquidators should satisfy claims of:

  (i) Any accountholder of the company (accountholder) for the return of his/her/its digital assets; and

  (ii) Unsecured creditors,

By conversion of such digital assets into fiat currency and paying such in accordance with Part 16 of the Companies Act 1993.

- [190] Given the answers I have given to questions (a) and (b) to the effect that the various digital assets held by the liquidators *do* constitute "property" as defined in s 2 of the Companies Act, and those digital assets here *are* held on trust for the accountholders, this question (c) does not arise.
- [191] But in any event, I note that even if I had found the digital assets were not "property" within s 2 of the Companies Act and were not held on trust for the accountholders, then those digital assets would be an "asset" of the company as that word is used in ss 253 and 313 of the Companies Act. In those circumstances the assets should be realised by the liquidators and the proceeds distributed in the ordinary way under pt16 of the Companies Act. In that event, accountholders' claims would rank with ordinary unsecured creditors of Cryptopia. Given my findings noted above, however, that is not the case here.

*Question (d) – What are the terms of the trust/s and when did the trust/s come into existence?*

- [192] For the reasons I have outlined above, I am satisfied that an express trust came into existence for every different type of currency here which Cryptopia acquired as a result of a dealing with an accountholder. The precise dates on which this may have occurred were not in evidence before me.

- [193] Nevertheless, once such a trust came into existence it applied to any currency of the relevant type subsequently acquired by Cryptopia as part of the running of its cryptocurrency platform whether or not the currency was in hot wallets or cold wallets.

- [194] In most cases the trusts in question will have pre-dated the varied terms in August 2018. But in any event as I see it, trusts arose in respect of each parcel of digital assets when they were acquired and the amended terms made no difference. Any new kinds of cryptocurrency acquired after the amended terms came into existence in August 2018, as I see it, from the time of acquisition will have become subject to trusts on the same basis.

- [195] As to what were the terms of the trust or trusts, in my view, it is not necessary or practicable at this point comprehensively to list all the terms that might govern the trusts in question. As Briggs J's judgment in *Pearson v Lehman Brothers Finance SA* stated:[57]

...the law commonly recognises the creation of a trust as a necessary consequence of an intention that parties should share property beneficially in

[57] *Pearson*, above n 53, at [245].

circumstances where the parties themselves have given no thought at all to the terms of the consequential trust, if indeed they even recognised its existence. In all such cases the law fills the consequential gaps by implication, and by importation of generally applicable principles.

- [196] As I see it here, Cryptopia essentially fulfilled the role of a bare trustee in relation to the accountholders. Cryptopia's trust duties therefore were somewhat confined. Its principal role was to hold each group of digital assets as trustee for the accountholders, to follow their instructions, and to let individual accountholders then increase or reduce their beneficial interest in the relevant trusts in accordance with the system Cryptopia had created for that purpose.

*Question (d)(iii) – Separate trust for each accountholder – or one trust for all accountholders – or multiple trusts for specific groups?*

- [197] As I have outlined above, I have found that Cryptopia here is a trustee of separate trusts, one for each cryptocurrency with the beneficiaries being all accountholders holding currency of the relevant type.

- [198] It follows that I reject alternatives 1 and 2 in Question (d)(iii) and uphold alternative 3 noted above at [46].

*Question (e) – Inability to identify individual accountholders?*

A002102

- [199] Question (e) outlined at para [46] above states:

What is the consequence of the applicant liquidators being unable to ascertain the identity of any accountholder, and what consequences flow in relation to any digital assets associated with that account, specifically:

(i) Can the applicant liquidators close any such accounts and retain any digital assets as assets of the company; or

(ii) Do any such digital assets fall to be dealt with pursuant to the Trustee Act 1956 or otherwise?

- [200] In my view, the appropriate course of action here where the liquidators find themselves unable to identify particular accountholders is the second alternative, namely for the digital assets that would otherwise fall to be allocated to that accountholder to be dealt with in accordance with s 76 of the Trustee Act 1956.
- [201] Section 76 of the Trustee Act provides:

**76 Distribution of shares of missing beneficiaries**

(1) Where any property is held by a trustee and the property or any part thereof cannot be distributed because the trustee does not know whether any person who is or may be entitled thereto is or at any material date was in existence, or whether all or any of the persons who are members of any class who are or may be entitled thereto are or at any material date were in existence, or because the trustee does not know whether any such person is alive or dead or where he is, the trustee may publish such advertisements (whether in New Zealand or elsewhere) as are appropriate in the circumstances calling upon every such person and every person claiming through any such person to send in his claim within a time to be specified in the advertisements, not being less than 2 months in any case from the date on which the advertisement is published. Where the trustee is in doubt as to what advertisements should be published under this subsection, he may apply to the court for directions in that regard.

(2) Where the trustee has received (whether as a result of the advertisements or not) any claim to be a person to whom any such advertisement relates, or any notice that any person may claim to be such a person, but the trustee is not satisfied that the claim is or would be valid, the trustee may serve upon the claimant or the person of whom he has notice as aforesaid, a notice calling upon him, within a period of 3 months from the date of service of the notice, to take legal proceedings to enforce the claim, if he wishes to pursue it, and to prosecute the proceedings with all due diligence; and advising him that, if he fails to do so, his claim may be disregarded and application may be made to the court without further notice for an order authorising the distribution of the property. Nothing in this subsection shall make it necessary for the trustee to serve such a notice on any such person; and the court may make an order under this section, whether or not such a notice has been served on any such person, if it is satisfied that the information supplied to the trustee by that person or otherwise in the possession of the trustee indicates either that the person is not one of the persons specified in the advertisements or that he is not likely to be one of those persons.

(3) Upon proof by affidavit of the circumstances, and of the inquiries that have been made, and of the results of inquiries and advertisements, and of the claims of which the trustee has received notice, and of the notices that the trustee has given to claimants under subsection (2), and of the action (if any) which the claimants have taken to enforce their claims, the court may order that the trustee may distribute the property or part thereof, subject to such conditions as the court may impose,—

(a) as if every person and every member of any class of persons specified in the order (being all or any of the persons specified in the advertisements) is not in existence or never existed or has died before a date or event specified in the order; and

(b) where as a consequence of the order it is not possible or practicable to determine whether or not any condition or requirement affecting a beneficial interest in the property or any part thereof has been complied with or fulfilled, as if that condition or requirement had or had not been complied with or fulfilled (as the court may determine).

A002103

(4) In making any order under subsection (3), the court may—

(a) disregard (without express reference thereto in the order) the claims of any persons who do not appear to the court to be, or to be likely to be, any of the persons specified in the advertisements:

(b) disregard (without express reference thereto in the order) the claim of any person to whom the trustee has given notice under subsection (2) and who has failed to take legal proceedings to enforce the claim or to prosecute any such proceedings with all due diligence:

(c) exclude from the operation of the order any person to whom the trustee has not given notice under subsection (2) and who in the opinion of the court may be one of the persons specified in the advertisements, or any person whom the court considers should for any reason be excluded from the operation of the order:

(d) provide that the order shall not be acted on for such period or except on such conditions as may be specified in the order or that the effect of the order shall during a period so specified be advertised in such manner and form as may be specified in the order, or that the order be served upon such person or persons as are specified therein; and in the event of the court exercising the jurisdiction conferred by this paragraph it may in the order direct that the same shall be of no effect in respect of any person specified therein in the event of that person instituting proceedings in New Zealand to enforce his claim and serving the proceedings upon the trustee within such period as is specified in the order.

(5) Any such order may be made notwithstanding that there has not been strict compliance with any directions as to advertisements previously given by the court, or that an error has been made in any advertisement (whether or not any directions have previously been given by the court) if the court considers that the error would not be likely to have prejudiced or misled the persons to whom the advertisement relates.

(6) Where the court makes an order under this section that the trustee may distribute any property or part thereof as if every person and every member of any class of persons specified in the order (not being a person expressly excluded from the operation of the order) is not in existence or never existed or has died before a date or event specified in the order, and the trustee distributes in accordance with the order, the trustee shall be exonerated from any further liability to any such person or to any member of any such class:

provided that nothing in this subsection shall prejudice any remedy which any person may have against any person other than the trustee, including any right which he may have to follow the property and any money or property into which it is converted.

(7) The court may make 1 or more orders under this section in respect of the same property.

(8) Any order made under this section may direct how the costs of the order and of advertising under or for the purposes of the order shall be borne.

(9) It shall not be necessary to serve notice of an application for an order under this section upon any person, unless the court otherwise orders.

(10) Nothing in this section shall prejudice the right of the trustee (if he so desires) to distribute under any other law or statutory provision or prejudice the protection thereby afforded when he makes distribution pursuant to any such law or provision.

- [202] This s 76 process needs to be undertaken here where appropriate. It must follow, therefore, that alternative 1 (suggesting that the digital assets be retained as assets of Cryptopia) is not appropriate here.

*Question (f) – Recovery of stolen digital assets*

- [203] Question (f) outlined at [46] states:

A002104

If and to the extent that the applicant liquidators recover stolen digital assets, then are such to be dealt with by the applicant liquidators:

(i) in accordance with the determination sought above;

(ii) pro rata according to the amounts recovered assessed against amounts stolen; or

(iii) as assets of the company.

- [204] Here, I have accepted submissions advanced to me for the accountholders that there are separate trusts for each type of cryptocurrency held by Cryptopia. There is one such trust for each type of cryptocurrency held. As such, it necessarily follows that only those accountholders who hold types of cryptocurrency that were stolen would have suffered a loss as a result of that misappropriation. Those losses, as I see it, should be borne pari passu by those accountholders alone.[58] It must follow

_____

[58] *Pearson*, above n 53 at [244].

therefore, in my view, that any recoveries of misappropriated cryptocurrency should enure to the benefit of those same accountholders.

- [205] To determine the position as between the accountholders who are beneficiaries of the relevant trusts relating to the particular misappropriated cryptocurrency is somewhat more difficult, however. The appropriate process as I see it is:

(a) as at the date of the theft, the liquidators should determine the accountholders affected and their relative shares in any trust of the digital assets which are the subject of the theft. The liquidators should then apply the loss from the theft pro rata to those existing holdings. It should not therefore be necessary for the liquidators otherwise to discriminate amongst those accountholders, although the default position might be seen as pari passu distribution of the loss;

(b) to the extent that subsequent to the theft any accountholder acquired digital assets of the type that suffered the theft and those assets were added to the relevant trust assets, no reduction for the theft should be applied to that accountholder's share in the trust assets; and

(c) any recoveries of cryptocurrency lost as a result of the theft should be applied pro rata to make up the loss suffered by such accountholders as were affected by it under the principles I have outlined above.

*Potential relevance of any fault of Cryptopia relating to the lost digital assets*

- [206] I have not been asked in the current application to address the relevance of any questions which might arise relating to the potential that Cryptopia may be legally culpable for lost digital assets here. This issue potentially arises if the digital assets were held on trust as I have found and Cryptopia is now holding fewer digital assets than were transferred to it by accountholders and not withdrawn by them. The losses may have occurred from the hack and theft, but there may be other causes of this shortfall.
- [207] It may be useful, however, to provide some brief comments on this aspect. In principle, where a trustee is one of the beneficiaries of the trust (as Cryptopia says is the case here) and there is a shortfall in the trust assets, the trustee cannot share in any distribution of assets among beneficiaries where the trustee is found to be legally culpable in respect of that shortfall to the extent of the shortfall.[59]

- [208] These comments are, however, by way of an aside as the issue of trustee-fault is not strictly before the Court here. This may be a matter for further consideration later.

## Result

- [209] As to the questions posed by the liquidators in their application as outlined at

- [46] above, the answers to those questions are:

  (a) On the question whether any or all of the digital assets held by the liquidators constitute "property" as defined in s 2 of the Companies Act, the answer is **yes**, *all* of the digital assets constitute "property".

  (b) On the question whether any or all of these digital assets are held on trust for accountholders, the answer is **yes**, they are *all* held by way of express trusts.

  (c) Question (c) raised issues only if the answer to question (a) or question

  (b) was, **no**. That is not the case here, given that those questions were both answered **yes**. Nothing further is required, therefore, with respect to this question (c).

  (d) Given that the answer to question (b) above is **yes**, then the following questions arise under Question (d), and their answers are:

  (i) Question (i): When did the trusts come into existence? The answer is that, in each case when the first tranche of a specific

59. *Finnigan v Yuan Fu Markets Ltd (in liq)* [2013] NZHC 2899 at [46]; and *Russell-Cooke Trust v Prentis* [2003] EWHC 1206 (Ch) at [6].

  cryptocurrency was accepted onto Cryptopia's platform, one trust was established for that particular cryptocurrency and came into existence (and this was the case either before or after 7 August 2018 when the company updated its terms and conditions).

  (ii) Question (ii): What are the terms of the trusts? The answer is that these are those terms which are implied into a particular trust by law.

  (iii) Question (iii): On what basis are the digital assets held on trust? The answer is as set out at as offered at subpara (iii) of this question. This means that the digital assets are held in multiple trusts for the benefit in each case of specific groups of accountholders who hold that particular group or type of digital asset with the result that accountholders within a specific group are co-beneficiaries of the same trust.

  (e) On this question (e) which relates to the consequence of the liquidators being unable to ascertain the identity of any particular accountholder and what consequences should follow in relation to digital assets associated with that account, The answer is that these digital assets fall to be dealt with pursuant to s 76 of the Trustee Act. The requirements set out in that provision are to apply here.

  (f) Question (f) asks if, and to the extent that the applicant liquidators recover stolen digital assets, how are these to be dealt with by the liquidators? The answer is as outlined at para (f)(ii) to the effect that they are to be dealt with pro rata within each specific trust for the digital asset concerned according to the amounts recovered assessed against the amounts stolen.

**Costs**

- [210] Outlined at para (g) of the liquidators' application specified at para [46] above, is a request, effectively from all parties, for a direction that their reasonable fees and disbursements on this application should be met in the first instance from the pool of realised bitcoin holdings pursuant to [3(b)] of the order of this Court dated 29 May 2019.

- [211] This is on the basis that these fees and disbursements are a necessary and reasonable expense of the liquidation of, and incidental to the protection, preservation, recovery, management and administration of, the assets of Cryptopia.

A002106

- [212] On this costs question, I am satisfied that the costs of counsel for the liquidators, counsel for the accountholders and counsel for the creditors should be met from the bitcoin holdings pool as sought on the basis outlined. All counsel at this point provided detailed and helpful submissions for the resolution of these issues and their costs are properly met from this pool.

- [213] A direction is now made that the reasonable fees calculated on an indemnity basis and disbursements of counsel for the liquidators, counsel for the accountholders and counsel for the creditors are to be met from the pool of realised bitcoin holdings pursuant to para [3(b)] of this Court's order dated 29 May 2019.

- [214] Insofar as it may be necessary here I certify for second counsel in each case.

......................................................

**Gendall J**

Solicitors:

Buddle Findlay, Wellington for Applicant Liquidators

Copies to:

Jenny Cooper QC, Barrister, Auckland, for Creditors Jane Barrow, Barrister, Auckland, for Creditors

Peter Watts QC, Barrister, Auckland, for Accountholders Samuel Jeffs, Barrister, Auckland, for Accountholders

---

**EASTERN CARIBBEAN SUPREME COURT**

**TERRITORY OF THE VIRGIN ISLANDS**

### IN THE HIGH COURT OF JUSTICE
### COMMERCIAL DIVISION

**CLAIM NO. BVIHC (COM) 0031 OF 2021**

**BETWEEN:**

### PHILIP SMITH AND JASON KARDACHI
### IN THEIR CAPACITY AS JOINT LIQUIDATORS OF
### TORQUE GROUP HOLDINGS LIMITED (IN LIQUIDATION)

Applicants

**and**

### TORQUE GROUP HOLDINGS LIMITED (IN LIQUIDATION)

Respondent

**Appearances:**

Mr. Brian Child, with him Miss Rachael Stitt for the Applicants

---

2021: May 25;

July 2.

---

### JUDGMENT

[1]     **WALLBANK J (Ag)**: This is the written Judgment of the Court in respect of an urgent application made by Mr. Philip Smith and Mr. Jason Kardachi, the Joint Liquidators ('the Joint Liquidators') of the Respondent, Torque Group Holdings Limited (In Liquidation) ('the Company'), on 12th May 2021.

The Joint Liquidators sought the Court's sanction pursuant to subsection 186(5) of the BVI Insolvency Act, 2003 ('the Act'), in respect of various actions proposed to be taken by the Joint Liquidators pertaining to crypto currencies.  The Court granted the sanction sought.  In doing so, the Applicants' Counsel was directed pursuant to rule 42.5(1)(c) of the Civil Procedure Rules, 2000, and readily agreed, to prepare a draft for a brief written judgment explaining the matter, as similar situations are likely to arise in the future.

**Background**

[2]    The Company operated as an online crypto-currency trading platform for crypto currency-to-crypto currency trading called 'Torque'.  This Company provided users with a trading platform and other crypto currency related services. The services were provided via the Company's websites as well as mobile applications.

[3]    Trading was suspended on the 'Torque' application, and via the Company's website, by the Company after a number of unauthorised leveraged trades that resulted in the Torque group of companies suffering losses.

[4]    Following an application made by the sole shareholder, sole director and Chief Executive Officer of the Company, Mr. Bernard Ong Hock Fong on 26th February 2021, on 2nd March 2021 the Court appointed the Joint Liquidators as Joint Provisional Liquidators over the Company.  On 18th March 2021 the Court appointed the Joint Liquidators as joint liquidators of the Company.

[5]    Upon being appointed as joint liquidators of the Company, the Joint Liquidators secured the Company's account within which the majority of the assets of the Company are held ('the Tran Account') on an exchange known as the Binance Exchange, another online exchange where users can trade cryptocurrencies.

A002109

[6]     The Tran Account has assets ('the Crypto Assets') held by the Company, in the various cryptocurrencies that they were denominated in, as at the date of the appointment of the Joint Liquidators as Joint Provisional Liquidators, being 2nd March 2021.

[7]     As a result of fluctuations in the cryptocurrency markets, the estimated book value of the Crypto Assets has fluctuated significantly since the appointment of the Joint Liquidators as Joint Provisional Liquidators.

[8]     The Joint Liquidators have expressed concern at the volatility of the Crypto Assets.  As such, the Joint Liquidators sought approval from this Court to convert or otherwise exchange the Crypto Assets to US Dollars or, alternatively, to Tether (a cryptocurrency pegged to the US Dollar).  This is discussed further below.

[9]     Within the Tran Account, the Joint Liquidators identified various 'wallets', including 'User Trading Wallets' and 'User Personal Wallets' containing Crypto Assets.

[10]    Having taken legal advice in Singapore and the BVI, the Joint Liquidators were of the view that:

    (1)     the Crypto Assets within the User Trading Wallets are assets of the Company, and affected customers of the Company may have corresponding contractual claims against the Company for debt claims in relation to their Crypto Assets lost and/or misappropriated; and

    (2)     the User Personal Wallet Crypto Assets are not assets of the Company's estate, on the basis that legal and beneficial ownership was never transferred from the Users to the Company.

[11]    On 3rd March 2021, the Joint Liquidators 'froze' the User Personal Wallets by disabling the user interface on the 'Torque' application.  As a result, Users have been unable to access the User Personal Wallets to effect any transfer of Crypto Assets held in their individual digital Personal Wallets.  The Joint Liquidators now sought to reactivate these Personal Wallets to permit Users to regain control of their Crypto Assets and deal with them as they see fit.

3

[12]   The Joint Liquidators sought the Court's approval of their proposed treatment of the Crypto Assets contained within these wallets (as outlined above) and approval of the Joint Liquidators' reactivation of the User Personal Wallets' functionality to allow Users to withdraw their assets.   This is also further discussed below.

[13]   In addition to the above, the Joint Liquidators also sought the sanction of this Court to utilise an online 'Proof of Debt Form' in an effort to reduce the administrative burden associated with the potential creditor claims of the 14,000 customers of the Company.

[14]   On 7th May 2021 the Joint Liquidators sent a copy of their Preliminary Report to the known creditors of the Company, along with a '4th Circular to Creditors' by email.  The Preliminary Report and the 4th Circular to Creditors notified the creditors of the Company of the Joint Liquidators' intention to seek sanction from this Court in respect of the various proposed actions outlined above.

**Discussion**

[15]   Cryptocurrency is a form of virtual asset that is available for use by private individuals and corporations. A cryptocurrency exchange facilitates the trading of cryptocurrencies in return for other cryptocurrencies, other crypto assets or currency.

[16]   A 'cryptoasset' may be defined as follows:

> "A cryptoasset is ultimately defined by reference to the rules of the system in which it exists. Functionally, it is typically represented by a pair of data parameters, one public (in that it is disclosed to all participants in the system or to the world at large) and one private.  The public parameter contains or references encoded information about the asset, such as its ownership, value and transaction history.  The private parameter—the private key—permits transfers or other dealings in the cryptoasset to be cryptographically authenticated by digital signature. Knowledge of the private key confers practical control over the asset; it should therefore be kept secret by the holder.   More complex

4

cryptoassets may operate with multiple private keys (multisig), with control of the asset shared or divided between the holders."[1]

[17]    The Crypto Assets held by the Company within the Tran Account include the following cryptocurrencies:

Bitcoin (BTC)

Ether (ETH)

Tether (USDT)

Litecoin (LTC)

Ripple (XRP)

Tron (TRX)

Bitcoin Cash (BCH)

Torque

**(1) Conversion of the Crypto Assets**

[18]    It has been demonstrated that regardless of any perceived advantages of cryptocurrency, it is also extremely volatile. Indeed, the Joint Liquidators' evidence was that Bitcoin experienced a significant drop in value, which, in turn caused a decrease in value of the Crypto Assets held by the Company, in the region of approximately 28%.

[19]    It is due to this volatility that the Joint Liquidators sought to convert the Crypto Assets to US Dollars or, alternatively, to Tether (USDT). The advantages of converting the Crypto Assets to US Dollars is evident – it is significantly more stable and would provide more certainty for the creditors of the Company. The advantages of converting the Crypto Assets to Tether are less evident, other than that Tether is 'pegged' to the US Dollar. The Applicants have filed evidence that converting the Crypto Assets to Tether would involve substantially reduced conversion fees compared to conversion to US Dollars. Additionally, 13% of the Company's Crypto Assets are already held in

---

[1] UK Jurisdiction Taskforce, 'Legal statement on cryptoassets and smart contracts' (November 2019), paragraph 28.

A002112

Tether – this means only 87% (rather than 100%) in value of the Crypto Assets would incur conversion fees if converted to Tether rather than US Dollars.

[20]    In all of the circumstances, and having had the benefit of the Joint Liquidators' evidence and analysis, the proposed conversion of the Crypto Assets to US Dollars, or alternatively to Tether, appeared to be a sensible approach that would better secure the value of the Crypto Assets and maximise the return for the creditors of the Company.

**(2) Treatment of the Crypto Assets as 'Assets' and 'Property'**

[21]    Pursuant to subsection 2(1) of the Act, an "asset" is defined as including,

> "money, goods, things in action, land and every description of property wherever situated and obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property."

[22]    Pursuant to subsection 185(1) of the Act, it is the duty of the Joint Liquidators to take possession of, protect and realise the 'assets' of the Company.  In this case, this necessarily includes the Crypto Assets held by the Company.

[23]    There is a lack of BVI case law that deals directly with cryptocurrency as an asset in liquidation or as 'property'.  As such, I have been guided by the UK Jurisdiction Taskforce ('UKJT') publication, 'Legal statement on cryptoassets and smart contracts' in the consideration of this application.

[24]    The UKJT concluded that crypto assets are to be treated in principle as any other property.  This has been cited with approval by the English High Court in **AA v Persons Unknown & Ors., Re Bitcoin**[2]. Specifically, the UKJT stated,

> "'Since cryptoassets can be property at common law, we have no doubt that they can be property for the purposes of the Insolvency Act.  If a particular cryptoasset is not property at common law, depending on circumstances it could still be property for the purposes of

---

[2] [2019] EWHC 3556 (Comm).

A002113

> the Insolvency Act if it is, for example, within the words "obligations and every description
> of interest, whether present or future or vested or contingent, arising out of, or incidental
> to, property"."

[25]   Applying the above analysis, it is a reasonable conclusion that crypto assets are to be considered as assets for the purposes of liquidation.

[26]   The Crypto Assets should, therefore, be treated as assets or 'property' for the purposes of the liquidation of the Company.

[27]   When considering the ownership of the crypto assets, I have again been guided by the UKJT.   For instance, paragraph 86(b) states,

> '(b) We would expect that the person with knowledge of a private key would generally be
> considered the owner of the cryptoasset (or the right in the asset) that the key controls,
> but that may depend on the circumstances and the rules of the system.'

[28]   A 'private key' is a method of securing access for an individual or corporate 'user' to access the crypto assets.

[29]   Within the User Trading Wallets the Crypto Assets were 'co-mingled' across various wallets.   The Joint Liquidators have provided evidence that the Company had exclusive control to deal with the Crypto Assets in the User Trading Wallets.   Additionally, the Company had knowledge of the private key.

[30]   Applying the analysis employed by the UKJT, this would indicate that the Crypto Assets in the User Trading Wallet are assets of the Company within the estate.   In giving this indication, it will be open to any stakeholder with an interest in the User Trading Wallets to seek to have this Court come to an alternative conclusion.

[31]   By contrast, the User Personal Wallets did not involve Users transferring Crypto Assets to wallets that were controlled by, or that belonged to, the Company.   The provision of the User Personal

A002114

Wallets was a separate service offered by the Company to its Users. The Users utilised the Company's platform as a 'hosting' service and the Company would not have access to, or knowledge of, the private key (despite the private key being generated by the Company's platform).

[32] I find that it is likely that the owner(s) of the Crypto Assets within the User Personal Wallets is/are the individual User(s). This conclusion is supported by the fact that at no time did the Company have the ability to deal with, transfer or control the Crypto Assets held in the User Personal Wallets.

**Conclusion**

[33] The Court granted the orders sought, with the costs of the application to be paid out of the assets of the Company as an expense of the liquidation.

[34] The seal on these proceedings has also been lifted to enable this judgment to be published.

[35] I take this opportunity to thank learned Counsel and the Applicants for their assistance during this matter.

**Gerhard Wallbank**
High Court Judge


**By the Court**


**Registrar**

8

A002115

Wang v Darby

*Overview*   |   **[2021] EWHC 3054 (Comm)**,   |   [2022] Bus LR 121

---

## *Wang v Darby [2021] EWHC 3054 (Comm)*

Queen's Bench Division (Commercial Court)

Stephen Houseman QC (sitting as a deputy judge of the High Court)

17 November 2021 Judgment

**Tim Penny QC and Daniel Scott** (instructed by **Curzon Green Solicitors**) for the **Claimant James Collins QC and Philip Jones** (instructed by **Mackrell.**) for the **Defendant**

Hearing dates: 9 & 10 November 2021

**Judgment Approved by the court for handing down**

**Covid-19 Protocol:  This judgment was handed down by the judge remotely by circulation to the parties'**

**representatives by email and release to BAILII.  The date**

**and time for hand-down is deemed to be 17 November**

**2021 at 11AM**

- - - - - - - - - - - - - - - - - - - -

**APPROVED JUDGMENT**

**Stephen Houseman QC sitting as a Deputy Judge of the High Court:**

INTRODUCTION

1.    The present dispute concerns two related contracts entered into by the Claimant ("Mr Wang") and the Defendant ("Mr Darby"): the first on 28 December 2018 as allegedly varied on or about 10 January 2019 ("First Contract") and the second on 24-25 January 2019 ("Second Contract") coinciding with or comprising a further alleged variation of the First Contract.

2.    Broadly speaking both contracts involved the individual parties exchanging specified quantities of respective cryptocurrencies, namely Tezos and Bitcoin, on terms as to reciprocal restoration of the same amounts of each currency upon or after an agreed period of two years, i.e. on/after 28 December 2020 and 25 January 2021, respectively.    The parties' cases as to the correct legal characterisation of the transactions, and their proprietary consequences for the Tezos transferred by Mr Wang to Mr Darby, are diametrically opposed.  This central issue was fully and forcefully contested at the present hearing.

3.    There are three separate applications before the Court:

(i)    Mr Wang's application dated 3 August 2021 to continue a worldwide freezing order (WFO) and proprietary injunction (together, "Injunction Order") granted by HHJ Pelling QC at a without notice hearing on 2 August 2021 ("WFO Continuation

Application" and "PI Continuation Application", respectively; together, "Continuation Application").

(ii)    Mr Darby's application dated 6 September 2021 seeking to strike out or enter reverse summary judgment in respect of the "*proprietary claims*" pleaded against him in this action ("SJ Application").

(iii)    Mr Wang's application dated 25 October 2021 seeking to vary the terms of the WFO in the Injunction Order as regards Mr Darby's expenditure allowance, which is necessarily contingent upon Mr Wang's prior success on the WFO Continuation Application ("WFO Variation Application").

4.    A further application dated 2 November 2021 was made by Mr Wang seeking permission to refer to a second expert report dated 21 October 2021 in connection with the Continuation Application and the SJ Application. Such report was served in support of the WFO Variation Application and was out of time in respect of the other applications, Mr Wang having previously obtained a series of extensions resulting in a final extension for service of his reply evidence on the Continuation Application. Mr Wang sought relief from sanctions in this context and for this purpose. Mr Darby did not contend that he would be prejudiced by the admission of this second expert report for such purposes, even though first intimated on behalf of Mr Wang at a hearing on 29 October 2021, at any rate so long as he (Mr Darby) was entitled to rely upon his own fourth witness statement dated 5 November 2021.

5.    I gave permission to both sides to refer to all such evidence in relation to all applications before the Court. The contested admissibility of the second expert report had been

stood over to the present hearing from the hearing before HHJ Pelling QC on 29 October 2021 at which a separate application by Mr Darby dated 13 October 2021 seeking variation of the Injunction Order to permit use of funds for legal expenditure was dismissed. Mr Darby was ordered to pay Mr Wang's costs of that application and hearing, assessment of which was reserved to the present hearing.

6.    Mr Darby has not served any expert evidence. The nature and uses of Tezos are explained in the expert evidence served on behalf of Mr Wang, in particular the first report of Mr Sanders. This general background is not disputed.

7.    The SJ Application concerns the proper legal characterisation of the relevant contracts pursuant to which Mr Wang transferred two separate parcels of 200,000 Tezos to Mr Darby in return for 13 Bitcoins (First Contract, concerning the "First 200k" as it was known) and 17 Bitcoins (Second Contract, concerning the "Second 200k" as it was known) transferred by Mr Darby to Mr Wang by way of simultaneous digital exchange. The key issue is whether some form of trust arose in respect of the 400,000 Tezos transferred by Mr Wang to Mr Darby. Both sides contend that *both* contracts were of the *same* essential nature and structure as one another: the core dispute concerns their proper legal characterisation as a matter of objective common intention.

Wang v Darby [2021] EWHC 3054 (Comm)

8. It is common ground that whether cryptocurrency such as Tezos is regarded as property which can be the subject of a trust is to be determined by English law for present purposes. English law is also assumed to govern the relevant contracts and any fiduciary duties arising in connection with such transactions. It is further agreed that, as a matter of English law, a unit or token of Tezos constitutes property which can in principle be the subject of a trust. This is so notwithstanding its entirely fungible character and non-identifiable status: no single unit bears any unique serial number or means of identification.

9. Mr Wang contends that there was an express or resulting or constructive trust in respect of the 400,000 Tezos in the hands (i.e. digital wallet) of Mr Darby and/or that Mr Darby owed fiduciary duties in respect of such digital assets, notwithstanding that Mr Wang himself was free to use or dispose of the 30 Bitcoins he received from Mr Darby. Hence the proprietary claim against Mr Darby in respect of the Tezos. Mr Darby says such claim lacks any real or reasonable prospect of success: the bilateral exchange and obligatory re-exchange (upon demand after two years) of different cryptocurrencies constituted a sale and buy-back arrangement akin to a 'repo' transaction which, by definition, precluded any trust arising in respect of the Tezos.

10. A notable feature of the present case is that the only evidence said to contain or demonstrate both contracts is comprised within the parties' private dialogue via an online communications platform called Telegram ("Telegram Transcript"). The parties communicated extensively through this platform between late December 2018 and early March 2019 predominantly in writing but with occasional voice messages left by Mr Wang. Mr Darby controlled the underlying Telegram account and blocked Mr Wang from it on 6 March 2019. The Telegram Transcript was, however, produced by Mr Wang and underwent modifications from its native format (including removal of voice messages) as described further below. There is a separate transcript of the deleted voice messages ("Voice Message Transcript") which augments the Telegram Transcript in a limited way so far as material.

11. This judgment deals with the SJ Application and the WFO Continuation Application. The PI Continuation Application was stood over to await the outcome of the SJ Application. The WFO Variation Application was stood over to await the outcome of the WFO Continuation Application.

12. I am grateful to counsel on both sides for the high quality of their oral and written submissions, including additional focussed written submissions requested by me as to the formation and content of the contracts.

RELEVANT BACKGROUND

13. The relevant background is of two kinds: general background about Tezos and specific background relating to the parties, their mutual dealings and other circumstances relevant to the determination of the SJ Application and WFO Continuation Application. 14. As regards Tezos, the following summary suffices for present purposes:

(1)    Tezos (XTZ) is one of the

estimated 2000+ cryptocurrencies now in existence, the best known of which is Bitcoin (BTC).   Tezos underwent its Initial Coin Offering (ICO) in mid-2017. Tezos is a so-called 'altcoin' denoting the fact that due to its scale it is not commonly used as a primary trading currency, in contrast to Bitcoin.

(2)  As noted above, individual units or tokens lack any unique identification. Their functional identification is achieved by reference to the unique digital wallet (i.e. account) in which they are held at any given time.  They are readily transferable and completely fungible.   They can be traded, i.e. bought and sold, in return for e.g. other cryptocurrency and/or traditional (so-called 'fiat') currency.   They can in principle be held on trust by one account-holder for and on behalf of another account-holder.

(3)  Tezos offers what is known as a 'baking' option whereby individual tokens are utilized so as to yield rewards in the form of additional tokens credited to the relevant account-holder by the global issuer.   The underlying activity which constitutes baking involves the signing and publishing of a new block in the blockchain, thereby validating transactions and growing the digital system organically so as to increase its capital base.   It is akin to 'mining' in other crypto contexts. Baking requires the relevant holder - known as the 'baker' - to run a blockchain node with appropriate software and to keep it online and current.  There is, in effect, a minimum capital margin requirement for this activity which requires that the baker holds at least 8.74% of the currency being baked by them at any given time. This is known as a 'bond'.

(4)   An account-holder may simply designate or delegate the voting rights associated with some or all of their Tezos to another account-holder for baking without any transfer of currency: this is a form of personal mandate or authorisation known as 'delegation' between delegator (principal/owner) and delegate (agent/baker).  It involves a private arrangement between account-holders that will ordinarily determine the baking service fee or any baking reward split.   Depending on usage of terminology, the delegator in this scenario is 'staking' their Tezos by authorising another account-holder to bake them without receiving or holding such units.  This is akin to 'farming' in other crypto contexts.

(5)   Alternatively, an account-holder may transfer currency into the account of another to undertake baking through what is sometimes known as a 'bond pool', i.e. a mixed account or wallet. The principal account-holder in this scenario ordinarily loans or entrusts their currency to another to undertake third party baking known as 'stake bonding' (as distinct from 'staking' simpliciter).  The additional currency in the latter's wallet/account enables them to undertake a higher volume of baking for other third party delegators by reference to the 8.74% bond margin requirement described above.   This may be reflected in enhanced economic benefits to the staking party (i.e. transferor) as compared with delegation, depending on the terms of the parties' private arrangements.

(6)  Tezos experienced some post-ICO delays before becoming fully live and operational.  It began to trade and bake about a year later in mid-2018 which is when Mr Wang first made contact with Mr Darby via Telegram.

Wang v Darby [2021] EWHC 3054 (Comm)

(7)   The value of Tezos rose significantly from around the time the parties entered into their contracts in late 2018 / early 2019.   It had effectively trebled in price by April 2019.

15.   Mr Wang is an Australian national who has been a cryptocurrency trader for a number of years.   He obtained 400,000 Tezos through its ICO.   He was 21 or 22 years old during the key period in late 2018 to early 2019.

16.   Mr Darby is a UK national who held himself out as an experienced cryptocurrency trader offering baking and equivalent services.   His evidence explains that he suffers from mental health issues resulting in memory impairment.   He has no independent recollection of the details of the relevant communications and circumstances. The expert evidence suggests that Mr Darby is or was a sophisticated cryptocurrency trader and registered baker of Tezos who operated an extensive and complex web of digital accounts/wallets, although the precise extent of his current or prospective ability to do so is a matter of doubt given his mental health condition.

17.   Mr Wang first contacted Mr Darby via Telegram in early July 2018.   Both he and Mr

Darby held Tezos acquired through its ICO a year earlier.   The precise amount held by Mr Darby then or at any given time is not known, save for glimpses into the digital wallet referred to as his OTC ('over the counter', i.e. trading) account ("OTC Account") at different dates in the crucial period.

18.   Discerning the precise terms or basis of the parties' dealings from the Telegram Transcript, as augmented by the Voice Message Transcript, requires some effort, not least in order to disregard the immaterial aspects of the parties' extensive and at times intensive or repetitive dialogue.   The written messaging on some days exceeds

14 pages of text.   One person's response to a single message forming part of a sequence of messages (e.g. a single composite message in terms of coherent meaning) appears on the page in a way that makes it difficult at first glance to follow the flow of the conversation between them.   The Telegram Transcript runs to 175 pages. I refer to pages in this transcript as "TT" for convenience.

19.   Each communication bears a time marker   (hour:minute:second)   by reference to an unspecified time zone assumed to be the location of Mr Wang in Australia.   It appears that Mr Wang communicated extensively through the night and often initiated contact

after any gaps in communication.   The dialogue was conversational in tone, somewhat disjointed in places and included occasional colourful or even abrasive language on the part of Mr Wang.

20.   Mr Wang's negotiating technique is somewhat idiosyncratic.   He was given to asserting something as already agreed which was obviously not or seeking to re-open a settled and executed position within a matter of days.   Nothing turns on this for present

Wang v Darby [2021] EWHC 3054 (Comm)

purposes. It is common ground that the two contracts and their respective alleged variations are contained within the four corners of the Telegram Transcript, as augmented in one material respect by a deleted voice message at the point of concluding the First Contract on 28 December 2018.

21. It is clear from the Telegram Transcript that Mr Wang was keen to get Bitcoins from Mr Darby. Mr Wang initiated and advocated both transactions and expressed a desire to obtain Bitcoins on an urgent basis from Mr Darby. Mr Wang's underlying purpose in obtaining Bitcoins, or what he did with the 30 BTC which he received from Mr Darby pursuant to these two swapping transactions, is not explained and does not ultimately matter. It may be inferred that Mr Wang wanted Bitcoins to trade and that is what he did with them, hence him subsequently insisting or requesting that his own counterrestoration obligation under both contracts be pegged to a USD equivalent value (see below). Mr Wang contends that he was ready, willing and able to transfer 30 Bitcoins or USD equivalent to Mr Darby at/after the relevant maturity dates - 28 December 2020 and 25 January 2021, respectively - and when he made formal demand on 15 February 2021 and at all times since then.

22. There was some discussion at the hearing as to the role of factual matrix in ascertaining the proper meaning and effect, including the proper legal characterisation, of the two transactions as recorded in the Telegram Transcript. Beyond a presumed knowledge of how Tezos worked, as summarised in paragraph 14 above, and the fact that Mr Darby held himself out publicly online (including through social media)

as a trader and baker of cryptocurrency, it is difficult to see how any factual matrix could impact the analysis of what they agreed or their commercial objectives or, therefore, the correct legal characterisation of their transactions. No material dispute exists as to any fact said to be admissible as matrix for present purposes.

23. The First Contract was concluded on 28 December 2018 (TT p.30) and the relevant cryptocurrency exchanges executed the same day (TT pp.32-35). This contract was later varied on 10 January 2019, according to Mr Wang, as to the terms of Mr Wang's counter-restoration obligation and the profit share split (TT pp.84-85). The Second Contract was concluded on 24 or 25 January 2019 on the same basis save for Mr Wang's enhanced entitlement to baking rewards and stake bonding profits, also said to have further varied the First Contract, and the relevant cryptocurrency exchanges executed on 25 January 2019 (TT pp.128, 132; pp.134, 140-141).

24. The Particulars of Claim (POC), which were in draft form at the time of Mr Wang's first affidavit sworn in support of his application for the Injunction Order, include the following allegations:

(1) As regards the First Contract it is alleged that Mr Darby was under an obligation to "*transfer the First 200k back to*" Mr Wang after a two year period "*in consideration*

*for* transfer [by Mr Wang to Mr Darby] *of 13 bitcoins*" (paragraph 8.5.1) (emphasis added).

(2)  As regards the variation of the First Contract, which is not said to have altered the basis or nature of such transaction, it is alleged that Mr Wang asked Mr Darby "*to vary the said obligation to sell the First 200k back to [Mr Wang] for 13 bitcoins*" (emphasis added) so as to allow Mr Wang to perform his counter-obligation in terms of an agreed figure in US Dollars (paragraph 12.1) and that this was agreed at US$50,000 (paragraph 13.2). The reference to "*said obligation to sell*" is to the obligation pleaded in paragraph 8.5.1 as quoted in (1) above. Paragraph 13.2 speaks of "*in consideration for the transfer back to [Mr Wang] of the First 200k*" in the same way as paragraph 8.5.1.

(3)  As regards the Second Contract it is alleged that Mr Darby was under an obligation to "*sell back to [Mr Wang] the Second 200k in consideration for the bitcoin equivalent of US$60,000…*" (emphasis added) after a two year period (paragraph

15.5.1).  Paragraph 15.6 alleges a specific term whereby Mr Wang could "*require the return of 100,000 Tezos in return for payment of the then equivalent of US$30,000*" in defined circumstances within two years. Paragraph 15.7 alleges a further specific term whereby Mr Darby was strictly liable "*to transfer 200,000 Tezos back to [Mr Wang]*" after the two year period, even if his account was hacked and the Tezos taken from him.  The primary obligation of re-delivery or restoration on the part of Mr Darby is pleaded as one to "*sell back*" the Second 200k.

(4)  Paragraph 22 pleads the existence of a constructive trust in respect of all

400,000 Tezos based upon a "*specifically enforceable agreement between the parties that after 2 years the 400k would be sold back by [Mr Darby] to [Mr Wang] for a consideration of the bitcoin equivalent of the sum of US$110,000…*" (emphasis added). Leaving aside that this allegation fuses two separate contracts into a single composite contract, it is conspicuous that Mr Darby's primary obligation of redelivery or restoration is pleaded as one of re-sale, consistent with paragraphs 12.1 and 15.5.1 (quoted in (2) and (3) above).

(5)  Likewise, Mr Wang alleges in paragraph 28 that he was "*required to pay the sum (or bitcoin equivalent) of US$110,000 for the purchase back of the 400K…*" (emphasis added)

25.  Thus, it is Mr Wang's own pleaded case that both contracts involved a sale and buyback of 400,000 Tezos.  Mr Wang's sworn evidence confirms this expressly in relation to the Second Contract and, therefore, impliedly in relation to the First Contract. Paragraph 31 of his first affidavit confirms the draft pleaded case and then sets out his own "*understanding of those terms*" in a series of sub-paragraphs. Sub-paragraph (e) says: "*After the expiry of the 2 year period [Mr Darby] would sell back to me the Second 200k in consideration for the Bitcoin equivalent of US$60,000…*" (emphasis added).  Paragraph 23 is in a similar format in respect of the First Contract, save that the language is the neutral or descriptive version: "*transfer the First 200k back to me*" / "*transfer him back the 13 Bitcoins*".  It is unlikely that Mr Wang used 'transfer back' and 'sell back' in any different way.  As noted above, the pleaded case does not.  This language is used

Wang v Darby [2021] EWHC 3054 (Comm)

interchangeably. The pleaded claim for constructive trust presupposes a valid and binding contract or option of re-sale.

26. As noted already, it is accepted by both sides that the proper legal characterisation of the two transactions is the same and, as part of this, that there was no change to the basis or nature of the First Contract after it was concluded. The subsequent alleged variations to the First Contract and the additional specific terms agreed for the Second Contract are not said to alter the legal characterisation of the First Contract or (therefore) the Second Contract or vice versa. The parties appear to have regarded them as a single composite transaction (albeit distinct 'trades' or 'deals') in various communications.

27. Mr Wang's sworn evidence endorsing the pleaded case, as identified above, is itself based on his stated review of the Telegram Transcript. He makes no reference in his first affidavit to the Voice Message Transcript.

28. The crucial exchange between the parties for present purposes took place at around 08:10 - 08:12 on the morning of Friday 28 December 2018 (TT p.30). This is accepted to be the point of conclusion of the First Contract.

29. By way of immediate context to this, Mr Wang had requested Bitcoins from Mr Darby the day before on the basis of a collateralised loan arrangement, i.e. borrowing Bitcoins in exchange for his Tezos as collateral (TT p.14 at 4:10:41AM). Mr Darby instead proposed that Mr Wang just sell some Tezos to him in return for Bitcoins to which Mr Wang replied "*I don't wanna sell … I wanna bake*" and suggested "*You can add the tezos I have to your baking pool*' (TT p.15 at 4:19:43AM – 4:22:17AM). Mr Darby reverted within the hour rejecting the idea of a loan arrangement (TT p.19 at 5:09:27AM) to which Mr Wang said: "*It's not even a loan / Just a temporary swap*" (5:11:52AM / 5:11:56AM).

30. Mr Wang chased five minutes later for Bitcoins ("*Come on please" / "Help me out*') (TT p.20 at 5:16:14AM / 5:16:16AM). Mr Darby suggested a sale and buy-back as an alternative to Mr Wang trading through an exchange: "*You can sell it to me and then buy back that would keep things simple and you wouldn't need to deal with exchanges*" (5:18:53AM). Mr Wang then revived or repeated his prior request to "*just do a loan*" (TT p.21 at 5:20:11AM). With a loan having already been flatly ruled out by Mr Darby,

Mr Wang pressed further: "*I need the btc ASAP*" (5:25:49AM) and then, "*I really need the btc today though can you like <u>sell it</u> to [me] at the price you'll <u>buy it back</u> for*" (TT p.22 at 5:27:19AM - 5:27:30AM) (emphasis added).

31. Mr Darby reiterated overnight that he wasn't interested in any loan arrangement due to his accounting position: "*only looking to buy or sell at the moment*" (TT p.28 at 12:01:25AM - 12:01:39AM). Mr Wang confirmed the following morning that the proposed swap would not be a loan, that he wished to "*bake together*" and offered 300,000 Tezos to Mr Darby at around 05:20 - 05:25AM on 28 December (TT p.28).

Wang v Darby [2021] EWHC 3054 (Comm)

32.    After exploring other baking options, Mr Wang then made his revised offer at 08:10AM (TT p.30): "*I'll give you 200k tezos just give me 50%*" / "*And the profits from staking we can share 5050 even though I'm contributing more*" (8:10:09 / 8:11:32AM).    (The latter was a reference to baking profit share, on the basis that the additional 200k would represent more than 50% of the Tezos in the OTC Account, i.e. 200,000 out of 356,000 at that time.)  Mr Darby agreed to this in principle offering 12 BTC on the basis that Mr Wang "*wouldn't want [the First 200k] back for at least one year so I can increase my delegates without the risk of being over delegated*" - a reference to using the First

200k for stake bonding in his account - adding: "*I'd be happy to give you 50% and then you could of course buy them back for 12 BTC*" (8:16:43AM) (emphasis added).    (The reference here and above to 50% reflected the fact that Mr Darby would be transferring Bitcoins of half the current value of 200,000 Tezos.)  Mr Darby gave Mr Wang the link to the OTC Account for transferring 200,000 Tezos (8:17:32AM).  The parties then agreed a minimum term of at least 2 years for this swapping arrangement (8:18:16AM - 8:18:43AM) and struck on an exchange price of 13 BTC for the First 200k (8:18:54AM - 8:20:43AM).    The First Contract was thereby concluded, as is common ground.

33.  Without more, the crucial exchange summarised above would suggest that the basis of the swapping arrangement was a sale and buy-back.  It was not intended to be a loan arrangement given the prior discussion.  Nor was it a unilateral transfer by principal to agent solely for the purposes of stake bonding.  Both parties used the word "*give*"; Mr Wang used the word "*sell*" and the phrase "*buy it back*"; Mr Darby used the phrase "*buy them back*".  The proper characterisation of the First Contract - and, hence, the Second Contract as is common ground - was set at this point.

34.  It is here that the integrity of the Telegram Transcript becomes material.  It shows in places that there was a "Cancelled Call" but all references to voice messages have been removed, evidently by Mr Wang when creating the transcript from the original native format.  The existence of voice messages within the chain of communication is only revealed by a separate transcript prepared by Mr Wang in which he had changed Mr Darby's name from "tezosotc" (being an abbreviation for Tezos OTC) to "Tezos Scammer 400k" after falling out with and being blocked by Mr Darby.  Page 30 of this separate edited transcript shows that there were three voice messages - all of them left by Mr Wang - between 05:32 and 08:11 on the morning of Friday 28 December 2018.

35.  The third of these voice messages from Mr Wang lasted 23 seconds and was sent at 08:11:35AM.  That was three seconds after Mr Wang finished the messages comprising his revised offer (TT p.30 at 8:10:46AM - 8:11:32AM) and, therefore, five minutes or so before Mr Darby responded (8:16:43AM), both as described above.  According to the Voice Message Transcript, Mr Wang suggested that Mr Darby just tally the trade in his own internal record or accounts: "*as you just bought under market … and then when you sell me back the Tezos for Bitcoins, you can tally it as a loss … or*

*something like that when we trade back. So just tally it as if you're trading with me*" (emphasis added). Mr Wang uses "*bought*", "*sell me back*" and "*trade back*" to describe the counterrestoration of 200,000 Tezos under the proposed transaction. Mr Darby's response five minutes later, as noted above, was framed on the basis that Mr Wang would "*buy them back*" for the relevant number of Bitcoins.

36.    Pausing here, and as addressed further in the context of the SJ Application below, a sale and buy-back is legally and logically preclusive of a trust arrangement in respect of either the First 200k or Second 200k. When confronted with this proposition based on Mr Wang's own pleaded case and sworn evidence at the beginning of the hearing, Mr Penny QC indicated that Mr Wang may wish to amend his pleaded case to remove references to 'sale' and 'buy back' or equivalent – and, by logical extension, the claim for constructive trusteeship. No such application has been made. Nor is it easy to see how it could succeed in light of Mr Wang's own sworn evidence based, as it is, upon the Telegram Transcript, as quoted in paragraph 25 above. The Voice Message Transcript makes that position even harder for Mr Wang, in my view.

37.    A conspicuous feature of the parties' dialogue throughout the Telegram Transcript - as illustrated by Mr Darby's own use of "*buy them back*" (different emphasis added) when concluding the First Contract - is what might be called possessive or proprietary language to describe the Tezos (to be) transferred by Mr Wang and/or re-transferred by Mr Darby after the applicable two year period in each case.  (No similar language was used

in respect of the Bitcoins (to be) transferred to Mr Wang, it seems.)  Mr Wang repeatedly referred to the First 200k and/or Second 200k as "*my*" or "*mine*" and Mr Darby was prone to using the correlative "*your*" or "*yours*" to describe such currency.

Perhaps the best example of this is when Mr Wang looked at the OTC Account on 24 January 2019 and saw that its balance had reduced from 356,000 to 259,000 Tezos.  Mr Darby responded: "*The 200k in there is yours and the 59k mine*" (TT p.131 at 11:30:12AM).

38.    In a similar way, Mr Wang referred to the 17 Bitcoins (to be) transferred to him under the Second Contract as "*borrowed*" (e.g.  TT p.129 at 11:15:01AM).  This was said notwithstanding the fact that the transactions were agreed not to be loans (and neither side contends that they are) and on Mr Wang's own case he took full ownership of both tranches of Bitcoins from the moment of receipt.  There are numerous references to "*trust*" both in the context of the mutual trust required when digitally executing the currency swaps and by reference to Mr Darby accounting to Mr Wang at the end of the day for baking rewards and stake bonding profits referable to the 400,000 Tezos.

39.    This type of language, used by laypersons during casual online messaging, does not dictate the proper legal characterisation of their transactions as a matter of objective common intention.  The same might be said about the language of 'sale' and 'buy-back' at the time of concluding the First Contract, although one obvious difference is that Mr Wang's pleaded

case, settled by leading and junior counsel, uses the language of sale/purchase back in relation to the Tezos, as set out above. The use of possessive or proprietary connotations to describe entirely fungible digital assets such as Tezos is, in any event, somewhat ambiguous. In the early stages of negotiation, Mr Wang suggested that Mr Darby could trade Tezos and "*buy the amount of tezos back at the end of the day so you don't lose my tezos*" (emphasis added). This suggests that possessive or proprietary terminology was being used as a means of identification or description, in particular given the use of a mixed wallet.

40.    The Second Contract was concluded on 24-25 January 2019. This followed an alleged variation of the First Contract on or about 10 January 2019 as regards profit share for baking the First 200k during the applicable minimum period and the terms upon which Mr Wang could perform his counter-restoration obligation in order to get the First 200k back upon maturity. In the course of that dialogue, Mr Wang reiterated that "*I need to stake that's the whole point*" (TT p.82 at 9:45:45AM). The agreed minimum term of the First Contract was reiterated as "*at least 2 years*" on 10 January 2019 (TT p.85 at 10:11:49AM - 10:12:27AM) and (therefore) offered as "*for 2 years +*" when negotiating the Second Contract on 24 January 2019 (TT p.127 at 11:04:30AM).

41.   It is clear from the totality of the exchanges that Mr Wang wished to remain invested in Tezos (as pleaded) and expected the 400,000 Tezos (or their fungible equivalent) to be used by Mr Darby during the applicable minimum period in each case for

baking and/or stake bonding.

42.   As to the former, Mr Darby appears to have undertaken a strict obligation to return the same number of Tezos to Mr Wang following the minimum contract period, which formed part of the Second Contract (but not apparently a further variation of the First Contract) (TT p.130 at 11:28:25AM - 11:29:05AM). It was understood at all material times that Mr Wang's entitlement to return of Tezos was conditional upon him restoring to Mr Darby the corresponding number of Bitcoins - 13 for the First 200k; 17 for the Second 200k - with discussion around how that counter-restoration obligation would or could be performed at the relevant time. The nucleus of this reciprocal arrangement is reflected in an exchange between the parties on 25 January 2019 in which Mr Darby assented ("*Yes*") to Mr Wang's recap as follows: "*so 110k usd yeah?*" / "*Upon returning that I get 400k*" / "*Plus all the staking rewards?*" (TT p.135 at 5:55:13AM - 5:55:36AM). When Mr Darby informed Mr Wang on 12 February 2019 that he had

"*hedged the XTZ now on exchanges*", Mr Wang immediately sought confirmation that "*My tezos will still be returned even if it goes up yeah?*" to which Mr Darby replied, "*Yes, for the $110,000 BTC*" (TT p.148-149 at 7:55:58PM - 7:57:45PM).

43.   As to the latter aspect, and putting it neutrally for now, it is clear that the contractual arrangements contemplated that Mr Darby would bake or stake-bond the 400,000 Tezos during the applicable minimum period for each tranche and account to Mr Wang upon reciprocal restoration for the rewards or

profits from such activities. The precise content of any obligation to do so, as distinct from unilateral option or discretion on the part of Mr Darby, is not for me to determine. The parties apparently reached agreement on 25 January 2019 to revise the profit share so that Mr Wang would receive 100% of the baking/staking profits from the use of the 400,000 Tezos during the applicable minimum periods (TT p.135 at 5:15:08AM - 5:15:43AM) as reflected in Mr Wang's uncontroversial recap at 05:55AM quoted above. On several occasions, Mr Wang sought to persuade Mr Darby to reduce his commission charged to third party delegators so as to attract more stake bonding business, demonstrating his (perceived) interest in Mr Darby's use of the 400,000 Tezos to generate profit from third party delegation.

44.    Thus, in a very real sense, Mr Wang wished to remain and did remain invested in Tezos. The transactions guaranteed the return to him of 400,000 Tezos after the applicable minimum period in each case, so long as he restored (the agreed value of) 30 Bitcoins to Mr Darby; plus profits from baking or stake bonding performed by Mr Darby using such currency volume in the meantime.

45.    There was a measure of fluidity in the parties' dealings as well as informality. As can be seen, certain terms especially concerning profit share and Mr Wang's counterrestoration obligations were the subject of discussion and apparent revision. In so far as occurring in the context of concluding the Second Contract on 24-25 January 2019, the same dialogue may also have varied relevant aspects of the First Contract. Nothing seems to turn on this for present purposes. It is common ground that nothing said or done after 28 December 2018 could alter the proper legal characterisation of the First Contract or, therefore, the Second Contract. The latter replicated the former as to its nature and structure.

46.    Mr Darby told Mr Wang on several occasions that he would return the 400,000 Tezos to him at any time in return for the corresponding Bitcoin or US$110,000, i.e. effectively cancelling the contracts if Mr Wang so wanted (e.g. TT p.143 at 7:25:44PM on 4 February 2019). This was framed in terms of Mr Wang buying back the 400,000 Tezos (e.g. TT p.151 at 6:29:37AM on 16 February 2019). Mr Wang accused Mr Darby

of scamming him on 4 March 2019 by reference to the level of fees charged by Mr Darby to third parties for his baking services. Mr Darby responded: "*I am not scamming as said you are welcome to buy the tezos back*" (TT p.160 at 7:40:30AM). (Mr Wang didn't dispute the notion of having to "*buy*" the 400,000 Tezos back from Mr Darby.)

47.    Matters came to a head two days later on 6 March 2019. Mr Wang appears to have reiterated a request he had made the previous day for yet more Bitcoins (TT p.167 at 3:14:29AM). This prompted Mr Darby to say: "*I'm going to be shutting the baking service down, but continuing the OTC for Tezos*" (3:28:19AM). (The reference to OTC is to currency trading.) Mr Wang's reaction prompted Mr Darby once again to offer to cancel and unwind both transactions: "*I'm happy to return the Tezos and you return the BTC*" (3:29:30AM). Mr Wang

became suspicious.  His tone became more aggressive.

He demanded compensation and asked at a minimum to be given five additional

Bitcoins (TT p.169 at 3:36:06AM).  Mr Darby offered to compensate Mr Wang for "*any real world*" losses he had suffered, but stated that none yet existed (3:37:39AM).  He reiterated his standing offer to unwind the transactions: "*Better to just send XTZ to you and you send BTC*" (TT p.170 at 3:41:02AM).

48.  The dialogue ends at 03:54AM that day when Mr Darby blocked Mr Wang from his Telegram account.  Mr Wang subsequently made contact with Mr Darby on Telegram from another device, demanding the return of his 400,000 Tezos on 15 February 2021.  Mr Darby blocked him again.  Mr Darby then blocked Mr Wang a third time when contact was made by other means a month or so later.  Mr Darby did not return any Tezos to Mr Wang.

49.  From around March 2019, when the value of Tezos started to rise, Mr Darby transferred the 400,000 Tezos out of his OTC Account into a deposit address at the Kraken exchange, a centralised global cryptocurrency exchange based in the USA.  Mr Darby removed his social media presence at around the same time, according to forensic/digital investigative evidence served on behalf of Mr Wang.  It is assumed that Mr Darby traded the 400,000 Tezos.  He had told Mr Wang on several occasions during their dialogue that he made significantly more return (i.e. for himself) from OTC than he did from baking or stake

bonding Tezos.  He described baking and bond staking as a bit of fun.

50.  None of the above narrative contains or constitutes any findings by me for present or any other purposes.  It is the impression formed on a close reading of key passages in the Telegram Transcript.

SJ APPLICATION

Legal Framework

51.  The proper approach to applications seeking (reverse) summary judgment is summarised by Lewison J (as he then was) in *EasyAir Limited (t/a OpenAir) v. Opal Telecom Limited* [2009] EWHC 339 (Ch) at [15] in seven numbered propositions (i) to (vii).  There was no material difference between the parties as to this approach.  Mr Collins QC for Mr Darby gave emphasis to the final proposition whereby a court faced with a short point or law or construction should 'grasp the nettle' and decide it on a final basis.  This approach can be appropriate where the Court is assured that no additional evidence is likely to turn up that could affect the outcome of the particular issue or claim.

52.  As regards the circumstances in which an express trust will be found to exist in a commercial transaction or relationship, the guiding principles are summarised by Briggs J (as he then was) in *Re Lehman Brothers International (Europe) (In Administration)* [2010] EWHC 2914 (Ch) at [225] in ten numbered propositions (i) to (x).  (This exposition of the relevant test is not affected by the judgment of the Court of Appeal in the same case: [2011] EWCA Civ 1544; [2012] 2 B.C.L.C. 15.)  I do not set out

the ten propositions here, save to observe that the guiding principle is one of objective common intention assuming the foundational requirements of certainty are met in the first place (propositions (i)-(v)). The parties' language is not determinative: it is a matter of substance not form (proposition (vi)). Special care is needed in a business or commercial context, such that: (a) a trust will be imposed where the parties' commercial objective calls for it; but (b) the law should not unthinkingly impose a trust where purely personal rights between the contracting parties sufficiently achieve their commercial objective (proposition (ix)).

53. Briggs J went on to give commentary on these ten propositions at [226]-[262]. In relation to the two limbs of proposition (ix), he commented at [261] that (a) the law should not be hidebound by traditional rules about trusts derived from their origins in family settlements; and (b) the parties' commercial agreements and arrangements should be interpreted purposively in order to ascertain their commercial objective.

54. There was some discussion at the hearing before me as to whether proposition (ix)(b) in the *Lehman* case involved a test of necessity, as might appear to be suggested by some of the language when Briggs J came to apply the legal principles to the various positions presented in that case (see e.g. [277]). Mr Collins QC for Mr Darby did not go so far as to say that the test was one of necessity, but where purely personal rights between the contracting parties sufficiently achieve their commercial objective that is a powerful contra-indication as to the creation of a trust. Stepping back slightly, it seems

the overriding approach in the context of a commercial transaction or arrangement is to ask whether a trust makes sense by furthering (rather than frustrating) the parties' commercial objectives.

55. As noted above, it is common ground that fungible and non-identifiable digital assets such as Tezos constitute property that is capable of being bought and sold as well as held on trust as a matter of English law. This reflects the position at first instance in this jurisdiction: see *AA v. Persons Unknown [2019] EWHC 3556 (Comm)*; [2020] 4 WLR 35-[61] (Bryan J) and *Ion Science Limited & another v. Persons Unknown* (21 December 2020, Butcher J). In both those cases the Commercial Court granted (interim) proprietary injunctions against the defendants in respect of cryptocurrencies that had been fraudulently extracted or misappropriated from the claimant or the traceable proceeds of such digital assets. The relevant hearings in both cases took place on an uncontested basis, the defendant not appearing or being represented in either matter as the case titles suggest.

56. The High Court of New Zealand in *Ruscoe & another v. Cryptopia Limited (In Liquidation)* [2020] NZHC 728 held that a cryptocurrency trading exchange, known as Cryptopia, held the digital assets of its customers (i.e. account-holders) on express trust.

Cryptopia operated as a form of depository and trading exchange/platform. The accounts of its customers were operated through so-called 'hot' wallets that were live and interconnected rather than so-called

Wang v Darby [2021] EWHC 3054 (Comm)

'cold' wallets. Cryptopia's own web-based instruction pages and live customer interfaces made it clear that account-holders would be depositing, trading and owning their own cryptocurrency in return for certain fees charged by Cryptopia. The possessive or proprietary language used to describe this position (e.g. "*your*" cryptoassets) was consistent with the existence of an express trust, rather than determinative of its creation (see [172] under "*Additional matters*").

57.    Moving from express trusts to the position with *Quistclose*-resulting trusts, the relevant principles are summarised by the Court of Appeal in *Bieber & others v. Teathers Limited (In Liquidation)* [2012] EWCA Civ 1466 at [14] endorsing the first instance judge's seven propositions based on the House of Lords decision in *Twinsectra Limited v. Yardley* [2002] UKHL 12; [2002] AC 164.    The touchstone, as always, is objective intention - specifically, that the relevant money should not become part of the general assets of the recipient but should be used *exclusively* to effect certain payments only.    Where such trust arises, the beneficial interest in the transferred money remains in the transferor/payor (beneficiary) who mandates the transferee/payee (trustee) to apply the money paid for a particular purpose which is identifiable with sufficient certainty.

58.    Patten LJ added for emphasis at [15] that in deciding whether particular arrangements involve the creation of a trust and with it the retention by the paying party of beneficial control of the monies, proper account needs to be taken of the structure of the arrangements and the contractual mechanisms involved.    The most common structure to preclude the

creation of such a trust was identified as a sale/purchase transaction under which advance payment would not ordinarily be impressed with any trust in favour of the purchaser/payor.    Transfer of ownership in the sale/purchase context is inimical to the creation or imposition of a trust.    This is inherent in the concept of consideration.

59.    No case has been identified in which a *Quistclose*-resulting trust has arisen in the context of a transaction involving reciprocal exchange (and re-exchange) of assets or economic value. A trust of this kind involves an asymmetrical transaction whereby one party transfers money to another for a specific use or purpose.    In a sale/purchase or other transaction involving reciprocal economic exchange, the money is paid by way of consideration for the counter-benefit rather than being paid for future or onward use by the payee.    Hence the focus, if not strict requirement, on circumstances such as payment into a segregated bank account: see *First City Monument Bank Plc v. Zumax Nigeria Limited* [2019] EWCA Civ 294 at [35].

60.    A constructive trust of the kind said to be relevant in the present case can arise when a specifically-enforceable contract of sale is concluded, such that beneficial ownership passes to the buyer and the seller is constituted a trustee on behalf of the buyer pending completion.    This illustrates the maxim that Equity deems as done that which ought to be done.    The best known example is, of course, sale of land; but this principle applies to other unique or sufficiently rare pieces or parcels of personal property such as unquoted shares or volumes of quoted shares that are not readily obtainable in the market.    No constructive trust arises if

the relevant sale contract is conditional (in the sense of requiring fulfilment of a condition outside the control of the buyer, such as third party or public authority approval) or is a mere option as yet unexercised. The trusteeship, if otherwise constituted, may cease through the conduct of the beneficiary/purchaser. See generally *Lewin on Trusts (20th ed.)* at 4-003 to 4-010.

61. Echoing some of the principles applicable to express trusts and resulting trusts summarised above, it is equally important not to rush to pigeonhole a transaction into a familiar category (e.g. loan, sale, swap, agency, etc.) if that does not give optimum or proper effect to the parties' commercial objectives. The process of characterisation, being a product of the more general process of contractual construction, is not necessarily the same thing as categorisation. Taxonomy is a helpful guide, but no more. Where the parties reach their own agreements through informal online dialogue, without legal advice or formal documentation, the process of characterisation needs to be sensitive to those features of the consensual dynamic.

62. As regards the existence or imposition of fiduciary duties on a party to a commercial contract absent the existence of a trust, i.e. non-trustee or independent fiduciary duties, it is possible for these to arise where there is a relationship of trust and confidence that justifies such equitable duties in conjunction with and consistent with the relevant contractual framework. A contractual obligation to use certain property (i.e. belonging to the obligor, in the absence of any trust) for a particular economic purpose and

account to the contractual counterparty (i.e. seller) for the rewards of such promised endeavour is theoretically capable of being conditioned or augmented by fiduciary duties in so far as consistent with such contractual scheme. The precise scope of any fiduciary duties must be moulded to the nature of the particular relationship and facts of the case so as to ensure that any fiduciary duties are consistent with non-fiduciary (i.e. contractual) duties: see *Snell's Equity (34th ed. 2019)* at 7-009 & 7-012.

63. A constructive trust may arise where a fiduciary receives a bribe or secret commission in breach of fiduciary duty. A constructive trust in this context gives effect to the fiduciary's obligation to account to their principal for profit generated in such capacity: see *Snell's Equity* at 7-057. The same does not apply in respect of equitable compensation for breach of fiduciary duty: *ibid.* 7-058.

64. With these principles in mind, I turn to the proprietary claim pleaded against Mr Darby in the present case. I deal first with the trust claims and then, so far as relevant in this context, the claim based on breach of fiduciary duty.

Present Case

65. The SJ Application targets the "*proprietary claims*" by reference to a series of paragraphs in the POC identified in the attached draft order, some of which are included only to the extent or for the purpose identified. Broadly speaking this covers all allegations as to the existence or breach of any form of trust or fiduciary duty on the part of Mr Darby *to transfer back to* Mr Wang the same digital assets comprising the First 200k or the

Wang v Darby [2021] EWHC 3054 (Comm)

Second 200k. This is said to include the pleaded claim for equitable compensation by reference to POC paragraph 40 and paragraph (3) of the prayer, as well as the claim for an account of profits at paragraph (4) of the prayer. It is not clear to me that these latter claims for relief are proprietary in nature.

66. As regards the pleaded case, the claim form makes no mention of fiduciary duties at all, i.e. independent from (breach of) trust as a matter of necessary implication. It contains a claim for "*damages and other relief including proprietary remedies for breach of contract and/or breach of trust in relation to a series of agreements between the parties concerning cryptocurrencies.*"

67. The POC were attached to the claim form. They contain a claim based on dishonest breach of fiduciary duty which extends beyond the claim based on the existence (and hence alleged dishonest breach of) trust: see paragraph 20. The precise scope and content of such alleged independent fiduciary duties is said to arise from the "*nature and terms of the contracts*" as pleaded; none of them is said to have required Mr Darby to preserve any of the 400,000 Tezos in his wallet (including the OTC Account) or prohibit him from dealing with or disposing of any of them - in contrast to the so-called

"*trustee duties*" pleaded at paragraph 24. (The fact that the alleged trustee duties pleaded at sub-paragraphs 24.1 to 24.4 are different in kind is further reflected by the fact that sub-paragraph 24.5 pleads a further duty "*[t]o comply with the fiduciary duties set out above*",

i.e. in paragraph 20.)

68. The pleaded case of (dishonest) breach of fiduciary duty is at POC paragraph 38. It fails to distinguish between which conduct is said to have been a (dishonest) breach of the pleaded fiduciary duties (or which specific duty), on the one hand, and a (dishonest) breach of the pleaded trustee duties (or which specific duty), on the other hand. The gist of the complaint is nevertheless improper use or disposal of the 400,000 Tezos and failure to return them to Mr Wang, plus a separate and standalone complaint about failure to provide information about dealings with the Tezos (POC paragraph 38.3(iv)).

69. The claim for equitable compensation is at POC paragraph 40. It pleads three separate heads of loss and damage, namely: (i) loss of the value of the 400,000 Tezos (minus credit for the "*consideration*" of US$110,000 required to obtain their return); (ii) loss of baking rewards during the applicable contractual periods; and (iii) loss of opportunity to earn third party baking profits through stake bonding during the applicable contractual periods. The only relief claimed by reference to (dishonest) breach of fiduciary duty is equitable compensation and an account of profits (paragraphs (3) & (5) of the prayer, as noted above).

70. Leaving aside the fact that the claim form did not mention (breach of) fiduciary duty independent from (breach of) trust, my reading of the pleaded case is that the claim based on such independent (i.e. non-trustee) fiduciary duty does not concern the allegations based upon Mr Darby's disposal of

and/or failure to return the 400,000 Tezos.  That is, in a sense, a 'capital' claim, as distinct from a 'profit' or 'accounting'

(i.e. 'non-capital') claim, and it is made by reference to the existence of a trust over 400,000 Tezos - either an express trust, *Quistclose*-resulting trust or constructive trust.

Paragraph 36 of Mr Penny QC's skeleton argument for the present hearing asserts that Mr Wang "*puts his proprietary claims in three different ways*" by reference to the three trust variants (addressed in paragraphs 37, 38 and 39, respectively).  This is consistent with the prayer for relief, which at paragraph (1) asserts a proprietary claim by way of declarations of beneficial interest by reference only to trust.

71.  The case based on independent (i.e. non-trustee / non-capital) fiduciary duties concerns the failure to generate and/or account for any generated baking rewards or stake bonding profits during the applicable contractual periods, coupled (perhaps) with the distinct complaint about failure to provide information described in paragraph 68 above.  This pleaded case is theoretically consistent with the absence of any trust, i.e. on the basis that Mr Darby assumed such duties in respect of the 400,000 Tezos notwithstanding that he owned them from the point of transfer in each case.

72.  This distinction is important given that the SJ Application targets the pleaded claim for breach of fiduciary duty under the blanket description of "*proprietary claims*" as noted above. On my reading of the pleaded case,

any independent claim for breach of fiduciary duty does not give rise to any proprietary claim.  The basis for asserting beneficial ownership over the 400,000 Tezos or their traceable proceeds is said to be trust and only trust (POC paragraphs 21-24 and 39; declarations sought at paragraph

(1) of the prayer).  A claim for equitable compensation or account of profits for (dishonest) breach of a fiduciary duty of a 'non-capital' nature and scope is not, without more, a proprietary claim: cf. paragraph 63 above as regards secret profit.

73.  With that survey of the pleaded case in mind, I turn to the analysis of the SJ Application.

74.  The existence of any trust or fiduciary duties on the part of Mr Darby arising out of the relevant contracts involves a self-contained question of contractual construction or characterisation based upon a closed set of potentially relevant evidence, namely the Telegram Transcript (augmented as necessary by the Voice Message Transcript) and the limited undisputed factual matrix identified above.  None of this is controversial, save in the sense that Mr Darby does not accept the veracity or integrity of the transcripts for all purposes.  The SJ Application proceeds on the basis that such transcripts nevertheless show that Mr Darby is obviously correct and the proprietary claims are bound to fail.

75.  I am satisfied that this is a case in which the Court should 'grasp the nettle' and determine the viability of the proprietary claims on a final basis.  The issues have been fully analysed and argued before me by reference to what

Wang v Darby [2021] EWHC 3054 (Comm)

is accepted to be the entirety of the evidence that matters or could realistically matter for such purposes.

### (i) Trust Claims

76. Mr Wang's pleaded case as reflected in Mr Penny QC's skeleton argument for this hearing is that the 400,000 Tezos were held on trust for him by Mr Darby in one of three ways: express trust, *Quistclose*-resulting trust or constructive trust. The same is said to apply to the traceable proceeds of such digital assets.

77. Mr Penny QC conspicuously did not press the constructive trust analysis during the hearing, notwithstanding its inclusion in his skeleton argument. It is, after all, premised upon a valid and binding contract of sale or, more accurately, conditional option to repurchase (see paragraph 36 above). It is difficult to see how a constructive trust as pleaded could arise in respect of entirely fungible and non-identifiable digital assets. There is no obvious analogy to a specifically-enforceable contract for the sale of land or some unique or sufficiently rare piece or parcel of personal property: see paragraph 60 above.

78. The fundamental problem with the existence or imposition of any kind of trust over the 400,000 Tezos is the essential economic reciprocity of the transactions, as described above. In order for Mr Wang to become entitled to the return of the 400,000 Tezos, assuming identification were possible or guaranteed for such purposes, he had to return corresponding value in (or equivalent to) Bitcoins to Mr Darby so as to reverse the swap. Whether or not this is characterised as a sale and re-purchase, still less a repo transaction,

may not ultimately matter for present purposes. It is the essential economic reciprocity that precludes any trust, in my judgment.

79. No case was identified in which a beneficiary under a trust is obliged to transfer or indeed re-transfer economic value to the trustee in order to obtain the trust property. This transactional element is inimical to the concept of a trust on both sides, let alone a trust on one side only. A beneficiary has an interest in and right to receive the trust property, not an option to (re-)acquire it for value or indeed (re-)purchase it for consideration. The analogy to the position of a purchaser of land is inapt. As noted above, Mr Penny QC did not press the constructive trust analysis at the hearing.

80. If Mr Wang had defaulted on his own restoration obligation at the relevant time, Mr Darby would have been entitled to keep the 400,000 Tezos according to Mr Wang's own case. How is that consistent with a trust? At what point does the trust expire or dissolve in light of Mr Wang's own default or insolvency? None of this is accommodated by Mr Wang's asymmetrical trust analysis.

81. If the essential economic reciprocity of the transactions were not in itself enough to preclude the creation of a trust, the pleaded characterisation of Mr Wang's restoration obligation as one of sale or purchase back is fatal to any trust analysis. A sale/purchase back of an asset (akin to the 'off leg' in a repo transaction) presupposes its original or prior sale/purchase in the other direction (akin to the 'on leg' in a repo transaction). Each sale/purchase transfers ownership from

A002134

Wang v Darby [2021] EWHC 3054 (Comm)

transferor/seller to transferee/purchaser. This is anathema to the existence of a trust over the relevant property arising upon or from the original outward transfer. It is the antithesis of a trust.

82.   As already noted, Mr Wang accepts and in fact avers (as he has to) that the transfer of Bitcoins to him from Mr Darby was a full transfer of ownership and concomitant freedom to deal with such property as he saw fit. This is consistent with Mr Wang's persistent requests to modify the terms of his counter-restoration obligation under the First Contract and to seek the same modified obligation for the Second Contract, recognising that he may or would not have the relevant currency to give back and may not be able to obtain a substitute for it at the required time. A trust over the 400,000 Tezos would impose a stark asymmetry in this reciprocal capital-swapping arrangement. Mr Wang himself recognised the possibility (at least) that Mr Darby might trade and therefore need to acquire other Tezos with which to perform his own restoration obligation when called upon to do so: see paragraph 39 above.

83.   If Mr Wang's analysis is correct, such that the 400,000 Tezos were held on trust for him, what would that make the other side of the transaction involving 30 Bitcoins? The obvious and perhaps only available characterisation is a loan. It would be an interestfree loan of 30 Bitcoins for the minimum contractual period. That is the very thing which Mr Wang sought initially, which Mr Darby ruled out as a possibility and which Mr Wang accepted was not available or desirable (see paragraphs 29 to 31 above). Neither party contends that the proper

characterisation for these capital-swapping transactions was a loan.

84.   There is no bootstrapping involved in this approach to characterisation. The sale/purchase structure logically precludes a trust, and vice versa. The Court is entitled to rely on the pleaded characterisation of sale/purchase, consistent with Mr Wang's own sworn evidence based upon his review of the Telegram Transcript and, of course, the contracting parties' use of such notorious or iconic transactional language when concluding their transactions: see paragraph 39 above.

85.   A trust over the 400,000 Tezos is not necessary to give effect to the parties' legitimate expectations or commercial interests, in the sense that they are sufficiently served by the existence of personal rights and obligations (see paragraph 54 above). On the contrary, a trust would subvert or frustrate the essence of their bargain. Whatever specific obligations Mr Darby may have assumed to keep the 400,000 Tezos in the OTC Account for the minimum applicable period or use them for baking or stake bonding are *personal* in nature and comfortably consistent with Mr Darby having become full owner of such digital assets when transferred to him. There is nothing objectionable in a purchaser undertaking to a seller in this way so long as the obligations are clear and enforceable. It is a personal obligation albeit capable of being conditioned by fiduciary duties where trust and confidence underpins the relationship. The existence of such post-transfer obligations does not alter or presuppose a contrary basis for the underlying proprietary position.

A002135

Wang v Darby [2021] EWHC 3054 (Comm)

86.   The fact that the parties used possessive or proprietary language at times to describe the 400,000 Tezos does not come close to dislodging this legal characterisation of the transactions, in my judgment.  Such language used by laypersons in an informal dialogue such as this one is consistent with description and identification, especially in the context of a mixed account/wallet held by the transferee (Mr Darby) that remains visible to the transferor (Mr Wang).  Such language is not enough to create a trust where none is appropriate to give effect to their commercial objectives or chosen transactional structure.

87.   The absence of a trust does not mean that Mr Wang ceased to be invested in Tezos: he had a personal right or option to buy back 400,000 Tezos after a minimum period and an additional personal right to receive any baking rewards and stake bonding profits generated in respect of such currency volume during that minimum period.  He was not selling up or selling out altogether.  He remained vested in Tezos, despite having sold his holding to Mr Darby on terms as to future re-acquisition.  In return for this he got his hands on Bitcoins.  That was the primary driver on his side for proposing and concluding these swapping transactions in the first place.

88.   Other matters are of lesser importance.  The fact that the 400,000 Tezos were transferred into a non-segregated account/wallet, namely the OTC Account, is not determinative although tends to contra-indicate the existence of a trust.  Likewise the fact that Mr Darby may have undertaken a strict obligation to return the Second 200k come what may, in contrast to the usual duty of a trustee to exercise care to preserve trust assets, is a further contra-indication of trusteeship, but not a big point in the scheme of things.

89.   I do not need to decide the proper characterisation of a pure, i.e. unilateral or asymmetrical, stake bonding relationship between two account-holders.  This is not relevant in the present case due to the reciprocal currency-swapping structure of their transactions.  There is limited utility in embarking upon a hypothetical discussion of the non-reciprocal scenario, save to observe that the transfer of digital assets from one account-holder to another for the purpose of baking or stake bonding could involve or constitute a trust.  That would depend on all the circumstances, including whether a loan or sale was the more appropriate characterisation to give effect to the parties' commercial objectives.

90.   As regards the case that an express trust was created in respect of the 400,000 Tezos upon receipt by Mr Darby, I conclude that such case has no real or reasonable prospect

of success at trial and there is no other compelling reason for such allegation to proceed to trial.  As indicated above, I am satisfied nevertheless that this issue is capable of being determined by me on a final basis given the evidential matrix peculiar to this case.  I conclude that there was no express trust.

91.   As regards the case that the 400,000 Tezos were subject to a resulting trust in accordance with *Quistclose* principles, I reach the same conclusion and for the same essential reasons.  No case has been identified

in which such a trust arose over property transferred as part of reciprocal exchange of assets and on terms whereby its re-transfer was expressly conditional upon a reciprocal or equivalent re-transfer of value from beneficiary to trustee. It is that obligatory economic reciprocity that precludes a trust of any kind, in my judgment.

92.  As regards the case that the 400,000 Tezos were subject to a constructive trust, in so far as this variant was advanced on behalf of Mr Wang at the hearing, I reach the same conclusion as above and for the same essential reasons. It is impossible to say that Mr Darby's conditional obligation to return 400,000 Tezos after the minimum contractual period would be enforceable by decree of specific performance given the entirely fungible and non-identifiable nature of such digital currency. There is no meaningful analogy with a seller's obligation to convey title to land following exchange of contracts.

93.  The only circumstance advanced as a compelling reason for the trust claim to proceed to trial absent threshold substantive prospects was said to be jurisprudential novelty, this being the first contested hearing in this jurisdiction (so far as counsel could discern) to deal with the question of whether a trust exists over cryptocurrency: cf. *Andoro Trading Corp, Uroco Limited & others v. Dolphin Financial (UK) Limited & others [2021] EWHC 1578 (Comm)* concerning an arguable trust over money paid as an investment in cryptocurrency. If there were serious controversy as to whether cryprocurrency constitutes property under English law, that submission may have more force. But that juridical

substratum is common ground. The task of this Court is to apply well-known principles of English private law to an ultra-bespoke set of facts in which all relevant evidence is contained within the four corners of verbatim transcripts. My conclusions on the relevant issues are such that I do not consider there to be any good let alone compelling reason for such claims to proceed to trial.

94.  It follows from the conclusions set out above that the proprietary claim based on the existence of a trust should be dismissed.

*(ii)         Fiduciary Duty*

95.  As explained in paragraphs 65 to 72 above, I read the pleaded claim for breach of fiduciary duty absent or beyond any trust to be limited to what I call non-capital and hence non-trustee obligations, i.e. using 400,000 Tezos to generate rewards/profits during and accounting for such rewards/profits after the applicable contractual periods. This may carry with it the correlative obligation not to use such currency to trade for personal profit. The only remedies claimed for (dishonest) breach of such independent fiduciary duties are equitable compensation and account of profits. These are not proprietary in nature and do not without more constitute proprietary claims such as to justify the grant of a proprietary injunction against Mr Darby.

96.  In so far as I am wrong about the meaning of the pleaded case, and the claim for (dishonest) breach of fiduciary duty overlaps with the pleaded trustee duties such as to impose a capital obligation upon Mr Darby - i.e. to return the same 400,000 Tezos when his conditional obligation to do so

Wang v Darby [2021] EWHC 3054 (Comm)

crystallised - then I find that such claim has no real or reasonable prospect at trial and there is no other compelling reason for such allegation to proceed to trial. Even if properly pleaded, such claim would in substance amount to the imposition of trustee duties in the absence of any trust. It would, in effect, introduce a trust by the back door. That conclusion is precluded by my finding as to the impossibility of any trust arising through the conclusion or execution of the transactions. Put another way, there is no room for a non-trustee fiduciary duty to restore the relevant assets given the essential economic reciprocity of the parties' bargain. Such fiduciary duties would be inconsistent with the contractual structure.

97. Any surviving claim based on fiduciary duty which could proceed to trial is, therefore, personal in nature, in the sense that it concerns only non-capital duties and supports only personal claims for equitable compensation and account of profits as matters stand. The profits which are the subject of this claim could be those generated by Mr Darby by baking or stake bonding the 400,000 Tezos (i.e. direct or authorised gains) or any profits he made from trading the 400,000 Tezos (i.e. indirect or unauthorised gains) instead of generating such direct or authorised gains as contemplated. Such claim if properly pleaded could have a real or reasonable prospect of success consistent with the position on the other personal claims pleaded against Mr Darby for breach of contract. These personal claims underpin the WFO.

98. I say no more at this stage as regards the merits of the personal claims against Mr Darby for breach of contract and/or breach of fiduciary duty. The precise terms of the parties' contracts, including any variations as alleged, and breach of such terms are all matters for the trial judge. That said, and so far as relevant in light of my conclusions above on the proprietary claims, I regard it as unarguable that either contract was for a fixed term of two years. The Telegram Transcript is tolerably clear that the applicable period in each case was a minimum of two years. The precise mechanism for bringing it to an end, so as to trigger any conditional option to re-acquire 400,000 Tezos or Mr Darby's accounting or related obligations to account for baking rewards or stake bonding profits, is a matter for trial.

99. Mr Darby concedes a good arguable case against him on all pleaded personal claims for the purposes of the WFO, to which I now turn.

WFO CONTINUATION APPLICATION

100. I can deal with this briefly in light of Mr Darby's sensible concession as to threshold substantive prospects on the personal claims against him.

101. The key issue concerns the existence of a real risk of unjustified dissipation of assets by Mr Darby that might render enforcement of any future judgment against him more difficult or less effective. There is no dispute between the parties as to the applicable principles, summarised by the Court of Appeal in *Lakatamia Shipping Company Limited v. Morimoto* [2019] EWCA Civ 2203; [2020] All ER (Comm) 359 at [34].

102. I conclude without serious hesitation that such risk of dissipation

Wang v Darby [2021] EWHC 3054 (Comm)

exists in the present case. The position before HHJ Pelling QC at the without notice hearing for injunctive

relief on 2 August 2021 has become more difficult for Mr Darby as a result of (i) his own incomplete and inconsistent asset disclosure pursuant to the Injunction Order, (ii) his own evidence (including conspicuous omissions) contained in four witness statements served in the meantime, and (iii) the expert evidence of Mr Sanders on behalf of Mr Wang, including the second report served in support of the WFO Variation Application and admitted for the purposes of the other applications at this hearing.

103.   The available evidence shows that Mr Darby is an experienced and sophisticated cryptocurrency trader with current or potential means of control over many digital wallets and access to different trading exchanges or platforms.   The two reports of Mr Sanders demonstrate that Mr Darby holds or held substantial quantities of Bitcoins worth, at current values, far in excess of his disclosed net worth.   I make allowance for Mr Darby's mental state and memory impairment, said to have resulted in loss of passwords and inaccessibility of digital wallets or platforms.   The inconsistencies, omissions and conspicuous obscurities in some of his explanations raise justifiable doubts about whether the correct or complete position has been disclosed or explained.   No application has yet been made for contempt of court, but Mr Darby must know by now that this is in prospect.

104.   The precise terms of the contracts and any breach by Mr Darby are for trial, as explained above.   It seems

likely, however, that Mr Darby must have appreciated - at the very least - that by transferring the 400,000 Tezos out of the OTC Account (which Mr Wang could view online) into a wallet at the Kraken exchange in mid-March 2019 and proceeding to trade such currency, rather than keep it in its original and visible wallet and use it to generate baking rewards or stake bonding profits for Mr Wang's benefit, he was not honouring the spirit or purpose of the swapping transactions. The minimum applicable periods had a long way to run when he did this: it was less than three months into the staking term for the First 200k and less than two months into the staking term for the Second 200k.   Mr Darby appears to have decided not to use the 400,000 Tezos for baking or stake bonding at all, and instead to trade them for his own gain.   Whether or not this was dishonest, and whether or not dishonesty forms an essential part of the personal claims remaining in these proceedings, it was manifestly arguably dishonourable or commercially colourable behaviour.

105.   It is not necessary for me to form a view, still less make any findings, about the circumstances in which Mr Darby ex-communicated Mr Wang without notice on 6 March 2019 and subsequently.   He says this was because Mr Wang became abusive. Mr Wang was clearly angered at being informed by Mr Darby on 6 March 2019 that he was ceasing baking Tezos: that must have felt like a wholesale repudiation of their mutual arrangement, so his reaction was understandable even if his tone and choice of language was not appreciated by Mr Darby.   Mr Wang demanded compensation and accused Mr Darby of defrauding him.

106.    What matters for present purposes is that Mr Darby immediately or very soon moved the 400,000 Tezos elsewhere and traded them for his own gain.  He took advantage of the rising value of Tezos.  The trading profit he made was at the expense of Mr Wang in so far as Mr Darby was under an obligation to seek to generate baking rewards or stake bonding profits for Mr Wang's benefit from the 400,000 Tezos.  Mr Darby also removed his social media presence at about the same time, according to forensic investigative evidence served by Mr Wang.

107.    No point was taken before me about delay in seeking the WFO.  This aspect was broached properly and fairly before HHJ Pelling QC at the without notice injunction hearing on 2 August 2021.  For the reasons given by the Court on that occasion, any delay on the part of Mr Wang is explicable and not such as to undermine or preclude the inference as to a real risk of unjustified dissipation on the part of Mr Darby.

108.    I conclude without serious hesitation that there is, at least, a real risk of unjustified dissipation by Mr Darby if not restrained by continuation of the WFO.  Such risk existed at the time of grant of the Injunction Order.  It persists today.  Mr Wang deserves assetfreezing protection to the extent of his personal claims against Mr Darby.  There is no manifest injustice or inconvenience to Mr Darby in continuing the WFO at this level, given the evidence as to his ownership of Bitcoins with a value far in excess of such frozen sum.  The grant and continuation of such relief is and remains just and convenient in all the circumstances.

DISPOSITION

109.  In summary:

(i)  The SJ Application is granted save for the pleaded claim for equitable compensation and account of profits based upon alleged (dishonest) breach of fiduciary duty independent of any trust.  Mr Wang's proprietary claims are struck out, save in so far as a viable claim can be maintained for a constructive trust in respect of any direct or indirect gains made by Mr Darby and not accounted for by him to Mr Wang (see paragraphs 63 and 97 above) on the basis of alleged (dishonest) breach of fiduciary duty independent of any trust.

(ii)  In light of (i) above, the proprietary injunction contained in the Injunction Order should be set aside given its current pleaded basis.  The further hearing of the PI Continuation Application will provide an opportunity for Mr Wang to persuade the Court that a proprietary injunction is appropriate in some form by reference to any viable residual claim for constructive trusteeship as outlined in (i) above.  That is very different and much smaller than the original pleaded proprietary claim based on capital deprivation, i.e. non-return of the 400,000 Tezos.  It is not yet clear whether any such claim exists or, even if it does, whether any proprietary injunction is appropriate.

(iii)  The WFO Continuation Application is granted on the basis of the personal claims made against Mr Darby such that the WFO will continue until further Order of the Court.

Wang v Darby [2021] EWHC 3054 (Comm)

(iv)  The WFO Variation Application will be heard in light of (iii) above.

(v)  The assessment of costs reserved from the hearing on 29 October 2021 and the costs associated with the ancillary application described in paragraphs 4 and 5 above will be dealt with at the further hearing consequential upon issuance of this judgment.

110. I will direct that a Draft Amended POC is provided on behalf of Mr Wang in time for it to be considered at the consequentials hearing. That way I can deal with any pleading disputes arising out of this judgment and give permission for amendments as required, whilst also determining whether any new proprietary injunction ought to be granted and making appropriate costs orders by reference to the new pleaded position.

**End of Document**

A002141

Investors' Compensation Scheme Ltd v West Bromwich Building Society, Investors' Compensation Scheme Ltd v Hopkin & Sons (a firm), Alford v West Bromwich Building Society, Armitage v West Bromwich Building Society

Overview    |    **[1998] 1 All ER 98**,    |    [1998] 1 WLR 896,    |    [1998] 1 BCLC 493, [1997] CLC 1243, [1997] NLJR 989, [1997] PNLR 541

---

# Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwich Building Society and others; Armitage v West Bromwich Building Society and others [1998] 1 All ER 98

HOUSE OF LORDS

LORD GOFF OF CHIEVELEY, LORD LLOYD OF BERWICK, LORD HOFFMANN, LORD HOPE OF CRAIGHEAD AND LORD CLYDE

21, 22, 23 APRIL, 19 JUNE 1997

**Investment business — Investors Compensation Scheme — Assignment of action to scheme — Interpretation of contractual document — Matrix of fact — Badly drafted document — Document to be interpreted to reflect parties' intention.**

The claimants (the **investors**) submitted a claim to the **Investors Compensation Scheme** Ltd (the ICS) for **compensation** in respect of negligent advice provided by brokers who had sold them home income plans in contravention of rules made under the Financial Services Act 1986. Under the home income plans the **investors** obtained mortgage loans from the respondent building society which were invested in equity-linked single premium bonds to provide income for the **investors**. The plans proved to be disastrous to the **investors**, who found their homes liable to repossession by the building society. The ICS required the **investors** to sign a claim form, which included an assignment to the ICS by the claimant of all his rights arising out of the transaction against the financial advisers and anyone else, subject to section 3(b). That clause excluded from the assignment 'Any claim (whether sounding in rescission for undue influence or otherwise) that you [the **investor**] have or may have against the [building society] in which you claim an abatement of sums which you would otherwise have to pay to that Society in respect of sums borrowed by you from that Society in connection with the transaction and dealings giving rise to the Claim'. The **investors** brought proceedings against the building society claiming damages for negligence, misrepresentation and

rescission of their mortgages and the question arose whether the **investors'** actions had been assigned to the ICS, and whether the assignment was valid and effective to enable the ICS to maintain the actions. The judge held: (i) that section 3(b) of the claim form was to be construed as if it excepted from the assignment to the ICS only claims sounding in rescission; and (ii) that an assignment of part of the remedies available to the **investors** (ie a claim for damages) while the **investors** retained other remedies (ie a claim for rescission) was invalid, because it was not possible to assign different remedies in respect of the same chose in action. On appeal, the Court of Appeal upheld the judge's decision that the **investors'** claims for damages for misrepresentation or

[*99]

breach of duty had not been validly assigned to the ICS but on the different grounds that on its ordinary and natural meaning section 3(b) excepted from the assignment of the **investors'** rights all possible claims of any kind in which the **investors** claimed against the building society an abatement or reduction of the amount due under the mortgage loans. The ICS appealed to the House of Lords.

**Held** – (Lord Lloyd of Berwick dissenting) The matrix of fact against which a contractual document was to be construed included anything which would have affected the way in which the language of the document would have been understood by a reasonable man. Although the court would as a matter of common sense normally apply the presumption that words were to be given their natural and ordinary meaning, if it was clear from the background that the parties, for whatever reason, had

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

used the wrong words or syntax or that something must have gone wrong with the language used, the court was not obliged to attribute to the parties an intention which they plainly could not have had. Notwithstanding the words used, section 3(b) of the claim form was to be construed to reflect the fact that the parties intended that an **investor** should assign to the ICS his claim for damages while retaining any claim for an abatement of his debt which arose out of a claim for rescission whether for undue influence or otherwise. Furthermore, although between them the ICS and an **investor** could not recover from the building society more than the loss actually suffered by the **investor**, there was nothing invalid in the **investor** retaining and pursuing the right to rescission, which could not in any event be assigned, while at the same time assigning his right to damages. It followed that all claims for damages and **compensation** had been validly assigned to the ICS and such claims could be maintained by the ICS but not by **investors** in their actions. However, the **investors** retained the right to claim rescission of their mortgages on such terms as the court considered just. The appeal of the ICS would therefore be allowed (see p 100 *g h*, p 114 *a e h* to p 115 *f*, p 116 *a*, p 118 *g* and p 119 *e h* to p 120 *e*, post).

**Notes**

For **compensation schemes** for the purpose of compensating **investors**, see Supplement to 32 *Halsbury's Laws* (4th edn) para 343.

**Cases referred to in opinions**

*Antaios Cia Naviera SA v Salen Rederierna AB, The Antaios* [1984] 3 All ER 229, [1985] AC 191, [1984] 3 WLR 592, HL.

*Barclays Bank plc v O'Brien* [1993] 4 All ER 417, [1994] 1 AC 180, [1993] 3 WLR 786, HL.

*Charter Reinsurance Co Ltd v Fagan* [1996] 3 All ER 46, [1997] AC 313, [1996] 2 WLR 726, HL.

*Investors Compensation Scheme Ltd v Cheltenham and Gloucester Building Society* (1 November 1995, unreported), Ch D.

*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] 3 All ER 352, [1997] 2 WLR 945, HL.

*Porter v National Union of Journalists, Pritchard v National Union of Journalists* [1980] IRLR 404, HL.

*Prenn v Simmonds* [1971] 3 All ER 237, [1971] 1 WLR 1381, HL.

*R v Investors Compensation Scheme Ltd, ex p Bowden* [1995] 3 All ER 605, [1996] AC 261, [1995] 3 WLR 289, HL.

[*100]

*Reardon Smith Line Ltd v Hansen-Tangen, Hansen-Tangen v Sanko Steamship Co* [1976] 3 All ER 570, [1976] 1 WLR 989, HL.

*Schuler (L) AG v Wickman Machine Tool Sales Ltd* [1973] 2 All ER 39, [1974] AC 235, [1973] 2 WLR 683, HL.

*Wilson v United Counties Bank Ltd* [1920] AC 102, [1918–19] All ER Rep 1035, HL.

**Appeal**

The **Investors Compensation Scheme** Ltd (the ICS) appealed with leave of the Appeal Committee of the House of Lords given on 27 February 1997 from the decision of the Court of Appeal (Leggatt, Swinton Thomas and Mummery LJJ) ((1996) Times, 8 November) delivered on 1 November 1996 dismissing the ICS's appeal from the decision of Evans-Lombe J ((1996) Times, 10 October) delivered on 3 October 1996 on the trial of certain preliminary issues whereby the judge held in actions against the respondent, the West Bromwich Building Society (WBBS), by Eric John Alford, Gladys Armitage and others (the **investors**) and the ICS, and against Hopkin & Sons and other firms of solicitors, by the ICS, that the **investors'** claims had not been validly assigned to the ICS. Philip Haring, one of the **investors** intervened on their behalf. The facts are set out in the opinion of Lord Hoffmann.

*Geoffrey Vos QC, Denis Brock* of *Clifford Chance* and *Guy Morpuss* (instructed by *Clifford Chance*) for the ICS.

*David Oliver QC, Andrew Hochhauser QC* and *Vernon Flynn* (instructed by *Eversheds*, Birmingham) for WBBS.

*Jonathan Sumption QC* and *Mark Cannon* (instructed by *Reynolds Porter Chamberlain)* for Hopkin & Sons.

*Nicholas Strauss QC* and *Neil Kitchener* (instructed by *Barnett Sampson* and *J Keith Park & Co*, St Helens) for

Case 22-50514-JTD    Doc 13-3    Filed 03/24/23    Page 193 of 333

Page 3 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

Mr Haring.

*Their Lordships took time for consideration.*

19 June 1997. The following opinions were delivered.

### LORD GOFF OF CHIEVELEY.

My Lords, I have had the opportunity of reading in draft the speech of my noble and learned friend Lord Hoffmann. I agree with the conclusion which he has reached as to the construction to be placed upon section 3(b) of the **Investors Compensation Scheme** claim form and, for the reasons given by him, I would answer the questions directed by Evans-Lombe J to be tried as preliminary issues in the manner proposed by my noble and learned friend. I would therefore allow the appeal.

### LORD LLOYD OF BERWICK.

My Lords,
**Background**

This is the second occasion on which the House has had to consider the **scheme** for compensating **investors** set up under s 54 of the Financial Services Act 1986. On the first occasion I described the rules made by the Securities and Investments Board under s 54(6) of the Act as being needlessly confusing and obscure. On this occasion it is not the rules that are primarily in issue, but a single clause in the claim form which **investors** are required to sign when making a claim for **compensation**; and the problem arises not from any obscurity of the language (the meaning is, I think, tolerably clear) but from slovenly drafting.

*[\*101]*

The general background to the home income plans, and the reasons why so many **investors** have come to grief, have already been described in the judgments in the earlier appeal, and need not be repeated here. The particular background to the present appeals are proceedings brought by two groups of **investors** against West Bromwich Building Society (WBBS) for damages for negligence at common law and under s 2(1) of the Misrepresentation Act 1967. They also claim rescission of their mortgages on the ground of misrepresentation and undue influence, equitable **compensation**, damages in lieu of rescission under s 2(2) of the 1967

Act, and a variety of other remedies. Some of these remedies overlap.

The **Investors Compensation Scheme** Ltd (the ICS) have also commenced proceedings against WBBS in which they claim as assignees of the **investors'** rights against WBBS. They assert that all the **investors'** claims against WBBS have been validly assigned to the ICS, with the exception of the **investors'** claim for rescission. It follows that there are competing claims against WBBS for the same damages, by the **investors** on the one hand and the ICS on the other. The resolution of the issue which thus arises indirectly between the ICS and the **investors** depends on the true construction of the claim form, and in particular on the scope of the provisions relating to the assignment of the **investors'** rights against third parties.

As between the ICS and WBBS there is a further issue. For WBBS allege in the alternative that if the question of construction is resolved in favour of the ICS, and the **investors** have purported to assign their claims for damages against WBBS, then the assignment is void or unenforceable on grounds of public policy.

In addition to their claim against WBBS, the ICS have brought proceedings against numerous firms of solicitors, in which they claim damages for negligence in advising their clients in relation to the home income plans. These proceedings are also brought as assignees under the claim form. But there are two important differences. In the first place, there is no issue as to the meaning or scope of the assignment in the case of claims against the solicitors. Secondly (and no doubt for the same reason) none of the **investors** have brought their own proceedings against the solicitors. So there is no underlying conflict between the ICS and the **investors** in relation to the ICS claim against the solicitors. The solicitors' defence is the same as the alternative argument advanced by WBBS, namely that the assignment is void or unenforceable on grounds of public policy.

Before turning to the question of construction, it is convenient to set out the main provisions of the claim form. The form is addressed to the individual **investor**. In section 2 it sets out the amount of the **compensation** to which the recipient is entitled under the **scheme**. Section 3(a) sets out the claimants' declaration. It provides (in a typical case) as follows:

'I/we hereby claim **compensation** for losses amounting to £20,345 as a result of the default of Fisher Prew-

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

Smith.

'I/we believe … that I/we have a claim against the firm in respect of negligent acts and/or advice given by Fisher Prew-Smith on or after 28 August 1988 …

'I/we confirm that I/we have received no **compensation** of any kind in respect of amounts owed to me/us at the date of default by Fisher Prew-Smith or any other person …

… I/we also confirm that I/we do not expect to receive any such **compensation** in the future …

'I/we understand that subject to section 3(b) below

1. I/we are not obliged to make a claim under this **scheme**.

*[*102]*

2. **Investors Compensation Scheme** Ltd. … will take over my/our rights and claims against Fisher Prew-Smith and other third parties on the payment of any **compensation** as described in the Transfer of Rights at section 4 of this form …'

The claimants' declaration is then signed by the **investor**.

Section 3(b) on which the present appeal turns, sets out a counter-declaration by the ICS. It provides:

'I.C.S. agrees that the following claims shall not be treated as a "Third Party Claim" [as defined in section 4 of this form] for the purposes of this agreement and that the benefits of such claims shall enure to you absolutely: Any claim (whether sounding in rescission for undue influence or otherwise) that you have or may have against the West Bromwich Building Society in which you claim an abatement of sums which you would otherwise have to repay to that Society in respect of sums borrowed by you from that Society in connection with the transaction and dealings giving rise to the claim (including interest in any such sums).'

Section 4 is headed '**Investor**'s Agreement and Acknowledgment (Rights Against Participant Firm)'. It provides as follows:

'1. I/we agree that my/our rights against the Participant Firm in respect of the Claim shall pass to **Investors Compensation Scheme** Ltd. ("I.C.S.") on payment of **compensation** pursuant to the Financial Services (**Compensation** of **Investors**) Rules 1990 ("the Rules") …

'3. I/we acknowledge that under the Rules on payment of the amount of £20,345·4315 I/we will no longer have the

right to make a claim against the Participant Firm in respect of the Claim and that any such right will be vested in I.C.S. pursuant to the Rules, and I/we further acknowledge that any sums which would otherwise be payable to me/us in respect of the Claim by the Participant Firm, or by any trustee appointed under the Financial Services Act 1986, shall be paid instead to I.C.S. …

'5. I/we agree that in the event of my/our receiving any moneys or assets in respect of the Claim from the Participant Firm or from any trustee appointed under the Financial Services Act 1986 I/we will forthwith pay or transfer them to I.C.S.

'6. I/we hereby assign absolutely to I.C.S. each and every Third Party Claim and the benefit thereof …

'12. In this document, "Third Party Claim" means any right, claim or cause of action which the claimant has or may have against any person other than the Participant Firm or against any fund or property in the hands of any person other than the Participant Firm and arising out of the circumstances giving rise to the Claim or otherwise relating to the Claim whether such claims shall arise in debt, breach of contract, tort, breach of trust or in any other manner whatsoever (and including all sums to which I/we may become entitled under sections 6 and 61 of the Financial Services Act 1986).'

Section 4 is then signed by the **investor**. There follows an explanatory note. Paragraphs 1, 2 and 3 are all concerned with the assignment of claims against the Participant Firm, in this case Fisher Prew-Smith. Paragraph 4 is concerned with the assignment of third party claims. It provides:

*[*103]*

'You also agree that I.C.S. should be able to use any rights which you now have against anyone else in relation to the claim. Examples might be directors of the firm or other persons also responsible for causing the loss for which you are being compensated. You give up all those rights and transfer them to I.C.S. (paragraph 6).'

So much for the general shape of the claim form. I now return to section 3(b). It provides for an exception in respect of third party claims assigned under para 6 of section 4. Mr Vos QC on behalf of the ICS submits that the exception is confined to claims against WBBS for rescission. Mr Oliver QC on behalf of WBBS and Mr Strauss QC on behalf of the **investors** submit that the exception covers all claims against WBBS whether for rescission or not, in which the **investor** claims a reduction in the amount due under the mortgage loan.

This is not the first time the court has had to consider the meaning of section 3(b). The same question arose in proceedings brought by the ICS against Cheltenham and Gloucester plc, formerly known as Cheltenham and Gloucester Building Society. In that case Evans-Lombe J, who has had overall charge of the litigation, ordered, and subsequently tried, a preliminary issue as to the construction of section 3(b). He held that the more natural meaning of the words was that for which the **investors** contend; in other words that the exception covers all possible claims against Cheltenham and Gloucester, and is not limited to claims for rescission. However, he went on to reject what he regarded as the more natural meaning of the words on the ground that it produced a 'ridiculous' result, contrary to the 'demonstrable purpose of the parties in entering into the claim forms'. He thus upheld the ICS's construction even though it meant, in his view, doing violence to the language of the claim form.

When the present proceedings were before Evans-Lombe J, he repeated his view that the **investors'** construction was the more natural meaning of the words, but held once again that such meaning was displaced by a consideration of the surrounding circumstances, and in particular by the need for an 'efficient system' to enable the ICS to recover its outlay. However, the learned judge went on to hold that the purported assignment in favour of the ICS was invalid, on the grounds that the assignment of some but not all the remedies available against WBBS in respect of a single cause of action is ineffective in law. Since the assignment was invalid, it followed that the **investors** were free to pursue their claims for damages against WBBS

The ICS appealed to the Court of Appeal. The Court of Appeal agreed with Evans-Lombe J that the **investors'** construction accords with the natural meaning of the words. But unlike the judge they did not regard the result as commercially ridiculous. Leggatt LJ, who gave the leading judgment, said: 'There is simply no warrant for limiting the rights retained to claims for or consequent upon rescission.' I find myself in complete agreement with the Court of Appeal.
**The question of construction**

A useful starting point for ascertaining the meaning of section 3(b) of the claim form is to put oneself in the position of the ordinary **investor** to whom the claim form is addressed. This was the approach adopted by the House in *Porter v National Union of Journalists,*

*Pritchard v National Union of Journalists* [1980] IRLR 404. The question in that case concerned the proper construction of the rules of the National Union of Journalists. Lord Diplock said (at 407):

[*104]

'I turn then to the interpretation of the relevant rules, bearing in mind that their purpose is to inform the members of the NUJ of what rights they acquire and obligations they assume vis-a-vis the union and their fellow members, by becoming and remaining members of it. The readership to which the rules are addressed consists of ordinary working journalists, not judges or lawyers versed in the semantic technicalities of statutory draftsmanship.'

The purpose of the claim form was to inform the **investor** in relatively non-technical language what his rights and liabilities were to be on receipt of **compensation** under the **scheme**. No doubt the **investor** would start by reading the explanatory note, as he is invited to do before signing section 4. He would notice that the first three paragraphs of the explanatory note are all dealing with his right to claim against the defaulting firm, Fisher Prew-Smith. This would not surprise him. For it was the firm of Fisher Prew-Smith which led him into his disastrous investment. He would well understand that the ICS might wish to recover some or all of its outlay from that firm: see para 2 of the explanatory note. He might then turn to section 4 itself. He would at once notice that the heading of section 4 refers specifically to '*Rights against Participant Firm*'. Next he would find that the first five paragraphs of section 4 are all dealing with the claim against Fisher Prew-Smith. He would infer that the claim against Fisher Prew-Smith was of primary importance to the ICS; otherwise it would hardly have been given such prominence.

Next he would read para 4 of the explanatory note. He would note that he was to give up his rights against 'anyone else' in relation to the claim (ie the claim against Fisher Prew-Smith). The examples given are any rights he might have against a director of Fisher Prew-Smith 'or any persons also responsible' for causing his loss. He might or might not at that stage envisage a claim against WBBS; probably not. Certainly the reference to 'other persons' in the context of the directors of Fisher Prew-Smith does not serve to highlight a possible claim against WBBS. If he were in doubt, he would turn to para 6 of section 4, note the definition of third party claim in para 12, and so come to section 3(b).

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

On a quick reading of section 3(b) our hypothetical reasonable **investor** would notice that it excludes from the definition of third party claim any claim which he might have against WBBS for an 'abatement' of sums due under his mortgage. The benefit of any such claim was to enure to him absolutely. In other words it was *not* to pass to the ICS under any circumstances. He would probably not pause over the words in brackets, recognising that words in brackets do not ordinarily govern the meaning of the rest of the sentence, especially if the parenthesis starts with the word 'whether' and ends with the words 'or otherwise'. He might well, in passing, understand the words in brackets as being the equivalent of 'whether or not sounding in rescission for undue influence'. He would then come to 'abatement'. This would strike him as an unusual word in the context. So he would turn to his lawyer (who is assumed to be at his elbow) and ask him whether abatement has some special meaning in law. His lawyer would reply that abatement has a technical meaning in the law of nuisance, and in connection with contracts for the sale of goods and the provision of services. But otherwise it simply means reduction. It has no technical meaning in relation to rescission. Counsel were unable to point to a single case in which the word had been used in that connection. So the **investor** would understand that if he still owed money on his mortgage, as would almost always be the case, he would

*[\*105]*

retain the right to sue WBBS in order to reduce his outstanding debt. Again, this would not surprise him. For in most cases he would not have recovered full **compensation** from the ICS, and in some cases nothing like full **compensation**. Certainly he would wish to have all defences available should WBBS start proceedings against him for recovery of the loan.

So the position would be that he, the **investor**, would retain his right to sue WBBS for a reduction of the mortgage debt, but the ICS would obtain the right to sue Fisher Prew-Smith and 'third parties' other than WBBS, on the understanding that the ICS would reassign those rights on request, should they not be needed: see para 5 of the explanatory note. This would strike the **investor** as fair and reasonable. At this stage our hypothetical **investor** would feel that he understood his rights and obligations well enough and would sign section 4.

Is there, then, any reason why the courts should not give section 3(b), and the claim form as a whole, the same meaning as the **investor**? (I shall refer to this as

'the plain meaning'.) The objections fall into two groups. The first group of objections relate to the language of section 3(b); the second group of objections relate to the legal and commercial consequences of adopting the plain meaning. I suspect that none of these objections would occur to anyone other than a lawyer.

**The meaning of the language**

The objection to the plain meaning is the inclusion of the words 'for undue influence' after 'rescission'; for any lawyer would know that there are other grounds on which the **investor** might claim rescission, for example on the ground of misrepresentation. Why, therefore, should the draftsman have specifically included one of the grounds on which the **investor** might claim rescission, but not others?

We do not know the answer to this question. It may be that if one had access to the preliminary drafts of the claim form, or to the mind of the draftsman himself, the answer would emerge clearly enough. It may be that a claim for rescission on the ground of undue influence was, for some reason, uppermost in the draftsman's mind; so he put the words in. But we cannot go into the draftsman's mind. We having nothing to go on but the words he has used. The inclusion of undue influence is odd, but not so odd as to obscure the meaning. 'Or otherwise' must relate back to 'whether sounding in rescission'. Any other construction would leave 'whether' hanging in the air. So 'or otherwise' covers claims in contract and tort. It is not limited to other grounds for claiming rescission. The drafting is slovenly. But I do not have any great difficulty with the meaning.

It is said that the plain meaning would make the words in brackets otiose. So indeed it would. But words in brackets are often otiose, especially brackets in the format '(whether … or otherwise)'. They show that the general words which precede the parenthesis are not limited to any particular kind of claim, but cover all claims so long as they are claims for reduction of sums due.

What are the alternatives? Mr Vos submits that section 3(b) means 'any claims sounding in rescission (whether for undue influence or otherwise) in which you claim an abatement …' I agree with Evans-Lombe J that such a construction does violence to the language. I know of no principle of construction (whether by reference to what Lord Wilberforce said in *Prenn v Simmonds* [1971] 3 All ER 237–242, [1971] 1 WLR 1381–1386 or otherwise) which would enable the court to take words from within

Case 22-50514-JTD    Doc 13-3    Filed 03/24/23    Page 197 of 333

Page 7 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

the brackets, where they are clearly intended

*[*106]*

to underline the width of 'any claim', and place them outside the brackets where they have the exact opposite effect. As Leggatt LJ said in the Court of Appeal, such a construction is simply not an available meaning of the words used; and it is, after all, from the words used that one must ascertain what the parties meant. Purposive interpretation of a contract is a useful tool where the purpose can be identified with reasonable certainty. But creative interpretation is another thing altogether. The one must not be allowed to shade into the other.

So with great respect to those taking a different view, I do not regard the present case as raising any question of ambiguity, or of choosing between two possible interpretations. The construction advocated by the **investors**, though it gives rise to the oddity which I have mentioned, is a permissible construction of the words used. The ICS's construction is not.

Nor does the ICS construction avoid one of the main objections which is raised against the **investors'** construction. If 'whether sounding in rescission for undue influence or otherwise' is otiose on the **investors'** construction, so also is 'whether for undue influence or otherwise' on the ICS's construction. Indeed the objection is all the greater, since a claim for rescission would necessarily result in an abatement, if by abatement is meant the financial adjustment which takes place in any event on rescission of a contract, and which would in this case be limited (if Mr Vos' argument is correct) to repayment of WBBS's charges and an adjustment in the rate of interest on the loan. On that view, section 3(b) would be an elaborate way of saying very little indeed.

**The legal and commercial consequences**

If Evans-Lombe J is right that the **investors'** construction is the more natural meaning of section 3(b) and if, a fortiori, the Court of Appeal is right that the ICS's construction is not even a possible meaning of the language used, then it would take a very strong case indeed before I would reject the former meaning in favour of the latter. As Lord Mustill said in *Charter Reinsurance Co Ltd v Fagan* [1996] 3 All ER 46, [1997] AC 313:

'If … the words "actually paid" can only as a matter of language and context mean what the syndicates maintain, I would hesitate long before giving them any other meaning, just because the result would be

extraordinary.'

What then are the consequences of the **investors'** construction which are said to be so extraordinary, or so 'very unreasonable' (the expression used by Lord Reid in *L Schuler AG v Wickman Machine Tool Sales Ltd* [1973] 2 All ER 39, [1974] AC 235), and which Evans-Lombe J described as producing a ridiculous result? I start with the commercial consequences. It is said that the ICS would have wanted to take over the **investors'** claim against WBBS, as well as their claim against Fisher Prew-Smith, since WBBS would be worth suing, whereas Fisher Prew-Smith, being insolvent, would not. Secondly it is said that the **investors** would have little incentive to sue WBBS, once they had received **compensation** from the ICS. A third objection was that the **investors** would not be entitled to claim on their own behalf, once they had accepted **compensation**. This third objection is now accepted as being wrong in law, and is no longer relied on.

By way of answer to the second objection, Mr Strauss pointed out that since, in the generality of cases, **investors** had received only between half and three-quarters of their losses by way of **compensation**, they would have every

*[*107]*

incentive to look elsewhere for a remedy. Over 500 **investors** have in fact done so, by bringing claims against Cheltenham and Gloucester, WBBS and other building societies. So it does not look as if the **investors** have been shy or backward in pursuing their rights.

As to the first objection, the structure and language of the claim form, and the express provisions of s 54(2)(e) of the 1986 Act, do not suggest that claims against participant firms were expected to be valueless. (It is common ground that 'person' in s 54(2)(e) means, and means only, the participant firm.) It is true that Fisher Prew-Smith is in liquidation. But other participant firms are not. Moreover the building societies are not the only third parties likely to be worth suing. It must not be forgotten that the ICS has brought proceedings against 197 firms of solvent solicitors. In any event it is not for the court to speculate on what the parties would have wanted. I accept, of course, as Mr Vos observed, that the ICS is not a charity. But it is far from being an ordinary commercial organisation. Its raison d'être is the **compensation** of **investors**.

Even so, if the ICS had undertaken to compensate the **investors** in full then one might perhaps have expected

Case 22-50514-JTD    Doc 13-3    Filed 03/24/23    Page 198 of 333

Page 8 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

the ICS to insist on a transfer of all third party rights. But that is not what has happened. It is common ground that **investors** have retained rights of some kind against WBBS. That being so it would seem to me as likely as not, commercially, that the agreement would provide for the **investors** to retain the whole of their rights against WBBS, including the right to claim damages in reduction of their loans. Such a consequence cannot be regarded as 'ridiculous' or 'extraordinary' or 'very unreasonable'.

Various other so-called anomalies are mentioned in Mr Vos' written submissions by way of reply. For example, a conscientious **investor** who had used his **compensation** to pay off his mortgage would lose his rights against WBBS, since there would then be no sum to be abated, whereas a less conscientious **investor** who had spent his **compensation** on a holiday would retain his rights in full. I agree with Mr Vos that there are theoretical anomalies on the **investors'** construction, though how likely they would be to arise in practice is another question. Where I disagree with him is in his evaluation of these anomalies. In my judgment they fall far short of the sort of absurdity which would justify the rejection of what I have called the plain meaning of section 3(b). They do not prompt the comment 'whatever else the parties may have had in mind, they cannot have meant *that'*.

As for the legal consequences, the difficulties are all on the other side. Both Evans-Lombe J and the Court of Appeal were of the view that the splitting of mutually inconsistent remedies in respect of a single cause of action against WBBS meant that the purported assignment was void for uncertainty, as well as being contrary to public policy. My noble and learned friend Lord Hoffmann has found a way round that difficulty. But the difficulty does not arise at all on the **investors'** construction. If the whole of the **investors'** rights against WBBS are retained, the question of splitting remedies, and 'dividing the indivisible' simply does not arise.

For the above reasons I would hold that on the true construction of the claim form the **investors'** claims against WBBS have been retained by the **investors**, and have not been assigned to the ICS. It follows that the question whether if there had been an assignment, it would have been valid or invalid does not call for an answer. In the result, therefore, I would uphold the reasoning of the Court of Appeal and dismiss the main appeal.

**The claim against the solicitors**

I can deal with the remaining point quite briefly, since I agree with your Lordships that the **investors'** claims against their solicitors have been validly assigned to the ICS, and that this part of the appeal should therefore be allowed. There can be no doubt that para 6 of section 4 purports to transfer to the ICS the **investors'** rights against the solicitors. There is no issue as to the meaning of para 6 in that connection. The only question is whether the assignment is effective in law. Evans-Lombe J dealt with the point briefly at the end of his judgment. Having held that it was not possible in law to assign some but not all remedies in respect of a single cause of action, he went on to conclude that the same reasoning must also apply, logically, to the claim against the solicitors, since the solicitors might wish to bring in WBBS as third parties.

Mr Sumption QC supports the judge's conclusion. He submitted that the purported assignment is void, because it is legally impossible for the **investors** to assign their right to claim against the solicitors while retaining the right to claim against WBBS in respect of the same loss. Mr Sumption was not able to point to any authority in support of this submission. He relies instead on the traditional antipathy of the courts to the assignment of bare rights to litigate. Alternatively he submits that if there can be an assignment at all in such circumstances, it will only be effective in law if the parties have agreed as to their respective priority. In the absence of agreement, the court has no means for deciding between competing claimants in regard to the same loss.

Since the claims against WBBS and the solicitors give rise to separate causes of action, the problem of splitting remedies in respect of the *same* cause of action, which Evans-Lombe J and the Court of Appeal regarded as insoluble, does not arise in so acute a form. I believe it could be solved satisfactorily by sensible case management. But I need not develop the matter further. For Mr Sumption concedes that if the main appeal is allowed, as your Lordships propose, then the appeal in the solicitors' action must also be allowed.

**LORD HOFFMANN.**

My Lords, the **Investors Compensation Scheme** was set up pursuant to s 54 of the Financial Services Act 1986 to provide a **compensation** fund for people who have unsatisfied claims against persons authorised

*[*108]*

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

under the Act to carry on investment business. The rules under which the **scheme** is administered provide that, on paying **compensation**, the company managing the **scheme** is to take over the applicant's rights against the authorised person and also, if the management company so determines, any rights he may have against other persons relating to the subject matter of his claim.

In 1992 the management company, called the **Investors Compensation Scheme** Ltd (the ICS), began to receive a large number of claims from home owners, mainly elderly retired people, who had been advised by authorised persons, independent financial advisers belonging to the Financial Intermediaries, Managers and Brokers Regulatory Association (FIMBRA), to enter into **schemes** called 'home income plans'. These **schemes** had been marketed by the financial advisers in conjunction with certain building societies during the late 1980s and involved the owners mortgaging their homes to secure advances at enhanced rates of interest which they mainly invested in equity-linked bonds. The subsequent fall in equities and house prices and the rise in interest rates had caused the owners severe losses. They had claims against the financial advisers for negligence and breach of their statutory duties under the

*[\*109]*

1986 Act as well as possible claims against the building societies and the solicitors who had acted in connection with the mortgages.

The ICS drafted a claim form for the home owner claimants (whom I shall call 'the **investors**') to sign. We shall have to examine it later in some detail. For the moment it is enough to say that it contained an assignment to the ICS of all the **investor's** rights arising out of the transaction against the financial advisers and anyone else, subject to a reservation of certain rights against the building society. This reservation, in section 3(b) of the form, has given rise to this litigation. Evans-Lombe J, who had to determine its meaning as a preliminary issue, thought that it was trying to reserve to the **investor** a part of his rights against the building society but that an assignment to the ICS of his remaining rights was legally impossible and invalid. An assignment of the **investor's** rights in respect of the same losses against the solicitors was also legally impossible and the whole assignment was therefore a failure. The Court of Appeal disagreed with the judge about the meaning of section 3(b). They thought it was

intended to reserve to the **investor** the whole of his rights against the building society. But they agreed that if it had been intended to assign part, it would have been ineffective. They also agreed that the assignment of rights against the solicitors was invalid. The unanimous view of the judge and the Court of Appeal was therefore that the ICS had no title to claim against either the building societies or the solicitors. From this decision the ICS appeals to your Lordships' House.

My Lords, I must start by setting out the material provisions of s 54 of the 1986 Act, the rules under which the **scheme** is operated and the claim form which the **investors** signed. First, the Act:

> '**54.**—(1) The Secretary of State may by rules establish a **scheme** for compensating **investors** in cases where persons who are or have been authorised persons are unable, or likely to be unable, to satisfy claims in respect of any description of civil liability incurred by them in connection with their investment business.
>
> (2) Without prejudice to the generality of subsection (1) above, rules under this section may—(a) provide for the administration of the **scheme** and, subject to the rules, the determination and regulation of any matter relating to its operation by a body appearing to the Secretary of State to be representative of, or of any class of, authorised persons; (b) establish a fund out of which **compensation** is to be paid; (c) provide for the levying of contributions from, or from any class of, authorised persons and otherwise for financing the **scheme** and for the payment of contributions and other money into the fund; (d) specify the terms and conditions on which, and to the extent to which, **compensation** is to be payable and in any circumstances in which the right to **compensation** is to be excluded or modified; (e) provide for treating **compensation** payable under the **scheme** in respect of a claim against any person as extinguishing or reducing the liability of that person in respect of the claim and for conferring on the body administering the **scheme** a right of recovery against that person, being, in the event of his insolvency, a right not exceeding such right, if any, as the claimant would have had in that event; and (f) contain incidental and supplementary provisions …'

Next, the rules. They are called the Financial Services (**Compensation** of **Investors**) Rules 1990 and were made by the Securities and Investments Board, exercising the powers under s 54 delegated by the Secretary of State. In these rules, the ICS is called 'the management company' and the financial advisers and

*[\*110]*

other **authorised** persons are called 'the participant firms'. For present purposes it is necessary to refer only

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

to the following rules:

'2.02 *Payment of* **compensation**

1. The Management Company is responsible for paying **compensation** to **investors** in accordance with these rules.

2. The Management Company may pay **compensation** where it is satisfied, on the basis of evidence provided by an **investor** or which is available to it from other sources, that: a. an eligible **investor** has duly applied for **compensation**; b. the **investor** has a claim against a participant firm in default … c. the participant firm is unable or likely to be unable to meet the claim within a reasonable period; and d. the **investor** has agreed, to the satisfaction of the Management Company, that the whole or any part of his rights in the claim and, if the Management Company so determines, any rights of his in a claim against any other person which relate to the subject matter of the claim, should pass to it …

2.10 *Recoveries*

1. Where, in connection with the payment of **compensation**, an **investor** agrees that the whole or any part of his rights in a claim against any person are to pass to the Management Company, the payment of **compensation** extinguishes the liability of that person to the **investor** in respect of that claim or part and confers on the Management Company a right of recovery against that person which is otherwise identical to the **investor's** former rights in the claim or part thereof.'

Finally we must look at the claim form. Various editions were produced in 1992 but for present purposes nothing turns on the differences. This case concerns a form used for claims in respect of a financial adviser called Fisher Prew-Smith Financial Services Ltd (FPS), which had marketed its home income plan in conjunction with the West Bromwich Building Society (WBBS). I shall refer to the one which was in use in July 1993.

Sections 1 and 2 dealt with the personal details of the claimants and the amount of **compensation** payable. Section 3(a) was called 'Claimant's Declaration' and contained the following statements:

'… I/we confirm that we have received no **compensation** of any kind in respect of the amounts owed to us at the date of default by [F.P.S.] or any other person …

I/we also confirm that I/we do not expect to receive any such **compensation** in the future. Any such **compensation** received by me/us, I/we will pay to [I.C.S.] in accordance with section 4 attached hereto.

I/we understand that, subject to section 3(b) below …

2. [I.C.S.] in its capacity as administrator of the **Scheme** will take over my rights and claims against [F.P.S.] and other third parties on the payment of any **compensation** as described in the Transfer of Rights at section 4 of this form. Any amount received will be paid direct to [I.C.S.] and any amounts (less costs and interest) which exceed the **compensation** payment will be paid to me/us.'

Section 3(b), which has given rise to all the difficulty, reads as follows:

'I.C.S. agrees that the following claims shall not be treated as a "Third Party Claim" [as defined in section 4 of this form] for the purposes of this

*[\*111]*

agreement and that the benefits of such claims shall enure to you absolutely: Any claim (whether sounding in rescission for undue influence or otherwise) that you have or may have against the [W.B.B.S.] in which you claim an abatement of sums which you would otherwise have to pay to that Society in respect of sums borrowed by you from that Society in connection with the transaction and dealings giving rise to the claim (including interest on any such sums).'

Finally, section 4 contained a statement that:

'I/we, the Claimant, agree and acknowledge as follows:

1. I/we agree that my/our rights against [F.P.S.] in respect of the Claim shall pass to [I.C.S.] on payment of **compensation** …

2. I/we agree that we will accept the sum of £ … from I.C.S. in satisfaction of my/our entitlement to **compensation** under the Rules in respect of the Claim.

3. I/we acknowledge that under the Rules on payment of the amount of £ … I/we will no longer have the right to make a claim against [F.P.S.] in respect of the Claim and that any such right will be vested in I.C.S. pursuant to the Rules, and I/we further acknowledge that any sums which would otherwise be payable to me/us in respect of the Claim by [FPS] … shall be paid instead to I.C.S.

4. So far as any rights in respect of the Claim would otherwise remain vested in me/us, I/we agree that I/we assign those rights to I.C.S. to the extent of the amount of the said **compensation** and **Scheme** interest paid.

5. I/we agree that in the event of my/our receiving any moneys or assets in respect of the Claim from [F.P.S.] … I/we will forthwith pay or transfer them to I.C.S.

6. I/we hereby assign absolutely to I.C.S. each and every Third Party Claim and the benefit thereof.

A002151

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

7. I.C.S. agrees and acknowledges that in the event that it recovers any monies in respect of a Third Party Claim, it will pay to you a sum equivalent to the aggregate of:— (a) the moneys which I.C.S. has recovered in respect of the Third Party Claim; and (b) any monies which I.C.S. has recovered in respect of the Claim; and (c) any monies which I.C.S. has recovered pursuant to clause 5 or 6 above; less (i) the amount of **compensation** which I.C.S. had paid to you; (ii) such amount in respect of interest as I.C.S. considers just; and (iii) the costs which I.C.S. has incurred in effecting, or in attempting to effect, any such recovery.

8. I/we agree that I/we will provide all reasonable co-operation and assistance that I.C.S. asks me/us to give in connection with any pursuit by I.C.S. of claims corresponding to the Claim and of any Third Party Claim, including the provision of documents, the provision of statements, the swearing of affidavits and the attendance at court to give oral evidence.

9. I.C.S. may give a good receipt to any person in respect of any Third Party Claim the benefit of which is assigned by this document.

10. I.C.S. will conduct all proceedings and settlement negotiations regarding claims assigned by you reasonably and with due regard to your interests as well as its own.

11. I.C.S. will re-assign to you at your request any claim which it and, if relevant its insurers decide at any time not to pursue or to pursue further.

*[*112]*

12. In this document, "Third Party Claim" means any right, claim or cause of action which the claimant has or may have against any person other than [F.P.S.] or against any fund or property in the hands of any person other than [F.P.S.] and arising out of the circumstances giving rise to the Claim or otherwise relating to the Claim, whether such claims shall arise in debt, breach of contract, tort, breach of trust or in any other manner whatsoever …'

Although the form was obviously trying not to use too much legalese, it could not have been easy for the ordinary retired home owner to understand. It referred to technical concepts like 'sounding in rescission' and 'in debt, breach of contract, tort, breach of trust or in any other manner whatsoever'. The ICS therefore also provided an explanatory note, which was a model of clarity:

'1. Under this document, once you have received your **compensation** from I.C.S., you will not be able to sue the "Participant Firm" mentioned above in relation to the claim which led to that **compensation**. This is because your claim is being met by I.C.S. instead. (Paragraphs 2 and 3).

2. But I.C.S. in turn may wish to recover some or all of its outlay to you by suing the firm, and you promise to help I.C.S. if I.C.S. decides to do so (Paragraph 8).

3. Further, since you are being compensated in relation to this claim, you should not expect any more money for it from the firm (or liquidator) (second half of paragraph 3); and any money sent to you because of it (e g by the liquidator) is really due to I.C.S. instead of to you, so you must pay the money to I.C.S. (paragraph 5).

4. You also agree that I.C.S. should be able to use any rights which you now have against anyone else in relation to the claim. Examples might be directors of the firm or other persons also responsible for causing the loss for which you are being compensated. You give up all those rights and transfer them to I.C.S. (paragraph 6).'

Before I turn to the question of construction, I must provide some of the background to how this litigation has come about. A number of the home owners instructed a firm of solicitors called Barnett Sampson to negotiate their claims. The rules provided that claims were to be met 'only where the Management Company considers that this is essential in order to provide fair **compensation** to the **investor**' (r 2.04(1)). The ICS decided that it would not pay **compensation** in respect of various heads of claim: in particular, that it would not reimburse money which the homeowners had given away or spent on themselves, or fees paid to lawyers and other professionals, or damages for illness, anxiety and stress. Barnett Sampson's clients challenged this decision in proceedings for judicial review but this House decided in *R v Investors Compensation Scheme Ltd, ex p Bowden* [1995] 3 All ER 605, [1996] AC 261 that the ICS had acted within its powers.

The ICS then commenced proceedings against various building societies for **compensation** for breach of statutory duty under the 1986 Act and damages for breach of duty at common law, claiming to sue as assignee of the **investors**. In proceedings against Cheltenham and Gloucester plc (previously the Cheltenham and Gloucester Building Society) the society took the point that section 3(b) of the claim form reserved to the **investor** all claims against the society and that the ICS therefore had no title to sue. Evans-Lombe J ordered this question to be tried

*[*113]*

Case 22-50514-JTD    Doc 13-3    Filed 03/24/23    Page 202 of 333

Page 12 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

as a preliminary issue and on 1 November 1995 gave a judgment in which he held that the only right reserved by section 3(b) was the right of the mortgagor, on rescission of the mortgage, to an adjustment of the mortgage debt as part of the mutual restoration of benefits consequent upon rescission. The assignment of the **investor**'s right to damages for misrepresentation or breach of duty was unaffected. A year later the same point came before Evans-Lombe J in proceedings by the ICS against WBBS. By this time, the ICS had also commenced proceedings against a large number of firms of solicitors who had acted for **investors** in connection with the home income plans. A number of **investors** represented by Barnett Sampson (the Alford plaintiffs) and another firm of solicitors (the Armitage plaintiffs) had also commenced separate proceedings against WBBS for rescission of their mortgages and damages. Evans-Lombe J therefore directed preliminary issues on the question of who, as between the ICS and the **investors**, had the title to sue WBBS for damages. These are the proceedings which are the subject of this appeal to your Lordships' House.

My Lords, I start with the construction of section 3(b). Evans-Lombe J followed his own decision in the earlier *Cheltenham and Gloucester* case and I shall first summarise his reasoning and then that of Leggatt LJ in the Court of Appeal. Evans-Lombe J focused on the words 'any claim (whether sounding in rescission for undue influence or otherwise) that you have … against the … Society in which you claim an abatement of sums which you would otherwise have to repay to that Society …' According to ordinary rules of syntax, 'any claim' is the antecedent of 'that you have' and the words 'or otherwise' in the adjectival parenthesis mean that it does not limit the breadth of 'any claim'. It follows that claims of any description are reserved as long as they amount to claims for an 'abatement' of what is owing to the society. There are various ways in which the amount owing might be abated but one would be on account of a set-off against the society's liability for damages. Thus the syntax of the words following 'any claim' points to a wide meaning of 'abatement' which includes the effect of cross-claims.

Evans-Lombe J then turned to the background against which the language in the claim form had been used. Two features seemed to him odd. First, the building society and the solicitors were the only solvent parties against which the **investors** were likely to have any claim. As between the building society and the solicitors, the former would certainly be the prime target. It had profited from the home income plans by lending money at enhanced rates of interest on safe security (maximum of 50% of value) at a time when lenders were falling over themselves to lend as much money as possible. One might expect that the ICS, having paid **compensation** to the **investor**, would take over his claim against the building society. If not, the **investor** might well be over-compensated. Other provisions of the form, like cl 7, seemed to assume that the ICS would do the suing and account to the **investor** for the net recovery in excess of the **compensation** paid. But there was no provision for the **investor** having to pay anything back to the ICS. This pointed to the ICS being entitled to any recoverable damages.

Secondly, the parenthesis seemed very strange against the background of the law. If it was exhaustive, why was 'sounding in rescission for undue influence' singled out? What about rescission on other grounds, or claims for breach of statutory or common law duty? It was rather like providing in a lease of a flat that the tenant should not keep 'any pets (whether neutered Persian cats or otherwise)'. Something seemed to have gone wrong.

*[\*114]*

Considerations of this kind led the judge to conclude in the *Cheltenham and Gloucester* case that the wider construction of 'any claim' and 'abatement' led to a 'ridiculous commercial result which the parties to the claim forms were quite unlikely to have intended' and that it was clear that 'the drafting of the second paragraph of section 3(b) was mistaken'. He therefore concluded that the meaning intended by the parties was that the **investor** should retain any claim for an abatement of his debt which arose out of a claim for rescission, whether for undue influence or otherwise. This could be fitted easily into the **scheme** of the law because the old equitable remedy of rescission included, as part of the restitutio in integrum, an accounting for benefits and indemnity against liabilities which could result in an abatement of the mortgage debt. Such a remedy was quite separate from a common law action for misrepresentation or breach of statutory duty. But the learned judge seems to have had some misgivings about his interpretation: he said that was doing violence to the natural meaning of the words and altering the drafting of the paragraph in a way 'more appropriate to rectification than the process of construction'. In the present case, however, the judge adhered to his construction and gave some additional reasons.

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

In the Court of Appeal, Leggatt LJ said, on the authority of *Alice Through the Looking Glass*, that the judge's interpretation was 'not an available meaning of the words'. 'Any claim (whether sounding in rescission for undue influence or otherwise)' could not mean 'Any claim sounding in rescission (whether for undue influence or otherwise)' and that was that. He was unimpressed by the alleged commercial nonsense of the alternative construction.

My Lords, I will say at once that I prefer the approach of the learned judge. But I think I should preface my explanation of my reasons with some general remarks about the principles by which contractual documents are nowadays construed. I do not think that the fundamental change which has overtaken this branch of the law, particularly as a result of the speeches of Lord Wilberforce in *Prenn v Simmonds* [1971] 3 All ER 237–242, [1971] 1 WLR 1381–1386 and *Reardon Smith Line Ltd v Hansen-Tangen, Hansen-Tangen v Sanko Steamship Co* [1976] 3 All ER 570, [1976] 1 WLR 989, is always sufficiently appreciated. The result has been, subject to one important exception, to assimilate the way in which such documents are interpreted by judges to the common sense principles by which any serious utterance would be interpreted in ordinary life. Almost all the old intellectual baggage of 'legal' interpretation has been discarded. The principles may be summarised as follows.

(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as the 'matrix of fact', but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this

distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of

[*115]

this exception are in some respects unclear. But this is not the occasion on which to explore them.

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax (see *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] 3 All ER 352, [1997] 2 WLR 945.

(5) The 'rule' that words should be given their 'natural and ordinary meaning' reflects the commonsense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said in *Antaios Cia Naviera SA v Salen Rederierna AB, The Antaios* [1984] 3 All ER 229, [1985] AC 191:

> '… if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense.'

If one applies these principles, it seems to me that the judge must be right and, as we are dealing with one badly drafted clause which is happily no longer in use, there is little advantage in my repeating his reasons at greater length. The only remark of his which I would respectfully question is when he said that he was 'doing violence' to the natural meaning of the words. This is an over-energetic way to describe the process of interpretation. Many people, including politicians, celebrities and Mrs Malaprop, mangle meanings and syntax but nevertheless communicate tolerably clearly

Case 22-50514-JTD    Doc 13-3    Filed 03/24/23    Page 204 of 333

Page 14 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

what they are using the words to mean. If anyone is doing violence to natural meanings, it is they rather than their listeners.

I shall, however, make four points supplemental to those of the learned judge. First, the claim form was obviously intended to be read by lawyers and the explanatory note by laymen. It is the terms of the claim form which govern the legal relationship between the parties. But in construing the form, I think that one should start with the assumption that a layman who read the explanatory note and did not venture into the claim form itself was being given an accurate account of the effect of the transaction. It is therefore significant that para 4 of the note says categorically and without qualification that the **investor** gives up all his rights against anyone else and transfers them to the ICS. If the effect of the claim form was that the **investor** retained his claim against the building society, para 4 of the note was very misleading. Secondly, this leads to the conclusion that section 3(b) was intended only to deal with the possibility that a lawyer might argue that some right was a 'claim' when it would not be regarded as a claim by a layman. This is a fair description of the possibility of a reduction of the mortgage debt as part of the equitable taking of accounts upon rescission, which would not result in the **investor** receiving any money but merely having to pay less to WBBS. Thirdly, any lawyer would think it extremely odd for the ICS to take an assignment of the **investor**'s claim for damages against the solicitors and

[*116]

leave the **investor** with a claim for the same damages against WBBS. He would be likely to wonder whether this was conceptually possible and, as I shall explain, I think that his doubts would be well founded. The **investor** and the ICS could not between them recover more than the loss which the **investor** had actually suffered. As a matter of common sense, one would therefore expect that the ICS either had a right to the damages or it did not. It would seem eccentric to leave this question to be decided (if such a thing were possible) by a race to judgment. Fourthly, no lawyer in his right mind who intended simply to say that all claims against the WBBS were reserved to the **investor** would have used the parenthesis. Nor, unless he intended to limit the reservation to the amount, if any, which happened to be outstanding on the mortgage, would he have described them as claims 'in which you claim an abatement of the sums which you would otherwise have to repay'. And it is difficult to think of any reason for such an arbitrary limitation.

Finally, on this part of the case, I must make some comments upon the judgment of the Court of Appeal. Leggatt LJ said that his construction was 'the natural and ordinary meaning of the words used'. I do not think that the concept of natural and ordinary meaning is very helpful when, on any view, the words have not been used in a natural and ordinary way. In a case like this, the court is inevitably engaged in choosing between competing unnatural meanings. Secondly, Leggatt LJ said that the judge's construction was not an 'available meaning' of the words. If this means that judges cannot, short of rectification, decide that the parties must have made mistakes of meaning or syntax, I respectfully think he was wrong. The proposition is not, I would suggest, borne out by his citation from *Alice Through the Looking Glass*. Alice and Humpty Dumpty were agreed that the word 'glory' did not mean 'a nice knock-down argument'. Anyone with a dictionary could see that. Humpty Dumpty's point was that 'a nice knock-down argument' was what *he* meant by using the word 'glory'. He very fairly acknowledged that Alice, as a reasonable young woman, could not have realised this until he told her, but once he had told her, or if, without being expressly told, she could have inferred it from the background, she would have had no difficulty in understanding what he meant.

The next question is whether, given the reservation of rights in section 3(b), the assignment of claims to **compensation** and damages against WBBS was valid. As we have seen, the judge and the Court of Appeal thought that they were not. Evans-Lombe J said that the 'fundamental problem' was that one could assign a chose in action but not a particular remedy by which that chose in action was enforced. He said:

> 'However what was here sought to be assigned was not the chose in action but part of the remedies which the original holder of the chose in action, the **investor**, held prior to the purported assignment. It follows … that what was purportedly assigned was not a chose in action and accordingly any attempted assignment is void.'

In the Court of Appeal Leggatt LJ accepted the submission of Mr Oliver QC that—

> 'the assignment for which the ICS contends attempts to divide the indivisible. Whatever else can be assigned, one remedy cannot be assigned whilst retaining a potentially alternative remedy. Since the purpose of
> 
> [*117]
> 
> section 3(b) is to procure a reduction in sums payable in respect of a mortgage, it is capable of constituting an alternative to rescission.'

Case 22-50514-JTD    Doc 13-3    Filed 03/24/23    Page 205 of 333

Page 15 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

(I should say that, as a matter of construction of the judgment, I think that by using the word 'rescission' Leggatt LJ meant 'damages'.)

My Lords, I agree that a chose in action is property, something capable of being turned into money. *Snell's Equity* (29th edn, 1990) p 71 defines choses in action as 'all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession'. At common law, for reasons into which it is unnecessary to discuss, choses in action could not be assigned. In equity, they could. Assignment of a 'debt or other legal thing in action' was made possible at law by s 136 of the Law of Property Act 1925. In each case, however, what is assignable is the debt or other personal right of property. It is recoverable by action, but what is assigned is the *chose*, the thing, the debt or damages to which the assignor is entitled. The existence of a remedy or remedies is an essential condition for the existence of the chose in action but that does not mean that the remedies are property in themselves, capable of assignment separately from the *chose*. So, for example, there may be joint and several liability; a remedy for the recovery of a debt or damages may be available against more than one person. But this does not mean that there is more than one chose in action. The assignee either acquires the right to the money (or part of the money) or he does not. If he does, he necessarily acquires whatever remedies are available to recover the money or the part which has been assigned to him. So far, therefore, I am in complete agreement with the learned judge and the Court of Appeal.

It is in applying these principles to the agreement constituted by the claim form that I respectfully differ. Let us consider what rights the **investor** might have had when he signed the form. He may have had a claim for damages in respect of the loss which he had suffered on account of entering into the transaction. This may have included money which he had lost on the ill-advised investment in an equity-linked bond, fees which he paid to advisers to extricate himself from his predicament, high rates of interest paid to the building society, possibly even money spent under the impression that he could afford to do so. The persons liable for this loss might have been the financial adviser, the building society and his solicitor. The building society, for example, might have been liable for participating in misrepresentations made by the financial adviser in the course of a joint **scheme** for marketing home improvement plans, or in breach of its duties

under the 1986 Act. I am not suggesting that any building society was actually liable on this basis, but only that the claim form contemplates this as a possibility. This right of damages would have been a chose in action, a right to recover money, which was capable of assignment in equity and under s 136 of the Law of Property Act 1925.

The **investor** might in addition have had a right against the building society to rescission of his mortgage. Or he might have such a right without having any claim for damages. For example, he might have been able to show that the building society had actual or constructive knowledge of undue influence exercised by the financial adviser: compare *Barclays Bank plc v O'Brien* [1993] 4 All ER 417, [1994] 1 AC 180. This would entitle him to rescission but not damages. By itself, the right to rescission would have done little to solve the **investor**'s problems because it would have been a condition of rescission that the **investor** should restore the benefits which he had received in return for the mortgage: the building society's advance and a reasonable rate of interest for having the use of

*[*118]*

the money. His real complaint was not merely that his house was mortgaged but that he no longer had the money to pay back to the building society. Until he had obtained **compensation** or damages, he would usually be unable to do so. Nevertheless, one can imagine reasons why it would be more advantageous to the **investor**, even after obtaining his **compensation**, to claim rescission of the mortgage rather than simply paying it off. For example, the reasonable rate of interest which a court might fix as a condition of rescission might be less than the higher rate due under the contract (some of which he had already paid) and so, on the taking of accounts for the purposes of rescission, there might be an abatement of what he would otherwise have to repay.

Now it is important to notice that a claim to rescission is a right of action but can in no way be described as a chose in action or part of a chose in action. It is a claim to be relieved of a mortgage, and such a claim can be made only by the owner of the mortgaged property. The owner cannot assign a right to rescission separately from his property because it would make no sense to acquire a right to have someone else's property relieved of a mortgage. Likewise, the possibility of an abatement of the debt as part of the process of rescission is not a chose in action which can be assigned. It is simply part

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

of the process of rescission, which is a right attached to the ownership of the house itself.

*[\*119]*

It can therefore be seen that in reserving to the **investor** any claim to an abatement of the mortgage debt consequent upon rescission, section 3(b) was not cutting down the scope of the chose in action which was assigned to the ICS. The possibility of an abatement could never have formed part of that chose in action and could never have been assigned separately from the house itself. One might therefore ask: what was the point of section 3(b)? The answer, I would suggest, is lawyerly caution. The draftsman wanted to make it clear that if, for example, the **investor** brought an action for rescission, any abatement of the debt which he secured was not something for which he would be accountable to the ICS. In my view, it was a mistake. The draftsman muddled up two separate questions. One is the extent of the assignment to the ICS and the other is the extent to which the **investor** is accountable to the ICS for any benefit he may receive. The two are not necessarily the same.

As this case shows, a right of action such as a claim for rescission of a mortgage may be unassignable as a chose in action, but there is no reason why the parties cannot agree that the **investor** is to be accountable to the ICS for all or part of the improvement in his financial position as a result of exercising his right to rescission. The words 'the benefits of such claim shall enure to you absolutely' in section 3(b) show that the draftsman's concern was with accountability for benefits. He wanted to make it clear that the **investor** would not be accountable for benefits derived from a claim for rescission. But the language he used referred to the extent of the assignment, for which purpose the exception in section 3(b) was unnecessary. Hence all the litigation: if you say something which is unnecessary, people suspect that you must mean something else. However, there was one thing which section 3(b) was not and could not be, and that was a reservation of a remedy which would ordinarily form part of the chose in action assigned by the ICS.

It is of course true that there are other links between the claim for damages and the claim for rescission. The facts giving rise to liability would have a great deal in common, so that if both claims were being made, by the ICS in the one case and the **investor** in the other, it would be sensible to try both cases together. But this can often happen when the same facts give rise to claims by different people

and there are procedural means for dealing with the possibility of duplicated evidence and conflicting decisions. For example, in *Wilson v United Counties Bank Ltd* [1920] AC 102, [1918–19] All ER Rep 1035 the breach by a bank of its contract to supervise Major Wilson's business while he was fighting in France gave rise to a claim for financial loss to the business and to general damages for injury to his credit and reputation. The House of Lords held that upon his bankruptcy the former claim was statutorily assigned to his trustee while the latter remained vested in him. He and the trustee joined as plaintiffs in the action and, if they had not done so, the bank would have been entitled to have their actions consolidated.

In addition, the damages recoverable by the ICS as assignee may be affected by whether or not the mortgage has been rescinded. If there has been no rescission, the damages may be calculated on the basis that the transaction has involved the **investor** in liability to pay a high rate of interest. If there has been rescission, the damages will be on the footing that the **investor** has only had to pay a reasonable rate. If the building society is to pay on the former basis, it is entitled to require that the **investor** affirm the mortgage and if the ICS cannot procure this, it may be necessary to assess damages on the footing that rescission will take place. If there is a dispute over the matter, the **investor** may have to be joined as a plaintiff, to avoid a situation in which the building society both resists a claim to rescission and has damages assessed on the basis that rescission has taken place. But these again are problems capable of solution by procedural means.

The fact that the exercise by the **investor** of a right to rescission may affect the quantum of the damages recoverable by virtue of the assignment to the ICS does not, however, mean that the **investor** has attempted to assign different remedies in respect of the same chose in action. What was assigned was the right to damages, whatever the quantum might be. It is not unusual for the quantum of damages to be affected by other proceedings which the person injured may bring, whether against a person liable for damages or someone else. For example, if one assumes that the financial adviser was solvent and that the **investor** had no cause of action whatever against the building society for damages but the possibility of rescission of the mortgage on the basis of constructive notice, the quantum of damages recoverable from the financial

Case 22-50514-JTD    Doc 13-3    Filed 03/24/23    Page 207 of 333

Page 17 of 17

Investors Compensation Scheme Ltd v West Bromwich Building Society; Investors Compensation Scheme Ltd
v Hopkin & Sons (a firm) and others; Alford v West Bromwic....

adviser by the **investor**, or by the ICS as his assignee, would be affected by whether or not the **investor** took successful proceedings for rescission. No one would think this an odd state of affairs and in principle I do not see that it makes any difference that the claim for damages and the claim for rescission are both against the building society.

My Lords, I think that if the rights of the **investor** are properly analysed, it will become clear that cl 6 of section 4 of the claim form is a complete and effectual assignment of the whole of the **investor's** claim to **compensation** and damages to the ICS. Section 3(b) may well have been unnecessary, but this conclusion seems to me preferable to attributing to the parties an intention, as, in their different ways, the judge and the Court of Appeal have done, to do six impossible things before breakfast and then regretfully saying that they could not be done. I would therefore allow the appeal. The first two questions which the judge directed to be tried as preliminary issues and the answers I suggest your Lordships should give are as follows.

*Question* 1: (a) Whether, upon the true construction of the express and (if any) implied terms of the ICS claim form, any (and if so which and to what extent) of the claims which the Alford and Armitage **investors** advance in the actions numbered Ch 1995 A 2266 and 3129 have been assigned to the ICS and (b) if so,

*[*120]*

whether such assignment is valid and effective and what consequences (if any) does it have as to the ability of those **investors** to maintain the actions.

*Answer.* Upon the true construction of the ICS claim form, all claims for damages and **compensation** have been validly assigned to the ICS and such claims cannot be maintained by the **investors** in their actions. The **investors** retain the right to claim rescission of their mortgages upon such terms as the court may consider just.

*Question 2*: (a) Whether, upon the true construction of the express and (if any) implied terms of the ICS claim form and in the light of the answer to issue 1, any (and if so which and which parts thereof) of the claims which the ICS advances in the actions numbered CH 1995 I 7087 and 8106 have been assigned to the ICS and (b) if so, is such assignment valid and effective and does it enable the ICS to maintain the actions.

*Answer.* (a) All (b) Yes.

The remaining questions do not arise.

**LORD HOPE OF CRAIGHEAD.**

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Hoffmann. For the reasons he gives I also would allow the appeal and would answer the questions which the judge directed to be tried as preliminary issues in the way he has suggested.

**LORD CLYDE.**

My Lords, I have had the advantage of reading a draft of the speech of my noble and learned friend Lord Hoffmann. For the reasons he has given, I too would allow the appeal.

Appeal allowed.

Celia Fox Barrister.

---

**End of Document**

HOUSE OF LORDS

SESSION 2008–09
**[2009] UKHL 38**
*on appeal from:[2008] EWCA Civ 183*

# OPINIONS
## OF THE LORDS OF APPEAL
## FOR JUDGMENT IN THE CAUSE

## Chartbrook Limited (Respondents) *v* Persimmon Homes Limited and others (Appellants) and another (Respondent)

### Appellate Committee

### Lord Hope of Craighead
### Lord Hoffmann
### Lord Rodger of Earlsferry
### Lord Walker of Gestingthorpe
### Baroness Hale of Richmond

**Counsel**

*Appellant*:
Christopher Nugee QC
Julian Greenhill
(Instructed by Mayer Brown International)

*Respondent*:
Robert Miles QC
Timothy Morshead
(Instructed by Carter-Ruck )

*Hearing dates:*

31 MARCH, 1 and 2 APRIL 2009

## ON
## WEDNESDAY 1 JULY 2009

## HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT IN THE CAUSE

### Chartbrook Limited (Respondents) *v* Persimmon Homes Limited and others (Appellants) and another (Respondent)

### [2009] UKHL 38

## LORD HOPE OF CRAIGHEAD

My Lords,

1.     I have had the privilege of reading in draft the opinion of my noble and learned friend, Lord Hoffmann.  Like my noble and learned friend, Lord Walker of Gestingthorpe, whose opinion I have also had the privilege of reading, I agree with all his reasoning and I share Lord Walker's admiration for the way it has been expressed.  For the reasons they give I would allow the appeal.

2.     I agree that Persimmon's argument that the House should take account of the pre-contractual negotiations raises an important issue. Every so often the rule that prior negotiations are inadmissible comes under scrutiny.  That is as it should be.  One of the strengths of the common law is that it can take a fresh look at itself so that it can keep pace with changing circumstances.  But for the reasons that have been set out by Lord Hoffmann I think that the arguments for retaining the rule have lost none of their force since *Prenn v Simmonds* [1971] 1 WLR 1381 demonstrated, as Lord Wilberforce put it at p 1384, the disadvantages and danger of departing from established doctrine.

3.     In the Court of Appeal Lawrence Collins LJ said that the policy reasons for the rule have not been fully articulated: [2008] EWCA Civ 183, para 106.  I am not sure, with respect, that everyone would agree with him.  Lord Gifford did his best to explain what they are in his dissenting opinion in *Inglis v Buttery* (1877) 5 R 58, 69-70.  When that

case came before this House Lord Blackburn said that they set out exactly what he himself thought: (1878) 3 App Cas 552, 577.  As Lord Gifford explained, the very purpose of a formal contract is to put an end to the disputes which would inevitably arise if the matter were left upon what the parties said or wrote to each other during the period of their negotiations.   It is the formal contract that records their bargain, however different it may be from what they may have stipulated for previously

4.      Lord Blackburn clearly saw no conflict between the exclusionary rule and Lord Justice Clerk Moncreiff's proposition that the Court was entitled to be put in the position that the parties stood before they signed: (1877) 5 R 58, 64.  In *River Wear Commissioners v Adamson* (1877) 2 App Cas 743, 763 he had already acknowledged that the court should look beyond the language of the contract and see what the circumstances were with reference to which the words were used.  As he put it, the meaning of words varies according to the circumstances with respect to which they are used.  It was the reasons that Lord Gifford articulated in *Inglis v Buttery* (1877) 5 R 58, 69-70, that persuaded him that to admit evidence of prior negotiations would be a step too far.  I think that what appealed to Lord Blackburn still holds true today.  If more is needed, Lord Hoffmann's analysis provides it.  As he has indicated, it would only be if your Lordships were confident that the rule was impeding the proper development of the law or contrary to public policy that it would be right for it to be departed from.  That this is so has not, as I see it, been demonstrated.

**LORD HOFFMANN**

My Lords,

5.      On 16 October 2001 Chartbrook Ltd ("Chartbrook") entered into an agreement with Persimmon Homes Ltd ("Persimmon"), a well-known house-builder, for the development of a site in Wandsworth which Chartbrook had recently acquired. The structure of the agreement was that Persimmon would obtain planning permission and then, pursuant to a licence from Chartbrook, enter into possession, construct a mixed residential and commercial development (commercial premises below, flats above, parking in the basement) and sell the properties on long leases. Chartbrook would grant the leases at the direction of Persimmon, which would receive the proceeds for its own account and

2

pay Chartbrook an agreed price for the land. Planning permission was duly granted and the development was built, but there is a dispute over the price which became payable.

6.     Schedule 6 contained the relevant provisions.  The price was defined as the aggregate of the Total Land Value and the Balancing Payment. The Total Land Value was made up of three parts: Total Residential Land Value, Total Commercial Land Value and Total Residential Cark Parking Land Value. Total Residential Land Value was to be £76.34 per square foot multiplied by the area for which planning permission for flats was granted. Total Commercial Land Value was £38.80 per square foot multiplied by the area for which planning permission for shops and other commercial uses was granted.  And Total Residential Cark Parking Land Value was £3,024 multiplied by the number of spaces for which planning permission was granted.  The Schedule set out the dates upon which the Total Land Value was to be paid.  In principle, payment would fall due as each flat, shop or parking space was sold. But there was also a backstop provision for payment of specified percentages of the Total Land Value (so far as not already paid) by dates commencing about two and a half years after the grant of planning permission and ending about two years later, by which time the whole sum was due, whether the properties had been sold or not.

7.     The provisions about Total Land Value are all quite straightforward and only require the insertion of the appropriate figures from the planning permission (which are not in dispute) into the formulae provided.  The other element in the price is the Balancing Payment. For reasons concerned with its drafting history which need not be explored, the Schedule defines the Balancing Payment as the Additional Residential Payment ("ARP") and then goes on to define the latter expression. So when I refer to the ARP, that means the Balancing Payment.

8.     The definition of the ARP, over which the whole dispute turns, is outwardly uncomplicated:

> "23.4% of the price achieved for each Residential Unit in excess of the Minimum Guaranteed Residential Unit Value less the Costs and Incentives."

A002162

9.    This contains three more defined concepts.  Residential Unit means a flat.  The Minimum Guaranteed Residential Unit Value ("MGRUV") means the Total Residential Land Value divided by the number of flats.  And Costs and Incentives ("C & I") mean the additional expense which Persimmon might have to incur to induce someone to buy a flat; for example, by providing fittings better than specification or paying legal expenses. Such payments are economically equivalent to a reduction in the price achieved.

10.    Chartbrook says that the meaning of the definition is perfectly simple. You take the price achieved, deduct the MGRUV and the C & I and calculate 23.4% of the result.  That gives you a figure for an individual flat which, together the figures for similar calculations on all the other flats, makes up the ARP or Balancing Payment. That and the Total Land Value is the price.  On the agreed figures, that produces a Total Land Value of £4,683,565 and an ARP of £4,484,862, making £9,168,427 in all. The judge (Briggs J) [2007] EWHC 409 (Ch) and a majority of the Court of Appeal (Tuckey and Rimer LJJ) [2008] EWCA Civ 183 agreed.

11.    This construction is certainly in accordance with conventional syntax, at any rate, up to the point at which one decides when C & I should be deducted.  As Briggs J said (at para 53) —

> "ARP means 23.4% of something. To the question '23.4% of what?' the clear answer is the excess of the price achieved for each Residential Unit over the MGRUV, less the Costs and Incentives."

12.    I do not think that the syntax helps one to decide whether C & I should be deducted before or after calculating the 23.4%, that is to say, whether there is a notional pause for breath after "MGRUV", represented in the passage I have quoted from the judgment by a comma which does not appear in the contract.  That is a grammatical ambiguity which must be resolved by considering the business purpose of providing for a deduction of C & I.  But the judge was clearly right about the effect of the syntax employed in the first part of the definition.

13.    Persimmon, on the other hand, says that the purpose of dividing the price into Total Land Value and ARP was to give Chartbrook a minimum price for its land, calculated on current market assumptions,

A002163

and to allow for the possibility of an increase if the market rose and the flats sold for more than expected. It is agreed that, at the time of the agreement, the parties expected that a 700 square foot flat would sell for about £200,000 or so, maybe slightly more. The MGRUV at £76.34 a square foot for such a flat was £53,438 or 26.7% of a price of £200,000. If the realised price was £228,000, it would represent 23.4%. The purpose of the ARP was to provide that if the flats sold for more than £228,000, Chartbrook would be entitled to the amount by which 23.4% of the higher price exceeded the £53,438 MGRUV. What the definition therefore means is that you deduct C & I from the realised price to arrive at the net price received by Persimmon, then calculate 23.4% of that price, and the ARP is the excess of that figure over MGRUV. On this calculation, ARP is £897,051, compared with Chartbrook's claim for £4,484,862. In the Court of Appeal Lawrence Collins LJ, dissenting, held that Persimmon's construction was correct.

14.    There is no dispute that the principles on which a contract (or any other instrument or utterance) should be interpreted are those summarised by the House of Lords in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912-913. They are well known and need not be repeated. It is agreed that the question is what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean. The House emphasised that "we do not easily accept that people have made linguistic mistakes, particularly in formal documents" (similar statements will be found in *Bank of Credit and Commerce International SA v Ali* [2002] 1 AC 251, 269, *Kirin-Amgen Inc v Hoechst Marion Roussel Ltd* [2005] RPC 169, 186 and *Jumbo King Ltd v Faithful Properties Ltd* (1999) 2 HKCFAR 279, 296) but said that in some cases the context and background drove a court to the conclusion that "something must have gone wrong with the language". In such a case, the law did not require a court to attribute to the parties an intention which a reasonable person would not have understood them to have had.

15.    It clearly requires a strong case to persuade the court that something must have gone wrong with the language and the judge and the majority of the Court of Appeal did not think that such a case had been made out. On the other hand, Lawrence Collins LJ thought it had. It is, I am afraid, not unusual that an interpretation which does not strike one person as sufficiently irrational to justify a conclusion that there has been a linguistic mistake will seem commercially absurd to another: compare the *Kirin-Amgen* case [2005] RPC 169 at pp. 189-190. Such a division of opinion occurred in the *Investors Compensation Scheme* case

5

itself.  The subtleties of language are such that no judicial guidelines or statements of principle can prevent it from sometimes happening.  It is fortunately rare because most draftsmen of formal documents think about what they are saying and use language with care. But this appears to be an exceptional case in which the drafting was careless and no one noticed.

16.    I agree with the dissenting opinion of Lawrence Collins LJ because I think that to interpret the definition of ARP in accordance with ordinary rules of syntax makes no commercial sense.    The term "Minimum Guaranteed Residential Unit Value", defined by reference to Total Residential Land Value, strongly suggests that this was to be a guaranteed minimum payment for the land value in respect of an individual flat.    A guaranteed minimum payment connotes the possibility of a larger payment which, depending upon some contingency, may or may not fall due. Hence the term "Additional Residential Payment". The element of contingency is reinforced by paragraph 3.3 of the Sixth Schedule, which speaks of the "date of payment *if any* of the Balancing Payment." (My emphasis).

17.    The judge declined to regard the terms Total Land Value and Minimum Guaranteed Residential Unit Value as indicative of an intention that MGRUV was to be the minimum Chartbrook would receive as the land value of a flat because both terms were defined expressions.    They might just as well have been algebraic symbols. Indeed they might, and I strongly suspect that if they had been, they would have made it clear that the parties were intending to give effect to Persimmon's construction. But the contract does not use algebraic symbols. It uses labels. The words used as labels are seldom arbitrary. They are usually chosen as a distillation of the meaning or purpose of a concept intended to be more precisely stated in the definition. In such cases the language of the defined expression may help to elucidate ambiguities in the definition or other parts of the agreement: compare *Birmingham City Council v Walker* [2007]  2 AC 262, 268.  I therefore consider that Lawrence Collins LJ was right to take into account the connotations of contingency to be derived from the defined terms.

18.    On Chartbrook's construction, there is virtually no element of contingency at all. ARP is payable in every case in which the flat sells for more than £53,438.  Chartbrook submits that is still a contingency. Who could tell whether or not the market for flats in Wandsworth might not collapse?    In the Court of Appeal, Rimer LJ accepted that submission. He said that the "relevant language", i.e. the language of

A002165

contingency, was "strictly consistent also with Chartbrook's construction."

19.     My Lords, I cannot believe that any rational parties who wished to make provision for such a catastrophic fall in the housing market (itself an unlikely assumption) would have adopted so precise a sum to represent their estimate of what might happen.  Why £53,438?   That was the agreed minimum figure for that part of the value of a flat attributable to the *land* which Chartbrook was selling. It was clearly based upon a careful and precise estimate of current market prices and building costs. But how could this figure have been appropriate as a minimum expected *sale* price of the entire flat at some future date?  If the parties were wanting to guess at some extraordinary fall in the market against which Chartbrook was to be protected, why £53,438? Why not £50,000 or £60,000, or £100,000?  A figure chosen to represent someone's fears about a possible collapse in the market could only have been based upon wild speculation, not the kind of calculation which produces a figure like £53,438.   That figure cannot have been meant to play the part in the calculation which Chartbrook's construction assigns to it. It must have been intended to function as a minimum land value, not a minimum sale price. To compare it with the realised sale price would not be comparing like with like.

20.     It is of course true that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says.  The reasonable addressee of the instrument has not been privy to the negotiations and cannot tell whether a provision favourable to one side was not in exchange for some concession elsewhere or simply a bad bargain.  But the striking feature of this case is not merely that the provisions as interpreted by the judge and the Court of Appeal are favourable to Chartbrook.  It is that they make the structure and language of the various provisions of Schedule 6 appear arbitrary and irrational, when it is possible for the concepts employed by the parties (MGRUV, C & I etc) to be combined in a rational way.

21.     I therefore think that Lawrence Collins LJ was right in saying that ARP must mean the amount by which 23.4% of the achieved price exceeds the MGRUV. I do not think that it is necessary to undertake the exercise of comparing this language with that of the definition in order to see how much use of red ink is involved.  When the language used in an instrument gives rise to difficulties of construction, the process of interpretation does not require one to formulate some alternative form of

7

A002166

words which approximates as closely as possible to that of the parties.  It is to decide what a reasonable person would have understood the parties to have meant by using the language which they did. The fact that the court might have to express that meaning in language quite different from that used by the parties ("12th January" instead of "13th January" in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd*  [1997] AC 749; "any claim sounding in rescission (whether for undue influence or otherwise)" instead of "any claim (whether sounding in rescission for undue influence or otherwise)" in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]  1 WLR 896) is no reason for not giving effect to what they appear to have meant.

22.    In *East v Pantiles (Plant Hire) Ltd* (1981)  263 EG 61 Brightman J stated the conditions for what he called "correction of mistakes by construction":

> "Two conditions must be satisfied: first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake. If those conditions are satisfied, then the correction is made as a matter of construction."

23.    Subject to two qualifications, both of which are explained by Carnwath LJ in his admirable judgment in *KPMG LLP v Network Rail Infrastructure Ltd* [2007]  Bus LR 1336, I would accept this statement, which is in my opinion no more than an expression of the common sense view that we do not readily accept that people have made mistakes in formal documents.   The first qualification is that "correction of mistakes by construction" is not a separate branch of the law, a summary version of an action for rectification.  As Carnwath LJ said (at p. 1351, para 50):

> "Both in the judgment, and in the arguments before us, there was a tendency to deal separately with correction of mistakes and construing the paragraph 'as it stands',  as though they were distinct exercises. In my view, they are simply aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended."

8

24.     The second qualification concerns the words "on the face of the instrument".   I agree with Carnwath LJ (at pp 1350-1351) that in deciding whether there is a clear mistake, the court is not confined to reading the document without regard to its background or context.   As the exercise is part of the single task of interpretation, the background and context must always be taken into consideration.

25.     What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed.   All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant.   In my opinion, both of these requirements are satisfied.

26.     That leaves the question of the deduction of C & I, which the judge and the majority of the Court of Appeal regarded as an insuperable obstacle to Persimmon's construction. I cannot see why this should be so. Everyone agrees that the only sum from which C & I can rationally be deducted is the headline price achieved on the sale, so as to arrive at the net amount received by Persimmon. That is accordingly what the parties must have meant. You deduct the C & I from the nominal price achieved and the ARP is the excess, if any, of 23.4% of that net sum over the MGRUV.   Giving this meaning to the provision about C & I does not in any way weaken or affect the argument for interpreting the rest of the definition in a way which gives ARP a rational meaning. To say, as Rimer LJ said, that it requires "rewriting", or that it "distorts the meaning and arithmetic of the definition" is only to say that it requires one to conclude that something has gone wrong with the language – not, in this case, with the meanings of words, but with the syntactical arrangement of those words.  If however the context drives one to the conclusion that this must have happened, it is no answer that the interpretation does not reflect what the words would conventionally have been understood to mean.

27.     If your Lordships agree with this conclusion about the construction of the contract, the appeal must be allowed.   There is no need to say anything more.   But Persimmon advanced two alternative arguments of very considerable general importance and I think it is appropriate that your Lordships should deal with them.   The first was that (contrary to the unanimous opinion of the judge and the Court of Appeal) the House should take into account the pre-contractual negotiations, which in the opinion of Lawrence Collins LJ (at paragraph 132), were determinative confirmation of Persimmon's argument on

A002168

construction. The second was that the judge and the Court of Appeal had misunderstood the principles upon which rectification may be decreed and that if Persimmon had failed on construction, the agreement should have been rectified.

28. The rule that pre-contractual negotiations are inadmissible was clearly reaffirmed by this House in *Prenn v Simmonds* [1971] 1 WLR 1381, where Lord Wilberforce said (at p. 1384) that earlier authorities "contain little to encourage, and much to discourage, evidence of negotiation or of the parties' subjective intentions." It is clear that the rule of inadmissibility has been established for a very long time. In *Inglis v John Buttery & Co* (1878) 3 App Cas 552, 577 Lord Blackburn said that Lord Justice Clerk Moncreiff (at (1877) 4 R 58, 64) had laid down a principle which was nearly accurate but not quite when he said that in all mercantile contracts "whether they be clear and distinct or the reverse, the Court is entitled to be placed in the position in which the parties stood before they signed". The only qualification Lord Blackburn made was to reject Lord Moncreiff's view that the Court was entitled to look at the pre-contractual negotiations because unless one did so, one could not be fully in the position in which the parties had been.

29. Instead, Lord Blackburn preferred (at p. 577) the opinion of Lord Gifford ((1877) 4 R 58, 69-70):

> "Now, I think it is quite fixed - and no more wholesome or salutary rule relative to written contracts can be devised - that where parties agree to embody, and do actually embody, their contract in a formal written deed, then in determining what the contract really was and really meant, a Court must look to the formal deed and to that deed alone. This is only carrying out the will of the parties. The only meaning of adjusting a formal contract is, that the formal contract shall supersede all loose and preliminary negotiations - that there shall be no room for misunderstandings which may often arise, and which do constantly arise, in the course of long, and it may be desultory conversations, or in the course of correspondence or negotiations during which the parties are often widely at issue as to what they will insist on and what they will concede. The very purpose of a formal contract is to put an end to the disputes which would inevitably arise if the matter were left upon verbal negotiations or upon mixed communings partly consisting

10

of letters and partly of conversations. The written contract is that which is to be appealed to by both parties, however different it may be from their previous demands or stipulations, whether contained in letters or in verbal conversation. There can be no doubt that this is the general rule, and I think the general rule, strictly and with peculiar appropriateness applies to the present case."

30.    To allow evidence of pre-contractual negotiations to be used in aid of construction would therefore require the House to depart from a long and consistent line of authority, the binding force of which has frequently been acknowledged: see *Bank of Scotland v Dunedin Property Investment Co Ltd* 1998  SC 657, 665 ("well-established and salutary", per Lord President Rodger; *Alexiou v Campbell* [2007] UKPC 11 ("vouched by…compelling authorities", per Lord Bingham of Cornhill.)  The House is nevertheless invited to do so, on the ground that the rule is illogical and prevents a court from, as the Lord Justice Clerk in *Inglis v John Buttery & Co* (1878)  3 App Cas  552 said, putting itself in the position of the parties and ascertaining their true intent.

31.    In   *Prenn v Simmonds* [1971]   1 WLR 1381, 1384 Lord Wilberforce said by way of justification of the rule:

"The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back: indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to. It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact.

11

Cardozo J. thought so in the *Utica Bank* case. And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get 'agreement' and in the hope that disputes will not arise. The only course then can be to try to ascertain the 'natural' meaning. Far more, and indeed totally, dangerous is it to admit evidence of one party's objective - even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised."

32.     Critics of the rule, such as Thomas J in New Zealand (*Yoshimoto v Canterbury Golf International Ltd* [2001] 1 NZLR 523, 538-549) Professor David McLauchlan ("Contract Interpretation: What is it About?" (2009) 31:5 Sydney Law Review 5-51) and Lord Nicholls of Birkenhead ("My Kingdom for a Horse: The Meaning of Words" (2005) 121 LQR 577-591) point out that although all this may usually be true, in some cases it will not. Among the dirt of aspirations, proposals and counter-proposals there may gleam the gold of a genuine consensus on some aspect of the transaction expressed in terms which would influence an objective observer in construing the language used by the parties in their final agreement.  Why should court deny itself the assistance of this material in deciding what the parties must be taken to have meant? Mr Christopher Nugee QC, who appeared for Persimmon, went so far as to say that in saying that such evidence was unhelpful, Lord Wilberforce was not only providing a justification for the rule but delimiting its extent. It should apply only in cases in which the pre-contractual negotiations are actually irrelevant.  If they do assist a court in deciding what an objective observer would have construed the contract to mean, they should be admitted. I cannot accept this submission. It is clear from what Lord Wilberforce said and the authorities upon which he relied that

A002171

the exclusionary rule is not qualified in this way.  There is no need for a special rule to exclude irrelevant evidence.

33.    I do however accept that it would not be inconsistent with the English objective theory of contractual interpretation to admit evidence of previous communications between the parties as part of the background which may throw light upon what they meant by the language they used. The general rule, as I said in *Bank of Credit and Commerce International SA v Ali* [2002]  1 AC 251, 269, is that there are no conceptual limits to what can properly be regarded as background.  Prima facie, therefore, the negotiations are potentially relevant background. They may be inadmissible simply because they are irrelevant to the question which the court has to decide, namely, what the parties would reasonably be taken to have meant by the language which they finally adopted to express their agreement. For the reasons given by Lord Wilberforce, that will usually be the case. But not always. In exceptional cases, as Lord Nicholls has forcibly argued, a rule that prior negotiations are always inadmissible will prevent the court from giving effect to what a reasonable man in the position of the parties would have taken them to have meant. Of course judges may disagree over whether in a particular case such evidence is helpful or not. In *Yoshimoto v Canterbury Golf International Ltd* [2001]  1 NZLR 523. Thomas J thought he had found gold in the negotiations but the Privy Council said it was only dirt. As I have said, there is nothing unusual or surprising about such differences of opinion. In principle, however, I would accept that previous negotiations may be relevant.

34.    It therefore follows that while it is true that, as Lord Wilberforce said, inadmissibility is normally based in irrelevance, there will be cases in which it can be justified only on pragmatic grounds. I must consider these grounds, which have been explored in detail in the literature and on the whole rejected by academic writers but supported by some practitioners.

35.    The first is that the admission of pre-contractual negotiations would create greater uncertainty of outcome in disputes over interpretation and add to the cost of advice, litigation or arbitration. Everyone engaged in the exercise would have to read the correspondence and statements would have to be taken from those who took part in oral negotiations.  Not only would this be time-consuming and expensive but the scope for disagreement over whether the material affected the construction of the agreement (as in the *Yoshimoto* case) would be considerably increased. As against this, it is said that when a

A002172

dispute over construction is litigated, evidence of the pre-contractual negotiations is almost invariably tendered in support of an alternative claim for rectification (as in *Prenn v Simmonds* and in this case) or an argument based on estoppel by convention or some alleged exception to the exclusionary rule. Even if such an alternative claim does not succeed, the judge will have read and possibly been influenced by the evidence. The rule therefore achieves little in saving costs and its abolition would restore some intellectual honesty to the judicial approach to interpretation.

36.     There is certainly a view in the profession that the less one has to resort to any form of background in aid of interpretation, the better. The document should so far as possible speak for itself. As Popham CJ said in the *Countess of Rutland's Case* (1604) 5 Co Rep 25b, 26a:

> "it would be inconvenient, that matters in writing made by advice and on consideration, and which finally import the certain truth of the agreement of the parties should be controlled by averment of the parties to be proved by the uncertain testimony of slippery memory."

37.     I do not think that these opinions can be dismissed as merely based upon the fallacy that words have inherent or "available" meanings, rather than being used by people to express meanings, although some of the arguments advanced in support might suggest this. It reflects what may be a sound practical intuition that the law of contract is an institution designed to enforce promises with a high degree of predictability and that the more one allows conventional meanings or syntax to be displaced by inferences drawn from background, the less predictable the outcome is likely to be. In this respect, it is interesting to consider the reaction to the statement of principle in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896,912-913, which was viewed with alarm by some distinguished commercial lawyers as having greatly increased the quantity of background material which courts or arbitrators would be invited to consider: see Lord Bingham's recent paper ("A New Thing Under the Sun: The Interpretation of Contract and the ICS Decision" (2008) 12 Edinburgh LR 374-390) and Spigelmann CJ, "From Text to Contract: Contemporary Contractual Interpretation" (2007) 81 ALJ 322. As Lord Bingham pointed out, there was little in that statement of principle which could not be found in earlier authorities. The only points it decided that might have been thought in the least controversial were, first, that it was not necessary to find an

14

"ambiguity" before one could have any regard to background and, secondly, that the meaning which the parties would reasonably be taken to have intended could be given effect despite the fact that it was not, according to conventional usage, an "available" meaning of the words or syntax which they had actually used.

38.     Like Lord Bingham, I rather doubt whether the *ICS* case produced a dramatic increase in the amount of material produced by way of background for the purposes of contractual interpretation. But pre-contractual negotiations seem to me capable of raising practical questions different from those created by other forms of background. Whereas the surrounding circumstances are, by definition, objective facts, which will usually be uncontroversial, statements in the course of pre-contractual negotiations will be drenched in subjectivity and may, if oral, be very much in dispute. It is often not easy to distinguish between those statements which (if they were made at all) merely reflect the aspirations of one or other of the parties and those which embody at least a provisional consensus which may throw light on the meaning of the contract which was eventually concluded. But the imprecision of the line between negotiation and provisional agreement is the very reason why in every case of dispute over interpretation, one or other of the parties is likely to require a court or arbitrator to take the course of negotiations into account.  Your Lordships' experience in the analogous case of resort to statements in Hansard under the rule in *Pepper v Hart* [1993]  AC 593 suggests that such evidence will be produced in any case in which there is the remotest chance that it may be accepted and that even these cases will be only the tip of a mountain of discarded but expensive investigation. *Pepper v Hart* has also encouraged ministers and others to make statements in the hope of influencing the construction which the courts will give to a statute and it is possible that negotiating parties will be encouraged to improve the bundle of correspondence with similar statements.

39.     Supporters of the admissibility of pre-contractual negotiations draw attention to the fact that Continental legal systems seem to have little difficulty in taking them into account. Both the *Unidroit Principles of International Commercial Contracts* (1994 and 2004 revision) and the *Principles of European Contract Law* (1999) provide that in ascertaining the "common intention of the parties", regard shall be had to prior negotiations: articles 4.3 and 5.102 respectively.  The same is true of the United Nations Convention on Contracts for the International Sale of Goods (1980). But these instruments reflect the French philosophy of contractual interpretation, which is altogether different from that of English law.  As Professor Catherine Valcke explains in an

A002174

illuminating article ("On Comparing French and English Contract Law: Insights from Social Contract Theory") (16 January 2009), French law regards the intentions of the parties as a pure question of subjective fact, their *volonté psychologique*, uninfluenced by any rules of law. It follows that any evidence of what they said or did, whether to each other or to third parties, may be relevant to establishing what their intentions actually were. There is in French law a sharp distinction between the ascertainment of their intentions and the application of legal rules which may, in the interests of fairness to other parties or otherwise, limit the extent to which those intentions are given effect.    English law, on the other hand, mixes up the ascertainment of intention with the rules of law by depersonalising the contracting parties and asking, not what their intentions actually were, but what a reasonable outside observer would have taken them to be. One cannot in my opinion simply transpose rules based on one philosophy of contractual interpretation to another, or assume that the practical effect of admitting such evidence under the English system of civil procedure will be the same as that under a Continental system.

40.    In his judgment in the present case, Briggs J thought that the most powerful argument  against admitting evidence of pre-contractual negotiations was that it would be unfair to a third party who took an assignment of the contract or advanced money on its security.  Such a person would not have been privy to the negotiations and may have taken the terms of the contract at face value. There is clearly strength in this argument, but it is fair to say that the same point can be made (and has been made, notably by Saville LJ in *National Bank of Sharjah v Dellborg* [1997] EWCA Civ 2070, which is unreported, but the relevant passage is cited in Lord Bingham's paper in the Edinburgh Law Review) in respect of the admissibility of any form of background.  The law sometimes deals with the problem by restricting the admissible background to that which would be available not merely to the contracting parties but also to others to whom the document is treated as having been addressed. Thus in *Bratton Seymour Service Co Ltd v Oxborough* [1992] BCLC 693 the Court of Appeal decided that in construing the articles of association of the management company of a building divided into flats, background facts which would have been known to all the signatories were inadmissible because the articles should be regarded as addressed to anyone who read the register of companies, including persons who would have known nothing of the facts in question.  In *The Starsin* (*Homburg Houtimport BV v Agrosin Private Ltd* [2004] 1 AC 715) the House of Lords construed words which identified the carrier on the front of a bill of lading without reference to what it said on the back, on the ground that the bankers to whom the bill would be tendered could not be expected to read the small

A002175

print. Ordinarily, however, a contract is treated as addressed to the parties alone and an assignee must either inquire as to any relevant background or take his chance on how that might affect the meaning a court will give to the document. The law has sometimes to compromise between protecting the interests of the contracting parties and those of third parties. But an extension of the admissible background will, at any rate in theory, increase the risk that a third party will find that the contract does not mean what he thought. How often this is likely to be a practical problem is hard to say.  In the present case, the construction of the agreement does not involve reliance upon any background which would not have been equally available to any prospective assignee or lender.

41.    The conclusion I would reach is that there is no clearly established case for departing from the exclusionary rule.  The rule may well mean, as Lord Nicholls has argued, that parties are sometimes held bound by a contract in terms which, upon a full investigation of the course of negotiations, a reasonable observer would not have taken them to have intended. But a system which sometimes allows this to happen may be justified in the more general interest of economy and predictability in obtaining advice and adjudicating disputes. It is, after all, usually possible to avoid surprises by carefully reading the documents before signing them and there are the safety nets of rectification and estoppel by convention. Your Lordships do not have the material on which to form a view. It is possible that empirical study (for example, by the Law Commission) may show that the alleged disadvantages of admissibility are not in practice very significant or that they are outweighed by the advantages of doing more precise justice in exceptional cases or falling into line with international conventions. But the determination of where the balance of advantage lies is not in my opinion suitable for judicial decision.  Your Lordships are being asked to depart from a rule which has been in existence for many years and several times affirmed by the House. There is power to do so under the *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234.  But that power was intended, as Lord Reid said in *R v National Insurance Comrs, Ex p Hudson* [1972] AC 944, 966, to be applied only in a small number of cases in which previous decisions of the House were "thought to be impeding the proper development of the law or to have led to results which were unjust or contrary to public policy".  I do not think that anyone can be confident that this is true of the exclusionary rule.

42.    The rule excludes evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It does not exclude the use of

A002176

such evidence for other purposes: for example, to establish that a fact which may be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These are not exceptions to the rule. They operate outside it.

43.     There is however a group of cases in which judges have found an exception to the exclusionary rule and your Lordships will have to decide whether such an exception can be justified. The leading case is the decision of Kerr J the *Karen Oltmann* (*Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd* [1976] 2 Lloyd's Rep 708. This concerned a time charter for 2 years (14 days more or less in charterers' option) which contained a break clause:

> "Charterers to have the option to redeliver the vessel after 12 months' trading subject to giving three months' notice".

44.     The issue was whether "after 12 months' trading" meant that the break clause could be operated only at the end of the first year or at any time during the second year. The judge said that he was entitled to look at telexes by which the fixture was negotiated in which the parties discussed various lengths of break clauses and were clearly using the word "after" to mean "on the expiry of" rather than "at any time after the expiry of". He justified the admissibility of this evidence on the following principle (p 712):

> "If a contract contains words which, in their context, are fairly capable of bearing more than one meaning, and if it is alleged that the parties have in effect negotiated on an agreed basis that the words bore only one of the two possible meanings, then it is permissible for the court to examine the extrinsic evidence relied upon to see whether the parties have in fact used the words in question in one sense only, so that they have in effect given their own dictionary meaning to the words as the result of their common intention. Such cases would not support a claim for rectification of the contract, because the choice of words in the contract did not result from any mistake. The words used in the contract would ex hypothesi reflect the meaning which both parties intended."

18

A002177

45.   In his judgment in this case, Lawrence Collins LJ said of this principle (in paragraph 121) that he doubted whether it differed in any material respect from admitting evidence of prior negotiations in construing a contract.  Indeed, the case is frequently cited as an example of an exception which undermines the rule: see for example Professor McLauchlan, "Contract Interpretation: What is It About?" (2009) 31:5 Sydney Law Review 5-51. It is true that evidence may always be adduced that the parties habitually used words in an unconventional sense in order to support an argument that words in a contract should bear a similar unconventional meaning.  This is the "private dictionary" principle, which is akin to the principle by which a linguistic usage in a trade or among a religious sect may be proved: compare *Shore v Wilson* (1842) 9 Cl & F 355.  For this purpose it does not matter whether the evidence of usage by the parties was in the course of negotiations or on any other occasion. It is simply evidence of the linguistic usage which they had in common.  But the telexes in the *Karen Oltmann* did not evidence any unconventional usage.  There was no private dictionary. The case involved a choice between two perfectly conventional meanings of the word "after" in a particular context. In my opinion Lawrence Collins LJ was right in saying that the admission of the evidence infringed the exclusionary rule. It is perhaps significant that the evidence merely confirmed the meaning which Kerr J, as an experienced commercial judge, would in any case have given to the clause.

46.   What would have been the position if Kerr J had thought that, without the evidence of the telexes, he would have construed the clause in the opposite sense?  He said that rectification would not be available because "The words used in the contract would ex hypothesi reflect the meaning which both parties intended."   I do not understand this, because, on this hypothesis, the telexes would show that the words (as construed by the judge) did *not* reflect the meaning which both parties intended. And it is generally accepted that Brightman J was right in *Re Butlin's Settlement Trusts* [1976] Ch 251 in holding that rectification is available not only when the parties intended to use different words but also when they mistakenly thought their words bore a different meaning.

47.   On its facts, the *Karen Oltmann* was in my opinion an illegitimate extension of the "private dictionary" principle which, taken to its logical conclusion, would destroy the exclusionary rule and any practical advantages which it may have. There are two legitimate safety devices which will in most cases prevent the exclusionary rule from causing injustice. But they have to be specifically pleaded and clearly established. One is rectification. The other is estoppel by convention,

A002178

which has been developed since the decision in th*e Karen Oltmann*: see *Amalgamated Investment & Property Co. Ltd. v. Texas Commerce International Bank Ltd.* [1982] QB 84. If the parties have negotiated an agreement upon some common assumption, which may include an assumption that certain words will bear a certain meaning, they may be estopped from contending that the words should be given a different meaning. Both of these remedies lie outside the exclusionary rule, since they start from the premise that, as a matter of construction, the agreement does not have the meaning for which the party seeking rectification or raising an estoppel contends.

48.    The last point is whether, if Chartbrook's interpretation of the agreement had been correct, it should have been rectified to accord with Persimmon's interpretation.   The requirements for rectification were succinctly summarized by Peter Gibson LJ in *Swainland Builders Ltd v Freehold Properties Ltd* [2002] 2 EGLR 71, 74, para 33:

> "The party seeking rectification must show that:
>
> (1)    the parties had a common continuing intention, whether or not amounting to an agreement, in respect of a particular matter in the instrument to be rectified;
> (2)    there was an outward expression of accord;
> (3)    the intention continued at the time of the execution of the instrument sought to be rectified;
> (4)    by mistake, the instrument did not reflect that common intention."

49.    To explain how the claim for rectification arose, I must summarise the relevant pre-contractual exchanges between the parties. They began by discussing a proposal for an outright sale of the land by Chartbrook to Persimmon at a price calculated by reference to such planning permission as Chartbrook might obtain. In early 2001 this structure was abandoned and Persimmon in a letter dated 1 February 2001 proposed the building licence arrangement eventually agreed.  The letter included the following passages:

> "we would be prepared to pay you 29.8% of the net sales proceeds generated from the private sale residential

A002179

element of the scheme and a further 45% of the net sales revenue generated from the disposal of the commercial element of the site. We would pay you this proportion of the income regardless of the development costs incurred by my Company and the quantum of accommodation that we ultimately obtain planning permission for…By tying your land value to a percentage of the income, you will also automatically share in any sales uplift that we experience."

50.    This offer of a straightforward sharing of the proceeds was modified in a letter dated 6 February 2001 by the addition of what were described as "guaranteed backstop dates and minimum payments":

"Upon receipt of the purchase monies, the revenue will be apportioned to Chartbrook on the basis of 29.8% of the net revenue achieved from the disposal of the private sale residential units and 45% of the net revenue from the disposal of the commercial units. In addition, we are prepared to provide you with guaranteed backstop dates and minimum payments that will be made regardless of the actual performance of the project both in terms of timescales and costs. I set out on the attached schedule our proposals concerning this element of the deal.

Based on the current scheme for 80 units, and 9020 sq ft of commercial floor space, the minimum land value we are prepared to pay to Chartbrook on the disposal of each residential unit is £67,000, together with a further minimum payment of £400,000 on the disposal of the commercial unit. If as a result of improvements in the market, Chartbrook are entitled to more than the minimum payments I suggest an equalisation calculation takes place following the disposal of the last unit…

Within the contract, I…suggest that a formula is included whereby the land value is calculated using the following inputs:

Private Sale Residential Accommodation…..94.96/sq ft…

21

A002180

> Once the total land value has been calculated, a simple formula can then be applied to divide the land values by the number of units, in order for us to calculate the guaranteed payments that you will receive on the sale of each plot…"

51.    On 12 February there was a further modification to make separate provision for the sales of car parking spaces, but the overall offer for land value remained the same.  The judge found (paragraph 110) that Chartbrook accepted this offer in principle and Persimmon's solicitors were instructed to draft an agreement. Their draft was attached to an e-mail dated 1 March 2001 and contained essentially the same formulae for calculating the price as those in the final agreement. The definition of "Additional Residential Payment" was (save for the percentage figure) in precisely the same words as those of the final agreement.

52.    Between March and May Chartbrook acquired some additional adjoining land and Persimmon revised its cost estimates.  The result was a change in the figures but not in the formulae.  In a letter dated 24 May 2001 Persimmon offered a new total land value of £7,191,947.  The letter contained a table setting out —

> "the minimum guaranteed  land values that you will receive for the respective elements of the scheme, together with the percentage of sales revenue that you will also be entitled to if the project performs better than is currently anticipated"

53.    The figures in the table were 23.4% for "percentage of sales revenue" and £53,333 for "minimum value per plot."   The judge found that this offer was also accepted in principle and the new figures were inserted into the final contract. The words of the definition of ARP in the final draft remained (subject to the change in the percentage figure) exactly the same as in the first draft.

54.    It is I think clear that a reasonable person who read the February and May letters in the light of the background known to the parties would have taken them to have been intending that Chartbrook should receive an ARP if, but only if, "the project performs better than is currently anticipated".

A002181

55.    Persimmon's case on rectification at the trial was that the letter of 24 May 2001 was an outward expression of the common and continuing intention of the parties and (if Chartbrook was right about its true construction) the definition had been drafted in the mistaken belief that it gave effect to that common intention.  On the other hand, the evidence of the two principals of Chartbrook, Mr Vantreen and Mr Reeve, was that they had made no mistake. The definition accorded exactly with what they had thought they were being offered in the letters of February and May 2001. Indeed, they said they would not have done the deal for any less.  It was put to them in cross-examination that no rational person could have understood the letters in the sense which they claimed and Mr Vantreen was caused some little difficulty by the fact that, on his copy of the May 2001 letter, he had calculated the amount which (on Persimmon's construction of the definition) the sale price of a 700 sq ft flat would have to exceed before any ARP became payable (£228,000). This calculation would have been irrelevant on his own construction of the definition and he was unable to explain why he had made it. Nevertheless the judge accepted the evidence of Mr Reeve and Mr Vantreen that they had honestly believed that the definition (as they claimed to have understood it) was what had been agreed and they were not been mistaken.  The judge therefore held that the mistake was not common to both parties and dismissed the claim for rectification.

56.    The case was argued at trial on the assumption that rectification required both parties to be mistaken about whether the written agreement reflected what they believed their prior consensus to have been. In the Court of Appeal, Persimmon challenged the finding of fact about what Mr Reeve and Mr Vantreen had believed, but not the underlying proposition of law. The Court of Appeal unanimously dismissed this part of the appeal on the ground that it could not disturb the findings of fact. There are accordingly concurrent findings of fact about the states of mind of Mr Reeve and Mr Vantreen.  Your Lordships indicated at the hearing that in accordance with the usual practice, you would not re-examine them: see *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd*  [1997] AC 254, 274-275.

57.    In the printed case, however,  Persimmon (encouraged by articles in the Law Quarterly Review by Marcus Smith ("Rectification of Contracts for Common Mistake*, Joscelyne v Nissen* and Subjective States of Mind" (2007) 123 LQR 116-132 and Professor McLauchlan ("The 'Drastic' Remedy of Rectification for Unilateral Mistake" (2008) 124 LQR 608-640)) asked for leave to challenge, for first time, the proposition of law. Mr Nugee submitted that the judge and the Court of Appeal had been wrong in their assumption about what a party had to be

mistaken about. Rectification required a mistake about whether the written instrument correctly reflected the prior consensus, not whether it accorded with what the party in question believed that consensus to have been. In accordance with the general approach of English law, the terms of the prior consensus were what a reasonable observer would have understood them to be and not what one or even both of the parties believed them to be. In the present case, submitted Mr Nugee, the prior consensus was contained in the May letter, which made it clear that the terms were to be as contended for by Persimmon. If the definition in the final agreement did not have that meaning, it was not in accordance with the prior consensus and if Mr Reeve and Mr Vantreen believed that it was, then they, like the representatives of Persimmon, were mistaken.

58.    Mr Robert Miles QC, for Chartbrook, objected to Persimmon being given leave to advance this argument. He said that if the point had been taken at the trial, the evidence might have taken a different shape. I rather doubt this, but as I understand that the Committee shares my view that Persimmon is entitled to succeed without rectification, the question is academic. Nevertheless, as it has been very well and fully argued, I propose to express an opinion about it.

59.    Until the decision of the Court of Appeal in *Joscelyne v Nissen* [1970] 2 QB 86 there was a view, based upon dicta in nineteenth and early twentieth century cases, that rectification was available only if there had been a concluded antecedent contract with which the instrument did not conform. In *Lovell and Christmas Ltd v Wall* (1911) 104 LT 85, 88 Sir Herbert Cozens-Hardy MR said that rectification "may be regarded as a branch of the doctrine of specific performance". It presupposed a prior contract and required proof that, by a common mistake, the final completed agreement as executed failed to give proper effect to the prior contract. In *Joscelyne*'s case the Court of Appeal declared itself puzzled by the reference to specific performance, but I think it is clear enough that the Master of the Rolls had in mind a contractual obligation to execute a lease, conveyance, settlement or similar instrument, giving rise to a specifically enforceable obligation to do so. A failure to execute a document giving effect to the terms of the agreement would be a breach of that obligation and the court, in rectifying the instrument, would be specifically performing the agreement. Since the decision in *Joscelyne's* case extended the availability of rectification to cases in which there had been no enforceable prior agreement, specific performance is plainly an inadequate explanation of the doctrine. But for present purposes the significance of cases like *Lovell and Christmas Ltd v Wall* (1911) 104 LT 85 is that the terms of the contract to which the subsequent

24

instrument must conform must be objectively determined in the same way as any other contract. Thus the common mistake must necessarily be as to whether the instrument conformed to those terms and not to what one or other of the parties believed those terms to have been.

60.     Now that it has been established that rectification is also available when there was no binding antecedent agreement but the parties had a common continuing intention in respect of a particular matter in the instrument to be rectified, it would be anomalous if the "common continuing intention" were to be an objective fact if it amounted to an enforceable contract but a subjective belief  if it did not. On the contrary, the authorities suggest that in both cases the question is what an objective observer would have thought the intentions of the parties to be. Perhaps the clearest statement is by Denning LJ in *Frederick E Rose (London) Ltd v William H Pim Jnr & Co Ld* [1953]  2 QB 450, 461:

> "Rectification is concerned with contracts and documents, not with intentions. In order to get rectification it is necessary to show that the parties were in complete agreement on the terms of their contract, but by an error wrote them down wrongly; and in this regard, in order to ascertain the terms of their contract, you do not look into the inner minds of the parties - into their intentions - any more than you do in the formation of any other contract. You look at their outward acts, that is, at what they said or wrote to one another in coming to their agreement, and then compare it with the document which they have signed. If you can predicate with certainty what their contract was, and that it is, by a common mistake, wrongly expressed in the document, then you rectify the document; but nothing less will suffice."

61.     Likewise in the *Olympic Pride (Etablissements Georges et Paul Levy v Adderley Navigation Co Panama SA* [1980] 2 Lloyd's Rep 67, 72, Mustill J said:

> "The prior transaction may consist either of a concluded agreement or of a continuing common intention. In the latter event, the intention must have been objectively manifested. It is the words and acts of the parties

A002184

demonstrating their intention, not the inward thoughts of
the parties, which matter."

62.    An example of the application of this objective ascertainment of
the terms of the prior transaction is *George Cohen Sons & Co Ltd v
Docks and Inland Waterways Executive* (1950)  84 Lloyd's Rep 97 in
which a landlord negotiating a new lease proposed to the tenant that "the
terms and conditions contained in the present lease to be embodied in
the new lease where applicable."  The tenant accepted this offer, but the
new lease as executed made the tenant liable for repairs which under the
old lease had been the responsibility of the landlord. In answer to a
claim for rectification, the landlord said that the new lease was in
accordance with what he had understood to be the effect of his offer.
The Court of Appeal said that this was irrelevant. What mattered was
the objective meaning of what the landlord had written.  Sir Raymond
Evershed MR said, at p 107:

> "If the defendants…did misconstrue [the letter] that is
> unfortunate for them, but at least they cannot be heard to
> say that their letter was intended to mean anything other
> than that which the words convey to the reader as a piece
> of ordinary English."

63.    As against these authorities, there are two cases upon which Mr
Miles relied. The first is *Britoil plc v Hunt Overseas Oil Inc* [1994]
CLC 561, in which the Court of Appeal by a majority (Glidewell and
Hobhouse LJJ, Hoffmann LJ dissenting) refused to rectify an agreement
which was alleged not to be in accordance with what had previously
been agreed in summary heads of agreement. Hobhouse LJ, who gave
the majority judgment, affirmed the decision of Saville J, who said that
the defendants had failed to establish that there was a prior common
agreement or intention in terms that the court could ascertain or (which
is probably another way of saying the same thing) that the definitive
agreement failed to reflect that prior agreement. In other words, the
language of the heads of agreement was too uncertain to satisfy the
requirement stated by Denning LJ in *Rose's* case that one should be able
to "predicate with certainty what their contract was".  Hobhouse LJ
noted that Saville J "did not base himself upon any consideration of the
evidence as to the actual state of mind of the parties" and in my opinion
the case lends no support to the view that a party must be mistaken as to
whether the document reflects what he subjectively believes the
agreement to have been.

A002185

64.    The other case is the decision of Laddie J in *Cambridge Antibody Technology Ltd v Abbott Biotechnology Ltd* [2005] FSR 590, in which he rejected a submission that evidence of the subjective state of mind of one of the parties contained in statements which had not been communicated to the other party ("crossed the line") was inadmissible. In my opinion, Laddie J was quite right not to exclude such evidence, but that is not inconsistent with an objective approach to what the terms of the prior consensus were. Unless itself a binding contract, the prior consensus is, by definition, not contained in a document which the parties have agreed is to be the sole memorial of their agreement.  It may be oral or in writing and, even if the latter, subject to later variation. In such a case, if I may quote what I said in *Carmichael v National Power plc* [1999] 1 WLR 2042, 2050 - 2051:

> "The evidence of a party as to what terms he understood to have been agreed is some evidence tending to show that those terms, in an objective sense, were agreed. Of course the tribunal may reject such evidence and conclude that the party misunderstood the effect of what was being said and done."

65.    In a case in which the prior consensus was based wholly or in part on oral exchanges or conduct, such evidence may be significant. A party may have had a clear understanding of what was agreed without necessarily being able to remember the precise conversation or action which gave rise to that belief.  Evidence of subsequent conduct may also have some evidential value.  On the other hand, where the prior consensus is expressed entirely in writing, (as in *George Cohen Sons & Co Ltd v Docks and Inland Waterways Executive* (1950) 84 Lloyd's Rep 97) such evidence is likely to carry very little weight. But I do not think that it is inadmissible.

66.    In this case there was no suggestion that the prior consensus was based on anything other than the May letter. It is agreed that the terms of that letter were accepted by Chartbrook and no one gave evidence of any subsequent discussions which might have suggested an intention to depart from them. It follows that (on the assumption that the judge was right in his construction of the ARP definition) both parties were mistaken in thinking that it reflected their prior consensus and Persimmon was entitled to rectification.

27

67.    Since, however, I think that the judge and the majority of the Court of Appeal were wrong on the question of construction, I would allow the appeal on that ground.


**LORD RODGER OF EARLSFERRY**


My Lords,


68.    I have had the privilege of considering the speeches of my noble and learned friends, Lord Hoffmann and Lord Walker of Gestingthorpe, in draft.    For the reasons which they give, I consider that the construction favoured by Persimmon is appropriate.    In particular, it seems to me that once you grasp the general structure of schedule 6 of the agreement, as described by Lord Walker in para 79 of his speech, the appropriate interpretation becomes clear.


69.    Like Lord Hoffmann, I would decline counsel's elegant but, in the event, unnecessary invitation to revisit the rule in *Prenn v Simmonds* [1971] 1 WLR 1381.  No-one could possibly say that the rule is based on some error of law or misconception.  On the contrary, the main pros and cons of having regard to prior negotiations when interpreting a formal contract have been known and discussed for centuries.    The present law represents a choice which was already second nature to the Earl of Eldon LC as long ago as *Millers v Miller* (1822) 1 Sh App 309. When interpreting a clause in a marriage contract which had been preceded by "a vast deal of correspondence", the Lord Chancellor assured the House that he did not recollect a case to which he had given more earnest attention, but still gave the correspondence short shrift, at p 317:

> "My Lords, all the previous correspondence I lay entirely out of the case, because I cannot conceive that any thing can be more dangerous than the construing deeds by the effect of letters and correspondence previous to the execution of them."

Subsequently, at p 319, he described the possibility of looking at the effect of the correspondence as "a very singular thing".  Some sixty years later, with rather more deliberation, the House affirmed that approach in *Inglis v John Buttery* (1873) 3 App Cas 552 and, a century

A002187

after that, reaffirmed it in *Prenn v Simmonds* [1971] 1 WLR 1381. The rule could scarcely be more firmly embedded in our law.

70.    Of course, in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443 the House departed from a rule, of which Lord Denning had said some fifteen years previously, "if there is one thing clear in our law, it is that the claim must be made in sterling and the judgment given in sterling": *In re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007, 1068-1069. But not only was that rule essentially procedural: in addition, the House could point to a change of circumstances which seemed to cry out for intervention. Here, by contrast, the rule about prior negotiations forms part of the law of evidence and there are no particular pressing circumstances which call for a change. The House is simply being asked to make a fresh policy decision and, in effect, to legislate to provide for a different rule. The wisdom of the proposed change is, however, debatable. So, if there is to be a change, it should be on the basis of a fully informed debate in a forum where the competing policies can be properly investigated and evaluated. Although counsel presented the rival arguments with conspicuous skill, your Lordships' House in its judicial capacity is not that forum.

71.    Like Lord Walker, I see no reason to differ from what Lord Hoffmann has said on rectification.

## LORD WALKER OF GESTINGTHORPE

My Lords,

72.    I shall first address, on a traditional approach, the issue of construction raised in this appeal. That approach requires the court to consider the disputed definition of "Additional Residential Payment" in the context of the agreement as a whole, and the parties' shared understanding of the general situation and the aim of the transaction they were entering into.

73.    The owner (Chartbrook) had assembled a site off Wandsworth High Street, London SW18 (Numbers 1,3,5,7 and 9 Hardwicks Way), with valuable potential for development. Under the agreement dated 16

A002188

October 2001 the developer (Persimmon Homes, a subsidiary of a well-known quoted company which guaranteed the developer's obligations) had the responsibility of applying for planning permission for a mixed commercial and residential development in a form approved by the owner.    The agreement was conditional on the developer obtaining planning permission in a satisfactory form within 15 months (subject to extension in certain circumstances).    If planning permission in a satisfactory form was obtained the owner would continue as registered owner of the site, but would execute a charge of the property as security for its obligations to the developer.    The developer would occupy the site as a licensee and carry out the development at its own expense, including responsibility for insurance.    The developer's obligations in carrying out the residential development (by the construction of flats) were not prescribed in detail.    Its obligations in carrying out the commercial development were limited to what were described as "core and shell works".

74.    As the flats were developed they were to be marketed by the developer, at its own expense, and sold (together with parking spaces) on 125-year leases at escalating ground rents. The commercial development, when the core and shell works were completed, was to be sold to a nominee of the owner on a 125-year lease at a peppercorn rent. There was to be a premium calculated at the rate of £110 per square foot of the net internal area of the commercial premises (plus VAT).    The developer was also to negotiate the eventual sale of the freehold subject to all these leases.    The owner was under an obligation to grant all the necessary leases and to make the eventual transfer of the freehold.

75.    As I have mentioned, the agreement did not provide in detail for the specification or cost of the construction by the developer of the residential part of the development – that is, the flats.    The owner had to approve the planning application, and the developer had to meet NHBC standards, but that was all.    In particular, the developer did not commit itself to any particular level of expenditure, with two minor exceptions: the developer undertook to spend a sum of at least £250,000 on planning gain through an agreement under section 106 of the Town and Country Planning Act 1990, and to pay at least £25,000 in compensation to adjoining owners for the loss of rights to light.    There was also an unquantified contingency sum for dealing with possible pollution in the sub-structure.    These three items were to be deducted in computing the Total Residential Land Value ("TRLV") for the purposes of schedule 6 (the Price) but there was nothing at all in the agreement providing for the developers' overall profit as such to be computed and brought into the bargain.

A002189

76.   All this is background, but to my mind relevant background, to the problem at the heart of this appeal, that is the correct construction of the definition of the Additional Residential Payment ("ARP") set out in para.1 of schedule 6. The ARP (also pointlessly relabelled as the Balancing Payment) is one of two components which had to be aggregated to make up the Price—that is, the total consideration payable by the developer to the owner.  The other component was the Total Land Value ("TLV"), that is the aggregate of (i) the TRLV already mentioned; (ii) the Total Commercial Land Value ("TCLV") and (iii) the Total Residential Car Parking Land Value ("TRCPLV").   Under para 3 of schedule 6 the TLV was payable by instalments over 52 months, starting nine months after the grant of planning permission, and the ARP was payable on completion of the last residential sale or six months after the completion of the development, whichever was the earlier.

77.   Each of the three components of the TLV was defined by a formula.  The TRLV was to be computed by reference to the net internal area of the residential units for which planning permission was obtained at the rate of £76.34 per square foot ("less the section 106 money and less the rights of light money and less the sub-structure assumptions additional cost").   The TCLV was to be computed by reference to the net internal area of the commercial premises for which planning permission was obtained, at the rate of £38.80 per square foot.   The TRCPLV was to be £3,024 multiplied by the number of residential parking places for which planning permission was obtained.

78.   Both parties were experienced in the property world—the owner as a land dealer, the developer as a developer—and they shared the knowledge that the site (including units 1 and 3 Hardwicks Way which the owner acquired during the negotiations), with the benefit of planning permission on favourable terms, would have a market value in the general region of £5m.   They hoped that planning permission for residential development would be granted for up to 100 flats with an aggregate internal area of 50,000 to 60,000 square feet.   The background facts known to the parties included the recent takeover by the developer's group of Beazer Homes Ltd, as a result of which the developer decided that it could not afford an outright purchase of the Wandsworth site. Instead the purchase was to be funded out of the proceeds of the disposal of the development, and the owner would expect to be compensated for the deferment of its consideration.

A002190

79.    The definitions that I have already mentioned, and others, such as Costs and Incentives ("C&I"), that I have yet to come to, can be quite confusing. It is important, I think, to discern and keep in mind the general structure of schedule 6 of the agreement. The components of the price referable to the commercial development (TCLV) and the residential parking (TRCPLV) were to be calculated under the simple formulae already mentioned (together they eventually amounted to about £1.727m).   By contrast, the price for the residential development was to consist of two elements, the TRLV and the ARP.   The TRLV is agreed to be approximately £4.684m, reflecting the approved residential internal area of rather over 61,000 square feet at £76.34 per square foot. The question is how much this sum has to be increased by the ARP to make up the owner's total consideration for the residential development.

80.    The ARP is defined as follows:

"23.4% of the price achieved for each Residential Unit in excess of the Minimum Guaranteed Residential Unit Value ['MGRUV'] less the [C&I]"

The amount of the C&I is agreed to have been relatively trivial – a little less than £250,000 for all 100 flats – and I put it aside for the moment, while recognising that it plays an important part in the technicalities of the argument on construction. If this item is disregarded for the moment the disputed text can be set out in a simplified form, using "RP" (for residential price) where the judge and the Court of Appeal referred to Unit Price:

"23.4% of the RP in excess of the MGRUV".

81.    The MGRUV was defined as meaning:

"for each Residential Unit [ie each flat] the [TRLV] divided by the number of Residential Units for which Planning Permission is granted".

Under the planning permission eventually granted on 23 August 2002 there were to be exactly 100 flats, which simplifies the arithmetic. Nevertheless it may be unfortunate that the draftsman chose to define the ARP by a formula referring to the MGRUV rather than by referring directly to the TRLV (to which the MGRUV is directly linked, being, as

32

A002191

events turned out, one per cent of it).    The use of the two linked formulae rather than one, and the fact that the formulae are not set out in mathematical notation, make it harder to keep clearly in mind the structure of the arrangements contained in schedule 6.

82.    Briggs J expressed the issue in paras 20 and 21 of his judgment:

> "Leaving aside for the moment the point at which the C&I are deducted, the broad commercial effect of each of the parties' rival submissions may be summarised as follows. Chartbrook's case was that it was entitled to a 23.4% share of the net proceeds of sale of each Residential Unit in excess of a minimum guaranteed amount (being the unitised Total Residential Land Value of £76.34 per square foot of Residential Net Internal Area).  Put another way, its stake in the residential part of the development was to be the whole of the first £76.34 per square foot of net sales value, and 23.4% of the surplus.
>
> By contrast, Persimmon's case was that Chartbrook was to receive an additional payment only if 23.4%  of the net sales price amounted to more than the Minimum Guaranteed Residential Unit Value.  Put more broadly, Chartbrook's stake in the residential part of the development was whichever was the greater of :
> (i)    23.4% of the net residential sales price; and,
> (ii)    the guaranteed minimum of £76.34 per square foot of Residential Net Internal Area."

83.    That is, with great respect to the judge, a confusing way of putting it, because it fails to distinguish between the two elements of the price for the residential development and to make clear whether it is addressing both elements, or only the ARP.   The owner was to get the TRLV in any event, as the most important component of the TLV (a point that may be reflected in the expression "in excess of" in the definition of the ARP).   Indeed paras 20 and 21 of the judgment are to my mind two ways of describing the same result, unless the judge intended para 20 to state the owner's view of the ARP alone, and para 21 to state the developer's view of the TRLV and the ARP operating in conjunction.

A002192

84.    In his brief judgment Rimer LJ quoted the definition of the ARP and observed in para 183:

> "There is nothing unclear, uncertain or ambiguous about that.    It is clear, certain and unambiguous and its arithmetic is straightforward".

Tuckey LJ agreed. With profound respect to both of them, I totally disagree.   The definition is obviously defective as a piece of drafting. To start with defects that can be spotted and remedied fairly easily, the draftsman could not decide whether he was dealing with the flats ("each Residential Unit") collectively or individually.   The MGRUV was one-hundredth of the TRLV, but the C&I was plainly defined as a single aggregate figure.

85.    Much more significantly and problematically, the draftsman has failed to notice the ambiguity of the formula "$x$ per cent of the RP in excess of the MGRUV less the C&I".   The ambiguity could be resolved by the use of mathematical notation, as the judge observed in paras 18 and 19 of his judgment (though he did not mention that there was also a choice to be made as to putting another set of brackets round MGRUV – C&I, so producing four possibilities rather than two).

86.    Treated acontextually, the formula "$x$ per cent of A in excess of B" is undoubtedly ambiguous.    It can mean ($x$/100 x A)-B or  $x$/100(A-B).   If required to guess I would opt for the latter meaning, because the expression "in excess of" has been used rather than "less", and to my mind "in excess of" suggests a focus on B as an integer and distances it from the percentage.   But I readily accept that this would be little more than guesswork.

87.    In a contract negotiated between businessmen there always is a commercial context.  If a contracting party agrees to pay the whole of some budgeted cost (B, say £100,000) and also agrees to pay 25% of the eventual actual cost (A, say £140,000) in excess of the budgeted costs, he would expect to pay a total of £110,000. Both elements of the obligation are, as it were, in the same currency, that is, cost, and the wording of the second element naturally translates into the formula ¼ (A-B), as (¼A)-B would be commercial nonsense.   The owner can therefore give plausible examples in which ¼(A-B) would obviously be the right answer.   But the present appeal is not such a case.

A002193

88.    In this case the very significant difference between the results produced by the competing formulae is demonstrated in the figures set out in para 14 of the judgment of Lawrence Collins LJ in the Court of Appeal.  The difference between the two bottom lines (£5,580,616 and £9,168,427) is £3,587,811.    That difference figure is 76.6% of the TRLV (£4,683,565).  On the owner's case it gets one hundred times the MGRUV as the TRLV, but in effect has to give credit for only 23.4% of it in the calculation of the ARP.  That seems to be a fairly surprising bargain for commercial men to make.  It becomes not merely surprising but totally incredible if one takes account of the fact that although schedule 6 does not in terms state that the ARP is to have no value unless the actual receipts from sales of flats exceed the TRLV, that is implicit in its structure. On the owner's construction any such limitation is contradicted, and the ARP has a substantial value even if the sales do not reach the "trigger point" of £20.015m (23.4% of which is £4.684m).

89.    This can be illustrated by considering the effect of the competing formulae (set out in paras 18 and 19 of the judge's judgment, but continuing to exclude C&I for the present) for assumed residential sale price totals (RP) of £18m, £20m, £20.015m (the trigger point),  £22m and £23.849m (the actual result):

| RP | Owner's Construction | | Developer's Construction | |
|---|---|---|---|---|
| | 23.4%(**RP**-MG) = | **ARP** | (23.4%**RP**)-MG = | **ARP** |
| **18.000** | 23.4%(18.000-4.684) = | **3.116** | (23.4% x 18.000)-4.684 = | **Negative** |
| **20.000** | 23.4% (20.000-4.684) = | **3.584** | (23.4% x 20.000)-4.684 = | **Negative** |
| **20.015** *Trigger Point* | 23.4%(20.015-4.684) = | **3.587** | (23.4%x 20.015)-4.684 = | **Zero** |
| **22.000** | 23.4%(22.000-4.684) = | **4.052** | (23.4% x 22.000)-4.684 = | **0.464** |
| **23.849** *Actual Result* | 23.4%(23.849-4.684) = | **4.485** | (23.4% x 23.849)- 4.684 = | **0.897** |

RP = Total actual receipts from residential sales
MG = Total Residential Land Value (100 x MGRUV)
All amounts in £m

A002194

The figures are, on the owner's construction, commercial nonsense. They would bring the owner a total of £7.8m for the residential development (£4.684m + £3.116m) even if sales of flats were disastrously low at £18m. The idea of the TRLV (linked as it is to the MGRUV) as a guaranteed minimum would be totally subverted.

90.   The judge accepted that there was some force in the developer's reliance on the words "if any" which occur in para 3.3 of schedule 6 with reference to the Balancing Payment (alias the ARP).   He saw less force in the submission that he should give weight to the natural meaning of the expressions "minimum", "guaranteed" and "additional" in the definitions of the MGRUV and the ARP, on the ground that by the use of a special definition "[t]he word or phrase is stripped of its natural meaning"(para 61). In preferring the owner's submissions the judge attached particular weight to the difficulty (for the developer) of explaining the words "less the C&I".   The judge observed (paras 55-57):

> "An equally serious problem with Persimmon's construction is what to do with the subtraction of the C&I. It is common ground that the Costs and Incentives have a linear relationship with the amount of the price achieved for each Residential Unit.  For example, Persimmon may agree the sale of a flat for £250,000 after incurring Costs and Incentives of say £50,000 or, with the same commercial consequence, sell the same flat for £200,000 but incur no Costs and Incentives.  Typical Incentives would include payment of the purchaser's legal fees or stamp duty, or the installation of special features such as wooden floors, over and above the standard fit-out specification.
>
> One would expect Chartbrook's profit share to be unaffected, one way or the other, by the decision of Persimmon to sell a particular flat by one or other of those methods (high price plus Incentives or low price without Incentives).  Chartbrook's construction, under which the Costs and Incentives are deducted from the price achieved for each Residential Unit before the application of the 23.4% share, fulfils precisely that expectation.
>
> By contrast, Persimmon's construction deducts the C&I from the 23.4% of the price achieved for the Residential

A002195

Unit before the net amount is compared with the MGRUV, to ascertain whether there is any excess.  By comparison with Chartbrook's construction, that calculation magnifies the negative effect of C&I by a factor of more than 3 in comparison with the positive effect of the increase in the Residential Unit Price attributable to the C&I."

91.    Lawrence Collins LJ took a different view, and I unhesitatingly prefer his view.   His reasons are set out clearly in paras 90 to 94 of his judgment, and I cannot usefully add much to them.   But I would make a few further comments.

92.    The first is as to the perceived problem about C&I.   It is true that from the developer's point of view it made little or no difference (except perhaps for timing and tax) whether or not, in relation to a particular flat, it spent an extra £2,000 on parquet flooring or granite worktops and managed to sell the flat for £2,000 more as a result.   But it did make a marginal difference to the owner, as its ARP was calculated (in some way or other, on any view) by reference to the total achieved by residential sales: that is, by reference to the developer's turnover and not by reference to the developer's profit (the judge's reference to "Chartbrook's profit share" was not therefore entirely apposite).   So (to adopt the expression used in the courts below) C&I had a linear relationship for the developer, but not for the owner.   It would therefore have made sense for the parties to have agreed that C&I expenditure and allowances should be deducted from the total obtained for residential sales for the purposes of these computations (rather as the section 106 money and the rights of light money were to be disregarded in computing the TRLV).   But it would not make sense to deduct the whole of the C&I from 23.4 per cent of the total obtained for residential sales.

93.    Rimer LJ gave an example (para 185) to reinforce his view about the C&I.   His example produces very odd results but that is partly because the figures taken are unrealistic.   If one takes more realistic figures (such as a normal average sale price of £200,000 with C&I of £2,500 and an MGRUV of £47,500) the result is much less surprising.  But it is still anomalous and makes no commercial sense, as Lawrence Collins LJ observed. An ARP of (23.4% of [RP less C&I]) less MGRUV does make commercial sense, and in my opinion it is well within the principles in *Antaios Cia Naviera v Salen Rederiana AB* [1985] AC 191, 201 and *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912-913, to read the agreement in that way.

A002196

94.    I am sure that Lawrence Collins LJ was right to give a lot of weight to the terms "minimum", "guaranteed" and "additional" in the relevant definitions.    There is a good deal of authority, if authority is needed, to give weight to the natural meaning of words in a definition. In relation to statutory definitions there are the observations of my noble and learned friend, Lord Hoffmann, in *Macdonald v Dextra Accessories Ltd* [2005] 4 All ER 107, para 18 and *Birmingham City Council v Walker* [2007] 2AC 262, para 11 and Lord Scott of Foscote in *Oxfordshire County Council v Oxford City Council* [2006] 2 AC 674, paras 82-83.    I would apply the same principle to a definition in a commercial contract.

95.    That brings me back to what I said earlier about the need, in the midst of a thicket of rather confusing definitions, to keep in mind the general structure of the bargain.    As part of the TLV the owner was to receive the TRLV,  the total residential land value, representing the estimated value attributable to land which would (on the agreement becoming unconditional) have the benefit of a favourable planning permission for residential development (but on which development had not yet taken place). The developer was to bear all the costs of the development.  The owner was also to have the prospect of an additional payment, the ARP.  As regards the residential development the bargain could have been expressed between businessmen as "a guaranteed minimum of the first £76.34 per square foot of residential internal area from the total proceeds of the flats, and 23.4% of the excess" (indeed the judge, in para 20 of his judgment, summarised the owner's case in very similar terms, except that he used "surplus" rather than "excess").  If one approaches it in that way, the developer's case as to the meaning of the definition is not merely linguistically possible, but is linguistically (as well as commercially) compelling.  The owner's case becomes plausible only if one concentrates on the ARP, forgetting the TRLV (to which the MGRUV is directly linked).  Lawrence Collins LJ dealt with this point quite briefly, in paras 81 and 93 of his judgment.   He must have thought it unnecessary to spell it out more fully.    But as he ended in the minority I have dealt with the point more fully.

96.    Since preparing this opinion I have had the privilege of reading in draft the opinion of my noble and learned friend, Lord Hoffmann.  In paras 1 to 22 of his opinion Lord Hoffmann reaches precisely the same conclusion as I have reached in regard to the correct construction, by traditional methods, of the agreement.  I agree with all his reasoning, which is essentially the same as my own, but more trenchantly expressed.  I have however thought it worthwhile setting out my own more pedestrian route to the conclusion that this House should, without

A002197

having to depart from established principles of construction, allow the appeal and dismiss Chartbrook's claim.

97.    I have also read with interest and admiration Lord Hoffmann's observations, in the remaining part of his opinion, on the important questions that we do not have to decide.  I would not differ from any of these views.  In particular, I agree that *Karen Oltmann* is a questionable application of the "private dictionary" principle, since the meaning of the English word "after" can hardly be equated to the use of a technical or trade term.

## BARONESS HALE OF RICHMOND

My Lords,

98.    I too have had the privilege of reading in draft the opinions of my noble and learned friends, Lord Hoffmann and Lord Walker of Gestingthorpe.  For the reasons they give, together with those of Lawrence Collins LJ in the Court of Appeal, I agree that Persimmon's construction of this contract is correct and that this appeal should be allowed.

99.    But I have to confess that I would not have found it quite so easy to reach this conclusion had we not been made aware of the agreement which the parties had reached on this aspect of their bargain during the negotiations which led up to the formal contract. On any objective view, that made the matter crystal clear. This, to me, increased the attractions of accepting counsel's eloquent invitation to reconsider the rule in *Prenn v Simmonds* [1971] 1 WLR 1381, the pot so gently but effectively stirred by Lord Nicholls of Birkenhead in his Chancery Bar Association lecture of 2005 ([2005] 121 LQR 577). My experience at the Law Commission has shown me how difficult it is to achieve flexible and nuanced reform to a rule of the common law by way of legislation. In the end abolition may be the only workable legislative solution, as eventually happened with the hearsay rule (Law Com No 216 (1993), *The Hearsay Rule in Civil Proceedings*). Even that can prove difficult if, on analysis, the view is taken that the rule has no real content, as with the parol evidence rule (Law Com No 154 (1986), *The Parol Evidence Rule*). The courts, on the other hand, are able to achieve step-by-step

A002198

changes which can distinguish cases in which such evidence is "helpful" from cases in which it is not.


100.   However, the approach to rectification adopted by Lord Hoffmann would go a long way towards providing a solution. If the test of the parties' continuing common intentions is an objective one, then the court is looking to see whether there was such a prior consensus and if so what it was. Negotiations where there was no such consensus are indeed "unhelpful". But negotiations where consensus was reached are very helpful indeed. If the language in the eventual contract does not reflect that consensus, then unless there has been a later variation of it, the formal contract should be rectified to reflect it. It makes little sense if the test for construing their prior consensus is different from the objective test for construing their eventual contract. This situation is, and should be, quite different from the situation where one party is mistaken as to its meaning and the other party knows this – the latter should not be permitted to take advantage of the former.


101.   For those reasons, I would respectfully associate myself, as does Lord Walker, with the views of Lord Hoffmann on the issues which we do not have to decide. In particular, I would like to express my admiration for the skill and charm with which both issues were argued by counsel on each side. It is perhaps surprising that questions of such practical and theoretical importance in the law of contract should still be open to debate and development. But that is also the great strength of the common law.

A002199



Michaelmas Term
**[2011] UKSC 50**
*On appeal from: [2010] EWCA Civ 582*

# JUDGMENT

# Rainy Sky S. A. and others (Appellants) *v* Kookmin Bank (Respondent)

**before**

**Lord Phillips, President**
**Lord Mance**
**Lord Kerr**
**Lord Clarke**
**Lord Wilson**

## JUDGMENT GIVEN ON

## 2 November 2011

**Heard on 27 July 2011**

|  |  |
|---|---|
| *Appellants* | *Respondent* |
| Mark Howard QC | Guy Philipps QC |
| Michael Ashcroft QC | James Cutress |
| (Instructed by Ince & Co LLP) | (Instructed by Linklaters LLP) |

A002201

**LORD CLARKE, (WITH WHOM LORD PHILLIPS, LORD MANCE, LORD KERR AND LORD WILSON AGREE)**

*Introduction and factual background*

1.　　This appeal raises a short question of construction of shipbuilder's refund guarantees given pursuant to six shipbuilding contracts ("the Contracts"). The Contracts, which were all dated 11 May 2007, were between each of the first to sixth claimants ("the Buyers") and Jinse Shipbuilding Co Ltd ("the Builder"). Under the Contracts the Builder agreed to build and sell one vessel to each of the Buyers. The price of each vessel was US$33,300,000, payable in five equal instalments of US$6,660,000 due at specified points of time, with the final instalment payable on delivery.[1] By Article X.8 of the Contracts it was a condition precedent to payment by the Buyers of the first instalment that the Builder would deliver to the Buyers refund guarantees relating to the first and subsequent instalments in a form acceptable to the Buyers' financiers. As envisaged by Article X.8, by letter dated 22 August 2007 the respondent, Kookmin Bank ("the Bank"), issued six materially identical "Advance Payment Bonds" ("the Bonds"), one to each of the Buyers. The seventh claimant ("the Assignee") is the assignee of the benefit of the Bonds.

2.　　On 29 August 2007, the Buyers each paid the first instalment of US$6,660,000 due under the Contracts. On 29 September 2007, the first claimant paid the second instalment of US$6,660,000 under the contract to which it is a party.

3.　　In 2008 the Builder experienced financial difficulties and in late January 2009 it entered into and/or became subject to a debt workout procedure under the Korean Corporate Restructuring Promotion Law 2007. On 25 February 2009 the Buyers wrote to the Builder notifying it that this development triggered Article XII.3 of the Contracts and demanding an immediate refund of all the instalments paid, together with interest at 7% per annum. The Builder refused to make any refund on the ground that Article XII.3 of the Contracts had not been triggered as alleged. The dispute between the Buyers and the Builder has been submitted to arbitration pursuant to Article XIV.3 of the Contracts.

---

[1] There was subsequently a small reduction in the overall price and a corresponding reduction in the final instalment for each vessel but that is immaterial to the issues in the appeal.

4.     On 23 April 2009, the Buyers wrote to the Bank demanding repayment under the Bonds of the instalments paid under the Contracts. The Bank refused to pay. It did so initially on the ground that it was not obliged to pay pending resolution of the dispute between the Buyers and the Builder. That argument was subsequently rejected by Simon J ("the Judge") and there was no appeal to the Court of Appeal against that part of his order: [2009] EWHC Civ 2624 (Comm). The Bank subsequently raised a separate, and logically prior, argument that, on their true construction, the Bonds did not cover refunds to which the Buyers were entitled pursuant to Article XII.3 of the Contracts.

5.     That argument was also rejected by the Judge, who gave summary judgment for the Assignee, but succeeded in the Court of Appeal, which gave summary judgment for the Bank against the Buyers and the Assignee.  In the Court of Appeal Sir Simon Tuckey agreed with the Judge but the majority, comprising Thorpe and Patten LJJ, held the Bank's argument to be correct: [2010]  EWCA Civ 582. The orders of the Judge and the Court of Appeal were made on 29 October 2009 and 27 May 2010 respectively. The Court of Appeal refused permission to appeal.

6.     The Buyers appeal to this Court pursuant to permission granted by the Court.  The issue is whether, on the true construction of paragraph 3 of the Bonds, the Buyers are entitled to payment under the Bonds in respect of refunds to which they are entitled under Article XII.3 of the Contracts. No-one suggested that the successful parties should not have summary judgment in their favour.

*The Bonds*

7.     I begin with the Bonds because it was common ground that all depends upon the true construction of the Bonds and that the terms and meaning of the Contracts are only relevant to the extent that they inform the true construction of the Bonds. The paragraphs in the letter comprising the Bonds were not numbered but both the Judge and the Court of Appeal referred to them by number for convenience of reference and I will do the same. As so numbered the relevant parts of each Bond were these:

> "[1]   We refer to the … Contract entered into between … the Builder and yourselves for the construction and delivery of … the 'Vessel' to be delivered before [31 July 2009]. Other terms and expressions used in this Bond shall have the same meaning as in the Contract, a copy of which has been provided to us.
>
> [2]     Pursuant to the terms of the Contract, you are entitled, upon your rejection of the Vessel in accordance with the terms of the

A002203

Contract, your termination, cancellation or rescission of the Contract or upon a Total Loss of the Vessel, to repayment of the pre-delivery instalments of the Contract Price paid by you prior to such termination or a Total Loss of the Vessel (as the case may be) and the value of the Buyer's Supplies delivered to the Shipyard (if any) together with interest thereon at the rate of ... (7%) per annum (or ... (10%) per annum in the case of a Total Loss of the Vessel) from the respective dates of payment by you of such instalments to the date of remittance by telegraphic transfer of such refund.

[3]    In consideration of your agreement to make the pre-delivery instalments under the Contract and for other good and valuable consideration (the receipt and adequacy of which is hereby acknowledged), we hereby, as primary obligor, irrevocably and unconditionally undertake to pay to you, your successors and assigns, on your first written demand, all such sums due to you under the Contract (or such sums which would have been due to you but for any irregularity, illegality, invalidity or unenforceability in whole or in part of the Contract) PROVIDED THAT the total amount recoverable by you under this Bond shall not exceed US $[26,640,000] ... plus interest thereon at the rate of ... (7%) per annum (or ... (10%) per annum in the case of a Total Loss of the Vessel) from the respective dates of payment by you of such instalments to the date of remittance by telegraphic transfer of such refund.

[4]    Payment by us under this Bond shall be made without any deduction or withholding, and promptly on receipt by us of a written demand (substantially in the form attached) signed by two of your directors stating that the Builder has failed to fulfil the terms and conditions of the Contract and as a result of such failure, the amount claimed is due to you and specifying in what respects the Builder has so failed and the amount claimed. Such claim and statement shall be accepted by us as evidence for the purposes of this Bond alone that this amount claimed is due to you under this Bond.

[5]    Our liability under this Bond shall not be affected by … (v) any insolvency, re-organisation or dissolution of the Builder, or (vi) any other matter or thing which may operate to discharge or reduce our liability hereunder.

…"

8.    The Bonds further provided that they were assignable, that they were governed by English law and that all disputes arising out of them were to be determined by the Commercial Court.

A002204

9.     The resolution of the issue between the parties depends upon the true construction of paragraph [3]. The Bank promised to pay on demand "all such sums due to you under the Contract". The question is what was meant by "such sums". Only two possibilities were suggested. The Buyers said (and the Judge and Sir Simon Tuckey held) that the expression "such sums" referred back to the "pre-delivery instalments" in the first line. They said that the purpose of the Bond was to guarantee the refund of pre-delivery instalments and that the promise was therefore to refund pre-delivery instalments. By contrast the Bank said (and Thorpe and Patten LJJ held) that the expression "such sums" was a reference back to the sums referred to in paragraph [2], namely the repayment of the pre-delivery instalments paid prior to a termination of the Contract or a Total Loss of the vessel and the value of the Buyer's Supplies in the case of a Total Loss. On the Buyers' analysis the Bond guaranteed pre-delivery instalments which were repayable under Article XII.3 in the case of any insolvency event, whereas on the Bank's analysis it did not.

*The Contracts*

10.     It is common ground that the terms of the Contracts are relevant to the true construction of the Bonds. They are referred to in the Bonds and provide the immediate context in which the Bonds were entered into.  They are thus plainly an important aid to the meaning of the Bonds.

11.     Article X of the Contracts provided, so far as material as follows:

> "ARTICLE X: PAYMENT
>
> 5.     REFUND BY THE BUILDER
>
> …
>
> The payments made by the Buyer to the Builder prior to delivery of the Vessel shall constitute advances to the Builder. If the Vessel is rejected by the Buyer in accordance with the terms of this Contract, or if the Buyer terminates, cancels or rescinds this Contract pursuant to any of the provisions of this Contract specifically permitting the Buyer to do so, the Builder shall forthwith refund to the Buyer in US dollars, the full amount of total sums paid by the Buyer to the Builder in advance of delivery together with interest thereon as herein provided within thirty (30) banking days of acceptance of rejection.
>
> ... The interest rate of the refund … shall be seven per cent (7%) per annum …

A002205

If the Builder is required to refund to the Buyer the installments paid by the Buyer to the Builder as provided in this Paragraph, the Builder shall return to the Buyer all of the Buyer's Supplies as stipulated in Article XIII which were not incorporated into the Vessel and pay to the Buyer an amount equal to the cost to the Buyer of those Buyer's Supplies incorporated into the Vessel.

6. TOTAL LOSS

If there is a total loss or a constructive total loss of the Vessel prior to delivery thereof, the Builder shall proceed according to the mutual agreement of the parties hereto either:

(a) to build another vessel in place of the Vessel so lost ... provided that the parties hereto shall have agreed in writing to a reasonable cost and time for the construction … or

(b) to refund to the Buyer the full amount of the total sums paid by the Buyer to the Builder under the provisions of Paragraph 2 of this Article and the value of Buyer's Supplies delivered to the Shipyard, if any, together with interest thereon at the rate of ten percent (10%) per annum ...

If the parties hereto fail to reach such agreement within two (2) months after the Vessel is determined to be a total loss or constructive total loss, the provisions of (b) hereinabove shall be applied."

…

8. REFUND GUARANTEE

The Builder shall as a condition precedent to payment by the Buyer of the first installment deliver to the Buyer an assignable letter of guarantee issued by a first class Korean Bank .... to Buyer's Financiers for the refund of the first installment, and at the same time, together with the letter of guarantee relating to the first installment, Builder shall also deliver to the Buyer an assignable letter of guarantee issued by a first class Korean Bank .... for the refund of the respective installments following the way of the payment stipulated in this Article. The refund guarantees by the Builder to the Buyer shall be indicated pre-delivery installments plus interest as aforesaid to the Buyer under or pursuant to paragraph 5 above in the form annexed hereto as Exhibit 'A' which is yet to be agreed…

In the event that the Refund Guarantees, for all installments, have not been provided to the Buyer in a form acceptable to the Buyer's financiers and have not been issued by an entity acceptable to

A002206

Buyer's financiers, by the 31st of August 2007 then the Buyer may cancel this Contract without penalty on either side."

It is common ground that no form of guarantee was in fact annexed to the Contracts.

12.     Article XII provided, so far as relevant:

"ARTICLE XII: BUILDER'S DEFAULT

…

3.     If the Builder shall apply for or consent to the appointment of a receiver, trustee or liquidator, shall be adjudicated insolvent, shall apply to the courts for protection from its creditors, file a voluntary petition in bankruptcy or take advantage of any insolvency law, or any action shall be taken by the Builder having an effect similar to any of the foregoing or the equivalent thereof in any jurisdiction, the Buyer may by notice in writing to the Builder require the Builder to refund immediately to the Buyer the full amount of all sums paid by the Buyer to the Builder on account of the Vessel and interest thereon at seven percent (7%) per annum on the amount to be refunded to the Buyer, computed from the respective date such sums were paid by the Buyer to the date of remittance of the refundable amount to the Buyer and immediately upon receipt of such notice the Builder shall refund such amount to the Buyer. Following such refund the Builder may, but shall not be obliged to, by notice in writing to the Buyer given within ten (10) business days terminate this contract. If the Builder does not so terminate the Contract the Buyer's obligation to pay further installments prior to delivery of the Vessel under Article X 2(a),(b),(c) and (d) shall be suspended and the full Contract price shall be paid to the Builder upon delivery of the Vessel in the manner contemplated by Article X paragraph 2(e)."

13.     The Contracts contained a number of provisions which entitled the Buyer to cancel the contract, namely Articles III.1 and XII.1 (delay) and Article III.2(b), 3(c), 4(d) and 5(d) (insufficient speed, excessive fuel consumption, deficient deadweight or cargo capacity).  Some of those provisions specifically entitled the Buyer to a refund of all advance payments following cancellation. Others did not, although in such cases Article X.5 would apply and have the same effect. The Contracts also contained in Article XIII further detailed provisions relating to Buyer's Supplies.

A002207

*The correct approach to construction*

14.    For the most part, the correct approach to construction of the Bonds, as in the case of any contract, was not in dispute. The principles have been discussed in many cases, notably of course, as Lord Neuberger MR said in *Pink Floyd Music Ltd v EMI Records Ltd* [2010] EWCA Civ 1429; [2011] 1 WLR 770 at para 17, by Lord Hoffmann in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, passim, in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912F-913G and in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101, paras 21-26. I agree with Lord Neuberger (also at para 17) that those cases show that the ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant. As Lord Hoffmann made clear in the first of the principles he summarised in the *Investors Compensation Scheme* case at page 912H, the relevant reasonable person is one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

15.    The issue between the parties in this appeal is the role to be played by considerations of business common sense in determining what the parties meant. Sir Simon Tuckey said at para 19 of his judgment that there was no dispute about the principles of construction and the Bank so submitted in its skeleton argument. However, I do not think that is quite correct.

16.    At para 18 Sir Simon identified the question of construction substantially as set out in para 9 above and said at para 19:

> "There is no dispute about the principles of construction to be applied in order to answer this question. The court must first look at the words which the parties have used in the bond itself. The shipbuilding contract is of course the context and cause for the bond but is nevertheless a separate contract between different parties. If the language of the bond leads clearly to a conclusion that one or other of the constructions contended for is the correct one, the Court must give effect to it, however surprising or unreasonable the result might be. But if there are two possible constructions, the Court is entitled to reject the one which is unreasonable and, in a commercial context, the one which flouts business common sense. This follows from the House of Lords decisions in *Wickman Machine Tools Sales Limited v Schuler AG* [1974] AC 235, where at 251 Lord Reid said:

> 'The fact that a particular construction leads to a very
> unreasonable result must be a relevant consideration.
> The more unreasonable the result, the more unlikely it
> is that the parties can have intended it, and if they do
> intend it the more necessary it is that they shall make
> that intention abundantly clear.'

and *The Antaios* [1984] AC 191, where at 201 Lord Diplock said:

> 'If detailed and syntactical analysis of words in a
> commercial contract is going to lead to a conclusion
> that flouts business common sense it must yield to
> business common sense.'"

17.    As I read his judgment, Patten LJ did not put the question in quite the same
way. This can be seen from paras 35 to 44 of his judgment. At para 35 he referred
to Sir Simon Tuckey's approach at para 19 (as quoted above). He also referred to
para 18(iii) of the Judge's judgment, where the Judge described the Bank's
construction of the Bond as having the surprising and uncommercial result of the
guarantee not being available to meet the Builder's repayment obligations in the
event of insolvency. Patten LJ noted that the Judge appeared to have taken that
into account as a factor in favour of the Buyers' construction of paragraph [3] of
the Bonds. Patten LJ added that the Judge's approach was the same as that of Sir
Simon Tuckey.

18.    Patten LJ then referred to the cases mentioned above and expressed his
conclusion in principle thus at para 42:

> "In this case (as in most others) the Court is not privy to the
> negotiations between the parties or to the commercial and other
> pressures which may have dictated the balance of interests which the
> contract strikes. Unless the most natural meaning of the words
> produces a result which is so extreme as to suggest that it was
> unintended, the Court has no alternative but to give effect it its terms.
> To do otherwise would be to risk imposing obligations on one or
> other party which they were never willing to assume and in
> circumstances which amount to no more than guesswork on the part
> of the Court."

19.    Finally, at paras 43 and 44, Patten LJ quoted from the speeches of Lord
Wilberforce in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384-5 and of Lord
Hoffmann in *Chartbrook* at para 20, where they discussed the reason for the rule
excluding evidence of pre-contractual negotiations.  In particular they stressed the

A002209

irrelevance of the parties' subjective intentions and noted that the mere fact that a term in the contract appears to be particularly unfavourable to one party or the other is irrelevant. As Lord Hoffmann put it, the term may have been agreed in exchange for some concession made elsewhere in the transaction or it may simply have been a bad bargain.

20.    I entirely accept those caveats. However, it seems to me to be clear that the principle stated by Patten LJ in para 42 is different from that stated by the Judge in his para 18(iii) and by Sir Simon Tuckey in para 19. It is not in my judgment necessary to conclude that, unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning.

21.    The language used by the parties will often have more than one potential meaning. I would accept the submission made on behalf of the appellants that the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other.

22.    This conclusion appears to me to be supported by Lord Reid's approach in *Wickman* quoted by Sir Simon Tuckey and set out above. I am of course aware that, in considering statements of general principle in a particular case, the court must have regard to the fact that the precise formulation of the proposition may be affected by the facts of the case. Nevertheless, there is a consistent body of opinion, largely collated by the Buyers in an appendix to their case, which supports the approach of the Judge and Sir Simon Tuckey.

23.    Where the parties have used unambiguous language, the court must apply it. This can be seen from the decision of the Court of Appeal in *Co-operative Wholesale Society Ltd v. National Westminster Bank plc* [1995] 1 EGLR 97. The court was considering the true construction of rent review clauses in a number of different cases. The underlying result which the landlords sought in each case was the same. The court regarded it as a most improbable commercial result. Where the result, though improbable, flowed from the unambiguous language of the clause, the landlords succeeded, whereas where it did not, they failed. The court held that ordinary principles of construction applied to rent review clauses and applied the principles in *The Antaios (Antaios Compania Naviera SA v Salen Rederierna AB)*

[1985] AC 191. After quoting the passage from the speech of Lord Diplock cited above, Hoffmann LJ said, at p 98:

> "This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

24.     The court also comprised Leggatt and Simon Brown LJJ.  Simon Brown LJ at p 101 said that, having regard to the improbable result for which the landlords contended, only the most unambiguous of such clauses could properly be found to bear the landlords construction and that in the case of only one of the leases did the clause "unambiguously …achieve the improbable result for which the landlords contend".  The case is of interest because Simon Brown LJ considered that, of the other three cases, one unambiguously failed to achieve the result sought by the landlords, whereas, of the other two, he said this at p 102:

> "For my part, I would accept that the more obvious reading of both favours the landlord's construction. I am persuaded, however, that they are capable of being, and therefore, for the reasons already given, should be, construed differently."

That case is therefore an example of the adoption and application of the principle endorsed by the Judge and by Sir Simon Tuckey. See also *International Fina Services AG v Katrina Shipping Ltd, The Fina Samco* [1995] 2 Lloyd's Rep. 344, where Neill LJ said at page 350 it was necessary when construing a commercial document to strive to attribute to it a meaning which accords with business common sense.

25.     In 1997, writing extra-judicially ("Contract Law: Fulfilling the reasonable expectations of honest men") in 113 LQR 433, 441 Lord Steyn expressed the principle thus:

> "Often there is no obvious or ordinary meaning of the language under consideration. There are competing interpretations to be considered. In choosing between alternatives a court should primarily be guided by the contextual scene in which the stipulation in question appears. And speaking generally commercially minded judges would regard the commercial purpose of the contract as more

A002211

important than niceties of language. And, in the event of doubt, the working assumption will be that a fair construction best matches the reasonable expectations of the parties."

I agree. He said much the same judicially in *Society of Lloyd's v Robinson* [1999] 1 All ER (Comm) 545, 551:

> "Loyalty to the text of a commercial contract, instrument, or document read in its contextual setting is the paramount principle of interpretation. But in the process of interpreting the meaning of the language of a commercial document the court ought generally to favour a commercially sensible construction. The reason for this approach is that a commercial construction is likely to give effect to the intention of the parties. Words ought therefore to be interpreted in the way in which a reasonable commercial person would construe them. And the reasonable commercial person can safely be assumed to be unimpressed with technical interpretations and undue emphasis on niceties of language".

26.     Similar assistance is at hand nearer at home.  In *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd* [2001] CLC 1103, 1118-1119; [2011] EWCA Civ 1047; [2001] 2 All ER (Comm) 299, Mance LJ said:

> "13.   Construction, as Sir Thomas Bingham MR said in *Arbuthnott v Fagan* [1995] CLC 1396 at p 1400 is thus 'a composite exercise, neither uncompromisingly literal nor unswervingly purposive'. To para (5), one may add as a coda words of Lord Bridge in *Mitsui Construction Co Ltd v A-G of Hong Kong* (1986) 33 BLR 14, cited in my judgment in *Sinochem International Oil (London) Ltd v Mobil Sales and Supply Corp* [2000] CLC 878 at p 885. Speaking of a poorly drafted and ambiguous contract, Lord Bridge said that poor drafting itself provides:
>
>> 'no reason to depart from the fundamental rule of construction of contractual documents that the intention of the parties must be ascertained from the language that they have used interpreted in the light of the relevant factual situation in which the contract was made. But the poorer the quality of the drafting, the less willing the court should be to be driven by semantic niceties to attribute to the parties an improbable and unbusinesslike intention, if the language used, whatever it may lack in precision, is reasonably capable of an interpretation which attributes

> to the parties an intention to make provision for
> contingencies inherent in the work contracted for on a
> sensible and businesslike basis.'

…

> 16      ... in my judgment the subclause has no very natural meaning
> and is, at the least, open to two possible meanings or interpretations -
> one the judge's, the other that it addresses two separate subject-
> matters. In these circumstances, it is especially important to
> undertake the exercise on which the judge declined to embark, that is
> to consider the implications of each interpretation. In my opinion, a
> court when construing any document should always have an eye to
> the consequences of a particular construction, even if they often only
> serve as a check on an obvious meaning or a restraint upon adoption
> of a conceivable but unbusinesslike meaning. In intermediate
> situations, as Professor Guest wisely observes in *Chitty on Contracts*
> (28th edn) vol 1, para. 12-049, a 'balance has to be struck' through
> the exercise of sound judicial discretion."

27.   More generally, in *Homburg Houtimport BV v Agrosin Private Ltd*: *The
Starsin* [2004] 1 AC 715, para 10 Lord Bingham referred to

> "the rule to which Lord Halsbury LC alluded in *Glynn v Margetson
> & Co* [1893] AC 351, 359, 'that a business sense will be given to
> business documents. The business sense is that which businessmen,
> in the course of their ordinary dealings, would give the document."

28.   Three other cases merit brief reference.  The same approach was adopted by
Arden LJ in *In the Matter of Golden Key Ltd (In Receivership)* [2009] EWCA Civ
636, paras 29 and 42 and by this Court in *In Re Sigma Finance Corporation (in
administrative receivership)* [2009] UKSC 2; [2010] 1 All ER 571, where Lord
Mance said at para 12 that the resolution of an issue of interpretation in a case like
the present was an iterative process, involving checking each of the rival meanings
against other provisions of the document and investigating its commercial
consequences.

29.   Finally, it is worth setting out two extracts from the judgment of Longmore
LJ in *Barclays Bank plc v HHY Luxembourg SARL* [2010] EWCA Civ 1248;
[2011] 1 BCLC 336, paras 25 and 26:

> "25.   The matter does not of course rest there because when
> alternative constructions are available one has to consider which is

the more commercially sensible. On this aspect of the matter Mr Zacaroli has all the cards. ...

26.    The judge said that it did not flout common sense to say that the clause provided for a very limited level of release, but that, with respect, is not quite the way to look at the matter. If a clause is capable of two meanings, as on any view this clause is, it is quite possible that neither meaning will flout common sense. In such circumstances, it is much more appropriate to adopt the more, rather than the less, commercial construction."

30.    In my opinion Longmore LJ has there neatly summarised the correct approach to the problem. That approach is now supported by a significant body of authority. As stated in a little more detail in para 21 above, it is in essence that, where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense.  For these reasons I prefer the approach of the Judge and Sir Simon Tuckey to that of Patten LJ, which is to my mind significantly different on this point.

*Application to the facts*

31.    As indicated above, two possible interpretations of paragraph [3] of the Bonds were advanced. It was conceded on behalf of the Bank in the Court of Appeal that both constructions were arguable. I did not understand Mr Guy Philipps QC to resile from that position on behalf of the Bank in this Court.  In any event, in my judgment there are indeed two possible interpretations.

32.    The strength of the Bank's interpretation is that it is not easy to see the point of paragraph [2] of the Bonds if the Buyers' interpretation of paragraph [3] is correct. On the other hand, the Buyers' interpretation is straightforward. It is that, reduced to its essentials, the Bank's promise in paragraph [3] was that "in consideration of your [ie the Buyers'] agreement to make the pre-delivery instalments … we hereby, as primary obligor, promise to pay to you, your successors and assigns, on your first written demand, all such sums due to you under the Contract …". In the absence of paragraph [2] there could be no doubt that the reference to 'such sums' was a reference to the 'pre-delivery instalments' at the beginning of paragraph [3]. That makes perfect sense because one would naturally expect the parties to agree (and the Buyers' financiers to insist) that, in the event, for example, of the insolvency of the Builders, the Buyers should have security for the repayment of the pre-delivery instalments which they had paid.

33.     The question is whether the presence of paragraph [2] leads to a different conclusion. It was submitted with force by Mr Philipps on behalf of the Bank that it did. He correctly submitted that paragraph [3] must be construed in its context and that part of the context was paragraph [2], which was of course the immediately preceding paragraph. He submitted that the only purpose there can have been for including paragraph [2] in the Bonds was to identify the scope of paragraph [3]. He further submitted that no other sensible explanation for the inclusion of paragraph [2] had been advanced on behalf of the Buyers.

34.     I accept the submission that no very good reason was advanced on behalf of the Buyers for the inclusion of paragraph [2] in the Bonds. The best they could do was to say that it was a preamble to the operative provision in paragraph [3], that it simply set out some of the Buyers' rights under the Contracts and that it was not intended to identify the scope of the Bank's liability under the Bonds. Patten LJ accepted at para 50 that the Buyers' construction was arguable but said that, in his view, it was not the meaning that the document would convey to a reasonable person reading it with knowledge of the terms of the Contracts. This must I think mean that he took the view that, although it was arguable that it had that effect, it did not in fact do so.  Otherwise the Buyers' construction could not in any relevant sense have been said to be arguable and Patten LJ would surely not have described it as such.  Patten LJ made this clear in para 51 (quoted below), where he described the alternative constructions as not being in any way evenly balanced. The position is thus that, although he regarded both constructions as arguable in the sense that the Bonds might convey either construction to a reasonable person reading the Bonds with knowledge of the terms of the Contracts, in his view the Bank's construction was plainly to be preferred.  If Patten LJ went further later in para 51, where he said that the fact that cover for the insolvency of the Builder was desirable did not justify a departure from what would otherwise be "the natural and obvious construction of the bond", I respectfully disagree because I do not regard the Bank's construction as being the natural and ordinary meaning of the Bonds.

35.     I have considered the competing arguments for myself and have concluded that they are much more finely balanced than suggested by Patten LJ and the Bank. In para 48 Patten LJ expressed the view that paragraph [2] of the Bonds reproduced the terms of Article X.5 and Article X.6 of the Contracts and therefore complied with Article X.8. In para 49 he concluded that the obvious purpose of paragraph [2] was to give the addressee of the Bonds a clear statement of the Builder's obligations under the Contracts "which are to be covered by the guarantee and one which is consistent with the terms of the Builder's obligations to provide the bond under Article X.8 of the contract".

36.     For my part, I would not entirely accept that analysis. Paragraph [2] of the Bonds did reproduce the terms of Article X.5 and Article X.6 of the Contracts but it does not seem to me that it complied with the requirements of Article X.8. As I

see it, Article X.8 did not provide for the terms in which the Bonds were to be issued. It provided that two letters of guarantee were to be provided, the first by a first class Korean Bank or Guarantee Insurance Company for the refund of the first instalment and the second issued by "a first class Korean Bank or Guarantee Insurance Company acceptable to the Buyer's financiers for the refund of the respective installments following the way of the payment stipulated in this Article". The first paragraph of Article X.8 included this:

> "The refund guarantees by the Builder to the Buyer shall be indicated pre-delivery instalments plus interest as aforesaid to the Buyer under or pursuant to paragraph 5 above in the form annexed hereto as Exhibit 'A' which is yet to be agreed."

37.    In fact there was no form annexed to the Contracts, so it is far from clear what was meant by the sentence of the first paragraph of Article X.8 just quoted. As I see it, it was left that the parties would agree the final form of the Bonds referable to the second and subsequent instalments. Moreover both the identity of the issuer of the Bonds and the form of the Bonds were to be acceptable to the Buyers' financiers. That was made clear by the second paragraph of Article X.8 which is quoted in para 11 above. I would accept the submission made on behalf of the Buyers that it is clear that neither Article X.5 nor Article X.8 was intended to set out all the circumstances in which the refund guarantees should operate. For example, there was no cross-reference in Article X.8 to the Builder's obligation under Article X.6 of the Contracts to refund the instalments paid in the event of actual or constructive total loss, although it is common ground that the Bonds did cover that obligation. In short, Article X.8 did not purport to dictate the final scope of the Bonds. In particular, it did not require that the guarantees should cover refund obligations only under Article X.5 and Article X.6 of the Contracts.

38.    There is a further curiosity in paragraph [2] of the Bonds. In describing the Buyers' rights under the Contracts, it did not limit their rights to a refund of the pre-delivery instalments of the price. It extended them to the case where the Buyers were entitled to "the value of the Buyer's Supplies delivered to the Shipyard (if any)", although in so doing it failed accurately to reflect the contractual position in relation to termination as opposed to total loss, since under Article X.5 of the Contracts the obligation on termination was to return the Supplies, and only to (re)pay their value insofar as already incorporated into the Vessel. It would seem to follow from the Bank's submission that para [2] defined the scope of the Bank's obligations under para [3] that the expression "all such sums due to you under the Contract" included both the obligations to refund identified in para [2] and the obligation to pay the value of the Buyer's Supplies" (whatever that might cover). That was indeed the submission advanced in the Bank's skeleton argument in the Court of Appeal. It is however a submission that is no longer advanced by either party. That is no doubt because the difficulty with

it is that the Bonds were described as "Advance Payment Bonds" and the amount of each bond was US$26,640,000, which was the total amount of the second and subsequent instalments of the price, and because interest was only payable under para [3] of the Bonds "from the respective dates of payment by [the Buyers] of such instalments", thus leaving no room for a right to payment of the value of Buyer's Supplies under the Bonds.

39.     Sir Simon Tuckey took a different view of the construction of the critical clauses of the Bonds from that of Patten and Thorpe LJJ. He did so in para 28, where he was considering whether in the particular circumstances of the case the Judge should have had regard to considerations of commercial and business common sense.  He said this:

> "But should the judge's approach in this case have been more restricted as Mr Philipps contends? I do not think so. The title to Article X as a whole is "Payment" but it contains an assortment of different terms. Article X.8 is drafted on the basis that the form of guarantee which the parties contemplated would be annexed to the agreement. That would be the document to look at if one was trying to discover from the contract what the Buyer was looking for, not the reference back to Article X.5. This reference back is poorly drafted and quite capable of referring simply to the opening sentence of paragraph 5. It is difficult to construe it in a way which restricts the refund obligations which the bond was to cover, not least because there is no reference to the Article X.6 obligation to a refund following total or constructive loss of the vessel which both parties agree was to be covered by the bond. By the same token, no significance should be attached to the omission of the Article XII.3 refund obligation. Nor do I think there is anything in Mr Philipps' further point. On the happening of an Article XII.3 event the Buyer was entitled to a refund of its advance payments '*immediately*'. If that did not happen the contract was in a state of limbo: neither party could terminate at that stage. If the Builder did not proceed with the construction of the vessel, as would be extremely likely if it was insolvent, the Buyer could terminate for delay under Article XII.l but, under the terms of this article, only after 90 days plus 14 days notice. Only then could it call on the Bond. I cannot see how any Buyer (or its financiers) could possibly be satisfied with this as a remedy in the situation where the Builder was insolvent or nearly so."

I agree with Sir Simon Tuckey and prefer his approach to that of the majority in the Court of Appeal.

A002217

40.     In all these circumstances, because of the difficulties in construing para [2] as setting out the sums due under the Bond, if I were focusing only on the language of the clause, I would be inclined to prefer the Buyers' construction to that of the Bank.  I note in passing in this regard that the construction advanced by the Bank was something of an afterthought. However, I recognize that, on the Buyers' construction, it is not easy to see why paragraph [2] was included in the Bond at all, and that the Bank's construction is arguable.  This case is therefore a good example of the kind of case referred to in the authorities to which I have referred. Since the language of paragraph [3] is capable of two meanings it is appropriate for the court to have regard to considerations of commercial common sense in resolving the question what a reasonable person would have understood the parties to have meant.

41.     As noted at para 17 above, at his para 18(iii) the Judge described the Bank's construction of the Bonds as having what he called the surprising and uncommercial result that the Buyers would not be able to call on the Bonds on the happening of the event, namely insolvency of the Builder, which would be most likely to require the first class security. I agree with Sir Simon Tuckey that an appellate court is entitled to take account of the fact that an experienced judge of the Commercial Court reached that conclusion.  In any event, Sir Simon Tuckey expressed essentially the same view in strong terms at para 30:

> "On the Bank's construction the Bonds covered each of the situations in which the Buyers were entitled to a return or refund of the advance payments which they had made under the contracts apart from the insolvency of the Builder. No credible commercial reason has been advanced as to why the parties (or the Buyers' financiers) should have agreed to this. On the contrary, it makes no commercial sense. As the judge said, insolvency of the Builder was the situation for which the security of an advance payment bond was most likely to be needed. The importance attached in these contracts to the obligation to refund in the event of insolvency can be seen from the fact that they required the refund to be made immediately. It defies commercial common sense to think that this, among all other such obligations, was the only one which the parties intended should not be secured. Had the parties intended this surprising result I would have expected the contracts and the bonds to have spelt this out clearly but they do not do so."

I agree.

42.     Patten LJ's view to the contrary is summarised at para 51:

A002218

"For the reasons which I have given, I do not regard the alternative constructions of paragraph (3) advanced on this appeal as being in any way evenly balanced. I also agree with Mr Philipps that it is impermissible to speculate on the reasons for omitting repayments in the event of insolvency from the bond. Although the judge is right to say that cover for such event was, objectively speaking, desirable, that is not sufficient in itself to justify a departure from what would otherwise be the natural and obvious construction of the bond. There may be any number of reasons why the Builder was unable or unwilling to provide bank cover in the event of its insolvency and why the Buyer was prepared to take the risk. This is not a case in which the construction contended for would produce an absurd or irrational result in the sense described in the cases I have referred to and merely to say that no credible commercial reason has been advanced for the limited scope of the bond does, in my view, put us in real danger of substituting our own judgment of the commerciality of the transaction for that of those who were actually party to it."

43.    As Hoffmann LJ put it, after quoting from Lord Diplock's speech in *The Antaios* [1985] AC 191, if the language is capable of more than one construction, it is not necessary to conclude that a particular construction would produce an absurd or irrational result before having regard to the commercial purpose of the agreement.  See, for example, per Hoffmann LJ quoted at para 23 above, where he said:

"But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

See also the quotation from Longmore LJ at para 29 above, where he said that, if a clause is capable of two meanings, it is quite possible that neither meaning will flout common sense, but that, in such a case, it is much more appropriate to adopt the more, rather than the less, commercial construction.

44.    In para 51 Patten LJ appears to have accepted that no credible commercial reasons were advanced for the limited scope of the Bonds being advanced by the Bank. Mr Philipps submitted that it was not necessary for the Bank to address the question but I have no doubt that if he or the Bank had been able to think of a credible reason for excluding repayments in the event of the Builder's insolvency, such a reason would have been at the forefront of the Bank's case.

A002219

45.    In these circumstances I would, if necessary, go so far as to say that the omission of the obligation to make such re-payments from the Bonds would flout common sense but it is not necessary to go so far. I agree with the Judge and Sir Simon Tuckey that, of the two arguable constructions of paragraph [3] of the Bonds, the Buyers' construction is to be preferred because it is consistent with the commercial purpose of the Bonds in a way in which the Bank's construction is not.

46.    I note that Thorpe LJ was initially inclined to agree with the conclusions of the Judge but, in the event, agreed with Patten LJ without giving any independent reasons of his own.

*CONCLUSION*

47.    For these reasons I would allow the appeal and restore the order of the Judge.



**Trinity Term**
**[2015] UKSC 36**
*On appeal from: [2013] EWCA Civ 902*

# JUDGMENT

# Arnold (Respondent) *v* Britton and others (Appellants)

**before**

**Lord Neuberger, President**
**Lord Sumption**
**Lord Carnwath**
**Lord Hughes**
**Lord Hodge**

# JUDGMENT GIVEN ON

# 10 June 2015

**Heard on 26 January 2015**

| *Appellants* | *Respondent* |
|---|---|
| Timothy Morshead QC | Michael Daiches |
| Rawdon Crozier | |
| (Instructed by Fursdon | (Instructed by Morgan la |
| Knapper Solicitors) | Roche Solicitors) |

A002222

**LORD NEUBERGER: (with whom Lord Sumption and Lord Hughes agree)**

1.     This appeal concerns the interpretation of service charge contribution provisions in the leases of a number of chalets in a caravan park in South Wales.

*The facts*

2.     The facts may be summarised as follows (although they are more fully set out by Lord Carnwath in paras 81 to 103).

3.     Oxwich Leisure Park is on the Gower Peninsular, and contains 91 chalets, each of which is let on very similar terms. The five leases which we have seen were granted between 1978 and 1991, either for a premium (of less than £20,000) or in return for the lessee constructing the chalet. Each of the 91 chalets was let on a lease which was for a term of 99 years from 25 December 1974 and reserved a rent of £10 per annum increasing by £5 for each subsequent period of 21 years. Para (2) of the recital of each lease contains the statement that the chalets on the Leisure Park were intended to be subject to leases "upon terms similar in all respects to the present demise".

4.     Clause 3 of each lease contains various covenants by the lessee, and it is introduced by the words:

> "The lessee hereby covenants with the lessor and with and for the benefit of the owners and lessees from time to time during the currency of the term hereby granted of the other plots on the estate so far as the obligations hereinafter mentioned are capable of benefitting them …"

The covenants that follow concern use, repair, alienation and the like. Crucially for present purposes, clause 3(2) is a covenant to pay an annual service charge. Each lease also contains covenants by the lessor. One such covenant is to provide services to the Park, such as maintaining roads, paths, fences, a recreation ground and drains, mowing lawns, and removing refuse. The lessor also covenants in clause 4(8) that leases of other chalets "shall contain covenants on the part of the lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit".

5.     Twenty-five of the chalets are said by the respondent, the current owner of the Leisure Park and the landlord under the leases, to be subject to leases containing a service charge provision in clause 3(2), which requires the lessee to pay for the first year of the term a fixed sum of £90 per annum, and for each ensuing year a fixed sum representing a 10% increase on the previous year – ie an initial annual service charge of £90, which increases at a compound rate of 10% in each succeeding year. The issue on this appeal is whether the respondent's interpretation of clause 3(2) in those 25 leases is correct.

6.     Of the 25 leases in question, 21 were granted between 1977 and 1991. Prior to the grant of most of those 21 leases, the other 70 chalets had been the subject of leases granted from the early 1970s. In each of those 70 leases, clause 3(2) was a covenant by the lessee:

> "To pay to the Lessor without any deduction in addition to the said rent a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part thereof."

The effect of this clause, at least on the face of it, is that the initial service charge of £90 per annum was to be increased on a compound basis by 10% every three years, which is roughly equivalent to a compound rate of 3% per annum.

7.     The 21 leases referred to in para 6 have two slightly different versions of clause 3(2), but the clause can be set out in the following form (with the words shown in bold included in 14 of the 21 leases, but not in the other seven):

> "To pay to the Lessor without any deductions in addition to the said rent **as** a proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal **and renewal of the facilities of the Estate** and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year **or part** thereof."

8.     To complicate matters a little further, the service charge clause in four of these 21 leases (being three of the seven which did not include the words in bold in the preceding quotation), had the word "for" before "the yearly sum of Ninety

A002224

Pounds". These four leases also included a proviso to the effect that, so long as "the term hereby created is vested in the [original lessees] or the survivor of them", clause 3(2) would be treated as being in the form set out in para 6 above. This proviso has ceased to have effect as these four leases are no longer vested in the original lessees.

9.      Finally, the service charge clause in four of the 70 leases referred to in para 6 above were varied pursuant to deeds of variation executed between October 1998 and August 2002 so as to be identical to that set out in para 7 above, including the words in bold.

*The issues between the parties*

10.      As already explained, the respondent, the current landlord, contends that the service charge provisions in clause 3(2) of the 25 leases referred to in paras 6 to 9 above have the effect of providing for a fixed annual charge of £90 for the first year of the term, increasing each subsequent year by 10% on a compound basis. The appellants, the current tenants under 24 of the 25 leases, primarily contend that the respondent's construction results in such an increasingly absurdly high annual service charge in the later years of each of the 25 leases that it cannot be right. They argue that, properly read, each service charge clause in the 25 leases requires the lessee to pay a fair proportion of the lessor's costs of providing the services, subject to a maximum, which is £90 in the first year of the term, and increases every year by 10% on a compound basis. In other words, the appellants argue that, in effect, the words "up to" should be read into the clause set out in para 7 above, between the words "the provision of services hereinafter set out" and "the yearly sum of Ninety Pounds". The appellants also have an alternative contention, based on the provisions of recital (2), the opening words of clause 3 and the provisions of clause 4(8) of their leases, namely that the lessor cannot recover more by way of service charge than could be recovered under each of the first 70 leases.

*The evidence*

11.      Apart from the documents themselves and the published Retail Price Index (RPI) for each of the years 1970-2010, there is no evidence as to the surrounding circumstances in which the 21 leases were executed, other than the fact that the four leases referred to in para 8 above were granted to individuals connected with the lessor. Following a request from the court, we were also told that three of the four deeds of variation referred to in para 9 above were entered into with the lessor's daughter as lessee.

A002225

12.     I do not find it surprising that we have not been provided with any further evidence. So far as the wording of clause 3(2) is concerned, there may have been letters or notes of discussions in connection with the original drafting and granting (and, in the four cases referred to in para 9 above, the amending) of the leases. But, even if such notes or letters had survived, I very much doubt that they would have thrown any light on what was intended to be the effect of the drafting of the various forms of clause 3(2). Even if they had done, they would probably have been inadmissible as I strongly suspect that they would merely have shown what one party thought, or was advised, that the clause meant. If such documents had shown what both parties to the lease in question intended, they would probably only have been admissible if there had been a claim for rectification.

13.     As to the possibility of other material, I am unconvinced that, even if it existed, evidence of the original level of services, the original cost of the services or any investigations made on behalf of a potential lessee in relation to the original services and their cost would have assisted on the issue of what clause 3(2) of any of the 25 leases meant. The provisions for increase at the end of clause 3(2) of each lease were plainly included to allow for inflation, and the only evidence which appears to me to be potentially relevant would be contemporary assessments of the actual and anticipated annual rate of inflation, and, as already mentioned, we have the RPI for each of the years in question.

*Interpretation of contractual provisions*

14.     Over the past 45 years, the House of Lords and Supreme Court have discussed the correct approach to be adopted to the interpretation, or construction, of contracts in a number of cases starting with *Prenn v Simmonds* [1971] 1 WLR 1381 and culminating in *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900.

15.     When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] 1 AC 1101, para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see *Prenn* at pp 1384-1386 and *Reardon Smith*

*Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989, 995-997 per Lord Wilberforce, *Bank of Credit and Commerce International SA (in liquidation) v Ali* [2002] 1 AC 251, para 8, per Lord Bingham, and the survey of more recent authorities in *Rainy Sky*, per Lord Clarke at paras 21-30.

16.    For present purposes, I think it is important to emphasise seven factors.

17.    First, the reliance placed in some cases on commercial common sense and surrounding circumstances (eg in *Chartbrook*, paras 16-26) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

18.    Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.

19.    The third point I should mention is that commercial common sense is not to be invoked retrospectively. The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. Judicial observations such as those of Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251 and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191, 201, quoted by Lord Carnwath at para 110, have to be read and applied bearing that important point in mind.

20.    Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the

A002227

natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21.     The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22.     Sixthly, in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56, 2012 SCLR 114, where the court concluded that "any … approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered into" the contract (see paras 17 and 22).

23.     Seventhly, reference was made in argument to service charge clauses being construed "restrictively". I am unconvinced by the notion that service charge clauses are to be subject to any special rule of interpretation. Even if (which it is unnecessary to decide) a landlord may have simpler remedies than a tenant to enforce service charge provisions, that is not relevant to the issue of how one interprets the contractual machinery for assessing the tenant's contribution. The origin of the adverb was in a judgment of Rix LJ in *McHale v Earl Cadogan* [2010] EWCA Civ 14, [2010] 1 EGLR 51, para 17. What he was saying, quite correctly, was that the court should not "bring within the general words of a service charge clause anything which does not clearly belong there". However, that does not help resolve the sort of issue of interpretation raised in this case.

A002228

*Discussion: interpretation of clause 3(2)*

24.     When one turns to clause 3(2) of each of the 91 leases of the chalets in Oxwich Park, the natural meaning of the words used, at least until one considers the commercial consequences, seems clear. The first half of the clause (up to and including the words "hereinafter set out") stipulates that the lessee is to pay an annual charge to reimburse the lessor for the costs of providing the services which he covenants to provide, and the second half of the clause identifies how that service charge is to be calculated.

25.     The fact that the second half of the clause results in the service charge being a fixed sum, rather than a sum dependent on the costs to the lessor of providing the contractual services is readily explicable. As stated in Wonnacott's *The History of the Law of Landlord and Tenant in England and Wales* (2012), p 106, clauses which provide for charges which vary with the costs of providing services have resulted, at least since around 1960, in "more trouble between landlord and tenant than anything else". Further, legislation which started to come into force in 1972 has rendered it progressively more difficult for an "amateur landlord" (to use Wonnacott's expression) to recover a disputed service charge calculated on such a basis. The fact that the second half of the clause goes on to provide for a fixed increase in the annual sum is also readily explicable: the parties assumed that the cost of providing the services in sterling terms would increase, or, to put the same point another way, they assumed that the value of money would fall.

26.     Davis LJ concisely explained the thinking behind the clause in the course of his judgment in the Court of Appeal, [2013] EWCA Civ 902, para 52:

> "Lack of correspondence between outlay and receipt is the almost inevitable consequence of such a clause if the parties have elected for a fixed charge formula. It has a similarity with a liquidated damages clause: it represents the parties' estimate at the outset for the future with neither guarantee nor even expectation of entire coincidence with the eventual outcome. But the advantage is certainty. The parties know from the outset where they stand. Moreover, it is a surrounding circumstance legitimately to be taken into account here that the leases were made at a time of inflation – in some years, very significant inflation – which the parties, objectively and commercially speaking, could be expected to want to confront. They chose to do so by this particular formula of increase."

27.     In those seven leases where the word "as" is not included, I suppose that it might be said that this is not clear unless words such as "quantified in the sum of"

A002229

were included in order to link the two halves of the clause, but that is, to my mind, a really pedantic argument. Although perfectionist drafting might suggest the inclusion of such words, it seems to me that the absence of such words cannot fairly be invoked to suggest ambiguity or a lack of clarity. The reasonable reader of the clause would see the first half of the clause as descriptive of the purpose of clause 3(2), namely to provide for an annual service charge, and the second half as a quantification of that service charge.

28.    It is true that the first part of the clause refers to a lessee paying a "proportionate part" of the cost of the services, and that, unless inflation increases significantly in the next 50 years, it looks likely that the service charge payable under each of the 25 leases may exceed the cost of providing services to the whole of the Leisure Park. However, if, as I believe is clear, the purpose of the second part of the clause is to quantify the sum payable by way of service charge, then the fact that, in the future, its quantum may substantially exceed the parties' expectations at the time of the grant of the lease is not a reason for giving the clause a different meaning. As already explained, the mere fact that a court may be pretty confident that the subsequent effect or consequences of a particular interpretation was not intended by the parties does not justify rejecting that interpretation.

29.    However, given the way things have turned out, it is tempting to latch onto the absence of words such as "quantified in the sum of", and to see the two halves of clause 3(2) as mutually inconsistent in their effect. This would be on the ground that the first half of the clause requires the lessee to pay a "proportionate part" of the cost to the lessor of providing services, whereas the latter half requires the lessee to pay a sum which could exceed the whole of that cost. On that basis, it might be said that the court can reject or modify one half to give effect to the real intention of the parties – see eg *Walker v Giles* (1848) 6 CB 662. However, as explained in para 24 and 25 above, this argument would, in my view, involve the court inventing a lack of clarity in the clause as an excuse for departing from its natural meaning, in the light of subsequent developments.

30.    Were it not for the percentage increases of 10% per annum specified in the 25 service charge clauses which are being considered on this appeal, coupled with the subsequent history of inflation in the United Kingdom, that would be the end of it. Thus, it seems to me that the original 70 leases (referred to in para 6 above), with a clause 3(2), which provided for increases of about 3% per annum (at a time when inflation was running at a significantly higher rate), should plainly be interpreted in the way in which the respondent contends. However, the consequences of the annual sum of £90 being increased annually by 10% on a compound basis are plainly unattractive, indeed alarming, to a lessee holding a chalet under one of the 25 leases. If one assumes a lease granted in 1980, the service charge would be over £2,500 this year, 2015, and over £550,000 by 2072. This appears to be an alarming outcome for the lessees, at least judging by how things look in 2015, because annual inflation in

the last 15 years has hardly ever been above 4%, indeed has been under 3% for ten of those years, and has notoriously been falling recently almost to the point of turning negative, whereas the service charge over that period has increased, and will continue to increase, by 10% per annum.

31.     The appellants argue that these figures illustrate the extreme unlikelihood of the parties to the 21 leases (or to the four subsequent deeds of variation), and in particular the lessees, having intended to agree that the original £90 service charge would be automatically increased by 10% annually on a compound basis. Accordingly, they contend, the latter half of clause 3(2) should be interpreted as imposing a maximum on the annual service charge recoverable by the lessor. In other words, the effect of the clause is said to be that the lessor is entitled to an appropriate percentage of the annual cost of providing the contracted services, subject to a maximum – which was initially £90, but which increases by 10% compound annually.

32.     Despite the unattractive consequences, particularly for a lessee holding a chalet under one of the 25 leases, I am unconvinced by this argument. It involves departing from the natural meaning of clause 3(2) in each of those leases, and it involves inserting words which are not there.

33.     Further, the appellants' argument involves attributing to the parties to the 25 leases an intention that there should be a varying service charge and that the lessor (or some other unspecified person) should assess the total costs of the services and determine the appropriate proportion of the cost of the contractual services to allocate to each chalet. Although I accept that it has an element of circularity, it appears to me that the average reader of clause 3(2) would have thought that those are exercises which the clause seems to have been designed to avoid.

34.     Although there are one or two very small errors in the drafting, I do not consider that anything has gone significantly wrong with the wording of clause 3(2) of any of the 25 leases. As already explained, I would reject the notion that, on a natural reading, the two parts of the clause do not relate to each other, or appear to say different things, even in the seven cases where the word "as" is not included: as the Court of Appeal said, the first half imposes a liability for an annual service charge and the second half explains how it is to be assessed. I do not think that the reference to part of a year in the closing words of the clause (para 7 above refers), or the inclusion of an unnecessary "for" (para 8 above refers), in some of the 25 leases can possibly justify departing from the natural meaning of clause 3(2). At best the reference to part of a year is meaningless. However, given that the 99 year term of each lease ran from Christmas 1974, all of them would have ended part way through a year, as they would also have been very likely to do if surrendered or forfeited. Furthermore, the fact that some clauses refer not merely to "repair

maintenance and renewal", but also to "renewal of facilities on the Estate" seems to me to be irrelevant to the issue on this appeal.

35.   Quite apart from the fact that the effect of clause 3(2) appears clear in each lease as a matter of language, I am far from convinced by the commercially-based argument that it is inconceivable that a lessee would have agreed a service charge provision which had the effect for which the respondents contend, at least in the 1970s and much of the 1980s. Although I would have expected most solicitors to have advised against it, and imprudent though it undoubtedly has turned out to be (at least so far), a lessee could have taken the view that a fixed rate of increase of 10% per annum on a fixed initial service charge, at a time when annual inflation had been running at a higher rate for a number of years (well over 10% per annum between 1974 and 1981, indeed over 15% per annum for six of those eight years; although it was less than 10% per annum after 1981), was attractive or at least acceptable.

36.   If inflation is running at, say 10% per annum, it is, of course, very risky for both the payer and the payee, under a contract which is to last around 90 years, to agree that a fixed annual sum would increase automatically by 10% a year. They are taking a gamble on inflation, but at least it is a bilateral gamble: if inflation is higher than 10% per annum, the lessee benefits; if it is lower, the lessor benefits. On the interpretation offered by the appellants, it is a one way gamble: the lessee cannot lose because, at worst, he will pay the cost of the services, but, if inflation runs at more than 10% per annum, the lessor loses out.

37.   The fact that a court may regard it "unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money" over many decades (to quote Gibbs J in *Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd* [1981] HCA 3, (1981) 145 CLR 625, 639) is nothing to the point. People enter into all sorts of contracts on the basis of hopes, expectations and assessments which no professional expert would consider prudent, let alone feel able to "predict with accuracy". I have little doubt that many fortunes have been both made and lost (and sometimes both) by someone entering into such a contract.

38.   In terms of commercial justification, the analysis in paras 34 and 35 above becomes more difficult to invoke the further one moves on from 1981, the last year when inflation was above 10% per annum, although in 1990 it almost hit that figure. Accordingly, while I think the analysis comfortably applies to the 21 leases referred to in paras 6 to 8 above, which were granted between 1977 and 1990, it is unconvincing in relation to the four leases whose service charge provisions were amended around 2000, as mentioned in para 9 above.

39.     It seems rather extraordinary that a lessee under a lease which provided for an increase in a fixed service charge at the rate of 10% over three years should have agreed to vary the lease so that the increase was to be at the rate of 10% per annum, at a time when inflation was running at around 3% per annum. However, I do not accept that this justifies reaching a different result in relation to any of the four leases which were varied in 2000. Three of them are relatively easily explicable, as the lessee who agreed the variation was closely connected with the lessor. The fact that they were subsequently assigned is, I accept, remarkable, but that later fact cannot affect the interpretation of the deeds. As to the fourth deed, it was, on any view, an improvident variation to have agreed, but, as already explained, that is not enough to justify the court rewriting the contract under the guise of interpreting it. Further, given that, at least in my view, there could be no ground for suggesting that the original clause 3(2) in the three leases (providing as it did for an annual increase of around 3%) had any effect other than that for which the respondent contends, it is particularly difficult to suggest that the substituted clause, which changed the annual increase to 10%, but was otherwise identically worded (save that it included the word "as" and was therefore even clearer), should have a different effect.

40.     I note in this connection that, at a time when inflation was running at well over 10% per annum from 1974 to 1980 (possibly excepting 1984), the lessor was granting leases which provided, in effect, for increases in the £90 at the rate of about 3% per annum (para 6 above refers). Of course, that cannot be taken into account when interpreting any of the 25 leases, but it shows the lessor was prepared to take what appears to have been an unwise decision which was not entirely dissimilar from the unwise decision which, in my view, the lessees under the 25 leases took.

41.     I do not think that this is a case where the approach adopted by this court in *Aberdeen City Council* can assist the appellants. Unlike that case, this is not a case where one of the parties has done something which was not contemplated by the contract. It is clear that the 10% per annum increase in clause 3(2) was included to allow for a factor which was out of the control of either party, namely inflation. In my judgment, there is no principle of interpretation which entitles a court to re-write a contractual provision simply because the factor which the parties catered for does not seem to be developing in the way in which the parties may well have expected.

42.     It also appears to me that there is a degree of inconsistency in the appellants' case. That case is, of course, ultimately based on the unlikelihood of a lessor and lessee of a single chalet agreeing that an initial annual service charge of £90 should be increased at a rate which could well lead to the annual charge being an absurdly high figure – possibly more than the cost of providing the services for the whole Leisure Park. But it is also rather unlikely (albeit less unlikely, I accept) that they will have agreed a ceiling on the annual service charge which would become so absurdly high that it would be meaningless. In other words, it can be said with some

A002233

force that the appellants' solution to the problem which they identify does not actually address the problem: it merely changes its commercial consequences.

43.    I should add that, subject to the point dealt with in the next section of this judgment, I am unconvinced that any assistance can be gained from the differences between the various forms of clause 3(2). It seems to me positively unlikely that the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases. But, even if they had been so aware, it seems to me that it would assist the respondent's case, not that of the appellants. That is because, given that it appears clear that the second half of clause 3(2) in the earlier 70 leases operated to quantify the service charge, then it seems to me (as explained in the last sentence of para 39 above) that it is very unlikely that the parties can have intended the almost identically worded second half of clause 3(2) in the later 21 leases to have a very different effect from that in the earlier 70 leases.

44.    In his judgment at para 116, Lord Carnwath rightly points out that, even after he assigns the lease, the original lessee is bound for the duration (at least if it was granted before 1996). However, I do not see what that adds in this case: on any view, these leases involve long term commitments on both sides. I agree with his view in para 117 that a prospective lessee of a flat in a block or the like (as here) will normally be likely to have less negotiating freedom as to the terms than in relation to a "free standing" property. But so will the lessor, and either is free to walk away if he regards the terms as unsatisfactory.

45.    I am also unconvinced that the remedies available (whether in common law or under statute) to the parties in the event of a breach in connection with services or service charge, as discussed in Lord Carnwath's para 121-123, assists on the issue we have to decide. We are concerned with what a service charge clause means, not how it is being operated.

46.    Finally on this first point, Lord Carnwath makes some remarks about service charge provisions in his para 119. There will, I suspect, be many cases where his observations are very much in point: indeed, they may well be normally in point. However, the lessor has no duty to be "fair" when negotiating the terms of a lease (any more than the lessee does), although it may well be in his interest to be (or at least to appear to be) fair. But, whosever interpretation is correct, clause 3(2) was self-evidently not a "normal" service charge clause: on the respondent's case, the landlord might get more or less than the costs of providing the services; on the appellants' case, the landlord might get less than the costs of providing the services.

A002234

*Discussion: the effect of clause 4(8) and the terms of the other leases*

47.    The appellants, at the invitation of the court, argued that clause 4(8), which as explained in para 4 above required leases of chalets to be granted subject to identical or similar obligations, substantially mitigated the effect of clause 3(2) of their leases. They contended that clause 4(8), when read together with the opening words of clause 3 and para (2) of the recital to each lease, referred to in paras 3 and 4 above, enable them to limit the service charge which the landlord could otherwise recover under clause 3(2).

48.    The appellants' argument in this connection proceeds in two steps. First, as a result of clause 4(8), the opening words of clause 3, and para (2) of the recital in each of their leases, a term was implied into their leases to the effect that clause 3(2) was in the same terms as clause 3(2) of the leases of chalets which had already been granted – ie the 70 leases referred to in para 6 above. Secondly, in those circumstances the lessor is now precluded from recovering more by way of service charge than would be recoverable under the terms of the service charge provisions in the 70 leases – ie £90 plus 10% compounded every three years. While this argument has obvious attraction, I would reject it.

49.    The purpose of clause 4(8), the opening words of clause 3, and recital (2) was, I would accept, to create what is sometimes referred to as a "building scheme", but, at least in the present context is more accurately described as a letting scheme. Such a scheme, which is recognised and given effect to by equity, has to be apparent from the terms of the relevant leases (or, very unusually, from a side agreement entered into by each lessee with the lessor). A letting scheme involves properties within a given area being let on identical or similar terms, normally by the same lessor, with the intention that the terms are to be enforceable not only by the lessor against any lessee, but as between the various lessees – even by an earlier lessee of one property against a later lessee of another property. There is plainly a strong case for saying the combination of para (2) of the recital, the opening words of clause 3 and the provisions of clause 4(8) establishes that there is such a scheme in relation to the chalets in the Leisure Park. Accordingly, I am prepared to assume that there was envisaged that there would be a degree of reciprocity and mutual enforceability between the lessees of chalets when it came to the covenants they entered into.

50.    However, in my view, the appellants' reliance on the scheme in order to limit the service charges recoverable under clause 3(2) of their leases faces a number of problems.

51.    First, it seems to me to be unclear whether a provision such as clause 3(2) could be or was subject to the scheme. There is room for argument whether a letting

Page 14

A002235

scheme can only extend, like freehold schemes, to restrictive covenants, or whether it can also extend to positive covenants (on the basis that positive covenants between lessor and lessee are enforceable as between their respective successors, whereas only restrictive covenants are enforceable as against successors of covenantors in relation to freeholds). Even if a leasehold scheme can extend to positive covenants, it is also questionable whether a lessee's covenant to pay a service charge, or any other sum of money to the lessor, can be within the ambit of a scheme.

52.     Secondly, in so far as they are dealing with the provisions of leases of other chalets, clause 4(8), and (arguably) the opening words of clause 3 and recital (2) appear to refer to future lettings, not to past lettings. It is quite a bold step to imply a term as to what has happened in the past from an express provision which is limited to the future. Having said that, there is considerable practical force in the contention that the scheme contemplated by the three provisions could only work if leases of all the chalets, past, present and future, were on the same terms.

53.     Thirdly, even if the appellants' argument based on an implied term was otherwise correct, there would still be considerable force in the contention that it would not exonerate the appellants from complying with their obligations under clause 3(2). It seems clear that, where there is a letting scheme, a tenant can enjoin the landlord from letting a property within the scheme area on terms which are inconsistent with the scheme. However, as far as I am aware, there is no case where the landlord has been held liable to a tenant in damages (or otherwise) for having let a property within the scheme area on such terms, prior to the grant of the tenant's lease.

54.     Fourthly, even if these arguments are all rejected, the closing words of clause 4(8) clearly permit a degree of variation between the terms of the leases of different chalets. If the second part of clause 3(2) is intended to reflect the level of projected inflation, then the parties may well have regarded it as almost inevitable that any annual or triennial adjustment would vary from time to time. On that basis, there may be no breach of any implied term anyway.

55.     However, it is unnecessary to address the four points identified in paras 51-54 above, because, in my judgment, there is a fatal flaw in the appellants' argument based on an implied term. In effect, the appellants' case is that the implied term in each of the 21 leases is that the lessor was not asking anything of the lessee which had not been, or would not be, required of lessees of other chalets, whether their leases were in the past or the future. However, it seems to me that, assuming everything else in the appellants' favour, that would not be the correct term to imply. As I see it, if there is an implied term along the lines argued for, it is that the already existing 70 leases of chalets contain a clause 3(2) identical with that in the

A002236

appellant's leases – ie that the 70 existing leases have service charges which increase at the compound rate of 10% per annum as in the 21 leases.

56.    In so far as it relates to the 70 existing leases, the implied term suggested by the appellants is inconsistent with both (a) an express term of the appellants' leases, namely clause 3(2) itself, and (b) what is implied in relation to future leases. As to point (a), the appellants' suggested implied term means that clause 3(2) involves a 10% increase every three years, whereas there is an express term to the effect that the 10% increase is every year; and it is a fundamental principle that one cannot imply a term which is inconsistent with an express term. As to point (b), any reader of an appellant's lease who was asked what future leases of chalets would contain by way of a service charge provision would answer that it would be the same as that in the instant lease – ie £90 pa subject to an increase of 10% per annum compounded; and the implied term applicable to future leases should be the same as that applicable to past leases.

57.    If the appellants are right in their contention that there is an implied term, the term which I would favour (as set out at the end of para 55 above) runs into neither of these difficulties. It amounts to saying that, as clause 3(2) of an appellant's lease means that the service charge is to be £90 pa increasing by 10% pa compounded, there is a term implied into the lease that that is what the existing leases provide and it is what future leases will provide.

58.    If, as the appellants contend, there is an implied term, but that is its correct characterisation, it is difficult to see how it can help them. An appellant can say that the fact that the 70 existing leases contain a different clause 3(2) means that there is a breach of the implied term, but it is hard to see what damage or other injury has been suffered if the respondent now insists on enforcing clause 3(2) of their leases against the appellants. If an appellant could show that the value of his lease was reduced because the lessor had not granted the first 70 leases with the same clause 3(2) as was in the appellant's lease, the consequent reduction in the value of that lease could well be the appropriate measure of damages. But I cannot at the moment see on what basis the breach can assist an appellant in resisting the full financial consequences of the clause 3(2) he entered into.

59.    I should add that, if, contrary to my view expressed in para 43 above, the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases (as Lord Carnwath suggests), it would negative any reliance which the lessees under the 21 leases could place on clause 4(8), as just discussed. This is because the later lessees would have known of, and accepted, the departure from the original clause 3(2).

*Conclusion*

60.     Accordingly, in agreement with the reasons given by Lord Hodge in this court, Davis LJ in the Court of Appeal and Morgan J in the High Court, I would dismiss this appeal, and I do not consider that the appellants are assisted by the additional argument raised in this court. I should, however, make five final points.

61.     First, the Court of Appeal suggested that the only way the lessees under the 25 leases could escape from their problems would be by surrendering or suffering forfeiture. In case this is misinterpreted, it is right to point out that surrender is consensual between lessee and lessor, and forfeiture involves unilateral action by a lessor, and so neither course can be forced on the lessor.

62.     Secondly, I have considerable sympathy with Lord Carnwath's conclusion that the appeal should be allowed (not least because it is a much more satisfactory outcome in common sense terms, particularly viewed as at today), and I acknowledge that his reasons are as powerful as his conclusion allows. However, for the reasons I have given, I cannot agree with him.

63.     Thirdly, the fact that four leases were granted to associates of the lessor with the proviso described in para 8 above, and that three of the deeds of variation described in para 9 above were entered into with a lessee who was a close relation of the lessor, is worthy of comment. It suggests that the lessor or her advisers may have appreciated the potential disadvantages of the clause now contained in the 25 leases. However, I do not see how it can assist the lessees on the issue in these proceedings, namely the interpretation of the clause in the 25 leases.

64.     Fourthly, as Lord Carnwath records in para 155 below, it appears that the respondent realistically recognises the unsatisfactory situation in which the lessees under the 25 leases find themselves, and is prepared to agree appropriate amendments to their leases. I hope that a fair and just amendment can be agreed.

65.     Finally, as Lord Carnwath also points out in paras 90-93 below, there are various statutory provisions which protect tenants against unreasonable service charges, but none of them apply here. The present case suggests that there may be a strong case for extending such provisions to cases such as the present, even though they involve a fixed sum payable by way of service charge. But that is a policy issue for Parliament, and there may be arguments either way.

A002238

**LORD HODGE: (agrees with Lord Neuberger)**

66.    I agree that the appeal must be dismissed for the reasons which Lord Neuberger sets out. But it is a highly unsatisfactory outcome for the chalet tenants who are affected by the annual escalator of the service charge. It is not clear whether there are many long leases containing fixed service charges with escalators which are beyond the reach of statutory regulation. If there are, there may be a case for Parliament to consider extending the provisions that protect tenants against unreasonable service charges.

67.    Mr Morshead QC for the appellants submitted in his written case that what was important was "(a) that the risk [of inflation falling and remaining substantially below 10%] would have been obvious to the officious, reasonable bystander who must be imagined interrogating the actual parties and (b) that no reasonable person in the position of the parties, looking at the leases in their entirety and in context, would understand them to have intended that the tenants should assume that risk". He envisaged that in a hypothetical dialogue the officious bystander would warn the parties of the risks of their proposed contract and they would make it clear that that was not their intention.

68.    In the course of the debate we were referred directly or by reference to several cases concerning the remediation of a mistake by construction or the implication of a term. In my view they do not give the support that Mr Morshead needs.

69.    In *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2004] 1 AC 715 the mistaken omission of words in a clause was apparent because the bill of lading had been modelled on a standard clause. The person who had transposed the standard clause into the bill of lading had omitted a phrase in the standard clause in which the same word had appeared at the end of two consecutive phrases. The mistake was clear and it was apparent what correction was called for (paras 22 and 23 per Lord Bingham).

70.    In *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101 a definition, which contained a grammatical ambiguity, made no commercial sense if interpreted in accordance with the ordinary rules of syntax. The background to the deal and the internal context of the contract showed that there was a linguistic mistake in the definition, which the court was able to remove by means of construction. In his speech Lord Hoffmann (at p 1114) referred with approval to the judgment of Carnwath LJ in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336. In that case, which concerned a rent review clause in a lease, it was clear from the terms of the clause that its wording did not make sense. The court was assisted by an earlier agreement which set out the then intended clause containing a parenthesis,

of which only part had remained in the final lease. It was not clear whether the parties had mistakenly deleted words from the parenthesis, which they had intended to include, or had failed to delete the parenthesis in its entirety. But that uncertainty as to the nature of the mistake, unusually, did not matter as the outcome was the same on either basis.

71.     In *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56, 2012 SCLR 114 the internal context of the contract provided the answer. The sale contract provided for the payment to the vendor of a further sum on disposal of the land by the purchaser. Two of the methods of disposal required the parties to ascertain the market value of the property on disposal in calculating the additional payment and the other used the "gross sales proceeds" in calculating that payment. The purchaser sold the site at an under-value to an associated company, a circumstance which on the face of the contract the parties had not contemplated. The courts at each level interpreted the provision, which used the gross sales proceeds in the calculation, as requiring a market valuation where there was a sale which was not at arm's length. They inferred the intention of the parties at the time of the agreement from the contract as a whole and in particular from the fact that the other two methods of disposal required such a valuation. While this line of reasoning was criticised by Professor Martin Hogg ((2011) Edin LR 406) on the ground that it protected a party from its commercial fecklessness, it seems to me to be the correct approach in that case as the internal context of the contract pointed towards the commercially sensible interpretation.

72.     The context, whether internal to the contract or otherwise, provides little assistance in this case. Beyond the words of the relevant clauses, there is the context of the other provisions of each of the 25 individual leases which are at issue. They are long leases, having a term of 99 years. The court in interpreting the leases can and should take into account the great difficulty in predicting economic circumstances in the distant future and ask itself whether the parties really intended to do so.

73.     The court also can and should take into account the economic circumstances which prevailed at the time each lease was entered into. It is clear from the table which Lord Carnwath has set out in para 100 of his judgment that between 1974 and 1988 the use of a 10% annual escalator achieved a result which was not far off the diminution of the value of money in the difficult economic circumstances that then prevailed. The future was and is unknown.

74.     Little else is known and I do not think that it is appropriate to speculate about the extent to which lessees would have known the terms of earlier leases. In my view there is much to be said for the practice, which Lord Drummond Young and other judges have encouraged in Scotland, of requiring parties to give notice in their

A002240

written pleadings both of the nature of the surrounding circumstances on which they rely and of their assertions as to the effect of those facts on the construction of the disputed words: *MRS Distribution Ltd v DS Smith (UK) Ltd* 2004 SLT 631, para 14. Such notice of relevant facts, which are either admitted or proved at trial, would avoid disputes on appeal such as whether the affected lessees were aware of the earlier leases.

75.    While there are infelicities in the language of the relevant clauses in some of the leases and no clear explanation of minor changes in drafting, I am not persuaded that the meaning of the language is open to question when full weight is given to the very limited factual matrix with which the courts have been presented in this case. We are invited to construe that which reads on a first consideration as a fixed service charge with an escalator to deal with future inflation, as a variable service charge which is subject to a cap to which the escalator applies. I find that very difficult. In my view there is nothing in the relevant context to support the construction of the clause as creating a cap, other than the view, which events have fully justified, that it was unwise of the lessees to agree to a fixed service charge with an escalator based on an assumption that the value of money would diminish by 10% per year.

76.    This conclusion is not a matter of reaching a clear view on the natural meaning of the words and then seeing if there are circumstances which displace that meaning. I accept Lord Clarke's formulation of the unitary process of construction, in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, para 21:

> "[T]he exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."

77.    This unitary exercise involves an iterative process by which each of the rival meanings is checked against the provisions of the contract and its commercial consequences are investigated (*Re Sigma Finance Corp* ([2009] UKSC 2) [2010] 1 All ER 571, para 12 per Lord Mance). But there must be a basis in the words used and the factual matrix for identifying a rival meaning. The role of the construct, the reasonable person, is to ascertain objectively, and with the benefit of the relevant background knowledge, the meaning of the words which the parties used. The construct is not there to re-write the parties' agreement because it was unwise to

gamble on future economic circumstances in a long term contract or because subsequent events have shown that the natural meaning of the words has produced a bad bargain for one side. The question for the court is not whether a reasonable and properly informed tenant would enter into such an undertaking. That would involve the possibility of re-writing the parties' bargain in the name of commercial good sense. In my view, Mr Morshead's formulation (para 67 above), on which his case depends, asks the court to re-write the parties' leases on this illegitimate basis.

78.    Nor is this a case in which the courts can identify and remedy a mistake by construction. Even if, contrary to my view, one concluded that there was a clear mistake in the parties' use of language, it is not clear what correction ought to be made. The court must be satisfied as to both the mistake and the nature of the correction: *Pink Floyd Music Ltd v EMI Records Ltd* [2010] EWCA Civ 1429, para 21 per Lord Neuberger MR. This is not an unusual case, such as *KPMG* (above) in which a mistake was obvious on the face of the contract and the precise nature of the correction had no effect on the outcome.

79.    My conclusion that the court does not have power to remedy these long term contracts so as to preserve the essential nature of the service charge in changed economic circumstances does not mean that the lessees' predicament is acceptable. If the parties cannot agree an amendment of the leases on a fair basis, the lessees will have to seek parliamentary intervention.

## LORD CARNWATH: (dissenting)

*Preliminary comments*

80.    The contractual provisions in this case pose unusual interpretative challenges, which may call for unusual solutions. The leases with which we are concerned are of 25 chalets within Oxwich Leisure Park, in South Wales. It is an estate of 91 such chalets first developed in 1974. It is in an attractive holiday location close to Oxwich Beach on the Gower Peninsular. The challenges arise from a combination of factors. The intention, stated in the preamble to each lease, was that they should be "upon terms similar in all respects …". Yet we are faced with five forms of service charge provision, agreed over a period of some 20 years, the variations in which at first sight defy rational analysis. As interpreted by the Court of Appeal, they would lead over the course of the leases to supposedly "proportionate" service charges becoming wholly disproportionate to the costs of the relevant services, to extreme and arbitrary differences between the treatment of different groups of leases within the estate, and to the prospect in the foreseeable future of potentially catastrophic financial consequences for the lessees directly concerned.

A002242

81.    It does not help that, remarkably, the case has come to us with minimal evidence to explain the circumstances, or "factual matrix", in which these variations were agreed at different times, or even simply to add some context or colour to the bare legal and statistical analysis. That applies even to the most recent, and most surprising, of the transactions, effected as recently as 2000, and to which Mrs Arnold the present respondent was herself a party. Nor have we been told anything about how the clauses have been operated in practice at any time: for example how the estate has been managed and what costs incurred by the lessor, what service charge payments have been demanded of the various categories of lessee, and what has happened to any surplus.

82.    It is to be borne in mind also that in the early 1970s (when this clause was first devised) variable service charge provisions were a relatively "new and modern" addition to the law, prompted in part by rapidly increasing prices (see Mark Wonnacott, *The History of the Law of Landlord and Tenant in England and Wales* (2012) p 105; *Hyams v Titan Properties Ltd* (1972) 24 P & CR 359). Since then, it is said in the same history (*ibid* p 106), service charges have caused "more trouble between landlord and tenant than anything else", but they have in turn been regulated by statute to such an extent as to make it "all but impossible for an amateur landlord to recover (a service charge) in the event of a dispute". Whether or not that extreme view is justifiable, the need for special measures to safeguard the interests of lessees has been acknowledged by the legislature, which has thus for the most part relieved the courts of responsibility for developing a common law response to the problems.

83.    As I shall explain, these leases are a rare example of a category of residential lease which has slipped through the statutory net. That is of no direct relevance to the legal issues before us, save that it may help to explain why no ready solutions are to be found in the authorities. Furthermore, in so far as policy has a part to play in the development of the common law, it may be legitimate to seek guidance in the approaches adopted by the legislature in analogous contexts (see *Johnson v Unisys Ltd* [2003] 1 AC 518 para 37, per Lord Hoffmann).

*The leases*

84.    The first lease was granted on 26 October 1974. Of the others most were granted during the 1970s, and are not directly involved in the present dispute. The 25 with which we are concerned were granted (or varied) in the period from 1980 to 2000. Whenever granted, all the leases (with one immaterial exception) were expressed as being for terms of 99 years starting from 25 December 1974, and for a yearly rent of £10, increasing by £5 for every subsequent period of 21 years. Each lease began with a preamble which described the "lessor" as the owner of the land edged pink on the attached lay-out plan ("the estate") and stated:

"(2) It is intended to erect chalets on the estate and to grant leases upon terms similar in all respects to the present demise."

The lessees' covenants (clause 3) limited the use to that of a "holiday residence of a single family" from March to October (clause 3(12)).

85.     It seems from the examples before us that the earliest leases were granted in return for lessees' covenants to construct chalets in accordance with plans approved by the lessors (eg chalet 40 - lease dated 9 August 1977, clause 3(3)). Later chalets, presumably after erection of chalets by the lessor or others, were granted without such a covenant but for a premium (eg £13,000 for chalet 76 - lease dated 22 September 1980; £16,500 for chalet 96 –lease dated 1 July 1985). Otherwise no issue arises on the lessee's covenants other than clause 3(2) relating to service charges, to which I will come.

86.     The lessors in turn covenanted to provide various common services. They included constructing and maintaining the roads and footways (unless or until becoming maintainable at public expense), mowing lawns, maintaining a recreation ground, keeping fences and drains in good repair, issuing regulations, and arranging refuse collection and a regular patrol to discourage vandalism during the unoccupied period (clause 4). By clause 4(viii) the lessors covenanted:

"(viii) That the Leases granted by the Lessors of all other plots on or comprised in the estate shall contain covenants on the part of the Lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit."

87.     Five leases have been selected for the purpose of showing the different versions of clause 3(2) relevant to the dispute. The principal difference is between the original leases, granted between 1974 and 1980, in which an initial service charge figure of £90 is increased by 10% every three years ("the triennial formula"), and later leases in which it is increased by 10% every year ("the annual formula"). The five versions were applied as follows (the selected lease in each case is indicated in brackets):

i)      *Version 1* (Chalet 40, dated 9 August 1977) - This was the "original version", applied to 70 leases granted mainly during the 1970s. The first was granted on 26 October 1974. The rest followed at a steady rate over the next six years at an average of just over 12 per year, until 1980 when seven were granted in this form, the last on 9 July 1980. Four of these leases (granted

A002244

between August 1977 and July 1980) were varied in 2000 to incorporate the annual formula (see version 5 below).

ii)     *Version 2* (Chalet 76, dated 22 September 1980) - This version applied to 14 leases granted between August 1980 and February 1983, the first being dated 11 August 1980.

iii)    *Version 3* (Chalet 96 dated 1 July 1985) - This applied to three leases granted between July 1985 and January 1988.

iv)     *Version 4* (Chalet 29 dated 22 March 1991) - This applied to four leases granted between December 1988 and March 1991.

v)      *Version 5* (Deed of variation dated 20 August 2000) - This applied to four leases previously subject to version 1.

The lessors for the first three selected leases in this list were Mr A and Mr B Lewis; for version 4, Mrs J Short; and for version 5, Mrs Arnold, the present respondent. In the result the triennial formula now applies to 66 leases on the estate, the annual formula to 25.

88.     I now set out the five clauses, emphasising the parts which are material to the dispute:

i)      *Version 1 – triennial (1974-1980)*

        "To pay to the Lessors without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years* of the term hereby granted increasing thereafter *by Ten Pounds per Hundred for every subsequent Three year period or part thereof.*"

ii)     *Version 2 – annual (1980-1983)*

A002245

"To pay to the Lessors without any deductions in addition to the said rent *as a proportionate part* of the expenses and outgoings incurred by the Lessors in the repair maintenance and renewal *of the facilities of the Estate and the provisions* of services hereinafter set out the yearly sum of Ninety pounds and Value Added tax (if any) *for the first year of the term* hereby granted increasing thereafter *by ten pounds per hundred for every subsequent year or part thereof*."

Apart from the change from the triennial to the annual 10% rate, other differences are the lengthening of the expression "… renewal and the provision of services" to "renewal of the facilities of the Estate and the provisions (*sic*) of services", and the inclusion of "as" before "a proportionate part".

iii)    *Version 3 – annual (1985-1988)*

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and Value Added tax (if any) *for the first Year of the term hereby granted increasing thereafter by Ten Pounds per hundred for every subsequent year thereof*."

Changes from version 2 are: reversion to the expression "renewal and the provision of services", the omission of "as" before "a proportionate part", and the omission at the end of "or part (thereof)".

iv)    *Version 4 – annual subject to triennial proviso (1988-1991)*

"To pay to the Lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out *for* the yearly sum of Ninety Pounds and value Added tax [if any] *for the first year of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent year thereof*."

This version was subject to a proviso:

A002246

"Provided always and it is hereby expressly agreed that *whilst the term hereby created is vested in the said William Richard Short and the said Janice Short or the survivor of them* then maintenance shall be calculated as follows:-

To pay to the Lessor without any deduction in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services hereinafter set out the yearly sum of Ninety Pounds and value added tax (if any) *for the first three years of the term hereby granted increasing thereafter by Ten Pounds per Hundred for every subsequent three year period or part thereof.*"

The main clause is identical to version 3 save for the insertion of "for" before "the yearly sum". The proviso had the effect of substituting temporarily the triennial formula as in version 1, but that has ceased to be operative following the disposal of the lease by the Shorts.

v)   *Version 5 – varied from triennial to annual (2000)*

In four of the original 1970s version 1 leases (triennial), a Deed of Variation dated 20th August 2000, at the same time as revising the extent of land demised, substituted with effect from the beginning of the lease a new clause 3(2) in the form of version 2 (annual formula).

89.    Although we have been invited to consider all five versions, the most important for the purposes of interpretation are the first (October 1974) and the second (August 1980), and the circumstances surrounding them. The first is not directly in issue but set the drafting pattern, and provided the background to what followed. The second saw the first incorporation of the controversial annual formula. The later versions are of more limited relevance, save in so far as they throw some light on how the clauses were interpreted in practice, or help to illustrate the relative merits of the rival interpretations.

*The statutory provisions*

90.    By sections 18-19 of the Landlord and Tenant Act 1985, a "service charge" (as defined) payable by a tenant of a "dwelling", is limited to an amount which reflects the costs "reasonably incurred" in the provision of services. The controls originally applied only to "flats" but were extended by amendment in 1987 to

include "dwellings" as defined (Landlord and Tenant Act 1987 section 60). It is not in dispute, in these proceedings at least, that the chalets are "dwellings" for this purpose. The issue is whether the charges are "service charges" as defined by section 18(1):

> "'service charge' means an amount payable by the tenant of a dwelling as part of or in addition to the rent –
>
>> (a) which is payable, directly or indirectly, for services, repairs, maintenance, improvements or insurance or the landlord's costs of management, and
>>
>> (b) the whole or part of which varies or may vary according to the relevant costs."

91.    The lessees submit that properly interpreted the clause imposes an obligation to pay a "proportionate part" of the costs incurred, subject only to an upper limit or cap determined by reference to the formula in the second part of the clause. On this footing it is an amount which "varies or may vary according to the relevant costs" (section 18(1)(b)). The respondent submits that charge is outside the statutory definition because the annual amount is fixed by that formula, without any reference to the costs actually incurred by the lessor. If the lessees are right, the amount of the charge is limited to the amounts reasonably incurred. If the lessor is right, there is no statutory limit or other control.

92.    Other safeguards for lessees were introduced by the 1987 Act, but none covers the present situation. Thus it introduced a new right for any party to a long lease (not only the lessee) of a "flat" to apply to the court (now the first-tier tribunal) for an order varying a lease on the grounds that it "fails to make satisfactory provision" in respect of various matters, one being the computation of service charges, but this did not apply to other forms of dwelling such as in this case. There is a more general provision, for application by "a majority of parties" for variation of a number of leases under a single lessor (section 75), but again it applies only to flats. On the other hand, section 40, which allows similar applications for variation of insurance provisions, applies to "dwellings" in general. It is difficult to detect any legislative purposes for these distinctions. The present case illustrates the potentially unfortunate consequences for parties to those rare forms of residential lease which for no apparent reason fall outside any of the protections given by the legislative scheme.

93.     For completeness, I note also that no issue arises in the present proceedings as to the possible application of other more general protections relating to unfair contractual terms. Sections 2 to 4 of the Unfair Contract Terms Act 1977 do not in any event apply to contracts relating to the creation or transfer of interests in land (Schedule 1, paragraph 1(b)). No such limitation appears in the Unfair Terms in Consumer Contracts Regulations 1999 (SI 1999/2083), which give effect in this country to EC Directive 93/13/EEC of 5 April 1993 on unfair terms in consumer contracts. The Directive was first transposed in 1994 Regulations (SI 1994/3159) which were later replaced by the 1999 Regulations. The 1994 Regulations came into effect on 1 July 1995, and therefore would not it seems apply to contracts concluded before that date (regulation 1; Chitty on Contracts para 37-087). Accordingly, it could be relevant if at all only to version 5 (2000).

*The proceedings*

94.     We know very little about the background to the present dispute. It first reached the courts in September 2011 in the form of an application by the appellant lessees to the county court for pre-action disclosure. The application was said to be in anticipation of a representative application to resolve an ambiguity in the service charge clause, which "appears to result in a variable service charge but on the other hand create a fixed service charge". It also spoke of the lessees' concerns that the sums collected by way of service charge were exceeding the amount of "legitimate" expenditure by "such a substantial amount as to produce a credit balance that should be held in a service charge trust account"; and also that the lessor had disposed of the former clubhouse for the park to provide accommodation for her daughter. They sought disclosure of information about the sums collected as service charge and the amounts expended since 2005.

95.     An order for disclosure was made on 20 September 2011, but was quickly met by an application by the lessor for declaratory relief relating to the interpretation of the service charge clause, following which the disclosure order was stayed pending the determination of these proceedings. The application sought in particular a declaration that on the true interpretation of the service charge clause, the sum payable was not a "service charge" within the meaning of section 18 of the Landlord and Tenant Act 1985. In the county court, HHJ Jarman QC determined the issue in favour of the lessees. But his decision was reversed on appeal to Morgan J, whose judgment was upheld by the Court of Appeal (Richards, Davis and Lloyd Jones LJJ). The lessees appeal to this court with permission granted by the court itself.

96.     The issue between the parties has throughout been very narrow: that is, whether the figure of £90 as inflated is to be read as a fixed amount, or as an upper limit or cap. That in turn depends on whether it is permissible and appropriate to

read in such words as "limited to" (Judge Jarman's words) or "up to" before the reference to "ninety pounds". As Mr Morshead submits in his printed case:

> "There is no need to undertake an elaborate drafting exercise. The necessary effect can be achieved by implying the words 'up to' before the words 'Ninety pounds'; and, in versions 2 and 5, deleting the word 'as'."

97.     Giving the single judgment in the Court of Appeal, Davis LJ rejected that approach, holding in substantial agreement with Morgan J that the addition of these words -

> "… would involve subverting the proper process of construction of the language actually used and would in truth involve the court rewriting the bargain the parties have made." (para 45)

He rejected the argument that this interpretation would consign the first part of the clause to "mere surplusage". Its function was to identify "the character of the payment to be made". The words "a proportionate part" were apt for a situation where "other lessees also are contributing to the overall service charge, which is in consequence to be apportioned between them". Although he accepted that the word "incurred" was "the language of actual outlay", it was "entirely explicable when one appreciates that this part of the sub-clause identifies the character of the payment being made" (paras 48-49). He also pointed to other difficulties in Mr Morshead's interpretation, in particular the problems of calculating a "proportionate" amount, and the lack of any protection for the lessor if the inflation regularly exceeded 10% (para 53).

*Inflation calculations*

98.     The judge was shown without objection two sets of tables, one showing the annual Retail Price Index (RPI) from 1948 to 2012, taken from figures published by the Office of National Statistics ("the inflation table"); the other, the effect of the increases of service charge compounded over the period of the leases in accordance with respectively the annual and the triennial formula ("the compounding table"). As I understand it, the information in these tables is accepted as forming part of the factual matrix against which it is appropriate to judge the parties' contractual intentions at the relevant dates. There are some minor but apparently immaterial differences between the hard-copy and electronic versions of the compounding table; I have used the latter.

A002250

99.     It is helpful to focus on the rates which would have been in immediate contemplation of the parties at dates when each of the five versions was first agreed: that is, 26 October 1974 (the date of the first lease on the estate incorporating version 1, rather than the 1977 lease which was used as an example at the hearing); 11 August 1980 (the first version 2 lease); 1 July 1985 (version 3); 1 December 1988 (the first version 4 lease); 20 August 2000 (version 5). The table below includes also the rate in contemplation at the date of the county court hearing (June 2012), and in the last year of the lease (2072). The figures in the compounding table are given for 25 December 1974, the commencement of the lease period, and for the same date in each subsequent year. For illustrative purposes I have taken the rate for the year commencing after each of the identified dates (ie 25 December next following each such date), which would have been the rate applicable to the first complete year under each new lease.

100.    The resulting figures (rounded) for annual service charges at each such years:

|      | Triennial | Annual | [Actual inflation] |
|------|-----------|--------|--------------------|
| 1974 | £90 | £90 | £90 |
| 1980 | £109 | £159 | £219 |
| 1985 | £132 | £257 | £310 |
| 1988 | £145 | £342 | £350 |
| 2000 | £212 | £1,073 | £557 |
| 2012 | £311 | £3,366 | £794 |
| 2072 | £1,900 | £1,025,004 | N/A |

[The last column shows for purposes of comparison the equivalent figures implied by actual inflation, arrived at by increasing the initial £90 by the recorded price increases over the period from 1974 to each of the selected years. Though not in evidence before us, those figures have been taken from the "inflation calculator" on the Bank of England's website, and are used for illustration only.]

101.    The rate of price increase during the 1970s can also be contrasted with the pattern in the previous and subsequent decades. Average annual inflation in the 1950s and 1960s was of the order of 3.5-4%. (It had averaged 2.5% in the 50 years from 1900 to 1950.) It then rose sharply to 6.4% in 1970 and 9.3% in 1973, followed by a much steeper rise to 16% in 1974 and an annual peak of 24.2% in 1975. It dropped to 8.3% in 1978 before rising again to 16% in 1980. The annual rate fell to 12% in 1981, and then to around 5-6% in the period 1983-85 (immediately before version 3), 4-5% in 1986-1988 (before version 4), and 3% in 2000 (version 5). It has remained at, or below, that low level ever since.

A002251

102.    The compounding table enables comparisons to be drawn between the contributions made respectively by the 66 "triennial" and the 25 "annual" leases over different periods, if the lessor is correct. For example, on the 1988 figures, the triennial leases would have contributed a total of £8,712 (66 x £132), slightly more than the total contribution of the annual leases (£8,550 = 25 x £342). On the basis of the figures in the third column, the combined total (£17,262) was still much lower than the figure required to keep pace with actual inflation since 1974 (91 x £350 = £31,850). The figures at or about the time of the hearing show a very different picture. On the 2012 figures the triennial leases would have been contributing a total of £18,612 (66 x £282) compared to £84,150 (25 x £3,366) contributed by the annual leases. The total amount (£102,762) was now substantially more than that required to keep pace with inflation (91 x £794 = £72,254). (These figures differ slightly from those in the submitted tables due to rounding.)

103.    The table also shows the amounts that, on the lessor's interpretation, would be payable under each formula over the whole period from 24 December 2013 to the end of the term (2072). The total amount payable during that period under each "annual" lease would be £11,238,016, compared to £53,386 payable for the same period under each "triennial" lease.

*Inflation and the factual matrix*

104.    There is no difficulty in principle in taking account of the calculations in the compounding table, which require no outside information, and could have been carried out by the parties (or a reasonable observer) at any of the relevant dates. On the Court of Appeal's interpretation, the figures show increases which appear extraordinary in themselves, in the light of modern conditions of low inflation. No less importantly, they result in dramatically increasing, and ultimately grotesque, differences between the amounts payable by the two different groups of lessees on the same estate. This consequence could and should have been anticipated at the time, certainly by the lessors who were parties to both groups of leases and responsible for maintaining reasonable equivalence between them.

105.    The use to be made of the historic inflation figures raises rather different questions. By agreeing to their use, the parties impliedly ask us to assume that the figures up to and including those for each of the relevant years (or the then most recently published figures) would been have been known to the parties at the time, and therefore must be taken as part of the relevant factual matrix. This is no doubt a reasonable working assumption to indicate the general trend as known to the public.

106.    It is however highly artificial to be asked to take account of the bare statistics, without reference to the political and economic circumstances which surrounded

them, so far as they were common knowledge at the time. We are not required to assume total ignorance of current events, in the parties or their reasonable observers. It would not have been difficult to obtain information about contemporary perceptions of the direction of inflation, whether from official reports of the time, or from reports in the South Wales press. Even without such evidence, we are entitled in my view to assume knowledge of some of the key events: for example, of the dramatic rise in oil prices at the end of 1973 and again in 1979, each followed by a sharp increase in inflation in the following year; and also of the election in 1979 of a new Conservative government committed to controlling inflation. We are not required to assume that predictions about future inflation were made in a vacuum.

107.    We are also entitled, as part of the factual matrix, to take account of the nature and circumstances of the estate, as they would have been perceived by potential purchasers. It was planned as a holiday estate close to a popular beach. Potential buyers were likely to come from people already familiar with the area from previous visits with their families. It is fair to assume also that they would have regarded the acquisition of a holiday chalet, not simply as source of pleasure, but also as a long term investment for them and their families. They would have been keen to avoid undue financial burden or risk. It would be strange if they had not taken the opportunity to talk to existing residents about their own experiences of the estate and its management, and of the associated costs. This will become relevant when considering what knowledge of previous terms should be attributed to the first version 2 lessees.

*Approach to interpretation*

108.    In an unusual case such as this, little direct help is to be gained from authorities on other contracts in other contexts. As Tolstoy said of unhappy families, every ill-drafted contract is ill-drafted "in its own way". However, the authorities provide guidance as to the interpretative tools available for the task. The general principles are now authoritatively drawn together in an important passage in the judgment of Lord Clarke JSC in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, paras 14-30. As that passage shows, there is often a tension between, on the one hand, the principle that the parties' common intentions should be derived from the words they used, and on the other the need if possible to avoid a nonsensical result.

109.    The former is evident, as Lord Clarke emphasised, in the rule that "where the parties have used unambiguous language, the court must apply it" (para 23). However, in view of the importance attached by others to the so-called "natural meaning" of clause 3(2), it is important to note that Lord Clarke (paras 20-23) specifically rejected Patten LJ's proposition that -

> "… unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning."

In Lord Clarke's view it was only if the words used by the parties were "unambiguous" that the court had no choice in the matter.

110.   He illustrated the other side of the coin by quotations from Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251:

> "The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."

> and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191, 201:

> "If detailed and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense it must yield to business common sense."

As a rider to the last quotation, Lord Clarke cited the cautionary words of Hoffmann LJ (*Co-operative Wholesale Society Ltd v National Westminster Bank plc* [1995] 1 EGLR 97, 99):

> "This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

111.   I agree with Mr Morshead (questioning in this respect the approach of Davis LJ, para 35) that it may be unnecessary and unhelpful to draw sharp distinctions between problems of ambiguity and of mistake, or between the different techniques available to resolve them. In *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101, para 23, Lord Hoffmann cited with approval a passage of my own (in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336, para 50) where I

A002254

discussed the role of what is sometimes called "interpretation by construction". I criticised the tendency to deal separately with "correction of mistakes" and "construing the paragraph 'as it stands'", as though they were distinct exercises, rather than as "aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended". Lord Hoffmann added:

> "What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant." (para 25)

112.    Another permissible route to the same end is by the implication of terms "necessary to give business efficacy to the contract". I refer again to Lord Hoffmann's words, this time in *Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10, [2009] 1 WLR 1988, para 22, explaining the "two important points" underlined by that formulation:

> "The first, conveyed by the use of the word 'business', is that in considering what the instrument would have meant to a reasonable person who had knowledge of the relevant background, one assumes the notional reader will take into account the practical consequences of deciding that it means one thing or the other. In the case of an instrument such as a commercial contract, he will consider whether a different construction would frustrate the apparent business purpose of the parties. … The second, conveyed by the use of the word 'necessary', is that it is not enough for a court to consider that the implied term expresses what it would have been reasonable for the parties to agree to. It must be satisfied that it is what the contract actually means."

113.    *Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56 is a useful recent illustration in this court of how these various principles may be deployed, to enable the court to achieve a commercially sensible result in the face of apparently intractable language. A contract for the sale of development land gave the council the right to an uplift (described as "the profit share") in certain defined circumstances, one being the sale of the property by the purchaser. The issue was the calculation of the profit share, which the contract defined as a specified percentage of the "estimated profit" (defined by reference to "open market value") or "the gross sale proceeds". The issue was how the definition should be applied in the case of a sale by the purchaser to an associated party at an undervalue. The court

held in agreement with the lower courts that, in that event, notwithstanding the apparently unqualified reference to gross sale proceeds, the calculation should be based on open market value.

114.   In a concurring judgment, with which all the members of the court agreed, Lord Clarke referred to his own judgment in *Rainy Sky* as indicating the "ultimate aim", that is:

> "… to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant; the relevant reasonable person being one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." (para 28)

As he pointed out, "on the face of it" the reference in the contract to the gross sale proceeds was a reference to the "actual sale proceeds" received by the appellants. It was not easy to conclude "as a matter of language" that the parties meant, not the actual sale proceeds, but the amount the appellants would have received on an arm's length sale at market value of the property; nor was it easy to conclude that the parties "must have intended" the language to have that meaning. He referred to the comment of Baroness Hale in the course of the argument that:

> "… unlike *Rainy Sky*, this is not a case in where there are two alternative available constructions of the language used. It is rather a case in which, notwithstanding the language used, the parties must have intended that, in the event of an on sale, the appellants would pay the respondents the appropriate share of the proceeds of sale on the assumption that the on sale was at a market price."

He thought the problem should be solved by implying a term to the effect that, in the event of a sale which was not at arm's length in the open market, an open market valuation should be used. As he explained:

> "If the officious bystander had been asked whether such a term should be implied, he or she would have said "of course". Put another way, such a term is necessary to make the contract work or to give it business efficacy."

He preferred the use of an implied term to "a process of interpretation", although "the result is of course the same". (paras 30-33)

Page 35

115.   As Mr Morshead observes, the result in *Aberdeen City* could probably have been explained equally as a case of correction by interpretation. In any event, this example provides support for his proposition that, where an ordinary reading of the contractual words produces commercial nonsense, the court will do its utmost to find a way to substitute a more likely alternative, using whichever interpretative technique is most appropriate to the particular task.

*Residential leases*

116.   Long residential leases are an exceptional species of contract, and as such may pose their own interpretative problems. In no other context is a private individual expected to enter into a financial commitment extending for the rest of his or her life, and probably beyond. The original lessee may have been unaware that (at least under contracts before the Landlord and Tenant (Covenants) Act 1995) he was taking on a personal legal commitment which could continue even after he had disposed of any interest in the property itself (*Norwich Union Life Insurance Society v Low Profile Fashions Ltd* (1991) 64 P & CR 187). So far as it relates only to ground rent, the commitment is unlikely to be burdensome, and it may be readily accepted as a necessary incident of a valuable property interest. Service charges are a different matter, since the amounts may be substantial, and, apart from statute, the lessee is likely to have no direct control over the lessor's expenditure.

117.   Where the lease is for one of a number of units in a managed building or estate, provision has to be made for expenditure by the lessor on common services and maintenance, and for the cost to be shared between the lessees. Substantial equivalence of rights and obligations under such leases is normally important for all parties, both for the good management of the building or estate, and for harmony among those living within it. Equivalence can only be achieved by the lessor, who alone is party to them all. After the first lease has been negotiated and granted, later incoming lessees will usually have little choice in practice but to accept the covenants in the form dictated by the lessor. Their reasonable expectation will be that all have been granted in like terms, both in terms of covenants and in terms of sharing financial responsibility for services, with a view to ensuring fair distribution of the overall cost. Often that expectation and the lessor's responsibility for achieving it, will be expressed in the terms of the lease (as here, in the preamble and clause 4(viii)).

118.   Mr Daiches submits, correctly in my view, that the effect of such words is to create "a letting scheme, or local law, of negative obligations mutually enforceable in equity between all occupiers of the properties on the estate". He cites authorities such as *In re Dolphin's Conveyance* [1970] Ch 654, which related to an estate of freehold properties. Examples of the same principle as applied to leasehold developments are given in the textbooks (see *Megarry & Wade Law of Real*

A002257

*Property* 8th ed (2012), para 32-079). As I understand his argument, he asks us to infer that a clause such as 4(viii) has to "look to the future not the past", and that accordingly it is not to be construed as containing any implied representation as to previous leases. I cannot agree. In my view, the existence of such a scheme reinforces the view that each lessee has a legitimate interest in the form and content of all leases within the development, whenever granted. Even if, as in clause 4(viii), the lessor's responsibility is expressed as an obligation in respect of future leases, it should in its context (including the preamble) be read also as containing an implied representation that leases previously granted are also in substantially the same form.

119.    Provision for services is normally dealt with by reciprocal covenants, positive in form: by the lessor to arrange and pay for the carrying out of the necessary services, and by the lessees to pay their respective shares of the costs so incurred. There is no common format for such service charge covenants, and they can and do vary greatly between different buildings or estates. Unlike negative covenants, it seems that they are not mutually enforceable as such, but the expectation is that they will have been drafted to ensure that the lessees' financial obligations are shared fairly between them all. Again this is in the interests of good management and harmony within the development for both lessor and lessees. Differences may be necessary to cater for differences in size of the individual units or other features, but otherwise they will normally be in a standard form in all the leases.

120.    In the courts below there was some discussion of the "restrictive" approach said to be appropriate to service charge provisions (*McHale v Earl Cadogan* [2010] 1 EGLR 51, para 17 per Rix LJ). I agree, if by this it is meant that the court should lean towards an interpretation which limits such clauses to their intended purpose of securing fair distribution between the lessees of the reasonable cost of shared services.

121.    Support for this approach is to be found also in the disparity in practice between the potential remedies available to each party for breach by the other. A lessor who fails to maintain services at the level thought appropriate by the lessees is in principle open to enforcement action in court. But the practical effect of such action for the lessees is uncertain in the absence of a precise definition of what he is required to provide. If there has been a complete breakdown of services, they may be able to obtain injunctive relief or appointment of their own manager. In less extreme circumstances the form of remedy or the extent of any damages may be difficult to define.

122.    By contrast, the lessor's remedies for breach of the service charge clause are all too clear. In the Court of Appeal, Davis LJ was apparently content to assume that the charges might "*in extremis*, force some of these lessees into surrender or forfeiture" (para 57). However, if by this he intended to imply that either escape-

route would be available to the lessees other than by agreement with the lessors, he would have been wrong. Apart from any special provision, the lessee's obligation, once the service charge has been determined, will have crystallised into a contractual obligation to pay a fixed amount. That is in principle enforceable by a simple action through the courts, and ultimately by forfeiture and bankruptcy. The legislature intervened long ago to provide some statutory relief against forfeiture (Law of Property Act 1925, section 146). But that provides no protection against enforcement of the personal liability to pay the contractual amount.

123.   As already explained, the scope for abuse has been recognised by the legislature in the special provision made for controlling "variable" charges as defined in the 1987 Act. Fixed service charges do not normally give rise to the same risk of abuse. The lessee is given the certainty of a fixed financial commitment, and the lessor has the advantage of simplified administration. Provision is needed to deal with price inflation. But if this is fixed by reference to an independent formula, such as an official inflation index, there is no significant risk to either party. The approach adopted in this case seems highly unusual, if not unique. Even where the legislature has not intervened, the courts have a responsibility in my view to ensure that such clauses are interpreted as far as possible not only to give effect to their intended purpose, but also to guard against unfair and unintended burdens being placed on the lessees.

*Interpretation of clause 3(2)*

124.   Against that general background, I come to consider the construction of clause 3(2) in its various versions. At first sight, the main principles seem reasonably clear:

  i)     The intention was that all the leases should be on terms as "similar … as the circumstances permit", and that it was the lessors' responsibility to achieve such equivalence (necessarily, since only they would be party to all of them) (preamble (2); clause 4(8))

  ii)    The commercial purpose of clause 3(2) was to enable the lessor to recover from the lessees the costs incurred by him in maintaining the estate on their behalf, the payment by each lessee being intended to represent a "proportionate" part of the expenses so incurred.

  iii)   Although there was a general description of the services which the lessor was contractually obliged to provide, the extent of those services was not precisely defined by the lessors' covenants (clause 4),

A002259

which left to them a large measure of discretion as to the amounts to be spent in practice.

In themselves, these features are typical and uncontroversial. It is at the next stage, in giving effect to those principles, that the clause becomes problematic.

125.    It is clear to my mind that something has gone wrong with the drafting, at least in the original wording, as it appeared in the 1974 version, and (apart from the change of inflation formula) was repeated in 1985 and 1988. The clause imposes an obligation to pay, but contains two different descriptions of the payable amount: by reference, first, to a "proportionate part of the expenses and outgoings incurred by the Lessor in the repair maintenance renewal and the provision of services …", and secondly, to a "yearly sum" determined by reference to a fixed formula. There are two linguistic problems. First, there is no grammatical connection to show the relationship between the two descriptions. Secondly, they are mutually inconsistent. A figure can be determined as a proportionate part of some other variable amount, or it can be a yearly sum, fixed by a predetermined formula; but it cannot be both. There is an inherent ambiguity which needs to be resolved.

126.    In the Court of Appeal Davis LJ thought that the first part of the clause was designed simply to identify "the character of the payment to be made" (para 48). I find that unconvincing. If the intention was to indicate no more than the purpose of the payment, one would have expected some such general words as "by way of contribution to the services", not a detailed and specific formula. Conversely, if the character of the contributions was to be that of payments determined by reference to a fixed formula and nothing else, the description in the first part was neither accurate nor useful. Proportionality had no part to play in such a fixed calculation, nor any relation to reality after 1980 if the court's interpretation is correct. Nor is it easy to explain the purpose of the specific reference to "expenses and outgoings incurred" by the lessor on a defined range of services, unless it was intended to play some material part in the calculation.

127.    At this point it is convenient to note the minor differences of wording in some later versions. A change such as the omission of the words "or part …" in version 3 can readily be dismissed as a copying error. Others give more room for argument. It would be tempting to read more significance into the word "as", which appears for the first time in the important 1980 version 2. Grammatically, it may be said (with Davis LJ – para 54), the insertion of the word "as" implies that the operative text is in the second part of the clause, the first part being merely descriptive. There are two difficulties with that explanation. First, for the reasons I have given, neither the reference to proportionality nor the detail of the formula in the first part is compatible with that limited sense. Secondly, there are linguistic indications the other way. The word "as" did not survive into any of the later versions, except the

2000 deed of variation (version 5), which seems to have been copied directly from version 2. Version 2 itself also saw the introduction of a new reference to expenditure on "the renewal of the facilities of the estate", which is hard to explain if the detail of the first part had no practical significance. Version 4 added to the mystery by adopting a different connecting word "for", this time in front of the second description ("*for* the yearly sum of ninety pounds"). That is even more difficult to interpret, but if anything it seems to imply that it was the first part of the clause which was the primary description. In the end I conclude that no persuasive guidance, one way or the other, is to be derived from these minor changes.

128.    There are only two realistic possibilities for the second part of the clause, which are those respectively adopted by Judge Jarman, on the one hand, and Morgan J and the Court of Appeal, on the other. Either it is a fixed amount which in effect supplants any test of proportionality under the first part; or it is no more than an upper limit to the assessment of a proportionate amount. I reject the theoretical alternative that it was designed as a lower limit for the benefit of the lessors. That interpretation would have made no sense at all in relation to version 1, agreed at a time when the possibility of inflation falling *below* 3% would have occurred to no-one as a risk requiring special provision, particularly for the lessor who unlike the lessees was in control the level of his own expenditure. There is thus no doubt that this part of the clause was originally designed for the benefit of the lessees, and I see no reason to think that its purpose had radically changed by the time of version 2.

129.    Davis LJ was concerned as to the practicalities of determining the "proportionate" amount of the qualifying expenditure. Morgan J (para 51) described it as "workable but not ideal". I do not see any great difficulty. The relevant items are precisely defined. The lessor has simply to demonstrate (to the lessees and if necessary to the court) that the expenditure has been properly incurred on those items, and that it has been divided "proportionately" between the lessees.

130.    I note that in *Hyams v Titan Properties* (see para 82 above), which was decided two years before the first of these leases, the court had to fix the terms of a new business lease under the Landlord and Tenant Act 1954 taking account of rapid price inflation. Buckley LJ recorded that "the modern practice generally accepted … was to make service charges payable on a proportional basis". In that case (where there were nine units) the court approved a clause "requiring the tenant to pay one-ninth of the cost of providing the services under the covenant in addition to the rent payable under the lease". There was no suggestion that this formulation was defective in the absence of specific machinery to settle the figure. The first half of clause 3(2) follows the same model, allowing for the fact that the precise number of units was probably not known at the outset, so that it was not possible to put in a specific fraction. The use of the same figure of £90 in all the leases (whatever its precise purpose) would have been a strong indication that equal shares were intended.

131.    I turn therefore to consider the two alternatives as applied to each of the five versions in its own context. In the words of the authorities, we must inquire "what a reasonable person would have understood the parties to have meant", that person being one who had "all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract", and who would have also taken into account "the practical consequences of deciding that it means one thing or the other". Where necessary the reasonable observer can be invited notionally to take on the more active role of "officious bystander", in order to interrogate the parties as to their common intentions.

*The five versions in context*

*Version 1 (October 1974 - July 1980)*

132.    It is impossible to do more than guess at the common intentions of the parties to the first lease in relation to this part of clause 3(2). It is hard at first sight to see any rational basis for selecting a rate of 10% every three years, at a time when annual inflation was running at around twice that rate. At little over 3% per year, it was a little low even by reference to the inflation of the two previous decades, although it was in line with the historic long term average.

133.    In such inflationary conditions, there is no difficulty in understanding why it was acceptable to the lessees. It is the lessor's thinking which needs explaining. We know nothing of the first lessors (the Lewises). They may perhaps have been builders, themselves involved in the development of the estate, and so more able to absorb the initial costs of maintenance in their other expenditure. If so, to make the estate attractive to purchasers, they may have gambled on being able to bear the price increases during the early years, in the expectation of inflation falling to more reasonable levels in the near future. (Comparable optimism seems to have been reflected in their view of ground rent, which was to be increased by only 50% every 21 years.)

134.    In any event, their apparent generosity would be more explicable if, as may have been the case, the figure of £90 was based not simply on an estimate of current costs, but gave a reasonable margin for anticipated inflation in the short term. That possibility is borne out to some extent by the fact that the triennial formula survived, apparently without question, for six years of high inflation. If so, it is certainly possible that, even during that period, it was treated as a cap, the contributions being based on a share of actual expenditure from year to year. (Unlike Morgan J - para 32 - I see no basis, in the absence of evidence, for any positive inference that service charges were paid, then or later, "in accordance with the lessor's interpretation".)

A002262

135.   Since version 1 is not in issue, it is unnecessary to decide between the alternative interpretations at this stage. Version 1 does however provide the necessary background to the contentious versions which came later. It makes clear that the inclusion of a specific figure for inflation was designed originally for the benefit of the lessees not the lessor. It may also enable one to discount any intention on the part of the Lewises at least to take unfair advantage of their lessees.

   *Version 2 (August 1980 – February 1983)*

136.   As I have said, the fact that it took the Lewises six years to react to the apparent disparity between the triennial formula and actual inflation suggests that, one way or another, they were able to maintain expenditure within the initial figure for some time. The change of heart may well have been triggered by the renewed jump in inflation in 1979, which reached its peak in summer 1980, although it is notable that the last version 1 lease was granted as late as July 1980. If the Court of Appeal is right, there was then in August 1980 a dramatic change in their thinking, from the exaggerated optimism which had prevailed over the last six years, to such abject pessimism about the future of the economy that they thought it reasonable to assume continuing 10% inflation for the remaining 93 years of the leases, and to expect their purchasers to share that assumption.

137.   If that is the correct interpretation, they would have been contemplating an impossibility, even for economists. In *Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd* [1981] HCA 3, (1981) 145 CLR 625, 639 Gibbs J spoke of the reasons for making no allowance for inflation in awards for future loss:

> "It is unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money during a period extending for several decades ahead. Whether inflation increases or is brought under control depends upon political and economic events and decisions at home and abroad as to whose occurrence it is not possible to do more than conjecture. Predictions as to the economic future in 30 years time may perhaps be made by a soothsayer but expert evidence cannot rationally be given on such a subject." (cited with approval by Lord Hope in *Helmot v Simon* [2012] UKPC 5, para 45)

If that is unreasonable for an economist, how much less likely is it as an explanation of the thinking of the lessors or lessees of these modest holiday chalets in August 1980?

138.    The improbability becomes even more striking when one compares the figures for the new and old groups of lessees. It is true that, even as a cap, the annual formula would result in the new lessees paying more initially than the existing lessees (£159 in 1980, compared to £109 under version 1). But over the period of the lease the differences become grotesque. On the Court of Appeal's interpretation the parties were accepting, as a mathematical certainty, that by the end of the lease period each lessee's service charges would have totalled over £11m, more than 200 times the amounts payable by the existing lessees. Put the other way, if the assumed prediction were correct, the lessees of more than two-thirds of the chalets on the estate would by then have contributed 200 times less than the figure necessary for the lessors' expenditure to keep pace with inflation. Even from the lessors' point of view, that scenario implied commercial disaster.

139.    Whatever the lessors' state of mind, it beggars belief that the new lessees would have been content to proceed on that basis. It is particularly improbable for a person of ordinary means investing perhaps limited savings in a holiday home. It is simply inconceivable that such a potential purchaser would have been willing to accept a prediction of continuing inflation at that level for over 90 years, and to take that as a basis for undertaking a contractual obligation lasting for the rest of his life and beyond without any escape route.

140.    There has been some discussion before us as to whether the lessees would have known of the comparable clauses in the previous leases. Mr Daiches asks us (and through us the reasonable observer) to proceed on the basis that the new lessees in 1980 would have been unaware of the triennial formula used in the previous leases, and says that is the basis on which the case has been approached hitherto. I am unwilling to make that assumption, which I regard as wholly unrealistic. It is not on any view an assumption that can be made in respect of versions 4 and 5, where the change was apparent on the face of the documents (see below).

141.    Even without direct information in the documents, a potential purchaser in 1980 could be expected to have wanted to satisfy himself about the existing arrangements within the estate, and would have had a legitimate interest in doing so. Absent bad faith, it is hard to see any reason why the lessor would have wished or felt able to hide information about the previous leases. In any event, it could readily have been discovered by talking to other lessees within the estate. In Lord Clarke's words, it would have been "background knowledge … reasonably … available to the parties" in the circumstances of the contract. I would accordingly approach the interpretation of version 2 on the assumption that both parties (like their reasonable observer) would have been aware of the proposed change from the triennial formula, and that they are to be taken as having accepted the change for what they regarded as good reasons.

A002264

142.   On the basis that it was intended as a cap, the lessees' thinking is understandable. They would have needed persuasion to take the leases on less generous terms than their predecessors. On the other hand, they would have understood that any assumptions made in 1974 about the prospects of an early fall in inflation had been falsified by events. They would have understood also that the lessor would find it difficult to support reasonable expenditure on services without some adjustment. We do not of course know what if anything may have been said about increasing future contributions from the existing lessees to ensure fair distribution. But from their own point of view, with current inflation at or around 20%, substitution of a limit of ten per cent might have been seen by them as an acceptable compromise for the immediate future, while allowing for a return to more normal levels in the medium term. That may not be a complete explanation, but it is at least plausible, unlike the alternative.

143.   As in the *Aberdeen Council* case, we can imagine the responses of lessor and lessee to questioning by the officious bystander as to the purpose of the clause. Did they really intend to enter into a contract which had the extraordinary long term implications outlined in the previous paragraphs? I find it hard to conceive of any other response than "of course not; it is a cap not a fixed amount". The alternative would have seemed absurd and unreasonable to both, as much to the lessor as to the lessees.

144.   The Court of Appeal thought they were applying the "natural meaning" of the clause, and that it was not the task of the court to relieve the lessees of a "bad bargain" entered into in different circumstances, albeit possibly without having done their arithmetic. For the reasons I have given, I am not convinced that the "natural meaning" is that adopted by the Court of Appeal, at least once one discounts the inclusion of the word "as" in version 2, or that, even if it is, it relieves the court of the obligation to seek a sensible result. On the other side of the coin, I agree with Mr Morshead that "bad bargain" is a gross understatement of the implications of their interpretation, which as he says were from the outset "not only stark but disastrous". Nor do I see any reason to assume that these contracting parties, treated (in Lord Hoffmann's words) as alive to the "practical consequences" of the alternative interpretations, should have been ignorant of the ordinary principles governing compound interest.

*Version 3 (1985)*

145.   By this time inflation had fallen significantly to around 5-6%. Pessimistic thoughts about the future direction of inflation for the foreseeable future would have largely dissipated. If it was difficult in 1980, it would surely be impossible now, for the reasonable observer to imagine the parties committing themselves, even in the

medium term, to a fixed inflation figure of almost double the current rate. As a cap, it would hardly have attracted attention.

### Version 4 (1988)

146.   By this time annual inflation had fallen to less than 5%. The annual formula produced a figure more than double that implied by the triennial formula, but one closely comparable to that resulting from actual inflation since 1974 (£342 compared to £350, in the table at para 100 above). If the then lessor, Mrs Short, was still charging her pre-1980 lessees by reference to the lower triennial rate, it raises a question of how she was covering her own expenditure on services, in circumstances where two-thirds of the leases were contributing at only half the rate implied by inflation since 1974. That may suggest either that she was able in practice to keep expenditure to a level significantly below that implied by inflation, or possibly that in order to maintain services at a reasonable level some of the pre-1980 lessees had been persuaded to pay more than their strict obligation.

147.   The only novel feature of this version is that it was subject to a proviso in effect substituting the triennial formula during the tenure of the named lessees. It appears to have escaped notice in the courts below that the example used for this version was in a lease between the lessor, Mrs J Short, and herself and a Mr W R Short (her husband) as joint lessees. Since the hearing it has been confirmed that she had the same interest in the other three "proviso" leases granted between 1988 and 1991. They were clearly not arms-length transactions.

148.   We know nothing about Mrs Short, or her thinking. It is difficult to understand how this special personal protection could have been reconciled with her obligation to the other post-1980 leases (under clause 4(viii)) to ensure that the covenants in these leases were as "similar … as the circumstances permit". It is even more difficult, at least on the Court of Appeal's interpretation, to understand how she would have explained the change to her future assignees, who were to lose that protection. The contrast between the two versions could not have been drawn more clearly to their attention. On the basis that the revised percentage figure was no more than a cap, they may plausibly have been content to accept an obligation to keep pace with inflation, in line with other post 1980-lessees. The alternative assumes that, at time when inflation rates were less than 5% and apparently falling, they knowingly accepted a continuing obligation to pay service charges increasing at twice that rate for the rest of the term. On any view that is absurd.

A002266

*Version 5 (2000)*

149.    By this time inflation had fallen to about 3%. The clause 3(2) figure was by now more than five times greater under the annual formula than under the triennial formula. As Mr Daiches accepts, the parties to these transactions were fully aware of the differences between the two versions. In those circumstances, whatever the changes in the extent of their holdings, there is on the face of it no rational explanation for four lessees agreeing not only to the loss of the protection of version 1, but to the substitution of a permanent obligation to pay service charges increasing at a rate three times the then current rate of inflation.

150.    Since these variations were agreed only 15 years ago, and since by this time the respondent, Mrs Arnold, was herself directly involved, it might have been thought that she at least would be able to throw some light on these extraordinary transactions. After the hearing, the parties were put on notice of the court's concern on this point, and invited to comment. It has emerged that three out of the four variations were agreed between Mrs Arnold and her daughter, Mrs Fraser (signed under a power of attorney by Mrs Arnold's son). The fourth was a Mrs Pace, of whom no information has been provided, save that she is apparently still the owner of the chalet, and she is named as one of the defendants in these proceedings.

151.    If there was in Mrs Arnold's thinking a rational explanation for these particular variations, she has not taken the opportunity to disclose it. Instead of such direct evidence, Mr Daiches remarkably asks us to imagine a series of "inferences" drawn by the parties (including his client and her daughter) and the reasonable observer. They would have inferred, he says, that version 1 lessees were paying less than the rates required by inflation and that there were in consequence "historic shortfalls" in the lessor's service charge income; and that the multiplier was to be increased, not only to take account of actual inflation since 1974, and to reflect the fact that it might once again rise to levels above that implied by the triennial formula, but also to compensate the lessor both for past shortfalls, and for the risk that he or she might not be able to persuade other lessees to agree to similar increases in the future.

152.    With respect to Mr Daiches I have to say that, even in this extraordinary case, I find these submissions quite astonishing. Given that his client and her daughter were the principal parties to these transactions, why on earth should the court be expected to draw "inferences" as to what was in their minds? Why should we speculate as to the extent of any "historic shortfalls", when she presumably has access to the actual accounts, and has resisted the lessees' requests for disclosure? What evidence is there that by 2000 anyone was seriously concerned about an imminent risk of return to double-digit inflation? Finally, what possible reason would these lessees have had for wishing to "compensate" the lessor for the past or

A002267

future financial consequences of imperfections in leases for which they were not responsible?

153.    With regard to the only independent party, Mrs Pace, Mr Daiches asks us to note that her variation was agreed shortly after the sale of the lease to her by the respondent herself. It should not be difficult, he says, to "infer that the purchase price paid by her to the respondent reflected her agreement to increase the multiplier". Although she is apparently one of the appellants represented by Mr Morshead, he has not volunteered any specific explanation on her behalf. He merely points to the difficulty of imagining any price reduction or other inducement sufficient to compensate her for "the devastating implications" of the multiplier if it operates as Mrs Arnold contends.

154.    In the absence of further evidence from either side, it is impossible to draw any clear conclusions about the purpose of these curious transactions. It is enough to observe that, viewed objectively, they are at least consistent with an interpretation which limits the lessees' future exposure to actual inflation, within a defined limit. On the lessors' interpretation, as with version 4, they make no sense at all.

*Conclusion*

155.    The true explanation for these wretchedly conceived clauses may be lost in history, but the problems for the parties are all too present and deeply regrettable. No doubt in recognition of such considerations, Mr Daiches, on behalf of Mrs Arnold, indicated that his client "fully understands the appellants' predicament and is sympathetic to it", and that if the appeal fails there would have to be a re-negotiation of the leases "for pragmatic if not for legal reasons". She wished it to be stated openly that –

> "… she is willing for the appellants' leases to be renegotiated on terms that would, among other things, involve the leases being varied by substituting an adjustment linked to the Consumer Price Inflation index instead of the current fixed adjustment of 10% per annum."

156.    Although on its face this indication seems helpful and realistic, it is not clear what it would mean in practical terms. It rightly acknowledges that the problems may well be incapable of truly satisfactory resolution by conventional legal analysis. The main obstacle may be that hinted at in Mr Daiches' post-hearing submission. That is the need to find some way of making good the shortfall resulting from the unrealistically low contributions required from more than two-thirds of the lessees under the pre-1980 leases. Even if the lessees' interpretation prevails, it will still

leave an unhappy imbalance between these lessees, and the version 1 lessees, who will be left paying substantially less than their proportionate share.

157.    Whatever the strict legal position, the other lessees may perhaps be persuaded that they have a common interest in the good management of the estate, and at least a moral obligation to contribute their fair share of its costs. A long-running dispute of this kind can hardly be conducive to the atmosphere appropriate to a holiday location, even for those not directly involved. It is to be hoped that some way can be found of bringing them into the discussions. On any view, the case seems to cry out for expert mediation, if it has not been attempted before, preferably not confined to the present parties. If thought appropriate, one possibility might be an application by consent to the President of the First-Tier Tribunal (Property Chamber – Residential Property) to appoint as mediator a senior judge of that tribunal, with the benefit of that tribunal's experience of dealing with service charge issues under statute. However, that must be a matter for the parties not this court.

158.    It is necessary therefore to return to the essential question: what in the view of a reasonable observer did clause 3(2) mean? It will be apparent from my detailed analysis that I regard the consequences of the lessor's interpretation as so commercially improbable that only the clearest words would justify the court in adopting it. I agree with HH Judge Jarman QC that the limited addition proposed by the lessees does not do such violence to the contractual language as to justify a result which is commercial nonsense.

159.    For these reasons, in respectful disagreement with the majority, I would have allowed the appeal and restored the order of HH Judge Jarman QC.

A002269



**Hilary Term**
**[2017] UKSC 24**
*On appeal from: [2015] EWCA Civ 839*

# JUDGMENT

# Wood (Respondent) *v* Capita Insurance Services Limited (Appellant)

**before**

**Lord Neuberger, President**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Hodge**

# JUDGMENT GIVEN ON

# 29 March 2017

**Heard on 7 February 2017**

A002270

*Appellant*
Edward Cumming

(Instructed by Enyo Law
LLP)

*Respondent*
Andrew Twigger QC

(Instructed by Birketts
LLP)

**LORD HODGE: (with whom Lord Neuberger, Lord Mance, Lord Clarke and Lord Sumption agree)**

1.     This appeal raises a question of contractual interpretation. It concerns an indemnity clause in an agreement dated 13 April 2010 ("the SPA") for the sale and purchase of the entire issued share capital of a company, Sureterm Direct Limited ("the Company"), which carries on business as a specialist insurance broker, primarily offering motor insurance for classic cars.

2.     The sellers of the Company were the respondent, Mr Andrew Wood ("Mr Wood"), who owned 94% of its share capital, and Mr Christopher Kightley and Mr Howard Collinge, who owned 1% and 5% of its share capital respectively. Each was a director of the Company and Mr Wood was its managing director. The purchaser was Capita Insurance Services Ltd ("Capita"). Mr Wood remained as managing director of the Company until the end of 2010. He brought proceedings against Capita arising out of the termination of his employment and Capita brought a counterclaim against him under the indemnity provision in the SPA, which is the subject matter of this appeal. Mr Kightley and Mr Collinge were, but are no longer, parties to the proceedings.

3.     It is not necessary to set out in any detail the circumstances in which Capita came to make its claim under the indemnity. It suffices to summarise Capita's claim as follows.

4.     In about August 2008 the Company began to sell motor insurance through online aggregator sites such as Confused.com. The sales were not completed online: potential customers obtained a quotation from the Company on the aggregator site and the Company then contacted the potential customer directly with a view to confirming their risk details before selling them the appropriate insurance policy.

5.     Shortly after Capita's purchase of the Company's share capital, employees of the Company raised concerns about the Company's sales processes, which had resulted in some customers paying substantially more than they had been quoted online. The employees alleged that the Company had presented customers with higher quotations without informing them why the quotations had increased. The Company had thus increased its own arrangement fees when neither the underwriting premium nor the risk profile had changed significantly. The Company responded to the allegations by carrying out a review of its sales between January 2009 and January 2011. This review revealed that in many cases the Company's telephone operators had misled customers into believing that an underwriter had

required a higher premium or that their risk profile was worse than it was or had pressurised the customer to make sure that a sale was made.

6.      Capita and the Company were obliged to inform the Financial Services Authority ("FSA") of the findings and did so on 16 December 2011. The FSA informed them that the customers had been treated unfairly and had suffered detriment and that there would have to be redress. After the FSA had conducted a risk assessment visit to the Company in November 2012, Capita and the Company agreed with the FSA to conduct a remediation scheme to pay compensation to customers who were identified as potentially affected by the Company's mis-selling. Capita alleges that it, the Company and Capita's other subsidiaries have suffered loss as a result of the mis-selling or suspected mis-selling of insurance products in the period before the completion of the sale under the SPA. Capita's claim is for £2,432.883.10, comprising an estimate of the compensation at £1.35m, interest of about £400,000 and the costs of the remediation scheme.

7.      It is appropriate to record that some of Capita's allegations are disputed, including the extent of the mis-selling and any detriment to customers. Other than, perhaps, the facts narrated in para 4 above (which do not appear to be disputed), they are not facts by reference to which the SPA is to be construed. But the circumstances in which Capita and the Company were required to set up the remediation scheme are of some importance because Mr Wood contends that they fall outside the scope of the indemnity clause which is the subject matter of this action. In particular, the requirement to compensate was not the result of a claim by one or more of the Company's customers or a complaint by those customers to the FSA or another public authority. It resulted, as I have said, from information about the internal review which Capita and the Company gave the FSA and the requirement by the FSA that compensation should be paid to the customers.

*Contractual interpretation*

8.      In his written case counsel for Capita argued that the Court of Appeal had fallen into error because it had been influenced by a submission by Mr Wood's counsel that the decision of this court in *Arnold v Britton* [2015] AC 1619 had "rowed back" from the guidance on contractual interpretation which this court gave in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900. This, he submitted, had caused the Court of Appeal to place too much emphasis on the words of the SPA and to give insufficient weight to the factual matrix. He did not have the opportunity to develop this argument as the court stated that it did not accept the proposition that *Arnold* had altered the guidance given in *Rainy Sky*. The court invited him to present his case without having to refer to the well-known authorities on contractual interpretation, with which it was and is familiar.

9.      It is not appropriate in this case to reformulate the guidance given in *Rainy Sky* and *Arnold*; the legal profession has sufficient judicial statements of this nature. But it may assist if I explain briefly why I do not accept the proposition that *Arnold* involved a recalibration of the approach summarised in *Rainy Sky*.

10.     The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning. In *Prenn v Simmonds* [1971] 1 WLR 1381 (1383H-1385D) and in *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989 (997), Lord Wilberforce affirmed the potential relevance to the task of interpreting the parties' contract of the factual background known to the parties at or before the date of the contract, excluding evidence of the prior negotiations. When in his celebrated judgment in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 Lord Hoffmann (pp 912-913) reformulated the principles of contractual interpretation, some saw his second principle, which allowed consideration of the whole relevant factual background available to the parties at the time of the contract, as signalling a break with the past. But Lord Bingham in an extra-judicial writing, *A new thing under the sun? The interpretation of contracts and the ICS decision* Edin LR Vol 12, 374-390, persuasively demonstrated that the idea of the court putting itself in the shoes of the contracting parties had a long pedigree.

11.     Lord Clarke elegantly summarised the approach to construction in *Rainy Sky* at para 21f. In *Arnold* all of the judgments confirmed the approach in *Rainy Sky* (Lord Neuberger paras 13-14; Lord Hodge para 76; and Lord Carnwath para 108). Interpretation is, as Lord Clarke stated in *Rainy Sky* (para 21), a unitary exercise; where there are rival meanings, the court can give weight to the implications of rival constructions by reaching a view as to which construction is more consistent with business common sense. But, in striking a balance between the indications given by the language and the implications of the competing constructions the court must consider the quality of drafting of the clause (*Rainy Sky* para 26, citing Mance LJ in *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299 paras 13 and 16); and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest: *Arnold* (paras 20 and 77). Similarly, the court must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms.

12.     This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial

consequences are investigated: *Arnold* para 77 citing *In re Sigma Finance Corpn* [2010] 1 All ER 571, para 10 per Lord Mance. To my mind once one has read the language in dispute and the relevant parts of the contract that provide its context, it does not matter whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each.

13.    Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the field of contractual interpretation. Rather, the lawyer and the judge, when interpreting any contract, can use them as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements. Some agreements may be successfully interpreted principally by textual analysis, for example because of their sophistication and complexity and because they have been negotiated and prepared with the assistance of skilled professionals. The correct interpretation of other contracts may be achieved by a greater emphasis on the factual matrix, for example because of their informality, brevity or the absence of skilled professional assistance. But negotiators of complex formal contracts may often not achieve a logical and coherent text because of, for example, the conflicting aims of the parties, failures of communication, differing drafting practices, or deadlines which require the parties to compromise in order to reach agreement. There may often therefore be provisions in a detailed professionally drawn contract which lack clarity and the lawyer or judge in interpreting such provisions may be particularly helped by considering the factual matrix and the purpose of similar provisions in contracts of the same type. The iterative process, of which Lord Mance spoke in *Sigma Finance Corpn* (above), assists the lawyer or judge to ascertain the objective meaning of disputed provisions.

14.    On the approach to contractual interpretation, *Rainy Sky* and *Arnold* were saying the same thing.

15.    The recent history of the common law of contractual interpretation is one of continuity rather than change. One of the attractions of English law as a legal system of choice in commercial matters is its stability and continuity, particularly in contractual interpretation.

*The Sale and Purchase Agreement*

16.    The SPA is a detailed and professionally drafted contract. It provided for the sale and purchase of the Company's share capital (clause 3) for the consideration of

A002275

£7,681,661 payable on completion (clause 4), and it also provided for deferred consideration (Schedule 8). Clause 1 contained the following definitions which are relevant to the construction of the disputed indemnity:

> "**Authority** means any local, national, multinational, governmental or non-governmental authority, statutory undertaking, agency or public or regulatory body (whether present or future) which has jurisdiction over the Business or any decision, consent or licence which is required to carry out the Business and Authorities shall be construed accordingly.

> **Company** means Sureterm Direct Ltd …

> **Completion Date** means the date of this Agreement.

> **Employees** has the meaning given to it at paragraph 6 of Schedule 4 [which refers to a list of all of the employees employed by the Company].

> **FSA** means the Financial Services Authority and any body which supersedes it.

> **Regulatory Authority** means any body by which any part of the Business is or was regulated pursuant to any Applicable Financial Services Laws (including, but not limited to, the FSA, the Personal Investments Authority Ltd, the General Insurance Standards Council, the Insurance Brokers Registration Council and including the Financial Services Ombudsman and any voluntary regulatory body with whose rules the Company has agreed to comply).

> **Relevant Person** means an Employee or a former employee of the Company and any dependant of an Employee or a former employee of the Company.

> **Shares** means all of the issued shares in the capital of the Company.

A002276

> **Warranties** means the Tax Warranties and the warranties set out in Schedule 4."

17.     Clause 7 dealt with warranties and indemnities. Each of the sellers severally warranted to the buyer on a proportionate basis in terms of the Warranties (clause 7.1); the Warranties were qualified by matters which had been fairly disclosed in the disclosure letter (clause 7.2); and where a Warranty was qualified by an expression such as "so far as the Sellers are aware" that referred to the actual knowledge of the sellers, who confirmed that they had made due and careful enquiry of the Company's compliance manager, IT Director and HR Director (clause 7.3).

18.     The indemnity clause whose interpretation is in dispute is clause 7.11. It provided:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and all fines, compensation or remedial action or payments imposed on or required to be made by the Company following and arising out of claims or complaints registered with the FSA, the Financial Services Ombudsman or any other Authority against the Company, the Sellers or any Relevant Person and which relate to the period prior to the Completion Date pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

19.     This clause must be seen in its contractual context. Schedule 4 contained 30 pages of detailed warranties. In Part 12 of that Schedule, which concerned litigation, disputes and investigations, the sellers warranted that they were not aware of circumstances which were likely to give rise to any investigation or enquiry by any Authority (para 12.4) and that no breach of contract, tort, statutory duty or law had been committed for which the Company was or might be liable (para 12.5). Part 14 which was concerned with compliance and regulatory matters included the following para:

> "14.1
>
> (a)     The Company conducts, and has conducted the Business in accordance with the requirements of all Competition laws

A002277

and Applicable Financial Services Laws applicable to the business has not been and is not being investigated for any alleged non-compliance or infringement of such Competition Laws and Applicable Financial Services Laws. …

(c)    The Company has no reason to believe that any action will be taken against it in relation to any of its current or past activities based on any alleged non-compliance or infringement of any Competition Laws and Applicable Financial Services Laws."

20.    Part 14 also contained detailed warranties that the Company had complied with its regulatory obligations and that correspondence between the Company and all Regulatory Authorities had been disclosed, that the Company, its officers and employees had not been subject to any regulatory sanction and that no such sanction was likely or pending; and that the Company had not been subject to a regulatory investigation and, so far as the Sellers were aware, there were no circumstances which could give rise to a visit by any Regulatory Authority.

21.    Clause 8 of the SPA provided for limitations on the sellers' liability in Schedule 5, which in para 1 provided that the aggregate maximum liability of all claims under the SPA (with one exception) would not exceed the purchase price and that the liability of each seller would not exceed his proportionate liability (ie 94%, 5% and 1%). That limitation applied to claims under clause 7.11 as well as under the warranties. But paragraph 3 of Schedule 5 imposed time limits on the warranties by providing:

"3.1    Save in respect of a Warranty Claim or a claim under the Tax Covenant notified in writing to the Sellers prior to such a date, the Sellers will cease to be liable:

(a)    for any claim under the tax warranties or under the Tax Covenant on the seventh anniversary of Completion; and

(b)    for any other Warranty Claim on the second anniversary of Completion."

Thus in contrast to the indemnity under clause 7.11, the warranties relating to, among other things, regulatory compliance, had a lifespan of only two years.

A002278

22.    In a judgment dated 14 October 2014 ([2014] EWHC 3240 (Comm)) Popplewell J decided the preliminary issue of the interpretation of the indemnity clause and held, in effect, that it required Mr Wood to indemnify Capita even if there had been no claim or complaint by a customer. The Court of Appeal (Patten LJ, Gloster LJ and Christopher Clarke LJ) in a judgment written by Christopher Clarke LJ ([2015] EWCA Civ 839) disagreed. In its order dated 30 July 2015 the Court of Appeal declared that Mr Wood's liability under the indemnity in clause 7.11 of the SPA:

> "cannot arise unless the matter in respect of which indemnity is sought follows and arises out of either (i) a claim made against the Company, a Seller or a Relevant Person or (ii) a complaint registered with the FSA, the Financial Services Ombudsman or any other Authority against the Company, a Seller or a Relevant Person and, in either case, the claim or complaint (a) relates to the period prior to the Completion Date and (b) pertains to any mis-selling or suspected mis-selling of any insurance or insurance related product."

23.    Capita appeals against that order, arguing that the contractual indemnity is not confined to loss arising out of a claim or complaint.

24.    In this case both Popplewell J and the Court of Appeal have considered and weighed both the language of the disputed clause 7.11 and the commercial considerations. They have both started by examining the language but have reached opposing conclusions. This disagreement is not caused by any failure to apply the correct principles but is, in my view, the result of an opaque provision which, as counsel for each party acknowledged, could have been drafted more clearly.

25.    I have concluded that the Court of Appeal has come to the correct view as to the meaning of this difficult clause. I set out below my reasons, which are essentially the same as those which Christopher Clarke LJ presented.

*Discussion*

26.    Clause 7.11 has not been drafted with precision and its meaning is avoidably opaque. My preliminary view of the meaning of the clause on a first reading was consistent with the view which the Court of Appeal favoured, namely that the indemnity covered loss and damage which (a) followed and arose out of claims or complaints against the Company, the Sellers or any Relevant Person, (b) related to the period before completion and (c) pertained to the mis-selling or suspected mis-

A002279

selling of insurance products or services. But it is necessary to place the clause in the context of the contract as a whole, to examine the clause in more detail and to consider whether the wider relevant factual matrix gives guidance as to its meaning in order to consider the implications of the rival interpretations.

27.    The contractual context is significant in this case. The indemnity in clause 7.11 is an addition to the detailed warranties in Schedule 4. The mis-selling which clause 7.11 addresses is also covered by the warranty in paragraph 14.1 of Schedule 4 (para 18 and para 19 above). But liability for the Schedule 4 warranties is time-limited by Schedule 5. In particular paragraph 3.1(b) of that Schedule (para 20 above) required the Company to claim within two years of the completion of the sale and purchase. The scope of the clause 7.11 indemnity, breach of which gives rise to a liability which is unlimited in time, falls to be assessed in the context of those time-limited warranties.

28.    All of the parties to the SPA were commercially sophisticated and had experience of the insurance broking industry. Capita was not involved in the management of the Company before the share purchase. The Sellers were the directors and the only shareholders of the Company. They were the people who knew or ought to have known how the Company had operated its business; Capita would in all probability not have that knowledge. The parties to the SPA would have known this. That lack of knowledge explains why Capita required the disclosures in the disclosure letter and the detailed warranties in Schedule 4; but it does not assist the court to determine the scope of the indemnity clause. The court is not aware of the negotiations which led to the SPA; they are not relevant to the task of interpreting that agreement: *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101. Business common sense suggests that Capita had an interest in obtaining as broad an indemnity against the adverse consequences of mis-selling as it could obtain. But the sellers had given warranties of compliance with regulatory requirements, which covered such mis-selling, subject to the agreed limits of quantum and time. The sellers were exposed to a potential liability under those warranties for the two years after the Completion Date, during which Capita could learn of the Company's sales practices. One may readily infer that they had an interest in minimising their further exposure to liability after that time had elapsed. Business common sense is useful to ascertain the purpose of a provision and how it might operate in practice. But in the tug o' war of commercial negotiation, business common sense can rarely assist the court in ascertaining on which side of the line the centre line marking on the tug o' war rope lay, when the negotiations ended. I therefore turn to examining the clause in more detail before returning to the commercial context.

29.    In order to illustrate the competing contentions of the parties Popplewell J helpfully divided clause 7.11 into its constituent parts. I set that presentation out below with the addition in (B) of the sub-headings (i) and (ii) to assist my exegesis.

30.    Clause 7.11 thus divided provides:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against
>
> (1)    all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and
>
> (2)    all fines, compensation or remedial action or payments imposed on or required to be made by the Company
>
>> (A)    following and arising out of claims or complaints registered with the FSA, the Financial Services Ombudsman or any other authority against the Company, the Sellers or any Relevant Person
>>
>> (B)    (i) and which relate to the period prior to the Completion Date (ii) pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

31.    Counsel for Capita submitted that the clause should be read by treating (2) and (A) as a composite phrase so that the Sellers were bound to indemnify against both (1) and (2+A), each of which was subject to the two conditions in (B). This meant that it was only the fines etc in (2) which had to follow on or arise out of claims or complaints made to the FSA or other Authority against the Company etc as provided in (A). Thus, it was submitted, the indemnity covered all liabilities in (1) provided only that (i) they related to the period prior to the completion date and (ii) pertained to any mis-selling or suspected mis-selling of insurance products etc.

32.    Counsel for Mr Wood submitted that the clause was properly construed by treating both (1) and (2) as being subject to three conditions, namely (A), B(i) and (B)(ii). He submitted that (A) should be read as if there was a comma after "claims", so that it provided as a condition for the triggering of the indemnity under (1) or (2) that there must be either claims by customers, or complaints made to the regulatory authorities, in each case against the Company, the Sellers or any Relevant Person. Thus, on his approach, either a claim by a customer against the Company, the Sellers or an employee or former employee of the Company, or a complaint to a regulatory authority against the Company, the Sellers or an employee or former employee of the Company would trigger the indemnity if the two conditions in (B) were met.

A002281

33.     Both counsel accepted that, because of the breadth of the terms used in (1), the types of loss and damage in (1) covered all of the types of loss and damage in (2). Thus it was suggested that (2) must have been included only for the avoidance of doubt. This means that on Mr Wood's approach (2) was otiose while on Capita's approach the composite (2+A) was otiose. I find the latter proposition remarkable and unlikely for two reasons.

34.     First, and to my mind most significantly, (A) would serve no purpose by restricting the source of loss and damage if (A) governed only (2) and therefore (1) was unrestricted. (A) would not restrict the scope of the indemnity in any way. On Mr Wood's construction the words in (A) have a purpose as they limit the scope of both (1) and the otiose (2).

35.     Secondly, if one airbrushes out (2+A) as otiose, the clause does not specify against whom the actions, proceedings and claims in (1) are directed. The clause would read:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against
>
> all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and which relate to the period prior to the Completion Date pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

The identity of the persons against whom the relevant claims etc could be made so as to trigger the sellers' indemnity would, on Capita's approach, be left to implication. There must be a limit on who such persons could be as it would be absurd for Capita to have a claim against the Sellers for indemnity resulting from any mis-selling on its part before the Completion Date. But, even assuming that the target was mis-selling by or on behalf of the Company, it is far from obvious that the delimited class of persons would be "the Company, the Sellers or any Relevant Person".

36.     Capita made three further points against Mr Wood's interpretation. First, there is an element of tautology as the "claims" in (1) are said in (A) to follow and arise out of "claims". But as Christopher Clarke LJ observed, tautology in commercial contracts is not unknown and the verbal exuberance (or torrential drafting) of (1) makes tautology difficult to avoid.

A002282

37.     Secondly, Capita pointed out that there is a comma after "incurred" at the end of (1) and no comma after "Company" at the end of (2). This could support the separation of (1) from (2) and the conjunction of (2) and (A). Similarly, Mr Wood's interpretation would involve inserting in (A) a comma after "claims" and also after "any other Authority" so as to limit both the claims and the regulatory complaints to those against "the Company, the Sellers or any Relevant Person". Again in agreement with Christopher Clarke LJ I do not think that the use of commas in this clause is a strong pointer in favour of Capita's interpretation, both because there are no set rules for the use of commas and in any event the draftsman's use of commas in this clause is erratic.

38.     Thirdly, the draftsman used an adjectival participle at the start of (A) ("following and arising out of") and "changed tone" by using a relative pronoun ("and which") at the start of (B). But the use of the adjectival participle does not tie (A) exclusively into (2) because in (B) the adjectival participle ("pertaining to") unquestionably applies to both (1) and (2). These detailed points of style and syntax are of little assistance in construing an admittedly opaque clause.

39.     I return to the commercial context and the practical consequences of the rival interpretations. On Mr Wood's interpretation it requires a customer or customers to make a claim, or complaint to the regulatory authorities, against the Company, the sellers or a Relevant Person in order to trigger the indemnity. Thus if a whistle-blower alerted the regulatory authorities of suspected or actual mis-selling, or if (as in fact occurred) management, complying with their regulatory obligations, reported such mis-selling to the FSA, which ordered the payment of compensation, the indemnity would not be triggered. Yet in each case, the mis-selling before the date of completion causes the Company loss.

40.     The general purpose of clause 7.11, to indemnify Capita and its group against losses occasioned by mis-selling is clear. Had clause 7.11 stood on its own, the requirement of a claim or complaint by a customer and the exclusion of loss caused by regulatory action which was otherwise prompted might have appeared anomalous. But clause 7.11 is in addition to the wide-ranging warranties in Part 14 of Schedule 4 (paras 18 and 19 above) which probably covered the circumstances which eventuated. Capita had two years after completing the purchase to examine the sales practices of the Company's employees and so uncover any regulatory breaches in order to make a claim under the Schedule 4 indemnities. Prima facie that was not an unreasonable time scale. Indeed, Capita was able to send its findings to the FSA within 20 months of the Completion Date. It is not contrary to business common sense for the parties to agree wide-ranging warranties, which are subject to a time limit, and in addition to agree a further indemnity, which is not subject to any such limit but is triggered only in limited circumstances.

41.     From Capita's standpoint the SPA may have become a poor bargain, as it appears that it did not notify the sellers of a warranty claim within two years of Completion. But it is not the function of the court to improve their bargain.

42.     In this case, the circumstances which trigger that indemnity are to be found principally in a careful examination of the language which the parties have used.

*Conclusion*

43.     I would therefore dismiss the appeal.